Michael Akselrud (SBN 285033)
Michael.Akselrud@lanierlawfirm.com
THE LANIER LAW FIRM, P.C.
2829 Townsgate Rd., Ste. 100
Westlake Village, California 91361
Telephone: (310) 277-5100
Facsimile: (310) 277-5103

W. Mark Lanier (*pro hac vice*)
WML@lanierlawfirm.com
Alex J. Brown (*pro hac vice*)
Alex.Brown@lanierlawfirm.com
Ryan D. Ellis (*pro hac vice*)
Ryan.Ellis@lanierlawfirm.com
THE LANIER LAW FIRM, P.C.
10940 W. Sam Houston Pkwy N
Houston, Texas 77064
Telephone: (713) 659-5200
Facsimile: (713) 659-2204

Christopher T. Nidel (*pro hac vice*)
chris@nidellaw.com
Jonathan Nace, Esq. (*pro hac vice*)
jon@nidellaw.com
Nidel & Nace, P.L.L.C.
One Church Street
Suite 802
Rockville, MD 20850
Telephone: (202) 780-5153

David P. Page (*pro hac vice*)
dpage@eenradvocates.com
Environmental Energy & Natural
Resources Advocates, PLLC
1921 S Boston Ave.
Tulsa, Oklahoma 74119
Telephone: (918) 764-8984

Gideon Kracov (Cal. SBA # 179815)
gk@gideonlaw.net
Jordan R. Sisson (Cal. SBN # 327057)
jordan@gideonlaw.net
Law Office of Gideon Kracov
801 S. Grand Ave., 11th Floor
Los Angeles, CA 90017
Telephone: (213) 629-2071

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| JED and ALISA BEHAR, individually and on behalf of all others similarly situated,<br><br>                            Plaintiffs,<br><br>v.<br><br>NORTHROP GRUMMAN CORPORATION AND NORTHROP GRUMMAN SYSTEMS CORPORATION,<br><br>                            Defendants | Case No. 21-cv-03946-HDV-SK<br><br>CLASS ACTION<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Hearing:**<br><br>Date:    March 14, 2024<br>Time:   10:00 a.m.<br>Place:  Courtroom 5B, 5th Floor<br>            350W. 1st Street<br>            Los Angeles, CA 90012<br>Judge: Hon. Hernán D. Vera<br><br><br>Complaint Served: June 30, 2021 |

Jed and Alisa Behar, on behalf of themselves and all others similarly situated, respectfully move to certify the following classes: liability and damages under Fed. R. Civ. P. 23(b)(2), (b)(3), or (c)(4).

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iv

INDEX OF EXHIBITS...................................................................................vii

L.R. 7-19 MEMORANDUM .................................................................................ix

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION ..................................................................1

I.     Introduction & Summary of Argument...........................................................1

II.    Background ...................................................................................................2

    A.    Litton released TCE into the groundwater in the PCA. ......................................2

    B.    Plaintiffs' expert testimony supports class certification. ....................................3

    C.    TCE contamination impacts all PCA homes. .......................................................4

        1.    Defendants' TCE contaminates the entire PCA.......................................4

        2.    The presence of TCE in shallow groundwater is an ever-present threat to residents. ...............................................................................................5

        3.    Defendants' indoor air investigation was inadequate and flawed. ..........7

III.   Standard of Review.......................................................................................9

IV.    Argument ...................................................................................................10

    A.    Plaintiffs have proposed an objectively ascertainable class. ............................10

    B.    The Proposed Class satisfies Rule 23(a)............................................................11

        1.    Joinder is impracticable because the class is sufficiently numerous. ....11

        2.    Questions of law and fact are common to the class. ..............................12

        3.    Plaintiffs' claims are typical of the class members................................12

        4.    Plaintiffs and counsel will adequately protect the interests of the class. 14

    C.    The Proposed Class satisfies Rule 23(b)(3). ......................................................15

     1.      Common issues predominate over individual issues. ...........................16

     2.      Predominance is satisfied. ......................................................19

     3.      Damages can be determined class-wide. ...............................20

     4.      A class action is manageable and superior to alternative adjudication forms. .....................................................................................23

D.      Alternatively, a Rule 23(c)(4) issue class should be certified. ...........................24

E.      Class definitions can be modified and subclasses identified to promote certification. ...............................................................................24

F.      The Court should appoint undersigned as class counsel. ...................................25

G.      Alternatively, the Court Should Certify a Rule(b)(2) Injunction Class. .............25

V.      CONCLUSION ...............................................................................25

CERTIFICATE OF SERVICE ...............................................................28

CERTIFICATE OF COMPLIANCE .......................................................29

# TABLE OF AUTHORITIES

**Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952 (9th Cir. 2013) .............................................15

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997)........................................................................15

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013). .........................10, 18

*Andrews v. Plains All American Pipeline*, 2020 WL 3105425 (C.D. Cal. Jan. 16, 2020) .........22

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) .....................................................................14

*Baker v. Saint-Gobain Performance Plastics Corp.*, 632 F. Supp. 3d 19 (N.D.N.Y. 2022) ......23

*Bentley v. Honeywell Int'l*, 223 F.R.D. 471 (S.D. Ohio 2004)...........................................14, 19

*Charlebois v. Angels Baseball, LP,* 2011 WL 2610122 (C.D. Cal. June 30, 2011) ...................25

*City of Oakland v. Wells Fargo & Co.*, 972 F.3d 1112 (2020) .....................................................22

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)..........................................................................20

*Comm'r of the Dep't of Plan. v. Century Aluminum Co.*, 2013 WL 1235655 (D. V.I. Mar. 26, 2013) ............................................................................................................................................21

*Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378 (D. Colo. 1993) ....................................11, 19, 23

*Cox v. Ametek, Inc.*, 2020 WL 7353425 (S.D. Cal. Dec. 15, 2020) ...........................................23

*Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803 (7th Cir. 2018)....................................................22

*Evon v. Law Offices of Sidney Mickell,* 688 F.3d 1015 (9th Cir. 2012) .....................................12

*Hanlon v. Chrysler*, 150 F.3d 1011 (9th Cir. 1998)....................................................................14

*Hanon v. Dataproducts Corp.,* 976 F.2d 497 (9th Cir. 1992)......................................................13

*Heaven v. Trust Company Bank*, 118 F.3d 735 (11th Cir. 1997)................................................25

*In re Bextra*, 524 F.Supp.2d 1166 (N.D. Cal. 2007) .................................................................22

*In re Burbank Environmental Litigation*, 42 F. Supp. 2d 976 (C.D. Cal. 1998)........................18

*In re Chiquita Brands Int'l Inc.*, 331 F.R.D. 675 (S.D. Fla. 2019). ...........................................11

*In re Delta Airlines*, 2023 WL 2347074 (C.D. Cal. Feb. 8, 2023).................................2, 11, 19

*In re Katrina Canal Breaches Consol. Lit.*, 2007 WL 3245438 (E.D. La. Nov. 1, 2007) .........23

*In re Revco Sec. Litig.*, 142 F.R.D. 659 (N.D. Ohio 1992) .........................................................15

*Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161 (9th Cir. 2014) ......................................................16

*Johns v. Bayer Corp.*, 280 F.R.D. 551 (S.D. Cal. 2012) ............................................................15

*Just Film, Inc. v. Buono*, 847 F.3d 1108 (9th Cir. 2017) ...........................................................20

*Leyva v. Medline Industries, Inc.,* 716 F.3d 510 (9th Cir. 2013)....................................10, 16, 20

*Local Joint Executive Bd. v. Las Vegas Sands*, 244 F.3d 1152 (9th Cir. 2001)..........................24

*Ludwig v. Pilkington N. America*, 2003 WL 22478842 (N.D. Ill. Nov. 4, 2003).......................19

*Martin v. Behr Dayton Thermal. Prods.*, 896 F.3d 405, *cert. denied*, 139 S.Ct. 1319 (2019) (6th Cir. 2018) .............................................................................................................10, 24, 25

*Mass. Mut. Life Ins. Co. v. DB Structured Products, Inc.*, 2015 WL 2130060 (D. Mass. May 7, 2015) .........................................................................................................................23

*Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910 (7th Cir. 2003). .........................................16, 19

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ...............................15

*Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867 (N.D. Cal. 2016).............................22

*Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563 (C.D. Cal. 2012) ........................................12

*Ocean Harbor House Homeowners Assn. v. California Coastal Com.*, 163 Cal.App.4th 215 (Cal. Ct. App. 2008).........................................................................................................21

*Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014)...............................................................15

*Ralphs Grocery Co. v. Victory Consultants, Inc.*, 17 Cal.App.5th 245 (Cal. Ct. App. 2017). ...18

*Rowe v. E. I. Dupont De Nemours*, 262 F.R.D. 451 (D.N.J. 2009).............................................13

*Sabetian v. Exxon Mobil Corp.*, 57 Cal.App.5th 1054 (Cal. Ct. App. 2020). ...........................17

*Schaeffer v. Gregory Village Partners, L.P.*, 105 F. Supp. 3d 951 (N.D. Cal. 2015) ................19

*Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918 (9th Cir. 2019) ............................10

*Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988)..............................................19

*Tesoro Ref. & Mktg. Co. v. City of Long Beach*, 334 F. Supp. 3d 1031 (C.D. Cal. 2017) .........18

*Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006) ..............................................17

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016)............................................................16

*U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980)...............................................................25

*U.S. v. Duke Energy Carolinas, LLC*, 499 F. Supp. 3d 213 (M.D. N.C. 2020).........................21

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996).........................................10, 16

*Wang v. Chinese Daily News,* 737 F.3d 538 (9th Cir. 2013) ......................................................12

*Wilson v. S. Cal. Edison Co.*, 21 Cal.App.5th 786 (Cal. Ct. App. 2018) ..............................17, 18

*Wright v. Linkus Enterprises, Inc.*, 259 F.R.D. 468 (E.D. Cal. 2009).......................................24

*Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532 (6th Cir. 2012) .............................................11

**Statutes**

Fed. R. Civ. P.  23(a) ....................................................................................................................10

Fed. R. Civ. P.  23(b)....................................................................................................................10

Fed. R. Civ. P. 23(a)(3). ..............................................................................................................13

Fed. R. Civ. P. 23(a)(4) ...............................................................................................................14

Fed. R. Civ. P. 23(b)(3) ...............................................................................................................15

Fed. R. Civ. P. 23(c)(4). ..............................................................................................................24

Fed. R. Civ. P. 23(g)(1) ...............................................................................................................25

Fed. R. Civ. P. 23(g)(1)(A)..........................................................................................................25

Fed. R. Civ. P. 23(g)(1)(B)..........................................................................................................25

Fed. R. Civ. P. 23(g)(4) ...............................................................................................................25

Fed. R. Cv. P. 23(b)(3)(B) ...........................................................................................................24

**Treatises**

Federal Judicial Center, Reference Manual on Scientific Evidence *(3d ed. 2011)*...................22

Miller & Wright, Federal Practice & Procedure § 1778 (2d ed. 1986).....................................19

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| 1 | State of California Regional Water Quality Control Board, Lost Angeles Region, *Cleanup and Abatement Order No. R4-2022-XXXX*, October 10, 2022. |
| 2 | Filed Under Seal. |
| 3 | Work Plan for Offsite Indoor Air Sampling to the California Regional Water Quality Control Board, Lost Angeles Region, June 14, 2016, NGSC_0025382-427 |
| 4 | City of Los Angeles Department of Public Works Bureau of Sanitation, Industrial Waste Control Section, Application for Industrial Waste Permit, March 18, 1968, NGSC_0076796-99. |
| 5 | Orion Environmental, Inc., 2015 Groundwater Investigation Report Canoga Park Site, January 2016, NGSC_0139801-34. |
| 6 | Excerpts from the Deposition of Jeffrey Gwinn, July 27, 2023 |
| 7 | Response and Rebuttal Opinions Related to the Release of the Chlorinated Solvents at 8020 Deering Avenue, Hugh S. Gorman, PhD, November 22, 2023. |
| 8 | Filed Under Seal. |
| 9 | Litton Systems Inc. Site 4811 West Kearney Street, Springfield, MO Greene County, Missouri Natural Resources, June 2022. |
| 10 | National Environmental, Inc., Report on Preliminary Site Investigation, November 25, 1998, NGSC_0068619-31. |
| 11 | Additional Site Assessment Report for Commercial Property Located at 8020 Deering Avenue, Canoga Park, California, August 17, 1999, NGSC_0060430-99. |
| 12 | Expert Report of W. Richard Laton, PhD, September 27, 2023. |
| 13 | Expert Rebuttal Report of W. Richard Laton, PhD, November 15, 2023. |
| 14 | Expert Report of Matthew J. Tonkin, PhD, September 27, 2023. |
| 15 | Rebuttal Report of Matthew J. Tonkin, PhD, November 21, 2023. |
| 16 | Expert Report of Dr. Mark Kram, September 27, 2023. |
| 17 | Dr. Mark Kram's Rebuttal of Defendants' Expert Reports, November 15, 2023. |
| 18 | Expert Report Hugh S. Gorman, PhD, September 27, 2023. |
| 19 | Rebuttal Report of Hugh S. Gorman, PhD, November 22, 2023. |
| 20 | Expert Report of Jill E. Ryer-Powder, PhD, DABT, September 27, 2023. |
| 21 | Expert Report of Dr. Kevin J. Boyle, September 27, 2023. |
| 22 | Rebuttal Report of Dr. Kevin J. Boyle, November 20, 2023. |
| 23 | Off-Property Vapor Intrusion Investigation Summary Report, Geosyntec Consultants, December 5, 2019.  NGSC_0366367 |
| 24 | Earth Forensics, Inc., Northrup Grumman Well Location Map, September 27, 2023. |
| 25 | Orion Environmental, Inc., TCE Isoconcentration Contours in Groundwater with Proposed Well Locations, February 16, 2017. |
| 26 | Brian L. Murphy, PhD, Vapor degreasing with chlorinated solvents, 2016, Vol. 17, No. 4, 282-93. |
| 27 | Geosyntec Consultants, Revised Off-Property Vapor Intrusion Investigation Summary Report and Off-Property Vapor Intrusion Long Term Monitoring Plan (LTMP), July 16, 2020, NGSC_0017354-8984. |
| 28 | Orion Environmental, Inc., Vapor Intrusion Investigation Area, Priority Study Areas, November 3, 2017. |
| 29 | Excerpts from the Deposition of Bart Eklund, November 7, 2023. |

| 30 | USEPA, OSWER Technical Guide for Assessing and Mitigating the Vapor Intrusion Pathway from Subsurface Vapor Sources to Indoor Air, June 2015. |
|----|----|
| 31 | Excerpts from the Deposition of Robert Ettinger, November 9, 2023. |
| 32 | California Environmental Protection Agency, Department of Toxic Substances Control, Final Guidance for the Evaluation and Mitigation of Subsurface Vapor Intrusion to Indoor Air, October 2011. |
| 33 | California Water Boards, Regional Water Quality Control Board, Vapor Intrusion Mitigation Guidance, June 2022. |
| 34 | California Department of Toxic Substances Control, Supplemental Guidance: Screening and Evaluating Vapor Intrusion, February 2023 |
| 35 | Excerpts from the Rule 30(b)(6) Deposition of Northrup Grumman Corporation, through Kevin Miskin, P.E., July 6, 2023. |
| 36 | Email from Shantal Der Boghosian to Dr. Helen Dawson, December 18, 2017, NGSC_2578770-71 |
| 37 | Excerpts from the Deposition of Murray Einarson, November 8, 2023. |
| 38 | Excerpts from the Deposition of Helen Dawson, PhD, September 13, 2023. |
| 39 | Excerpts from the Deposition of Robert Scofield, November 14, 2023. |
| 40 | Excerpts from the Deposition of Matthew Thomas, PhD, July 14, 2023. |
| 41 | Excerpts from the Deposition of Jedidiah Nathan Behar, July 25, 2022. |
| 42 | Excerpts from the Deposition of Akzayakatl Mexikatzin, September 20, 2023. |
| 43 | Declaration of Christopher Nidel. |

