# EXHIBIT 7

Response and Rebuttal Opinions
Related to the Release of the Chlorinated Solvents
at 8020 Deering Avenue

Prepared by: Hugh S. Gorman, PhD

*Hugh S. Gorman*
_____

November 22, 2023

Nov. 22, 2023

## 1.  Introduction

After submitting the expert report "The Use of Chlorinated Solvents at 8020 Deering Ave., Canoga Park, Ca.," Sept. 27, 2023, at the request of the Lanier Law Firm, I was asked to review the Oct. 24, 2023 expert report of Jay Vandeven, prepared for Gibson, Dunn, & Crutcher LLP and Cermak & Inglin, LLP, and to provide my response and any changes to my opinion.

A fundamental question addressed by both reports is, based on the available data, what is the likely origin of the chlorinated solvents that form the contamination plume originating at 8020 Deering Avenue? This report compares the opinions articulated in the two reports regarding that question. It does not attempt to repeat the background material found in those reports but focuses on points where they diverge.

In this comparison, I make use of no information from sources not cited in the Vandeven report or my report (Gorman report).

## 2.  Core Arguments Underlying Each Opinion

Here, I lay out the core arguments underlying each opinion about the source of chlorinated solvents in the contamination plume.

### Core argument underlying Gorman's opinion

- Litton ACD manufactured printed circuit boards at 8020 Deering Avenue in the approximate period 1968 to 1971 and owned the property to 1974.
- A plume of chlorinated solvents (mainly TCE and PCE) can be traced back to the location of a treatment structure and its associated piping on the property of 8020 Deering Avenue. According to Vandeven and others, the features of the plume are consistent with the periodic release of solvents in concentrated form, such as that associated with the disposal of spent solvents.
- The treatment structure associated with the contamination plume matches the functional specifications of the treatment structure for which Litton received a permit. Therefore, it is reasonable to conclude that the clarifier associated with the contamination plume is either the original treatment structure used by Litton ACD or one that Litton ACD installed to replace a previous structure that had failed. It would be highly unlikely for another company to remove the clarifier used by Litton ACD just to replace it with one matching the functional needs of Litton ACD.
- Replacement of the original piping connecting floor drains to the treatment structure appears to have occurred sometime after 1971, indicating that a problem existed with the original piping or with both the treatment structure and piping.

2

Nov. 22, 2023

- The waste disposal permit obtained by Litton ACD indicated that the company would be disposing of "acids and solvents" from the "plating, etching, and cleaning" of circuit boards. The permit included a code ("62"), indicating that Litton ACD would be operating a waste-generating process associated with "metal plating, degreasing, and tumbling."[1]

- Not much is directly known about the specific processes used by Litton ACD at 8020 Deering. What is known is that the 8020 Deering operation represented an expansion of the Litton ACD facility in Springfield, Missouri, to provide "speedier and more convenient production and delivery of prototype custom-designed circuitry," from "complex multi-layer to conventional single and double-side types" and that they contained all the equipment and processes associated with the plating, etching, and cleaning of printed circuit boards, similar to the processes at the Springfield facility but on a smaller scale in terms of size and production capacity.[2] Vandeven also points to hiring ads and ads selling equipment consistent with this description (introduced for the purpose of showing that those ads do not reference a vapor degreaser operator or vapor degreaser). He also points to patents Litton ACD obtained associated with the manufacture of multilayer boards that included a step in which the unclad side of boards were wiped with TCE or acetone before bonding. That, along with the waste disposal permit and what is included in interviews performed by Verdict Resources, is about all we know directly about the processes used by Litton ACD at 8020 Deering, none of which alters my conclusion.

- Textbooks, handbooks, and articles from approximate period in which Litton operated indicate that TCE and other chlorinated solvents were commonly used in the manufacture of printed circuit boards in that period. Therefore, an underspecified set of processes used by a printed circuit board manufacturing at the time likely involved the use of processes requiring the disposal of spent chlorinated solvents such as TCE and PCE. (Job ads and ads for equipment auctions/sales that fail to reference a vapor degreaser in no way eliminate the possibility of a process involving the disposal of concentrated spent solvents.)

- Additional support for the scenario in which Litton ACD used TCE in processes other than wiping the unclad side of printed circuit boards is that the Litton ACD facility in Springfield, Missouri, which the Canoga Park facility was an extension of, disposed of spent TCE in quantities large enough to create a TCE contamination problem at that site.[3]

- Support for a scenario in which Litton ACD released wastes into a system with faulty piping and connections is that soil samples containing high concentrations of TCE and PCE also contained high concentrations of copper and nickel,

---

[1]NGSC_0076796, NGSC_0083937
[2]*Solid State Technology*, v11, 1968, p12; multiple witness statements in Verdict Resources report, NGSC_0077067.
[3]Missouri Dept. of Natural Resources, "Litton Systems Inc. Site, 4811 West Kearney Street, Springfield," June 2022, accessed at https://dnr.mo.gov/document-search/litton-systems-inc-site-june-2022.

