# EXHIBIT 17

# Dr. Mark Kram's Rebuttal of Defendants' Expert Reports

In the Matter Of:

## Jedidiah and Alisa Behar, et al.

## v.

## Northrop Grumman, et al.

## Case No: 21-cv-03946-HDV-SK

**November 15th, 2023**

In the Matter Of:

# Jedidiah and Alisa Behar, et al.

# v.

# Northrop Grumman, et al.
# Case No: 21-cv-03946-HDV-SK

I declare under the penalty of perjury that the following is true and correct, to the best of my information and belief. Executed on the 15th of November 14, 2023, at Goleta, California

Mark L. Kram, Ph.D.

# Contents

Section 1. Introduction and Methodology ...................................................................................1

Section 2. General Challenges Associated with the Defendants' Expert Opinions .....................................2

Section 3. Review and Rebuttal of Defendant's Expert Reports.....................................................8

    Mr. Robbie Ettinger Expert Report dated 10/24/23..................................................................8

    Mr. Bart Eklund Expert Report dated 10/24/23.......................................................................34

    Mr. Murray Einarson Expert Report dated 10/24/23...............................................................52

Section 4. Facts and Data Considered by Witness in Forming Opinions....................................65

Section 5. Figures Used to Summarize and Support Opinions.....................................................78

Section 6. Qualifications..............................................................................................................91

    Relevant Publications and Presentations Over Past Twenty-Five Years.................................93

Section 7. List of Cases Over Previous 4 Years for Which Testimony Was Given as Expert at Trial or by Deposition ...............................................................................................................98

Section 8. Statement of Compensation.......................................................................................98

Appendix A (Curriculum Vitae).................................................................................................99

Dr. Kram Rebuttal of Defendants' Expert Report; Behar v. Northrop Grumman      i

## Section 1. Introduction and Methodology

I have been retained by the Lanier Law Firm on behalf of the Plaintiffs to provide scientific review, analysis, and opinions concerning groundwater and soil contamination in and around the City of Canoga Park, California, resulting from the Former Northrop Grumman Facility where Defendants'[1] manufacturing and chemical discharge activities occurred hydraulically upgradient from the residential neighborhood. The Former Northrop Grumman Facility is located at 8020 Deering Avenue in Canoga Park, California (Figure 1). The Canoga Park Residential Class Area and the Defendants' groundwater contaminant plume extent are depicted in Figure 2.

In preparation for my Expert Report (submitted on September 27, 2023; supplemental submitted on October 6, 2023) I reviewed numerous documents from the public and litigation record and analyzed multiple lines of evidence to reach several opinions in this case. I offered these opinions to a reasonable degree of scientific certainty based on my review of these documents as well as my education, training, and experience that spans close to four decades in the fields of hydrogeology, environmental assessment, geochemistry and, specifically, my extensive vapor intrusion and chlorinated solvent assessment experience.

I have reviewed technical opinions prepared by several of the Defendants' consulting experts on or around October 24, 2023, and have prepared this written response. The reports I reviewed include opinions generated by Mr. Robert Ettinger, Mr. Bart Eklund, and Mr. Murray Einarson. This response is organized to include two main sections. The first section summarizes general challenges to the Defendants' expert opinions that encapsulate several common themes while establishing important facts that render several of their opinions flawed and inconsistent with their own findings and claims as well as state and federal regulatory agency recommendations and industry "best practices" designed to unequivocally derive correct conclusions with the primary objective aimed at preventing public exposures. The second section addresses key flaws associated with specific itemized claims (organized according to page numbers, sections, and specific claims) proposed by each of the Defendants' experts. Please note that I refer to specific pages of the pdf files provided to attorneys for the Plaintiffs.

In this report I have provided these opinions as well as the basis for these opinions. The process of formulating these opinions is based upon my formal education and over 39-years of professional experience in the fields of chemistry, geology, hydrogeology, geochemistry, spatial statistics, environmental science, contaminant fate and transport, field and laboratory analytical technologies, and site characterization and remediation. My Ph.D. work (dissertation entitled "*DNAPL Detection Using Optimized Fluorescence Methods*") and related laboratory and

---

[1] The term "Defendants" in this report refers to the named parties (including Northrup Grumman Corporation, Northrop Grumman Systems Corporation, and their predecessors) and their consultants and representatives that have provided environmental services regardless of whether they worked directly for any Defendant, as all the consultants involved in this effort have collaborated, adopted and propagated the Defendants' investigative and interpretive reports, approaches and conclusions.

Dr. Kram Rebuttal of Defendants' Expert Report; Behar v. Northrop Grumman                 1

field efforts and publications are of relevance to this case. I have also relied upon my review of reports made available to me, my review of publications generated by other industry experts, and by direct observation at sites I've worked on that share similar characteristics and challenges. Specific documents and publications are listed in the section entitled "Facts and Data Considered by Expert in Forming Opinions" and include materials generated by the Defendants' consultants, expert reports, standard methodologies, as well as recent revelations regarding adequacy of current standard practices when deriving conclusions and decisions associated with sites where groundwater and vapor transport and chemical exposure pathways are of concern. Specific recent observations regarding adequacy of current groundwater and vapor assessment standard practices include my personal field observations at the Behars' home in the plume area, from more than one hundred hazardous waste sites I've characterized, from my published efforts (Kram 1998, 2002, 2003, 2004, 2006, etc.; Kram *et al*. 2000, 2001, 2002, 2004, 2008, 2011, 2013, 2015, 2016, 2019, 2020, 2022, etc.), and from efforts sponsored by the US Department of Defense (US DoD), the US Environmental Protection Agency (USEPA), the American Society of Testing and Materials (ASTM) and the National Ground Water Association (NGWA). I have also relied upon related policy and technology trends supported by the USEPA and US DoD technology and policy leaders regarding adequacy of standard practices for assessing vapor intrusion and dense non-aqueous phase liquid (DNAPL) related risks. In addition, I have relied upon changes in toxicological interpretation regarding exposure risks and the associated policy changes recently implemented by the USEPA and state regulatory agencies.

My analysis, evaluations and opinions contained in this Report are provided to a reasonable degree of scientific certainty. Given the voluminous nature of the documents produced regarding this matter, I reserve the right to further identify additional records and to supplement my analysis and opinions should additional facts that I have not previously considered become available during this endeavor.

## Section 2. General Challenges Associated with the Defendants' Expert Opinions

While there are multiple challenges associated with the Defendants' expert opinions, I describe several below that were selected based on the common thread they represent in each of the experts' reports.

1)  <u>Defendants' Experts Each Claim There is No Vapor Intrusion (VI) Risk</u> – The experts rely upon indoor and crawl space data that were not collected under "conservative" conditions and that do not adhere to USEPA's recommended VI risk decision criterion described as the Reasonable Maximum Exposure (RME). RME occurs when VI "on" conditions occur (e.g., conducive to vapor transport upward through the soil column into overlying structures). As such, the crawl space and indoor vapor data collected to-date are not appropriate for deriving VI risk-based decisions such as whether to mitigate or what constitutes an appropriate conservative attenuation factor (AF) for various media (e.g., soil vapor or groundwater). The data are also not appropriate for concluding whether a VI risk exists, as the tendency would be to underestimate indoor

concentrations given that samples did not adhere to agency recommendations specifically derived to err on the side of caution and reduce the potential for false negative results. This is consistent with Dr. Helen Dawson's testimony under oath (excerpts listed below). Dr. Dawson is one of the Defendants' key consultants.

Dr. Dawson stated the following under oath on February 3rd, 2023 (Dawson, 2023a):
"*If you're going to do a risk assessment, then the guidance is you need to estimate a reasonable maximum exposure -- if you're going to walk away from a site.*"

Dr. Dawson later reiterated the following:
"*In order to walk away from a site, that -- as done as needing no further action, that has to be based on a reasonable maximum exposure and formal risk assessment.*"

In a more recent deposition (Dawson deposition, September 13, 2023; Dawson, 2023b), in reference to the off-site Canoga Park investigation, the following exchange transpired:
Counsel: "*Okay. You cannot identify the reasonable maximum exposure by doing such an investigation; right?*"

Dr. Dawson: "*As I've described, the purpose of this [Canoga Park] investigation was not to calculate RMEs. It was to contain -- or collect indoor air and crawl space samples for comparison against screening levels.*"

This discussion continues as follows:
Dr. Dawson: "*So for a risk from the vapor intrusion pathway contribution to indoor air, for the purposes of this investigation, a formal risk assessment isn't necessary.*"

Counsel: "*The risk has not been fully characterized. That was not your objective; right?*"

Dr. Dawson: "*It was not in the scope to conduct a formal risk assessment. Our scope was to evaluate the sampling data that were collected.*"

Counsel: "*My question was: Was your objective to fully characterize the risk? You said no, it was not. It was to do a screening assessment. Is that still your testimony?*"

Dr. Dawson: "*That's correct.*"

Counsel: "*Okay. And a formal risk assessment to fully characterize the risk has not been done; correct? To your knowledge.*"

Dr. Dawson: "*To my knowledge, that is my understanding.*"

Given Dr. Dawson's admission that the Class Area vapor intrusion investigation represents a "*screening assessment*", it is not appropriate for concluding there is no VI

risk (as was claimed by Mr. Ettinger, Mr. Eklund and Mr. Einarson). While more accurate data would be required to better understand the community exposure risks (consistent with Dr. Dawson's testimony), given the time needed to achieve this, a more appropriate option would be to mitigate and resolve exposure risks in the immediate term. Consistent with state and federal regulatory guidance (including USEPA and Interstate Technology and Regulatory Counsel, ITRC), given that large sites require efficient decision-making, and that mitigation can be used in lieu of a complete evaluation of the VI pathway, pre-emptive mitigation is warranted due to the uncertainties that exist and the fact that groundwater remediation will require years (at least) in the Class Area.

2) <u>Defendants' Experts Rely Upon Groundwater Data that is Outdated to Draw Conclusions About the Existence of a Freshwater Lens</u> – The Defendants' experts rely upon Hydropunch groundwater sample data collected approximately 8 years ago to draw conclusions about current shallow groundwater concentrations and the presence of a freshwater lens above the TCE groundwater plume. Any freshwater lenses over the main portion of the shallow TCE plume are ephemeral (e.g., not permanent). It is important to note that shallow samples were not collected from several of the most strategically located downgradient Hydropunch probe characterization efforts within the eastern sixth of the TCE dissolved plume outline. In several statements made by the Defendants' experts (e.g., Mr. Einarson), they imply that most of the plume underlies a freshwater lens (e.g., every home east of the Browns Canyon Wash, BCW). This is not only misleading, but is also inconsistent with their own data as rendered in cross sections G to G' and G' to G" where shallow concentrations exceeding groundwater risk screening levels extend far east of BCW (Figures 3 and 4). The plume (including shallow components along the water table) has been mobile since the Hydropunch data was collected. Given that the plume has grown from approximately 4,000 feet in length in 2003 (Larson, 2003) to approximately 17,000 feet in length (Tonkin, 2023) over twenty years, this equates to approximately 650 feet of average TCE migration per year. The vertical distribution of concentrations in the "northern lobe" depicted using data from 2015 and 2016 (cross section G' to G''', Figure 5) suggests that the shallow portion of the depiction represented the shallow component of the "leading edge" at that time. Given the elevated concentrations in the shallow portion of the plume at that time (e.g., 120 to 880µg/L), it makes sense to conclude that elevated TCE concentrations along the water table currently extend far east of where they are depicted in G' to G'''. ***More specifically, given the rate of TCE transport, one can expect the shallow portion of the plume to have potentially migrated hundreds to thousands of additional feet eastward along the water table at concentrations exceeding 1.2µg/L over the past 8 years.*** This is supported by dynamic groundwater and soil vapor TCE concentrations depicted in Figures 9 through 12 that document TCE mobility that has occurred over the past 8 years. For instance, Monitoring Well C-65 registered non-detects when cross section G' to G" was generated using data from 2015-2016, but currently has detections above risk screening levels. This proves that the plume has migrated more than 1000 feet east since that time. The Defendants' experts' claims about a lens of fresh water overlying

deeper contaminants are therefore speculative and without merit, as they are based on outdated observations and require the assumption that a migrating plume is immobile. Shallow TCE concentrations (along the water table) within the eastern edge of Class Area are currently expected to exceed risk screening levels based on historical plume migration rates. Given the time and effort required to unequivocally assess this, pre-emptive mitigation is warranted due to the uncertainties that exist and the fact that groundwater remediation will require years (at least) in the Class Area.

3) <u>Defendants' Experts Commonly Present Renderings of Contaminant Plumes Using Misleading Values and Units of Measure</u> - Several experts present graphics of the spatial distribution of soil vapor and groundwater contaminants that are not consistent with agency recommended risk screening levels. For instance, most groundwater TCE distribution renderings only extend to 5µg/L. These "shell" renderings should be mapped out to 1.2µg/L to be consistent with the regulatory agency risk screening level. In several instances, TCE in soil vapor is mapped to a "shell" contour equaling 1µg/L. The preferred unit for soil vapor is $\mu g/m^3$, and the regulatory risk screening level for TCE in soil vapor is $16\mu g/m^3$. The value 1µg/L of TCE in soil vapor is equal to $1000\mu g/m^3$, which is 62.5 times the regulatory risk screening level. The net effect of using these misleading values and units is to promote the perception that the volumetric and areal extent of contamination are less than the actual extent. The Defendants' TCE groundwater plume exceeding regulatory risk screening levels extends miles in length under thousands of properties. This is one of the largest groundwater contaminant plumes exceeding VI risk screening levels under a residential neighborhood in California.

4) <u>Defendants' Experts Fail to Acknowledge That Defendants Withheld Critical Information from Regulators</u> – The Defendants claim that every characterization effort was approved by regulators. However, they did not let regulators know that doors and windows were open, or that fans were operating during sampling. They also did not acknowledge that Santa Ana wind and pressure conditions prevailed during the Winter sampling event (which was anticipated to represent elevated indoor air concentrations) or the impact this could have on VI sampling campaigns. The Defendants also used the ratio of TCE to PCE concentrations as a "line of evidence" to incorrectly claim that observing PCE indoor air concentrations similar to or higher than TCE always indicates the presence of an indoor source. The Defendants claimed that since groundwater concentrations of TCE were typically higher than PCE, a relatively similar or higher indoor air PCE concentration was proof that PCE emanated from an indoor source. This was one of the key lines of evidence used by the Defendants to argue that VI was not occurring. In fact, unsaturated soil samples collected in the source area in 2019 exhibited PCE concentrations similar to or higher than TCE, even though the underlying groundwater contained higher TCE than PCE concentrations (Orion, 2019). Agency representatives were therefore misled, as they did not consider any of these factors when evaluating data provided by the Defendants' consultants, and when they were developing risk management determinations and approvals of the Long-Term Monitoring Plan (LTMP), mitigation requirements, and other vapor intrusion related risk decision criteria

(Mexikatzin, 2023). The net result is an increased potential for public exposures due to an underestimate of risk that impacted critical risk-based decisions. As such, every instance the Defendants' experts claim their work was approved by regulators should be reviewed within the proper context (e.g., the regulators were not privy to critical information that could have impacted approvals).

5) <u>Defendants' Consultants Devise and Implement a Long-Term Monitoring Plan that Is not Protective of Class Area Residents</u> - After acknowledging the existence of a VI issue in the Class Area due to their toxic chemical releases at 8020 Deering, the Defendants and their consultants devised a multi-phase scheme for navigating the regulatory process that does not prioritize the health and well-being of the thousands of community members occupying buildings above the contaminant plumes. More specifically, around March of 2019 they became aware that the State of California was about to adopt the soil vapor-to-indoor air attenuation factor (AF) of 0.03 (which translates to a soil vapor risk screening level of 16μg/m$^3$ for TCE) and groundwater-to-indoor AF of 0.001 (which translates to a groundwater risk screening level of 1.2μg/L for TCE). Given the historically elevated soil vapor and groundwater concentrations in the Class Area, the Defendants understood that implementation of this pending screening criteria would potentially result in regulators requiring mitigation throughout the community. In response to this, the Defendants directed their consultants to resist this regulatory development. More specifically, Shantal Der Boghosian (of Northrop Grumman) issued the following directive to the Defendants' consultants in an email dated March 21st, 2019: "***The VI report needs to be finalized in a way that sets us up in a position to argue out of the new attenuation factor. I have discussed with Helen already and she plans on incorporating edits to support this***."

In response to the Defendants' directive, their consultants leveraged flawed data that underestimates crawl space and indoor vapor concentration data to argue for a more lenient soil vapor-to-indoor air AF of 0.002. The data is flawed because the sample timing and prevailing conditions were inconsistent with regulatory guidance derived to err on the side of caution and protect communities residing over contaminant plumes. Knowing that the subsurface vapor concentrations were relatively stable, the Defendants' consultants then developed a Long-Term Monitoring Plan (LTMP) that focused on tracking trends in the soil vapor concentrations (which they knew ahead of time would be stable) relative to the relaxed and inadequate risk screening level of 240μg/m$^3$ (corresponding to the AF of 0.002 derived using flawed indoor air data). The Defendants also argued against regulatory recommendations for indoor air monitoring. The Defendants' consultant claimed that they would potentially revisit the indoor air question, provided their soil vapor data suggested there was a need to do so after a subsequent multiple lines of evidence (MLE) study. The MLE study, if ever warranted, would not commit the Defendants to any indoor sampling. Based on the historical data, the consultants knew ahead of time that their soil data would be relatively stable and presumed they would not be forced to sample indoors again. As such, implementation of this scheme allowed the Defendants to avoid doing what is necessary to protect the

Dr. Kram Rebuttal of Defendants' Expert Report; Behar v. Northrop Grumman                    6

community within the Class Area. With only one exception (e.g., Behar residence in 2022), the Defendants have not sampled indoors for any of the thousands of Class Area homes since 2019 even though soil vapor and groundwater TCE concentrations continue to exceed regulatory recommended risk screening levels and are expected to remain elevated until remediation is complete. Given the time and effort required to properly assess the Class Area residential properties, a more efficient and effective (and protective) option would include mitigation.

6) <u>Given the Level of TCE in Groundwater and the Fact that Near-Term Remediation is not Possible, Mitigation is Required for the Residents in the Class Area</u> – It is well documented that TCE released by the Defendants have contaminated groundwater extending miles from the release at 8020 Deering. Less than one percent of the homes overlying TCE in groundwater at concentrations exceeding risk screening levels have been tested, and several of these were only tested once. The testing of those relatively few homes was flawed due to the random sample timing and the lack of adherence to key state and federal regulatory recommendations designed to err on the side of caution. It is widely acknowledged that the methods employed underestimate risks (Holton et al., 2013; USEPA, 2015; Schuver et al., 2018; Dawson et al., 2019; Gabris, 2023). The VI data collected to-date does not represent Reasonable Maximum Exposure (RME) and therefore does not qualify for long-term VI risk management decision criteria for any of the properties tested (USEPA, 2015; Dawson, 2023b; Gabris, 2023) or for the thousands of properties that have yet to be tested. In fact, the results have an elevated probability of representing false negative conclusions (Holton et al., 2013; Schuver et al., 2018). The entire basis for the LTMP relied upon the trust that the data collected to-date correctly represented the potential for VI risk. Unfortunately, this data does not accurately represent the potential for exposure risk or most effectively protect the community due to the conditions that prevailed and methods employed during sampling (e.g., open windows, open doors, operating fans, Santa Ana winds and rising barometric pressure, sample proximity to crawl space vents, random sample timing, etc.). As such, the LTMP does not adequately protect the community at large. In fact, the Defendants specifically directed their consultants to "*argue out of*" risk management decision criteria specifically developed to protect citizens from VI exposures. The recently proposed theory regarding the presence of a freshwater lens in a small portion of the Class Area based on a one-time sampling event performed 8 years ago along the plume leading edge has not been substantiated by more current data. The plume continues to migrate, and yet the Defendants have not collected data to determine whether changes in the shallow portion of the downgradient TCE plume render this theory valid (or not). Given that TCE concentrations in groundwater and soil vapor are dynamic in the downgradient portion of the groundwater plume, it is likely that the VI potential that existed 8 years ago in that area is no longer valid. There is a pathway that exists for the TCE and PCE in groundwater to enter homes as vapors across the Class Area. Given the level of TCE in groundwater and the fact that near-term remediation is not possible, mitigation is required for the residents in the Class Area.

## Section 3. Review and Rebuttal of Defendant's Expert Reports

### Mr. Robbie Ettinger Expert Report dated 10/24/23

General Comments:

It is important to consider that Mr. Ettinger's firm is well-known and often claims to be industry leaders in the VI area of practice. They also regularly post regulatory guidance on their web site. As such, they are aware that many agencies (federal and state) commonly require that indoor samples be collected under what is referred to as "conservative" conditions. For state agencies, this often includes keeping doors and windows closed. For instance, on the Geosyntec web site, they cite the New York VI guidance which states:

> "24 Hours Prior to Sampling, All Reasonable Measures Should be Taken to Avoid:
> * Opening any window, fireplace dampers, openings, or vents
> * Operating ventilation fans
> * etc."

They also cite California guidance (which refers to sampling under "conservative" conditions) and USEPA guidance, which recommends determining the reasonable maximum exposure (RME) and using this for all VI risk-based management decisions. The fact that these were not adhered to renders all the indoor air sampling results flawed as well as the decisions and criteria that depend on these results (e.g., derivation of attenuation factors [AFs], risk screening levels, risk evaluations, long-term risk management decisions, and mitigation options). This theme will be referred to within the specific responses to Mr. Ettinger's opinions in the sections below.

To illustrate lessons learned as reflected in updates to California VI guidance (CalEPA, 2023), the following quotes are provided to show that the sampling efforts and related interpretations at the Canoga Park Class Area are impacted in a way that underestimates the VI conclusions.

* "If the subsurface vapor source at a particular building is soil or groundwater contamination that is deeper than 20 feet bgs, samples collected at approximately 15 feet below a building's foundation is expected to provide a conservative estimate of conditions immediately below the building. Soil gas samples less than 15 feet below a building's foundation is likely to underestimate the VI."

* "Soil gas samples less than 5 feet bgs are generally not recommended for VI screening evaluations as discussed in Attachment 1. Barometric pressure trends at the time of sampling should be noted and used as a LOE [line of evidence] for interpreting shallow soil gas sampling results."

* "Use of exposure assumptions less conservative than defaults may require institutional controls to ensure all relevant parties are aware of the building use restrictions."

Specific Comments:

Beginning on Pdf Page 8, Mr. Ettinger offers the following opinions:

   a) The VI investigation was thorough.
   b) The VI investigation data show that the potential for residential VI exposures is not significant.
   c) The long-term monitoring plan (including screening levels and monitoring plan) is sufficient and defensible for evaluating changes in the VI pathway in the Class Area.
   d) If conditions were to change that result in an increase in potential risks, the potential significance of the VI pathway would be variable across the Class Area.
   e) The VI pathway for the Behars is not complete.
   f) If VI mitigation were to be required, design, installation, operation, maintenance, and monitoring of VI mitigation systems would be variable across the Class Area.

Each of these opinions (in particular a, b, c, and e) assumes that the VI related data collected to-date are sufficient and appropriate for drawing VI risk conclusions. This is an incorrect assumption based on the unequivocal fact that the indoor and crawl space data were not collected with the goal being to specifically determine the RME in accordance with USEPA guidance (Dawson, 2023b). In addition, these data were not collected during "conservative" conditions in accordance with California VI guidance. More specifically, sampling during open doors and windows, near open crawl space vents, and during high barometric pressure and winds each represent investigation flaws. As such, the data is not appropriate for VI risk-based decisions regarding whether to mitigate, which attenuation factors are sufficiently conservative, and what constitutes a long-term management plan designed to best protect the Class Area community.

In Section 4.0, Mr. Ettinger proposes a VI Conceptual Site Model (CSM), describes factors that affect VI, and discusses VI attenuation factors. While much of this section represents a general summary of the concept of VI, the section includes several important omissions. For instance, in Exhibit 4a (p.83), there is no mention of advective flux or dynamic differential pressure. These are essential elements to consider for the Canoga Park Class Area. For instance, when the subsurface exhibits a higher pressure than above ground, vapors can be advectively transported upward through the soil column under and into homes; a situation that can be described as VI "On". Understanding the causes (e.g., controlling factors) and timing is critical, as the RME can occur during VI "On" conditions. As such, it is important to be able to sample during VI "On". Randomly timed samples collected without considering whether VI "On" is occurring (e.g., every crawl space and indoor vapor sample collected to-date in the Class Area) are not appropriate for rendering risk based VI decisions (USEPA, 2015; Dawson, 2023a). In fact, the Winter 2017 sampling even occurred during pressure and wind conditions known to prohibit VI and to dilute crawl space concentrations.

Mr. Ettinger cites Einarson (2023) in describing a lens of uncontaminated water inhibiting upward vapor transport, and states that concentrations more than a few feet deeper than the water table are not appropriate for VI assessment. The main challenge with this assertion as it relates to the Class Area is that the Defendants did not install monitoring wells in key locations

to confirm or refute their claims of a freshwater lens. Mr. Einarson depicts what he refers to as a freshwater lens above the "northern lobe" (cross section G' to G"', p.144 of Ettinger). However, the screening data relied upon as the basis for this theory is approximately 8 years old, and shallow groundwater zones were not sampled in key locations at the time. Shallow plume migration eastward over the past 8 years is likely given the documented transmissive lenses of soil and the fact that the deeper portions of the plume continue to migrate (Figure 11). In cross sections G to G' (p.142) and G' to G" (p.143), elevated shallow groundwater dominates the extent of the TCE plume along the water table. In G' to G" ("southern lobe"), the shallowest zones exhibit TCE concentrations that exceed the groundwater screening level of 1.2µg/L as far east as Winnetka Avenue and continue to migrate eastward. The key point is that the freshwater lens theorized by Mr. Einarson is speculative, as it may not currently exist.

On Page 11, Mr. Ettinger mentions potential impacts of fine-grained layers, lateral separation, and background sources. None of these factors have been appropriately investigated. As such, they do not apply in this case. Regarding claims of background sources, the Defendants' consultants failed to specifically identify a single indoor source and relied upon flawed lines of evidence such as ratios of TCE and PCE to justify attributing PCE detections to indoor sources.

Mr. Ettinger states that key factors will be variable and that they should be considered on a property-by-property basis, but then clarifies that he is not recommending that sampling is necessary for every property. While regulatory guidance agrees that every building behaves differently, and given that the time and resources required to assess every building will extend the exposure duration, the solution is to mitigate all properties overlying soil vapor and groundwater exceeding regulatory agency recommended risk screening levels. This solution is consistent with USEPA when they describe the concept of investigation prioritization and appropriate courses of action for multiple building VI situations (USEPA, 2015; p.69-71). More specifically, while USEPA recommends a "worst first" approach for prioritizing buildings for investigation, they are careful to also state the following to support mitigation even before all buildings have been tested:

> *"In situations where "higher-priority" buildings and locations are investigated initially, investigation of locations of other buildings may still be warranted, for example, to ensure that the CSM is complete and accurate and that variability in the subsurface conditions and building conditions is understood. There usually is substantial spatial variability in the concentrations of subsurface vapors, caused by heterogeneities in the subsurface materials and other factors, that can result in variability among buildings in vapor flux and indoor air concentrations arising from vapor intrusion. Additionally, building construction, building age and maintenance, and occupants' activities that affect soil gas entry and air exchange rate will vary from building to building, further adding to the variability in indoor air concentrations between buildings. Therefore, it may be difficult to identify <u>a priori</u> either a "representative" or "reasonable worst case" building or group of buildings, when it is determined that sampling all buildings is not practical. When sampling all buildings is not practical, but other lines of evidence suggest that vapor intrusion may be occurring, the site management team may wish to consider installing engineered exposure controls for vapor*

*intrusion mitigation in buildings without baseline indoor air data (i.e., building mitigation as an early action)."*

Regarding lateral separation, Mr. Ettinger mentions that guidance typically does not require assessment more than 100 feet beyond the groundwater plume. For the Class Area, the Plaintiffs focus on what is directly over the plume at screening levels corresponding to agency (federal and state) recommended groundwater risk screening level of 1.2μg/L for TCE. As can be seen in Figure 11, the plume has reached the edge of the Class Area.

Mr. Ettinger claims that sewer releases are not an issue because these occurred above the water table. It is unclear whether this claim was ever verified. In addition, it does not appear that sewers and laterals were investigated within the contaminant plume domains (e.g., outermost soil vapor and groundwater spatial depictions).

Regarding variability, Mr. Ettinger claims that a desktop review will be sufficient to evaluate the relative significance of VI at each property. A desktop review for the Class Area is unreliable given that the data collected to-date consists of randomly timed samples without regard to whether VI was "On", whether "conservative" conditions prevailed during sampling, Santa Ana wind and pressure conditions during the Winter campaign, barometric pumping impacts on shallow soil vapor samples, and other factors that tainted the current data and rendered these unacceptable for risk-based decisions in accordance with USEPA RME criteria.

Beginning on Pdf p.14, Mr. Ettinger provides commentary on attenuation factors (AFs). While he summarizes the concept and how AFs are used, he also acknowledges that these can vary by orders of magnitude. For instance, he notes that soil vapor-to-indoor AF values can range from 0.000025 to 0.94 and that groundwater-to-indoor AF values can range from $1 \times 10^{-7}$ to 0.021. Mr. Ettinger is critical of the USEPA's 2012 study that the default AF values are based on, and claims that AF values are expected to be lower in California. Mr. Ettinger cites more recent work derived using California Geotracker data (e.g., Abbasi et al., 2022; Ettinger and Lahvis, 2021), but does not acknowledge the flaws in each of these efforts that are in common with the work performed to-date within the Canoga Park Class Area. More specifically, data used in each of these studies do not represent RME, as there was no effort to measure indoor air concentrations during VI "On" conditions prior to Geotracker data submissions. As such, the results are not in compliance with risk decision criteria advocated for in USEPA (2015) to reduce the potential for false negative results.

Mr. Ettinger states that at the time of the investigation, California DTSC recommended the use of 0.002 for the soil vapor-to-in door AF (DTSC, 2011a). Mr. Ettinger also claims that OEHHA and the Regional Board approved of this AF. However, they were not informed of the Santa Ana conditions, "non-conservative" conditions during sampling, Santa Ana conditions during the Winter of 2017, or that the data only qualifies as "screening" data (as per Dawson, 2023b) that is inappropriate for risk-based decisions (e.g., whether to mitigate, selection of AF values, etc.).

During a February 2020 California CUPA Training Forum presentation given by Mr. Ettinger and others, the slide depicted in Figure 6 was presented. The slide compares various soil vapor-to-indoor air AF values and includes the Defendants' value of 0.002 as well as the USEPA recommended value of 0.03. Note that the slide questions whether 0.002 is correct and claims this value is not protective in all cases. It also mentions that an AF of 0.002 is not based on the RME and is therefore not in compliance with the California Water Code Section 13304.2, which states:

"*In conducting a site-specific assessment of human health or ecological risks, the discharger shall address all of the following factors to the extent relevant based on site-specific conditions:*

*(6) The development of reasonable maximum estimates of exposure for both current land use conditions and reasonably foreseeable future land uses at the site.*

*(7) The development of reasonable maximum estimates of exposure to volatile organic compounds that may enter structures that are on the site or that are proposed to be constructed on the site and that may cause exposure due to accumulation of these volatile organic compounds in the indoor air of those structures.*"

While the AF value of 0.03 is described as "conservative" on the slide, it is also characterized as protective. This supports the Plaintiffs' position that 0.03 should be applied to the Canoga Park Class Area.

Beginning on Pdf p.14, Section 5, Mr. Ettinger describes several phases of the VI investigation. A few key elements will be addressed below.

Mr. Ettinger states that during the 2014-2015 Offsite VI Assessment soil vapor concentration variability was less than a factor of 2 to 3 over four quarters. This is important for at least two reasons. The first stems from the fact that indoor air concentration variability can be greater than this, as it will depend on dynamic controlling factors. The second point is that the Defendants recognized that the limited soil vapor concentration variability suggested that the vapor component of the plume in the areas measured is relatively stable. This observation becomes an important issue later when devising a long-term monitoring plan (LTMP).

Mr. Ettinger claims that all households residing over the 5µg/L groundwater contour were offered indoor air sampling. This does not seem to include community members located towards the toe of the plume based on the homes sampled. Mr. Ettinger states that the number of homes eventually offered indoor air sampling was reduced based on the regulatory agency recommendations. It is important to note that the risk screening level is 1.2µg/L. As such, more buildings should have been considered for testing and eventually evaluated.

In 2017, a Supplemental Offsite VI Assessment was performed. Additional multi-depth soil vapor probes were installed and tested for two events, and groundwater was sampled.

Exceedances based on agency screening criteria were observed. Soil vapor temporal variability was limited to about a factor of 1.5 over the two events – again suggesting that the soil vapor conditions were relatively stable in the portion of the plume tested.

During the 2017-2019 Off-Property Building-Specific VI Investigation, 27 buildings were evaluated (e.g., 1 church, 26 residential). Of these, only 22 were tested more than once. Mr. Ettinger claims the Defendants' consultants concluded that most properties exhibited little or no VI issues. More specifically, Mr. Ettinger claims that indoor air and crawl space sample results were below DTSC's urgent and accelerated response levels, and that they were below TCE screening levels for 20 of the 27 properties. The consultants (including Mr. Ettinger) concluded that for every one of the 7 properties exceeding the screening levels, these were due to background sources (which were not unequivocally identified). Mr. Ettinger also concludes that that 240µg/m$^3$ in soil vapor and 500µg/L in groundwater were sufficiently protective and that these represent "*conservative screening levels*". These conclusions are not consistent with regulatory guidance or agency opinions. For instance, instance, OEHHA (2020) commented on the claims and conclusions reiterated by Mr. Ettinger as follows:

> *"USEPA currently recommends a default AF of 0.03 for soil vapor data…The recommended AF is from the upper bound of a distribution of AFs (based on a nationwide database of paired chemical concentrations measured in indoor air and soil gas). The current ambient air SL for TCE is 0.48µg/m3, indicating that the appropriate soil gas SL for TCE is 16µg/m3 for residential exposure…* **OEHHA recommends using this updated SL to drive decision rules that would effectively continue, modify or terminate the LTMP**.*"*

OEHHA (2020) continued with the following:
> **"Currently, all the soil gas detections exceed this TCE SL. In addition, there are accelerated response action levels (ARALs) and urgent response action levels (URALs) for TCE in indoor air which, if exceeded, requires immediate action to reduce TCE exposure. OEHHA used the 0.03 AF and found that 3 of the 14 soil vapor probes exceeded the residential ARAL, and 8 exceeded the residential URAL."**

The positions and concerns expressed by OEHHA (2020) are consistent with my opinions.

