# EXHIBIT 18

The Use of Chlorinated Solvents
at 8020 Deering Ave, Canoga Park, Ca.

Expert Report
Hugh S. Gorman, PhD

Sept. 27, 2023

**Table of Contents**

I. **General Remarks**
  A.  Statement of the Problem
  B.  Credentials
  C.  Compensation
  D.  Material Reviewed and Considered

II.    **Summary**

III.    **Report**
  A. The Origins of Litton's Operation at 8020 Deering Ave
  B. The Manufacture of Circuit Boards circa 1970
  C. Waste Disposal at Facilities Manufacturing Circuit Boards circa 1970
  D. Other Activity at 8020 Deering Prior to Discovery of Contamination
  E. The Discovery of Soil and Groundwater Contamination
  F. The Contamination Path
  G. Assessment

**Appendix A. Curriculum Vita**

**Appendix B. List of Material Considered and Reviewed**

Sept. 27, 2023

## I. General Remarks

### A. Statement of the Problem

In 1998, when Landowners, Ltd., the owner of a Los Angeles light-manufacturing industrial facility at 8020 Deering Avenue in Canoga Park planned to sell the property, the buyer's mortgage company requested a Phase I environmental site assessment (ESA).[1] A Phase I ESA consists of a physical inspection of the site, interviews with property owners and occupants, and a review of the documentation associated with past ownership and use. The company that performed the Phase I assessment, National Environmental Inc., recommended taking preliminary soil samples near a concrete pad for storing chemicals and in an area adjacent to a pretreatment structure referred to as "the clarifier."[2] Soil samples taken near the clarifier indicated that concentrations of several contaminates—including copper, nickel, trichloroethylene (TCE), and perchloroethylene (PCE)—were above action levels, resulting in a recommendation for further sampling to "delineate the vertical and lateral extent of the soil and groundwater impairment related to the leaking clarifier."[3]

The results of the additional sampling, performed by MSE Environmental Inc., were submitted to the Regional Water Control Board (RWCB) in January 1999 and included recommendations for further sampling.[4] That additional sampling, approved by the RWCB, was completed in August 1999 by Certified Environmental Consultants. The results confirmed the presence of the chlorinated solvents TCE and PCE in groundwater. The solvent 1,1,1-trichloroethane (1,1,1 TCA) was also detected. Given that the samples were taken at the downgradient edge of the property, the investigator concluded that "the lateral extent of impacted ground water extends beyond the limits of the site."[5] Additional sampling done in the years since indicate

---

[1] NGSC_0054108, Deposition of Darrel Greenwald of Landowners, Ltd., pp. 99-101.

[2] NGSC_0068380, p. 127 of 302, "Report on the Preliminary Site Assessment, The Transit Authority, 8020 Deering Ave., Canoga park, CA 91304," Oct 15, 1998, p. ii.

[3] NGSC_0068380, p. 240 of 302, "Report on the Preliminary Site Assessment, The Transit Authority, 8020 Deering Ave., Canoga park, CA 91304," Nov. 25, 1998, pp. 7-8.

[4] NGSC_0060430," p. 1 of 70, "Additional Site Assessment Report for Commercial Property Located at 8020 Deering Avenue, Canoga Park, California," Aug 17, 1999, p. 1.

[5] NGSC_0060430, p. 1 of 70, "Additional Site Assessment Report for Commercial Property Located at 8020 Deering Avenue, Canoga Park, California," prepared for Land Owners Limited Partnership by Certified Environmental Consultants, Aug 17, 1999, p. 6.  The tables of data at the end of the report indicate the presence of 1,1,1-trichloroethane in addition to PCE and TCE.

Sept. 27, 2023

that the plume of contamination extends 2.5 miles downgradient (toward the southeast), reaching and underlying residential neighborhoods.[6]

The Phase I assessment identified Litton's Advanced Circuitry Division (ACD) as the first occupant of the facility.[7] In 2000, Litton contracted with Verdict Resources to conduct a search of past industrial activity at 8020 Deering Avenue and nearby properties for the purpose of determining which activities may have contributed to the contamination. Verdict Resources listed the sequence of businesses that occupied 8020 Deering and neighboring locations but offered no conclusions other than to recommend further investigation. The companies that occupied 8020 Deering after Litton ACD include a manufacturer of copier toner, various engineering, printing, and sales offices, an auto body shop, and a van conversion company.[8] None of these occupants employed the type of metal cleaning and plating processes performed by Litton ACD.

The purpose of this report is to summarize the practices associated with the manufacture of printed circuit boards circa 1970, to summarized what is known about Litton ACD's process for manufacturing printed circuit boards, and to offer an opinion as to whether the process used by Litton ACD for manufacturing printed circuit boards was the source of the chlorinated solvents in the existing contamination plume.

## B.  Credentials

My name is Hugh Gorman and I am a historian of industry, technology, and the environment by training and profession. I have a PhD degree in History and Policy from Carnegie Mellon University. From 1996 to 2021, I was a professor in the Department of Social Sciences at Michigan Technological University. Michigan Tech is a research university, and my research has focused on using historical case studies to provide insight into the development of industrial practices that are environmentally sustainable. I joined the Department of Social Sciences at Michigan Tech because it houses two graduate programs relative to my interests: a graduate program in Industrial Heritage and Archaeology and a graduate program in Environmental and Energy Policy. I have taught a variety of graduate courses associated with those programs, including courses in industrial history and

---

[6]NGSC_0555103, p. 1 of 19, slide presentation, "Project Status and Uncertainties Influencing Future Remediation Costs, by Jeff Gwinn, Orion Environmental, Inc., p. 6 of 19.

[7]NGSC_0068380, p. 127, "Report on the Preliminary Site Assessment, The Transit Authority, 8020 Deering Ave., Canoga park, CA 91304," pp. 3-5.

[8]NGSC_0077067, p. 1 of 64, "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

2

Sept. 27, 2023

environmental history. The department has also been the headquarters for the Society of Industrial Archaeology for over a quarter century. I served as the Chair of the department from 2015 to 2021. I currently have the status of professor emeritus.

In addition to a variety of journal articles, book chapters, and reports, I have published two monographs, which are scholarly books written by a single author that advances disciplinary knowledge in a particular field. The first is relevant to this assignment. It is a history of pollution control in the U.S. petroleum industry in which I examined how engineers and executives in oil companies addressed pollution concerns in the general period 1890 to 1990, from a period in which operations in the oil and gas industry were generally unregulated to one in which a system of governance for maintaining air quality and water quality had been constructed. In that project, I examined the history of operations and practices in the production sector (oil fields), the transportation sector (tankers and pipelines), and the refining sector, with the focus on practices associated with emissions to the air, discharges to bodies of water, and the disposal of wastes.

The two main professional associations I engage with are the Society for the History of Technology and the American Society for Environmental History. The annual meeting of the Society for the History of Technology is attended by several hundred historians and includes several days of concurrent sessions in which researchers report on their current projects. Before the pandemic, I had attended this conference almost every year for over twenty years and served as an officer of the society for six years. The annual meeting of the American Society for Environmental History is also attended by several hundred historians and also includes several days of concurrent paper sessions. I had attended this conference almost every year for over twenty years as well. The two associations have a special interest group known as EnviroTech that consists of historians interested in how interactions between sociotechnical systems and the environment have changed over time. I chaired that group for approximately three years.

I have also participated in other relevant conferences on a less frequent basis, including the Business History Conference, the Society for Industrial Archaeology, and the Policy History Conference.

My training and experience are relevant to this assignment in several ways:

- The historical method, in which one asks questions about the past and then answers those questions using a variety of primary and secondary sources, always critical of those sources but considering all, is applicable to the

3

assignment. Among other things, the historian's job is to reconstruct and communicate the events of the past as reliably and transparently as possible.

- Historians examine change over time, asking how factors such as policies, practices, and organizing structures evolve over a particular period. The process of examining what the practices were in place in a specific time period is relevant to this assignment.
- Historians specialize in subfields. My focus is on the history of industry, technology, and the environment, and I have experience analyzing practices leading to the generation of pollution-causing wastes by past industrial operations, which is relevant to this assignment.

I have written one expert report before but the case was settled before I was deposed. My curriculum vita is included as Appendix B.

## C.  Compensation

My billing rate is $250/hour to research and address the questions posed.

## D.  Material Reviewed and Considered

I have reviewed the case material made available to me by counsel. These documents include copies of various environment assessments of 8020 Deering, copy of permits, disposal manifests, depositions, documents associated with the facility's chain of title, etc. The case documents that I reviewed and considered are cited in the footnotes and identified by their Bates number (where applicable). Cited material not in the record (such as textbooks and corporate histories) are identified in the footnotes by author, title, publisher, and date. Appendix B lists materials reviewed and considered.

Sept. 27, 2023

## II. Summary

In the 1960s, the Advanced Circuitry Division (ACD) of Litton Industries was a leader in the manufacture of multilayer printed circuit boards for military applications.[9] Litton ACD's main facility was located in Springfield, Missouri. The division also operated a facility at 8020 Deering Avenue in Canoga Park, California from at least 1968 to 1970.[10] The Canoga Park facility "employed all the industrial processes required to produce a printed circuit board including metal plating."[11]

In the period when Litton ACD manufactured printed circuit boards in Canoga Park, the manufacturing of printed circuit boards involved some permutation of these steps: cutting unprocessed boards to size, drilling holes, and performing other preparatory steps; coating the boards with a material known as photoresist; exposing an image of the desired conductive pattern on the board, causing the photoresist to develop/harden in areas not blocked by the mask, stripping away the undeveloped photoresist; plating copper in the desired areas (or etching it away, depending on the process); stripping away the hardened photoresist; cleaning and degreasing, and completing the manufacture of the board, including labelling.[12] However, no records are available that document the specific sequence of processes used by Litton ACD at 8020 Deering Avenue. All that is available are fragmented descriptions provided by Litton ACD employees from Springfield, Missouri, who recalled what they remembered from visits to the site thirty years previously.[13] Their descriptions are consistent with the manufacture of printed circuits board employing steps such as those listed above.

