# EXHIBIT 22

**Rebuttal of:**

**Jennifer N. Pitts, MAI,** *Expert Report*

**and**

**Andrea L. Eisfeldt, Ph.D.,** *Expert Report*

By:

Dr. Kevin J. Boyle

Behar

v.

Northrop Grumman Corp., et al.

Case No. 2:21-cv-02946

Prepared for:

Plaintiff's Counsel

November 20, 2023

In forming my expert opinion, I rely on broad personal, professional, and academic knowledge of economics and environmental contamination. I have participated in many academic studies, public and private decision-making contexts, and court cases related to monetary losses due to environmental contamination. Through this experience I have observed property-valuation diminutions, like in the current case, which range from 5% to over 20%.

For example, a 2023 study of wildfire risk in California found that disclosing the risk to buyers reduced property values by 4.3%.[1] A 2020 national study of lake water quality found that a 1-meter reduction in water clarity due to eutrophication can reduce property values by 10%.[2] A 2017 study found that toxic algae in lakes reduces the values of properties located near lakes between 11% and 17%, and the percent value diminution is over 22% for homes adjacent to lakes. Another example is a 2015 study of sites where toxic material had been released reduced property values by 11%.[3] These studies, and many others, show that disamenities, such as groundwater contamination, reduce the values in communities by a common percentage.[4]

I use this knowledge in forming my expert opinion and responding to the reports of Ms. Pitts and Professor Eisfeldt. I respond to the comments of Ms. Pitts and Professor Eisfeldt separately, but there is overlap in some of their comments so there are some points of repetition in my responses to both. However, my responses may not be entirely duplicative because the emphasis of the comments, while similar, may vary between Ms. Pitts and Professor Eisfeldt. I do try to reduce the duplication of my responses to the greatest extent possible while being responsive to the comments of Ms. Pitts and the comments of Professor Eisfeldt.

My responses to comments by Ms. Pitts and Professor Eisfeldt serve to establish that the percentage property value diminution I provide is reliable, is based established methods in the disciplines of environmental economics and real estate economics that are well accepted, and applied in a manner that fits the conditions of the case.

### Boyle Area of Expertise

1. I offer my opinion as an economist who has considerable professional knowledge of real estate and the effects of property attributes, including environmental contamination, on property values.

2. I hold a B.A., Economics from the University of Maine, a M.S., Agricultural and Resource Economics from Oregon State University, and a Ph.D., Agricultural Economics from the University of Wisconsin with a major field in Environmental and Resource Economics.

---

[1] Source: https://media.rff.org/documents/WP_23-26.pdf, accessed November 20, 2023.
[2] Source: https://www.sciencedirect.com/science/article/abs/pii/S0921800919311012, accessed November 20, 2023.
[3] Source: https://www.sciencedirect.com/science/article/abs/pii/S0921800916305031, accessed November 20, 2023.
[4] Source: https://www.sciencedirect.com/science/article/pii/S0095069615000194?casa_token=F7N1dE2QLwkAAAAA:e0JK Tb0My-7NG7U02FNKlggXjNCFkCWY6wdDo5TTwmJecMVRjIRMt8gsh3jWTbxq5TCOQS0edQ, accessed November 20, 2023.

3. I have over 35 years of professional experience applying economic methods to value resources, including the valuation of property characteristics and the effects of environmental contamination on property values.

4. I am currently the Founding Head and Blackwood Professor, Blackwood Department of Real Estate, Pamplin College of Business, Virginia Tech.

5. The Bachelor's Degree Center ranks Virginia Tech's BS Real Estate as the #1 Bachelors in Real Estate degree in the U.S. (see: https://www.bachelorsdegreecenter.org/best-real-estate-degrees/#:~:text=degree%20for,20real-,estate,-from%20Virginia%20Tech).

6. I am listed as one of the Top 100 real estate professionals in the United States for 2022 (see: https://www.thetop100magazine.com/kevin-boyle).

7. I am a Fellow of the Association of Environmental and Resource Economists, which is the highest recognition bestowed by the leading professional association of environmental economists in the U.S. (see: https://www.aere.org/aere-fellows-award-recipients).

### Economic Analysis Methods Applied to Form the Boyle Opinion

8. The Boyle report follows well-established and generally accepted methods for economic valuation that have been validated in the peer-reviewed literature and are widely applied to valuing losses due to environmental contamination.

9. A Google Scholar search of *"economic valuation of environmental contamination"* yields *"(a)bout 1,040,000"* scientific citations as of November 10, 2023.[5]

10. The economic valuation of environmental contamination is an accepted practice by the U.S. Environmental Protection Agency and is documented in their peer-reviewed Guidelines for Preparing Economic Analyses.[6]

    a. The EPA guidance does not reference appraisal or appraising as an accepted method of valuing the effects of environmental contamination (see Chapters 7 and 8).

    b. The economic methods relied on in the Boyle report, hedonic analysis, meta-analysis, and benefit transfer, are referenced 64, 38 and 22 times, respectively in chapter 7 of the EPA's guidance.

    c. While Ms. Pitts presents the appraisal method as the only option for valuation of property or assessing diminished value of land, this is simply not the case.

---

[5] Source: https://scholar.google.com/scholar?q=economic+valuation+of+environmental+contamination&hl=en&as_sdt=0&as_vis=1&oi=scholart, accessed November 15.

[6] Source: https://www.epa.gov/environmental-economics/guidelines-preparing-economic-analyses, Accessed November 15.

d. The EPA guidance **does not** reference paired sales comparisons and explicitly **endorses** hedonic price regressions and meta-analyses for property-value impact studies.

e. With respect to meta-analyses, the Guidelines note that their advantage "is that they are generally easier to estimate while controlling for a relatively large number of confounding variables. This approach has been widely used in environmental economics …" (EPA, p. 7-48).

f. In addition, the EPA Handbook on the Benefits, Costs and Impacts of Land Cleanup and Reuse (2011) has an extensive discussion of the hedonic property regression approach to valuation and advises that "… analysts conducting either a benefit cost analysis or an environmental impact assessment are **urged to follow methodological guidance from the environmental economics literature rather than appraisal studies when the two diverge**" (p. 44, emphasis added).[7]

11. The methods relied on in the Boyle report are widely accepted by real estate economists and have a long history of publication in the top, peer-reviewed real estate journals. Examples include:

a. *Journal of Housing Research* (e.g., Sirmans et al., 2010)

b. *Journal of Real Estate Literature* (e.g., Devaux and Dubé, 2016)*,*

c. *Journal of Real Estate Economics* (e.g., Turnbull and Zheng, 2021),

d. *Journal of Real Estate Research* (e.g., Flower and Rajas, 1994)*,*

e. *The Appraisal Journal* (e.g., Laurice and Bhattacharya, 2005), and

f. *The Journal of Real Estate Finance and* Economics (e.g., Chamblee et al., 2015).

12. The American Real Estate Society, which is the top professional society among real estate educators, rates the 3rd, 4th and 6th journals listed above as the top three journals in Real Estate Finance and among the top journals in Real Estate and Urban Economics.[8]

13. The methods used in the Boyle report are widely accepted and reliable, have been tested and applied in similar contexts, and are featured in guidance published in peer-reviewed economics journals (hedonic property-value modeling - Bishop et al., 2020; meta-analysis - Nelson and Kenedy,  2009; benefit transfers - Johnston et al., 2021).

### Revisions to the Dr. Boyle's Expert Report

The following revisions are made to my Expert Report dated September 27, 2023.

---

[7] Source: https://www.epa.gov/sites/default/files/2017-08/documents/ee-0569-02.pdf, accessed November 19, 2023.
[8] Source: https://cdn.ymaws.com/www.aresnet.org/resource/resmgr/files/journals/real_estate_journal_list_202.pdf, Accessed November 17, 2023.

B1. Certain multifamily properties are removed from the analysis, which are condominiums in buildings with three or more floors of residential units and townhomes where the living areas are located over garages.

    a. These properties were included in the original damage analysis because they are listed as single-family properties in the Los Angeles County assessor's data.

    b. An example condominium building from the assessor's data is 6800 Corbin Avenue, Reseda. Table B1 presents a screen shot from the assessor's data that shows the units are classified as residential, single family because each unit is privately owned in this multistory, multifamily building.

| Residential | Single 6800 CORBIN AVE | 101 | RESEDA CA 91335-3664 |
|---|---|---|---|
| Residential | Single 6800 CORBIN AVE | 102 | RESEDA CA 91335-3664 |
| Residential | Single 6800 CORBIN AVE | 103 | RESEDA CA 91335-3664 |
| Residential | Single 6800 CORBIN AVE | 104 | RESEDA CA 91335-3664 |
| Residential | Single 6800 CORBIN AVE | 105 | RESEDA CA 91335-3664 |
| Residential | Single 6800 CORBIN AVE | 106 | RESEDA CA 91335-3664 |

Table B1. Example 6800 Corbin Avenue Assessors Data

    c. An image of the 6800 Corbin Avenue building is Shown in Figure B1.



Figure B1. Image of 6800 Corbin Avenue, Reseda, CA

B2. Removing single-family units in multifamily, multistory buildings reduces the number of injured properties in my original report from 3,787 to 3,294 here.

    a. A list of excluded properties is provided in the Appendix.

B3.  In the preparation of my *Expert Report,* I had qualified assistance in computing the property-value diminutions to make efficient use of my time. There was a miscommunication between me and the assistants where they thought the distance to properties from 8020 Deering Avenue, Canoga Park was measured in meters. Revised damage estimates, based on feet from the source of contamination to properties, converted to miles, are now reported.

B4.  Property values in my *Expert Report* were each updated to a current value using the All-Transactions House Price Index for Los Angeles-Long Beach-Glendale, CA Metropolitan Statistical Area[9] that includes more than Los Angeles County. In this revision, the updating is done using the All-Transactions House Price Index for Los Angeles County, CA[10], which matches the source of the property data used in the damage calculations.

B5.  The above revisions reduce the damage estimate in my original *Expert Report* of $259,840,872 to $236,035,711 here.

B6.  A revised spreadsheet of calculations accompanies this report and is not included in this document due to the size of the file.

**Responses to Ms. Pitt's *Expert Report***

Ms. Pitts organized comments in seven areas within the Executive Summary of her *Expert Report*. Following her *Executive Summary*, Ms. Pitts offered eight opinions. In my rebuttal responses I have organized sections for each of Ms. Pitts' seven *Executive Summary* comments and have integrated responses to her eight opinions as they are associated with the *Executive Summary* comments to minimize repetition in my responses. I finish by rebutting Ms. Pitts' comments on environmental history and market awareness.

**Conclusions Regarding Ms. Pitts' Comments on Dr. Boyle's *Expert Report***

P1.  I present an economic analysis of the impact of contamination on property values that is based on data from sales of properties and do not conduct appraisals of properties.

P2.  Ms. Pitts does not demonstrate education nor professional experience with environmental economics as applied to real esate economics and economic modeling of property values.

  a.  In her deposition Ms. Pitts states "as far as specifically environmental economics as a separate field, I am not familiar" (p. 18, 1-17).

  b.  Ms. Pitts, in her deposition, incorrectly states that "… meta-analysis is basically a literature review …" (p. 18, 1-17) and fails to recognize that a comprehensive review of the literature is just the first step in the scientific process of a meta-analysis.

---

[9] See: https://fred.stlouisfed.org/series/ATNHPIUS31084Q, accessed November 13, 2023.
[10] See: https://fred.stlouisfed.org/series/ATNHPIUS06037A, accessed November 13, 2023.

    c.  Ms. Pitts also revealed in her deposition that she is only "vaguely familiar" with benefit transfer analysis (p. 21, 17-23).

P3.    Ms. Pitts fails to understand that I used actual sale prices of properties as a starting point for the analysis because sale prices are the true market values of properties, and they account for structure, lot, age, location, and other differences in properties.

P4.    Properties with larger living areas, larger lots, newer houses and in desirable locations sell for more in the market.