**L.R. 7-19 MEMORANDUM**

Pursuant to Local Rule 7-19, below are the names and contact information for Defendants' counsel of record:

PATRICK W. DENNIS, SBN 106796 pdennis@gibsondunn.com
CHRISTOPHER CHORBA, SBN 216692 cchorba@gibsondunn.com
ABBEY HUDSON, SBN 266885 ahudson@gibsondunn.com
DEENA KLABER, SBN 285237 dklaber@gibsondunn.com
JOSEPH D. EDMONDS, SBN 297984 jedmonds@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Phone: 213.229.7000 / Fax: 213.229.7520


JOHN CERMAK, SBN 146799 jcermak@cermaklegal.com
HANNAH BLOINK, SBN 307442 hbloink@cermaklegal.com
CERMAK & INGLIN, LLP
12121 Wilshire Blvd, Ste 322
Los Angeles, CA 90025-1166
Phone: 424.465.1531 / Fax: 424.371.5032

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'**

**MOTION FOR CLASS CERTIFICATION**

### I.        Introduction & Summary of Argument

"The presence of high levels of contamination in the groundwater, the soil matrix, and the soil vapor and the threat of vapor intrusion caused by these contaminants ***constitutes a public nuisance per se***…" Ex. 1, at 1. The Los Angeles Regional Water Quality Control Board ("Water Board") recognizes the gravity of the situation that confronts Plaintiffs Jed and Alisa Behar, homeowners living with contamination in their Canoga Park suburb of the City of Los Angeles. Like many, they worked hard to buy and maintain a safe and comfortable home. Indeed, the law ensures them of that right, as homeowners, to be free from others damaging or interfering with their property.

Unfortunately, Defendants Northrop Grumman Corporation and Northrop Grumman Systems Corporation ("Defendants"), and their predecessor Litton Industries, encroached on the Behars' rights and those of their neighbors. Defendants' efforts to clean up the contamination are too little and too late.  The contamination plume now extends nearly 2.5 miles in very shallow groundwater underneath thousands of homes just north of the Los Angeles River. Thankfully, our civil justice system does not allow even corporate behemoths to contaminate this working-class neighborhood without consequence. To right these wrongs, the Behars filed this case for negligence, nuisance, and trespass against Defendants and seek monetary damages for cost of mitigation and property damage.

This class action arises from Defendants' release of toxic chemicals from a manufacturing facility located at 8020 Deering Avenue (the "Site") that created the contamination deemed in need of corrective action by the Water Board. The Site is centered in a residential area where people live, work, and play, and where the water table is extremely shallow—ranging from 13 to 35 feet below grade. Ex. 1, at 4. The contamination at issue exceeds

1

contaminant screening levels, injuring properties within the Proposed Class Area, damaging the value of these homes, and necessitating mitigation while long-term remediation efforts continue.

Plaintiffs now bring this Motion to certify a class under Federal Rule of Civil Procedure 23(b)(3) or (c)(4). Class certification is appropriate when Defendants' common course of conduct toward all homeowners within a confined, geographic boundary results in damage to properties. *See In re Delta Airlines*, 2023 WL 2347074, at *14, 17 (C.D. Cal. Feb. 8, 2023) (certifying Rule 23(b)(3) trespass class for jet fuel released on homes); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, at 1196–97 (6th Cir. 1988) (affirming class certification in landfill contamination case because the cause of disaster was a single course of conduct by defendants, which was identical for each of the plaintiffs); *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911–12 (7th Cir. 2003) (affirming class certification to determine core question of whether and to what extent defendant contaminated soil and groundwater under class members' homes).[1]

Defendants' common course of conduct in negligently handling trichloroethylene ("TCE") and perchloroethylene ("PCE"), discharging TCE and PCE, failing to identify, contain, remediate, and properly investigate the resulting contamination underpins the claims made in this case and justifies the use of class treatment. The resulting contamination uniformly exceeds threshold levels at every Proposed Class Area ("PCA") property, necessitating mitigation and causing economic property damage as a function of distance from the 8020 Deering Site.

## II.    Background

**A.    Litton released TCE into the groundwater in the PCA.**

From 1968 until roughly 1970, Defendants, through their predecessors Litton Industries and Litton Systems, Inc. ("Litton"), manufactured printed circuit boards ("PCBs") at the Site, even installing an underground clarifier to handle wastes. Ex. 2, at NGSC_0555109. According

---

[1] All internal citations, quotations, and alterations omitted unless otherwise noted.

2

to Defendants, their past operations "included circuit board production [and related processes such as], copper plating, silk screening, photo printing, and chemical stripping. A four-stage underground clarifier permitted for use as part of the circuit board manufacturing operations was removed in April 2006." Ex. 3, at NGSC_0025388. Based on findings after this removal, Defendants' understanding of the contamination source has been that "VOCs consisting primarily of chlorinated solvents [including TCE & PCE] were released from the former clarifier and associated piping and impacted both soil and groundwater." Ex. 3, at NGSC_0025393. Defendants used the clarifier to discharge solvents from degreasing operations in its circuit board manufacturing. Ex. 4, Ex. 5, at 00139805. Defendants' own consultants at the Site admit that the carcinogens TCE and PCE were widely used for circuit board manufacturing and that solvent contamination is common in this timeframe from these operations. Ex. 6, at 165:16–20, 166:15–25. The clarifier and associated piping are the source of contamination emanating from the Site into the PCA. *See, e.g.,* Ex. 6, at 150:24–151:3.

Litton's manufacturing in Canoga Park was an expansion of its PCB manufacturing operation in Springfield, Missouri. Ex. 7, at 3; Ex. 8, at NGSC_0077072–73. Despite Defendants' knowledge of contamination associated with its PCB manufacturing operations since at least the 1980s (Ex. 9, at 1), Defendants failed to investigate the extent of TCE contamination in Canoga Park until the late 1990s. Ex. 10. Later, investigations at the Site established high level contamination of multiple carcinogenic chlorinated solvents along with copper and nickel from Litton's plating operations. Ex. 11, at NGSC_0060432–38.

**B.      Plaintiffs' expert testimony supports class certification.**

The testimony of several key experts supports certification:

- **Dr. Laton,** a hydrogeologist, mapped Defendants' data identifying PCA properties exceeding the 1.2 µg/L TCE level in groundwater. Exs. 12–13.

- **Dr. Tonkin**, a hydrogeologist and modeler, assessed the source location and timing of the plume, analyzing multiple lines of evidence, including groundwater modeling, that demonstrate the plume is consistent with discharges during Litton's ownership and operation. Exs. 14–15.

- **Dr. Kram**, a vapor intrusion expert, analyzed the contaminant plume, and opined that based on the presence of TCE throughout the PCA there is a path for TCE vapors to enter homes, requiring mitigation to prevent vapors from entering homes. Exs. 16–17.

- **Dr. Gorman**, an industrial historian and engineer, determined that the source of contamination is Litton's PCB manufacturing operations at 8020 Deering during the late 1960s and early 1970s. Exs. 18–19.

- **Dr. Ryer-Powder**, a toxicologist, identified TCE and PCE as carcinogens; established their health risks and the reasonableness of avoiding unnecessary exposure. Ex. 20.

- **Dr. Boyle**, a real estate economist, opined that proximity to the <u>source of TCE</u> damages homes in the PCA and provides a class-wide method to calculate damages. Exs. 21–22.

The facts relevant to class certification are simple: Releases of TCE during Litton's operation and ownership of the Site created a plume of contamination "approximately 2.4 miles long and 1.8 miles wide." Ex. 1, at 3. This plume exceeds the California Environmental Screening Level (ESL) for TCE and affects 3,294 properties. Ex. 1, at 3; Ex. 14, at 3-4; Ex. 18, at 23; Ex. 12, at 12; Ex. 22, at 4. TCE is carcinogenic and contamination at levels exceeding the ESL require mitigation at each PCA home to prevent resident exposure from soil gas vapors. Ex. 16, at 30; Ex. 20, at 12. Additionally, the trespass of contamination causes economic damage, including diminution of value, as a function of distance from the Site. Ex. 21, at 8.