Nov. 22, 2023

consistent with wastes generated by Litton ACD's plating operation. Given that no other company occupying 8020 Deering after Litton ACD operated a plating line or anything similar, the most likely conclusion is that wastes released by Litton ACD were leaking into the soil.

- Based on the computer modeling performed by S.S. Papadoulus & Associates, the contamination plume is consistent with releases of TCE and PCE from the 8020 Deering facility that occurred prior to 1975, which is consistent with my conclusion regarding the use and disposal of TCE and PCE by Litton ACD. This conclusion is also consistent with the deposition of Stephen P. Larson.[4]

- The other occupants of 8020 Deering in the period before 1975 were Monroe Calculator (active in the approximate period 1971 to 1976), Biojester (active in the approximate period 1971-1973), and Material & Process Research Associates (M&PRA) (active in the approximate period 1970 to 1973). There is evidence that M&PRA may have conducted bench-scale research activity involving the use TCE and PCE at 8020 Deering Avenue based on patents that mention those chemicals. However, there is no affirmative evidence of the scale of this activity. Neither is it known whether M&PRA had access to the floor drains or, if it did, whether they were used.

Given the available data, I argue that the only plausible and likely scenario regarding the releases responsible for the contamination originating at 8020 Deering is one in which Litton ACD released spent solvents, including PCE and TCE, to a treatment structure via faulty piping that was later replaced with ABS pipe. Based on patents filed by the president of M&PRA after the company vacated 8020 Deering, there is a possibility that bench-scale research by M&PRA could have made a minor contribution to the contamination, but it cannot be established with any certainty that Kessler conducted his patent-related research at 8020 Deering or, if he did, had access to floor drains and used them to dispose of wastes containing chlorinated solvents.

<u>Core argument underlying Vandeven's opinon</u>

Vandeven argues that Litton ACD did not release the chlorinated solvents responsible for the contamination plume.

- Vandeven argues that there is a lack of direct evidence indicating that Litton ACD operated a vapor degreaser. This conclusion is reached primarily from the absence of its specific mention in the scant record that remains regarding Litton ACD's activities at the property: hiring ads placed by Litton ACD do not mention a position for a vapor degreaser operator and auction/sale ads do not mention the

---

[4]Expert Report of Matthew J. Tonkin, PhD, in the matter of *Jed and Alisa Behar v. Northrop Grumman Corporation and Northrop Grumman Systems Corporation*, U.S. District Court, Central District of California, Case No. 2:21-cv-03946-HDV-SK, Sept. 27, 2023, Opinion; Deposition of Steven B. Larson, March 25, 2003, p. 22.

4

Nov. 22, 2023

sale of a vapor degreaser. Vandeven also uses a patent that mentions a manual cleaning process in which solvents (including TCE) are used only in non-bulk amounts to support the point that there is a lack of direct evidence for other processes involving the use of TCE.[5]

- Vandeven argues that there is a lack of direct evidence that Litton ACD released wastes into the treatment structure associated with the contamination plume. He argues that the permit obtained by Litton ACD describes a 3-stage clarifier made of fiberglass while the treatment structure that was removed was a concrete structure with, in Vandeven's view, a 4-stage clarifier. The replacement of the piping connecting floors drains to the clarifier is used to support a highly unlikely scenario in which another company for unknown reasons removed a working fiberglass clarifier and its associated piping and replaced it with a functionally similar concrete clarifier in another location.[6]
- Vandeven argues that there is evidence in the form of patents suggesting that M&PRA carried on research activity involving TCE and other chlorinated solvents at 8020 Deering.[7]
- Vandeven argues that there is evidence that the toner manufacturers Black Copy and Graphic Technologies used chlorinated solvents in some manner given the presence of the breakdown products of TCE in samples taken from the clarifier in 1989, the presence of PCE and TCE in samples taken from the clarifier in 1999, and the presence of PCE and TCE from samples taken from the clarifier and associated piping in 2003.[8]
- Vandeven argues that historical documents demonstrate that Litton ACD complied with permitting requirements.[9]

Therefore, according to Vandeven, it is reasonable to conclude that a company other than Litton ACD, most likely M&PRA, Black Copy, or Graphic Technologies, was the likely source of the wastes that entered the soil in the vicinity of the treatment structure and associated piping.