On Pdf p.20, Mr. Ettinger briefly describes the LTMP. This plan includes semi-annual monitoring of 9 multi-depth soil vapor wells and annual monitoring of 15 additional multi-depth soil vapor wells. The plan is to use the soil vapor dynamics as the defining risk decision criterion relative to a relaxed soil vapor screening level of 240µg/m$^3$. This is not appropriate given the flaws in the data as described above and below. ***The plan does not include any indoor vapor sampling, and is therefore not addressing the primary concern, as the soil vapor concentrations continue to exceed the current DTSC and EPA risk screening levels (e.g., 16µg/m)***. ***The conclusion one can draw from this is that this endeavor represents a multi-step plan to avoid doing what is in the best interest of the community.*** More specifically, once it was revealed to the Defendants that the soil vapor concentrations exceeded pending California risk screening levels (e.g., 16µg/m$^3$ corresponding to a soil vapor AF of 0.03), they directed their consultants to ***"argue out of the***

*new attenuation factor"* (Der Boghosian, 2019). During the indoor testing, the consultants did not follow agency recommendations that would have qualified the data to be used for VI risk decisions (e.g., they did not properly characterize RME as per USEPA [2015] and Dawson [2023b]). They also did not inform the regulators of critical flaws in their efforts (e.g., sampling with windows and doors open, during Santa Ana winds, etc.), and represented their "screening" data to agency representatives as valid and appropriate for deriving "*conservative screening levels*" (Mr. Ettinger's term). The next step was for the consultants to do all in their power to avoid having to sample indoors. Knowing that the elevated soil vapor concentrations were relatively stable, they focused on using this as the key risk decision criterion for their long-term monitoring plan. The impact of this stepwise endeavor is to underestimate exposure risks for thousands of citizens and to avoid sampling indoors even though the soil vapor and groundwater concentrations continue to exceed regulatory risk screening levels to this day.

On Pdf p.20, Mr. Ettinger describes his VI Conceptual Site Model. Several key items are presented that warrant comment. For instance, Mr. Ettinger cites Mr. Einarson and claims that many of the groundwater samples were collected more than 5 feet below the water table and should therefore not be considered exceeding VI risk screening levels. However, Mr. Ettinger shows TCE concentrations exceeding risk screening levels in cross sections G to G' and G' to G" along the water table and shallowest zones sampled out to approximately 8,000-10,000 feet from the 8020 Deering facility. When describing Vapor Transport, Mr. Ettinger uses units to create an impression that soil vapor conditions are less severe. More specifically, in this section as well as in Exhibit #7 (TCE Soil Vapor Results), Mr. Ettinger uses units of µg/L for soil vapor. Note that 1µg/L TCE is equal to 1,000µg/m$^3$. As such, when Mr. Ettinger cites a value of 88µg/L, this is equal to 88,000µg/m$^3$, or 5500 times the risk screening level.

Mr. Ettinger once again claims the USEPA and California default soil vapor AF of 0.03 (and associated risk screening level of 16µg/m$^3$) are too conservative and that the empirical "conservative" AF should be 0.002 (along with the associated risk screening level of 240µg/m$^3$). As stated above, the flawed crawl space and indoor air data relied upon do not meet USEPA RME requirements and are therefore inappropriate for characterizing the less than protective AF of 0.002 as "conservative".

Beginning on Pdf p.23, Mr. Ettinger claims that the VI investigation for the residential areas downgradient of the 8020 Deering facility were thorough (Section 7) and describes several phases of the investigations to-date. Mr. Ettinger does not acknowledge the shortcomings I raised regarding RME, the Santa Ana conditions, the intentional bias to advocate for a relaxed soil vapor-to-indoor air AF, and the lack of transparency with agencies. Mr. Ettinger maintains that an AF of 0.002 was consistent with regulatory policies at the time, but does not address the fact that the Defendants were told in 2019 that 0.03 was to become the policy and is currently the regulatory agency's position. Furthermore, there is no mention of the directive received by their client to "*argue out*" of this policy. While Mr. Ettinger states how site-specific AF determination is allowed, he does not acknowledge the multiple challenges to their sampling efforts and how they are therefore not appropriate for risk-based decisions as per USEPA (2015) and consistent with Dawson (2023b). Given that their biased AF value based on

Dr. Kram Rebuttal of Defendants' Expert Report; Behar v. Northrop Grumman                14

screening data is being used for risk decisions, this represents a fatal flaw in the overall VI risk management effort.

On Pdf p.24, Mr. Ettinger documents how soil vapor concentration temporal variability is limited (e.g., less than a factor of 3). This observation would later be exploited when devising the LTMP, as it would serve as the key risk decision criterion regarding whether to continue with indoor testing. Mr. Ettinger describes how the consultants sampled twice in 22 of the 27 buildings, and claims that temporal variability in indoor air was limited. There is no acknowledgement of the multiple flaws in the building specific testing given that they were not tested under "conservative" conditions and the fact that RME was never determined. As such, the conclusion that indoor air temporal variability is limited is based on flawed data.

On Pdf p.25, Mr. Ettinger claims that there is little or no risk for most properties, that background sources are contributing to indoor air levels at many of the homes, and that 240µg/m3 (for soil vapor) and 500µg/L (for groundwater) represent what he classifies as "*appropriate conservative screening levels for the site*". This position is inconsistent with California guidance, USEPA guidance, and with Dr. Helen Dawson's (Dawson, 2023b) positions, as the indoor sample results were not collected during "conservative" conditions (e.g., with windows and doors closed, fans off, etc.) or with an attempt to estimate RME (e.g., during VI "On" conditions). OEHHA and DTSC both questioned the reliance upon the 500µg/L groundwater concentration and repeatedly advocated for 16µg/m3 (soil vapor) and 1.2µg/L (groundwater) risk screening levels (see earlier quote and OEHHA, 2020).

Mr. Ettinger further claims that their LTMP is sufficient to evaluate the VI pathway, but they do not sample indoors, evaluate RME, or apply a conservative AF to all non-sampled properties. As such, it falls short of protecting the community. Given that more appropriate methods would need to be implemented to correctly assess conditions (which Geosyntec has used at numerous sites as described in marketing efforts and USEPA sponsored workshops), and the time and money required for such efforts while extending the potential for exposures, it behooves the Defendants to mitigate throughout the Class Area. The LTMP is designed in such a way that if soil vapor concentration changes are observed sufficient to warrant indoor air sampling, they will recommend performing another investigation (e.g., a multiple lines of evidence, MLE, study), but they do not commit to indoor testing. Given that they already know that subsurface temporal dynamics is limited, the LTMP represents a biased effort aimed at doing the minimal amount to navigate the regulatory process, regardless of risks to the community. While Mr. Ettinger claims this was performed under Regional Board oversight, material facts were not disclosed (Mexikatzin, 2023). For instance, Santa Ana conditions occurred during the Winter campaign (thereby biasing results low), their AF data demonstrates that 0.002 is lower than what was observed at many of the properties (even with underestimation based on flawed sampling protocol), they sampled with windows and doors open, and their client directed their consultants to "*argue out of*" implementing the agency's recommended soil vapor AF of 0.03.

In Section 8 (beginning on Pdf p.25), Mr. Ettinger claims the potential for VI is not significant and bases this on MLE justifications. However,

1) Their data is flawed based on the sample timing and prevailing conditions associated with their campaigns (e.g., open doors, windows, Santa Ana conditions; see Kram [2023] Table 1 for more information).
2) They disregarded indoor air data by attributing detections to indoor sources without specifically identifying these.
3) They did not attempt to determine RME.
4) They were directed by their client to advocate for a much lower AF than what is recommended by USEPA and California guidance.
5) The TCE groundwater plume extends miles downgradient of the release at levels exceeding risk screening levels based on the EPA and CA default screening AF for groundwater (e.g., 1.2µg/L).
6) The Defendants consultants only tested very few of the more than 3700 homes in the Class Area, and employed sampling methods acknowledged to be prone to false negative results (Schuver et al., 2018; Holton, 2012; Indicator, Tracer, the Surrogate [ITS] Team; etc.). Flaws associated with this type of testing continues to be the rationale for the formation and funding of the ITS efforts and the primary subject of EPA's annual "State of VI Science" workshops (see: https://iavi.rti.org/workshops.html), which have included Geosyntec participation since inception (e.g., Gabris, 2023, etc.).
7) The Defendants' consultants conclude that there is a "moderate potential for VI" where groundwater is above 500µg/L and soil vapor is above 240µg/m$^3$. This is inconsistent with the "insignificant" claim above and with USEPA and CA default screening levels that should be applied to each building (of which only a few were evaluated, albeit with flawed methods and timing). In addition, OEHHA regulators dispute the Defendants' consultants claims regarding the validity of using 500µg/L as a viable decision criterion.

Homes are separated into 3 categories (moderate, low potential, no potential), but not every home was tested, and the soil vapor concentration spatial variability is significant. As such, it is not possible to claim that results from one home apply to another. The guidance is based on building-specific testing, which they did not adhere to. Given the time and effort required to correct the deficiencies in the assessments to-date and the remaining uncertainties, the most effective way to protect the community would include mitigation throughout the Class Area.

In Section 9 (beginning on Pdf p.26), Mr. Ettinger claims that the LTMP provides a scientifically defensible approach for monitoring the VI pathway changes. Multiple problems with this plan include the following:
1) The soil vapor screening criteria is biased and was derived using flawed investigations that underestimate risks and risk decision criteria (e.g., AF values are suppressed by underestimating crawl space and indoor air concentrations).

2) The Defendants are only monitoring groundwater and soil vapor, and use this data to potentially trigger indoor samples. However, indoor testing is not guaranteed. If indoor testing were to be triggered, it would not occur potentially for several additional years. This is a glaring flaw in the approach and extends the exposure duration for longer than necessary. A complete pathway assessment should also include indoor sampling. While

Dr. Kram Rebuttal of Defendants' Expert Report; Behar v. Northrop Grumman                                      16

the community is concerned about the "devil _at_ the door", they are most directly concerned about the "devil _in_ the door".

3) Given the flaws in their investigation and the fact that the consultants were not forthcoming about the fact they observed AF values greater than 0.002, that they failed to evaluate RME, that they attributed detections to indoor sources that were never specifically identified, and that they tested with doors and windows open (and fans operating) and did not tell regulators they did so, the entire foundation of the LTM effort is insufficiently protective of the residents of the Class Area. Given that the consultants have publicly presented on the shortcomings of the methods employed (e.g., that 1 to 4 indoor testing rounds are insufficient for deriving RME; Gabris, 2023), and have recommended superior methods to their clients and in USEPA sponsored workshops (e.g., continuous monitoring, building pressure cycling, specific and unequivocal indoor source identification, etc.), and the fact that they were not forthcoming regarding observations and methodology flaws, the current LTMP represents an effort to navigate regulatory requirements with minimal commitment to protecting the public. Ms. Gabris (Geosyntec) recently gave a USEPA VI workshop presentation entitled "_Why Go "Above and Beyond" To Collect Defensible VI Data?_" (Gabris, 2023). The LTMP is inconsistent with this theme.

4) The consultants have determined that location-specific soil vapor concentrations are relatively constant. This is common for a mature plume. As such, their task was to leverage off this observation and to convince regulators to refrain from implementing a default AF of 0.03 (corresponding to a risk screening level of 16μg/m$^3$ for TCE) as directed by their client. Agency representatives from OEHHA advocated for the more protective AF criterion as well as for additional indoor air testing, but ultimately deferred to the Water Board, which was not provided with critical material facts (e.g., that an AF of 0.002 was not conservative, that windows and doors were open during testing, etc.). The Defendants advocated for more lenient decision criterion and resisted any additional indoor air sampling knowing that the subsurface concentrations were relatively stable in areas they had previously monitored and therefore would most likely not trigger indoor sampling based on their LTMP "rules". This modus operandi is cynical by design in that the goal was to gain agency acceptance for a pathway forward using limited data, no indoor testing, and bias in a manner that results in an extension of the exposure risk duration for thousands of building occupants in the Class Area.

In Section 10 beginning on Pdf p.27, Mr. Ettinger claims that if conditions change and pose an additional VI risk, then the potential significance of the VI pathway would be variable across the Class Area. Spatial variability in soil vapor has already been demonstrated. Mr. Ettinger further claims that the groundwater concentrations in his Exhibit 10 map of the plume are from beneath the water table and are therefore not indicative of VI potential. It is important to consider that these are long-screened wells. As such, the net effect is to dilute the perceived concentrations (Martin-Hayden and Robbins, 1997). Mr. Ettinger does not include the well screen lengths, which would show that they indeed have the potential to dilute groundwater

sample concentrations. These long-screened wells can be seen on p.142 (cross section G to G'). Mr. Ettinger also claims that the plume extent generated by Plaintiffs is more than 100 feet outside the plume they depict. It is important to consider that the Defendant's consultants mapped the plume out to 5µg/L, while the Plaintiffs (Laton, 2023) mapped this to 1.2µg/L (consistent with USEPA and CA default AF of 0.001 for TCE). As such, the Plaintiff team extended the plume outline to adjust for this screening level. Mr. Ettinger cites Einarson (2023) and claims that TCE in groundwater east of Brown's Canyon Wash (BCW) are predominantly below the water table overlain by clean water that creates a barrier to VI. On p.142 (cross section G to G'; Figure 3), groundwater concentrations in the shallow depths along the water table are depicted as 50 to 500µg/L near that location. Similarly, cross section G' to G" (p.143, "southern lobe"; Figure 4) TCE concentrations exceed the risk screening level along the shallowest sampling locations as far east as Winnetka Ave. It is important to consider that the data used for these as well as for cross section G' to G"' (p.144, "northern lobe"; Figure 5) was collected approximately 8 years ago and the shallow portion of the plume continues to migrate. Figures 9 through 12 show that the soil vapor and groundwater concentrations along the leading edge of the plume have been dynamic over the past several years, which demonstrates that TCE continues to be mobile. Given that the Defendants did not install monitoring wells screened across the water table along the leading edge of the TCE groundwater plume, claims about concentrations at the water table being less than risk screening levels is speculative based on old data and assumptions that the plume has not continued to migrate east.

Mr. Ettinger claims that areas with fine-grained materials lower the potential for VI. There is insufficient information to show the distribution of fine-grained layers or the impacts this would have within the Class Area. The observation there are fine layers is a textural observation, not an empirical vapor flux assessment. There are locations within the Class Area with soil vapor exceeding the risk screening level that overly clay layers. As such, the texture claim is based on conjecture that is inconsistent with empirical evidence.

Mr. Ettinger acknowledges that every structure is different. While this is justification for the Defendants to test additional buildings, the commonality they share is that they each overly the plume depicted at levels that exceed the agency recommended risk screening levels based on groundwater concentration and the AF of 0.001. ***Given the level of TCE in groundwater, the immediate solution is to mitigate all homes within areas impacted by TCE – a shared classification***.

In Section 11 beginning on p.28, Mr. Ettinger claims the VI pathway is not complete at the Behar residence. A VI pathway is potentially complete if toxins released by the Defendants are near or under the building, can penetrate the foundation/flooring, are found in indoor air, and the building is occupied. While several indoor air samples exhibit both PCE and TCE at J-flagged values, it is important to note that the samples were not appropriately collected (e.g., open windows and doors, fans operating, crawl space sample not collected from proper locations, etc.). As such, the VOCs were detected in the indoor environment even though the lab results are biased low due to dilution. PCE was also detected under the garage. Therefore, the criteria

for a potentially complete pathway is met. While Mr. Ettinger acknowledges that trace levels were observed, he does not acknowledge that the samples are biased low or the reasons why.

Mr. Ettinger claims that PCE detections without TCE detections in soil vapor means that the PCE is not from their release. However, the detection levels achieved for TCE are elevated, so the values are presented as "below X". It is unclear whether this means there were detections, but they were below the laboratory detection levels. Mr. Ettinger does not present chromatograms, which could reveal TCE detections.

Mr. Ettinger also claims that TCE to PCE ratios observed suggest the hits are not related to the Defendants' release, as they maintain that PCE is always lower in concentration than TCE in soil vapor results attributed to their release. However, this is inconsistent with their own data (see Kram report). The Defendants also present data that is inconsistent with this claim. More specifically, they report maximum TCE concentration at 5' bgs at $8.5\mu g/m^3$ and PCE at $28\mu g/m^3$ from a location 350' southeast of the Behar property. This runs counter to the claim that PCE is always less than TCE in soil vapor. They then point to locations 1500 feet upgradient and describe where TCE is higher than PCE. Further evidence is found in Table 1 of the Secondary Source Area Investigation Progress Report (Orion, 2019), where the saturated soil samples tend to exhibit higher TCE than PCE concentration. However, the unsaturated samples exhibit similar or higher PCE than TCE. All this demonstrates is that there is variability in the TCE:PCE ratios. This is not a line of evidence that unequivocally demonstrates that the PCE detected at the Behar property is unrelated to the Defendants' release, nor is this a line of evidence to suggest indoor sources at other properties.

Mr. Ettinger further cites the $500\mu g/L$ groundwater screening level argument (which is not supported by agency personnel as viable criteria). Mr. Ettinger also cites the $240\mu g/m^3$ soil vapor screening level (which is not in compliance with agency policy and is based on biased interpretations, flawed field protocol, and a process whereby the Defendants did not reveal data that runs counter to this biased narrative), their conclusion that TCE was not identified in the soil vapor (see above) or the crawl space (see Kram report about how they did not follow agency requirements). Mr. Ettinger claims the TCE detections were indistinguishable from outdoor air levels. This last point is not surprising given that the doors and windows were open while fans were operating during the sampling campaign.

Mr. Ettinger concludes that the VI pathway is incomplete and that historical releases did not impact the Behar property. This position fails to acknowledge how the underground groundwater concentrations exceed risk screening levels.

In Section 12 beginning on p.30, Mr. Ettinger claims that mitigation requirements would be variable across the class area. This is an accurate statement. The Defendants received a per building quote from their consultants that did not distinguish from one home to another regarding design requirements or costs. Mr. Ettinger claims that agencies do not require mitigation, but this is based on flawed data. When many buildings overly groundwater plumes exceeding risk screening levels, pre-emptive mitigation is commonly acknowledged and

implemented. Mr. Ettinger claims that mitigation recommendations should be made on a case-by-case basis. There is not sufficient time for that type of investigation. Mr. Ettinger claims it is inappropriate to assume that the same mitigation approach would be used for every property. We acknowledge that there could be slight variations in installation requirements and costs. The Defendants' consultants employed a common pricing approach when deriving their mitigation estimate. For consistency, we used an identical approach and pricing.

Mr. Ettinger presents his rebuttals to my opinions in Section 13 (beginning on Pdf p.33).

Rebuttal 13.1 (beginning on Pdf p.35): Mr. Ettinger claims they did not delay their VI investigative efforts and that they did not withhold critical information from the regulatory agencies. My comments regarding delay have more to do with the fact they knew of the off-site migration and potential for VI years before any off-site VI investigations occurred in 2007 (e.g., in the early 2000s). In fact, the 2004 VI guidance they reference required years to develop. As such, industry representatives knew that the VI pathway would soon become an issue. Regardless of whether they were directed by agencies, given their understanding of the potential for VI and the fact that their groundwater plume was defined to several thousand feet downgradient, at least a soil vapor survey was warranted much earlier for the off-property neighborhood. My comments regarding the sharing of material facts with agency representatives is based on documented testimony by their regulator (Mexikatzin, 2023), who revealed they did not know that samples were collected during Santa Ana wind conditions, that windows and doors were open and fans were operating during indoor sampling, that crawl space samples were not consistent with agency guidance, and that the range of soil gas-to-indoor air AF values document how 0.002 was at the low end of this range. Each of these facts represents bias aimed at convincing agencies to relax VI risk management criteria. This is consistent with the Defendants' stated objective articulated in a March 21, 2019, email from Shantal der Boghosian when she directed her consultants to "*argue out of the new attenuation factor*". The consultants complied with this directive. Exhibit 12 lists communications and interactions through time, but does not include any of the material facts listed above.

Rebuttal 13.2 (beginning on Pdf p.35):  Mr. Ettinger claims I incorrectly assert that the VI investigation is flawed and inconsistent with regulatory guidance.

a) With respect to the number of homes sampled, Mr. Ettinger claims they offered to sample all homes over 5μg/L, focused on the centerline, and worked under approval of agencies. Regardless, the number of homes tested still only represents a small sampling of all the homes meeting agency criteria. In addition, meeting the minimal agency requirements is not sufficient for situations where so many uncertainties exist. As Ms. Gabris stated in the March 2023 EPA VI Workshop, practitioners should go above and beyond minimal requirements to protect clients from liability (Gabris, 2023) and to adhere to USEPA's RME VI risk decision criterion.

b) Regarding ventilation conditions, Mr. Ettinger claims I do not acknowledge the logistical challenges associated with conducting building-specific VI investigations at residential

Dr. Kram Rebuttal of Defendants' Expert Report; Behar v. Northrop Grumman                    20

properties. While I agree that challenges exist (and have experienced these myself), in the context of proper sampling protocol and empirical assessment of the results, controlling factors must be considered for an objective evaluation of the laboratory results and conclusions used to derive long-term risk management plans that best protect the community as well as the responsible parties. We are not debating the field challenges. However, we are questioning the conclusions drawn by the data without considering these critical factors – most of which result in a propensity to underestimate exposure concentrations. This impacts risk conclusions as well as positions associated with AF values and long-term monitoring criteria. Ettinger claims that "as-is" conditions are sufficient, and that closing doors and windows and that the type of testing I am advocating for would be an unnecessary burden. First, guidance recommends that doors and windows be closed. This critical fact was not revealed to Mr. Mexikatzin ("Mexi"), who acknowledged that this could impact conclusions drawn, or to his colleagues reviewing reports submitted by the Defendants. Second, Mr. Ettinger claims that performing the types of tests advocated by me and others (including VI practitioners at Geosyntec) would bias the results and represent "artificially high" exposure conditions. This is without merit. For instance, if occupants ever close doors and windows as barometric pressure is dropping, this represents a viable scenario. Given that agencies are concerned about acute TCE risks, and that USEPA aims to err on the side of caution by testing when VI is "On" (e.g., to estimate RME), what I am advocating for is not unreasonable. At a minimum, data derived when windows and doors are open should be characterized as "biased low", as they are inconsistent with agency guidance, do not represent RME and therefore are not valid for critical risk related management decisions (e.g., derivation of AF, LTMP "rules", etc.) - particularly for buildings that have yet to be tested. My recommendations represent a prudent approach consistent with regulatory agencies' objective to conservatively managing risk for the community. Instead, agencies trusted the Defendants and assumed they would be forthcoming, the results were taken as "gospel", mischaracterized as "conservative", and used as a lever to meet their clients' objective (e.g., "*argue out of the new attenuation factor*").

c) Regarding spatial and temporal variability, the "common practice" approach described by Mr. Ettinger, while convenient and potentially of lower cost for the client, is not adequate for assessing spatial and temporal variability for an individual structure or for the entire community. As Gabris (2023), Holton et al. (2013), Schuver et al. (2018) and others point out (EPA, 2015), these approaches are insufficient for determining RME and exhibit a propensity for false negative conclusions and an underestimate of long-term risks. Passive samplers do not capture the full range of concentrations or the concentration pattern, particularly when doors and windows are open (which runs counter to what is recommended in agency guidance). Furthermore, due to the fact that a single laboratory result is generated, passive samplers do not represent the short-term temporal variability or yield critical information regarding controlling factors that contribute to the dynamic concentration patterns. These patterns help when assessing whether detections are from alternate sources and when deriving risk mitigation plans. Inconsistencies between the 7-day passive sampler and the 24-hour canister samples

were documented without explanation. While Mr. Ettinger claims that two or more sampling events are typically relied upon to capture temporal dynamics, this has been documented to be insufficient even by practitioners working for Geosyntec (e.g., Holton, Gabris, Dawson, etc.), as it does not capture RME. A more prudent approach would be to time the sampling events to coincide with VI "On" conditions to at least attempt to derive an estimate of RME. This was not attempted. At best, the data should be characterized as "screening" data. As such, the data does not meet the minimum standard required for risk assessments (Dawson, 2023a and 2023b) or for VI risk-based management decisions that include application of a community-wide soil vapor-to-indoor AF or LTMP "rules".

d) Regarding Impacts of Wind and Other Meteorological Conditions –

i. Wind: Mr. Ettinger claims I did not provide quantitative assessment of the impact. This would not be possible. However, I did mention the high winds and rising and elevated pressure associated with Santa Ana conditions, which can reduce the potential for VI because of the limit to upward flux (see Hosangadi et al., 2017) and propensity to reduce crawl space concentrations due to dilution. This latter point is acknowledged by Eklund (2023). Mr. Ettinger claims there are limited openings to crawl spaces. However, the consultants failed to measure or document whether there was lateral flow in the crawl space during the high wind conditions, so the impacts remain unknown. The Defendants acknowledge that impacts from Santa Ana winds are possible and potentially of interest in a December 18, 2017, email from Shantal Der Boghosian. However, this was not revealed to Mr. Mexikatzin ("Mexi"). Mr. Ettinger states that a separate sampling event also occurred in the Summer. However, it is often assumed by regulators that Winter conditions can yield relatively higher indoor concentrations.

ii. Barometric Pressure (BP): Mr. Ettinger acknowledges that BP was stable during the Winter sampling event. For many situations (Hosangadi et al., 2017), a drop in BP can result in a VI "On" condition due to the induced differential pressure between the subsurface and indoors (Figure 7). For instance, a rapid drop in BP results in a relatively higher pressure in the subsurface. Vapors can move from relatively higher pressure (subsurface) to lower pressure (crawl space or indoors) when this occurs. In contrast, a stable BP or slowly dropping BP does not induce vapor movement. In fact, Mr. Eklund (2023) shared data that clearly shows a rise in BP during the Winter 2017 sampling campaign, which is characteristic of VI "Off" conditions (Figure 8). As such, it is unlikely that samples were collected during VI "On" conditions, and therefore, the results do not reflect RME and should not be used for risk-based decisions (e.g., AF estimation, whether to mitigate, etc.).

iii. Meteorological Conditions: Mr. Ettinger claims that differing conditions between the two sampling events do not result in a significant difference in indoor and

crawl space TCE is a moot point for several reasons. As mentioned above, Summer sampling events are often expected to exhibit lower indoor air concentrations than Winter sampling events for various reasons related to weather and other building operation factors. The criticism is a distraction because sampling was not performed in a manner that would result in RME estimates for either event.

e) With respect to the crawl space samples, Mr. Ettinger claims that I relied on more current guidance regarding the number of and locations of crawl space samples to conclude that the investigation is flawed. Regulators who updated their guidance obviously concur with my assessment that the experimental design associated with assessing the crawl space was insufficient to draw proper conclusions, regardless of whether the consultants followed earlier guidance. The key point is that the investigation does not adhere to current guidance. Mr. Ettinger again claims that I fail to consider practical challenges associated with crawl space sampling. I have been involved in many crawl space investigations and am aware of the challenges. My point is that the sampling effort was not in compliance with guidance and is prone to underestimate concentrations and risk.

f) Regarding analytical reporting limits, Mr. Ettinger claims I misleadingly assert that reporting limits were insufficient to properly and accurately quantify chemical concentrations and claims that many of the J-flagged results are for indoor air samples with analytical detection levels above risk screening levels. Once again, this criticism is a distraction because sampling was not performed in a manner that would result in RME estimates (e.g., exposure concentrations were potentially underestimated as a result). Any J-flagged result that includes detection levels above risk screening levels demonstrates that the laboratory analytical system was not properly calibrated. This happens from time to time. However, this should be discussed in reports in a transparent manner and the data should not be relied upon to assert "no risk" when risks level concentrations may have been detected.

g) With respect to passive soil vapor samples, Mr. Ettinger claims I discount the use of passive soil vapor samples and that I claim that shallow (less than 3 feet bgs) samples are inconsistent with CalEPA guidance. Shallow passive samples _are_ inconsistent with CalEPA guidance. More specifically, CalEPA guidance states that these should not be used for quantitative analyses or to exclude or "_screen-out_" buildings from further VI evaluation, which is what the Defendants' consultants have done. Mr. Ettinger claims they used this data as a line of evidence to "_refine the conceptual site model_". Their conceptual site model is not sufficiently conservative, as it did not result in recommendations for further indoor air evaluation. The shallow passive soil vapor sample results were used in support of that position.

h) Regarding RME determination, Mr. Ettinger claims I mischaracterize the objective of the RME assessment used for risk assessment and risk management and USEPA's

recommendations regarding RME. This is inaccurate, as my characterizations not only comport with USEPA recommendations, but my related data are often used in USEPA sponsored workshops to convince practitioners and regulators to stop implementing the types of sampling strategies used in the Class Area and to opt for superior methods based on more appropriate sample timing (e.g., coincident with VI "On" conditions). Mr. Ettinger claims that exposure assessments should be based on "*reasonable potential exposure*" and not exposures that are not reflective of occupied conditions. This is only partially correct, as exposure assessments and related risk management decisions should be based on RME as recommended in USEPA (2015). Determining RME during occupancy is acceptable, but this was not attempted in the buildings tested, as there was no effort to determine whether or for how long VI "On" conditions occurred. Mr. Ettinger claims that USEPA (2015) states that multiple samples may be collected to characterize a reasonable maximum vapor intrusion condition. However, Mr. Ettinger does not acknowledge that his own colleagues assert that 1 to 4 sample rounds is not sufficient to accurately estimate RME (Gabris, 2023), and that Dr. Henry Schuver (USEPA HQ, key promoter of RME and sample timing improvement) and his colleagues (including Dr. Jeffrey Kurtz from Geosyntec) report that 58 randomly timed samples would be required to achieve a 95% level of confidence in an RME estimate for each structure (Schuver et al., 2018). The fact that 58 randomly timed samples would be impractical for most cases is a primary justification for the EPA-supported Indicator Tracer Surrogate (ITS) program that focuses on improving VI sample timing to collect samples during VI "On" conditions for assessment of RME. Mr. Ettinger asserts that I support sampling under conditions with "artificially elevated VI". This is not accurate. I support sampling during VI "On", which is when vapors are migrating into the structure, as this should better estimate RME conditions. ***EPA (2015) advocates for using RME for all VI risk-based management decisions***. I maintain that RME should be used to derive attenuation factors, given that this criterion is used for key risk management decisions. Mr. Ettinger claims that 0.002 is more conservative than the 95th percentile of the AF estimates derived for the site. Given that RME was not determined for any of those estimates, this represents a critical flaw in the logic being applied. In addition, Mr. Ettinger claims that my position "*implies that the approach used by USEPA to derive their default AF of 0.03 was derived using "indoor air concentrations measured while VI is 'on'."*" This is incorrect, misleading, and represents one of my biggest criticisms of the USEPA (2012) effort. More specifically, given that more recent guidance (e.g., USEPA, 2015) focuses on RME as a key factor in risk management decisions due to the documented evidence that traditional approaches are prone to false negative results and underestimates of risk because they do not appropriately capture temporal variability, I believe that the USEPA (2012) effort using randomly timed samples collected during 'as-is' conditions (as was done in Canoga Park) should be revised to account for RME. This also applies to more recent studies and related publications based on randomly timed paired sub-slab and indoor air concentrations (e.g., Abbasi et al., 2022, and Lahvis and Ettinger, 2021). In fact, I am currently working with colleagues on related efforts to accurately estimate building-specific AF values during VI "On" conditions. These are not based on "*artificially elevated*" indoor air concentrations, but

reflect analytical observations during VI "On" conditions as verified using concurrent controlling factor data (e.g., barometric pressure trend, differential pressure, wind, etc.).

i) With respect to alternative investigation methods, Mr. Ettinger claims that while the alternative methods suggested by me provides more data, they do not provide better data related to the assessment of long-term average concentrations. This is a misleading statement because these alternative approaches allow for the measurement of indoor concentrations during confirmed VI "On" conditions, which is what should dictate the estimate of RME and subsequently the derivation of AF. This is consistent with USEPA (2015), as it minimizes the potential for underestimation and false negative results, and better informs VI risk-based decisions for the buildings tested and for the entire community overlying groundwater at 1.2µg/L TCE. Added benefits include the fact that practitioners can also derive defensible long-term average concentrations while answering critical questions related to potential indoor sources, vapor entry pathways, risk assessments and mitigation design. Mr. Ettinger states that these alternatives are not commonly used. However, these are readily available and have been used effectively for hundreds of sites throughout the US and beyond. Mr. Ettinger states that monitoring pressure for buildings with crawl spaces is not common and would not alter the CSM. If the experienced and trusted consultant (such as Mr. Ettinger) recommends this type of measurement, the client would approve this relatively small additional cost. With respect to the CSM, pressure measurement can have a profound impact. More specifically, it can dictate when to sample (and therefore impact sample results), can be used to determine the duration of VI "On" conditions, and can therefore be used to derive defensible RME estimates and risk assessments. In contrast to claims made by Mr. Ettinger, the alternative methods I recommended have improved the CSM and VI assessment at hundreds of sites. For instance, most of the high-frequency monitoring projects my colleagues and I have performed occurred at sites where previous sampling data had been collected, but key questions remained unanswered. In most cases, within a few days of monitoring, these questions were resolved and the CSM was greatly improved.

Rebuttal 13.3 (beginning on Pdf p.40):  Mr. Ettinger claims the 1.2µg/L groundwater contour should not be used as the sole line of evidence to define the Class Area. Mr. Ettinger quotes SFBRWQCB (2019) with the following: "*The presence of a chemical at concentrations exceeding an ESL does not necessarily indicate adverse effects on human health or the environment, rather that additional evaluation is warranted.*" Mr. Ettinger does not consider the fact that the VI assessments to-date are flawed due to the missing RME assessment, the relatively limited number of buildings tested, and other flaws articulated above and in my expert report. A more appropriate and accurate assessment that complies with USEPA RME criteria would potentially require years of additional effort, while groundwater remediation to levels below the ESL will potentially require even longer. As such, VI mitigation represents a prudent, timely and effective way to prevent public exposures in the near-term. The regulatory supported ESL of 1.2µg/L TCE represents an appropriate decision criterion regarding extent of plume and

delineation of the Class.

Mr. Ettinger claims that the 1.2µg/L contour was derived using samples collected from below the water table. However, in his Exhibit 9 depicting vertical distributions of groundwater concentrations, the 50 to 500µg/L contour is depicted along the water table (see pdf p.142-143, cross sections G to G' and G' to G"; Figure 3 and Figure 4). Note that these images were generated 8 years ago and that the groundwater plume is mobile (Figure 11).

Mr. Ettinger claims that "*the presence of fine-grained layers will provide lithologic barriers to vapor intrusion*". Fine-grained layers are not continuous throughout the plume. In addition, a textural observation is not the same as an empirical measurement of hydrologic properties or vapor flux potential. Vapor flux through fine-grained materials occurs and is common, particularly when moisture content is low (Bekele et al., 2014). In fact, PCE was documented under the garage slab at the Behar residence even though Mr. Ettinger's cross section on p.143 depicts shallow fine-grained layers in that vicinity.

Mr. Ettinger maintains that the soil vapor concentrations are preferable to groundwater concentrations when assessing potential risks, and claims these are below their biased and inappropriate 240µg/m$^3$ soil vapor risk screening criterion. The soil vapor criterion was derived with "screening" methods prone to underestimation of indoor concentrations, without considering RME, and by adamantly objecting to agency recommendations to use a more conservative soil vapor-to-indoor air AF of 0.03 and the associated risk screening level of 16µg/m$^3$. Using a risk decision criterion that is not based on the RME is inconsistent with USEPA (2015), as it increases the potential for false negative results (e.g., public exposures without their knowledge).