The purpose of this report is to assess the potential of Litton ACD's manufacturing process being the source of chlorinated solvents in the contamination plume

---

[9]Walter J. Prise, *Electronic Circuit Packaging* (Columbus, Ohio: C. E. Merrill Books, 1967), pp. 128-129; NGSC_0077067, p. 51 of 64, witness report of Don L. Krueger, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

[10]NGSC_0077067, p. 41 of 64, witness report of Leslie "Les" Bown, Verdict Resources, "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

[11]NGSC_0077067, p 51 of 64, witness report of Don L. Krueger in Verdict Resources, "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000. The quoted text are the words of the interviewer.

[12]Marshall Sittig, *Electroplating and Related Metal Finishing: Pollutant and Toxic Materials Control* (Noyes Data Corp., 1978), p. 83; William S. DeForest, *Photoresist: Materials and Processes* (New York: McGraw-Hill, 1975), pp. 6-16, 63-88; Charles A. Harper, ed., *Handbook of Materials and Processes for Electronics* (New York: McGraw Hill, 1970), pp. 14-90 to 14-99; Robert D. Morrison, *Environmental Forensics: Principles & Applications* (CRC Press, 2000), 168; Clyde F. Coombs, *Printed Circuits Handbook* (McGraw-Hill, 1967, 1979), Section 2 "Fabrication."

[13]These interviews are found in NGSC_0077067. Verdict Resources, "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000. In addition, a 2003 deposition given by one of the Springfield interviewees (Jerry Estes) is found in  NGSC_0055899.

Sept. 27, 2023

originating at 8020 Deering Avenue. My opinion is that Litton ACD's manufacturing operation was the source of chlorinated solvents found in the contamination plume that originates at 8020 Deering Ave. Evidence supporting this conclusion includes the following:

- Textbooks and engineering handbooks—such as *Photoresist: Materials and Processes* (1975*); Handbook of Material and Processes for Electronics* (1970); *Electroplating and Related Metal Finishing* (1978); *Printed Circuits Handbook (1967, 1979), and Environmental Forensics*—identify trichloroethylene (TCE), perchloroethylene (PCE), and 1,1,1-trichloroethane (1,1,1 TCA) as common solvents used in the production of circuit boards in the period of interest.[14] All three of these solvents are present in the contamination plume.[15] In particular, the author of *Photoresist*, writing in 1975, notes that "Nearly all degreasing is performed in one of three solvents: 1,1,1-trichloroethane [1,1,1-TCA], trichloroethylene [TCE], and perchloroethylene [PCE]."[16]
- The 1968 permit issued by the Industrial Waste Control Section of the Los Angeles Bureau of Sanitation to Litton ACD, allowing Litton ACD to discharge wastes into the city's sewer system, indicates that the wastewater being discharged from Litton ACD's operation contained "acids and solvents."[17]
- The presence of other substances in the contaminated soil at 8020 Deering Ave., such as high concentrations of copper and nickel, are consistent with the manufacture of printed circuit boards. Together with the solvents, these contaminants represent a chemical signature of a printed circuit board manufacturing operation.
- Environmental releases of wastewater containing TCE from 8020 Deering Avenue suggests a release from a manufacturing process at a time before strong pollution control laws were in place, i.e., before the early 1970s, when Litton ACD's operation was active.
- Modeling performed by S.S. Papadopulus & Associates, Inc., indicates that releases of contaminants at the 8020 Deering Avenue site (the source of the plume) overwhelmingly occurred between the years 1968 and 1975, which is consistent with the period in which Litton ACD manufactured circuit boards.[18]

---

[14]See note 12 for citations.

[15]Expert Report of W. Richard Laton, PhD, Sept. 27, 2023, Section 5.1.

[16]William S. DeForest, *Photoresist: Materials and Processes* (New York: McGraw-Hill, 1975), p. 68.

[17]NGSC-0348748, p. 128 of 388, "Application for Industrial Waste Permit," approved March 18, 1968.

[18]Expert Report of Matthew J. Tonkin, PhD, in the matter of *Jed and Alisa Behar v. Northrop Grumman Corporation and Northrop Grumman Systems Corporation*, U.S. District Court, Central District of California, Case No. 2:21-cv-03946-HDV-SK, Sept. 27, 2023, Opinion 7.

Sept. 27, 2023

- The size of the groundwater contamination plume (~2.5 miles) associated with 8020 Deering suggests a manufacturing operation in which the use of solvents was a proscribed part of the process, such as in the manufacture of printed circuit boards, not an occasional use such as that associated with cleaning parts during maintenance.

- In the years since Litton ACD ceased operations at 8020 Deering Avenue, no other manufacturing operation employed degreasing and plating operations that would have resulted in the mix of metal and solvent wastes discovered in the soil near the clarifier. Furthermore, no other occupant operated a manufacturing operation of the scale capable of producing the size plume that exists.

- Environmental consultants who have given depositions relevant to the contamination plume originating at 8020 Deering have indicated that environmental releases of solvents from printed circuit board manufacturers were common. One consultant noted they had experience with three previous remediation projects involving printed circuit board manufacturing operations and, in all three projects, TCE was a soil contaminant.[19] Another representative for the Defendants indicated that environmental releases of solvents from printed circuit board manufacturing operations was "common" in the past.[20] A third, with similar remediation experiences, explicitly concluded that the Litton ACD operation was the source of the contamination at the site.[21]

- The production manager for the Litton ACD facility in Springfield, Missouri, described the 8020 Deering operation in this way: "The operations and material used there were much like the one's in Springfield."[22] The similarity between the two ACD operations is relevant because the Missouri Dept. of Natural Resources, which documents cases of hazardous contamination, indicates that the Springfield facility "generated waste materials containing metals, such as copper, and solvents, also called volatile organic compounds (VOCs). The primary solvent used was trichloroethylene (TCE)."[23]

This report examines the points supporting the conclusion that TCE and other solvents found in contamination plume originating at 8020 Deering Avenue were waste products from Litton ACD's printed circuit board manufacturing operation.

---

[19]NGSC_0053905, Deposition of Richard E. Freudenberger, March 26, 2003, pp. 19-20.
[20]Deposition of Jeff Gwinn, July 27, 2023, p. 166.
[21]NGSC_0083509, Deposition of David L. Bauer, March 18, 2003, p. 21.
[22]NGSC_0077067, p. 44 of 64, witness report of Jerry M. Estes, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.
[23]Missouri Dept. of Natural Resources, "Litton Systems Inc. Site, 4811 West Kearney Street, Springfield," June 2022, accessed at https://dnr.mo.gov/document-search/litton-systems-inc-site-june-2022.

Sept. 27, 2023

## III.  Report

This report examines the potential for the manufacture of printed circuit boards by Litton Industries' Advanced Circuitry Division (ACD) at 8020 Deering Avenue to be the source of solvents found in a contamination plum originating at that site. First, this report briefly examines the origins of Litton ACD and its operations at 8020 Deering Avenue. Then it examines the general process for manufacturing circuit boards circa 1970 and the types of wastes generated by those operations. Next, it summarizes what is known about Litton ACD's manufacturing operations at 8020 Deering Avenue and about subsequent operations by occupants up to the discovery of soil contamination. Finally, it examines what is known about wastes generated by printed circuit board manufacturers in general and about the wastes generated by Litton ACD's operation in particular. The pre-treatment structure (clarifier) located in the area where wastes appear to have entered the soil is also discussed. Based on all material reviewed, my opinion is that Litton ACD's manufacturing operation was the source of contamination that formed the contaminant plume at issue in this case.[24]

### A.  The Origins of Litton's Operation at 8020 Deering Ave

The land that is now Canoga Park was home to Tongva (Gabrielino) tribal villages when Spanish explorers and missionaries reached the area in the late 1700s.[25] In the second half of the nineteenth century, the area around Canoga Park was gradually transformed into a farming community. In 1893, the Southern Pacific railroad constructed a branch line that ran from Chatsworth to Burbank, with Canoga Park being a stop on that line.[26] By 1928, the existing network of main roads in Canoga Park had been established but the majority of the land remained farmland.[27] By the 1960s, residential and commercial development had replaced much of the farmland.[28]

In the 1960s, some of the remaining undeveloped land, including what is now 8020 Deering Avenue was developed for light industrial use. The Roscoe-Canoga Industrial Park purchased the land at 8020 Deering in 1960 and completed the structure at 8020 Deering in 1967.[29]

---

[24]For the contamination plume at issue, see Expert Report of W. Richard Laton, Sept. 23, PhD, Figure 1.
[25]Richard B. Rice, *The Elusive Eden: A New History of California* (McGraw-Hill, 2011), p. 69.
[26]1897 Rand McNally Map, displayed in online presentation about the Chatsworth railroad history by the Chatsworth Historical Soc., accessed in digital archive at www.chatsworthhistory.com on July 21, 2023.
[27]Based on 1928 aerial photo of the area appearing in NGSC_0068380, p. 169 of 302, photo 21 in Preliminary Assessment.
[28]Based on 1965 aerial photo of the area appearing in NGSC_0077067, p. 26 of 64, Verdict Resources, "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.
[29]NGSC_0077067, Verdict Resources, "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000, p. 6 of 64.