P5.    Ms. Pitts incorrectly asserts that the periods of ownership of class properties are not addressed in the damage analyses, but this information is contained in column AY (most recent sale date) of the excel file documenting the Boyle analyses.

P6.    Ms. Pitts' critique of the class definition is misguided as the types of properties and boundary of the class area are presented in the Boyle report.

P7.    Ms. Pitts fails to understand that the plaintiff's property **is similar**, which does not mean properties are identical, to class properties and differences in class properties are addressed using both sale prices of class properties and distance to the source of the contamination for each class property.

P8.    Ms. Pitts does not present evidence that other types of disamenities are affecting the percentage diminution in value applied in the Boyle analyses and overlooks that Boyle analyses do account for differences in properties based on their distances from the source of the contamination as well as their sale prices.

P9.    Ms. Pitts conclusions of no diminution in value is fundamentally flawed.

    a.  Ms. Pitts does not address whether her appraisal conclusions would change if she did repeated appraisals using common assumptions but different comparable properties, which goes to error.

    b.  Ms. Pitts does not address whether her appraisal conclusions would change if the appraisals were conducted by a different appraiser, which goes to bias.

    c.  Ms. Pitts does not identify the error rate in her appraisals.

    d.  Ms. Pitts cannot address whether her conclusion of no diminution is due to no diminution or simply that buyers and sellers are not sufficiently informed of the contamination risk, which is Type II error in statistical terms.

P10.    Ms. Pitts does not present sufficient data to support the conclusion that sellers and buyers in the class area are sufficiently informed, to date, of the environmental risk affecting property values or that such risks have been sufficiently disclosed.

**Ms. Pitts notes the "*Diversity of Residential Properties in the Proposed Class Area*" (p. 2). Pitts' OPINION 1:** "Property characteristics such as size, age, and condition vary property-by property

throughout the proposed class area. From an appraisal perspective … these diverse properties cannot be meaningfully or reliably analyzed together, … " (p. 17)

P11. The Boyle *report* considers single family homes as recorded in the Los Angeles County Assessor's data, which includes "single family detached, single family with an accessory dwelling unit, duplexes and townhomes" (Boyle p. 21).

P12. Unique "physical and locational" characteristics of properties are accounted for by basing the damage analyses on the most recent sale price of each property, which is the best market data on value (Boyle p. 22).

P13. The environmental economics and real esate literatures both indicate that properties within a market experience a common percentage diminution in value and this is demonstrated by the hedonic property value studies the Simons and Saginor meta-analysis relies on and in the peer-reviewed Boyle and Kiel (2001) article summarizing hedonic property value studies of environmental contamination.

   a. Boyle and Kiel (2001) review 12 air pollution, 7 water pollutions, and 16 undesirable land use hedonic studies, conducted across the U.S., which demonstrated affected properties in each study experience a common diminution in value.

P14. Thus, property value diminutions are higher for properties with higher values when the common, proportionate diminution is applied to their market values.

P15. Ms. Pitts misrepresents the Impaired Value of a property when she states it is the Unimpaired Value minus Cost minus Use minus Risk effects that arise from contamination (Pitts, p. 17).

   a. Cost, Use and Risk all contribute to the diminutions in value but are not additive components of diminution; they are considerations that go into a transaction in terms of how much less a seller will accept and a buyer will offer.

   b. Hedonic, property-value models, based on sale prices, show that value diminutions from disamenities (e.g., environmental contamination) and amenities (e.g., a city park) are commonly captured in the models through variables that measure distance to the disamenity or amenity, which includes the combined effects of cost, use and risk (Taylor, 2017).

P16. In Table 2 (Pitts, p. 18) Ms. Pitts misrepresents the Boyle report as including damage to multifamily buildings and vacant residential land that is not included in the analysis of class damages.

   a. There were some condominium units in multistory buildings included in the Boyle report because they are listed as single family in the Los Angeles County assessor's data, and these properties have been removed from the analysis in the revised Boyle report.

7

P17. Ms. Pitts fails to understand that property characteristics such as lot size, living area and year built (Pitts, Table 3, p. 21), are accounted for by using the most recent sale prices of properties.

   a. Properties with larger lots, larger living areas and that are newer sell for more in the market and these are reflected in their sale prices.

   b. If there are any market-area differences between properties located in Canoga Park versus Winnetka versus Reseda, these differences are also captured by using actual sale prices of properties.

   c. Market differences between properties located in Canoga Park, Winnetka, and Reseda, three adjacent communities are highly unlikely, and in Ms. Pitts paired sales analysis she used a Reseda sale as a comparable for a Winnetka property, indicating she believes properties in these communities are within a common market (Pitts, p. 65).

   d. Notably, all properties in Ms. Pitts appraisals are in Winnetka except for the Reseda property. If Ms. Pitts believes there are different market areas, it is expected she would test her appraisals in the different market segments, but she uses Winnetka to represent the entire class area as one market.

P18. Ms. Pitts questions whether current market values in Boyle report, updating sale prices to current dollars using the Federal Reserve All-Transactions House Price Index, accounts for improvements in homes (Pitts, Table 4-2, p. 24).

   a. The price index reflects what one would consider typical or average year-over-year adjustments in market values.

   b. If some residences have a substantial enhancement or are not maintained, then their values would, respectively, increase more or less than the market average.

   c. The most important consideration is that Ms. Pitts records an average job value of $13,516 over 1,065 property renovations and expenditures of this amount are very unlikely to affect property values.

   d. Overall, this should not materially affect the aggregate damage estimate of $236,035,711 in the Boyle Revised Expert Report, which still provides a reliable estimate of the class-wide damage to property values.

P19. Ms. Pitts questions the application of the All-Transactions House Price Index for Los Angeles County for older sales (Pitts, p. 84).

   a. It is important to keep in mind that the use of price indices to update economic data is a commonly used and well-accepted practice in economics and financial analyses.

b.  In fact, the Appendix B of the Economic Report of the President contains multiple price indices, dating back to 1972, that are commonly used to support financial analyses, which often bring economic data to current values.[11]

c.  In a scientific analysis, methods are applied consistently and not changed from observations because the analyst likes or dislikes an outcome, and the use of the All-Transactions House Price Index is a reliable and well accepted method.

d.  In updating prices using any price index, just like in conducting appraisals, some values may be overestimates and others underestimates.

e.  This is also the case for property appraisals, some properties sell for more than the appraised value and others sell for less than the appraised value.

f.  It is notable that Ms. Pitts identifies some example values that may be considered outliers in the data but does not document that this is a systemic issue that reduces the reliability of the analysis in the Boyle report.

g.  Overall, with some properties being overvalued and others being undervalued, these effects average out over all class properties such that the overall damages estimate of diminished property values is reliable.

P20.  Ms. Pitts references "boundaries of market areas" (Pitts, p.24).

a.  Using sale prices as the basis of damage assessments ensures that the values represent the market where the properties are located.

b.  Ms. Pitts overlooks that the Federal Reserve considers Los Angeles County as a market when constructing the All-Transactions House Price Index for Los Angeles County.

P21.  Ms. Pitts incorrectly argues "separate regressions should be run for different types of properties, different locations, etc." (Pitts, p. 25) and "there is an issue termed aggregation error that results from the over inclusion of properties with dissimilar characteristics" (Pitts, p. 25).

a.  This comment continues the error Ms. Pitts made in representing the properties included in the damage analysis.

b.  Ms. Pitts overlooks that the hedonic studies Simons and Saginor (S&S, p. 77) relied on were conducted in 58 separate locations (markets) and each estimated a separate property-value regression.

c.  Several types of single-family properties are included in the damage assessment that are substitutes to buyers in the market, should be analyzed together in an economic analysis, and do not give rise to an aggregation error.

---

[11] Source: https://www.whitehouse.gov/wp-content/uploads/2023/03/ERP-2023.pdf, accessed November 19, 2023.

d. Ms. Pitts fails to understand that meta-analysis is an established statistical method to understand commonalities in studies conducted in diverse locations and is not an aggregation error.

e. Stanley (2001) explains that "(i)f a number of independent studies have been conducted on a particular subject, using different data sets and methods, then combining their results can furnish more insight and greater explanatory power than the mere listing of the individual results" (p. 131).

**Ms. Pitts notes the "*Diversity of Ownership of Ownership Interests*" (p. 3). Pitts' OPINION 2:** "Multiple periods of ownership would further complicate any attempts to evaluate property value diminution on a class-wide basis. … Further, property owners in different locations throughout the proposed class area may have different levels of market knowledge. …" (p. 26)

P22. This comment is mislabeled as Ms. Pitts discusses when owners purchase their properties, not ownership interests in their properties.

P23. The Boyle report accounts for when properties were purchased in two ways.

a. First, using the most recent sale prices of properties accounts for differences in time when the properties were purchased (Boyle, p. 22).

b. Second, sale prices are updated to current values (August 2023) using the respected Federal Reserve Bank of St. Louis All-Transactions House Price Index for Los Angeles County, which accounts for year-over-year variation in the housing market (Boyle, p. 23).

P24. The most recent sale prices of class properties also account for differences in value due to property locations; those in desirable locations sell for more and those in undesirable locations sell for less.

P25. It is common practice for hedonic, property-value studies, which the Simons and Saginor meta-analysis is based, to analyze sales of properties transacted over time.

a. For example, Guignet et al. (2023) used property-sale data from 2004 through 2014 to estimate a common property-value diminution from chemical accidents.

P26. In any market, there are differences in knowledge among sellers and differences in knowledge among buyers.

a. Differences in knowledge do not preclude the estimation of economic models.

b. Given differences in knowledge, estimated economic models represent the average or typical outcome for the topic being studied.

P27. Groundwater contaminated with TCE, and the associated risks will become common knowledge at class certification and notices are sent to all property owners, which is the time that sellers and realters will need to notify buyers of the class.

a. Pope (2008a) explained "(r)evealed preference methods like the hedonic model generally assume economic agents have access to publicly available information and use it effectively. In the housing market, the recent proliferation of seller disclosure laws suggests that policymakers perceive buyers to be less than "fully informed," presumably since they face higher information acquisition costs than sellers."

b. Pope (2008a) found that required seller disclosure of airport noise reduce property values by 2.9%.

c. Pope (2008b) found that seller flood zone disclosure reduces property values by 4%.

d. Guignet (2012) finds leaking underground storage takes reduce property values by "… a 9-12% depreciation when households are well informed" (Abstract).

**Ms. Pitts asserts a "*Vague and Unsupported Proposed Class Definition*" (p. 3). Pitts' OPINION 3:** "The proposed class definition does not specify the residential property types included in the proposed class. Additionally, there is no apparent basis for the proposed class area boundary, and the real estate market could not be expected to differentiate between properties within and directly outside of the boundary. Lastly, the proposed class definition does not specify a date of period of ownership." (p. 28)

P28. The "residential property types" Ms. Pitts questions have been clarified in the revised Boyle report. "These properties are single family properties as identified in the Los Angeles County assessor's data and include single family detached, single family with an accessory dwelling unit, duplexes and townhomes residences" (Boyle, p. 21).

P29. The Boyle *Revised Expert Report* documents 3,294 class members.

P30. The Excel spreadsheet that accompanies the Boyle report identifies properties by their Assessors Identification Number (AIN – column C), Appraisers Parcel Number (APN – column D), Use Type (column E), Use Description (column F) and property street address (column L).

P31. Property sale dates are provided in column AY of the Excel file, which defines the period of ownership.

P32. The class boundary relies on the extent of the groundwater contamination plume as defined in the Laton *Expert Report* and replicated in Figure 1 of the Boyle report (area defined by the red line in Figure P1 below).

11



Figure P1. Groundwater Contamination Plume

P33.   While criticizing the groundwater contamination plume as a "class area boundary from a real estate market perspective." Ms. Pitts does not provide any evidence that the class properties fall in different real estate markets.