**C.      TCE contamination impacts all PCA homes.**

   1.   *Defendants' TCE contaminates the entire PCA.*

4

Defendants' legal predecessor used the Site to manufacture printed circuit boards. Since 2007, Defendants have investigated contamination offsite in water, soil and soil vapor. Ex. 23, at NGSC_0366379. Using thousands of samples from over 100 well locations, Defendants outlined the extent of TCE contamination emanating from the Site, identifying a TCE groundwater plume based on the drinking water standard of 5 µg/L as a boundary. Exhibit 25. Defendants' investigations concluded TCE contaminates the soil vapor "mirroring" groundwater. Ex. 3, at NGSC_0025394 ("Investigation results confirm the soil vapor plume mirrors the groundwater plume off site."). TCE, however, is a volatile, toxic substance that can infiltrate indoor air from the soil gas akin to radon in homes, thus the drinking water standard is not sufficiently protective, requiring a lower concentration (1.2 µg/L) to protect the public.  Ex. 26, at 283 ("US EPA's Vapor Intrusion Screening Level Calculator indicates that this corresponds…to a groundwater concentration of 1.2 µg/L."). Therefore, using this same data, Dr. Laton re-mapped the geographic boundary of the PCA based on the presence of TCE in groundwater exceeding 1.2 µg/L, showing the same TCE pattern with slightly extended boundaries due to the lower boundary concentration. Ex. 12, at 36–37; Ex. 24.



**Defendants' 5 µg/L plume map (left) & Plaintiffs' 1.2 µg/L map (the PCA) (right).**

As defined, <u>every property in the PCA</u> has TCE levels in groundwater above 1.2 µg/L. It is this—the presence of TCE uniformly above 1.2 µg/L—that injures class properties.

2.    *The presence of TCE in shallow groundwater is an ever-present threat to residents.*

Volatile contaminants like TCE and PCE in groundwater directly impact PCA homes, particularly since the groundwater beneath the homes in this part of Canoga Park near the Los Angeles River is very shallow (in some cases as little as 13-feet below surface). Ex. 1, at 4. These contaminants volatilize—enter the vapor phase—and migrate through soil to the surface. Ex. 16 at 75, Fig. 4. The chemicals contaminate the soil, migrating up as vapor which can be measured as "soil gas" or "soil vapor." *Id*. The spatial and temporal variability—variation in levels from location to location and from day to day—in soil gas measurements is expected to be significant. Ex. 16 at 23. From the soil, TCE and PCE migrate through the foundation and/or crawlspace and accumulate in indoor air resulting in toxic exposures to residents.



Whether these chemicals happen to be detected during any given indoor air test depends on numerous variables that effect the flow of vapors into the home (vapor intrusion "VI on" conditions) and whether the air sample taken is representative of indoor air levels at the time of testing. Ex. 16 at 6. Defendants' consultants and experts agree. Ex. 38 at 175:5–185:3, 186:20–188:23; Ex. 29 at 135:13–155:20. Conditions like having the windows open can affect both of these by reducing or eliminating negative pressure gradients into the home turning VI "off" and by diluting any contaminants present in the indoor air by increased ventilation. *See* Ex. 39 at 82:2–85:17; Ex. 38 at 103:11–104:21. Some of these variables vary generally by season (e.g. indoor-outdoor temperature differences); and, therefore, sampling during multiple seasons is a means of attempting to capture the variety of indoor air conditions, but several rounds of

sampling within each home are required to adequately characterize the impact of contamination on the indoor air by identifying what EPA deems the "reasonable maximum exposure" or RME. *See* Ex. 16 at 7, 27 ("a thorough evaluation of the range of conditions as well as the reasonable maximum exposure (RME) should inform all vapor intrusion risk-based decisions as recommended by USEPA") (citing USEPA 2015). The fewer rounds of sampling in each home the greater the likelihood of false-negative findings (finding no contaminant risk when one exists) and research published by EPA experts indicates that as many as 58 rounds of sampling are required within each home to assess contaminant risks. *Id.* at 27.

As discussed below, Defendants' investigation was inadequately limited and technically flawed, failing to determine indoor contaminant levels. Due to the necessarily overwhelming time and expense of properly investigating indoor air for the 3,000-plus contaminated properties, and the imposition and risk placed on residents during such an investigation, Plaintiffs' VI expert determined "it is my opinion that mitigation systems be immediately installed for each home located above areas of the groundwater plume that exceed the screening limit…" *Id.* at 27. The screening limit of 1.2 μg/L in groundwater used by Dr. Kram is based on default assumptions used by the EPA and State of California to assess vapor risks from TCE to avoid exceedances of the safe level of TCE in indoor air of 0.48 μg/m$^3$. *Id.* at 19. Given the limitations discussed in his report and summarized below, there is no basis to depart from EPA's default assumptions for the PCA homes. *Id.* at 41–44.

3.   *Defendants' indoor air investigation was inadequate and flawed.*

Despite knowing the threat posed by offsite contamination for decades including exceedance of EPA's risk screening limit of 1.2 μg/L, Defendants did not begin testing residences for toxic vapors until late 2017. Defendants identified 355 "Priority Study Area" residents for testing and a second set of several hundred contingency homes. Ex. 23, at

7

NGSC_0366380; Ex. 28. The indoor air testing required residents to allow testing in their homes over multiple 7-day periods, each time removing household chemicals, storing them outside for over a week. Ex. 27, at NGSC_0017378–80. Defendants did not offer residents compensation for the inconvenience. *See* Ex. 29, at 124:22–125:2. With no incentive or understanding of the threats, only 26 homeowners allowed testing and only 21 allowed testing during winter and summer, which is critical for reliably assessing indoor air. Ex. 27, at NGSC_0017399, Table 9.

In addition to the small sample size, Defendants' investigation was not consistent with agency guidance and replete with technical flaws. *See* Ex. 16 at Table 1. ***Despite these significant flaws biasing results toward false negatives, 24 of 26 homes detected TCE and/or PCE in indoor and/or crawlspace air during testing***. Ex. 27, at NGSC_00173596–97, Tables 7 & 8. Vapor intrusion into homes is dynamic and varies significantly based on conditions in and outside of the home. Ex. 30, at 34; Ex. 31, 71:18–92:3 (defense expert); Ex. 29 at 135:13–155:20 (defense expert); Ex. 16, at 8. Due to this variation, the guidance requires that multiple rounds of sampling must be done, including testing under conservative conditions with windows/doors closed and with HVAC systems both on and off. Ex. 32, at 29; Ex. 33, at 67–68; Ex. 34, at 34. Instead, Defendants sampled all 26 homes "as is" with no effort to maintain conservative conditions and no record was made of the test conditions. Ex. 35, at 333:12–336:4. Because of these, and numerous other limitations, Defendants' indoor sampling does not capture conservative conditions and cannot be used for determining or dismissing risk. Ex. 16, at 4, 35 ("Given the limited number of homes tested, the methods employed, and serious flaws in the testing efforts, the data collected is not sufficient to determine actual risks to residents…").

Additionally, Defendants' testing improperly relied on passive samples to measure TCE concentrations in soil vapor at a depth of 3-feet below grade. Ex. 27, at NGSC_0017381. Soil vapor samples should be taken at least 5-feet below grade to avoid dilution and samples taken with passive samplers "cannot be used to measure the contaminant concentration." Ex. 32, at 7,

8

12; Ex. 34, at 15, 17. Both guidance and good science require multiple samples of crawlspaces taken away from ventilation. Ex. 33, at 70; Ex. 40 at 195:14–16 ("but you'd want them [crawlspace samples] away from the exterior opening so that you can get an accurate reading inside."). Here, crawlspaces were only sampled once each round, many of these taken within 1-2 feet of ventilated access and/or taken during Santa Ana wind conditions diluting contaminant levels. Ex. 27 at NGSC_0017444–68; Ex. 36; Ex. 38, at 277:7–280:14. These flaws are significant because Defendants relied quantitative results from these to dismiss the indoor air detections, blaming residents for these contaminants. *See* Ex. 27, at NGSC_0017398–0017403 (e.g., dismissing indoor detections that exceed crawlspace or soil gas); Ex. 16 at 6–7.