3. Points of disagreement

The following are points underlying one opinion or the other where there is disagreement:

a. whether the concrete structure associated with the chlorinated solvent contamination plume was the treatment structure used by Litton ACD;
b. the significance of the 2003 inspection indicating the presence of plastic ABS pipe;

---

[5]Vandeven Report, pp. 17-23
[6]Vandeven Report, pp. 24-27
[7]Vandeven Report, pp. 28-30
[8]Vandeven Report, pp. 30-31.
[9]Vandeven Report, p. 32.

Nov. 22, 2023

c.   the significance of patents obtained by Litton ACD that mention wiping boards with a "pad dampened in acetone or trichlorethylene";
d.   the relevance of Litton ACD's operation in Springfield, Missouri, disposing of quantities of TCE sufficient to cause a contamination problem at that site;
e.   the significance of Litton ACD hiring ads that do not mention a position for a vapor degreaser operator and Litton ACD ads advertising equipment for sale that do not mention a vapor degreaser;
f.   the relevance of textbooks and handbooks that identify TCE as a commonly used solvent in printed circuit board manufacturing operations circa 1970;
g.   the accuracy of hydrological modeling indicating that releases of the chlorinated solvents responsible the contamination plume occurred before 1975;
h.   the significance of patents obtained by Saul Kessler;
i.   the significance of chlorinated solvents in clarifier wastes long after Litton ACD ceased operations;
j.   the integrity of the ABS pipe; and
k.   the use of information in the Verdict Resources report.

a.   <u>Whether the concrete structure associated with the chlorinated solvent contamination plume was the treatment structure used by Litton ACD</u>

Vandeven argues that the permit obtained by Litton ACD describes a three-stage fiberglass clarifier while the treatment structure associated with the contamination plume was a four-stage concrete clarifier. Furthermore, he asserts there is no reason to believe that a fiberglass structure would be located in the same area as the concrete structure.[10] The implication is that Litton ACD released their wastes into a treatment structure with tightly sealed piping and then a later company replaced that working treatment system with a closely matching concrete structure, placing it and all the associated piping in a different location.

Vandeven's analysis on this point is flawed. First, there is clear evidence that the clarifier associated with the contamination plume exactly matches the functional specifications of the treatment structure described in Litton ACD's permit. The concrete treatment structure associated with the plume is a three-stage clarifier with a sample chamber, which is exactly what the permit describes. Second, there is no evidence or reason to believe that any company removed a working fiberglass structure and replaced it with a functionally equivalent treatment structure—one meeting Litton ACD's needs, not theirs—in an entirely different location.

The basis for the disagreement is that the 1968 permit includes these lines:[11]

Required treatment facility: 3cc-?x3'x3' B.I. WITH SAMPLE BOX

---

[10]Vandeven Report, pp. 25-27.
[11]NGSC_0076796

Nov. 22, 2023

Additional information: CLARIFIER IS 1250 GALLON FIBERGLASS
THIS FIRM WILL INSTALL PH METER & DOSING SYSTEM

(The depth of the working chambers is identified above with a "?" to indicate an illegible character on the permit.)

Vandeven argues that the 1968 permit does not describe the clarifier that was removed for two reasons: (a) first, because the "additional information" provided in the permit indicates that "Clarifier is 1250 gallon fiberglass," indicating that it was made out of fiberglass not concrete, and (b) second, because, the treatment structure that was removed had four chambers large enough to qualify it as a four-stage clarifier.[12]

Vandeven's analysis is flawed because the clear evidence is that the functional specifications of the "required treatment facility" in the 1968 permit matches what was removed in 2006, which was a treatment structure with three working chambers having a cross section of 3' by 3' and a smaller chamber serving as a sample box. A 2003 photo of the concrete clarifier supports this interpretation.[13] It shows that the cross section of the sample box, the last chamber closest to the sewer connection, is visually smaller than that of the three working chambers. In addition, the 1998 Phase One assessment describes the structure associated with the plume in this way: "The clarifier near the southwest corner of the building is 15 feet long, 5½ feet wide, and approximately 7 feet deep with three settlement chambers and a fourth shallower outlet chamber."[14]

The two reports also disagree on the possible meaning of "cc" in the description of the "required treatment facility," whether the handwritten character indicating the depth of the structure is legible in the permit, and whether the word "fiberglass" might refer to a liner or something other than the structural material, and the relevance of there being no evidence that a fiberglass structure was ever removed—but these discussions are tangential. The obvious question is why would any company after Litton ACD abandon a working clarifier and install a treatment structure with the same functional specifications—specifications that fit Litton ACD's needs, not theirs—and to place the new structure in a different location, even if that meant ripping up all the piping and re-routing it?  The only plausible explanation is that no company did.