Mr. Ettinger claims that the building-specific sampling conducted in the priority area concluded that the VI pathway is not significant and that the areas outside of this zone would be expected to exhibit lower risk. This conclusion is based on flawed data (see above and Kram report). Note also that as one moves downgradient, the groundwater depth becomes shallower at least to Winnetka as of 8 years ago, which means that the vapor transport distance between the water table and buildings becomes less.

Rebuttal 13.4 (beginning on Pdf p.42): Mr. Ettinger claims that the VI risk potential is overstated. Mr. Ettinger is basing his opinion on flawed data that does not comport with USEPA's recommended RME criterion, which (as Dr. Helen Dawson acknowledged in her testimony; Dawson,2023b) is required for assessment of VI risk. Regardless of the CSM Mr. Ettinger describes, the soil vapor and groundwater concentrations exceed the default risk screening levels throughout the Class Area. The keys to understanding risk potential include accurate determination of indoor air RME and the presence of VOCs under and around the buildings.

A model is only as good as its' weakest assumption. Models can inform process. However, empirical data collected with appropriate methodology are superior to model assumptions. The

weakest assumption in the CSM includes the assertion that the indoor air sample results to-date represent accurate "conservative" exposure profiles and that they are appropriate to use to derive risk management criteria such as attenuation factors and associated risk screening levels. The Defendants' indoor air sample data is inconsistent with USEPA (2015) VI risk management recommendations. Claims about depth to water, lithology, and VOC concentration distributions are outweighed by indoor air exposure profiles represented by accurate estimates of the RME. RME, which can be estimated while VI is "On", should be used to derive more appropriate building-specific AF values. When randomly timed samples are collected while windows and doors are open and while fans are operating, an underestimate of the exposure profile and building-specific AF values will result. This is acknowledged in USEPA and California VI guidance that recommends determination of "conservative" indoor air concentrations. Given that every building behaves differently, and that less than one percent of the buildings overlying the regulatory agency groundwater risk screening concentration of 1.2µg/L TCE were assessed (although improperly), it is essential to employ conservative AFs as the VI risk management criteria throughout the Class Area to avoid false negative conclusions that would increase risks to occupants without their knowledge.

The Defendants' consultants did not employ conservative AFs. On the contrary, they were directed by their client to "*argue out of the new attenuation factor*" of 0.03 for soil vapor-to-indoor air. The consultants complied with this directive by failing to base their conclusions on RME and by not disclosing material facts to the regulators as they argued against agency requests to use more conservative risk management decision criteria and processes (e.g., soil vapor-to-indoor air AF of 0.03, including an indoor air monitoring component to the long-term monitoring plan, etc.). More specifically, the Defendants' consultants did not inform regulators that they sampled during Santa Ana wind conditions, that they sampled with doors and windows open while fans were operating, or that their crawl space samples do not currently meet regulatory guidance recommendations. Whenever indoor air concentrations were observed to be inconsistent with their narrative, the Defendants' consultants argued that elevated indoor air concentrations were due to indoor sources that were never unequivocally proven. They have the equipment and experience to verify their claims (see Gabris, 2023), yet they did not attempt to do so.

After formidable resistance, OEHHA (who on multiple occasions advocated for more conservative risk management criteria; e.g., AF of 0.03 for soil vapor and 0.001 for groundwater, respectively) deferred to the Water Board regarding the decision to approve or deny the Defendants' proposed AF of 0.002. They apparently did not want to be held responsible for deviating from their position or the potential harm this could cause the Canoga Park community by adopting a lax risk management position. The Water Board eventually approved the Defendants' proposed AF of 0.002 as well as the flawed LTMP without being told of the multiple investigation shortcomings (Mexikatzin, 2023). In addition, and contrary to agency requests, the LTMP does not currently include any indoor air sampling. The Defendants consultants, understanding that subsurface vapor concentrations can appear stable (relative to indoor air concentrations), exploited this commonly observed soil vapor plume feature and convinced the agency to accept soil vapor concentration trend analysis as the driving risk

decision criterion in their LTMP. They focused on the biased risk screening level of 240µg/m$^3$ (corresponding to the flawed AF of 0.002) for TCE in soil vapor instead of the more conservative screening level of 16µg/m$^3$ (corresponding to the agency-preferred AF of 0.03) and the groundwater screening level of 1.2µg/L (corresponding to the agency-preferred AF of 0.001). When combined with the fact that no indoor air monitoring is included in the LTMP, the net result was to implement a process that does not appropriately consider the well-being of the Canoga Park community.

Mr. Ettinger suggests that the 10-to-1 TCE to PCE ratio criteria used to conclude that indoor sources exist is scientifically defensible. While component ratios can be useful for implying whether potential indoor sources exist, it is not conclusive without supporting evidence. In addition, Mr. Ettinger fails to acknowledge that their own soil vapor and crawl space data does not support this (e.g., soil vapor: VP-3, VP-4, VP-5, VP-7, VP-8, VP-9, VP-11, VP-12, VP-15, VP-16, VP-17, VP-18, VP-19, VP-20, VP-21, VP-22, VP-23, and VP-24; crawl space: ARM-2, HEM-1, IND-1, IND-2, KES-6, LOM-1, LUL-1, LUL-3). The Orion (2019) secondary source zone investigation included soil sample analytical results that exhibited PCE concentrations similar to or higher than TCE in almost every vadose zone sample. Mr. Ettinger appears to have backed off the 10-to-1 ratio position by stating that this only applies to the plume centerline. However, when aiming to obtain agency support for their assertion that this criterion was valid for concluding that indoor sources were responsible for indoor exceedances, exceptions to this pattern were not presented. Furthermore, the Defendants' consultants did not specifically isolate and unequivocally identify the presumed indoor sources. They know how to do this (e.g., Gabris, 2023, USEPA VI Workshop presentation) and even employed the proper equipment for doing so (e.g., Hapsite), yet they opted to not pursue this. As such, the theory about every indoor air exceedance being attributed to indoor sources is not convincing. However, this is not how the data was presented to regulators. In fact, the regulators were not told about the inconsistencies between their proposed TCE to PCE ratio theory and the actual data.

By strongly advocating that he understands the risk profile for every building in the Class Area, and his conclusion that these risks are insignificant, Mr. Ettinger is supporting a position that is subject to uncertainty based on the flawed non-conservative sampling efforts to-date. It should be intuitively obvious to every VI practitioner that sampling with windows and doors open while fans are operating will not represent RME (the USEPA's preferred risk management criterion) or "conservative" conditions. Mr. Mexikatzin ("Mexi"; CalEPA) acknowledged this under oath (Mexikatzin, 2023). Closing of windows and doors prior to and during sampling to evaluate "conservative" conditions is specifically recommended in regulatory guidance throughout the nation (including USEPA and California guidance). The consequences of this sampling campaign shortcoming and the associated uncertainties regarding indoor vapor concentrations and exposures warrants immediate mitigation throughout the Class Area.

Rebuttal 13.5 (beginning on Pdf p.43): Mr. Ettinger claims I incorrectly evaluated the empirical attenuation factor and have misinterpreted the use of site-specific soil vapor screening levels for risk-based decision making. Mr. Ettinger cites AF studies by USEPA (2012), Abbasi et al. (2022) and Lahvis and Ettinger (2021) and claims that the USEPA default AF of 0.03 is too

conservative. As stated previously, the RME is to be used for VI risk-based management decisions. The AF impacts (and often dictates) VI risk-based management decisions. As such, building-specific AF estimates should be based on the RME. None of the studies cited based their AF assessments on RME determinations for indoor air. In fact, the data used for each of these studies was not intentionally collected to determine AF. Randomly timed paired subsurface and indoor air samples were used in these studies much later than the data was collected. The sampling methods used exhibit "*relatively high probabilities of false-negative decisions and poor characterization of long-term mean concentrations*" (Holton et al., 2013). As such, and consistent with the work performed within the Class Area, these studies do not comply with USEPA (2015) recommendations to estimate RME. The resulting AF estimates are therefore not appropriate for risk-based decisions, as the conclusions are not sufficiently conservative.

In response to this situation and the gap between USEPA (2015) RME recommendations and the use of non-RME data for building-specific AF determinations, ongoing studies are being performed using more appropriate indoor air monitoring efforts to observe a range of concentrations during VI "On" conditions along with subsurface concentrations and controlling factors (e.g., differential pressure, climate, etc.). This is essential, as traditional randomly timed samples have a high probability of underestimating indoor air concentrations (Holton et al., 2013; Schuver et al., 2018; Dawson et al., 2019; Kram et al., 2020). As such, AF values derived using traditional sample results (like those used in Canoga Park) will be underestimated and the associated risk screening levels will be elevated – allowing for higher levels of concentration to exist under occupied buildings.

Mr. Ettinger states that the AF values derived relied upon indoor air samples. As stated above, these were out of compliance with regulatory guidance because they do not represent "conservative" conditions or VI "On" conditions. As such, the indoor air data is not appropriate for determining building specific or community-wide AFs or screening levels. Mr. Ettinger proposes that the AF calculation consider background sources, which were never unequivocally identified and their contribution to the sample results were never quantified. In addition, a relatively small number of buildings were sampled (albeit with flawed methods). Therefore, the entire argument for an AF lower than the regulatory recommended default AF of 0.03 is based on questionable data and should not be used as the decision criteria for any of the buildings within the Class Area.

Mr. Ettinger misrepresents my discussion of Figure 12 that was prepared by the Defendants' consultants. My main point is that their own data demonstrates that their assertion that 0.002 is a conservative soil vapor-to-indoor air AF is not reflected in their data. More specifically, this value (0.002) sits at the extreme low end of the ratios presented.

Another example of the flaws in Mr. Ettinger's assertion that an AF of 0.002 is "conservative" is represented in an August 1st, 2018, letter to the occupants of 21006 Keswick (NGSC_2705452). The reported bedroom TCE concentration exhibited 0.52µg/m3 while soil vapor probes measured from 5.8µg/m3 to 75µg/m3. Two key conclusions can be derived from this

observation. First, this clearly demonstrates that, in contrast to what the Defendants' consultants maintain, soil vapor concentrations lower than 240µg/m3 (corresponding to their proposed AF of 0.002) can result in indoor air risk screening level exceedances. Second, a conservative building-specific AF derived by dividing 0.52µg/m3 in indoor air by 5.8µg/m3 in soil vapor would equal 0.089, which is higher than the 0.03 default AF and approximately 45 times higher than the Defendants' proposed soil vapor-to-indoor air AF of 0.002.

As practitioners begin to compile AF data derived from RME estimates, we are beginning to observe that in general, higher AF values can be documented for relatively lower subsurface concentrations. The reason for this is not yet well-understood, but this is important to understand for the Canoga Park Class Area. The implication is that due to the spatial and temporal variability, building-specific AF values would be needed to confidently reduce the potential for false negative conclusions. Given the level of TCE in groundwater and the fact that near-term remediation is not possible, mitigation is required for the residents in the Class Area.

Rebuttal 13.6 (beginning on Pdf p.45): Mr. Ettinger claims that opinions regarding the potential for sanitary sewers to act as preferential VOC migration pathways from the release point are speculative and mischaracterize the potential significance of these pathways. While it is well documented that discharges to the sewer have occurred at the Defendants' facility, it appears that this pathway has yet to be evaluated, even as the industry has acknowledged the risks posed by this pathway for years. This should be assessed immediately. Mr. Ettinger claims that there are other releases of VOCs to the sewer system. While this may be true, source attribution at this time represents speculation, as an investigation has yet to commence. Therefore, contributions from the Defendants and the fate and transport and exposure implications have not yet been characterized. Instead of proactively addressing this potential pathway, it appears the Defendants are waiting for regulatory agencies to require this.

Rebuttal 13.7 (beginning on Pdf p.46): Mr. Ettinger claims my justification for installing VI mitigation systems throughout the Class Area is flawed. Mr. Ettinger once again relies on indoor air concentrations and the AF and screening levels that were derived using non-conservative results. As a result, the criteria used in the LTMP is not sufficiently protective. While we agree that soil vapor monitoring is warranted, the AF is biased low, the soil vapor risk screening levels biased high, and there is no plan for indoor air monitoring. Their approach is inconsistent with EPA guidance that advocates for RME and long-term management recommendations. More specifically, the following is from EPA (2015):

"*EPA recommends that site managers also evaluate whether subsurface vapor sources that remain have the potential to pose unacceptable human health risks due to vapor intrusion in the future if site conditions were to change. The vapor intrusion pathway is referred to as 'potentially complete' for a building when:*

- *a subsurface source of vapor-forming chemicals is present underneath or near an existing building or a building that is reasonably expected to be constructed in the future;*

- *vapors can form from this source(s) and have a route along which to migrate (be transported) toward the building; and*
- *three additional conditions are reasonably expected to all be met in the future, which may not all be met currently; i.e.,*
    - *the building is susceptible to soil gas entry, which means openings exist for the vapors to enter the building and driving forces exist to draw the vapors from the subsurface through the openings into the building;*
    - *one or more vapor-forming chemicals comprising the subsurface vapor source(s) is (or will be) present in the indoor environment; and*
    - *the building is or will be occupied by one or more individuals when the vapor-forming chemical(s) is (or are) present indoors.*"

With respect to the Canoga Park Class Area, even with the investigation flaws, the data demonstrates that the pathway is complete for many of the homes tested and could potentially be complete for homes residing over the groundwater plume that have yet to be tested. To be certain, testing (to meet the second lower bullet) would be required to reduce uncertainties due to spatial and temporal variability throughout the area. ***Given the level of TCE in groundwater, the immediate solution is to mitigate all homes within areas impacted by TCE – a shared classification***.

Rebuttal 13.8 (beginning on Pdf p.46): Mr. Ettinger claims that the cost estimates for mitigation are speculative and incorrectly characterize hypothetical cost estimates prepared for the Defendants. Costs were derived for the number of buildings overlying the groundwater plume contour mapped to the TCE risk screening level of 1.2µg/L. Mr. Ettinger claims there is no data to support this. However, given that the studies performed to-date do not comply with guidance that recommends measurement of indoor air under "conservative" conditions aimed at deriving RME, a proper study would require years to assess all the properties documented to reside over groundwater that exceeds risk screening levels. The goal is to protect those building occupants. As such, it is reasonable to allocate resources towards this goal. Mitigation (as opposed to a drawn-out investigation to correct the shortcomings of the previous efforts) represents the best path forward.

Mr. Ettinger states the I erroneously assumed that 2 IAP units would be required per building, while the Orion estimate was for 1 IAP unit. Mr. Ettinger is correct. I mistakenly interpreted the short-term number of 40 units to apply to 20 homes (e.g., 40/20 = 2). I also revised the per unit cost to be $1,007, as my original assumption was that the $2,600 for replacement filters was not included in the total itemized price. As such, my total short-term equipment cost for the 3,787 homes has been adjusted to $3,813,509, which now accounts for 1 unit per home and filter replacement. Adjusted total costs for both short-term as well as long-term mitigation now equals approximately $277,791,598. These equipment estimates are consistent with Orion's estimate dated 29 November 2017. Given that inflation was not considered, this represents a conservative estimate.

Mr. Ettinger claims that I provide no justification for the assumptions used in the O&M components. The values presented in my report are reasonable and representative of situations encountered based on my experience. More specifically, power requirements of $1,000 per year, verification services at $1,000 per year, and laboratory analyses of $500 per year represent reasonable estimates for these components. All labor estimates were consistent with the Orion quote from 2017. Given that inflation and net present value calculations were not considered, these annual estimates are conservative.

Mr. Ettinger claims that implementation of VI mitigation measures would be variable across the Class Area and would need to be assessed on a property-specific basis. Property-specific assessment at this time would require additional time and resources, as the investigations to-date are flawed as described above. As such, implementation of mitigation measures throughout the Class Area is warranted to prevent any further public exposures. Estimates for these measures were derived using proposals generated by the Defendants' consultant. Given that these were derived several years ago (Orion, 2017), this represents a conservative estimate.

Rebuttal 13.9 (beginning on Pdf p.48): Mr. Ettinger claims that my recommendation for analysis for 1,4-Dioxane and PFAS/PFOA is unsubstantiated and without merit. Mr. Ettinger understands that these compounds are commonly associated with the industrial activities that occurred at 8020 Deering. Geosyntec is a leader in the assessment and remediation of these chemicals and claims to have "*decades of experience addressing emerging contaminants, including PFAS*" (https://www.geosyntec.com/pdf/PFAS-Geosyntec.pdf). The fact that these compounds are commonly associated with industrial activities like those that occurred at 8020 Deering is well-established, and the fact that regulatory agencies are beginning to require these types of assessments supports my contention that assessment of the presence and fate and transport of these toxic chemicals should commence without haste. While Mr. Ettinger seems to constrain his criticism of me to assert that these compounds do not represent a VI challenge, it behooves the Defendants to add these to at least their groundwater monitoring program. It is also important to note that EPA is currently performing studies to determine whether PFAS releases can pose a VI risk (https://cfpub.epa.gov/si/si_public_record_report.cfm?dirEntryId=353518&Lab=CEMM&subject=Health%20Research&showcriteria=0&searchall=Waste%20Management%20or%20Materials%20Management&sortby=revisionDate).

Closing 14.0 (beginning on Pdf p.48): Mr. Ettinger reiterates his opinion that the VI pathway is not significant and that the VI pathway for the Behar residence is incomplete. His opinions lack merit because the indoor air and crawl space data is flawed and does not comport with state or federal guidance that advocates for testing under "conservative" conditions to err on the side of caution. In contrast, the samples were not collected to evaluate RME, and are therefore insufficient for deriving a representative soil vapor-to-indoor air AF and associated risk screening levels. Mr. Ettinger relies upon the fact that agency representatives eventually relented in their opposition to the screening criteria advocated by the Defendant's consultants. However, the Defendants' consultants were not forthcoming about key field related conditions

and data interpretations as they implemented their clients' directive to "*argue out of the new attenuation factor*". The regulator overseeing the site had never heard of RME before they sat for a deposition (Mexikatzin, 2023). The consultants, who are very familiar with RME and the implications (Gabris, 2013; Dawson et al., 2019), leveraged off the inexperience of the regulators and, instead of working to effectively protect the community, opted to form a narrative that would reduce costs for their client regardless of the potential implications for the Canoga Park Class Area residents. This narrative is consistent among key components of the investigation and interpretation. This includes the defense of flawed sampling methods, the failure to report that windows and doors were open while fans were operating, the failure to mention Santa Ana conditions, the failure to point out when their rationale for concluding there are indoor sources is inconsistent with empirical evidence, the failure to specifically identify any indoor sources while claiming these are responsible for detections, and the development of a LTMP that excludes indoor sampling.

In summary, the Defendants' conclusions are based on flawed data that should not be used to make risk-based decisions when public exposures are possible. Decades have passed while exposure potential has persisted. ***Given the level of TCE in groundwater, the immediate solution is to mitigate all homes within areas impacted by TCE – a shared classification***.

**Mr. Bart Eklund Expert Report dated 10/24/23**

General Comments:
Mr. Eklund makes the following claims:
1. Groundwater and soil vapor plumes are sufficiently characterized to evaluate VI.
2. The off-property investigation conducted in the downgradient residential area was sufficient to evaluate VI, and supports the conclusion of no significant VI.
3. The conclusions from the off-property VI investigation are sufficient to draw conclusions across the Class Area, demonstrate that there is no significant risk of VI for the buildings in the Class Area, and that no buildings require mitigation.
4. The Behar residence has no VI impacts.

Mr. Eklund cites California guidance (which refers to sampling under "conservative" conditions) and USEPA guidance, which recommends determining the reasonable maximum exposure (RME) and using this for all VI risk-based management decisions. The fact that these were not adhered to renders all the indoor air sampling results flawed as well as the decisions and criteria that depend on these results (e.g., derivation of attenuation factors [AFs], risk screening levels, risk evaluations and risk management decisions). This theme will be referred to within the specific responses to Mr. Eklund's opinions in the sections below.

Specific Comments:
Beginning on Pdf p.15, Section 4.2 regarding Off-Property Groundwater Concentrations, Mr. Eklund states that depth to groundwater in 2023 was about 1 foot less than during prior testing events, and claims that this suggests that "*local rains had left a relatively clean water lens atop the water table*". Given that there is no empirical evidence provided, this is purely speculative. In addition, regardless of whether the rise in water table is due to localized (e.g., direct infiltration beneath the homes) or regional infiltration (e.g., infiltration occurring outside of the Class Area), it does not prove that the long-term potential for VI will be reduced (as implied by Mr. Eklund's statements).

Beginning on Pdf p.19, Section 4.3, Mr. Eklund discusses his opinions related to Off-Property Soil Vapor Concentration. On pdf p.21, Mr. Eklund states that the soil vapor results are closely related to the groundwater results and that the shallow vapor concentrations have been relatively stable since 2014 (which he depicts in his Figure 5). Two points can be derived from this: 1) absent subsurface and indoor data from the thousands of building that have yet to be assessed, the groundwater plume environmental screening level (ESL) of 1.2μg/L TCE represents a valid extent for defining the Class Area; and 2) using stable soil vapor data as the key long-term monitoring driver for determining whether to sample indoors does not make sense from a risk management perspective, as these are not expected to change significantly. The consultants know this and are using this criterion (e.g., soil vapor concentration trends) to avoid having to sample indoors.

A superior approach would be to include indoor sampling in the LTMP (as advocated for by OEHHA), as these values are expected to vary. If the Defendants are not willing to do so, then a

Dr. Kram Rebuttal of Defendants' Expert Report; Behar v. Northrop Grumman          34

more conservative soil vapor screening criteria should be used to determine when and where to sample indoors. Given that the indoor sampling data to-date was not collected under "conservative" conditions (e.g., closed windows and doors) to err on the side of caution and to estimate RME by sampling during VI "On" conditions, the AF derived by the Defendants' consultants (e.g., 0.002) is biased low and therefore the soil vapor risk screening level (e.g., $240\mu g/m^3$) is biased high. As such, the regulatory adopted default AF of 0.03 (and associated TCE risk screening level of $16\mu g/m^3$) should be used to determine where and when VI risks exist and whether mitigation is warranted. The potential for false negative results and unnecessary exposures is too great to maintain the current LTMP decision criteria and "rules".

Beginning on Pdf p.23 regarding Attenuation Factors in California VI Guidance, Mr. Eklund states that "*Screening levels are health-protective levels at which no adverse health effects are expected and reflect the absence of a serious health risk.*" Mr. Eklund then describes how attenuation factors are used to derive screening levels and states that "*attenuation factors are intentionally conservative*". This is not the case for the Canoga Park Class Area. The indoor air results were used to derive the attenuation factors (and the corresponding screening levels) for the entire neighborhood – including the thousands of homes that were never sampled. Open doors and windows, operational fans, and sampling while VI is not "On" is not only inconsistent with state and federal VI guidance, but results in soil vapor-to-indoor AF values that are *not* conservative. More specifically, the AF results are suppressed because the air concentrations used in the numerator of the AF calculation were most likely diluted and do not represent the RME. The net result is for the consultant to advocate for allowing higher levels of contaminants to reside under homes. When using incorrect non-conservative AF and screening levels to dictate whether samples should be collected indoors, it is likely that undetected exposures will occur. This is precisely the problem with the LTMP for the Canoga Park Class Area. People are potentially being exposed without their knowledge because of the bias introduced by the Defendants' consultants at the direction of their client who told them to "*argue out of the new attenuation factor*".

On Pdf p.24, Mr. Eklund mentions that the default regulatory soil vapor-to-indoor air AF of 0.03 has been criticized. This is an accurate statement. However, to-date, there has yet to be an AF investigation that adheres to the USEPA (2015) RME criterion recommended for all VI risk-based management decisions, which should include the derivation of building-specific AF values using samples collected at appropriate times to err on the side of caution. Ongoing studies where AF is being determined during VI "On" conditions should hopefully help resolve this issue. However, until this is completed, advocating for the use of AF and associated risk screening levels derived from randomly timed indoor sample results that are not "conservative" or representative of RME places the public at risk.

Beginning on Pdf p.25, Section 4.4, Mr. Eklund discusses his opinions related to Results of Testing at Off-Property Buildings. On Pdf p.28, Mr. Eklund states that 20 of 27 properties were screened out based on the $0.48\mu g/m^3$ TCE indoor air screening level. Two points can be made regarding Mr. Eklund's statement:

1) The indoor sample results do not represent "conservative" results or RME because the sample timing was random, windows and doors were open, and there was no attempt to sample during VI "on" conditions to estimate RME; and

2) Even with the flawed sampling, approximately 25% of the property indoor results exceeded the TCE screening level while a higher percentage exhibited TCE detections. As such, a proper sampling effort adhering to agency recommendations regarding sampling during conservative conditions and aimed at RME estimation would likely reveal higher TCE concentration levels and include more buildings exhibiting concentrations exceeding screening levels. Proper sampling would also most likely result in a higher calculated AF and associated risk screening level, as a higher indoor air (or crawl space) value in the formula numerator results in a higher calculated AF.

In Table 4 (Overview of Results for Testing at Specific Properties), most of the subsurface sample results exceed $16\mu g/m^3$, which is the soil vapor screening level when applying the agency's recommended soil vapor-to-indoor air AF of 0.03. The range in soil vapor results in Table 5a (Summary of TCE Results for Testing at 7 Selected Properties) suggests that the shallow subsurface concentrations are dynamic, and that variability depends upon the specific location sampled as well as the timing. For instance, the 2017 ELK-7 soil vapor results exhibited $3.9\mu g/m^3$ and $1,200\mu g/m^3$ TCE. Therefore, extrapolating these types of conclusions to other properties that were not sampled would be inappropriate and would therefore support adoption of conservative risk decision criteria (e.g., an agency-recommended AF of 0.03).

Mr. Eklund describes situations where indoor air values are higher than crawl space values and concludes that this is due to indoor sources which were never specifically identified. This result could also be due to the sample timing, weather conditions at the beginning of the campaign (e.g., high winds that dilute the crawl space), and the improper placement of the crawl space sample (e.g., near a vent or open access point). Mr. Eklund mentions that a Hapsite revealed elevated values in closets and cabinets (e.g., ARM-2). However, these results could also be due to vapor entry pathways, particularly under sinks with foundation penetrations. The Hapsite should have been used along with isolation of suspected sources (as described by Gabris, 2023) to unequivocally verify this claim. Without proper sample timing (e.g., during VI "on" and not during Santa Ana winds) and conditions (e.g., with closed doors and windows), and without indoor source confirmation, drawing such conclusions is speculative and without merit. Mr. Eklund concedes that the VI pathway is complete at several of the properties (ELK-1, ELK-7, HEM-1, KES-6, and LUL-2). This is notable, as this conclusion was derived even with inappropriate sample timing and conditions.

On Pdf p.33, Mr. Eklund discusses results from the sampling at 7031 Keokuk Avenue (Behar residence). Mr. Eklund is correct in that the same flawed approaches used to assess the Behar property were used for the other 27 properties. More specifically, as verified by eyewitnesses (e.g., I was present) and photographic evidence, the approaches were flawed because windows and doors were open while fans were operating during the indoor air sampling. In addition, the crawl space sample was collected adjacent to the exterior wall and access port. These factors

run counter to regulatory guidance recommendations because they each contribute to a high probability of yielding false negative results and exposure concentration underestimation. At a minimum, the indoor sample results are not valid for making risk management decisions because they do not represent RME, which is what USEPA recommends for all risk-based decisions. Furthermore, the match between indoor and outdoor results is unsurprising given that the windows and doors were open, the fans were operating, and the crawl space sample was so close to the vent. As such, Mr. Eklund's conclusions, like those associated with the other 27 buildings sampled where the consultants were not careful to adhere to agency VI guidance, are invalid and without merit. Mr. Eklund does not attempt to account for the subslab PCE detection.

Beginning on Pdf p.37, Section 5.0, Mr. Eklund describes his Conceptual Site Model for VI . One key element that is missing from the CSM described by Mr. Eklund includes sample timing. More specifically, given that concentrations are dynamic and spatially variable, in order to meet USEPA's RME estimation criteria for correct risk management decisions, it is essential to time the sampling to coincide with VI "On" conditions. Randomly timed samples (like those used for all the Canoga Park properties sampled) exhibit a propensity for false negative results and underestimates of risk (Holton et al., 2013; Schuver et al., 2018). This is the primary motivation for the USEPA sponsored Indicator Tracer Surrogate (ITS) program, which aims to encourage more appropriate sample timing by relying on controlling factor data. This would include differential pressure, barometric pressure trend, thermal gradient and other factors that dictate when conditions conducive to vapor transport toward and into buildings can be expected. Randomly timed samples are not appropriate for deriving accurate RME estimates (Schuver et al., 2018) or for deriving accurate risk assessments (Dawson, 2023b).

Mr. Eklund describes the five conditions that define a complete VI pathway according to USEPA (2015) and acknowledges that "*these definitions are independent of whether indoor air concentrations are above or below a given screening level*". This is an important point because Mr. Eklund and others provide risk conclusions based on whether a screening level is exceeded. However, they do not acknowledge the demonstrable fact that the indoor concentrations to-date were not derived during "conservative" conditions or with the goal of determining RME. As such, these data are not consistent with regulatory guidance and likely represent underestimates of exposure concentrations. Therefore, the VI risk conclusions provided by Mr. Eklund that rely on these data are invalid and without merit.

Mr. Eklund claims that groundwater samples collected over a screened interval of a monitoring well can overpredict potential VI impacts. However, long screened wells, such as those within the Canoga Park network, can yield the false appearance of concentration attenuation due to averaging that occurs throughout the vertically screened section of the well (Martin-Hayden and Robbins, 1997). As such, oversimplification of the spatial distribution of concentration commonly occurs with the use of low-resolution data represented by long-screened wells. High resolution tools (which are not currently in use for the long-term monitoring efforts) can be used to better identify preferential groundwater flow pathways and vertical and lateral concentration distributions.

Dr. Kram Rebuttal of Defendants' Expert Report; Behar v. Northrop Grumman                    37

Mr. Eklund acknowledges that sewers can play a role and result in VI concerns, but does not discuss how this pathway may impact releases by the Defendants or the fact that this has yet to be evaluated.

On Pdf p.38, Mr. Eklund claims that advective transport via barometric pumping in the shallow subsurface will be minimal in the Canoga Park area without providing empirical evidence of this. Given that concentration fluctuations were observed in several shallow subsurface vapor samples, advective transport is possible and ongoing in this area. This is critical, as it demonstrates how important it is to measure crawl space and indoor air concentrations while the ground is "*exhaling*" (e.g., when the pressure in the shallow soil is greater than the pressure in the crawl space and indoors). This would be consistent with objectives supporting the USEPA (2015) RME criteria. More specifically, this would yield an AF and associated risk screening level that is conservative.

On Pdf p.42, Mr. Eklund acknowledges the role that differential pressure plays. He also describes how in Winter, conditions can represent worst-case VI potential due to the pressure differential caused by occupant building settings. There is no mention of the fact that Santa Ana wind conditions prevailed during the Winter 2017 sampling event or how this would result in an underestimate of the VI potential.

On p.43, Mr. Eklund claims that his review of Geotracker data from 14 other buildings with crawl spaces represents empirical evidence in support of the conclusion that 0.002 is an appropriate attenuation factor for the Canoga Park Class Area. This assertion is without merit as there is no data provided, every site and every building are different, the samples were most likely randomly timed (as is most Geotracker data), and therefore the data does not comply with USEPA (2015) RME recommendations. Mr. Eklund describes how crawl space vents provide cross-ventilation that serves to discharge vapors. However, he does not discuss how Santa Ana winds can dilute crawl space concentrations, and how sampling during these conditions (which did occur) can underestimate potential risks.

On Pdf p.44, Mr. Eklund states the following when referring indoor concentration: **"*Greater attenuation would be expected during times when windows are open*." This is a direct acknowledgement that Mr. Eklund agrees that open windows will result in lower indoor air concentration. This will effectively reduce the calculated soil vapor-to-indoor AF. As such, Mr. Eklund's acknowledgment supports my contention that the sampling campaign performed in the Canoga Park Class Area resulted in less than conservative risk decision criteria.**

On Pdf p.45, Mr. Eklund mentions how the indoor air concentrations match the outdoor air for specific analytes, including TCE. This is not surprising, given that windows and doors were open while fans were operating during the sampling event.

Beginning on Pdf, p.48, Section 6.0, Additional Data Analysis & Conclusions, Mr. Eklund presents Table 11: Sub-Slab to Indoor Air. In this example, Mr. Eklund does not consider the fact

that the indoor sample results do not represent RME due to the sample timing. In addition, given that the team sampling indoors did not make sure that doors and windows were closed prior to and during the sampling event, the values used in the AF calculations are not appropriate, as open doors and windows would render the conditions "non-conservative".

On Pdf p.49, Mr. Eklund presents Table 12: TCE Shallow Soil Vapor to Crawl Space Air Attenuation. In this example, Mr. Eklund does not consider the fact that the crawl space samples were not collected in accordance with California VI guidance (e.g., a minimum of 2 samples near the center of the building footprint, far from the perimeter and vents) and that the December 2017 samples (representing 5 of the 6 samples in his table) were collected during Santa Ana wind conditions which would have a propensity to be biased low due to dilution as well as VI "Off" conditions prevailing during rising and relatively stable barometric pressure. As such, the crawl space results and AF calculations are not appropriate, as they do not represent conservative values.

On Pdf p.49, Mr. Eklund describes a model he generated to estimate the attenuation factor. The model is not representative in that the Santa Ana wind conditions are not considered, nor are the incorrect sampling locations (e.g., not collected in the middle of the building footprint). Mr. Eklund assumed an air change rate of 1 per hour (ACH = 1), which would most likely be higher during Santa Ana wind conditions if the crawl space is properly vented. The net effect would be to bias the predicted indoor air concentration low (as the equation used expresses ACH in the denominator for the concentration calculation). This would subsequently bias the AF low. For instance, increasing ACH to 1.5 in the model used by Mr. Eklund to simulate high winds (more air exchanges per hour) would decrease the predicted crawl space TCE concentration by about 50% (e.g., from $3\mu g/m^3$ to $2\mu g/m^3$ in the example provided). This means that high wind conditions (and higher air exchange rates) can dilute the crawl space concentration, which makes sense. As with open windows and doors, a lower concentration in the crawl space due to dilution of a sample collected during these conditions would result in an attenuation factor that is biased low.

In terms of vapor flux (e.g., the rate of vapor movement), the model used by Mr. Eklund appears to be driven by the concentration gradient, which controls diffusion. Diffusion is not the key driver of most shallow vapor transport situations. More specifically, vapor transport is dominated by a pressure gradient, where flow is from high pressure to low pressure (e.g., advection). VI "On" conditions occur when the subsurface exhibits a higher pressure than indoors (or in the crawl space), and can be caused by HVAC operation as well as a rapid drop in barometric pressure (see below). Perhaps the most important flaw with the model has to do with the fact that reality is dynamic and includes many transient components, while the model incorrectly assumes stasis. While models can be helpful for informing processes and performing sensitivity analyses, empirical observations generated with properly collected samples during VI "On" conditions (as documented by tracking controlling factors such as pressure) should dictate risk decisions.