8

Sept. 27, 2023

## Litton Industries

Litton Industries is closely associated with the career of Charles "Tex" Thorton.  In the years after World War II, Thorton had been one of Robert McNamara's so-called 'Whiz Kids' brought in to turn the ailing Ford Motor company around using the methods of statistical control.[30] After several years, Thorton left Ford and took on the task of transforming Hughes Aircraft, a subsidiary of Hughes Tools, into a successful military contractor.[31] In 1953, he started his own company, the Electro Dynamics Corporation, and embarked on a search to acquire a promising company in the field of military electronics. The company he decided on was a manufacturer of magnetron tubes founded by Charles Litton, an electronics engineer with little experience managing companies. Electro Dynamics purchased the company in 1954 for approximately one million dollars and absorbed the Litton name. Over the next decade, Litton Industries grew by purchasing additional companies, transforming itself into a conglomerate.[32]

## Litton's Advanced Circuitry Division

One of the many companies Litton Industries purchased was the United States Engineering Co. (USECO) of Glendale, California, a manufacturer of electronic hardware. According to an interview with a former USECO employee—Les Bown, interviewed by Verdict Resources in 2000—the printed circuit board division of USECO continued to grow after the acquisition and "was relocated to Springfield MO and renamed the Advanced Circuitry Division (ACD) of Litton."[33] Other companies, such as West Coast Electronics, purchased by Litton in 1954, and Monroe Calculator, acquired in 1958, added to the corporation's expertise in electronics.[34]

Jack Gentry, the executive vice president at Litton with responsibility for USECO, moved the operation to Springfield, Missouri and established the Advanced Circuitry Division in 1964.[35] In 1967, the author of textbook *Electronic Circuit Packaging*, explained that "the demand for miniaturized electronic circuitry has led to the development of high density multi-layer circuit boards" and credited the Advanced

---

[30]John A. Byrne, The Whiz Kids (Doubleday, 1993), p. 8.

[31]John A. Byrne, The Whiz Kids (Doubleday, 1993), p. 159-163, 230-244

[32]Robert Sobel, *The Rise and Fall of the Conglomerate Kings* (New York: Stein and Day, 1984), pp. 54-55.

[33]NGSC_0077067, p. 41 of 64, witness report of Leslie J. Bown, Verdict Resources, "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000. The quoted text are the words of the person who interviewed Bown.

[34]Robert Sobel, *The Age of Giant Corporations: A Microeconomic History of American Business, 1914-1970* (Westport, Conn.: Greenwood Press, 1972), p. 198.

[35]"Jack Gentry Obituary," 2006, Springfield News-Leader, accessed at https://www.legacy.com/us/obituaries/news-leader/name/jack-gentry-obituary?id=48918295 on July 19, 2023.

Sept. 27, 2023

Circuitry Division of Litton for developing some of the basic technology for interconnecting layers.[36] The author of a Litton corporate history described the ACD in this way: "The Advanced Circuitry Division of Litton in Springfield, Missouri had its 614 people turning out multi-layer circuit boards, depended on heavily by NASA, which had need of close tolerance and precision printed circuits, and single-sided and multi-layer back panels."[37]

The manufacturing of printed circuit boards at Litton ACD's facility in Springfield, Missouri, continued until 2007, with Northrop Grumman taking ownership in 2001.[38] According to the Missouri Department of Natural Resources, "From 1994 to 2001, Litton conducted Phase I (site-wide summary) and Phase II (soils) investigations. . . . During its operation, the facility generated waste materials containing metals, such as copper, and solvents, also called volatile organic compounds (VOCs). The primary solvent used was trichloroethylene (TCE)."[39]

### Litton ACD's West Coast Facility (8020 Deering Avenue)

In 1966, the trade publication *Signal* wrote "Litton Industries' Advanced Circuitry Division has announced a million-dollar expansion program which includes the establishment of a new West Coast facility to conduct research and development of sophisticated circuitry."[40]

In 1968, *Solid State Technology* announced "Increased production capabilities and a national customer service network are being provided in an expansion program underway at Advanced Circuitry Division of Litton Industries. New regional centers in Canoga Park, Ca. and Smyrna Del. and an enlarged plant at the Springfield, Mo, headquarters will quadruple the division's floor space. The centers also will offer speedier and more convenient production and delivery of prototype custom-designed circuitry. ACD offers a complete range of printed circuitry, from complex multi-layer to conventional single and double-side types."[41]

---

[36]Walter J. Prise, *Electronic Circuit Packaging* (Columbus, Ohio: C. E. Merrill Books, 1967), pp. 128-129.
[37]Barney Oldfield, *The Litton adventure that Was: a Tribute to the founder Charles B. "Tex" Thornton* (Lincoln, Neb.: Kinman-Oldfield Family Foundation, 2006), p. 402.
[38]Missouri Dept. of Natural Resources, "Litton Systems Inc. Site, 4811 West Kearney Street, Springfield," June 2022, accessed at https://dnr.mo.gov/document-search/litton-systems-inc-site-june-2022.
[39]Missouri Dept. of Natural Resources, "Litton Systems Inc. Site, 4811 West Kearney Street, Springfield," June 2022, accessed at https://dnr.mo.gov/document-search/litton-systems-inc-site-june-2022.
[40]*Signal* v21 (Nov. 1966), p. 32.
[41]*Solid State Technology*, vol. 11, 1968, p. 12.

Sept. 27, 2023

The Burton Crescent Corporation and Litton Precision Products took ownership of 8020 Deering in October 1967.[42] (Burton Crescent was a company acquired by Litton Industries in 1967.[43]) A few weeks later, ownership was transferred to Litton Industries.[44] Based on a former Litton ACD employee who referenced an in-house newsletter, announcements about the opening and closing of the facility occurred in March 1968 and September 1970.[45] The operation ran multiple shifts per day.[46]

Based on interviews with former employees of Litton ACD by Verdict Resources in 2000, the manufacturing operation at 8020 Deering was similar to ACD's main manufacturing operation in Springfield, Missouri. Jerry Estes, the production manager for the Springfield facility, was sent to Canoga Park several times to troubleshoot problems, including one three-week assignment "right after it was set up." Estes indicated that (in the words of the interviewer) "The operations and material used there were much like the ones in Springfield."[47] Estes, in a deposition given in 2003, indicated that he did not notice if TCE was used at the Canoga Park operation, but described TCE being used in the Springfield facility in small amounts.[48]

Another former Litton employee—Don Krueger, who had been a group controller—inspected the operation at Deering Avenue in 1968. According to the summary of his interview, the facility was "handling small lot sizes of boards, no more than a few hundred at a time" for "exclusive use in military applications." In addition, "the circuit boards they were attempting to produce were very complex and the division was only capable of achieving an approximate yield of 20%." Some of the details about the operation he remembered were that the facility had "eight to ten different plating tanks," each approximately "8 feet by 10 feet." According to the interviewer, Krueger was "confident that the Division 'must' have used degreasers to clean the circuit boards during the production process but did not recall what, if any, chemical solvents had been used."[49]

---

[42]NGSC_0077067, p. 6 of 64, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

[43]Robert Sobel, *The Money Manias: The Eras of Great Speculation in America, 1770-1970* (Beard Books, 2000), p. 324.

[44]NGSC_0077067, p. 6 of 64, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

[45]NGSC_0077067, p. 42 of 64, witness report of Leslie Bown, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

[46]NGSC_0077067, p. 44 of 64, witness report of Jerry M. Estes, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

[47]NGSC_0077067, p. 44 of 64, witness report of Jerry M. Estes, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

[48]NGSC_0055899, deposition of Jerry Estes, September 20, 2002.

[49]NGSC_0077067, p. 51 of 64, witness report of Don L. Krueger, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

11

## B.  The Manufacture of Circuit Boards circa 1970

The description by former Litton employees of the equipment and processes (e.g., plating tanks, silk screening, photo printing, chemical stripping, photo resists, the processing of boards, etc.) used at 8020 Deering Avenue is consistent with the general process for manufacturing printed circuit boards at the time Litton ACD operated at that location (and later).[50]

**General Process**

In the manufacturing of printed circuit boards, the specific materials used, the sequence in which the various steps are executed, and the details of how each step is performed varied from facility to facility depending on the specific design choices and product specifications, but the general process included steps such as the following:[51]

- Cut board to size, drill holes as appropriate, and clean.
- Coat the boards with a photosensitive material known as photoresist.
- Expose image of desired copper pattern on the board, causing the photoresist to develop/harden in areas not blocked by the mask.
- Strip away the undeveloped photoresist.
- Electroplate to deposit a layer of copper in the desired areas (or, alternatively) etch away copper from a pre-plated board.
- Strip away all etching chemicals and the hardened photoresist.
- Clean and degrease surfaces before plating and coating.
- Complete the manufacture of the board, including labelling.