P34.   The Federal Reserve Bank of St. Louis treats Los Angeles County, where the class properties are located, as a common real estate market in the All-Transactions House Price Index for Los Angeles County, and Ms. Pitts does not criticize this credible data source (see Figure P2).



Figure P2. All-Transactions House Price Index for Los Angeles County, California
Source: https://fred.stlouisfed.org/series/ATNHPIUS06037A, accessed November 7, 2023.

12

P35.    It is also notable that the Boyle analysis is based on actual sale prices, so it is not necessary to define a market area for comparable sales as Ms. Pitts would be required to do when conducting an appraisal.

**Ms. Pitts asserts the "*Named Plaintiffs' Property Not Representative*" (p. 3). Pitts' OPINION 4:** "The Named Plaintiffs' Property and ownership interest in not representative of many of the property types, locations and ownership interests in the proposed class." (p. 29)

P36.    For an economic analysis of damage, it is not necessary that properties are identical in all aspects.

P37.    Ms. Pitts appears to conveniently overlook that this is also the case when performing an appraisal, which requires judgment on the part of the appraiser to determine properties that are "comparable" but are not required to be identical and to choose adjustments in value if needed.

P38.    As explained above, using actual sale prices as the basis for the damage analysis accounts for "different physical, locational, and environmental influences" on property values.

P39.    The Boyle report documents two common property-value diminution effects shared by class properties.

   a.    First, all class properties experience a common percentage diminution of 9.4% in value (Boyle, Table 2)

   b.    Second, all class properties experience a common percentage value diminution gradient with distance from the source of the contamination (Boyle, Table 3, 4th column).

   c.    This does not, as Ms. Pitts suggests, mean that all properties have suffered the same diminution as the total diminution for each property is a function of distance from the source of the contamination and the property value, which both capture differences between properties.

P40.    The peer-reviewed economics literature on hedonic modeling of property values demonstrates that injured properties that have differences in lot size, living area, age and location within a community experience a common diminution of value.

   a.    Boyle and Kiel (2001) review 12 air pollution, 7 water pollutions, and 16 undesirable land use hedonic studies, conducted across the U.S., which demonstrated affected properties in each study experience a common diminution in value.

**Ms. Pitts asserts "*Environmental Condition not Uniform*" (p. 3). Pitts' OPINION 5:** "The proposed environmental characteristics of proposed class properties are non-uniform. …" (p. 32). **Pitts' OPINION 6:** "There are other local and regional environmental influences within and around the proposed class area …" (p. 35).

P41.  Ms. Pitts references "other environmental disamenities" and later in her expert report, lists "Potentially Adverse Influences" (Pitts, Table 5, p. 35) but does not clearly link these to property-value diminutions.

   a.  For example, Ms. Pitts merely identifies the locations of dry cleaners and leaking underground storage tanks (Pitts, Exhibit 6, no page #) but does not provide any data on the extent of contamination from these sites.

   b.  Ms. Pitts references clandestine drug labs but, if clandestine, one would not expect them to diminish the values of other properties because they are clandestine.

P42.  Other environmental disamenities only come into play if they are correlated with the source of contamination of interest, and if they are not correlated, orthogonal in statistical terms, to the groundwater contamination plume, they would not affect the price diminution estimate.

   a.  For example, air pollution emissions would likely be ubiquitous though out the plume area and would not be correlated with the source of contamination nor path of the groundwater contamination plume.

   b.  Ms. Pitts does not present any information to indicate other sources of disamenities are correlated with the groundwater contamination from the Northrop Grumman site.

P43.  The Laton *Expert Report* (Section 6.0) dismisses other sources as being substantial contributors to groundwater contamination in the class area, e.g., dry cleaners (Section 6.3.1, p. 43).

P44.  The Laton *Expert Report* states "no off-Site sources have been identified that are contributing any significant mass of TCE to the Northrop Grumman Plume" (p. 46).

P45.  The Boyle property-value diminution considers proximity to the source, Areas 1 and 2 in Ms. Pitts' Figure 5 (p. 33), by including distance to the source of the contamination as part of the property-value diminution calculations.

   a.  Table 3 (p. 19) in the Boyle report shows that all properties adjacent to the source of the contamination have an additional 2% diminution and properties at the furthest extent of the groundwater contamination plume experience only an additional 1% diminution.

P46.  The Simons and Saginor meta-analysis, which Boyle uses, considers nine factors that will diminish property values, in addition to distance from the source of contamination and groundwater contamination (Boyle Table 1, p. 12). Thus, the Boyle analysis **does consider** groundwater contamination (and differences therein) in the context of other factors that

14

might diminish property values. Only those variables that fit this case were included in computing the percentage property-value diminution of 9.4%.

**Ms. Pitts asserts "*No Diminution in Value at the Plaintiffs' Property or at Properties in Area 1*" (p. 4). Pitts' OPINION 7:** "There is no evidence of property value diminution …" (p. 40).

P47.   In conducting the paired-sales appraisals, Ms. Pitts does not document conditions such that buyers and sellers were sufficiently aware of the groundwater contamination and the environmental and health risks associated with it to affect sale prices.

P48.   Ms. Pitts draws conclusions about environmental contamination affecting sale prices of properties via hearsay, not documented data on sellers and buyers' knowledge, intentions and actions.

   a.   Pitts' *Paired Sales Analysis Two*: "The listing agent confirmed that the buyer was an investor in the area and was aware of the environmental investigation associated with the 8020 Deering property, but that the environmental issues did not have a negative impact on sale price or terms" (Pitts, p. 51).

   b.   Pitts' *Paired Sales Analysis Three*: "The listing agent stated that the sales price was not impacted by any environmental concerns" (Pitts, p. 53).

   c.   Pitts' *Paired Sales Analysis Four*: "The seller also reported that the sale price was not impacted by any environmental issues" (Pitts, p. 55).

   d.   Pitts' *Paired Sales Analysis Six*: "The listing agent confirmed that … that the sale price was not negatively impacted by any environmental concerns" (Pitts, p. 59).

   e.   Pitts' *Paired Sales Analysis Seven*: "This was confirmed by the listing agent, who stated that the sales price was not impacted by any environmental issues" (Pitts, p. 61).

   f.   Pitts' *Testing Area Paired Sales Analysis One*: "The listing agent stated that the buyer was aware of the vapor intrusion sampling that had occurred at the house previously. The seller provided the buyer with copies of the environmental reports detailing the sampling and the results. The listing agent confirmed that the prior vapor intrusion sampling did not have a negative impact on the sale price" (Pitts, p. 68).

   g.   Pitts' *Testing Area Paired Sales Analysis Two*: "This was confirmed by the listing agent who stated … the sales price was not impacted by any environmental concerns" (Pitts, p. 69).

P49.   There are multiple flaws in the above quotations from Ms. Pitts' report.

   a.   All but one of the quotes are from the listing agent.

   b.   Ms. Pitts does not document whether the listing agents also represented the buyers, so the quotes do not provide evidence of what the buyers knew about groundwater

15

contamination in the area and consider when making offers and agreeing to purchase prices.

    c.   The listing agents represent the sellers, and their obligations are to the sellers, and they would not reveal any negative information about contamination unless it is known, and they were required to do so.

    d.   For P59 (a), no information is provided about what the buyer knew and understood about the contamination. Ms. Pitts has no way of knowing if the buyer may have reduced what they offered for and agreed to buy the property.

    e.   For P59 (c), there is no information about what the seller knew about what the buyer considered in offering and agreeing to the price paid for the property.

    f.   For P59 (f), again there is no reliable information about what the buyer considered and agreed to in buying the property.

    g.   It is possible that the evidence Ms. Pitts provides is just as likely to show that insufficient information is available in the market at this time to negatively impact sale prices even though sale properties are, in fact, injured by the groundwater plume contaminated with TCE.

P50.   In summarizing her appraisals Ms. Pitts repeatedly asserts that environmental concerns did not affect property sale prices but the evidence she provides supports the conclusion that sellers and especially buyers were unaware of the environmental contamination.

P51.   The implicit hypothesis in Ms. Pitts' appraisals is that there is no effect of groundwater contamination on subject property values.

    a.   Ms. Pitts' hypothesis is rejected if the subject property value is less than the values of the selected comparable properties.

    b.   Failure to reject Ms. Pitts' hypothesis could arise because the contamination does not affect the property values or because sellers and buyers do not have sufficient information about the contamination and associated risks from the contamination.

    c.   Ms. Pitts has no way to differentiate which of these outcomes is correct.

    d.   The latter condition, insufficient information, is what is referred to as a Type II error in statistics in terms of Ms. Pitts' appraisal conclusions.

P52.   Appraisals depend crucially on assumptions and judgments made by the appraiser, and Ms. Pitts does not comment on whether the outcomes of each of her appraisal opinions would differ if they were conducted by another appraiser, which would address if there were an error or bias in her appraisals.

P53.   These considerations are in direct comparison to the analysis in the Boyle report where Simons and Saginor built their meta-analysis on results from over 50 hedonic-property

16

value studies from across the country, conducted by different real estate researchers, and using thousands of property value transactions.

P54.   The sales trend presented in Ms. Pitts' Figure 7 (p. 42) is conceptually flawed when considering property-value diminutions.

   a.  Ms. Pitts makes the meritless assumption that because market prices have been increasing there are no property-value diminutions.

P55.   Consider the example of a used car that had a severely dented fender from an accident.

   a.  The value of the car is diminished due to this injury.

   b.  The owner of the car only realizes this loss at the time of selling the car.

   c.  During Covid, used car prices rose rapidly and suppose the owner sold the car at that time.

   d.  The owner would have gained value due to the increase in market value but would still have experienced a loss.

   e.  The question to ask is, "how much more would the car have sold during Covid in the absence of the dented fender?"

P56.   Ms. Pitts, in considering an appraised value for the Behar property (p. 45), makes the naive assumption that there is no "Use Effect" or "Risk Effect".

   a.  Considering Use and Risk effects relates to the comment above, which explains that Use and Risk effects are not additive.

   b.  Once the TCE contamination in the groundwater is known, the risk harms property owners' enjoyment of the use of their properties.

**Ms. Pitts' "*Rebuttal Opinio*n …" (p. 5). Pitts' OPINION 8:** "The estimates of diminution in value presented in the Boyle report are unsupported by relevant market data and untethered from the environmental facts and market conditions in this matter."

P57.   Ms. Pitts critique overlooks that the meta-analysis is used in conjunction with the most recent sale prices of each property that account for structure, lot and location and other property differences and that sale prices are updated to 2022 dollars using local market data before being applied to the meta-analysis prediction of property-value diminutions.

P58.   The meta-analysis is not used to predict property values.

P59.   The meta-analysis is based on over 50 property value studies from across the U.S. that are based on thousands of sales prices (market values) of residential properties.

17

P60.  The meta-analysis represents what is collectively learned from the many studies of property transactions and allows for a property-value diminution that is calibrated to class conditions.

P61.  Hedonic property-value studies are well established in the peer-reviewed economics and real estate literatures, and document that properties do experience common property value diminutions in the presence of contamination risks.

P62.  It is common practice for hedonic property value models to analyze sales over time and meta-analysis to evaluate studies over time.

P63.  The Boyle economic analysis does not need to appraise an "unimpaired baseline value for each property" because the sale prices of properties are the unimpaired market values for each property.

P64.  The analysis in the Boyle report is well grounded in market data.

　　　　a.  The Simons and Saginor meta-equation is estimated using results from over 50 hedonic property value studies of tens of thousands of actual property transactions that show disamenities, including groundwater contamination, diminish property values.

　　　　b.  The base values used in the Boyle analysis are sale prices, actual market data, for class properties.

　　　　c.  Property sale prices are updated to 2022 values using the Federal Reserve Bank of St. Louis All-Transactions House Price Index that is based on local market data.

　　　　d.  The property-value diminutions are calibrated to local conditions using local unemployment and mortgage interest data that are key factors in sale values of properties.