Defendants will no doubt point to the fact that the Water Board's Corrective Action Order ("CAO"), which validates many of Plaintiffs' allegations underlying their legal claims, was never issued as a final administrative order. Plaintiffs explored this in a deposition taken of Mr. Akzayakatl Mexikatzin, the Project Manager for the Site and the author of the CAO. Ex. 42 at 21:4-6. Mr. Mexikatzin confirmed that the Draft was simply never finalized because Defendants agreed to perform the tasks identified in the Order. *Id.* at 214:17–215:6. He also confirmed that, despite its status as "draft," the findings and conclusions included were the result of his review of the Site record and are accurate, including the finding that Defendants' contamination constitutes a "public nuisance *per se.*" *Id.,* at 205:18–206:4; 207:16–208:9. Mr. Mexikatzin's testimony confirms several other allegations relevant here including that the soil vapor plume on properties mirrors the groundwater plume, that the plume is over 2-miles long, that TCE concentrations exceed applicable ESLs, and that Defendants' remedial efforts "do not address the extensive offsite plume which poses a threat to nearby residences." *Id.* at 209:2–212:14.

### III.    Standard of Review

To obtain class certification, Plaintiff must satisfy Rule 23(a) and at least one sub-section of Rule 23(b). *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 927 (9th Cir. 2019).

Under Rule 23(a), a party seeking certification of a class must satisfy four requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. The proposed class or subclass must also satisfy one of the sub-sections of Rule 23(b), "which defines three different types of classes." *Leyva v. Medline Industries, Inc.*, 716 F.3d 510, 512 (9th Cir. 2013).

The district court's role is to determine the method best suited to the fair and efficient adjudication of the controversy. *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013). *Although class certification analysis may "entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage*." *Id.* at 466 (emphasis added). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

The court may also certify a class limited to specific issues. "Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). The Sixth Circuit recognized that certifying specific issues for class treatment may help resolve environmental cases. *Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 414–15 (6th Cir. 2018), *cert. denied*, 139 S.Ct. 1319 (2019) (holding that issues certified for class resolution "need only be answered once because the answers apply in the same way to each property owner within the plumes."). In the wake of *Martin*, Courts have recognized "a more permissive approach to Rule 23(c)(4) certification…on the theory it better serves the purposes of Rule 23 by providing courts with greater flexibility in managing potential class actions." *In re Chiquita Brands Int'l Inc.*, 331 F.R.D. 675, 687 (S.D. Fla. 2019).

## IV.   Argument

**A.      Plaintiffs have proposed an objectively ascertainable class.**

Implicit in Rule 23(a) is that the class definition distinguishes members of the proposed class from the public based upon defendant's actions against them. "Reference to fixed, geographic boundaries will generally be sufficiently objective for proper inclusion in a class definition." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538–39 (6th Cir. 2012). Environmental class areas often reflect a geographic area impacted by contamination. *Delta*, 2023 WL 2347074, at *3; *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 67–68 (S.D. Ohio 1991) (certifying class defined as persons within six-miles of plant that released contaminants); *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 382 (D. Col. 1993) (certifying class defined by geographic boundaries based on contours of radioactive materials). Here, the PCA is based on mapping Defendants' groundwater data identifying the area of exceedances of the TCE screening level and therefore provides a clear relationship to Defendants' activities at the Site. Ex. 12, at 36–37; Ex. 16, at 19. Membership in the class can easily be ascertained through publicly available property records. Thus, Plaintiffs seek to certify the following classes:

**Mitigation Class**: All persons who own a single family or townhome within the PCA at the time of Class Certification.

**Property Damage Class**: All persons who own a single family or townhome within the PCA at the time of Class Certification.

Both classes exclude employees of Defendants as well as anyone who purchased a home with disclosure of contamination at their property from the 8020 Deering Avenue Site.

**B.      The Proposed Class satisfies Rule 23(a).**

   *1.    Joinder is impracticable because the class is sufficiently numerous.*

Although Rule 23(a)(1) does not specify a minimum number of plaintiffs to obtain class certification, in the Central District of California, "a proposed class of at least forty members presumptively satisfies the numerosity requirement." *Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 569 (C.D. Cal. 2012). Here, class membership includes over 3,000 PCA

11

homeowners (at least 3,000 individual plaintiffs) and the discovery is both complex and extensive including the review of nearly 3,000,000 pages, sixteen experts, and nearly 30 depositions. The time, volume of work, and cost of pursuing individual claims establish that joinder would be impracticable. Thus, the numerosity requirement is satisfied.

2.    *Questions of law and fact are common to the class.*

Commonality only requires a "single common question" that is "capable of class resolution." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013). Thus, "[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012).

Here, several common questions of law and fact exist for all class member claims that can be established in one action, including, but not limited to, whether:

- Defendants' acts or omissions at the Site proximately caused TCE and PCE[2] to be released and migrate into, at, on, or around the PCA;

- Defendants failed to exercise reasonable care in their storing, use, disposal, containment, investigation, and remediation of TCE and PCE;

- TCE released from the Site migrated throughout the entire PCA;

- Properties within the PCA are contaminated with TCE and PCE; and

- TCE contamination at or above 1.2 µg/L has caused injury to the PCA properties in the form of financial damage and necessitates mitigation of soil vapor.

3.    *Plaintiffs' claims are typical of the class members.*

---

[2] Defendants released multiple chlorinated chemicals including both TCE and PCE. Both are volatile and were detected in indoor air during testing and would be remedied with mitigation. While PCE was a co-contaminant, TCE is the dominant chemical that uniformly exceeds the screening limit and primary cause of injury in the PCA.

Plaintiffs satisfy typicality when they show that the named parties' claims are typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Courts evaluate these interests by determining "whether other members have the same or similar injury, whether the action is based on conduct[,] which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.*

In environmental cases, typicality is satisfied when the named plaintiffs and the class members are impacted by the same type of contamination caused by the same defendants. *See, e.g.*, *Rowe v. E. I. Dupont De Nemours*, 262 F.R.D. 451, 456 (D. N.J. 2009) (finding typicality established where claims "arise from the same course of conduct committed by DuPont, involve the same legal theories…and seek the same injunctive relief"). Here, the predominating issues involve Defendants' common course of conduct in handling, storing, and discharging TCE. The resulting TCE contamination is above the screening levels across the PCA impacting all class members in a similar way. Plaintiffs and all class members have groundwater, soil, and soil vapor contamination on their properties, the same claims, and the same interest in the outcome of the case.

Plaintiffs Jed and Alisa Behar are homeowners in the Canoga Park neighborhood. SAC at ¶ 5. Plaintiffs purchased their home at 7031 Keokuk Avenue, which is in located within the 1.2 µg/L plume that defines the PCA, in December of 2011. Ex. 41, at 11:14–15; 64:14–16. They live there together with their two young children. *Id.* at 39:12–13. The Behars' home is impacted by the same plume in the same manner that Plaintiffs' have pled has impacted every other class member. They live within the plume that Plaintiffs' experts have determined impacts their property's value and requires mitigation and this aligns their claims and their interest in pursuing those claims with those of every other class member.

13

4.   *Plaintiffs and counsel will adequately protect the interests of the class.*

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This requirement involves two questions, "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v. Chrysler*, 150 F.3d 1011, 1020 (9th Cir. 1998).

First, the Behars have no conflicts with other class members. They reside within the 1.2 µg/L plume—like all PCA residents—and have been injured as a result. Defendants may argue that the Behars are not adequate representatives because other homes nearer to the Site have greater risk. This argument, however, is misguided. First, when the injuries result from the same conduct, the injuries must only be "similar." *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001); *see also Bentley v. Honeywell Int'l*, 223 F.R.D. 471, 485 (S.D. Ohio 2004) (finding harm of the same type may differ as to "degree"). More importantly, Plaintiffs' injury claims can be established by common evidence. Injury to the Mitigation Class is based on the presence of TCE at each property exceeding 1.2 µg/L—a condition that applies for every PCA home. Ex. 16, at 19. Property damages, as established by Dr. Boyle, are similar for the entire class, with slight variation based on proximity to the Site itself accounted for in the damages model. The Behars have suffered the same harm from Defendants' conduct—TCE contamination of water, vapor, and soil at their properties—as all other putative class members. The first question is satisfied.