b.  <u>The significance of the 2003 inspection indicating the presence of plastic ABS pipe</u>

In 2003, an inspection of the pipes connecting abandoned floor drains to the concrete clarifier were determined to be ABS plastic piping.[15] The pipes are relevant to this

---

[12]Vandeven Report, pp. 25-27.
[13]NGSC_0061451
[14]NGSC_0068506, NEI Preliminary Site Assessment, p. 13.
[15]NGSC_0061966, depo of G. Tofani; NGSC_0061451, photos from G. Tofani cleanout

7

Nov. 22, 2023

discussion because the pattern of contamination underlying the building is consistent with releases in the channels associated with the piping. That the pipes were made out of ABS plastic is also significant because the Los Angeles plumbing code did not allow the use of ABS plastic until some time between 1971 and 1974 (corresponding to known editions of the plumbing code that <u>did not</u> and <u>did</u> allow the use of ABS pipe in building sewers).[16]

I argue that the replacement of the piping used to carry Litton ACD's wastes to the treatment structure suggests a failure in the original piping. This scenario is consistent with high concentrations of copper and nickel present in the soil samples. These are wastes associated with plating processes, and Litton ACD was the only company that operated a plating process or anything similar.

Vandeven embraces a scenario that is inconsistent with the available data. He appears to be arguing that the original piping used by Litton was tightly sealed and any leakage of waste occurred sometime after Litton ceased operations. This scenario is inconsistent with high concentrations of copper and nickel in soil samples.

c.  <u>The significance of patents obtained by Litton ACD that mention wiping boards with a "pad dampened in acetone or trichlorethylene"</u>

Vandeven points to patents assigned to Litton Systems associated the manufacture of multilayer printed circuit boards.[17] Two mention the use of TCE to clean the unclad sides of boards after being roughened with sandblasting to improve bonding with other surfaces. Specifically, they describe the board as "being wiped with a suitable pad dampened in acetone or trichloroethylene." In such applications, Vandeven notes, any TCE present would evaporate and there would be no need for the disposal of spent solvents in concentrated form. Vandeven concludes, based on these patents, that Litton ACD did not use TCE in other processes not described by the patents.

Vandeven's logic is flawed and his conclusion unfounded. The description of how TCE is used in one step of a patent application does not eliminate the possible use of TCE in steps and processes not covered by the patent. For example, Vandeven's logic would also apply to Litton ACD's main facility in Springfield, Missouri. Yet that facility disposed of TCE in concentrations sufficient to cause a contamination problem at that site.[18]

d.  <u>The relevance of Litton ACD's operation in Springfield, Missouri, disposing of quantities of TCE sufficient to cause a contamination problem at that site</u>

---

[16]NGSC_0056746, plumbing codes.

[17]Vandeven report, pp. 23-24

[18]Missouri Dept. of Natural Resources, "Litton Systems Inc. Site, 4811 West Kearney Street, Springfield," June 2022, accessed at https://dnr.mo.gov/document-search/litton-systems-inc-site-june-2022.

Nov. 22, 2023

Vandeven argues that any comparison between the Litton ACD facility in Springfield, Missouri, and the facility at 8020 Deering is not appropriate because the Springfield facility was much larger than the facility at 8020 Deering Ave (approximately 600 versus anywhere from 40 to 150 employees)[19], operated for a much longer time (decades versus multiple shifts for approximately 2 years), employed different disposal methods (pits vs sanitary sewer connection), and is in an area with different soil/geological formations.[20]

I argue that differences in size, disposal methods, and soil and geology are irrelevant to the question of what production processes were used. The point here is that the Deering Avenue facility represented an expansion of the operations performed at the Springfield facility. Vandeven's observation that patents obtained by Litton only describe processes in which any TCE used would have evaporated would also apply to the larger Springfield facility. Yet that facility disposed of TCE in quantities sufficient to cause a contamination problem at that site, indicating that scenario in which Litton ACD also used chlorinated solvents in ways not described in the patent are completely plausible.

e. <u>The significance of Litton ACD hiring ads that do not mention a position available for a vapor degreaser operator and Litton ACD ads advertising equipment for sale that do not mention a vapor degreaser</u>