Dr. Kram Rebuttal of Defendants' Expert Report; Behar v. Northrop Grumman                    39

On Pdf p.51, Mr. Eklund discusses the role of barometric pressure (BP) trends. Unfortunately, he analyzed general trends over multiple days. Kram et al. (2020) and others note that the diurnal barometric pressure trend over just a few hours can impact whether VI is "On" or not. Figure 7 displays data from another site in Southern California, where decreasing BP coincides with an increase in differential pressure (DP) as well as an increase in indoor concentration of TCE. The more rapidly the BP decreases, the more pronounced the DP and the higher the indoor air concentration. Slow or short-lived BP drops do not yield high DP or the highest indoor concentrations. The key point is that evaluating BP endpoints or general trends over multiple days (as Mr. Eklund describes) is not sufficiently resolved to understand the dynamics and durations of VI "On" conditions or the varying impacts of upward vapor transport.

From December 5th to 8th (Pdf p.120, of Mr. Eklund's report; Figure 8 of this report), note the rapid increase in BP and that winds were up to 50mph during that time (Pdf p. 124 of Mr. Eklund's report). A rapid rise in BP is characterized by VI "Off" conditions, as the pressure at the surface is higher than the pressure in the subsurface. This is exemplified in Figure 7 of this report where the rise in BP coincides with a decrease in indoor TCE concentration. The net effect of sampling during a rising BP (which occurred during the Winter 2017 sampling event) is to underestimate VI, underestimate crawl space and indoor concentrations, underestimate AF, and to derive an associated risk screening level that is not sufficiently protective of the Canoga Park community.

A Santa Ana wind condition is characterized by a rising and persistent high BP that only slightly fluctuates for several days as well as strong winds (e.g., typically greater than 20mph). This would be typified by VI "Off" conditions that preclude vapors from flowing upward through the soil profile and into the crawl space or indoors. The strong winds can also "flush out" the crawl space. The net effect is to reduce the observed indoor concentrations, crawl space concentrations, shallow soil vapor concentrations, calculated AF values, and the associated risk screening levels.

Mr. Eklund also mentioned that the subsurface concentrations were low beneath all the buildings. However, the spatial distribution in soil vapor is variable (as documented in the Defendants' data). If Mr. Eklund is referring to soil vapor samples collected from 3 feet below grade, those would be susceptible to barometric impacts and use of such data is discouraged in regulatory agency guidance.

In summary, **collecting samples during a Santa Ana wind condition is arguably the absolute worst time for a Winter VI investigation unless the objective is to underestimate risks and "*argue out of the new attenuation factor*"**.

On Pdf p.53, Mr. Eklund acknowledges that high winds occurred during what was to be considered the most conservative sampling event (Winter). However, he claims that high winds tend to *increase* VI potential due to the increase in pressure across the slab or ground surface. The opposite is actually accurate. While shear can result in an increase in DP in a portion of a building slab, the relatively higher pressure at the ground surface typified by Santa Ana

conditions precludes upward advective flow from the soil vapor into the crawl space or indoors because the ground surface experiences a higher pressure than the subsurface soil or exists in pressure equilibrium with the subsurface. When the ground surface pressure drops (e.g., diurnal pattern or approaching storm), the subsurface exhibits a higher pressure than the crawl space and indoors, and promotes upward advective vapor flow (e.g., VI "On"). This does not occur during Santa Ana conditions, which are dominated by VI "Off" conditions.

On Pdf p.54, Mr. Eklund concludes there are no buildings that require mitigation. He fails to acknowledge the shortcomings in the sample timing and the impacts as described above (e.g., underestimation of indoor concentrations). As such, his conclusions are without merit. A proper investigation that adheres to state and federal guidance would require years of effort. A superior option would be to mitigate all buildings exceeding regulatory risk screening levels (e.g., $16\mu g/m^3$ in soil vapor, $1.2\mu g/L$ in groundwater).

Mr. Eklund presents his rebuttals to my opinions beginning on Pdf p.57.

Pdf, p.57, #1 – Re: Dr. Kram's Opinion that Every Building Requires Testing (or Mitigation). Mr. Eklund criticizes this position and states that the process implemented is considered standard (e.g., test in an area that is assumed to pose highest risk and derive decisions based on the results). Unfortunately, given that every building behaves differently with respect to VI potential (as acknowledged by the Defendants' consultants and federal and state regulatory agencies), and the fact that the spatial distribution of soil vapors measured to-date is variable and temporally dynamic in the shallow subsurface (e.g., ranges orders of magnitude for several individual buildings tested), it is not possible to know the impacts for every building in the Class Area. In fact, it is impossible to know impacts between adjacent buildings unless each is properly tested. This is why regulatory agency guidance focuses on "*building-specific*" assessment.

Since the indoor air tests to-date did not adhere to policies that include measurement during "conservative" conditions with an emphasis on estimating RME, conclusions drawn from this data are flawed. As such, results, conclusions, or recommendations for buildings that have yet to be tested that are derived from the investigations to-date do not apply to any buildings within the Class Area. Given the time and resources required to perform a representative investigation for all buildings in the Class Area, installation of mitigation systems for all properties overlying the regulatory recommended default soil vapor screening level (e.g., $16\mu g/m^3$ of TCE) and groundwater risk screening level ($1.2\mu g/L$) is required. ***Given the level of TCE in groundwater, the immediate solution is to mitigate all homes within areas impacted by TCE – a shared classification***.

Pdf p.58, #2 Re: Dr. Kram's Opinion #12 that USEPA's Default Attenuation Factors Should be Used to Derive Mitigation Decisions. Mr. Eklund claims that the degree of conservatism associated with the regulatory agencies' default attenuation factors "*makes them inappropriate for use in planning remediation or mitigation measures*". Mr. Eklund provides insufficient support for his statement, as every AF study performed to-date (including USEPA [2012], Abbasi

et al. [2022], Lahvis and Ettinger [2021]) relied upon data that does not qualify for RME characterization, as the condition of VI "On" was not included in these efforts. As such, these studies are inconsistent with USEPA (2015) guidance that acknowledges concentration dynamics and recommends determination of RME to err on the side of caution. This is particularly applicable for the Canoga Park situation given that the US government considers TCE an acute risk.

I provided examples using the Defendants' consultants' data that exceed the soil vapor-to-indoor air AF of 0.002 (e.g., 0.09 for ARM-2, 0.11 for KES-2). This was observed even with the flaws in the Defendants' efforts described above. In addition, I provided a recent example described by Goldstein and Goldberg-Day (2023) where the investigators documented an AF of 0.12 at another site. It is also important to note that when proposing a region-specific attenuation factor of 0.002, the Defendants based their argument in part on a plot of _maximum_ IA versus _maximum_ SG. This is not sufficiently conservative given the temporal and spatial variability they've documented. To err on the side of preventing exposures, a more prudent approach would be to pair _maximum_ IA and _minimum_ SG results for each property assessed.

In summary, Mr. Eklund relies upon flawed data to assert that the default attenuation factors advocated for by OEHHA on numerous occasions is overly conservative. Given that the Defendants' investigations to-date are flawed, and that thousands of Class Area buildings overlying the regulatory agency groundwater-to-indoor air risk screening level of 1.2µg/L (corresponding to the regulatory AF of 0.001) have yet to be tested, applying a less than conservative AF to this neighborhood would not be responsible, as the potential for false negative conclusions and public exposures is unacceptable to the community. The Defendants directed their consultants to "_argue out of the new attenuation factor_" (March 21, 2019, email from Shantal der Boghosian) of 0.03 for soil vapor-to-indoor air when they knew this criterion was pending in draft California guidance. Mr. Eklund's claims and positions represent actions in furtherance of this directive, regardless of the potential impacts on the Class Area community.

Pdf p.58, #3 Re: Dr. Kram's Questioning of the Timing of the Assessment and Response to the Potential for Vapor Intrusion. Mr. Eklund asserts that the Defendants followed the protocol of the time beginning in 2007. As early as 2012, Forand et al. (2012) determined there could be birth defects associated with inhalation of TCE and PCE. Around that same time, USEPA (2012) published a study that proposed implementation of a soil vapor-to-indoor air attenuation factor of 0.03, and shortly afterwards released acute risk screening levels for TCE (USEPA, 2014). However, several years passed without any off-property indoor air sample collection events. More specifically, it wasn't until 2017 that any off-property indoor air samples were collected. When the Defendants finally implemented their VI investigation, they did not follow agency data collection recommendations. More specifically, they did not sample indoors during "conservative" conditions or even attempt to estimate RME. In fact, during the Winter of 2017 (a season which is often assumed to represent worst case), they sampled without requiring windows and doors to be closed, and during an increasing barometric pressure and high wind event (e.g., VI "Off" conditions). They did not reveal these facts to the regulators and presented their data as valid. They continue to treat this data as representative and characterize their

position as "conservative" as they implement their clients' directive to "*argue out of the new attenuation factor*". They derived their LTMP that does not include any indoor testing and further delays the implementation of risk prevention measures. They promote a narrative that there is no risk to the community when their methods and approaches were flawed. They should understand this because their own consultants have criticized the same approaches and publicly promoted more appropriate methods in their USEPA sponsored workshop presentations (Gabris, 2023). More specifically, and consistent with my opinions, Gabris (2023) maintains that 1 to 4 sampling events are not sufficient for RME determination (which is also supported by Dawson, 2023b) and that indoor sources can be empirically and unequivocally confirmed by isolating suspected sources and testing with devices that include the Hapsite. Given that implementation of a more appropriate investigation would require more time, a more prudent response would be to mitigate the buildings meeting USEPA risk screening criteria. Every day that passes without mitigation represents additional potential for public exposures. ***Given the level of TCE in groundwater, the immediate solution is to mitigate all homes within areas impacted by TCE – a shared classification***.

Pdf p.59, <u>#4 Re: Dr. Kram's Claims that the Investigations are Deficient Because no RME was Calculated</u>. Mr. Eklund claims that two or more rounds of sampling are typically conducted and that he has never determined RMS at over 350 VI projects he's worked on. This reflects the failures of agencies to encourage practitioners to adhere to USEPA (2015) guidance criteria and USEPA's consistent message through their Indicator Tracer Surrogate (ITS) group and annual workshops that advocate for collecting indoor air samples during VI "On" conditions. USEPA's ITS group message is consistent with my position. In fact, after my colleagues and I showed key ITS members data from high-resolution continuous monitoring of concentration dynamics and associated controlling factor patterns (Hosangadi et al., 2018), the members (including USEPA researchers) embarked on a multi-year study that confirms these findings and is being used to develop new approaches to improve sample timing based on differential pressure and other factors indicative of VI "On" conditions.

For more than a decade, practitioners have been unequivocally demonstrating that spatial variability and temporal dynamics prevails at sites where the vapor intrusion pathway is of concern. The philosophies and justifications behind the RME and ITS are consistent with the philosophy behind the use of conservative default AF estimates – namely, to err on the side of caution to reduce the potential for false negative conclusions and unnecessary public exposures. Mr. Eklund claims that OEHHA accepts maximum levels in lieu of a more robust sampling effort "*representative of site conditions*". Given that the Canoga Park investigation is replete with flaws due to sample timing under VI "Off" conditions and open doors and windows, the maximum levels observed do not represent the maximum levels anticipated during VI "On" conditions. Superior approaches to estimated RME (e.g., continuous monitoring over a few barometric cycles, building pressure cycling, etc.) yield defensible data during VI "On" conditions to estimate RME. The Defendants' consultants are familiar with these methods and have implemented them at other sites. Mr. Eklund's claim that he has never pursued this, or that the regulatory agencies are not adhering to USEPA recommendations does not mean my positions are incorrect or inappropriate. On the contrary, the goal should be to prevent

exposures. As such, consistent with USEPA (2015), VI risk related decisions (including the AF and risk screening criteria) should be based on an RME estimate.

Pdf p.60, #5 Re: Dr. Kram's Claim that the List of Chemicals of Concern is Inadequate. I note that potential releases of 1,1,1-TCE, 1,4-Dioxane and PFAS/PFOA have yet to be assessed. The Defendants and their consultants know these toxic chemicals are associated with the activities that occurred at the Defendants' facility. While Mr. Eklund frames this within the context of VI, I did not specify the VI potential for these compounds. This is because the community does not want toxic chemicals in groundwater under their homes. While new research is underway to evaluate the potential VI issues associated with specific PFAS chemicals, my point in raising this issue is to emphasize how the regulatory agencies have yet to require a complete assessment and delineation of these compounds. Given that the Defendants know of the potential for the presence of these compounds, and the fact that they could potentially be transported downgradient of their release, they have opted to wait until this is required. Regulatory agencies are just starting to require assessment of PFAS releases. As such, it could be beneficial to the Defendants to begin characterization efforts in case any releases attributed to them are currently mobile. As with many other chemicals that are transported via groundwater flow, early detection and response can often result in cost savings.

Pdf, p.61, #6 Re: Experts Position Regarding Missing Assessment of Sewers. Mr. Eklund claims that sewer releases are only an issue when the utility is below the water table, that concentrations of releases are diluted due to the air in sewer lines, and that concentrations observed are too low to attribute significant contributions to sewer releases.  Each of Mr. Eklund's points is speculative, as there has yet to be an investigation to evaluate the sewer components shared with nearby downgradient neighbors. This is an emerging area of inquiry. For the related studies I've been involved with, transport of vapors into sewer laterals was evident and concentrations in sewer cleanouts were dynamic due to the heavy use of this utility. Elevated VOC concentrations in sewer cleanouts can also be caused by soil vapors that enter breaches in the utility. As such, an investigation of this VOC transport pathway should commence to be certain potential risks and exposure pathways are not missed.

Pdf p.62, #7 Re: Dr. Kram's Concerns Regarding Passive Soil Vapor Data. Mr. Eklund claims that shallow subsurface vapor concentrations do not vary. This is not always true, particularly with widely ranging barometric pressure that can rise and fall rapidly. This is precisely the reason why landfills represent some of the largest contributors of methane in the atmosphere and barometric pressure drop is often the criterion used for cogeneration via methane capture. In laboratory studies evaluating passive samplers, tests were conducted under fixed concentration. This is not representative of the shallow soil environment. Regardless, California (2023) does not allow for use of passive soil vapor samples to "screen out" buildings from further VI investigations, which is how the Defendants are using this data. In fact, soil vapor samples collected less than 5 feet is inconsistent with state and federal guidance due to the potential to be impacted by "barometric pumping".

Pdf p.63, #8 Re: Dr. Kram's Questioning of the Testing Approach and Implementation. Mr. Eklund's various criticisms fail to acknowledge the fact that "conservative" conditions and RME were not considered during the sampling efforts. As such, the data is not sufficient for drawing accurate conclusions appropriate for risk based VI management decisions. Mr. Eklund claims that high winds tend to increase VI, which is speculative and inconsistent with empirical observations, particularly when barometric pressure is rising or stable, as was observed during the Santa Ana wind conditions over the course of the December 2017 sampling event (Figure 8). Mr. Eklund concedes that winds can dilute crawl spaces. He also concedes that "***Greater attenuation would be expected during times when windows are open".*** However, Mr. Eklund claims that concentrations in the shallow soil are limited. For one, if Mr. Eklund is referring to the 3-foot below grade passive soil vapor samples, these are not adequate for drawing conclusions. Secondly, if Mr. Eklund is using 240μg/m$^3$ as his qualifier for "limited concentration", this threshold is inappropriate because it was derived using flawed indoor sample data.

Pdf, p.64, #9 Re: Dr. Kram's Assertion that Work was not Performed Consistent with Regulatory Guidance. Mr. Eklund maintains that the work was approved by regulatory agencies and, as such, it is consistent with regulatory guidance. Mr. Eklund presents a July 2016 OEHHA quote that reads "*the described procedures for indoor air sampling appear to be consistent with DTSC guidance*" as well as similar quotes. The word "*appear*" is particularly applicable and pertinent for several reasons. For instance, the guidance recommends sampling during "conservative" conditions. The Defendants' consultants failed to notify the regulators that their sampling events did not take place under "conservative" conditions. For instance, Mr. Mexikatzin ("Mexi"; CalEPA/DTSC) was not made aware that the doors and windows were open during sampling or that Santa Ana conditions prevailed during the anticipated worst case Winter sampling event. The regulators conceded that they trusted the Defendants to present their data and positions with transparency and without bias (Mexikatzin, 2023). Also, the Defendants disregard the USEPA (2015) concept and application of RME, even when they specialize in methods derived to estimate this critical risk decision criterion (Gabris, 2023; Dawson, 2023b).

Pdf p.65, #10 Re: Mr. Eklund's Assertion that the Plaintiffs Make Incorrect or Questionable Claims. Mr. Eklund challenges my assertion that the AF should be derived using indoor air concentrations collected during VI "On" conditions. Mr. Eklund's position is inconsistent with USEPA's RME recommendations, with ITS efforts sponsored over the past several years by USEPA, with leading practitioner efforts (including highly-regarded Geosyntec VI practitioners) who offer building pressure cycling services, and would allow for false negative decisions and unnecessary public exposures to prevail in VI investigations. While collecting samples during VI "On" conditions does not guarantee assessment of worst-case situations, the objective is to at least attempt to derive a reasonably conservative estimate to reduce the potential for false negative decisions and an underestimate of long-term risk. Given that TCE is considered an acute risk driver by the USEPA, and that families currently occupy homes in the Canoga Park Class Area that have yet to be sampled, it is critical to implement proper sampling approaches during VI "On" conditions to derive risk management approaches aimed at protecting the community.

Mr. Eklund criticizes my assertion that AF could be calculated using maximum indoor air versus minimum soil vapor concentrations because some values are J-flagged. This could be performed for buildings where a complete VI pathway has been confirmed and where RME has been applied to the indoor samples. This approach would yield a more representative and conservative AF that adheres to the demonstrable fact that concentrations are dynamic and spatially variable.

Mr. Eklund criticizes my assertion that PCE measured in Behar residential sub-slab samples is related to the groundwater plume. Mr. Eklund relies upon flawed indoor and crawl space data (see above) to draw his conclusions as well as the observation that TCE was not detected in the sub-slab. It is unclear why TCE was not detected. However, without a much more comprehensive sampling effort, understanding the spatial distribution of subsurface TCE and PCE is not possible. The variability in the co-located subsurface data and spatial variability throughout the community collected to-date spans several orders of magnitude. Drawing conclusions regarding component ratios or presence/absence of individual compounds from this type of data is fraught with challenges.

Mr. Eklund claims that the Goldstein AF values that exceed 0.002 do not apply to the Canoga Park site. For instance, Mr. Eklund claims that HVAC operation was transporting VOCs into the building for several of these examples. HVAC operations that generate negative building pressure relative to the subsurface are common. As such, this is a valid scenario, occurs in Southern California, and was documented by Goldstein. To assume that HVAC systems do not exist or are not operating in the Class Area and can potentially result in increases in indoor VOC concentrations would not be prudent.

In response to my observation that inappropriate detection levels were used in several indoor sample instances (e.g., detection levels were above the risk screening levels), Mr. Eklund claims that there was no VI occurring. However, he bases this on samples collected under conditions that render the results flawed (see above regarding RME and "conservative" conditions).

Mr. Eklund states that he has had previous dealings with me and finds my claims to be inconsistent with basic scientific principles and his own "extensive field experience". Mr. Eklund provides no specifics, his statements are inconsistent with the fact that I have consistently been at the forefront of our industry for close to four decades, and many of my developments and discoveries have been leveraged by industry and adopted by regulatory agencies - including USEPA and CalEPA as well as international regulatory agencies. In fact, the Defendants' consultants have relied upon some of my demonstration and validation achievements (e.g., Kram et al., 2008) during their Canoga Park groundwater plume characterization efforts. Consistent with his contention that the indoor data collected to-date for the Class Area is representative and appropriate for deriving risk management decisions that include attenuation factors and associated risk screening levels, Mr. Eklund does not acknowledge the consequences of improper sampling methodology and timing and how this could potentially be harmful to the community.

Mr. Eklund references rebuttals to an editorial I published in 2016 in the peer-reviewed journal *Groundwater Monitoring and Remediation*. I was asked to prepare this editorial by both the President and the Director of Science and Technology at the time for the National Ground Water Association (NGWA) following the release of the USEPA (2015) VI guidance and a conversation they participated in where Mr. Eklund argued that his claims about subsurface vapor transport were accurate even after my colleagues and I shared data demonstrating he was incorrect. More specifically, Mr. Eklund argued that much higher differential pressure (DP) was required to mobilize shallow subsurface methane than is necessary, and he incorporated his position and related risk decision criteria into a draft national standard. Mr. Eklund argued that practitioners could document explosive levels of methane in the shallow subsurface and that, with a single measurement of DP, one could readily conclude there was no risk. The implications are important because methane concentrations and differential pressure are dynamic. An incorrect assessment could result in property damage and fatalities. As such, I argued that it would be prudent to collect more appropriate data over at least a few barometric pressure cycles to be certain that risks are minimal. My colleagues and I demonstrated with empirical evidence that methane transport occurs with far less DP than what Mr. Eklund claimed is required. Mr. Eklund's position, much like his position in the Canoga Park Class Area, places the public at risk due to the uncertainties and potential for false negative conclusions. For instance, encountering an explosion after concluding conditions are safe at a methane release site based on insufficient characterization efforts and incorrect decision criteria is analogous to Canoga Park Class Area VI exposures occurring after concluding conditions are safe using the flawed approaches employed to-date.

When the USEPA (2015) released their guidance I expressed concerns in my editorial because I do not believe dynamic risk conditions were appropriately addressed. While USEPA acknowledged that dynamics and spatial variability occurs, and promoted the use of RME as the recommended risk decision criterion, they also described the use of canister samples that are not capable of adequately assessing exposure risk unless specifically targeting VI "On" conditions. The USEPA had the opportunity to dramatically improve our industry and prevent public exposures. While they introduced the concept of RME, the document unfortunately did not adequately encourage practitioners to pursue this via implementation of superior VI assessment methodology. [Note: The USEPA sponsored ITS group is working to correct this deficiency through their annual "State of VI Science" workshops and peer-reviewed publications (e.g., Schuver et al., 2018).] Once the EPA released their long-awaited 2015 VI guidance, I accurately predicted that practitioners would disregard RME and continue to use approaches such as those implemented at the Canoga Park Class Area. I expressed my concerns in my 2016 invited guest editorial that this could result in underestimation of risk and flawed conclusions. Since that publication was released, regulatory agencies have agreed with me and incorporated continuous monitoring, building pressure cycling, tracking of barometric pressure *trend*, and the concept of RME in VI guidance documents (including in the most recent California guidance update; CalEPA, 2023) and EPA-sponsored VI workshops. I've been invited to present at several of these workshops. My colleagues and I have also completed hundreds of

VI continuous monitoring investigations in the US, Brazil, Australia and Europe since 2016, and our observations have been consistent with the editorial statements I made at that time.

Pdf p.67, #11 Re: Expert's Opinion that the Study and On-going Monitoring are Insufficient to Address the Potential for Vapor Intrusion. Mr. Eklund claims that these concerns are unwarranted. Mr. Eklund claims that the groundwater and soil vapor plumes have been well delineated and that the LTMP is appropriate for monitoring changes in conditions for VI. Given that the AF used is inappropriate and based on flawed indoor sample results, and that no indoor samples are to be collected, the LTMP is not appropriate for evaluating vapor intrusion for the thousands of buildings overlying soil vapor and groundwater concentrations exceeding regulatory agency recommended risk screening levels. Mr. Eklund claims the Defendants did not defy OEHHA's recommendation to include indoor sampling. It is well-documented that indoor samples were recommended by OEHHA. However, they are not included in the LTMP.

Pdf p.68, #12, Re: Dr. Kram's Table 1 Summarizing Concerns. Regarding testing under "as-is" conditions and the potential for underestimating risks, Mr. Eklund responds that this was approved by regulators. However, he fails to acknowledge that conditions during sampling were prone to underestimating risks. In other sections (e.g., pdf p.44), Mr. Eklund acknowledges that open windows and strong winds can contribute to reducing indoor and crawl space concentrations.

Regarding documentation of ventilation conditions and not knowing whether sampling with VI "On" is occurring during sampling, Mr. Eklund speculates that this does not make a difference and points to the challenges and intrusiveness of documenting these conditions in residential neighborhoods. This does not address the fact that VI "On" conditions were not intentionally tracked to determine whether sampling was appropriate for determining RME.

Regarding my concern that very few sampling rounds were performed, including only one round for 5 of the 27 properties, Mr. Eklund points to the challenges associated with residential sampling. While this is true, it does not negate my concerns. The consultants acknowledge that 1 to 4 sampling events are not sufficient for estimating RME (Gabris, 2023).

Regarding my concern that continuous monitoring and BPC were not employed for the area, Mr. Eklund claims that in his experience, employing these as a first effort would yield ambiguous results, but provides no support for this. Regarding not using BPC, Mr. Eklund claims it is not required or essential and is not typically performed on structures with crawl spaces. However, BPC can be used to distinguish between indoor sources and VI, and when combined with continuous monitoring of subsurface, crawl space and indoor air, can help answer key questions regarding VI, vapor entry pathways, alternative (e.g., indoor) sources, and mitigation strategies. At a minimum, there was no effort to measure during conservative conditions. As such, to characterize a soil vapor-to-indoor air AF of 0.002 as "conservative" is misleading. Regarding continuous monitoring with a GC or Hapsite, Mr. Eklund claims this is not necessary. However, when indoor air detections were registered, the Defendants claimed these were from

indoor sources. Use of a GC or Hapsite could rapidly confirm this. A Hapsite was used at one home, but not in a manner that would allow for unequivocal indoor source confirmation.

Regarding the lack of differential pressure data, Mr. Eklund claims this is only for slab on grade construction. In lieu of this, the barometric pressure (BP) trend can be monitored to time the sampling event to occur during a rapid drop in BP, as this is often associated with upward vapor transport. Web sites such as WeatherUnderground.com provide useful BP predictions up to several days in advance that can be used to at least attempt to properly time sampling campaigns. Similarly, a rapid rise in BP (which was documented during the Winter 2017 sampling event) is not appropriate, as it coincides with VI "Off" conditions. Sampling during this time can and should be avoided.

Regarding 3-foot-deep passive samplers, Mr. Eklund claims this is standard practice and that BP and wind impacts are not expected to be significant. Mr. Eklund provides no evidence of this, but claims these are for qualitative assessment. Many regulatory agencies recommend against the use of shallow passive soil vapor samples because of concerns regarding impacts of BP (e.g., CalEPA). Regarding concerns about using passive soil vapor results to screen-out buildings, Mr. Eklund claims they are not being used to screen-out buildings. However, whenever there are claims that the soil vapor concentrations are minimal to assert that there is no risk for specific buildings, this represents an argument to screens-out buildings from further sampling considerations.

Regarding concerns that only one crawl space sample was collected, Mr. Eklund points out that requirements for more than one sample were not released until 2023, and that only one sample is appropriate given the size of the structures. This is inconsistent with current thought based on lessons learned and disregards the fact that many of the samples were collected close to the building perimeter and potentially near access points or vents (although access point and vent locations are not provided in the Defendants' reports). Mr. Eklund acknowledges that several of the crawl space samples were not collected in the center of the building footprint.

Regarding collection during high winds and rising and elevated BP, Mr. Eklund asserts that this would increase the potential for VI with no support for this claim. In fact, a rising BP and elevated winds would typically result in VI "Off" conditions and therefore decrease VI potential (Figure 7).

Regarding not trying to identify indoor sources, Mr. Eklund states that it is common to assert that indoor sources exist without confirmation and that there is limited time in residential situations. Given that this type of assessment can be rapid (minutes) when the proper equipment is used (e.g., Hapsite and a metal bowl as presented by Gabris, 2023), this should not be that difficult to perform, and represents an important line of evidence - particularly when claims of indoor sources are so prevalent within the study area.

Regarding claims that 10:1 TCE to PCE ratio is inconsistent with observations, Mr. Eklund states that there was no claim that this was the case. This is incorrect. This proposed "line of

evidence" was used to conclude that indoor sources were present, and several exceptions to this were documented. As such, it should not have been used to screen-out buildings from further VI assessment.

Regarding claims that the Defendants did not share critical information with the regulatory agents, Mr. Eklund claims that Mr. Mexikatzin ("Mexi") was not the case manager until 2017. However, he was the case manager prior to the approval of the Long-Term Monitoring Plan (LTMP) and he and OEHHA representatives were not privy to the directive by Ms. Der Boghosian regarding arguing against the use of the 0.03 AF, the open windows and doors during sampling, the fact that Santa Ana wind conditions occurred during the Winter 2017 sampling event, or the impacts this would have on the decisions moving forward. These could have all factored into the criteria and "rules" included in the LTMP.

Pdf p.75, #13 Re: Dr. Kram's Cost Estimates. Mr. Eklund claims that no structures require mitigation, even when he's acknowledged that open windows and high winds can impact results and conclusions. As such, this claim is without merit. Regarding per property cost issues raised by Mr. Eklund, Mr. Eklund correctly points out that the Orion quote includes short-term vapor mitigation at 40 properties and long-term mitigation at 20 properties. This was misinterpreted when the initial estimate was derived, as I incorrectly thought there were 40 units for 20 structures (or 2 units per structure). Another misinterpretation included the assumption that $2,600 for replacement filters was external of the per unit costs for the 40 systems. As such, this has since been corrected and recalculated so that the revised numbers and descriptions are as follows:

A proposal was derived by the Defendants' consultant Orion (Orion, 2017) approximately six years ago where installation of short-term indoor air purification units (Tasks F.4.1 and F.5.1) was to be followed by installation of long-term vapor mitigation systems (Tasks F.4.2 and F.5.2). Orion (2017) estimated that the air purification units would cost $1,007 per unit and that one unit would be required per building. Consulting charges would equal $772 per building. For the long-term vapor mitigation systems, Orion estimated equipment costs would be $14,730 per building plus $6,845 per building in consulting services. A reasonable estimate consistent with Orion (2017) and based on my professional experience and expertise was derived as follows:

Short-Term Indoor Air Purification Units Equipment (includes tax, shipping, four replacement filters, 1 unit per building – As per Orion):

      3,787 buildings @ $1,007/building = $3,813,509

Short-Term Indoor Air Purification Units and HVAC Modification Consulting (As per Orion):

      3,787 buildings @ $772/building = $2,923,564

      Subtotal Short-Term Air Purification Equipment plus Consulting: $6,737,073

<u>Long-Term Vapor Mitigation System Equipment</u> (As per Orion):

3,787 buildings @ $14,730/building = $55,782,510

<u>Long-Term Vapor Mitigation (VM) System Initial Consulting</u> (As per Orion):

3,787 buildings @ $6,845/building = $25,922,015

Subtotal Long-Term VM Equipment plus Initial Consulting: <u>$81,704,525</u>

These estimates did not include long-term operation and maintenance costs for the VM systems. If one assumes 20 years will be required to remediate the groundwater and soil under the neighborhood, and that power (at $1,000/building-year), verification services (at $1,000/building-year) and laboratory analyses (at $500/building-year) will be required, these add the following costs:

Subtotal Long-Term O&M:

3,787 buildings @ $2500/building for 20 years = <u>$189,350,000</u>

**Grand Total (Short-Term, Long-Term, O&M): <u>$277,791,598</u>**

***Given the level of TCE in groundwater, the immediate solution is to mitigate all homes within areas impacted by TCE – a shared classification***.

### Mr. Murray Einarson Expert Report dated 10/24/23

<u>General Comments:</u>

Mr. Einarson contends that the shallow groundwater east of the Brown's Canyon Wash (BCW) does not represent a TCE VI risk due to a freshwater lens and the plunging nature of the groundwater contaminant plume. There are many problems with Mr. Einarson's claim. It is important to consider that key cross-sections and three-dimensional depictions presented display TCE concentration distributions that are much greater than the regulatory agency recommended risk screening level of 1.2µg/L. For instance, Figure R-4 (Pdf p.73) includes cross-section G to G' and displays TCE concentrations along the water table east of BCW ranging from 50-500µg/L – well above the risk screening level of 1.2µg/L. Similarly, Mr. Einarson's Figures 19, 20, and 21 use 50µg/L to depict the shape and distribution of the groundwater TCE plume.

Mr. Einarson relies upon Hydropunch groundwater sample data collected approximately 8 years ago to draw conclusions about current shallow groundwater TCE concentrations. Any freshwater lenses over the main portion of the shallow TCE plume are expected to be ephemeral (e.g., not permanent). For instance, it has rained every year since the plume extended thousands of feet from the 8020 Deering facility, and yet elevated TCE groundwater concentrations have consistently been above the 1.2µg/L risk screening level along the water table throughout most of the monitoring locations within the Class Area. It is important to note that shallow samples were not collected from several of the most strategically located downgradient Hydropunch probe pushes within the "leading edge" of the "northern lobe" of the TCE plume during the 2015-2016 effort.

In several statements made by Mr. Einarson, he implies that every home east of the Brown's Canyon Wash (BCW) is safe from VI because of the presumed freshwater lens. This is inconsistent with the Defendants' data as rendered in cross sections G to G' and G to G" where shallow concentrations exceeding groundwater risk screening levels extend far east of BCW (Figures 3 and 4). The plume (including shallow components along the water table) has most likely been mobile since the Hydropunch data was collected. Given that the plume has grown from approximately 4,000 feet in length in 2003 (Larson, 2003) to approximately 17,000 feet in length (Tonkin, 2023, personal communication) over twenty years, this equates to approximately 650 feet of average TCE migration per year. The vertical distribution of concentrations in the "northern lobe" depicted using data from 2015 and 2016 (cross section G' to G''', Figure 5) suggests that the shallow portion of the depiction represents the shallow component of the "leading edge" at that time. Given the elevated concentrations in the shallow portion of the plume at that time (e.g., 120 to 880µg/L), it is likely that elevated TCE concentrations along the water table currently extend far east of where they are depicted in G' to G'''. ***More specifically, given the rate of TCE transport, one can expect the shallow portion of the plume to have migrated a considerable distance along the water table at concentrations exceeding 1.2µg/L over the past 8 years.*** The experts' claims about a lens of freshwater overlying deeper located contaminants are speculative, based on outdated observations, require an assumption that the plume is immobile, and are not supported by current data (Figures 9 through 12). Unfortunately, no monitoring wells are currently located in

that portion of the plume. Based on concentration dynamics documented in groundwater and soil vapor data collected in the downgradient portion of the plume since 2016, it is highly probable that the shallow portion of the northern plume lobe has migrated east along the water table. ***Given the level of TCE in groundwater, the immediate solution is to mitigate all homes within areas impacted by TCE – a shared classification***.

Specific Comments:

Section 3, Re: Opinion #3 (Pdf p.11). Mr. Einarson claims there are no significant CVOC exposure to vapor receptors in the proposed Class Area west of BCW. Two points apply as follows:

1) The VI investigation to-date is flawed in that sampling was not performed under conservative conditions as recommended in regulatory guidance and the results do not represent RME as recommended by USEPA to serve as the VI risk management decision criterion (USEPA, 2015); and

2) Thousands of building occupants reside over the groundwater and vapor plumes west of BCW.