In designing a process for manufacturing printed circuit boards, engineers had a wide range of options to choose from, such as: the type of board, type of artwork (positive or negative image); type of photoresist; the specific sequence of steps; the chemicals for stripping, cleaning, and degreasing; the method of plating, and the equipment used to perform the various tasks. The variety of choices available to engineers in this period is reflected in advertisements and articles in trade journals such as *Circuit Manufacturing* and *Electronic Industries* as well as various

---

[50]See NGSC_0077067, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

[51]Marshall Sittig, *Electroplating and Related Metal Finishing: Pollutant and Toxic Materials Control* (Noyes Data Corp., 1978), p. 83; William S. DeForest, *Photoresist: Materials and Processes* (New York: McGraw-Hill, 1975), pp. 6-16, 63-88; Charles A. Harper, ed., *Handbook of Materials and Processes for Electronics* (New York: McGraw Hill, 1970), 14-90 to 14-99; Clyde F. Coombs, *Printed Circuits Handbook* (McGraw-Hill, 1967, 1979), Section 2 "Fabrication."

engineering handbooks. For example, the diagram in Figure 1 is from a chapter on "Printed Board Production" in *Electroplating and Related Metal Finishing*.



**Figure 1. Example of process flow for the production of printed circuit boards.**
Source: Marshall Sittig, *Electroplating and Related Metal Finishing: Pollutant and Toxic Materials Control* (Noyes Data Corp., 1978), p. 12.

Degreasing and other cleaning steps were performed before steps involving the coating or plating of surfaces. According to *Electroplating and Related Processes,* cleaning often involved multiple steps, such as degreasing with a solvent and following that with an alkaline wash.[52]

**Board Material**

Based on the interviews with former employees, the material used for the printed circuit boards at 8020 Deering was fiberglass. According to the summary of the Verdict Resources interview with Estes, the production manager at the Springfield facility, the operation at 8020 Deering used "large vacuuming equipment that would capture airborne dust particles, mostly from the routing fiberglass boards in the Fabrication Department."[53]

---

[52]James B. Mohler, *Electroplating and Related Processes* (New York: Chemical Publications, 1969), p. 45.
[53]NGSC_0077067, p. 44 of 64, witness report of Jerry M. Estes, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

Sept. 27, 2023

## Plating

A plating process can either be electroless (involving the deposition of a metal on a nonconductive surface such as fiberglass without an electric current) or a process of electrodeposition in which an electric current is used to facilitate the process. It is also possible to apply a thin layer of conductive metal using an electroless process and complete the process through electrodeposition.[54] The tanks for plating would have held the solutions used to deposit various metals on the board.

According to *Electroplating and Related Metal Finishing*, plating could be "employed at several junctures in the production of printed circuit boards," including "the actual buildup of the circuit" and to cover "the tabs of 'fingers'" of the boards.[55] The plating of tabs often involved nickel for its hardness and anti-corrosion properties. The handbook indicates that nickel also served as a good substrate for a gold flash. According to the interviews with former Litton employees by Verdict Resources, the plating tanks at 8020 Deering were either sold or moved to the Springfield facility after the Litton ACD shut down its operations in Canoga Park.[56]

## Cleaning, Stripping, and Degreasing

*Environmental Forensics* identifies 1,1,1-trichloroethane (1,1,1 TCA), trichloroethylene (TCE), methylene chloride, and methyl ethyl keytone (MEK) as popular solvents used in the manufacture of printed circuit boards during the period of interest. (See Figure 2.)  The author indicates that "in 1970, trichloroethylene accounted for 82% of all solvents used in vapor degreasing." It also indicates that "the demand for trichloroethylene [TCE] in the U.S. peaked in 1968 at 261,000 metric tons."[57]

No documentation is available for the specific processes used by Litton ACD at 8020 Deering Avenue. However, absent any additional information, one would expect a facility manufacturing printed circuit boards for use in military electronics would use a vapor degreaser. The 1970 *Handbook of Material and Processes for Electronics* notes that "vapor degreasing is a very widely used and efficient method for cleaning electronic parts. According to this method, the part is suspended in a specially designed chamber (commercially available) so that the vapors of a heated solvent

---

[54]James B. Mohler, *Electroplating and Related Processes* (New York: Chemical Publications, 1969), p. 264.

[55]Marshall Sittig, *Electroplating and Related Metal Finishing: Pollutant and Toxic Materials Control* (Noyes Data Corp., 1978), pp. 91-93.

[56]NGSC_0077067, p. 44 of 388, witness report of Jerry M. Estes, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

[57]Robert D. Morrison, *Environmental Forensics: Principles & Applications* (CRC Press, 2000), p. 9.

14

Sept. 27, 2023

condense on and flush the surface clean." (See Figure 3.) The handbook notes that "the two most widely used vapor-degreasing solvents for removing greases and other hydrophobic contaminants were trichloroethylene (TCE) and perchloroethylene (PCE). They may be purchased from a number of manufacturers under different trade names."[58]



FIGURE 4.3 Solvent transitions at three facilities between 1940 and 1990.

**Figure 2. Solvents used in different industries between 1940 and 1990.**

Source: Robert D. Morrison, *Environmental Forensics: Principles & Applications* (CRC Press, 2000), p. 167.



Fig. 13   Two types of commonly used vapor degreasers.

**Figure 3: Vapor Degreasing**

---

[58]Charles A. Harper, ed., *Handbook of Material and Processes for Electronics* (New York: McGraw-Hill, 1970), Section 5, p. 54.

15

Sept. 27, 2023

The author of *Electroplating and Related Processes* (1969) explains that "most cleaning in a vapor degreaser is done by merely allowing the hot vapors to condense on the cold work. Condensation and efficient flushing of all surfaces continues until work reaches the temperature of the vapor. The method is unique among cleaning systems in that the cleaning medium, presented to the work, is continuously free of contamination. It is an efficient means of removing solvent-soluble organics from the surface. Also, the part comes dry from the degreaser. It is a one-step cleaning and drying process." The author also notes that "Many solvents are a health hazard and so pose a drying problem. Hot vapor degreasing overcomes these major objections."[59]

Solvents were also used to strip away photoresists. The 1975 text *Photoresist: Materials and Processes* describes this step in the manufacture of printed circuit boards.[60] After photoresist is applied to a board, it is exposed to ultraviolet light in the pattern of the desired circuit, which causes the exposed resist to harden. Then, the undeveloped resist is stripped away, allowing the board in those areas to be either plated with copper or, for pre-clad boards, etching copper away from the previously plated board, with what remains serving as the conductive path.

The handbook *Electroplating and Related Metal Finishing* notes that after exposed resist has hardened, "the unexposed resist is then removed by various methods, usually a trichloroethylene degreaser."[61] In addition, the author of *Photoresist* emphasizes that "in the preparation of copper (or any metal) for subsequent processing, it is almost universally accepted that the part will arrive at the cleaning station with some form of grease, oil, or organic contamination on its surface. These substances are sufficiently water-repellant to interfere with the uniform cleaning action of solutions without degreasing capabilities."[62] The author also notes that "Nearly all degreasing is performed in one of three solvents: 1,1,1-trichloroethane [1,1,1 TCA], trichloroethylene [TCE], and perchloroethylene [PCE]."[63] All three of these solvents were detected in soil samples taken at 8020 Deering Avenue.

---

[59]James B. Mohler, *Electroplating and Related Processes* (New York: Chemical Publications, 1969), p. 45-46.
[60]William S. DeForest, *Photoresist: Materials and Processes* (New York: McGraw-Hill, 1975).
[61]Marshall Sittig, *Electroplating and Related Metal Finishing: Pollutant and Toxic Materials Control* (Noyes Data Corp., 1978), p. 91.
[62]William S. DeForest, *Photoresist: Materials and Processes* (New York: McGraw-Hill, 1975), p. 67.
[63]William S. DeForest, *Photoresist: Materials and Processes* (New York: McGraw-Hill, 1975), p. 68.

16

Sept. 27, 2023

## C. Waste Disposal at Facilities Manufacturing Circuit Boards circa 1970

In general, there are three possible paths associated with material leaving an industrial site as waste: discharges of effluent into a water body, sewer, or deep well; emissions to the air; and the disposal of solid wastes and sludges. Today, most problematic wastes leave an industrial facility in the form of solid or liquid wastes delivered to a hazardous waste disposal facility. However, effective laws governing the disposal of industrial wastes were not in place while Litton ACD was operating at 8020 Deering. Litton ACD operated its Canoga Park facility at the end of a transition between the loosely governed practices of waste disposal in the years before World War II and the post-1970s system of strong air and water quality governance.

**Textbook Descriptions**

The 1978 volume *Electroplating and Related Metal Finishing: Pollutant and Toxic Materials Control* notes that, in the manufacture of printed circuit boards, the rinse water used in various operations (surface preparation, electroless plating operations, electroplating operations, etching operations, and tab plating) was the main contributor to the wastewater released by printed circuit board manufacturing operations. The following sources are also listed: "(1) rinsing away spills; (2) air scrubbing water; (3) washing of equipment; and (4) dumping spent process solutions." [64]

Based on samples taken in 1978 at ten printed board installations, the author of *Electroplating and Related Metal Finishing* notes that contaminants typically included metals, chemicals used as chelating agents (which are used to bind to metal ions in electroless plating solutions), chemicals used in cleaning processes, and suspended solids from etching and cleaning operations.[65] By 1978, according to the author, effluents containing "solvents including kerosene, benzene, trichloroethylene, and similar solvents" require "in-plant or waste-treatment control."[66] Previously, before passage of the federal Resource Conservation and Recovery Act (RCRA) of 1976, which established procedures for the disposal of hazardous wastes, and the Clean Water Act of 1972, which established clear pre-treatment standards, the laws

---

[64]Marshall Sittig, *Electroplating and Related Metal Finishing: Pollutant and Toxic Materials Control* (Noyes Data Corp., 1978), pp. 160-161.