P65.  Meta-analysis is an accepted method to estimate reliable values when data are not available to compute values, property-value diminutions in this case, where broad community knowledge of the contamination is not known (Boyle, p. 23).

　　　　a.  Meta-analysis is accepted and used by the U.S. EPA to assess the benefits and cost of environmental policies that affect people across the U.S.

　　　　b.  Meta-analyses, including Simons and Saginor's study, are published in peer-reviewed journals, have been tested, and have guidance for implementation.

P66.  The meta-analysis allows property-value diminutions, to be calibrated to local market conditions and applied to local market values of properties.

　　　　a.  Regarding Ms. Pitts' Table 18 (p. 75), Simons and Saginor update all values to 2003 dollars.

　　　　b.  Ms. Pitts fails to understand that meta-analysis is commonly used to compare economic data over time and the hedonic method, which is the basis of the original empirical

18

studies Simons and Saginor base their meta-analysis, analyze property sale transactions over time (many years).

c.  Ms. Pitts does not provide any evidence that the percentage property-value diminution changes over time.

P67.  Ms. Pitts' discussion of the statistical significance of variables in the Simons and Saginor meta-equation overlooks the interpretation of the statistical null hypothesis.

a.  The null hypothesis of no effect could not be rejected.

b.  In statistics, this means that the hypothesis of no effect could not be rejected, not that it is proved that there is no effect.

P68.  The coefficient on the groundwater variable in the Simons and Saginor meta-analysis (Exhibit 3, p. 85) is nearly significant.

a.  The significance (Sig.) of the groundwater variable is 0.106 (see Figure P3).



| Groundwater | −0.085 | 0.052 | −0.219 | −1.627 | 0.106 | 0.187 | 5.348 | |

Figure P3. Excerpt from Simons and Saginor Exhibit 3

b.  If "Sig" was 0.10 or smaller, the estimated coefficient would be statistically significant.

c.  If the sample size for estimating the equation was greater than 184, it is likely that "Sig" for the groundwater variable would have been less than 0.10 and deemed statistically significant.

P69.  More importantly, the hypothesis test in the Simons and Saginor could logically be that the Groundwater coefficient is negative, not just different from zero where it could be negative or positive, because the many studies in the literature show that groundwater contamination reduces property values.

a.  This appropriate alternative hypothesis indicates that the Groundwater coefficient in the Simons and Saginor meta-equation is significant at the 0.10 level of confidence.

P70.  There is more on the significance of the Groundwater coefficient from the Simons and Saginor meta-equation in my responses to Dr. Eisfeldt.

P71.  The estimated coefficients are the best estimates of the effects given the available data.

P72.  Ms. Pitts misinterprets the $R^2$ from the Simons and Saginor meta-equation.

a.  First, an $R^2$ of 0.38 is quite good for analyses of different studies, which is referred to as cross-sectional data in statistical analyses.

b.  Respected applied economist Marc Bellemare explains that "… any R-squared around 0.25 is considered very good. Given how much unobserved heterogeneity we deal with,

anything more than 0.30 is a crazy high R-squared when using cross-sectional data" (see: https://marcfbellemare.com/wordpress/10793).

**Ms. Pitts' "ENVIRONMENTAL HISTORY AND MARKET AWARENESS" (p. 10).**

P73.    Ms. Pitts lists public communications regarding groundwater contamination from the former Northrop Grumman facility, in Tables 1-1 – 1-4 (Pitts, p. 11- 16).

P74.    Ms. Pitts documents the "Area 1 – Priority Testing Area" (green shaded area in Figure P4) that was included in some public communications as Exhibit 1 in her report (Pitts, no page number).



Figure P4. Ms. Pitts Exhibit 1

20

P75.    The California Water Boards' May 2016 Fact Sheet[12] presents three investigation areas, with only the two areas nearest the source of the groundwater contamination being investigated for vapor intrusion (green and purple shaded areas in Figure P5).



Figure P5. Groundwater Contamination Investigation Areas

P76.    As far as I can find, the public communication materials do not present the full extent of the groundwater contamination plume as documented in Figure 01 (Laton, p. 57) of Dr. Laton's *Expert Report* and replicated in Figure 1 (Boyle, p. 6) of the Boyle report (See Figure P1 above).

---

[12] See:
https://documents.geotracker.waterboards.ca.gov/regulators/deliverable_documents/8152300775/0843%20Fact%20Sheet%2012may2016.pdf, accessed November 8, 2023.

21

P77.    Nor does the public communication document the TCE concentrations in the groundwater that gives rise to risks from TCE in soil gas vapor as presented by Dr. Kram (Kram, Figure 3, p. 74) (green shaded areas in Figure P6).



Figure P6. TCE Concentrations in the Groundwater Contamination Plume

P78.    Public communications, to my knowledge, have not conveyed the health risks from exposure to TCE, nor any information that documents whether the risk posed by TCE throughout the area is decreasing, stable or increasing over space and time, which are important for risk communication.

P79.    Less than 1% of the properties located over the plume are known to have been tested for vapor intrusion; Dr. Kram notes that "(a)ll but 27 of the 3,787 residential properties overlying the more appropriate risk screening level of 1.2μg/L have yet to be tested" (Kram, p. 19).

P80.    The most recent public document Ms. Pitts cites is a June 2017 update letter (Pitts, Table 1-1, p. 11), indicating there is no contemporary information on potential risks to homeowners.

P81.    The most recent public meetings Ms. Pitts cites are July 13 and 14, 2021 (Pitts, Table 1-2, p. 11), and she provides no data on who was contacted, how many attended, and what information was presented.

P82.    This sparsity of communication and information about the contaminated groundwater plume does not support a conclusion that knowledge of groundwater contamination is common to owners of properties located over the plume.

22

P83.    Nor is there information about the groundwater contamination plume and the risks publicly available through notices, the media and other outlets that are easily accessible to buyers, nor are there notifications by property sellers and real estate agents that properties are located over a TCE groundwater contamination plume.

P84.    This incomplete information supports the statement in Boyle report that "knowledge of groundwater contamination is not common knowledge to home sellers and home buyers. … Thus, market values of injured residential properties have not experienced the full extent of diminished value" (Boyle, p. 10).

### Conclusions Regarding Professor Eisfeldt's Comments on Dr. Boyle's Expert Report

E1.    Professor Eisfeldt indicates in her deposition that she is not familiar with the field of environmental economics and this lack of understanding carries over to multiple flaws in her critique of the Boyle report.

E2.    Professor Eisfeldt argues that properties require "exposure to VOCs" to be injured, but the peer-reviewed, reliable, and well accepted hedonic property-value literature reveals that proximity to the source of the environmental contamination is the driver of diminutions in property values.

E3.    The reports by Dr. Laton and Dr. Kram document that class properties have been injured via proximity to the source of the contamination and location over the TCE contaminated groundwater plume.

E4.    Professor Eisfeldt, in addition to overlooking that class properties are injured, provides no information that confirms that sellers and buyers of class properties know and understand the TCE contaminated groundwater plume and potential risks.

E5.    Professor Eisfeldt documents information that has been provided regarding the TCE contaminated groundwater plume but provides no evidence that sellers currently are, or must, convey their knowledge of the contaminated groundwater plume to buyers nor that buyers even know enough to ask the right questions about the contamination when purchasing properties in the class.

E6.    Professor Eisfeldt criticizes the Boyle report for not considering drinking water when contaminated drinking water is not part of the injuries, and she critiques the groundwater studies used in the Simons and Saginor study while she concurrently provides data that shows that proximity to the source of the contamination is the key condition and that many of the studies were conducted in areas where residents use municipal that is treated to remove contaminants.

E7.    While not critiquing the methods used in the Boyle report, Professor Eisfeldt's lack of knowledge of the methods results in numerous flawed critiques and a lack of understanding of how the methods were applied in the Boyle report.

23

E8.    Professor Eisfeldt overlooks that the use of the Simons and Saginor meta-equation to develop a transfer percentage diminution in value is based on factual conditions of the case that allows a customized, reliable percentage prediction of the typical property-value diminution in property values that fits class properties.

### Responses to Professor Eisfeldt's Expert Report

Professor Eisfeldt provides five Summary Opinions (items 12-16, pp. 5-8) in her *Amended Expert Report* and then provides a variety of material in the remainder of the report. I will address these summary opinions first and then progress through other topics Professor Eisfeldt raised in the remainder of the report. If I have addressed a topic in response to her summary opinions, I will try to not reiterate my rebuttal responses in reply to later Paragraphs in her report.

### Professor Eisfeldt Summary Opinions

**Summary Opinion 12, p. 5**

- **Professor Eisfeldt states "… the Boyle Report has not shown that its methodology can measure those damages because it does not include any data that reliably establishes that any property has experienced any exposure to VOCs from the site. Nor does the Boyle report provide any reliable analysis to establish that such exposures have ever occurred at any property."**

*Responses*

E9.    I offer my opinion as an economist with specializations in environmental economics and real estate, not as a groundwater hydrologist nor as a vapor intrusion expert.

E10.    I rely on the expert reports of Dr. Laton and Dr. Kram for data on groundwater contamination.

E11.    Dr. Laton explains his expertise "… an expert in the field of hydrology, hydrogeology, environmental contamination, and site investigations" (p.8).

E12.    Dr. Laton states: "The Northrop Grumman Plume is approximately 2.5 miles in length, and up to ¾ mile wide at its widest, and extends to depths of at least 100 feet bgs" (p. 11).

E13.    Dr. Laton continues: "The extents of the PCE, cis 1,2-DCE, and 1,1-DCE groundwater contamination are all contained within the delineated 1.2 µg/L TCE plume contour" (p.11).

24

E14.   I follow Dr. Laton's delineation of the groundwater contamination plume in his Expert Report (Figure 01, p. 57) in defining class properties and this figure is replicated as Figure 1 in the Boyle report (replicated below as Figure E1).



Figure E1. Groundwater Contamination Plume

E15.   Dr. Kram documents his expertise as "… a professional Hydrogeochemist" (p.86).

E16.   Dr. Kram states: "The contaminants discharged by the Defendants migrated toward and under the Canoga Park Class Area residential properties …" (p. 14).

E17.   Dr. Kram states: "The groundwater contaminants currently extend up to 2.5 miles from the location the Defendants originally discharged their toxic waste and reside under at least 3800 residential structures at concentrations of potential concern based on USEPA and California State criteria" (p. 17).

E18.   Dr. Kram states: "There is a pathway for TCE and PCE to contaminate the soil gas, which then can impact the sub-slab and/or crawlspace air. From these locations, there is a direct pathway into the home. This pathway has not been properly addressed by the Defendants' limited and flawed investigation, as characterization efforts were not performed in a manner consistent with regulatory guidance and fundamental scientific principles" (p. 20).

25

E19.    Dr. Kram presents contours of TCE in the groundwater plume in his Figure 3 (p. 74) (replicated below in Figure E2).



Figure E2. TCE Concentrations in the Groundwater Contamination Plume

- **Professor Eisfeldt states "… the Boyle report states that the damages it measures will occur in the future, at an indeterminate date when information about the Site will become "common knowledge," or when sellers of properties in the proposed Class Area will disclose to buyers' knowledge of the alleged contamination."**

*Responses*

E20.    Given the data from Dr. Laton and Dr. Kram that, cited immediately above, owners of class properties are injured by location of their properties over the groundwater contamination plume.

E21.    The question is not whether their properties are injured (they are), but when the monetary measure of the injuries will be realized in the market.

E22.    In response to Mrs. Pitts, I explained the example of a used car that had a severely dented fender from an accident.

    a.    The value of the car would be diminished due to this injury.

    b.    The owner of the car would **only realize** this loss at the time of selling the car.

c.   During Covid, used car prices rose rapidly and suppose the owner sold the car at that time.

d.   The owner would have gained value due to the increase in market value but would still have experienced a loss.

e.   The question to ask is how much more would the car have sold for in the absence of the dented fender.