Second, Plaintiffs have retained counsel who are qualified and experienced in prosecuting complex environmental class actions. Mark Lanier is a nationally recognized trial lawyer who has served as lead counsel in numerous mass tort and class action cases, including environmental cases. Christopher Nidel, an M.I.T. chemical engineer, has also served as lead counsel in several environmental and class action cases. David Page has represented both plaintiffs and defendants in environmental litigation for over 40 years. Gideon Kracov has

14

extensive experience with environmental litigation and regulatory practice. Plaintiffs' counsel has vigorously litigated the claims made in this case for over 2.5-years, reviewing millions of pages of documents, hiring six experts, taking almost 30 depositions to date, as well as defeating multiple motions to dismiss. Counsel clearly have the knowledge, resources, experience, and commitment to adequately represent the class. The second question is, therefore, satisfied.

**C.      The Proposed Class satisfies Rule 23(b)(3).**

Rule 23(b)(3)'s predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "Even mass tort cases arising from a common cause…may, depending on the circumstances, satisfy the predominance requirement." *Id.* at 625. Predominance is qualitative and not determined "simply by counting noses." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). Where "common questions predominate regarding liability, the courts generally find the predominance requirement to be satisfied even if individual damages issues remain." *Johns v. Bayer Corp.*, 280 F.R.D. 551, 559 n.7 (S.D. Cal. 2012) (quoting *Smilow v. S.W. Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003)). "Predominance is usually decided on the question of liability, and if the liability issue is common to the class, common issues are held to predominate over individual questions." *In re Revco Sec. Litig.*, 142 F.R.D. 659, 662 (N.D. Ohio 1992). Predominance does not require the absence of individual issues. *See Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 964 (9th Cir. 2013). The inquiry is focused on whether common questions predominate over individual questions—not whether there are "common answers to those questions." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 819 (7th Cir. 2012).

"Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Valentino*, 97 F.3d at 1234. When just one common question predominates "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately…." *Tyson Foods, Inc. v.*

*Bouaphakeo*, 577 U.S. 442, 453 (2016); *Leyva*, 716 F.3d at 514 (finding predominance in wage-and-hour class based on liability); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167–68 (9th Cir. 2014) (holding that issues of liability predominate over individualized assessment of damages).

1.   *Common issues predominate over individual issues.*

There are several questions relevant to Plaintiffs' claims which are common to all class members relevant to issues of liability, causation, and damages. These questions include: 1) the volume, timing, and manner in which Litton used and disposed of TCE and PCE at the Site, 2) other entities' use and disposal of TCE and PCE at the Site, 3) the source of offsite TCE and PCE contamination that defines the PCA, 4) the effectiveness of actions taken by Defendants to contain and/or remediate the offsite contamination, 5) the migration and presence of contaminants into the PCA, 6) their toxicity, 7) the need for mitigation due to the TCE in water, soil, and vapor at PCA homes, and 8) any economic property damage caused by proximity to contamination. Through the testimony of expert and fact witnesses Defendants contest each of these questions and their ultimate resolution applies to each PCA member. These common questions are sufficient to warrant class treatment. *Mejdrech*, 319 F.3d at 911 ("If there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop").

Plaintiffs have claims for negligence, nuisance, and trespass. While each are established through slightly different elements, the merit of each claim rests on evidence of Defendants' conduct and the migration, source, and presence of TCE and PCE in the PCA (causation) as discussed above. These together form the bases for Defendants' liability. These can be established through common evidence for all class members for each of the common law claims.

*Negligence*: The elements of negligence are duty, breach of duty, and proximate cause of an injury. *Sabetian v. Exxon Mobil Corp.*, 57 Cal.App.5th 1054, 1070 (Cal. Ct. App. 2020). Here,

16

evidence of Defendants' common course of conduct to all class members will answer the common questions establishing the negligence claim. *Sterling*, 855 F.2d at 1196–97. Evidence that Defendants improperly released TCE, contaminating the water, soil, and vapors across all PCA homes and have failed to properly test for and remediate those contaminants, thereby breaching their duty to Plaintiffs, is likewise common. Causation—whether, how and to what extent TCE released from the Site has contaminated the PCA properties—can also be established through common evidence. Here, Defendants' own data establishes the class-wide presence of TCE in the very shallow groundwater at levels above state screening levels causing common injury. Each class members' claim is thus established through evidence of conduct, migration, and contamination common to all class members.

Because common questions of liability predominate over potential individualized damages questions courts frequently certify negligence claims in environmental cases. For instance, in *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 607 (E.D. La. 2006), the court found that the individual issue of the extent of contamination on a particular property did not require extensive individualized proof that would preclude class treatment of the negligence claim.

*Private Nuisance*: Nuisance requires proof of three elements. A plaintiff must prove 1) an interference with the use and enjoyment of property, 2) that the invasion caused the plaintiff to suffer substantial actual damage, and 3) the interference is unreasonable. *Wilson v. S. Cal. Edison Co.*, 21 Cal.App.5th 786, 802–03 (Cal. Ct. App. 2018); *Leland Stanford Junior Univ. v. Agilent Techs.*, 628 F.Supp.3d 972, 972 (N.D. Cal. 2022) (finding TCE contamination raised triable issues on trespass and nuisance claims); *Limo Co. v. Chem. Milling Int'l Corp.*, 2017 WL 4358423, at *5 (C.D. Cal. Sep. 28, 2017) (holding that TCE/PCE contamination established nuisance claim on default judgment). The standard for the second and third elements is an objective, reasonable person standard. *Wilson,* 21 Cal.App.5th at 802-03. Critically, the Supreme

17

Court has explained that an objective standard is more likely to be "proved through evidence common to the class." *Amgen*, 568 U.S. at 467. Notably, the Water Board deemed Defendants' contamination a nuisance *per se*. Ex. 1, at 1.

The interference here is the presence of TCE above screening limits at all PCA properties. As with other claims, the source of this plume is established by common evidence. As with negligence, the remaining elements are also answered by common evidence, namely the toxicity of TCE and the significance of its presence on property damage and the need for mitigation. Defendants' liability for this nuisance is entirely determined by answering common questions through common evidence for all class members' claims based on an objective standard that must be decided by a jury. *Tesoro Ref. & Mktg. Co. v. City of Long Beach*, 334 F. Supp. 3d 1031, 1051, n.15 (C.D. Cal. 2017) ("Whether conduct is sufficiently 'substantial' and 'unreasonable' are questions of fact that must be determined by the trier of fact in each case in the light of all the circumstances of that case.").

*Trespass*: Trespass is an unlawful interference with possession of property; its elements are: "(1) the plaintiff's ownership or control of the property; (2) the defendant's intentional, reckless, or negligent entry onto the property; (3) lack of permission for the entry; (4) harm; and (5) the defendant's conduct was a substantial factor in causing the harm." *Ralphs Grocery Co. v. Victory Consultants, Inc.,* 17 Cal.App.5th 245, at 261-62 (Cal. Ct. App. 2017) "A claim for trespass may be based on the presence of contamination on property." *In re Burbank Environmental Lit.*, 42 F. Supp. 2d 976, 983–84 (C.D. Cal. 1998).

Plaintiffs' trespass claims arise from Defendants' releases of hazardous wastes into the community and onto Plaintiffs' and the proposed class members' properties. *Schaeffer v. Gregory Village Partners, L.P.*, 105 F. Supp. 3d 951, 956 (N.D. Cal. 2015) (holding that PCE contamination under plaintiff's home raise triable issues on negligence, trespass, and nuisance claims). As with the negligence claim, Defendants' liability for trespass will be established with

18

common evidence. Defendants' common conduct, contaminant migration, presence, and harm, and the role Defendants had in causing that harm are common questions all established by common evidence. *Delta*, 2023 WL 2347074, at *13–14 (certifying contamination trespass claim with expert evidence of common cause).