When Litton ACD was hiring for positions associated with its printed circuit board manufacturing operation at 8020 Deering, it advertised positions for: "inspector," "laminator," "quad drill operator," "tape drill operator," "expediter,"  and "lab assistant" in one ad (March 24, 1968, Van Nuys News); "estimating," "fabrication," "inspection," "lamination," "processing," "production control," "plating," "planning," "silk screening," "tape drill," and "touch up" in another (April 23 1968, Van Nuys News); "silk screening, fabrication, lamination, chemical lab techs, touch-up, stock room clerk, and drilling" in another (June 2, 1968, Van Nuys News); a person to "plan printed circuit board manufacturing cycle through all phases of in-process work" in another (June 9, 1968, Van Nuys News); and someone to "prototype," requiring an "ability to perform all operations necessary to manufacture printed circuit boards" during the second shift (Oct 29, 1968, Valley News). In addition, after ceasing operations, Litton ACD published announcements that they were selling "circuit board mfgr. equip. incl. tape drills, Riston equip., & full plating lines (Feb. 4, 1971, LA Times) and auctioning off a range of office equipment and machines, including plating and rinse tanks (Feb 21, 1971, LA Times)[21]

---

[19]Vandeven estimates 40 (Vandeven report, p. 8) ; a former Group Controller of Litton estimates 60-70 (NGSC_0077067, Verdict Resources, Krueger interview); and a former vice president of Litton ACD placed the estimate as high as 100-150, perhaps taking into account multiple shifts (NGSC_0077067, Verdict Resources, Guyette interview).

[20]Vandeven report, pp. 40-41.

[21]Vandeven report,

9

Nov. 22, 2023

Vandeven argues that the lack of any mention of a vapor degreaser in these ads indicate that Litton ACD did not make use of a vapor degreaser in their production line and therefore is not the likely source of wastes containing spent solvents in concentrated form.[22]

Vandeven's logic is flawed. First and foremost, the assumption that underlies this flawed logic is that the record we have for the hiring and liquidation of operations is complete. The lack of vapor degreaser operator in hiring ads and the lack of a vapor degreaser in lists of equipment for sale does not eliminate scenarios involving the concentrated releases of spent chlorinated solvents by Litton ACD, either through the use of a vapor degreaser or other process requiring the disposal of spent solvents. Categorically eliminating scenarios involving the disposal of spent chlorinated solvents on the basis of job ads and lists of equipment for sale that do not mention a vapor degreaser is unjustified. Other scenarios are entirely possible, such as: the record of hiring represented by the ads not being complete; some job positions being subsumed under another; some equipment being shipped back to Springfield, previously sold, or scrapped; and the use of processes not involving a vapor degreaser that still required the disposal of spent solvents.

f.  <u>The relevance of textbooks and handbooks that identify TCE as a commonly used solvent in printed circuit board manufacturing operations circa 1970</u>

Vandeven argues that it is inappropriate to refer to textbook descriptions of processes used in printed circuit board manufacturing because textbook descriptions are not specific to processes used at 8020 Deering and do not prove anything about those processes. He devotes much of his rebuttal arguing against a point that I did not make.[23]

My point was <u>not</u> to definitely prove that Litton ACD used one process or another but to test a scenario involving the release of chlorinated solvents by a printed circuit board manufacturer.  A relevant question when examining a scenario involving the disposal of chlorinated solvents by a manufacturer of printed circuit boards is whether such a scenario is even plausible, and the technical literature overwhelming indicates that the answer is yes, such a scenario is common. The literature indicates that the manufacturing of printed circuit boards is a complex operation, one in which chlorinated solvents, including TCE and PCE, are used in multiple processes. Given that Litton ACD's operation at 8020 Deering involved relatively small runs, justifying full-time positions for a planner and someone to "prototype", it was even more complex than operations involving large production runs. This assessment is reinforced by Verdict Resources' summary of the comments made by a former Litton

---

[22]Vandeven report, pp. 17-18
[23]Vandeven report, pp. 41-45.

Group Controller, who had inspected the operation at 8020 Deering and indicated that "the circuit boards they were attempting to produce were very complex" and "they were handling small lots sizes of boards, no more than a few hundred at a time in the production process." It is also consistent with a scenario in which chemicals might be changed and disposed of more frequently than one might expect.

My report points to vapor degreasers as the most likely process involving the disposal of spent solvents but textbooks also show that processes allowing for the concentrated releases of chlorinated solvents without a vapor degreaser are also plausible. For example, the volume *Printed Circuit Handbook* (1979), describes the use of TCE as a possible agent for "thoroughly rinsing" boards during the "development" process.  (See Figure 1.)  This indicates that the use of a vapor degreaser at 8020 Deering, which has not been ruled out, is not required to establish a plausible scenario.

g. <u>The accuracy of hydrological models indicating that releases of chlorinated solvents responsible for the contamination occurred before 1975</u>

Vandeven argues that the method used by S.S. Papadoulus & Associates to identify the release timeframe as being before 1975 is circular.[24]