Section 3, Re: Opinion #4 (Pdf p.11). Mr. Einarson claims there is no possibility of VI resulting from TCE partitioning east of BCW where he claims the plume dives deeply beneath the water table. The sampling to-date is not sufficient to draw that conclusion, so Mr. Einarson's claims are speculative. In the easternmost area where the consultants draw the plume as plunging deep, the Hydropunch data used to delineate this was collected approximately 8 years ago and may no longer be accurate. The farthest extent of the plume outline drawn only delineates to 5µg/L (instead of the agency-recommended risk screening level of 1.2µg/L). By using the appropriate risk screening value, the north and south lobes would cover larger areas (in map view) and volume (in three dimensions) than what is currently depicted. In Figure R-4 cross section G to G' (pdf p.73), shallow groundwater concentrations located east of BCW range from 50 to 500µg/L along the water table. Cross section G' to G" and G' to G'" (Ettinger pdf p.143 and 144) also show shallow TCE groundwater detections east of BCW that exceed 1.2µg/L (Figure 3 and Figure 4). The renderings in the northern lobe cross section (Ettinger pdf p.144; Figure 5) is incomplete, as there is no downgradient monitoring well screened into the shallow strata, and the deeper distribution and extent of TCE is not rendered. The Hydropunch data in the downgradient extent displayed is approximately 8 years old and therefore should not be relied upon to support Mr. Einarson's claim regarding current conditions. There are not currently any vapor monitoring points located in that area (e.g., the region Mr. Einarson considers the northern TCE plume lobe; see Figure 7, pdf p.49). However, dynamic soil vapor and groundwater TCE concentrations demonstrate plume mobility along the downgradient portion of the plume (Figures 9 through 12). In fact, as can be seen with Monitoring Well C-65 (Figure 11), the groundwater plume has migrated approximately 1000 feet downgradient of the leading edge rendered with the 2015-2016 data at concentrations exceeding the risk screening level of 1.2µg/L.

Section3, Re: Opinion #5 (Pdf p.11). Mr. Einarson claims that if future VI investigations are to be performed, they should be performed on a case-by-case basis because the subsurface

conditions in the Class Area are extremely variable. We agree that conditions are variable, which is why the investigations to-date are not sufficient to rule out VI. More specifically, they were not performed in a manner that meets regulatory recommendations (e.g., under "conservative" conditions and with VI "On" to best estimate RME). If the time requirements to perform a more accurate VI assessment were not significant, and people were not currently living in these homes, an entirely new VI investigation may be recommended. However, ***given the level of TCE in groundwater, the immediate solution is to mitigate all homes within areas impacted by TCE – a shared classification***.

Sections 4.4.1 and 4.4.2 (beginning on Pdf p.17) include Mr. Einarson's descriptions of the historical and current chemical impacts in soil and groundwater. Mr. Einarson acknowledges the presence of DNAPL and describes how a PVC well was deformed and had to be removed. Mr. Einarson claims the TCE plume dives to deeper depths east of BCW based on his 50µg/L contour level depiction. However, we see in Fig R-4 (pdf p.73) 50 to 500µg/L TCE along the water table east of BCW in the G to G' cross-section (Figure 3). Ettinger's p.143 (cross section G' to G"; Figure 4) also shows shallow TCE exceeding risk screening levels east of BCW. Cross-section G' to G'" (Figure 5) shows TCE plunging with several non-detect ("ND") values in the shallow strata. Our understanding is that the detection level for the Hydropunch was 1µg/L, so the shallow zones with sampling points marked ND 8 years ago could have had (and may currently have) TCE. Mr. Einarson's Figures 14 to 17 (Pdf p.56-59) should have been mapped out to 1.2µg/L, as this represents the regulatory agency ESL and default risk screening level corresponding to a groundwater-to-indoor AF of 0.001. Also, Behar's residence is displayed in the north lobe depiction (Mr. Einarson's Figure 17) in a manner that suggests the Behar residence is not near groundwater or soil vapor contamination above risk screening levels, which is not accurate (e.g., VP-24, Figure 12). When proper units are used to generate the renderings, one can see that the Behar residence is located above the contaminant plume (Figure 13).

There are several other misleading features in the images. For instance, in the cross-section depicted in Figure 15 (pdf p.57), the lobes are presented as separate features. However, the single sample they use to determine this does not seem to be collected from the proper depth. More specifically, if this were mapped out to 1.2µg/L, the interpretation could be very different. For instance, because TCE was mapped out to a contour "shell" of 50µg/L in cross section N to N', Mr. Einarson did not connect the plume lobes. Given that there are detections between the lobes that exceed 1.2µg/L along N to N', there would not be two lobes and the plume in map view would more closely resemble the Class Area as depicted by the Plaintiffs. Given the low-resolution vertical sampling distribution, it appears that contaminated strata between the proposed lobes was missed. This gets amplified when using an outer contour of 50µg/L.

Mr. Einarson claims there is up to 60 feet of clean water detected above the diving plume lobes east of the BCW. This is not verified with current data and appears to be inconsistent with the cross sections when contours are mapped out to the ESL of 1.2µg/L along the water table east of BCW. As stated above, much of the data used to derive that assumption is old (approximately 8 years old), was based on one Hydropunch sampling campaign that did not

sample everywhere within the Class Area along the water table, and it is therefore not appropriate for deriving claims regarding current conditions. More specifically, the shallow component of the plume has most likely moved farther east over the past 8 years.

Pdf P.18, Section 4.4.2.1, Re: Beneficial Effects of Source Zone Remediation. While it is certainly beneficial to remediate the source zone, it will require years (and potentially decades) before the source zone will be remediated to the point that will completely resolve vapor intrusion in the Class Area. More specifically, the Defendants are still in the pilot remediation phase, so testing and confirmation over the next few years will be required before any meaningful conclusions can be derived regarding effectiveness. DNAPL source zones are notorious for being long-term remediation challenges. Source zone characterization may not yet be completed. Mr. Einarson is well-versed in the use of Dye-LIF for source zone characterization (Einarson et al., 2018). To-date, it appears that this useful tool has not yet been employed. As such, it could take many years to bridge data gaps, remediate and resolve the VI challenges in the Class Area.

Mr. Einarson describes how source zone removal can impact the long-term dissolved plume underlying the Class Area over time. I agree. However, as stated above, it will require years (possibly decades) before completely remediating the plume down to the risk screening level of 1.2µg/L. While Mr. Einarson's Mann-Kendall assessment in Figure 19 is interesting, it is based on data with low spatial density, plume concentrations can be variable, the outermost contour displayed is 50µg/L (when it should be 1.2µg/L), and a prediction regarding complete remediation is not provided. As such, this does not represent a complete assessment of the duration of risk within the Class Area.

Pdf p.19, Section 4.4.3, Re: Soil Vapor. Mr. Einarson's Figure 20 depicts the distribution of the 1µg/L TCE "shell" in soil vapor. This is equal to 1000µg/m$^3$, which is 62.5 times the regulatory risk screening level of 16µg/m3. As such, it is misleading to use this concentration to depict the spatial distribution of the vapor intrusion risks in the Class Area. The distribution of soil vapor concentration of 16µg/m$^3$ should be mapped in this graphic, as should the groundwater concentration of 1.2µg/L. In addition, the Behar residence is plotted to assert that it is not overlying the TCE plume, which is incorrect and misleading. Mapping with the correct risk screening level concentrations shows that the Behar residence is located above TCE concentrations that exceed risk screening criteria (Figure 13).

Figure 21 is similarly misleading, as the units selected for the soil vapor and groundwater contour "shells" are not consistent with regulatory agency recommended risk screening levels. Selection of much higher values for these depictions incorrectly asserts that the soil vapor and groundwater plumes cover less volume and area. The spatial distributions of these plumes at regulatory risk screening levels are larger than what is represented in this figure.

Regarding Mr. Einarson's assertion that a layer of clean water exists everywhere east of the BCW is misleading and inconsistent with the data presented in Ettinger's p.142 (cross section G to G', Figure 3) that shows groundwater at the water table with TCE concentrations of 50 to 500µg/L, and p.143 cross section (G' to G'', Figure 4) that shows shallow TCE levels that exceed

Dr. Kram Rebuttal of Defendants' Expert Report; Behar v. Northrop Grumman                55

risk screening levels thousands of feet downgradient of BCW. In addition, the data Mr. Einarson relies upon along the southeastern extent of the groundwater plume was collected approximately 8 years ago in a screening mode with a Hydropunch. As such, given the time that has transpired, the potential for mixing, the fact that this should have been mapped out to 1.2µg/L, and the fact that p.144 of Ettinger (Figure 5) does not show any samples collected from shallow depths near the water table, the assertions are not valid as they are not based on current data and misrepresent groundwater TCE concentrations along the water table. As can be seen in Figures 9 through 12, groundwater and soil vapor TCE concentrations are dynamic. Figure 11 plots concentrations measured in Monitoring Well C-65 since cross section G' to G" was generated. This well is located approximately 1,000 feet east of the plume leading edge as depicted in G' to G" (Figure 4) and unequivocally demonstrates that the plume has migrated farther downgradient over the past 8 years.

Mr. Einarson claims the TCE vapor plume is contracting and displays plume outlines for four separate time steps in Figure 23 (Pdf p.65). Unfortunately, the contour "shell" value used equates to 1000µg/m$^3$ in these depictions. It would be informative to revise this using the risk screening level of 16µg/m$^3$ to better understand the spatial and temporal relationships between the soil vapor footprint and the overlying properties.

Mr. Einarson claims that fine-grained materials are attenuating the upward transport of TCE vapors west of the BCW. However, elevated vadose zone concentrations are well-documented, so to claim that VI is not likely is inconsistent with evidence consistently generated by the Defendants' consultants for more than a decade.

Pdf p.20, <u>Section 4.4.4, Re: Other Possible VOC Sources</u>. This section is speculative, as no alternative source testing has been performed by the Defendants. While all the other sources cited will require additional investigation, the contiguous shapes of the groundwater and vapor plumes mapped by the Defendants are consistent with what would be expected from discharges emanating from 8020 Deering. Mr. Einarson suggests that in some of the vapor wells, PCE is higher in concentration than TCE, and claims this is due to a release other than from the 8020 Deering property. The observation that PCE is elevated relative to TCE in indoor samples was used by the Defendants as a proposed line of evidence to conclude that indoor sources existed for those properties. This is inconsistent with other observations near the source area (e.g., saturated soil TCE concentrations tended to be much higher than PCE while vadose zone soil PCE concentrations were similar to or higher than TCE; Orion 2019). Elevated PCE to TCE in vapors is observed in the Defendants' vapor plume and in homes tested. As such, this does not confirm the speculative assumption that those observations were caused by alternative sources. While Mr. Einarson's theories are novel, without demonstrable proof using high-resolution assessment and mapping of alternative groundwater and vadose zone plumes, they represent speculative assertions.

Pdf p.22, <u>Section 4.4.5, Re: Previous Case, Overlapping O'Connor TCE Plume Theory; Overlapping Hexavalent Chromium Theory</u>. Figure 25 (Pdf p.67) is difficult to understand. Mr. Einarson claims that the southeastern extent of the O'Connor TCE plume overlaps the

northwestern portion of the Defendant's plume. There is not sufficient data provided to comment on this or the associated implications. Regarding Mr. Einarson's Figures 26 and 27 (p.68 and 69), he maps out the hexavalent chromium plume in relation to the Defendants' TCE plume outline mapped to 1.2µg/L. No Defendant monitoring well sample data is provided to evaluate whether hexavalent chromium in the groundwater emanating from 8020 Deering tracks with their TCE plume. As such, Mr. Einarson's comments trigger the need for the Defendants to implement additional investigation efforts that include assessment of hexavalent chromium in their future groundwater sampling efforts. If this toxic compound is identified in the Defendants' monitoring wells, source attribution investigations would then be recommended.

Section 5. Mr. Einarson presents his opinions beginning on Pdf p.24.
Pdf p.24, Opinion 5.1. Mr. Einarson claims there is no risk of polluted groundwater consumption or dermal contact. An assessment of the potential for discharge into surface waters has yet to be completed. For instance, the southern portion of the TCE plume reaches the Los Angeles River. The potential for discharge into the Los Angeles River should be investigated.

Pdf p.24, Opinion 5.2. Mr. Einarson claims that remediation has been appropriately focused on remediation at the source of the contamination. While it is agreed that remediation of the source will be required, ensuring that downgradient concentrations of pollutants are reduced to values below risk screening levels throughout the Class Area is essential. To-date, very little has been accomplished to meet that critical objective. While pilot efforts are pending, concentrations in groundwater and soil vapors within the Class Area have been above risk screening levels for decades. It is unknown how much longer this will be the case. Complete reduction of risk could require decades more. ***Given the level of TCE in groundwater, the immediate solution is to mitigate all homes within areas impacted by TCE – a shared classification***.

Pdf p.24, Opinion 5.3. Mr. Einarson claims that there are no significant risks of CVOCs to vapor receptors in the Class Area west of BCW. This claim is unsubstantiated and without merit given that the previous indoor vapor sampling results were not generated under "conservative" conditions or with VI "On" conditions. As such, the data to-date does not represent RME and therefore does not comply with USEPA's (2015) risk management decision criterion. Any conclusions drawn from these investigations are flawed, as the data is flawed. Mr. Einarson claims that only in the northwestern portion of the groundwater plume is TCE observed along the water table at levels that warrant concern for VI. This is inconsistent with p.142 (cross section G to G'; Figure 3) and p.143 (cross section G' to G"; Figure 4) of Ettinger, where shallow TCE values range from 50 to 500µg/L along the water table thousands of feet east of BCW. In C-54, C-55, C-65, and OHP-44, samples were not collected along the water table. On pdf p.144 of Ettinger (cross section G' to G"; Figure 5), much of the data used to render what Mr. Einarson refers to as the "northern lobe" was generated with a Hydropunch sampling tool approximately 8 years ago. There were no samples collected at the water table along the easternmost extent of the TCE plume at that time (e.g., OHP-38 was not sampled at the shallowest depth of 15 to 18 feet below ground surface). Given that this data was collected many years ago, and that

Dr. Kram Rebuttal of Defendants' Expert Report; Behar v. Northrop Grumman          57

strata between Mason Avenue and the easternmost extent of the plume is comprised of soils with medium to high hydraulic conductivity, the potential for further shallow groundwater transport of TCE towards the east over the past eight years is likely. Mr. Einarson's claims are inconsistent with the data in these plots (particularly the cross sections in Ettinger p.142 and 143), are based on outdated sampling results, and remain questionable due to the flawed indoor sample results to-date. Furthermore, dynamic soil vapor and groundwater concentrations (Figures 9 through 12) and detections far downgradient of the earlier plume depiction (Figure 11) demonstrate that contaminants are mobile and have migrated father east over the past 8 years. Given the elevated shallow concentrations documented 8 years ago, it is likely that elevated concentrations have also migrated along the water table, thereby displacing what was assumed by Mr. Einarson to be a freshwater lens based on outdated information.

Pdf p.25, Opinion 5.4. Mr. Einarson claims that VI is not possible east of BCW where the plume dives beneath the water table. See comments above. The data used to make these claims is old and based on Hydropunch screening data. There were no samples collected at the water table in the key areas claimed by Mr. Einarson to suggest plume "diving", and the contours used are not appropriate for making such claims. More specifically, the claim that the plume dives is based on mapping of TCE to concentrations higher than the risk screening level of 1.2μg/L as well as limited sample depth resolution (e.g., in C-54, C-55, and OHP-44 on p. 143 of Ettinger, G' to G"). Samples were not collected at the water table in those key locations. As such, given the values detected and the fact that the shallow portion of the plume is mobile, the potential for TCE concentrations along the water table exceeding 1.2μg/L exists.

Contaminants are documented under homes throughout the Class Area. The Defendants do not know the current TCE concentrations along the water table within what Mr. Einarson represents as the "northern lobe". The documented plume mobility and the spreading of the deeper plume components at concentrations exceeding risk screening levels warrants concern, as the shallower components along the water table are also likely to have moved east since the 2015-2016 Hydropunch field efforts.

Pdf p.25, Opinion 5.5. Mr. Einarson claims that future investigations should be performed on a case-by-case basis. If the time requirements to perform a more accurate VI assessment were not so significant, an entirely new VI investigation may be recommended. However, given that the VI pathway exists, there is a need to mitigate buildings above the TCE plume. Mr. Einarson once again claims that 50 feet of clean water overlies the TCE groundwater plume. See related responses to Opinions 5.3 and 5.4.

Pdf p.25, Opinion 5.6. Mr. Einarson claims there have been permanent reductions in groundwater and soil vapor and that these will continue. Mr. Einarson does not attempt to predict how much time will be required before all groundwater TCE concentrations will be reduced to levels below 1.2μg/L. This is because it would be very difficult to do so with an acceptable level of accuracy and confidence. Risk screening level exceedances are expected to potentially last decades given the size and extent of contamination, the fact that DNAPL is

present in the source area beneath 8020 Deering, and the complexities associated with dynamic chemical transport and matrix diffusion.

Pdf p.25, Opinion 5.7. Mr. Einarson claims the concentrations of CVOCs in soil vapors are decreasing over time.  Mr. Einarson does not attempt to predict how much time will be required before all soil vapor TCE concentrations will be reduced to levels below $16\mu g/m^3$. This is because it would be very difficult to do so with an acceptable level of accuracy and confidence. Risk screening level exceedances are expected to potentially last decades given the size and extent of contamination, and the presence of DNAPL in the source area subsurface beneath 8020 Deering.

Pdf p.25, Opinion 5.8. Mr. Einarson claims that remediation is being performed under regulatory oversight. Mr. Einarson does not acknowledge that the Defendants withheld critical information from the agencies that included failing to inform them of open windows and doors during sampling events, sampling during Santa Ana conditions, the fact that elevated PCE relative to TCE in indoor samples should not be a valid line of evidence (as this was observed in vadose zone soil, soil vapor and crawl spaces), and the fact that the Defendants' proposed soil-vapor-to-indoor AF of 0.002 was derived using flawed indoor air data. At key points during exchanges between agency representatives and regulators, the regulators encountered resistance when they advocated for positions that would best protect the community. This included use of the soil vapor-to-indoor AF of 0.03 (and associated soil vapor risk screening level of $16\mu g/m^3$), a groundwater-to-indoor AF of 0.001 (and the associated groundwater risk screening level of $1.2\mu g/L$), and when regulators advocated for including indoor air sampling as part of the LTMP.

Pdf p.26, Opinion 5.9. Mr. Einarson claims that other potential contaminant release sources exist. However, these sources have yet to be appropriately characterized, and a comprehensive evaluation of plume convergence has not been performed. The current shapes and lengths of the groundwater and soil vapor plumes are consistent with the documented historical releases at 8020 Deering.

Mr. Einarson presents his rebuttals to my opinions in Section 6 (beginning on Pdf p.27).

Pdf p.27, Section 6.1. Mr. Einarson claims that experts for the Plaintiffs failed to acknowledge the existence of clean groundwater overlying the dissolved TCE plume east of BCW in their CSM, and that this would eliminate the threat of VI. Mr. Einarson's claims are inconsistent with the data provided in Defendant reports. More specifically, Mr. Einarson's claims are inconsistent with pdf p.142 (cross section G to G'; Figure 3) and 143 (cross section G' to G"; Figure 4) of Ettinger, where shallow TCE values range from 50 to $500\mu g/L$ at the water table thousands of feet east of BCW. In C-54, C-55, and OHP-44, samples were not collected at the water table. On pdf p.144 of Ettinger (cross section G' to G"', Figure 5), much of the data used to render what Mr. Einarson refers to as the "northern lobe" was generated with a Hydropunch sampling tool approximately 8 years ago. There were no samples collected at the water table along the easternmost extent of the TCE plume at that time (e.g., OHP-38 was not sampled at

the shallowest depth of 15 to 18 feet below ground surface). Given that this data was collected many years ago, and that geologic strata between Mason Avenue and the easternmost extent of the plume is comprised of soil with medium to high hydraulic conductivity (which can readily transmit groundwater pollutants), the potential for further shallow groundwater transport of TCE towards the east from Mason Avenue over the past eight years is likely. Mr. Einarson's claims are inconsistent with the data in these plots (particularly the cross sections in Ettinger p.142 and 143; Figures 3 and Figure 4) and are based on outdated sampling results. More recent data (Figure 12) demonstrates that the TCE plume continues to spread. Given that the shallow portion of the TCE plume leading edge has not been evaluated for close to 8 years, that the shallow stratigraphy is highly transmissive, and the recent evidence that other portions of the plume continue to migrate, there is insufficient shallow groundwater data to support Mr. Einarson's "freshwater lens theory".

Mr. Einarson's Figure R-1 is misleading. When compared to his Figure 16, one can see that in R-1, Mr. Einarson intentionally omitted the portion of the graphic that shows groundwater concentrations along the water table that ranges from 50 to 500µg/L TCE. The risk screening level is 1.2µg/L. Mr. Einarson does not plot any of his renderings out to that risk screening concentration. As such, his rendering incorrectly suggests that the extent of contamination is less than reality. In the image where critical information is omitted (R-1), it is important to note that the vertical separation distances between sample depths in Mr. Einarson's proposed "clean" water zone render the characterization "low resolution". Given the age of the data (approximately 8 years old), the fact that the plume is highly mobile, the low resolution of the characterization effort, and the fact that the leading edges of plumes express high vertical variability in concentration, the conclusions drawn by Mr. Einarson regarding a clean water zone above deeper TCE zones are outdated. These are also inconsistent with data depicting shallow TCE contamination (Ettinger cross sections G to G' and G' to G"; Figure 3 and Figure 4). In fact, more recent groundwater and soil vapor data along the leading edge of the plume (Figures 9 through 12) document detections that are dynamic. This confirms that the plume is mobile. In fact, Monitoring Well C-65 (located along the easternmost portion of G' to G") did not exhibit TCE detections when these plots were prepared. These wells have since registered TCE detections above the risk screening level (Figure 12). While monitoring wells are not currently installed along the water table in the downgradient leading edge of the plume, it is probable that concentrations exceeding the risk screening level of 1.2µg/L have migrated farther east along the water table over the past 8 years, rendering the "freshwater lens theory" questionable. ***Given the level of TCE in groundwater, the immediate solution is to mitigate all homes within areas impacted by TCE – a shared classification***.

Pdf p.28, <u>Section 6.2</u>. Mr. Einarson claims that experts for the Plaintiffs did not consider the heterogeneous nature of the subsurface hydrology. Mr. Einarson claims that because some of the experts did not include geologic cross sections that they did not appropriately address key hydrogeologic conditions. Mr. Einarson disregards the key facts pointed out by Plaintiffs related to the complex nature of DNAPL fate and transport, the challenges associated with DNAPL assessment and remediation, and the implications regarding long-term management of vapor intrusion at the source area and within the Class Area. While fine-grained materials certainly

impact groundwater and solute transport and the potential for vapor intrusion, we assumed that the Defendants' lithologic data was helpful, but lacking in detail. For instance, as one moves downgradient from northwest towards the southeastern extent, the level of confidence the Defendants' consultants convey in their rendering of soil type and concentration distributions becomes significantly lower. This is exemplified in cross section G' to G"' (Ettinger p.144; Figure 5). More specifically, stratigraphy and concentrations depicted between OHP-41 and OHP-55 is represented with far more detail than the eastward locations OHP-31 and OHP-38, where clay lenses are drawn as continuous strata in some cases approximately 1500 feet in length while in other cases they are drawn a few hundred feet from data collection points without any support for these assumptions. This is due to the lack of stratigraghic resolution along the leading edge of the plume. Similarly, the TCE concentration distribution is drawn with confidence using one-time groundwater samples collected approximately 8 years ago with vertically sparse sample density. Given the lack of resolution, the age of the data, and the fact that the TCE plume is mobile, there is a high probability that the edge of the shallow portion of the plume is currently farther east than is depicted in this rendering. The net result is that this contradicts Mr. Einarson's claims that a thick lens of freshwater resides under all the homes east of BCW. Cross sections G to G' and G to G" both show shallow groundwater concentrations east of BCW that far exceed the risk screening level of 1.2µg/L. This is therefore not consistent with Mr. Einarson's assertions. Mr. Einarson carefully selects words to describe this situation. For instance, Mr. Einarson consistently repeats his assertion that a freshwater lens is located "east of BCW", implying that every location east of BCW is safe from VI risk. However, the Defendants' data shows that shallow TCE exceedances extend far from BCW.

Regarding clay layers serving as barriers to vapor flow in the vadose zone, there are shallow clay layers depicted by the Defendants' consultants' stratigraphic representations throughout the length of the plume that have not significantly prohibited the build-up of TCE concentrations in the shallow soils just beneath the Class Area homes. If one were to map out the TCE soil vapor concentrations to a more appropriate risk screening concentration of 16µg/m³ (as opposed to 1µg/L [equal to 1000µg/m³], as we see in Figure 20), one would notice that the extent of soil vapor concentrations of concern is much greater than the perception Mr. Einarson depicts – regardless of the complex stratigraphy.

All the theoretical attenuation background provided by Mr. Einarson, while correct, is moot in that the main concern is vapor exposures, which have yet to be properly assessed throughout the community overlying the groundwater and soil vapor toxins released by the Defendants. While it is acknowledged that complex stratigraphy impacts groundwater and vapor flow, Mr. Einarson gives very little attention to the spatial and temporal dynamics associated with indoor and crawl space concentrations. This is critical, as these factors are fundamental and represent the regulatory agency rationale for requiring measurement during "conservative" conditions (e.g., windows and doors closed, fans off, etc.) and USEPA's RME criterion prior to deriving VI risk-based conclusions and management decisions. The Defendants readily acknowledge they failed to adhere to these key agency recommendations (Miskin deposition, 2023; Ettinger and Eklund reports, 2023). As a result, they relied upon flawed data to advocate for a lenient soil vapor-to-indoor air AF of 0.002 and for no more indoor air monitoring to be included in their

LTMP. This places the Class Area community at risk because the core data these decisions are based upon represent crawl space and indoor air exposure underestimates. While Mr. Einarson criticizes the Plaintiff experts for not generating cross-sections, given that he relies on low resolution stratigraphic and outdated plume shape renderings along the leading edge to draw conclusions regarding attenuation that have yet to be empirically demonstrated through proper soil vapor, crawl space and indoor air testing, his argument serves as a distraction from the key elements that would best protect the Class Area community residents living over polluted groundwater and soil.

USEPA (2015) discussed the concept of prioritizing investigations with multiple buildings (p.69-71). While they recommend a "worst first" approach for prioritizing buildings for investigation, they are careful to also state the following:

> *"In situations where "higher-priority" buildings and locations are investigated initially, investigation of locations of other buildings may still be warranted, for example, to ensure that the CSM is complete and accurate and that variability in the subsurface conditions and building conditions is understood. There usually is substantial spatial variability in the concentrations of subsurface vapors, caused by heterogeneities in the subsurface materials and other factors, that can result in variability among buildings in vapor flux and indoor air concentrations arising from vapor intrusion. Additionally, building construction, building age and maintenance, and occupants' activities that affect soil gas entry and air exchange rate will vary from building to building, further adding to the variability in indoor air concentrations between buildings. Therefore, it may be difficult to identify a priori either a "representative" or "reasonable worst case" building or group of buildings, when it is determined that sampling all buildings is not practical. When sampling all buildings is not practical, but other lines of evidence suggest that vapor intrusion may be occurring, the site management team may wish to consider installing engineered exposure controls for vapor intrusion mitigation in buildings without baseline indoor air data (i.e., building mitigation as an early action)."*

The Defendants claim they implemented a "worst-first" approach, but they only used the groundwater plume center line as the key driver for prioritization. Building-specific VI potential will vary considerably based on many factors. The Defendants' consultants did not consider building types and conditions or geologic materials and controlling factors (e.g., climate, vapor entry pathways, spatial variability, and temporal dynamics, etc.). As such, it is not possible to know which home represents the worst case based on the data collected to-date. For instance, soil vapor concentration does not correspond to the highest levels observed in homes (at least not with the data collected to-date). Mr. Einarson may not have been asked to address this, as he does not acknowledge the subsurface heterogeneities and other factors that can impact the spatial variability in the subsurface, crawl space and indoor vapor concentrations or the dynamics that impact exposure related conclusions to-date. His focus is on how stratigraphy and ephemeral (and theoretical) freshwater lenses represent attenuating elements. Given the effort required to test every building and the time requirements to properly investigate, doing so would extend the exposure duration for potentially thousands of community members.

***Given the level of TCE in groundwater, the immediate solution is to mitigate all homes within areas impacted by TCE – a shared classification***.

Pdf p.30, <u>Section 6.3</u>. Mr. Einarson claims that Dr. Tonkin's methodology for estimating DNAPL volume is flawed and that I have authored publications critical of the method used. Determining DNAPL volume and spatial distribution is extremely challenging, which is a key reason why these types of releases require decades to resolve. Mr. Einarson is a promoter of the DyeLIF method. It is unclear why the Defendants did not deploy this DNAPL direct observation approach, as much could be gained by doing so.

Pdf p.31, <u>Section 6.5</u>. Mr. Einarson claims that Plaintiff experts have not presented any analysis to substantiate claims regarding dates or durations of historical CVOCs discharges. I relied upon statements made by Defendants' consultants, regulatory agencies, as well as the opinions of experts offered under oath during a prior lawsuit (e.g., Larson, 2003; Bauer, 2003), and provided direct quotes. I was not asked to analyze claims regarding timing or duration of historical toxic discharges by the Defendants.

Pdf p.32, <u>Section 6.8</u>. Mr. Einarson claims that my assertion that long-term remediation of groundwater everywhere in the Class Area is necessary to protect receptors is not valid. Mr. Einarson claims that there is no risk of exposure to TCE in groundwater or soil. While there has yet to be an effort to evaluate potential groundwater to surface water discharges (that I am aware of), there remains a vapor intrusion risk because groundwater underlying the Class Area contains TCE that exceeds the regulatory risk screening level of 1.2µg/L associated with the vapor intrusion exposure pathway. As such, while remediation of the groundwater to levels below 1.2µg/L is desirable, this will potentially require decades to complete. In the meantime, and consistent with USEPA (2015, p.69-71), I am recommending mitigation to prevent VI exposures until concentrations below regulatory risk screening levels for groundwater and soil are achieved.

Pdf p.33, <u>Section 6.9</u>. Mr. Einarson claims that CVOC detections show that leaking sewers are not likely a significant source of CVOC impacts to groundwater in the Class Area. Mr. Einarson's depiction in Figure R-9 is misleading in that he uses 50µg/L for the groundwater TCE plume rendering. Given the scale provided, it appears he is displaying the TCE vapor plume out to an outer "shell" of 300µg/m$^3$. A revised graphic using 16µg/m$^3$ as the "shell" for soil vapor and 1.2µg/L for TCE in groundwater would reveal a larger overlap of the plumes with the location of the sewer line. Regardless, my main point in raising the issue of Defendant discharges to the sewer line is that their consultants have yet to evaluate the potential impacts caused by vapor migration towards receptors in locations adjacent to main line breaks, the potential for vapor transport into buildings with laterals connected to the line, and the potential impacts on soil and groundwater beneath breaks in the line. Speculation on the part of Mr. Einarson can (and should) be thoroughly tested to effectively reduce the potential for an incorrect CSM that results in public exposures.

In summary, the Defendants' experts' conclusions are based on flawed sampling data and assertions rooted in outdated information that is inconsistent with current evidence. As such, flawed data and unconfirmed assertions should not be used to make risk-based decisions when public exposures are possible. Decades have passed while exposure potential has persisted. ***Given the level of TCE in groundwater, the immediate solution is to mitigate all homes within areas impacted by TCE – a shared classification***.

## Section 4. Facts and Data Considered by Witness in Forming Opinions

The following items were considered by the expert in forming professional opinions:

Abbasi, R., W. Bosan, and D. Gallagher, 2022. *Empirically Derived California Vapor Intrusion Attenuation Factors*, GWMR, v.23, no.1, 60-68.

Adamson, D.T., P.C. de Blanc, S.K. Farhat, and C.J. Newell, 2016. *Implications of Matrix Diffusion on 1,4-Dioxane Persistence at Contaminated Groundwater Sites.* Science of the Total Environment, 562:98-107.

ASTM STP1570, 2013. *Continuous Soil Gas Measurements: Worst Case Risk Parameters*, Eds.: Lorne Everett and Mark Kram, Special Technical Publication, 182pp. [*http://www.astm.org/DIGITAL_LIBRARY/STP/SOURCE_PAGES/STP1570.htm*]

Barzen-Hanson, Krista A., Simon C. Roberts, Sarah Choyke, Karl Oetjen, Alan McAlees, Nicole Riddell, Robert McCrindle, P. Lee Ferguson, Christopher P. Higgens, and Jennifer A. Field, 2017. *Discovery of 40 Classes of Per- and Polyfluoroalkyl Substances in Historical Aqueous Film-Forming Foams (AFFFs) and AFFF-Impacted Groundwater*, ES&T, 51:2047-2057. [https://pubs.acs.org/doi/abs/10.1021/acs.est.6b05843]

Bauer, David L., 2003. Deposition in Case #BC255187, Los Angeles County Superior Court, Landowners LTD. *v.* Litton Industries, et al., March 18, 2003.

Beckley, L. and T. McHugh, 2020. A Conceptual Model for VI from GW through Sewer Lines, Science of the Total Environment, V.698, https://www.sciencedirect.com/science/article/pii/S0048969719342664.

Bekele, Dawit, Ravi Naidu, and Sreenivasulu Chadalavada, 2014. *Influence of Spatial and Temporal Variability on Subsurface Soil Moisture and Temperature on Vapour Intrusion*, Atmospheric Environment 88 (2014) 14-22.

Blankenbuehler, Paige, 2019. *See Where PFAS Pollution has been Confirmed in the American West, Western States Lag Behind in both Monitoring and Regulating the Class of "Forever Chemicals"*, High Country News, May 30, 2019 [https://www.hcn.org/articles/public-health-see-where-pfas-contamination-has-been-confirmed-in-the-west].

Boice J.D. Jr, Marano DE, Fryzek J.P., et al. *Mortality Among Aircraft Manufacturing Workers.* Occup Environ Med. 1999; 56:581–597. [https://www.ncbi.nlm.nih.gov/pubmed/10615290]

California Department of Toxic Substances Control (DTSC). (2014). Human health risk assessment note 5 – Indoor air action levels for trichloroethylene (TCE). Sacramento, CA: California Department of Toxic Substances Control.

California EPA, 2023. Final Draft Supplemental Guidance: Screening and Evaluating Vapor Intrusion, https://dtsc.ca.gov/wp-content/uploads/sites/31/2023/02/VI_SupGuid_Screening-Evaluating.pdf

California EPA, 2020. Draft Supplemental Guidance: Screening and Evaluating Vapor Intrusion, https://dtsc.ca.gov/vapor-intrusion/

California OEHHA, 2020. Review of Off-Property Vapor Intrusion Investigation Summary and Off-Property Vapor Intrusion Long Term Monitoring Plan – Commercial Property 8020 Deering Avenue, Canoga Park, California, OEHHA #880145-18; February 21, 2020; https://documents.geotracker.waterboards.ca.gov/regulators/deliverable_documents/2650937736/SCP%200843%20Comm%20Prop%20Transmittal%20of%20OEHHA%20Comments.pdf

California Regional Water Quality Control Board (RWQCB), 2022. Vapor Intrusion Mitigation Guidance, Technical Resource Document, San Francisco Bay RWQCB, June, 2022; https://www.waterboards.ca.gov/rwqcb2/water_issues/programs/sitecleanup/2022_VIM_Guidance.pdf

California Regional Water Quality Control Board (RWQCB), Los Angeles Region, 2022. Draft Cleanup and Abatement Order R4-2022-XXXX, Requiring William Giamela and Litton Systems, Inc. (now known as Northrop Grumman Corporation to Assess Cleanup, and Abate Waste Discharged to Water of the State Pursuant to California Water Code Sections 13267 and 13304 at 8020 Deering Avenue, Canoga Park, California (Site Cleanup Program no. 0843 and Site ID no. 2040T00).