[65]Marshall Sittig, *Electroplating and Related Metal Finishing: Pollutant and Toxic Materials Control* (Noyes Data Corp., 1978), pp. 160-161.

[66]Marshall Sittig, *Electroplating and Related Metal Finishing: Pollutant and Toxic Materials Control* (Noyes Data Corp., 1978), p. 141.

Sept. 27, 2023

governing waste disposal (and environmental releases of contaminants) were much less stringent. As noted in Litton's permit to dispose of wastes into the Los Angeles sanitary sewer, Litton ACD releases included solvents and acids.[67]

Additional insight about the waste disposal challenge posed by circuit board production and the transition to better waste management can be found in the article "A Multilayered Look at Printed Circuit Boards" in the trade journal *Industrial Finishing* in April 1981. Written eleven years after Litton ACD closed their Canoga Park operation but soon after pretreatment standards associated with the Clean Water Act were developed, the article (which describes the Litton ACD operation in Springfield, Missouri, as "one of the largest operations") indicates that "meeting pretreatment standards for printed circuit board manufacturing is 'not all that easy, and will be very expensive.'"[68]

**The Litton ACD Permit to Discharge Wastes**

The initial postwar pollution-control challenge involved gaining control over the disposal of municipal sewage. At the time, many cities still discharged sewage to water bodies with minimal treatment. Only after a strategy for controlling municipal sewage was in place did public officials turn their attention to the control of industrial waste disposal processes. In the case of Los Angeles, its City Sanitation Bureau operated a wastewater treatment plant that was updated in 1951 to include secondary treatment (e.g., biological digestion and the settling of additional sludges).[69] The presence of secondary treatment required the Sanitation Bureau to prevent wastes from reaching the facility that would disrupt its secondary treatment processes. Toward this end, the Bureau required industrial facilities to apply for a permit before connecting to the city's sewers and to identify the wastes they expected to discharge in their effluent.

The permit issued by the Bureau of Sanitation's Industrial Waste Control Section to Litton ACD is consistent with the textbook descriptions of the wastes generated by printed circuit board manufacturers. The permit, issued in 1968, was a one-page printed form.[70] In the space for "Processes Involved:" the following has been typed:

"Plating, Etching, Cleaning of circuit boards"

---

[67]NGSC_0348748, p. 128 of 388, "Application for Industrial Waste Permit," approved March 18, 1968.
[68]Steve Suslik, "A Multilayered Look at Printed Circuit Boards," *Industrial Finishing* Apr. 1981, pp. 14-23
[69]Martin V. Melosi, *The Sanitary City* (Johns Hopkins University Press, 2000), p. 332.
[70]NGSC_0348748, p. 128 of 388, "Application for Industrial Waste Permit," approved March 18, 1968.

18

Sept. 27, 2023

Below that, in a space to describe the "Chemical and physical characteristics of waste discharge:" are the following typed words:

"Acid and solvents"

Below that is a space for describing "Waste Processes." In that space is handwritten:

METAL CLEANING, ETCHING, PRINTED CIRCUITS, PLATING

Next, in a space to describe the "Required Treatment:" is handwritten:

CLARIFICATION-NEUTRALIZATION

Acidic wastes were corrosive and disruptive to secondary treatment processes and would have had to be neutralized with an alkaline solution before reaching the city sewer system. There is no information about what material in the effluent triggered the need for "clarification," but one would expect waste photoresist, fiberglass particles from the drilling and cutting of the boards, and various metal compounds to be in the mix.

The next line of the form is "Required Treatment facility" and beside that is the handwritten note:

3CC-?X3'X3' B.I. WITH SAMPLE BOX

The above is consistent with a structure having three concrete chambers ("3cc"?), each with a 3' by 3' cross section and a built-in sampling box. The depth of the chambers (noted above with a question mark) is unreadable on the permit due to having been crossed out and written over. After that, in a space for "Additional Information" is written:

CLARIFIER IS 1250 GALLON FIBERGLASS THIS FIRM WILL INSTALL PH METER & DOSING SYSTEM

The permit also indicates that the maximum flow into the sewer system would be 10 gallons per minute.

## D. Other Activity at 8020 Deering Prior to Discovery of Contamination

The 5/2000 report by Verdict Resources, Inc. summarizes the business activity that occurred at 8020 Deering after Litton ACD ceased operations. Litton

19

Sept. 27, 2023

Industries maintained ownership of the facility until 1975, at which time the facility was sold to Christopher Green. In the following year, ownership was expanded to include Sidney Floersheim before being transferred to Elaine Floersheim and back to Christopher Green. Landowners, Ltd, purchased the facility in 1980. At times, multiple businesses occupied the site at the same time, resulting a mix of office-based and shop-floor based activity. Table 1 summarizes the list of occupants in the period 1968 to 2000, by which time the contamination originating from 8020 Deering had been discovered.

Of the occupants following Litton ACD, Graphic Technology/Black Copy's operation for manufacturing toner for copiers generated the most waste. According to the interview by Verdict Resources with Black Copy's maintenance foreman, Raymond Gwynn, workers placed the raw material from which the toner was made (rubber and plastic materials, carbon black, styrene acrylic, and waxes) into a large mixing (Banbury) machine. When it was the right consistency, they ran the mixture through a calendar mill to create thin sheets of the material.  Finally, they broke the dry sheets into fine

**Table 1. Occupants of 8020 Deering Ave., 1968 to 2000**[71]

| Name | Activity | ~ Years |
|---|---|---|
| Litton Advanced Circuitry Division | Manufacturing of printed circuit boards. | 1968 - 1970 |
| Monroe Calculator Division of Litton | Repair of calculators | "Early 1970s" |
| Material and Process Research Associated | Improvement of metal coatings and surfaces. | 1970-1973 |
| Memory Products Division of Litton | Design and prototyping of electrical components. | 1970-1977 |
| Biojester, Inc | Portable sewage treatment systems. | 1971-1972 |
| Reed Industries | Manufacture of consumer products, such as safety knobs. | 1971/72-1974 |
| Graphic Technology / Black Copy Co. | Manufactured toner for laser printers and copiers. | 1974-1990 |
| Licensed Products Co. | Unknown. | 1977-?? |

---

[71]The information in Table 1 is a summary of the information in NGSC_0077067, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000, pp. 5-12.

Sept. 27, 2023

| Creative Collect Forms | A litho-press operation. | 1985-?? |
|---|---|---|
| Tiger Star Bar Co. | Manufactured a print machine part. | ?? |
| West Coast Drag Racing | Auto service. | 1991-?? |
| Vito's Auto Body | Auto body repair. | ?? - 1997 |
| Young's Towing | Towing service? | 1988-1991 |
| Trinity Mot. Sprts/ Transit Authority | Van conversion. | 1990-2000 + |

powder. Between "80,000 and 90,000 pounds of toner" were manufactured each month.[72]  Jay Seaver, who purchased Black Copy in 1985, described the process as using a solvent (either MEK or methylene chloride, he couldn't remember) to dilute a resin coating on steel beads. The beads and solvent, according to Seaver, were placed in a solvent recovery machine, but the recovered solvent could not be used and was stored in a drum before being taken away by a hazardous materials contractor.[73]

The Black Copy operation released fine black particles into the air. For this reason, "Black Copy installed a scrubber on the roof . . . [that] sprayed a fine mist of water that filtered dust from the air, and the water drained to the clarifier." The clarifier "separated out the toner sludge before the effluent entered the public sewer system" and the sludge that settled in the clarifier "had to be pumped out periodically," about "every three months."  Gwynn indicated that no solvents were used in the maintenance of the equipment, which were cleaned with compressed air.[74] According to the Verdict Resources interviews, another occupant of the building at the same time as Black Copy, Dick Hightower, remembered borrowing trichloroethylene (TCE) from Black Copy to clean the rollers of his printing machine, but he didn't remember how Black Copy used it.[75] However, nothing in the description of Black Copy's processes indicates the routine use of TCE as part of the production process.

---

[72]NGSC_0077067, witness report of Raymond Gwynn, p. 47 of 64, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.
[73]NGSC_0077067, witness report of Jay Seaver, p. 56 of 64, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.
[74]NGSC_0077067, witness report of Raymond Gwynn, p. 47 of 64, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.
[75]NGSC_0077067, witness report of Dick Hightower, p. 48 of 64, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

21

Sept. 27, 2023

No occupants of 8020 Deering Avenue after Black Copy operated manufacturing processes. The auto body repair operation and van conversion service may have used solvents for cleaning but the use of those solvents would not have been on the scale required for wastes and spills to produce a contamination plume of the size that exists. Further, the modeling performed by S.S. Papadopulus & Associates, which dates releases responsible for the plume to the period before 1975 is inconsistent with activity in the 1990s being responsible for the contamination plume.[76]

## E. The Discovery of Soil and Groundwater Contamination

In 1998, Landowners, Ltd., listed the 8020 Deering Avenue for sale. The real estate agent advised Darrell Greenwald, the property manager for Landowners, that he would have to have a Phase I investigation performed.[77] National Environmental Inc. performed that investigation, which consisted of "interviews with primary parties, a review of property history, a chain of title review, a visual site inspection, a hazardous materials audit, an agency review, [and] a geologic/hydrologic summary." The associated report also recommended "preliminary investigations of soil underlying clarifier and barrel containment area."[78]

**Environmental Assessments**

When soil samples taken in the area near the clarifier were analyzed, copper, nickel, total recoverable petroleum hydrocarbons (TRPH), trichloroethylene (TCE), perchloroethylene (PCE), 1, 2-dichloroethene (1,2 DCE), and 1,2-dichlorobenzene (1, 2 DBE) were present at concentrations above their action level—that is, above "the levels that require cleanup."[79] Those findings led to follow-up sampling by MSE Environmental, which "indicated low levels of chlorinated solvents were present in soils within roughly 35 feet of the clarifier, and extended to depths of at least 40 feet below grade, where groundwater was encountered. Analysis of the groundwater samples indicated dissolved-phase solvents were present at concentrations that exceeded typically applied 'action levels'"[80]

---

[76]Expert Report of Matthew J. Tonkin, PhD, in the matter of *Jed and Alisa Behar v. Northrop Grumman Corporation and Northrop Grumman Systems Corporation*, U.S. District Court, Central District of California, Case No. 2:21-cv-03946-HDV-SK, Sept. 27, 2023, Opinion 7.