E23.   In fact, groundwater contamination and associated risks are more insidious than this car example because groundwater contamination does not present any visible signs to sellers and buyers of properties.

a.   Suppose the frame of the car was bent in the accident in addition to the dented fender.

b.   The seller would only know if the frame was bent if the car was taken to a repair shop for an inspection of potential damage.

c.   A buyer would have no way to know the frame was bent based on visual inspection and not from a test drive.

E24.   The methods used in the Boyle report are widely accepted and reliable, have been tested and applied in similar contexts, and are featured in guidance published in peer-reviewed economics journals (hedonic property-value modeling - Bishop et al., 2020; meta-analysis - Nelson and Kenedy,  2009; benefit transfers - Johnston et al., 2021).

**Summary Opinion 13, p. 6**

- **Professor Eisfeldt states "… the Boyle Report fails to show that the proposed meta-analysis methodology is reliable or appropriate for application in this matter."**

*Responses*

E25.   The reliability of meta-analysis has been investigated. For example, Zakzanis concluded "… meta-analysis is a reliable method of research review" (p. 220).

a.   Professor Eisfeldt herself does not have any criticism of the Simons and Saginor meta-analysis (Eisfeldt deposition, p. 97, 9-14).

E26.   Professor Eisfeldt overlooks the documentation in the Boyle report that meta-analysis is an approved method by the U.S. EPA for estimating values associated with environmental contamination.

a.   The *Guidelines for Preparing Economic Analyses: Analyzing Benefits* state: "There are several approaches for transferring values from study cases to the policy case.

27

These include unit value transfers, value function transfers, and non-structural or structural **meta-analysis**" (emphasis added) (p. 7-46).[13]

   b.   The Guidelines underwent "… external peer review prior to finalization, either through the EPA's Science Advisory Board Environmental Economics Advisory Committee (SAB-EEAC) or through independent reviews by external experts."[14]

   c.   Professor Eisfeldt cannot and does not offer any criticism of adherence to U.S. EPA guidelines for estimating values associated with environmental contamination (Eisfeldt deposition, p. 148, 14 through p. 150, 10; p. 152, 20 through p. 153, 2).

E27.   Professor Eisfeldt overlooks that the Simons and Saginor meta-analysis was published in a peer-reviewed journal.

   a.   In her deposition, Professor Eisfeldt claimed to not know whether the Simons & Saginor underwent the peer-review process (Eisfeldt deposition, p. 93, 14 and p. 94, 15). Yet, the Aims and Scope of the *Journal of Real Estate Research* articulates the peer-review policy.

   b.   "**Peer Review Policy:** All articles submitted to this journal undergo a "double-anonymous" peer review by two to three referees after initial screening by the editor or designate."[15]

   c.   Peer review "… acts as a filter to ensure that only high-quality research is published, especially in reputable journals, by determining the validity, significance, and originality of the study. Secondly, peer review is intended to improve the quality of manuscripts that are deemed suitable for publication. Peer reviewers provide suggestions to authors on how to improve the quality of their manuscripts and identify any errors that need correcting before publication."[16]

E28.   Professor Eisfeldt overlooks that she has published an article in *Real Estate Economics*, a journal like the *Journal of Real Estate Research* where the Simons and Saginor article was published.

   a.   These are two of the three real estate finance journals the American Real Estate Society rate as exceptional (24 journals were evaluated).[17]

---

[13] Source: https://www.epa.gov/sites/default/files/2017-09/documents/ee-0568-07.pdf, accessed November 14, 2023.

[14] Source: https://www.epa.gov/environmental-economics/guidelines-preparing-economic-analyses-2016, accessed November 14, 2023.

[15] Source: https://www.tandfonline.com/action/journalInformation?show=aimsScope&journalCode=rjer20, accessed November 14, 2023.

[16] Source: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4975196/#:~:text=Peer%20Review%20is%20defined%20as,same%20field%E2%80%9D%20(1)., accessed November 14, 2023.

[17] Source: file:///D:/My%20Work/Real%20Estate/Journals/AERES%20real_estate_journal_list_202.pdf, accessed November 14, 2023.

b. The fact that Professor Eisfeldt has published (Demers and Eisfeldt, 2022) in one of the three top real estate finance journals is an indication that she finds these journals scientifically reliable and would rely on them herself.

**Summary Opinion 14, p. 6**

- **Professor Eisfeldt states the "… Boyle Report fails to show that the proposed meta-analysis methodology is appropriate in this matter given that information about the Site and the alleged contamination from the Site has been included in communications provided (or made available) to homeowners in the Proposed Class Area since 2005."**

**Responses**

E29. The fact that there has been communication about groundwater contamination does not preclude application of the Simons and Saginor meta-analysis.

E30. Application of the meta-analysis includes information that groundwater contamination plume when this condition becomes common knowledge in the market ("Groundwater" and "Announcement of a bad thing" variables).

a. The distance variable where property-value diminutions decline with distance from the source of the contamination reflects that more information has been provided to property owners located closer to the source, which is what has happened in the current case.

b. The Groundwater variable reflects that messaging has been about groundwater contamination.

c. The announcement of a bad thing follows the communications that there is a contamination site that has given rise to groundwater contamination that can injure properties.

E31. More on this topic is provided in several of the responses to Professor Eisfeldt's comments that follow.

E32. Nowhere in her report does Professor Eisfeldt document that the groundwater contamination plume or the associated risks have been communicated effectively, establishing common knowledge, to owners of class properties and especially to potential buyers of residential properties within the class area. Nor does Ms. Pitts provide such information.

**Summary Opinion 15, p. 7**

- **Professor Eisfeldt states "… Dr. Boyle does not reliably establish that the effects from the various types of contamination summarized in the meta-analysis that the Boyle Report**

29

**relies on can be extrapolated to measure and effects of the type of groundwater contamination present in the Proposed Class Area."**

*Responses*

E33.   Professor Eisfeldt demonstrates her lack of knowledge of hedonic modeling, meta-analysis, and benefit transfer with this comment.

E34.   Hedonic property value models typically measure proximity to a disamenity or amenity to estimate property-value impacts, not the "type" of disamenity or amenity, which makes the Simons and Saginor meta-analysis a good fit for the current case.

E35.   Professor Eisfeldt acknowledge that proximity is the key variable in hedonic property value models in her Figure 4 (p. 48), where six of the nine studies she lists, used proximity to the source of contamination as a measure of the disamenity (toxic and hazardous waste sites). Her figure is replicated here as Figure E3 has proximity (or distance) highlighted in red circles.



Figure E3. Groundwater Valuation Study Summary from Dr, Eisfeldt Report

E36.   Of the three studies in Figure E3 (1, 5 and 9), where Professor Eisfeldt does not reference proximity or distance (no red circles), none provide information to contradict that proximity is the most common variable in hedonic models to identify the effects of contamination on property values.

30

a.  In the DesRosiers et al. paper, the authors' abstract provides validity to the common 9.4% property value diminution in the Boyle report when stating "water-related health hazards exert a detrimental and measurable impact on higher property values, …"

b.  Page et al. uses a case study approach, which is not is not considered in the common property-value diminution presented in the Boyle report. As shown in Table 2 of the Boyle report, the Case variable is coded "0" so it does not influence the percentage property value diminution.

c.  Zeis and Atwater list a water quality variable (Table 1, p. 70), but do not explain how this variable was measured.

E37.  For five of the studies in Figure E3, municipal, city or public (blue circles) deliveries of groundwater are cited as drinking water sources, which indicates that property-value diminutions are due to proximity to the contamination, not contaminated drinking water, as public water supplies are treated prior to delivery to residences.

E38.  Professor Eisfeldt does not understand that there are two common types of benefit transfers, value transfers and function transfers (Johnston et al. 2021).

a.  A value transfer takes a single value from a study and transfers it to a new application. Consider a possible situation where that a hedonic model has been estimated in a county in Wisconsin to identify the value homeowners place on lake water quality and the outcome is applied to value lake water quality in another county.

b.  A function transfer uses an equation to predict a value calibrated to conditions at a new application. Following with the preceding example, suppose separate hedonic models of lake water quality were estimated for all counties in Wisconsin and a meta-analysis was conducted using the results from all models. A function transfer would occur if the estimated meta-equation were used to predict the value of lake water quality in Michigan.

c.  Kaul et al. (2013) and Rosenberger (2017) find that function transfers, which meta-analysis is the most common form, are more accurate than value transfers.

E39.  By focusing on groundwater, Professor Eisfeldt mistakenly interprets the Boyle benefit transfer as a value transfer where all conditions between the location where the study was conducted, and the new application must be identical.

E40.  In a function transfer, using a meta-analysis, the information from multiple studies that collectively have similar and different conditions provides a rich and reliable basis for predicting a customized value for the study site.

E41.  Stanley (2001) explains that "(i)f a number of independent studies have been conducted on a particular subject, using different data sets and methods, then combining their

31

results can furnish more insight and greater explanatory power than the mere listing of the individual results" (p. 131).

E42.    As a result, the Simons and Saginor meta-equation can be used to predict a reliable percentage, property-value diminution in the current case.

- **Professor Eisfeldt states "… the Boyle Report provides no evidence that drinking water supply wells are present in the Proposed Class Area."**

*Responses*

E43.    Professor Eisfeldt provides no substantive evidence that drinking water was the primary driver of property-valued diminutions in the studies she cites in her Figure 4 (Figure E3 above).

   a.    Professor Eisfeldt infers drinking water from groundwater, but five (blue circles in the Figure E3) of the nine studies she cites reference municipal water supplies where water is treated prior to delivery to homes and contaminated drinking water is unlikely to be the cause of the property-value diminutions.

   b.    The Kohlhase (1991) study references wells but does not identify if they are public or private homeowner wells and this study uses proximity to hazardous waste sites as the key variable, not contaminated well water or contaminated drinking water or the level and type of contaminants in the well water.

   c.    Three studies in Figure E3 reference private wells (green circles in the above figure), but two of these studies rely on distance to the source of the contamination and the third, Zeis and Atwater, reference private and public wells.

- **Professor Eisfeldt states "… the Boyle report does not demonstrate how the meta-analysis it relies upon allows Dr. Boyle to exclude the potential impact of confounding variable specific to the Proposed Class Area, …."**

*Responses*

E44.    Professor Eisfeldt overlooks basic elements of regression analysis in this comment.

E45.    Any equation, be it a hedonic property value model or a meta-equation, typically includes a constant term.

   a.    The constant term is included because it is impossible to include all possible explanatory variables in an equation.

   b.    Using the Simons and Saginor meta-analysis as an example, there are thirty coefficients that were estimated, including the constant.

   c.    The constant term in all regression equations capture the effects of variables that are not included in the equation but influence the outcome being analyzed. The

32

constant term in the Simons and Saginor meta-analysis (S&S, Exhibit 3, p. 85) indicates such other variables decrease property values by 4.3%.

E46. When estimating a regression there are what are known as missing relevant variables and missing irrelevant variables.

a. A variable is only missing and relevant if it is correlated with a key variable included in the equation.

b. For example, in the Simons and Saginor meta-equation, an omitted relevant variable would be one that might be correlated with the Groundwater variable, and this would bias the estimated effect of the groundwater variable on property-value diminutions.

c. From a practical, on-the-ground perspective, there are no such confounding variables as Professor Eisfeldt suggest without providing supporting evidence.

d. Mrs. Pitts list several factors as possibly confounding without evidence (Table 5, p. 35), but as explained in responses to her *Expert Report*, there is no reason to assume or believe that the factors are correlated with the source of the groundwater contamination plume nor the plume itself in this case and they are not confounding.

e. Dr. Laton finds "no off-Site sources have been identified that are contributing any significant mass of TCE to the Northrop Grumman Plume" (p. 46).

**Summary Opinion 16, p. 7 (responses here address Professor Eisfeldt's comments in Paragraphs 85 and 86)**

- **Professor Eisfeldt states the "… benefit transfer is an out-of-sample prediction of the results in the Simons and Saginor Meta-analysis."**

*Responses*

E47. This comment by Professor Eisfeldt's speaks to her lack of professional knowledge about benefit transfers which is, by definition, an out-of-sample prediction.