2.   *Predominance is satisfied.*

Predominance does not require all issues be identical, or even common, simply that common issues predominate. *See supra* at pp. 15-16. Certification allows for factual variation from home to home. *Delta*, 2023 WL 2347074 at *13–14; *Boggs*, 141 F.R.D. at 65 (certifying class when "people and parcels of real property, like snowflakes, necessarily have different and unique characteristics"). Courts certify environmental classes with various factual variations including differing types of properties, distance from the source, and varying levels of contamination or damage. *See id.; see also Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988); *Bentley*, 223 F.R.D. at 484; *Cook*, 151 F.R.D. at 386; *Ludwig v. Pilkington N. America*, 2003 WL 22478842, at *5 (N.D. Ill. Nov. 4, 2003). Even the question of whether contamination reached all homes does not overwhelm class-wide issues of liability. *Mejdrech*, 319 F.3d at 911.

Here, the liability and causation questions underlying all claims present a "significant aspect of the case and they can be resolved for all members of the class in a single adjudication," justifying class treatment. *See* MILLER & WRIGHT, FEDERAL PRACTICE & PROCEDURE § 1778 (2d ed. 1986). Liability for all claims and all class members is determined by the facts surrounding Defendants' handling of chemicals at the Site, their effort to contain and remediate it, and the migration of TCE and the resulting contamination of all class properties as well as evidence of alternative sources of TCE. The presence of TCE at all properties in exceedance of groundwater screening levels, detected in water, soil, and soil vapor, and the toxic threat posed by it establish the class-wide injury upon which Plaintiffs' damage models are based. Each of

these is established by the same body of evidence for every putative class member, namely the record of Defendants' historical operations and on and offsite environmental investigations and expert testimony on both sides.

### 3. Damages can be determined class-wide.

*Economic Property Damage*: Property damages suffered by the Plaintiffs and putative class members can be determined on a class-wide basis. Although Plaintiffs are not required to calculate damages to certify a class, Plaintiffs' economic expert, Dr. Boyle, calculated the economic damage for each property in the PCA based on proximity to the contamination source at 8020 Deering to provide compensatory damages to the class members. Ex. 21, at 1–2, 11.

At class certification, plaintiff's burden is "establishing that damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). But the presence of individualize damages cannot, by itself, defeat class certification under Rule 23(b)(3)—the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability. *Leyva*, 716 F.3d at 514; *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 (9th Cir. 2017) ("At this stage, Plaintiffs need only show that such damages can be determined without excessive difficulty and attributed to their theory of liability.").

Dr. Boyle is an environmental economist and widely-published, tenured professor. Ex. 21, at 2–4. Dr. Boyle calculated the class-wide diminution in value for each home using hedonic regression analysis and a form of meta-analysis called a "benefit transfer." Ex. 21, at 11. Meta-analysis is a widely used method to calculate the property value diminution based on proximity to a disamenity such as a contamination source. Ex. 21, at 13–14, 23–24. Dr. Boyle derived a damage equation from the Simons and Saginor (2006) ("S&S") meta-analysis which he used "to compute the value diminutions for the injured properties" using a "benefit transfer" method. Ex. 21, at 13–14. Benefit transfer is a widely used method to calculate resource values, both enhancements and diminutions. *Id.* at 13.

20

As Dr. Boyle explains, the EPA publishes guidelines for conducting benefit transfers, (*id.* at 14), which are used to determine the economic impact of contamination on real property by analyzing similar past contamination events and studies. *U.S. v. Duke Energy Carolinas, LLC*, 499 F. Supp. 3d 213, 220 (M.D.N.C. 2020) (accepting benefit transfer to determine lost value in use of park due to defendant's contamination); *Ocean Harbor House Homeowners Assn. v. California Coastal Com.*, 163 Cal.App.4th 215, 238 (Cal. Ct. App. 2008) (approving benefit transfer analysis under EPA guidelines to calculate value of lost beach access). At least one district court specifically denied a motion to exclude Dr. Boyle's use of benefit transfer analysis. *Comm'r of the Dep't of Plan. v. Century Aluminum Co.*, 2013 WL 1235655, at *3–5 (D. V.I. Mar. 26, 2013) (denying motion to exclude Dr. Boyle's benefit transfer analysis).

Here, Dr. Boyle's report describes his methodology for calculating class-wide damages. Dr. Boyle calculated the unimpaired value of homes by using actual transaction prices, updating them to current home value using the Federal Reserve Economic Data Index. Ex. 21, at 10–11, 20. Second, Dr. Boyle conducted a benefit transfer analysis based on the S&S model that considered 58 peer-reviewed studies of contamination effects on property prices. *Id.* at 15–19.

Third, he used hedonic regression through a meta-equation that weighed the 58 past studies of environmental contamination to determine that the average value diminution in the PCA is 9.4% to 11.4% depending on distance from 8020 Deering. Ex. 21, at 1–2, 18–19. Finally, he applied the percentage diminution to each home, controlling for the factor of distance from 8020 Deering to determine the damage to each home. *Id.* at 19–21.

As noted below, Dr. Boyle's methodologies are reliable for calculating class-wide damages. In economic and scientific disciplines, "meta-analysis pools the results of various studies to arrive at a single figure to represent the totality of the studies reviewed…Meta-analysis has the advantage of pooling more data so that the results are less likely to be misleading solely due to chance." *In re Bextra*, 524 F.Supp.2d 1166, 1174 (N.D. Cal. 2007). For that reason, meta-

analysis is a widely used and reliable methodology. Ex. 21, at 9–10; *Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803, 809 (7th Cir. 2018) (FDA using meta-analysis to study suicide risk of anti-depressants); *Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 884 (N.D. Cal. 2016) ("Among types of medical evidence, meta-analysis is considered the strongest.") (citing Federal Judicial Center, *Reference Manual on Scientific Evidence* 55 (3d ed. 2011)).

Likewise, Dr. Boyle's hedonic regression reliably calculates damages on a class-wide basis. "Hedonic regression is a technique that isolates the factors that contribute to the value of a property by studying thousands of transactions. Hedonic analysis determines the contribution of each of these factors to the value of a home." *City of Oakland v. Wells Fargo & Co.*, 972 F.3d 1112, 1120 n.11 (2020), *vacated on other grounds*, 993 F.3d 1077 (9th Cir. 2021), *reh'g granted*, 14 F.4d 1030, 1040 (9th Cir. 2021) (declining to decide whether statistical modeling could be used to establish causation element of claim). On original submission, the panel in *Oakland* called hedonic regression analysis a "sophisticated, reliable, and scientifically rigorous" methodology for determining how factors impact home values. 972 F.3d at 1128.

District courts have found hedonic regression reliable and capable of determining class-wide property damages. *Andrews v. Plains All American Pipeline*, 2020 WL 3105425, at *6–8 (C.D. Cal. Jan. 16, 2020) (denying motion to decertify class for negligence and trespass claims using regression analysis for property damages even though analysis does not account for every conceivable variable); *Baker v. Saint-Gobain Performance Plastics Corp.*, 632 F. Supp. 3d 19, 59 (N.D.N.Y. 2022) (holding for groundwater contamination class action that hedonic regression analysis was able to determine class-wide average percent diminution of home value); *Mass. Mut. Life Ins. Co. v. DB Structured Products, Inc.*, 2015 WL 2130060, at *10 (D. Mass. May 7, 2015) (rejecting *Daubert* motion to exclude expert using hedonic regression analysis in residential mortgage-backed securities fraud case to determine correct home valuation); *In re Katrina Canal Breaches Consol. Lit.*, 2007 WL 3245438, at *13 (E.D. La. Nov. 1, 2007)

22

(denying *Daubert* motion to strike expert in context of class certification using mass appraisal technique with hedonic regression analysis); *Cook*, 580 F. Supp. 2d at 1110 (denying *Daubert* motion to preclude expert in certified contamination class action from opining on class property diminution based on proximity to contamination site using hedonic regression analysis).