Vandeven's assertion of circular logic is unjustified. In the case of the hydrological modeling, Gorman's understanding is that S.S. Papadoulus & Associates determined the pre-1975 timeframe for the releases responsible for the contamination by running computer-based simulations of chemical transport models starting at different years to determine which starting years resulted in patterns that best matched the existing plume. The timeframe demonstrated by S.S. Papadoulus & Associates is consistent with the opinions expressed in the deposition of Steven B. Larson, whose 2003 chemical transport modelling placed the responsible releases as occurring between 30 and 35 years earlier (1968 to 1973).[25] This modeling simply provides another line of evidence establishing the consistency of a scenario involving releases in the timeframe that Litton ACD operated at the facility.

h. <u>The significance of patents obtained by Saul Kessler</u>

Vandeven points to several patents assigned to Saul Kessler that describe the use of TCE and PCE in patents, both as a component used in the bench-scale production of coatings and in the use of TCE in its vapor phrase to clean a test object (a cylinder approximately 35" x 1"). Vandeven then presents calculations that suggest Kessler's

---

[24]Vandeven report, p. 54.
[25]NGSC_0061830, Deposition of Steven B. Larson, March 25, 2003, p. 22.

research activity, repeated many times constantly over seven years, could result in the disposal of sufficient solvent to be responsible for the contamination plume.[26]

Vandeven's assumptions about the intensity of Kessler's research activity at 8020 Deering are unjustified. First, the assumption that Kessler was active at 8020 Deering for 7 years appears unfounded. In July 1970, Kessler filed for articles of incorporation under the name Materials & Process Research Associates, with he, Eileen Helfinstein (Kessler), and Carl Cagan as the company's first directors. He and his wife list their addresses as "7020 Rivol Rd., Canoga Park, Calif."; Cagan's address is listed as "192 College Park Dr., Seal Beach, Calif." The address 8020 Deering Avenue does not appear, only a statement that the principal office would be located in Los Angeles country.  The 8020 Deering Avenue address for M&PRA appears on a "Statement By Domestic Corporation" filed with the California Secretary of State in September 1971.[27]  The report prepared by Verdict Resources indicates that, "in its filings with the California Secretary of State," M&PRA "declared that its business address was 8020 Deering from 1970 until its suspension in 1973."[28] Based on those dates, M&PRA operated at 8020 Deering only for approximately three years. Vandeven's assumption that M&PRA operated at 8020 Deering until 1977 likely comes from Kessler's patents. One is a re-issued patent (normally associated with correcting an error) filed in 1977. Neither that patent or his earlier patents make any mention of M&PRA or Deering Avenue.  In each, the applicant is identified as "Saul Kessler, Canoga Park, Calif.," which is consistent with the address identified in his articles of incorporation, presumedly his home address.

Second, when interviewed by Verdict Resources, Carl Cagan indicated that he was involved "in name only," which suggests that M&PRA was a small company, if not a one-person operation. In addition, the liter-scale mixtures identified in the patents are described as resulting in copious "fluffy, waxlike, gelatinous" reaction products, which would reduce the quantity of concentrated chlorinated solvent wastes Vandeven describes as necessary to produce the type of plume originating at 8020 Deering. Furthermore, it is not known where in the building M&PRA was housed and whether Kessler had access to floor drains or, if he did, whether he even used them. Given that Kessler operated in the building at the same time as the manufacturing company Biojester (which began operations in 1971), his space may not even have been located in the area serviced by the floor drains.

i. <u>The significance of chlorinated solvents in clarifier wastes after 1989</u>

Vandeven argues that the operations of Black Copy and Graphic Technologies (or, potentially, companies operating after them) were more likely to be sources of the

---

[26]Vandeven, p. 28-30; US patent 4,004,064; US patent 3,996,115; US patent 4,031,027; US patent RE 2,852
[27]NGSC_0082241, M&PRA Corp Docs
[28]Verdict Resources, p. 7, NGSC_0077067.

Nov. 22, 2023

concentrated chlorinated solvent releases responsible for the contamination plume than Litton ACD. He bases his conclusion on samples of sludge taken from the clarifier in 1989 that contained the breakdown products of TCE, samples taken from the clarifier in 1999 that contained TCE and PCE, and samples from the piping in 2003 that also included TCE and PCE.[29]