California Regional Water Quality Control Board (RWQCB), San Francisco Region, 2019. Environmental Screening Levels, v.2.

Dawson, Helen, 2023a. Deposition in Case # 1:19-CV-04757-TWP-DLP, U.S District Court, Southern District of Indiana, Indianapolis Division, Denney, et al. *v*. Amphenol, et al., February 3, 2023.

Dawson, Helen, 2023b. Deposition in Case #21-cv-03946-HDV-SK, U.S. District Court, Central District of California, Western Division, Behar, et al. *v*. Northrop Grumman, et al., September 13, 2023.

Dawson, H., W. Wertz, T. McAlary, T. Gabris, D. Carr, 2019. Presentation entitled "Distinguishing Vapor Intrusion Sources from Background Sources of Volatile Organic Chemicals in Indoor Air Using Building Pressure Cycling", National Environmental Monitoring Conference, August 6th, 2019; https://nemc.us/docs/2019/presentations/pdf/Tuesday-Air%20Methods%20and%20Monitoring-8.4-Dawson.pdf

Derycke, V., A. Coftier, C. Zornig, H. Leprond, M. Scamps, and D. Gilbert. 2018. Environmental Assessments on Schools Located on or Near Former Industrial Facilities: Feedback on Attenuation Factors for the Prediction of Indoor Air Quality. Science of Total Environment, v. 626, pp. 754-761.

Einarson, M., 2023. Expert Report, in Case #21-cv-03946-HDV-SK, U.S. District Court, Central District of California, Western Division, Behar, et al. *v*. Northrop Grumman, et al., October 24, 2023.

Einarson, M., A. Fure, R. St. Germain, S. Chapman and B. Parker, 2018. DyeLIF™: A New Direct-Push Laser-Induced Fluorescence Sensor System for Chlorinated Solvent DNAPL and other Non-Naturally Fluorescing NAPLs, GWMR, v.38, no.3, p.28-42. [https://ngwa.onlinelibrary.wiley.com/doi/abs/10.1111/gwmr.12296]

Eklund, B., 2023. Expert Report, in Case #21-cv-03946-HDV-SK, U.S. District Court, Central District of California, Western Division, Behar, et al. *v*. Northrop Grumman, et al., October 24, 2023.

Ettinger, R., 2023. Expert Report, in Case #21-cv-03946-HDV-SK, U.S. District Court, Central District of California, Western Division, Behar, et al. *v*. Northrop Grumman, et al., October 24, 2023.

Forand, Steven P., Elizabeth L. Lewis-Michl, and Marta Gomez, 2012. *Adverse Birth Outcomes and Maternal Exposure to Trichloroethylene and Tetrachloroethylene through Soil Vapor Intrusion in New York State*, Environmental Health Perspectives, v. 120, no. 4, April 2012, p.616-621. [https://www.ncbi.nlm.nih.gov/pubmed/22142966]

Gabris, Theresa, 2023. AEHS conference presentation entitled "Why Go "Above and Beyond" to Collect Defensible VI Data?", USEPA sponsored "State of VI Science" Workshop; https://iavi.rti.org/assets/docs/04_Gabris-Defensible_VI.pdf.

Geosyntec, 2020a. Revised Off-Property Vapor Intrusion Investigation Summary Report and Off-Property Vapor Intrusion Long Term Monitoring Plan (LTMP) Canoga Park Site 8020 Deering Avenue Canoga Park, California SLIC No. 843, Site ID No. 2044T00, 16 July 2020.

Geosyntec, 2020b. Letter to Renee Purdy (LA RWQCB), Response to LARWQCB Comments on the Off-Property Vapor Intrusion Long-Term Monitoring Plan Site/Case: Canoga Park Site located at 8020 Deering Avenue Canoga Park, California (SCP No. 0843, Site ID No. 2044T00), 6 October 2020.

Geosyntec, 2020c. Letter to Renee Purdy (LA RWQCB), Response to LARWQCB Comments on the Off-Property Vapor Intrusion Long-Term Monitoring Plan Site/Case: Canoga Park Site located at 8020 Deering Avenue Canoga Park, California (SCP No. 0843, Site ID No. 2044T00), 27 April 2020.

Goldstein, L., A. Golberg-Day, 2013. Anomalous High Vapor Intrusion Measured at Commercial and Industrial Sites in California and Its Impact on Initial Risk Assessments, presented at AEHS 32nd Annual International Conference on Soil, Water, Energy and Air, March 20-23, 2013, San Diego, CA.

Guo, Y., C. Holton, H. Luo, P. Dahlen, K. Gorder, E. Dettenmaier, and P.C. Johnson. 2015. Identification of Alternative Vapor Intrusion Pathways Using Controlled Pressure Testing, Soil Gas Monitoring, and Screening Model Calculations. Environmental Science and Technology, v. 49, pp. 13472–13482.

GWMR, 2019. *Lawmaker Reintroduces Bill to Give Michigan Strictest Limit on PFAS in Drinking Water*, GWMR, Spring, v.39, no.2, p.7. [https://waterwelljournal.com/lawmaker-reintroduces-bill-to-give-michigan-strictest-limit-on-pfas-in-drinking-water/]

Hardie, D.W.F., 1964. Trichloroethylene. In Kirk-Othmer Encyclopedia of Chemical Technology, 2nd Edition, New York: Wiley-Interscience. [https://onlinelibrary.wiley.com/doi/abs/10.1002/app.1964.070080238]

Holton, C., Luo, H., Dahlen, P., Gorder, K., Dettenmaier, E., & Johnson, P., 2013. *Temporal Variability of Indoor Air Concentrations Under Natural Conditions in a House Overlying a Dilute Chlorinated Solvent Groundwater Plum*e. Environmental Science & Technology, 47(23), 13347–13354.

Hosangadi, V., B. Hartman, M. Pound, M. Kram, C. Frescura, B. Shavers, 2017. *High Frequency Continuous Monitoring To Track Vapor Intrusion Resulting From Naturally Occurring Pressure Dynamic*s, Remediation, Spring, v.27, no.2, p.9-25.

Jacobs, J.A., O.P. Jacobs, and K. Pennell. 2015. Updating Site Conceptual Models for Potential Sewer Gas and Vapor Intrusion into Indoor Air from Breached Sewer Conveyance Systems. Presentation at the 25th Annual AEHS West Coast Conference, San Diego, CA. March.

Jacobs, O.P., J.A. Jacobs, and K. Pennell. 2016. Exposure Pathway Analysis Using Passive Diffusion Air Sampling Methods to Sample Sewer Air in Manholes and Cleanouts. Presentation at the 26th Annual AEHS West Coast Conference, San Diego, CA. March.

Kastanek, J., M. Radford, Q. Bingham, C. Holton, K. Moffat, and C. Lutes. 2016. A Review of VI Preferential Pathway Cases Leading to an Evaluation Toolkit. Presentation at the Air and Waste Management Association Vapor Intrusion, Remediation, and Site Closure Conference, San Diego, CA. December.

Kram, M.L., Expert Report, in Case #21-cv-03946-HDV-SK, U.S. District Court, Central District of California, Western Division, Behar, et al. *v.* Northrop Grumman, et al., September 27, 2023.

Kram, M. L., B. Hartman, and C. Frescura, 2022. "Simultaneous Monitoring of Volatile Organic Contaminant Concentration and Controlling Factors for Vapor Intrusion Risk Evaluations—Two Select Cases". Remediation, v.32, issue 4, p.259-272.

Kram, Mark L., Blayne Hartman, Cliff Frescura, Paulo Negrao and Dane Egelton, 2020. *Vapor Intrusion Risk Evaluation Using Automated Continuous Chemical and Physical Parameter Monitoring*, Remediation, v.30, p.65-74.

Kram, M. L., Hartman, B., & Clite, N., 2019. *Automated Continuous Monitoring and Response to Toxic Subsurface Vapors Entering Overlying Buildings—Selected Observations, Implications and Considerations*. Remediation, 29(3), 31–38.

Kram, Mark L., Blayne Hartman, and Clifford Frescura, 2016. *Vapor Intrusion Monitoring Method Cost Comparisons: Automated Continuous Analytical vs. Discrete Time-Integrated Passive Approaches*, Remediation, Fall 2016, v.26, issue 4, p.41-52. [https://onlinelibrary.wiley.com/doi/abs/10.1002/rem.21482]

Kram, Mark L., Peter Morris and Lorne G. Everett, 2011. *Dynamic Subsurface Explosive Vapor Concentrations – Observations and Implications*, Remediation Journal, Winter 2011, v.22, issue 1, p.59-69. [https://www.provectusenvironmental.com/mz/Dynamic_Subsurface_Explosive_Vapor_Concs-Kram_Winter_2011.pdf]

Kram, Mark L., William Major, Louise Parker, Joel Michaelsen, and Tim McHale, 2008. *Demonstration/Validation of Long-Term Monitoring Using Wells Installed by Direct Push Technologies, Cost and Performance Report, ESTCP ER-0011*, March, 2008, 32pp.

Kram, Mark L., A. Keller, J. Rossabi, and L. Everett, 2001. *DNAPL Characterization Methods and Approaches, Part 1: Performance Comparisons*, GWMR, Fall, 2001, p.109-123. [https://clu-in.org/download/char/GWMR_Fall_109-123.pdf]

Lahvis, M.A. and R.A. Ettinger, 2021. *Improving Risk-Based Screening at Vapor Intrusion Sites in California*, GWMR, v.41, no.2, 73-86.

Larson, Steven P., 2003. Expert Deposition in Case #BC255187, Los Angeles County Superior Court, Landowners LTD. *v.* Litton Industries, et al., March 25, 2003.

Los Angeles Regional Water Quality Control Board (LARWQCB), 2020. Letter from Renee Purdy to Shantal Der Boghosian, Subj: Review of Off-Site Vapor Intrusion Investigation Summary Report, Commercial Property Located at 8020 Deering Avenue, Canoga Park, CA (SCP no. 0843, Site ID no. 2044TOO), August 25, 2020.

Martin-Hayden, J.M. and G.A. Robbins, 1997. Plume Distortion and Apparent Attenuation Due to Concentration Averaging in Monitoring Wells. Ground Water, v.35, no. 2, pp. 339-347, March-April 1997. [https://ngwa.onlinelibrary.wiley.com/doi/abs/10.1111/j.1745-6584.1997.tb00091.x]

McHugh, T.E., L. Beckley, D. Bailey, K. Gorder, E. Dettenmaier, I. Rivera-Duarte, S. Brock, and I. MacGregor. 2012. Evaluation of Vapor Intrusion Using Controlled Building Pressure. Environmental Science and Technology, v. 46, pp. 4792-4799.

McHugh, T., L. Beckley, T. Sullivan, C. Lutes, R. Truesdale, R. Uppencamp, B. Cosky, J. Zimmerman, and B. Schumacher. 2017a. Evidence of a Sewer Vapor Transport Pathway at the USEPA Vapor Intrusion Research Duplex. Science of the Total Environment, v. 598, pp. 772-779.

McHugh, Thomas, Per Loll, and Bart Eklund, 2017a. *Recent Advances in Vapor Intrusion Site Investigations*, Journal of Environmental Management, v.204, part 2, 15 December 2017, p.783-792, https://www.sciencedirect.com/science/article/pii/S0301479717301196?via%3Dihub

McHugh Thomas, L. Beckley, T. Sullivan, C. Lutes, R. Truesdale, R. Uppencamp, B. Cosky, J. Zimmerman, and B. Schumacher, 2017b. *Evidence of Sewer Vapor Transport Pathway at the USEPA Vapor Intrusion Research Duplex*, Science of the Total Environment, V.598, pp. 772-779.

Mexikatzin, Akzayakatl, 2023. Deposition in Case #21-cv-03946-HDV-SK, U.S. District Court, Central District of California, Western Division, Behar, et al. *v.* Northrop Grumman, et al., September 20, 2023.

Miskin, Kevin, 2023. Expert Deposition, Case #2:21cv03947 FMO-SK, US District Court Central District of California Western Division, Behar v. Northrop Grumman, July 6, 2023.

Morrison, Robert D., 2013. *A Forensic Analysis of Contaminant Releases from a Sewer Pipe*, in Environmental Forensics, Proceedings of the 2013 INEF Conference, 25pp. [https://pubs.rsc.org/en/content/chapter/bk9781849739443-00001/978-1-84973-944-3]

Nohmi, Takehiko, 2018. Thresholds of Genotoxic and Non-Genotoxic Carcinogens, Toxicol Res., 2018 October, 34(4): 281–290.

Northrop Grumman, 2019. Email from Shantal Der Boghosian to colleagues and consultants, Subj: RE: Canoga Park Site - Secondary Source Area Investigation Work Plan for RWQCB Review, March 21, 2019.

Northrop Grumman, 2017. Presentation by Richie Hodge entitled Canoga Park SMS, 8 February, 2017.

NGWA, 2017. *Groundwater and PFAS: State of Knowledge and Practice*, National Ground Water Association Press.

Orion, 2017. Proposal for Indoor Air Sampling and Vapor Mitigation Activities, Canoga Park Site, 8020 Deering Avenue, Canoga Park, California, 29 November 2017.

Orion, 2019. Secondary Source Area Investigation Progress Update, Canoga Park Site, 8020 Deering Avenue, Canoga Park, California, 4 December 2019.

Parker, Jack, 2003. *Physical Processes Affecting Natural Depletion of Volatile Chemicals in Soil and Groundwater*, Vadose Zone Journal, 2:222-230. [https://dl.sciencesocieties.org/publications/vzj/abstracts/2/2/222]

Pennell, K.G., M.K. Scammell, M.D. McClean, J.A.B. Weldon, L. Friguglietti, E.M. Suuberg, R. Shen, P.A. Indeglia, and W.J. Heiger-Bernays. 2013. Sewer Gas: An Indoor Air Source of PCE to Consider During Vapor Intrusion Investigations. Ground Water Monitoring and Remediation, v. 33, n. 3, pp. 119-126.

San Francisco Bay Regional Water Board. (2014). Interim framework for assessment of vapor intrusion at TCE-contaminated sites in the San Francisco Bay region. San Francisco, CA: San Francisco Bay Regional Water Board.

Schuver, H.J., C. Lutes, J.Kurtz, C. Holton, and R.S. Truesdale, 2018. *Chlorinated Vapor Intrusion Indicators, Tracers and Surrogates: Supplemental Measurements for Minimizing the Number of Chemical Indoor Air Samples – Part 1: Vapor Intrusion Driving Forces and Related Environmental Factors*; Remediation, v.28, p.7-31.

USEPA, 2015. *OSWER Technical Guide for Assessing and Mitigating the Vapor Intrusion Pathway from Subsurface Vapor Sources to Indoor Air*. Washington, DC: EPA. [https://www.epa.gov/sites/production/files/2015-09/documents/oswer-vapor-intrusion-technical-guide-final.pdf]

U.S. Environmental Protection Agency, Office of Solid Waste and Emergency Response, 2014. Vapor intrusion screening level (VISL) calculator, User's guide. Washington, DC: U.S. Environmental Protection Agency, Office of Solid Waste and Emergency Response.

U.S. Environmental Protection Agency, 2014. EPA Region 9 memorandum response action levels and recommendations to address near-term inhalation exposures to TCE in air

from subsurface vapor intrusion. San Francisco, CA: U.S. Environmental Protection Agency.

U.S. Environmental Protection Agency, 2013. EPA region 9 guidelines and supplemental information needed for vapor intrusion evaluations at the South Bay national priorities list (NPL) sites, December 3, 2013 letter from Kathleen Sayler (U.S. EPA) to Stephen Hill (California Regional Water Quality Control Board, San Francisco Bay Region). San Francisco, CA: U.S. Environmental Protection Agency.

USEPA, 2013. Integrated Risk Information System (IRIS), *1,4-Dioxane (CASRN 123-91-1)*. cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?su bstance_nmbr=326.

USEPA, 2012. *EPA's Vapor Intrusion Database: Evaluation and Characterization of Attenuation Factors for Chlorinated Volatile Organic Compounds and Residential Buildings*. Washington, DC: EPA. https://www.epa.gov/sites/default/files/2015-09/documents/oswer_2010_database_report_03-16-2012_final_witherratum_508.pdf (accessed March 13, 2018).

USEPA, 2011. *Toxicological Review of Trichloroethylene in Support of the Integrated Risk Information System (IRIS)*, EPA/635/R-09/011F. [http://www.epa.gov/iris/toxreviews/0199tr/0199tr.pdf]

USEPA, 2009. *PFOS Chromium Electroplater Study, USEPA-Region 5, Final Report*, September 2009 (https://www.in.gov/idem/ctap/files/plating_chromium_pfos_study.pdf).

USEPA, 2009. *Risk Assessment Guidance for Superfund Volume I: Human Health Evaluation Manual (Part F, Supplemental Guidance for Inhalation Risk Assessment)*, *Final,* EPA-540-R-070-002, OSWER 9285.7-82, January 2009.

Vogel, T.M. and P.L. McCarty, 1985. *Biotransformation of Tetrachloroethylene to Trichloroethylene, Dichloroethylene, Vinyl Chloride and Carbon Dioxide Under Methanogenic Conditions*, <u>Applied Environmental Microbiology</u>, 1985 May, (49)5, p.1080-1083 [https://www.ncbi.nlm.nih.gov/pmc/articles/PMC238509/].

Wallace, A., and A. Friedrich. 2017. Vapor Intrusion Conceptual Site Model Development for the Sewer Gas to Indoor Air Pathway. Presentation at 27th Annual AEHS West Coast Conference, San Diego, CA. March.

Photos – Various photographs taken during investigation phases that include toilets, samplers, crawl spaces, open doors and windows, etc.

The following additional documents (which may overlap with the above) were reviewed and considered, in whole or in part, in forming the opinions expressed:

LARWQCB,  8/25/20 Review of Off-Site VI Investigation Summary Report NGSC_0000282 - 290

Northrop Grumman Corporation,  3/17/16 CANOGA PARK-OFFSITE VI ASSESSMENT REPORT NGSC_0002785 - 11063

Geosyntec Consultants,  RESPONSE TO OEHHA COMMENTS TO OFF-PROPERTY VI REPORT AND LTMP NGSC_0017337 - 17353

Geosyntec Consultants,  OFF-PROPERTY VAPOR INTRUSION INVESTIGATION SUMMARY REPORT NGSC_0017354 - 18984

Orion Environmental, Inc.,  WORK PLAN FOR OFFSITE INDOOR AIR SAMPLING ADDENDUM NO. 1 NGSC_0020743 - 20805

Northrop Grumman Corporation,  6/21/06 REPORT OF CLARIFIER REMOVAL AND METALS-IMPACTED SOIL EXCAVATION NGSC_0021189 - 21407

Northrop Grumman Corporation,  WORK PLAN FOR OFFSITE INDOOR AIR SAMPLING NGSC_0025382 - 25427

Orion Environmental, Inc.,  8/10/17 NOTIFICATION AND RESPONSE PLAN  NGSC_0025796 - 25820

LARWQCB,  MEETING MINUTES FOR MAY 18TH CALL WITH RWQCB AND OEHHA NGSC_0030267 - 30269

Orion Environmental, Inc.,  FORMER LITTON CANOGA PARK SITE - SUMMER SEASON INDOOR AIR SAMPLE RESULTS SUMMARY NGSC_0035184 - 35198

Northrop Grumman Corporation,  Second Phase Indoor Air Sampling Log NGSC_0092120 - 92120

Northrop Grumman Corporation,  3/21/19 Email from Shantal Der Boghosian to M. Nelson NGSC_0318564 - 318566

Northrop Grumman Corporation,  2/29/2016 Response to OEHHA Comments Indoor Air NGSC_0324904 - 324914

Orion Environmental, Inc.,  10/9/17 Email from M. Nelson to O. Chun NGSC_0346030 - 346030

Orion Environmental, Inc.,  9/8/2008 Email from J. Gwinn to J. Ortman NGSC_0352593 - 352593

Orion Environmental, Inc.,  9/18/2008 Email from J. Gwinn to J. Ortman NGSC_0352594 - 352597

Orion Environmental, Inc.,  9/18/08 Email from J. Gwinn to J. Ortman NGSC_0353094 - 353095

Orion Environmental, Inc.,  1/16/18 DRAFT Indoor Air Sampling Results (with SV and GW data) NGSC_0379519 - 379519

Northrop Grumman Corporation,  Appendix C, Ambient Air and Passive Soil Gas Sampling Results NGSC_0379736 - 379748

Northrop Grumman Corporation,  Appendix H - Air and Soil Gas Sampling Results NGSC_0381051 - 381051

Northrop Grumman Corporation,  Table 11 Vapor Intrusion Evaluation of Participating Properties NGSC_0381092 - 381093

Orion Environmental, Inc.,  12/4/15 Offsite VI Assessment Report ec NGSC_0389213 - 390211

Orion Environmental, Inc.,  08/03/18 IA Sampling Results Summary Submittal NGSC_0398464 - 398478

Geosyntec Consultants,  12/24/19 Off-Property VI Long Term Monitoring Plan NGSC_0401853 - 402092

Orion Environmental, Inc.,  6/22/18 First Seasonal IA Sampling Event Summary Report NGSC_0421485 - 421485

Orion Environmental, Inc.,  5/14/19 Winter 2019 IA Sampling Results Summary Submittal NGSC_0482404 - 482418

LARWQCB,  VI Report APPENDICES NGSC_0492873 - 494434

Orion Environmental, Inc.,  3/20/18 Residential and Building Surveys (combined) NGSC_0533419 - 533464

Orion Environmental, Inc.,  6/22/2018 First Seasonal IA Sampling Event Summary Report.docx NGSC_0533467 - 533499

Orion Environmental, Inc.,  Results Table DRAFT (KW) NGSC_0534005 - 534014

Geosyntec Consultants,  Figures 11 - 12 Maximum TCE Concentrations in Passive/Sub-Slab Soil Gas and Indoor Air/Crawl Space Air NGSC_0534015 - 534016

Stantec Consulting Corporation,  1/5/18 Indoor Air Sampling Draft NGSC_0557381 - 557384

Stantec Consulting Corporation,  8/1/18 Ambient Air and PSG Sampling Results NGSC_0583093 - 583093

Orion Environmental, Inc.,  2/28/19 DRAFT Vapor Intrusion Investigation Summary Report.docx NGSC_0614835 - 614835

Stantec Consulting Corporation,  11/9/18 Email from K. Miskin to M. Nelson NGSC_0614931 - 614934

Geosyntec Consultants,  7/16/18 Email from H. Dawson to O. Chun, et al.  NGSC_0615097 - 615098

Geosyntec Consultants,  7/16/18 Ambient Air and PSG Sampling Results NGSC_0615099 - 615099

Geosyntec Consultants,  Table 1 Ambient Air and Passive Soil Gas Sampling Results and attached indoor sampling Figures and Tables NGSC_0620197 - 620239

Geosyntec Consultants,  4/11/19 Email from H. Dawson to K. Miskin et al.  NGSC_0620241 - 620243

Geosyntec Consultants,  4/8/19 Ambient Air and PSG Sampling Results  NGSC_0620244 - 620244

Orion Environmental, Inc.,  6/10/16 DRAFT Work Plan for Offsite Indoor Air Sampling NGSC_0624639 - 624639

Northrop Grumman Corporation,  4/13/16 Email from R. Hodges to M. Nelson NGSC_0624731 - 624731

Northrop Grumman Corporation,  3/23/16 Fig 1 Investigation Area for Fact Sheet NGSC_0624732 - 624732

LARWQCB,  4/16 Draft Factsheet 8020 Deering Ave NGSC_0624733 - 624736

Orion Environmental, Inc.,  11/11/15 Email from G. Datt to M. Nelson et al.  NGSC_0625235 - 625238

Orion Environmental, Inc.,  Figure 2 TCE Isoconcentration Contour Map with Proposed Boring Locations NGSC_0625239 - 625239

Orion Environmental, Inc.,  Figure 3, Geological Cross Section A-A' NGSC_0625240 - 625240

Orion Environmental, Inc.,  3/26/19 DRAFT VI Summary Report NGSC_0625648 - 625648

Geosyntec Consultants,  4/23/20 Email from T. Gabris to M. Thomas et al.  NGSC_0680112 - 680113

Geosyntec Consultants,  11/20/19 Email from H. Dawson to T. Gabris NGSC_0681004 - 681016

Geosyntec Consultants,  11/20/19 Email from H. Dawson to T. Gabris NGSC_0683505 - 683516

Geosyntec Consultants,  VP Statistal Summary NGSC_0683517 - 683517

Geosyntec Consultants,  12/3/19 Email from H. Dawson to A. King et al.  NGSC_0684491 - 684500

Geosyntec Consultants,  12/3/19 Off Property VI Investigation Report.docx NGSC_0684673 - 684727

Helen Dawson,  Collection of All Site Data NGSC_0684742 - 684742

Orion Environmental, Inc.,  11/21/2019 Soil Vapor Summary Report NGSC_0684764 - 685103

Orion Environmental, Inc.,  Table 2 - VOC Results_GIS NGSC_0685105 - 685105

Geosyntec Consultants,  8/5/19 SOW for 2019 Soil Vapor Monitoring NGSC_0685142 - 685146

Orion Environmental, Inc.,  Table 2 - Historical Soil Vapor NGSC_0685384 - 685384

Orion Environmental, Inc.,  4/8/19 Ambient Air and PSG Sampling Results  NGSC_0687036 - 687036

Geosyntec Consultants,  9/10/20 Email from T. Gabris to C. Hollowell NGSC_0738412 - 738417

ARCADIS,  7/30/20 DRAFT Canoga Park 2Q 2020 WDR NGSC_0935095 - 935322

Northrop Grumman Corporation,  4/30/18 NG Budget Tracking and Change Logs Arcadis Canoga Park NGSC_0935324 - 935324

Northrop Grumman Corporation,  NGC - Universal Format - Analytical Results Crosstab NGSC_0935330 - 935330

ARCADIS,  Combined Figures 1-8 DFT 20180920 NGSC_0935590 - 935597

ARCADIS,  Combined Tables 1-3 FIN 09242018 NGSC_0935619 - 935715

ARCADIS,  2020 Q2 WDR tables NGSC_0935723 - 935723

ARCADIS,  2020 Q2 WDR tables DRAFT NGSC_0935727 - 935727

ARCADIS,  2020.07.30 Canoga Park 2Q 2020 WDR text NGSC_0936030 - 936041

ARCADIS,  2020.07.30 Canoga Park 2Q 2020 WDR NGSC_0936056 - 936291

ARCADIS,  Figure - DRAFT NGSC_0936298 - 936298

ARCADIS,  9/15/19 NGC Figure 3 NGSC_0936549 - 936549

ARCADIS,  9/19/19 NGC Figure 4 NGSC_0936594 - 936594

JHA Environmental,  JHA Additional GWM Changeorder NGSC_0936613 - 936632

ARCADIS,  9/24/19 Figure 5 NGSC_0936636 - 936636

ARCADIS,  9/24/19 Figure 6 good NGSC_0936639 - 936639

ARCADIS,  9/24/19 Figure 8 NGSC_0936643 - 936643

Northrop Grumman Corporation,  7/26/17 Canoga Park Arcadis v1_With extra slides NGSC_0948011 - 948050

Northrop Grumman Corporation,  2/8/17 Canoga Park-SMS Site Review NGSC_0949424 - 949441

Equipoise Corporation,  2/9/18 Email from C. Stoker to O. Chun NGSC_1103175 - 1103176

Northrop Grumman Corporation,  8/3/16 Regional Plume Review NGSC_1104140 - 1104144

LARWQCB,  9/13/21 Comm Prop Transmittal of OEHHAs Comments 9-13-21 NGSC_1184182 - 1184190

Geosyntec Consultants,  Compilation of Site Data NGSC_1187240 - 1187240

Geosyntec Consultants,  Maximum TCE Concentrations in 5-Foot Vapor Probes (2017-2019) NGSC_1197808 - 1197808

Geosyntec Consultants,  4/8/19 Ambient Air and PSG Sampling Results NGSC_1229108 - 1229108

Geosyntec Consultants,  4/8/19- Ambient Air and PSG database with pivot table NGSC_1229116 - 1229116

Geosyntec Consultants,  Tbl 1-Ambient Air and PSG Sampling Results MW Pivot NGSC_1229130 - 1229130

Geosyntec Consultants,  4/8/19 Recreate plots in Ambient Air and PSG database with pivot table NGSC_1234206 - 1234206

Geosyntec Consultants,  Figure 6 7 NGSC_1234621 - 1234622

Geosyntec Consultants,  Figure 8_Canoga_Max_TCE_GW HD NGSC_1234636 - 1234636

Geosyntec Consultants,  Tbl 1-Ambient Air and PSG Sampling Results MW Pivot NGSC_1238620 - 1238620

Geosyntec Consultants,  Tbl 1-Ambient Air and PSG Sampling Results MW Pivot NGSC_1238622 - 1238622

Geosyntec Consultants,  NGC21-01 Table 2 - Soil Vapor VOC Analytical Results NGSC_1242701 - 1242701

Northrop Grumman Corporation,  Orion Report re Clarifier Removal, June 21, 2006 NGSC_1256299 - 1256517

Northrop Grumman Corporation,  7/1/07 Letter from J. Kwan to P. Raftery, P.G. NGSC_1307392 - 1307589

Orion Environmental, Inc.,  2/7/19 Email from M. Nelson to K. Miskin NGSC_1307624 - 1307659

LARWQCB,  12/19/18 ARM-5 Results Letter - owner NGSC_1308032 - 1308037

Orion Environmental, Inc.,  2/11/19 Secondary Source Area Investigation Work Plan NGSC_1308071 - 1308092

Stantec Consulting Corporation,  8/1/17 Community Relations Kickoff Presentation NGSC_1308219 - 1308231

Orion Environmental, Inc.,  8/30/18 RWQCB Project Update Meeting Record NGSC_1312002 - 1312027

Northrop Grumman Corporation,  2/8/17 Canoga Park-SMS Site Review Presentation NGSC_1312931 - 1312949

Stantec Consulting Corporation,  10/1/19 Email from K. Miskin to H. Dawson et al. NGSC_1316280 - 1316281

Stantec Consulting Corporation,  Well Flush Out Time Calculator NGSC_1335660 - 1335660

ARCADIS,  4/20/15 Email from C. Divine to R. Ruscitto NGSC_1335837 - 1335842

ARCADIS,  ARCADIS Technical Proposal NGSC_1335845 - 1335892

ARCADIS,  2019.10.10 Figures 1-8 FIN_pdf NGSC_1336187 - 1336194

Stantec Consulting Corporation,  Fig19_Fig16_8000 Deering Avenue VI Sampling Results (January 2021) NGSC_1346729 - 1346729

Stantec Consulting Corporation,  Fig9_GeologicalCross-SectionA-A NGSC_1346750 - 1346750

Stantec Consulting Corporation,  4/9/21 LARWQCB Presentation NGSC_1356295 - 1356326

Stantec Consulting Corporation,  5/6/21 LARWQCB Presentation NGSC_1357825 - 1357869

Orion Environmental, Inc.,  6/28/2019 Figures 1-13 NGSC_1383839 - 1383851

Orion Environmental, Inc.,  Figures and Appendices NGSC_2552560 - 2552570

Orion Environmental, Inc.,  10/31/17 IASP WKP Addendum NGSC_2554571 - 2554571

Orion Environmental, Inc.,  9/9/16 RIDES RTR Package NGSC_2557256 - 2557286

Orion Environmental, Inc.,  Work Notification Areas NGSC_2559544 - 2559544

Orion Environmental, Inc.,  2/23/17 Vapor Intrusion Overview Presentation NGSC_2568916 - 2568950

Stantec Consulting Corporation,  5/6/21 8020 Deering Presentation NGSC_2587168 - 2587204

Northrop Grumman Corporation,  2/11/21 Email from S.D. Boghosian to A. Mexikatzin, et al. NGSC_2589594 - 2589594

Northrop Grumman Corporation,  11/16/21 Email from M. Shannon to K. Miskin et al. NGSC_2589883 - 2589883

Geosyntec Consultants,  4/19/21 Email from M. Thomas to M. Shannon NGSC_2595647 - 2595650

Northrop Grumman Corporation,  Canoga Park Compliance Calendar NGSC_2596695 - 2596695

Northrop Grumman Corporation,  2/10/21 Email from M. Shannon to S.D. Boghosian et al. NGSC_2603952 - 2603954

Geosyntec Consultants,  Canoga IA and SS sample locations NGSC_2604967 - 2604968

Orion Environmental, Inc.,  2/28/18 Email from M. Nelson to S.D. Boghosian et al. NGSC_2639733 - 2639737

Northrop Grumman Corporation,  2/23/17 Vapor Intrusion Overview Presentation NGSC_2640969 - 2641003

Northrop Grumman Corporation,  12/21/17 Email from C. Stoker to O. Chun et al. NGSC_2643410 - 2643411

Northrop Grumman Corporation,  Table 15 VP-13 Data Set NGSC_2643412 - 2643412

Northrop Grumman Corporation,  Table 16 VP-14 Data Set NGSC_2643413 - 2643413

Northrop Grumman Corporation,  Table 17 VP-15 Data Set NGSC_2643414 - 2643414

Northrop Grumman Corporation,  Table 27 Summary of Short-Term TCE Exposures NGSC_2643415 - 2643422

Northrop Grumman Corporation,  VP-14 5 Foot Combined NGSC_2643423 - 2643446

Northrop Grumman Corporation,  VP-14 Source Zone Combined NGSC_2643447 - 2643470

Northrop Grumman Corporation,  1/21/21 Email from S.D. Boghosian to M. Shannon NGSC_2664562 - 2664562

Northrop Grumman Corporation,  8/29/18 KES-6 Results Letter NGSC_2705452 - 2705455

Northrop Grumman Corporation,  1/11/22 Invoice 1875212 NGSC_2745502 - 2745504

LARWQCB,  Comm Prop Transmittal of OEHHAs Comments NGSC_2746663 - 2746671

Geosyntec Consultants,  10/8/21 Email from M. Thomas to A. Chang et al.  NGSC_2747476 - 2747476

Geosyntec Consultants,  2/11/21 Canoga Park Geosyntec Budgetary Proposal NGSC_2748385 - 2748388

Northrop Grumman Corporation,  10/2/23 Canoga Park LARWQCB Presentation NGSC_2759072 - 2759132

Northrop Grumman Corporation,  10/19/2016 Work Plan Vapor Intrusion Assessment NGSC_2819280 - 2819301

Mark H. Rademacher, Esq. ,  1/23/2003, Letter from Rose & Rademacher to Alan R. Maler, Esq.  NGSC_2885330 - 2885331

## Section 5. Figures Used to Summarize and Support Opinions



**Figure 1. 8020 Deering Avenue, Canoga Park, California Location**. North direction is towards top of image.



**Figure 2. Canoga Park Class Area with Grumman Groundwater TCE Plume Delineations** (EarthForensics, Inc., 2023). The plume delineated by the Defendants' consultants is not mapped to the regulatory risk screening level of 1.2µg/L.