[77]NGSC_0054108, Deposition of Darrel Greenwald of Landowners, Ltd., pp. 99-101.

[78]NGSC_0068380, p. 127 of 302, National Env. Inc., Report on Preliminary Site Assessment, Oct. 15, 1998. Quoted text appears on pp. ii and 1 of the report.

[79]NGSC_0068380, p. 240 of 302, National Env. Inc., "Report on the Preliminary Site Assessment, The Transit Authority, 8020 Deering Ave., Canoga Park, CA 91304," Nov. 25, 1998, pp. 6-7 and p. 10.

[80]NGSC_0060430, "Additional Site Assessment Report for Commercial Property Located at 8020 Deering Avenue, Aug 17, 1999, p 1. of report.

22

Sept. 27, 2023

In January 1999, MSE Environmental submitted a work plan for a Phase II investigation to the Regional Water Quality Control Board (RWQCB), which was

approved on June 3, 1999. The Phase II investigation was carried out by Certified Environmental Consultants, Inc. (CEC) and reported on in August 1999. That investigation determined that "the lateral extent of impacted ground water extends beyond the limits of the site."[81]

CEC subsequently performed additional sampling for the RWQCB on behalf of Landowners. A report to Peter Raftery of the RWQCB in May 2002 noted that the findings "continue to suggest the clarifier area is the source of the ground water impacts." It also concluded that "the impacted groundwater has a low velocity" and that the impacts to groundwater "relate to an older, possibly several decades ago, release."[82]

The focus of attention then turned to the process of onsite remediation. In 2007, in a report prepared by Orion Environmental for Northrop Grumman (which had acquired Litton Industries) and submitted to the RWQCB, the authors note that "confirmation sampling and risk evaluation results indicate that soil remediation [at the site] is complete" and recommended "Northrop Grumman Corporation request a 'no further action' letter from the RWQCB." The remediation included the installation of "a soil vapor extraction system," "removal of a four-stage clarifier," and "a permanganate injection pilot test."[83] The Orion report also noted "that TCE-impacted groundwater extends approximately 1 mile downgradient of the site."[84] By 2018, the length of the plume had been determined to be approximately 2.5 miles long, .5 miles wide, and up to 130 feet deep.[85] The engineer who performed the work for Orion Environmental has indicated that releases of solvents from printed circuit board manufacturing operations was "common" in the past.[86]

---

[81]NGSC_0060430, p. 1 of 70, "Additional Site Assessment Report for Commercial Property Located at 8020 Deering Avenue, Canoga Park, California," prepared for Land Owners Limited Partnership by Certified Environmental Consultants, Aug 17, 1999, p. 6 of report.

[82]NGSC_0059600, p. 16 of 19, "Groundwater Monitoring Report for Commercial Property Located at 8020 Deering Avenue," submitted to Peter Raftery of the RWQCB on behalf of Landowners, May 20, 2002, p. 3 of memo.

[83]NGSC_1307790, p. 2 of 198, "Confirmation Sampling and Soil Closure Report," Orion Environmental, July 1, 2007, p. 1-2.

[84]NGSC_0059600, p. 16 of 19, "Groundwater Monitoring Report for Commercial Property Located at 8020 Deering Avenue," submitted to Peter Raftery of the RWQCB on behalf of Landowners, May 20, 2002.

[84]NGSC_1307790, "Confirmation Sampling and Soil Closure Report," July 2007, p. 1-2 of report.

[85]NGSC_0555103, slide presentation, "Project Status and Uncertainties Influencing Future Remediation Costs, by Jeff Gwinn, Orion Environmental, Inc., p. 3 of 19, p. 6 of 19.

[86]Deposition of Jeff Gwinn, July 27, 2023, p. 166.

23

Sept. 27, 2023

### F.  The Contamination Path

The consensus of environmental consultants that have investigated the contamination originating at 8020 Deering Avenue is that the material entered the soil in the area of the cement pre-treatment structure referred to as the clarifier and beneath the building itself near the clarifier.

### The Clarifier

The clarifier, located beside the building before being removed in 2006, had three equivalent-sized chambers, each about eight feet deep, and a shallower "sample box," with most of the structure below ground. The company that removed the structure noted that the three deeper chambers had a cross section of 3 feet by 3 feet. The shallower sample box measured 2.5 feet by 2.5 feet.[87]

Confusion has emerged over supposed differences between the clarifier described on Litton ACD's permit and the concrete structure that was removed. The permit includes the note "Clarifier is 1250 gallon fiberglass," which has been interpreted to mean that the clarifier installed by Litton ACD was constructed of fiberglass. However, no physical remains of a fiberglass clarifier exists and no other documentation supports its existence.

The evidence suggests that the cement clarifier is the original pretreatment structure installed by Litton ACD. First, the cement clarifier matches the specifications included on the 1968 permit.[88]

- The cement clarifier that was removed was a 3-stage clarifier with what appears to be a fourth, smaller "sample box," which is what the permit describes.
- The cross section of the three main chambers measure 3 feet by 3 feet, which is what the permit describes.
- According to the removal report, the depth of the main chambers was approximately 8 feet deep.[89] The below-grade depth of the inlet and outlet was 6 feet, which suggests the functional capacity of the structure was between 1,200 gallons (3 chambers x 3' x 3' x 6' ft$^3$ / .134 gallons/ ft$^3$) and 1,600 gallons (3

---

[87]NGSC_0318753, p. 2 of 219, memo, Tseng to Sood, June 21, 2006, p. 2 of memo. That the last chamber was shallower is noted in NGSC_0068380, p. 240 of 302, "Report on the Preliminary Site Assessment, The Transit Authority, 8020 Deering Ave., Canoga park, CA 91304," Nov. 25, 1998, p. 2.

[88]NGSC_0348748, p. 128 of 388, "Application for Industrial Waste Permit," approved March 18, 1968.

[89]NGSC_0021189, Memo, Sood to Raftery, June 21, 2006, "Report of the Clarifier Removal."

Sept. 27, 2023

chambers x 3' x 3' x 8' ft$^3$ / .134 gallons/ ft$^3$), which is in the range of the 1,250 gallons listed on the permit.

- The phrasing in the permit ("Clarifier is 1250 gallon fiberglass") does not state that the main structure was made of fiberglass. Instead, the treatment structure is further described in the permit as "3cc-?'x3'x3' B.I. sample box " (possibly short for 3 concrete chambers built in with sample box). The more likely scenario is that "fiberglass" was referring to something additional to the structural concrete, such as fiberglass liners or tanks to prevent solvents such as TCE from penetrating the cement (which TCE is able to do).

Second, the evidence suggests that the cement structure was in place in 1974, and the sequence of occupants suggests that whatever structure was in place in 1974 dates back to the Litton ACD operation. No company occupying 8020 Deering Avenue between 1970 (when Litton ACD ceased operations) and 1974 (when Black Copy started operations) required use of a clarifier.

Based on the interviews performed by Verdict Resources in 2000, the company Black Copy (also known as Graphic Technology) made use of the clarifier between approximately 1974, when the company occupied 8020 Deering Avenue, and 1990, when it ceased operations at the site. A former owner of the toner operation, Jay Seaver, described the clarifier as having three stages, with the toner settling out in the first stage and lighter particles in subsequent stages. He reported having the sludge pumped out as necessary.[90] The maintenance foreman for Black Copy, Ray Gwynn, who started with the company before it moved to 8020 Deering (around 1974) and stayed until 1985, explained that the company installed a dust collection system with a scrubber on the roof "that sprayed a fine mist of water that filtered the dust from the air, and the water drained to the clarifier."[91] When Black Copy moved out of 8020 Deering in 1990, Landowners, Ltd. arranged for the building to be thoroughly cleaned because surfaces inside the building were coated with a layer of black toner dust. The company that performed the cleaning pumped out the clarifier, which contained a black sludge consisting of toner dust and light oils.[92] Neither of the people associated with Black Copy made any mention of removing a fiberglass structure and replacing it with a cement one.

---

[90]NGSC_0077067, p. 56 of 64, witness report of Jay Seaver, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

[91]NGSC_0077067, p. 47 of 64, witness report of Raymond Gwynn, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

[92]NGSC_0077067, 58 of 64, witness report of Stephen Young, Verdict Resources "Historical Land Use and Operations History for 8020 Deering Avenue," May 15, 2000.

25

Sept. 27, 2023

If Litton ACD had replaced a fiberglass structure due to some kind of failure, it would suggest a reason why contaminants entered the soil. After all, if a fiberglass clarifier had been installed and replaced with a cement one, both would have been located in the same area (i.e., below ground at the sewer connection). However, the more likely scenario, given what is known, is that the cement clarifier is the original structure and that leaks to the subsurface occurred in the piping leading to the clarifier.