E48. Bergstrom and DeCivita explain that "(b)enefits transfer refers to the use of existing benefit estimates in a different but similar context compared with the original study that generated the benefit estimates" (Abstract).

E49. Benefit transfer is a special type of out-of-sample data transfer that are commonly used such as strength of materials tables in construction[18] and actuarial life expectancy tables used in the Social Security administration and life insurance companies.[19]

---

[18] See: https://extension.okstate.edu/fact-sheets/strength-properties-of-wood-for-practical-applications.html, accessed November 14, 2023.
[19] See: https://www.ssa.gov/oact/STATS/table4c6.html, accessed November 14, 2023.

E50.    As mentioned elsewhere, benefit transfer is also an accepted method under the EPA Guidelines for Economic Analysis for calculating the economic impacts of environmental contamination.

- **Professor Eisfeldt states the "… Boyle Report does not provide reliable support for the values it assigned to key variables to make the out-of-sample prediction."**

*Responses*

E51.    The Boyle report carefully explains the values assigned to key variables in the Simons and Saginor meta-analysis on pages 17-18 and the coding of all variables in the meta-equation are carefully explained here:

a. Constant – This represents all factors that influence property-value diminutions that are not controlled by the variables in the meta-equation and is coded "1" as would be done in any prediction using the Simons and Saginor meta-equation.

b. Real 2003$ value – This represents the market value of properties in the area affected by the contamination.  While this variable is relevant, the parameter estimate on this variable is so small (<0.000) that it does not influence the property-value diminution prediction.

c. Southern Calif. – This identifies the region of the area of the country where Canoga Park, Winnetka, and Reseda are located, and is coded "1" to include it in the property-value diminution prediction.

d. Northeast, Industrial Midwest, South, Farmland, Mineral Extraction, and Northern Calif. – These variables are coded "0" and do not affect the property-value diminution prediction because they represent other regions of the country (see Simons and Saginor region map, Figure E4).



Figure E4. Simons and Saginor Map of Study Regions

34

e.  U.S. – This variable is coded "0" because the property-value diminution prediction is not for the whole U.S.

f.  Sudden – Simons and Saginor define this variable as the "result of a sudden event" (p. 75), and it is coded "0" because the groundwater contamination has evolved through time.

g.  NFA Postrem – Simons and Saginor define this variable as a contamination site that is "in post-remediation" (p. 75), which is not the case for the Northrop Grumman groundwater contamination plume and is coded "0".

h.  Log of distance – This uses the centroid of the 8020 Deering Avenue location that is the origin of the groundwater contamination plume (Dr. Laton *Expert Report*) to the centroid of the location of injured properties (propdist). The maximum distance is set at three miles (maxdist); the distance from the 8020 Deering Avenue source to the furthest extent of the groundwater contamination plume. The calculation is as follows:

$$0.006 \times [\ln(maxdist) - \ln(propdist)] \times 100 \times (-1)$$

where 0.006 is the coefficient estimated by Simons and Saginor, the distance difference is the basis for properties nearer the source of the contamination being valued less than those that are located at the farthest limit of the contamination plume, 100 converts the proportion to a percentage, and the product of these parameters is multiplied by -1 to convert to a property-value diminution.

i.  Nukemanuf – Simons and Saginor define this variable as a "nuclear power plant or manufacturing facility" (p. 75) and is coded "0" because the Northrop Grumman site was not a power plant or nuclear manufacturing facility.

j.  Superfill – Simons and Saginor define this variable as a "landfill, hazardous waste site, or Superfund site" (p. 75), and is coded "1" to include in the property-value diminution prediction because 8020 Deering Avenue is the source of the hazardous waste that gives rise to the groundwater contamination plume.

k.  Groundwater – Simons and Saginor define this variable as "groundwater contamination from leaking underground storage tanks and other sources" (p. 75) and is coded "1" to include in the property-value diminution prediction because the contamination from the Northrop Grumman site is other source.

l.  AirCafo – Simons and Saginor define this variable as "air pollution including that from concentrated animal feeding operations" (p. 75) and is coded "0" because the environmental insult is groundwater contamination.

m.  Urban disamenity – Simons and Saginor define this variable as "including airport noise, sex offenders and rental property" (p. 75) and is coded "0" because these

35

conditions do not apply to the 8020 Deering Avenue site nor the groundwater contamination plume.

n. Litigation dummy – Simons and Saginor define this variable as the "study was conducted for, or the sale was part of litigation" (p. 75) and coded "1" to include in the property-value diminution prediction as there is litigation that is the purpose of the damage estimates in the Boyle report.

o. Announcement of a bad thing – This variable indicates a "information was disclosed based on the announcement of contamination" (p. 75) and is coded as "1" to include in the property-value diminution prediction as information has been released on the groundwater contamination plume.

p. Announcement of closing – Simons and Saginor define this variable as occurring "when the source is closed" as when landfills reach capacity (p. 78) and is coded "0" because the groundwater contamination plume is different from a site closing.

q. Suburban – Simons and Saginor define suburban, rural, and mixed as the "market where sale was recorded" (p. 75) and Suburban is coded as "1" as the groundwater contamination plume is located below suburban neighborhoods.

r.  Rural – Simons and Saginor define suburban, rural, and mixed as the "market where sale was recorded" (p. 75) and Rural is coded as "0" because the groundwater contamination plume is not located in a rural area.

s. Mix – Simons and Saginor define suburban, rural, and mixed as the "market where sale was recorded" (p. 75) and Mix is recorded as "0" because the groundwater contamination plume is not located in a mixed suburban-rural area.

t. Unemployment rate – Simons and Saginor define this variable as "unemployment rate in the county of sale" (p. 75) and the August 2023 unemployment data for Los Angeles County (5%) is used to calibrate the property-value diminution prediction to Los Angeles California and current economic conditions (screen shot is source is provided in Appendix A of the Boyle Report).

u. 30yrrt – Simons and Saginor define this variable as the "conventional 30-year mortgage rate" (p. 75) and the loan rate for a conventional 30-year mortgage as of February 26, 2023, provided by Realtor.com for Los Angeles (7.77%) is used to calibrate the property-value diminution prediction to Losa Angels California and current economic conditions (screen shot is source is provided in Appendix A of the Boyle Report).

v. Log of sample size – Simons and Saginor define this variable as  the "number of impacted properties from study" (p. 75). This is the log of the sample size used to estimate the hedonic equations that were the basis of the meta-equation data.  S&S did not report his information, but Ready (2010) did include sample sizes for hedonic studies of proximity to landfills that supported his meta-analysis. Given

36

the data Ready provides in his Exhibit 3 (p. 331), sample sizes for specific landfills are used to compute an average of 1,612 properties. This is a plausible and conservative number as sample sizes for hedonic equations can range from less than a hundred to tens of thousands.

    w. Case – Simons and Saginor define this variable as identifying diminutions computed from "case" studies and are coded "0" because they are not based on hedonic studies of property sale prices.

    x. Survey – Simons and Saginor define this variable as identifying diminutions computed from "survey" data and are coded "0" because they are not based on hedonic studies of property sale prices.

    y. Other – Simons and Saginor define this variable as identifying diminutions computed from "sale-resale analysis, conjoint analysis and similar techniques" (p. 76) and are coded "0" because they are not based on hedonic studies of property sale prices.

E52.    The coding of the variables in the Simons and Saginor meta-equation are mostly yes/no outcomes based on the facts of the application.

E53.    Coding exceptions that are not yes/no outcomes are based on factual information.

    a. Log of distance is GIS, as the crow flies, measurements of distance.

    b. Unemployment and 30yrrt are based on documented local market data.

    c. Log of sample size is based on documented information from a peer-reviewed journal article.

E54.    The careful and correct coding of variables in the Simons and Saginor meta-equation provides the basis for property value diminution predictions that are calibrated to class conditions.

- **Professor Eisfeldt states the "…Boyle Report also makes arbitrary adjustments to the Simons and Saginor Meta-Analysis' methodology when doing the benefit transfer."**

*Response*

E55.    No adjustments were made to the Simons and Saginor meta-equation. The coefficient estimates from Simons and Saginor's Exhibit 3 (p. 85) are replicated in Table 2 of the Boyle report and are used to compute the property-value diminution percentages.

- **Professor Eisfeldt states the "… Dr. Boyle was asked to produce data underlying calculations in the Simons and Saginor Meta-Analysis he directly relied on, but said he did not have it …"**

  *Response*

  E56.  It is not standard practice to request data from peer-reviewed studies that are cited or relied upon.

  E57.  This is not the practice in writing journal articles nor in the peer review process for author submissions to peer-reviewed journals as Professor Eisfeldt understands as a researcher and a journal editor.

  E58.  The peer-review process is the scientific metric for the reliability of the information provided in peer-reviewed journal articles.

  E59.  The Boyle report does not directly rely on the data underlying the Simons and Saginor meta-analysis, rather the outcomes of the peer-reviewed meta-analysis.

- **Professor Eisfeldt states the "… Boyle Report does not provide error rates for the estimated property value diminution percentages, …"**

  *Responses*

  E60.  This comment demonstrates Professor Eisfeldt's lack of knowledge of meta-analysis and benefit transfers.

  E61.  Google Scholar is a primary search engine to locate peer-reviewed publications regarding scientific research.

  a.  A search of the term "meta-analysis" yields "About 4,050,000 results."[20]

  b.  A search of the term "benefit transfer" yields "About 6,150,000 results."[21]

  c.  These search results speak to the broad acceptance of the methods.

  E62.  Both methods have established procedures for their reliable applications.

  a.  Nelson and Kennedy (2009) present peer-reviewed guidance for the reliable meta-analyses in "environmental and natural resource economics" (pp. 26-27).

  b.  Johnston (2021) et al. present peer-reviewed guidance for the reliable conduct of "environmental benefit transfers."

  E63.  The validity and reliability of meta-analysis and benefit transfer have been investigated and published in the peer-reviewed literature.

---

[20] Source: https://scholar.google.com/scholar?hl=en&as_sdt=0%2C47&q=meta-analysis&btnG=, accessed November 15, 2023.

[21] Source: https://scholar.google.com/scholar?hl=en&as_sdt=0%2C47&q=benefit+transfer&btnG=, accessed November 15, 2015.

    a.  Stanley (2001) summarizes research on the overall credibility of the use of meta-analysis in economic applications.

    b.  Rosenberger (2015) summarizes research on the validity and reliability of benefit transfers.

E64.  Kaul et al. (2013) and Rosenberger (2015) discuss error rates on benefit transfers.

    a.  Both Kaul et al. and Rosenberger find that function transfers, of which meta-analysis  is the most common type, are more accurate than value transfers.

E65.  Kaul et al. report an overall median transfer error of 33% and Rosenberger reports a function transfer error of 36%.

E66.  These summary statistics substantially overstate the error in applications because they are based on research investigating the bounds of benefit transfer, not specific applications to support decision making lie when the U.S. EPA, and the current application, use benefit transfer to support important decisions.

- **Professor Eisfeldt states the "… Boyle report ignores potential variation in the individual home prices not captured by the index used."**

*Responses*

E67.  This issue is addressed in detail in my responses to the *Expert Report* by Mrs. Pitts.

E68.  Property characteristics such as lot size, living area, year built, and location are accounted for by using the most recent sale prices of properties.

    a.  Properties with larger lots, larger living areas and that are newer sell for more in the market and this is reflected in their sale prices.

E69.  Updating sale prices to current dollars using the  Federal Reserve All-Transactions House Price Index reflects what one would consider typical or average year-over-year adjustments in market values.

    a.  Some residences may have a substantial enhancement or others may not be maintained, which could result in some values, respectively, increasing more or less than the market average.

    b.  An important consideration is that Mrs. Pitts recorded an average improvement job value of $13,516 over 1,065 property renovations and expenditures of this amount are very unlikely to affect property values.

    c.  Overall, this should not materially affect the aggregate damage estimate of $236,035,711 in my revised calculations.