*Property Mitigation*: TCE levels in groundwater throughout the PCA exceed threshold levels and require mitigation to prevent toxic vapors from entering homes. While Plaintiffs' experts and the Water Board agree that "remediation is necessary based upon high residual concentrations…" in the groundwater of the offsite plume in the PCA, remediation could take decades. Ex. 1, at 4; Ex. 16, 39–40, 54–56; Ex. 37, at 246:14–247:8; Ex. 35, at 110:19–24 ("There's certainly potential it could take more than a decade and certainly 40 or 50 years."). As in areas with high radon presence, elevated levels of TCE throughout the PCA require mitigation to prevent the intrusion of vapors into homes. Ex. 16, at 56–58; *Cox v. Ametek, Inc.*, 2020 WL 7353425, *3 (S.D. Cal. Dec. 15, 2020) (certifying mobile home mitigation system subclass on consent in TCE plume contamination case and approving settlement).

### 4.   A class action is manageable and superior to alternative adjudication forms.

Plaintiffs can satisfy the superiority requirement when there is a "disparity between [class members]'s litigation costs and what they hope to recover." *Local Joint Executive Bd. v. Las Vegas Sands*, 244 F.3d 1152, 1163 (9th Cir. 2001). Class actions allow individuals to "pool claims which would be uneconomical to litigate individually." *Id.*

Defendants may insinuate that because individual damages are relatively great—because of the significant diminished value to the class members' homes—each class member is incentivized to pursue individual litigation. This would be misguided. The key focus in the superiority inquiry is the difference between cost of litigation and the potential recovery. Here, a class action is clearly the superior method of adjudicating this case because the costs of pursuing individual claims **greatly** exceed the potential recovery for each class member.

23

Moreover, requiring duplicative discovery and multiple trials regarding the same issues would be wasteful, unfair to the litigants, and would consume significant judicial resources. *Martin*, 896 F.3d at 416. If Plaintiffs cannot proceed as a class, most—if not all—will be barred from proceeding because of the disparity between litigation costs and their potential recovery.

As to Rule 23(b)(3)(B), the risk of a "multiplicity of suits" continuing through the litigation can weigh against certification when other pending cases concern "the same or substantially similar claims." *Wright v. Linkus Enterprises, Inc.*, 259 F.R.D. 468, 474 (E.D. Cal. 2009). Currently, no other claims have been filed.

Manageability of this class action will pose no exceptional difficulties. No issues have arisen indicating that a class action will be more difficult than litigating thousands of individual cases. Finally, concentrating the litigation in this Court is desirable because it is familiar with this matter, and it is the proper venue for claims arising from contamination of a neighborhood in Los Angeles, California.

**D.    Alternatively, a Rule 23(c)(4) issue class should be certified.**

The Court may alternatively certify specific issues pursuant to Rule 23(c)(4). In recent appellate treatment of this Rule's application to environmental cases, the Sixth Circuit recognized that Rule 23(c)(4) may help resolve contamination lawsuits. *Martin*, 896 F.3d at 414–15. Here, like in *Martin*, there are numerous issues that can, and should, be resolved class-wide because they will substantially advance resolution of this case. *Id.* Thus, if the Court rejects certification under Rule 23(b)(3), it should certify these issues, including liability and injury, for class treatment under Rule 23(c)(4). This will promote judicial efficiency as well as efficiencies for Defendants, avoid the risk of inconsistent outcomes, and advance the resolution of all claims.

**E.    Class definitions can be modified and subclasses identified to promote certification.**

Redefining a class or creating subclasses should be considered by a district court before drastically denying certification. *See Heaven v. Trust Company Bank*, 118 F.3d 735, 738 (11th

24

Cir. 1997) (citing *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 408 (1980)); *see, also, Charlebois v. Angels Baseball, LP*, 2011 WL 2610122, at *3–4 (C.D. Cal. June 30, 2011). The D.C. Circuit explained that rather than reject certification, "a district court should either define the class itself or, perhaps most productively, simply suggest an alternate class definition..." *In re White*, 64 F.4th 302, 315 (D.C. Cir. 2023). The Third Circuit stated "rather than decertify the class [] we prefer to take a less drastic course and simply modify the class definition to remove the ambiguity." *Chiang v. Veneman*, 385 F.3d 256, 268 (3d Cir. 2004). Thus, if the Court finds proposed class definitions inadequate, it should modify them or grant leave to amend.

**F.      The Court should appoint undersigned as class counsel.**

When a court certifies a class, it must also appoint class counsel. Fed. R. Civ. P. 23(g)(1). In making the appointment, the Court is to consider class counsel's work to identify and investigate the claims, experience in class actions and other complex litigation, knowledge of the applicable law, and the resources for litigation. Fed. R. Civ. P. 23(g)(1)(A). Class counsel must be able to represent the class fairly and adequately. Fed. R. Civ. P. 23(g)(1)(B), (g)(4). To date, class counsel has litigated this case for 2.5 years, including review of over three million pages of discovery, and taking nearly 30 depositions, most of which involved expert witnesses.

**G.      Alternatively, the Court Should Certify a Rule(b)(2) Injunction Class.**

Alternatively, if the Court does not certify a Rule (b)(3) or Rule (c)(4) issues class, Plaintiffs request the Court grant an injunction mitigation class pursuant to Rule (b)(2) requiring Defendants to pay the cost of mitigation for all members of the Property Damages Class.

### V.      CONCLUSION

Plaintiffs' Motion for Class Certification should be GRANTED and Plaintiffs' counsel appointed as Class Counsel for (1) a mitigation class, (2) a property damage class, and, in the alternative, (3) a Rule 23(c)(4) class on the issues of liability and injury.

Dated:  December 22, 2023

/s/ *Michael Akselrud*

Michael Akselrud (SBN 285033)
michael.akselrud@lanierlawfirm.com
**THE LANIER LAW FIRM, P.C.**
2829 Townsgate Rd., Ste. 100
Westlake Village, California 91361
Phone: (310) 277-5100
Fax: (310) 277-5103


W. Mark Lanier (*pro hac vice*)
WML@lanierlawfirm.com
Alex J. Brown (*pro hac vice*)
Alex.Brown@lanierlawfirm.com
Ryan D. Ellis (*pro hac vice*)
Ryan.Ellis@lanierlawfirm.com
**THE LANIER LAW FIRM, P.C.**
10940 W. Sam Houston Pkwy N
Houston, Texas 77064
Phone: (713) 659-5200
Fax: (713) 659-2204

Christopher T. Nidel (*pro hac vice*)
chris@nidellaw.com
Jonathan Nace (*pro hac vice*)
jon@nidellaw.com
**NIDEL & NACE, P.L.L.C.**
One Church Street, Suite 802
Rockville, Maryland 20850
Phone: (202) 780-5153

David P. Page (*pro hac vice*)
dpage@eenradvocates.com
**ENVIRONMENTAL ENERGY & NATURAL RESOURCES ADVOCATES, PLLC**
1921 S Boston Ave.
Tulsa, Oklahoma 74119
Phone: (918) 764-8984

26

Gideon Kracov (Cal. SBA # 179815)
gk@gideonlaw.net
Jordan R. Sisson (Cal. SBN # 327057)
jordan@gideonlaw.net
**LAW OFFICE OF GIDEON KRACOV**
801 S. Grand Ave., 11th Floor
Los Angeles, California 90017
Phone: (213) 629-2071

***Attorneys for the Plaintiffs and the
Putative Class Members***

27

**CERTIFICATE OF SERVICE**

I, Michael Akselrud, an attorney, hereby certify that the **MOTION FOR CLASS CERTIFICATION** was served to counsel for the Defendants through the Court's ECF/CM system on December 22, 2023.

By: */s/ Michael Akselrud*
        Michael Akselrud

*Attorneys for the Plaintiffs and the Putative Class Members*

28

**CERTIFICATE OF COMPLIANCE**

I, Michael Akselrud, attorney for the Plaintiffs and the putative class members, hereby certify that this memorandum of points and authorities does not exceed twenty-five (25) pages, that the font is twelve (12) point Times New Roman, and that footnotes are no smaller than ten (10) point font. Thus, this motion complies with the limitation requirement of the Civil Standing Order, Section IX.C., which overrides L.R. 11-6.1 as per instruction from Wendy Hernandez on December 19, 2023.

By: */s/ Michael Akselrud*
Michael Akselrud

***Attorney for the Plaintiffs and the Putative Class Members***

29