The conclusion that Black Copy, Graphic Technologies, or companies operating after them were more likely to be responsible for the contamination plume than Litton ACD is unjustified for several reasons. First, it is possible that Black Copy or Graphic Technologies used chlorinated solvents in limited applications, enough to be detected in the toner-waste sludge released to the clarifier but there is no indication that the toner manufacturers employed chlorinated solvents in processes requiring the routine disposal of spent solvent in concentrated form, which Vandeven indicates would be necessary to produce the plume that exists. Second, there is no evidence that the ABS piping was faulty, removing the focus on companies that disposed of wastes after that pipe was installed. Given that Tofani reports that black powdery wastes were present in the piping 2003, which is consistent with wastes associated with toner manufacturing, the piping is unlikely to have been replaced by companies operating after the toner manufacturers. Furthermore, as far as I am aware, there is no indication that the black powdery wastes from either of the toner manufacturers reached the soil or that these companies replaced the piping. Third, as noted previously, experts report that computer modeling of chlorinated solvents releases occurring in the period before 1975, which is before these companies operated, are consistent with the existing plume.

### j.   The integrity of the replacement ABS pipe

Vandeven's argument suggests that the ABS pipe rather than the original piping was faulty.

The reverse would seem to be the case for at least three reasons. First, the presence of copper and nickel wastes in the soil indicates that the problem lay with piping used by Litton ACD, not the ABS pipe. Second, there would be no reason to replace piping that had not failed. (Vandeven suggests that the piping was replaced because an unknown company with unknown reasons decided to abandon a working clarifier and to replace it with a concrete clarifier having the same functional specifications in a different location. As noted earlier, this logic is flawed.) Third, in 2003, when the ABS pipe was cleaned out and inspected, no obvious leak was identified. Glenn Tofani, after inspecting a video of the inside of the cleaned-out pipe, describes an area of standing water caused by an undulation in the piping channel that could have been the area of the leak, but the standing water suggests no leak was present at that

---

[29]Vandeven, p.26.

13

Nov. 22, 2023

time.[30] In any case, Tofani did not describe the ABS or any of its connections as having failed.

It is not known when the original piping was replaced. Based on plumbing codes available for review,[31] it had to be after 1971 as that plumbing code did not allow for ABS pipe to be used in building sewers. Replacement in 1974 and after was clearly possible as that edition of the plumbing code allows for plastic pipe. However, in the absence of knowing what was allowed in 1972 and 1973, replacement of the pipe in those years would not conflict with the available data.

k.  The use of information in the report by Verdict Resources

Vandeven is critical of my use of information from the report prepared by Verdict Resources, which is a report prepared for Litton in 2000 on the historical land use and operations history for 8020 Deering Avenue.[32] It built on previous research performed by National Environmental Inc. in association with its 1998 preliminary site assessment. It also included witness statements from 19 individuals.

For example, Vandeven criticizes my statement that the Verdict Resources "offered no conclusions other than to recommend further investigation" as misleading.[33] However, what the Verdict Report literally recommends is "additional investigation into the nature of certain 1960s and 1970s business tenants in Tables 1 and 2. Because two witnesses have identified a nearby circuit board manufacturing operating in about 1970, it is probable that it and its processes can be identified as a possible contributing source of ground water contamination." In three additional bullet points, the report also recommended more research into the use of an underground storage tank at 8000 Deering Ave., an expanded search of Black Copy's bankruptcy filing, and a search for more information about Graphic Technologies. The Verdict Resources report, in fact, makes no conclusion about the source of the contamination, which was my point. Vandeven's intent appears to question why I did not conduct additional research in the areas suggested by Verdict Resources. My understanding is that experts have established that releases of chlorinated solvents responsible for the contamination originated in the area around the clarifier and the associated piping, and so my focus on the use of the clarifier before the original piping was replaced is appropriate.

Another example is a criticism by Vandeven of my statement that "nothing in the description of Black Copy's processes indicates the routine use of TCE as part of the production process," suggesting that I was using information in the Verdict Resources

---

[30]Tofani deposition, NGSC_0061966
[31]NGSC_0056746
[32]NGSC_0077067, Verdict Resources.
[33]Vandeven Report, p. 46.

14

report uncritically and that more of my research should have been focused on that operation.[34] However, for the reasons articulated above and in sections a, b, e, f, and g of this comparison, my focus on the use of the clarifier by Litton ACD and on the use of chlorinated solvents in the manufacturing of printed circuit boards was and is appropriate. In addition, experts such as David L. Bauer have also reached the conclusion that the processes used by the toner manufacturers could be eliminated as a potential source of the wastes responsible for the plume.[35]

Vandeven also questions why I am accepting of some information in the Verdict Resources report, such as the description of the toner manufacturing process provided by witnesses (further discussed above), but less accepting of information in other areas, such as in the statements of Litton ACD employees from Springfield, Les Bown and Jerry Estes, who were sent to 8020 Deering Avenue on various assignments. Both indicate that another printed circuit board manufacturer operated in the area, suggesting that the other operation might be responsible—and Vandeven questions why I did not follow that line of argument in searching for a plausible scenaro.[36] He also notes that their statements (and in the case of Estes, a later deposition) indicate that they were not aware of the chlorinated solvents TCE and PCE being used in a form that would result in concentrated disposal of spent solvents—and questions why I would not put more weight on their statements.