**Figure 3. Grumman TCE Groundwater Plume Delineation, Centerline Cross-Section G-G'**
(Ettinger, 2023). This rendering was produced with Hydropunch screening data collected from
2015-2016. Values that exceed the regulatory risk screening level of 1.2µg/L are found
throughout the length of the cross-section along the water table.



**Figure 4. Grumman TCE Groundwater Plume Delineation, "South Lobe" Cross-Section G'-G"**
(Ettinger, 2023). This rendering was produced with Hydropunch screening data collected from
2015-2016. Values that exceed the regulatory risk screening level of 1.2µg/L were found
throughout the shallowest samples collected in the cross-section and TCE plume mapped out
beyond Winnetka Avenue. Winnetka Avenue is located approximately 4,000 feet southeast of
Brown's Canyon Wash (BCW) along the length of cross sections prepared by the Defendants
using 8-year-old data.



**Figure 5. Grumman TCE Groundwater Plume Delineation, "North Lobe" Cross-Section G'-G"'** (Ettinger, 2023). This rendering was produced with Hydropunch screening data collected from 2015-2016. Given that medium to highly transmissive soil layers are present just east of where the Defendants previously mapped elevated shallow TCE concentrations (e.g., much higher than 1.2µg/L) along the western portion of this image (left side of this cross-section), it is highly probable that this portion of the plume has moved farther the east (toward the right side of this image) since this rendering was generated. There are no shallow monitoring wells (e.g., along the water table) installed in that region to substantiate the freshwater lens theory proposed by the Defendants. As such, this theory is speculative based on 8-year-old data and disregards the fact that the TCE plume is mobile.



**Figure 6. Attenuation Factor Slide from Ettinger et al., California CUPA Presentation, February, 2020.** Note the reference to RME in the California water code and how the AF of 0.002 is deemed "not protective in all cases", while 0.03 is characterized as "protective".



**FIGURE 1**    Indoor TCE concentration versus barometric pressure over time. TCE, trichloroethylene [Color figure can be viewed at wileyonlinelibrary.com]



**FIGURE 2**    Indoor TCE concentration versus pressure differential over time. TCE, trichloroethylene [Color figure can be viewed at wileyonlinelibrary.com]

**Figure 7. Impact of Barometric Pressure and Differential Pressure on Indoor Concentration** (after Kram et al., 2020). As BP drops, this causes DP (with higher pressure in the subsurface than above ground), which results in VI "On" and an increase in indoor TCE exposure concentration. The more rapidly BP drops, the higher the resulting DP and indoor concentration. This example of "barometric pumping" commonly occurs in Southern California (where this data was collected). Similarly, as BP rises, the pressure at the ground surface is higher than in the soil. The resulting DP during this VI "Off" condition forces air downward (from above ground into the subsurface), thereby reducing indoor air TCE concentration. Sampling during VI "On" can yield estimates of RME. Sampling during VI "Off" will underestimate exposure risks.



*The daily range of atmospheric pressure (gray bars), as measured by the altimeter setting reported in e.g. a METAR report.*



*The daily range of reported wind speeds (gray bars), with maximum gust speeds (red ticks).*

**Figure 8. Barometric Pressure and Wind Speed During Winter 2017 Canoga Park Class Area Sampling Event** (after Eklund, 2023). The red oval signifies the date range of the Winter 2017 sampling event. Rising BP and extreme winds (which occurred during the sampling campaign) can result in an underestimation of VI. Rising BP is typified by VI "Off", while extreme Santa Ana winds dilute crawl space and indoor air VOC concentrations (e.g., when samples are collected with windows and doors open). Rising BP can also dilute shallow soil vapor samples.



**Figure 9. Time Series Results for Monitoring Well C-59**. This well is located east of BCW and shows that dynamic groundwater concentrations exceeding the risk screening level of 1.2µg/L have been documented since the Hydropunch sampling campaign was performed in 2015-2016. As such, the groundwater plume continues to be mobile. While shallower wells (e.g., screened at the water table) do not currently exist along the "northern lobe" depicted in cross-section G' to G'", given that the plume is mobile, it is likely that the shallow component of the leading edge of the plume has also moved farther east than what was depicted using the 2015-2016 Hydropunch campaign. This suggests that a freshwater lens vapor barrier is not currently present in the downgradient portion of the Class Area.



**Figure 10. Time Series Results for Monitoring Well C-62**. This well is located east of BCW and shows that dynamic groundwater concentrations have been documented above the risk screening level of 1.2µg/L since the Hydropunch sampling campaign was performed in 2015-2016. As such, the downgradient portion of the groundwater plume continues to be mobile. While shallower wells (e.g., screened at the water table) do not currently exist along the "northern lobe" depicted in cross-section G' to G"', given that the plume is mobile, it is likely that the shallow component of the leading edge of the plume has also moved farther east than what was depicted using the 2015-2016 Hydropunch campaign. This suggests that a freshwater lens vapor barrier is not currently present in the downgradient portion of the Class Area.



**Figure 11. Time Series Results for Monitoring Well C-65**. This well is located east of BCW and shows that dynamic groundwater concentrations have been documented since the Hydropunch sampling campaign was performed in 2015-2016. This well is located east of the easternmost edge of the plume when plotted using the 2015-2016 data. As such, the leading edge of the groundwater plume continues to be mobile. While shallower wells (e.g., screened at the water table) do not currently exist along the "northern lobe" depicted in cross-section G' to G"', given that the plume is mobile, it is likely that the shallow component of the leading edge of the plume has also moved farther east than what was depicted using the 2015-2016 Hydropunch campaign. This suggests that a freshwater lens vapor barrier is not currently present in the downgradient portion of the Class Area.



**Figure 12. Time Series Results for Vapor Probe VP-24**. This probe is located east of BCW and show that dynamic soil vapor concentrations have been documented since the Hydropunch sampling campaign was performed in 2015-2016. As such, the leading edge of the soil vapor plume continues to be mobile and most likely extends farther east than what is inferred (e.g., towards the eastern edge of the Class Area) based on the 2015-2016 Hydropunch data. This suggests that a freshwater lens vapor barrier is not currently present in the downgradient portion of the Class Area.



**Figure 13. Reproduction of Mr. Einarson's EVS Model of TCE Distribution out to the Regulatory Risk Screening Level**. This image shows the TCE distribution in groundwater for the Canoga Park plume using Mr. Einarson's EVS data. This rendering includes additional contour bins to represent the spatial distribution of the plume out to the regulatory risk screening level of 1.2µg/L. Note the shape relative to the Class Area as well as the location of the Behar residence relative to the "northern lobe". The Behar residence is located over a band ranging from 10-50µg/L. This dataset does not appear to include recent detections just west of Corbin Avenue (MW C-65) along the easternmost portion of the Class Area.

## Section 6. Qualifications

I am a professional Hydrogeochemist. While I perform expert consulting services, I am also the Founder and current Chief Scientist for Groundswell Technologies, LLC. I earned a Ph.D. in Environmental Science and Management from the University of California at Santa Barbara (UCSB), a master's degree in Geology from San Diego State University, and a bachelor's degree in Chemistry from UCSB. I have over 39 years of experience deploying and developing innovative environmental assessment techniques, have authored peer-reviewed articles, national standards and book chapters on the subject, and have taught graduate level courses on related topics. I worked for the US Navy as a Senior Hydrogeologist for close to two decades, where I managed dozens of soil and groundwater site assessment and restoration projects, invented new technologies for expedited environmental assessment and groundwater monitoring well design, prepared related national guidance, collaborated with other experts from various government and private entities, managed federally funded grant projects for demonstrating and validating technologies for cost-effective expedited site assessment, and operated and helped commercialize innovative site characterization technologies. I served as an Adjunct Professor at UCSB, where I taught graduate level courses in Fate and Transport of Pollutants, Field Environmental Soil and Water Quality, and Geographical Information Systems (GIS). I hold multiple domestic and international patents for commercialized inventions, am an internationally recognized expert in site characterization and remediation technologies and approaches, have worked on high-profile international and domestic projects, and my products and services have been instrumental in the areas of sensor development and implementation, innovative GIS applications, non-aqueous phase liquid (NAPL) site characterization, cone penetrometer based chemical and hydraulic assessment, vapor intrusion, chemical field screening, well design, mass flux and discharge based remediation performance, groundwater basin yield and storage change assessment, and optimized water resources sustainability. One key example is represented by my DoD-sponsored efforts to demonstrate that direct push wells perform as well as traditional drilled wells, which have had profound financial, technical and logistical impacts on the environmental assessment, remediation and long-term monitoring industry components. Domestic and international regulatory acceptance for these cost-effective options was based on my demonstration/validation efforts, presentations and written products. Regarding high-profile domestic and international projects, I served as key investigator and Senior Hydrogeologist on dozens of military and Department of Energy assessment and remediation efforts that included assessment of petroleum hydrocarbons, halogenated solvents, metals and radionuclide contaminants, and served as a consultant to a consortia of stakeholders where I developed plans aimed at remediating nitrate contaminated groundwater resources in the critical Central Valley and Central Coast agricultural regions of California. I've managed multiple projects on Navy and Marine Corps facilities, the Hanford Nuclear Facility, and for hundreds of private sector sites. I have worked on overseas projects that included several phases of investigation performed within neighborhoods adjacent to the Kuwaiti Oil Field (where several homes exploded and my services were sought to determine causes), as well as recent projects in Australia, Brazil and Europe. I have given multiple national workshops on site characterization techniques sponsored by the EPA and helped prepare EPA and state regulatory guidance documents for cost-effective expedited site characterization techniques. I have given keynote presentations (by invitation) at overseas conferences and workshops in Chile, New Zealand and Germany, and have collaborated

Dr. Kram Rebuttal of Defendants' Expert Report; Behar v. Northrop Grumman                    91

with engineers from Thailand, Kuwait, Belgium, Sweden, Australia and Brazil to apply innovative solutions to resolve key environmental challenges. In 2013 I was selected by the US Trade and Development Agency to present to and meet with the Chinese Environmental Ministry leaders, who expressed interest in applying technologies I've developed to help restore contaminated sites in their nation. I have patented inventions for automated Cloud based sensor interpolation and multivariate analyses, for real-time detection of contaminants, for in-situ measurement of groundwater contaminant flow rates and directions, and for water supply sustainability technologies. I am an active member of the National Ground Water Association (NGWA) and the American Society of Testing and Materials (ASTM Subcommittees D18.21 and E50.02) and am currently preparing national guidance for chemical vapor intrusion risk characterization and mitigation, and for Phase II investigations. I have been credited as being one of the first industry practitioners to document shallow subsurface vapor geospatial and temporal dynamics using continuous monitoring techniques. As such, I was invited to co-Chair an ASTM International symposium on continuous soil vapor chemical measurements held in January of 2013, served as co-Editor for the ASTM International book entitled "*Continuous Soil Gas Measurement: Worst Case Risk Parameters*" (http://www.astm.org/BOOKSTORE/PUBS/STP1570.htm), am the recipient of the NGWA's prestigious Technology Award (https://www.wateronline.com/doc/ngwa-announces-annual-groundwater-industry-0001; https://www.ngwa.org/members/awards/technology-award-recipients), and received the 2014 ASTM Committee D18 Technical Editors Award. Additional qualifications are listed in my CV provided in Appendix A.

## Relevant Publications and Presentations Over Past Twenty-Five Years

Bartlett, S.A., Robbins, G.A., Mandrick, J.D., Barcelona, M.J., McCall, W., and **Kram, M.L.**, 2004, *Comparison of Hydraulic Conductivity Determinations in Direct Push and Conventional Wells*, Naval Facilities Engineering Service Center Technical Report, TR-2252-ENV, October, 2004, 88pp.

Hosangadi, V., B. Hartman, M. Pound, **M. Kram**, C. Frescura, B. Shavers, 2017. *High Frequency Continuous Monitoring To Track Vapor Intrusion Resulting From Naturally Occurring Pressure Dynamics*, Journal of Remediation, Spring, v.27, no.2, p.9-25.

James Jacobs, **Kram, Mark L**., and Stephen H. Lieberman, 2000. *Direct Push Technology Sampling Methods* in Standard Handbook of Environmental Science, Health, and Technology, Jay Lehr, ed., McGraw-Hill, 2000, pp.11.151 – 11.176.

**Kram, Mark L.**, Blayne Hartman, and Cliff Frescura, 2022. "Simultaneous Monitoring of Volatile Organic Contaminant Concentration and Controlling Factors for Vapor Intrusion Risk Evaluations—Two Select Cases". Remediation, v.32, issue 4, p.259-272.

**Kram, Mark L.**, Blayne Hartman, Cliff Frescura, Paulo Negrao and Dane Egelton, 2020. *Vapor Intrusion Risk Evaluation Using Automated Continuous Chemical and Physical Parameter Monitoring*, Remediation, v.30, p.65-74.

**Kram, Mark L.**, Blayne Hartman, and Nova Clite, 2019. *Automated Continuous Monitoring and Response to Toxic Subsurface Vapors Entering Overlying Buildings – Selected Observations, Implications and Considerations*, Remediation, v.29, p.31–38.

**Kram, Mark L.**, Peter Morris and Lorne G. Everett, 2013, *Dynamic Subsurface Explosive Vapor Concentrations,* in D18 Symposium on Continuous Soil Gas Measurements: Worst Case Risk Parameters, Eds.: Mark Kram and Lorne Everett, Special Technical Publication #1570.

**Kram, Mark L.**, Peter Morris and Lorne G. Everett, 2011. *Dynamic Subsurface Explosive Vapor Concentrations – Observations and Implications*, Remediation Journal, Winter 2011, v.22, issue 1, p.59-69.

**Kram, Mark L.**, Steve Airhart, Daniel Tyler, Amy Dindal, Andrew Barton, John L. McKernan, and Gregg Gustafson, 2011. *Web-Based Automated Remediation Performance Monitoring and Visualization of Contaminant Mass Flux and Discharge*, Remediation Journal, Summer 2011, v. 21, issue 3, p.89-101.

**Kram, Mark L.**, R. Edward Beighley, and Hugo A. Loaiciga, 2010. *Automatic Analysis*, Pollution Engineering, June 2010, v.42, no.6, p.18-23, http://digital.bnpmedia.com/publication/?i=39268.

**Kram, Mark L.**, R. Edward Beighley, and Hugo A. Loaiciga, 2010. *Automated Environmental Monitoring, Data Visualization, and Critical Resource Management*, A-093*,* in K.A. Fields and G.B. Wickramanayake (Chairs), *Remediation of Chlorinated and Recalcitrant Compounds—2010.* Seventh International Conference on Remediation of Chlorinated and Recalcitrant Compounds (Monterey, CA; May 2010). ISBN 978-0-9819730-2-9, Battelle Memorial Institute, Columbus, OH, www.battelle.org/chlorcon.

**Kram, Mark L.** and Per Ljunggren, 2010. *Use of the High-Resolution Piezocone for Geoenvironmental Applications*, in Proceedings of CPT '10: International Symposium on Cone Penetration Testing, eds. Dr. Peter Robertson, May 9-11, 2010, Huntington Beach, CA.

**Kram, Mark L**. R. Edward Beighley, Hugo A. Loaiciga, and Clark Easter, 2010. *Automated Environmental Monitoring and Visualization for Optimized Project Management*, in Proceedings of the 20th Annual International Conference on Soils, Sediments, Water, and Energy, March 15-18, 2010, San Diego, CA.

**Kram, Mark L.**, R. Edward Beighley, and Hugo A. Loaiciga, 2010. *Automated Environmental Monitoring and Visualization for Optimized Groundwater Management,* in Proceedings of North American Environmental Field Conference and Exposition, January 12-14, 2010, Tampa, Fla.

**Kram, Mark L.**, R. Edward Beighley, and Hugo A. Loaiciga, 2009. *Automated Environmental Monitoring, Data Visualization, and Critical Resource Management,* in Proceedings of SERDP and ESTCP Partners in Environmental Technology Technical Symposium and Workshop, December 1-3, 2009, Washington D.C.

**Kram, Mark L.**, Thomas D. Dalzell, and Per Ljunggren, 2009. *Rapid Single Mobilization Solutions for High-Resolution Contaminant Flux Characterization, Network Design, and Monitoring System Deployment*, in Proceedings for NovCare2009, May, 2009, Leipzig, Germany.

**Kram, Mark L.**, R. Edward Beighley, and Hugo A. Loaiciga, 2009. *Automated Environmental Monitoring and Data Visualization for Streamlined Groundwater Management*, in Proceedings for Second Western Forum on Energy and Water Sustainability, UCSB, April 10, 2009, Santa Barbara, CA.

**Kram, Mark L.**, Thomas Dalzell, and Per Ljunggren, 2009. *Expedited High-Resolution Mass Flux Assessments Using Direct Push Technologies*, in Proceedings of First Remediation Technology Summit (RemTec), March 2009, Atlanta, GA.

**Kram, Mark L.**, R. Edward Beighley, and Hugo A. Loaiciga, 2008. *Automated Environmental Monitoring and Data Visualization*, in Proceedings of SERDP and ESTCP Partners in Environmental Technology Technical Symposium and Workshop, December 2-4, 2008, Washington D.C.

**Kram, Mark L.**, and Gregg Gustafson, 2008. *Triad: Beyond Characterization to Long-Term Management of Groundwater Contaminant Plumes*, USEPA Technology Innovation Program Sponsored Workshop, September 12, 2008, http://www.clu-in.org/conf/tio/beyondcharacterization/.

**Kram, Mark L.**, 2008. *Using High-Resolution Piezocone to Determine Hydraulic Parameters and Mass Flux Distribution*, USEPA Technology Innovation Program Sponsored Workshop, August 27, 2008, http://www.clu-in.org/conf/tio/piezocone/.

**Kram, Mark L.**, Norm Jones, Jessica Chau, Gary Robbins, and Amvirossious Bagtzoglou, 2008. *Mass Flux Distribution Using the High-Resolution Piezocone and GMS*, in: Proceedings of the Sixth International Conference on Remediation of Chlorinated and Recalcitrant Compounds (Monterey, CA; May 2008), Paper Q-017. ISBN 1-57477-163-9, published by Battelle, Columbus, OH, www.battelle.org/chlorcon.

**Kram, Mark L.**, Gary Robbins, Jessica Chau, and Amvirossious Bagtzoglou, 2008. *Detailed Hydraulic Assessment Using a High-Resolution Piezocone Coupled to the GeoVIS, Final Report, ESTCP ER-0421,* NAVFAC TR-2291-ENV, April, 2008, 99pp.

**Kram, Mark L.**, Gary Robbins, Jessica Chau, and Amvirossious Bagtzoglou, 2008. *Detailed Hydraulic Assessment Using a High-Resolution Piezocone Coupled to the GeoVIS, Cost and Performance Report, ESTCP ER-0421*, April, 2008, 59pp.

**Kram, Mark L.**, William Major, Louise Parker, Joel Michaelsen, and Tim McHale, 2008. *Demonstration/Validation of Long-Term Monitoring Using Wells Installed by Direct Push Technologies, Cost and Performance Report, ESTCP ER-0011*, March, 2008, 32pp.

**Kram, Mark L.**, 2008. *Two New Technologies for Expedited Groundwater Contaminant Remediation Design and Monitoring*, RPM Newsletter, Spring 2008, p.10-14.

**Kram, Mark L**. and Norm Jones, 2007. *3D Flux Model Development Using the High-Resolution Piezocone and GMS*, in Proceedings of the 17th Annual AEHS Meeting and West Coast Conference on Soils, Sediments, and Water, March 19-22, 2007, San Diego, CA.

**Kram, Mark L**., Gary Robbins, Ross Bagtzoglou, Jessica Chau, Meridith Metcalf, Norm Jones, 2006. *Detailed Hydraulic Assessment Using a High-Resolution Piezocone and 3-D Conceptual Models*, in Proceedings of the Groundwater Resources Association Symposium on High Resolution Site Characterization and Monitoring, Long Beach, CA, November 14-15, 2006.

**Kram, Mark L**., 2006. *DNAPL Characterization Methods and Approaches: Performance and Cost Comparisons*, in The Practical Handbook of Environmental Site Characterization and Ground-Water Monitoring, D. M. Nielsen, Editor, CRC Press/Taylor & Francis Publishers, Boca Raton, FL, p.473-516.

**Kram, Mark L**., R. Edward Beighley, and Sanya Sirivithayapakorn, 2006. *Sensor and GIS Integration for Automated Environmental Monitoring and Data Visualization*, in Proceedings of the North American Environmental Field Conference, Tampa, FL.

**Kram, Mark L**., Arturo A. Keller, Steve M. Massick, and Leroy E. Laverman, 2004. *Complex NAPL Site Characterization Using Fluorescence* in Treating Dense Non-Aqueous-Phase Liquids, Remediation of Chlorinated and Recalcitrant Compounds, G.B. Wickramanayake, A.R. Gavaskar, and N. Gupta, eds.

**Kram, Mark L**., Arturo A. Keller, Steve M. Massick, and Leroy E. Laverman, 2004. *Complex NAPL Site Characterization Using Fluorescence, Part 1: Selection of Excitation Wavelength Based on NAPL Composition*, Soil and Sediment Contamination: an International Journal, March/April, v.13, no.2, pp.103-118.

**Kram, Mark L**., and Arturo A. Keller, 2004. *Complex NAPL Site Characterization Using Fluorescence, Part 2: Analysis of Soil Matrix Effects on the Excitation/Emission Matrix*, Soil and Sediment Contamination: an International Journal, March/April, v.13, no.2, pp.119-134.

**Kram, Mark L**., and Arturo A. Keller, 2004. *Complex NAPL Site Characterization Using Fluorescence, Part 3: Detection Capabilities for Specific Excitation Sources*, Soil and Sediment Contamination: an International Journal, March/April, v.13, no.2, pp.135-148.

**Kram, Mark L**., D. Lorenzana, J. Michaelsen, B. Major, L. Parker, C. Antworth, and T. McHale, 2003. *Direct-Push Wells for Long-Term Chemical Monitoring*, WWJ, April, p.16-19.

**Kram, Mark L.**, 2002. DNAPL Contaminant Detection Using Optimized Fluorescence Methods, Ph.D. Dissertation, University of California, Santa Barbara, September, 2002, 255pp.

**Kram, Mark L**., A. Keller, J. Rossobi, and L. Everett, 2002. *DNAPL Characterization Methods and Approaches, Part 2: Cost Comparisons*, GWMR, Winter, 2001, v.22, no.1, p.46-61.

**Kram, Mark L**., A. Keller, J. Rossobi, and L. Everett, 2001. *DNAPL Characterization Methods and Approaches, Part 1: Performance Comparisons*, GWMR, Fall, 2001, v.21, no.1, p.109-123.

**Kram, Mark L**., Stephen H. Lieberman, and James Jacobs, 2000. *Direct Sensing of Soils and Ground Water* in Standard Handbook of Environmental Science, Health, and Technology, Jay Lehr, ed., McGraw-Hill, 2000, pp. 11.124 – 11.150.

**Kram, Mark L**. and Fred Goetz, 1999. Natural Attenuation General Data User's Guide, Naval Facilities Engineering Command document UG-2035-ENV, February, 1999, 35 pp.

**Kram, Mark L**., 1998. *Use of SCAPS Petroleum Hydrocarbon Sensor Technology for Real-Time Indirect DNAPL Detection.* Journal of Soil Contamination, 1998, Volume 7, No. 1, pp. 73-86.

**Kram, Mark L**., 1998. *New Tool for Rapidly Evaluating Ground Water Transport Properties Now Available,* Remedial Project Manager News, Summer 1998, p. 4.

**Kram, Mark L**. and Ernest Lory, 1998. *Use of SCAPS Suite of Tools to Rapidly Delineate a Large MTBE Plume,* Conference Proceedings for the Annual Meeting of the Environmental and Engineering Geophysical Society, March 22-26, 1998, Chicago, Illinois, pp. 85-99.

**Kram, Mark L**., 1997. *Use of SCAPS Petroleum Hydrocarbon Sensor Technology for Real-Time Indirect DNAPL Detection.* Proceedings of the Seventh Annual AEHS West Coast Conference on Contaminated Soils and Groundwater: Analysis, Fate, Environmental and Public Health Effects, and Remediation, Oxnard, CA, 1997.

**Kram, Mark L**., Marlene Dean, and Rod Soule, 1997. *The ABCs of SCAPS*. Soil and Groundwater Cleanup, May 1997, pp. 20-22.

**Kram, Mark L**., 1996.  *Framework for Successful SCAPS Deployment*. Proceedings of the Sixth Annual AEHS West Coast Conference on Contaminated Soils and Groundwater: Analysis, Fate, Environmental and Public Health Effects, and Remediation, Newport Beach, CA, 1996.

**Kram, Mark L**., 1996.  *SCAPS Team Efforts Saves Navy Dollars: Success Stories*, Remedial Project Manager News, v.2, no.4, December 1996.

**Kram, Mark L**., Vern Novstrup and Stephen H. Lieberman, 1994.  *Fast-Track Environmental Site Characterization Using Cone Penetrometer Technology*.  White Book, Society of American Military Engineers.

**Kram, Mark L**., 1993.  *Free Product Recovery: Mobility Limitations and Improved Approaches.*  Naval Facilities Engineering Service Center Information Bulletin #IB-123, October 1993.

Widdowson, M., F. Chapelle, C. Casey and **M. Kram**, 2008. *Estimating Cleanup Times Associated with Combining Source-Area Remediation with Monitored Natural Attenuation, Final Report,* ESTCP ER-0436, February, 2008, 65pp.


***Served as technical reviewer or contributing author for numerous additional reports, standards, books, and publications including the following:***

ASTM D5088, *Standard Practice for Decontamination of Field Equipment Used at Nonradioactive Waste Sites*.  Annual Book of ASTM Standards, v.04.08.

ASTM D5092, *Standard Practice for Design and Installation of Ground Water Monitoring Wells in Aquifers*.  Annual Book of ASTM Standards, v.04.08.

ASTM D6001, *Standard Guide for Direct-Push Water Sampling for Geoenvironmental Investigations*. Annual Book of ASTM Standards, v.04.08.

ASTM D6067, *Standard Guide for Using the Electronic Cone Penetrometer for Environmental Site Characterization*. Annual Book of ASTM Standards, v.04.08.

ASTM D6187, *Standard Practice for Cone Penetrometer Technology Characterization of Petroleum Contaminated Sites with Nitrogen Laser-Induced Fluorescence*. Annual Book of ASTM Standards, v.04.08.

ASTM D6724, *Standard Guide for Installation of Direct Push Ground Water Monitoring Wells*. Annual Book of ASTM Standards, v.04.08.

ASTM D6725*, Standard Practice for Direct-Push Installation of Prepacked Screen Monitoring Wells in Unconsolidated Aquifers*.  Annual Book of ASTM Standards, v.04.08.

ASTM E1903, *Standard Practice for Environmental Site Assessments: Phase II Environmental Site Assessment Process*, Annual Book of ASTM Standards, v.04.08.

ASTM PS85, *Guide for Expedited Site Characterization of Hazardous Waste Contaminated Sites.*

ASTM STP1570, *Continuous Soil Gas Measurements: Worst Case Risk Parameters*, Eds.: Lorne Everett and **Mark Kram**, Special Technical Publication, 182pp.

ASTM WK#32621, *Standard Practice for Evaluating Potential Hazard as a Result of Methane in the Vadose Zone*, Subcommittee E50 on Real Estate Assessment and Management.

ASTM WK#45360, Standard Guide for the Development of Long-Term Monitoring Plans for Vapor Mitigation Systems, in draft.

Boulding, J. Russell, 1994.  Practical Handbook of Soil, Vadose Zone, and Ground-Water Contamination: Assessment, Prevention, and Remediation, 976 pp., Lewis Publishers.

ESTCP, 1999.  Cost and Performance Report: High Resolution Seismic Reflection to Characterize and Plan Remediation and Hazardous Waste Sites, 40pp.

ESTCP, 2000.  Cost and Performance Report: Electromagnetic Surveys for 3-D Imaging of Subsurface Contaminants, 54pp.

ESTCP, 2008. Final Report: Demonstration/Validation of Long-Term Monitoring Using Wells Installed by Direct-Push Technologies (ER-0011).

ESTCP, 2008. Cost and Performance Report: Estimating Cleanup Times Associated with Combined Source-Area Remediation with Monitored Natural Attenuation (ER-0436).

ESTCP, 2008. Final Report: Estimating Cleanup Times Associated with Combined Source-Area Remediation with Monitored Natural Attenuation (ER-0436), February 2008, Navy Technical Report, TR-2288-ENV, 65pp.

ESTCP, 2008. Cost and Performance Report: Detailed Hydraulic Assessment Using a High-Resolution Piezocone Coupled to the GeoVIS (ER-0421), April 2008, 59pp.

ESTCP, 2008. Final Report: Detailed Hydraulic Assessment Using a High-Resolution Piezocone Coupled to the GeoVIS (ER-0421), April 2008, NAVFAC TR-2291-ENV, 99pp.

ESTCP, 2008. Cost and Performance Report: Demonstration/Validation of Long-Term Monitoring Using Wells Installed by Direct Push Technologies, Cost and Performance Report (ER-0011), March, 2008, 32pp.

ITRC, 2006. *Technical Regulatory Guide for Installation and Use of Direct Push Monitoring Wells.*

ITRC, 2010. *Use and Measurement of Mass Flux and Mass Discharge*. MASSFLUX-1. Washington, D.C.: Interstate Technology & Regulatory Council, Integrated DNAPL Site Strategy Team. www.itrcweb.org.

Kresic, N., and Mikszewski, A, 2012. Hydrogeological Conceptual Site Models: Data Analysis and Visualization, CRC Press Taylor and Francis Publishers, 600pp.

NAVFACENGCOM Guide Specification for Extraction and Monitoring Wells, NFGS-02670.

NEESA 1992. *Immediate Response to Free Product Discovery.* NEESA Document No. 20.2-051.4, November 1992, 11 pp.

Nielsen, D.M., 2006. Practical Handbook of Environmental Characterization and Ground-Water Monitoring, Second Edition, CRC Taylor and Francis Publishers, 1318pp.

U.S. Air Force, 1994. United States Air Force Remediation Handbook for POL-Contaminated Sites.

U.S.D.O.E., 2001. Induced Fluorescence Sensors for Direct Push Systems, Innovative Technology Summary Report, Tech ID 2237, CMST-CP-SCFA, 28pp.

U.S.E.P.A., 1993. Subsurface Characterization and Monitoring Techniques, A Desk Reference Guide, Volume II: The Vadose Zone, Field Screening and Analytical Methods, Appendices C and D. Office of Research and Development, Washington DC 20460, May 1993, EPA/625/R-93/003b.

U.S.E.P.A., 2003. Applied and Potential Technologies for DNAPL Investigations. Technology Innovation Office, Washington DC, 2003, EPA/524/R-01/03.

## Section 7. List of Cases Over Previous 4 Years for Which Testimony Was Given as Expert at Trial or by Deposition

I have not testified in trial or deposition within the last four years with the exception being my depositions on August 18, 2022, January 17, 2023, and on September 20, 2023, for a case in Indiana (Frances Denney, et al. *v.* Amphenol, et al. Case No: 1:19-cv-04757-TWP-DLP). I have served as a paid technical consultant on related environmental issues brought to the Hawaii Department of Health, the Santa Barbara Planning Commission, the Santa Barbara County Board of Supervisors, the California Coastal Commission, and the California State Water Resources Control Board. I was also hired by the Santa Barbara Chapter of the Surfrider Foundation to address environmental and health risks associated with the proposed Paradiso Del Mare Development, Gaviota, California, which was at the time under consideration by the California Coastal Commission. I was also hired by a coalition comprised of the Otter Project, Monterey Coastkeeper, Santa Barbara Channelkeeper, San Luis Obispo Coastkeeper, the Environmental Defense Center, the California Rural Legal Assistance, the California Sportfishermen's Protection Alliance, the Pacific Coast Federation of Fishermen's Associations, and the Environmental Justice Coalition for Water to assist with a project concerning the SWRCB Irrigated Lands Regulatory Program. I am currently serving as an expert on cases that have yet to go to trial or require my deposition.

## Section 8. Statement of Compensation

For consulting services associated with this matter, I am being compensated at a rate of $325 per hour. For deposition and trial testimony services associated with this matter, I am being compensated at a rate of $450 per hour. My opinions are not conditioned upon my compensation. I am deriving my opinions based upon my experience and customs and standards expected of a professional expert in the environmental assessment and restoration industry.

**Appendix A (Curriculum Vitae)**

**MARK L. KRAM, Ph.D., CGWP #471**
**7127 Hollister Ave., #25A-108**
**Goleta, CA 93117**
**(805) 899-8142**

**OBJECTIVE**    To utilize state of the art groundwater, chemical and GIS applications to assess and restore contaminated and over-drafted areas in the most fiscally responsible manner available.

**EDUCATION**    Ph.D., Environmental Science and Management (UCSB, 2002); Thesis entitled "*DNAPL Contaminant Detection Using Optimized Fluorescence Methods*"; M.S. Geology (SDSU, 1988); Thesis entitled "*Fate and Distribution of Organotin in Sediments of Four U.S. Harbors*"; B.S., Chemistry (UCSB, 1983).

**EXPERIENCE**    **Founder – CTO/CEO**
*Groundswell Technologies, LLC, since 4/08*
Developed sensor technologies for real-time monitoring and reporting of environmental, water supply, security, and industrial data; emergency response and alarm systems.

**Lecturer**
*University of California, Santa Barbara, 9/02 to 1/08*
Taught graduate level Fate and Transport of Pollutants, Field Environmental Soil and Water Quality, and Geographical Information Systems.

**Hydrogeologist**
*Naval Facilities Engineering Service Center, 6/89 to 5/08*
Lead Research Scientist for DOD National Environmental Technology Test Site; Inventor of hydrogeologic, chemical assessment and well design technologies; West Coast Field Project Manager for SCAPS; Project Manager for remediation of ground water and soil contamination, and contaminant fate and transport modeling efforts; Lead on dozens of environmental reports and remedial design specifications; Operator of laser spectroscopic cone penetrometer and other field analytical methods; Author of Navy, ASTM, ITRC, and EPA environmental quality assurance standard guidance.

**Geochemist**
*Naval Oceans Systems Center, 9/86 to 12/88*
Collected and analyzed environmental water and sediment samples for antifouling agent tributyltin; published articles contributed to Congressional legislation concerning marine pesticide applications.

**Material Specialist**
*Decisive Testing, 2/86 to 9/86*
Performed chemical, X-ray, and destructive analyses of industrial materials; administered engineering and welder certification examinations.

**Geochronologist**
*San Diego State Foundation, 4/85 to 2/86*
Mineral preparation, K-Ar age determination of terrestrial and extraterrestrial rock samples.

Dr. Kram Rebuttal of Defendants' Expert Report; Behar v. Northrop Grumman        100

**OTHER**  Recipient of the prestigious NGWA Technology Award and the 2014 ASTM International D18 Technical Editors Award; internationally recognized leader in innovative environmental technology development, demonstration, and technology transfer; holds several key patents for environmental assessment; published more than 40 peer-reviewed articles, several national standards and book chapters; participating ASTM member (Committees D18 and E50); familiar with various PC graphics, modeling, and statistical packages.