**Piping to the Clarifier**

The path allowing solvents and other wastes to reach the subsurface was more likely due to failures in the piping running from the floor drains to the clarifier than the clarifier itself. The 1999 Phase II report by CEC, Inc. includes this observation:

> ". . . it continues to appear the site's clarifier represents the source area for the soil and ground water contamination that has been detected. However, although observation of the clarifier floor and sidewalls was inhibited by limited access and residual staining, no readily apparent cracks or holes were noted with the clarifier's concrete walls. Therefore, it is possible the soil and ground water impacts that have been detected at the site are related to leakage along the piping that leads to the now-plugged floor drains. The clayey nature of shallow soils would tend to promote the flow of leaked fluids along the base of the piping trench into the clarifier pit. This scenario could explain why the clarifier appears to be the contaminant source, yet appears to be intact."[93]

When the cement clarifier was removed in 2006, the pipes running to the clarifier from floor drains were determined to be ABS plastic pipes, which representatives of Northrop Grumman indicate were not permitted in Los Angeles until 1974.[94] The 1968 permit indicates that the city sewer pipes to which Litton ACD was connecting were "VCP," i.e., vitrified clay pipes, but the permit is silent on the piping that carried wastes from floor drains to the clarifier. The presence of ABS pipes suggests that the original piping was replaced at some point. According to a brief followed by Litton Industries in 2003, "the installation of the new ABS material is further confirmed by

---

[93]NGSC_0060430, p. 1 of 70, "Additional Site Assessment Report for Commercial Property Located at 8020 Deering Avenue, Canoga Park, California," prepared for Land Owners Limited Partnership by Certified Environmental Consultants, Aug 17, 1999, p. 6-7.
[94]NGSC_2583680, p. 1 of 10, email, Michael Shannon to Lauren Baerg, Dec. 27, 2018, p. 2 of email.

Sept. 27, 2023

the existence of markings in the concrete floor suggesting that the original flooring had been removed and replaced following installation of the new lines."[95] The need for pipes to be replaced, regardless of when, suggests a problem existed with the original piping.

## G. Assessment

The assessment I have made is whether it is reasonable to conclude that the degreasing solvents used by Litton ACD in their manufacture of printed circuit boards are the source of the contamination plume originating at 8020 Deering Avenue. Based on the material reviewed, there is agreement on the following:

- Litton ACD manufactured printed circuit boards at 8020 Deering Avenue at least from 1968 to 1970.
- In 1968, Litton ACD obtained a permit for a sewer connection that indicated their manufacturing operation would be releasing solvents into the sewer system. The permit also called for a pre-treatment structure that would allow solids to settle out of the effluent.
- The chlorinated solvents trichloroethylene (TCE) and perchloroethylene (PCE), along with other contaminants (e.g. copper and nickel compounds) are associated with a printed circuit board manufacturing operation, and they were discovered in the soil near a cement clarifier.
- The clarifier and the associated plumbing have been identified as the source of the plume.
- The size of the groundwater contamination plume (~2.5 miles) associated with 8020 Deering suggests a manufacturing operation in which the use of solvents was a proscribed part of the process, not an occasional use such as that associated with cleaning parts during maintenance.
- The toner manufacturer Black Copy/Graphic Technologies made use of the clarifier in the approximate period 1974 to 1990 but did not have a waste stream that included copper compounds, nickel compounds, or the solvents found in the plume.
- No other occupant of the facility operated a manufacturing process or used chlorinated solvents on a scale consistent with the size of the contamination plume.

---

[95]NGSC_0054358, p. 1 of 19, Litton Defendants' Trial Brief, p. 4 of brief.

Sept. 27, 2023

- When the clarifier was removed in 2006, the cement clarifier appeared to be intact, with no obvious cracks, but the pipe connecting to the clarifier was made of ABS plastic, which was not permitted in Los Angeles when Litton ACD operated, suggesting that the pipe had been replaced at some point.

Based on the above, it appears that a failure in the piping to the clarifier allowed effluent from Litton ACD's waste stream to enter the subsurface. Further support for a scenario in which the contamination at the site came from Litton ACD's printed circuit board manufacturing operation include the following:

- All textbooks and handbooks published circa 1970 indicate that the chlorinated solvents TCE and PCE were commonly used as degreasers in the manufacturing of printed circuit boards, with TCE being the identified as the most common and effective degreaser.
- The various solvents, copper, and nickel in the contaminated soil at 8020 Deering Avenue are consistent with material associated with the manufacture of printed circuit boards circa 1970, representing a type of waste fingerprint associated with printed circuit board manufacturing. No other company operating at 8020 Deering Avenue in the period 1968 to 1999 (i.e., before the discovery of the contamination) used materials identified as contaminants in the plume on a routine basis.
- Environmental consultants who have given depositions relevant to 8020 Deering Avenue have indicated that environmental releases of solvents from printed circuit board manufacturers were common.[96]
- The release of TCE from 8020 Deering suggests a release from a manufacturing process at a time before strong pollution control laws, i.e., before the early 1970s, which is when Litton ACD was active.
- Modeling of the contamination plume suggests that the releases responsible for the contamination occurred before 1975—i.e., before Black Copy or the subsequent operations associated with auto repair and van conversions occupied the site.
- The production manager for the Litton ACD facility in Springfield, Missouri, described the 8020 Deering operation as much like the one in Springfield. The similarity between the two ACD operations is relevant because the Missouri Dept. of Natural Resources, which documents cases of hazardous contamination, indicates that the Springfield facility "generated waste materials containing metals, such as

---

[96]NGSC_0053905, Deposition of Richard E. Freudenberger, pp. 19-20; Deposition of Jeff Gwinn, July 27, 2023, p. 166; NGSC_0083509, Deposition of David L. Bauer, March 18, 2003, p. 21.

Sept. 27, 2023

copper, and solvents, also called volatile organic compounds (VOCs). The primary
solvent used was trichloroethylene (TCE)."[97]

Considering all the material reviewed, my opinion is that the chlorinated solvents in
the contamination plume that originates at 8020 Deering Avenue came from Litton
ACD's printed circuit board manufacturing operation that was active in the
approximate period 1968 to 1970. The most likely scenario is that a failure in the
piping and connections associated with to the clarifier allowed wastes containing
solvents and metals to enter the soil over the course of Litton ACD's operations.

---

[97] Missouri Dept. of Natural Resources, "Litton Systems Inc. Site, 4811 West Kearney Street, Springfield,"
June 2022, accessed at https://dnr.mo.gov/document-search/litton-systems-inc-site-june-2022.

29

**Appendix A. Curriculum Vita**

# Hugh S. Gorman

114 S. Angell Street
Providence, Rhode Island 02906

## ACADEMIC POSITIONS

Professor Emeritus                                                     2021 - present
Michigan Technological University

Chair, Department of Social Sciences                                   2015 - 2021
Michigan Technological University

Professor of History and Policy                                        2013 - 2021
Michigan Technological University

Associate Researcher (Sabbatical, Fulbright Scholar)                          2011
Centro Internacional Para el Desarrollo Sostenible, Panamá

Associate Professor of History and Policy                             2003 - 2012
Michigan Technological University

John C. Haas Environmental Fellow (Sabbatical)                        2003 - 2004
Beckman Center for the History of Chemistry, Chemical Heritage Foundation

Assistant Professor of History and Policy                             1996 - 2002
Michigan Technological University

## EDUCATION

Ph.D., History and Policy, Carnegie Mellon University, 1996
M.S., Applied History, Carnegie Mellon University, 1992
M.A., Professional Writing, Carnegie Mellon University, 1985
B.S., Electric Power Engineering, Rensselaer Polytechnic Institute, 1979

## PUBLICATIONS

### Books

Hugh S. Gorman. *The Story of N: A Social History of the Nitrogen Cycle and the Challenge of Sustainability*. Piscataway, N.J.: Rutgers University Press, 2013.

Hugh S. Gorman*, Redefining Efficiency: Pollution Concerns, Regulatory Mechanisms, and Technological Change in the U.S. Petroleum Industry*. Akron: Univ. of Akron Press, 2001.

### Relevant Journal Articles

Judith A. Perlinger, Noel R. Urban, Amanda Giang, Noelle E. Selin, A. N. Hendricks, H. Zhang, H., Aditya Kumar, Shiliang Wu, Valoree S. Gagnon, Hugh S. Gorman, Emma S. Norman, "Responses of deposition and bioaccumulation in the Great Lakes region to policy and other largescale drivers of mercury emissions," *Environmental Science: Processes and Impacts* 20 (2018): 195-209.

Hugh S. Gorman, Valoree S. Gagnon, and Emma S. Norman, "Local Impacts, Global Sources:

The Governance of Boundary-Crossing Chemicals," *History of Science* 54 (2016): 443-459.

Judith A. Perlinger, Hugh S. Gorman, Emma S. Norman, Daniel Obrist, Noelle E. Selin, Noel Urban, and Shilang Wu, "Measurement and Modeling of Atmosphere-Surface Exchangeable Pollutants (ASEPs) to Better Understand their Environmental Cycling and Planetary Boundaries," *Environmental Science and Technology* 50 (2016): 8392-8394).

Hugh S. Gorman, "Learning from 100 Years of Ammonia Synthesis: Establishing Human-Defined Limits through Adaptive Systems of Governance," *GAiA: Ecological Perspectives for Science and Society* 22 (2013): 263-270.