**Professor Eisfeldt Other Comments**

**Professor Eisfeldt Paragraph 27 (p. 12)**

E70.   Professor Eisfeldt incorrectly states that the Boyle report presents "… the present-value of future property-value diminution …." No discounting is conducted in the Boyle report. Rather, current property-value diminutions are presented based on the current values of class properties.

**Professor Eisfeldt Paragraph 28 (p. 13)**

E71.   Professor Eisfeldt incorrectly states the Boyle report uses "… assumptions about the site to arrive at a property-value percentage diminution …" As carefully explained above in response to Professor Eisfeldt's Summary Opinion 16, the values assigned to all variables in the Simons and Saginor meta-equations are based on factual information.

**Professor Eisfeldt Paragraph 28 (p. 14)**

E72.   Professor Eisfeldt incorrectly states that "distance … the only property-level variation in the proposed percentage property-value diminution estimates." This statement overlooks that property-value diminutions also vary by current property values that account for differing property characteristics such as lot size, living area, year built, and location.

**Professor Eisfeldt Paragraphs 33 & 34 (pp. 17 & 18)**

E73.   Professor Eisfeldt alleges that properties must individually experience exposure to VOCs to be injured. I explained above in response to Professor Eisfeldt's Summary Opinion 15 that it is well grounded in the environmental economics and real estate literatures that properties are affected (injured) by their proximity to the source of the contamination.

E74.   All class properties are located over the groundwater contamination plume that is delineated in Dr. Laton's report and Dr. Kram delineates the major contaminate, TCE concentrations, within the plume. This plume has been identified as those properties specifically exceeding state screening levels designed to protect the public from the threats associated with the contamination.

E75.   The environmental economics and real estate literatures demonstrate that proximity to contamination and risks from the contamination diminish property values. The location of properties over the groundwater contamination plume, documented in the *Expert Reports* of Dr. Laton and Dr. Kram, represent proximity to the source of the contamination and potential risk.

E76.   Use of the Simon's and Saginor meta-analysis accounts for property injuries due to the diminution in value from proximity to the source of the contamination and from the

40

groundwater contamination (the Log of distance and Groundwater variables in Table 2 of the Boyle report).

**Professor Eisfeldt Paragraph 35 (p. 18)**

E77.    Professor Eisfeldt oversimplifies the injury to class properties to "… some indeterminate time in the future." Class properties have been injured based on three important sources of evidence.

E78.    First, Dr. Laton's report documents the extent of the groundwater contamination plume, which is the injury experienced by class properties.

E79.    Second, Dr. Krams report documents the concentrations of TCE in the groundwater contamination plume that further delineates the injury experienced by class properties.

E80.    Third, the peer-reviewed environmental economics and real estate literatures demonstrate one manifestation of the injury, reduced property values, which arises from proximity to the source of contamination and the contaminated groundwater. The reductions in property values have been documented by many peer-reviewed hedonic property value studies where some have been reviewed by Boyle and Kiel (2001) and are demonstrated by the many hedonic studies that the Simons and Saginor meta-analysis relies on.

**Professor Eisfeldt Paragraphs 36-38 (p. 19-20)**

E81.    Professor Eisfeldt questions when the diminution in property values will be realized.

E82.    There is an important distinction between when the injury has occurred and when the injury will be reflected in property values.

E83.    As explained in the reports by Dr's Laton and Kram, the injuries to class properties have occurred; the groundwater plume with TCE is established and documented.

E84.    The available evidence shows that the information on the groundwater contamination, to date, has yet to rise to the level that it is "common knowledge" Sellers are not consistently revealing the risk and there is not public information about the TCE plume that is readily available to buyers. This issue has been discussed previously and will be discussed further in the next set of responses.

E85.    At the time of class certification, class members will be notified of the class with information communicated about historical operations of the site, the source of the contamination and the extent of the TCE groundwater plume.

E86.    The communications would be published in the media that would make the class information available to property owners as well as to potential buyers that would not receive a property- specific notification.

E87.    Thus, if not beforehand, at the point of class certification, information on the source of contamination, extent of groundwater plume contaminated with TCE, and potential

41

risks would become common knowledge to sellers, real estate agents and buyers, and would be manifested in class property values.

**Professor Eisfeldt Paragraphs 39-40 (p. 20-22)**

E88.  Professor Eisfeldt questions how homeowners and buyers will react after the groundwater contamination plume becomes common knowledge.

E89.  Professor Eisfeldt cites studies where home values rebound after cleanup of contamination (p. 21) but does not reference when the contaminated groundwater plume in the current case will achieve a status of "No Further Action".

   a. Dr. Laton concludes "(t)he lack of off-Site remediation has exacerbated the potential long-term exposure to TCE, which will continue into the foreseeable future" (p. 39).

   b. Dr. Kram concludes the "… threat continues so long as the plume exists unabated" (p. 44) "… that contamination still exists and could remain for decades …" (p. 54).

   c. So "cleanup" and "no further action" are unlikely to occur soon with the injury to class properties persisting.

E90.  Professor Eisfeldt overlooks peer reviewed studies that show disclosure and common knowledge, particularly on the part of buyers, results in the manifestation of reduced property values because of environmental injuries.

   a. Pope (2008a) explained "(r)evealed preference methods like the hedonic model generally assume economic agents have access to publicly available information and use it effectively. In the housing market, the recent proliferation of seller disclosure laws suggests that policymakers perceive buyers to be less than "fully informed," presumably since they face higher information acquisition costs than sellers."

   b. Pope (2008a) found that required seller disclosure of airport noise reduce property values by 2.9%.

   c. Pope (2008b) found that seller flood zone disclosure reduces property values by 4%.

   d. Guignet (2012) finds leaking underground storage takes reduce property values by "… a 9-12% depreciation when households are well informed" (Abstract).

   e. Moreover, it is not sufficient to provide information, people must be able to understand the degree of risk (Chivers and Flores, 2002).

E91.  Professor Eisfeldt does not demonstrate that sellers are disclosing groundwater contamination below their properties nor that the information that is available is known and understood by sellers and buyers. Ms. Pitts' report also fails to provide such information.

42

**Professor Eisfeldt Paragraphs 41-57 (p. 22-37)**

E92. Professor Eisfeldt incorrectly alleges that the Boyle report "… Does Not Take into Account the Fact That Information About Contamination from the Site Has Been Available but that Dissemination Has Varied from Property to Property."

E93. I have addressed this assertion in my responses to Ms. Pitts' comments and will not repeat all those responses here but will raise just a few summary rebuttal points.

E94. Professor Eisfeldt and Ms. Pitts provide data on communications about groundwater contamination, but quantity does not reflect the content and quality of the content of information.

E95. As far I see from the communication, it does not:

    a. Identify the extent of the groundwater contamination plume.

    b. Identify the extent of TCE content in the groundwater contamination plume.

    c. Explain if the groundwater contamination plume is stabilized or continuing to migrate.

    d. The potential risks to homes located over groundwater contaminated with TCE.

    e. Identify what was communicated in major meetings and who was in attendance.

    f. Identify if information efforts were not directed to potential buyers.

E96. Professor Eisfeldt does not document whether sellers and buyers know of the GeoTracker website and, if accessed, whether a lay person would know how to navigate the site and understand the information presented through the site.

E97. The Boyle report through the Simons and Saginor meta-analysis does reflect the information available about the contamination.

    a. The distance variable reflects that people located closer to the source of contamination have received more direct information about the groundwater contamination, which is common for contaminated sites and is one of the reasons that observed property-value diminutions are lower for properties located closer to the source of the contamination.

E98. The Superfill, Groundwater, Litigation dummy and Announcement of a bad thing variables in the meta-equation all address the condition when knowledge of the TCE contaminated groundwater plume is commonly known to sellers and revealed to buyers in the market (see response to Eisfeldt's Summary Opinion 16).

    a. 8020 Deering Avenue has been identified as a "hazardous waste site."

    b. Groundwater contamination has been identified in the communications.

    c. The plaintiffs' attorneys have provided information about the pending litigation.

     d.  A bad thing has been communicated as "information was disclosed based on the announcement of contamination."

E99.  The analysis in the Boyle report is based on the information about groundwater contamination emanating from the 8020 Deering Avenue site as is known today, which indicates that class properties are injured.

E100.  Use of these variables, when applying the Simons and Saginor meta-equation, provide the property-value diminutions when this knowledge becomes common to sellers and buyers of class properties so that property values reflect the injury from the groundwater contamination.

**Professor Eisfeldt Paragraphs 58-66 (p. 38-44)**

E101.  Some of the content my immediately preceding responses address Professor Eisfeldt's comment here and will not be repeated.

E102.  Professor Eisfeldt incorrectly states "… the Boyle report provides no evidence to support its assertions regarding what buyers and sellers in the Proposed Class Area know or how they have processed any information they had."

E103.  The following points are made in response to this comment.

     a.  First and most importantly, the large literature on hedonic property values and the hedonic studies that the Simons and Saginor meta-analysis relies on, demonstrate over and over that people will pay less for properties when environmental contamination is present.

     b.  Second, in responses to Professor Eisfeldt's Paragraphs 39 and 40, peer-reviewed studies show that buyers pay less for properties when contamination is disclosed.

     c.  Further the Boyle analysis is not confounded by some people having more information and others having less, this is a feature that is inherent in all markets.

     d.  The key issue is that there is a common set of information available to all members of the class and potential buyers of their properties.

     e.  In responses to Eisfeldt's Paragraphs 41-57 I explain why the information available is incomplete.

     f.  Moreover, there is asymmetric information available between sellers and buyers of class properties, as the level of information about the groundwater contamination has yet to reach the level that sellers are disclosing that their properties are located over a groundwater contamination plume.

E104.  Professor Eisfeldt's claim that individual information is required and missing from the Boyle analysis is flawed.

    a. Individualized information is available and used in terms of the distance from properties to the source of the groundwater contamination and sale prices of each property.

    b. If there is other relevant information affecting property-value diminutions, this is captured in the constant term in the Simons and Saginor meta-equation, and these factors increase the property value diminution by 4.3%.

**Professor Eisfeldt Paragraphs 67-71 (p. 44-50)**

E105. Professor Eisfeldt returns to the flawed critique of the Boyle benefit transfer as value transfer when, in fact, it is a function transfer.

E106. I have addressed this flaw in Professor Eisfeldt's critique response to her Summary Opinion 15.

    a. A value transfer requires equivalence between the study and the site where the study result is being transferred.

    b. A function transfer uses the variables in the equation to customize the transferred information to conditions at the new site, which was done using factual information to assign codes to the variables in the Simons and Saginor meta-analysis.

    c. In this set of comments Professor Eisfeldt incorrectly attempts to reduce the meta-analysis function transfer to a value transfer.

    d. Professor Eisfeldt overlooks the extensive literature on benefit transfers and her critiques here demonstrate her lack of knowledge of this method.

**Professor Eisfeldt Paragraphs 72-77 (p. 52-57)**

E107. Professor Eisfeldt presents a flawed critique, stating "… Information about Contamination (or the risk of Contamination) from Other Sites" is not addressed.

E108. I have addressed and provided information to discount concerns about potential confounding of the Boyle analysis from other contamination sites in responses to Ms. Pitts and to Professor Eisfeldt's Summary Opinion 15.

E109. Ms. Pitts and Professor Eisfeldt simply list sites that might diminish property values and neither provides any evidence that the items they list affect the property-value diminutions in the Boyle report.

E110. I have provided evidence in response to Ms. Pitts and Professor Eisfeldt explaining why the items they list would not affect property-value diminutions in the Boyle report.

**Professor Eisfeldt Paragraphs 78-79 (p. 58-59)**

E111. Professor Eisfeldt presents a flawed critique that the "Boyle Report Has Not Shown That the Simons and Saginor Meta-Analysis Reliability Accounts for What May Be Important Characteristics of the Properties at Issue."