As mentioned earlier, my understanding is that sampling has established that releases of chlorinated solvents responsible for the contamination originated in the area around the clarifier and the associated piping, and so my focus on 8020 Deering and the use of the clarifier (rather than operations elsewhere) is appropriate. Furthermore, I do not place as much weight on Estes and Bown's lack of knowledge about the use of TCE in Litton ACD's operation as I do on aspects of the Verdict Resources report that provides affirmative evidence, just as I do not assume that ads lacking a reference to a vapor degreaser or a vapor degreaser operator automatically rule out processes requiring the disposal of spent solvents.

## 4.  Methodological Differences

In historical analysis, several basic steps involve critically evaluating the available data (artifacts, primary sources, secondary sources, etc.), proposing hypotheses (scenarios, narratives, etc.), and testing those hypotheses against the available data. In this case, the available data includes facts on the ground that cannot be ignored, such as a cement treatment structure that meets the functional specifications of Litton ACD's disposal permit, piping that appears to have been replaced, and copper and nickel wastes and chlorinated solvents in the soil around the treatment structure and its associated piping.

---

[34]Vandeven Report, p. 47.
[35]NGSC_0054005, Deposition of David L. Bauer, March 18, 2003.
[36]Vandeven report, p. 49.

Nov. 22, 2023

I propose a coherent scenario that takes the artifactual evidence into account and, in areas where less is known, tests that data for consistency with the technical literature, chemical transport models performed by experts, and simple logic.

Vandeven claims to have employed a "holistic view"[37] but that is not evident in his approach. He does not present a coherent scenario that explains the artifactual evidence. What he does do is to focus on narrow pieces of data (e.g., ads, patents, and several examples of Litton ACD compliance) and suggests that this data demonstrates that Litton ACD did not use processes requiring the disposal of spent chlorinated solvents such as TCE and PCE.

## 5.  Summary

In my opinion, based on the material reviewed and taking Vandeven's expert report into consideration, Litton ACD--which I conclude was disposing of its wastes to a treatment structure via a system of piping that was faulty, had wastes that reached the soil, and was using processes similar to another operation that disposed of TCE in quantities sufficient to cause a contamination problem at another site—was the source of chlorinated solvents responsible for the contamination plume at 8020 Deering. There is a possibility that Saul Kessler used TCE and PCE in research activity conducted at 8020 Deering in the period 1970 to 1973 and a possibility that wastes from that research made a minor contribution to the contamination found at 8020 Deering, but that contribution would not have been significant and cannot be established with any certainty.

---

[37]Vandeven report, p. 13.

**19. Developing**  The developing operation consists in the removal of the soluble photoresist material. Which developing solution is used depends upon the type of photoresist. Various solvents, such as TCE, mixtures of alcohol and Stoddard solvent, xylene, and

**Image Transfer    6-19**

commercial developers, are available for negative-acting resists. The positive-acting resists are readily solubilized by acetone, ketones, esters, and commercially available alkali-base developers.

The developing operation is preferably carried out in a deep narrow tank with an internal spray. Simple immersion may also be used, but spraying will generally yield the ultimate in resolution. Ultrasonic agitation during immersion has been found to aid the development process. Several developing tanks may be used to ensure cleanout.



(a) NEGATIVE-ACTING PHOTORESIST

(b) POSITIVE-ACTING PHOTORESIST

**Fig. 6.7**  Coving of negative- and positive-acting photoresists.

The time for the developing operation is dependent upon the type and thickness of resist, the developer, and the method used. Typical times are about 2 to 3 min.

*a. Rinsing.*  After the developing is complete, the coated substrate is thoroughly rinsed in the developing solution, TCE, xylene, or acetone. A deionized water spray rinse or a dye bath followed by a water rinse completes the developing operation.

*b. Dyeing.*  Dyeing is used to reduce retouching time on regular printed boards either plated or print-and-etched. When the ultimate in fine-line images or the best in chemical resistance is required, dyeing is not recommended. Techniques using photographic developers with silver have been used in place of dyeing, but they involve problems of poor color contrast, silver contamination, and discoloration.

Figure 1. Description of a process involving the use of chlorinated solvents not involving the use of a vapor degreaser. (Clyde Coombs, ed., *Printed Circuit Handbook*, New York, McGraw Hill, 1979).

17