**BIOGRAPHICAL STATEMENT:**

Dr. Mark Kram is the Founder and CTO for Groundswell Technologies, Inc., a group specializing in automated Cloud based monitoring and modeling of environmental sensor and analytical instrumentation networks. Dr. Kram earned his Ph.D. in Environmental Science and Management from the University of California at Santa Barbara, an M.S. degree in Geology from San Diego State University, and his B.S. degree in Chemistry from the University of California at Santa Barbara. He has over 39 years of experience using innovative environmental assessment techniques, has authored articles, national standards and book chapters on the subject, and has taught graduate level courses on related topics. Dr. Kram is an internationally recognized expert in site characterization and remediation and has been instrumental in the areas of sensor development and implementation, innovative GIS applications, DNAPL site characterization, chemical field screening, well design, direct push well acceptance, mass flux/discharge-based remediation performance, and groundwater basin yield and storage change assessment. Dr. Kram has patented inventions for automated sensor based contouring and multivariate analyses, automatic determination of groundwater basin storage change, water sustainability to protect from basin overdraft, seawater intrusion and stream depletion, and for in-situ measurement of groundwater contaminant flow rates and directions. Dr. Kram is credited with demonstrating that direct push monitoring wells perform as well as drilled wells, and his related published efforts served as critical ITRC and regulatory references that resulted in industry and agency cost savings exceeding tens of millions per year. Dr. Kram has been featured in Forbes, is an active member of the National Ground Water Association (NGWA), American Society of Testing and Materials (ASTM Subcommittees D18.21 and E50.02), and the Interstate Technology Regulatory Council (ITRC), and is currently preparing national guidance for vapor intrusion and environmental characterization applications. Dr. Kram recently co-chaired an ASTM International symposium on continuous soil vapor chemical measurements, served as Editor for the ASTM International book entitled "*Continuous Soil Gas Measurement: Worst Case Risk Parameters*" (http://www.astm.org/BOOKSTORE/PUBS/STP1570.htm), is the recipient of the NGWA's prestigious Technology Award, and received the 2014 ASTM Committee D18 Technical Editors Award. Dr. Kram has also recently served as an expert witness on several high-profile legal cases involving disputes surrounding groundwater quality and volatile contaminant emissions.

**Dr. Kram's 'Industry Firsts' (Selected):**
1) Demonstrated how direct push wells perform as well as drilled wells (chemistry and hydraulics) and helped gain global approval for use of direct pushed wells for long term monitoring.
2) First to integrate sensors and GIS to automatically generate geospatiotemporal characterizations and responses.
3) First to directly locate Dense Non-Aqueous Phase Liquid source zones using optimized fluorescence.
4) Part of team to first directly locate Light Non-Aqueous Phase Liquid source zones using fluorescence.
5) First to use direct push techniques (e.g., high resolution piezocone) to characterize hydrogeologic parameters (gradient, hydraulic conductivity, Darcy velocity, etc.).
6) First to use direct push techniques to generate solute mass flux and discharge distributions.

Dr. Kram Rebuttal of Defendants' Expert Report; Behar v. Northrop Grumman                    102

7) First to use sensors to generate solute mass flux and discharge distributions.

8) Part of team first to document earth "breathing" and develop implications regarding vapor intrusion.

9) Part of team first to automate responses to acute vapor intrusion exposure risks.

10) Part of team first to use sensors and game theory for automated water resource sustainability management.

## MARK KRAM'S
## UNITED STATES AND INTERNATIONAL PATENTS:

1.   6,208,940, March 27, 2001, Cone Tipped Cylindrical Probe For Use In Groundwater Testing, **Kram, Mark L**., Santa Barbara, California, Massey, James A., Ventura, California, The United States of America as represented by the Secretary of the Navy, Washington, District of Columbia, United States Government.

2.   6,235,941, May 22, 2001, Cone Tipped Cylindrical Probe For Use In Groundwater Testing, **Kram, Mark L**., Santa Barbara, California, Massey, Auldin James, Ventura, California, The United States of America as represented by the Secretary of the Navy, Washington, District of Columbia, United States Government.

3.   6,317,694, November 13, 2001, Method And Apparatus For Selecting A Sand Pack Mesh For A Filter Pack And Well Casing Slot Size For A Well, **Kram, Mark L.**, Santa Barbara, California, Farrar, Jeffrey A., Littleton, Colorado, The United States of America as represented by the Secretary of the Navy, Washington, District of Columbia, United States Government.

4.   6,915,211, July 5, 2005, GIS Based Real-Time Monitoring and Reporting System, **Kram, Mark L.**, Sirivithayapakorn, Sanya, Beighley, Edward.

5.   7,227,139, June 5, 2007, System And Method For Optical Detection Of Petroleum And Other Products In An Environment, **Kram, Mark L.**, Laverman, Leroy E.

6.   8,892,221, November 18, 2014, Integrated Resource Monitoring System with Interactive Logic Control**, Kram, Mark L. and Loaiciga, Hugo** (overseas issues initiated; NZ: 584482).

7.   Submitted Application 09/10, Method and Apparatus for Groundwater Basin Storage Tracking, Remediation Performance Monitoring and Optimization, **Kram, Mark L** (overseas issues initiated; NZ: 604020 and 700747; AU: 2011253144).

**MARK KRAM'S PUBLICATIONS**

Bartlett, S.A., Robbins, G.A., Mandrick, J.D., Barcelona, M.J., McCall, W., and **Kram, M.L.**, 2004, Comparison of Hydraulic Conductivity Determinations in Direct Push and Conventional Wells, Naval Facilities Engineering Service Center Technical Report, TR-2252-ENV, October, 2004, 88pp.

Girty, Gary H. and **Mark L. Kram**, 1988. *Are Paleozoic Thrust Faults in the Shoo Fly Complex, Sierra Nevada, Related to the Antler Orogeny in Nevada?* Geological Society of America, Abstracts With Programs, Proceedings of the 84th Annual Meeting of the Cordilleran Section, Las Vegas, Nevada, March 29-31, 1988.

Hosangadi, V., B. Hartman, M. Pound, **M. Kram**, C. Frescura, B. Shavers, 2017. *High Frequency Continuous Monitoring To Track Vapor Intrusion Resulting From Naturally Occurring Pressure Dynamics*, Journal of Remediation, Spring, v.27, no.2, p.9-25.

James Jacobs, **Mark L. Kram**, and Stephen H. Lieberman, 2000. *Direct Push Technology Sampling Methods* in Standard Handbook of Environmental Science, Health, and Technology, Jay Lehr, ed., McGraw-Hill, 2000, pp.11.151 – 11.176.

Keller, Arturo A., Sanya Sirivithayapakorn, **Mark L. Kram**, and Michael Joy, 2000. *Innovative Treatment of MTBE in Groundwater, Soil and Air: A Case Study*, Soil Sediment and Groundwater, March 2000, pp. 92 - 93.

Keller, Arturo A., Britta Bierwagon, Sanya Sirivithayapakorn, and **Mark L. Kram**, 1999. *Advances in Groundwater Treatment to Remove MTBE*, Hazardous and Industrial Wastes, Proceedings of the Thirty-First Mid-Atlantic Industrial and Hazardous Waste Conference, pp. 199-208.

Keller, Arturo A. and **Mark L. Kram**, 1999. *Use of Laser Induced Fluorescence to Detect DNAPL and Fluorophore Mixtures In-Situ*, Proceedings of the XXVIII IAHR Congress, Graz, Austria, 22-27 August, 1999, p.6.

Keller, Arturo A., Sanya Sirivithayapakorn, and **Mark L. Kram**, 1999. *Remediation of MTBE-Contaminated Water and Soil*, Remediation, Winter 1999, pp. 55 - 68.

Keller, Arturo A. and **Mark L. Kram**, 1998. *Use of Fluorophore/DNAPL Mixtures to Detect DNAPLs In-Situ*, in Nonaqueous-Phase Liquids, Remediation of Chlorinated and Recalcitrant Compounds, Battelle Press, eds. Godage B. Wickramanayake and Robert E. Hinchee, pp.131-136.

Koglin, Eric N., Edward J. Poziomek, and **Mark L. Kram**, 1994. *Emerging Technologies for Detecting and Measuring Contaminants in the Vadose Zone* in Vadose Zone Characterization and Monitoring: Principles, Methods, and Case Studies, 896 pp., Lewis Publishers.

**Kram, Mark L.**, Hugo Loaiciga, Mark Widdowson, Eduardo Mendez, Ryan Solgi and Michael Lamar. 2023. *Resolving the Water Crisis: There's a Way, But Is There the Will?*, Groundwater, v.61, issue 5, p.617-625.

**Kram, Mark L.**, Blayne Hartman, Cliff Frescura, 2022. *Simultaneous Monitoring of VOC Concentration and Controlling Factors for VI Risk Evaluations – 2 Select Cases*, Remediation, v.32, issue 4, p.259-272.

**Kram, Mark L.**, Blayne Hartman, Cliff Frescura, Paulo Negrao and Dane Egelton, 2020. *Vapor Intrusion Risk Evaluation Using Automated Continuous Chemical and Physical Parameter Monitoring*, Remediation, v.30, p.65-74.

**Kram, Mark L.**, Blayne Hartman, and Nova Clite, 2019. "*Automated Continuous Monitoring and Response to Toxic Subsurface Vapors Entering Overlying Buildings – Selected Observations, Implications and Considerations*", Remediation, v.29, p.31–38.

**Kram, Mark L.,** Lorne Everett and Arturo Keller, 2019."Comments in Response to "DyeLIF™: A New Direct-Push Laser-Induced Fluorescence Sensor System for Chlorinated Solvent DNAPL and Other Non-Naturally Fluorescing NAPLs"", Ground Water Monitoring and Remediation, Winter 2019, v.39, issue 1, p.73-74.

**Kram, Mark L**., Blayne Hartman, and Clifford Frescura, 2016. *Vapor Intrusion Monitoring Method Cost Comparisons: Automated Continuous Analytical vs. Discrete Time-Integrated Passive Approaches*, Journal of Remediation, Fall 2016, v.26, issue 4, p.41-52.

**Kram, Mark L.**, 2016. *The Emperor's Old Cloths Revisited*, Guest Editorial Ground Water Monitoring and Remediation, Spring 2016, v.36, issue 2, DOI: 10.1111/gwmr.12150

**Kram, Mark L.**, 2015. *The Emperor's Old Clothes: An Inconvenient Truth About Currently Accepted Vapor Intrusion Assessment Methods*, Guest Editorial, Ground Water Monitoring and Remediation, Fall 2015, v.35, issue 4, DOI: 10.1111/gwmr.12140.

**Kram, Mark L.**, Peter Morris and Lorne G. Everett, 2013, *Dynamic Subsurface Explosive Vapor Concentrations,* in D18 Symposium on Continuous Soil Gas Measurements: Worst Case Risk Parameters, Eds.: Mark Kram and Lorne Everett, Special Technical Publication #1570.

**Kram, Mark L.**, Peter Morris and Lorne G. Everett, 2011. *Dynamic Subsurface Explosive Vapor Concentrations – Observations and Implications*, Remediation Journal, Winter 2011, v.22, issue 1, p.59-69.

**Kram, Mark L.**, Steve Airhart, Daniel Tyler, Amy Dindal, Andrew Barton, John L. McKernan, and Gregg Gustafson, 2011. *Web-Based Automated Remediation Performance Monitoring and Visualization of Contaminant Mass Flux and Discharge*, Remediation Journal, Summer 2011, v. 21, issue 3, p.89-101.

**Kram, Mark L.**, Steve Airhart and Daniel Tyler, 2011. *Automated Monitoring and Visualization of Groundwater and Surface Water Interactions*, Sixth International Conference on Remediation of Contaminated Sediments (New Orleans, Louisiana; February 2011).

**Kram, Mark L.**, R. Edward Beighley, and Hugo A. Loaiciga, 2010. *Automatic Analysis*, Pollution Engineering, June 2010, v.42, no.6, p.18-23, http://digital.bnpmedia.com/publication/?i=39268.

**Kram, Mark L.**, R. Edward Beighley, and Hugo A. Loaiciga, 2010. *Automated Environmental Monitoring, Data Visualization, and Critical Resource Management*, A-093**,** in K.A. Fields and G.B. Wickramanayake (Chairs), *Remediation of Chlorinated and Recalcitrant Compounds—2010.* Seventh International Conference on Remediation of Chlorinated and Recalcitrant Compounds (Monterey, CA; May 2010). ISBN 978-0-9819730-2-9, Battelle Memorial Institute, Columbus, OH, www.battelle.org/chlorcon.

**Kram, Mark L.** and Per Ljunggren, 2010. *Use of the High-Resolution Piezocone for Geoenvironmental Applications*, in Proceedings of CPT '10: International Symposium on Cone Penetration Testing, eds. Dr. Peter Robertson, May 9-11, 2010, Huntington Beach, CA.

**Kram, Mark L**. R. Edward Beighley, Hugo A. Loaiciga, and Clark Easter, 2010. *Automated Environmental Monitoring and Visualization for Optimized Project Management*, in

Proceedings of the 20th Annual International Conference on Soils, Sediments, Water, and Energy, March 15-18, 2010, San Diego, CA.

**Kram, Mark L.**, R. Edward Beighley, and Hugo A. Loaiciga, 2010. *Automated Environmental Monitoring and Visualization for Optimized Groundwater Management,* in Proceedings of North American Environmental Field Conference and Exposition, January 12-14, 2010, Tampa, Fla.

**Kram, Mark L.**, R. Edward Beighley, and Hugo A. Loaiciga, 2009. *Automated Environmental Monitoring, Data Visualization, and Critical Resource Management,* in Proceedings of SERDP and ESTCP Partners in Environmental Technology Technical Symposium and Workshop, December 1-3, 2009, Washington D.C.

**Kram, Mark L.**, Thomas D. Dalzell, and Per Ljunggren, 2009. *Rapid Single Mobilization Solutions for High-Resolution Contaminant Flux Characterization, Network Design, and Monitoring System Deployment*, in Proceedings for NovCare2009, May, 2009, Leipzig, Germany.

**Kram, Mark L.**, R. Edward Beighley, and Hugo A. Loaiciga, 2009. *Automated Environmental Monitoring and Data Visualization for Streamlined Groundwater Management*, in Proceedings for Second Western Forum on Energy and Water Sustainability, UCSB, April 10, 2009, Santa Barbara, CA.

**Kram, Mark L.**, Thomas Dalzell, and Per Ljunggren, 2009. *Expedited High-Resolution Mass Flux Assessments Using Direct Push Technologies*, in Proceedings of First Remediation Technology Summit (RemTec), March 2009, Atlanta, GA.

**Kram, Mark L.**, R. Edward Beighley, and Hugo A. Loaiciga, 2008. *Automated Environmental Monitoring and Data Visualization*, in Proceedings of SERDP and ESTCP Partners in Environmental Technology Technical Symposium and Workshop, December 2-4, 2008, Washington D.C.

**Kram, Mark L.**, and Gregg Gustafson, 2008. *Triad: Beyond Characterization to Long-Term Management of Groundwater Contaminant Plumes*, USEPA Technology Innovation Program Sponsored Workshop, September 12, 2008, http://www.clu-in.org/conf/tio/beyondcharacterization/.

**Kram, Mark L.**, 2008. *Using High-Resolution Piezocone to Determine Hydraulic Parameters and Mass Flux Distribution*, USEPA Technology Innovation Program Sponsored Workshop, August 27, 2008, http://www.clu-in.org/conf/tio/piezocone/.

**Kram, Mark L.**, Norm Jones, Jessica Chau, Gary Robbins, and Amvirossious Bagtzoglou, 2008. *Mass Flux Distribution Using the High-Resolution Piezocone and GMS*, in: Proceedings of the Sixth International Conference on Remediation of Chlorinated and Recalcitrant Compounds (Monterey, CA; May 2008), Paper Q-017. ISBN 1-57477-163-9, published by Battelle, Columbus, OH, www.battelle.org/chlorcon.

**Kram, Mark L.**, Gary Robbins, Jessica Chau, and Amvirossious Bagtzoglou, 2008. *Detailed Hydraulic Assessment Using a High-Resolution Piezocone Coupled to the GeoVIS, Final Report, ESTCP ER-0421,* NAVFAC TR-2291-ENV, April, 2008, 99pp.

**Kram, Mark L.**, Gary Robbins, Jessica Chau, and Amvirossious Bagtzoglou, 2008. *Detailed Hydraulic Assessment Using a High-Resolution Piezocone Coupled to the GeoVIS, Cost and Performance Report, ESTCP ER-0421*, April, 2008, 59pp.

**Kram, Mark L.**, William Major, Louise Parker, Joel Michaelsen, and Tim McHale, 2008. *Demonstration/Validation of Long-Term Monitoring Using Wells Installed by Direct Push Technologies, Cost and Performance Report, ESTCP ER-0011*, March, 2008, 32pp.

**Kram, Mark L.**, 2008. *Two New Technologies for Expedited Groundwater Contaminant Remediation Design and Monitoring*, RPM Newsletter, Spring 2008, p.10-14.

**Kram, Mark L**. and Norm Jones, 2007. *3D Flux Model Development Using the High-Resolution Piezocone and GMS*, in Proceedings of the 17th Annual AEHS Meeting and West Coast Conference on Soils, Sediments, and Water, March 19-22, 2007, San Diego, CA.

**Kram, Mark L.**, Gary Robbins, Ross Bagtzoglou, Jessica Chau, Meridith Metcalf, Norm Jones, 2006. *Detailed Hydraulic Assessment Using a High-Resolution Piezocone and 3-D Conceptual Models*, in Proceedings of the Groundwater Resources Association Symposium on High Resolution Site Characterization and Monitoring, Long Beach, CA, November 14-15, 2006.

**Kram, Mark L**., 2006. *DNAPL Characterization Methods and Approaches: Performance and Cost Comparisons*, in The Practical Handbook of Environmental Site Characterization and Ground-Water Monitoring, D. M. Nielsen, Editor, CRC Press/Taylor & Francis Publishers, Boca Raton, FL, p.473-516.

**Kram, Mark L**., Gary Robbins, Renduo Zhang, Lanbo Liu, Norm Jones, 2006. *Detailed Hydraulic Assessment Using a High-Resolution Piezocone Coupled to the GeoVIS*, in Proceedings of the North American Environmental Field Conference, Tampa, FL.

**Kram, Mark L**., Arturo A. Keller, Steve M. Massick, and Leroy E. Laverman, 2006. *Complex NAPL Site Characterization Using Fluorescence*, in Proceedings of the North American Environmental Field Conference, Tampa, FL.

**Kram, Mark L**., R. Edward Beighley, and Sanya Sirivithayapakorn, 2006. *Sensor and GIS Integration for Automated Environmental Monitoring and Data Visualization*, in Proceedings of the North American Environmental Field Conference, Tampa, FL.

**Kram, Mark L**., Arturo A. Keller, Steve M. Massick, and Leroy E. Laverman, 2004. *Complex NAPL Site Characterization Using Fluorescence* in Treating Dense Non-Aqueous-Phase Liquids, Remediation of Chlorinated and Recalcitrant Compounds, G.B. Wickramanayake, A.R. Gavaskar, and N. Gupta, eds.

**Kram, Mark L**., Arturo A. Keller, Steve M. Massick, and Leroy E. Laverman, 2004. *Complex NAPL Site Characterization Using Fluorescence, Part 1: Selection of Excitation Wavelength Based on NAPL Composition*, Soil and Sediment Contamination: an International Journal, March/April, v.13, no.2, pp.103-118.

**Kram, Mark L**., and Arturo A. Keller, 2004. *Complex NAPL Site Characterization Using Fluorescence, Part 2: Analysis of Soil Matrix Effects on the Excitation/Emission Matrix*, Soil and Sediment Contamination: an International Journal, March/April, v.13, no.2, pp.119-134.

**Kram, Mark L**., and Arturo A. Keller, 2004. *Complex NAPL Site Characterization Using Fluorescence, Part 3: Detection Capabilities for Specific Excitation Sources*, Soil and Sediment Contamination: an International Journal, March/April, v.13, no.2, pp.135-148.

**Kram, Mark L**., D. Lorenzana, J. Michaelsen, B. Major, L. Parker, C. Antworth, and T. McHale, 2003. *Direct-Push Wells for Long-Term Chemical Monitoring*, WWJ, April, p.16-19.

**Kram, Mark L**., D. Lorenzana, L. Parker, J. Michaelsen, B. Major, and E. Lory, 2003. *Performance Comparison Between Direct-Push and Conventional Hollow Stem Auger Installed Monitoring Wells*, GWMR.

**Kram, Mark L.**, 2002. *DNAPL Contaminant Detection Using Optimized Fluorescence Methods*, Ph.D. Dissertation, University of California, Santa Barbara, September, 2002, 255pp.

**Kram, Mark L.**, Arturo A. Keller, Joseph Rossabi, and Lorne G. Everett, 2002.  DNAPL Characterization Methods And Approaches, Part 2: Cost Comparisons, <u>*GWMR, v.22, p.46-61.*</u>

**Kram, Mark L.**, Arturo A. Keller, Joseph Rossabi, and Lorne G. Everett, 2001.  DNAPL Characterization Methods And Approaches, Part 1: Performance Comparisons, <u>*GWMR*</u>, *v.21, no.4, p.109-123.*

**Kram, M.**, D. Lorenzana, J. Michaelsen, and E. Lory, 2001.  *Performance Comparison Between Direct-Push and Conventional Hollow Stem Auger Monitoring Wells*, in Proceedings: Tri-Service Environmental Technology Symposium, San Diego, CA, TMC Design Corporation, Smithfield, VA, pp.80-83.

**Kram, Mark L.**, Stephen H. Lieberman, Jerome Fee, and Arturo A. Keller, 2001.  *Use of LIF for Real-Time In-Situ Mixed NAPL Source Zone Detection*, <u>GWMR</u>, v.21, no.1, pp. 67-76.

**Kram, Mark L.**, 2001.  *Direct-Push Versus HSA Drilled Monitoring Wells*, <u>RPM News</u>, Spring 2001, p.6 - 7.

**Kram, Mark**, D. Lorenzana, J. Michaelsen, E. Lory, 2001.  <u>Performance Comparison: Direct-Push Wells Versus Drilled Wells</u>, Naval Facilities Engineering Service Center Technical Report, TR-2120-ENV, January 2001, 55pp.

**Kram, Mark L.**, Arturo A. Keller, and Lorne G. Everett, 2000.  *DNAPL Site Characterization Methods and Approaches: Cost and Performance Comparisons* in <u>Treating Dense Non-Aqueous-Phase Liquids, Remediation of Chlorinated and Recalcitrant Compounds</u>, G.B. Wickramanayake, A.R. Gavaskar, and N. Gupta, eds., pp. 59-68.

**Kram, Mark L.**, Stephen H. Lieberman, and James Jacobs, 2000.  *Direct Sensing of Soils and Ground Water* in <u>Standard Handbook of Environmental Science, Health, and Technology</u>, Jay Lehr, ed., McGraw-Hill, 2000, pp. 11.124 – 11.150.

**Kram, Mark L.**, Sanya Sirivithayapakorn, Michael Joy, Ernest Lory, and Arturo A. Keller, 2000. <u>MTBE Remediation Using Hollow Fiber Membrane and Spray Aeration Vacuum Extraction Technologies</u>, Naval Facilities Engineering Service Center Contract Report, CR 00-004-ENV, September, 2000, 52pp.

**Kram, Mark L**. and Fred Goetz, 1999.  <u>Natural Attenuation General Data User's Guide</u>, Naval Facilities Engineering Command document UG-2035-ENV, February, 1999, 35 pp.

**Kram, Mark L.**, Sanya Sirivithayapakorn, Michael Joy, Ernest Lory, and Arturo A. Keller, 1999. *MTBE Remediation Using Hollow Fiber Membrane and Spray Aeration Vacuum Extraction Technologies* in <u>Abstracts for the Proceedings of the 1999 American Geophysical Union Annual Conference</u>, December 1999.

**Kram, Mark L.**, 1998.  *Use of SCAPS Petroleum Hydrocarbon Sensor Technology for Real-Time Indirect DNAPL Detection.*  <u>Journal of Soil Contamination</u>, 1998, Volume 7, No. 1, pp. 73-86.

**Kram, Mark L.**, 1998.  *Use of SCAPS Suite of Tools to Rapidly Delineate a Large MTBE Plume*, <u>Remedial Project Manager News</u>, Winter 1998, pp. 13-15.

**Kram, Mark L.**, 1998.  *New Tool for Rapidly Evaluating Ground Water Transport Properties Now Available,* <u>Remedial Project Manager News</u>, Summer 1998, p. 4.

**Kram, Mark L**., 1998. *This is the Year of the Ocean: Let's Clean it Up*, Santa Barbara News-Press, Tuesday, August 18, 1998.

**Kram, Mark L**. and Ernest Lory, 1998. *Use of SCAPS Suite of Tools to Rapidly Delineate a Large MTBE Plume,* Conference Proceedings for the Annual Meeting of the Environmental and Engineering Geophysical Society, March 22-26, 1998, Chicago, Illinois, pp. 85-99.

**Kram, Mark L**., 1997. *Use of SCAPS Petroleum Hydrocarbon Sensor Technology for Real-Time Indirect DNAPL Detection.* Proceedings of the Seventh Annual AEHS West Coast Conference on Contaminated Soils and Groundwater: Analysis, Fate, Environmental and Public Health Effects, and Remediation, Oxnard, CA, 1997.

**Kram, Mark L**., Marlene Dean, and Rod Soule, 1997. *The ABCs of SCAPS.* Soil and Groundwater Cleanup, May 1997, pp. 20-22.

**Kram, Mark L**., 1996. *Framework for Successful SCAPS Deployment*. Proceedings of the Sixth Annual AEHS West Coast Conference on Contaminated Soils and Groundwater: Analysis, Fate, Environmental and Public Health Effects, and Remediation, Newport Beach, CA, 1996.

**Kram, Mark L**., 1996. *SCAPS Team Efforts Saves Navy Dollars: Success Stories*, Remedial Project Manager News, v.2, no.4, December 1996.

**Kram, Mark L**., Vern Novstrup and Stephen H. Lieberman, 1994. *Fast-Track Environmental Site Characterization Using Cone Penetrometer Technology.* White Book, Society of American Military Engineers.

**Kram, Mark L**., 1993. *Free Product Recovery: Mobility Limitations and Improved Approaches.* Naval Facilities Engineering Service Center Information Bulletin #IB-123, October 1993.

**Kram, Mark L**., 1991. *We Can Change The World.* San Diego Publishing Company, 48 pp.

**Kram, Mark L**., 1990. *Measurement of Floating Petroleum Product Thickness and Determination of Hydrostatic Head in Monitoring Wells.* Navy Energy and Environmental News Information Bulletin, November 1990, p.7-10.

**Kram, Mark L**., 1989. *Let's Not Trash the 90's.* Hotwater Magazine, v.2, p.18.

**Kram, Mark L**., 1989. *Now is the Time for San Diego to Begin Bracing for Future Environmental Concerns.* Beach and Bay Press, v.1, no. 15, p.2.

**Kram, Mark L**., 1989. *Recycling Response.* Beach and Bay Press, v.1, no. 16, p.2.

**Kram, Mark L**., 1989. *Fate and Distribution of Organotin in Sediment of Four United States Harbors.* Masters' Thesis, San Diego State University, 147 pp.

**Kram, Mark L**., 1989. *World Security.* Environmental Science and Technology, v.23, no.12, p.1434.

**Kram, Mark L**., Peter M. Stang, and Peter F. Seligman, 1989. *Fate and Distribution of Organotin in Sediment of Four United States Harbors.* U.S. Navy Technical Report #1280, 79 pp.

**Kram, Mark L**., Peter M. Stang, and Peter F. Seligman, 1989. *Adsorption and Desorption of Tributyltin in Sediments of San Diego Bay and Pearl Harbor.* Applied Organometallic Chemistry, v.3, p.523-536.

**Kram, Mark L**., 1988. *Earth Day Festival Comes Back to Life.* San Diego State University Daily Aztec, April 22nd, p.1.

**Kram, Mark L**., 1988. *The Surfer's Diet and Obligations.* Hotwater Magazine, v.1, p.20.

**Kram, Mark L**., 1987. *Practical Approaches to Environmental Solutions.* San Diego State University Daily Aztec, December 4th, p.3.

Lieberman, Stephen H., Vern Novstrup, and **Mark L. Kram**, 1995. *Fast-Track Environmental Site Characterization Accomplished Using CPT*, Remedial Project Manager News, v.1, no. 4, March 1995.

J. Rossabi, B. D. Riha, C. A. Eddy-Dilek, and **M. L. Kram**, 2000. *Field Tests of Cone Penetrometer-Based, DNAPL Characterization Methods*, Groundwater Research, Rosbjerg *et al.* eds., Balkema, Rotterdam, Denmark.

Sinclair, Nate and **Mark Kram**, 1998. *High Resolution 3-D Seismic Reflection Surveys for Characterization of Hazardous Waste Sites*, in Proceedings for the Third Tri-Service ESTCP Workshop, 18 August, 1998.

Stang, Peter M., Peter F. Seligman, Richard F. Lee and **Mark L. Kram**, 1990. *Distribution and Fate of Butyltin Compounds in Marine Sediments.* Proceedings of the 3rd International Organotin Symposium, Monaco, 17-20 April 1990, pp. 49-54.

Widdowson, M., F. Chapelle, C. Casey and **M. Kram**, 2008. *Estimating Cleanup Times Associated with Combining Source-Area Remediation with Monitored Natural Attenuation, Final Report,* ESTCP ER-0436, February, 2008, 65pp.


***Served as technical reviewer or contributing author for numerous additional reports, standards, books, and publications including the following:***


ASTM D5088, *Standard Practice for Decontamination of Field Equipment Used at Nonradioactive Waste Sites.* Annual Book of ASTM Standards, v.04.08.

ASTM D5092, *Standard Practice for Design and Installation of Ground Water Monitoring Wells in Aquifers*. Annual Book of ASTM Standards, v.04.08.

ASTM D6001, *Standard Guide for Direct-Push Water Sampling for Geoenvironmental Investigations*. Annual Book of ASTM Standards, v.04.08.

ASTM D6067, *Standard Guide for Using the Electronic Cone Penetrometer for Environmental Site Characterization*. Annual Book of ASTM Standards, v.04.08.

ASTM D6187, *Standard Practice for Cone Penetrometer Technology Characterization of Petroleum Contaminated Sites with Nitrogen Laser-Induced Fluorescence*. Annual Book of ASTM Standards, v.04.08.

ASTM D6724, *Standard Guide for Installation of Direct Push Ground Water Monitoring Wells*. Annual Book of ASTM Standards, v.04.08.

ASTM D6725*, Standard Practice for Direct-Push Installation of Prepacked Screen Monitoring Wells in Unconsolidated Aquifers*. Annual Book of ASTM Standards, v.04.08.

ASTM E1903, Standard Practice for Environmental Site Assessments: Phase II Environmental Site Assessment Process, Annual Book of ASTM Standards, v.04.08.

ASTM E2993, *Standard Practice for Evaluating Potential Hazard as a Result of Methane in the Vadose Zone*, Annual Book of ASTM Standards, v.11.05.

ASTM PS85, *Guide for Expedited Site Characterization of Hazardous Waste Contaminated Sites.*

ASTM STP1570, *Continuous Soil Gas Measurements: Worst Case Risk Parameters*, Eds.: Lorne Everett and **Mark Kram**, Special Technical Publication, 182pp.

ASTM E2993, *Standard Practice for Evaluating Potential Hazard as a Result of Methane in the Vadose Zone*, Subcommittee E50 on Real Estate Assessment and Management.

ASTM WK#45360, *Standard Guide for the Development of Long-Term Monitoring Plans for Vapor Mitigation Systems*, in draft.

ASTM WK#57579, *Standard Practice for Environmental Site Assessments: Phase II Environmental Site Assessment Process*, revision of E1903, in draft.

Boulding, J. Russell, 1994.  Practical Handbook of Soil, Vadose Zone, and Ground-Water Contamination: Assessment, Prevention, and Remediation, 976 pp., Lewis Publishers.

ESTCP, 1999.  Cost and Performance Report: High Resolution Seismic Reflection to Characterize and Plan Remediation and Hazardous Waste Sites, 40pp.

ESTCP, 2000.  Cost and Performance Report: Electromagnetic Surveys for 3-D Imaging of Subsurface Contaminants, 54pp.

ESTCP, 2008. Final Report: Demonstration/Validation of Long-Term Monitoring Using Wells Installed by Direct-Push Technologies (ER-0011).

ESTCP, 2008. Cost and Performance Report: Estimating Cleanup Times Associated with Combined Source-Area Remediation with Monitored Natural Attenuation (ER-0436).

ESTCP, 2008. Final Report: Estimating Cleanup Times Associated with Combined Source-Area Remediation with Monitored Natural Attenuation (ER-0436), February 2008, Navy Technical Report, TR-2288-ENV, 65pp.

ESTCP, 2008. Cost and Performance Report: Detailed Hydraulic Assessment Using a High-Resolution Piezocone Coupled to the GeoVIS (ER-0421), April 2008, 59pp.

ESTCP, 2008. Final Report: Detailed Hydraulic Assessment Using a High-Resolution Piezocone Coupled to the GeoVIS (ER-0421), April 2008, NAVFAC TR-2291-ENV, 99pp.

ESTCP, 2008. Cost and Performance Report: Demonstration/Validation of Long-Term Monitoring Using Wells Installed by Direct Push Technologies, Cost and Performance Report (ER-0011), March, 2008, 32pp.

ITRC, 2006. *Technical Regulatory Guide for Installation and Use of Direct Push Monitoring Wells*.

ITRC, 2010. *Use and Measurement of Mass Flux and Mass Discharge*. MASSFLUX-1. Washington, D.C.: Interstate Technology & Regulatory Council, Integrated DNAPL Site Strategy Team. www.itrcweb.org.

Kresic, N., and Mikszewski, A, 2012. Hydrogeological Conceptual Site Models: Data Analysis and Visualization, CRC Press Taylor and Francis Publishers, 600pp.

NAVFACENGCOM Guide Specification for Extraction and Monitoring Wells, NFGS-02670.

NEESA 1992. *Immediate Response to Free Product Discovery*.  NEESA Document No. 20.2-051.4, November 1992, 11 pp.

Nielsen, D.M., 2006.  Practical Handbook of Environmental Characterization and Ground-Water Monitoring, Second Edition, CRC Taylor and Francis Publishers, 1318pp.

U.S. Air Force, 1994.  United States Air Force Remediation Handbook for POL-Contaminated Sites.

U.S.D.O.E., 2001. Induced Fluorescence Sensors for Direct Push Systems, Innovative Technology Summary Report, Tech ID 2237, CMST-CP-SCFA, 28pp.

U.S.E.P.A., 1993.  Subsurface Characterization and Monitoring Techniques, A Desk Reference Guide, Volume II: The Vadose Zone, Field Screening and Analytical Methods, Appendices C and D.  Office of Research and Development, Washington DC 20460, May 1993, EPA/625/R-93/003b.

U.S.E.P.A., 2003.  Applied and Potential Technologies for DNAPL Investigations.  Technology Innovation Office, Washington DC, 2003, EPA/524/R-01/03.