Meredith Ballard Lebeau, Hugh S. Gorman, Alex S. Mayer, David Dempsey, and Alicia Sherrin, "Phosphorus Monitoring in the U.S. Portion of the Laurentian Great Lake Basin: Drivers and Challenges," *Journal of Great Lakes Research*, 39 (2013): 569-577.

Samir Qadir and Hugh S. Gorman, "The Use of ISO 14001 in India: More Than a Certificate on the Wall?" *Environmental Practice* 10 (2008): 53-65.

Hugh S. Gorman and Kathleen E. Halvorsen, "The Regulation of Alternative Onsite Wastewater Technologies in the Great Lakes Region," *Small Flows Quarterly* 7 (2006): 23-37.

Hugh S. Gorman, "Laying the Foundation for the Control of Industrial Pollution, 1930-1970: Two Canals, a Refinery, and Clarence W. Klassen," *J. of Illinois History* 8 (2005): 182-208.

Hugh S. Gorman and Erik Conway, "Monitoring the Environment: Taking a Historical Perspective," *Environmental Management and Assessment* 106 (2005): 1-10.

Hugh S. Gorman, "Brownfields in Historical Context," *Env. Practice* 5 (2003): 21-24.

Hugh S. Gorman and Barry D. Solomon, "The Origins and Practice of Emissions Trading," *Journal of Policy History* 14 (2002): 293-320.

Hugh S. Gorman, "Conflicting Goals: Superfund, Risk Assessment, and Community Participation in Decision-Making," *Environmental Practice* 3 (2001): 27-37.

Hugh S. Gorman, "Efficiency, Environmental Quality, and Oil Field Brines: The Success and Failure of Pollution Control by Self-Regulation," *Business Hist. Rev.* 73 (1999): 601-640.

Barry D. Solomon and Hugh S. Gorman, "State-Level Air Emissions Trading: The Michigan and Illinois Models," *J. of the Air and Waste Management Association* 48 (1998): 1156-1165.

Hugh S. Gorman, "Manufacturing Brownfields: The Case of Neville Township, Pennsylvania, 1899-1989," *Technology and Culture* 38 (1997): 539-574.

## Relevant Book Chapters

Hugh S. Gorman, Valoree S. Gagnon, Amanda Giang, Judith A. Perlinger, and Noel R. Urban, "Policy, Science, and Transdisciplinary Research: When Will it Be Safe to Eat as Much Fish as Desired?" in *A Research Agenda for Environmental Management,* ed. Kathleen E. Halvorsen, Chelsea Schelly, Robert Handler, and Jessie L. Knowlton. Edward Elgar Publishing, 2019, 93-106.

Hugh S. Gorman, "The Role of Businesses in Constructing Systems of Environmental Governance," in *Green Capitalism? Business and the Environment in the Twentieth Century*, ed. Hartmut Berghoff and Adam Rome (University of Penn Press, 2017), 33-50.

Hugh S. Gorman, "Thinking in Cycles: Flows of Nitrogen and Sustainable Uses of the Environment" in *Managing the Unknown*, ed. Frank Uekotter and Uwe Lübken (New York: Berghahn, 2014), 32-52.

Hugh S. Gorman and Betsy Mendelsohn, "Where Does Nature End and Culture Begin? Converging Themes in the History of Technology and Environmental History" in *The

*Illusionary Boundary: Historical Research at the Intersection of Technology and the Environment*, ed. Stephen H. Cutcliffe and Martin Reuss (University of Virginia Press, 2010), 265-301.

Hugh S. Gorman, "The Houston Ship Channel and the Changing Landscape of Industrial Pollution" in *An Environmental History Of Houston and the Gulf Coast*, ed. Martin V. Melosi and Joseph Pratt (University of Pittsburgh Press, 2007): 52-68.

## Relevant Reports

Hugh S. Gorman, "The Aliso Canyon Natural Gas Storage Facility: Its History and Operation by SoCalGas," expert report prepared for Panish, Shea, and Boyle, Sept. 2021.

Valoree S. Gagnon, Hugh S. Gorman, and Emma S. Norman, "Eliminating the Need for Fish Consumption Advisories: A Policy Primer," contribution no. 50, Great Lakes Research Center, Michigan Technological University, 2018.

## TEACHING AND PROFESSIONAL SOCIETIES

## Courses Taught

Undergraduate Courses
   Science, Technology, and Society: Interactions and Interrelationships.
   U.S. Environmental History
   Institutions: Capitalism, Democracy, and Globalization
   History of Science in America
   History of Science and Technology
   Western Civilization
   Social, Ethical, and Legal Implications of Nanotechnology

Graduate Courses
   Global Industrial History
   Global Environmental History
   Environmental Decision Making
   U.S. Environmental Policy and Politics

## Professional Societies

Society for the History of Technology (SHOT)
American Society for Environmental History (ASEH)
History of Science Society
Society for Industrial Archeology
Business History Conference
Policy History Conference

**Appendix B. Material Reviewed and Considered**

**A. Case-related material with a Bates Number**

| | | |
|---|---|---|
| NGSC_0021189 | NGSC_0318753 | NGSC_1307755 |
| NGSC_0034264 | NGSC_0348672 | NGSC_1307790 |
| NGSC_0053761 | NGSC_0348748 | NGSC_1346728 |
| NGSC_0053905 | NGSC_0352608 | NGSC_1346773 |
| NGSC_0054108 | NGSC_0362300 | NGSC_1446680 |
| NGSC_0054358 | NGSC_0555103 | NGSC_2583680 |
| NGSC_0055899 | NGSC_0617841 | NGSC_2583760 |
| NGSC_0056140 | NGSC_0935717 | NGSC_2583913 |
| NGSC_0059130 | NGSC_1152487 | NGSC_2614229 |
| NGSC_0059600 | NGSC_1152496 | NGSC_2755720 |
| NGSC_0060430 | NGSC_1152510 | NGSC_2759072 |
| NGSC_0068380 | NGSC_1152514 | NGSC_2795105 |
| NGSC_0077067 | NGSC_1152517 | NGSC_2796454 |
| NGSC_0083496 | NGSC_1152518 | NGSC_2811281 |
| NGSC_0317309 | NGSC_1152603 | NGSC_2816798 |
| NGSC_0318752 | NGSC_1307753 | NGSC_2885330 |

**B. Case-related material without a Bates Number**

Deposition of Jeff Gwinn, July 27, 2003

Deposition of Kassidy Jones, April 25, 2023

Expert Report of W. Richard Laton, PhD, Sept. 27, 2023.

Expert Report of Matthew J. Tonkin, PhD, in the matter of *Jed and Alisa Behar v. Northrop Grumman Corporation and Northrop Grumman Systems Corporation*, U.S. District Court, Central District of California, Case No. 2:21-cv-03946-HDV-SK, Sept. 27, 2023.

B - 2

### C.  Books and Articles

Byrne, John A. *The Whiz Kids* (Doubleday, 1993).

Coombs, Clyde F. *Printed Circuits Handbook* (McGraw-Hill, 1967, 1979).

DeForest, William S. *Photoresist: Materials and Processes* (New York: McGraw-Hill, 1975).

Harper, Charles A., ed. *Handbook of Material and Processes for Electronics* (New York: McGraw-Hill, 1970).

Melosi, Martin V. *The Sanitary City* (Johns Hopkins University Press, 2000).

Mohler, James B. *Electroplating and Related Processes* (New York: Chemical Publications, 1969).

Morrison, Robert D. *Environmental Forensics: Principles & Applications* (CRC Press, 2000).

Oldfield, Barney. *The Litton adventure that Was: a Tribute to the founder Charles B. "Tex" Thornton* (Lincoln, Neb.: Kinman-Oldfield Family Foundation, 2006).

Prise, Walter J. *Electronic Circuit Packaging* (Columbus, Ohio: C. E. Merrill Books, 1967).

Rice, Richard B. *The Elusive Eden: A New History of California* (McGraw-Hill, 2011).

Sittig, Marshall. *Electroplating and Related Metal Finishing: Pollutant and Toxic Materials Control* (Noyes Data Corp., 1978).

Sobel, Robert. *The Age of Giant Corporations: A Microeconomic History of American Business*, 1914-1970 (Westport, Conn.: Greenwood Press, 1972).

Sobel, Robert. *The Money Manias: The Eras of Great Speculation in Americ*a, 1770-1970 (Beard Books, 2000).

Sobel, Robert. *The Rise and Fall of the Conglomerate Kings* (New York: Stein and Day, 1984).

Suslik, Steve. "A Multilayered Look at Printed Circuit Boards," *Industrial Finishing* Apr. 1981, pp. 14-23.

### D.  Other

"Jack Gentry Obituary," 2006, Springfield News-Leader, accessed at https://www.legacy.com/us/obituaries/news-leader/name/jack-gentry-obituary?id=48918295 on July 19, 2023.

B - 3

1897 Rand McNally Map, displayed in online presentation about the Chatsworth railroad history by the Chatsworth Historical Soc., accessed in digital archive at www.chatsworthhistory.com on July 21, 2023.

Missouri Dept. of Natural Resources. "Litton Systems Inc. Site, 4811 West Kearney Street, Springfield," June 2022, accessed at https://dnr.mo.gov/document-search/litton-systems-inc-site-june-2022.

*Circuit Manufacturing*, various issues

*Electronic Industries*, various issues

*Signal*, various issues

*Solid State Technology*, various issues