E112. I extensively explained why this critique is flawed in responses to Ms. Pitts' comments and responses to Professor Eisfeldt's Summary Opinion 16.

E113. Property characteristics such as lot size, living area, year built, and location are accounted for by using the most recent sale prices of properties.

E114. Properties with larger lots, larger living areas, which are newer and in more desirable locations sell for more in the market and this is reflected in their sale prices.

**Professor Eisfeldt Paragraphs 80 (p. 60)**

E115. Professor Eisfeldt's critique of the application of the Groundwater variable in the Boyle report is a continuation of her mischaracterizing the Boyle benefit transfer as a value transfer and not carefully reviewing the groundwater hedonic studies in the data supporting the Simons and Saginor meta-analysis, which are addressed in responding to Professor Eisfeldt's Summary Opinion 15.

**Professor Eisfeldt Paragraphs 81-82 (p. 60-61)**

E116. I address this comment in the responses to Ms. Pitts and provide more information here.

E117. It is important to fully understand the statistical significance of variables reported in the Simons and Saginor results.

 a. The hypotheses Simons and Saginor tested are that the estimated coefficients are equal to zero versus not equal to zero at the 10% level of confidence.

 b. A coefficient is significant if the calculated z-statistic is greater than the critical value for or the 10% level of confidence.

 c. The z-statistic reported by Simons and Saginor is 1.627, which is less than the critical value of 1.645, which is just barely insignificant.

 d. It would have been logical for Simons and Saginor to also test the hypothesis that the groundwater coefficient is less than zero versus not given that the hedonic literature shows that groundwater contamination reduces property values.

 e. The critical value for this hypothesis is 1.285, which is less than 1.627, indicating that the null hypothesis that groundwater increases property values cannot be rejected and has a statistically significant effect.

E118. Given a more appropriate statistical test, the coefficient on the groundwater variable is statistically significant and it is not appropriate to assign a value of "0" to this variable when using the Simons and Saginor meta-equation to compute the property value diminution.

E119. However, narrowly basing a scientific conclusion on whether the significance of a variable passes a specific threshold is a practice that is soundly rejected by professional statisticians.

a. In 2016, the American Statistical Association issued a statement condemning sole reliance on statistical significance when interpreting and using scientific outcomes.[22]

b. Wasserstein and Lazar (2014) state that "(p)ractices that reduce data analysis or scientific inference to mechanical "bright-line" rules (such as "$p < 0.05$") for justifying scientific claims or conclusions can lead to erroneous beliefs and poor decision making. A conclusion does not immediately become "true" on one side of the divide and "false" on the other. Researchers should bring many contextual factors into play to derive scientific inferences, including the design of a study, the quality of the measurements, the external evidence for the phenomenon under study, and the validity of assumptions that underlie the data analysis. … The widespread use of "statistical significance" (generally interpreted as "p 0.05") as a license for making a claim of a scientific finding (or implied truth) leads to considerable distortion of the scientific process." (p. 131).

**Professor Eisfeldt Paragraphs 83-84 (pp. 61-62)**

E120. Professor Eisfeldt presents a flawed critique of the coding of the Log of distance variable in the Boyle report , which indicates that Professor Eisfeldt does not understand how distance affects property value diminutions.

E121. Following Professor Eisfeldt's calculation in her Figure 7 (2nd column), results in the illogical conclusion that property-value diminutions increase with distance from the source of the contamination.

E122. In fact, the Simons and Saginor meta-equations shows that property-value diminutions decrease with distance from the source of the contamination, and this is supported by many hedonic property value studies in the peer reviewed economics and real esate literatures.

**Professor Eisfeldt Paragraph 87 (p. 63)**

E123. The issue of variable significance has been addressed in responses to Ms. Pitts' comments and in response to Professor Eisfeldt's Paragraphs 81 and 82.

**Professor Eisfeldt Paragraph 88 (p. 64)**

E124. Professor Eisfeldt argues that the Boyle report should have relied on appraiser values is a flawed argument.

E125. An appraisal is an estimate of value from one person.

E126. I used sale prices that are true market values, not estimates, based on arms-length transactions between willing buyers and sellers.

---

[22] Source: https://www.amstat.org/asa/files/pdfs/p-valuestatement.pdf, accessed November 19, 2023.

E127.   Updating prices with an index is a well-established, common practice used by economists. For example, there are on-line tools to help people convert part values to current values, such as the US Inflation Calculator[23] or the U.S. Bureau of Labor Statistics' Consumer Price Index.[24]

E128.   The U.S. Bureau of Labor Statistics states that "(t)he CPI is also used as a deflator of the value of the consumer's dollar to find its purchasing power. The purchasing power of the consumer's dollar measures the change in the value to the consumer of goods and services that a dollar will buy on different dates. In other words, as prices increase, the purchasing power of the consumer's dollar declines."[25]

E129.   The Federal Reserve price index is based on sale prices of properties, not estimates, in the area where the class properties are located.

**Professor Eisfeldt Paragraph 89 (p. 64)**

E129.   I address variation in property value appreciation across properties in response to Ms. Pitts' comments.

E130.   Professor Eisfeldt overlooks that heterogeneity arises with any price index but that indices are commonly used in economic analyses.

E131.   Professor Eisfeldt provides no evidence that the use of the Federal Reserve price index created an error in computing current property values.

**Professor Eisfeldt Paragraphs 90-91 (pp. 65-66)**

E132.   The content of these Paragraphs have been addressed in my above responses.

November 20, 2023

---

[23] Source: https://www.usinflationcalculator.com/, accessed November 20, 2023.
[24] Source: https://www.bls.gov/data/inflation_calculator.htm, accessed November 20, 2023.
[25] Source: https://www.bls.gov/cpi/questions-and-answers.htm#:~:text=The%20CPI%20and%20its%20components,National%20Income%20and%20Product%20Accounts., accessed November 20, 2023.

**References**

Bergstrom, J.C., and De Civita, P. 1999. Status of benefits transfer in the United States and Canada: a review. Canadian Journal of Agricultural Economics, 47 (1): 79-87.

Bishop, K.C., N.V. Kuminoff, H.S. Banzhaf, K.J. Boyle, K. von Gravenitz, J.C. Pope, V.K. Smith, and C.D. Timmins. 2020. Best Practices in Using Hedonic Property-value models to Measure Willingness to Pay for Environmental Quality. Review of Environmental Economics and Policy, 14 (2), 260–281.

Boyle, K.J. September 2023. Expert Report.  Behar v. Northrop Grumman Corp., et al. Case No. 2:21-cv-02946.

Boyle, K.J. November 2023. Expert Report – Revised.  Behar v. Northrop Grumman Corp., et al. Case No. 2:21-cv-02946.

Boyle, M. and Kiel, K. 2001. A survey of house price hedonic studies of the impact of environmental externalities. Journal of Real Estate Literature, Vol. 9 (2): 117-144.

Chivers, J., and Flores, N.E. 2002. Market failure in information: the national flood insurance program. Land Economics, 78 (4): 515-521.

Demers, A., and Eisfeldt, A.L. 2022. Total returns to single-family rentals. Real Estate Economics, 50 (1): 7-32.

Eisfeldt, A.L. 2023. Expert Report. Jed Behar, et al. vs. Northrop Grumman Corp., et al. Case No. 2:21-cvo3946-HDV-SK.

Guignet, D. 2012 What do Property values really Tell Us? A Hedonic Study of Underground Storage tanks. Working Paper #12-01, National Center for Environmental Economics. U.S. Environmental Protection Agency.

Guignet, D., Jenkins, R.R., Belke, J. and Mason, H. 2023. The property value impacts of industrial chemical accidents. Journal of Environmental Economics and Management, 120, p. 102839.

Johnston, R.J., Boyle, K.J., Loureiro, M.L., Navrud, S. and Rolfe, J. 2021. Guidance to enhance the validity and credibility of environmental benefit transfers. Environmental and Resource Economics, 79 (3): 575-624.

Kaul, S., Boyle, K.J., Kuminoff, N.V., Parmeter, C.F. and Pope, J.C.  2013. What can we learn from benefit transfer errors? Evidence from 20 years of research on convergent validity. Journal of Environmental Economics and Management, 66 (1): 90-104.

Laton, W. Richard. 2023. Expert Report. Jedidiah and Alisa Behar, et al. vs. Northrop Grumman Corporation, et al. Case No. 21-3946 HDV (SKx).

Nelson, J.P., and Kennedy, P.E. 2009. The use (and abuse) of meta-analysis in environmental and natural resource economics: an assessment. Environmental and Resource Economics, 42: 345-377.

Pitts, J.N. 2023. Expert Report. Jed Behar, et al. vs. Northrop Grumman Corp., et al. Case No. 2:21-cvo3946-HDV-SK.

Pope, J.C. 2008a. Buyer information and the hedonic: the impact of a seller disclosure on the implicit price for airport noise. Journal of Urban Economics, 63 (2): 498-516.

Pope, J.C. 2008b. Do seller disclosures affect property values? Buyer information and the hedonic model. Land Economics, 84 (4): 551-572.

Rosenberger, R.S. 2015. Benefit transfer validity and reliability. In Benefit Transfer of Environmental and Resource Values: A Guide for Researchers and Practitioners, pp.307-326.

Simons, R. and Saginor, J. 2006. A meta-analysis of the effect of environmental contamination and positive amenities on residential real estate values. Journal of Real Estate Research, Vol. 28 (1): 71-104.

Stanley, T.D. 2001. Wheat from chaff: Meta-analysis as quantitative literature review. Journal of Economic Perspectives, 15 (3): 131-150.

Taylor, L.O. 2017. Hedonics. In, A Primer on Nonmarket Valuation, P.A. Champ, K.J. Boyle and T.C. Brown (eds.), pp.235-292.

Wasserstein, R.L., and Lazar, N.A. 2016. The ASA statement on p-values: context, process, and purpose. The American Statistician, 70 (2): 129-133.

Zakzanis, K.K. 1998. The reliability of meta-analytic review. Psychological Reports, 83 (1): 215-222.

**Appendix B**
**Properties Removed in the Revision**
**(Street Addresses and Units)**

- 6800 CORBIN AVE, RESEDA, CA 91335 - 30 Units

- 6840 HATILLO AVE, LOS ANGELES, CA 91306 - 5 Units

- 6846 HATILLO AVE, LOS ANGELES, CA 91306 - 6 Units

- 6852 HATILLO AVE, LOS ANGELES, CA 91306 - 2 Units

- 6858 HATILLO AVE, LOS ANGELES, CA 91306 - 6 Units

- 6864 HATILLO AVE, LOS ANGELES, CA 91306 - 6 Units

- 7211 COZYCROFT AVE, LOS ANGELES, CA 91306 - 72 Units

- 7219 LOMA VERDE AVE, LOS ANGELES CA 91303 - 14 Units

- 7230 KELVIN AVE, LOS ANGELES CA 91306 - 24 Units

- 7320 INDEPENDENCE AVE, LOS ANGELES, CA 91303 - 12 Units

- 7348 DE SOTO AVE, CANOGA PARK, CA 91303 - 8 Units

- 19932 SHERMAN WAY, LOS ANGELES CA, 91306 - 5 Units

- 19938 SHERMAN WAY, LOS ANGELES CA, 91306 - 5 Units

- 19944 SHERMAN WAY, LOS ANGELES CA, 91306 - 5 Units

- 19950 SHERMAN WAY, LOS ANGELES CA, 91306 - 5 Units

- 19956 SHERMAN WAY, LOS ANGELES CA, 91306 - 5 Units

- 19960 SHERMAN WAY, LOS ANGELES CA, 91306 - 5 Units

- 20000 SHERMAN WAY, LOS ANGELES CA, 91306 - 5 Units

- 20008 SHERMAN WAY, LOS ANGELES CA, 91306 - 5 Units

- 20134 LEADWELL ST, LOS ANGELES, CA 91306 - 195 Units

- 20224 SHERMAN WAY, LOS ANGELES CA, 91306-3225 - 73 Units