PATRICK W. DENNIS, SBN 106796
  pdennis@gibsondunn.com
CHRISTOPHER CHORBA, SBN 216692
  cchorba@gibsondunn.com
ABBEY HUDSON, SBN 266885
  ahudson@gibsondunn.com
DEENA KLABER, SBN 285237
  dklaber@gibsondunn.com
JOSEPH EDMONDS, SBN 297984
  jedmonds@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

JOHN CERMAK, SBN 146799
  jcermak@cermaklegal.com
HANNAH BLOINK, SBN 307442
  hbloink@cermaklegal.com
CERMAK & INGLIN, LLP
12121 Wilshire Blvd, Ste 322
Los Angeles, CA 90025-1166
Telephone:  424.465.1531
Facsimile:   424.371.5032

Attorneys for Defendants NORTHROP GRUMMAN
CORPORATION and NORTHROP GRUMMAN
SYSTEMS CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JED and ALISA BEHAR,<br><br>                Plaintiffs,<br><br>        v.<br><br>NORTHROP GRUMMAN CORPORATION and NORTHROP GRUMMAN SYSTEMS CORPORATION,<br><br>                Defendants. | CASE NO. 2:21-cv-03946-HDV-SK<br><br>**DECLARATION OF DEENA B. KLABER IN SUPPORT OF DEFENDANTS NORTHROP GRUMMAN CORPORATION'S AND NORTHROP GRUMMAN SYSTEMS CORPORATION'S MOTION TO EXCLUDE OPINIONS OF DR. KEVIN BOYLE** |

Gibson, Dunn &
Crutcher LLP

## DECLARATION OF DEENA B. KLABER

I, Deena B. Klaber, declare as follows:

1. I am an attorney admitted to practice law before all courts of the State of California. I am Of Counsel at the law firm Gibson, Dunn & Crutcher LLP, and I am one of the attorneys representing Defendants Northrop Grumman Corporation and Northrop Grumman Systems Corporation (together, "Northrop Grumman") in the above-referenced action. I submit this declaration in support of Northrop Grumman's Motion to Exclude Opinions of Dr. Kevin Boyle. Unless otherwise stated, the following facts are within my personal knowledge and, if called and sworn as a witness, I could and would testify competently to these facts.

2. Attached hereto as **Exhibit A** are true and correct excerpts of the transcript and certain exhibits from the December 5, 2023 deposition of Dr. Kevin Boyle taken in this matter.

3. Attached hereto as **Exhibits B1 and B2**, respectively, are true and correct copies of the Motion to Exclude Expert Testimony of Robert A Simons dated January 11, 2013, and the February 7, 2013 Order of the Court granting that motion, in the case *John Michael Albicht et al. v. Republic Services of Ohio II, LLC*, Case No. 2008 CT 10 0741, Court of Common Pleas, Tuscarawas County, Ohio.

4. Attached hereto as **Exhibit C** is a true and correct copy of the article by Kathy K. Condo and Louis L. Wilde, titled "Expert Opinion Based on Meta-Analysis Rejected as Basis for Determining Property Value Diminution Due to Alleged Contamination, originally published in the Expert Evidence Report, 15 EXER 519, December 7, 2015, and reproduced by Bloomberg BNA.

5. Attached hereto as **Exhibit D** is a true and correct of copy the March 8, 1999 Notice of Submission of Affidavit re Mailing of Class Notice filed in *Lawrence O'Connor, et al. v. Boeing North American, Inc. et al.*, Case No. 97-1554 ABC (RCx), United States District Court for the Central District of California.

6. Attached hereto as **Exhibit E** is a true and correct copy of the October 27, 2000 Notice of Submission of Affidavit re Mailing of Notice of Class Decertification, filed in *Lawrence O'Connor, et al. v. Boeing North American, Inc. et al.*, Case No. 97-1554 ABC (RCx), United States District Court for the Central District of California.

Gibson, Dunn &
Crutcher LLP

1

7.     Attached hereto as **Exhibit F** is a true and correct copy of the article co-authored by Dr. Kevin Boyle, titled "Best Practices for Using Hedonic Property Value Models to Measure Willingness to Pay for Environmental Quality," published in the *Review of Environmental Economics and Policy*, volume 14, issue 2, Summer 2020.

8.     Attached hereto as **Exhibit G** is a true and correct copy of the article co-authored by Dr. Kevin Boyle, titled "Spatial Heterogeneity in Hedonic Price Effects for Lake Water Quality," published in *Land Economics*, volume 100, issue 1, February 2024.

9.     Attached hereto as **Exhibit H** is a true and correct copy of the September 27, 2023 expert report of Dr. Kevin Boyle prepared in this matter.  Plaintiffs attempted to file this document as Exhibit 21 to their Motion to Certify Class (Dkt. 116), but the filed version of Exhibit 21, Dr. Boyle's expert report (Dkt. 119-1), appears to be inoperable and therefore inaccessible from the case docket. Northrop Grumman is therefore providing a copy of Dr. Boyle's expert report here for ease of reference.

10.     Attached hereto as **Exhibit I** are true and correct excerpts of the transcript of the January 23, 2024 deposition of Miles Grose taken in this matter.

11.     Attached hereto as **Exhibit J** are true and correct excerpts of the transcript of the January 23, 2024 deposition of Lisa Ford Grose taken in this matter.

12.     Attached hereto as **Exhibit K** are true and correct excerpts of the transcript of the July 25, 2022 deposition of Jedidiah Nathan Behar taken in this matter.

13.     Attached hereto as **Exhibit L** are true and correct excerpts of the transcript of the July 25, 2022 deposition of Alisa Lorraine Behar taken in this matter.

/

/

/

/

/

/

/

Gibson, Dunn &
Crutcher LLP

2

14.     Attached hereto as **Exhibit M** are true and correct excerpts of the transcript of the November 9, 2023 deposition of Professor Andrea Eisfeldt, Ph.D taken in this matter.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that I executed this Declaration at San Francisco, California on this 23rd day of February, 2024.

_____

Deena B. Klaber

Gibson, Dunn & Crutcher LLP

3

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

JED BEHAR, et al.,                )Case No.

                                  )2:21-cv-03946

    Plaintiffs,                   )HDV-SK

                                  )

vs.                               )

                                  )

NORTHROP GRUMMAN SYSTEMS  )

CORPORATION, et al.,              )

                                  )

    Defendants.                   )

_____)

Videotaped Deposition of

KEVIN J. BOYLE, Ph.D.

December 5, 2023

9:09 a.m.

Reported by:  Bonnie L. Russo

Job No. 6312160

Page 1

just looking generally would get to that                    12:14:57

information, and then when I looked at it in                12:15:00

more detail, in response, it only affirmed my              12:15:03

conclusion.                                                 12:15:07

    Q.    My question was a bit different and               12:15:08

a lot more simple so I will ask it again.  It              12:15:11

is just a yes or no.                                        12:15:14

            In preparing your September 27, 2023           12:15:15

report, which is Exhibit 41 here, you had not              12:15:19

looked at the information that was sent out by             12:15:22

Northrop Grumman and the state with respect to             12:15:26

the groundwater contamination in Canoga Park;              12:15:28

is that correct?                                            12:15:28

    A.    I was aware of it but I had not                   12:15:32

reviewed it.                                                12:15:35

    Q.    Have you reviewed the GeoTracker                  12:15:36

website related to the 8020 Deering site?                  12:15:46

    A.    I have looked at it.                              12:15:51

    Q.    What did you review on the                        12:15:52

GeoTracker website?                                         12:15:55

    A.    I basically went down through the                 12:15:58

different entries and looked at what was                    12:16:01

Page 148

available for the entries.   12:16:03

Q.   Did you do that prior to submitting   12:16:05
your September 27, 2023 expert report, or did   12:16:10
you do that after?   12:16:14

A.   As I said before, I was aware, but I   12:16:16
did it after and it didn't change my opinion.   12:16:18

Q.   Can a publicly-available website   12:16:22
with reports about the groundwater   12:16:29
contamination in the Canoga Park area provide   12:16:32
widespread community knowledge of   12:16:35
contamination?   12:16:37

A.   Just because something is accessible   12:16:37
to the public doesn't mean that it is   12:16:42
necessarily sufficient to provide the knowledge   12:16:44
that is needed to affect the market.   12:16:48

Q.   Can you explain why a   12:16:51
publicly-available website with reports about   12:16:54
the contamination in the Canoga Park area is   12:16:56
not sufficient to provide community widespread   12:17:01
or common community knowledge?   12:17:06

A.   Because what the literature has   12:17:08
shown is that you need to have that specific   12:17:11

Page 149

For homes that had VI testing            12:22:31

performed in the 2017-2018 time frame, do you    12:22:35

know how many of those homes have subsequently   12:22:39

sold?                                            12:22:42

A.    Can you ask the question again.          12:22:43

Q.    Of the homes that had VI testing,        12:22:49

vapor intrusion testing in the 2017-2018 time    12:22:55

frame, do you know how many of those homes sold  12:23:01

subsequent to the vapor intrusion testing?       12:23:06

A.    I don't, but one thing that is          12:23:10

important to understand is, the damages in the   12:23:12

model I use and in the literature is dependent   12:23:15

on proximity to the source of contamination.     12:23:19

The environmental economics and real       12:23:22

estate literature demonstrates over and over     12:23:25

again that the key thing is proximity, so what   12:23:27

goes on in terms of the specific tests in homes  12:23:30

is not fundamental to the opinion that I         12:23:38

offered.                                         12:23:41

Q.    Of any homes in the class area that     12:23:42

had vapor intrusion testing in the 2017-2018     12:23:50

time frame and subsequently sold, did you make   12:23:55

Page 155

BY MS. KLABER:                                    12:49:59

Q.    Do you know if any putative class          12:49:59

members have actual knowledge of the alleged     12:50:03

contamination in the groundwater plume?          12:50:06

MR. NIDEL:  Objection to form.                    12:50:09

THE WITNESS:  Can you clarify that                12:50:13

for me, please.                                   12:50:15

BY MS. KLABER:                                    12:50:16

Q.    And what -- can you explain what was        12:50:19

not clear so I can do that?                       12:50:20

MR. NIDEL:  Objection to form.                    12:50:22

THE WITNESS:  I guess from a legal                12:50:24

perspective, I don't know exactly who you mean    12:50:26

by putative class members.                        12:50:28

BY MS. KLABER:                                    12:50:30

Q.    A putative class member is a                12:50:30

potential class member, so somebody who lives     12:50:34

within the class area, so I can ask my question   12:50:37

again.                                            12:50:40

Do you know if anyone who lives                    12:50:40

within the proposed class area has actual          12:50:42

knowledge of the existence of the groundwater      12:50:44

Page 183

plume beneath their home?                    12:50:48

MR. NIDEL:  Objection to form.       12:50:50

THE WITNESS:  I would assume that    12:50:53

some do have knowledge.                      12:50:55

MS. KLABER:  Okay.  I think now       12:50:59

would be a great time for the lunch break.  I'm    12:51:00

sorry, I think that might have gone a few more      12:51:03

minutes than I represented.                  12:51:05

THE WITNESS:  That's all right.      12:51:07

MS. KLABER:  So we can go off the     12:51:08

record.                                      12:51:10

THE VIDEOGRAPHER:  This marks the    12:51:10

end of Media Unit No. 5.  Going off the record.    12:51:13

The time is 12:51 p.m.                       12:51:16

(A short recess was taken.)           12:51:19

THE VIDEOGRAPHER:  This marks the    13:49:31

beginning of Media Unit No. 6.  Going back on      13:50:28

record.  The time is 1:50 p.m.               13:50:29

BY MS. KLABER:                         13:50:31

Q.   Dr. Boyle, we are back from lunch.        13:50:31

Did you have any discussions with counsel about    13:50:35

the substance of your testimony during the         13:50:37

Page 184

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

plume beneath their home to a buyer who                    13:51:47

purchased before today, is it your opinion that           13:51:50

that seller would have suffered damages?                  13:51:53

                MR. NIDEL:  Objection to form.             13:51:59

                THE WITNESS:  So it is likely that         13:52:02

they may have been able to get more from the              13:52:07

buyer if they had not disclosed.                          13:52:10

                BY MS. KLABER:                             13:52:17

    Q.    And in that case, would it be your              13:52:17

opinion that the seller has already suffered a            13:52:19

property value diminution loss?                           13:52:22

                MR. NIDEL:  Objection to form.             13:52:24

                THE WITNESS:  So if the seller did         13:52:28

it, then the seller would have experienced the            13:52:30

loss.                                                     13:52:33

                BY MS. KLABER:                             13:52:33

    Q.    We just discussed your opinion that             13:52:37

the value diminution in the class area has not            13:52:39

been realized today.                                      13:52:43

                Do you have an opinion as to when         13:52:44

the value diminution will be realized?                    13:52:45

    A.    So what I would expect is, at the               13:52:50

Page 186

point of class certification, when everyone in 13:52:55

the class is notified, that it would take 13:52:58

effect and not be able to see it in the sales, 13:53:03

it would probably take a year to two to kind of 13:53:06

go through the market. 13:53:11

You wouldn't expect it to go down 13:53:12

immediately, kind of expect it to asymptote 13:53:14

down, and you need enough sales to occur to be 13:53:18

able to identify it. 13:53:20

Q.    So is it correct to say that you 13:53:23

cannot identify a particular date at this time 13:53:25

when the property value diminution will be 13:53:30

realized by class members? 13:53:33

MR. NIDEL:  Objection to form. 13:53:35

Misstates the witness's testimony. 13:53:36

THE WITNESS:  I have no information 13:53:38

that would allow me to specify a specific date 13:53:40

at this time. 13:53:43

I gave you conditions that would be 13:53:44

probable for it, but I cannot give you a 13:53:47

specific date. 13:53:49

BY MS. KLABER: 13:53:50

Page 187

damages?                                                          14:03:34

MR. NIDEL:  Objection to form and                14:03:35

foundation.                                                      14:03:36

THE WITNESS:  So I believe that                  14:03:37

there are only two if my memory serves me                        14:03:38

right, and we don't know.  I mean, all of her                    14:03:42

information is with the sellers and -- or the                    14:03:47

seller's agent.  The agent isn't going to -- if                  14:03:52

they don't have to, isn't going to reveal --                     14:03:56

there is no information really from the buyers                    14:03:59

to know how they reacted, so we can't tell from                  14:04:01

the information that is available whether the                    14:04:04

-- ultimately, the buyers paid less.                             14:04:09

BY MS. KLABER:                                   14:04:11

Q.   So a seller could disclose the                          14:04:11

contamination from the groundwater plume and a                   14:04:14

buyer may still -- may choose to not pay less;                   14:04:16

is that correct?                                                 14:04:21

A.   That isn't what I said.  I said                          14:04:21

there is no evidence in what Ms. Pitts provided                  14:04:23

that tells us how the buyer did react.                           14:04:29

Q.   Well, you know the price that the                       14:04:33

Page 197

buyer paid?  14:04:38

A.   We don't know what the price is that  14:04:39
the buyer would have paid in the absence of  14:04:41
contamination.  14:04:43

Q.   Is it not your opinion that every  14:04:44
buyer would pay less in the face of knowledge  14:04:49
of contamination?  14:04:52

MR. NIDEL:  Objection to form.  14:04:53

THE WITNESS:  So when you -- when  14:04:54
you look at it, you don't know what every  14:04:58
individual buyer will do, but if you look at  14:05:04
the evidence, the evidence shows that by and  14:05:07
large, the buyers are paying less because we  14:05:11
would not find a statistically significant  14:05:13
price diminution if the buyers were not acting  14:05:16
in a common way and paying less for properties.  14:05:18

BY MS. KLABER:  14:05:22

Q.   So your opinion here is that every  14:05:22
homeowner has realized at least a 9.4 percent  14:05:30
diminution in their property value by virtue of  14:05:35
being over -- proximate to the groundwater  14:05:38
plume; is that correct?  14:05:42

Page 198

BY MS. KLABER:                                    14:09:17

Q.    So have those properties that you          14:09:17

have been asked to consider for the class,       14:09:20

already experienced an injury or have they not   14:09:22

yet experienced an injury?                       14:09:25

A.    My -- my understanding is that the         14:09:27

conditions for them experiencing an injury are  14:09:32

in place, so that they have experienced injury.  14:09:35

The consequence of the injury in terms of price  14:09:37

diminution has not been manifested yet.          14:09:40

Q.    Does the level of contamination           14:09:46

present in the plume beneath a given property    14:09:49

affect the injury that a property owner would    14:09:53

suffer?                                          14:09:58

MR. NIDEL:  Objection to form.                   14:09:58

THE WITNESS:  I was thinking on the              14:10:02

first part, and so can you just reread it        14:10:04

again, please.                                   14:10:07

BY MS. KLABER:                                    14:10:07

Q.    Does the injury that a property           14:10:07

owner in the class area suffer depend upon the   14:10:09

level of contaminants that are present in the    14:10:13

Page 202

know, kind of -- as the crow flies distance or    14:12:39

buffers.  The specific contaminants or their    14:12:42

concentrations have not been shown to be the    14:12:47

key factor.  It's proximity, so it is not that    14:12:50

it doesn't take account for it.  It takes    14:12:53

account for what people react to it and how    14:12:55

they make their decisions.    14:12:59

    BY MS. KLABER:    14:13:00

    Q.    So you believe, whether or not a    14:13:00

property actually has vapor intrusion, such    14:13:01

that the indoor air is contaminated, will not    14:13:05

affect how much a buyer will pay for that    14:13:09

property; is that right?    14:13:12

    A.    So what my model shows is that the    14:13:13

-- excuse me, it's the proximity to it that    14:13:22

matters, and I think that that's consistent    14:13:26

across the literature.    14:13:30

    Q.    So under your model, if two    14:13:32

properties are both one-half mile from the    14:13:34

source of contamination and one experiences    14:13:38

vapor intrusion and has contamination in indoor    14:13:43

air, and the other experiences no vapor    14:13:48

Page 205

intrusion and has no contamination of indoor    14:13:51

air, both properties will be treated the same    14:13:54

by your model; is that correct?    14:13:55

     A.    Both models -- both would be treated    14:13:57

the same under my model.    14:14:00

     Q.    Your model does not consider the    14:14:06

depth of the plume beneath the property in    14:14:13

calculating property value diminution, correct?    14:14:17

     A.    I think I have answered that one    14:14:20

over and over again.  It depends on distance to    14:14:22

the source of the contamination.    14:14:26

     Q.    So it does not consider the depth of    14:14:29

the plume, correct?    14:14:31

     A.    It does not.    14:14:32

     Q.    If there was a clean water layer    14:14:32

between the contaminated groundwater and any    14:14:37

property in the class, would that impact your    14:14:40

view as to whether the properties have suffered    14:14:44

any injury?    14:14:47

     A.    It would not.  It would still be    14:14:48

there, you know, and the case that we worked    14:14:52

on, the Hovensa one, there were -- they called    14:14:57

Page 206

them donuts in that case.  I think the

hydrogeologists, those ones, and there was

still the damage that was accepted all the way

throughout the affected area.

Q.    Can you please define the term

"market value" for me?

A.    Market value of what?

Q.    Market value -- is market value not

a term that can be defined broadly?

MR. NIDEL:  Objection to form.

THE WITNESS:  There are -- there are

different market values.

BY MS. KLABER:

Q.    Okay.  How would you define --

define market value in the context of

residential real estate?

MR. NIDEL:  Objection to form.

THE WITNESS:  So there is still

multiple market values, so I'm going to give

you the one for buying and selling houses and,

you know, the best market value is the price

that a buyer and a seller agreed on, when they

Page 207

both are informed of the property that they are                14:16:05

transacting.                                                   14:16:11

            BY MS. KLABER:                                     14:16:12

    Q.    So in your research, generally, you                  14:16:12

equate the term "market value" with sale price                 14:16:17

when we are talking about residential real                     14:16:20

estate; is that correct?                                       14:16:22

    A.    I do.                                                14:16:23

    Q.    How did you determine the market                     14:16:23

value of the properties within the proposed                    14:16:26

class area for purposes of your report?                        14:16:28

            MR. NIDEL:  Objection to form.                     14:16:31

            THE WITNESS:  I didn't determine                   14:16:33

them.  I used the Los Angeles County data and                  14:16:34

also Zillow data on the most recent sale to get                14:16:41

the best data on market value so it wasn't                     14:16:46

something I determined.  I obtained factual                    14:16:51

information on the market values of properties.                14:16:55

            BY MS. KLABER:                                     14:16:58

    Q.    Did you speak to any market                          14:16:58

participants as part of your effort to                         14:17:02

determine the market value of the properties                   14:17:05

Page  208

record.  The time is 2:31 p.m.                          14:31:07

BY MS. KLABER:                                          14:31:10

Q.   Does a home sale price represent                  14:31:10

market value if it is not the result of an             14:31:12

arm's length transaction?                              14:31:16

MR. NIDEL:  Objection to form.                          14:31:22

THE WITNESS:  It depends on kind of                     14:31:24

what -- what the other type was, but arm's             14:31:29

length ensures that there is market value.             14:31:32

There is others that may be in there.  There is        14:31:35

others that would not be.                              14:31:39

BY MS. KLABER:                                          14:31:44

Q.   So when you defined market value as               14:31:44

sales price, is there a qualification there            14:31:49

that it is the sales price from an arm's length        14:31:51

transaction or is there no qualification?              14:31:54

A.   So we took the -- the sale price                  14:31:57

that was recorded in Zillow as representative          14:32:06

of an -- excuse me, a market value, and then we        14:32:12

looked at the distribution of sale prices to           14:32:21

see if there was any indication that they were         14:32:25

not arm's length and we did not see any                14:32:30

Page 216

evidence.    14:32:38

That's typically what is done in    14:32:39

these types of economic analyses, that you look    14:32:43

at the distributions and see whether they are    14:32:46

within the range of expected values.  You know,    14:32:52

if you looked at the literature and hedonic    14:32:57

property value models, it would show different    14:33:01

checks like that that people have done.    14:33:04

Q.    So what did you do to identify or    14:33:07

filter out any sales with, you know, unusual    14:33:11

sale conditions, such as a special or unusual    14:33:13

financing or estate sales or foreclosure sales    14:33:16

from the Zillow data?    14:33:19

A.    So we did not have any information    14:33:21

that would exclude them, but we didn't see    14:33:23

anything that would be -- excuse me, wayward to    14:33:28

suggest that.  An estate sale could very well    14:33:35

be an arm's length transaction and we took them    14:33:39

as the best evidence available.    14:33:46

When you are doing a study, there    14:33:48

are things that you do, that you take some    14:33:52

sales out that you are using, get your    14:33:56

Page 217

analysis, but this is a different situation where we would be saying it as the -- that we are taking somebody out of a class and we didn't feel like we should be doing that, so we took what we had as the best available information to represent each class member.

Q.   So in your research and academic work, it sounds like you don't typically just accept all Zillow sales data as representing the market value, whereas here, you did accept all sales data as representing market value; is that correct?

MR. NIDEL:  Objection to form.

THE WITNESS:  So I didn't say that we take it as not representing the market data. We may have questions about it.  Sometimes, you know, we could be doing things, like, in your hedonic model, you know, at a minimum, you want square footage of a home and square footage might not be available, so there is a variety of different filters that you would put on.

You could be wrong, you could be

Page 218

about $450,000 and a million.                                    14:37:51

And so that's, you know, quite                                   14:37:55

reasonable for where the values would fall and                   14:37:56

by any standards of data analysis that I have                    14:38:00

done, that's really pretty darn good.                            14:38:02

Q.    You calculated the current market                          14:38:04

value of a property at 7101 Lubao Avenue as                      14:38:10

$3.74 million.                                                   14:38:15

Do you recall that?                                              14:38:17

MR. NIDEL:  Objection to form.                                   14:38:18

THE WITNESS:  I remember that there                              14:38:20

were some that were high, there were about 3                     14:38:21

percent that were above a million dollars.                       14:38:24

BY MS. KLABER:                                                   14:38:27

Q.    Are you aware of any homes in the                          14:38:27

proposed class area that have sold for -- over                   14:38:29

a price of over $3 million in the past year or                   14:38:31

two?                                                             14:38:34

A.    I am not, but we left those ones in,                       14:38:35

because we were -- we understood that it is                      14:38:38

important to be using a common model when you                    14:38:42

are doing it and not have the investigator do a                  14:38:44

Page 221

-- individual adjustments because they didn't    14:38:50

like a value.    14:38:52

It's not a -- it's not a problem    14:38:53

with the model that we applied.  That occurs    14:38:55

based on what the sale value was of the    14:39:00

property at the most recent sale, and so it    14:39:04

could be driven by a buyer paying more for a    14:39:08

property than they should have, or it could be    14:39:12

driven by a data recording error in the    14:39:14

information we received on the sales.    14:39:17

Q.    Did you attempt to identify data    14:39:18

recording errors and remove them from your    14:39:22

database?    14:39:24

MR. NIDEL:  Objection to form.    14:39:24

THE WITNESS:  There was no way to    14:39:26

identify data recording, but as I said, you    14:39:27

know, previously, in any empirical work that    14:39:31

you're doing, there are some errors.  You know,    14:39:34

only having 3 percent kind of be an outlier to    14:39:37

the top is really pretty darn good by any    14:39:40

empirical standard.    14:39:44

BY MS. KLABER:    14:39:45

Page 222

Q.   Why did you not create your own model?   14:49:56   14:49:58

A.   Because I thought the Simons and Saginor model was a peer-reviewed model that was suitable to develop damage estimates that fit this case.   14:49:58   14:50:01   14:50:04   14:50:09

Q.   Why did you think it was suitable for this case?   14:50:09   14:50:12

A.   Because it was the best information available out there in the literature, and it's well established that when you are doing transfers, to do it -- that meta-analyses is one of the best approaches to follow.   14:50:12   14:50:15   14:50:21   14:50:23   14:50:26

Q.   How did you determine that Simons and Saginor was the best model out there, I believe you said.   14:50:29   14:50:31   14:50:36

A.   So I looked at other -- other ones that are out there.  There is a study by Ready that is cited, but that one only looked at landfills and did not identify whether there was contamination, so it wasn't one that was broad enough in the application.   14:50:38   14:50:42   14:50:45   14:50:49   14:50:52   14:50:56

Page 232

There was another one by Braden and colleagues that did it, but when you looked at it, the water part of it was for surface waters, not groundwater contamination, so of the ones that were in the literature, it was the best fit.

Q.   And Simons and Saginor 2006 study was the best fit because you felt it was the closest match in terms of the groundwater contamination component; is that right?

A.   No.

MR. NIDEL:  Objection to form.

THE WITNESS:  No, I did not say that.  I said that overall, it was the best fit.  I was giving you specific reasons why I had excluded the other two.

BY MS. KLABER:

Q.   So was it the best fit simply because the other two were not a good fit, or was it a good fit on its own, Simons and Saginor?

MR. NIDEL:  Objection to form.

14:50:59
14:51:02
14:51:05
14:51:10
14:51:13
14:51:15
14:51:17
14:51:22
14:51:24
14:51:26
14:51:28
14:51:28
14:51:29
14:51:30
14:51:35
14:51:38
14:51:40
14:51:42
14:51:44
14:51:47
14:51:51
14:51:51

Page 233

Q.    And I want to look at Page 77,    14:57:34

numbered in the upper right, upper right-hand    14:57:41

corner.    14:57:45

Let me know when you are there.    14:57:56

A.    Yep.  Yep.    14:57:57

Q.    Okay.  Towards the bottom of Page    14:57:58

77, it says:  "The superfill variable contains    14:58:01

landfills, hazardous waste sites, and Superfund    14:58:07

sites."    14:58:12

Do you see that?    14:58:12

A.    I am still looking.    14:58:14

Q.    Five lines from the bottom.    14:58:16

A.    Yes.    14:58:36

Q.    How did you determine that 8020    14:58:39

Deering is a hazardous waste site?    14:58:41

A.    That was relying on Laton and Kram    14:58:45

for the release of TCE into the groundwater.    14:58:49

Q.    Okay.  So you didn't have your own    14:58:55

definition of hazardous waste site; is that    14:58:56

correct?    14:58:56

A.    No.    14:58:59

Q.    Do you know if any of the underlying    14:59:02

Page 239

studies for the Simons and Saginor  14:59:09

meta-analysis define a hazardous waste site?  14:59:12

A.  I was confused by the wording of  14:59:16

that question.  14:59:20

Q.  Do any of the underlying studies  14:59:21

from the Simons and Saginor meta-analysis  14:59:25

define the term "hazardous waste site"?  14:59:28

MR. NIDEL:  Objection to form and  14:59:32

foundation.  14:59:33

THE WITNESS:  I do not know if they  14:59:35

define it or if it's defined consistently.  14:59:36

BY MS. KLABER:  14:59:39

Q.  Have you reviewed the underlying  14:59:40

studies coded as superfill to ensure that they  14:59:42

involve sites similar to the 8020 Deering site  14:59:48

here?  14:59:52

A.  So once again, you are -- I'm just  14:59:52

going to explain that, you know, basically, we  14:59:55

are using the meta-analysis to do a benefit  14:59:58

transfer.  When you start breaking it down  15:00:01

saying, does it match this A, does it match B,  15:00:04

making it the same, that is -- is -- like you  15:00:08

Page 240

are doing a value transfer versus a function    15:00:11

transfer.  What matters in the function    15:00:14

transfer is that you can use the information    15:00:16

collectively.    15:00:18

        And I relied on the Simons and    15:00:19

Saginor which was a peer-reviewed study and did    15:00:23

not go back to kind of asking, does each item    15:00:26

match up directly.  It's that they match up    15:00:32

collectively.    15:00:35

    Q.    So you didn't do anything to    15:00:36

determine that the hazardous waste sites in    15:00:37

Simons and Saginor's meta-analysis were similar    15:00:42

to 8020 Deering in any way before determining    15:00:45

that 8020 Deering was a hazardous waste site as    15:00:49

defined by the superfill variable; is that    15:00:55

right?    15:00:57

    A.    So I guess a couple of things here,    15:00:57

when you are -- when you are doing it as the --    15:01:00

I lost my train of thought.  Sorry.    15:01:12

        So you don't go back, and I did not    15:01:14

go back and review each -- each site.  I have    15:01:19

to take it as it is in this Simons and Saginor,    15:01:22

Page 241

and I have applied it directly without changing    15:01:25

their coding or anything as -- following as    15:01:29

they have it.    15:01:32

Q.    Well, how did you determine that the    15:01:33

superfill variable should be turned on?    15:01:35

A.    I think I have already answered that    15:01:38

and I said that it -- they classify ones that    15:01:41

are hazardous waste and -- excuse me, I took    15:01:44

that from Laton and Kram, but you also -- I    15:01:49

think if I can find it, hang on just a second.    15:01:51

I thought I remembered something else from    15:02:22

Simons and Saginor but I don't think I'm going    15:02:25

to be able to quickly, off the cuff, find it.    15:02:28

Hang on.    15:02:33

I can't find it right off the top of    15:02:54

my head.  Sorry.    15:02:56

Q.    Okay.  Let me ask a different    15:02:57

question.    15:02:59

Do you know if 8020 Deering has been    15:03:00

classified as a California hazardous waste site    15:03:04

by the California Department of Toxic    15:03:05

Substances Control?    15:03:09

Page 242

MR. NIDEL:  Objection to form and    15:03:09

foundation.  Calls for a legal conclusion.    15:03:12

THE WITNESS:  I do not have that    15:03:13

information and that is not necessarily    15:03:14

something that would be required for people to    15:03:18

be reacting to contamination from a site.  It    15:03:22

would be one of the factors that could come in    15:03:25

play, but not the only one.    15:03:28

BY MS. KLABER:    15:03:29

Q.    Right, but if we are going to    15:03:29

classify it under the model as a hazardous    15:03:31

waste site, shouldn't we make sure that it's a    15:03:34

hazardous waste site?    15:03:37

MR. NIDEL:  Objection to form.  Now,    15:03:39

you are misstating the document completely.    15:03:40

THE WITNESS:  So the hazardous waste    15:03:43

is a coding that is used in the model for when    15:03:44

there is hazardous waste.  It is not a legal    15:03:48

definition or a state one.  The only one in    15:03:52

here that would come -- rise to that level is    15:03:58

-- let me just go back up here.    15:04:02

So if it is a Superfund, then    15:04:10

Page 243

clearly, you know, to be that one, Superfund is    15:04:13

a very specific classification, so it would    15:04:16

have to be hazardous waste, it's not in that    15:04:19

same category as a Superfund site.    15:04:22

BY MS. KLABER:    15:04:25

Q.    Right.  So on Page 76 here of the    15:04:25

Simons and Saginor study, superfill is defined    15:04:29

as three types of sites, Superfund sites, and    15:04:33

we said this is not a Superfund site, correct?    15:04:35

A.    Yes.    15:04:38

Q.    It's defined as landfills.  8020    15:04:39

Deering is not a landfill; is that correct?    15:04:43

A.    That's correct.    15:04:44

Q.    And then hazardous waste sites, so    15:04:45

it is your opinion or Dr. Kram and Laton's who    15:04:48

you are adopting, that 8020 Deering is a    15:04:52

hazardous waste site; is that right?    15:04:56

MR. NIDEL:  Objection to form.  Now,    15:04:58

again, you are misstating the document.    15:04:59

THE WITNESS:  So it is a site where    15:05:01

hazardous materials have been released.    15:05:03

BY MS. KLABER:    15:05:06

Page 244

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q.    Okay.  In your mind, is there a    15:05:06
difference between a hazardous waste site and a    15:05:09
site where hazardous materials have been    15:05:12
released, or are they the same?    15:05:14

A.    It's a label that was put on the    15:05:16
variable, and I would understand that it    15:05:18
includes both.    15:05:20

Q.    How would you understand that it    15:05:21
includes both?    15:05:23

A.    From my extensive knowledge in the    15:05:24
field of labeling variables and understanding    15:05:26
how people label variables and peer reviewing    15:05:29
journal articles, that you use general    15:05:32
categories for groupings.    15:05:36

Q.    But you haven't reviewed the    15:05:38
underlying studies that are coded here by    15:05:41
Simons and Saginor to determine if they involve    15:05:45
both hazardous waste sites and sites on which    15:05:48
hazardous waste is present; is that correct?    15:05:53

A.    In my mind, there is -- if they're a    15:06:00
hazardous waste site, then there is hazardous    15:06:04
waste present.  I don't understand the    15:06:07

Page 245

distinction you're trying to draw.

Q.    So if California draws a distinction and has a specific definition of hazardous waste sites and identifies them publicly, that doesn't matter to you in whether or not 8020 Deering is a hazardous waste site; is that right?

A.    That would be correct, because it's how the variable was coded in the analysis, not a legal definition.

Q.    Okay.  But I am trying to understand how you think the variable was coded in the analysis, and my understanding is, you didn't look at all the studies that received superfill coding to determine whether -- when they were coded as superfill, due to being a, quote unquote, hazardous waste site, they simply had some hazardous waste versus being, for example, a hazardous waste disposal site.

Did you make that determination?

MR. NIDEL:  Objection to form.

THE WITNESS:  I didn't -- I did not

Page 246

make that distinction, but I will say it again,    15:07:03

my experience is, is that what they are talking    15:07:07

about is where there have been hazardous    15:07:10

materials released.  I have reviewed hundreds    15:07:14

of these studies through time that have gone    15:07:17

out, and it could be a site operations that    15:07:20

there was fill, it could be a disposal site    15:07:24

where they are doing, there would be hazardous    15:07:27

waste.    15:07:30

The only ones that are, you know,    15:07:31

there are some studies that are very specific,    15:07:32

like, the Superfund, but there are other ones    15:07:35

that -- just looking at the many sites where    15:07:37

there is some type of hazardous material    15:07:40

released.    15:07:43

BY MS. KLABER:    15:07:43

Q.    So you are relying on your    15:07:43

experience as to what the term "hazardous waste    15:07:46

site" means without actually making a    15:07:49

determination of whether the studies underlying    15:07:52

the Simons and Saginor meta-analysis fit that    15:07:56

criteria; is that right?    15:07:59

Page 247

MR. NIDEL:  Objection to form.   15:08:00

Misstates the witness's testimony.   15:08:02

THE WITNESS:  I am making that   15:08:04

judgment on my experience.  I am also making it   15:08:05

on the basis that it is a peer-reviewed journal   15:08:08

that others have reviewed and accepted.   15:08:11

If others thought that it was a   15:08:14

concern, there would have been an issue brought   15:08:18

up in the peer-review process that would have   15:08:21

asked them to change it so it made it through   15:08:24

the peer-review process and I think that, you   15:08:26

know, the peer-review process provides a   15:08:30

reliable analysis to base my model on.   15:08:32

BY MS. KLABER:   15:08:35

Q.   Why would the peer-review process   15:08:35

care about whether hazardous waste sites means   15:08:37

actually designated hazardous waste sites, or   15:08:40

whether it means sites on which hazardous waste   15:08:44

could be present in some capacity?   15:08:47

MR. NIDEL:  Objection to form.   15:08:49

THE WITNESS:  The peer review would   15:08:51

not be worried about the distinction that you   15:08:52

Page 248

are making.  The peer review would be -- excuse    15:08:56

me, concerned with whether the label hazardous    15:09:00

waste was an appropriate label to use for this    15:09:06

variable in the analysis.    15:09:09

       BY MS. KLABER:    15:09:10

   Q.    And if the hazardous waste sites in    15:09:11

the studies underlying Simons and Saginor all    15:09:16

involved hazardous waste disposal sites, would    15:09:21

that be an inappropriate use of the variable?    15:09:23

       MR. NIDEL:  Objection to form.    15:09:31

       THE WITNESS:  I don't know whether I    15:09:32

can really answer that without any -- any --    15:09:33

without further information.  I mean, you are    15:09:40

splitting hairs in terms of how things are    15:09:44

coded and when the models are being done.    15:09:50

       BY MS. KLABER:    15:09:55

   Q.    So you don't know whether the    15:09:55

hazardous waste sites and the studies    15:09:58

underlying Simon and Saginor are either deemed    15:10:00

to be hazardous waste sites by a regulatory    15:10:04

body or hazardous waste disposal sites.    15:10:09

      You just didn't look at that level    15:10:12

Page 249

of granularity; is that right?                    15:10:13

A.    I did not, but if, in the review          15:10:15

process, the reviewers saw that they were using   15:10:18

ones that were defined by a regulatory body,      15:10:22

they would have asked Simons and Saginor to       15:10:24

clarify their -- their variable definition or     15:10:28

labeling.                                         15:10:31

Q.    How do you know they would have          15:10:33

asked?                                           15:10:33

A.    Because I would have asked in my         15:10:36

peer review and I have had peer reviewers ask     15:10:38

me to clarify.                                    15:10:41

Q.    Peer review is a flawless process        15:10:41

that catches every error; is that right?          15:10:44

MR. NIDEL:  Objection to form.           15:10:47

THE WITNESS:  There is no process         15:10:48

that is perfect, so there could be errors, but,   15:10:50

you know, one of the things that -- typically,    15:10:53

on these papers, you have three peer reviewers,   15:10:55

so there is three different expert eyes looking   15:10:58

at it, going over it, but there could -- this     15:11:01

-- possibly could be errors in anything in the    15:11:04

Page 250

and the other is describing the consequence.    15:17:12

Q.    Under your model, proximity to the    15:17:16
source is the main driver of property value    15:17:20
diminution; isn't that correct?    15:17:24

A.    Yes.    15:17:27

Q.    So then why do you need to account    15:17:28
for both?    15:17:30

A.    Because the groundwater described --    15:17:30
further describes what is happening at that    15:17:36
source, that it is contaminating groundwater.    15:17:39

Q.    If you turned off the superfill    15:17:43
variable hypothetically, because it was not    15:17:57
appropriately applied, that would reduce your    15:18:00
property value diminution percentage by almost    15:18:05
half; is that right?    15:18:07

A.    That is about half, but, I mean,    15:18:22
that is a hypothetical and something that you    15:18:25
would not do.    15:18:27

Q.    That's a hypothetical, I understand    15:18:28
that.    15:18:30

You applied the announcement of a    15:18:32
bad thing variable in performing your    15:18:34

Page 257

sample size for hedonic equation can range 15:38:52

from" less to a hundred -- "less than a hundred 15:38:55

to tens of thousands;" is that right? 15:38:57

A.    Yes. 15:38:58

Q.    You don't know, for the Simons and 15:38:59

Saginor study, whether the sample size was less 15:39:03

than a hundred or tens of thousands? 15:39:05

A.    I am fairly certain that they were 15:39:08

not tens of thousands, because tens of 15:39:14

thousands have really only been available for 15:39:17

us doing analysis with some of the big data 15:39:21

availability that has happened in recent years, 15:39:26

and so there are much more likely to be in the 15:39:29

hundreds range. 15:39:34

Q.    How is borrowing the 1612 figure 15:39:35

from Ready not just applying a random number 15:39:41

from an unrelated study and assuming it is 15:39:44

relevant in Simons and Saginor? 15:39:48

MR. NIDEL:  Objection to form. 15:39:50

THE WITNESS:  Well, what I did was 15:39:51

actually avoid just picking a random number 15:39:54

from an arbitrary study.  If I went out into 15:39:57

Page 262

the literature and just pulled one study, that                    15:40:00

would be just pulling one arbitrarily, and                        15:40:02

Simons and Saginor had multiple studies so if I                   15:40:08

would have been using it, if they had a report,                   15:40:12

it would have been the average that I was                         15:40:15

using.                                                            15:40:17

So I went to another meta-analysis,                               15:40:18

I needed to find out what their average was,                      15:40:22

and so I was actually doing the best with the                     15:40:23

information to have one that would be --                          15:40:28

provide a similar sample size versus                              15:40:32

arbitrarily picking a random study for one.                       15:40:37

BY MS. KLABER:                                                    15:40:38

Q.    How did you know it was a similar                           15:40:38

sample size?                                                      15:40:40

A.    I didn't say it was a similar sample                        15:40:42

size.  I said it was a similar type of                            15:40:45

analysis, meta-analysis of hedonic, which would                   15:40:49

give me the best estimate of what it might be                     15:40:52

for Simons and Saginor.                                           15:40:54

Q.    You said earlier that the Ready 2010                        15:40:55

study was another meta-analysis that you                          15:41:00

Page 263

decided not to use in this case; is that                15:41:03

correct?                                                15:41:03

    A.    That's correct.                               15:41:05

          MS. KLABER:  I would like to mark             15:41:07

another exhibit.                                        15:41:08

          (Deposition Exhibit 46 was marked            15:41:22

for identification.)                                    15:41:23

          BY MS. KLABER:                                15:41:23

    Q.    So we have marked Exhibit 46, which          15:41:59

should make it to you momentarily.                      15:42:03

          This is an expert report authored by         15:42:08

you in the case of Romano v. Northrop Grumman.          15:42:13

          Do you recognize this report?                15:42:18

    A.    Yes.                                          15:42:20

    Q.    If you could look at Page 18 of              15:42:21

Exhibit 46.  It's numbered Page 18.  I think it         15:42:27

will probably also be PDF Page 18.                      15:42:36

    A.    Sorry, it's not scrolling fast.              15:42:54

    Q.    Well, while you are waiting, I will          15:42:56

confirm, for this report in Romano v. Northrop          15:42:59

Grumman, you also used the Simons and Saginor           15:43:03

meta-analysis to write your report; is that             15:43:06

Page 264

have properties that sell and properties for                  15:44:30

different areas, but I thought that if I looked               15:44:36

at the -- excuse me, the hedonic studies, that                15:44:38

gives me a better idea of the number of                       15:44:46

observations that would be used in hedonic                    15:44:52

studies, and so I adjusted, but these do not                  15:44:57

change very much.                                             15:45:01

If you, you know, look at the                                 15:45:02

variable, it's Point 003, so I thought it would               15:45:05

be better to kind of use information that came                15:45:11

from another meta-analysis, but I also checked                15:45:17

it against this, and there is not a huge                      15:45:20

difference in the outcome, so I could have used               15:45:23

either one.                                                   15:45:25

Q.    Do you know if any of the studies                       15:45:26

reviewed by Simons and Saginor involved vapor                 15:45:30

intrusion?                                                    15:45:35

A.    I do not believe.  When you look at                     15:45:37

their variable definitions for air, it does not              15:45:41

appear that they classify vapor intrusion as                  15:45:47

one of them and I will just kind of go back to                15:45:52

the baseline of what I am doing.  It's the                    15:45:54

Page 266

proximity to the source of the contamination.    15:45:57

Q.    That's okay.  You don't have to get    15:46:00
into that.  I think you answered the question.    15:46:02

MR. NIDEL:  Okay.  You are not going    15:46:04
to tell him how to answer the questions.  So I    15:46:05
object to interrupting his answer.    15:46:08

BY MS. KLABER:    15:46:10

Q.    Do you know how Simons and Saginor    15:46:10
chose the 75 journal articles that they used    15:46:13
for their meta-analysis?    15:46:17

A.    They describe it in their paper,    15:46:18
but, you know, without going back to the    15:46:21
details, I think they did an extensive review    15:46:23
of the literature to find out what ones are    15:46:27
there and then chose the ones that had the    15:46:29
information to use in their meta-analysis and    15:46:35
they followed standard procedures that are used    15:46:38
in meta-analysis.    15:46:40

Q.    So if I wanted to know specifically    15:46:41
how they chose those 75 articles, I would have    15:46:43
to ask Simons and Saginor; is that right?    15:46:46

A.    I think we could go back to their    15:46:50

Page 267

information shouldn't be used unrelated or is          15:59:31

unreliable.  It just means that there are              15:59:36

cautions that you put in.                              15:59:39

It's standard that you do, and, you                    15:59:41

know, one of the reasons you do robustness             15:59:43

analyses is to see how strong your results are.        15:59:46

If one of the ways that you would look for             15:59:50

these dated ones is, you would expect if they          15:59:53

were of concern that they would be outliers,           15:59:58

and one of the reasons I chose Exhibit 3 was           16:00:02

the one with outliers removed, and so I                16:00:05

followed their robustness to provide the best,         16:00:09

most reliable estimates.                               16:00:12

Q.    Can we go and look at the abstract               16:00:14

of Exhibit 4, the Simons and Saginor study.           16:00:22

It will be the first page, but I'm                     16:00:31

sure you know that.                                    16:00:34

A.    Okay.  I got it up.                              16:00:46

Q.    Okay.  And in the abstract here,                 16:00:47

Simons and Saginor note that they generated a          16:00:50

data set of about 290 observations that contain        16:00:52

information about each study's loss, the               16:00:57

Page 279

dependent variable, with the independent    16:01:02

variable being distance from the source, type    16:01:04

of contamination, urban and rural environment,    16:01:06

geographic region, market conditions and    16:01:14

other -- and several other variables.    16:01:14

     Do you see that?    16:01:15

    A.   Yes.    16:01:15

    Q.   Have you ever reviewed that data    16:01:16

set?    16:01:18

    A.   I have not.    16:01:18

    Q.   Do you have the data set underlying    16:01:19

the Simons and Saginor study?    16:01:25

    A.   I do not have the data set.  It    16:01:25

would not be standard to request it, when you    16:01:27

look at peer reviewed, that's a scientific    16:01:30

signal that the study is valid and reliable.    16:01:34

    Q.   Have you ever asked for the Simons    16:01:38

and Saginor data set?    16:01:42

    A.   I have not.    16:01:42

    Q.   Do you know if Simons and Saginor    16:01:43

still have it?    16:01:45

    A.   I do not.    16:01:46

Page 280

A.    Yes.    16:10:51

Q.    In the coefficient estimates column; is that right?    16:10:52 16:10:52

A.    Yes.    16:10:56

Q.    Okay.  And the variables that you have turned on for purposes of your model are coded as 1 in this predicted loss -- this predicted coding column, the middle column; is that right?    16:10:57 16:11:01 16:11:04 16:11:12 16:11:15

A.    Ones or down the bottom, there are some other codes.    16:11:15 16:11:17

Q.    Some other codes.  Okay.    16:11:18

So looking at the Southern California variable, that was not statistically significant at the 10 percent level, correct?    16:11:20 16:11:22 16:11:25

A.    That is correct.    16:11:28

Q.    And looking at the superfill variable, that was not statistically significant at the 10 percent level; is that correct?    16:11:30 16:11:35 16:11:37 16:11:39

A.    That's correct.    16:11:40

Q.    And looking at the groundwater    16:11:41

Page 290

variable, that was not statistically 16:11:45

significant at the 10 percent level; is that 16:11:46

correct? 16:11:46

A. It is not significant at the 10 16:11:49

percent level for the hypothesis equal to zero 16:11:52

or not, but it is, if you do -- that's a 16:11:54

two-sided test. If you do a one-sided test, 16:11:57

that -- the coefficient is negative, which you 16:12:01

expect versus zero, it is statistically 16:12:04

significant. 16:12:08

Q. Did you do a two-sided test or a 16:12:08

one-sided test? 16:12:11

A. I reported a one-sided test in my 16:12:11

rebuttal. I was looking at that when I did it. 16:12:14

Here, all I am doing is replicating Simons and 16:12:18

Saginor and taking the information directly. 16:12:21

Q. Did Simons and Saginor do a 16:12:24

one-sided or a two-sided test? 16:12:26

A. They did a two-sided. 16:12:27

Q. Why did you switch from two-sided to 16:12:29

one-sided using their model? 16:12:32

A. Because the evidence in the 16:12:34

Page 291

literature has shown that disamenities reduce    16:12:35

values, so that supports doing a one-sided test    16:12:40

versus a two-sided.  You would not expect a    16:12:43

disamenity to increase values.    16:12:47

Q.    For the groundwater variable, which    16:12:50

you said was not significant at the 10 percent    16:12:53

level, that means you can't rule out no effect;    16:12:56

is that correct?    16:12:59

MR. NIDEL:  Objection to form.    16:13:00

THE WITNESS:  So first of all, I    16:13:02

said that if -- if you do the one-sided, which    16:13:05

I think is the appropriate one, there is an    16:13:09

effect and it is that you cannot -- you cannot    16:13:12

reject it so that means that there may be an    16:13:17

effect, but it -- you can't conclude that there    16:13:20

is no effect.    16:13:24

BY MS. KLABER:    16:13:25

Q.    Okay.  For -- and Simons and Saginor    16:13:25

study for the superfill variable, which was not    16:13:30

significant at the 10 percent level, you also    16:13:33

can't rule out no effect; is that correct?    16:13:36

MR. NIDEL:  Objection to form.    16:13:38

Page 292

First sentence reads:  "The scope of                16:24:56

the guidelines is on economic analysis                      16:24:57

typically conducted for environmental policies              16:24:59

using regulatory or nonregulatory management                16:25:02

strategies."                                                16:25:06

          Do you see that?                                  16:25:06

     A.   Yes.                                              16:25:08

     Q.   Your assignment in this case was not             16:25:09

to perform an economic analysis for                        16:25:11

environmental policies using regulatory or                 16:25:13

nonregulatory management strategies, correct?              16:25:17

          MR. NIDEL:  Objection to form.                   16:25:19

          THE WITNESS:  My -- my -- it was not             16:25:21

policies, but it's the same procedures that are            16:25:25

used.                                                      16:25:27

          BY MS. KLABER:                                   16:25:27

     Q.   How do you know that it should be                16:25:27

the same procedures, if you are working from               16:25:29

guidelines written for policies when you are               16:25:31

not doing an assignment based on -- or about               16:25:33

environmental policies?                                    16:25:38

          MR. NIDEL:  Objection to form.                   16:25:39

Page 303

THE WITNESS:  These are general  16:25:41

procedures that are used in environmental  16:25:43

economics and real estate and the guidance for  16:25:46

them does not vary with the type of application  16:25:51

that you are using.  This just shows that there  16:25:55

is one place where they are used, accepted,  16:25:59

with -- there's important consequences of how  16:26:06

the decisions turn out.  16:26:08

BY MS. KLABER:  16:26:12

Q.  Is there somewhere in these  16:26:12

guidelines that says they were written for  16:26:14

general application purposes?  16:26:17

A.  No.  I am saying the methods are for  16:26:18

general application and this is showing one  16:26:20

area where they are accepted specifically.  16:26:23

Q.  Is it your opinion that this  16:26:25

document addresses guidelines for performing  16:26:28

economic analysis to determine property  16:26:31

valuation?  16:26:33

A.  So it is guidance for determining  16:26:34

economic values and property value diminutions  16:26:40

is one of them that is discussed in here.  16:26:43

Page 304

Q.   Do you know if the words "property valuation" appear anywhere in this 300-page document?                                              16:26:45 16:26:47 16:26:51

A.   I do not know specific, but I cited places in my report where they are -- where hedonics are referenced.                              16:26:51 16:26:54 16:26:59

Q.   And you believe those hedonics -- those hedonic models reference for -- to the valuation of residential real estate?                  16:27:01 16:27:06 16:27:10

A.   Yes.                                                                 16:27:14

Q.   I want to turn to Chapter 7 of the EPA guidelines.  This is going to be more than a hundred pages in, and we'll get you a page number when we can.  This is really tough because this does not have actual page numbers on it.                                                             16:27:36 16:27:39 16:27:42 16:27:48 16:27:51 16:27:54

MR. NIDEL:  The other beauty of AgileLaw.                                 16:27:55 16:27:59

MS. KLABER:  How does AgileLaw interest this issue?                       16:27:59 16:28:02

MR. NIDEL:  Well, you can highlight places in your exhibit that let you go straight  16:28:02 16:28:04

Page 305

to them.

MS. KLABER:  I am not working in that, so it wouldn't help me.  Mine is 7-1.

MS. GEARY:  92.

BY MS. KLABER:

Q.   If you type in 92 in that little box at the bottom.

A.   Okay.

Q.   So this is -- you cite to Chapter 7 of these EPA guidelines in your report, correct?

A.   Yes.

Q.   And it states here:  "The aim of an economic benefit analysis is to estimates the benefits and monetary terms of proposed policy changes in order to inform decision-making."

Do you see that?

A.   Yes.

Q.   Your assignment wasn't to estimate the benefits and monetary terms of proposed policy changes in order to inform decision-making, correct?

Page 306

MR. NIDEL:  Objection to form.    16:29:11

THE WITNESS:  So a loss of just a    16:29:12

negative benefit, so when they talk about    16:29:16

benefits here, it could be a gain, a positive    16:29:18

or a loss, a negative benefit, and I will just    16:29:24

repeat what I have said already is, you know,    16:29:27

these are commonly used and nimble procedures    16:29:30

for different ones, so this is one specific    16:29:34

example where they are accepted.    16:29:38

BY MS. KLABER:    16:29:39

Q.   Okay.  And just to be clear, you    16:29:39

were not doing an analysis with respect to    16:29:42

proposed policy changes; is that right?    16:29:44

A.   Correct.    16:29:46

Q.   Okay.    16:29:48

A.   But from an economic perspective,    16:29:48

you would do the analysis exactly the same,    16:29:50

whether it's litigation or a policy one.    16:29:52

Q.   To come to your opinions in this    16:29:56

case, you performed a benefit transfer,    16:29:58

correct?    16:29:58

A.   Yes.    16:30:02

Page 307

Q.   Okay.  Now I have the page numbers 16:30:02 from this point on. 16:30:07

Can we go to Page 133 of the PDF. 16:30:08

It should say 7-44 on the bottom. 16:30:16

MR. NIDEL:  Hang on.  134. 16:30:24

MS. KLABER:  It's 134? 16:30:27

MR. NIDEL:  Uh-huh. 16:30:28

MS. KLABER:  Okay. 16:30:29

THE WITNESS:  Yeah. 16:30:30

MS. KLABER:  Okay.  It may be 135. 16:30:40

THE WITNESS:  135 is where it took 16:30:42 me. 16:30:44

MS. KLABER:  Okay. 16:30:44

THE WITNESS:  I went scrolling from 16:30:44 there.  I am at 135. 16:30:46

BY MS. KLABER: 16:30:48

Q.   Okay.  And here under 7.4, benefit 16:30:48 transfer, it says:  "Benefit transfer refers to 16:30:53 the use of estimated nonmarket values of 16:30:56 environmental quality changes from one study 16:30:58 and the evaluation of a different policy that 16:31:01 is of interest to the analyst." 16:31:03

Page 308

Do you see that?                                    16:31:05

A.    Yes.                                          16:31:05

Q.    And again, you were not analyzing            16:31:06
any environmental policies here, correct?           16:31:07

A.    Yes, but I was taking the basics of          16:31:10
it, taking an estimated environmental value,        16:31:14
and applying it to a new decision-making            16:31:17
context, which is standard for benefit              16:31:20
transfer.                                           16:31:23

Q.    Looking to the next paragraph here,          16:31:24
which would be on the next page, 7-45.              16:31:27

Towards the middle of that                          16:31:38
paragraph, it states that:  "A benefit transfer    16:31:40
should only be used as a last resort," isn't        16:31:44
that right?                                          16:31:47

A.    So I don't know what -- you said             16:31:48
towards the middle of that paragraph.  I don't      16:31:51
know what paragraph you are referring to.           16:31:53

Q.    The next paragraph down from the one         16:31:55
we were previously reading.  On the next page.      16:31:57

A.    The one that says:  "Benefit                 16:32:01
transfer is necessary"?                             16:32:02

Page 309

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q.    Yes.  And then towards the middle, 16:32:02

it says:  "Benefit transfer should only be used 16:32:04

as a last resort." 16:32:07

A.    Yes. 16:32:09

Q.    Isn't that right? 16:32:10

A.    Yes. 16:32:11

Q.    And then further down in this 16:32:11

paragraph, it says:  "The advantages of benefit 16:32:14

transfers in terms of time and cost savings 16:32:20

must be weighed against the disadvantages in 16:32:22

terms of potential reduced reliability of the 16:32:25

final benefit estimates;" isn't that right? 16:32:27

A.    Yes, and I made that tradeoff in my 16:32:30

decision that if we did another meta-analysis, 16:32:33

we would not substantially change the outcome. 16:32:38

Q.    Then the EPA guidelines provide 16:32:42

steps for conducting a benefit transfer, 16:32:47

correct? 16:32:47

A.    Yes. 16:32:50

Q.    Step 2 is:  "Select case studies," 16:32:51

right? 16:32:53

A.    A study case, yes. 16:32:54

Page 310

excuse me, that had a variety of regressors or    16:35:11

explanatory variables that allowed you to    16:35:18

develop a benefit transfer that customized or    16:35:22

fits the Canoga Park case, and so, yes, I was    16:35:25

looking at them and I have talked to you    16:35:29

earlier about, there is not a large group out    16:35:31

there but I talked about why there are ones    16:35:35

that were available but were not selected.    16:35:38

Q.    But you didn't read the studies with    16:35:40

groundwater contamination underlying Simons and    16:35:43

Saginor to see if they were similar to the    16:35:46

alleged groundwater contamination here,    16:35:49

correct?    16:35:50

MR. NIDEL:  Objection to form.    16:35:51

THE WITNESS:  That is not what I was    16:35:52

doing.  So if I was just going to use the    16:35:55

groundwater ones, yeah, that's what I would be    16:35:56

doing, but I did not do that.  I was doing a --    16:36:00

looking at meta-analysis ones that looked    16:36:03

broadly at -- at hedonic property value    16:36:05

studies, and I did read each of those    16:36:11

meta-analyses.    16:36:14

Page 313

BY MS. KLABER:                                      16:36:16

Q.    And you didn't read the studies that          16:36:16

Simons and Saginor coded as superfill              16:36:20

observations to see if those were similar to       16:36:25

the 8020 Deering site, correct?                     16:36:26

A.    I didn't and that was not necessary          16:36:29

in either of those cases.                          16:36:30

Q.    And you didn't read the studies that          16:36:30

Simons and Saginor coded as Southern California    16:36:33

to see if those areas were similar to the class    16:36:35

area here, correct?                                16:36:39

A.    I did not, and they do not need to          16:36:40

be similar.  It's what you can do with them         16:36:43

collectively.                                      16:36:45

Q.    I'm sorry, did you say you did or          16:36:46

you didn't?                                        16:36:49

A.    Did or didn't --                           16:36:50

MR. NIDEL:  Objection to form.            16:36:53

THE WITNESS:  I don't --                  16:36:53

BY MS. KLABER:                             16:36:56

Q.    I asked:  You didn't read the            16:36:56

studies that Simons and Saginor labeled as          16:36:58

Page 314

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

A.   I provided information of what the error might be in my rebuttal, but there was not specific information that allowed me to look at the specific error.

Q.   Okay.  So just to be clear, you have not calculated an error rate for your common diminution of value percentage of 9.4 percent; is that correct?

MR. NIDEL:  Objection to form.

THE WITNESS:  I do not, but from the work that I have done with errors and benefit transfers, I know that an outside one is plus or minus 30 percent, but that is based on the benefit transfer studies that are just looking at how broadly you can apply benefit transfer in the literature, so it overstates when you are doing a specific case versus just looking at all the possible ranges in there.

BY MS. KLABER:

Q.   Could you have calculated an error rate here?

MR. NIDEL:  Objection to form.

Page 317

THE WITNESS:  There was not information that would allow me to do a specific error rate calculation in this, but we kind of know the error rate of -- the potential of what it is based on many applications in the literature.

BY MS. KLABER:

Q.   So if you know the error rate or the potential error rate based on the literature, what is your best estimate of the error rate for your 9.4 percent calculation?

MR. NIDEL:  Objection to form.  Asked and answered.

THE WITNESS:  So the outer bound of it would -- is plus or minus 30 percent.  If you ask me what my best professional guess is, it would be plus or minus 10 percent.

BY MS. KLABER:

Q.   If your error rate was 10 percent, wouldn't that erase the entire 9.4 percent property value diminution calculation on one end?

Page 318

benefit transfer. 16:42:32

They also didn't necessarily do -- 16:42:33

they might have done value transfers versus 16:42:36

function transfers and so it gives you that -- 16:42:39

that wide range, and this would be using best 16:42:43

practices and ones where you use an equation to 16:42:47

fit the situation, so that it would not be 16:42:51

those large ones that would be excluded, when 16:42:55

you just do it from, you know, there, you are 16:42:59

doing exploratory research. 16:43:01

Q.   You also cite to a report by 16:43:03

Rosenberger which found a function transfer 16:43:10

error rate of 36 percent, correct? 16:43:12

A.   And so Rosenberger was also -- that 16:43:15

one is based on the broad -- where can we 16:43:18

explore where it might be done, so it is not 16:43:23

coming down to a specific case of following. 16:43:26

So those are error rates based on the 16:43:30

exploratory research in both cases. 16:43:33

Q.   How did you arrive at the 16:43:36

approximate 10 percent error rate for your 16:43:38

common property value diminution percentage 16:43:41

Page 320

here?                                                      16:43:46

A.    I was using, you asked me what it                    16:43:46

was, and I was using my best professional                  16:43:49

experience to say that it's likely around 10               16:43:51

percent, and from what I know of the studies               16:43:54

that were used in the Kaul analysis and from               16:43:57

discussions with Rosenberger about benefit                 16:44:06

transfer.                                                  16:44:07

Q.    I'm going to show you another                        16:44:09

exhibit.                                                   16:44:10

A.    While we were talking, it appears                    16:44:29

that it has bumped me out again.                           16:44:32

MS. KLABER:  Oh, really?                                   16:44:34

Can we go off the record then and                          16:44:34

figure out how to get him back in.                         16:44:36

THE VIDEOGRAPHER:  This marks the                          16:44:40

end of Media Unit 8.  We are going off the                 16:44:41

record.  The time is 4:45 p.m.                             16:44:46

(A short recess was taken.)                                16:44:50

THE VIDEOGRAPHER:  This marks the                          17:07:33

beginning of Media Unit 9.  Going back on                  17:07:38

record.  The time is 5:08 p.m.                             17:07:41

Page 321

types of disamenities are affecting the                    17:21:52

percentage diminution in value applied in the              17:21:55

Boyle analyses."                                           17:21:58

       Do you see that?                                 17:21:59

   A.   Yes.                                               17:21:59

   Q.   Do you have any basis to assert that         17:22:00

other types of disamenities are not affecting             17:22:02

property values in the proposed class area?               17:22:05

   A.   I do, from the work of Dr. Laton,              17:22:07

and he talks about how the TCE -- there's no              17:22:15

other source of, you know, contributing to the           17:22:21

TCE, and so there is information in Dr. Laton's           17:22:27

report that supports that.                                17:22:31

   Q.   Did Dr. Laton look at environmental           17:22:32

disamenities outside of TCE contamination?                17:22:36

   A.   I can't remember everything that he            17:22:39

talked about at this time.                                17:22:42

   Q.   So you believe Dr. Laton ruled out           17:22:46

the possibility in his report that there are              17:22:50

other environmental disamenities in the area              17:22:54

that could impact property values; is that                17:22:57

correct?                                                  17:23:00

Page 334

MR. NIDEL:  Objection to form.

Misstates his testimony.

THE WITNESS:  So Dr. Laton was talking about the plume of other ones doing it, and there could be other things that affect property values, but when you look at it, the -- excuse me, the literature, as you are looking at distance from a contamination source is what you look at and then also, there is a number of variables in the Simons and Saginor equation that are turned on and off, so yes, there is air pollution in the area, but I did not turn that variable on.

So there could be some other disamenities but we tried to account for them within the equation and within the information from Dr. Laton.

BY MS. KLABER:

Q.   How did you try to account for them with the equation and with the information from Dr. Laton?

A.   So I just said that, you know,

Page 335

Dr. Laton had information that, you know, that   17:24:02

would -- there was no evidence of TCE coming   17:24:04

from another source, so that is not another   17:24:11

disamenity contributing to the plume, and I   17:24:14

just gave you the example where we did not   17:24:16

include air pollution in the damages.   17:24:21

By turning that off, we don't -- we   17:24:24

could have turned it on and said that there are   17:24:28

damages from air pollution in the area, but   17:24:30

that would not have been appropriate because   17:24:32

that's not emanating from the source.   17:24:34

Q.    Ignoring TCE, did you do any   17:24:37

analysis to determine whether any other   17:24:41

environmental disamenities impact property   17:24:43

values in the proposed class area?   17:24:46

A.    No.   17:24:48

Q.    In Paragraph P9 you discuss Ms.   17:24:49

Pitts, quote unquote, conclusion of no   17:24:57

diminution in value.   17:25:01

A.    Yeah.   17:25:02

Q.    Are you referring to the appraisal   17:25:03

of the Behar home?   17:25:06

Page 336

your answer as well.    17:38:01

A.    Ask the question again then, please.    17:38:02

Q.    Do you understand that Dr. Laton    17:38:03

explains that the putative class area    17:38:06

represents only the area where there is threat    17:38:09

of vapor intrusion and not actual vapor    17:38:12

intrusion?    17:38:14

MR. NIDEL:  Objection to form.    17:38:16

THE WITNESS:  I would have to go    17:38:21

back and look at Dr. Laton's report to be sure    17:38:22

in answering that question, but I, you know, I    17:38:26

reference back that, you know, my analysis is    17:38:30

based on models that shows its distance to the    17:38:34

source of the contamination so how he -- he    17:38:38

testifies that would not change the damage    17:38:42

calculations that I report.    17:38:46

BY MS. KLABER:    17:38:49

Q.    So just to confirm, whether or not    17:38:49

any property actually experiences vapor    17:38:53

intrusion is not relevant to your model or your    17:38:56

calculations, correct?    17:38:58

A.    Right.  It's based on proximity    17:39:00

Page 349

which is well-established.    17:39:02

Q.    And you don't make any claim that    17:39:06
Simons and Saginor's methodology accounts for    17:39:19
harm due to actual vapor intrusion, correct?    17:39:22

A.    I do not make any claim.    17:39:27

Q.    Are you aware that the risk of vapor    17:39:32
intrusion may vary depending on individual    17:39:34
physical characteristics of the home?    17:39:37

MR. NIDEL:  Objection to form and    17:39:41
foundation.    17:39:42

THE WITNESS:  I am not a vapor    17:39:43
intrusion expert and cannot testify to vapor    17:39:45
intrusion.    17:39:47

BY MS. KLABER:    17:39:48

Q.    Did you perform any analysis of the    17:39:48
characteristics of any homes in the class area    17:39:50
to see if they may -- if those characteristics    17:39:54
may influence the risk of vapor intrusion?    17:39:58

A.    Same answer as before.  I am not a    17:40:01
vapor intrusion expert.    17:40:03

Q.    So you did not do that work,    17:40:05
correct?    17:40:05

Page 350

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

A.    No.                                      17:40:07

Q.    Your model does not incorporate in       17:40:07
any way the fact that the risk of vapor        17:40:20
intrusion may be different for two properties  17:40:22
that have different physical characteristics,  17:40:25
correct?                                       17:40:27

MR. NIDEL:  Objection to form.          17:40:27

THE WITNESS:  Sorry.  It just           17:40:28
flashed up that the meeting has ended here, and 17:40:29
that distracted my attention.  Could you ask   17:40:31
again.                                         17:40:34

BY MS. KLABER:                          17:40:34

Q.    Sure.  Your model does not         17:40:34
incorporate any way -- in any way the fact that 17:40:38
the risk of vapor intrusion may be different    17:40:41
for two properties that have different physical 17:40:43
characteristics, correct?                       17:40:45

MR. NIDEL:  Objection to form.          17:40:47
Asked and answered.                             17:40:48

THE WITNESS:  It's the same answer.     17:40:50
Its proximity.  It's not vapor intrusion.       17:40:51

BY MS. KLABER:                          17:40:56

Page 351

Q.    And with respect to the studies in                   18:03:49

this -- your Figure E3 which comes from Figure             18:03:52

4 of Professor Eisfeldt's report, you state:               18:03:58

"For five of the studies in Figure E3,                     18:04:03

municipal, city or public (blue circles)                   18:04:09

deliveries of groundwater are cited as drinking            18:04:11

water sources which indicates that property                18:04:13

value diminutions are due to proximity to the              18:04:15

contamination, not contaminated drinking water             18:04:17

as public water supplies are treated prior to              18:04:21

delivery to the residents."                                18:04:23

Do you see that?                                           18:04:26

A.    Yes.                                                 18:04:26

Q.    Is it your contention that water                     18:04:26

that is publicly treated is never contaminated?            18:04:28

MR. NIDEL:  Objection to form.                             18:04:32

THE WITNESS:  So my understanding                          18:04:35

is, is that water that is from cities is                   18:04:36

checked regularly, and if there is                         18:04:41

contamination, then do not drink it, or other              18:04:45

things are issued until the issue is remedied.             18:04:49

BY MS. KLABER:                                             18:04:51

Page 369

Q.   And so if that scenario that you just described occurred, it would be your assumption that a study covering that topic then is showing property value diminution based on groundwater contamination as opposed to drinking water contamination; is that correct?

MR. NIDEL:  Objection to form.

THE WITNESS:  I am assuming that the -- it's looking at groundwater contamination, yes, and I am also looking at a number of them did, proximity or distance to the source as well.

MS. KLABER:  I'm going to show you Exhibit 52.

(Deposition Exhibit 52 was marked for identification.)

BY MS. KLABER:

Q.   This is the article that is listed as No. 1 in your Figure E3, by Des Rosiers: "Environment and Value.  Does drinking water quality affect house prices."

A.   Oh.

Page 370

Q.    No?                                                      18:06:05

A.    What?                                                    18:06:05

Q.    I'm sorry.  Did you say no?                              18:06:05

A.    No, I didn't say no.  I think I                          18:06:07
might have just grunted it and recognized it.                 18:06:10

Q.    Oh, okay.  I didn't know whether it                      18:06:12
showed up as no.                                              18:06:12

A.    Oh.                                                      18:06:14

Q.    Are you able to see that exhibit?                        18:06:16

A.    I have it up.  I think I was just                        18:06:18
acknowledging that I saw the exhibit.  Sorry.                 18:06:23
No answer.                                                    18:06:25

Q.    Okay.  So this is one of the                             18:06:27
articles that you identify as studying property              18:06:32
value diminution due to groundwater                           18:06:40
contamination, because there is municipal                     18:06:43
delivery of water rather than property value                  18:06:48
diminution for contaminated drinking water,                   18:06:51
correct?                                                      18:06:53

A.    Yes.                                                     18:06:53

Q.    Have you reviewed this study in                          18:06:53
full?                                                         18:06:57

Page 371

A.    I have read this study.    18:06:57

Q.    Okay.  Can we look at Page 446 of    18:06:58

this study, the number in the upper right-hand    18:07:03

corner.    18:07:03

A.    Yes, I'm there.    18:07:03

Q.    And I am looking at the first full    18:07:19

paragraph on that page.    18:07:21

It says:  "The present research is    18:07:22

based on information provided by the Ministry    18:07:24

of the Environment of Quebec (MEQ) pertaining    18:07:28

to drinking water quality levels in    18:07:33

Charlesbourg, a major municipality (70,000    18:07:35

inhabitants) of the Quebec City region.  The    18:07:41

MEQ (1988) requires that a series of    18:07:43

bacteriological tests be performed on a regular    18:07:47

basis on water samples provided by the local    18:07:51

authorities.  Where results of tests do not    18:07:54

conform to established quality standards, a    18:07:57

public warning indicates that water should be    18:07:58

brought to the boil before use is issued to the    18:08:00

population of the concerned sector.  The    18:08:04

duration of the warning expressed in days    18:08:07

Page 372

depends on the seriousness of the    18:08:09

bacteriological problem.  The City of    18:08:13

Charlesbourg obtains its drinking water from    18:08:15

three distribution networks fed by wells, the    18:08:18

Sept-Ponts River, Lake Saint-Charles (via    18:08:22

Quebec City) and the Montmorency River by the    18:08:24

City of Beauport.  Over the 1990-1991 period,    18:08:29

Charlesbourg experienced repeated water quality    18:08:33

problems which resulted in a severe    18:08:35

gastro-enteritis epidemic among local    18:08:38

residents.  Considering the extent and duration    18:08:41

of the phenomenon, it is relevant to address    18:08:43

the issue of possible negative impacts on    18:08:45

property values."    18:08:47

      Do you see that?    18:08:47

    A.    I do.    18:08:48

    Q.    Do you read this as the article    18:08:49

providing the impact of contaminated drinking    18:08:54

water on the value of property?    18:09:00

      MR. NIDEL:  Objection to form.    18:09:02

      THE WITNESS:  Could you read back    18:09:06

that question, please.    18:09:07

Page 373

(The record was read as requested.)    18:09:16

MR. NIDEL:  Objection to form.    18:09:17

THE WITNESS:  I did -- I did see    18:09:19

that and I -- once again, when you are doing a    18:09:20

function transfer, it is not how each one    18:09:23

matches up, it's how they do collectively, and    18:09:28

also going back, that contaminated water, what    18:09:32

you are looking at -- at the -- you know,    18:09:36

percentage of property diminution is a common    18:09:40

effect that you see across these, and so, yes,    18:09:45

there is going to be a mix in the studies that    18:09:47

are used and not everyone needs to match    18:09:50

perfectly, it's what they provide collectively    18:09:53

that you use in your analysis.    18:09:56

BY MS. KLABER:    18:09:58

Q.   So in your report, Exhibit 50, your    18:09:58

rebuttal report, at E37, you describe this    18:10:05

study as one that involves the public delivery    18:10:08

of groundwater indicating that property value    18:10:16

diminutions are due to proximity to    18:10:20

contamination, not contaminated drinking water.    18:10:22

Do you stand by that description    18:10:27

Page 374

with respect to the Des Rosiers study?                 18:10:28

A.    I would need to look further down           18:10:32

through it.  Just give me a second here.            18:10:38

Q.    Okay.  If you see anything in here          18:10:40

indicating that the analysis is with respect to     18:10:45

property value diminution due to proximity to       18:10:48

groundwater contamination as opposed to             18:10:52

contaminated drinking water, please tell me         18:10:55

where you see it.                                   18:10:57

A.    So I don't see it in there, but I           18:11:01

did not say that that study had proximity.  I       18:11:03

was showing proximity where the red circles         18:11:06

are, and there is not a red circle on the Des       18:11:10

Rosiers one in my Figure E3.                        18:11:14

Q.    You referenced blue circles here in         18:11:16

Paragraph E37 that we're looking at.                18:11:19

A.    Right, but it was looking at all of         18:11:20

this information collectively.                       18:11:23

Q.    What does a blue circle show?               18:11:24

A.    A blue circle just shows where it is        18:11:26

city water, red circles show where its              18:11:29

proximity.                                          18:11:32

Page 375

Q.    And you tell me that a -- well, your report says that a blue circle indicates public water.

A.    What page are you on, what number?

Q.    Paragraph E37, same we were looking at.

You say that a blue circle indicates that drinking water is delivered from a public source, such that the property value diminution in due to proximity to contamination, not contaminated drinking water.

Do you see that?

A.    I do.

Q.    Do you believe that is an accurate description of the Des Rosiers study that we just read?

A.    Not the Des Rosiers study individually, but that was my interpretation of what the studies collectively show, and there could be exceptions.  You could pick at any one when you are doing a meta-analysis, but that's my interpretation of what they collectively

Page 376

show.                                                    18:12:24

Q.   So the Des Rosiers study is an                18:12:24

exception to what you state in Paragraph 37?            18:12:26

A.   Yes.                                          18:12:29

MR. NIDEL:  Objection to form.                18:12:29

MS. KLABER:  Okay.  If we could take          18:12:30

one last break so I can figure out if there are         18:12:33

any last questions to ask, and then hopefully,          18:12:37

we will be able to finish up relatively                 18:12:40

quickly.                                                18:12:43

MR. NIDEL:  Before we go on the               18:12:44

break, I just want to point out on the record           18:12:44

that we did probably an hour and a half ago,            18:12:45

send invoices for Industrial Economics.                 18:12:48

MS. KLABER:  Okay.  Thank you.                18:12:50

MR. NIDEL:  So you have those.                18:12:51

THE VIDEOGRAPHER:  This marks the            18:12:58

end of Media Unit 10.  Going off record.  The           18:12:59

time is 6:13 p.m.                                       18:13:03

(A short recess was taken.)                   18:13:05

THE VIDEOGRAPHER:  This marks the            18:28:46

beginning of Media Unit 11.  Going back on              18:28:47

Page 377

exactly everything you included in there, but    18:31:22

it's the direction of the flow of the    18:31:24

contamination.    18:31:29

    Q.    And just to be clear, you are saying    18:31:30

a property will experience value diminution if    18:31:34

it is within a certain proximity of the    18:31:39

contamination source, as well as in the    18:31:42

direction of the contamination dispersion,    18:31:45

regardless of whether there is any actual    18:31:48

contamination on a particular property in the    18:31:52

area; is that correct?    18:31:56

       MR. NIDEL:  Objection to form.    18:31:57

       THE WITNESS:  So it is the direction    18:31:59

of it and the potential for properties in that    18:32:06

direction to be affected.    18:32:13

       BY MS. KLABER:    18:32:17

    Q.    And that is regardless of whether or    18:32:17

not properties in that direction are actually    18:32:19

affected, correct?    18:32:22

       MR. NIDEL:  Objection to form.    18:32:24

       THE WITNESS:  Right, because there    18:32:26

could be the -- could be concerned about the    18:32:27

Page 380

risk to them, also the stigma just being                18:32:31

associated near them.  There is a number of             18:32:35

factors that could come in that would affect            18:32:38

it.                                                      18:32:44

MS. KLABER:  Okay.  I am going to                        18:32:45

show you one last exhibit.                               18:32:46

THE WITNESS:  Okay.  Cross your                          18:32:48

fingers that we are still here.                          18:32:49

BY MS. KLABER:                                           18:32:51

Q.    This exhibit has been marked Exhibit               18:32:51

1 in a prior deposition and we are going to              18:32:53

maintain that exhibit numbering here.  So it             18:33:01

will also be Defendant's Exhibit 1 here.                 18:33:03

THE WITNESS:  Have you sent it?                          18:33:15

BY MS. KLABER:                                           18:33:16

Q.    It has not yet come through.                       18:33:16

It should have come through now.                         18:33:39

This is a document with a Bates                          18:33:42

stamp on it of Behar_000401 and it is titled:           18:33:45

"Addendum to Residential Purchase or Lease              18:33:51

Agreement."                                              18:33:54

Do you see that at the top, there is                     18:33:55

Page 381

an address written in 7031 Keokuk Avenue?                    18:33:57

        A.    I do see that.                                  18:34:01

        Q.    Do you recognize that as the Behars'           18:34:02

address?                                                      18:34:04

        A.    I do.                                           18:34:05

        Q.    Let's turn to Paragraph 18 of this             18:34:05

addendum to residential purchase or lease                     18:34:15

agreement.                                                    18:34:18

            And this paragraph is a disclosure               18:34:20

regarding the Boeing Rocketdyne Santa Susana                  18:34:24

facility.                                                     18:34:24

            Are you familiar with the Boeing                 18:34:29

Rocketdyne Santa Susana facility at all?                      18:34:32

        A.    Yes.                                            18:34:33

        Q.    It reads:  "Buyer is aware that                18:34:34

there is a former Rocketdyne testing facility                 18:34:37

located in the Santa Susana Mountains between                 18:34:39

Chatsworth and Simi Valley.  The U.S.                         18:34:43

Department of Energy has indicated that there                 18:34:45

are some radioactive materials and industrial                 18:34:46

solvents on this site which are in the process                18:34:49

of clean-up.  Lawsuits have been filed alleging              18:34:51

Page 382

that the Rocketdyne facility has caused    18:34:54

environmental contamination beyond the site.    18:34:57

Two recent studies by UCLA and the University    18:34:59

of Michigan have indicated that residents    18:35:02

living within two miles of this facility may    18:35:05

have been exposed to toxic chemicals and have    18:35:06

slightly higher cancer rates than people in    18:35:09

communities farther from the lab.  However,    18:35:11

authors of both reports have warned that the    18:35:15

results of those studies do not conclusively    18:35:17

show that contamination from this facility    18:35:20

caused cancer or other illnesses in the    18:35:21

surrounding community.  The seller and real    18:35:24

estate brokers are unable to give any    18:35:26

definitive answers regarding potential health    18:35:28

hazards that may result from proximity of the    18:35:29

property to this former testing facility.    18:35:32

Buyer is advised to conduct an independent    18:35:36

investigation of this matter.  It is strongly    18:35:38

recommended that buyer have a soil test    18:35:40

conducted of the subject property to determine    18:35:41

any potential contamination."    18:35:44

Page 383

Do you see that?  18:35:44

A.  Yes.  18:35:47

Q.  Do you believe this disclosure would  18:35:48
result in property value diminution?  18:35:50

MR. NIDEL:  Objection to form and  18:35:53
foundation.  Incomplete hypothetical and beyond  18:35:55
the scope.  18:35:57

THE WITNESS:  It is of the type that  18:35:57
one would expect that there would be a property  18:36:00
value diminution.  18:36:03

BY MS. KLABER:  18:36:05

Q.  Are you aware that Jed Behar  18:36:05
testified that he was not concerned about this  18:36:08
disclosure because he believed he was protected  18:36:11
from any contamination by a mountain range?  18:36:13

MR. NIDEL:  Objection to form and  18:36:16
foundation.  Assumes facts not in evidence.  18:36:17

THE WITNESS:  I'm not aware.  18:36:19

BY MS. KLABER:  18:36:20

Q.  Are you aware that Alisa Behar  18:36:20
stated that she was not concerned about this  18:36:23
disclosure because she believed the Rocketdyne  18:36:25

Page 384

# EXHIBIT 44

# A Meta-Analysis of the Effect of Environmental Contamination and Positive Amenities on Residential Real Estate Values

**Authors**   Robert A. Simons and Jesse D. Saginor

**Abstract**

This paper addresses the effects of environmental contamination and positive amenities on proximate residential real estate property values in the United States. Contamination sources include leaking underground storage tanks, superfund sites, landfills, water and air pollution, power lines, pipeline ruptures, nuclear power plants, animal feedlots and several other urban nuisance uses. The study summarizes a literature review of 75 peer-reviewed journal articles and selected case studies, and generates a data set of about 290 observations that contain information about each study's loss (the dependent variable), with the independent variables being distance from the source, type of contamination, urban or rural environment, geographic region, market conditions and several other variables. Ordinary least squares is used to determine the effect of the contamination variables on reduction in property value. Broad contamination types, amenities, selected economic regions, distance from the source, information, research method and several other variables are statistically significant.

This research addresses how proximity to source influences environmental contamination effects on residential property values. Environmental sources that influence change property values include superfund sites, leaking underground storage tanks (LUSTs), landfills, air and water pollution, pipeline ruptures, nuclear power plants, overhead transmission lines, roads and several other urban nuisance uses. The paper begins with summarization of a literature review of 58 peer-reviewed technical journal articles and selected case studies from among over 100 articles and over 500 hours of research. Research findings are distilled into a data set of 230 observations that contain information about each study's dollar property value loss (the dependent variable), with the independent variables being distance from source, type of contamination, information, urban or rural environment, local and national market conditions, information about the contaminative event, remediation, study type and several other variables. Another 17 articles and 62

**Exhibit NGC 44**

JRER | Vol. 28 | No. 1 – 2006

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

observations were gleaned from literature on views, parks, beaches and other positive amenities and their effect on residential sales price. Regression analysis is used to determine the effect of contamination and amenity variables on sales price, expressed in dollars or percent.

Contamination affects property values through impact on the real estate bundle of rights. These include the rights to possess, enjoy, control and dispose of real property. A loss can occur in ways other than the discounted sale (*i.e.*, inability to access capital, finance or refinance, delay of sale, etc.). See Simons, Bowen and Sementelli (1999) or Jackson (2001) for a review how a loss can occur. The sales prices studied in this research are just the net proceeds in the disposal part of the real estate bundle of rights (realized capital loss), and do not consider the timing of sale. Conversely, positive amenities can provide additional value to property.

Meta-analysis has traditionally been used for clinical studies and never widely applied to other research disciplines. The main findings are that survey and case study methodologies consistently have a higher property value loss than regression analysis. While this observation has often been assumed, this study solidifies and quantifies the difference between methodologies. Other results are limited to the specific models and discussed in depth in their respective section. The motivation for conducting such an involved study is to determine the feasibility of developing a predictive model for analyzing environmentally-contaminated real estate, as well as whether different types of contamination can be included in the same model. This paper strives to understand and analyze the relevant literature.

## Literature Review

There has been one meta-analysis of similar scope for air pollution, and three comprehensive literature reviews on the effect of contamination on real estate values. These are covered below. In addition, Simons (2006) conducted a literature review of over 100 peer-reviewed articles on proximity influence (both positive and negative) for residential and commercial property, which is the source of the data set for this study. Despite several excellent international studies, the dataset consists of the literature pertaining to the United States due to difficulties in finding comparable economic indicators for non-U.S. studies.

Smith and Huang (1995) conducted a meta-analysis of 37 air pollution studies providing 86 estimates of marginal willingness to pay (MWTP) for reduction of PM10 (air pollution particulate of ten microns in diameter) during 1982–1984. The hedonic meta-analysis provides an average of the marginal values estimated under specific circumstances across several U.S. cities. The Ordinary Least Squares (OLS) regression model and the MAD econometric model were employed. Using the MAD estimator, a one unit reduction of PM10 ($\mu g/m^3$) resulted in an average MWTP (price increase) of \$110 in 1992 dollars, or about 0.1% of property value for each unit reduction in air pollution. Their study was

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

based on reconstructed data, and there were influential outliers that affected the results substantially. Their approach validates the use of OLS and related statistical techniques for this type of study.

Three other literature reviews on the broad subject of contamination and property values have recently been published in peer-reviewed journals. All three are thorough and logical. However, none of the studies made an attempt to statistically compare results, opting instead for a descriptive approach within contamination types or land use categories.

Farber (1998) focused on the theory and empirical outcomes for about 50 articles mostly on landfills, solid waste, superfund sites and other large projects, on residential property values. He used studies dated back to the 1960s. His analytical framework was from the public benefit-cost perspective, and covered the theory and methodology issues for both revealed preferences (*e.g.*, for actual sales using hedonic regression analysis) and stated preferences (using contingent valuation analysis). He found considerable agreement in the gradient effects across three post-announcement studies (with good public information), and that sanitary landfills and coal-fired utilities had comparable gradients. He also concluded that chemical refineries and nuclear power plants had roughly comparable gradients, and that the zonal effects of refineries and sanitary landfills were quite comparable and substantial (Farber, 1998: 11–12). Factors affecting property value included type of facility, distance, information (relative to an opening or closing date), thin markets and the employment effects of the source. He also brought his results to a base year for analysis.

Boyle and Kiel (2001) do not address theory, reviewing instead over 30 exclusively hedonic price studies and their effect on residential property. Their study is organized into air pollution, water quality, undesirable land uses, multiple pollution sources and which neighborhood variables are important. They focus on getting results into a same base year for comparison, and look to see if effects change over time, and with new information. They find that air studies produce mixed results, and posit that measurement factors are not generally known to homebuyers. The water quality studies consistently produce negative signs and statistical significance where theory would predict it, but with fluctuation in dollar amounts. Readily visible factors like water clarity and information announcements, and distance from water, are important factors. The studies on undesirable land uses also consistently produce negative signs and statistical significance where theory would predict it, but with considerable fluctuation in dollar amounts. Factors such as distance, information, neighborhood characteristics and visibility are important factors.

Jackson (2001) considered about 45 articles that dealt with the effects of environmental contamination on real estate, covering real estate appraisal theory and sales price analysis. The appraisal theory coverage includes stigma, mortgage financing, marketability of frozen assets, risk premium adjustment to the discount rate, market demand and timing of sale with respect to remediation. Other

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

transaction-specific items, notably possibility of third-party lawsuits and indemnification of buyers by sellers, are also addressed. In terms of the quantitative review, Jackson reviewed about 20 articles that had empirical results for residential and commercial property affected by landfills, petroleum, superfund sites and similar uses. His articles included hedonic regression analysis, case studies and reported appraisal outcomes. The residential studies were published from 1982 on. He looks at effects over time, distance, in different markets, and at sales price discounts (some found no effects) and other reported effects on transaction rates and seller financing. Jackson offers no final observations on the consistency of the findings, other than that 15 studies showed negative effects and 4 showed no effects, and that intervening factors may play a role. He calls for a more systematic study and additional research for non-residential property.

To summarize, the three literature reviews and consideration of the theory concerning the effects of contamination on property values reveal that the effect of contamination or another amenity on property value is based on several factors, including: land use type, distance from the source, pathway, passage of time, existence of the condition, information, calendar year, urban or rural environment and market conditions. In some cases, indemnification, the presence of litigation, may also play a role. Finally, study type (*e.g.*, regression, case study, survey) should be controlled for because they may also generate different results.

## Model and Data

The review of the literature on this topic has revealed a number of factors that can affect the price of residential real estate from environmental contamination, other neighborhood factors or offsite amenities. The dependent variable is the real change in property value in 2003 dollars. The regression model for this study is expressed as:

$$
\begin{aligned}
REALVAR = {} & \beta_0 + \beta_1 REALVAL + \beta_2 GEO + \beta_3 CONTCOND \\
& + \beta_4 LOGDIST + \beta_5 CONTTYPE + \beta_6 LITIG \\
& + \beta_7 INFO + \beta_8 URB + \beta_9 UNEMP \\
& + \beta_{10} CONV30RT + \beta_{11} LOGN + \beta_{12} STUDY + \varepsilon.
\end{aligned}
\tag{1}
$$

Where these factors are variables or vectors as follows:

$REALVAR$ = Property value diminution variation in 2003 dollars (dependent variable). An alternative specification is $DIMPERC$ the real loss in percent, used with other negative amenities. A third variation is $ABSVALREALVAR$, is the absolute value, used when positive amenities are mixed together.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

REALVAL = Unimpaired property value in 2003 dollars.

GEO = U.S. economic geographic location based on Salomon Brothers definitions: Farmbelt, Industrial Midwest, Mid-Atlantic Corridor, Mineral Extraction, New England, Northern California, South and Southern California.

CONTCOND = Influence condition is either in remediation or ongoing (ongoing), is the result of a sudden event (sudden), or is in post-remediation (NFA Postrem).

LOGDIST = Log of distance from the property to the source of contamination. For zones, the midpoint was used. If a property was adjacent to a site, the default distance was set at 0.00001 miles.

CONTTYPE = Type or source of contamination: including nuclear power plant or manufacturing facility (NUKEMANUF); a landfill, hazardous waste site, or Superfund site (SUPERFILL); linear sources such as roads, power lines, railroad tracks and pipelines (linear); groundwater contamination from leaking underground storage tanks and other sources (groundwater); air pollution including that form concentrated animal feeding operations (airCAFO); or urban disamenity including airport noise, sex offenders and rental property (urban disamenity). The positive amenity category (POSITIVE) includes views, proximity to parks, and new housing construction.

LITIG = The study was conducted for or the sale was part of litigation.

INFO = Information was disclosed based on the announcement of contamination (announcement of bad), the announcement of closing (announcement of closing), or common knowledge (common knowledge) at time of sale.

UNEMP = Unemployment rate in the county of sale in 1999.

CONV30RT = Conventional 30-year mortgage rate for the sale year.

URB = Intra-urban market location urban (urban), suburban (suburban), rural (rural) or mixed (mix) market where sale was recorded.

LOGN = Log of number of impacted properties from study (log of sample).

STUDY = Study methodology, such as hedonic regression (regression), survey (survey), or case study (case).

$\varepsilon$ = Error term.

## Data Set

The data set for this study is based on a detailed literature review conducted by Simons (2004). A list of the articles reviewed is included as Appendix A. This detailed review included about 75 peer-reviewed technical journal articles and selected case studies published since 1980, covering the empirical effects of contamination on residential and commercial property. It also covers a few dozen technical journal articles addressing the effects of positive amenities on property value. The 58 negative amenity articles used in this research represent the vast

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

majority of residential empirical articles reviewed in the other three literature reviews on the topic.[1] No known literature review has been compiled on positive amenities, so the 17 articles abstracted and utilized in this research are without comparison. The list of these articles is shown in Appendix B.

This literature review is organized based on type of contamination or influence. Each study generated 1–12 usable observations. Each observation contains about 40 variables about the property, sale location and year, contamination, sale amount, unimpaired value of similar property in the area, location from the influence or source, with the other economic data also available. This literature review on negatively impacted residential properties generated a total of 228 observations. The positive amenity group had 17 articles yielding 62 observations (shown below in parentheses), in the following groups:

- *LINEAR* (power lines, pipelines, railroad tracks, roads, 45 observations);
- *SUPERFILL* (superfund sites, landfills, hazardous waste sites, 75 observations);
- NUKEMANUF (nuclear power plants, manufacturing facilities with beneficial employment and/or positive tax base effects beyond contamination, 34 observations);
- *URBAN DISAMENITY* (shopping centers, sex offenders, rental property, 15 observations);
- *AIR* (air pollution including concentrated animal feeding operations, 35 observations);
- *GROUNDWATER* (water pollution from LUSTs and other sources, 24 observations); and
- *POSITIVE* (positive amenities including beach access, views, park and riparian area proximity, new housing construction, 62 observations).

The positive amenity group (*POSITIVE*) presents unique modeling issues, and thus are run separately at the end of this analysis. This was accomplished primarily to determine if there is any symmetry in proximity influence, and to determine the order of magnitude of the parameter estimates. Unless otherwise noted, positive amenities are not discussed until the last section of the paper.

Since the data on negative amenities were based almost exclusively on peer-reviewed articles, all of the observations are either residential or land zoned for residential use. Hedonic regression dominated the methodology typology, consisting of 72% (164) of all observations. Surveys accounted for 31 observations and case studies provided an additional 26 observations. The "other" study category, consisting of sale-resale analysis, conjoint analysis and similar techniques not in the previous categories added another 7 observations.

The change in property value (*REALVAR*) is the dependent variable in this research, although a model was also run with percent diminution (*DIMPERC*, calculated as *REALVAR/REALVAL*). An important independent variable is

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

unimpaired property value price (*REALVAL*). In cases where either one or the other was missing, the median home value for the sale locality from the most time-proximate decennial census was used and then inflated or deflated based on the overall Consumer Price Index for that year to get the estimated home value in 2003 dollars. If the change in property value was given in dollars rather than percent and no median sales price existed in the study, unimpaired property value was derived by dividing the dollar loss by the reported percentage reduction in value. In cases where a study covers multiple years, the average year was used. In studies using multiple periods, each period became a single observation in the data and the average year was used to determine property value.

The geographic variable (*GEO*) comes from the economic region definitions set forth by David Hartzell and others from Salomon Brothers for the purpose of real estate portfolio diversification analysis in the late 1980s, and highlighted in Malizia and Simons (1991). The Salomon Brothers' Economic Geography of the United States has eight distinct geographic regions.[2] A map of these regions is included in Appendix C.

Condition (*CONTCOND*) focuses on the environmental condition of the affected property at the time the study was conducted. In some cases, as in an explosion or chemical spill, it happened suddenly at a single point in time with a definite date corresponding to it. In other cases, such as noise from a railroad or airport, the effect is ongoing. The effect is also ongoing if the source of contamination is presently in remediation. For some studies, the property was in post-remediation and/or had received No Further Action status. A dummy variable was created for each of these situations.

The natural log (*LOGDIST*) of distance was used to convert miles from the distance from the source location. There was a wide range of variation in the distance variable, from 25 miles for a nuclear power plant to zero in cases of mold, asbestos, groundwater or similar on-site forms of contamination. For studies that used zones or buffers, the midpoint was used.[3]

There were six general types of contamination based on the overall sample.[4] These categories were needed because of the relatively small sample size. The groups were created because the expected effects of each type were of a similar magnitude and from the same general pathway. The large operating plant category (*NUKEMANUF*) includes manufacturing plants, airports and nuclear plants that have a large tax base. This category is of particular interest because it has positive location effects (access to jobs, large positive tax base impacts, and sometimes large amounts of open space), which may offset negative effects of potential explosions or other hard-to-predict events that have a high degree of uncertainty. The (*SUPERFILL*) variable contains landfills, hazardous waste sites and Superfund sites. These sites had a relatively small overall tax base, and limited jobs. Linear sources of negative proximity influence (*LINEAR*) are classified as power lines, railroads, roads and pipelines. Groundwater (*GROUNDWATER*) focused on the type of contamination, and included general water pollution studies, effects from

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**Page 91**

LUSTs, water bound PCBs and other sources. Air pollution (*AIR*) comprised sources such as particulate matter without a known source, mold, asbestos, or similar forms of airborne contamination, including concentrated animal feeding operations (*CAFOs*). Urban disamenities (*URBAN*) included a wide range of urban phenomena, including proximity to sex offenders, traffic density from shopping centers, proximity to concentrations of rental property and airport noise.

Many of the peer-reviewed technical journal articles were prepared by researchers with purely an academic interest in the determining the property effects from an environmental source. Several studies were also involved in litigation, such as a class action suit in response to contamination. In the case of concentrated animal feeding operations, the lawsuit may only include one adjacent property due to their relatively remote locations. Other litigation includes cases against governmental entities with tax assessment authority. Hence, a litigation dummy (*LITIG*) was included to determine if these sales were more likely to sustain larger losses.

The information variable (*INFO*) captures the amount of media or other public exposure received regarding the source of contamination. This dummy had three classifications: common knowledge, announcement of a bad thing and announcement of closing. Common knowledge refers to the obvious; most people can see a nuclear power plant or large industrial plant or understand the source of noise from an airport or a railroad in their backyard. Additionally, an explosion or similar sudden event is also considered common knowledge. Announcement of a bad thing is the discovery of the contamination, such as a study conducted that revealed groundwater contamination or the release of a radioactive cloud. Announcement of closing occurs when the source is closed, and often occurred with landfills that had reached capacity.

Two other variables were inserted to control for variation in economic market conditions. The unemployment variable (*UNEMP2K*) used the 1999 unemployment rate in the county of sale (from the 2000 Census) and served as a proxy variable for local economic conditions on the demand side of the housing market. To control for the national economy and interest rates for the year of sale, the annual average rate of the conventional 30-year mortgage (*CONV30RT*) was included.

The urban variable (*URB*) addresses intra-urban location of the sales area, as a proxy for market depth. This variable was specified as urban, suburban, rural, or mixed. Some studies mixed either urban and suburban or suburban and rural depending on the location of the contamination.

The study methodology (*STUDY*) and log of the number of impacted properties (*LOGN*) were also included to control for the type of research conducted. The study methodology dummy is one of four categories: regression, case, survey, or other. There were several studies that did not fit in any of the first three, such as pre- and post-analysis research.[5] The number of impacted properties ranged from several thousand for a hedonic regression to only one for a case study.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

One final note merits mention before discussing the model results. Some of the results are dated and may not be indicative of changes in either the market or existing laws. The disclosure laws from the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) changed in 1994 and again in 2003. The 1994 change required disclosure of environmental hazards to residents, which likely heightened awareness of nearby contamination to prospective homebuyers. The 2003 change, largely in response to possible terrorist threats, included several chemicals that were not sources of contamination, but nearby existing hazards (EPA Legislative website). Despite the changes in laws and market behavior, there is no indication that it affected the results of each included study, as well as the overall meta-analysis.

## Regression Diagnostics

The data for negative amenities were checked for multicollinearity between independent variables and report the VIF and TOL indicators along with the model results. No variables had multicollinearity problems, since all scored well below the VIF cutoff of 10.0. The data set was also screened for outliers, and a model was run with some outliers excluded. To test for heteroscedasticity, a scatterplot was run of the residuals of the dependent variable. No fanning or cone-shaped pattern was evident; however, several outliers with large losses were present below the trend line. As a result, the outlier run was performed with these additional observations excluded.

Exhibit 1 contains descriptive statistics for the negative factors data set. The average loss was $15,055, or 9.5%, for a home with an unimpaired value of $157,818. The typical distance was slightly less than two miles from the source. Most other important factors are dummy variables, and this exhibit reflects their presence in the data set (*e.g.*, 77 sales from the industrial Midwest, 154 sales with common knowledge, 57 with litigation).

## Results

A number of models were run. The overall model with negative amenities contains the entire set of 228 observations. This model was later run without outliers. To avoid a meta-analysis pitfall, called a filebox effect, a smaller dataset using no more than five observations per study was also used. Of the 228 observations, 34 were associated with zero property value loss. These observations were included in all of the models to minimize bias in the effects of contamination on property value.

The base model included all residential sales affected by negative proximity influences. Exhibit 2 contains results for this full model consisting of all 228 observations. The $F$-Statistic was 23.9, and the adjusted $R^2$ was .75. This means the variables in the model explain 75% of the variation in the decrease in property values.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

**Page 93**

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**Exhibit 1** | Descriptive Statistics

|  | Range | Min. | Max. | Mean | Std. Dev. |
|---|---|---|---|---|---|
| Diminished Property Value | $473,623 | −$438,198 | $35,425 | −$15,055 | $45,038 |
| Property Value | $1,158,722 | $25,278 | $1,184,000 | $157,878 | $143,848 |
| Year of Sale | 29 | 1973 | 2002 | 1989 | 6.50 |
| Log of Distance | 14.73 | −11.51 | 3.22 | −4.36 | 5.76 |
| Unemployment Rate 2000 | 9.23 | 2.01 | 11.24 | 6.13 | 2.17 |
| Conventional 30-Year Mortgage Rate | 10.09 | 6.54 | 16.63 | 9.97 | 2.17 |
| Log of Sample Size | 5.30 | 0 | 5.30 | 2.48 | 1.11 |
| Geographic Regions |  |  |  |  |  |
| Northeast | 27 |  |  |  |  |
| Industrial Midwest | 77 |  |  |  |  |
| Mid-Atlantic | 25 |  |  |  |  |
| South | 28 |  |  |  |  |
| Farmbelt | 9 |  |  |  |  |
| Mineral Extraction | 17 |  |  |  |  |
| Southern California | 16 |  |  |  |  |
| Northern California | 22 |  |  |  |  |
| U.S. | 7 |  |  |  |  |
| Contamination Condition |  |  |  |  |  |
| Ongoing | 207 |  |  |  |  |
| Sudden | 15 |  |  |  |  |
| NFA Post-remediation | 6 |  |  |  |  |

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**Exhibit 1** | (continued)

Descriptive Statistics



| | Range | Min. | Max. | Mean | Std. Dev. |
|---|---|---|---|---|---|
| **Source of Contamination** | | | | | |
| Nuclear Power Plant, Manufacturing | 34 | | | | |
| Landfill, Hazardous Waste, Superfund | 75 | | | | |
| Linear | 45 | | | | |
| Groundwater | 24 | | | | |
| Air, CAFO | 35 | | | | |
| Urban disamenity | 15 | | | | |
| Litigation | 57 | | | | |
| **Information** | | | | | |
| Common knowledge | 154 | | | | |
| Announcement of a bad thing | 53 | | | | |
| Announcement of a closing | 9 | | | | |
| **Location** | | | | | |
| Urban | 186 | | | | |
| Suburban | 8 | | | | |
| Rural | 14 | | | | |
| Mix | 20 | | | | |
| **Study Methodology** | | | | | |
| Regression | 164 | | | | |
| Case | 26 | | | | |
| Survey | 31 | | | | |
| Other | 7 | | | | |

Note: Valid N = 228.

**Exhibit 2** | Full Model

| | Beta | Std. Error | Std. Beta | t-Stat. | Sig. | Tolerance | VIF |
|---|---|---|---|---|---|---|---|
| (Constant) | 24057.984 | 16272.584 | | 1.478 | 0.141 | | |
| Real 2003$ value | −0.232 | 0.016 | −0.741 | −14.882 | 0.000 | 0.453 | 2.206 |
| Northeast | 10001.824 | 7450.501 | 0.072 | 1.342 | 0.181 | 0.391 | 2.556 |
| Industrial Midwest | −11745.621 | 6577.420 | −0.124 | −1.786 | 0.076 | 0.234 | 4.267 |
| South | −21074.724 | 7913.008 | −0.154 | −2.663 | 0.008 | 0.336 | 2.975 |
| Farmland | −2986.366 | 11019.416 | −0.013 | −0.271 | 0.787 | 0.493 | 2.030 |
| Mineral Extraction | 12321.428 | 8983.833 | 0.072 | 1.372 | 0.172 | 0.407 | 2.456 |
| Southern Calif. | 24.081 | 10117.610 | 0.000 | 0.002 | 0.998 | 0.339 | 2.946 |
| Northern Calif. | 20172.658 | 8209.452 | 0.133 | 2.457 | 0.015 | 0.386 | 2.591 |
| U.S. | 22769.792 | 12773.813 | 0.087 | 1.783 | 0.076 | 0.467 | 2.141 |
| Sudden | 9666.305 | 7362.430 | 0.070 | 1.313 | 0.191 | 0.401 | 2.495 |
| NFA Postrem | 60833.211 | 25636.382 | 0.089 | 2.373 | 0.019 | 0.790 | 1.266 |
| Log of distance | 873.157 | 426.798 | 0.112 | 2.046 | 0.042 | 0.377 | 2.656 |
| Nukemanuf | −25885.182 | 7013.232 | −0.205 | −3.691 | 0.000 | 0.363 | 2.752 |
| Superfill | 1531.336 | 6384.856 | 0.016 | 0.240 | 0.811 | 0.254 | 3.941 |
| Groundwater | −16610.194 | 9710.841 | −0.115 | −1.710 | 0.089 | 0.246 | 4.060 |
| AirCAFO | −19303.986 | 7069.330 | −0.155 | −2.731 | 0.007 | 0.349 | 2.864 |
| Urban disamenity | −12018.997 | 10410.890 | −0.066 | −1.154 | 0.250 | 0.340 | 2.938 |
| Litigation dummy | −9002.766 | 5201.625 | −0.087 | −1.731 | 0.085 | 0.447 | 2.237 |
| Announcement of bad thing | −1452.143 | 6809.926 | −0.015 | −0.213 | 0.831 | 0.238 | 4.206 |
| Announcement of closing | 52377.579 | 14067.737 | 0.227 | 3.723 | 0.000 | 0.302 | 3.309 |
| Suburban | −8508.088 | 10232.289 | −0.035 | −0.831 | 0.407 | 0.640 | 1.563 |
| Rural | 11095.010 | 9027.876 | 0.059 | 1.229 | 0.221 | 0.483 | 2.071 |
| Mix | −1198.789 | 6887.093 | −0.008 | −0.174 | 0.862 | 0.597 | 1.674 |
| 2000 unemployment rate | 1878.386 | 1070.011 | 0.091 | 1.755 | 0.081 | 0.421 | 2.378 |
| 30yrrt | 342.978 | 978.125 | 0.017 | 0.351 | 0.726 | 0.500 | 2.000 |
| Log of sample size | 1212.765 | 2635.505 | 0.030 | 0.460 | 0.646 | 0.258 | 3.874 |
| Case | −45612.525 | 10514.199 | −0.328 | −4.338 | 0.000 | 0.196 | 5.089 |
| Survey | −10561.260 | 6151.500 | −0.081 | −1.717 | 0.088 | 0.510 | 1.960 |
| Other | 2054.510 | 10991.003 | 0.008 | 0.187 | 0.852 | 0.631 | 1.585 |

Notes: Dependent Variable: real 2003$ dim. Reference categories: Mid-Atlantic, ongoing, linear, common knowledge, urban, regression. $N = 228$, DF $= 198$, adj. $R^2 = .75$, $R^2 = .78$, F-Statistic $= 23.9$.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

The reference categories for the model were as follows: Mid-Atlantic region, common knowledge of contamination, ongoing site condition, linear contamination sources (the one with the smallest and most localized losses) and regression analysis methodology. A positive parameter estimate means losses from contamination are smaller, a negative number means losses increase. The following variables had statistically significant results:

- *REALVAL*: Property losses due to proximity to environmental contamination were $0.23 higher for every additional dollar in real unimpaired value, and were statistically significant at a 99% level of confidence, holding all else constant.

- *GEO*: In terms of economic geography variables, compared with the Mid-Atlantic region (reference category), the Northern California region and the U.S. overall had lower losses of approximately $21,000, significant at 90% or better. This may be related to more rapid overall property appreciation. The South region had larger losses of approximately $21,000, significant at 95%, and the Industrial Midwest region had losses that were $11,700 deeper at a 90% level of confidence. Other regions were not significantly different than the Mid-Atlantic region.[6]

- *CONTCOND*: The condition of the contamination variables is compared to the reference category where the environmental condition was ongoing. Contaminated properties that were either in post-remediation or received an NFA had a large reduction in losses (over $60,000) and were significant at the 95% level of confidence. The plausibility of this parameter estimate's magnitude is limited. It may be unduly influenced by a few observations. Sales proximate to with sudden events (*e.g.*, explosions) had losses that were smaller by approximately $6,000, but results were only significant at the 80% level of confidence, beyond normal scientific standards.

- *LOGDIST*: The logarithm of distance is positive (873) and significant at the 95% level. As a property is located away from the source, the effect on price is positive and losses get smaller.

CONTTYPE: Type of contamination: compared with a property sold proximate to linear sources of nuisance, such as railroad tracks and roads, and power lines and pipelines, which is the reference category.

- *NUKEMANUF*: Nuclear power plants and manufacturing facilities with substantial ongoing employment had the expected negative sign, and were significant at the 95% level. The parameter estimate of $-$25,900 was quite large.

- *SUPERFILL*: Superfund sites and incinerators, landfills and hazardous waste sites were not significantly different from linear effects. Several of these observations had little or no effect.

- *GROUNDWATER*: Groundwater contamination including water quality as well as contamination without a known source had a significant, negative

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

84 | Simons and Saginor

effect, resulting in losses that were $16,600 larger (significant at the 90% confidence level).

- *AIR*: Air pollution including CAFOs also had a significant, negative effect, with losses that were $19,300 larger (significant at the 99% confidence level).

- *URB DIS*: Urban disamenity (sex offenders, shopping malls, airport noise) had the expected negative sign, but it was not statistically significant.

- *LITIG*: Litigation has a significant negative effect on value. Properties involved in litigation had losses that were $9,000 larger, at a 90% level of confidence, holding all else constant.

- *INFO*: The announcement of a bad thing was negative but not significantly different from an ongoing source or a source in remediation. The announcement of a closing was significant and positive ($52,300, with a 99% level of confidence) supporting the theory that property values increase with news of the source's closing. However, the magnitude of the positive effects is almost too large to be plausible.

- *UNEMP*: The local unemployment rate variable was significant and positive. This result was unexpected, given that the theory that increased unemployment has a positive affect on property values is counterintuitive.

- *STUDY*: Case study (−$45,600) and survey methods (−$10,600) were both statistically significant at the 90% level or better. Unlike the reference category of hedonic regression models that use a large data sample, case methods often have larger losses because they focus on one or a few properties more likely to show a definite change. Survey methods are also negative because respondents are likely to have better and more complete information than actual sales, where information may not be complete. It is interesting to note that log of sample size was not statistically significant.

## Outlier Analysis

Exhibit 3 contains the results of the residential model without outliers. The dependent variable was percentage reduction in property value.[7] There were several observations that were located a very large distance from the source of contamination (greater than ten miles); results showed a positive effect in response to contamination (indicating some misspecification in the statistical models), or observations that had an unusually high prevailing mortgage rate (over 15%). Observations with unimpaired property values in excess of $500,000 were removed.[8] Running the same model as Exhibit 2 without these outliers resulted in a data set of 184 observations. The outliers included two studies that dealt with vacant residential land and multifamily structures.

The $F$-Statistic dropped substantially from the original model to 4.9, with a parallel decrease in the adjusted $R^2$ .38. Despite the loss in overall goodness of

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

**Exhibit 3** | Outlier-free Model

| | Beta | Std. Error | Std. Beta | t-Stat. | Sig. | Tolerance | VIF |
|---|---|---|---|---|---|---|---|
| (Constant) | −0.043 | 0.103 | | −0.415 | 0.679 | | |
| Real 2003$ value | 0.000 | 0.000 | −0.137 | −1.493 | 0.137 | 0.402 | 2.487 |
| Northeast | −0.041 | 0.042 | −0.101 | −0.956 | 0.340 | 0.305 | 3.275 |
| Industrial Midwest | −0.087 | 0.038 | −0.323 | −2.266 | 0.025 | 0.166 | 6.027 |
| South | −0.074 | 0.045 | −0.168 | −1.658 | 0.099 | 0.330 | 3.034 |
| Farmland | −0.101 | 0.053 | −0.171 | −1.897 | 0.060 | 0.417 | 2.395 |
| Mineral Extraction | 0.021 | 0.044 | 0.046 | 0.475 | 0.636 | 0.366 | 2.736 |
| Southern Calif. | 0.023 | 0.059 | 0.048 | 0.394 | 0.694 | 0.225 | 4.438 |
| Northern Calif. | 0.041 | 0.042 | 0.094 | 0.968 | 0.335 | 0.358 | 2.791 |
| U.S. | 0.007 | 0.068 | 0.008 | 0.107 | 0.915 | 0.571 | 1.750 |
| Sudden | 0.064 | 0.040 | 0.156 | 1.605 | 0.111 | 0.356 | 2.811 |
| NFA Postrem | 0.115 | 0.084 | 0.113 | 1.374 | 0.172 | 0.495 | 2.019 |
| Log of distance | 0.006 | 0.003 | 0.256 | 2.212 | 0.028 | 0.252 | 3.961 |
| Nukemanuf | −0.097 | 0.040 | −0.240 | −2.412 | 0.017 | 0.340 | 2.938 |
| Superfill | −0.048 | 0.041 | −0.180 | −1.195 | 0.234 | 0.148 | 6.738 |
| Groundwater | −0.085 | 0.052 | −0.219 | −1.627 | 0.106 | 0.187 | 5.348 |
| AirCAFO | −0.091 | 0.038 | −0.266 | −2.428 | 0.016 | 0.281 | 3.561 |
| Urban disamenity | −0.043 | 0.059 | −0.089 | −0.724 | 0.470 | 0.224 | 4.460 |
| Litigation dummy | −0.061 | 0.030 | −0.207 | −2.049 | 0.042 | 0.331 | 3.025 |
| Announcement of bad thing | 0.012 | 0.041 | 0.043 | 0.290 | 0.772 | 0.154 | 6.484 |
| Announcement of closing | 0.128 | 0.074 | 0.203 | 1.715 | 0.088 | 0.241 | 4.148 |
| Suburban | 0.001 | 0.052 | 0.001 | 0.013 | 0.990 | 0.640 | 1.563 |
| Rural | −0.102 | 0.053 | −0.196 | −1.921 | 0.057 | 0.325 | 3.075 |
| Mix | −0.013 | 0.034 | −0.030 | −0.367 | 0.714 | 0.493 | 2.030 |
| 2000 unemployment rate | 0.004 | 0.006 | 0.070 | 0.669 | 0.504 | 0.307 | 3.261 |
| 30yrrt | 0.014 | 0.005 | 0.227 | 2.491 | 0.014 | 0.408 | 2.450 |
| Log of sample size | −0.003 | 0.016 | −0.026 | −0.195 | 0.846 | 0.194 | 5.151 |
| Case | −0.116 | 0.057 | −0.294 | −2.028 | 0.044 | 0.160 | 6.242 |
| Survey | −0.063 | 0.031 | −0.170 | −2.033 | 0.044 | 0.482 | 2.077 |
| Other | 0.083 | 0.053 | 0.124 | 1.576 | 0.117 | 0.549 | 1.820 |

Notes: Dependent Variable: DIMPERC (Property diminution in percent). Reference categories: Mid-Atlantic, ongoing, linear, common knowledge, urban, regression. $N = 184$, $DF = 154$, adj. $R^2 = .38$, $R^2 = .48$, F-Statistic = 4.9.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

fit, this outlier-free model makes good economic sense. Many of the variables significant in the first model became slightly more significant in the model without the outliers. In some cases, parameter estimates also changed substantially, and these are reflected in percent because the dependent variable is percent (not real) diminution in property value. The Northern California region (4.1%) and U.S. (0.7%) maintained their expected positive signs, but were no longer significant at the 90% level of confidence. Farmland remained negative ($-10.1\%$) and was significant near the 95% level. Post-remediation NFA had a reduction of 11.5% on losses but was not significant. Two variables not significant in the previous model but significant here are the rural location variable and the 30-year conventional mortgage rate. The rural variable had a larger loss of 10.2% at the 90% level. The 30-year conventional mortgage rate (1.4% at the 95% level) is now significant. This suggests that the expected rate of real estate appreciation does not cause any reduction in potential buyers from higher interest rates. Overall, the model presented in Exhibit 3 had the most plausible parameter estimates of any of the models (*e.g.*, none appeared excessively high or low). Exhibit 3 also displays the highest VIF values and weaker *t*-tests, which brings into question the reliability of several coefficients.

## Common Validity Threats to Meta-Analysis

Unlike conventional regression analysis where the unit of observation is individual sales, meta-analysis poses certain additional validity threats due to the nature of data collection. Wolf (1986: 9) has identified a number of potential validity threats to meta-analysis, many of which were avoided in the current study by the selection of only peer-reviewed studies. These include: having an identical dependent variable (dollar/percentage loss in value) for all studies, reporting instead of interpreting the results from each article, having rigorous oversight on data input procedures and by having a strong theoretical basis for finding results.

However, there are a few threats. One of the more important is the "file drawer effect" (studies with no significant findings get buried in a file drawer, hence a bias toward studies with significant findings); sensitivity of the results where multiple observations are derived from one study (Wolf 1986: 24–45), and using weighting schemes where studies had a different sample size.[9]

The file drawer effect looks at the potential bias of peer-reviewed journals to accept research that only has findings supporting a theory. While there are several studies accounting for 34 observations in the overall model that show no effect, most indeed have some significant negative results, as predicted by theory. The test for this problem is to determine the "fail safe *N*," the number of studies with a positive finding that would be required to "overturn" the findings of statistical significance. Following Wolf (1986: 38–39), the formula to determine the fail safe ($N_{fs}$) where $p = .05$ (*e.g.*, a 95% level of significance) is: $N_{fs.05} = (\Sigma Z / 1.645)^2 - N$, where $\Sigma Z =$ the sum of individual $Z$ scores (the standardized score associated with each $p$ value) and $N =$ the number of studies. Solving for $N_{fs.05}$, the number

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

of studies (not observations) needed to invalidate the statement that contamination negatively affects property values. The sum of the $Z$ scores was 8.11. There were 58 studies, and assuming the absolute value of the equation, it would take 34 studies with a positive finding to overturn the results.

In order to test for study bias issues and using the maximum number of observations, the model was run with a maximum of five observations from any one peer-reviewed study. Studies with more than five observations were input into SPSS and five observations were then randomly selected. The remaining observations were taken out of the model. This diminished the degrees of freedom available ($N = 160$). The $F$-Statistic for the five observations maximum model was 21.2 and the adjusted $R^2$ was .785. Unlike the previous models, the constant is significant and positive. In general, similar signs and results are expected, but statistical significance will drop. Therefore, the threshold of statistical significance is relaxed to a confidence level of 85%.

For this model, the key variables of unimpaired value and distance, the results in Exhibit 4 were essentially the same as in the basic model displayed in Exhibit 2. However, the five observation maximum model had several different variables that were statistically significant when compared to the base model. The Northeast region was positive, showing a reduction of $11,268 from the Mid-Atlantic reference category, and was significant at the 15% level. The South, Northern California and U.S. regions are now found to be statistically insignificant. The *SUDDEN* variable is also positive at $10,828 and at the 15% level, indicating that property values affected by a sudden contamination event sell for a higher amount. Among the intra-urban variables, the suburban variable shows larger losses of $15,173 at the 10% level, which is higher than urban properties. This may be a result of greater market depth, but may also reflect higher initial sales prices. In Model 4, unlike the base model, groundwater, litigation and the unemployment rate have all become insignificant. The case and survey method variables continue to be negative, but their significance increases in both cases compared to earlier models.

## Adding in Positive Amenities

As a final analysis, 62 observations from 17 peer-reviewed articles that address the effect of positive amenities on property values were added. The types of positive amenities included beach frontage, water view (including desert riparian areas, river, lake and ocean), parks, golf courses and new housing construction. The studies included residential land uses, but a few included residential lots prior to development, rather than existing houses. The research hypothesis is that markets can internalize proximity to positive factors and that this effect can be determined, holding all other factors in the model constant.

However, there are some conceptual issues, the primary one of which is that proximity to these features is positive, rather than negative. Thus, the distance

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

88 | Simons and Saginor

**Exhibit 4** | Five Observations Max Model

| | Beta | Std. Error | Std. Beta | t-Stat. | Sig. | Tolerance | VIF |
|---|---|---|---|---|---|---|---|
| (Constant) | 37559.92 | 16215.22 | | 2.316 | 0.022 | | |
| Real 2003$ value | −0.18 | 0.01 | −0.709 | −12.230 | 0.000 | 0.399 | 2.505 |
| Northeast | 11268.32 | 7577.76 | 0.081 | 1.487 | 0.139 | 0.454 | 2.203 |
| Industrial Midwest | −12390.90 | 6410.21 | −0.140 | −1.933 | 0.055 | 0.256 | 3.905 |
| South | −11084.33 | 8164.75 | −0.097 | −1.358 | 0.177 | 0.260 | 3.840 |
| Farmland | 4004.47 | 10501.94 | 0.021 | 0.381 | 0.704 | 0.423 | 2.365 |
| Mineral Extraction | 9007.70 | 8717.44 | 0.065 | 1.033 | 0.303 | 0.343 | 2.916 |
| Southern Calif. | 1031.53 | 10234.09 | 0.006 | 0.101 | 0.920 | 0.361 | 2.771 |
| Northern Calif. | 9368.38 | 8093.56 | 0.065 | 1.158 | 0.249 | 0.423 | 2.362 |
| U.S. | −13367.36 | 11954.14 | −0.067 | −1.118 | 0.266 | 0.371 | 2.699 |
| Sudden | 10828.01 | 7251.98 | 0.090 | 1.493 | 0.138 | 0.369 | 2.709 |
| NFA Postrem | 46378.98 | 22401.25 | 0.090 | 2.070 | 0.040 | 0.711 | 1.407 |
| Log of distance | 617.23 | 420.82 | 0.090 | 1.467 | 0.145 | 0.360 | 2.778 |
| Nukemanuf | −17485.90 | 7052.61 | −0.154 | −2.479 | 0.014 | 0.349 | 2.865 |
| Superfill | −1316.68 | 6317.99 | −0.015 | −0.208 | 0.835 | 0.243 | 4.112 |
| Groundwater | −13506.52 | 9939.17 | −0.100 | −1.359 | 0.177 | 0.249 | 4.015 |
| AirCAFO | −13617.72 | 7018.98 | −0.126 | −1.940 | 0.055 | 0.320 | 3.123 |
| Urban disamenity | −9851.90 | 10217.23 | −0.059 | −0.964 | 0.337 | 0.362 | 2.762 |
| Litigation dummy | −4061.32 | 4820.70 | −0.045 | −0.842 | 0.401 | 0.471 | 2.125 |
| Announcement of bad thing | −1728.19 | 6580.44 | −0.020 | −0.263 | 0.793 | 0.240 | 4.164 |
| Announcement of closing | 50878.33 | 21168.88 | 0.218 | 2.403 | 0.018 | 0.163 | 6.124 |
| Suburban | −15173.23 | 9061.23 | −0.081 | −1.675 | 0.096 | 0.568 | 1.761 |
| Rural | 59.89 | 11185.56 | 0.000 | 0.005 | 0.996 | 0.255 | 3.920 |
| Mix | 1223.33 | 6522.79 | 0.009 | 0.188 | 0.852 | 0.578 | 1.729 |
| 2000 unemployment rate | 827.62 | 1077.82 | 0.043 | 0.768 | 0.444 | 0.432 | 2.314 |
| 30yrrt | −97.11 | 1018.98 | −0.005 | −0.095 | 0.924 | 0.462 | 2.163 |
| Log of sample size | −3385.06 | 2833.48 | −0.094 | −1.195 | 0.234 | 0.219 | 4.570 |
| Case | −51944.43 | 13584.26 | −0.414 | −3.824 | 0.000 | 0.115 | 8.723 |
| Survey | −16105.96 | 6263.07 | −0.134 | −2.572 | 0.011 | 0.495 | 2.021 |
| Other | 1276.32 | 9990.70 | 0.006 | 0.128 | 0.899 | 0.530 | 1.885 |

*Notes:* Dependent Variable: real 2003$ dim. Reference categories: Mid-Atlantic, ongoing.
Reference categories: Mid-Atlantic, ongoing linear, common knowledge, urban, regression. $N =$
160, DF $=$ 130, adjusted $R^2 =$ .79, $R^2 =$ .82, F-Statistic $=$ 21.2.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

variable can be expected to become insignificant because the effects of new observations on sales price run in the opposite direction than negative amenities. Also, the geographic distribution of the positive amenities is not as broad as for the negative amenities: most of the observations were in the Northern California and South coastal regions, with a few in the Midwest. The dependent variable was also changed, using the absolute value of the magnitude of the change in dollars instead. A dummy variable for the positive amenities was also added.

Exhibit 5 shows the results of a model run with the 228 negative amenities observations, plus the 62 positive amenity observations. The model had an $R^2$ of .63 and an $F$-Statistic of 14.8.[10] This is adequate, but lower than with the previous comparable model containing fewer observations of only negative factors. The parameter estimate of the *POSITIVE* variable was positive and statistically significant at the 99% level of confidence. However, several other variables that were significant under earlier runs with just negative models became insignificant. A large negative or positive parameter estimate means that the value effects due to proximity to an environmental attribute are greater, and a small parameter estimate closer to zero means the impact is less. The following variables had statistically significant results:

- *REALVAL*: Property values due to proximity to positive or negative environmental attributes were $0.27 higher for every additional dollar in real unimpaired value. This value was statistically significant at the 99% level of confidence, holding all else constant;

- *GEO*: Compared with the Mid-Atlantic region (reference category), the Northeast ($-$13,963), Southern California ($-$30,328) and the U.S. region ($-$27,642) were significant at the 85% level or better. Unlike in the first model, Northern California, South and the Industrial Midwest regions were no longer significant, which is expected due to the offsetting combination of positive and negative studies on these regions. The other regions were not significantly different from the Mid-Atlantic region in either model.

- *CONTCOND*: The condition of the contamination variables is compared to where the environmental condition was ongoing (reference category). Properties receiving an NFA or that were in post-remediation continued to be significant at the 95% level of confidence. The few observations in this category may exert greater influence than can be realistically expected. Sudden events were not significantly different from the ongoing sources.

- *LOGDIST*: The logarithm of distance is negative ($-$111) but not significant. Unlike the first model focusing on proximity to negative effects, this result was expected. Introducing interaction terms to isolate distance for positive or negative attributes did not change the lack of significance.

CONTTYPE: Compared with a property sold proximate to linear sources of nuisance, which is the reference category.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**Page 103**

**Exhibit 5** | Full Model including Positive Amenities

| | Beta | Std. Error | Std. Beta | t-Stat. | Sig. | Tolerance | VIF |
|---|---|---|---|---|---|---|---|
| (Constant) | −352.738 | 20732.549 | | −0.017 | 0.986 | | |
| Real 2003$ | 0.266 | 0.018 | 0.769 | 14.542 | 0.000 | 0.508 | 1.967 |
| Northeast | −13962.826 | 9476.326 | −0.089 | −1.473 | 0.142 | 0.393 | 2.546 |
| Industrial Midwest | 9096.404 | 8592.284 | 0.088 | 1.059 | 0.291 | 0.205 | 4.870 |
| South | 4970.477 | 9014.822 | 0.041 | 0.551 | 0.582 | 0.261 | 3.831 |
| Farmland | 18783.687 | 13446.290 | 0.071 | 1.397 | 0.164 | 0.548 | 1.826 |
| Mineral Extraction | −7517.679 | 10711.699 | −0.042 | −0.702 | 0.483 | 0.404 | 2.474 |
| Southern Calif. | −30327.869 | 11184.110 | −0.172 | −2.712 | 0.007 | 0.354 | 2.822 |
| Northern Calif. | −11846.742 | 9172.574 | −0.099 | −1.292 | 0.198 | 0.244 | 4.093 |
| U.S. | −27641.705 | 15723.240 | −0.093 | −1.758 | 0.080 | 0.511 | 1.956 |
| Sudden | 7190.605 | 9121.629 | 0.046 | 0.788 | 0.431 | 0.424 | 2.359 |
| NFA Postrem | −42774.499 | 18079.852 | −0.133 | −2.366 | 0.019 | 0.449 | 2.225 |
| Log of Distance | −110.791 | 443.787 | −0.014 | −0.250 | 0.803 | 0.468 | 2.135 |
| Nukemanuf | 14984.633 | 8863.555 | 0.105 | 1.691 | 0.092 | 0.366 | 2.730 |
| Superfill | −7336.750 | 8344.406 | −0.070 | −0.879 | 0.380 | 0.225 | 4.440 |
| Groundwater | 1303.279 | 12156.383 | 0.008 | 0.107 | 0.915 | 0.265 | 3.767 |
| AirCAFO | 538.992 | 8702.970 | 0.004 | 0.062 | 0.951 | 0.371 | 2.699 |
| Positive | 27672.917 | 7788.091 | 0.248 | 3.553 | 0.000 | 0.292 | 3.422 |
| Urban Disamenity | −2757.847 | 12910.358 | −0.013 | −0.214 | 0.831 | 0.364 | 2.746 |
| Litigation Dummy | 19086.802 | 6983.865 | 0.166 | 2.733 | 0.007 | 0.387 | 2.585 |
| Announcement of bad thing | 868.311 | 8165.361 | 0.008 | 0.106 | 0.915 | 0.254 | 3.933 |
| Announcement of closing | −13996.399 | 15896.511 | −0.053 | −0.880 | 0.379 | 0.392 | 2.552 |
| Suburban | −1645.491 | 11905.268 | −0.007 | −0.138 | 0.890 | 0.631 | 1.585 |
| Rural | −12149.809 | 7918.104 | −0.082 | −1.534 | 0.126 | 0.498 | 2.010 |
| Mix | −4236.639 | 8968.512 | −0.023 | −0.472 | 0.637 | 0.577 | 1.734 |
| 2000 unemployment rate | 1268.266 | 1019.763 | 0.065 | 1.244 | 0.215 | 0.523 | 1.911 |
| 30yrrt | −2253.065 | 1180.558 | −0.104 | −1.908 | 0.057 | 0.484 | 2.067 |
| Log of sample size | −5497.991 | 3006.477 | −0.131 | −1.829 | 0.069 | 0.276 | 3.623 |
| Case | 13815.971 | 12154.904 | 0.086 | 1.137 | 0.257 | 0.247 | 4.049 |
| Survey | 1931.742 | 7496.193 | 0.013 | 0.258 | 0.797 | 0.555 | 1.801 |
| Other | −12024.160 | 13854.640 | −0.040 | −0.868 | 0.386 | 0.658 | 1.519 |

Notes: Dependent Variable: absolute value of real 2003$ dim. Reference categories: Mid-Atlantic, ongoing, linear, common knowledge, urban, regression. $N = 290$, $DF = 259$, $R^2 = .63$, adj. $R^2 = .59$, F-Statistic $= 14.8$.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

- *NUKEMANUF*: Nuclear power plants and manufacturing facilities with substantial ongoing employment was positive at $14,985 and significant at the 90% level. This parameter estimate was somewhat less than the −$25,900 estimate in the negative model.

- *SUPERFILL*: Landfills, incinerators, hazardous waste sites and Superfund sites were not significantly different from linear effects. Most of these observations had minor impacts or no effect.

- *GROUNDWATER*: Groundwater contamination including water quality and contamination without a known source had a positive effect, but was not significant. The loss of significance from the previous model was likely due to the dilution in the model from incorporating positive amenities.

- *AIR*: Air pollution including CAFOs, like the groundwater variable, was positive and also not significant.

- *POSITIVE*: Proximity to positive environmental attributes was positive ($27,673) and significant at the 99% level of confidence. Properties located near a positive attribute were worth a 25% premium.

- *URB DIS*: Urban disamenity had the expected negative sign, but was not significant.

- *LITIG*: Litigation continues to have a significant effect on value. Lawsuits should have a negative effect on property value. Since none of the positive observations contained litigation, the parameter estimate of $19,087 was likely due to negative effects. This parameter estimate was significant the 99% level of confidence.

- *INFO*: Announcement of a bad thing was slightly positive but not significant from common knowledge (reference category). Announcement of a closing was negative but also not significant.

- *UNEMP*: The local unemployment rate was positive but not significant. This result was unclear from the previous model. It could reflect the previous observations that increased unemployment should not have a positive effect on property values or it could be due to the incorporation of the absolute value of property value.

- *CONV30RT*: The conventional 30-year mortgage rate was negative (−$2,253) and significant at the 90% level of confidence. A higher mortgage rate should lead to higher property values, not lower, making this result against theory. Real estate is positively correlated with inflation, as is the mortgage rate. Therefore, higher mortgage rates are associated with higher interest rates.

- *URB*: Compared to urban areas (reference category), both suburban and mix were negative but not significantly different from urban. Rural was also negative and significant at the 85% level of confidence. Rural properties near a positive or negative effect sold for $12,150 less than an unaffected property.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Page 105

- *LOGN*: The log of the sample size was negative and significant at the 90% level of confidence. All of the positive observations used regression analysis to determine the effects on property value, accounting for the change in significance from previous studies.
- *STUDY*: Case, survey and other methods were not significantly different from studies using regression analysis. Case and survey were both positive, while other methods was negative. This result was expected due to the additional 62 observations for positive amenities utilizing regression analysis, which diminishes the significance of the other methods.

## Conclusion

This paper has addressed the overall effects of proximity influence of environmental contamination on residential real estate property values. Empirical research from peer-reviewed studies were distilled into a data set that contains information about each study's loss (the dependent variable), with the independent variables being geographic location, distance from the source, condition of the contaminated site, urban, suburban, rural, or mixed environment, market conditions and a few other variables. Regression analysis was used to determine the effect of contamination variables on the real change in value.

To make an apples-to-apples comparison across the negative models, the diminution in value variable was used as the dependent variable in each of the three models (Exhibit 6). Upon running the models, the standardized beta weights and significance for all variables in each model was analyzed. In all three negative environmental proximity models (overall, outlier-free and 5-observation maximum), the following variables were significant and had the expected signs: the unimpaired value (+), the Industrial Midwest region (−), a site in post-remediation or which had received its NFA (+), *NUKEMANUF* (pollution sources with a large tax base and substantial employment, with a negative sign), air pollution (−), announcement of a closing (+), case method (−) and survey method (−). The first two models (overall and outlier) had the following additional significant variables: South and Northern California regions (+), the log of distance (+), groundwater contamination (−), litigation (−) and the unemployment rate (+ and contrary to theory). Any two models indicated the following variables were significant: post-remediation/NFA (+), distance (+) and groundwater pollution (−). The findings indicate that regression studies systematically show a lower level of losses compared with other methodologies.

The model that included both negative and positive observations had several variables that were also significant in the full negative model. The unimpaired value (+), U.S. region (−), post-remediation/NFA (−), *NUKEMANUF* (+) and litigation (+) were all significant. Other variables that were significant only in the combined model were the Northeast and Southern California regions (−), positive amenity (+), rural (−), *30YRRT* (−) and *LOGN* (−). Due to the positive effects

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Environmental Contamination

**Exhibit 6** | Comparison of the Three Negative Amenity Models

| | Exhibit 2 Full Model | | Exhibit 3 Outlier-free Model | | Exhibit 4 Five Observations Max | | Number of Models Showing Variable as Significant at the 15% Level |
|---|---|---|---|---|---|---|---|
| | Beta | Sig. | Beta | Sig. | Beta | Sig. | |
| (Constant) | | 0.141 | | 0.141 | | 0.022 | |
| Real 2003$ | −0.741 | 0.000 | −0.402 | 0.000 | −0.709 | 0.000 | 3 |
| Northeast | 0.072 | 0.181 | −0.099 | 0.391 | 0.081 | 0.139 | 1 |
| Industrial Midwest | −0.124 | 0.076 | −0.429 | 0.005 | −0.140 | 0.055 | 3 |
| South | −0.154 | 0.008 | −0.094 | 0.374 | −0.097 | 0.177 | 1 |
| Farmland | −0.013 | 0.787 | 0.077 | 0.415 | 0.021 | 0.704 | 0 |
| Mineral Extraction | 0.072 | 0.172 | 0.078 | 0.450 | 0.065 | 0.303 | 0 |
| Southern Calif. | 0.000 | 0.998 | 0.029 | 0.824 | 0.006 | 0.920 | 0 |
| Northern Calif. | 0.133 | 0.015 | −0.014 | 0.897 | 0.065 | 0.249 | 1 |
| U.S. | 0.087 | 0.076 | −0.013 | 0.871 | −0.067 | 0.266 | 1 |
| Sudden | 0.070 | 0.191 | 0.159 | 0.128 | 0.090 | 0.138 | 2 |
| NFA Postrem | 0.089 | 0.019 | −0.055 | 0.532 | 0.090 | 0.040 | 2 |
| Log of Distance | 0.112 | 0.042 | 0.305 | 0.015 | 0.090 | 0.145 | 3 |
| Nukemanuf | −0.205 | 0.000 | −0.236 | 0.033 | −0.154 | 0.014 | 3 |
| Superfill | 0.016 | 0.811 | −0.226 | 0.163 | −0.015 | 0.835 | 0 |
| Groundwater | −0.115 | 0.089 | −0.428 | 0.003 | −0.100 | 0.177 | 2 |
| AirCAFO | −0.155 | 0.007 | −0.090 | 0.442 | −0.126 | 0.055 | 2 |
| Urban disamenity | −0.066 | 0.250 | −0.227 | 0.088 | −0.059 | 0.337 | 1 |
| Litigation dummy | −0.087 | 0.085 | −0.101 | 0.356 | −0.045 | 0.401 | 1 |

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**Exhibit 6** | (continued)

Comparison of the Three Negative Amenity Models

| | Exhibit 2 Full Model | | Exhibit 3 Outlier-free Model | | Exhibit 4 Five Observations Max | | Number of Models Showing Variable as Significant at the 15% Level |
|---|---|---|---|---|---|---|---|
| | Beta | Sig. | Beta | Sig. | Beta | Sig. | |
| Announcement of bad thing | −0.015 | 0.831 | 0.303 | 0.058 | −0.020 | 0.793 | 1 |
| Announcement of closing | 0.227 | 0.000 | 0.475 | 0.000 | 0.218 | 0.018 | 3 |
| Suburban | −0.035 | 0.407 | −0.139 | 0.079 | −0.081 | 0.096 | 2 |
| Rural | 0.059 | 0.221 | −0.183 | 0.080 | 0.000 | 0.996 | 1 |
| Mix | −0.008 | 0.862 | −0.198 | 0.027 | 0.009 | 0.852 | 1 |
| 2000 unemployment rate | 0.091 | 0.081 | −0.078 | 0.489 | 0.043 | 0.444 | 1 |
| 30yrrt | 0.017 | 0.726 | 0.090 | 0.356 | −0.005 | 0.924 | 0 |
| Log of sample size | 0.030 | 0.646 | −0.124 | 0.356 | −0.094 | 0.234 | 0 |
| Case | −0.328 | 0.000 | −0.457 | 0.003 | −0.414 | 0.000 | 3 |
| Survey | −0.081 | 0.088 | −0.107 | 0.232 | −0.134 | 0.011 | 2 |
| Other | 0.008 | 0.852 | −0.060 | 0.482 | 0.006 | 0.899 | 0 |

associated with this model, several variables were counteracted. A majority of the positive studies occurred in Northern California and South regions, offsetting the negative studies and making the effects insignificant. Since all of the studies regarding positive amenities used regression analysis, the remaining methodology variables lost significance due to the premium accorded to properties proximate to positive environmental features.

The most consistent result from all three models is that the use of survey and case study techniques provides larger estimates of property losses regarding contamination than regression studies do (Exhibit 7). Case studies may be considered to be somewhat subjective based on the case researcher, and may often be chosen due to their dramatic, atypical conditions. Surveys also may have potential bias due to the subjectivity of the respondents, who may lack the expertise to make an accurate estimation of the impact of the contamination, or hypothetically bias issues.

Basic descriptive analysis on each of the respective methodologies demonstrates widely different outcomes. For the 164 observations that utilize regression analysis, the largest loss was $42,480 and the mean loss was $6,443. These values correspond to a percentage loss in value of 29% for the largest loss and a mean loss of 4%. Case studies, while often highlighting worst-case scenarios and often only one home, had losses ranging from zero to $438,200 (88%) of home value, with a mean of 21%. Survey methods also had larger losses in terms of percent. The maximum loss was $96,669 (94%), with a mean loss of $17,164 (19%).

Analyzing correlation coefficients further illustrates differences between methodologies. For regression, the correlation coefficients for urban disamenities, common knowledge of the disamenity, occurrence in an urban area, mortgage rate and log of the sample size were all positive and significant at the 5% level. Variables that were negatively correlated and significant at the 5% level included air pollution, litigation, announcement of a bad thing, announcement of a closing, rural area, mixed (urban, suburban and/or rural) locations, case method, survey method and other methods. The positive correlation to urban location is expected based on the fact that urban governments are more likely to keep better records more conducive to utilizing regression analysis whereas rural areas may not provide an adequate sample size to run regression. Despite the significance of several correlation coefficients, the only correlations stronger than .5 were related to data collection: the log of the sample size (.572), case method ($-.574$), survey method ($-.635$) and other methods ($-.285$). The correlation of case study methods to survey methods was significant at the 5% level and negative ($-.142$). These correlations suggest that case and survey methods yield similar results despite their slightly negative correlation. Case and survey methods, compared to regression analysis, are highly and significantly negatively correlated, resulting in higher property loss values. Further, regression studies may show lower loss figures because information about the source of contamination may not be known to all buyers and sellers. In other words, specific disclosure of the contaminative conditions may not have taken place.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**Exhibit 7** | Correlation Coefficients for Regression, Case and Survey Methodologies

| Regression | | Case | | Survey | |
|---|---|---|---|---|---|
| Log of sample size | 0.57 | Announcement of closing | 0.42 | Mixed location | 0.42 |
| Diminution in percent | 0.44 | Rural location | 0.31 | 2000 Unemployment rate | 0.25 |
| Diminution in value | 0.31 | Sudden contamination | 0.30 | | |
| Common knowledge | 0.28 | Air pollution | 0.27 | | |
| Urban location | 0.21 | Value | 0.25 | | |
| Urban disamenity | 0.17 | Groundwater contamination | 0.19 | | |
| Mortgage rate | 0.14 | Litigation | 0.18 | | |
| | | Announcement of a bad thing | 0.14 | | |
| Survey methodology | −0.64 | Log of sample size | −0.62 | Regression methodology | −0.64 |
| Case methodology | −0.57 | Regression methodology | −0.57 | Diminution in percent | −0.30 |
| Other method | −0.29 | Diminution in value | −0.42 | Urban location | −0.24 |
| Air pollution | −0.25 | Common knowledge | −0.31 | Log of sample size | −0.22 |
| Announcement of closing | −0.22 | Diminution in percent | −0.31 | Sudden contamination | −0.15 |
| Mixed location | −0.22 | Survey methodology | −0.14 | Case methodology | −0.14 |
| Litigation | −0.20 | Ongoing | −0.14 | Groundwater contamination | −0.14 |
| Announcement of a bad thing | −0.18 | | | | |
| Rural location | −0.17 | | | | |

Note: For variables significant at the 5% level.

Regression analysis provides a more conservative, statistically accurate estimation of property value losses, but may not always be possible in some cases of contamination, such as mold where the level of contamination is often confined to the immediate home. Where multiple methods exist, an average may be more appropriate rather than taking the method providing the highest or lowest value. The negative value on the Midwest variable is also not surprising given the long history of industrialization and contamination in this region. Sites in post-remediation, receiving NFA status, or announcing their closure are likely to have a positive impact once the contamination threat is greatly reduced or completely removed. Air pollution studies might also be worth revisiting in cases where the source of air pollution has implemented greater contamination control and/or reduction measures.

The primary focus of this paper has been on the effects of contamination on property values, especially off site. All these effects are negative, or at best neutral. Observations from positive amenity factors, such as views, proximity to beaches, parks, etc. were inserted. Then it was determined that there is little symmetry between positive and bad things. It also confounded the simplicity of the terminology, from bad things, to amenities of positive or bad nature, from decrease in property values to change in property values, and from pre-or-post remediation to existence of condition effecting value. Absolute value of the dependent value was used instead of loss, and dummy variables were included for the amenities. Additional research may focus on creating more variables to better differentiate the effects between negative and positive influences.

Further studies may include testing the strength of the variables showing significance across all three models in the meta-analysis. Given the loss of manufacturing companies in the U.S., especially the Midwest, have the values of homes previously impacted by these companies rebounded in value or appreciated at an equal or greater rate than surrounding areas? Controlling for the impact of these factors may yield conclusive, but not generalizable, results. Can a study be conducted using case study, survey and regression analysis methodologies to show how the methodology may affect results when applied to the same situation? The existing literature fails to analyze such a situation, but this merits future research. Additional research might compare studies conducted in years surrounding major changes in environmental laws to determine if the laws had any impact on the market. A study of this nature would analyze sales before and after some type of law, such as disclosure. Finally, laws may be important, but the role of terrorism could also be analyzed by comparing sales before and after 9/11/2001 based on proximity to nuclear power plants and other major producers of electricity.

Future research could also incorporate commercial property, with additional dummy variables for land use type and revised outlier cutoffs. Additional research may also lead to the construction of predictive models based on the regression coefficients, to determine, within an error band, the expected range of property value losses for certain situations within the experience of the model's data set. Based on this predictive model, policies for adjusting housing values based on a

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

specific source or type of contamination may be possible. If feasible, this predictive model could provide a realistic benchmark for the accuracy of future studies based on the contamination source or type, location, distance and methodology employed in the study.

## Appendix A

## Negative Proximity References Used in the Meta-Analysis

Anistine, J., Property Values in A Low Populated Area When Dual Noxious Facilities Are Present, *Growth and Change*, 2003, 34:3, 345–58.

Asabere, P. K., The Value of a Neighborhood Street with Reference to the Cul de Sac, *Journal of Real Estate Finance and Economics*, 1990, 3, 185–93.

Bell, R., The Impact of Airport Noise on Residential Real Estate, *The Appraisal Journal*, 2001, 69:3, 312–21.

Bleich, D., M. C. Findlay, III and G. M. Phillips, An Evaluation of the Impact of a Well-Designed Landfill on Surrounding Property Values, *The Appraisal Journal*, 1991, 59:2, 247–52.

Clark, D. E. and T. Allison, Spent Nuclear Fuel and Residential Property Values: The Influence of Proximity, Visual Cues and Public Information, *Papers in Regional Science*, 1997, 78:4, 403–21.

Clark, D. E., L. Michelbrink, T. Allison and W. C. Metz, Nuclear Power Plants and Residential Housing Prices, *Growth and Change*, 1997, 28, 496–519.

Clark, E. D., Ignoring Whistle Bans and Residential Property Values: A Hedonic Housing Price Analysis, Paper presented at the 45th North American Meetings of the Regional Science Association International Meetings, November 11–14, 1998, Santa Fe, NM.

Closser, B. M., Fuel-Oil Contamination of a Residence: A Case Study in Stigma, *The Appraisal Journal*, 2001, 69:3, 307–11.

Colwell, P., Power Lines and Land Value, *Journal of Real Estate Research*, 1990, 5:1, 117–27.

Delaney, C. and D. Timmons, High Voltage Power Lines: Do They Affect Residential Property Value?, *Journal of Real Estate Research*, 1991, 6:2, 315–30.

Des Rosiers, F., Power Lines, Visual Encumbrance, and House Values: A Microspatial Approach to Impact Measurement, *Journal of Real Estate Research*, 2002, 23, 275–301.

Des Rosiers, F., A. Lagana, M. Thériault and M. Beaudoin, Shopping Centers and House Values: an Empirical Investigation, *Journal of Property Valuation and Investment*, 1996, 14:4, 41–62.

Des Rosiers, F., A. Bolduc and M. Thériault, Environment and Value: Does Drinking Water Quality Affect House prices?, *Journal of Property Investment and Finance*, 1999, 17:5, 444–63.

Des Rosiers, F., A. Lagana and M. Thériault, Size and Proximity Effects of Primary Schools on Surrounding House Values, *Journal of Property Research*, 2001, 18:2, 149–68.

Flower, P. and W. Ragas, The Effects of Refineries on Neighborhood Property Values, *Journal of Real Estate Research*, 1994, 9:3, 319–38.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Folland, S. and R. Hough, Externalities of Nuclear Power Plants: Further Evidence, *Journal of Regional Science*, 2000, 40:4, 735–53.

Frankel, M., Aircraft Noise and Residential Property Values: Results of a Survey Study, *The Appraisal Journal*, 1991, January, 96–110.

Gamble, H. and R. Downing, Effects of Nuclear Power Plants on Residential Property Values, *Journal of Regional Science*, 1982, 22:4, 457–78.

Gawande, K. and H. Jenkins-Smith, Nuclear Waste Transport and Residential Property Values: Estimating the Effects of Perceived Risks, *Journal of Environmental Economics and Management*, 2001, 42, 207–33.

Greenberg, M. and J. Hughes, Impact of Hazardous Waste sites on Property Value and Land Use: Tax Assessors' Appraisal, *The Appraisal Journal*, 1993, 1, 42–51.

Hamilton, S. W. and G. M. Schwann, Do High Voltage Electric Transmission Lines Affect Property Value?, *Land Economics*, 1995, 71:4, 436–44.

Helmuth Obata and Kassabaum, Inc. and Raytheon Infrastructure Services, Sea-Tac International Airport Mitigation Study, 1997, Washington State Department of Trade and Economic Development (www.wenet.net/~hpb) last visited April 2003.

Hite, D., W. Chern, F. Hitzhusen and A. Randall, Property-Value Impacts of an Environmental Disamenity: The Case of Landfills, *Journal of Real Estate Finance and Economics*, 2001, 22:2/3, 185–202.

Hughes, W. T. and C. F. Sirmans, Traffic Externalities and Single Family House Prices, *Journal of Regional Science*, 1992, 32:4, 487–500.

——., Adjusting House Prices for Intra-Neighborhood Traffic Differences, *The Appraisal Journal*, 1993, 61:4, 533–38.

Johnson, M., P. Welcome and D. Frank, Case Study: The House of Mold, *Assessment Journal*, 2001, 8:6, 37–40.

Jenkins-Smith, H., C. Silva, R. Berrens and A. Bohara, Information Disclosure Requirements and the Effect of Soil Contamination on Property Values, *Journal of Environmental Planning and Management*, 2002, 45:3, 323–39.

Ketkar, K., Hazardous Waste sites and Property Values in the State of New Jersey, *Applied Economics*, 1992, 24:6, 647–59.

Kiel, K., Measuring the Effect of the Discovery and Cleaning of Identified Hazardous Waste Sites on House Values, *Land Economics*, 1995, 71:4, 428–35.

Kiel, K. and K. McClain, The Effect of an Incinerator Siting on Housing Appreciation Rates, *Journal of Urban Economics*, 1995a, 37, 311–23.

——., House Prices During Siting Decision States: The Case Of An Incinerator From Rumor Through Operations, *Journal of Environmental Economics and Management*, 1995b, 28:2, 241–55.

Kilpatrick, J., Concentrated Animal Feeding Operations and Proximate Property Values, *The Appraisal Journal*, 2001, July, 301–06.

Kinnard, W. P., Mitchell, G. Beron and J. R. Webb, Market Reactions to an Announced Release of Radioactive Materials: The Impact on Assessable Value, *Property Tax Journal*, 1991, 10:3, 283–97.

Kohlhase, J., The Impact of Toxic Waste Sites on Housing Values, *Journal of Urban Economics*, 1991, 30, 1–26.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Kung, H. and C. F. Seagle, Impact of Power Transmission Lines on Property Value: A Case Study, *The Appraisal Journal*, 1992, 60:3, 413–18.

Leggett, C. and N. Bockstael, Evidence of the Effects of Water Quality on Residential Land Prices, *Journal of Environmental Economics and Management*, 2000, 39, 121–44.

McClelland, G., W. Schultze and B. Hurd, The Effect of Risk Beliefs on Property Values: A Case Study of a Hazardous Waste Site, *Risk Analysis*, 1990, 10:4, 485–97.

McCluskey, J., R. Huffaker and G. Rausser, Neighborhood Effects and Compensation for Property Value Diminution, *Law and Policy*, 2002, 24:1, 37–50.

Michaels, R. G. and V. K. Smith, Market Segmentation and Valuing Amenities with Hedonic Models: The Case of Hazardous Waste Sites, *Journal of Urban Economics*, 1990, 28, 223–42.

Mundy, B. and D. McLean, Using the Contingent Value Approach for Natural Resource and Environmental Damage Applications, *The Appraisal Journal*, 1998, July, 290–97.

Nelson, A., J. Genereux and M. Genereux, House Price Effects of Landfills, *Land Economics*, 1992, 68:4, 359–65.

Page, G. W. and H. Rabinowitz, Groundwater Contamination: Its Effects on Property Values and Cities, *Journal of the American Planning Association*, 1993, Autumn, 473–81.

Patchin, P., Contaminated Properties and the Sales Comparison Approach, *The Appraisal Journal*, 1994, July, 402–09.

Reichert, A. K., Impact of a Toxic Waste Superfund Site on Property Values, *The Appraisal Journal*, 1997, 65:4, 381–92.

——., The Persistence of Contamination effects: A Superfund site Revisited, *The Appraisal Journal*, 1999, July, 126–35.

Reichert, A. K., M. Small and S. Mohanty, The Impacts of Landfills on Residential Property Values, *Journal of Real Estate Research*, 1992, 7:3, 297–314.

Schoppa, J., Mold, Moisture, Stigma and Value, *Appraiser E-Gram*, October 2002.

Sementelli, A. and R. A. Simons, Regulation of Leaking Underground Storage Tanks, *Economic Development Quarterly*, 1997, 11:3, 236–48.

Simons, R. A., The Effects of Oil Pipeline Ruptures on Non-Contaminated Easement-Holding Property, *The Appraisal Journal*, 1999, July, 255–63.

——., Estimating Proximate Property Damage from PCBs in a Rural Market: A Multiple Techniques Approach, *The Appraisal Journal*, 2002, October, 388–400.

Simons, R. A., W. Bowen and A. Sementelli. The Effect of Underground Storage Tanks on Residential Property Values in Cuyahoga County, Ohio. *Journal of Real Estate Research*, 1997, 14:1/2, 29–42.

——., The Price and Liquidity Effects of UST Leaks from Gas Stations on Adjacent Contaminated Property, *The Appraisal Journal*, 1999, April, 186–94.

Simons, R. A., K. Winson-Geideman and B. A. Mikelbank, The Effects of an Oil Pipeline Rupture on Single Family House Prices, *The Appraisal Journal*, 2001, October, 410–18.

Simons, R. A. and R. Throupe, An Exploratory Review of the Effects of Toxic Mold on Real Estate Values, *The Appraisal Journal*, 2005, Spring, 156–66.

Simons, R. A. and A. El Jaouhari, The Effect of Freight Railroad Tracks and Train Activity on Residential Property Values, *The Appraisal Journal*, 2004, Summer.

Skaburskis, A., Impact Attenuation in Nonconflict Situations: The Price Effects of a Nuisance Landfill, *Environment and Planning A*, 1989, 21, 375–83.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Smolen, G. E., G. Moore and L. V. Conway, Economic Effects of Hazardous Chemical and Proposed Radioactive Waste Landfills on Surrounding Real Estate Values, *Journal of Real Estate Research*, 1992, 7:3, 283–95.

Steinnes, D., Measuring the Economic Value of Water Quality: The Case of Lakeshore Land, *Annals of Regional Science*, 1992, 26, 171–76.

Thayer, M., H. Albers and M. Rahmatian. The Benefits of Reducing Exposure to Waste Disposal Sites: A Hedonic Housing Value Approach, *Journal of Real Estate Research*, 1992, Summer, 265–82.

Wang, K., T. Grissom, J. R. Webb and L. Spellman, The Impact of Rental Properties on the Value of Single Family Residences, *Journal of Urban Economics*, 1991, 30, 152–66.

Webb, J. R., Nuclear Power Plants: Effects on Property Values, *The Appraisal Journal*, 1980, April, 230–35.

Wise, K. and J. Pfeifenberger. The Enigma of Stigma: The Case of the Industrial Excess Landfill, *BNA Toxics Law Reporter*, 1994, 5-18-4: 1435–42.

Zeiss, C. and J. Atwater. Waste Facility Impacts on Residential Property, *Journal of Urban Planning and Development*, 1989, 115:2, 64–80.

## Appendix B

### Positive Proximity References Used in the Meta-Analysis

Benson, E. D., J. L. Hansen and A. L. Schwartz Jr., Water Views and Residential Property Values, *The Appraisal Journal*, 2000, 68:3, 260–71.

Bolitzer, B. and N. R. Netusil, The Impact of Open Spaces on Property Values in Portland, Oregon, *Journal of Environmental Management*, 2000, 59, 185–93.

Bond, M. T., V. L. Seiler and M. J. Seiler, Residential Real Estate Prices: A Room With A View, *Journal of Real Estate Research*, 2000, 23:1/2, 129–37.

Colby, B. G. and S. Wishart, Quantifying the Influence of Desert Riparian Areas on Residential Property Values, *The Appraisal Journal*, 2002, 70:3, 304–08.

Coulson, E. N. and R. M. Leichenko, The Internal and External Impact of Historical Designation On Property Values, *Journal of Real Estate Finance and Economics*, 2001, 23:1, 113–24.

Des Rosiers, F., M. Theriault, Y. Kestens and P. Villeneuve, Landscaping and House Values: An Empirical Investigation, *Journal of Real Estate Research*, 2002, 23:1/2, 139–61.

Ding, C., R. A. Simons and E. Baku, The Effect of Residential Investment on Nearby Property Values: Evidence from Cleveland, Ohio, *Journal of Real Estate Research*, 2000, 19:1/2, 23–48.

Fraser, R. and G. Spencer, The Value Of An Ocean View: An Example Of Hedonic Property Amenity Valuation, *Australian Geographical Studies*, 1998, 36:1, 94–8.

Geoghegan, J., The Value of Open Spaces in Residential Land Use, *Land Use Policy*, 2002, 19:1, 91–8.

Leggett, C. and N. Bockstael, Evidence of the Effects of Water Quality on Residential Land Prices, *Journal of Environmental Economics and Management*, 2000, 39, 121–44.

Leichenko, R. M., N. E. Coulson and D. Listokin, Historic Preservation and Residential Property Values: An Analysis of Texas Cities, *Urban Studies*, 2001, 38:11, 1973–87.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Mooney, S. and L. M. Eisgruber, The Influence of Riparian Protection Measures on Residential Property Values: The Case of The Oregon Plan for Salmon and Watersheds, *Journal of Real Estate Finance and Economics*, 2001, 22:2/3, 273–86.

Pompe, J. J. and J. R. Rhinehart, Beach Quality and The Enhancement of Recreational Property Values, *Journal of Leisure Research*, 1995, 27:2, 143–54.

Rhinehart, J. R. and J. J. Pompe, Adjusting the Market Value of Coastal Property for Beach Quality, *The Appraisal Journal*, 1994, 62:4, 600–03.

——., Estimating the Effect of a View on Undeveloped Property Values, *The Appraisal Journal*, 1999, 67:1, 57–61.

Rodriguez, M. and C. F. Sirmans, Quantifying the Value of a View in Single Family Housing Markets, *The Appraisal Journal*, 1994, 62:4, 600–03.

Seiler, M. J., M. T. Bond and V. L. Seiler, The Impact of World Class Great Lakes Water Views On Residential Property Values, *The Appraisal Journal*, 2001, 69:3, 287–95.

Simons, R. A., R. Quercia and I. Maric, The Value Impact of Neighborhood Transition on Residential Sales Price, *Journal of Real Estate Research*, 1997, 15:2, 147–61.

Tyrvaiinen, L., The Amenity Value of the Urban Forest: An Application of Hedonic Pricing Method, *Landscape and Urban Planning*, 1997, 37, 211–22.

# Appendix C

## Salomon Brothers Asset Management's Economic Geography of the United States



Hawaii is in the Southern California region and Alaska is in the Mineral Extraction region.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

# Endnotes

[1] Depending on the context and the way proximity to the source of contamination is measured, some of these articles demonstrated positive price effects. This phenomenon occurred most often in the case of high voltage overhead transmission lines. These studies showing positive price effects were included in the full model for what theory would deem to be negative amenities, but not in the outlier model.

[2] New England consists of all states east of New York. The Industrial Midwest stretches from New York to Pennsylvania, West Virginia, Ohio, southern Michigan, central and northern Indiana and Illinois and southeastern Wisconsin, including Milwaukee. The Farmbelt includes northern Michigan and Wisconsin, extreme southern Indiana and Illinois, Missouri, Iowa, Minnesota, North and South Dakota, Nebraska and Kansas. The Mid-Atlantic Corridor covers Delaware, Maryland and New Jersey. The South runs from Virginia and Kentucky south to the gulf states of Florida, Mississippi and Alabama. It also includes Arkansas but not Louisiana. Based on Louisiana's oil industry, it is part of the Mineral Extraction region, which also includes Texas, Oklahoma and New Mexico, then moving northwest across Colorado, and west to east central Nevada, with Idaho and Montana as its northern border. Alaska is also included in the Mineral Extraction region. Southern California includes southern California, southern Nevada and Arizona. Northern California includes northern California north of Los Angeles, northwestern Nevada, Oregon, Washington and Hawaii.

[3] Since logging 0 is not possible, .00001 replaced zero to enable the model to run without rejecting this variable.

[4] The original model had 14 different types of contamination. Of these 14, only PCBs were statistically significant at the 95% and 90% levels of confidence. At the 85% level of confidence, agricultural contamination, mainly from concentrated animal feeding operations, was statistically significant. Additionally, the model had positive signs for proximity to a Superfund site or landfill, indicating statistical issues, and contradicting theory that would indicate these sources would negatively affect property value.

[5] In the final model, only one or the other is used to minimize the likelihood of multicollinearity between the two.

[6] Based on the helpful comments of two anonymous referees, the model was re-run with a variable called *REALAPP* based on appreciation rates from 1990 to 2000. The variable was not significant (.688) and did not improve the adjusted $R^2$ (.739). A separate model was run with a variable called *REALMORT* based on the real mortgage rate calculated by subtracting the rate of inflation for a respective year by the mortgage rate. The variable was significant (.081) at the 10% level for the full model, but did not improve the overall adjusted $R^2$ (.74). The *REALMORT* variable was not significant in any of the other models.

[7] A model was also run with these observations where the dependent variable was real diminution in property value. The $R^2$ was .32.

[8] Many of these were influential outliers with respect to large losses and large residuals.

[9] This is not believed to be a problem because the log of study size variable is not statistically significant. Additionally, study type was controlled for and the results reported. The related problem of over-sampling from any study was also controlled for.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Page 117

Although it may be possible to rerun the data set with artificial weights that reflect the source of the study, this was deemed to be unnecessary.

[10] Other models run did not yield better results and only one resulted in an $R$ value explaining more than 50% of the variation in the variables. These models included using absolute value of change in percentage of property values ($R = .28$), change in property values ($R = .56$) and percentage change in property values ($R = .39$) as dependent variables. Attempts to improve model accuracy by changing reference variables also did not produce improved model accuracy. Running models with only positive observations ($N = 62$) also did not produce better results. Using change in value as the dependent variable for a model on POSITIVE observations, the $R^2$ was .55 and with change in percentage of value, the $R^2$ was .23.

# References

Boyle, M. and K. Kiel, A Survey of House Price Hedonic Studies of the Impact of Environmental Externalities, *Journal of Real Estate Literature*, 2001, 9:2, 116–44.

Farber, S., Undesirable Facilities and Property Values: A Summary of Empirical Studies, *Ecological Economics*, 1998, 24, 1–14.

Jackson, T., The Effects of Environmental Contamination on Real Estate: A Literature Review, *Journal of Real Estate Literature*, 2001, 9:2, 93–116.

Malizia, E. and R. A. Simons, Comparing Regional Classifications for Real Estate Portfolio Diversification, *Journal of Real Estate Research*, 1991, 6:1, 53–77.

Simons, R. A., *When Bad Things Happen To Good Property*, Chapter 4: Peer Reviewed Evidence on Property Value Impacts by Source of Contamination. Washington DC: Environmental Law Institute Press, 2006.

Simons, R. A., W. Bowen and A. Sementelli, The Price and Liquidity Effects of UST Leaks from Gas Stations on Adjacent Contaminated Property, *The Appraisal Journal*, 1999, April, 186–94.

Smith, K. V. and J. Huang, Can Markets Value Air Quality? A Meta-Analysis of Hedonic Property Value Models, *Journal of Political Economy*, 1995, 103:1, 209–27.

Wolf, F., Meta-Analysis Quantitative Methods for Research Synthesis, Newbury Park, CA: Sage Publications Quantitative Applications in the Social Sciences #59, 1986.

*Robert A. Simons, Cleveland State University, Cleveland, OH 44115 or roby@urban.csuohio.edu.*

*Jesse D. Saginor, Cleveland State University, Cleveland, OH 44115 or c2254107@urban.csuohio.edu.*

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

# EXHIBIT 48

# Guidelines for Preparing
# Economic Analyses

*December 17, 2010*

*(updated May 2014)*

National Center for Environmental Economics
Office of Policy
U.S. Environmental Protection Agency

**Exhibit**
NGC 48

**Chapter 1** Introduction

guidance documents, are referenced in the revised *Guidelines* where appropriate.

As a result of these modifications and updates the new, revised *Guidelines* will ensure that EPA's economic analyses are prepared to inform the policy-making processes and satisfy OMB's requirements for regulatory review. The new *Guidelines* also seeks to establish an interactive policy development process between analysts and decision makers through an expanded set of cost, benefit, economic impacts, and equity effects assessments; an up-to-date encapsulation of environmental economics theory and practice; and an enhanced emphasis on practical applications.

Underlying these efforts is the recognition that a thorough and careful economic analysis is an important component in informing sound environmental policies. Preparing high-quality economic analysis can greatly enhance the effectiveness of environmental policy decisions by providing policy makers with the ability to systematically assess the consequences of various actions. An economic analysis can describe the implications of policy alternatives not just in terms of economic efficiency, but also in terms of the magnitude and distribution of an array of impacts. Economic analysis also serves as a mechanism for organizing information carefully. Thus, even when data are insufficient to support particular types of economic analysis, the conceptual scoping exercise can provide useful insights.

It is important to note that economic analysis is but one component in the decision-making process and under some statutes it cannot be used in setting standards. Other factors that may influence decision makers include enforceability, technical feasibility, affordability, political concerns, and ethics, to name but a few. Nevertheless, economic analysis provides a means to organize information and to comprehensively assess alternative actions and their consequences. Provided early in the regulatory design phase, economic analysis can help guide the selection of options. Ultimately, good economic analysis based on sound science should lead to better, more defensible rules.

## 1.2 The Scope of the *Guidelines*

The scope of the *Guidelines* is on economic analysis typically conducted for environmental policies using regulatory or non-regulatory management strategies. Separate guidance documents exist for related analyses, some of which are inputs to economic assessments. No attempt is made here to summarize these other guidance materials. Instead, their existence and content are noted in the appropriate sections.

As with the 2000 *Guidelines,* the presentation of economic concepts and applications in this document assumes the reader has some background in microeconomics as applied to environmental and natural resource policies. To fully understand and apply the approaches and recommendations presented in the *Guidelines,* readers should be familiar with basic applied microeconomic analysis, the concepts and measurement of consumer and producer surplus, and the economic foundations of benefit-cost evaluation. Appendix A provides the reader with a brief review of economic foundations and the Glossary defines selected key terms.

These *Guidelines* are designed to provide assistance to analysts in the economic analysis of environmental policies, but they do not provide a rigid blueprint or a "cookbook" for all policy assessments. The most productive and illuminating approaches for particular situations will depend on a variety of case-specific factors and will require professional judgment. The *Guidelines* should be viewed as a summary of analytical methodologies, empirical techniques, and data sources that can assist in performing economic analysis of environmental policies. When drawing upon these various resources, there is no substitute for reviewing the original source materials.

In all cases, the *Guidelines* recommends adhering to the following general principles as stated by OMB (1996):

"'Analysis of the risks, benefits, and costs associated with regulation must be guided

most common approach is to examine the relevant measurable characteristics of the respondent group, such as income, resource use, gender, age, etc., and to compare them to the characteristics of the study population. Similarity in mean characteristics across the two groups suggests that the respondents are representative of the study population and that non-response bias is expected to be minimal.

A second way to evaluate potential survey non-response bias is to conduct a short follow-up survey with non-respondents. This can sometimes be accomplished through interviews conducted during the recruiting phase. Such follow-ups typically ask a few questions about attitudes and opinions on the topic of the study as well as collecting basic socioeconomic information. Questions need to match those in the full survey closely enough to compare non-respondents to respondents. The follow-up must be very brief or response rates will be low (OMB 2006).

### 7.3.3 Combining Revealed and Stated Preference Data

Instead of looking at revealed preference and stated preference data as two separate methods for estimating environmental benefits, an increasing number of researchers are using them in combination. The practice has been in use much longer in the marketing and transportation literature and many of the lessons learned by those researchers are now being employed in environmental economics. In theory, the strengths of each data type should help overcome some of the weaknesses of the other. As described by Whitehead et al. (2008) in a recent assessment of the state of the science, the advantages of combining revealed preference and stated preference data include:

- Helping to ground the hypothetical stated preference data with real world behavior potentially decreasing any hypothetical bias;

- Providing the ability to test the validity of both data sources;[43]

- Increasing the range of historical stated preference data to include conditions not observed in the past and thereby reducing the need to make predictions outside of the sample;

- Increasing the sample size;

- Extending the size of the market or population to include larger segments than captured by either method alone; and

- Exploiting the flexibility of stated preference experimental design to overcome revealed preference data's potential multicollinearity and endogeneity problems (von Haefen and Phaneuf 2008).

The different strategies for combining revealed preference and stated preference data can be roughly grouped into three main methods. The first two methods rely on joint estimation. If the revealed preference and stated preference data have similar dependent and independent variables and the same assumed error structures, then they can simply be pooled together and treated as additional observations (Adamowicz et al. 1994; Boxall, Englin, and Adamowicz 2003; and Morgan, Massey, and Huth 2009). If the revealed preference and stated preference data sources cannot be pooled, it is sometimes possible to use them in a jointly estimated mixed model that relies on a utility theoretic specification of the underlying WTP function (Huang, Haab, and Whitehead 1997; Kling 1997; and Eom and Larson 2006). If the data cannot be combined in estimation, it can still be useful to estimate results separately and then use them to test for convergent validity between the two data sources (Carson et al. 1996, and Schlapfer et al. 2004).

### 7.4 Benefit Transfer

Benefit transfer refers to the use of estimated non-market values of environmental quality changes from one study in the evaluation of a different policy that is of interest to the analyst (Freeman 2003, p. 453). The case under consideration for a

---

43  Herriges, Kling, and Phaneuf (2004) point out that revealed preference may not always be valid for estimating WTP for quality changes when weak complementarity cannot be assured.

new policy is referred to as the "policy case." Cases from which estimates are obtained are referred to as "study cases." A benefit transfer study identifies stated preference or revealed preference study cases that sufficiently relate to the policy context and "transfers" their results to the policy case.

Benefit transfer is necessary when it is infeasible to conduct an original study focused directly on the policy case. Original studies are time consuming and expensive; benefit transfer can reduce both the time and financial resources required to develop estimates of a proposed policy's benefits. While benefit transfer should only be used as a last resort and a clear justification for using this approach over conducting original valuation studies should be provided (OMB 2003), the reality is that benefit transfer is one of the most common approaches for completing a BCA at EPA. However, the advantages of benefit transfer in terms of time and cost savings must be weighed against the disadvantages in terms of potential reduced reliability of the final benefit estimates. The transfer of benefits estimates from any single study case is unlikely to be as accurate as a primary study tailored specifically to the policy case, although it is difficult to characterize the uncertainty associated with transferred benefits estimates.

The number and quality of relevant studies available for application to the policy case can limit the use of benefit-transfer methods.[44] Even when a study case is qualitatively similar to the policy case, the environmental change associated with the policy case may be of a different scope or nature than the changes considered in the study cases. In addition, methodological advances and changes in demographic, economic, and environmental conditions over time may make otherwise suitable studies obsolete.[45]

### Steps for conducting benefit transfer
While there is no universally accepted single approach for conducting benefit transfer there are some generalized steps involved in the process. These steps are described below.

**1. Describe the policy case.** The first step in a benefit-transfer study is to clearly describe the policy case so that its characteristics and consequences are well understood. Are human health risks reduced by the policy intervention? Are ecological benefits expected (e.g., increases in populations of species of concern)? It is also important to identify to the extent possible the beneficiaries of the proposed policy and to describe their demographic and socioeconomic characteristics (e.g., users of a particular set of recreation sites, children living in urban areas, or older adults across the United States). Information on the affected population is generally required to translate per person (or per household) values to an aggregate benefits estimate.

**2. Select study cases.** A benefit-transfer study is only as good as the study cases from which it is derived, and it is therefore crucial that studies be carefully selected. First, the analyst should identify potentially relevant studies by conducting a comprehensive literature search. Because peer-reviewed academic journals may be more likely to publish work using novel approaches compared to established techniques, some studies of interest may be found in government reports, working papers, dissertations, unpublished research, and other "gray literature."[46] Including studies from the gray literature may also help mitigate "publication bias" that results from researchers being more likely to present and/or editors being more likely to publish studies that demonstrate statistically significant results, or results that are of an expected sign or magnitude.[47] Online searchable databases

---

44   One possible reason that a relatively limited number of value estimates exist in peer-reviewed literature is that researchers and editors of scholarly journals may be more interested in new theoretical or methodological advances than in studies that apply established valuation methods to confirm earlier findings.

45   A 2006 special issue of *Ecological Economics* (volume 60) focused exclusively on benefit transfer for environmental policy, covering diverse topics such as publication bias, theoretical motivation and emerging issues. Florax et al. (2002), and Navrud and Ready (2007) are two general references for benefit transfer studies.

46   Peer review of benefit-transfer studies using gray literature is highly advisable.

47   There is some evidence of publication bias towards studies showing statistically significant results. For example, in a meta-analysis of studies in labor economics, Card and Krueger (1995) argue that just-significant results are reported more frequently than would be predicted by chance. Similar practices may prevail in other areas of economic research. Combining results from a group of studies that suffer from publication bias may lead to inaccurate conclusions. See Stanley (2005, 2008) for a discussion of methods to correct for and identify publication bias.

summarizing valuation research may be especially helpful at this stage.[48]

Next, the analyst should develop an explicit set of selection criteria to evaluate each of the potentially relevant studies for quality and applicability to the policy case. The quality of the value estimates in the study cases will in large part determine the quality of the benefit transfer. As a first step, the analyst should review studies according to the criteria listed for each methodology in the previous sections in this chapter. Results from study cases must be valid as well as relevant. Concerns about the quality of the studies, as opposed to their relevance, will generally hinge on the methods used. Valuation approaches commonly used in the past may now be regarded as unacceptable for use in benefits analysis. Studies based on inappropriate methods or reporting obsolete results should be removed from consideration.

It is unlikely that any single study will match perfectly with the policy case; however each potential study case should inform at least some aspect of the policy decision. Study cases potentially suitable for use in benefit transfer should be similar to the policy case in their: (1) definition of the environmental commodity being valued (include scale and presence of substitutes); (2) baseline and extent of environmental changes; and (3) characteristics of affected populations. Analysts should avoid using benefit transfer in cases where the policy or study case is focused on a "good" with unique attributes or where the magnitude of the change or improvement across the two cases differs substantially (OMB 2003).[49]

The analyst should determine whether adjustments should and can be made for important differences between each study and policy case. For example, some case studies will report Marshallian demand while others may report Hicksian demand.[50] The ability of the analyst to make these adjustments will depend, in part, on both the number of value estimates for suitably similar study sites and the method used to combine these estimates. These methods are now discussed in turn.

**3. Transfer values.** There are several approaches for transferring values from study cases to the policy case. These include unit value transfers, value function transfers, and non-structural or structural meta-analysis. Each of these approaches is typically used to develop per person or per household value estimates that are then aggregated over the affected population to compute a total benefits estimate. As a general rule, the more related case study estimates involved in a benefit transfer, the more reliable the estimate.

*Unit value transfers* are the simplest of the benefit-transfer approaches. They take a point estimate of WTP for a unit change in the environmental resource from a study case or cases and apply it directly to the policy case. The point estimate is commonly a single estimated value from a single case study, but it can also be the (otherwise unadjusted) average of a small number of estimates from a few case studies. For example, a study may have found a WTP of $20 per household for a one-unit increase on some water quality scale. A unit value transfer would estimate total benefits for the policy case by multiplying $20 by the number of units by which the policy is expected to increase water quality and by the number of households who will benefit from the change. This approach can be useful for developing preliminary, order-of-magnitude estimates of benefits, but it should be possible to base final benefit estimates on more

---

48   For example, the EVRI is maintained by Environment Canada and managed by a working group that includes the U.S. EPA and members of the European Union. EVRI contains over 1,100 studies that can be referenced according to medium, resource, stressor, method, and country. EVRI also provides a bibliography on benefit transfer. See www.evri.ca for more information. Envalue, developed by the New South Wales EPA in 1995, is similar: Studies can be identified according to medium, stressor, method, country, and author.

49   In some cases the transfer method itself may inform the choice of study cases to include. For example, meta-analysis approaches (discussed below) can facilitate some forms of statistical validity testing (Hunter and Schmidt 1990, and Stanley 2001), so some otherwise suitable studies may be rejected as "outliers."

50   See Desvousges et al. (1992), Brouwer (2000), Florax et al. (2002), Bergstrom and Taylor (2006), and Navrud and Ready (2007) for additional information on criteria used to determine quality and applicability. For more information on applicability as related to specific benefit categories, see Desvousges et al. (1998), the draft *Handbook for Non-Cancer Valuation* (U.S. EPA 2000c), and the *Children's Health Valuation Handbook* (U.S. EPA 2003b). It may also be useful for the analyst to discuss her interpretation and intended use of the study case with the original authors.

## Text Box 7.6 - The Benefits and Costs of the Clean Air Act 1990 to 2010: Reduced Acidification in Freshwater Adirondack Lakes

One component of the total benefits of the Clean Air Act (CAA) was determined to be improved recreational fishing due to reduced acidification in freshwater Adirondack lakes. To value this benefit, EPA relied on the results of Montgomery and Needleman's (1997) New York State Adirondack region recreational fishing study. EPA first developed estimates of the percentage Adirondack of lakes affected by acidification pre and post CAA. Then, using a probit model, the likelihood that each individual lake would become acidified was estimated (the model relates acidity to lake characteristics such as elevation, surface area, watershed, and others) and the lakes were ranked from highest to lowest probability of being acidified. The acidification status of individual lakes in the choice set was then assigned, starting with the highest probability lake and proceeding down until the appropriate number of lakes affected under each scenario (i.e., the estimated percentage of lakes affected) was achieved. Using these lake designations and the Montgomery and Needleman model's estimated coefficients, welfare was calculated for the pre and post CAA levels of lake acidification. The difference between the two welfare estimates was assumed to be the value of improved Adirondack freshwater recreational fishing under the CAA.

information than a single point estimate from a single study. Point estimates reported in study cases are typically functions of several variables, and simply transferring a summary estimate without controlling for differences among these variables can yield inaccurate results. It is important to recognize that unit value transfer assumes that the original good, as well as the characteristics and tastes of the population of beneficiaries, are the same as the policy good. Unit values transfers should only be used if the case and policy studies are evaluating the same environmental good, the same change in environmental levels, and same affected populations.

***Function transfers*** also rely on a single study, but they use information on other factors that influence WTP to adjust the unit value for quantifiable differences between the study case and the policy case. This is accomplished by transferring the estimated function upon which the value estimate in the study case is based to the policy case. This approach implicitly assumes that the population of beneficiaries to which the values are being transferred has potentially different characteristics, but similar tastes, as the original one and allows the analyst to adjust for these different characteristics. Generally, benefit function transfers are preferable to unit value transfers as they incorporate information relevant to the policy scenario (OMB 2003). For example, suppose that in the hypothetical example above the $20 unit value was the result of averaging the results of an estimated WTP function over all individuals in

the study case sample, where the WTP function included income, the baseline water quality level, and the change in the water quality level for each household. A function transfer would estimate total benefits for the policy case by:

1. Applying the WTP function to a random sample of households affected in the policy case using each household's observed levels of income, baseline water quality, and water quality change;

2. Averaging the resulting WTP estimates; and

3. Multiplying this average WTP by the total number of households affected in the policy case.

See Text Boxes 7.6 and 7.7 for examples of value and function transfers.

If the WTP function is nonlinear and statistics on average income, baseline water quality, and water quality changes are used in the transfer instead of household level values, then bias would result. Feather and Hellerstein (1997) provide an example of a function transfer that attempts to correct for such bias. Although unit transfers can adjust and compensate for small differences between the case and policy study populations, they are subject to the same basic usage rules governing unit value transfers. Function transfers should only be used if the case and policy studies are evaluating very similar environmental goods, change in environmental levels, and affected populations.

# EXHIBIT 49

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.



ANNUAL REVIEWS **Further**

**Click here** for quick links to Annual Reviews content online, including:

- Other articles in this volume
- Top cited articles
- Top downloaded articles
- Our comprehensive search

# The Benefit-Transfer Challenges

Kevin J. Boyle,[1] Nicolai V. Kuminoff,[2] Christopher F. Parmeter,[3] and Jaren C. Pope[4]

[1]Department of Agricultural and Applied Economics, Virginia Tech, Blacksburg, Virginia 24061; email: kjboyle@vt.edu

[2]Department of Economics, Arizona State University, Tempe, Arizona 85287

[3]Department of Economics, University of Miami, Miami, Florida 33124

[4]Department of Economics, Brigham Young University, Provo, Utah 84602

Annu. Rev. Resour. Econ. 2010. 2:161–82

The *Annual Review of Resource Economics* is online at resource.annualreviews.org

This article's doi: 10.1146/annurev.resource.012809.103933

Copyright © 2010 by Annual Reviews. All rights reserved

1941-1340/10/1010-0161$20.00

## Key Words

policy evaluation, validity, nonmarket valuation

## Abstract

Presidential Executive Order 12,866 requires federal agencies to design "cost-effective" regulations and to assess "costs and benefits" of these regulations on the basis of "the best reasonably obtainable scientific, technical, economic, and other information." Benefit transfers are one economic approach used to estimate these benefits and costs, and the use of existing economic information to predict the effects of new policies is well established. However, advancing the practice of benefit transfers is crucial if economists are to play a role in developing federal policies. We review contributions to the benefit-transfer literature and present a unified conceptual framework to guide the design and evaluation of benefit-transfer guidelines.

**Exhibit
NGC 49**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

## 1. INTRODUCTION

Economic analyses play a key role in the evaluation of policies promulgated by federal agencies in the United States. Presidential Executive Order 12,866 (1993) requires federal agencies to design "cost-effective" regulations and to assess "costs and benefits" of these regulations on the basis of "the best reasonably obtainable scientific, technical, economic, and other information." Benefit transfers are one economic approach used to estimate these benefits and costs. A benefit transfer occurs when an estimated value, based on original studies (study sites), is transferred to a new application (policy site).

Benefit transfers can be transfers through time or space; the key feature is that a study-site value(s) is used to estimate a value for a policy that is different from the original policy objective. Benefit transfers are typically employed when policy analysts are faced with time or monetary constraints that preclude the conduct of an original study. Benefit transfers are also used to develop liability payments for court cases.

There are two types of benefit transfers, value transfers and function transfers. A value transfer uses a single value from a study site or a mean from multiple study sites to provide a policy-site value estimate. A function transfer uses an estimated valuation function to compute a transfer estimate that is calibrated to policy-site conditions using the variables in the equation. A function transfer may be an estimated preference function from a single study site or a meta-analysis of results from multiple study sites.

The practice of conducting benefit transfers for changes in environmental quality came under considerable academic scrutiny in the early 1990s, and a special issue of *Water Resources Research* (1992, Vol. 28, No. 3) focused on this topic. Since then, benefit transfers have become standard practice to evaluate benefits and costs in federal regulatory impact analyses of environmental programs. For example, the Economic Report of the President (U.S. Executive Off. President 2009, table 3-1, p. 115) includes net benefits of federal policies to improve air quality. These estimates were obtained from regulatory impact analyses conducted by the U.S. Environmental Protection Agency (EPA) that relied on benefit-transfer procedures to develop some of the clean-air benefit estimates (e.g., EPA 2005, pp. 4–48, table 4-11).

Although benefit transfers are now common practice, even a cursory review of the benefit-transfer literature displays a wide variety of implementation procedures, with no consensus on which procedure actually results in the lowest transfer error beyond two general principles:

- Study sites and policy sites should be similar, and
- equation transfers are more accurate than value transfers.

These principles are related because equations can be used to predict welfare estimates that are calibrated to policy-site conditions, which is one approach to imposing similarity. No consensus exists on what actually constitutes similarity and what type of equation transfer might work best. This lack of consensus undermines the credibility of benefit transfers as an accepted economic tool for inferring the nonmarket benefits of public actions. In this article, we review selected contributions to the benefit-transfer literature and present a unified conceptual framework that formally addresses similarity, provides guidelines for equation transfers, and provides a basis for evaluating and comparing future contributions to the benefit-transfer literature.

**Page 128**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

## 2. BENEFIT TRANSFERS IN CONTEXT

Advancing the practice of benefit transfers is crucial if economists are to play a role in the development of major federal policies such as climate change and health care. The Economic Report of the President (2009, p. 126) states that "energy policy will continue to be one of the major challenges facing the United States for many years to come." Another major application will be analyses of alternatives for implementing the national health care reforms passed by Congress (**http://www.whitehouse.gov/issues/health-care/**, accessed January 27, 2010). Economic analyses that arise from these national policies can be accomplished only if some information is inferred from existing economic studies.

The practice of using existing economic information to predict the effects of new policies is well established. Transfers are often made to predict the benefits and costs of future policies, although the process is rarely termed benefit transfer outside of environmental economics. For example, Hines (1999, p. 167) notes that "…to quantify the economic costs of (taxes, regulations, externalities, monopolistic practices, etc.)…it is standard practice—and has been since the 1960s—to use a small number of assumptions and selected elasticities to estimate areas of the relevant 'Harberger triangles.'"[1]

In fact, the transfer of existing information to new applications is not unique to economics:

- Engineers use steam tables to predict pressure and flow in power facilities,
- architects use weight-load tables to predict weight-holding capacity of floors and roofs, and
- the U.S. government publishes an actuarial table of the probability of death.

Each type of transfer avoids the need to conduct a potentially time-consuming and expensive study by using past results to predict future outcomes.[2]

Property appraisals are a specific example of transfers of monetary values. A typical appraisal uses sale prices of three nearby and similar properties to develop a calibrated appraisal value for the subject property on the basis of an appraiser's professional judgment of differences between sold properties and the appraised property (see **http://www.appraisalinstitute.org/profession/appraiser.aspx**, accessed October 21, 2009). Thus, a real estate appraisal is similar to a benefit transfer in that the three selected properties are "study sites" and the appraised property is the "policy site."

Some degree of error is unavoidable in any information transfer. Weather conditions can affect weight-holding capacities of roofs, and preexisting health conditions can affect the average probability of death. In real estate appraisals, an appraiser may not pick the best set of comparables, may not know constraints faced by sellers, or may not account for buyers with unique preferences. For example, Fisher et al. (1999) found an average error in U.S. commercial real estate appraisals between 1980 and 1998 of 11%, with 89% of the prediction errors falling between 0% and 25%.

---

[1]Harberger triangles (Harberger 1964, 1971) are based on elasticities from Marshallian demand functions that are estimated using choices people make in markets.

[2]For links to tables for steam, weight-load, and probability of death, see **http://www.engineeringtoolbox.com/saturated-steam-properties-d_101.html** (accessed October 21, 2009), **http://www.awc.org/technical/spantables/tutorial.htm** (accessed October 21, 2009), and **http://www.ssa.gov/OACT/STATS/table4c6.html** (accessed September 14, 2009). Additional examples of data transfers include dose-response functions developed by physical scientists that have been used to identify changes in quality for original applications at study sites (Spash & Vatn 2006).

**Page 129**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

Errors can also arise when one uses existing information, such as the Harberger triangles, to compute the welfare implications of policies. Hausman (1981) showed that for a single price change, which is similar to many benefit-transfer applications, it is possible to derive estimates of Hicksian consumer surplus and that the error associated with using Marshallian elasticities can be small for compensating variation (3.2%) and much larger for deadweight loss (32%). More recently, Chetty et al. (2009) showed that consumers react differently to different presentations of a tax, which can affect estimated price and income elasticities. This finding suggests that elasticities estimated in one policy context may involve error when transferred to another policy context with a different framing of the policy.

All these examples involve transfers of existing information to predict outcomes in new situations. Environmental benefit transfer is perhaps the most difficult type of information transfer. The difficulty is that the provision of environmental services almost always occurs outside formal markets. As a result, study-site analysts must define the units of measurement for quality (or quantity) and estimate a Marshallian virtual price or Hicksian willingness to pay. The way in which this is done varies from study to study. The benefit-transfer practitioner is left to develop a strategy for synthesizing existing information on Marshallian and Hicksian willingness to pay for potentially different proxy measures of environmental quality to predict welfare outcomes at a policy site.[3]

To see the contrast between market and nonmarket benefit transfers, consider the Harberger triangle example. Harberger triangles rely on price and income elasticities to infer the welfare consequences of a new policy, whereas environmental benefit transfers typically use existing welfare estimates to infer the welfare consequences of a new policy. Harberger triangles are typically based on market data for private goods, whereas environmental benefit transfers rely on values estimated using nonmarket valuation methods for publicly provided goods. Although Harberger triangles have been used for more than four decades, there are still challenges when this approach is employed to evaluate public policies. Thus, it is not surprising that environmental benefit transfer, which has been in use for only approximately two decades, also faces challenges to the credibility of this approach to welfare evaluations of public policies.

## 3. A HISTORICAL PERSPECTIVE

The scrutiny that the special issue of *Water Resources Research* (1992, Vol. 28, No. 3) brought to benefit transfers is not surprising; the library of nonmarket values was growing rapidly, and in response, the use of benefit transfers was expanding. President Reagan's 1981 Executive Order 12,291 (§ 2b) stated that "regulatory action shall not be undertaken unless the potential benefits to society for the regulation outweigh the potential costs to society." This motivated analysts and decision makers to seek data on benefits and costs to support regulatory impact analyses.

This was a time when researchers were beginning to seriously ask how accurate study-site value estimates were. Cummings et al. (1986, p. 244) concluded that contingent valuation was accurate to ±50%. Smith & Kaoru (1990) asked whether travel-cost models

---

[3]For example, consider a benefit transfer for a policy that targets air quality. Some studies have used revealed-preference methods, such as hedonic models, to estimate Marshallian virtual prices for marginal changes in ozone concentrations. Others have estimated Hicksian willingness to pay for nonmarginal changes in particulate matter using stated-preference methods.

**Page 130**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

were presenting value "signals or noise." Contingent valuation and travel cost were (and continue to be) the methods most frequently used to estimate study-site values. If there was error in the original study-site values, the rhetorical question is, How accurate could benefit transfers be that are based on data with measurement error? Although this question is still relevant today, the conduct of nonmarket valuation studies has improved substantially over the past 25 years (Champ et al. 2003, Mäler & Vincent 2003). In this paper, we take study-site values as given (but not necessarily unbiased estimates) and focus on discussing benefit-transfer protocols and the accuracy of these protocols.

The *Water Resources Research* articles began to address benefit-transfer protocols and accuracy. Several of the articles presented examples of the state of the art in benefit transfers (Boyle & Bergstrom 1992, Desvousges et al. 1992, Loomis 1992, Luken et al. 1992). Smith (1992) considered convergent validity of the benefit transfers presented in the Desvousges et al. and Luken et al. articles. McConnell (1992) began the conceptual framework for benefit function transfers through the use of travel-cost models. Walsh et al. (1992) presented a meta-analysis of recreation demand studies as another function transfer approach that uses the collective information from multiple studies. Atkinson et al. (1992) investigated Bayesian exchangeability in a hedonic model as a third approach.

The Boyle & Bergstrom (1992) and Desvousges et al. (1992) articles set the foundation for benefit-transfer guidelines that were codified in the EPA's *Guidelines for Preparing Economic Analyses* (2000, pp. 86–87).[4] These include

- describing the policy case;
- identifying existing, relevant studies;
- reviewing available studies for quality and applicability;
  - basic commodities must be essentially equivalent, baseline and extent of change should be similar, and affected populations should be similar;
- transferring the benefit estimates; and
- addressing uncertainty.

The U.S. Office of Management and Budget (OMB) subsequently developed similar guidelines for benefit transfers. A notable difference between the EPA and OMB guidelines is that the OMB guidelines advocated that "you should transfer the entire demand function (referred to as benefit function transfer) rather than adopting a single point estimate (referred to as benefit point transfer)" (U.S. OMB 2003, p. 25).

Although the primary use of benefit transfers in the United States has been to assess benefits and costs as components of federal regulatory impact analyses, another use has been to develop liability payments for court cases. This latter use of benefit transfers requires adherence to the *Daubert* standard (**http://www.daubertexpert.com/basics_daubert-v-merrell-dow.html**, accessed November 21, 2009) for scientific evidence. Under this standard, admissible evidence must

- be tested for validity,
- have a known error rate,
- be peer reviewed and published, and
- have general acceptance.

---

[4]The EPA guidelines are currently being revised (**http://yosemite.epa.gov/sab/sabproduct.nsf/c91996cd39a82 f648525742400690127/2dd3f407cb483bd685257352004b72b7!OpenDocument**, accessed October 21, 2009).

**Page 131**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

These guidelines and criteria are very general and do not focus on key issues such as what constitutes similarity between study and policy sites and what type of function transfer works best.

## 4. FORMALIZING BENEFIT TRANSFERS

Benefit transfers, like any economic policy analysis, seek to measure the economic consequences of a policy action. The analysis starts with a conceptual definition of the value to be estimated. Suppose that the policy-relevant dimension is a change in environmental quality ($q_j$) and willingness to pay might be defined as

$$V_i(P,x,q_j'',I_i - WTP_{i,j}; d_i) = V_i(P,x,q_j',I_i; d_i), \tag{1}$$

where $V$ is the indirect utility function for individual $i$, $P$ is a vector of market prices, $q_j$ is the dimension of environmental quality that is changing ($q_j'' > q_j'$), $x$ is a vector of other quality attributes, $I$ is income, $WTP_{i,j}$ is willingness to pay for the increase in $q_j$, and $d_i$ is demographic characteristics of individual $i$. Let us assume that $q_j$ is a change in coastal water quality due to the presence of a harmful algal bloom (HAB) (**http://www.cdc.gov/hab/**, accessed February 15, 2010). HABs can negatively affect the desirability of coastal waters for a variety of activities, and nonmarket valuation methods can be used to estimate the benefits of avoiding exposure to a HAB. Common estimation methods include revealed-preference approaches such as travel-cost models (Herriges & Kling 1999, Parsons 2003), hedonic models (Taylor 2003, Baranzini et al. 2008), and stated-preference approaches such as contingent valuation (Bateman et al. 2002, Boyle 2003) and choice modeling (Bennett & Blamey 2001, Holmes & Adamowicz 2003).

The different nonmarket valuation approaches present a number of challenges to the application of benefit transfers. Revealed-preference methods typically estimate Marshallian virtual prices, whereas stated-preference methods are capable of estimating Marshallian and Hicksian values. Travel-cost models are capable of estimating nonmarginal changes in consumer surplus, whereas most hedonic models estimate marginal prices. Revealed-preference methods are most frequently used to estimate use values, whereas stated-preference methods are used commonly to measure both use and nonuse values. Thus, the benefit-transfer analyst must sort through the relevance and appropriateness of the welfare measures represented in the available studies.

In the case of a HAB, which can occur anywhere along the Atlantic Coast, Gulf of Mexico, or Pacific Coast in the United States, a key challenge in benefit transfer is making sense of the available economic information in a coherent manner (**http://tidesandcurrents.noaa.gov/hab/**, accessed February 15, 2010). There may have been travel-cost, hedonic, and choice-modeling studies done at three different locations, all of which are different from the new policy site, and the analyst must decide how to best utilize this information in the benefit transfer. A travel-cost study may provide Marshallian use values, a hedonic study may provide a Marshallian implicit price, and a choice-modeling study may provide a Hicksian measure of total value that includes use and nonuse values. Thus, just as in an original study in which a definition of the value to be estimated, such as Equation 1, is needed to guide data collection and analysis, a similar framework is needed for benefit transfers to select studies (data) and to compute benefit transfers.

**Page 132**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

Estimated willingness to pay ($WTP$) in any benefit transfer may depend on the demographic characteristics of consumers ($d_j$), the levels of other site characteristics ($X_j$), a vector of econometric parameter estimates ($\hat{\beta}_j$), and quality:

$$WTP_{i,j} = f(d_{i,j}, q_j, X_j, \hat{\beta}_j), \tag{2}$$

where the observed relationships have been estimated from study site(s) $j$ on the basis of Equation 1. Equation 2 provides the first insight into similarity between study sites and policy sites. Similarity includes characteristics of affected individuals ($d_i$), site and other location characteristics ($q_j$ and $X_j$), and preferences of affected individuals ($\beta_j$). Benefit transfers use the relationship in Equation 2 to predict the benefits from a change in $q$ that is calibrated to policy site $k$'s conditions. This is typically done through value transfers or equation transfers.

## 4.1. Value Transfers

Value transfers apply a single statistic (usually an average from one or more study sites) to the policy site. For example, in the case of a single study site, aggregate benefits for a comparable change in $q$ at the policy site is predicted by $M \times \left( \sum_{i=1}^{N} WTP_{i,j}/N \right)$, where $M$ and $N$ are the number of people at the policy site and the study sites, respectively. An alternative, and more common, value transfer is to average the means from $K$ study sites, and the benefit-transfer estimate is $M \times \left( \sum_{s=1}^{K} MWTP_s/K \right)$, where $MWTP_s$ is mean willingness to pay from study site $s$ and $K$ is the number of studies. The EPA used this approach to estimate the annualized benefit of reduced mortality due to limits on particulate matter imposed by the Clean Air Act (EPA 1999). This approach to benefit estimation is appealing for its simplicity, but value transfers do not account for any differences between the study sites and the policy site. If $MWTP$ is increasing in income, for example, and if income distributions differ between the two sites, one will need to adjust for this difference to develop an accurate benefit measure. Making adjustments to calibrate transfer predictions to policy-site conditions is the focus of benefit function transfers.

## 4.2. Function Transfers

Function transfers use an econometric model such as Equation 2 to predict a calibrated value for a new policy as a function of variables describing characteristics of the policy site and people at the policy site. In this case, aggregate benefits for a quality change at site $k$ could be approximated by $\sum_{i=1}^{M} f(d_{i,k}, q_k, X_k, \hat{\beta}_j)$. This was the approach the U.S. Department of Agriculture used to predict the water quality and wildlife habitat benefits associated with "environmentally friendly" farming practices subsidized by the Conservation Reserve Program (USDA 2005). There are a variety of function transfers, and the more common types are described in the following section.

**Page 133**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

## 5. A DIVERSITY OF FUNCTION TRANSFER METHODS

A recent special issue of *Ecological Economics* focused on benefit-transfer methods (Wilson & Hoehn 2006). This was accompanied by edited books by Rolfe & Bennett (2006) and Navrud & Ready (2007). Together, these assemblages of studies present perspectives on the current state of the art in benefit transfer. The current literature focuses on function transfers to develop calibrated value predictions for policy sites. Most function transfers fit within one of two broad categories: reduced-form meta-analysis or structural transfers of preference functions.

### 5.1. Reduced-Form Meta-Analysis

This approach provides an informative way to summarize results across a large number of distinct study sites that investigate a common policy value. A group of studies can collectively cover variation in site and population characteristics, which is not possible in a single study.

The meta-analysis approach begins by regressing study-site value estimates on a set of variables describing the data (site and population characteristics) and methods used to estimate values. For example, a linear version of the equation could be

$$WTP_j = \alpha + \beta_1 d_j + \beta_2 \Delta q_{jp} + \beta_3 \Delta X_j + \beta_4 A_j, \tag{3}$$

where $d_j$ is the demographic characteristics of consumers at site $j$, $\Delta q_j$ is the size of the quality change that was valued, $\Delta X_j$ contains other relevant site characteristics, and $A_j$ is a set of variables describing study-design features that may help explain variation in value estimates (e.g., data collection procedures and valuation methods). Plugging policy-site values for $d_k$, $q_k$, and $X_k$ into Equation 3 provides a calibrated prediction about willingness to pay at policy site $k$. A meta-analysis by Mrozek & Taylor (2002) was the basis of the EPA benefit transfer of values for air quality improvements reported in the *Economic Report of the President* (U.S. Executive Off. President 2009).

Researchers and government agencies have used meta-analyses to conduct benefit transfers, but the validity of this approach is relatively unexplored (Rosenberger & Loomis 2000, Shrestha & Loomis 2001, Smith & Pattanayak 2002, Johnston et al. 2005). Lindhjem & Navrud (2008, p. 425) "question whether the use of meta-analysis for practical benefit transfer achieves reliability gains." However, their conclusion is based on the results from a benefit transfer across different countries. Other investigators have reported that subnational transfers tend to be more accurate (Loomis 1992, Vandenberg et al. 2001).

The error in benefit-transfer predictions from meta-analysis equations depends on the bias in the estimates of the $\beta$ vector and the spurious error associated with omitted variables that may be unique to the policy site. Nelson & Kennedy (2009) highlight five potentially important issues that can lead to biases: (*a*) sample selection, (*b*) data summary, (*c*) data heterogeneity, (*d*) heteroskedasticity, and (*e*) dependency. Some, but not all, of these issues have been addressed in the context of benefit transfer.

A unique feature of the meta-analysis approach is the ability to address some potential sources of bias and error explicitly. The results from past valuation studies may reflect systematic decisions about what questions to research and what methodologies to use. Controlling for these investigator decisions through the $A_j$ term in Equation 3, one can measure their influence on past value estimates and choose the set of study-design

**Page 134**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

conditions to be imposed on the benefit-transfer estimate. Rosenberger & Johnston (2009, p. 424) conclude that "meta-analysis offers . . . an ability to correct for selection effects that is not available in other mechanisms for benefits transfer." However, Stapler & Johnston (2009, p. 244) conclude that "methodological covariates within benefit transfer is neither the source of the substantial errors sometimes intimated by the literature, nor can it be ignored as trivial in all cases."

Finally, Smith & Pattanayak (2002, p. 274) note that "[m]eta-analyses summarizing non-market valuation studies have often not met the goal of measuring 'identical' concepts." Even if numerous studies exist to conduct a meta-analysis, the results can be misleading if the objects being valued are dissimilar. For example, hedonic and travel-cost models produce Marshallian measures of value, whereas contingent-valuation and random-utility models produce Hicksian measures of value. One approach to this problem is to be judicious in the studies selected for the meta-analysis. Another solution is to adopt a structural approach to benefit transfer that uses a specification for the preference function to make consistent adjustments between different concepts of value.

## 5.2. Structural Preference Functions and Preference Calibrations

Two types of function transfers are capable of ensuring that the benefit-transfer process is theoretically consistent: preference transfers and preference calibration. Both approaches seek to estimate structural preference parameters for consumers at one or more study sites and then transfer information from the corresponding demand or utility function(s) to the policy site. The difference between the two methods is that preference transfer uses the results from a previous study to transfer a utility (or demand) function to the policy site (Parsons & Kealy 1994, Zanderson et al. 2007), whereas preference calibration uses previous estimates of nonmarket values to calibrate the parameters of a utility function posited by the analyst (Smith et al. 2000). In either case, the resulting utility parameters can be combined with information on site quality and income and other consumer demographics to compute the transfer value calibrated to policy-site conditions.

**5.2.1. Preference function transfers.** This approach begins by specifying a parametric form of the utility function at the study site. It is common to use an indirect utility function that is linear in parameters. In this case, individual $i$'s utility from choice $j$ at the study site can be expressed as

$$V_{ij} = \alpha_{1,i}(y_i - p_{ij}) + \alpha_{2,i}\Delta q_j + \alpha_{3,i}\Delta X_j + \varepsilon_{ij}, \tag{4}$$

where $\varepsilon_{ij} \sim$ type I extreme value, $y$ is income, and $p$ is the cost of consuming choice $j$. The preference parameters may be a function of consumer demographics and/or a random error, $\alpha_i = f(d_i)$. Estimates of the preference parameters for this random-utility model can be combined with data on the characteristics of the policy site and demographics to predict a calibrated willingness to pay for a change in $q$. An advantage of this approach is that many objects of valuation are multiattribute goods or services and that Equation 4 allows marginal values to be estimated for these component attributes. The valuation methods best able to support preference function transfers are choice modeling, site-choice travel-cost models (RUMs), and structural hedonic models in which the estimated preference functions include study-site and demographic characteristics.

**Page 135**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

Preference function transfers provide theoretically consistent welfare measures for the policy site. Yet, theoretical consistency comes at a cost. The preference function that is transferred is based on the results of a single study site rather than all the relevant research that has been done. Useful information from other study sites may be excluded.

**5.2.2. Preference calibration transfers.** Smith and coauthors (2000, 2006; Smith & Pattanayak 2002) addressed the multiple-study limitation to structural benefit transfers by proposing an approach to calibrating the preference function that would use all congruent and available information to estimate a common economic value. Their proposal for preference calibration is the structural equivalent to meta-analysis.

The process of preference calibration begins by choosing a parametric specification for the preference function, $U(q,X,d;\alpha)$. Then the analyst derives the relationship between the parameters of that function from benefit measures reported by previous studies. For example, suppose that one study estimated the Marshallian consumer surplus ($MCS_j$) for a change in $q$ at study site $j$ and another study estimated the compensating variation ($CV_k$) for a different change in $q$ at study site $k$. Both welfare measures can be expressed in terms of the underlying arguments of utility,

$$MCS_j = f(\Delta q_j, \Delta X_j, d_j; \alpha_1) \text{ and } CV_k = g(\Delta q_k, \Delta X_k, d_k; \alpha_2), \tag{5}$$

where $\alpha_1 \cup \alpha_2 = \alpha$. Parametric versions of the two equations in Equation 5 serve as moment conditions for generalized method of moments estimation of the parameter vector $\alpha$, using data on $MCS_j$, $\Delta q_j$, $\Delta X_j$, $d_j$ and $CV_k$, $\Delta q_k$, $\Delta X_k$, $d_k$. Intuitively, $\alpha$ is chosen to calibrate the preference function to approximately reproduce the estimates reported by the two previous studies. Finally, the calibrated preference function can be used to predict the welfare implications of a quality change at the policy site:

$$CV_{ps} = h(\Delta q, \Delta X, d; \alpha), \tag{6}$$

where $CV_{ps}$ is the estimated compensating variation for the policy site.

Unlike the reduced-form approach to meta-analysis, preference calibration guarantees that the transfer process is consistent with economic theory. Preference calibration ensures that the model will not make predictions for benefit measures at the policy site that exceed income, for example. This approach also forces the analyst to be explicit in the assumptions that they make about how to specify the utility function, which original studies to select, and how to translate the information from different studies into common units of measurement. Preference calibration is subject to the same data limitations that exist for reduced-form meta-analyses.

### 5.3. A Unified Conceptual Framework for Benefit Function Transfers

The choice among function transfer methods has yet to be carefully studied. There is no consensus on which type of function transfer provides the most accurate predictions. However, a common set of assumptions is required of all function transfers to ensure that the transfer process will yield a consistent measure of value at the policy site. Boyle et al. (2009) illustrate this using a unified conceptual framework for the initial estimation of benefits and the subsequent transfer of values. They demonstrate that four *S* conditions are necessary to guarantee that benefit estimates at the policy site will be econometrically consistent: (*a*) *s*eparability (utility must be separable in unobserved characteristics at the

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

study and policy sites), (*b*) *s*pecification (the study-site and policy-site models must be specified correctly), (*c*) *s*orting (people must not be sorted between the study and policy sites according to unobserved features of their preferences), and (*d*) *s*election (data on the characteristics of consumers and their choices must be free of selection problems). These four assumptions are necessary for the consistency of all benefit transfers and are sufficient to establish the consistency of preference function transfers.

First, the *s*eparability assumption implies that it is possible to explain the values that consumers assign to the amenity of interest in terms of the observable features of the data. This assumption is routinely invoked in random-utility models for computational convenience. For example, in Equation 4, the time-constant unobserved variables, represented by $\varepsilon_{ij}$, cancel out of individual measures of compensating variation. Although there is no simple test for separability in variables that are unobserved, intuition may provide some guidance. For instance, it is likely problematic to assume separability in situations in which a consumer's valuation of the relevant amenity depends on her fitness or the fitness of her family members or other metrics of health that are difficult to observe outside of specialized surveys.

Regarding the second assumption of *s*pecification, Nelson & Kennedy (2009, p. 372) concluded that numerous studies in environmental and natural resource economics have abused the meta-analysis methodology by failing to adequately deal with specification issues (see also Stanley 2001). When we move from meta-analysis to preference functions that have been estimated or calibrated, there is less precedent for developing specification tests. One possibility is to exploit unexpected shocks. If one can observe consumer behavior before and after a shock to the market, there may be an opportunity to judge the out-of-sample performance of competing specifications for the preference function (Provencher & Bishop 2004). Even without such data, Banzhaf & Smith (2007) and Kuminoff (2009) demonstrated that it may be possible to assess the sensitivity of value estimates to subjective modeling decisions.

Third, the no-*s*orting assumption is made to rule out any systematic variation in unobserved preferences between the study-site populations and the policy-site population. Put differently, any systematic variation in preferences between the two populations is assumed to be fully explained by differences in their observable demographic characteristics. This is most likely to be true for transfers based on unexpected events, such as the discovery of a cancer cluster, in which people did not have a prior opportunity to sort themselves according to their preferences over risk (Davis 2004). The assumption is more problematic for transfers between the site of an unexpected event and a site with long-term contamination, such as a Superfund site, for which people have knowledge of the quality change and had considerable time to move.

When considering the scope for sorting, one should keep in mind that sorting is simply a metaphor for the way that market forces partition consumers across the landscape; the process need not be premeditated or explicit. If preferences for spatially delineated amenities are a function of past experience with those amenities, for example, then sorting may arise, even if mobility is limited or nonexistent. Unfortunately, there is no simple test for the presence of sorting. That participants in the annual American Housing Survey consistently choose looks and design of neighborhood as top factors influencing where they choose to live suggests that sorting does occur. Yet, there is very little evidence on the spatial and temporal scales over which sorting occurs in response to specific amenities (Rhode & Strumpf 2003, Banzhaf & Walsh 2008).

**Page 137**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

The final assumption, *s*election, is that data are available on the relevant demographic characteristics of the policy-site population. This is important because we often expect willingness to pay for environmental quality to depend on income and perhaps other variables. Without direct data on the policy-site population, one approach would be to use the Census of Population and Housing to predict the population's demographic characteristics. Yet, this approach raises the possibility of site-selection bias. The people who choose to visit beaches and parks, for example, may have demographic characteristics that differ from those of the average household living in the area. We are unaware of any existing strategies to detect and correct for this problem.

## 6. CONVERGENT VALIDITY OF BENEFIT TRANSFERS

Research on the validity of benefit transfers has focused largely on convergent validity, which is a special type of what Carmines & Zeller (1979) call criterion-related validity. Convergent validity asks whether parallel studies, one conducted at the study site and one conducted at the policy site, provide statistically similar estimates of value, or if study-site data can be used to predict a calibrated policy-site value; the policy-site estimate is the validity criterion. A benefit transfer is deemed valid in this context if one fails to reject the null hypothesis of no difference between the policy-site value estimate and the predicted value obtained by calibrating the study-site estimate(s) to policy-site conditions.

Unfortunately, the literature has not adopted a consistent approach to evaluating the validity of benefit transfers. Studies of convergent validity have

- tested for differences between mean values,
- tested for differences between individual parameters in value functions,
- tested for differences in entire vectors of parameters in value functions,
- measured transfer prediction error, but not in a consistent manner, and
- made other statistical and qualitative comparisons.

In addition, the validity studies have not consistently addressed similarity between study sites and policy sites in terms of site and population characteristics.

Four papers demonstrate different approaches that have been implemented to investigate the validity of benefit transfer (**Table 1**).[5] All these studies are benefit transfers for which a stated-preference method was used to estimate study-site values.

Downing & Ozuna (1996) investigated the transfer of values for eight saltwater fishing sites in Texas, with observations from three different years at each site. They rejected the null hypothesis of no difference in the parameter estimates from benefit functions between 41% and 63% of the time over four sets of comparisons. From these results they conclude that "benefit functions transfer...is unreliable" (Downing & Ozuna 1996, p. 322). The authors also observe that confidence intervals on welfare estimates did not overlap in more than 90% of the 16 comparisons conducted. The results of this study are somewhat surprising because it is actually a test of temporal reliability (values for the same site for three consecutive years). Other authors have shown that contingent-valuation estimates, the valuation method used by Downing & Ozuna, are reliable (Loomis 1989, Teisl et al. 1995, Carson et al. 1997, Whitehead & Hoban 1999).

---

[5]We selected the benefit-transfer validity studies from peer-reviewed journal articles that had 100 or more Google Scholar citations.

**Page 138**

**Table 1**  Benefit-transfer convergent-validity studies (listed in chronological order)

| Authors | Valuation method | Location | Application | Prediction errors[a,b] (absolute values) |
|---|---|---|---|---|
| Downing & Ozuna (1996) | Contingent valuation | Texas | Saltwater fishing | 15–164% Mean = 50% ($n = 16$) |
| Kirchhoff et al. (1997) | Contingent valuation | Arizona and New Mexico | Day hikes and white-water boating | 2–87% Mean = 33% ($n = 12$) |
| Brouwer & Spaninks (1999) | Contingent valuation | Netherlands | Peat meadow land | 22–60% Mean = 39% ($n = 12$) |
| Morrison et al. (2002) | Choice modeling (attribute-based valuation) | Australia | Wetlands | 4–65% Mean = 32% ($n = 9$) |

[a]Percent errors were not reported by Downing & Ozuna (1996) or Morrison et al. (2002). Percent errors are computed as [(study-site value – policy-site value)/policy-site value] × 100.
[b]Kirchhoff et al. (1997) computed prediction errors as [(study site #1 value – study site #2 value)/study site #2 value] × 100 and then flipped the order and computed [(study site #2 value – study site #1 value)/study site #1 value] × 100. Only data from the first set of error calculations are reported here.

Kirchhoff et al. (1997) investigated transfers between two natural area sites in Arizona and two white-water boating sites on the Rio Grande River in New Mexico. Their transfers were over different sites and different populations of people. They rejected the null hypothesis of equality of benefit function parameters for the Arizona comparison and the New Mexico comparison. They were not able to reject the null hypothesis of no difference in welfare estimates. The authors conclude that "empirical results indicate that benefit function transfer is more robust than transfer of average site benefits. Our results suggest that the circumstances under which benefit function transfer provides valid, policy-relevant information may be limited and that errors from applying benefit transfer can be quite large, even across seemingly similar amenities" (Kirchhoff et al. 1997, p. 75).

Brouwer & Spaninks (1999) investigated transfers between two different areas of wildlife management on agricultural peat meadows in the Netherlands. They conducted transfers for which only the populations varied and transfers for which both the populations and sites varied. They rejected the equality of benefit function parameters in three of the four tests and rejected the null hypothesis in one of the two comparisons of mean values. The authors conclude that "in the case of statistically valid benefits transfer, the function approach results in a more robust benefit transfer than the unit value approach" (Brouwer & Spaninks 1999, p. 95).

Finally, Morrison et al. (2002) investigated the transfer of values from two study sites to one policy site for wetland values in Australia. Their transfers were for different populations for the same site and the same population for different sites. They could not reject the null hypothesis of no difference in the implicit prices for wetland attributes in five of the eight comparisons. They rejected the null hypothesis of equality of benefit function parameters for two comparisons. The authors conclude that "transfers across sites showed greater evidence of convergent validity than across population transfers" (Morrison et al. 2002, p. 170). Key elements of the Morrison et al. study are that choice modeling was used to estimate values at the original study sites and that the estimated implicit prices for site characteristics facilitated the calibration of transfer estimates to policy-site characteristics.

**Page 139**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org by Brigham Young University - Utah on 05/14/14. For personal use only.

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

Three insights can be drawn from these studies:

1. Different tests of convergent validity result in different conclusions regarding the validity of benefit transfers. There is a need for discussion of which tests are most appropriate.
2. Function transfers, because of their ability to customize predictions to policy-site conditions, tend to have lower transfer errors.
3. More research is needed before we can draw broad conclusions about the precise conditions under which benefit function transfer errors will be minimized.

Transfer errors from these four papers are reported in **Table 1** and range from 2% to 87%. If the Downing & Ozuna (1996) transfer errors are removed because of the inconsistency of Downing & Ozuna's findings with the findings from studies of temporal reliability, average transfer errors range from 32% to 39% ($\sim$35%).

In contrast to the studies reported in **Table 1**, Parsons & Kealy (1994) conducted a convergent-validity study of benefit transfers using a revealed-preference method, a random-utility travel-cost model. They observed an average error of 21% ($n = 11$) with a range from 1% to 75%. More recently, Zanderson et al. (2007), in another travel-cost transfer, observed an average transfer error of approximately 53% ($n = 53$) with a range from 1% to 229%, using the authors' preferred transfer function. The midpoint of the Parsons & Kealy and Zanderson et al. means is 37%, approximately the same as the 35% midpoint of the latter three studies in **Table 1**. The Parsons & Kealy range of errors is similar to that of the latter three studies in **Table 1** (2–87% versus 1–75%), but this is not the case for the Zanderson et al. study (2–87% versus 1–299%).

Two recent convergent-validity studies of benefit transfers report transfer errors from choice-modeling data that allow for value predictions calibrated to policy-site conditions. Colombo et al. (2007) report an average transfer error of 66% ($n = 27$) with a range from 11% to 366% (the authors preferred preference function). Johnston (2007) estimates an average error of 37% ($n = 24$) with a range from 7% to 101%. Thus, Johnston's study confirms a transfer error of approximately 35%, similar to the latter three studies in **Table 1**. However, the Colombo et al. study indicates that the average error may be twice as large (66/35 = 1.9) and that the maximum error may be four times as large (366/87 = 4.2).

The rhetorical question is how accurate benefit-transfer errors are compared with other estimation errors. Six of the eight studies just discussed used stated-preference methods to estimate study-site values. Murphy et al. (2005) report a median error in original study-site values of 35% when stated-preference methods were used, and the error may be as large as 2,500% ($n = 87$). The error in commercial real estate appraisals cited earlier is 11%, but this level of accuracy may be unrealistic for benefit transfers for which there are not a lot of repeat studies of similar populations and resources.

If we assume that study-site values are estimated consistently, the weight of evidence from the cited studies suggests that benefit transfers may have an average error of approximately 35%, with exceptions indicating that the error may be even higher. Two clarifications are important for interpreting the reported errors. First, the errors reported are absolute errors, and benefit transfers may result in overestimates or underestimates. Second, our discussion takes transfer errors at face value and does not explore the quality of

**Page 140**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

the original study-site values or the quality of the transfer. Controlling for study quality, which is not easy, may reduce the transfer errors.

With an average transfer error rate of 35% or greater, there is clearly room for improvement in the conduct of benefit transfers. At least three issues must be addressed in future convergent-validity studies of benefit transfers. First, studies of convergent validity must explain how they address the EPA and OMB guidelines for implementing benefit transfers. If these guidelines are not followed in validity research, a schism that limits the applicability of research results arises between research and practice. In particular, a key topic in the benefit-transfer guidelines is establishing similarity between study sites and policy sites in terms of

- the affected populations whose values are elicited,
- the physical conditions of the object being valued,
- the institutional settings,
- the availability of substitutes, and
- other site-specific characteristics.

Similarity was implicitly addressed in a number of the studies discussed above, but not in a systematic or rigorous manner. Downing & Ozuna (1996) compared the same sites at different points in time, but site and user characteristics could have changed through time. Kirchhoff et al. (1997) compared two different sites on the same river. Morrison et al. (2002) compared the same wetlands with different affected populations and the same affected populations with different wetlands. Parsons & Kealy (1994) investigated different subsets of fishing sites. None of these studies presented a framework for quantifying, documenting, and testing for similarities and differences between study and policy sites.

The second issue is determining which tests of validity are most appropriate. For the most part, the literature has been agnostic about the choice of validity test, but this is an important issue; the use of different test procedures can drive differences in study conclusions. We suggest that testing the equality of benefit function parameters is fundamental because equations allow study-site estimates to be combined with policy-site data to predict a calibrated transfer value. Equality of parameters is indicative that different populations value a common resource similarly, which is a key dimension of the EPA and OMB guidelines. A potential limitation of testing for equality of benefit function parameters is that, in a worst-case scenario of a type I error, the null hypothesis can be rejected if a single pair of parameters is significantly different. The significant difference can be driven by a parameter that describes a variable that has little or no relevance to the transfer value. A related concern is that well-designed studies may tend to have smaller error components, which implies that better designs may be more likely to reject the null hypothesis of no difference in estimated benefit functions but may still possess small transfer errors. One can hedge against these limitations by carefully crafting a test of equality to reflect the relevant subset of parameters and by balancing results from statistical tests with computed transfer errors.

The third issue is that tests of convergent validity are not strongly convincing about whether benefit transfers are valid. Convergent validity establishes only whether study-site estimates and policy-site estimates are equivalent. Both estimates can (and are likely to) include biases. For example, parallel studies conducted at different sites using the same stated-preference survey or same revealed-preference model, which is the common approach and includes common biases at study and policy sites, will reduce transfer errors

**Page 141**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

relative to comparisons that use different designs at study and policy sites (e.g., meta-analyses and preference calibration methods). These biases are induced by study-design choices, and tests of convergent validity cannot identify such endogenous effects. In addition, convergent-validity tests may be compromised by features of models and data that have nothing to do with the validity test but that nevertheless affect value estimates. For example, an attribute may be measured with error at the study site, or the model of utility may be misspecified at the policy site. Thus, convergent-validity tests may spuriously confirm or reject the validity of a benefit transfer.

Finally, some authors have considered alternatives to standard testing for equivalence in convergent-validity studies of benefit transfers. Muthke & Holm-Mueller (2004) introduced the accuracy *t*-test, and Kristofersson & Navrud (2005) applied the concept of equivalence testing. Neither of these approaches overcomes the fundamental issues with convergent-validity tests. In contrast, Bateman & Jones (2003) introduced a hierarchal modeling framework that allows for clustering of similar study-site data as a rigorous approach to reducing transfer errors when meta-analyses are employed.

## 7. MOVING FORWARD

Two key features of benefit transfers are important to consider: (*a*) better data and (*b*) transfer functions that account for the inherent uncertainty in predicting policy-site values. Data are crucial because once preference function parameters are estimated, the availability and quality of characteristic data will affect the accuracy of calibrated policy-site value predictions.

### 7.1. Enhancing Function Transfers Through Enhanced Data

Troy & Wilson (2006) investigated the use of a geographic information system (GIS) to make resource conditions explicit between study sites and policy sites (see also Eade & Moran 1996). This data-rich environment provides an opportunity to include quality and demographic characteristics for calibrated transfer predictions that are spatially explicit. This approach will be successful only if original studies are designed to include the level of detail available in GIS databases. This approach is relevant only for natural-resource applications in which the valuation attributes are spatially explicit (e.g., the valuation of wetlands and other types of natural areas) and is not relevant for applications in which this is not the case (e.g., health risks from drinking contaminated municipal tap water).

Brouwer (2000) noted that, although some value estimates may be precisely defined in terms of the increment of change (e.g., hedonic-price functions), other studies may not present clearly defined values (e.g., stated-preference studies of nonuse values). Both of these types of studies present challenges to benefit-transfer practitioners. The former, although having a precise definition of the change valued, may not have the change defined correctly or may have defined the change in a manner that is too narrow to transfer. However, if the definition is correct and matches policy-site conditions, this greatly facilitates accomplishing a credible benefit transfer. In the case of poorly defined changes in values, there is little hope for a credible transfer. These limitations apply to all types of function transfers and highlight the need for careful design and documentation of study-site designs.

Benefit transfers can also be enhanced by improving the use of existing data. Moeltner et al. (2007) used Bayesian methods to consider challenges to classical meta-analyses:

**Page 142**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

(*a*) the trade-off between increasing sample size and a reduced set of regressors common to all studies and (*b*) the treatment of the original study valuation method in the analysis. This is done in the context of random parameters to allow for heterogeneity and correlation between study-site value estimates. Over four welfare scenario comparisons, the difference between the classical meta-analysis and Bayesian estimates is approximately 8%. Thus, the Bayesian framework provides an approach that explicitly addresses important data issues and that reduces transfer errors.[6]

## 7.2. A New Approach to Function Transfers: Bounding

Both structural and reduced-form approaches to benefit function transfer are typically used to predict mean or median values for quality changes at the policy site. Confidence intervals on these predictions rely on maintained assumptions about the study-site model. For example, preference function transfers based on random parameter logit models (e.g., Colombo et al. 2007, Zanderson et al. 2007) are conditioned by assumptions about the statistical distributions used to describe variation in unobserved sources of preference heterogeneity (e.g., normal, type I extreme value, etc.). The extent to which these maintained assumptions ultimately drive transfer values is unclear. This is important because the final step in the EPA's benefit transfer guidelines requires practitioners to address uncertainty about transferred values. At present, there is virtually no discussion in the literature of how to quantify uncertainty about the structure of the study-site model.

Recent advances in discrete-choice estimation have provided new ways to measure structural uncertainty. Berry & Pakes (2007) and Bajari & Benkard (2005) developed semiparametric estimators that require a specification for the preference function but that avoid the need for distributional assumptions. Relaxing distributional assumptions means that individual preferences are no longer point identified. Instead, observed choices identify a set of preference parameters for each consumer. Kuminoff (2009) illustrated how these preference sets can be translated into bounds on welfare measures for changes in environmental quality at a study site. The bounds reflect the analyst's uncertainty about the true structure of the study-site model.

The bounding logic from the literature on discrete-choice estimation can be adapted to preference function transfers. The first step of the process is to solve for bounds on the set of values for the preference parameters that are capable of explaining the observed behavior of each individual at the study site. These preference sets are then used to define bounds on the preference function. For example, a bounded version of the indirect utility function in Equation 3 can be expressed as

$$V_{ij} = \alpha_{1,i}(y_i - p_{ij}) + \alpha_{2,i}q_j + \alpha_{3,i}X_j + \xi_j, \tag{7a}$$

where

$$(\alpha_{1,i}, \alpha_{2,i}, \alpha_{3,i}) \in \left\{ \tilde{\alpha}_{ij} : j^* = \max_j V_{ij}(\alpha_i; y_i, p_{ij}, q_j, X_j, \xi_j) \right\}. \tag{7b}$$

In words, $\tilde{\alpha}_{ij}$ is the set of preference parameter vectors for which the model predicts that consumer $i$'s utility-maximizing choice, $j = j^*$, is the same choice that the consumer was

---

[6]Leon-Gonzalez & Scarpa (2008) investigated Bayesian averaging to identify the set of study sites that best describes policy-site conditions. They found that failure to address this site similarity can have a substantial effect on benefit-transfer estimates.

**Page 143**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

observed making at the study site.[7] Finally, the model in Equation 7a is transferred to the policy site and is used to predict upper and lower bounds on the value that each individual would assign to a change in quality, $CV_{i,\min} = \min\limits_{\alpha_i \in \tilde{\alpha}_{ij}} CV_{ps}(\alpha_i; y_i, p, q, X, \xi)$ and $CV_{i,\max} = \max\limits_{\alpha_i \in \tilde{\alpha}_{ij}} CV_{ps}(\alpha_i; y_i, p, q, X, \xi)$. Because there is a range of predicted values for each individual, the process is not technically a function transfer. Rather, it is a correspondence transfer. By providing bounds on point estimates for aggregate transfer values, Boyle et al.'s (2009) conceptual model for correspondence transfer is an approach to the EPA's guideline for addressing uncertainty.

Data transfers based on maxima and minima have been useful in other contexts, such as the weight-load tables used by architects to judge the maximum weight-holding capacity of floors and roofs. In the context of environmental policy, a correspondence transfer could allow policy makers to judge the maximum cost of a potential deterioration in quality at the policy site or the minimum benefit from an improvement. Although Boyle et al. (2009) focus on preference functions, the logic of correspondence transfer is not limited to structural estimation. A similar approach could be developed for reduced-form meta-analysis following Manski (1990).

### 7.3. Concluding Comments

A common theme in the benefit-transfer literature is that function transfers outperform value transfers because transfer values can be calibrated to policy-site conditions. This is a key element in addressing similarity between study-site conditions and policy-site conditions. Any of the existing nonmarket valuation methods can support function transfers (Champ et al. 2003). Just like original valuation studies, benefit transfers are hard to do well and require rigorous analysis. The lack of time and funds for the conduct of an original valuation study is no excuse for not conducting a rigorous analysis of the available valuation data. All future function transfers, whether they are practical transfers to support public decision making or studies of the validity of this approach, should explicitly address the above-discussed four *S* assumptions that underlie all function transfers. These analyses will enhance the policy credibility of transfers and will make investigator assumptions, which are required in every empirical analysis, explicit and transparent.

As noted in the introduction to this paper, Presidential Executive Order 12,866 (1993) requires federal agencies to evaluate changes in public policies on the basis of the **best reasonably obtainable** scientific, technical, economic, and other information. As the above discussion indicates, benefit transfers are capable of providing estimates for specific changes that are based on economic theory, that have a rigorous analysis to support a scientific estimate, and that have a known error range. However, the tendency toward an average error of approximately 35% must be interpreted with caution. This is a relative average error, not an absolute error, because original study-site values are estimated with error.

The final benefit-transfer challenge comes from how transfer estimates are used in decision making. Let us use an example in which study-site values were estimated using a stated-preference study, which is common in many benefit transfers. Assume that the

---

[7]Notice that the idiosyncratic error term ($\varepsilon_{ij}$) from Equation 3 has been replaced by a composite unobserved characteristic ($\xi_j$) in Equation 5. To highlight this distinction, Berry & Pakes (2007) labeled Equation 5 as the pure-characteristics model of consumer behavior to distinguish it from the random-utility model in Equation 3.

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

study-site values are overestimated by 35% (the median error from stated-preference validity studies). If the benefit transfer underestimates a policy-site value by 35%, then the real transfer error is 0% (35% − 35%). In contrast, if the benefit transfer overestimates by 35%, the real transfer error is 70% (35% + 35%). From the information presented above, one could assume that the original study error and the transfer error are as likely to be less than 35% than they are to be greater than 35%.

One approach to addressing this uncertainty in the real error associated with benefit transfers may be to consider using a decision framework such as the safe minimum standard proposed by Bishop (1978), with adjustments on whether the policy goal is to remove a bad (e.g., contamination at a Superfund site) or to attain a good (e.g., the prevention of future global warming effects) and the reversibility of the decision. Another approach is to use a bounding approach (as described above), which estimates lower and upper bounds, rather than a specific point estimate of central tendency. If the transfer bounds are used in estimating benefits, then a lower-bound aggregate benefit that exceeded costs would be strong evidence that the policy was efficient. Or if the transfer bounds were used to estimate costs, an upper-bound aggregate cost that exceeded benefits would be strong evidence that the policy was inefficient. Convergent-validity studies have not and cannot address this real transfer error. Future research on the validity of benefit transfers must address real-transfer-error rates and conditions that lead to over- or underestimates, not just the magnitude of error.

## DISCLOSURE STATEMENT

The authors are not aware of any affiliations, memberships, funding, or financial holdings that might be perceived as affecting the objectivity of this review.

## ACKNOWLEDGMENTS

Funding for this research was provided by the U.S. EPA. The authors appreciate Kerry Smith's helpful comments on an earlier draft of this paper.

## LITERATURE CITED

Atkinson SE, Crocker TD, Shogren JF. 1992. Bayesian exchangeability, benefit transfer, and research efficiency. *Water Resour. Res.* 28(3):715–22

Bajari P, Benkard CL. 2005. Demand estimation with heterogeneous consumers and unobserved product characteristics: a hedonic approach. *J. Polit. Econ.* 113(6):1239–76

Banzhaf HS, Smith VK. 2007. Meta-analysis in model implementation: choice sets and the valuation of air quality improvements. *J. Appl. Econ.* 22:1013–31

Banzhaf HS, Walsh RP. 2008. Do people vote with their feet? An empirical test of Tiebout's mechanism. *Am. Econ. Rev.* 98(3):843–63

Baranzini A, Ramirez J, Schaerer C, Thalman P, eds. 2008. *Hedonic Methods in Housing Markets: Pricing Environmental Amenities and Segregation.* New York: Springer

Bateman IJ, Carson RT, Day BW, Hanemann M, Hanley N, et al. 2002. *Economic Valuation with Stated Preference Techniques: A Manual.* Cheltenham, UK: Edward Elgar

Bateman IJ, Jones AP. 2003. Contrasting conventional with multi-level modeling approaches to meta-analysis: expectation consistency in UK woodland recreation values. *Land Econ.* 79(2):235–58

**Page 145**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

Bennett J, Blamey R. 2001. *The Choice Modeling Approach to Environmental Valuation*. Cheltenham, UK: Edward Elgar

Berry S, Pakes A. 2007. The pure characteristics demand model. *Int. Econ. Rev.* 48(4):1193–225

Bishop RC. 1978. Endangered species and uncertainty: the economics of a safe minimum standard. *Am. J. Agric. Econ.* 60(1):10–18

Boyle KJ. 2003. Contingent valuation in practice. See Champ et al. 2003, pp. 111–70

Boyle KJ, Bergstrom JC. 1992. Benefit transfer studies: myths, pragmatism, and idealism. *Water Resour. Res.* 28(3):657–63

Boyle KJ, Kuminoff NV, Parmeter CF, Pope JC. 2009. Necessary conditions for valid benefit transfers. *Am. J. Agric. Econ.* 91(5):1328–34

Brouwer R. 2000. Environmental value transfer: state of the art and future prospects. *Ecol. Econ.* 32(1):137–52

Brouwer R, Spaninks FA. 1999. The validity of environmental benefits transfer: further empirical testing. *Environ. Resour. Econ.* 14(1):95–117

Carmines EG, Zeller RA. 1979. *Reliability and Validity Assessment*. Beverly Hills, CA: Sage

Carson RT, Hanemann WM, Kopp RJ, Krosnick JA, Mitchell RC, et al. 1997. Temporal reliability of estimates from contingent valuation. *Land Econ.* 73(2):151–63

Champ PA, Boyle KJ, Brown TC, eds. 2003. *A Primer on Nonmarket Valuation*. Dordrecht: Kluwer Acad.

Chetty R, Looney A, Kroft K. 2009. Salience and taxation: theory and evidence. *Am. Econ. Rev.* 99(4):1145–77

Colombo S, Calatrava-Requena J, Hanley N. 2007. Testing choice experiment for benefit transfer with preference heterogeneity. *Am. J. Agric. Econ.* 89(1):135–51

Cummings RG, Brookshire DS, Schulze WD, eds. 1986. *Valuing Environmental Goods: An Assessment of the Contingent Valuation Method*. Totowa, NJ: Rowman & Allanheld

Davis L. 2004. The effect of health risk on housing values: evidence from a cancer cluster. *Am. Econ. Rev.* 94(5):1693–704

Desvousges WH, Naughton MC, Parsons GR. 1992. Benefits transfer: conceptual problems in estimating water quality benefits using existing studies. *Water Resour. Res.* 28(3):675–83

Downing M, Ozuna T. 1996. Testing the reliability of the benefit function transfer approach. *J. Environ. Econ. Manag.* 30(3):316–22

Eade JDO, Moran D. 1996. Spatial economic valuation: benefits transfer using geographical information systems. *J. Environ. Manag.* 48(2):97–110

Fisher JD, Miles ME, Webb RB. 1999. How reliable are commercial appraisals? Another look. *Real Estate Finance* 16(3):9–15

Harberger AC. 1964. The measurement of waste. *Am. Econ. Rev.* 54(3):58–76

Harberger AC. 1971. Three basic postulates for applied welfare analysis. *J. Econ. Lit.* 9(3):785–97

Hausman JA. 1981. Exact consumer surplus and deadweight loss. *Am. Econ. Rev.* 71(4):662–76

Herriges JA, Kling CL, eds. 1999. *Valuing Recreation and the Environment: Revealed Preference Methods in Theory and Practice*. Cheltenham, UK: Edward Elgar

Hines JR. 1999. Three sides of Harberger triangles. *J. Econ. Perspect.* 13(2):167–88

Holmes TP, Adamowicz WL. 2003. Attribute based methods. See Champ et al. 2003, pp. 171–219

Johnston RJ. 2007. Choice experiments, site similarity and benefits transfer. *Environ. Resour. Econ.* 38(3):331–51

Johnston RJ, Besedin EY, Iovanna R, Miller CJ, Wardwell RF, Ranson MH. 2005. Systematic variation in willingness to pay for aquatic resource improvements and implications for benefit transfer: a meta-analysis. *Can. J. Agric. Econ.* 53(2-3):221–48

Kirchhoff S, Colby BG, LaFrance JT. 1997. Evaluating the performance of benefit transfer: an empirical inquiry. *J. Environ. Econ. Manag.* 33(1):75–93

Kristofersson D, Navrud S. 2005. Validity tests of benefit transfer: Are we performing the wrong tests? *Environ. Resour. Econ.* 30(3):279–86

**Page 146**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

Kuminoff NV. 2009. Decomposing the structural identification of nonmarket values. *J. Environ. Econ. Manag.* 57(2):123–39

Leon-Gonzalez R, Scarpa R. 2008. Improving multi-site benefit functions via Bayesian model averaging: a new approach to benefit transfer. *J. Environ. Econ. Manag.* 56(1):50–68

Lindhjem H, Navrud S. 2008. How reliable are meta-analyses for international benefit transfers? *Ecol. Econ.* 66(2-3):425–35

Loomis JB. 1989. Test-retest reliability of the contingent valuation method: a comparison of general population and visitor responses. *Am. J. Agric. Econ.* 71(1):76–84

Loomis JB. 1992. The evolution of a more rigorous approach to benefit transfer: benefit function transfer. *Water Resour. Res.* 28(3):701–5

Luken RA, Johnson FR, Kibler V. 1992. Benefits and costs of pulp and paper effluent controls under the Clean Water Act. *Water Resour. Res.* 28(3):665–74

Mäler K-G, Vincent JR. 2003, eds. *Handbook of Environmental Economics: Valuing Environmental Changes*, Vol. 2. Amsterdam: North-Holland

Manski CF. 1990. Nonparametric bounds on treatment effects. *Am. Econ. Rev.* 80(2):319–23

McConnell KE. 1992. Model building and judgment: implications for benefit transfers with travel cost models. *Water Resour. Res.* 28(3):695–700

Moeltner K, Boyle KJ, Paterson RW. 2007. Meta-analysis and benefit transfer for resource valuation: addressing classical challenges with Bayesian modeling. *J. Environ. Econ. Manag.* 53(2):250–69

Morrison M, Bennett J, Blamey R, Louviere J. 2002. Choice modeling and tests of benefit transfer. *Am. J. Agric. Econ.* 84(1):161–70

Mrozek JR, Taylor LO. 2002. What determines the value of life? A meta-analysis. *J. Policy Anal. Manag.* 21(2):253–70

Murphy JJ, Allen PG, Stevens TH, Weatherhead D. 2005. A meta-analysis of hypothetical bias in stated preference valuation. *Environ. Resour. Econ.* 30(3):313–25

Muthke T, Holm-Mueller K. 2004. National and international benefit transfer testing with a rigorous test procedure. *Environ. Resour. Econ.* 29(3):323–36

Navrud S, Ready R, eds. 2007. *Environmental Value Transfer: Issues and Methods*. Dordrecht: Springer

Nelson JP, Kennedy PE. 2009. The use (and abuse) of meta-analysis in environmental and natural resource economics: an assessment. *Environ. Resour. Econ.* 42(3):345–77

Parsons GR. 2003. The travel cost model. See Champ et al. 2003, pp. 269–329

Parsons GR, Kealy MJ. 1994. Benefit transfer in a random utility model of recreation. *Water Resour. Res.* 30(8):2477–84

Provencher B, Bishop RC. 2004. Does accounting for preference heterogeneity improve the forecasting of a random utility model? A case study. *J. Environ. Econ. Manag.* 48(1):793–810

Rhode PW, Strumpf KS. 2003. Assessing the importance of Tiebout sorting: local heterogeneity from 1850 to 1990. *Am. Econ. Rev.* 93(5):1648–77

Rolfe J, Bennett J. 2006. *Choice Modeling and the Transfer of Environmental Values*. Northampton, MA: Edward Elgar

Rosenberger RS, Johnston RJ. 2009. Selection effects in meta-analysis and benefit transfer: avoiding unintended consequences. *Land Econ.* 85(3):410–28

Rosenberger RS, Loomis JB. 2000. Using meta-analysis for benefit transfer: in-sample convergent validity tests of an outdoor recreation database. *Water Resour. Res.* 36(4):1097–107

Shrestha RK, Loomis JB. 2001. Testing a meta-analysis model for benefit transfer in international outdoor recreation. *Ecol. Econ.* 39(1):67–83

Smith VK. 1992. On separating defensible benefits from 'smoke and mirrors'. *Water Resour. Res.* 28(3):685–94

Smith VK, Kaoru Y. 1990. Signals or noise? Explaining the variation in recreation benefit estimates. *Am. J. Agric. Econ.* 72(2):419–33

**Page 147**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

Smith VK, Pattanayak SK. 2002. Is meta-analysis a Noah's Ark for non-market valuation? *Environ. Resour. Econ.* 22(1–2):271–96

Smith VK, Pattanayak SK, Houtven GV. 2006. Structural benefits transfer: an example using VSL estimation. *Ecol. Econ.* 60(2):361–71

Smith VK, Van Houtven G, Pattanayak SK. 2000. Benefit transfer via preference calibration: 'prudential algebra' for policy. *Land Econ.* 78(1):132–52

Spash CL, Vatn A. 2006. Transferring environmental value estimates: issues and alternatives. *Ecol. Econ.* 60(2):379–88

Stanley TD. 2001. Wheat from chaff: meta-analysis as quantitative literature review. *J. Econ. Perspect.* 15(3):131–50

Stapler RW, Johnston RJ. 2009. Meta-analysis, benefit transfer, and methodological covariates: implications for transfer error. *Environ. Resour. Econ.* 42(2):227–46

Taylor LO. 2003. The hedonic method. See Champ et al. 2003, pp. 331–93

Teisl MF, Boyle KJ, McCollum DW, Reiling SD. 1995. Test-retest reliability of contingent valuation with independent sample pretest and posttest control groups. *Am. J. Agric. Econ.* 77(3):613–19

Troy A, Wilson MA. 2006. Mapping ecosystem services: practical challenges and opportunities in linking GIS and value transfer. *Ecol. Econ.* 60(2):435–49

U.S. Dept. Agric. (USDA). 2005. *Conservation Security Program: Amendment to the Interim Final Rule Benefit Cost Assessment*, Mar. 18. Washington, DC

U.S. Environ. Prot. Agency (EPA). 1999. *The Benefits and Costs of the Clean Air Act 1990 to 2010.* EPA 410-R-99-001

U.S. Environ. Prot. Agency (EPA) 2000. *Guidelines for Preparing Economic Analyses*. EPA 240-R-00-003

U.S. Environ. Prot. Agency (EPA). 2005. *Regulatory Impact Analysis for the Final Clean Air Visibility Rule of the Guidelines for Best Available Retrofit Technology (BART) Determinants Under the Regional Haze Regulations*. EPA-452/R-050-004

U.S. Executive Off. President. 2009. *Economic Report of the President*. Washington, DC: U.S. GPO

U.S. Executive Off. President. 1981. Executive Order 12291: federal regulation. 46 *Fed. Regist.* 13193, 3 CFR. **http://www.archives.gov/federal-register/codification/executive-order/12291.html**, accessed Sept. 14, 2009

U.S. Executive Off. President. 1993. Executive Order 12866: regulatory planning and review. 58 *Fed. Regist.* 190. **http://www.archives.gov/federal-register/executive-orders/pdf/12866.pdf**, accessed Jan. 26, 2010

U.S. Off. Manag. Budget. (U.S. OMB). 2003. *Circular A-4: Regulatory Analysis*. **http://www.whitehouse.gov/OMB/circulars/a004/a-4.pdf**, accessed Oct. 21, 2009

Vandenberg TP, Poe GL, Powell JR. 2001. Assessing the accuracy of benefits transfers: evidence from a multi-site contingent valuation study of ground water quality. In *The Economic Value of Water Quality*, ed. JC Bergstrom, KJ Boyle, GL Poe, pp. 100–120. Cheltenham, UK: Edward Elgar

Walsh RG, Johnson DM, McKean JR. 1992. Benefit transfer of outdoor recreation demand studies, 1968–1988. *Water Resour. Res.* 28(3):707–13

Whitehead JC, Hoban TJ. 1999. Testing for temporal reliability in contingent valuation with time for changes in factors affecting demand. *Land Econ.* 75(3):453–65

Wilson MA, Hoehn JP. 2006. Valuing environmental goods and services using benefit transfer: the state-of-the art and science. *Ecol. Econ.* 60(2):335–42

Zanderson M, Termansen M, Jensen FS. 2007. Testing benefits transfer of forest recreation values over a twenty-year time horizon. *Land Econ.* 83(3):412–40

**Page 148**



**Annual Review of
Resource Economics**

Volume 2, 2010

# Contents

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

**Prefatory**

On the Increasing Role of Economic Research in Management of Resources and
Protection of the Environment
*William J. Baumol* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Modeling Choices Under Economic and Health Risks**

Empirical Challenges for Risk Preferences and Production
*David R. Just, Sivalai V. Khantachavana, and Richard E. Just* . . . . . . . . . . 13

Real Options in Resource Economics
*Esther W. Mezey and Jon M. Conrad* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Economics of Health Risk Assessment
*Erik Lichtenberg* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Invasive Species and Endogenous Risk
*David Finnoff, Chris McIntosh, Jason F. Shogren, Charles Sims, and
Travis Warziniack* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Managing Infectious Animal Disease Systems
*Richard D. Horan, Eli P. Fenichel, Christopher A. Wolf, and
Benjamin M. Gramig* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Antibiotic Effectiveness: New Challenges in Natural Resource Management
*Markus Herrmann and Ramanan Laxminarayan* . . . . . . . . . . . . . . . . . . . 125

**Measuring the Benefits of Economic and Environmental Amenities**

The Life Satisfaction Approach to Environmental Valuation
*Bruno S. Frey, Simon Luechinger, and Alois Stutzer* . . . . . . . . . . . . . . . . . 139

The Benefit-Transfer Challenges
*Kevin J. Boyle, Nicolai V. Kuminoff, Christopher F. Parmeter, and
Jaren C. Pope* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

**Page 149**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org
by Brigham Young University - Utah on 05/14/14. For personal use only.

Consumer Surplus with Apology: A Historical Perspective on Nonmarket
Valuation and Recreation Demand
*H. Spencer Banzhaf* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

What Have We Learned from 20 Years of Stated Preference Research in
Less-Developed Countries?
*Dale Whittington* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

Providing Safe Water: Evidence from Randomized Evaluations
*Amrita Ahuja, Michael Kremer, Alix Peterson Zwane* . . . . . . . . . . . . . . . 237

## Climate Change and Global Resources

Costs of Mitigating Climate Change in the United States
*Niven Winchester, Sergey Paltsev, Jennifer Morris, and John Reilly* . . . . . 257

Innovation and Climate Policy
*David Popp* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

Economic Incentives and Global Fisheries Sustainability
*Christopher Costello, John Lynham, Sarah E. Lester, and
Steven D. Gaines* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299

## Public Policy: The Environment and Agriculture

Regulatory Environmental Federalism
*Bouwe R. Dijkstra and Per G. Fredriksson* . . . . . . . . . . . . . . . . . . . . . . . 319

Product Differentiation and Quality in Food Markets:
Industrial Organization Implications
*Tina L. Saitone and Richard J. Sexton* . . . . . . . . . . . . . . . . . . . . . . . . . . 341

Agricultural Labor and Migration Policy
*J. Edward Taylor* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 369

## Errata

An online log of corrections to *Annual Review of Resource Economics* articles
may be found at http://resource.AnnualReviews.org

**Page 150**

Annu. Rev. Resour. Econ. 2010.2:161-182. Downloaded from www.annualreviews.org by Brigham Young University - Utah on 05/14/14. For personal use only.

# ANNUAL REVIEWS
## It's about time. Your time. It's time well spent.

**New From Annual Reviews:**

# *Annual Review of Statistics and Its Application*

Volume 1 • Online January 2014 • http://statistics.annualreviews.org

Editor: **Stephen E. Fienberg,** *Carnegie Mellon University*

Associate Editors: **Nancy Reid,** *University of Toronto*
**Stephen M. Stigler,** *University of Chicago*

The *Annual Review of Statistics and Its Application* aims to inform statisticians and quantitative methodologists, as well as all scientists and users of statistics about major methodological advances and the computational tools that allow for their implementation. It will include developments in the field of statistics, including theoretical statistical underpinnings of new methodology, as well as developments in specific application domains such as biostatistics and bioinformatics, economics, machine learning, psychology, sociology, and aspects of the physical sciences.

**Complimentary online access to the first volume will be available until January 2015.**

**TABLE OF CONTENTS:**

- *What Is Statistics?* Stephen E. Fienberg
- *A Systematic Statistical Approach to Evaluating Evidence from Observational Studies,* David Madigan, Paul E. Stang, Jesse A. Berlin, Martijn Schuemie, J. Marc Overhage, Marc A. Suchard, Bill Dumouchel, Abraham G. Hartzema, Patrick B. Ryan
- *The Role of Statistics in the Discovery of a Higgs Boson,* David A. van Dyk
- *Brain Imaging Analysis,* F. DuBois Bowman
- *Statistics and Climate,* Peter Guttorp
- *Climate Simulators and Climate Projections,* Jonathan Rougier, Michael Goldstein
- *Probabilistic Forecasting,* Tilmann Gneiting, Matthias Katzfuss
- *Bayesian Computational Tools,* Christian P. Robert
- *Bayesian Computation Via Markov Chain Monte Carlo,* Radu V. Craiu, Jeffrey S. Rosenthal
- *Build, Compute, Critique, Repeat: Data Analysis with Latent Variable Models,* David M. Blei
- *Structured Regularizers for High-Dimensional Problems: Statistical and Computational Issues,* Martin J. Wainwright
- *High-Dimensional Statistics with a View Toward Applications in Biology,* Peter Bühlmann, Markus Kalisch, Lukas Meier
- *Next-Generation Statistical Genetics: Modeling, Penalization, and Optimization in High-Dimensional Data,* Kenneth Lange, Jeanette C. Papp, Janet S. Sinsheimer, Eric M. Sobel
- *Breaking Bad: Two Decades of Life-Course Data Analysis in Criminology, Developmental Psychology, and Beyond,* Elena A. Erosheva, Ross L. Matsueda, Donatello Telesca
- *Event History Analysis,* Niels Keiding
- *Statistical Evaluation of Forensic DNA Profile Evidence,* Christopher D. Steele, David J. Balding
- *Using League Table Rankings in Public Policy Formation: Statistical Issues,* Harvey Goldstein
- *Statistical Ecology,* Ruth King
- *Estimating the Number of Species in Microbial Diversity Studies,* John Bunge, Amy Willis, Fiona Walsh
- *Dynamic Treatment Regimes,* Bibhas Chakraborty, Susan A. Murphy
- *Statistics and Related Topics in Single-Molecule Biophysics,* Hong Qian, S.C. Kou
- *Statistics and Quantitative Risk Management for Banking and Insurance,* Paul Embrechts, Marius Hofert

**Access this and all other Annual Reviews journals via your institution at www.annualreviews.org.**

**ANNUAL REVIEWS | Connect With Our Experts**

Tel: 800.523.8635 (US/CAN) | Tel: 650.493.4400 | Fax: 650.424.0910 | Email: service@annualreviews.org



# EXHIBIT B1



FILED
COURT OF COMMON PLEAS
TUSCARAWAS COUNTY, OHIO

2013 JAN 14   AM 10 43

JEANNE M. STEPHEN
CLERK OF COURTS

**IN THE COURT OF COMMON PLEAS**
**TUSCARAWAS COUNTY, OHIO**

JOHN MICHAEL ABICHT, et al.,

     Plaintiffs,

     vs.

REPUBLIC SERVICES OF OHIO II, LLC

     Defendant.

)  **CASE NO. 2008 CT 10 0741**
)
)  **JUDGE INDERLIED**
)
)  **DEFENDANT REPUBLIC SERVICES**
)  **OF OHIO II, LLC'S MOTION TO**
)  **EXCLUDE EXPERT TESTIMONY OF**
)  **ROBERT A. SIMONS, PH.D.**
)  **PURSUANT TO OHIO RULES OF**
)  **EVIDENCE 702 AND 703**

Pursuant to Ohio Rules of Evidence 702 and 703, Defendant Republic Services of Ohio II, LLC moves this Court to preclude Plaintiffs' retained expert, Robert A. Simons, Ph.D., from offering evidence in subsequent court proceedings, including at the first trial in this matter, scheduled for March. As explained in more detail below, Dr. Simons' opinions regarding the alleged property losses of 176 of the Plaintiffs are based on unscientific and unreliable methodologies as applied to unfounded assumptions, hearsay, and other faulty premises. Dr. Simons' techniques have been severely criticized by federal and state courts around the country; the same flaws noted in those cases warrant the exclusion of his opinion testimony here.

Further support for this Motion is set forth in the attached Memorandum, cited authority, and supporting exhibits.

**Page 153**

Dated: January 11, 2013

Respectfully submitted,

Robin G. Weaver (0020673)
Colin R. Jennings (0068704)
Squire Sanders (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304
(216) 479-8500 (Phone)
(216) 479-8780 (Fax)
robin.weaver@squiresanders.com
colin.jennings@squiresanders.com

Brian M. McQuaid (*admitted pro hac vice*)
Squire Sanders (US) LLP
1 E. Washington St., Suite 2700
Phoenix, Arizona 85004
(602) 528-4000 (Phone)
(602) 253-8129 (Fax)
brian.mcquaid@squiresanders.com

Aaron T. Brogdon (0081858)
Squire Sanders (US) LLP
2000 Huntington Center
41 South High Street
Columbus Ohio 43215
(614) 365-2700 (Phone)
(614) 365-2499 (Fax)
aaron.brogdon@squiresanders.com

*Attorneys for Defendant Republic Services of
Ohio II, LLC*

2

**Page 154**

## MEMORANDUM IN SUPPORT

### I.    INTRODUCTION

In this lawsuit, approximately 600 past and current residents and businesses of the Bolivar, Ohio area have sued Republic Services of Ohio II, LLC ("Republic"), as a result of sporadic odors that emanated from the Countywide Recycling & Disposal Facility (the "Facility" or "Countywide") from the first half of 2006 through the first quarter of 2008. Plaintiffs claim that the odors caused a diminution in their property values and affected their use and enjoyment of their properties.[1] There is no allegation that the odors caused or may cause any adverse health effects, nor that any hazardous material or contamination from the Facility entered onto Plaintiffs' properties.

Dr. Robert A. Simons ("Dr. Simons"), a professor of Urban Planning at Cleveland State University, has been hired by Plaintiffs to testify about the alleged diminution in value of Plaintiffs' real properties. In addressing the 164 residential properties of the 176 Plaintiffs deposed to date,[2] Dr. Simons has forgone separate evaluations of the properties and consideration of the unique characteristics of each (including age, lot size, lay-out, number of bathrooms and bedrooms, neighborhood, renovations, etc.), and has instead issued across-the-

---

[1] Plaintiffs are asserting separate claims—and purport to have suffered separate damages—for their loss of use and enjoyment of their real property relative to the alleged diminution in value of their real estate. *See* Consolidated Complaint. Indeed, Dr. Simons has disclaimed any opinion as to Plaintiffs' claims for loss of use and enjoyment of their properties, although he has acknowledged that such damages are "probably in the mix" in his opinion (which also seems to include improper damages related to ordinary landfill operations and stigma, among other things). *See* Simons Depo. at 144 ("I'm not offering opinions on use and enjoyment, but it's probably in the mix there. It's probably beyond my opinion."). Because the reaction odors that underlie this case have been abated and any damages related to lingering "stigma" are disallowed by Ohio law, no permanent diminution damage has befallen Plaintiffs' homes as a result of the odors and, thus, Plaintiffs' only potentially viable claim for damages (assuming, *arguendo*, a finding of liability), derives from their purported loss of use and enjoyment of their properties.

[2] Dr. Simons limited his diminution opinions to the 164 properties of the 176 Plaintiffs deposed to date on the grounds that the Plaintiffs' depositions "corroborated" his analysis. Deposition of R. Simons at 22-23; 193. Dr. Simons' utilization of the Plaintiffs' deposition testimony affirms Republic's position that the deposition of each Plaintiff is imperative to a thorough analysis of this case and provides useful information about each Plaintiff's particular claim.

board diminution opinions based on each property's distance from the perimeter of Countywide. Specifically, depending on each property's placement within one of three bands circling the Facility, Simons has assigned a measure of loss, opining that properties within two miles of the Facility's perimeter purportedly suffered a 20% diminution in value; properties between 2-4 miles of the Facility purportedly suffered a 10% diminution in value; and properties between 4-4.5 miles of the Facility purportedly suffered a 5% diminution in value. Report of Robert A. Simons, Ph.D., ("Simons Rep."), attached as Exhibit A, at 34. Properties more than 4.5 miles from the perimeter of the Facility were not assigned a loss. *See* 12/3/2012 Deposition of R. Simons ("Simons Depo."), cited excerpts attached as Exhibit B, at 27 ("[M]y opinion is that [property located more than 4.5 miles from the Countywide site] haven't sustained any losses from this landfill."). All told, Simons calculated that the 164 properties suffered an aggregate diminution in value totaling "at least $5.4 million as of March 31, 2012." Simons Rep. at 34.

Dr. Simons' opinions about the Plaintiffs' diminution losses are the result of unreliable, unscientific methodologies that have been severely criticized by other courts and here have been applied to faulty assumptions and hearsay. Because his methodologies and opinions are fundamentally flawed and fall far short of the requirements for admissibility of Ohio Rule of Evidence 702, his testimony should be excluded from any trial in this matter, including the trial scheduled to begin in March.

## II.    DR. SIMONS' TESTIMONY DOES NOT MEET THE REQUIREMENTS FOR ADMISSIBILITY UNDER OHIO LAW.

Ohio law gives this Court the power to determine whether a witness is qualified to testify at trial. *See* Evid. R. 104(A) ("Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by

4

the court. . . .").  In turn, Evid. R. 702 provides that expert opinion testimony must meet certain

requirements to be admissible:

> A witness may testify as an expert if *all* of the following apply:
>
> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; [and]
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. . . .

(Emphasis added.)

In interpreting the requirements of Evid. R. 702, Ohio courts have adopted the approach

taken by federal courts in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94

(1993) and its progeny.  *See State v. Nemeth*, 82 Ohio St. 3d 202, 211 (1998); *Ball v.*

*Consolidated Rail Corp.*, 142 Ohio App. 3d 748, 757 (Cuyahoga App. 2001).  Under *Daubert*,

the trial court *must* determine that expert opinion evidence is relevant and reliable before it can

be admitted into evidence.  *Daubert*, 509 U.S. at 589.  In undertaking the required analysis, the

trial court adopts the role of a "gatekeeper," whose goal is "to make certain that an expert,

whether basing testimony upon professional studies or personal experience, employs in the

courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).  Factors that the court

may consider include (1) whether the theory propounded has been tested; (2) whether it has been

subject to peer review; (3) the theory's known or potential rate of error; and (4) its general

acceptance in the scientific community as a whole.  *Miller v. Bike Athletic Co.*, 88 Ohio St. 3d

607, 611-612 (1998) (quoting *Daubert*, 509 U.S. at 593-94).  Expert testimony does not become

5

**Page 157**

reliable simply because a purported expert says so. Indeed, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

*Daubert* has been expanded to apply to *all* expert testimony, including testimony on technical or other "specialized" information, not just scientific evidence. *See, e.g., Kumho*, 526 U.S. at 149; *State Farm Mut. Auto. Ins. Co. v. Anders*, 197 Ohio App. 3d 22, 38, 2012 Ohio 824, ¶ 39 (Franklin App. 2012); *Jones v. Conrad*, 2001 Ohio App. LEXIS 3897, *11 (Butler App. 2001).

Plaintiffs have proffered the testimony of Dr. Simons to try to establish their claims that Plaintiffs' real property has lost value as a result of the odors that allegedly emanated from Countywide beginning in the first half of 2006. But Dr. Simons' opinions are not based on reliable scientific, technical, or other specialized information and methodologies and therefore do not meet the requirements of reliability under Evid. R. 702. Further, much of Dr. Simons' testimony is based on hearsay or other inadmissible evidence, contrary to Evid. R. 703. As explained more fully below, Dr. Simons' opinion testimony must be excluded from evidence.

## III.   DR. SIMONS' METHODOLOGIES ARE NOT BASED ON RELIABLE SCIENTIFIC, TECHNICAL, OR OTHER SPECIALIZED INFORMATION.

To reach his opinions regarding Plaintiffs' property diminution losses, Dr. Simons utilized several "primary" methodologies: (1) a "Sales Trend Analysis," by which he purported to compare real estate sales near the Facility to sales in a "control" area using only the number of sales, the square footage of homes sold, and sales prices to determine alleged diminution figures; (2) a "Contingent Valuation" survey involving an independent marketing firm's survey of random respondents about their imagined responses to hypothetical real estate situations; (3) the application of Dr. Simons' own "Big Matrix," described by him as a "quick and dirty" tool to

6

**Page 158**

estimate diminution in hazardous waste litigation; (4) a review of peer-reviewed literature on the subject of proximity stigma damages caused by operating landfills; and (5) county auditor valuations of Plaintiffs' properties and alleged across-the-board valuation decreases. Simons Depo. at 21-22, 29, 50, 66-67, 151, 171. Each of these methodologies, whether independently because of fundamental design flaws, or as applied to this case by Dr. Simons, is unreliable and incapable of assisting the fact-finder as required by Evid. R. 702. Dr. Simons' opinions related to these methodologies should be excluded from evidence.

A.      **Dr. Simons' Sales Trend Analysis Presents an Overly Simplistic, Generalized View of Sales Trends Near Countywide.**

The first of Dr. Simons' "primary" determiners of Plaintiffs' damages compares the number of real estate sales within 4.5 miles of Countywide to the number of sales in a "control" area designated by Dr. Simons, from October 1, 2006 through May 31, 2010. Simons Rep. at 46. As applied by Dr. Simons, this "Sales Trend Analysis" methodology considers only three factors—the number of sales in each area, the price of each sale, and the square footage of each home sold. Simons Depo. at 30, 47-48. Specifically, the square footage of sold homes are divided by their sales price and the resulting figure is used to determine the baseline value of homes in the subject area during the designated 3½ year period. Simons Depo. at 50, 59-61. The baseline values of the "control" and allegedly affected areas are then used to extrapolate the base amount of loss suffered by each Plaintiff holding property in the "affected" area, based on the proximity of that Plaintiff's property to the Facility. *Id.* Finally, to that figure, Dr. Simons added 5.11% interest on each Plaintiff's alleged loss from June 30, 2006 through March 31, 2012. Simons Depo. at 265, 277 (acknowledging using a seven year auction rate for U.S. Treasury Notes in calculating Plaintiffs' alleged damages). For myriad reasons,

7

Dr. Simons' "Sales Trend Analysis" presents an overly simplistic, unreliable picture of Plaintiffs' alleged diminution losses.

First, in conducting his "Sales Trend Analysis," Dr. Simons considered no unique characteristics of the subject homes, and thus, each home within three miles of the Facility, for example, was assigned the exact same percentage loss. Simons Depo. at 56 ("[W]e have three little buckets, inside two miles, two to four miles, four to four and a half miles."). Other factors influencing a home's value, including the lot size (often extensive in rural areas like those surrounding Countywide), the number of bedrooms or bathrooms, date of construction, improvements to the home not reflected by its square footage like finished basements or loft areas, the desirability of the neighborhood, the quality of the home's fixtures, and the idiosyncratic motivations of the buyers and sellers, were not taken into consideration. Simons Depo. at 50-53 (acknowledging that the Sales Trend Analysis "doesn't account for [lot size] specifically . . . it's not a perfect methodology in terms of [other variables that impact the value of the home])". Moreover, Dr. Simons lumped together all sales in the subject areas over the designated 3½ year period, making it difficult, if not impossible, to correlate the odors' alleged effects, if any, on property sales during the period of the reaction odors' potency, from the first half of 2006 through the first half of 2008, and to eliminate other factors that may affect property values, like the nationwide housing crash that reached its peak in about the second half of 2008. Simons Rep. at 195.

Federal and state courts have roundly criticized Dr. Simons for utilizing this type of overly simplistic, generalized analysis to determine alleged diminution damages. For instance, in *Palmer v. 3M Company*, 2007 Minn. Dist. LEXIS 162, *58 (Minn. Dist. Ct. June 19, 2007), the court cited "a lack of common sense" in Dr. Simons' proposal to determine property damages

8

**Page 160**

on an across-the-board basis in a putative class action, emphasizing that diminution claims require an individualized analysis of the subject properties:

> "[a] rational and common sense examination of the many factors that may impact each class member's property damages award leads to the conclusion that *such damages are not amenable to computation by an easy or mechanical method.* In fact, these property damage calculations would hinge on *property-specific determinations* of a number of facts including: to what extent the property is contaminated with PFCs; to what extent the class member has altered or changed her use of the property because of PFC contamination; *and any other non-PFC related problems or defects with the property that may affect that property's value, including the effects of the current state of the real estate market in any given area.*"

*Id.* at **59-60 (emphasis added).

Likewise, the United States District Court for the Southern District of Alabama rejected Dr. Simons' expressed intent to model and calculate the extent of diminution to contaminant-affected property "through a common, formulaic methodology as to all the property owners in the proposed class." *LaBauve v. Olin Corp.*, 231 F.R.D. 632, *678 fn. 99 (S.D. Ala. Nov. 10, 2005). Indeed, the *LaBauve* Court found Dr. Simons' "conclusory" testimony about the practicality of across-the-board valuations to be "so flawed as to be inadmissible as a matter of law." *Id.*

The *Palmer* and *LaBauve* courts' criticisms of Dr. Simons and his overly general, simplistic Sales Trend Analysis apply even more-so here, where hundreds of individual claims of diminution have been asserted. Yet Dr. Simons has attempted—again—to cut corners and determine diminution damages for scores of unique properties on an across-the-board, aggregate basis, with no consideration of unique property characteristics. And again, Dr. Simons has sacrificed reliability and accuracy for simplicity; an approach that, assuming *arguendo* there are

9

**Page 161**

compensable damages, could only lead to windfalls to most property owners and potential shortfalls to others.

Perhaps because of these fundamental flaws in his Sales Trend Analysis and the courts' criticisms of its resulting superficial, unreliable results, Dr. Simons has publicly advocated for the use of a vastly more detailed methodology to determine diminution in property value:

> Ideally, hedonic regression provides the ***best quality results*** in determining the effects of environmental contamination on property values.

*See* Robert A. Simons, Ph.D., *Estimating Proximate Property Damage from PCB Contamination in a Rural Market: A Multiple Techniques Approach*, The Appraisal Journal, October 2002, at 390, attached as Exhibit C (emphasis added). Dr. Simons' recognition of the superiority of regression analysis as a tool to assess diminution in property values is not surprising in light of the methodology's consideration of several material factors influencing a property's value, including its lot size, number of bathrooms and bedrooms and the condition of the property—all factors conspicuously absent in Dr. Simons' Sales Trend Analysis. Simons Depo. at 54 (acknowledging that "lot size or condition of house" are the "kinds of things" necessary for a regression analysis). Yet, Dr. Simons did not use this "ideal" methodology to determine Plaintiffs' diminution losses here due to, *inter alia*, the increased expense and effort associated with the more thorough methodology. Simons Depo. at 54 (regression analysis is "expensive. To run a regression for this, it's just—you know, goo gobs of effort and careful scrutiny of data. There's a lot of data preparation.").

Dr. Simons' corner-cutting Sales Trend Analysis failed to consider any particular Plaintiff's property and, instead, only superficially compared the most basic property characteristics—home size and sale price—to determine a baseline measure of "loss." Such a

10

**Page 162**

crude comparison cannot meet the requirements for reliability under Evid. R. 702. Dr. Simons'

Sales Trend Analysis and his resulting opinions must be excluded from the trials in this matter.

**B.      Dr. Simons' Contingent Valuation Survey Methodology Relies on Hearsay within Hearsay, Was Premised on Inaccurate and Prejudicial Representations of Fact, and is Unreliable.**

Dr. Simons next purports to determine Plaintiffs' diminution damages via a survey of

random homeowners about their supposed responses to a hypothetical factual situation.

Specifically, pursuant to Dr. Simons' contingent valuation ("CV") survey, an employee of a

marketing company called random people believed to be homeowners and posed questions about

the amount of money the respondent would bid on a hypothetical home. Simons Rep. at 17-21.

Following the initial hypothetical "bid," the marketer would then ask the respondent to assume

that the same home were located near various disamenities: a shopping center, a gasoline service

station with leaking gasoline tanks, or a highly odorous landfill with a "smoldering" fire.

Simons Rep. at 17-21; CV Survey, attached as Exhibit D. The respondent was then asked to

again bid on the home, giving consideration to each disamenity in turn. Simons Rep. at 17; CV

Survey. The respondents' answers to the hypothetical questions posed by the marketing firm

were then summarized and sent to Dr. Simons, who used the difference in the hypothetical

"bids," along with "a little bit of art," to estimate Plaintiffs' diminution damages here. Simons

Depo. at 130-132. Dr. Simons' contingent valuation methodology relies wholly on

impermissible hearsay and misrepresentations of fact, and is unreliable under Evid. R. 702.[3]

**1.      Dr. Simons' CV Survey Methodology Relies on Impermissible Hearsay.**

Although his CV survey provides a "primary" basis for Dr. Simons' opinions about

Plaintiffs' purported diminution losses, Dr. Simons is all but removed from the actual survey

---

[3] The CV survey methodology incorporates improper stigma damages which are unallowable under Ohio law, as more fully explained in Section D, below.

**Page 163**

process; he does not participate in the telephone surveys, does not listen to audio of the surveys (if any exists), and does not even review the resulting raw data. Simons Depo. at 94, 102 ("I don't know if [the interviews] were recorded or not;" "I get the dispositions of the calls, not the raw data."). Instead, Dr. Simons simply accepts as true the marketing company's unverified summary of the responses to the hypothetical questions and uses the summary to render an opinion about Plaintiffs' diminution losses. Simons Depo. at 100-101. The CV survey methodology relies entirely on hearsay within hearsay (the marketing firm's statements about the respondents' statements, based on the marketing firm's statements) and, as such, cannot form the basis for an expert opinion under Ohio Evid. R. 703.

Under Evid. R. 703, an expert's opinion may only be based on facts or data perceived by him or admitted into evidence. *See State v. Chapin*, 67 Ohio St.2d 437, 442 (1981) (excluding testimony of psychiatrists called to testify because they did not personally examine the defendant and because their testimony was based upon reports and records not in evidence and not prepared by the witnesses); *Blair v. Harmon*, 1996 Ohio App. LEXIS 4910, *10 (1st App. Dist. Nov. 13, 1996) (finding that an expert's testimony should be excluded where "there is no evidence to support an assumed fact or facts upon which an expert witness's opinion is based."); *Orr v. Ohio Bell Tel. Co.*, 1994 Ohio App. LEXIS 267, *6 (7th App. Dist. Jan. 25, 1994) (finding that the trial court erred in admitting expert testimony when he had not "based his opinion on personal knowledge or his own perceptions."). An expert may not be used as a conduit to pass inadmissible hearsay to the jury. *Schwarze v. Divers Supply*, 2002 Ohio 3945, ¶ 43 (5th App. Dist.) (excluding expert opinion based on inadmissible hearsay because it was "not based on 'facts in evidence' within the meaning of Evid. R. 703."); *In re Sherman*, 2005 Ohio 5888,

12

¶¶ 16-19 (3rd App. Dist. 2005) (stating that a psychologist's testimony should have been excluded because it was based in part on inadmissible hearsay).

Dr. Simons' opinions regarding Plaintiffs' diminution damages are premised, at least in part, on his "primary" CV survey methodology, which relies on statements allegedly made to a third party marketer by randomly contacted, purported homeowners in response to statements made by the marketer. Simons Rep. at 17-21. The unverified statements of the random respondents, the summaries of those statements made by the surveyors, and the questions and statements made by the surveyors in conducting the survey all constitute hearsay that cannot form the basis for an expert opinion under Evid. R. 703. Simons' opinions and testimony based on his CV survey methodology should therefore be excluded.

### 2.    Dr. Simons' Inaccurate, Prejudicial Description of Countywide Tainted the CV Survey and Its Results.

Even if Dr. Simons' opinions based on his CV survey methodology were not improper due solely to the methodology's basis in hearsay, his opinions based on the CV survey would be subject to exclusion due to the rampant, prejudicial inaccuracies in the survey's description of the "landfill" disamenity used as a stand-in for Countywide and due to the survey's failure to include any specific information about any actual property at issue here.

The description of the "landfill" disamenity included in the CV survey—and used to gauge a supposed random buyer's willingness to purchase property near Countywide—was drafted jointly by Dr. Simons and Plaintiffs' counsel. Simons Depo. at 81, 84. Perhaps not surprisingly, the description was rife with prejudicial inaccuracies and innuendo, including misleading statements that:

- "Within the last *ten years*, odors became noticeable near the landfill."

- "[A] *fire*... is smoldering" at the landfill . . . and it "*has not been put out.*"

13

- "There have been *continuing violations* and over 300 residential citizen odor complaints reported since summer of 2007 through 2009."

- "*[N]o plans have been finalized to put out the* fire."

- "The county auditor continues to provide a property tax reduction to all homeowners in this area."[4]

*See* CV Survey, at 3, Scenario EE1 (emphasis added). Moreover, other statements read to the respondents were not only misleading, but would be inadmissible into evidence at any trial,[5] and cannot, therefore, form the basis of an expert opinion under Evid. R. 703:

- "[t]he landfill was declared a public nuisance and fined over ten million dollars by the Ohio Environmental Protection Agency for improper management of the landfill."

*Id.* Dr. Simons' inclusion of insinuation, patent falsehoods, and inflammatory statements in the CV survey is particularly troubling in light of his previous acknowledgements that the accuracy of the facts included in a CV survey directly affects the results of the survey:

> A:   Well, I think what you're asking me is if I've got a wrong fact in [the CV survey], then there would be a problem. ***If it's incorrect, that would be a problem.***
>
> ***
>
> A:   The words we put in these fact paragraphs [in the CV surveys] affect the results. That's what we're looking for, people who are paying attention; and if the facts change, then they change their opinions.

---

[4] Indeed, regardless of what relevance or relationship tax valuations have to actual home values, this statement alone completely taints the survey and renders its results unduly prejudicial, given that the surveyors essentially told the lay respondents that property values had been lowered for tax purposes. Moreover, the statement fails to indicate that only one county auditor issued valuation decreases and even then, only for properties located within two miles of the Facility. Further, the statement omits mention of the fact that the grounds for the valuation decreases are unconfirmed, and instead leads the respondent to assume that the decreases are directly related to the landfill and its alleged odors or fire.

[5] Both R.C. § 3704.09 and the Consent Order entered into between Republic and the State of Ohio render inadmissible the determinations and findings of the Ohio EPA and the terms of the Consent Order, respectively. *See* September 30, 2009 Consent Order, *State of Ohio v. Republic Services of Ohio II, LLC*, Case No. 2007 CV 4762, ¶ 10 (Court of Common Pleas of Stark County, Ohio). Due to Plaintiffs' repeated attempts to rely on his inadmissible evidence, Republic will file a Motion *in Limine* to Preclude Plaintiffs from Referencing or Introducing Evidence Related to Agency Findings and Agreements in the coming days.

14

*See* 8/28/09 Depo. of Robert A. Simons, Ph.D., *Baker, et al. v. Chevron USA, Inc.*, S.D. Ohio Case No. 1:05-cv-227, at 162-64 ("Simons *Baker* Depo.") (emphasis added) (cited excerpts attached as Exhibit E).

Courts have also previously emphasized the importance that the fact description included in a CV survey analysis be thorough and accurate, and have criticized Dr. Simons for failing to accurately and specifically describe a subject disamenity. In *Palmer*, 2007 Minn. Dist. LEXIS 162, at *58, the court chastised Dr. Simons for failing to include in the CV survey disamenity description "any questions containing specific information about any of the named plaintiffs' properties," and expressed doubts regarding the reliability of Dr. Simons' opinions generally, saying, "[b]ased on that [CV] survey and his 'real estate trends analysis,' *Dr. Simons made questionable conclusions as to permanent reductions in the value of certain properties . . .*" *Id.* (emphasis added).

Ohio law also requires that any response to a hypothetical be based on reliable evidence and, under Evid. R. 703, expert opinion testimony based on hypothetical situations not introduced into evidence is inadmissible. *State v. Schell*, 13 Ohio App. 3d 313 (1984). While Dr. Simons' CV survey methodology renders the expert one step removed from the hypothetical situation and response, the standard for admissibility must still apply with at least the same stringency. Consequently, the CV survey respondents' opinions here, based on an inaccurate and incomplete set of facts, are inadmissible into evidence. *See Mayhorn v. Pavey*, 8 Ohio App.3d 189, 192 (10th Dist. 1982) (hypothetical questions are improper where they "assume facts not in evidence, unfairly reflect[] the facts in evidence, or omit[] facts in evidence so vital to the conclusion of the expert that the question manifestly fails to present the facts which it does include in their true and just relationship."); *see also In Davis v. Excel Extrusions*, 112 Ohio

15

**Page 167**

App.3d 425 (11th Dist. 1996) (finding that the trial court improperly allowed an employee's medical expert to give an opinion in response to a hypothetical question which assumed facts not in evidence and about which the physician did not have personal knowledge). Any evidence derived from the hypotheticals posed in the CV survey, whether in the form of the respondents' responses or Dr. Simons' opinions based on those responses is based on inadmissible misinformation and should be excluded from evidence.

3.     **Dr. Simons' CV Survey Failed to Consider Real World Factors.**

Based on a hypothetical scenario relayed to purported homeowners who may never actually be in the market for a home and, in any event, cannot be relied upon to accurately predict their actual behavior, Dr. Simons' CV survey exists in a vacuum and could only mislead a jury. In his CV survey, unlike in the "real world," no motivated buyer tours an actual home, considers factors such as layout, neighborhood, schools, or location, or trades off one amenity for another. Moreover, unlike purchasers in the real world, the pretend buyers in the CV survey are provided limited and largely inaccurate information about the reaction odors, their purported source, and their likely continuation or return. *See, e.g.,* CV Survey, at 3, Scenario EE1 ("a fire . . . is smoldering" at the landfill "and it has not been put out"). Since the fact of the abated reaction odors need not actually be disclosed to a potential buyer under Ohio law,[6] the CV survey's inclusion of inflammatory and prejudicial misstatements about the abated odors and their source, as well as the plain implication that the odors may return, further removed the

---

[6] R.C. § 5302.30(D)(1) requires only that a seller of real property "disclose *material* matters relating to the *physical condition* of the property." (Emphasis added.) Likewise, the Ohio Residential Disclosure form, based on R.C. § 5302.30(D)(1), speaks in the present tense and references problems "existing *on the property.*" *See* Residential Disclosure form, attached as Exhibit F (emphasis added). By their plain language, R.C. § 5302.30(D)(1) and the Residential Disclosure form do not extend to historical, offsite problems.

16

**Page 168**

survey from real world circumstances, invited improper stigma damages (as more fully discussed in Section D, below), and rendered any responses and resultant opinions unreliable.

### 4.    State and Federal Courts Have Rejected CV Surveys as Unreliable.

Finally, perhaps due to the failings described above, CV surveys have not been accepted as a reliable technique for determining the value of residential properties, and at least two courts have rejected CV-type surveys like that performed by Dr. Simons here.  In *Baker v. Motorola Inc.*, Maricopa Cty., Arizona Case No. 92-02603, the expert witness attempted to apply a CV-type survey to supplement his analysis of diminution damages based on actual property sales on the basis that the survey results reflected the amount of diminution that would result from the market becoming more knowledgeable.  In rejecting the expert's use of the CV-type survey methodology, the *Baker* court characterized it as "speculative":

> With respect to the with-knowledge opinions, I am going to preclude that to the extent that it seeks to offer an opinion based on *a speculative assessment* of factual matters as to what a buyer with knowledge would pay for the property.

2/28/01 Transcript of Proceedings, *Baker v. Motorola Inc.*, Maricopa Cty., Arizona Case No. 92-02603, at 3915 (attached at Exhibit G) (emphasis added).

Likewise, the United States District Court for the Northern District of California rejected a diminution expert's use of a CV-type survey in *Palmisano v. Olin Corp.*, U.S. Dist. N.D. Calif. Case No. 03-01607, where the expert, as here and in *Baker*, cited to the survey as reflecting losses that would be incurred once the market became more knowledgeable. *See Order granting in Part and Denying In Part Olin's Motion to Exclude Testimony of John Kilpatrick* (attached as Exhibit H).  In rejecting the methodology, the District Court noted that it had "*serious concerns with the degree of speculation* [the expert's] theory entails." *Id.* at 7, fn. 5 (emphasis added).

Here, as in *Baker* and *Palmisano*, the CV survey lacks scientific validity and fails to meet the threshold requirement of reliability under Ohio law. In particular, Dr. Simons' CV survey fails to replicate the considerations inherent in a "real world" property sale and relies on speculation and improper hearsay, as well as prejudicial and inaccurate statements about the Facility. As noted by the *Palmer* court in assessing Dr. Simons' use of the methodology there, any conclusions based on the methodology are, at least, "questionable."

C.    **Simons' Big Matrix Is Facially Inapplicable Here, Its Application Is Based on Misinformation, and It Lacks Any Indicia of Reliability under Ohio Law.**

Next, Dr. Simons relies on his own creation, the "Big Matrix", to provide a "quick and dirty"—yet purportedly "primary"—estimate of Plaintiffs' alleged diminution losses. Simons Depo. at 171, 184. Via the Big Matrix, points are assigned to the "bare bones facts" of a plaintiff's diminution claim via a step-by-step process which ultimately leads the user to a "rough estimate" of the plaintiff's diminution loss:

> Q:    So what is the Big Matrix?
>
> \*\*\*
>
> A:    The Big Matrix is a methodology that I developed . . . in order to simplify the many complicating factors related to determining the effect of contamination on residential property values and allow quick examination based on a bare bones number of facts for a preliminary estimate of value diminution, if any.

Simons Depo. at 171.

> Q:    The Big Matrix is really designed to provide a rough estimate of expected loss based upon the peer review and not specific to any fact or case information?
>
> A:    Correct . . .

18

**Page 170**

Simons Depo. at 178.Although he did not describe it as such in his recent deposition, Dr. Simons has acknowledged that he created the Big Matrix to provide leverage to plaintiffs in settlement negotiations:

> Q.     You intended The Big Matrix to be a negotiating tool for lawyers and litigants; is that right?
>
> A.     Right. I observed that some cases were kind of small and the litigants couldn't get resources to put up some kind of claim on their own without hiring a bunch of experts, so I figured this would be a way to get them—get their foot in the door.

Simons *Baker* Depo. at 277.

As a preliminary matter, Dr. Simons' opinions based on the Big Matrix should be excluded from evidence due to Dr. Simons' failure to produce all of the information and data underlying the Big Matrix, despite repeated requests from counsel for Republic. *See, e.g.*, 12/12/2012 and 12/31/2012 email correspondence from C. Jennings to C. Marshall, attached as Exhibit I. Indeed, while Dr. Simons produced some materials related to the Big Matrix in early January, months after the deadline for the production of reliance materials and after repeated prompting, the produced materials were incomplete and, more troubling, failed to match the meta-regression models in Dr. Simons' journal article, *Simons and Saginor (JRER, 2000)* or book, When Bad Things Happen to Good Properties, both of which purportedly formed the basis for the Big Matrix. For his part, Dr. Simons has acknowledged that the meta-regression models he produced last week are preliminary. *See* 1/3/13 email from Simons ("It appears some articles were not used in the final run."), attached as Exhibit J. Further, the recently provided index of references underlying the Big Matrix omits several papers listed in Simons and Saginor (JRER, 2000), making it impossible for Republic to discern whether those articles were actually used in the relevant version of the Big Matrix and, if so, in what way. Republic has requested that Dr.

19

**Page 171**

Simons produce these materials immediately but has not yet received a response to the requests. *See* 1/9/2013 email correspondence from C. Jennings to C. Marshall, attached as Exhibit K.

Until Dr. Simons produces all of the models, spreadsheets and coding (in a data dictionary) underlying the Big Matrix, as well as all versions of the Big Matrix, Republic cannot replicate and test the Big Matrix's meta-analysis and Dr. Simons' resulting opinions. Any opinions based on the Big Matrix should be excluded from evidence until the necessary information is produced and Republic has had an opportunity to review and test it. Nonetheless, even without the benefit of all of the information and models underlying the Big Matrix, it is clear that the Big Matrix is facially inapplicable to this case. Indeed, "Step 1" of the Big Matrix looks to the type of *contamination* underling the claimant's diminution claim. *See* Big Matrix at *Step 1*, attached as Exhibit L. Because there is *no* allegation of contamination underlying Plaintiffs' claims in this case, Simons' attempt to apply the Big Matrix here should have summarily ended there. But instead, Simons opted to improperly analogize this case to one involving contamination and, in doing so, has argued for the placement of Countywide into not one, but *two* different "contamination" categories within the Big Matrix: one specific to hazardous waste depositories and one applicable to Concentrated Animal Feeding Operations ("CAFO"):

> Q:    Okay. And you were saying that you could either use the super fund site or landfill site, which is negative 9 percent, or the mapped air plume from facility or CAFO, which is negative 13 percent?
>
> A:    Correct. So, actually, I could use both of those, according to my methodology, because both apply.

Simons Depo. at 183. Simons placed Countywide in these categories despite their clear inapplicability—the CAFO category, for instance, applies to livestock operations and ongoing odors, neither of which is present here, while the superfund/landfill category is specific to

20

hazardous and explosive waste depositories and has never before applied to a landfill like Countywide that has only demonstrated the "incremental effects of odors" related to a reaction. Simons Depo. at 177-78 ("**Q.** All right. And what about—anything related specific to landfill odors in those peer reviewed articles?" "**A.** Some of the—some of the articles had explosions, and, therefore, some smoke and odors. Others may or may not have had it."), 180; Big Matrix at *Step 1.*

Finally, in shoehorning the facts of this case into the Big Matrix, Simons assumed that the dross reaction and resulting odors persist to the present day, were "not sudden," and have not been deemed resolved by a regulatory agency. Simons Depo. at 180. Yet Simons' assumptions are again wrong because the site of the reaction odors has been capped and sealed and the Ohio Environmental Protection Agency has concluded its supervision and activities at the site. *See e.g.,* Operation, Maintenance and Monitoring Plan. Simons' application of the Big Matrix to misinformation and incorrect assumptions affects the resulting opinions, as he, himself, has acknowledged:

> Q:     If the reaction odors are under control, would that impact your analysis under the Big Matrix?
>
> A:     I mean, if I – if we knock out being related to that CAFO category, then, yeah, it would reduce the losses.

Simons Depo. at 190.

> Q:     —if the odors at issue in this case are coming from the 88 acres that we talked about earlier, and the 88 acres is under cover, would that—does that change or reduce your diminution opinions in this case?
>
> A:     So another way of saying they would be—the smell problem is solved and the county auditors drop off their reductions?
>
> Q:     Right.

**Page 173**

A: Yeah, there probably would be reduced losses.

Simons Depo. at 191.

In sum, Dr. Simons' reliance on the Big Matrix as a primary determiner of Plaintiffs' diminution losses is flawed for myriad reasons, including that he has not produced all of the data and models underlying the Big Matrix, the Big Matrix is facially inapplicable to cases like the one at bar where contamination is not at issue, and Dr. Simons applied the Big Matrix to faulty assumptions and misinformation. For all of these reasons, any opinions of Dr. Simons based on the Big Matrix should be excluded from any trial in this matter.

**D.     Dr. Simons' Opinions Improperly Rely on Peer-Reviewed Literature Concerning Proximity Stigma Related to Landfills.**

In his final "primary" methodology for determining Plaintiffs' alleged diminution losses, Dr. Simons referenced landfill diminution discussions included in peer-reviewed literature. Simons Rep. at 31. Like his Big Matrix, the peer reviewed literature cited by Dr. Simons is plainly and facially inapplicable here. Indeed, the literature cited by Simons as providing support for his diminution ranges concerns "proximity stigma," the stigma related to the mere existence of a nearby, operating landfill. Simons Depo. at 22 ("The peer review literature . . . contains a combination of direct event reaction type of cases and just proximity cases."). But stigma related to the ordinary operations of Countywide is irrelevant for two key reasons: (1) Plaintiffs' claims have never extended to Countywide's normal landfill operations (*see* 9/8/10 Consolidated Complaint); and (2) Ohio law does not recognize claims for so-called "stigma."

First, although this case has always turned on the circumstances and effects of the odors that resulted from a reaction in the 2006-2008 timeframe, Simons has acknowledged that he considered "nuisance factors" associated with the normal operations of the Facility, including the

22

**Page 174**

presence of seagulls, noise and dust related to vehicle traffic, the "visual cue" of the Facility, and occasional odors related to normal landfill operations, in rendering his opinions about Plaintiffs' losses. Simons Depo. at 18-19 (acknowledging that his damages analysis includes "[o]dors and dust related to the normal operations or non-normal operations—abnormal operations and the odors, and the noise and truck traffic, and possibly even birds, those kinds of things."); *see also* Simons Depo. at 17, 20-22, 41, 199-200. Dr. Simons also cross-referenced the ranges of diminution losses set forth in articles about proximity stigma damages in opining as to the purported damages of the Plaintiffs here. Simons Depo. at 22. Both tacks were improper. Under Ohio law, "[i]n order for a duly licensed and regulated sanitary landfill to be found liable for maintaining a nuisance, negligence must be established." *Brown v. County Commissioners of Scioto County*, 87 Ohio App. 3d 704, 719 (Scioto App. 1993). Here, Plaintiffs have asserted no claims of negligence related to Countywide's ordinary operations and, therefore, the presence of truck noise, dust, or seagulls related to the ordinary operations is irrelevant. Dr. Simons' consideration of such irrelevant factors in estimating Plaintiffs' diminution losses warrants the exclusion of his testimony under Evid. R. 402 and 703.

Moreover, because Dr. Simons cannot specify what portion of Plaintiffs' estimated diminution losses is attributable to proximity stigma related to the ordinary operations of the Facility, his opinions about Plaintiffs' diminution losses are unreliable and could only mislead the Jury and prejudice Republic at any trial in this matter. Simons Depo. at 22-23 ("[B]oth normal and abnormal operations are . . . implicit in my [diminution] opinion. . . . Although I haven't explicitly pulled out the normal operations component from the violations and odor components.").

23

Simons' reliance on peer-reviewed article estimates of standard proximity stigma damages is also improper here because Ohio law does not recognize claims for so-called "stigma." *Ramirez v. Akzo Nobel Coatings, Inc.*, 153 Ohio App.3d 115, 2003-Ohio-2859, ¶ 21 (5th Dist.) ("[P]ure environmental stigma, defined as when the value of real property decreases due solely to public perception or fear of contamination from a neighboring property, does not constitute compensable damages in Ohio. Rather, a plaintiff must show actual harm.") (citing *Chance v. BP Chemicals, Inc.*, 77 Ohio St. 3d 17 (1996)); *see also Baker v. Chevron USA, Inc.*, 2011 U.S. Dist. LEXIS 95653, *72 (S.D. Ohio Aug. 19, 2011) ("The Supreme Court of Ohio has made clear . . . that a landowner cannot recover stigma damages . . . absent physical damages or interference with the use of the property").

Likewise, Dr. Simons' assumption that the reaction odors may return with the same frequency and intensity as during the 2006-2008 timeframe in opining about Plaintiffs' damages constitutes the impermissible inclusion of stigma damages. Simons Depo. at 13, 192, 198-99, 285. As recognized by at least one court evaluating Dr. Simons' consideration of the "risk" of a future event in estimating diminution losses, *"[s]uch damages are unquestionably stigma damages." Burdette v. VigIndustries, Inc.*, 2012 U.S. Dist. LEXIS 15412, *33 (Dist. Kan. Feb. 8, 2012) (emphasis added). As in *Burdette*, stigma damages are improper here, and testimony including the consideration of stigma should be excluded from evidence in any trial in this matter.

**E. Dr. Simons' Reliance on County Auditor Information Is Improper.**

Finally, Dr. Simons uses purported county valuation information in estimating the base value of certain Plaintiffs' homes and as support for his opinion that Plaintiffs' properties have suffered across-the-board losses ranging from 5% - 20% due simply to their proximity to the Facility. Simons Rep. at 30. For this latter point, Dr. Simons cites to the representations of

24

certain Plaintiffs that the Tuscarawas County Auditor implemented an across-the-board valuation decrease due solely to the odors from the Facility, (Simons Rep. at 23), and to the statements of an employee of the Stark County Auditor's Office indicating that the Office, at one time, adopted 10% and 20% across-the-board decreases.  Simons Rep. at 21-22.  *While these representations were ultimately proved inaccurate*—no across-the-board Tuscarawas County decrease could be verified at all, and any Stark County decrease was limited to those residents living within two miles of the Facility and did not total 10% or 20% across the board—*Simons has nonetheless cited the alleged decreases in support of his across-the-board diminution calculation.*  Simons Rep. at 21-23.  The third party, out-of-court statements about the Auditors' purported across-the-board decreases in valuation constitute inadmissible hearsay which cannot form the basis of an expert opinion under Evid. R. 703.

But moreover, Dr. Simons' reliance on county valuation information in evaluating Plaintiffs' alleged diminution damages has previously been the subject of criticism—and exclusion—by at least one court,[7] and, as it was there, it is inconsistent with Ohio law here, which has recognized that tax valuations are unreliable evidence of a property's worth.  *See, e.g., Polster v. Webb*, 8th Dist. No. 77523, 2001 Ohio App. LEXIS 2736, **12-13 (June 21, 2001) (rejecting the plaintiffs' claim that a $70,000 reduction in the tax assessed value of their property established that their property had been diminished by the defendants' actions); *see also United States v. Certain Parcels of Land*, 261 F.2d 287, 290 (4th Cir.1958) ("The assessed valuation of property is not evidence of its value for other than tax purposes. . . . Unquestionably, the law is, and ought to be, that the valuation placed upon property by a public official for purposes of

[7] *See* Simons *Baker* Depo. at 297 ("**Q.** In [the *LaBauve*] case, did the court prohibit your testimony on the unimpaired value property based on county tax data?" "**A.** It did.").

25

**Page 177**

taxation only is not competent evidence to go to a jury on a litigated question of the value of the land.") (citations omitted).

Dr. Simons' reliance on county auditor valuations in establishing the allegedly unimpaired value of the Plaintiffs' homes and to corroborate his opinions about Plaintiffs' losses is contrary to Ohio law, based in hearsay, and unreliable under Evid. R. 702. Any testimony based on purported county auditor information should thus be excluded from evidence in any trial in this matter.

## IV.    CONCLUSION

In conclusion, the testimony of Plaintiffs' retained property diminution expert, Robert A. Simons, Ph.D., should be excluded from any trials in this matter, including the trial scheduled for March, because the various methodologies used by Dr. Simons in analyzing Plaintiffs' alleged diminution damages are unreliable or inapplicable under Evidence Rule 702 and, as applied by Dr. Simons, rely on misassumptions, hearsay, and other faulty bases contrary to Evidence Rule 703 and other Ohio law.

26

**Page 178**

Dated: January 11, 2013

Respectfully submitted,

Robin G. Weaver (0020673)
Colin R. Jennings (0068704)
Squire Sanders (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304
(216) 479-8500 (Phone)
(216) 479-8780 (Fax)
robin.weaver@squiresanders.com
colin.jennings@squiresanders.com

Brian M. McQuaid (*admitted pro hac vice*)
Squire Sanders (US) LLP
1 E. Washington St., Suite 2700
Phoenix, Arizona 85004
(602) 528-4000 (Phone)
(602) 253-8129 (Fax)
brian.mcquaid@squiresanders.com

Aaron T. Brogdon (0081858)
Squire Sanders (US) LLP
2000 Huntington Center
41 South High Street
Columbus Ohio 43215
(614) 365-2700 (Phone)
(614) 365-2499 (Fax)
aaron.brogdon@squiresanders.com

*Attorneys for Defendant Republic Services of
Ohio II, LLC*

27

**Page 179**

## CERTIFICATE OF SERVICE

This is to certify that a true and accurate copy of the foregoing **MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT A. SIMONS, PH.D., PURSUANT TO OHIO RULES OF EVIDENCE 702 AND 703** has been sent via electronic mail and regular U.S. Mail this ____ day of January, 2013 to the following:

Steven D. Bell
STEVEN D. BELL COMPANY LPA
Millside Creek Centre – Suite 11
8803 Brecksville Road
Brecksville, OH 44141
steve@stevebell-law.com

*Counsel for Plaintiffs*

Curt D. Marshall
Robin L. Greenwald
WEITZ & LUXEMBERG, P.C.
700 Broadway
New York, New York 10003
cmarshall@weitzlux.com
rgreenwald@weitzlux.com

*Counsel for Plaintiffs*

_____
One of the Attorneys for Defendant
Republic Services of Ohio II, LLC

28

**Page 180**

# EXHIBIT B2

FILED
COURT OF COMMON PLEAS
TUSCARAWAS COUNTY, OHIO

2013 FEB 11 PM 12 53

JEANNE M. STEPHEN
CLERK OF COURTS

IN THE COURT OF COMMON PLEAS
TUSCARAWAS COUNTY, OHIO

|  |  |  |
|---|---|---|
| JOHN MICHAEL ABICHT, et al., | : | CASE NO. 2008 CT 10 0741 |
|  |  | (Cons. w/ 2009 CV 10 0987) |
| Plaintiffs | : | JUDGE H. F. INDERLIED, JR. |
|  |  | (By Assignment #09 JA 0884 |
| -vs- | : | of the Chief Justice of the |
|  |  | Ohio Supreme Court |
| REPUBLIC SERVICES, INC., et al., | : |  |
|  |  | **ORDER OF THE COURT** |
| Defendants | : |  |

This matter came on for pretrial and motions hearing on February 5, 2013. Present were the parties' attorneys, Steven D. Bell, Esq., and Curt D. Marshall, Esq., for plaintiffs, Robin G. Weaver, Esq., and Colin R. Jennings, Esq., and Aaron P. Brogdon, Esq., for defendant. Evidence was presented and arguments heard with respect to the various motions.

The Court makes the following findings and orders:

1. At pretrial, the Court reviewed various matters and made the following orders:

    a. Eight trial jurors, six alternates.

    b. Opening statements, one hour each side.

    c. Plaintiffs' attorneys shall identify the ten (10) trial plaintiffs by February 11, 2013.

    d. Counsel may file proposed neutral judicial fact statements for voir dire by March 1, 2013.

**Page 182**

Case No.  2008 CT 10 0741
Page – 2 –

    e.    Counsel shall adhere to the Court's Rules on Voir Dire (copies provided).

    f.    On the first day of trial, counsel shall be present at 8:15 a.m.

    g.    There shall be a separation of witnesses and it shall also apply to the plaintiffs who may be called as witnesses but are not the named plaintiffs for this trial.

2.    Plaintiffs' motion to exclude the testimony of Peter J. Carey, P.E., a defense witness, is denied as moot .

3.    Plaintiffs' motion to exclude the testimony of Sharon B. Libicki, Ph.D., a defense witness, is denied; provided, however, that a foundation must be laid for the use of test results from the  device known as the  "Nasal Ranger" before she may testify to same.

4.    Plaintiffs' motion to limit the testimony of James J., Walsh, P.E., a defense witness, is granted in part.  Mr. Walsh's testimony is limited to facts observed.

5.    Plaintiffs' motion to exclude the testimony of Michael Michels, Barbara Beck and Deborah Gray is granted in part.  Mr. Michaels may be used as a fact witness only.  Ms. Beck has been withdrawn as a defendant's witness.  Ms. Gray's testimony is limited to "air monitoring."

6.    Defendant's motion to exclude Linda Aller , geologist, a plaintiffs' witness, is granted.  She may not testify.

7.    Defendant's motion to limit the testimony of David A. Atwood, Ph.D., is granted by agreement.  Plaintiffs shall not to seek opinion testimony of the

**Page 183**

Case No. 2008 CT 10 0741
Page – 3 –

witness regarding landfill operation or potential dangers known to chemists as opposed to those known in the solid waste disposal industry.

8.  Defendant's motion to exclude the testimony of Ernest Williams, a plaintiffs' witness, is denied as moot. Plaintiffs have withdrawn the witness.

9.  Defendant's motion to exclude the testimony of Robert A. Simons, Ph.D., is granted. The proposed testimony fails to meet the requirements of Evidence Rule 702.

10. Defendant's motion in limine to exclude the January 6, 1994, internal memorandum of the Ohio EPA is granted.

11. Defendant's motion in limine to exclude use of the April 11, 2008, U.S. EPA settlement agreement, the September 30, 2009, consent order, and the Ohio EPA DFFOs and NOV letters is granted.

12. Defendant's motion in limine to exclude the DOT regulations regarding aluminum dross is denied. The same motion regarding CG regulations is granted without objection.

13. Defendant's motion in limine to preclude plaintiffs from referencing or offering any evidence regarding post-reaction actions and documents regarding secondary aluminum process waste is granted. Such actions and documents constitute remediation under R.C. 3704.09. However, defendant is likewise precluded from the introduction of such evidence, including evidence of money spent on remediation.

14. Defendant's motion in limine to exclude evidence about alleged chemical composition and potential adverse health effects of odors is granted;

**Page 184**

Case No. 2008 CT 10 0741
Page – 4 –

provided, however, that witnesses experiencing the odors may testify to their experiences and their physical reactions to those experiences if they are relevant to the claims of the ten (10) named plaintiffs in this case.

15.    Defendant's motion in limine to exclude any self-diagnosis and/or evidence of plaintiffs' fear of odors is granted; provided, however that plaintiffs may testify to actions taken regarding the use and enjoyment of their property as a result of experiencing the odors.

16.    Defendants motion in limine to preclude plaintiffs from referencing newspaper articles is granted.

17.    Plaintiffs' motion in limine to exclude the testimony of Craig H. Benson, a defense witness, is granted because his testimony is impermissibly based upon news articles.

18.    Defendant's motion in limine to preclude plaintiffs from referring to injuries sustained by Michael D. Robison, P.E., is granted without objection.

19.    Defendant's motion in limine regarding punitive damages is denied as moot. Defendant's oral motion to bifurcate the compensatory and punitive damages stages of trial is granted although bifurcation was previously ordered by the Court.

20.    Defendant's motion in limine to preclude plaintiffs from referencing or introducing tax assessment reductions as evidence of damages is granted without objection.

21.    Defendant's motion in limine to limit the testimony of plaintiffs' landfill fire expert, Todd Thalhamer, to landfill fires/heating events is granted.

**Page 185**

Case No. 2008 CT 10 0741
Page – 5 –

22.     By agreement of the parties, slope stability is not an issue in this case.

23.     Motions in limine give the Court an opportunity to make a prefatory

evidentiary ruling.  Even if granted, they are subject to modification or

reversal if warranted by evidence admitted at trial.

FEB 07 2013

H. F. INDERLIED, JR., JUDGE (Ret.)

cc:     Steven D. Bell, Esq.
        Curt D. Marshall, Esq.
        Robin G. Weaver, Esq., and Colin R. Jennings, Esq.
        Aaron P. Brogdon, Esq.
        Brian McQuaid, Esq.
        Elizabeth Stephenson, Esq., Court Administrator
        Judge H. F. Inderlied, Jr. (Ret.)

# EXHIBIT C

# Bloomberg BNA

## Expert Evidence Report®

Reproduced with permission from Expert Evidence Report, 15 EXER 519, 12/7/2015. Copyright © 2015 by The Bureau of National Affairs, Inc. (800-372-1033) http://www.bna.com

**EXPERT EVIDENCE**

**CONTAMINATION**

A growing number of courts have addressed the applicability of methodologies that attempt to predict the impact of alleged contamination on property values through models that are not based on actual sales in the relevant market, attorney Kathy K. Condo and economist Louis L. Wilde say.

The authors discuss this trend, and examine in depth a July ruling by the Western District of Oklahoma that rejected an expert's proposed meta-analysis—a process that ''attempts systematically to integrate the results of various published and unpublished studies on a specific research topic.'' That exclusion was correct, the authors say, because the rejected models didn't fit the facts of the case and weren't based on the relevant market.

## Expert Opinion Based on Meta-Analysis Rejected as Basis For Determining Property Value Diminution Due to Alleged Contamination

 

BY KATHY K. CONDO AND LOUIS L. WILDE

In a recent case in federal court in Oklahoma, *Alexander v. Halliburton Energy Services, Inc.,*[1] Plaintiffs alleged that their properties were diminished in value due to present contamination or potential future contamination of groundwater beneath their properties by perchlorate. Plaintiffs' damages expert, Dr. Kevin J. Boyle, an economist, opined about the resulting diminution of property values based on the use of a meta-analysis and the prices paid for various properties purchased by Halliburton.[2] As discussed below, the specific meta-analysis relied upon by Dr. Boyle is one of four meta-analyses presented in an article published by Simons and Saginor.[3]

After considering Dr. Boyle's expert report and deposition testimony, the court excluded his opinions, stating:

> Thus, it is clear that Dr. Boyle's model does not give the value of the properties immediately after the injuries, as re-

---

[1] *Alexander v. Halliburton Energy Services, Inc.,* No. CIV–11–1343–M, 2015 BL 233828 (W.D. Okla. July 22, 2015).

[2] Dr. Boyle based his opinions on property value diminution for properties that were alleged to be presently contaminated on both methodologies but based his opinions on property value diminution for properties that were alleged only to be potentially contaminated in the future solely on meta-analysis. We focus herein on issues related to the meta-analysis upon which Dr. Boyle relied for each set of properties.

[3] Robert A. Simons and Jesse D. Saginor, ''A Meta-Analysis of the Effect of Environmental Contamination and Positive Amenities on Residential Real Estate Values,'' 28 J. Real Est. Res., No. 1 (2006).

COPYRIGHT © 2015 BY THE BUREAU OF NATIONAL AFFAIRS, INC.   ISSN 1536-1896

quired by Oklahoma law. In fact, based upon his deposition testimony, Dr. Boyle's model does not even give the value of the properties more than three years after the announcement of the potential contamination. Accordingly, the court finds that Dr. Boyle's opinions are not relevant to the issues of damages in these cases and should be excluded.[4]

## Traditional Appraisal Methodology

Under traditional appraisal methodology, the value of a property alleged to be contaminated is determined based on actual sales prices using sales comparisons, paired sales, or trend analyses.[5] In addition, economic methodologies such as hedonic regression models and repeat sales models can be applied to actual sales prices to determine whether an allegedly impacted real estate market has actually suffered diminished value due to the contamination.[6] Despite the existence of these methodologies which are based on actual sales data, Plaintiffs' experts often offer damages opinions that are not based on actual sales data from the allegedly impacted real estate market, such as the so-called "case studies" approach,[7] hypothetical surveys, and meta-analysis.[8] In support of the use of such methodologies, these experts argue that they are necessary because the actual market is not informed of the property impact, and therefore actual sales data does not reflect the true diminution in value.[9]

A growing number of courts have addressed the applicability of methodologies that attempt to predict value impacts on properties through use of methodologies that are not based on actual sales in the market at issue at the relevant time. The court in *Exxon Mobil Corp. v. Albright*,[10] reversed the trial court's admission of the expert opinion of Dr. John Kilpatrick which disregarded actual sales data. The court rejected Dr. Kilpatrick's rationale for disregarding the actual sales data recognizing that "the level of speculation attendant to

that conclusion [ignoring comparable sales data] is, as the United States District Court for the Northern District of California noted in reviewing Dr. Kilpatrick's proposed testimony in another case, 'seriously concerning.' "[11] The court held that the "the market prices represented by actual sales in the community still represent the highest and best price for the property—even if the buyers are paying, as Dr. Kilpatrick asserts, too much."[12] Similarly, the court in *Patrick v. FirstEnergy Generation Corp.*, No. 08-cv-01025, 2014 BL 88642 (W.D. Pa. March 31, 2014), recognized the unreliability of the "uninformed market theory" advanced by Dr. Kilpatrick as a rationale for disregarding actual sales data.[13]

## *Alexander v. Halliburton*

In *Alexander*, Dr. Boyle based his opinions on property value diminution on a meta-analysis article authored by Simons and Saginor. In seeking to preclude Dr. Boyle's diminution of property value opinion, defendant Halliburton argued that his opinions relied on calculations that did not fit the facts of the case because they were based on an economic model that ignores the actual real estate market at issue.

Instead, Dr. Boyle's opinion was based on data from a wide variety of studies which were included in Simons and Saginor's meta-analysis, which involved different locations, different time frames, and different types of contamination—none of which was shown to be comparable to conditions in the real estate market at issue.

The court granted Defendant's *Daubert* motion to preclude Dr. Boyle's expert opinions, recognizing that under Oklahoma law, "the measure of damages for permanent injuries to land is the difference between the reasonable market value of the land immediately before

[4] *Alexander*, 2015 BL 233828.

[5] Randall Bell, *Real Estate Damages: An Analysis of Detrimental Conditions* (The Appraisal Institute 1999).

[6] There is extensive literature on hedonic regression models of property values. *See, e.g.*, the citations in Louis Wilde, Jack Williamson, and Gail Wurtzler, "Keeping the Gate Redux: More Valuation Methodologies Come Under Fire in Property Value Diminution Cases," 30 BNA, Inc. Toxics Law Reporter, No. 19, n.4 (2015). For a recent example of a repeat sales model and citations to the literature *see* Bradford Case, Peter F. Colwell, Chris Leishman, and Craig Watkins, "The Impact of Environmental Contamination on Condo Prices: A Hybrid Repeat-Sale/Hedonic Approach," 34 Real Est. Econ., No. 1, 77-107 (2006).

[7] *See* Thomas O. Jackson and Randall Bell, "The Analysis of Environmental Case Studies," The Appraisal J. 8695 (Jan. 2002).

[8] While hypothetical survey techniques, such as contingent valuation method surveys ("CVM"), and meta-analyses are primarily economic methodologies, they also have been adopted by appraisers, especially in the context of litigation regarding the effects of contamination on property values. On the former, *see* Louis Wilde, "Keeping the Gate: Damages Testimony in Cases Alleging Property Value Diminution Due to Contamination," 9 BNA, Inc. Expert Evidence Report, No. 5, n.4 (2009).

[9] Louis Wilde, Gail Wurtzler, and Jack Williamson, "Real Estate Markets are Informationally Efficient: Evidence from Buyer and Agent/Broker Surveys," 26(3) Environmental Claims Journal 215 (2014).

[10] 71 A.3d 30, 99-105 (Md. 2013).

[11] *Exxon Mobil Corp.*, 71 A.3d at 103 (*quoting Palmisano v Olin Corp.*, No. C-03-01607, (N.D. Cal. July 5, 2005)).

[12] *Id.* at 103-104.

[13] In addition to *Exxon Mobil* and *Patrick*, *infra*, *see*, *e.g.*, *The Ponca Indian Tribe of Oklahoma v. Continental Carbon Co.*, 439 F. Supp. 2d 1171 (W.D. Okla. 2006)(diminution of property value expert's testimony precluded because his calculations were not temporally related to the emission events at issue); *Abicht v. Republic Services of Ohio, Inc.*, No. 2008 CT 100741 (Tuscarawas Co. Ohio, Feb. 11, 2013) (diminution of property value expert's opinion precluded because the damages based on real estate trends analysis and a survey were not individualized to each of the plaintiffs); *Cannon v. BP Products North America*, No. 3:10-cv-00622, 2013 WL 5514284 (S.D. Tex. Sept. 30, 2013) (diminution of property value expert's opinion which was based on a real estate trends analysis, a hedonic regression analysis, and a survey precluded because of a number of methodologic flaws).

Kathy K. Condo is a shareholder in the litigation group at Babst Calland in Pittsburgh, and is available at kcondo@babstcalland.com.

Louis L. Wilde is an economist and an expert in property value diminution. He is a Senior Advisor at Gnarus Advisors LLC and can be reached at lwilde@gnarusllc.com.

the injuries and the reasonable market value of the land immediately after the injuries.''[14]

## Meta-Analysis

As the court in *Alexander* recognized, meta-analysis is not actually a market-based property valuation methodology. A meta-analysis is a form of literature review which attempts systematically to integrate the results of various published and unpublished studies on a specific research topic.

> Meta-analysis is a body of statistical methods that have been found useful in reviewing and evaluating empirical research results. If a number of independent studies have been conducted on a particular subject, using different data sets and methods, then combining their results can furnish more insight and greater explanatory power than the mere listing of the individual results.[15]

A meta-analysis typically consists of a regression model in which the dependent variable (that which is meant to be explained) is a specific result from a set of related studies, and the independent variables (those which are meant to explain the specific result of each study) can include such characteristics as the methodology used, the design of the model, and/or descriptions of the data used.[16] Typically, a meta-analysis is based on a set of studies with some common theme, for instance, the treatment efficacy of a particular drug.[17] ''Implicit in any meta-analysis is the assumption that the primary studies are similar enough that they can be usefully combined or analyzed.''[18]

Meta-analysis has been applied to issues in environmental and natural resource economics to determine, for example, the effect of air pollution on property values using hedonic regression models, the effect of air pollution on morbidity risks using contingent valuation studies, the effect of proximity to Superfund sites on property values using hedonic regression models, and the value of water quality using contingent valuation studies. But meta-analyses must be conducted in a methodologically sound way. Four fundamental flaws can call into question the results of a meta-analysis.

1. Logical conclusions cannot be drawn by comparing and aggregating studies that include different measuring techniques, definitions of variables (e.g., treatments, outcomes), and subjects because they are too dissimilar.

2. Results of meta-analyses are uninterpretable because results from ''poorly'' designed studies are included along with results from ''good'' studies.

3. Published research is biased in favor of significant findings because nonsignificant findings are rarely published; this in turn leads to biased meta-analysis results.

4. Multiple results from the same study are often used which may bias or invalidate the meta-analysis and make the results appear more reliable than they really are, because those results are not independent.[19]

The use of meta-analysis based on studies that analyze the property value impacts of grossly dissimilar situations suffers from every one of the flaws that can render a meta-analysis unreliable. The meta-analyses offered by Simons and Saginor, one of which was relied upon by Dr. Boyle in *Alexander*, and the similar meta-analysis offered by Lipscomb,[20] provide prototypical examples of those flaws.[21]

## Simons and Saginor

In Simons and Saginor, the authors claim to have selected 58 articles or studies dealing with the effects of so-called negative amenities and 17 articles or studies dealing with the effects of so-called positive amenities on property values. From these they gleaned 228 observations about impacts from negative amenities and 62 observations about impacts from positive amenities. They then subjectively coded characteristics for each observation, and performed four meta-regression analyses based on those observations. Three of these analyses (the ''full model,'' the ''outlier-free model,'' and the ''five observations max model'') include observations from articles about effects on property values from negative amenities. The fourth analysis (the ''full model including positive amenities'') also includes observations from articles about effects on property values from positive amenities.

Although Simons and Saginor claim that their meta-analyses address how proximity to sources of environmental contamination affects residential property values, a preponderance of the observations in their models have nothing to do with contamination. For example, they include studies of the effects on residential property values of proximity to sex offenders, shopping centers, rental properties, and airports. They also include studies of the effects on residential property values of mere proximity to nuclear power plants, refineries, high voltage power lines, railroads, and other industrial and manufacturing facilities. Furthermore, not only do most of the studies included in their models have nothing to do with actual contamination, there is

---

[14] *Alexander*, 2015 BL 233828.

[15] Frederic Wolf, *Meta-Analysis; Quantitative Methods for Research Synthesis* 11 (Sage Publications, 1986) (quoting Gene Glass, ''Primary, Secondary, and Meta-Analysis of Research,'' 5 Educ. Res. 351 (1976)).

[16] *See*, *e.g.*, T.D. Stanley, ''Wheat From Chaff: Meta-Analysis as Quantitative Literature Review,'' 15(3) Journal of Economic Perspectives 31-150 (Summer 2001).

[17] *See*, *e.g.*, *In re Avandia Marketing, Sales Practices and Products Liability Litigation*, 817 F. Supp. 2d 535 (E.D. Pa. 2011); *Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1062 (D. Kan. 2002); *Deutsch v. Novartis Pharmaceuticals Corp.*, 768 F. Supp. 2d 420 (E.D.N.Y. 2011); *In re Pfizer Inc. Securities Litigation*, No. 04 Civ. 9866, (S.D.N.Y. Mar. 22, 2010); *In re Baycol Products Litigation*, 532 F.Supp. 2d 1029 (D.Minn. 2007).

[18] Jon Nelson and Peter Kennedy, ''The Use (and Abuse) of Meta-Analysis in Environmental and Natural Resource Economics: An Assessment,'' 42 Environmental Resource Economics 345-77 (2009).

[19] Wolf, *supra* note 15.

[20] Clifford A. Lipscomb, Abigail Mooney, and John A. Kilpatrick, ''Do CV Results Systematically Differ from Hedonic Regression Results? Evidence from a Residential Property Meta-Analysis'' 21(2) Journal of Real Estate Literature 233-53 (2013).

[21] *Id.* Nelson and Kennedy discuss the issues with meta-analyses at length and provide a number of examples of what they consider to be methodologically sound meta-analyses dealing with environmental and natural resource issues. *See*, *e.g.*, their Table 3.

---

4

no economic basis for trying to combine such disparate studies into a single meta-regression model. Thus, Simons and Saginor provide a classic example of a meta-analysis that falls prey to the first of the Wolf critiques—the "apples and oranges" problem.[22]

In addition, even those observations that do relate to a particular type of contamination tend to be lumped together with other observations that do not relate to that type of contamination, making it impossible to ascribe any meaning to the results of the meta-analysis. For example, the variable "*GROUNDWATER*" is described as being "focused on [groundwater] contamination . . . [including] general water pollution studies, effects from LUSTs, water bound PCBs and other sources."[23] In fact, out of 24 observations coded as *GROUNDWATER*, only roughly one-third actually involve groundwater contamination, all of which show no effect on property values. The remaining roughly two-thirds of the observations coded as *GROUNDWATER* include ones gleaned from studies of the effects on residential property values of proximity to contaminated bodies of water (e.g., New Bedford Harbor and the Chesapeake Bay), potentially hazardous or noxious sites (e.g., incinerators and landfills), or leaking underground storage tanks (LUSTS), and do not involve residential properties actually subject to groundwater contamination.

As a result, any attempt to apply the models reported in Simons and Saginor to predict the property value diminution effects of groundwater contamination in a specific situation is useless. The same is true of other types of negative amenities and is especially problematic for the model that includes positive amenities.[24]

In summary, the models reported in Simons and Saginor cannot be used to estimate damages to a particular property or a real estate market because they can never fit the facts of either, such as the type of property and/or real estate market, the source, type and extent of the contamination, the stage of remediation, if any, and the presence of other disamenities or amenities.[25]

## Lipscomb

Lipscomb reports on a meta-regression model in which the dependent variable is the percentage reduction in property value for some number of properties that range from one to over ten thousand. The model includes both amenities and disamenities and is similar to the "full model including positive amenities" in Simons and Saginor. It thus fails to pass the "apples and oranges" test and suffers from many of the same concep-

tual and technical issues as the models described in that paper.[26]

The authors of Lipscomb claim that their model can be used "to predict the property value diminution of a given situation,"[27] and provide two examples. The first example involves 100 rural properties with an average unimpaired value of $47,300. The source of the contamination is "linear," which means it could be a pipeline, high voltage power line, railroad tracks, or something else. The affected resource is "water," which could mean groundwater or surface water and could include any number of toxic substances as well as simple eutrophication. The maximum distance from the source of the contamination to any of the properties is one mile. It is assumed that there was a public announcement of the "contamination in the area," that the properties are involved in some way with litigation, data were "collected as of 2008" and the unemployment rate was 6.5 percent. According to the Lipscomb meta-analysis, these inputs yield an average property value diminution of 40.8 percent.[28]

The second example in Lipscomb is remarkably similar to the first example. It again involves 100 rural properties but now with a much higher average unimpaired value, $350,000. The source of the contamination again is "linear." The affected resource is "soil" as opposed to "water,"[29] and the maximum distance from the source of the contamination to any of the properties is one-half mile as opposed to one mile. It is again assumed that there was a public announcement of the "contamination in the area," and the properties were involved in some way with litigation. Data were assumed to have been "collected as of 2006" as opposed to 2008 and the unemployment rate was 4.5 percent as opposed to 6.5 percent. According to the Lipscomb meta-analysis, these inputs yield an average property value diminution for the second example of 27 percent as opposed to 40.8 percent for the first example.

These results are meaningless because each applies to a wide range of potential contamination scenarios, all for which they produce the same estimate of property value diminution, 40.8 percent or 27 percent.[30] In other words, as with the meta-analyses offered in Simons and Saginor, there simply is no way to make the meta-

---

[22] Dr. Boyle acknowledges that the full model including positive amenities in Simons and Saginor is "inappropriate" because assuming that the effects of negative and positive amenities on property values are "symmetric" is "just not a logical assumption." Videotaped Deposition of Kevin John Boyle, Ph.D., *Alexander v. Halliburton*, October 2, 2014, page 92.

[23] Simons and Saginor, *supra* note 3, pp. 77-78.

[24] There are numerous other conceptual and technical problems with the meta-analyses reported in Simons and Saginor, but a discussion of them goes beyond the scope of this paper.

[25] *See*, *e.g.*, Jackson and Bell, *supra* note 7.

[26] In particular, as observed by Dr. Boyle, it is simply inappropriate to combine observations involving negative amenities with observations involving positive amenities in the same meta-analysis. *See* note 22 and text, *supra*.

[27] The stated purpose of the research reported in Lipscomb is to determine, using a meta-analysis, whether "survey results systematically differ from hedonic regression results." However, their results fail to offer any basis for reaching such a determination because only one paper in their meta-analysis includes a contingent valuation type survey, and that paper yields only two observations.

[28] Lipscomb, *supra* note 20, at 245.

[29] None of the variables defined in Lipscomb mention soil contamination so it must be included in a baseline category against which variables such as "WATER" and "AIRCAFO are measured.

[30] Lipscomb does not report the 95 percent prediction intervals for these estimates but the adjusted r-squared statistic for their meta-regression model is very low, 0.245, so it is reasonable to presume that the 95 percent prediction intervals are large. As a technical matter, these examples are also meaningless because the only variables included in them that are statistically significant are LITIGATION, YEAR, and UNEMPLOYMENT.

---

**Page 191**

analysis in Lipscomb match the facts of any specific case.

## Conclusion

Meta-analysis of the effect of contamination on property value has been rejected by courts, including the court in *Alexander*, because the models used can never fit the facts of a specific case and because they are not based on the relevant market.

As the above discussion reflects, the two publications that attempt to use meta-analysis to combine the results of articles to predict property value diminution due to contamination, Simons and Saginor and Lipscomb, also fail because of their conceptual and technical flaws. In particular, the studies underlying the meta-analysis are too disparate and the variable definitions are too broad to produce reliable estimates of property value diminution due to a specific contamination event.

# EXHIBIT D

A. Barry Cappello, CSB 037835
J. Paul Gignac, CSB 125676
Mikal J. Apenes, CSB 176229
Troy A. Thielemann, CSB 174276
CAPPELLO & McCANN LLP
831 State Street
Santa Barbara, California 93101
Telephone: (805) 564-2444
Facsimile: (805) 965-5950

Tina B. Nieves, CSB 134384
Hector G. Gancedo, CSB 132139
GANCEDO & NIEVES LLP
119 E. Union Street, Suite G
Pasadena, California 91103
Telephone: (626) 685-9800
Facsimile: (626) 685-9808

Attorneys for Plaintiffs and Class Counsel

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| LAWRENCE O'CONNOR, et al., | Case No. 97-1554 ABC (RCx) |
| Plaintiffs, | **CLASS ACTION** |
| v. | [Action filed 3/10/97] |
| BOEING NORTH AMERICAN, INC., et al., | **NOTICE OF SUBMISSION OF AFFIDAVIT RE MAILING OF CLASS NOTICE** |
| Defendants. | |

02262.001 - 53996

Notice of Submission of Affidavit re Mailing of Class Notice

**Page 194**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

Pursuant to the Stipulation and Order re Amended Schedule for Mailing of Class Notice and Further Proceedings Related Thereto dated January 14, 1999, Class Counsel hereby submit the attached Affidavit of Wesley L. Nutten of Biggs & Co. detailing the steps undertaken in connection with the mailing of the Class Notice in this action.

Dated: March 8th, 1999

CAPPELLO & McCANN LLP

By _____
J. Paul Gignac
Class Counsel

2

02262.001 - 53996

Notice of Submission of Affidavit re Mailing of Class Notice

**Page 195**

AFFIDAVIT OF WESLEY L. NUTTEN

I, Wesley L. Nutten, declare as follows:

1.   I am a Certified Public Accountant, licensed to practice in the state of California and am a Manager at Biggs & Co., Certified Public Accountants.  I make this declaration based on my personal knowledge, and if called to testify, I could and would testify competently to the facts stated in this declaration.

2.   On September 18, 1998, the retention of Biggs & Co., Certified Public Accountants, to provide services to Class Counsel in connection with Class notification procedures was approved by the Court.

3.   Between August and October, 1998, Biggs & Co. solicited bids from several professional mailing list vendors.  Ultimately, Biggs & Co. selected the firm of Wholesale Mailing Lists to provide the mailing lists needed in connection with the Class notification procedures.

4.   On January 26, 1999, Biggs & Co. obtained from Wholesale Mailing Lists three separate mailing lists in accordance with the required form of Class Notice in this matter.  The first address list consisted of 171,039 resident addresses reflecting all valid resident addresses in the Class Area as described in the Class Notice.  The second address list consisted of 32,396 business addresses reflecting all valid business addresses located within the Class Area.  The third address list consisted of 13,045 addresses for each legal owner of real property located within the Class Area who does not reside within the Class Area ("absentee property owners").

5.   Biggs & Co. imported the mailing list data into proper database format, reviewed the data for consistency with control totals provided by Wholesale Mailing Lists, and prepared a computerized copy of each list in the format required for automated addressing of the Class Notices.

6.   Between September 18, 1998 and October 6, 1998, Biggs & Co. solicited bids from several professional printers for the cost of printing and mailing the Class Notice.  Based on price, reputation, and prior experience, Biggs & Co. selected the firm of Merrill Corporation to

3

02262.001 - 53996

Notice of Submission of Affidavit re Mailing of Class Notice

handle the printing and mailing of the Class Notice. At that time, Biggs & Co. also established a post office box to receive all returned mail and correspondence from potential Class members.

7. On January 21, 1999, Biggs & Co. received from Class Counsel a copy of the approved Class Notice on computer diskette. At the request of Class Counsel, Biggs & Co. reformatted the Class Notice into a format more conducive to the mailing of the Class Notice to the potential Class members.

8. On January 25, 1999, a "camera ready copy" of the Class Notice was provided to Merrill Corporation for printing and mailing to potential class members, and on January 28, 1999, a copy of the address data was provided to Merrill Corporation.

9. On February 5, 1999, Merrill Corporation coordinated the mailing of 216,480 Class Notices to the addresses included in the three address lists discussed above. A true and correct copy of the Class Notice as mailed is attached hereto as Exhibit "A".

10. On February 8, 1999, due to the unusually large number of notices which were returned undeliverable, Biggs & Co. contacted Merrill Corporation in an effort to determine if there was a problem with the automated addressing of the Class Notices. After careful review of the situation, it was determined that a computer programming error at a subcontractor utilized by Merrill Corporation to address and mail the notices had resulted in incomplete address labels being printed for a number of the Class Notices.

11. Merrill Corporation quickly rectified the problem, and on February 9, 1999, replacement notices were mailed to approximately 55,000 affected addresses.

12. On January 29, 1999, Biggs & Co. received from Class Counsel a copy of the approved Spanish version of the Class Notice on computer diskette. At the request of Class Counsel, Biggs & Co. reformatted the Spanish version of the Class Notice into a format more conducive to the mailing of the Class Notice to potential Class members.

13. On February 10, 1999, a "camera ready copy" of the Spanish version of the Class Notice was provided to Merrill Corporation for printing. Merrill Corporation subsequently printed 1,000 copies of the Spanish version of the Class Notice and forwarded these copies to the firm of Gancedo and Nieves, LLP for distribution to potential Class members requesting a

4

Spanish version of the Class Notice.  A true and correct copy of the Spanish version of the Class Notice is attached hereto as Exhibit "B".

14. Between February 5, 1999 and February 22, 1999, approximately 3,139 notices from the first mailing which were mailed to absentee property owners were returned undeliverable with no forwarding address.

15. Biggs & Co. retained the firm of Class Action Locator Services to conduct a "skip tracing" of these potential Class members.  Class Action Locator Services was able to identify more current addresses for 1,419 of these individuals.  On February 26, 1999, Biggs & Co. mailed replacement notices to each of these individuals.

I DECLARE, UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA, THAT THE FOREGOING IS TRUE AND CORRECT.

Executed this _____9TH_____ day of _MARCH___, 1999 at Santa Monica, California.

_Wesley L. Nutten_____

Wesley L. Nutten

5

02262.001 - 53996

Notice of Submission of Affidavit re Mailing of Class Notice

**Page 198**

<u>Lawrence O'Connor v. Boeing North American, Inc.</u>

Case No. CV 97-1554 ABC (RCx)

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF SANTA BARBARA

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 2800 Twenty-Eighth Street, Suite 300 Santa Monica, CA 90405-2934.

On March __9__ 1999, I served the foregoing document described as **NOTICE OF SUBMISSION OF AFFIDAVIT RE MAILING OF CLASS NOTICE** on the interested parties in this action

[X] by placing ☐ the original ☒ a true copy thereof enclosed in a sealed envelope addressed as follows:

John A. Reding, Esq.
William W. Schofield, Esq.
Barry E. Endick, Esq.
PAUL, HASTINGS, JANOFSKY & WALKER LLP
345 California Street, Twenty-Ninth Floor
San Francisco, CA 94104-2635

Tina B. Nieves, Esq.
GANCEDO & NIEVES LLP
119 East Union Street
Suite G
Pasadena, CA 91103

[X] by U. S. Mail. I am readily familiar with the firm's practice of collection and processing correspondence on the same day with postage thereon fully prepaid at Santa Barbara, California, in the ordinary course of business.

[X] (*FEDERAL*) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed at Santa Monica, California, on March 9, 1999.

WESLEY L. NUTTEN       *Wesley T. Nutten*
TYPE OR PRINT NAME       SIGNATURE

02262.001 - 53996       Notice of Submission of Affidavit re Mailing of Class Notice

**Page 199**

Rocketdyne Environmental Class Action
2801 Ocean Park Blvd., #9
Santa Monica, CA 90405

FIRST CLASS MAIL
U.S. POSTAGE
PAID
HDM

SI USTED DESEA OBTENER UNA COPIA DE ESTE DOCUMENTO LEGAL EN ESPANOL, FAVOR DE ACTUAR
IMMEDIATAMENTE Y LLAMAR A (626) 685-9800.

IF YOU ARE A BUSINESS ENTITY, YOU ARE REQUIRED BY ORDER OF THE COURT TO POST A COPY OF
THIS NOTICE IN A CONSPICUOUS LOCATION (E.G. A BULLETIN BOARD) WHERE IT MAY BE EASILY
VIEWED BY ALL OF YOUR EMPLOYEES.

FIRST CLASS MAIL                Exhibit __A__          PLEASE FORWARD - IMPORTANT LEGAL NOTICE

                          Page __1__ of _11_

                                                                    **Page 200**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

LAWRENCE O'CONNOR, et al.,

    Plaintiffs,

v.

BOEING NORTH AMERICAN, INC., et al.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 97-1554 ABC (RCx)

**CLASS ACTION**

**NOTICE OF PENDENCY
OF CLASS ACTION**

---

### THIS NOTICE MAY AFFECT YOUR RIGHTS.
### PLEASE READ IT CAREFULLY.

The purpose of this Notice is to inform you of the pendency of a class action, the manner in which this class action may affect your rights, and what steps you may take in relation to this class action.

THIS NOTICE IS NOT AN EXPRESSION OF ANY OPINION BY THE COURT AS TO THE MERITS OF THE CLAIMS OR DEFENSES BY ANY OF THE PARTIES TO THIS CLASS ACTION.

### PERSONS TO WHOM THIS NOTICE APPLIES

**YOU ARE HEREBY NOTIFIED**, pursuant to Rule 23 of the *Federal Rules of Civil Procedure* and an order of the United States District Court for the Central District of California ("the District Court") dated September 18, 1998, that there is now pending, before the Honorable Audrey B. Collins in the District Court, a class action on behalf of the following three classes of persons:

(1) All persons: (a) who presently reside or work within the boundaries of the Class Area depicted in the map attached to this Notice or who, at any time since 1946, have resided or worked in the Class Area; and (b) who have <u>not</u> been diagnosed with:

    (i)    a cancer which is advanced to a degree that it cannot be surgically cured;
    (ii)   an autoimmune disease which is diagnosed based upon the criteria used by the American Rheumatology Association;
    (iii)  a clinically significant neurologic disease which interferes with the affairs of daily living;
    (iv)  a clinically significant and poorly controlled endocrine disorder; or
    (v)   a birth defect.

(2) All persons who own real property located within the Class Area.

(3) All persons who presently reside or work in the Class Area and/or who own real property located within the Class Area.

1

## YOU MAY BE A CLASS MEMBER

If you fall within the definition set forth in paragraph (1) above, you may be a member of the class which will be referred to in this Notice as **Class I.**

If you fall within the definition set forth in paragraph (2) above, you may be a member of the class which will be referred to in this Notice as **Class II.**

If you fall within the definition set forth in paragraph (3) above, you may be a member of the class which will be referred to in this Notice as **Class III.**

You may be a member of any one or more of **Class I, Class II** and/or **Class III.**

## PERSONS NOT ELIGIBLE FOR MEMBERSHIP

If you are a present or former employee of any of the following companies, you are <u>not</u> eligible for membership in **Class I**: Boeing North American, Inc., Rockwell International Corporation, North American Rockwell Corporation, Rockwell Manufacturing Company, Rockwell Standard Corporation, Rocketdyne, Inc., North American Aviation, Inc., and Atomics International, Inc.

The companies listed above are not eligible for membership in **Class II** and/or **Class III.**

## ACTIONS TO BE TAKEN BY CLASS MEMBERS

If you are a member of **Class I** <u>only</u>, you are not required to take any action at this time, although there are certain actions described in this Notice which you may take if you wish to do so. If you take no action, your claims will continue to be pursued by the representatives of **Class I**, your interests will be represented by Class Counsel, and your rights as a member of **Class I** will be determined as part of the litigation which is being pursued on behalf of all members of **Class I.**

If you are a member of **Class II** and/or **Class III**, you have a choice to make, and you are <u>required</u> to make that choice by no later than **March 31, 1999.** Your choice is either to remain a member of **Class II** and/or **Class III** or to exercise your right to voluntarily exclude yourself from membership in **Class II** and/or **Class III.**

If you wish to remain a member of **Class II** and/or **Class III**, you are not required to take any action at this time, although there are certain actions described in this Notice which you may take if you wish to do so. If you take no action, your claims will continue to be pursued by the representatives of **Class II** and/or **Class III**, your interests will be represented by Class Counsel, your rights as a member of **Class II** and/or **Class III** will be determined as part of the litigation which is being pursued on behalf of all members of **Class II** and **Class III.**

**If you wish to exclude yourself from Class II and/or Class III, you must follow the steps set forth in the next section of this Notice entitled "Right to Exclude Yourself from Class II and/or Class III".** If you do not exercise your right to voluntarily exclude yourself from membership in **Class II** and/or **Class III**, you shall be deemed a member of **Class II** and/or **Class III**, your rights as a member of **Class II** and/or **Class III** will be determined in the manner described above, and you will be barred from pursuing your own individual claims against the defendants for the same type of relief which is being sought on behalf of **Class II** and/or **Class III** by means of a separate lawsuit. As a member of **Class II** and/or **Class III**, you will be entitled to participate in the proceeds of any judgment or settlement in favor of **Class II** and/or **Class III.** Any judgment entered as to the members of **Class II** and/or **Class III**, whether favorable or not, will include and bind you under the rule of <u>res judicata.</u>

2

## RIGHT TO EXCLUDE YOURSELF FROM CLASS II AND/OR CLASS III

If you are a member of **Class I**, you may <u>not</u> elect to voluntarily exclude yourself from membership in **Class I**. Rather, membership in **Class I** is mandatory, and you, as a member of **Class I**, are barred from pursuing your own individual claim for the same type of relief which is being sought on behalf of **Class I**. You may, however, choose not to participate in any of the relief which may be obtained for the benefit of **Class I**.

If you are a member of **Class II** and/or **Class III**, you may act to voluntarily exclude yourself from membership in **Class II** and/or **Class III** by exercising your right to be excluded from **Class II** and/or **Class III**. If you request exclusion, you will not be entitled to share in any recovery obtained for the benefit of **Class II** and/or **Class III**; you will not be bound by any judgment, whether favorable or not, entered for or against **Class II** and/or **Class III**; and you may pursue any claims which you have against the defendants by means of a separate lawsuit on your own behalf.

All requests for exclusion <u>must be made in writing</u> and must be mailed to:

Rocketdyne Environmental Class Action
2801 Ocean Park Boulevard #9
Santa Monica, California 90405

All requests for exclusion from **Class II** and/or **Class III** must be <u>postmarked</u> no later than **March 31, 1999**, and must include your name, address, telephone number and signature as well as an affirmative statement that you request to be excluded from **Class II** and/or **Class III**. Any request for exclusion made on behalf of a member of **Class II** and/or **Class III** by a representative of that class member must state the capacity in which the representative is acting (e.g. legal guardian). You may use the attached form entitled "Request for Exclusion."

## BOUNDARIES OF THE CLASS AREA

The boundary line of the Class Area in the map attached to this Notice is described as follows:

Beginning at the intersection of Canoga Avenue and Nordoff Street (referenced by the large black dot centrally located on the map), and moving in a clockwise direction, the boundary line of the Class Area crosses the following major intersections: DeSoto Avenue and Lassen Street *(Point 1)*; Lurline Avenue and Devonshire Street *(Point 2)*; Winnetka Avenue and Northridge Road *(Point 3)*; Corbin Avenue and Chatsworth Street *(Point 4)*; Tampa Avenue and Atlanta Avenue *(Point 5)*; Reseda Boulevard and the 118 Freeway *(Point 6)*; Balboa Boulevard and Halsey Street *(Point 7)*; Woodley Avenue and Chatsworth Street *(Point 8)*; Gothic Avenue and Devonshire Street *(Point 9)*; Hayvenhurst Avenue and Nordoff Street *(Point 10)*; Woodley Avenue and Rayen Street *(Point 11)*; Haskell Avenue and Roscoe Boulevard *(Point 12)*; Sepulveda Boulevard and Stagg Street *(Point 13)*; Sepulveda Boulevard and Saticoy Street *(Point 14)*; Sepulveda Boulevard and Vose Street *(Point 15)*; Noble Avenue and Vanowen Street *(Point 16)*; Sepulveda Boulevard and Victory Boulevard *(Point 17)*; Balboa Boulevard and the U.S. Highway 101 *(Point 18)*; Amestoy Avenue and Ventura Boulevard *(Point 19)*; White Oak Place and Alonzo Avenue *(Point 20)*; Reseda Boulevard and Hermano Drive *(Point 21)*; Tampa Avenue and Wells Drive *(Point 22)*; Winnetka Avenue and Wells Drive *(Point 23)*; West Hills Drive and Ventura Boulevard *(Point 24)*; DeSoto Avenue and Ventura Boulevard *(Point 25)*; Canoga Avenue and Arcos Drive *(Point 26)*; Topanga Canyon Boulevard and Buenaventura Street *(Point 27)*; Ryder Avenue and Ventura Boulevard *(Point 28)*; and Valley Circle Boulevard and Calenda Drive *(Point 29)*.

3

Exhibit ___4___
Page __4__ of _11_
**Page 203**

From Valley Circle Boulevard, the boundary line of the Class Area heads in a westerly direction and crosses the following streets and fire roads: Round Meadow Road and Smith Road *(Point 30)* and then Bell Canyon Fire Road approximately 2 miles north of U.S. 101 *(Point 31)*. From Bell Canyon Fire Road, the boundary line of the Class Area turns in a northerly direction approximately following East Bell Canyon Road to North Saddlebow Road *(Point 32)*. The boundary line of the Class Area then heads to the northwest and crosses the intersection of North Saddlebow Road and Bell Canyon Fire Road *(Point 33)*. The boundary line of the Class Area then turns in a westerly direction *(Point 34)* crossing Cheeseboro Canyon Road *(Point 35)*, Palo Comado Fire Road *(Point 36)*, Deerbrook Road *(Point 37)*, and several unnamed fire roads *(Points 38 through 40)*. The boundary line of the Class Area then heads north and northeasterly intersecting Sinaloa Road *(Point 41)*, Montgomery Fire Road *(Point 42)*, Runkle Hall Road *(Point 43)*, Edison Road *(Point 44)*, and Arness Fire Road *(Point 45)*.

The boundary line of the Class Area then heads in a northerly direction *(Point 46)*, after which it turns east and crosses the intersections of Stearns Street and Los Angeles Avenue *(Point 47)*, Yosemite Avenue and East Fearing Street *(Point 48)*, and Kuehner Drive and Menlo Street *(Point 49)*. The boundary line of the Class Area then turns in a southerly direction until intersecting Santa Susana Pass Road *(Point 50)*. The boundary line of the Class Area follows Santa Susana Pass Road until the intersection of Santa Susana Pass Road and Box Canyon Road *(Point 51)*. At that intersection, the boundary line of the Class Area heads north, then easterly, crossing Rocky Peak Fire Road *(Point 52)*.

The boundary line of the Class Area then heads back in a southerly direction crossing the 118 Freeway *(Point 53)* and, just south of Trigger Street *(Point 54)*, the boundary line heads in a southwesterly direction to the intersection of Box Canyon Road and Lake Manor Drive (Valley Circle Boulevard) *(Point 55)*. The boundary line of the Class Area then intersects Woolsey Canyon Road *(Point 56)* and follows in a southeasterly direction crossing Fallbrook Avenue near the Hughes Facility *(Point 57)*. At the intersection of Farralone Avenue and Roscoe Avenue *(Point 58)*, the boundary line of the Class Area proceeds in a northwesterly direction back to the intersection of Canoga Avenue and Nordoff Street.

## PARTIES TO THE CLASS ACTION

The plaintiffs who are pursuing this class action on behalf of the members of **Class I** are Harold Samuels and Joyce Samuels ("the Samuels"). The Samuels are members of **Class I** and have been certified by the District Court to represent the interests of all members of **Class I**. The Samuels reside in Woodland Hills, California.

The plaintiffs who are pursuing this class action on behalf of the members of **Class II** and **Class III** are Lawrence O'Connor, Margaret O'Connor, William Rueger and Mary Jane Vroman. They are members of **Class II** and **Class III** and have been certified by the District Court to represent the interests of all members of **Class II** and **Class III**. Plaintiff Robert Grandinetti also is acting as a representative of **Class III** and has been certified by the District Court to so act. The O'Connors reside in Woodland Hills, California; Mr. Rueger resides in Santa Susana, California; and Mrs. Vroman resides in Woodland Hills, California. Mr. Grandinetti works within the Class Area.

The defendants in this action are Boeing North American, Inc. and Rockwell International Corporation ("the Defendants").

## DESCRIPTION OF THE CLASS ACTION

The original complaint in this class action was filed on March 10, 1997. The operative Fourth Amended Complaint in this class action was filed on March 28, 1998.

4

In the Fourth Amended Complaint, plaintiffs allege that, beginning in approximately 1946, the Defendants researched, developed, manufactured and tested various missile and rocket engines, as well as propellants, lasers and nuclear reactors, at four facilities located in the greater Simi Valley and San Fernando Valley area. Those four facilities, referred to as "the Rocketdyne Facilities", were located at the following sites: (1) the Santa Susana Field Laboratory, or **Santa Susana** facility, located at the top of Woolsey Canyon Road and near the crest of the Simi Hills at the western border of the San Fernando Valley; (2) the **Canoga** facility located at or about 6633 Canoga Avenue and near the corner(s) of Canoga Avenue and Victory Boulevard in Canoga Park; (3) the **DeSoto** facility located at or about 8900 DeSoto Avenue and near the corner(s) of DeSoto Avenue and Nordoff Street in the San Fernando Valley; and (4) the **Hughes** facility located at or about 8433 Fallbrook Avenue and near the northwest corner of Fallbrook Avenue and Roscoe Boulevard in the San Fernando Valley.

Plaintiffs allege that the activities of the Defendants at the Rocketdyne Facilities involved the use and release of certain chemicals, including, among others, trichloroethene (TCE) and hexavalent chromium, as well as the use, storage, generation and disposal of certain radioactive materials. Plaintiffs allege that they were personally exposed to and/or that their properties were contaminated by certain radioactive and/or chemical substances which were released from one or more of the Rocketdyne Facilities and which were dispersed through the Class Area by means of air currents, surface water runoff and/or subsurface groundwater.

Plaintiffs allege that their exposure to these substances has placed them at an increased risk of developing cancer or some other serious illness or disease. As a result, plaintiffs seek the implementation of a court-supervised program of medical monitoring designed to detect early signs of such illness or disease.

Plaintiffs also allege that the Defendants' releases of these substances has resulted in the contamination of their property and has diminished the value of their property. Plaintiffs further allege that they have incurred certain necessary expenses in response to the alleged contamination of their property (including, for example, cleaning up their property) for which they seek reimbursement under federal law.

The Defendants maintain that plaintiffs have not been exposed to any substances released from the Rocketdyne Facilities that place them at an increased risk of illness or disease. The Defendants also maintain that plaintiffs' properties are not contaminated by any releases from the Rocketdyne Facilities and that, consequently, plaintiffs are not entitled to recover damages for any harm caused to their properties. The Defendants deny all allegations of damage to plaintiffs and contest the merits of plaintiffs' claims.

## TYPE OF RELIEF SOUGHT

The members of **Class I** assert claims for relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 et. seq., the Price Anderson Act, 42 U.S.C. § 2210 et. seq. and California common law. The members of **Class I** seek mandatory injunctive relief in the form of a comprehensive, court-supervised program of medical monitoring and declaratory relief. The medical monitoring program sought to be implemented does not include treatment.

The claims for relief asserted by the members of **Class II** include claims for negligence, strict liability, trespass and nuisance. The members of **Class II** seek compensatory and punitive damages for contamination of their property, loss of the use and enjoyment of their property, diminution in the fair value of their property, impairment of the salability of their property and stigmatization of their property. The members of **Class II** also seek mandatory injunctive relief requiring that the Defendants, *inter alia*, clean up the contamination caused to their property.

Exhibit _A_
Page _6_ of _11_

**Page 205**

The claims for relief asserted by the members of **Class III** are brought under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607 et. seq. and section 17200 of the California Business & Professions Code ("the UCA"). The members of **Class III** seek to recover necessary "response costs" under CERCLA including, *inter alia*, clean up costs, costs of alternative water supplies and costs for air filtration systems. The members of **Class III** also seek injunctive relief under the UCA.

## CLAIMS FOR PERSONAL INJURY OR WRONGFUL DEATH

**NO** CLAIMS FOR PERSONAL INJURY OR WRONGFUL DEATH ARE BEING ASSERTED, AND **NO** DAMAGES FOR PERSONAL INJURY OR WRONGFUL DEATH ARE BEING SOUGHT, ON BEHALF OF **CLASS I, CLASS II** AND/OR **CLASS III.** IF YOU, AS A MEMBER OF **CLASS I, CLASS II** AND/OR **CLASS III,** WISH TO PURSUE A CLAIM AGAINST THE DEFENDANTS FOR PERSONAL INJURY OR WRONGFUL DEATH RESULTING FROM THE RADIOACTIVE AND/OR CHEMICAL SUBSTANCES RELEASED FROM THE ROCKETDYNE FACILITIES, YOU MUST FILE AN INDIVIDUAL LAWSUIT ON YOUR OWN BEHALF SEEKING DAMAGES FOR PERSONAL INJURY OR WRONGFUL DEATH.

**PLEASE NOTE THAT** YOUR FAILURE TO ACT PROMPTLY AS TO ANY CLAIM FOR PERSONAL INJURY OR WRONGFUL DEATH MAY RESULT IN YOUR CLAIM BEING BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS.

## CLASS CERTIFICATION

On July 13, 1998, after a hearing before the Honorable Audrey B. Collins, the District Court conditionally certified this action as a class action to be maintained by plaintiffs on behalf of the members of **Class I, Class II** and/or **Class III** as defined in this Notice. The Court appointed A. Barry Cappello, Esq. and J. Paul Gignac, Esq. of Cappello & McCann LLP, as Lead Class Counsel, and Tina B. Nieves, Esq. and Hector G. Gancedo, Esq. of Gancedo & Nieves LLP, as Class Counsel.

Communications with Class Counsel should be in writing and directed to:

J. Paul Gignac, Esq.
CAPPELLO & McCANN LLP          or          Tina B. Nieves, Esq.
831 State Street                                        GANCEDO & NIEVES LLP
Santa Barbara, California 93101                 119 E. Union Street, Suite G
                                                                  Pasadena, California 91103

(English only)                                                    (Si se habla espanol)

## EFFECT OF CLASS CERTIFICATION

The fact that the District Court has certified this case to proceed as a class action does not mean that any money damages or other relief necessarily will be recovered in this action because there are numerous contested issues of fact and law which have not yet been resolved. Rather, the effect of class certification is that the final outcome of this lawsuit – whether in favor of plaintiffs or the Defendants – will apply in the same manner to each member of **Class I, Class II** and/or **Class III.**

Since the District Court has certified this action to proceed as a class action, the claims of **Class I, Class II** and/or **Class III** may not be dismissed, settled or compromised without the approval of the District Court. In the event of any proposed compromise or settlement on behalf **Class I, Class II** and/or **Class III,** the members of each respective class shall receive notice of the basis for and terms of any proposed compromise or settlement and will be afforded an opportunity to be heard.

6

## RECOVERY BY CLASS MEMBERS

Any recovery which may be obtained for the benefit of **Class I, Class II** and/or **Class III** will be distributed to members of that respective class pursuant to a plan of allocation approved by the District Court. You may be required, as a condition of participating in any recovery obtained, to provide certain information relating to your medical history, your occupational history, your ownership of property, and/or any necessary "response costs" incurred by you.

## RESPONSIBILITY FOR ATTORNEYS' FEES AND EXPENSES

In a class action, Class Counsel's entitlement to the payment of their attorneys' fees and reimbursement of their expenses is determined by the District Court at the conclusion of the case.

If this class action is successful and a recovery is obtained for the benefit of **Class I, Class II** and/or **Class III**, either through settlement or judgment, Class Counsel will apply to the District Court for approval of the payment of their attorneys' fees and reimbursement of their expenses from the recovery obtained for each respective class.

Under no circumstances will you, as a member of **Class I, Class II** and/or **Class III**, be personally responsible for any attorneys' fees incurred or expenses advanced by Class Counsel.

## RIGHT TO APPEAR IN THE CLASS ACTION

Any member of **Class I, Class II** and/or **Class III** who does not request exclusion, and who so wishes, may appear through his or her own attorney in this class action.

The original of all documents relating to an appearance through counsel should be filed with the Clerk of the District Court located at 312 N. Spring Street, Los Angeles, California 90012. Such documents must be identified as filed in connection with this class action by including thereon the caption and case number appearing at the head of this Notice. Copies of all documents filed with the District Court shall be served by mail upon the following counsel:

J. Paul Gignac, Esq.  
Cappello & McCann LLP  
831 State Street  
Santa Barbara, CA 93101

John A. Reding, Esq.  
Paul, Hastings, Janofsky & Walker LLP  
345 California Street  
San Francisco, CA 94104-2635

If you do not enter an appearance through counsel of your choice at your own expense, you will be represented in this class action by Class Counsel appointed by the District Court.

## RIGHT TO INTERVENE IN THE CLASS ACTION

Any member of **Class I, Class II** and/or **Class III** who does not request exclusion, and who so wishes, may apply to the District Court to intervene individually in this class action upon satisfaction of the requirements set forth under Rule 24 of the *Federal Rules of Civil Procedure.*

The original of all documents relating to an application to intervene should be filed with the Clerk of the District Court located at 312 N. Spring Street, Los Angeles, California 90012. Such documents must be identified as filed in connection with this class action by including thereon the caption and case number appearing at the head of this Notice. Copies of all documents filed with the District Court shall be served by mail upon the following counsel:

J. Paul Gignac, Esq.  
Cappello & McCann LLP  
831 State Street  
Santa Barbara, CA 93101

John A. Reding, Esq.  
Paul, Hastings, Janofsky & Walker LLP  
345 California Street  
San Francisco, CA 94104-2635

7

## POSTING A COPY OF THIS NOTICE

If you are a business entity, you are required to post a copy of this Notice in a conspicuous location (e.g. bulletin board) where it may be easily viewed by your employees.

## ADDITIONAL COPIES OF THIS NOTICE

You may obtain additional copies of this Notice by calling the following toll-free number:

### 1-800-700-1195

## ADDITIONAL INFORMATION

The matters identified and described in this Notice do not purport to be comprehensive and should not be considered as such. Therefore, if you desire further information, you may wish to review the pleadings and other records on file with the District Court. The documents publicly filed in this class action are available for inspection and copying during regular business hours at the office of the Clerk of the District Court located at 312 N. Spring Street, Los Angeles, California 90012.

**Please do not telephone the District Court or the Office of the Clerk for information regarding this class action.**

Dated: February 5, 1999                    Clerk of the United States District Court

8

Exhibit _A_
Page _9_ of _11_
**Page 208**

## . REQUEST FOR EXCLUSION

### Please read the Notice carefully before filling out this form.

I have read the Notice and wish to exclude myself or another person or entity for whom I am the legal representative (e.g. guardian or corporate officer) from one or more of the classes certified in the case of *Lawrence O'Connor, et al. v. Boeing North American, Inc., et al. CV No. 97-1554 ABC (RCx).*

My name, address and telephone number are as follows:

Name:_____

Address:_____

_____

Telephone: (     ) _____

I request exclusion from the following class(es):

**Class II:**      ____

(Please check one or both)

**Class III:**      ____

I am completing this form on behalf of:

Myself ____

(Please check one only)

Another Person
Or Entity      ____

Answer only if completing this form on behalf of another person or entity:

I am completing this form on behalf of _____ in my capacity as
_____ of such person or entity.    (name)
(legal relationship)

Dated:_____           By:_____
(Date)                                  (Signature)

**PLEASE NOTE:  A separate form must be completed for each person or entity requesting to be excluded from any of the class(es).**

9



Scale in miles

Exhibit _A_
Page _11_ of _11_

Page 210

**Rocketdyne Environmental Class Action**
2801 Ocean Park Blvd., #9
Santa Monica, CA 90405

SI USTED ES UNA ENTIDAD COMERCIAL, USTED ESTA <u>REQUERIDO</u> A PUBLICAR UNA COPIA DE ESTE
AVISO EN UNA UBICACIÓN VISIBLE (EJEMPLO: PIZARRA DE BOLETÍN) DONDE PUEDA SER
FÁCILMENTE VISTA POR SUS EMPLEADOS.

FIRST CLASS MAIL                                    PLEASE FORWARD - IMPORTANT LEGAL NOTICE

EXHIBIT B
Page 211 of 11

## TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS

### DISTRITO CENTRAL DE CALIFORNIA

### DIVISIÓN DEL OESTE

| | |
|---|---|
| LAWRENCE O'CONNOR, et al., | ) Acción Civil No. 97-1554 ABC (RCx) |
| Demandantes, | ) **DEMANDA LEGAL DE CLASE** |
| vs. | ) |
| BOEING NORTH AMERICAN, INC., et al., | ) **AVISO SOBRE UNA DEMANDA** |
| Demandados. | ) **LEGAL DE CLASE  PENDIENTE** |

### ESTE AVISO PUEDE AFECTAR SUS DERECHOS
### POR FAVOR LÉALO CUIDADOSAMENTE

El propósito de este Aviso es para informarle a usted sobre una demanda legal de clase pendiente, sobre la manera en que esta demanda puede afectar sus derechos y sobre los pasos que usted puede tomar con respecto a esta demanda legal de clase.

ESTE AVISO NO ES UNA EXPRESIÓN DE NINGUNA OPINIÓN EMITIDA POR EL TRIBUNAL CON RESPECTO A LOS MÉRITOS DE LOS RECLAMOS NI SOBRE LAS DEFENSAS POR NINGUNA DE LAS PARTES DE ESTA DEMANDA LEGAL DE CLASE.

### LAS PERSONAS A QUIENES ESTE AVISO APLICA

**AQUÍ A USTED SE LE NOTIFICA,** de acuerdo a la Regla 23 del *Reglas Federales del Procedimiento Civil* y por una orden del Tribunal de Distrito de los Estados Unidos por el Distrito Central de California ("el Tribunal de Distrito") con fecha de 18 de Septiembre de 1998, que frente al Honorable Juez Aurdrey B. Collins en el Tribunal de Distrito, hay ahora una demanda legal de parte de las siguientes tres clases de personas:

(1)    Todas las personas: (a) quienes en la actualidad residen o trabajan dentro de los límites del  Área de Clase  mostrada en el mapa que está adjunto a este Aviso o quienes, en algún momento desde 1946, han residido o trabajado en el Ares de Clase; y  (b) a quienes NO se les ha diagnosticado:

    (i)      un cáncer el cual está avanzado a un grado que no puede ser curado quirúrgicamente;

    (ii)    una enfermedad autoinmune que está diagnosticada basándose sobre el criterio usado por la American Rheumatology Association;

    (iii)   una enfermedad neurológica clínicamente significativa que interfiere con los asuntos de la vida cotidiana;

    (iv)   un desorden endocrinológico clínicamente significativo y pobremente controlado; o

    (v)    un defecto de nacimiento

(2)    Todas las personas que son propietarios de bienes inmobiliarios dentro del Área de Clase.

1

EXHIBIT B
Page 212 OF 11

(3)   Todas las personas quienes actualmente residen o trabajan en el Área de Clase y/o quienes son propietarios de bienes inmobiliarios ubicados dentro del Área de Clase.

## USTED PUEDE SER MIEMBRO DE UNA CLASE

Si usted está dentro de la definición establecida en el párrafo (1) anterior, usted puede ser un miembro de a clase a la cual en este aviso se refiere como **Clase I.**

Si usted está dentro de la definición establecida en el párrafo (2) anterior, usted puede ser un miembro de a clase a la cual en este aviso se refiere como **Clase II.**

Si usted está dentro de la definición establecida en el párrafo (3) anterior, usted puede ser un miembro de a clase a la cual en este aviso se refiere como **Clase III.**

Usted puede ser miembro de una o más de una de las **Clases I, Clases II** y/o **Clases III.**

## LAS PERSONAS QUE NO CALIFICAN PARA SER MIEMBROS

Si usted es empleado actual o ex empleado de cualquiera de las siguientes compañías, usted NO califica para ser miembro en la **Clase I:** Boeing North American, Inc., Rockwell International Corporation, North American Rockwell Corporation, Rockwell Manufacturing Company, Rockwell Standard Corporation, Rocketdyne, Inc., North American Aviation, Inc., y Atomics Intemational, Inc.

Las compañías antes mencionadas no califican para ser miembros en la **Clase II** y/o **Clase III.**

## LAS ACCIONES QUE DEBEN SER TOMADAS POR LOS MIEMBROS DE LAS CLASES

Si usted es un miembro de la **Clase I** únicamente, usted no está requerido a tomar ninguna acción en este momento, aunque hay ciertas acciones descriptas en este Aviso que usted puede tomar si desea hacerlo. Si usted no toma ninguna acción, sus reclamos continuarán siendo procesados por los representantes de la_**Clase I**, sus intereses serán representados por el Abogado de la Clase, y sus derechos como miembro de la **Clase I** serán determinados como parte del litigio que está siendo procesado de parte de todos los miembros de la **Clase I.**

Si usted es miembro de la **Clase II** y/o **Clase III**, usted tiene que tomar una decisión, y usted está requerido a tomar esa decisión no más tarde que el día **31 de Marzo de 1999.** Su decisión es o permanecer como miembro de la **Clase II** y/o **Clase III** o ejercer su derecho de excluirse voluntariamente de ser miembro de la **Clase II** y/o **Clase III.**

Si usted desea permanecer como miembro de **Clase II** y/o **Clase III**, usted no está requerido a tomar ninguna acción en este momento, aunque hay ciertas acciones descriptas en este Aviso que usted podría tomar si usted deseara hacerlo. Si usted no toma ninguna acción sus reclamos continuarán siendo procesados por los representantes de la **Clase II** y/o **Clase III**, sus intereses serán representados por el Abogado de la Clase, sus derechos como miembro de la **Clase II** y/o **Clase III** serán determinados como parte del litigio que está siendo procesado de parte de todos los miembros de la **Clase II** y **Clase III.**

Si usted desea excluirse de la Clase II y/o Clase III, usted debe cumplir con los pasos establecidos en la sección siguiente de este Aviso intitulada "El Derecho a Excluirse de la Clase II y la Clase II". Si usted no ejerce su derecho a excluirse voluntariamente como miembro de **Clase II** y/o **Clase III**, usted será considerado miembro de la **Clase II** y/o **Clase III**, sus derechos como un miembro de la **Clase II** y/o **Clase III** serán determinados en la manera descripta anteriormente, y usted tendrá prohibido procesar sus propios reclamos individuales en contra de los demandados por el mismo tipo de reparación que está siendo buscada de parte de la

2

EXHIBIT B
Page 213 of 11

Clase II y/o Clase III a través de una demanda legal separada. Como miembro de la Clase II y/o Clase III, usted tendrá el derecho a participar en los procedimientos de todo fallo o acuerdo a favor de la Clase II y/o Clase III. Todo fallo entrado con respecto a los miembros de la Clase II y/o Clase III, sean favorables o no, lo incluirán y lo obligarán a usted bajo la regla de res judicata.

## DERECHO A EXCLUIRSE A SI MISMO DE LA CLASE II Y/O LA CLASE III

Si usted es miembro de la Clase I, usted NO puede elegir voluntariamente excluirse a si mismo de ser miembro de la Clase I. O sea que ser miembro de la Clase I es obligatorio y usted, como miembro de la Clase I, tiene prohibido procesar su propio reclamo individual por el mismo tipo de recuperación que está siendo buscada de parte de la Clase I. Usted puede, sin embargo, elegir no participar en ninguna de las recuperaciones que pudieran ser obtenidas para beneficio de la Clase I.

Si usted es miembro de la Clase II y/o la Clase III, usted puede excluirse voluntariamente a si mismo de ser miembro de la Clase II y/o Clase III ejerciendo su derecho a ser excluido de la Clase II y/o la Clase III. Si usted pide exclusión, usted no tendrá el derecho a compartir en ninguna recuperación obtenida para el beneficio de la Clase II y/o la Clase III; usted no estará obligado por ningún fallo sea este favorable o no, entrado a favor o en contra de la Clase II y/o Clase III; y usted puede procesar todo reclamo que usted tenga en contra de los demandados a través de una demanda legal separada de parte suya.

Todos los pedidos de exclusión, deben ser hechos por escrito y deben ser enviados por correo a:

Rocketdyne Environmental Class Action
2801 Ocean Park Boulevard #9
Santa Monica, California 90405

Todos los pedidos de exclusión de la Clase II y/o Clase III deben tener el sello postal de no más tarde del 31 de Marzo de 1999, y debe incluir su nombre, su dirección, su número de teléfono y su firma como así también una declaración afirmativa que usted pide ser excluido de la Clase II y/o Clase III. Todo pedido de exclusión hecho de parte de un miembro de la Clase II y/o Clase III a través de un representante de ese miembro de la clase, debe declarar en calidad de que esta actuando ese representante (ejemplo: Guardián Legal). Usted debe usar el formulario adjunto intitulado "Pedido de Exclusión".

## LIMITES DEL ÁREA DE CLASE

La línea de límite en el Área de Clase en el mapa adjunto a este Aviso se describe de la siguiente manera:

Comenzando en la intersección de Canoga Avenue y Nordoff Street (referenciado por un punto negro grande ubicado centralmente en el mapa), y moviéndose en la dirección de las agujas del reloj, la línea límite de Área de Clase cruza las siguientes mayores intersecciones: DeSoto Avenue y Lassen Street (Punto 1); Lurline Avenue y Devonshire Street (Punto 2); Winnetka Avenue y Northridge Road (Punto 3); Corbin Avenue y Chatsworth Street (Punto 4); Tampa Avenue y Atlanta Avenue (Punto 5); Reseda Boulevard y el Freeway118 (Punto 6); Balboa Boulevard y Halsey Street (Punto 7); Woodley Avenue y Chatsworth Street (Punto 8); Gothic Avenue y Devonshire Street (Punto 9); Hayvenhurst Avenue y Nordoff Street (Punto 10); Woodley Avenue y Rayen Street (Punto 11); Haskell Avenue y Roscoe Boulevard (Punto 12); Sepulveda Boulevard y Stagg Street (Punto 13); Sepulveda Boulevard y Saticoy Street (Punto 14); Sepulveda Boulevard y Vose Street (Punto 15); Noble Avenue y Vanowen Street (Punto 16); Sepulveda Boulevard y Victory Boulevard (Punto 17); Balboa Boulevard y la U.S. Highway 101 (Punto 18); Amestoy Avenue y Ventura Boulevard (Punto 19); White Oak Place y Alonzo Avenue (Punto 20); Reseda Boulevard y Hermano Drive (Punto 21); Tampa Avenue y Wells Drive (Punto 22); Winnetka Avenue y Wells Drive (Punto 23); West Hills Drive y Ventura

3

EXHIBIT B
Page 214

Boulevard *(Punto 24)*; DeSoto Avenue y Ventura Boulevard *(Punto 25)*; Canoga Avenue y Arcos Drive *(Punto 26)*; Topanga Canyon Boulevard y Buenaventura Street *(Punto 27)*; Ryder Avenue y Ventura Boulevard *(Punto 28)*; y Valley Circle Boulevard y Calenda Drive *(Punto 29)*.

Desde Valley Circle Boulevard, la línea límite del área de clase va en dirección del oeste y cruza las siguientes calles y caminos de incendios: Round Meadow Road y Smith Road *(Punto 30)* y luego Bell Canyon Fire Road aproximadamente 2 millas al norte de la U.S. 101 *(Punto 31)*. Desde Bell Canyon Fire Road, la línea límite del Área de Clase gira en dirección al norte siguiendo aproximadamente East Bell Canyon Road hasta North Saddlebow Road *(Punto 32)*. La línea límite del Área de Clase luego sigue hacia el noroeste y cruza la intersección de North Saddlebow Road y Bell Canyon Fire Road *(Punto 33)*. La línea límite del Área de Clase luego gira en dirección al oeste *(Punto 34)* cruzando Cheeseboro Canyon Road *(Punto 35)*, Palo Comado Fire Road *(Punto 36)*, Deerbrook Road *(Punto 37)*, y varios caminos de incendios sin nombre *(Puntos 38 hasta el 40)*. La línea límite del Área de Clase luego va hacia el norte y hacia el noreste cruzando Sinaloa Road *(Punto 41)*, Montgomery Fire Road *(Punto 42)*, Runkle Hall Road *(Punto 43)*, Edison Road *(Punto 44)*, y Arness Fire Road *(Punto 45)*.

La línea límite del Área de Clase luego va hacia el norte *(Punto 46)*, y gira hacia el este cruzando las intersecciones de Stearns Street y Los Ángeles Avenue *(Punto 47)*, Yosemite Avenue y East Fearing Street *(Punto 48)*, y Kuehner Drive y Menlo Street *(Punto 49)*. La línea límite del Área de Clase luego gira en dirección al sur hasta cruzar Santa Susana Pass Road *(Punto 50)*. La línea límite del Área de Clase sigue por Santa Susana Pass Road hasta la intersección de Santa Susana Pass Road y Box Canyon Road *(Punto 51)*. En esa intersección, la línea límite de Área de Clase va hacia el norte, luego hacia el este, cruzando Rocky Peak Fire Road *(Punto 52)*.

La línea límite del Área de Clase luego vuelve a seguir en dirección al sur cruzando el Freway 118 *(Punto 53)* y, justo al sur de Trigger Street *(Punto 54)*, la línea límite sigue en dirección sudoeste hasta la intersección de Box Canyon Road y Lake Manor Drive (Valley Circle Boulevard) *(Punto 55)*. La línea límite del Área de Clase luego cruza Woolsey Canyon Road *(Punto 56)* y sigue en dirección sudeste cruzando Fallbrook Avenue cerca de Hughes Facility *(Punto 57)*. En la intersección de Farralone Avenue y Roscoe Avenue *(Punto 58)*, la línea límite del Área de Clase procede en dirección noroeste de regreso a la intersección de Canoga Avenue y Nordoff Street.

## PARTES DE LA DEMANDA LEGAL DE CLASE

Los demandantes que están procesando esta demanda legal de clase de parte de los miembros de la **Clase I** son Harold Samuels y Joyce Samuels ("Los Samuels"). Los Samuels son miembros de **Clase I** y han sido certificados por el Tribunal del Distrito para representar los intereses de todos los miembros de la **Clase I**. Los Samuels residen en Woodland Hills, California.

Los demandantes que están procesando esta demanda legal de parte de los miembros de la **Clase II** y **Clase III** son Lawrence O'Connor, Margaret O'Connor, William Rueger y Mary Jane Vroman. Ellos son miembros de la **Clase II** y **Clase III** y han sido certificados por el Tribunal de Distrito para representar los intereses de todos los miembros de **Clase II** y **Clase III**. El demandante Robert Grandinetti también está actuando como representante de **Clase III** y ha sido certificado por el Tribunal del Distrito para actuar como tal. Los O'Connors residen en Woodland Hills, California; el Sr. Rueger reside en Santa Susana, California; y la Sra. Vroman reside en Woodland Hills, California. El Sr. Grandinetti trabaja dentro del Área de Clase.

Los Demandados en esta demanda legal son Boeing North American, Inc. y Rockwell International Corporation ("los Demandados").

## DESCRIPCIÓN DE LA DEMANDA LEGAL DE CLASE

El reclamo original en esta demanda legal de clase fue registrado el 10 de Marzo de 1997. El Cuarto Reclamo Enmendado operativo en esta demanda legal de clase fue registrado el 28 de Marzo de 1998.

4

EXHIBIT B
PAGE Page 215

En el Cuarto Reclamo Enmendado, los demandantes alegan que comenzando aproximadamente en 1946, los demandados investigaron, desarrollaron, fabricaron y probaron varios motores de cohetes y misiles, como así también combustibles, reactores nucleares y de láser en cuatro instalaciones ubicadas en las áreas mayores de Simi Valley y San Fernando Valley. Esas cuatro instalaciones, que son conocidas como "the Rocketdyne Facilities", estaban ubicadas en los siguientes lugares: (1) el Santa Susana Field Laboratory, o instalación **Santa Susana** , ubicada en la cima de Woolsey Canyon Road y cerca de la cresta de Simi Hills en la frontera oeste del San Fernando Valley; (2) la instalación **Canoga** ubicada en el 6633 Canoga Avenue y cerca de la esquina de Canoga Avenue y Victory Boulevard en Canoga Park; (3) la instalación **DeSoto** ubicada en el 8900 DeSoto Avenue y cerca de la esquina de DeSoto Avenue y Nordoff Street en el San Fernando Valley; y (4) la instalación **Hughes** ubicada en el 8433 Fallbrook Avenue y cerca de la esquina noroeste de Fallbrook Avenue y Roscoe Boulevard en el San Fernando Valley.

Los demandantes alegan que las actividades de los demandados en las Rocketdyne Facilities involucraban el uso y descarga de ciertos químicos, incluyendo, entre otros , etano de tricloro (TCE) y cromo hexavalente, como así también el uso, almacenaje, generación y desecho de ciertos materiales radioactivos. Los demandantes alegan que ellos fueron personalmente expuestos y o que sus propiedades fueron contaminadas por ciertas substancias radioactivas y/o químicas, las cuales fueron descargadas de una o más de las Rocketdyne Facilities y que fueron dispersadas a través del Área de Clase por medio de corrientes de aires, desagües de aguas de superficies y/o subterráneas bajo superficies.

Los demandantes alegan que al estar expuestos a estas substancias los ha ubicado a ellos en riesgo aumentado del desarrollo del cáncer o de alguna otra enfermedad o lesión seria. Como resultado, los demandantes buscan la implementación de un programa supervisado por el tribunal para control médico diseñado para detectar señales tempranas de dicha lesión o enfermedad.

Los demandantes también alegan que las descargas de estas substancias por los demandados ha resultado en la contaminación de sus propiedades y ha reducido el valor de sus propiedades. Los demandantes además alegan que ellos han incurrido en ciertas expensas necesarias en respuesta a la alegada contaminación de su propiedad (incluyendo, por ejemplo, la limpieza de su propiedad) por lo cual ellos buscan ser reembolsados bajo la ley federal.

Los demandados mantienen que los demandantes no han sido expuestos a ninguna substancia descargada por las Rocketdyne Facilities que los colocara a ellos a un aumentado riesgo de lesión o enfermedad. Los demandados también mantienen que las propiedades de los demandantes no están contaminadas por ninguna descarga de las instalaciones de Rocketdyne Facilities y que consecuentemente, los demandantes no tienen el derecho a recuperar compensación por ningún daño causado a sus propiedades. Los demandados niegan todos los alegatos de daños a los demandantes y contienden los méritos de los reclamos de los demandantes.

## TIPO DE RECUPERACIÓN BUSCADA

Los miembros de la **Clase I** afirman reclamos por recuperación bajo el Acto de Fallo Declaratorio, 28 U.S.C. § 2201 et. seq., Acto de Price Anderson Act, 42 U.S.C. § 2210 et. seq. y ley común de California . Los miembros de la **Clase I** buscan una recuperación obligatoria por tribunales en la forma de un programa total supervisado por el tribunal de control médico y recuperación declaratoria. El programa de control médico buscado para ser implementado no incluye tratamiento.

Los reclamos de recuperación afirmados por los miembros de la **Clase II** incluyen reclamos por negligencia, por estricta responsabilidad, por traspaso y por molestia. Los miembros de la **Clase II** buscan daños compensatorios y punitivos por contaminación de su propiedad, pérdida de uso y disfrute de su propiedad, disminución en el valor justo de su propiedad, incapacidad en la venta de su propiedad y estigma negativo a su propiedad. Los miembros de la **Clase II** también buscan una recuperación obligatoria por tribunales requiriendo que los demandados, *inter alia*, limpien la contaminación causada a su propiedad.

5

EXHIBIT B
PAGE 6 OF 11

**Page 216**

Los reclamos por recuperación afirmados por los miembros de la **Clase III** son sacados a relucir debido a el ACTO DE RESPUESTA COMPENSACIÓN Y RESPONSABILIDAD TOTAL DEL MEDIO AMBIENTE (CERCLA), 42 U.S.C. § 9607 et. seq. y la sección 17200 del CÓDIGO DE COMERCIO Y PROFESIONES DE CALIFORNIA ("la UCA"). Los miembros de la **Clase III** pretenden recuperar los "costos de respuesta" necesarios bajo CERCLA incluyendo, *inter alia*, costos de limpieza, costos de provisión de agua alternativo y costos por los sistemas de filtración de aire. Los miembros de la **Clase III** también pretenden una recuperación ordenada por tribunales bajo la UCA.

## RECLAMOS POR LESIONES PERSONALES O MUERTE POR NEGLIGENCIA DE OTRO

NO SE ALEGAN RECLAMOS POR LESIÓN PERSONAL NI POR MUERTE CAUSADA POR NEGLIGENCIA DE OTROS, Y NO SE PRETENDEN DANOS POR LESIÓN PERSONAL NI POR MUERTE CAUSADA POR NEGLIGENCIA DE OTROS, DE PARTE DE CLASE I, CLASE II Y/O CLASE III. SI USTED, COMO UN MIEMBRO DE LA CLASE I, CLASE II Y/O CLASE III, DESEA PROCESAR UN RECLAMO EN CONTRA DE LOS DEMANDADOS POR LESIÓN PERSONAL O MUERTE CAUSADA POR NEGLIGENCIA DE OTROS COMO RESULTADO DE LAS DESCARGAS DE SUBSTANCIAS RADIOACTIVAS Y/O QUÍMICAS DESDE LAS INSTALACIONES DE ROCKETDYNE USTED DEBE INICIAR UNA DEMANDA LEGAL INDIVIDUAL DE PARTE SUYA PIDIENDO RECUPERACIÓN POR DANOS DE LESIÓN PERSONAL O POR MUERTE CAUSADA POR NEGLIGENCIA DE OTROS.

POR FAVOR NOTE QUE SU FALTA DE PRONTA ACCIÓN CON RESPECTO A TODO RECLAMO POR LESIÓN PERSONAL O MUERTE CAUSADA POR NEGLIGENCIA DE OTROS PUEDE RESULTAR EN QUE SU RECLAMO QUEDE PROHIBIDO DEBIDO A LOS ESTATUTOS DE LIMITACIÓN QUE SEAN APLICABLES..

## CERTIFICACIÓN DE LA CLASE

El 13 de Julio de 1998, después de una audiencia frente a la Honorable Juez Audrey B. Collins, el Tribunal de Distrito certifico condicionalmente esta demanda como una demanda legal de clase que debe ser mantenida por los demandantes de parte de los miembros de la **Clase I, Clase II** y/o **Clase III** como están definidas en este Aviso. El tribunal nombro a A. Barry Cappello, Esq. y J. Paul Gignac, Esq. de Cappello & McCann LLP, como Abogados Principales de la Clase ,y a Tina B. Nieves, Esq. y Hector G. Gancedo, Esq. de Gancedo & Nieves LLP, como Abogados de la Clase.

Las comunicaciones con los Abogados de la Clase deben ser hechas por escrito y dirigidas a:

J. Paul Gignac, Esq.                    Tina B. Nieves, Esq.
CAPPELLO & MCCANN LLP        o      GANCEDO & NIEVES LLP
831 State Street                        119 E. Union Street, Suite G
Santa Barbara, California 93101         Pasadena, California 91103

(Ingles únicamente)                     (Si se habla español)

## EL EFECTO DE CERTIFICACIÓN DE LA CLASE

El hecho que el Tribunal de Distrito ha certificado a esta causa para proceder como una demanda legal de clase no significa que necesariamente se recuperaran dinero u otras compensaciones debido a esta acción, porque existen numerosos asuntos en pleito debido a hechos y leyes, los cuales todavía no han sido resueltos. Si no que , el efecto de la certificación

6

EXHIBIT B
PAGE 7 OF 11
**Page 217**

de clase es que el resultado final de esta demanda legal – ya sea a favor de los demandantes o de los demandados – aplicaran de la misma manera a los miembros de la **Clase I, Clase II** y/o **Clase III.**

Como el Tribunal de Distrito ha certificado que esta acción proceda como una demanda legal de clase, los reclamos de la **Clase I, Clase II** y/o **Clase III** no pueden ser ni retirados, ni convenidos, ni comprometidos sin la aprobación del Tribunal de Distrito. En el caso de todo acuerdo o compromiso propuesto de parte de la **Clase I, Clase II** y/o **Clase III**, los miembros de cada respectiva clase deberán recibir un aviso sobre las bases y los términos de todo compromiso o acuerdo propuesto y se les otorgara la oportunidad de ser escuchados.

## RECUPERACIÓN POR LOS MIEMBROS DE LA CLASE

Toda recuperación que pudiera ser obtenida para el beneficio de la **Clase I, Clase II** y/o **Clase III** será distribuida a los miembros de esa respectiva clase de acuerdo a un plan de distribución aprobado por el Tribunal del Distrito . A usted se le podría requerir, como una condición de participar en toda recuperación obtenida, que provea cierta información relacionada a su historia medica, a su historia de empleo, su relación como propietario de la propiedad, y/o todos los "costos de respuesta" necesarios incurridos por usted.

## RESPONSABILIDAD POR LOS HONORARIOS Y EXPENSAS DE LOS ABOGADOS

En una demanda legal el derecho a los pagos de honorarios de abogados y reembolsos por las expensas de los Abogados de la Clase lo determina el Tribunal del Distrito a la conclusión del caso.

Si esta demanda legal de clase fuera exitosa y se obtuviera una recuperación para el beneficio de la **Clase I, Clase II** y/o **Clase III**, ya sea a través de un convenio o de un fallo, los Abogados de la Clase solicitarán que el Tribunal de Distrito apruebe el pago de sus honorarios y el reembolso de sus expensas de la recuperación obtenida para cada clase respectiva.

Bajo ninguna circunstancia usted, como miembro de la **Clase I, Clase II** y/o **Clase III**, será responsable personalmente por ningún honorario o expensa de abogados incurridos por los Abogados de la Clase.

## EL DERECHO DE COMPARECER EN UNA DEMANDA LEGAL DE CLASE

Todo miembro de la **Clase I, Clase II** y/o **Clase III** quien no solicitara su exclusión, y que así lo deseara, puede comparecer a través de su propio abogado en esta demanda legal de clase.

El original de todos los documentos que estén relacionados a una comparecencia a través de abogado debe ser presentada con la Secretaria (Clerk) del Tribunal del Distrito que esta ubicada en el 312 N. Spring Street, Los Angeles, California 90012. Tales documentos deben ser identificados como que han sido registrados en conexión con esta demanda legal de clase incluyendo en ellos el titulo y el numero de caso que aparece en el encabezamiento de este Aviso. Las copias de todos los documentos registrados con el Tribunal del Distrito deben ser entregados por correo a los siguientes abogados:

J. Paul Gignac, Esq.
Cappello & McCann LLP
831 State Street
Santa Barbara, CA 93101

John A. Reding, Esq.
Paul, Hastings, Janofsky & Walker LLP
345 California Street
San Francisco, CA 94104-2635

7

EXHIBIT B
PAGE 8 OF 11

**Page 218**

Si usted no registra una comparecencia a través de un abogado de su propia selección y a su propio costo, usted será representado en esta demanda legal de clase por los Abogados de la Clase nombrados por el Tribunal de Distrito.

## EL DERECHO A INTERVENIR EN LA DEMANDA LEGAL DE CLASE

Todo miembro de la **Clase I, Clase II** y/o **Clase III** que no solicitara su exclusión y que deseara hacerlo, puede solicitar al Tribunal de Distrito a intervenir individualmente en esta demanda legal de clase previa satisfacción de los requisitos establecidos bajo la Regla 24 del *Las Reglas Federales del Procedimiento Civil.*

El original de todos los documentos que estén relacionados a una solicitud para intervenir deben ser presentados con la Secretaria (Clerk) del Tribunal del Distrito que esta ubicada en el 312 N. Spring Street, Los Angeles, California 90012. Tales documentos deben ser identificados como que han sido registrados en conexión con esta demanda legal de clase incluyendo en ellos el titulo y el numero de caso que aparece en el encabezamiento de este Aviso. Las copias de todos los documentos registrados con El Tribunal del Distrito deben ser entregados por correo a los siguientes abogados:

| | |
|---|---|
| J. Paul Gignac, Esq. | John A. Reding, Esq. |
| Cappello & McCann LLP | Paul, Hastings, Janofsky & Walker LLP |
| 831 State Street | 345 California Street |
| Santa Barbara, CA 93101 | San Francisco, CA 94104-2635 |

## PUBLICACIÓN DE UNA COPIA DE ESTE AVISO

Si usted es una entidad comercial, usted esta <u>requerido</u> a publicar una copia de este Aviso en una ubicación visible (ejemplo: pizarra de boletín) donde pueda ser fácilmente vista por sus empleados.

## COPIAS ADICIONALES DE ESTE AVISO

Usted puede obtener copias adicionales de este aviso llamando al siguiente numero gratuitamente:

**1-800-700-1195**

## INFORMACIÓN ADICIONAL

Los temas identificados y descriptos en este aviso no pretenden ser totales y no deben ser considerados de tal manera. Por lo tanto, si usted desea mas información, usted debe revisar los alegatos y otros archivos que están registrados con el Tribunal de Distrito. Los documentos que han sido registrados públicamente en esta demanda legal de clase están disponibles para su inspección y copias durante las horas hábiles en las oficinas de la Secretaria (Clerk) del Tribunal de Distrito ubicada en el 312 N. Spring Street, Los Angeles, California 90012.

**Por favor no llame por teléfono ni al Tribunal del Distrito ni a las oficinas de la Secretaria (Clerk) pidiendo información sobre esta demanda legal de clase.**

Fechado: 5 de Febrero de 1999          Secretaria del Tribunal de Distrito de los Estados Unidos

8

EXHIBIT B
PAGE 9 OF 11
**Page 219**

# SOLICITUD DE EXCLUSIÓN

### Por favor lea el Aviso cuidadosamente antes de completar este formulario.

Yo he leído el Aviso y deseo excluirme a mi mismo o a otra persona o entidad de la cual soy el Representante Legal (ej.: Guardián o Funcionario Corporativo) de una o de mas de una de las clases certificadas en la causa de *Lawrence O'Connor, et al. v. Boeing North American, Inc., et al. CV No. 97-1554 ABC (RCx)*.

Mi nombre, dirección y numero de teléfono son los siguientes:

Nombre:_____

Direccion:_____

_____

Teléfono: (    ) _____

Yo solicito exclusión de las siguientes clase/s:

       **Clase II:**    ___

       **Clase III:**    ___      (Por favor marque una o ambas)

Yo estoy completando este formulario de parte:

       Mía    ___

       Otra persona      (Por favor marque una solamente)
       o entidad    ___

Responda únicamente si esta completando este formulario de parte de otra persona o entidad:

Yo estoy completando este formulario de parte de _____ en mi capacidad como _____ de dicha persona o entidad.    (nombre)
     (relación legal)

Fechado:_____          Por:_____
       (Fecha)                    (Firma)

**POR FAVOR NOTE: debe completarse un formulario por separado por cada persona o entidad solicitando ser excluida de cualquiera de la/s clase/s.**

EXHIBIT B

PAGE 10 OF 11



Scale in miles

2

EXHIBIT B
PAGE 11 OF 11

# EXHIBIT E

A. Barry Cappello, CSB 037835
J. Paul Gignac, CSB 125676
Kim A. Seefeld, CSB 075876
CAPPELLO & McCANN LLP
831 State Street
Santa Barbara, California 93101
Telephone: (805) 564-2444
Facsimile: (805) 965-5950

Tina B. Nieves, CSB 134384
Hector G. Gancedo, CSB 132139
GANCEDO & NIEVES LLP
119 E. Union Street, Suite G
Pasadena, California 91103
Telephone: (626) 685-9800
Facsimile: (626) 685-9808

Attorneys for Plaintiffs and Class Counsel

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| LAWRENCE O'CONNOR, et al., | Case No. 97-1554 ABC (RCx) |
| Plaintiffs, | **CLASS ACTION** |
| v. | [Action filed 3/10/97] |
| BOEING NORTH AMERICAN, INC., et al., | **NOTICE OF SUBMISSION OF AFFIDAVIT RE MAILING OF NOTICE OF CLASS DECERTIFICATION** |
| Defendants. | |

22262.001 - 79737



ENTERED ON ICMS

OCT 3 0 2000

CV

**Page 223**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

Pursuant to the Revised Order Approving Form of Notice of Class Decertification and Method of Distribution dated October 3, 2000, Class Counsel hereby submits the attached Affidavit of Wesley L. Nutten of BDO Seidman, LLP detailing the steps undertaken in connection with the mailing of the Notice of Class Decertification in this action.

Dated: October 27, 2000                    CAPPELLO & McCANN LLP

By _____
J. Paul Gignac
Class Counsel

## AFFIDAVIT OF WESLEY L. NUTTEN

I, Wesley L. Nutten, declare as follows:

1.  I am a Certified Public Accountant, licensed to practice in the state of California and am a Director at BDO Seidman, LLP ("BDO Seidman"). I make this declaration based on my personal knowledge, and if called to testify, I could and would testify competently to the facts stated in this declaration.

2.  Continuously from September 18, 1998 to the present, I have supervised all class notification procedures in connection with the Lawrence O'Connor, et al. v. Boeing North American, Inc., et al. matter. Between September 18, 1998 and September 10, 1999, I was employed by the firm of Biggs & Co. From September 20, 1999 to the present, I have been employed by the firm of BDO Seidman.

3.  On September 27, 2000, BDO Seidman received from Class Counsel a copy of the approved Notice of Class Decertification ("Notice") on computer diskette. At the request of Class Counsel, BDO Seidman reformatted the Notice into a format more conducive to the mailing of the Notice to the addresses in the Class member database.

4.  In connection with the initial Class Notice mailing in February 1999, three separate mailing lists were obtained from Wholesale Mailing Lists, Inc. The first list consisted of 171,039 resident addresses reflecting all valid resident addresses in the Class Area as described in the Class Notice. The second list consisted of 32,396 business addresses reflecting all valid business addresses located within the Class Area. The third list consisted of 13,045 addresses for each legal owner of real property located within the Class Area who does not reside within the Class Area ("absentee property owners"). The aggregate number of addresses in the Class member database is 216,480.

5.  Also in connection with the initial Class Notice mailing, the Class member database was updated with new addresses identified via a "skip tracing" process for over 1,400 absentee property owners.

6.  On September 28, 2000, BDO Seidman contacted the professional printing firm of Merrill Corporation ("Merrill") to handle the printing and mailing of the Notice. Merrill was selected based on price, reputation, and prior experience.

7.  On October 2, 2000, a "camera ready copy" of the Notice and a computerized copy of the

**Page 225**

address data was provided to Merrill for the printing and mailing of the Notice.

8. On October 12, 2000, Merrill coordinated the mailing of 216,480 Notices to the addresses in the original Class member database as described above. A true and correct copy of the Notice as mailed is attached hereto as Exhibit "A".

9. Between October 12, 2000 and October 25, 2000, BDO Seidman received approximately 6,000 Notices that were returned undeliverable by the Post Office. The majority of these Notices appear to have been returned due to the location being vacant.

I DECLARE, UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA, THAT THE FOREGOING IS TRUE AND CORRECT.

Executed this __27 ᵗʰ__ day of __October__, 2000 at Los Angeles, California.

Wesley L. Nutten

**Page 226**

Rocketdyne Environmental Class Action
2801 Ocean Park Blvd., PMB #9
Santa Monica, CA 90405

SI USTED DESEA OBTENER UNA COPIA DE ESTE DOCUMENTO LEGAL EN ESPANOL, FAVOR DE ACTUAR
IMMEDIATAMENTE Y LLAMAR A (626) 685-9800.

IF YOU ARE A BUSINESS ENTITY, YOU ARE REQUIRED BY ORDER OF THE COURT TO POST A COPY OF THIS
NOTICE IN A CONSPICUOUS LOCATION (E.G. A BULLETIN BOARD) WHERE IT MAY BE EASILY VIEWED BY ALL
OF YOUR EMPLOYEES.

FIRST CLASS MAIL                    _____ ____ ____PLEASE FORWARD - IMPORTANT LEGAL NOTICE

Exhibit A

**Page 227**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| LAWRENCE O'CONNOR, et al., | ) Civil Action No. 97-1554 ABC (RCx) |
| Plaintiffs, | ) **CLASS ACTION** |
| v. | ) |
| BOEING NORTH AMERICAN, INC., et al., | ) NOTICE OF CLASS |
| Defendants. | ) DECERTIFICATION |

## THIS NOTICE MAY AFFECT YOUR RIGHTS. PLEASE READ IT CAREFULLY.

### I. PURPOSE OF THIS NOTICE

The purpose of this Notice is to inform you of an order of the United States District Court for the Central District of California ("the District Court") which may affect your individual rights to pursue claims against Boeing North American, Inc. and Rockwell International Corporation for activities which the plaintiffs allege have taken place at any time since 1946 at four facilities located in the greater Simi Valley and San Fernando Valley area.

Those four facilities, referred to as "the Rocketdyne Facilities", are located at the following sites: (1) the Santa Susana Field Laboratory, or **Santa Susana** facility, located at the top of Woolsey Canyon Road and near the crest of the Simi Hills at the western border of the San Fernando Valley; (2) the **Canoga** facility located at or about 6633 Canoga Avenue and near the corner(s) of Canoga Avenue and Victory Boulevard in Canoga Park; (3) the **DeSoto** facility located at or about 8900 DeSoto Avenue and near the corner(s) of DeSoto Avenue and Nordoff Street in the San Fernando Valley; and (4) the **Hughes** facility located at or about 8433 Fallbrook Avenue and near the northwest corner of Fallbrook Avenue and Roscoe Boulevard in the San Fernando Valley.

### II. CLASS DECERTIFICATION

**YOU ARE HEREBY NOTIFIED**, pursuant to Rule 23 of the *Federal Rules of Civil Procedure* and an order of the District Court dated October 5, 2000, that the District Court has determined that this action should no longer proceed as a class action. The District Court's order affects the following seven categories of claims:

(1) claims for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. on behalf of the members of Class I;

(2) claims for medical monitoring of exposure to radioactive contaminants under the Price Anderson Act, 42 U.S.C. § 2210 et seq. on behalf of the members of Class I;

(3) claims for medical monitoring of exposure to hazardous, non-radioactive substances based upon negligence, negligence per se and/or strict liability for ultrahazardous activities on behalf of the members of Class I;

02262.001 . 73133

**Page 228**

(4) claims for property damage caused by radioactive contaminants, and other relief, under the Price Anderson Act, 42 U.S.C. § 2210 et seq. on behalf of the members of Class II;

(5) claims for property damage caused by hazardous, non-radioactive substances, and other relief, based upon negligence, negligence per se, strict liability for ultrahazardous activities, continuing trespass, permanent trespass, continuing private nuisance, continuing public nuisance, continuing public nuisance per se and/or permanent private nuisance on behalf of the members of Class II;

(6) claims for response costs and other relief under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). 42 U.S.C. § 9607 et seq on behalf of the members of Class III; and

(7) claims for injunctive relief under California Business and Professions Code §17200 on behalf of the members of Class III.

THIS NOTICE IS NOT AN EXPRESSION OF ANY OPINION BY THE DISTRICT COURT AS TO THE MERITS OF THESE CLAIMS. RATHER, THIS NOTICE IS MERELY INTENDED TO INFORM YOU OF THE CLASS DECERTIFICATION WHICH HAS BEEN ORDERED BY THE DISTRICT COURT AND THE EFFECT OF THE DECERTIFICATION OF THE CLASSES ON YOUR INDIVIDUAL CLAIMS.

### III. PERSONS TO WHOM THIS NOTICE APPLIES

This Notice applies to the members of Class I, Class II and Class III, which classes were previously conditionally certified by the District Court and defined as follows:

**Class I:** All persons: (a) who presently reside or work within the boundaries of the Class Area depicted in the map attached to the Class Notice dated February 5, 1999 or who, at any time since 1946, have resided or worked in the Class Area; and (b) who have not been diagnosed with:

(i) a cancer which is advanced to a degree that it cannot be surgically cured;
(ii) an autoimmune disease which is diagnosed based upon the criteria used by the American Rheumatology Association;
(iii) a clinically significant neurologic disease which interferes with the affairs of daily living;
(iv) a clinically significant and poorly controlled endocrine disorder; or
(v) a birth defect.

**Class II:** All persons who own real property located within the Class Area.

**Class III:** All persons who presently reside or work in the Class Area and/or who own real property located within the Class Area.

### IV. DESCRIPTION OF THE ACTION

The original complaint in this action was filed on March 10, 1997. The operative Fourth Amended Complaint in this action was filed on March 28, 1998. In the Fourth Amended Complaint, plaintiffs allege that, beginning in approximately 1946, the defendants researched, developed, manufactured and tested various missile and rocket engines, as well as propellants, lasers and nuclear reactors, at the Rocketdyne Facilities.

Plaintiffs allege that the activities of the defendants at the Rocketdyne Facilities involved the use and release of certain chemicals, including, among others, trichloroethene (TCE) and hexavalent chromium, as well as the use, storage, generation and disposal of certain radioactive

**Page 229**

materials. Plaintiffs allege that they were personally exposed to and/or that their properties were contaminated by certain radioactive and/or chemical substances which were released from one or more of the Rocketdyne Facilities and which were dispersed by means of air currents, surface water runoff and/or subsurface groundwater.

Plaintiffs allege that their exposure to these substances has placed them at an increased risk of developing cancer or some other serious illness or disease. As a result, plaintiffs seek the implementation of a court-supervised program of medical monitoring designed to detect early signs of such illness or disease.

Plaintiffs also allege that the defendants' releases of these substances has resulted in the contamination of their property and has diminished the value of their property. Plaintiffs further allege that they have incurred certain necessary expenses in response to the alleged contamination of their property (including, for example, cleaning up their property) for which they seek reimbursement under federal law.

The defendants maintain that they have not released any hazardous non-radioactive substances or radioactive substances above regulatory limits or in any manner that could have harmed class members; that class members have not been exposed to any substances released from the Rocketdyne Facilities that place them at an increased risk of illness or disease; that plaintiffs' properties are not contaminated by any releases from the Rocketdyne Facilities; and that, consequently, plaintiffs are not entitled to recover damages for any harm caused to their properties. The defendants deny all allegations of liability and damage to class members and contest the merits of plaintiffs' claims.

## V. EFFECT OF CLASS DECERTIFICATION

Because the District Court has determined that none of the claims identified in Section II of this Notice shall continue to proceed on a class action basis, this action will be prosecuted for the benefit of the named plaintiffs only as to the seven categories of claims identified in Section II of this Notice and not for the general benefit of the individual members of Class I, Class II and/or Class III as defined in Section III of this Notice. As a result, the effect of the District Court's class decertification on your individual claims is as follows:

(1) if you wish to preserve your right to pursue claims in any of the seven categories identified in Section II of this Notice, you may do so only by filing an individual lawsuit on your own behalf;

(2) in any such lawsuit, you likely will be bound under the doctrines of *res judicata* and/or *collateral estoppel* by any previous decisions of the District Court which predated the District Court's October 5, 2000 Decertification Order; and

(3) in order to determine whether your interests would be served by proceeding with an individual lawsuit, you should consult an attorney as soon as possible.

## VI. APPLICATION OF STATUTES OF LIMITATIONS

Your right to pursue claims in any of the seven categories of claims identified in Section II of this Notice will be affected by the application of statutes of limitations. Statutes of limitations require that a lawsuit must be brought within a specified time after an injury or damage is discovered or should have been discovered. Statutes of limitations are set by law and vary in length according to the type of claim. The statutes of limitations applicable to the seven categories of claims identified in Section II of this Notice may have been suspended or tolled during the pendency of this case as a class action.

02262.001 - 73188

3

**Page 230**

Defendants contend that the statutes of limitations were not tolled. However, if any tolling occurred, the applicable statutes of limitations will start to run again and your right to file an individual lawsuit may be affected. Therefore, if you intend to file an individual lawsuit, it is imperative that you act promptly to do so in order to avoid the possibility of your individual claims being barred by the applicable statutes of limitations.

## VII. COMMUNICATIONS WITH CLASS COUNSEL

The District Court previously appointed A. Barry Cappello, Esq. and J. Paul Gignac, Esq. of Cappello & McCann LLP, as Lead Class Counsel, and Tina B. Nieves, Esq. and Hector G. Gancedo, Esq. of Gancedo & Nieves LLP, as Class Counsel in this action.

Communications with Class Counsel should be in writing and directed to:

J. Paul Gignac, Esq.
CAPPELLO & MCCANN LLP          Tina B. Nieves, Esq.
831 State Street          or          GANCEDO & NIEVES LLP
Santa Barbara, California 93101          119 E. Union Street, Suite G
                                        Pasadena, California 91103
(English only)
                                        (Si se habla espanol)

## VIII. POSTING A COPY OF THIS NOTICE

If you are a business entity, you are required to post a copy of this Notice in a conspicuous location (e.g. bulletin board) where it may be easily viewed by your employees.

## IX. ADDITIONAL COPIES OF THIS NOTICE

You may obtain additional copies of this Notice and/or the Class Notice issued on February 5, 1999 (including a map of the Class Area) by calling the following toll-free number:

1-800-700-1195

## X. ADDITIONAL INFORMATION

The matters identified and described in this Notice do not purport to be comprehensive and should not be considered as such. Therefore, if you desire further information, you may wish to review the pleadings and other records on file with the District Court. The documents publicly filed in this action are available for inspection and copying during regular business hours at the office of the Clerk of the District Court located at 312 N. Spring Street, Los Angeles, California 90012.

Please do not telephone the District Court or the Office of the Clerk for information regarding this action.

Dated: October 6, 2000

                                        Clerk of the United States
                                        District Court

**Page 231**

Lawrence O'Connor v. Boeing North American. Inc.

Case No.  CV 97-1554 ABC (RCx)

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF SANTA BARBARA

I am employed in the County of Santa Barbara, State of California. I am over the age of 18 and not a party to the within action; my business address is 831 State Street, Santa Barbara, California 93101.

On October 27, 2000, I served the foregoing document described as **NOTICE OF SUBMISSION OF AFFIDAVIT RE MAILING OF NOTICE OF CLASS CERTIFICATION** on the interested parties in this action

[X] by placing ☐ the original [X] a true copy thereof enclosed in a sealed envelope addressed as follows:

John A. Reding, Esq.
William W. Schofield, Esq.
Barry E. Endick, Esq.
PAUL, HASTINGS, JANOFSKY & WALKER LLP
345 California Street, Twenty-Ninth Floor
San Francisco, CA  94104-2635

[X] by California Overnight. I am readily familiar with the firm's practice of collection and processing correspondence on the same day with this courier service, for overnight delivery. The delivery fees are provided for in accordance with this firm's ordinary business practices.

[X] by placing ☐ the original [X] a true copy thereof enclosed in a sealed envelope addressed as follows:

Tina B. Nieves, Esq.
GANCEDO & NIEVES LLP
119 East Union Street
Suite G
Pasadena, CA  91103

[X] by U. S. Mail. I am readily familiar with the firm's practice of collection and processing correspondence on the same day with postage thereon fully prepaid at Santa Barbara, California, in the ordinary course of business.

[X] (*FEDERAL*) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed at Santa Barbara, California, on October 27, 2000

Alison Daniels

3

Notice of Submission of Affidavit re Mailing of Notice of Class Decertification

# EXHIBIT F

260

# Best Practices for Using Hedonic Property Value Models to Measure Willingness to Pay for Environmental Quality

Kelly C. Bishop[*], Nicolai V. Kuminoff[†], H. Spencer Banzhaf[‡], Kevin J. Boyle[§], Kathrine von Gravenitz[¶], Jaren C. Pope[‖], V. Kerry Smith[‖‖], and Christopher D. Timmins[**]

## Introduction

The hedonic property-value model is among the most direct illustrations of how private markets can reveal consumers' willingness to pay (WTP) for measures of environmental quality. There have been thousands of applications of the model since it was first developed in the 1970s and its use has accelerated with increases in data accessibility and advances in econometrics and computing power. The hedonic model's enduring popularity is easy to understand. It begins with an intuitive premise that is both economically plausible and empirically tractable. The model envisions buyers choosing properties based on housing attributes (e.g., indoor space, bedrooms, bathrooms) and on location-specific amenities (e.g., air quality, park proximity, education, flood risk). In the absence of market frictions, spatial variation in amenities can be expected to be capitalized into housing prices. When buyers face the resulting menu of price–attribute–amenity pairings in the housing market,

[*]Department of Economics, Arizona State University; e-mail: kelly.bishop@asu.edu.
[†]Department of Economics, Arizona State University and NBER; e-mail: kuminoff@asu.edu.
[‡]Department of Economics, Georgia State University and NBER; e-mail: hsbanzhaf@gsu.edu.
[§]Department of Agricultural and Applied Economics and Virginia Tech Program in Real Estate, Virginia Tech; e-mail: kjboyle@vt.edu.
[¶]ZEW—Leibniz Center for European Economic Research; e-mail: kathrine.vongraevenitz@zew.de.
[‖]Department of Economics, Brigham Young University; e-mail: jaren_pope@byu.edu.
[‖‖]Department of Economics, Arizona State University and NBER; e-mail: kerry.smith@cavecreekinstitute.com.
[**]Department of Economics, Duke University and NBER; e-mail: timmins@econ.duke.edu.

Bishop and Kuminoff share lead authorship.

We are grateful for helpful comments and suggestions from Noelwah Netusil and participants in the 6th World Congress of Environmental Economics (Gothenburg, Sweden, June 2018).

*Review of Environmental Economics and Policy*, volume 14, issue 2, Summer 2020, pp. 260–281
doi: 10.1093/reep/reaa001
© The Author(s) 2020. Published by Oxford University Press on behalf of the Association of Environmental and Resource Economists. All rights reserved. For permissions, please email: journals.permissions@oup.com
This article is published and distributed under the terms of the Oxford University Press, Standard Journals Publication Model (https://academic.oup.com/journals/pages/open_access/funder_policies/chorus/standard_publication_model)

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

**Page 234**

their purchase decisions can reveal their WTP for marginal changes in each of the amenities.[1]

In recent years, the standard approach to empirical hedonic research has evolved to incorporate insights from the "credibility revolution" in applied microeconometrics. This revolution has raised expectations about data quality and econometric transparency. Recent research has also improved our understanding of how parameters identified through quasi-experimental research designs relate to welfare measures (i.e., measures of WTP). Based on an examination and synthesis of the evidence in the literature, this article summarizes "best practices" for hedonic property-value modeling when the goal is to measure households' WTP for a change in an environmental amenity.[2] Most of the studies that helped to establish best practices in hedonic modeling used rich data on metropolitan housing markets in advanced economies. Data describing housing transactions, characteristics, and amenities are becoming increasingly available around the world, creating new opportunities to use hedonic models for policy analysis.[3] Although hedonic property-value models are used for many purposes, our focus here is on measures of welfare that can be used to inform public policy.

We argue that the starting point for these best practices is a research design that identifies a source of exogenous variation in an amenity that is observable by prospective buyers (e.g., air quality). Data on the sale prices and physical attributes of individual houses, together with location-specific measures for amenities, are then used to estimate a flexible housing-price function. Under ideal conditions, the derivative of this price function can then be interpreted as indicating the amenity's implicit price, which can then be used to calculate household marginal WTP (MWTP) for the amenity. In principle, the process of estimating MWTP is straightforward. In practice; however, several key modeling decisions must be made, including choosing measures of sale prices and amenities and choosing the econometric specification. We conclude that although the steps required to develop a "best practices" study may seem daunting, the effort is both worthwhile and important for developing measures of MWTP that can help to inform policy. Indeed, the modern hedonic property-value model has been refined through more than forty years of intense scrutiny to become one of the premier approaches to valuing changes in environmental amenities in academic research, litigation, and public policy (Palmquist and Smith 2002; United States Environmental Protection Agency 2010).

The remainder of the article is organized as follows. The next section summarizes the foundations of the hedonic property-value model. We then discuss best practices for using hedonic property-value models to measure the WTP for environmental quality. In particular, we discuss best practices for defining the market, collecting data, choosing an econometric

---

[1]Nearly 100 years ago, in some of the first work on hedonic modeling, Waugh (1929, p. 100) proposed a remarkably similar "statistical analysis." He suggested that ". . .instead of compiling the reported likes and dislikes of individuals, this type of statistical analysis attempts to estimate these preferences for the whole group of dealers or consumers in the market area by measuring the market price differentials due to a number of quality factors."

[2]This article is part of a symposium on best practices for revealed-preference approaches to nonmarket valuation. The other articles are Bateman and Kling (2020), which introduces the symposium; Evans and Taylor (2020), which examines revealed-preference methods for estimating the value of reduced mortality risk; and Lupi, Phaneuf, and von Haefen (2020), which discusses best practices for recreation-demand analysis.

[3]See the online supplementary material for a summary of data availability and sources of information on house sales, sample applications of the hedonic property-value model for twenty-four countries, and additional discussion of modeling issues that may arise in rural areas and less-than-ideal data settings.

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

262                                                                                          K. C. Bishop et al.

specification for the hedonic-price function, mitigating omitted-variable bias, and using MWTP measures to inform policy. It is important to note that MWTP measures can also be combined with additional information about households to estimate amenity-demand curves and assess the WTP for nonmarginal changes in environmental amenities; however, we leave the task of defining best practices in hedonic demand estimation to future research. We conclude with a summary and a discussion of priorities for future research in this area.

## Foundations of the Hedonic Property Value Model

The hedonic framework has a long history in economics (e.g., Waugh 1929; Court 1939; Griliches 1961; Lancaster 1971). Rosen's (1974) seminal paper established the hedonic framework as an equilibrium model for understanding what differentiated-product prices could reveal about consumer demand for product attributes.[4] In the housing context, the hedonic model incorporates information about the supply of housing, including developers' decisions about new home construction and factors that influence resales of existing homes, as well as household preferences and income. After buyers and sellers negotiate transactions, market equilibrium occurs when no households can increase utility by moving. This equilibrium concept implies a relationship between house prices and house characteristics that reveals each buyer's MWTP for each characteristic, assuming that buyers are fully informed, freely mobile, and able to purchase continuous levels of each characteristic.[5] In the remainder of this section, we present key features of the hedonic property-value model.[6]

### The Housing Price–Amenity Function Reveals Each Buyer's MWTP for the Amenity

Figure 1a graphs housing prices as a function of the measure of one of the local amenities (e.g., air quality), holding physical characteristics and other amenities constant. Figure 1b illustrates the process through which this price function reveals buyers' MWTP for the amenity.[7] There are two buyers' bid curves, each of which indicates the maximum amount the respective buyer is willing to pay (as a function of the amenity level and holding other influences on their choices constant). Purchases occur where the bid curves are tangent to the price function. That is, buyer 2 purchases a house with amenity level $A_2$ at a price of $P_2$ and buyer 1 purchases a less expensive house ($P_1$) in a lower-amenity area ($A_1$). These two coordinate sets—($P_1$, $A_1$) and ($P_2$, $A_2$)—are the points at which each buyer's MWTP for a small change in

---

[4]It offers a direct analog to the Cowles Commission's approach to connecting structural and reduced-form models (Morgan 1990).

[5]These assumptions have subtle implications. For example, "free mobility" does not imply that it must be costless to move. Buyers' choices will still reveal their MWTP at the time of their purchase decisions if they were able to choose continuous levels of each characteristic, while facing a fixed cost of moving. However, the assumptions may be violated if some prospective buyers are excluded from renting or buying properties because of discrimination.

[6]For a technical discussion, see Palmquist (2005), Kuminoff, Smith and Timmins (2013), Freeman, Herriges and Kling (2014), Phaneuf and Requate (2017), or Taylor (2017).

[7]In the Rosen (1974) model, each point on the price function is the tangency between a particular seller's offer curve and a particular buyer's bid curve. These are the points at which market trades occur. To focus on demand, we do not show sellers' offer curves in figure 1b.

Best Practices for Using Hedonic Property Value Models                263



Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

**Figure 1**   Using the hedonic-price function to infer buyers' MWTP for an amenity.
*Notes*: (a): The hedonic housing price–amenity function. (b): The buyers' purchase decisions. (c): The implicit-price function reveals buyers' MWTP. (d): The implicit-price function and MWTP change over time.

the amenity (the bid curve's slope) equals the implicit price that each buyer must pay to obtain that small change (the price function's slope).

Figure 1c illustrates this same result in a different way. The algebraic forms used for the hedonic-price function (illustrated in figure 1a) and the buyer bid curves (in figure 1b) imply algebraic forms for the implicit-price function for the amenity and the buyer demand curves in figure 1c (i.e., the derivatives of the hedonic-price function and bid curves). Figure 1c shows that the implicit-price function for the amenity intersects the buyers' demand curves at their chosen amenity levels. Thus, one can estimate each buyer's MWTP for the amenity in three steps: (a) estimate the hedonic-price function using observed sales data, (b) estimate the implicit-price function by partially differentiating the price function with respect to the amenity of interest, and then (c) interpret the resulting implicit-price values paid by each buyer as estimates of the buyer's MWTP.

## More Information Is Needed to Estimate Each Buyer's Demand for the Amenity

Figure 1c also illustrates that knowing buyers' MWTP is not sufficient to estimate their demand curves. Just as prices in other consumer markets are equal to MWTP at a point on the demand curve, the implicit-price function for the amenity reveals only a marginal value, not the entire demand curve. In other words, home purchases reveal information about demand for the amenity only at the points where the demand curves for the amenity intersect the implicit-price function. It is important to note that any number of flatter or steeper demand specifications could be drawn through the point $(P_1^A, A_1)$. Thus, additional

K. C. Bishop et al.

information about buyers would be needed to infer their demand for the amenity from the implicit-price function or, equivalently, to predict their WTP for nonmarginal changes in amenity levels. Researchers have developed several strategies for providing this additional information, which we will return to later.

### The Housing Price–Amenity Function and MWTP May Change Over Time

Thus far, we have described how the hedonic-price function reveals each buyer's MWTP for the amenity at a point in time. Over time, buyers' MWTP may change and this may be reflected as a change in the implicit-price function for the amenity. Factors that may cause buyers' MWTP to change include policies that increase worker productivity, induce migration, provide new information about the amenity, or change amenity levels (e.g., stricter regulations on air pollution). Figure 1d shows the market-clearing implicit-price functions for an amenity that changes between an initial year S and a subsequent year T. The year-S implicit-price function identifies MWTP for the initial set of buyers in year S, while the year-T implicit-price function identifies MWTP for a different set of buyers in year T.[8] As we will discuss later, keeping track of temporal changes in implicit amenity prices is important for estimating MWTP for amenities.

With this background on the foundations of the hedonic property-value model, we turn next to best practices for using the hedonic model to estimate the MWTP for environmental amenities. The first step is to define the market.

## Best Practices for Defining the Market

The conceptual logic of the hedonic model implies that the market should be defined so that it satisfies the "law of one price function." This principle means that identical houses will sell for the same price throughout that market. The precise spatial and temporal boundaries that satisfy this condition may vary across space and over time as information, institutions, and moving costs change. One common practice is to define the market as a single metropolitan area over a few years (e.g., Pope 2008b; Abbott and Klaiber 2013). An alternative is to pool data over larger areas and longer periods and to model the hedonic-price function as evolving over space and time (e.g., Kuminoff and Pope 2014; Walls et al. 2017).

In principle, moving costs could lead to violations of the law of one price function. However, for households that move *within* metropolitan areas, moving costs are unlikely to vary substantially. This is because the physical and financial costs of moving (e.g., realtor fees, truck rentals) do not tend to change across within-metropolitan-area destination locations and the psychological costs of moving are more limited because within-metropolitan-area moves typically allow households to maintain ties to family, friends, and neighborhoods. Thus, the law of one price function can be maintained between locations within a metropolitan area through arbitrage (i.e., buyers will not purchase a given house if they can purchase an equivalent one in the same metropolitan area for substantially less). In contrast, the law of one

[8]We assume that buyer 1 has left the market, and thus we do not include a year-T demand function in the graph. Buyers who can be observed multiple times, such as buyer 2, may have experienced changes in their personal circumstances that change their demand (e.g., wealth shocks).

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

price function is less likely to be satisfied if the market is defined to include several metropolitan areas and/or several years.

## Challenges with Larger Geographic Areas and Longer Study Periods

One challenge with defining the market to include several metropolitan areas is that a move *between* metropolitan areas may impose large moving costs. In addition, workers who move between metropolitan areas may be forced to change jobs. Variations in local tax policies and the cost of living (aside from housing) across metropolitan areas also increase moving costs. Because the hedonic property-value model ignores labor-market considerations and heterogeneous moving costs, a focus on multiple metropolitan areas limits the model's ability to translate hedonic prices into MWTP measures. Thus, one option for avoiding this problem is to use data on commuting patterns to determine the circumstances in which moving to a different metropolitan area would likely imply moving to a new job.

Pooling data over a long period such as a decade or more introduces similar types of problems. For example, housing-price functions may change during boom–bust cycles because macroeconomic factors change the amounts homebuyers are willing to pay for amenities. Homebuyers' MWTP for amenities may also evolve with changes in policy. For instance, a policy that improves air quality may reduce homebuyers' MWTP for further air quality improvements (i.e., by moving them down their demand function for air quality). These types of changes are inconsistent with the principles underlying the law of one price function, thus limiting the model's ability to translate hedonic prices into MWTP measures.

## Using Econometric Flexibility to Maintain the Law of One Price Function

In principle, some sources of spatial–temporal variation in the shape of hedonic-price functions can be addressed through flexibility in the econometric specification (e.g., McMillen and Thorsnes 2003). For example, when pooling data over multiple metropolitan areas and years, researchers can add interactions between time dummies, geographic dummies, and price function parameters to allow price functions to differ across space and time. Overall, narrowing the assumed market will tend to improve the internal validity of the hedonic property-value model by increasing the likelihood that the law of one price function holds.[9]

# Best Practices for Data Collection

Once the market has been defined, the next step is to collect data. The gold standard for data collection in hedonic property value studies is to obtain a random sample (or the universe) of housing-transaction prices and characteristics for the relevant study area.[10] In recent years,

[9]Narrowing the assumed market may reduce external validity (i.e., the ability to apply the results to other markets) and the ability to examine geographically coarse amenities, such as climate features. If the goal is to understand how amenities affect the choice of a metropolitan area, then residential sorting models provide an approach for incorporating job opportunities and moving costs (Kuminoff, Smith, and Timmins 2013).

[10]We acknowledge the potential for selection bias when focusing only on houses that sell. Gatzlaff and Haurin (1998) propose a correction procedure that uses information on the non-price characteristics of houses that do not sell.

K. C. Bishop et al.

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

data on housing-transaction prices, characteristics, and amenities have become increasingly available for large portions of Australia, Japan, South Korea, and the United States. In addition, a few countries, such as Denmark and Sweden, have granted researchers access to administrative records containing rich socioeconomic panel data on buyers and sellers. In other countries, such as Canada and Portugal, it is still difficult to obtain microdata on transactions. The online supplementary material provides a country-by-country summary of what we could determine about data availability, data sources, and sample applications for Australia, Austria, Belgium, Canada, Chile, China, Denmark, Finland, France, Germany, Hungary, Ireland, Italy, Japan, Netherlands, Norway, Poland, Portugal, South Korea, Spain, Sweden, Switzerland, the United Kingdom, and the United States. While this set of countries is far from comprehensive, it provides a starting point for researchers looking for housing data or sample applications. The online supplementary material also includes a discussion of additional challenges that may arise in less than ideal data settings, including regulation of prices, sparse transactions, and lack of transaction prices.

Hedonic property-value studies that meet the gold standard for data collection often focus exclusively on single-family houses. In most parts of the United States, for example, housing transactions are a matter of public record and are usually filed with county tax-assessment boards.[11] This access allows researchers to work with data that approximate the universe of single-family housing sales in specific time periods. In the remainder of this section, we discuss best practices for preparing the data and assigning amenity levels to houses, and the challenges with using data other than single-family house transactions.

## Preparing the Data

It is reasonable to expect that publicly available data on housing sales, which are often collected for other reasons, will include some data entry errors as well as some sales that did not occur through a competitive bidding process. Identifying and excluding these cases reduces the potential for measurement error. For example, it is common practice to exclude transactions in which the buyer and seller share the same last name and thus have a higher probability of being related. Similarly, it is common practice to drop foreclosure sales and purchases by real-estate investment firms, because there is a higher probability that the property has characteristics or quality issues not documented in transactions data. Finally, it is common to remove outliers that clearly indicate data entry errors (e.g., a house with 1,800 bedrooms or 3 square feet). Many researchers address such outliers by dropping a small fraction of sales that have the highest and lowest values for each characteristic. Because there is no commonly accepted threshold for outliers, it is important to document these types of decisions and assess their impact on the study's findings.

## Assigning Amenity Levels to Houses

The hedonic model's logic requires the researcher to characterize how buyers perceive the amenity levels at each residential location. This requires developing an objective measure of spatial variation in the amenity that can be matched to individual houses. This task can be

---

[11]"Cleaned" data that had been previously filed with county boards can be purchased from CoreLogic, ATTOM Data Solutions, and other vendors.

complicated by the often "patchy" nature of amenity data. For example, air quality monitoring stations generate data on pollution levels, but houses may be located in "gaps" between monitoring stations. This means that researchers must use spatial interpolation, air-dispersion models, or predictions from satellites to assign pollution levels to houses. Similarly, proximity to recreation sites such as beaches, lakes, and parks may be measured by geographical distance, driving distance, total travel time, or the share of land devoted to that recreation use within some geographic area around a house. Thus, researchers must decide which measure best reflects the landscape characteristics that matter to homebuyers.

Another issue is whether homebuyers' beliefs about the amenity coincide with objective measures and, if not, to consider alternative ways of modeling buyer beliefs. The broader, nonmarket-valuation literature suggests that subjective beliefs about environmental quality (and nonenvironmental goods) are not always consistent with objective measures (Boyd et al. 2015). Thus, it is important to document the information channels that may influence buyers' beliefs and assess the sensitivity of estimates of MWTP to the measures of the amenity under consideration. For example, Davis (2004) shows that the measurement of cancer risk associated with a cluster of leukemia cases is robust to several different assumptions about how homebuyers formed their beliefs about the evolving level of risk. In contrast, Pope (2008a) finds that a new law requiring real-estate agents to disclose information about airport noise caused housing prices to adjust around an international airport, suggesting that the disclosure rule changed prospective buyers' beliefs about the spatial extent of noise. Assuming that the information disclosure improved buyers' knowledge about noise levels near the airport, sales after the post-disclosure period would be expected to provide more accurate estimates of MWTP to lower airport noise.

Because housing is a durable asset, households' purchase decisions may also reflect their expectations about the evolution of local-amenity levels in the future. When buying a house in the current period, for example, a forward-looking household would assess both the current and anticipated future flows of amenities when considering the current purchase price. Ignoring such forward-looking behavior can result in underestimating or overestimating MWTP. Bishop and Murphy (2019) show how to convert hedonic-price function estimates into households' MWTP when buyers are forward-looking over changing amenity levels.

## Challenges with Using Data Other Than Single-Family House Transactions

Data on the sales prices and characteristics of single-family house transactions are not always available. As an alternative, researchers sometimes use data on predicted prices, rental prices, and sales of bare land, as well as spatially aggregated summary measures such as means or medians. These alternative types of housing data sets present additional challenges for interpreting price function parameters as measures of MWTP.

### Predicted prices

Census data sets often include a self-reported property "value," which is generated from survey questions that ask occupants how much they think their properties would sell for. Predicted prices may also come from property assessors and other companies (e.g., Zillow).

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

**Page 241**

K. C. Bishop et al.

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

Actual transaction prices are always preferable to predicted prices. The problem with predicted prices is that they include measurement error that is correlated with buyer demographics, housing characteristics, and neighborhood amenities (Banzhaf and Farooque 2013).[12] This correlation may lead to bias in the price function's parameter estimates.

### Rental prices

In principle, housing rents may be used instead of or in conjunction with sales prices.[13] However, rental rates may be more complicated to work with than data on single-family transactions due to ambiguity about key rental-contract features, such as which party pays for utilities and maintenance. The short-term nature of rental contracts may also weaken the incentive for renters to become fully informed about local amenities prior to entering the market. On the other hand, rentals may better reflect current amenity flows. In addition, the use of rental-rate data may be particularly useful for deriving unbiased measures of average MWTP for amenities in neighborhoods where rates of owner occupation are low.

### Sales of vacant land

Estimating a hedonic model of vacant land sales is consistent with the idea that the price function maps how prices vary with land characteristics. However, important institutional factors, such as zoning, prior easements, and access to public water supplies, affect how land may be used. If these factors cannot be observed, they may bias estimates of price function parameters.

### Spatially aggregated data

Individual records of transaction prices are preferable to spatially aggregated measures, such as mean or median prices within Census tracts, zip codes, or counties, because theory does not provide guidance about how to move from aggregate prices to aggregate measures of MWTP. Specifically, regressing mean prices on mean amenity levels may yield an unbiased estimate of the hedonic-price function, but it will not yield an unbiased estimate of the implicit-price function (i.e., the derivative), which is necessary to derive MWTP for the amenity.[14] Moreover, median prices do not necessarily equal the price level at the medians of the attribute levels, which means that hedonic-price regressions that use medians may be biased from the outset. Thus, using summary statistics such as means and medians as if they were transaction-level prices can bias estimates of MWTP.

Apart from problems of interpretation, median prices have been found to introduce measurement error that can bias price function parameters. For example, in a study of Superfund cleanups of hazardous-waste sites in the United States, Gamper-Rabindran and Timmins (2013) find that focusing on the median house within a neighborhood produces lower

---

[12]The problem may be especially pronounced when prices are predicted using an algorithm (e.g., Zillow's zestimate). In this case, a hedonic regression may simply produce a reconstruction of the algorithm.

[13]This can be done by converting sales prices into annualized user costs of housing using standard formulas in the literature (Poterba 1984; Himmelberg, Mayer, and Sinai 2005).

[14]The derivative of the price function evaluated at the mean amenity level does not equal the mean of the derivatives.

estimates of MWTP than when individual house records are used. This is because hazardous-waste sites tend to be located near the lowest-price houses within a neighborhood, and thus the benefits of cleanups are mainly capitalized into housing prices at the lowest quantiles of the housing-price distribution. Problems with median prices are not limited to studies of hazardous-waste sites. For example, using data for Los Angeles, Banzhaf and Farooque (2013) compare several commonly used measures for house prices and find that among all of these measures, medians have the weakest correlation with local public goods, income, and other indices. While the reasons for this finding are not fully understood, the finding does suggest that results of hedonic models that are based on median prices should be interpreted with caution.

## Best Practices for Selecting an Econometric Specification

Next, we briefly consider best practices for choosing an econometric specification for the hedonic-price function. First, the price function should be assumed to be nonlinear. This is consistent with Ekeland, Heckman, and Nesheim (2004), who prove that transactions between heterogeneous buyers and sellers yield an equilibrium price function that is "generically" nonlinear.[15] In addition, Cropper, Deck, and McConnell (1988) show that relatively flexible nonlinear specifications for the price function provide more accurate estimates of average MWTP for housing characteristics than simpler linear and log-linear specifications when omitted-variable bias is not a concern. Moreover, Kuminoff, Parmeter, and Pope (2010) find that flexible nonlinear models continue to outperform linear models even when spatial dummy variables are used to reduce omitted-variable bias.[16] Another reason for using nonlinear functional forms is that they allow the market equilibrium to reflect complementarities between amenities. For example, the implicit price of proximity to a public park may vary with the levels of crime, noise, and air quality (Albouy, Christensen, and Sarmiento-Barbieri 2018).

Second, as a rule, applications should both rely on robust standard errors of the hedonic-price function parameters and cluster at a spatial–temporal scale of variation in the amenity of interest. This practice is motivated by the common belief that it is prudent to assume that the errors may exhibit heteroskedasticity and autocorrelation (spatial and temporal). Some applications have also experimented with spatial-weighting models. While such models may enhance small-sample efficiency, their standard errors may be biased.[17] Thus, most applications avoid making such assumptions.

---

[15] In other words, extraordinarily strong assumptions about the shapes of utility functions and housing-production functions would be required to generate linear hedonic price functions as equilibrium outcomes.

[16] Semiparametric and nonparametric methods can provide additional flexibility when estimating hedonic price functions and their gradients, although there is currently no evidence on the implications of the bias-variance trade-off implicit in such approaches (e.g., Bajari and Benkard 2005; Parmeter, Henderson, and Kumbhakar 2007; McMillen and Redfearn 2010; Bishop and Timmins 2018).

[17] Such bias can arise because spatial-weighting models require the researcher to specify the true parametric form of the error-correlation structure (e.g., a distance-decay weighting matrix). Incorrect specification of this structure can lead to biased standard errors.

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

270                                                                                    K. C. Bishop et al.

## Best Practices for Mitigating Omitted-Variable Bias

Theory and empirical evidence suggest that environmental amenities will be spatially corre-lated due to natural features of geography (e.g., mountains, oceans), environmental feedback effects (e.g., urban heat islands), and voting on local public goods (Kuminoff, Smith and Timmins 2013). This potential for spatial correlation has fueled widespread concern about omitted-variable bias. This concern has two components. First, it seems unlikely that researchers would be able to include every amenity that matters to buyers. Second, unob-served amenities are likely to be correlated with the amenity of interest, thus causing bias. For example, if wealthy and well-educated homebuyers move to areas with better air quality and then vote to increase public school funding, estimates of MWTP for air quality will be biased upward if school quality is omitted from the model. The potential for this type of behavior by homeowners means that, for the resulting estimates to be credible, the research design must isolate exogenous variation in the amenity of interest. In the remainder of this section, we discuss several research designs that have been implemented to address this requirement, including difference-in-differences (DIDs), matching estimators, spatial dummy variables, and boundary-discontinuity designs. Although it is important to assure econometric cred-ibility by mitigating omitted-variable problems, efforts to assure econometric credibility can sometimes hinder the ability to interpret the estimates as measures of MWTP. We discuss this trade-off for each of these research designs.

### DID Research Designs

Numerous studies have interpreted environmental-policy changes and natural experiments as quasi-random "treatments" to amenities to identify how these shocks lead to changes in housing prices. This process is generally known as "capitalization," although its meaning has evolved over time. Econometric models of the capitalization process generally fit within a DID framework, which is distinguished by the way in which it analyzes how changes in amenities cause housing prices to change.[18] Most DID studies assume a stationary price function.

**Advantages of the DID framework**

The main advantage of the DID framework is that it mitigates omitted-variable bias. The seminal study by Chay and Greenstone (2005) illustrates the DID framework by showing how nonattainment of the U.S. Environmental Protection Agency's standards for maximum-allowable particulate-matter concentrations at the county level can be used as an instrumen-tal variable to mitigate omitted-variable bias that could arise when analyzing how spatially varying reductions in particulate matter between 1970 and 1980 affected the (county level)

---

[18]This group of models includes fixed-effect and first-difference estimators that use data on repeated sales of the same houses. It also includes estimators that pool repeated cross-sections of transactions from the same geographic market. Sometimes these models utilize instrumental variables and/or regression-discontinuity designs.

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

**Page 244**

median, self-reported property value.[19] In addition to addressing concerns about omitted amenities, the study's use of instrumental variables addresses potential bias from measurement errors in air pollution levels. Chay and Greenstone's quasi-experimental approach has since been applied to microlevel housing-transaction data to estimate the capitalization effects of changes in a wide range of amenities, including cancer risk (Davis 2004), fracking externalities (Muehlenbachs, Spiller, and Timmins 2015), air pollution reductions (Bento, Freedman, and Lang 2015), sand dune construction (Dundas 2017), and open space (Lang 2018).

### Challenges of using the DID framework

The main challenge for interpreting results from the DID approach is that price functions may change over time (see figure 1d). Indeed, theory suggests that environmental policies and other events that create quasi-experimental changes in amenity levels may also cause price functions to adjust. This possibility means that the prices of houses in both the "control" group and the "treated" group are affected by the policy.[20] However, the key issue is not whether price functions change, but whether the changes are small enough to ignore. Such changes are important because large changes in price functions that are not specifically modeled may undermine the estimation of MWTP.

To illustrate this challenge, Kuminoff and Pope (2014) show that when a price function shifts over time, a standard DID model that ignores this shift will result in biased estimates of the slope of the price function and thus biased estimates of MWTP. This bias arises because the standard DID model combines information from two hedonic-price functions (i.e., that describe markets before and after the amenity "treatment") into a single estimate of MWTP. In an application of the DID framework to public school quality, Kuminoff and Pope (2014) show that housing-price functions in five U.S. metropolitan areas changed during the 2003–2007 boom period, which coincided with the implementation of the "No Child Left Behind Act."[21] They show that incorrectly assuming a time-constant price function would have produced a 75 percent downward bias in estimates of MWTP for school quality. This outcome contrasts with a 94 percent upward bias in cross-sectional models that ignore the omitted-variable problem. In addition, Klaiber and Smith (2013) find that cross-sectional models that ignore the omitted-variable problem may or may not outperform DID research designs if the latter are compromised by price function changes.

### Strategies for interpreting DID estimates

One strategy for addressing the challenge of interpreting DID estimates of MWTP is to collect data on random variation in the size of the change in the amenity of interest, which, as noted by Kuminoff and Pope (2014), can be used to identify MWTP in the posttreatment period. A second strategy is to model the change in the price function; this is done by generalizing the

---

[19]Although this study is notable for its innovative approach of using instrumental variables to mitigate omitted-variable bias, concerns have been raised regarding its use of median prices and predicted prices, and the assumption that the law of one price function holds across the United States from 1970 to 1980.

[20]This result is distinct from any changes that may occur due to macroeconomic forces and other background events during the study period.

[21]This policy targeted school quality and sought to improve information conveyed to parents.

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

K. C. Bishop et al.

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

DID model by interacting price function parameters with time-period dummies, which allows the shape of the price function to change over time. Kuminoff, Parmeter and Pope (2010) show that this strategy, which has been implemented in recent empirical studies (e.g., von Graevenitz 2018), improves the accuracy of estimates of MWTP in both the pretreatment and posttreatment periods. Banzhaf (2018) further shows that this approach can identify a lower bound on a general-equilibrium welfare measure under much weaker econometric assumptions (e.g., allowing for moving costs). A third strategy is to model how omitted variables change over time and to assume that buyers have rational expectations for that process (Bajari et al. 2012).

## Matching Estimators

Another option for mitigating omitted-variable bias is to use matching estimators, which match houses that received an amenity treatment with a set of untreated control houses (e.g., Abbott and Klaiber 2013; Walls et al. 2017). The goal is to find control houses that are as similar as possible to each treated house in terms of observed and unobserved physical and locational characteristics. This process uses observed property characteristics (e.g., observed amenities) to control for unobserved amenities. The challenge here is to determine the precise criteria for selecting matches between treated and untreated houses. In addition, although the econometric properties of matching estimators have been thoroughly analyzed in the program-evaluation literature, their accuracy in estimating MWTP for amenities in housing markets has yet to be evaluated.

## Use of Spatial Dummy Variables

Transactions data on house purchases often offer large sample sizes, which make it possible to include a set of spatial dummy variables for local neighborhoods, such as school districts, zip codes, or Census tracts, to absorb the price effect of omitted amenities. Kuminoff, Parmeter, and Pope (2010) show that including such spatial dummy variables can mitigate omitted-variable bias and improve the accuracy of estimates of MWTP. The choice of geographic scale for these dummy variables presents a bias-variance trade-off: defining neighborhoods to be smaller reduces bias by better controlling for omitted amenities but increases variance by relying on less within-neighborhood variation in the amenity of interest. GIS maps showing how the amenity varies within and across candidate neighborhoods can help to provide information about this bias-variance trade-off (e.g., von Graevenitz 2018), which can be used to define neighborhoods appropriately.[22]

## Boundary-Discontinuity Research Designs

Boundary-discontinuity designs can be used to improve the spatial dummy-variable approach by relying on variation in amenity levels within a neighborhood. The idea is to identify an amenity's marginal implicit price based on sharp changes in amenity levels that occur along administrative or geographic boundaries. By limiting the estimation sample to houses

---

[22]Abbott and Klaiber (2011) show how to use the Hausman and Taylor (1981) estimator to judge the importance of this tradeoff.

that are located within close proximity to boundaries (e.g., within a quarter mile) and using dummy variables for neighborhoods that surround each boundary (which absorbs all of the omitted amenities that are common to both sides of the boundary), this strategy assumes that a significant difference in the amenity of interest is most likely to lead to a price differential. Applications of this approach have included school-attendance zone boundaries (Black 1999), flood-zone boundaries (Pope 2008b), and public water-service-area boundaries (Muehlenbachs, Spiller, and Timmins 2015).

While the boundary-discontinuity design is consistent with the hedonic model's conceptual foundation, it faces at least two challenges. First, bias can arise if different types of households choose to live on opposite sides of a boundary. For instance, if wealthier households tend to locate on the "high quality" side of a school-zone boundary, and that side of the boundary also tends to spend more property-tax revenue on neighborhood parks, the estimate of MWTP for school quality will be biased if parks are not included in the model. Bayer, Ferreira, and McMillan (2007) address this challenge by controlling for differences in the socioeconomic status of households on opposite sides of boundaries. The second challenge is that the resulting measures of MWTP for school quality may have limited ability to inform policies aimed at the broader housing market. Indeed, although it is common to assume that boundary neighborhoods are representative of the broader population, we are not aware of any empirical studies that evaluate this assumption.

## Best Practices for using MWTP Estimates to Inform Policy

A research design that uses exogenous variation in the amenity of interest to estimate a credible measure of MWTP can help to inform policy. However, before using MWTP estimates for policy analysis, it is important to first assess their robustness to modeling choices. For some policy analyses, it may also be useful to assess how MWTP estimates vary across demographic groups and to combine MWTP estimates with additional information to assess the WTP for nonmarginal changes in amenities. This section discusses best practices for assessing robustness, heterogeneity, and the WTP for nonmarginal changes in amenities.

### Assessing Robustness

Every hedonic property-value study relies on modeling choices that affect welfare implications. We have focused here on the choice of the amenity variable, the source of variation in the amenity, the decisions made about sample composition (including removing observations that are likely coding errors or outliers), and the parametric assumptions that stem from the specification chosen for the price function. It is important to report the robustness of welfare conclusions to these and other modeling choices to alleviate concerns that the results may be driven by arbitrary assumptions or outlier observations. Dundas (2017, figure 5) provides an informative graphical example of robustness within a targeted sensitivity analysis.

### Assessing Heterogeneity in MWTP Estimates

If it is possible to match housing-transaction records to administrative data on households, then the heterogeneity in MWTP estimates can be linked to buyers' demographic

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

K. C. Bishop et al.

characteristics (e.g., race, income, education, children), to analyze how MWTP varies within and between policy-relevant demographic groups. In the United States, this has been done by combining publicly available Home Mortgage Disclosure Act data that describe basic demographic characteristics of buyers who finance their purchases through federally insured mortgages with data that describe housing transactions (e.g., Bishop and Timmins 2018). In some European countries, researchers have linked property transactions with even more detailed government records on household demographics to explore how MWTP varies across different demographic groups (von Graevenitz 2018).

## Assessing WTP for Nonmarginal Changes in the Amenity

As discussed earlier, a buyer's single observed house purchase reveals only one point on the buyer's amenity-demand curve. This means that the full amenity-demand function, which is needed to measure WTP for a policy that is expected to produce a nonmarginal change in the amenity, cannot be derived for each household.[23] The literature has presented a variety of econometric strategies to provide additional information for estimating amenity-demand functions. These strategies include imposing restrictions on: the parametric form of utility (e.g., Bajari and Benkard 2005); the scope of preference heterogeneity (e.g., Ekeland, Heckman, and Nesheim 2004; Bishop and Timmins 2019); the stability of preference heterogeneity across cities (Bartik 1987; Zabel and Kiel 2000); the stability of household preferences over time (Bishop and Timmins 2018; Banzhaf 2020); and migration patterns (Bartik 1987; Zhang, Boyle, and Kuminoff 2015). Several of these studies provide proof-of-concept applications. However, there is no consensus in the empirical literature about which is the best practices approach for amenity-demand function estimation.

Instead of estimating amenity-demand functions, some studies use MWTP estimates to construct "back-of-the-envelope" approximations of the WTP for policies that are expected to produce nonmarginal changes in amenities. The most common approach is to multiply MWTP by the change in the amenity. For this calculation to yield a valid measure of WTP, demand for the amenity must be perfectly elastic. The likelihood that this assumption is valid and thus that the calculation provides a reasonable approximation of WTP decreases with the size of the change in the amenity. When the change in the amenity is believed to be too large to assume perfectly elastic demand curves, an alternative approach is to establish bounds on WTP following the logic of Varian (1982). To illustrate this approach, we return to figure 1d. In period T, household 2 is observed to pay an implicit price of $P_3^A$ to consume $A_3$ units of the amenity. In period S, this household pays an implicit price of $P_4^A$ to consume $A_4$ units. If, for example, we had only observed the period-T choice, the rectangle defined by $P_3^A \times (A_4 - A_3)$ would provide an upper bound for the WTP to increase the amenity from $A_3$ to $A_4$. In this case, the lower bound would be zero. If instead we had only observed the period-S choice, the rectangle defined by $P_4^A \times (A_4 - A_3)$ would provide a lower bound for the WTP to avoid decreasing the amenity level from $A_4$ to $A_3$. In this case, the upper bound would be infinity.

---

[23]Rosen (1974) proposed estimating the demand function by regressing MWTP estimates on the corresponding quantities consumed and consumer characteristics such as demographics. Unfortunately, this estimation strategy has an endogeneity problem (see Bartik [1987] and Epple [1987]) because unobserved tastes simultaneously determine both a buyer's MWTP for the amenity (at the point of consumption) and the quantity chosen.

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

When the household is observed at two or more points on the hedonic-price function (e.g., because the household is observed purchasing different houses in different years), the upper and lower bounds on the WTP can be made tighter (Varian 1982). Moreover, with additional functional-form restrictions, the demand curve can be calculated without econometric estimation. Indeed, Bajari and Benkard (2005) and Bishop and Timmins (2018) show that if we assume that the demand curve is linear, then two points are sufficient to identify the demand curve and no statistical estimation is needed. One can simply connect the two dots between $(P_3^A, A_3)$ and $(P_4^A, A_4)$. By extension, three points are sufficient to identify a quadratic demand curve, and so forth. Furthermore, Banzhaf (2020) shows that with two points, the connect-the-dots approach provides a second-order approximation to consumer welfare. In addition, even if one cannot follow households over time, a panel of houses allows us to identify this approximation with additional structure or, alternatively, to bound it. Bishop and Timmins (2018) present this connect-the-dots approach for air quality in the Bay Area of California and find considerable heterogeneity in WTP for amenities that may be useful for informing policy.

## Conclusions and a Research Agenda

The choice of where to live may be the decision that has the greatest impact on a household's consumption of environmental amenities. It is natural to expect that analysis of housing markets can provide information about the WTP for changes in amenities. The hedonic property-value model provides an economically plausible and empirically tractable way to obtain this information. This article has summarized how recent advances in applied theory and econometrics have improved the model's credibility and policy relevance. Although we have discussed many challenges of following best practices for developing and implementing hedonic property value models, we urge researchers and policymakers not to allow these challenges to deter them from using the model. The literature has simply generated more insights about the "dos" and "don'ts" of hedonic modeling than what has been observed for other economic frameworks that are used to analyze policy. Indeed, the importance of the hedonic model is highlighted by the fact that it continues to be used extensively in the real world to inform both public and private decisions.[24] The bottom line is that hedonic property-value models that follow the "best practices" we have discussed in this article can provide credible estimates of what households are willing to pay for environmental amenities. We conclude with a discussion of some priorities for future research in this area.

### Expand the Use of Administrative Records

Increased access to government administrative records is important for improving our understanding of buyers' revealed preferences for local amenities. First, enhanced information about buyers, including their demographic characteristics, employment status, income levels,

---

[24]Triplett (1990) reported the first use of hedonic methods in a government price index in 1968 for new one-family houses sold. More recently, Triplett (2007) summarized the use of hedonic methods in developing price indexes and other measures for the national accounts. In the private sector, there are many areas where hedonic pricing is used in a proprietary fashion, most prominently in real estate by companies such as Zillow.

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

276                                                                                          K. C. Bishop et al.

and wealth, can enable researchers to analyze how hedonic estimates of MWTP for amenities vary with these factors (e.g., von Graevenitz 2018). Second, the information contained in administrative records may be helpful for estimating the demand curves for an amenity. For example, administrative records could assist in isolating the households who "fit" various assumptions used to estimate demand curves.[25] Similarly, the administrative data sets used by Voorheis (2017) and Bishop, Ketcham, and Kuminoff (2018) to track the evolution of individuals' health and wealth could be matched to housing transactions to yield new insights about how changes in health and wealth affect the demand for specific amenities.

## Focus on External Validation of the Estimated MWTP Function

Another research opportunity that would advance the empirical literature would be to determine which of the existing approaches to demand estimation (e.g., restricting the parametric form of utility versus restricting the stability of household preferences over time) is most suitable for policy analysis by testing the external validity of the assumptions used to move from point estimates of MWTP to a demand function. For example, Galiani, Murphy, and Pantano (2015) test the modeling assumptions in a discrete-choice model by developing testable, out-of-sample predictions about how changes in housing prices affect households' choices to change their neighborhoods. In principle, this approach could be adapted to identify testable predictions for how changes in local amenities would induce households to move.

## Adapt the Marginal Value of Public Funds Concept to Hedonic Models

Recently, public economists have argued that the concept of a marginal value of public funds (MVPF) presented in Hendren (2015) offers an opportunity for economists ". . . to harness the fruits of the 'credibility revolution' for the public finance goal of welfare analysis" (Finkelstein 2018, p. 1). In the environmental context, the MVPF is defined as the WTP for a marginal change in an amenity relative to the net incremental cost of providing that change through a policy. The MVPF metric differs from a simple benefit–cost ratio because it incorporates the impact on the government budget of behavioral responses to the policy. For example, a policy that reduces air pollution may also reduce federal healthcare expenditures or raise property-tax revenues (by increasing property values). Adapting the MVPF concept to the hedonic property-value model has the potential to make MWTP estimates more useful for evaluating competing environmental policies. The challenge for future research would be to estimate how behavioral responses affect taxpayers (i.e., the policy elasticities) and then combine this information with hedonic estimates of MWTP and data on policy implementation costs. If this was done for multiple policies, the resulting MVPF measures could be used to rank polices according to their return on investment and determine the most efficient way to allocate a marginal increase in environment-related government expenditures. The

---

[25]For instance, consider household 2 in figure 1d, which is observed in both period S and period T under different implicit price schedules; in principle, one should be able to literally "connect the dots" and identify this household's demand curve, as long as the household's income and preferences remain constant (Bishop and Timmins 2018).

**Page 250**

hedonic-equilibrium framework in Banzhaf (2019, 2020) could be used as a starting point for further research on the relationship between MWTP and MVPF.

### Investigate Heterogeneity in Beliefs

Finally, there is evidence that consumers' beliefs about product attributes are often heterogenous, with some consumers being misinformed at the time of purchase even when it comes to high-stakes financial decisions such as choosing a college major (Wiswall and Zafar 2015), choosing a health insurance plan (Handel and Kolstad 2015), or developing a strategy to save money for retirement (Bernheim, Fradkin, and Popov 2015). The same is true for expensive durable goods such as cars (Busse et al. 2015), refrigerators (Houde 2017), and water heaters (Allcott and Sweeney 2017). When consumers are not fully informed about product characteristics, their choices may not accurately reveal their preferences. Some of these studies (e.g., Wiswall and Zafar 2015; Handel and Kolstad 2015) address this problem by incorporating survey data on consumers' beliefs. Adapting these approaches to measure homebuyers' beliefs about amenity levels could be used to improve the accuracy of hedonic property-value model estimates of welfare measures when buyers are not fully informed.

Evidence on the degree to which buyers are informed about the characteristics of their houses and neighborhoods is mixed. Myers (2019) finds that homebuyers are well-informed about how future energy costs vary with a house's heating technology (gas versus oil). In contrast, Pope (2008a, 2008b) finds that some homebuyers did not pay attention to publicly available information about flood risk and airport noise prior to mandatory disclosure laws that required them to sign forms stating their awareness of the amenities. Bakkensen and Barrage (2017) provide more direct evidence by surveying homebuyers about beliefs concerning flood risk. Their findings suggest that residents of more flood-prone areas are more likely to underestimate flood risk. Because the current evidence suggests that the accuracy of buyers' beliefs varies from context to context, future research on housing purchases should focus on adapting the methods that have been developed to incorporate heterogenous beliefs. Ma (2018) shows how the learning process can be modeled and finds that accounting for learning has a large impact on estimates of the WTP for brownfield remediation. Adapting Ma's approach to hedonic property-value models could both improve our understanding of households' beliefs and help to refine welfare measures. A useful first step would be to combine house transactions data with surveys that reveal buyers' beliefs about the spatial dispersion of amenities at a point in time. The next step would be to study how households' beliefs evolve over time as they process new information.

## References

Abbott, Joshua K., and H. Allen Klaiber. 2011. An embarrassment of riches: Confronting omitted variable bias and multiscale capitalization in hedonic price models. *Review of Economics and Statistics* 93 (4): 1331–42.

———. 2013. The value of water as an urban club good: A matching approach to community-provided lakes. *Journal of Environmental Economics and Management* 65: 208–24.

Albouy, David, Peter Christensen, and Ignacio Sarmiento-Barbieri. 2018. Unlocking amenities: estimating public-good complementarity. NBER Working Paper #25107.

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

278                                                                                          K. C. Bishop et al.

Allcott, Hunt, and Richard L. Sweeney. 2017. The role of sales agents in information disclosure: Evidence from a field experiment. *Management Science* 63 (1): 21–39.

Bajari, Patrick, and C. Lanier Benkard. 2005. Demand estimation with heterogeneous consumers and unobserved product characteristics: A hedonic approach. *Journal of Political Economy* 113 (6): 1239–76.

Bajari, Patrick, Jane Cooley Fruehwirth, Kyoo Il Kim, and Christopher Timmins. 2012. A rational expectations approach to hedonic price regressions with time-varying unobserved product attributes: The price of pollution. *American Economic Review* 102 (5): 1898–1926.

Bakkensen, Laura, and Lint Barrage. 2017. Flood risk belief heterogeneity and coastal home price dynamics: Going under water? NBER Working Paper #23854.

Banzhaf, H. Spencer. 2019. Difference-in-differences hedonics. Working Paper.

———. 2020. Panel data hedonics: Rosen's first stage as a 'sufficient statistic'. International Economic Review 61 (2): 973–1000.

Banzhaf, H. Spencer, and Omar Farooque. 2013. Interjurisdictional housing prices and spatial amenities: Which measures of housing prices reflect local public goods? *Journal of Regional Science and Urban Economics* 43: 635–48.

Bartik, Timothy J. 1987. The estimation of demand parameters in hedonic price models. *Journal of Political Economy* 95 (1): 81–8.

Bateman, Ian J., and Catherine L. Kling. 2020. Revealed preference methods for nonmarket valuation: An introduction to best practices. *Review of Environmental Economics and Policy* 10.1093/reep/reaa009.

Bayer, Patrick, Fernando Ferreira, and Robert McMillan. 2007. A unified framework for measuring preferences for schools and neighborhoods. *Journal of Political Economy* 115 (4): 588–638.

Bento, Antonio, Matthew Freedman, and Corey Lang. 2015. Who benefits from environmental regulation? Evidence from the clean air act amendments. *Review of Economics and Statistics* 97 (3): 610–22.

Bernheim, B. Douglas, Andrey Fradkin, and Igor Popov. 2015. The welfare economics of default options in 401(k) plans. *American Economic Review* 105 (9): 2798–837.

Bishop, Kelly, and Alvin Murphy. 2019. Incorporating dynamic behavior into the hedonic model. *Review of Economics and Statistics* 101 (1): 134–45.

Bishop, Kelly, and Christopher Timmins. 2018. Using panel data to easily estimate hedonic demand functions. *Journal of the Association of Environmental and Resource Economists* 5 (3): 517–43.

———. 2019. Estimating the marginal willingness to pay function without instrumental variables. *Journal of Urban Economics* 109 (2019): 66–83.

Bishop, Kelly, Jonathan Ketcham, and Nicolai Kuminoff. 2018. Hazed and confused: the effect of air pollution on dementia. NBER Working Paper #24970.

Black, Sandra E. 1999. Do better schools matter? Parental valuation of elementary education. *Quarterly Journal of Economics* 114 (2): 577–99.

Boyd, James, Paul Ringold, Alan Krupnick, Robert J. Johnston, Matthew A. Weber, and Kim Hall. 2015. Ecosystem services indicators: Improving the linkage between biophysical and economic analyses. RFF Discussion Paper #15-40.

Busse, Meghan R., Devin G. Pope, Jaren C. Pope, and Jorge Silva-Risso. 2015. The psychological effect of weather on car purchases. *Quarterly Journal of Economics* 130 (1): 371–414.

Chay, Kenneth Y., and Michael Greenstone. 2005. Does air quality matter? Evidence from the housing market. *Journal of Political Economy* 113 (2): 376–424.

Cropper, Maureen L., Leyland B. Deck, and Kenneth E. McConnell. 1988. On the choice of functional form for hedonic price functions. *Review of Economics and Statistics* 70 (4), 668–75.

Court, Andrew T. 1939. Hedonic price indexes with automotive examples. In *The dynamics of automobile demand, 99–117.* New York: General Motors Corporation.

Davis, Lucas. 2004. The effect of health risk on housing values: Evidence from a cancer cluster. *American Economic Review* 94 (5): 1693–704.

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

**Page 252**

Dundas, Steve. 2017. Benefits and ancillary costs of natural infrastructure: Evidence from the New Jersey coast. *Journal of Environmental Economics and Management* 85: 62–80.

Ekeland, Ivar, James J. Heckman, and Lars Nesheim. 2004. Identification and estimation of hedonic models. *Journal of Political Economy* 112 (1): S60–S109.

Epple, Dennis. 1987. Hedonic prices and implicit markets: Estimating demand and supply functions for differentiated products. *Journal of Political Economy* 95 (1): 59–80.

Evans, Mary F., and Laura O. Taylor. 2020. Using revealed preference methods to estimate the value of reduced mortality risk: Best practice recommendations for the hedonic wage model. *Review of Environmental Economics and Policy* 10.1093/reep/reaa006.

Finkelstein, Amy. 2018. *Welfare Analysis Meets Causal Inference: A Suggested Interpretation of Hendren (2016, 2017)*. Unpublished lecture notes, March.

Freeman, A. Myrick, III, Joseph A. Herriges, and Catherine L. Kling. 2014. *The measurement of environmental and resource values: Theory and methods*. Washington, DC: RFF Press.

Galiani Sebastian, Alvin Murphy, and Juan Pantano. 2015. Estimating neighborhood choice models: Lessons from a housing assistance experiment. *American Economic Review* 105 (11):3385–415.

Gamper-Rabindran, Shanti, and Christopher Timmins. 2013. Does cleanup of hazardous waste sites raise housing values: Evidence of spatially localized benefits. *Journal of Environmental Economics and Management* 65: 345–60.

Gatzlaff, Dean H., and Donald R. Haurin. 1998. Sample selection and biases in local house value indices. *Journal of Urban Economics* 43 (2): 199–222.

Griliches, Zvi. 1961. Hedonic price indexes for automobiles: an econometric analysis of quality change. In *The Price statistics of the federal government: review, appraisal, and recommendations, ed. Price Statistics Review Committee, 173–96*. New York: NBER.

Handel, Benjamin R., and Jonathan T. Kolstad. 2015. Health insurance for humans: Information frictions, plan choice, and consumer welfare. *American Economic Review* 105 (8): 2449–500.

Hausman, J. A., and W. E., Taylor, 1981. Panel data and unobservable individual effects. *Econometrica* 49, 1377–98.

Hendren, Nathaniel. 2015. The policy elasticity. NBER Working Paper #19177.

Himmelberg, C., C. Mayer, and T. Sinai. 2005. Assessing high house prices: Bubbles, fundamentals, and misperceptions. *Journal of Economic Perspectives* 19 (4): 67–92.

Houde, Sébastien. 2017. How consumers respond to product certification and the value of energy information. *Rand Journal of Economics* 49 (2): 453–77.

Klaiber, H. Allen, and V. Kerry Smith. 2013. Quasi-experiments, hedonic models, and estimating tradeoffs for local amenities. *Land Economics* 89: 413–31.

Kuminoff, Nicolai V., Christopher F. Parmeter, and Jaren C. Pope. 2010. Which hedonic models can we trust to recover the marginal willingness to pay for environmental amenities? *Journal of Environmental Economics and Management* 60 (3), 145–60.

Kuminoff, Nicolai V., and Jaren C. Pope. 2014. Do capitalization effects measure the willingness to pay for public goods? *International Economic Review* 55 (4), 1227–50.

Kuminoff, Nicolai V., V. Kerry Smith, and Christopher Timmins. 2013. The new economics of equilibrium sorting and policy evaluation using housing markets. *Journal of Economic Literature* 51 (4): 1007–62.

Lancaster, Kelvin. 1971. *Consumer demand: A new approach.* New York, NY: Columbia University Press.

Lang, Corey. 2018. Assessing the efficiency of open space provision. *Journal of Public Economics* 158: 12–24.

Lupi, Frank, Daniel J. Phaneuf, and Roger H. von Haefen. 2020. Best practices for implementing recreation demand models. *Review of Environmental Economics and Policy* 10.1093/reep/reaa007.

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

280                                                                              K. C. Bishop et al.

Ma, Lala. 2018. Learning in a hedonic framework: Valuing brownfield remediation. *International Economic Review* 60 (3): 1355–87.

McMillen, Daniel P., and Christian L. Redfearn. 2010. Estimation and hypothesis testing for non-parametric hedonic house price functions. *Journal of Regional Science* 50 (3): 712–33.

McMillen, Daniel P., and Paul Thorsnes. 2003. The aroma of Tacoma: Time-varying average derivatives and the effect of a superfund site on house prices. *Journal of Business and Economic Statistics* 21 (2): 237–46.

Morgan, Mary S. 1990. *The history of econometric ideas*. New York: Cambridge University Press.

Muehlenbachs, Lucija, Elisheba Spiller, and Christopher Timmins. 2015. The housing market impacts of shale gas development. *American Economic Review* 105 (12): 3633–59.

Myers, Erica. 2019. Are home buyers myopic? Evidence from capitalization of energy costs. *American Economic Journal: Economic Policy* 11 (2): 165–88.

Palmquist, Raymond B. 2005. Property value models. In *Handbook of environmental economics*, vol. 2, eds. Gören-Mäler Gören-Mäler and Jeffery Vincent, 763–819. Amsterdam: North Holland Press.

Palmquist, Raymond B., and V. Kerry Smith. 2002. The use of hedonic property value techniques for policy and litigation. *The International Yearbook of Environmental and Resource Economics* 2003, 115–64.

Parmeter, Christopher F., Daniel J. Henderson, and Subal C. Kumbhakar. 2007. Non-parametric estimation of a hedonic price function. *Journal of Applied Econometrics* 22 (3), 695–9.

Phaneuf, Daniel J., and Till Requate. 2017. *A course in environmental economics: Theory, policy and practice*. Cambridge, UK: Cambridge University Press.

Pope, Jaren C. 2008a. Buyer information and the hedonic: The impact of a seller disclosure on the implicit price for airport noise. *Journal of Urban Economics* 63: 498–516.

———. 2008b. Do seller disclosures affect property values? Buyer information and the hedonic model. *Land Economics* 84 (4): 551–72.

Poterba, James M. 1984. Tax subsidies to owner-occupied housing: An asset-market approach. *Quarterly Journal of Economics* 4: 729–52.

Rosen, Sherwin. 1974. Hedonic prices and implicit markets: Product differentiation in pure competition. *Journal of Political Economy* 82 (1): 34–55.

Taylor, Laura. 2017. The hedonic method. In *A primer on nonmarket valuation*, eds. Champ Champ, Kevin Boyle, and Tomas C. Brown, 331–93. Netherlands: Springer Netherlands.

Triplett, Jack E. 1990. Hedonic methods in statistical agency environments: an intellectual biopsy. In *Fifty years of economic measurement*, vol. 54, eds. Berndt Berndt and Jack E. Triplett, 207–38. Chicago: University of Chicago Press for NBER, Studies in Income and Wealth.

———. 2007. Zvi Griliches's contributions to economic measurement. In *Hard to measure goods and services: Essays in honor of Zvi Griliches*, vol. 67, eds. Berndt Berndt and Charles R. Hulten, 365–97. Chicago: University of Chicago Press for NBER, Studies in Income and Wealth.

United States Environmental Protection Agency. 2010. *Guidelines for preparing economic analyses*. EPA-240-R-10-001.

Varian, Hal R. 1982. The nonparametric approach to demand analysis. *Econometrica* 50 (4): 945–73.

von Graevenitz, Kathrine. 2018. The amenity cost of traffic noise. *Journal of Environmental Economics and Management* 90: 1–22.

Voorheis, John. 2017. Air quality, human capital formation and the long-term effects of environmental inequality at birth. Working Paper.

Walls, Margaret, Todd Gerarden, Karen Palmer, and Xian Fang Bak. 2017. Is energy efficiency capitalized into home prices? Evidence from three U.S. cities. *Journal of Environmental Economics and Management* 82: 104–24.

Waugh, Frederick V. 1929. Quality as a determinant of vegetable prices: a statistical study of quality factors influencing vegetable prices in the Boston wholesale market. PhD thesis, Columbia University.

Wiswall, Matthew, and Basit Zafar. 2015. Determinants of college major choice:

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

**Page 254**

Identification using an information experiment. *Review of Economic Studies* 82 (2): 791–824.

Zabel, Jeffrey E., and Katherine A. Kiel. 2000. Estimating the demand for air quality in four US cities. *Land Economics* 76 (2): 174–94.

Zhang, Congwen, Kevin J. Boyle, and Nicolai V. Kuminoff. 2015. Partial identification of amenity demand functions. *Journal of Environmental Economics and Management* 71 (1), 180–97.

Downloaded from https://academic.oup.com/reep/article/14/2/260/5894759 by 81695661, OUP on 24 August 2020

© 2020 Association of Environmental and Resource Economists. Copyright of Review of Environmental Economics & Policy is the property of Oxford University Press / USA and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# EXHIBIT G

# Spatial Heterogeneity in Hedonic Price Effects for Lake Water Quality ⧉

**Kristen Swedberg** *Graduate Student, Department of Agricultural and Applied Economics, Virginia Polytechnic Institute and State University, Blacksburg; ORISE Fellow, Office of Water, U.S. Environmental Protection Agency, Washington, DC; swedkm@vt.edu*

**Diego S. Cardoso** *Assistant Professor, Department of Agricultural Economics, Purdue University, West Lafayette, Indiana; cardosod@purdue.edu*

**Adriana Castillo-Castillo** *Graduate Student, Department of Applied Economics, University of Minnesota, St. Paul; casti229@umn.edu*

**Saleh Mamun** *Postdoctoral Associate, Department of Applied Economics, University of Minnesota, St. Paul; Postdoctoral Associate, Natural Resources Research Institute, University of Minnesota, Duluth; salmamun@d.umn.edu*

**Kevin J. Boyle** *Professor, Department of Agricultural and Applied Economics, Virginia Polytechnic Institute and State University, Blacksburg; Willis Blackwood Director, Blackwood Department of Real Estate, Virginia Polytechnic Institute and State University, Blacksburg; kjboyle@vt.edu*

**Christoph Nolte** *Assistant Professor, Department of Earth and Environment, Boston University, Massachusetts; Affiliate Assistant Professor, Faculty of Computing and Data Sciences, Boston University, Massachusetts; chrnolte@bu.edu*

**Michael Papenfus** *Economist, Office of Research and Development, U.S. Environmental Protection Agency, Corvallis, Oregon; papenfus.michael@epa.gov*

**Stephen Polasky** *Regents Professor and Fesler-Lampert Professor of Ecological and Environmental Economics, Department of Applied Economics, University of Minnesota, St. Paul; Regents Professor, Department of Ecology, Evolution and Behavior, University of Minnesota, St. Paul; polasky@umn.edu*

**ABSTRACT** *This study uses Zillow's Transaction and Assessment Database to investigate variation in hedonic price effects of water clarity on single-family houses throughout the United States. We consider five spatial scales and estimate models using different sample selection criteria and model specifications. The results indicate considerable spatial heterogeneity within and across the four U.S. census regions. However, we also find heterogeneity resulting from different types of investigator decisions, including sample selection and modeling choices. Thus, it is necessary to use practical knowledge to consider the limits of market areas and to investigate the robustness of estimation results to investigator choices. (JEL Q51)*

*Land Economics* • February 2024 • 100 (1): 89–108
DOI:10.3368/le.100.1.102122-0086R
ISSN 0023-7639; E-ISSN 1543-8325
© 2024 by the Board of Regents of the University of Wisconsin System

## 1. Introduction

Lakes are enticing environmental features that provide myriad benefits, including recreational opportunities, aesthetic appeal, and ecosystem services. People who own properties near lakes are primary beneficiaries, and their enjoyment depends on the level of perceived lake water quality. To monetize potential water quality benefits to homeowners, economists frequently use hedonic property models that examine how lake water quality is capitalized in housing markets. Over time, these models have revealed price premiums for improved water clarity and reductions in nutrient levels and algal content (Gibbs et al. 2002; Walsh, Milon, and Scrogin 2011; Walsh and Milon 2016; Wolf and Klaiber 2017; Weng et al. 2020; Wolf and Kemp 2021).

The extant literature focuses on small areas, such as metropolitan statistical areas (MSAs) (Boyle, Poor, and Taylor 1999), counties (Walsh, Milon, and Scrogin 2011), or individual lakes (Weng et al. 2020) where

Downloaded from by guest on February 16, 2024. Copyright 2023

Supplementary materials are available online at: https://le.uwpress.org.

89

**Land Economics** *February 2024*

Downloaded from by guest on February 16, 2024. Copyright 2023

socioeconomic and ecological conditions that impact the implicit value of water quality may be fixed in each individual study. Although these studies provide strong evidence that people value lake water quality, a key limitation arises from the effects of fixed factors on implicit price estimates that cannot be identified. This limits the ability to draw insights across study areas or to unstudied areas where the fixed factors might vary. Thus, the spatial scope of the available literature limits the ability to assess the benefits of national policies to improve water quality that are often implemented at the state level.

Recent studies aim to broaden the geographic scope of lake hedonic studies, incorporating property sales from multiple states or regions into a single model. For example, Zhang, Phaneuf, and Schaeffer (2022) consider seven regional lake housing markets made up of two to eight states each. Swedberg et al. (2022) estimate models for six states in the Northeast and Upper Midwest at the state and substate levels. Mamun et al. (2023) and Moore et al. (2020) consider a larger spatial scale using a "nationwide housing market" comprising lakes from 43 and 32 states, respectively. These studies help policy makers understand the effects of lake water quality regionally and nationally.

Local land-use regulations at the community and county levels play a key role in lake water quality, and surrounding ecological conditions determine how well a lake can respond to upstream actions to reduce activities that degrade water quality. There are tensions between local actions and policies set at large geographic scales and hedonic modeling that may not be consistent with either of these to inform the costs and benefits of lake water quality degradation and improvements. Studies conducted at the local level demonstrate differences in implicit values for water quality, which are confirmed by the Guignet et al. (2022) meta-analysis that reports significant differences in elasticity estimates across broad regions of the country (see also Heberling, Guignet, and Papenfus 2022). Further, Zhang, Phaneuf, and Schaeffer (2022) and Swedberg et al. (2022) observe heterogeneity in value estimates at the regional and state levels. In a national housing market framework, Mamun

et al. (2023) observe spatial heterogeneity by state and ecoregion, whereas Moore et al. (2020) do not find evidence for heterogeneity at the state level. Given the small number of studies considering large spatial scales for hedonic models of lake water quality, we can see that this issue deserves further investigation. The open questions are whether housing markets defined on small spatial scales can be rescaled to support policy analyses at the state and national levels and if models at broad spatial scales account for important differences between lake ecosystems and the surrounding housing markets at smaller spatial scales.

A key reason many hedonic studies have examined limited spatial areas is limited property sale data and or environmental data. Because rich data across large spatial areas can be difficult or costly to obtain, researchers' spatial scale choices are often determined by cost-effective data availability. Further, while data scraping is an alternative, it can be time consuming and is limited by publicly available records and differences in reporting across states, which ultimately require a choice between geographic coverage and data richness. Hedonic studies for water quality also face the challenge of suitable and consistently measured water quality across states with different water quality standards and sampling priorities.

We exploit the broad spatial coverage of Zillow's Transaction and Assessment Database (ZTRAX) to investigate how different spatial scales of hedonic estimation affect water quality elasticity estimates for residential properties (i.e., single-family houses) (Zillow Group 2021). Models are estimated using data ranging from a local, substate scale to a single national model. Our primary goal is to evaluate spatial heterogeneity in hedonic price effects for lake water quality. Further, because such an investigation can be influenced/confounded by investigator analysis choices, such as measurement of the policy variable, inclusion/exclusion of model covariates, and functional form of the hedonic (e.g., Guignet et al. 2022; Heberling, Guignet, and Papenfus 2022), we also evaluate the sensitivity of hedonic estimates at different spatial scales to common investigator decisions.

**Page 259**

Downloaded from by guest on February 16, 2024. Copyright 2023

We estimate hedonic models at five different spatial scales and evaluate spatial heterogeneity defined by differences in water quality elasticity estimates across the four census regions and U.S. Environmental Protection Agency (EPA) ecoregions. We consider the most frequently available metric of water quality, Secchi depth, that relates to environmental quality changes due to nutrient loading to lakes and eutrophication. We divide elasticity estimates by four U.S. Census regions and compare the distributions for models estimated at each spatial scale. We systematically repeat model estimation for different sample selection criteria and modeling choices to assess the sensitivity of estimates to investigator choices. In doing so, we form the largest set of spatially explicit hedonic elasticity estimates for water quality present in the literature, which includes previously understudied areas of the country. These results in aggregate can advance future research around the underlying sources of spatial heterogeneity and the impact of methodological decisions in hedonic analysis.

Our results indicate considerable spatial heterogeneity in hedonic estimates with the largest, on average, in the Northeast and most variable estimates across the West. Elasticity estimates from lake-dense states in the Northeast and Upper Midwest are more stable than those in the South or West to investigator analysis decisions. Further, elasticity estimates in substate models are highly sensitive to investigator decisions in all regions. These results highlight the importance of accounting for spatial heterogeneity when evaluating capitalized benefits of lake water quality in housing markets; small-spatial-scale models may not reflect effects at larger spatial scales and vice versa. The effects of investigator choices highlight the importance of robustness checks.

## 2. Exploring Spatial Heterogeneity

We investigate spatial heterogeneity in hedonic price effects of lake water quality at the substate (county and urbanized areas), state, census divisions and regions, and national scales. In estimating a hedonic model,

researchers inherently define market boundaries by the geographic area(s) they choose to study. However, housing markets are a nebulous concept related to local property amenities, integrated labor markets, physical characteristics of the area, and geopolitical considerations, but rarely formally defined. Real estate multiple-listing areas traditionally were a practical guide (Michaels and Smith 1990; Michael, Boyle, and Bouchard 2000), but with the advent of online listing of properties and working from home options, the usefulness of this guidance has become less clear. From an economic perspective, one might define market boundaries where arbitrage leads to equal prices for equivalent properties at the margins (Phaneuf and Requate 2016). More commonly, when estimating hedonic models, researchers make tacit assumptions about market boundaries determined by data availability or simply a practical choice of policy reach.

Bishop et al. (2020) note that much of the focus of the broad hedonic literature is on large, data-rich metropolitan areas. County boundaries have also been used to define housing markets in hedonic studies (White and Leefers 2007; Phaneuf et al. 2008; Walsh and Milon 2016). Counties and MSAs might be loosely considered "markets." However, for lake water quality studies, these definitions may not work. For example, people in Boston looking for a second home on a lake may look over properties in Maine, New Hampshire, and Vermont. Given these challenges, we do not make the hard decision of what a real estate market is. Instead, we investigate hedonic estimation at differing spatial scales where significant differences may be indicative of different markets and lack of significance may indicate a common market, and such insights can inform future market analysis studies.

We ask if there are differences in outcomes of hedonic studies estimated at different spatial scales, which can be considered potential advantages or limitations in scaling hedonic model results to fit different policy goals. The five different spatial scales are shown in Figure 1: nation, region, division, state, and substate. Nation corresponds to the contiguous United States; region and division are U.S.

Downloaded from by guest on February 16, 2024. Copyright 2023

**Figure 1**
Market Boundary Definition by Spatial Scale



*Note:* The nation, region, division, and state boundaries are defined by a single census product. Substate boundaries are defined first by census urbanized areas then by census counties.

Census geographic delineations.[1] For the substate boundaries, we first use the 2010 census urbanized areas to divide sales within a state.[2]

---

[1] Census regions and divisions are grouping of states. There are four census regions that are subdivided by two or more census divisions; see https://www.census.gov/programs-surveys/economic-census/guidance-geographies/levels.html.

[2] According to the 2010 census, urbanized areas are collections of census tracts or blocks with a "densely settled core" of more than 50,000 people along with adjacent nonresidential or low-density areas that link other high-density areas to the core; see https://www.census.gov/programs-surveys/

Then sales in the remaining area are divided by county boundaries.

Spatial heterogeneity can be investigated with the hedonic model by including interaction terms between water quality and dummy variables for the spatial boundary of interest. Moore et al. (2020) and Mamun et al. (2023) consider national models with state interaction terms. In addition to administrative boundaries, other characteristics may also be important to consider when determining spatial boundaries. Surrounding ecological conditions might include a unifying set of amenities that draw people to consider buying properties near lakes. To test heterogeneity related to environmental amenities, Mamun et al. (2023) specify a model using ecoregion interaction terms with water quality. To capture potential effects of geopolitical and environmental characteristics, we include both state and ecoregion interaction terms with water quality.

## 3. Controlling for Investigator Decisions

When comparing estimated effects across studies, investigator decisions can confound comparisons, making it difficult to identify which differences result from spatial heterogeneity versus investigator modeling decisions. Variation in investigator choices arises because the measure of water quality considered by buyers and sellers is unknown. Similarly, the appropriate mix of other property characteristics and the best functional form are not known or may simply be driven by data availability. These types of investigator decisions result in different hedonic specifications and can result in different samples due to data availability.

A crucial first step is determining how property sales are matched to water quality measures. Homebuyers may observe the lake at different points prior to the sale (e.g., over the year before the sale, at the time of purchase decision), and their bid function may be influenced by different summary measures.

---

geography/guidance/geo-areas/urban-rural/2010-urban-rural.html.

Downloaded from by guest on February 16, 2024. Copyright 2023

**Table 1**
Sample Selection Criteria and Modeling Choices

| Category | Criterion Type | Subcategory | Baseline Choice | Alternative |
|---|---|---|---|---|
| Water quality | Measurement | Water quality statistic | Summer mean | Summer minimum, summer maximum |
| Water quality | Measurement | Water quality timing | Closest within ± 5 years | Year of sale, year prior to sale, closest within previous 5 years |
| Water quality | Minimum threshold | Coefficient of variation for Secchi depth | 0.25 | N/A |
| Property | Measurement | Property attributes | Lot size; building size; building age | None, bedrooms and bathrooms[a] |
| Property | Maximum threshold | Lakefront property buffer | 150 m | 300 m |
| Property | Minimum threshold | Sales in buffer | 1 | 0, 25 |
| Property | Maximum threshold | Property distance to lake | 1,000 m | 2,500 m |
| *Modeling Choices* | | | | |
| Functional form | | Sale price, water quality | Log, log | Log, linear |
| Functional form | | Covariates[b] | Log | N/A |
| Fixed effects | | Spatial unit | Census tract | Block group |
| Fixed effects | | Interactions | Spatial unit × sale year | Spatial unit + sale year |

[a] All combinations of property attributes are considered (e.g., individual attributes, two at a time, three at a time, and all attributes). Bedrooms and bathrooms are always included together.
[b] In addition to the selected property attributes, model covariates include distance to lake, lake area, median income of block group, and slope and elevation of the parcel.

Some may make their decisions based on typical water quality conditions (e.g., average water quality over the summer months), whereas others may be most concerned about the poorest water quality conditions during the summer months. Note that with nutrient loading and eutrophication, which is the environmental quality investigated here, water quality declines over the summer months. Frequently, studies match a sale to a water quality sample in the year of sale or the year before sale (Walsh, Milon, and Scrogin 2011; Weng et al. 2020). However, given limited water quality and sale data and slow changes in water quality year to year, researchers may match sales in a specific window of time. Moore et al. (2020) match sales from 2010–2013 to 2007 water quality data, and Mamun et al. (2023) use a plus or minus five-year window from the sale date to match water quality observations. Michael, Boyle, and Bouchard (2000) test different measures of Secchi depth (water clarity) averaged over different time scales and find an effect on implicit price estimates but do not draw a conclusion about which measures are most appropriate. Wolf and Kemp (2021) find similar impacts when comparing minimum and mean Secchi depth and satellite water clarity measures.

The investigator decisions considered in the current analysis include the measurement of the water quality variable, choice of property characteristics, specification of the hedonic, and treatment of fixed effects in the hedonic (Table 1). Water quality measures considered include the summer mean, minimum, and maximum Secchi measurements of water clarity for the summer months. In addition, the Secchi measurement could be the closest in time within five years of the property sale, year of sale, year prior to sale, or closest in the time from the previous five years. We define year of sale as the most recent summer, meaning that for a year of sales data, sales in January through May will correspond to the previous year of water quality data, and sales in June through December will correspond to the same year of water quality data. The selection of the water quality measure can have a direct impact on the hedonic coefficient estimate for water quality, where the timing of the measurement more likely affects the sample size. The current or previous year measures likely result in the smallest sample while the

**Page 262**

**Land Economics** *February 2024*

Downloaded from by guest on February 16, 2024. Copyright 2023

± five-year window likely maximizes the sample size.

Lake water quality changes slowly year to year, and spatial variation in water quality is necessary to identify effects of water quality on property values.[3] Therefore, we set a minimum coefficient of variation (CV) for lake water quality in the sample to improve the likelihood that the coefficient estimates are meaningful. If water quality is similar across lakes in specific regions, it would be challenging to identify significant water quality effects. The minimum CV is based on estimation results from previous hedonic studies. CVs for Secchi range from as low as 0.21 for a substate area in New Hampshire (Gibbs et al. 2002) and as high as 0.90 at the national level (Moore et al. 2020). While 0.21 is the minimum CV, the next three smallest CVs are 0.31, 0.32, and 0.34 from Michael, Boyle, and Bouchard (2000), Gibbs et al. (2002), and Swedberg et al. (2022), respectively. We choose 0.25 as the minimum CV as it falls in between 0.21 and 0.31. No alternative CV is considered in the analyses.

In selecting property attributes, researchers must balance the potential for omitted variable bias against limiting the number of sales. Excluding variables with many missing observations could result in an omitted bias if the omitted variables are correlated with the policy variable (water quality here). On the other hand, including the variables can compromise sample representativeness if observations are not missing at random. Although some researchers may include all property attributes available in the data as controls, this approach often becomes untenable across broad spatial areas, because comparable property attributes are not consistently available across all regions of the country. Therefore, researchers use discretion in selecting the most commonly available property attributes that relate to the size and quality of the property. For example,

Moore et al. (2020) choose bedrooms, bathrooms, house size, and building age. In contrast Zhang, Phaneuf, and Schaeffer (2022) do not use any property attributes, instead using census block group fixed effects to control for neighborhood and structural attributes of homes that remain fixed through time. We estimate models with lot size, building size, and building age for the baseline.

The maximum distance from the lake determines which properties are included in the sample, and controlling distance can influence the functional form of the hedonic. Although much of the early literature focused on lakefront properties (e.g., Michael, Boyle, and Bouchard 1996), more recent studies consider broader distances from lakes (1,000–3,000 m) (Walsh, Milon, and Scrogin 2011; Walsh and Milon 2016; Wolf and Klaiber 2017). However, recent studies consistently find that the largest effects of water quality occur for lakefront properties, and the effects decay rapidly with distance from lakes. Wolf and Klaiber (2017) find insignificant estimates beyond 250 m, while Walsh et al. (2017) find a significant effect up to 1,000 m from the waterfront. Three lake proximity characteristics are considered to address lake proximity. The first is an indicator of whether the property has lake frontage, and two buffer distances were considered: within 150 m and within 300 m of the lake. The second is distance to the lake measured in meters with two alternatives: properties within 1,000 m and 2,500 m of the lake. The third is the minimum number of sales within the lakefront buffers with the levels of 0, 1, and 25.

In the selection of minimum sample sizes, we consider prior lake hedonic studies conducted at the substate level. While studies in the late 1990s and early 2000s had sample sizes of only a few hundred and sometimes less than a hundred (Boyle, Poor, and Taylor 1999; Michael, Boyle, and Bouchard 2000; Poor et al. 2001; Boyle and Taylor 2001), recent studies, due to the advent of large spatial scale data on property sales and environmental characteristics, may include 10,000–50,000 observations (Walsh, Milon, and Scrogin 2011; Liu, Opaluch, and Uchida 2017; Weng et al. 2020). The smallest sample size we

---

[3]Weng et al. (2020) simulate summertime Secchi and chlorophyll a from 2008 to 2013 for Lake Mendota, Wisconsin, and find more larger seasonal variation in water quality than inter-annual variation. Kung, Guignet, and Walsh (2017) perform a scoping analysis and found that variation in *Enterococcus* levels is more spatial than temporal.

Case 2:21-cv-03946-HDV-SK    Document 133-1    Filed 02/23/24    Page 265 of 396
Page ID #:7151

Downloaded from by guest on February 16, 2024. Copyright 2023

found in the recent literature comprises 1,020 observations in two counties in Wisconsin (Wolf and Kemp 2021). Thus, we set the minimum sample size for our study at 1,000 transactions, and no alternative is considered.

In addition, we consider alternative functional specifications for the hedonic and fixed effects. The alternative log-linear functional form provides a complementary interpretation of the effects, as the estimated parameter measures the average percent response in prices given a linear change (instead of a percent change) in the water quality metric. Although we vary the functional form of water quality, all continuous covariates enter the model in log form, as in Walsh and Milon (2016). Spatial fixed effects control for time-invariant characteristics in the delimited spatial unit and time interval that are not specifically addressed by property characteristics in the hedonic and that may be correlated with the water quality measurement. Two spatial controls are included census tract and block group. Interacting spatial fixed effects with sale year fixed effects allows the characteristics in the spatial unit to vary year to year to control for omitted variables that may change over time but can further restrict the identifying variation for the model. For the baseline, we consider a log-log functional form with census tract × year fixed effects.

For parsimony in reporting, our primary results feature elasticity estimates for models specified using the investigator decisions indicated in baseline choice column (Table 1). We then run models for each combination of baseline and alternative sample selection and modeling choices. We present summaries of these results in a sensitivity analysis.

## 4. Data

To provide an extensive analysis of lake properties throughout the contiguous United States, we draw on a wide range of several large-scale data repositories. We discuss environmental and geospatial data sources and present property sale data. The base data that we work with contains water quality

measurements from over 6,000 lakes across all 48 of the contiguous United States (Table 2).

### Environmental and Geospatial Data

Water quality is measured by Secchi, an indicator of water clarity.[4] Secchi is commonly used in hedonic studies for lake water quality as clearer water has repeatedly been shown to be valued by homeowners (Michael, Boyle, and Bouchard 2000; Calderón-Arrieta, Caudill, and Mixon 2019; Wolf and Kemp 2021; Guignet et al. 2022; Mamun et al. 2023) and is one of the most available measures throughout the United States. We consider water quality samples from June through September, when most people enjoy lake activities, and use average, minimum, and maximum values for each lake for each year.

We access water quality data from two large-scale data repositories: LAGOS-NE and EPA's water quality portal (WQP).[5] LAGOS-NE provides extensive water quality data in LAGOS-NE LIMNO, inspected for data quality for 17 northeastern and midwestern states, made accessible through the LAGOS-NE R package (Soranno et al. 2015, 2017; Soranno and Cheruvelil 2017a, 2017b; Stachelek, Oliver, and Masrour 2019). WQP provides water quality data for additional states, with sampling locations given as geographic coordinates that are spatially joined to the National Hydrography Database (NHD).[6] When combining the two datasets, LAGOS-NE values supersede WQP when the data sources overlap, as the LAGOS platform provides additional quality controls not documented in the WQP data assemblage.

Throughout the contiguous United States, there are 20 level II ecoregions that capture

---

[4] We also ran the models using chlorophyll a (chl-a); those results are presented in Appendix C. Both Secchi measurements of clarity and chlorophyll a are measures of the effects of nutrient loading on water quality.

[5] LAGOS data products are available at https://lagoslakes.org/the-lagos-database. More information about the WQP is available at https://www.epa.gov/waterdata/water-quality-data-download.

[6] The USGS National Hydrography Dataset is available at https://www.usgs.gov/national-hydrography/national-hydrography-dataset.

Downloaded from by guest on February 16, 2024. Copyright 2023

**Figure 2**
Spatial Distribution of Ecoregions, Lakes, and Property Sales



*Note:* The top map depicts 20 EPA ecoregions with labels referencing level II ecoregion codes. The middle map depicts NHD lakes larger than 4 ha in dark gray with state boundaries. The bottom map depicts the number of sales within 2,500 m of lakes that have Secchi depth samples within five years of sale for individual counties and urbanized areas.

a combination of ecosystem characteristics specific to a given location (Figure 2, top). These regions divide the country into areas that share similar environmental resources to help develop resource management goals, including water quality standards (U.S. EPA 2021). We overlay these data with political boundaries from TIGER/Line for U.S. counties, urbanized areas, and states, which are then aggregated into respective census regions and divisions.[7] Lake shapefiles for all

U.S. lakes greater than 4 ha are obtained from LAGOS-NE GIS (Soranno and Cheruvelil 2017b) (Figure 2, middle).[8]

Lake density and properties of lakes, such as size and hydrological characteristics, vary across the United States. Lakes are highly concentrated in the Northeast, Upper Midwest,

---

[7] TIGER/Line Shapefiles are available yearly for all census boundary definitions at https://www.census.gov/

geographies/mapping-files/time-series/geo/tiger-line-file. html.

[8] LAGOS sets 4 ha as the threshold for lakes in its data owing to errors in digitization of lakes between 1 and 4 ha (Soranno et al. 2015). This threshold corresponds with the minimum size threshold for lakes in Minnesota; see https://www.dnr.state.mn.us/faq/mnfacts/water.html.

Downloaded from by guest on February 16, 2024. Copyright 2023

**Table 2**
Descriptive Statistics by Region

| | Northeast | Midwest | South | West |
|---|---|---|---|---|
| *Full Sample* | | | | |
| Sale price (2020 $) | 450,060 | 344,023 | 356,748 | 642,456 |
| | (426,614) | (250,921) | (282,424) | (377,061) |
| Secchi depth (m) | 2.49 | 1.67 | 1.49 | 2.93 |
| | (1.61) | (1.22) | (0.87) | (1.85) |
| Lake distance (m) | 1,016 | 924 | 1,016 | 1,325 |
| | (734) | (687) | (708) | (695) |
| Lake distance < 150 m (1/0) | 0.13 | 0.14 | 0.11 | 0.04 |
| | (0.34) | (0.34) | (0.32) | (0.19) |
| Lake distance 150–300 m (1/0) | 0.09 | 0.10 | 0.09 | 0.05 |
| | (0.29) | (0.30) | (0.28) | (0.21) |
| Lake area (ha) | 8,944 | 967 | 5,334 | 2,451 |
| | (28,427) | (5,083) | (17,441) | (7,227) |
| Urbanized area (1/0) | 0.60 | 0.67 | 0.67 | 0.76 |
| | (0.49) | (0.47) | (0.47) | (0.43) |
| Median income (2016 $) | 83,769 | 78,565 | 66,228 | 82,623 |
| | (35,013) | (32,392) | (30,839) | (37,863) |
| Slope (degrees) | 3.89 | 2.69 | 3.41 | 3.93 |
| | (3.27) | (2.22) | (3.41) | (3.88) |
| Elevation (m) | 148.95 | 291.20 | 136.82 | 885.74 |
| | (130.50) | (59.09) | (142.42) | (791.58) |
| *N* | 396,988 | 1,241,194 | 1,388,818 | 344,394 |
| Lakes | 1,112 | 4,012 | 830 | 308 |
| States | 9 | 12 | 16 | 10 |
| Ecoregions | 5 | 10 | 7 | 8 |
| *Samples Restricted by Property Attribute Availability* | | | | |
| Lot size (sq. ft.) | 43,190 | 30,916 | 31,008 | 17,659 |
| | (78,291) | (64,055) | (55,912) | (40,489) |
| | *n* = 380,289 | *n* = 1,057,113 | *n* = 1,291,411 | *n* = 323,733 |
| Building age (years) | 48.60 | 43.19 | 27.23 | 32.70 |
| | (29.12) | (30.09) | (21.85) | (27.29) |
| | *n* = 318,287 | *n* = 870,459 | *n* = 1,069,065 | *n* = 286,611 |
| Building size (sq. ft.) | 1,924 | 1,820 | 2,057 | 1,969 |
| | (871) | (972) | (1,024) | (846) |
| | *n* = 345,396 | *n* = 860,124 | *n* = 684,586 | *n* = 271,974 |
| Bathrooms | 2.07 | 2.39 | 2.71 | 2.24 |
| | (0.92) | (1.33) | (1.30) | (0.84) |
| | *n* = 258,968 | *n* = 725,467 | *n* = 473,398 | *n* = 170,154 |
| Bedrooms | 3.20 | 3.59 | 3.61 | 3.27 |
| | (0.98) | (1.46) | (1.36) | (0.97) |
| | *n* = 258,968 | *n* = 725,467 | *n* = 473,398 | *n* = 170,154 |

*Note:* The means are reported with standard deviations in parentheses.

and Florida compared with the West, which may partially explain the concentration of hedonic studies conducted in those areas. The South has the lowest water clarity on average (1.49 m), whereas the West has the clearest water on average (2.93 m) (Table 2). With the exception of the Great Lakes, states throughout the Midwest are characterized by many small lakes, whereas the Northeast has much larger lakes—9,000 ha on average compared with 1,000 ha in the Midwest.

## Property Data

Property sale data for the hedonic analysis come from the ZTRAX database that is made available through the PLACES lab at Boston University (Zillow Group 2021).

**Land Economics**

Downloaded from by guest on February 16, 2024. Copyright 2023

PLACES merged ZTRAX parcel-level data with spatially explicit datasets, including the National Historical Geographic Information System (NHGIS),[9] the U.S. Geological Survey (USGS) National Elevation Database (NED),[10] and the USGS NHD. From NHGIS we include historical median income data for each census block group, and from NED we use elevation and slope data for each parcel. PLACES further uses the NHD data to calculate distances between individual residential land parcels and the nearest lake larger than 4 ha. Thus, the analysis only includes lakes larger than 4 ha.

We adjust sale prices to 2020 dollars using the Federal Housing Finance Agencies' seasonally adjusted housing price index.[11] We use a filter in PLACES to identify sales that are considered arm's-length transactions with high and medium confidence (Nolte et al. 2024 [this issue]).[12] We exclude sale prices less than $10,000 (Gindelsky, Moulton, and Wentland 2022) and remove the top 1% of sale prices in each state (Chun, Pierce, and Van Leuven 2021). Finally, we keep only properties classified as residential, single-family houses (RR000, RR101, RR102, RR999).[13] The full sample of property sales within 2,500 m contains 3,371,394 transactions. Imposing investigator decisions, such as including property attributes, reduces the available data for estimation due to missing data and data exclusions. For example, data cleaning removed observations with negative or zero bedrooms or are in the top 1% for each state. For continuous property attributes, we drop observations in the bottom 1% of observations. The property characteristic summary statistics (Table 2) show how sample sizes

are reduced by region as these restrictions are placed on the data.

Figure 2 (bottom) shows the spatial distribution of the full sample, which follows the distribution of lakes (Figure 2, middle) except in nondisclosure states where property sales are not required to be publicly reported and other states, like Maine, that have limited transaction data available.[14] We find average sale prices are the largest in the West at $642,456 and smallest in the Midwest at $344,023 (Table 2). The West, at 0.76, also has the highest proportion of urbanized areas, compared with 0.60 in the Northeast. At least 20% of properties in the Northeast, Midwest, and South are within 300 m of the lakefront, whereas only 9% of sales in the West are within this buffer.

When it comes to summary statistics for property attributes available in the ZTRAX data, there are numerous missing observations that vary by characteristic (Zillow Group 2021). These missing values are not missing at random; rather, select attributes are often missing for entire counties and sometimes for most of a state (Nolte et al. 2024 [this issue]). Lot size is the most widely available property attribute, and we find properties in the Northeast are characterized by larger parcels (1.29 acres on average), whereas parcels in the West are approximately half that size. The next most available property attribute is building age, although the overall sample shrinks considerably by about 25%.

## 5. Econometric Analysis

Examining spatial heterogeneity across the different spatial scales requires multiple model specifications. For a national-scale hedonic model, heterogeneity can be modeled using interaction terms between water quality and dummy variables for the

---

[9] See https://www.nhgis.org.

[10] The USGS National Elevation Dataset is available at https://www.sciencebase.gov/catalog/item/4f4e48b1e4b 07f02db530759.

[11] FRED Data available at https://fred.stlouisfed.org/tags/series?t=hpi.

[12] For states where medium-confidence sales account for more than 33% of the combined high- and medium-confidence sales, we consider both confidence levels. For states where medium-confidence sales account for less than 33% of the combined high- and medium-confidence sales, we only consider high-confidence sales.

[13] ZTRAX data processing is discussed in Appendix E.

[14] Wentland et al. (2020) and Nolte et al. (2024 [this issue]) note that nondisclosure states include Alaska, Idaho, Indiana, Kansas, Louisiana, Mississippi, Montana, New Mexico, North Dakota, South Dakota, Texas, Utah, and Wyoming, and states with markedly lower available sales data throughout the country include Maine and Missouri. We choose to include data from nondisclosure states where available in the sample to maximize potential geographic coverage.

Downloaded from by guest on February 16, 2024. Copyright 2023

spatial boundaries of interest (e.g., states), as in Moore et al. (2020) or Mamun et al. (2023). At finer spatial scales or with more restrictive boundaries, spatial heterogeneity is controlled through sample selection (e.g., a state model). Thus, we first define the national model, and models for smaller spatial scales are adjustments with the relevant dummy variable interaction terms removed. We describe how we compute elasticities for each observation to compare the effects between the different spatial scale models and with different investigator choices imposed and then discuss the sensitivity analysis.

## Model Specification

We specify the national hedonic model as

$$
\begin{aligned}
ln(P_{it}) = {} & \beta_0 + \beta_1 ln(WQ_{it}) + \beta_2 ln(WQ_{it})*LF_{ig} \\
& + \beta_3 ln(WQ_{it})*ln(Dist_i) + \beta_4 ln(WQ_{it}) \\
& *[ln(Area_i) - \overline{ln(Area)}] + \beta_5 ln(WQ_{it}) \\
& *U_i + \beta_E ln(WQ_{it})*E_i + \beta_S ln(WQ_{it})*S_i \\
& + \beta_6 LF_i + \beta_7 Dist_i + \beta_8 Area_i \\
& + \beta_{Prop} Prop_i + \gamma_q + \tau_{it} + \epsilon_{it}, \qquad [1]
\end{aligned}
$$

where $P_{it}$ is sales price of a property $i$ at the time $t$ and $WQ_{it}$ is the associated water quality. $LF_i$ is a dummy variable for properties within the selected lakefront distance buffer as described in Table 1 (150 m in the baseline).[15] $Dist_i$ is distance of the property to the lake, and $Area_i$ is the corresponding lake surface area, with $\overline{ln(Area)}$ equal to its sample log mean. $U$ is a dummy variable for properties in urbanized areas, and $E$ and $S$ are vectors of dummy variables for ecoregions and states, respectively. We exclude one ecoregion and one state from each model to preserve full rank of the data matrix. $Prop_i$ is a vector of other property attributes. Some of these attributes vary based on selected sample selection

parameters (e.g., lot size, building size, and building age for the baseline), whereas others are included in all models. These variables include median income in block group and slope and elevation of the parcel. Last, $\gamma_q$ are sale quarter fixed effects and $\tau_{it}$ are spatial-temporal fixed effects that vary according to Table 1. For the baseline, $\tau_{it}$ represents census tract × year fixed effects. For models, where year fixed effects are added to (as opposed to interacted with) spatial fixed effects, $\tau_{it}$ implicitly includes the spatial fixed effects and year fixed effects.

The coefficients of interest are the water quality coefficient and its associated interaction terms: $\beta_1$, $\beta_2$, $\beta_3$, $\beta_4$, $\beta_5$, $\beta_E$, and $\beta_S$. The first three interaction terms ($\beta_2$, $\beta_3$, and $\beta_4$) capture local heterogeneity related to proximity to lake and lake area using variable specifications that are common in the literature (Walsh and Milon 2016). We further interact water quality with demeaned lake area $[ln(Area_i) - \overline{ln(Area)}]$, which improves interpretability of regression coefficients (Wooldridge 2010). Using this specification, $\beta_1$ represents the effect of Secchi on a lake with area at the sample log mean, and $\beta_4$ remains the effect of Secchi for an increase in lake area.[16] $\beta_5$, $\beta_E$, and $\beta_S$ are spatial interaction terms that capture potential heterogeneity in the effect of water quality relative to the omitted categories. At the state level, $\beta_S$ drops out of the model, and at the substate level, $\beta_5$, $\beta_E$, and $\beta_S$ drop out of the model. $\beta_1$ collects the baseline effect of water quality in the combination of all omitted categories. For simplicity, in the results and discussion, we refer to all coefficients by variable name as opposed to the corresponding $\beta$.

## Computing Elasticities

Although the coefficients of interest allow us to examine heterogeneity in a sample, they provide less insight when comparing across samples that are modeled with different specifications. In addition, interpreting the results of models with many spatial interaction terms

---

[15] Other hedonic studies (e.g., Walsh and Milon 2016) make use of a waterfront indicator in the assessment data. However, a similar variable is not available nationally in the ZTRAX data. We choose a unifying GIS measurement (i.e., distance to lake < 150 m) to define lakefront. Given that this measurement may be imprecise, especially as the average distance to lake may vary across rural and urban areas, there may be more variance in our estimate of $\beta_2$.

[16] Without demeaning lake area, the interpretation of $\beta_1$ is the effect of water quality for a lake of size 0, which is not a meaningful value.

Downloaded from by guest on February 16, 2024. Copyright 2023

can be challenging. Thus, we compute individual elasticities for observations in each sample using the corresponding model coefficients. For the log-log model in equation [1], the formula for elasticities is just the first derivative of the model equation with respect to $ln(WQ_{it})$.[17] Then we input the relevant coefficient estimates and sample data for each observation.

$$\widehat{elast_i} = \hat{\beta}_1 + \hat{\beta}_2 * LF_i + \hat{\beta}_3 ln(Dist_i)$$
$$+ \hat{\beta}_4 [\ln(Area_i) - \overline{\ln(Area)}] + \hat{\beta}_5 U_i$$
$$+ \hat{\beta}_E E_i + \hat{\beta}_S S_i. \quad\quad [2]$$

After computing elasticities for each observation in a sample, we divide them into three groups based on distance to lake: less than 150 m, between 150 m and 300 m, and greater than 300 m. We select the first two categories based on our baseline and alternative definitions for lakefront properties, which allow us to investigate the effect of water quality in properties adjacent to the lake and slightly farther away. The remaining category contains the distances where we expect smaller effects and less variation related to distance. After splitting into groups, we take the median of the estimates in each group by census tract.[18]

Comparing elasticities across census tract allows us to observe spatial heterogeneity in our results. To examine this heterogeneity more broadly, we divide elasticities by region and examine their distributions. Wide variation in elasticities in a single region and differences in the central tendencies of distributions between different regions implies spatial heterogeneity. We also compare the distributions

of elasticities regarding spatial scale. Differences in elasticity distributions across spatial scales indicate potential heterogeneity related to the scale of the model, model misspecification, or sample selection bias.

### Sensitivity Analysis

To assess the sensitivity of estimated elasticities to spatial scale and investigator decisions, we consider elasticity estimates from all combinations of the investigator choices and sample criteria outlined in Table 1. For each combination, we divide the median census tract elasticities by buffer group, spatial scale, and region and then compute the regional median. Because medians are less sensitive to extreme outliers than the mean, regional medians should be constant across all investigator decisions under ideal conditions. However, if the model estimates are sensitive to spatial scale, sample selection criteria, or model selection, the regional medians will differ.

## 6. Results

First we discuss the national model specified in equation [1] for the baseline conditions defined in Table 1. We present the distributions of elasticities for all spatial scales and regions and address the sensitivity of the elasticities to the spatial scale in each region.[19]

### National Results

The estimation results indicate a positive significant effect of Secchi depth of 0.262 for lakes in the excluded category, defined by Minnesota in ecoregion 8.1, with lake area equal to the sample mean (Table 3). The interaction term between Secchi and lake area demeaned is also positive, indicating that the effect of Secchi increases with the size of the lake. As expected, we observe the largest effect of Secchi within 150 m of the lakefront, which decays at further distances from the

---

[17] Derivations for elasticity formulas are found in Appendix D.

[18] As we are focused on spatial heterogeneity, we aggregate elasticity estimates from the property level to census tracts thereby controlling for the larger number of observations in urbanized areas. We investigate variation in lake area and distance to lake in the census tract to test whether aggregation is appropriate. We find no variation in lake area in more than 75% of census tracts in our baseline sample. Only in 6% of census tracts is the standard deviation in lake area larger than 100 ha. For distance, we find a median standard deviation across census tracts of 200 m and maximum standard deviation of 643 m. After we divide the observations by buffer groups, the median standard deviation is 115 m and the maximum is 565 m.

[19] A complete set of model results and associated descriptive statistics is available at https://zenodo.org/records/7844473.

Downloaded from by guest on February 16, 2024. Copyright 2023

**Table 3**
National Regression Results

| Parameter | Estimate | Std. Error | Parameter | Estimate | Std. Error |
|---|---|---|---|---|---|
| Const | 7.123*** | (0.207) | Secchi * MD | −0.259** | (0.085) |
| Secchi[a, b, c] | 0.231*** | (0.034) | Secchi* ME | 2.428*** | (0.077) |
| Secchi * lake area demeaned[c] | 0.009* | (0.004) | Secchi * MI | −0.0680 | (0.048) |
| Secchi * < 150 m | 0.025** | (0.009) | Secchi * MO | 0.6730 | (0.739) |
| Secchi * lake distance | −0.034*** | (0.005) | Secchi * MT | −2.021*** | (0.465) |
| Secchi * urban[d] | −0.0150 | (0.014) | Secchi * NC | −0.1830 | (0.123) |
| Secchi * ecoregion 5.2[d] | 0.075* | (0.036) | Secchi * ND | −0.2230 | (0.292) |
| Secchi * ecoregion 5.3 | 0.0430 | (0.033) | Secchi * NE | −0.1790 | (0.101) |
| Secchi * ecoregion 6.2 | 0.5940 | (0.462) | Secchi * NH | −0.0650 | (0.047) |
| Secchi * ecoregion 7.1 | 0.9910 | (0.596) | Secchi * NJ | −0.0030 | (0.052) |
| Secchi * ecoregion 8.2 | 0.0570 | (0.077) | Secchi * NY | −0.0740 | (0.04) |
| Secchi * ecoregion 8.3 | 0.0550 | (0.048) | Secchi * OH | −0.1980 | (0.16) |
| Secchi * ecoregion 8.4 | −0.0170 | (0.069) | Secchi * OK | −0.1240 | (0.266) |
| Secchi * ecoregion 8.5 | 0.0260 | (0.031) | Secchi * OR | −0.8670 | (0.525) |
| Secchi * ecoregion 9.2 | 0.150 | (0.1) | Secchi * PA | 0.154*** | (0.036) |
| Secchi * ecoregion 9.3 | 0.2230 | (0.201) | Secchi * RI | 0.102* | (0.047) |
| Secchi * ecoregion 9.4 | 0.2030 | (0.149) | Secchi * SC | −0.0530 | (0.084) |
| Secchi * ecoregion 10.2 | 0.3060 | (0.462) | Secchi * SD | −0.1270 | (0.287) |
| Secchi * ecoregion 11.1 | 0.6620 | (0.462) | Secchi * TN | −0.1130 | (0.078) |
| Secchi * ecoregion 13.1 | 0.3660 | (0.475) | Secchi * TX | −0.3930 | (0.233) |
| Secchi * ecoregion 15.4 | 0.0320 | (0.048) | Secchi * VA | −0.1340 | (0.083) |
| Secchi * AL[d] | 0.0030 | (0.202) | Secchi * VT | −0.0780 | (0.129) |
| Secchi * AR | 0.1210 | (0.15) | Secchi * WA | −0.9890 | (0.597) |
| Secchi * AZ | −0.3960 | (0.475) | Secchi * WI | −0.0330 | (0.08) |
| Secchi * CA | −0.7280 | (0.465) | < 150 m | 0.124*** | (0.009) |
| Secchi * CO | −0.4980 | (0.461) | Lake distance | −0.095*** | (0.005) |
| Secchi * CT | −0.266* | (0.12) | Lake area[e] | 0.013* | (0.005) |
| Secchi * DE | −0.0860 | (0.402) | Median income | 0.131*** | (0.014) |
| Secchi * FL | −0.0190 | (0.037) | Slope | 0.019*** | (0.002) |
| Secchi * GA | 0.0330 | (0.128) | Elevation | −0.0230 | (0.023) |
| Secchi * IA | −0.221* | (0.11) | Lot size | 0.101*** | (0.004) |
| Secchi * IL | −0.1070 | (0.08) | Building age | −0.125*** | (0.003) |
| Secchi * IN | 0.20 | (0.515) | Building size | 0.547*** | (0.01) |
| Secchi * KY | −1.956*** | (0.058) | Quarter 2 | 0.044*** | (0.002) |
| Secchi * LA | 0.0840 | (0.211) | Quarter 3 | 0.05*** | (0.002) |
| Secchi * MA | −0.0270 | (0.024) | Quarter 4 | 0.015*** | (0.002) |

*Note:* N = 485,860, standard errors clustered at tract level.

[a] Interaction terms for MN and ecoregion 8.1 were preselected as the excluded categories, because the area intersection contains the most observations in the sample.

[b] During estimation, interaction terms for KS, NM, WV, ecoregion 10.1, and ecoregion 12.1 were fully absorbed by fixed effects and dropped from model. Observations for ecoregion 12.1 all fall within AZ. Variation in estimates for KS, NM, and WV can be explained by the corresponding ecoregion interactions.

[c] The log of lake area is demeaned in the interaction term with Secchi. Thus, the Secchi coefficient alone can be interpreted as the effect of water quality for a lake with the mean log-lake area. Secchi * Lake area demeaned can be interpreted as the effect of an increase in lake size over the sample mean.

[d] Because this model is estimated with census tract by year fixed effects, it is not necessary to include urban, ecoregion, and state constituents as control variables.

[e] The lake area when not interacted with Secchi is not demeaned, as it only serves as a control variable in the model not a coefficient of interest.

*p < 0.005 **p < 0.01 ***p < 0.001.

lake, as evidenced by the negative and significant interaction between Secchi and lake distance. The interaction term for urban is negative but not significant, resulting from census tract by year fixed effects in the model specification with urbanized areas defined as collections of census tracts.[20] Overall, Secchi

---

[20] We investigate this further using county-level fixed effects in Appendix B, finding a positive significant effect.

**Land Economics**

Downloaded from by guest on February 16, 2024. Copyright 2023

elasticities for lakefront properties in the excluded category on lakes with area at the sample mean is 0.256. his effect decays rapidly to 0.061 for properties 150 m from the lakefront and to 0.000 for properties 900 m away.

We find some evidence for spatial heterogeneity, as indicated by significant coefficient estimates for interaction terms with some ecoregions and states. We find more significant coefficients for states than ecoregions, indicating that political boundaries may play a stronger role in capitalization rates for water quality than do ecological conditions. Coefficient estimates for ecoregions and states indicate both positive and negative effects relative to the excluded category. In many areas, the sum of the corresponding ecoregion and state interaction is needed to assess the magnitude of the effect. In other areas, where there are relatively few observations, variation in water quality is fully absorbed by the census tract by year fixed effects, and the effect of Secchi relative to the excluded category can be explained by a single ecoregion or state interaction term. Some of the coefficients are surprisingly large, such as KY, ME, and MT, indicating potential outliers in the sample or factors that might not be captured by the spatial fixed effects.[21] From Figure 2 (bottom), we can see that these regions contain a small portion of the overall sample.[22]

The coefficient estimates provide information on the relative differences in the effect of Secchi across spatial boundaries and the statistical significance of the estimated effects. However, differences in lake size throughout the country can make it difficult to understand the total effect. We provide maps summarizing the elasticities for all observations in the baseline sample in Appendix A.

---

[21] In Appendix B, we implement additional controls for the hedonic price gradient by interacting state dummies with all control variables, and we find that the coefficient estimates for the outliers are still large and significant.

[22] We consider dropping interaction terms in state and ecoregions with few observations. However, setting an appropriate observation threshold can be problematic, as dropping the interaction term would result in the elasticity for the excluded category being misattributed to observations in these locations, whereas keeping the interaction terms allows us to identify locations where further investigation is warranted.

## Baseline Results

For the remaining baseline models, we consider only elasticity estimates for properties within 150 m from the lake. We use kernel density plots to present the different distributions of elasticities for each region across spatial designations to help understand spatial heterogeneity and the effect of spatial scale on elasticity estimates (Figure 3). Kernel density plots depict distribution as continuous curves, similar to histograms, allowing us to observe broad dispersion patterns in our results. Rather than simply considering means and standard deviations, the plot shows the distributions of elasticity values.

First, holding the spatial scale of the model constant at the division level, we compare the distributions of elasticities for the Northeast, Midwest, South, and West (Figure 3a). We chose the division level because it is the smallest spatial scale that preserves the spatial distribution of the national sample. We find the largest elasticities in the Northeast, with a peak centered around 0.15. The distribution in the Midwest exhibits the least variance and is characterized by multiple distinct peaks. The tallest is centered 0.10, while the smaller peaks are centered around −0.10 and 0.25. In the South and the West, we find the widest distributions centered around 0 and −0.05, respectively. Overall, these results indicate that spatial heterogeneity in the effect of water quality is present broadly across the different regions and within regions.

We compare differences in distributions across our five spatial designations, nation, region, division, state, and substate, within each census region (Figure 3b). Starting with the Northeast, we find the central peaks of the distributions at the region and division scales are larger than those at the nation, state, and substate scales. In the Midwest, we find that all the distributions overlap considerably, indicating strong agreement between model estimates at different spatial scales. In the South, the nation and region elasticities are mostly positive, whereas the state and substate elasticities are centered around −0.05. Last, in the West, there is wide variation in elasticities except at the national scale. Some

Downloaded from by guest on February 16, 2024. Copyright 2023

**Figure 3**

Distribution of Baseline Elasticity Estimates by (a) Region and (b) Spatial Scale



*Note:* The median elasticity estimates at the census tract level for properties within 150 m of the lakefront are shown on the *x*-axis. The kernel density along the *y*-axis is rescaled to one for each plot. The 1st and 99th percentiles are dropped from the figure because of the relative magnitude of outliers.

differences in distributions across spatial scale can be attributed to differences in the underlying sample at the state and substate levels. However, differences in the distributions at the larger spatial scales suggest that scale of the model can influence results and potential decision-making.

**Sensitivity Analysis**

We further assess the sensitivity of our elasticity estimates to spatial scale by comparing elasticities estimated across all combinations of sample selection criteria and model choices. In Figure 4, we plot the regional medians associated with each combination of spatial

**Page 272**

Downloaded from by guest on February 16, 2024. Copyright 2023

**Figure 4**
Regional Median Elasticity Estimates for All Models



*Note:* Census tract median estimates for properties within 150 m of the lakefront are divided by region for unique combinations of spatial scale, sample selection, and model choice before computing regional median. Medians are sorted by region, spatial scale, sample selection criteria, and methods. For each region and market boundary, estimates vary along different sample selection criteria and methods. The 1st and 99th percentiles are dropped from the figure because of the relative magnitude of outliers.

scale, sample selection criteria, and modeling choices for the models sorted by region and spatial scale.[23] Each regional median is represented by a single dot in the top panel, and each region is separated by a solid black line with the associated label below the top panel. Lines in the bottom panel indicate the spatial scale of the model. As seen in the baseline results, estimates in the Midwest are the least sensitive to spatial scale and are the most stable across different sample selection criteria and model choices. Results in the Northeast, though sensitive to spatial scale, are also relatively stable but are more sensitive to investigator decisions. The South demonstrates more variability and the West even more variability in each spatial scale, indicating that elasticity estimates are highly sensitive to sample selection and modeling choices as well as spatial scale. Across all regions, we note that hedonic results are most sensitive at the substate spatial scale.

---

[23]While the points are also sorted by respective data selection criteria and modeling techniques, these categories are not presented in this plot. They are explored more in Appendix B.

## 7. Discussion and Conclusion

In the analyses reported here, we observe heterogeneity in terms of the central tendency of elasticity estimates across spatial scales and dispersion of elasticity estimates within spatial scales. The results reveal wide variation in estimated elasticities for lake water quality throughout the United States, and the heterogeneity varies across the Northeast, Midwest, South, and West regions with the largest heterogeneity effects occurring at the state and substate scales. Thus, contrary to Moore et al. (2020), we observe significant spatial heterogeneity along state and substate scales using a national scale model. Similarly, Zhang, Phaneuf, and Schaeffer (2022) report regional heterogeneity in the effect of harmful algal blooms on lakes when the United States is divided into seven climate regions. Our results are also in line with the Guignet et al. (2022) meta-analysis that revealed significantly larger elasticity estimates for Secchi in the Northeast.

The differences in elasticity estimates we observe at the state and substate scales align

Downloaded from by guest on February 16, 2024. Copyright 2023

with the many small-spatial-scale models in the published literature. Our results provide suggestive evidence that this heterogeneity may be smoothed and averaged out in models estimated at larger spatial scales, thereby missing important market and ecosystem differences. We conclude that heterogeneity across spatial scales indicates market differences that may not support the rescaling of hedonic models to fit local and national policy aims in all parts of the country. That is, small-spatial-scale models may reflect locally unique effects that do not represent a national average, and a national model can obscure unique local or regional effects. We recommend caution in transferring model results across spatial boundaries to ensure the effects documented by the underlying model match that of the policy application.

We further conclude that heterogeneity within spatial scales, represented by differences in regional medians, indicates the influence of investigator choices when estimating hedonic equations. Thus, our study demonstrates an important insight: differences in investigator decisions observed in spatial scales indicate that modeling choices may have more influence on the magnitudes of elasticity estimates than changes in spatial scale. This observation brings into question whether the differences in hedonic estimates across highly restricted spatial scales in the literature are real or the outcomes of investigator choices. This observation implies that rigorous robustness analyses are needed for all hedonic studies, regardless of spatial scale, and such analyses should be reported, at least in appendix tables, so more can be learned about the necessary choices investigators make when estimating hedonic models. A rigorous robustness analysis would go beyond the usual varying of model specifications, such as testing different levels of fixed effects, and quantify the impact of alternative sample criteria and data merging procedures, including reasonable variations of water quality summary metrics and matching time frame.[24] Such reporting will allow a richer meta-analysis to clarify whether results

observed are real spatial differences or simply due to differences in investigator choices across studies.[25]

Another consideration is that the distributions we report of elasticity estimates indicate that estimates can be zero or negative when the expectation that elasticity estimates will be positive and significant. There are counterintuitive hedonic estimates published in the peer-reviewed literature from time to time (e.g., Swedberg et al. 2022) but not often. Thus, our study suggests more anomalous outcomes than what a casual observation of the literature reveals. One must be careful when taking anomalous outcomes as prima facie evidence that some do not value water quality or there is no effect. One must keep many considerations in mind. No hedonic sample is representative of homeowners, just those who bought a property during a specific period. Matching sale dates with water quality is challenging because water quality measures are limited, and one does not know specifically what people consider when they buy a property. These issues are compounded by property and water quality data limitations. Nondisclosure states scattered throughout much of the West and in some states in the Midwest and South restrict which communities are incorporated in hedonic models, and the small sample sizes in these areas may lead to high variability in model results. Lake water quality samples are also not representative, as a variety of factors related to state and local government, community activism, use type, and existing water quality impairments impact whether a lake is routinely sampled. Thus, there are necessary caveats when attempting to interpret results from a single hedonic model. Instead, we maintain that insights should only be made after repeated hedonic modeling in the locations where results are found to be highly robust.

Last, when choosing a hedonic modeling framework, our study was fortunate to have

---

sample selection parameters have a larger effect on regional medians.

[25] Some of this work is already under way, with Heberling, Guignet, and Papenfus (2022) finding that methodological choices play a larger role in estimated relationships than variables related to market and commodity.

[24] In Appendix B, we evaluate the sensitivity of our results to water quality sample parameters, property location parameters, and fixed effects. We find that water quality

Downloaded from by guest on February 16, 2024. Copyright 2023

access to ZTRAX data, which enabled us to run a broad set of hedonic property models and explore how different sample selection criteria and modeling techniques shape the various model coefficients (Zillow Group 2021). Without freely available nationwide property sales data, researchers may not be able to conduct similar tests. We hope the results from this work can lay the groundwork for future research concerning systematic effects of spatial scale on market boundaries and investigator decisions on hedonic estimates. Therefore, given the sunsetting of ZTRAX, it is critical that new large-scale open-access or low-cost property sale databases become available, allowing more research into the broad range of environmental and other pertinent policy topics at scale.

## Acknowledgments

Swedberg and Boyle were supported by the College of Agricultural and Life Sciences at Virginia Tech in leading this research effort. Swedberg was also supported in part by an appointment to the EPA Research Participation Program, administered by the Oak Ridge Institute for Science and Education (ORISE) through an interagency agreement between the U.S. Department of Energy (DOE) and the EPA. ORISE is managed by Oak Ridge Associated Universities (ORAU) under DOE contract no. DE-SC0014664. All opinions expressed herein are the authors and do not necessarily reflect the policies and views of the EPA, DOE, ORAU/ORISE. The authors acknowledge Advanced Research Computing at Virginia Tech for providing computational resources and technical support that have contributed to the results reported here (https://arc.vt.edu/). Nolte acknowledges support from the Department of Earth and Environment at Boston University, the Junior Faculty Fellows program of Boston University's Hariri Institute for Computing and Computational Science, and the Nature Conservancy. We thank David Keiser, Catherine Kling, Dan Phaneuf, and Jiarui Zhang for providing helpful feedback in the early development of this project as well as EPA reviewers and journal referees for their valuable comments and suggestions. Data are provided by ZTRAX. More

information on accessing the data can be found at http://www.zillow.com/ztrax. The results and opinions are those of the authors and do not reflect the position of Zillow Group.

## References

Bishop, K. C., N. V. Kuminoff, H. S. Banzhaf, K. J. Boyle, K. von Gravenitz, J. C. Pope, V. K. Smith, and C. D. Timmins. 2020. "Best Practices for Using Hedonic Property Value Models to Measure Willingness to Pay for Environmental Quality." *Review of Environmental Economics and Policy* 14 (2): 260–81. https://doi.org/10.1093/reep/reaa001.

Boyle, K. J., P. J. Poor, and L. O. Taylor. 1999. "Estimating the Demand for Protecting Freshwater Lakes from Eutrophication." *American Journal of Agricultural Economics* 81 (5): 1118–22. https://doi.org/10.2307/1244094.

Boyle, K. J., and L. O. Taylor. 2001. "Does the Measurement of Property and Structural Characteristics Affect Estimated Implicit Prices for Environmental Amenities in a Hedonic Model?" *Journal of Real Estate Finance and Economics* 22 (2): 303–18. https://doi.org/10.1023/A:1007855901029.

Calderón-Arrieta, D., S. B. Caudill, and F. G. Mixon. 2019. "Valuing Recreational Water Clarity and Quality: Evidence from Hedonic Pricing Models of Lakeshore Properties." *Applied Economics Letters* 26 (3): 237–44. https://doi.org/10.1080/13504851.2018.1458187.

Chun, Y., S. C. Pierce, and A. J. Van Leuven. 2021. "Are Foreclosure Spillover Effects Universal? Variation over Space and Time." *Housing Policy Debate* 31 (6): 924–46. https://doi.org/10.1080/10511482.2021.1882533.

Gibbs, J. P., J. M. Halstead, K. J. Boyle, and J.-C. Huang. 2002. "An Hedonic Analysis of the Effects of Lake Water Clarity on New Hampshire Lakefront Properties." *Agricultural and Resource Economics Review* 31 (1): 39–46. https://doi.org/10.1017/S1068280500003464.

Gindelsky, M., J. G. Moulton, and S. A. Wentland. 2022. "Valuing Housing Services in the Era of Big Data: A User Cost Approach Leveraging Zillow Microdata." In *Big Data for Twenty-First-Century Economic Statistics*. Vol. 79, *Studies in Income and Wealth*, edited by K. G. Abraham, R. S. Jarmin, B. Moyer, and M. D. Shapiro, 339–70. Cambridge, MA: National Bureau of Economic Research.

Downloaded from by guest on February 16, 2024. Copyright 2023

Guignet, D., M. T. Heberling, M. Papenfus, and O. Griot. 2022. "Property Values, Water Quality, and Benefit Transfer: A Nationwide Meta-analysis." *Land Economics* 98 (2): 191–218. https://doi.org/10.3368/le.98.2.050120-0062R1.

Heberling, M. T., D. Guignet, and M. Papenfus. 2022. "Water Quality and Hedonic Models: A Meta-analysis of Commodity, Market, and Methodological Characteristics." Working paper. Boone, NC: Appalachian State University. Available at https://econ.appstate.edu/RePEc/pdf/wp2206.pdf.

Kung, M., D. Guignet, and P. Walsh. 2017. "Comparing Pollution Where You Live and Play: A Hedonic Analysis of Enterococcus in the Long Island Sound." NCC Working Paper 17-08. Washington, DC: U.S. EPA National Center for Environmental Economics. Available at https://www.epa.gov/sites/default/files/2017-12/documents/2017-08.pdf.

Liu, T., J. J. Opaluch, and E. Uchida. 2017. "The Impact of Water Quality in Narragansett Bay on Housing Prices." *Water Resources Research* 53 (8): 6454–71. https://doi.org/10.1002/2016WR019606.

Mamun, S., A. Castillo-Castillo, K. Swedberg, J. Zhang, K. J. Boyle, D. Cardoso, C. L. Kling, *et al.* 2023. "Valuing Water Quality in the United States Using a National Dataset on Property Values." *Proceedings of the National Academy of Sciences* 120 (15): e2210417120. https://doi.org/10.1073/pnas.2210417120.

Michael, H. J., K. J. Boyle, and R. Bouchard. 1996. "Water Quality Affects Property Prices: A Case Study of Selected Maine Lakes." Miscellaneous Report 398. Augusta: Maine Agricultural and Forest Experiment Station. Available at https://digitalcommons.library.umaine.edu/cgi/viewcontent.cgi?article=1003&context=aes_miscreports.

———. 2000. "Does the Measurement of Environmental Quality Affect Implicit Prices Estimated from Hedonic Models?" *Land Economics* 76 (2): 283–98. https://doi.org/10.2307/3147229.

Michaels, R. G., and V. K. Smith. 1990. "Market Segmentation and Valuing Amenities with Hedonic Models: The Case of Hazardous Waste Sites." *Journal of Urban Economics* 28 (2): 223–42. https://doi.org/10.1016/0094-1190(90)90052-O.

Moore, M. R., J. P. Doubek, H. Xu, and B. J. Cardinale. 2020. "Hedonic Price Estimates of Lake Water Quality: Valued Attribute, Instrumental Variables, and Ecological-Economic Benefits." *Ecological Economics* 176: 106692. https://doi.org/10.1016/j.ecolecon.2020.106692.

Nolte, C., K. J. Boyle, A. M. Chaudhry, C. Clapp, D. Guignet, H. Hennighausen, I. Kushner, *et al.* 2024. "Data Practices for Studying the Impacts of Environmental Amenities and Hazards with Nationwide Property Data." *Land Economics* 100 (1): 200–21. https://doi.org/10.3368/le.100.1.102122-0090R.

Phaneuf, D. J., and T. Requate. 2016. *A Course in Environmental Economics*. Cambridge, UK: Cambridge University Press.

Phaneuf, D. J., V. K. Smith, R. B. Palmquist, and J. C. Pope. 2008. "Integrating Property Value and Local Recreation Models to Value Ecosystem Services in Urban Watersheds." *Land Economics* 84 (3): 361–81. https://doi.org/10.3368/le.84.3.361.

Poor, P. J., K. J. Boyle, L. O. Taylor, and R. Bouchard. 2001. "Objective versus Subjective Measures of Water Clarity in Hedonic Property Value Models." *Land Economics* 77 (4): 482–93. https://doi.org/10.2307/3146935.

Soranno, P. A., L. C. Bacon, M. Beauchene, K. E. Bednar, E. G. Bissell, C. K. Boudreau, M. G. Boyer, *et al.* 2017. "LAGOS-NE: A Multi-scaled Geospatial and Temporal Database of Lake Ecological Context and Water Quality for Thousands of US Lakes." *GigaScience* 6: gix101. https://doi.org/10.1093/gigascience/gix101.

Soranno, P. A., E. G. Bissell, K. S. Cheruvelil, S. T. Christel, S. M. Collins, C. Emi Fergus, C. T. Filstrup, *et al.* 2015. "Building a Multi-scaled Geospatial Temporal Ecology Database from Disparate Data Sources: Fostering Open Science and Data Reuse." *GigaScience* 4: s13742-015-0067-4. https://doi.org/10.1186/s13742-015-0067-4.

Soranno, P. A., and K. S. Cheruvelil. 2017a. "LAGOS-NE-LIMNO v1.087.1: A Module for LAGOS-NE, a Multi-scaled Geospatial and Temporal Database of Lake Ecological Context and Water Quality for Thousands of U.S. Lakes: 1925–2013." Version 2 [database]. Environmental Data Initiative. https://doi.org/10.6073/pasta/08c6f9311929f4874b01bcc64eb3b2d7.

———. 2017b. "LAGOS-NE-GIS v1.0: A Module for LAGOS-NE, a Multi-scaled Geospatial and Temporal Database of Lake Ecological Context and Water Quality for Thousands of U.S. Lakes: 2013–1925." Version 4 [database].

Downloaded from by guest on February 16, 2024. Copyright 2023

Environmental Data Initiative. https://doi.org/10.6073/pasta/4b04db93c53be4b65937d0fedd0fcf4b.

Stachelek, J., S. K. Oliver, and F. Masrour. 2019. "LAGOSNE: Interface to the Lake Multi-scaled Geospatial and Temporal Database." R Package Version 2.0.2 [data package]. Available at https://CRAN.R-project.org/package=LAGOSNE.

Swedberg, K., K. J. Boyle, J. Stachelek, N. K. Ward, W. Weng, and K. M. Cobourn. 2022. "Examining Implicit Price Variation for Lake Water Quality." *Water Economics and Policy* 2240005. https://doi.org/10.1142/S2382624X22400057.

U.S. EPA (U.S. Environmental Protection Agency). 2021. "Ecoregions of North America." Available at https://www.epa.gov/eco-research/ecoregions-north-america.

Walsh, P., C. Griffiths, D. Guignet, and H. Klemick. 2017. "Modeling the Property Price Impact of Water Quality in 14 Chesapeake Bay Counties." *Ecological Economics* 135: 103–13. https://doi.org/10.1016/j.ecolecon.2016.12.014.

Walsh, P. J., and J. W. Milon. 2016. "Nutrient Standards, Water Quality Indicators, and Economic Benefits from Water Quality Regulations." *Environmental and Resource Economics* 64 (4): 643–61. https://doi.org/10.1007/s10640-015-9892-2.

Walsh, P. J., J. W. Milon, and D. O. Scrogin. 2011. "The Spatial Extent of Water Quality Benefits in Urban Housing Markets." *Land Economics* 87 (4): 628–44. https://doi.org/10.3368/le.87.4.628.

Weng, W., K. J. Boyle, K. J. Farrell, C. C. Carey, K. M. Cobourn, H. A. Dugan, P. C. Hanson, N. K. Ward, and K. C. Weathers. 2020. "Coupling Natural and Human Models in the Context of a Lake Ecosystem: Lake Mendota, Wisconsin, USA." *Ecological Economics* 169: 106556. https://doi.org/10.1016/j.ecolecon.2019.106556.

Wentland, S. A., Z. H. Ancona, K. J. Bagstad, J. Boyd, J. L. Hass, M. Gindelsky, and J. G. Moulton. 2020. "Accounting for Land in the United States: Integrating Physical Land Cover, Land Use, and Monetary Valuation." *Ecosystem Services* 46: 101178. https://doi.org/10.1016/j.ecoser.2020.101178.

White, E. M., and L. A. Leefers. 2007. "Influence of Natural Amenities on Residential Property Values in a Rural Setting." *Society & Natural Resources* 20 (7): 659–67. https://doi.org/10.1080/08941920601171998.

Wolf, D., and T. Kemp. 2021. "Convergent Validity of Satellite and Secchi Disk Measures of Water Clarity in Hedonic Models." *Land Economics* 97 (1): 39–58. https://doi.org/10.3368/wple.97.1.050819-0062R1.

Wolf, D., and H. A. Klaiber. 2017. "Bloom and Bust: Toxic Algae's Impact on Nearby Property Values." *Ecological Economics* 135: 209–21. https://doi.org/10.1016/j.ecolecon.2016.12.007.

Wooldridge, J. M. 2010. *Econometric Analysis of Cross Section and Panel Data*. 2nd ed. Cambridge, MA: MIT Press.

Zhang, J., D. J. Phaneuf, and B. A. Schaeffer. 2022. "Property Values and Cyanobacterial Algal Blooms: Evidence from Satellite Monitoring of Inland Lakes." *Ecological Economics* 199: 107481. https://doi.org/10.1016/j.ecolecon.2022.107481.

Zillow Group. 2021. "Zillow's Transaction and Assessment Database (ZTRAX)." Available at https://www.zillow.com/research/ztrax/.

**Page 277**

# EXHIBIT H

Expert Report:

Property Value Damages from Groundwater Contamination

Emanating from the former Northrop Grumman Manufacturing Facility

located at 8020 Deering Avenue, Canoga Park, CA

By:

Dr. Kevin J. Boyle

Behar

v.

Northrop Grumman Corp., et al.

Case No. 2:21-cv-02946

Prepared for:

Plaintiff's Counsel

September 27, 2023

**Summary of Opinion**

- Residential properties in Canoga Park, Winnetka, and Reseda, located in Los Angeles County, CA, are injured by a groundwater contamination plume emanating from the former Northrop Grumman manufacturing site (the "Site") in Canoga Park.

- The groundwater contamination contains volatile organic compounds such as trichloroethylene (TCE) and perchloroethylene (PCE) (documented in the Laton and Kram expert reports).

- Kram and Powder expert reports document the pathway for residential exposure to TCE in homes located over the groundwater contamination plume.

- The California Office of Environmental Health Hazard Assessment[1] and the U.S. Environmental Protection Agency[2] indicate that exposure to TCE can have significant health impacts.

- Environmental contamination, of which groundwater contamination is one example, has been shown to injure residential properties through reduced property values.

- There are 3,787 injured single and two-unit residential properties wholly or partially located over the groundwater contamination plume.

- Public information about the presence and extent of the groundwater contamination plume, the types of contamination and potential effects on human health have not been publicly shared in the community.

- As groundwater contamination is not common knowledge in the communities, injured residential properties have yet to experience the full extent of diminished value.

- As the groundwater contamination plume becomes common knowledge and sellers of properties disclose knowledge of the contamination as required by California law[3], the full extent of the value diminution on injured properties will be realized.

- Residential properties in Canoga Park, Winnetka, and Reseda, located wholly or partially over the groundwater contamination plume, will experience a common property-value diminution of 9.4%.

- Properties located nearer the source of the contamination will have a greater value diminution relative to properties further from the source, with a common gradient of diminution with distance from the Site. Examples are as follows:

---

[1] See: https://oehha.ca.gov/media/downloads/risk-assessment/fact-sheet-california-human-health-screening-levels-chhsls/tceindoorairfactsheet.pdf, accessed August 28, 2022.

[2] See: https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-evaluation-trichloroethylene-tce-0, accessed August 28, 2022.

[3] See: https://leginfo.legislature.ca.gov/faces/codes_displayText.xhtml?lawCode=CIV&division=2.&title=4.&part=4.&chapter=2.&article=1.5., accessed August 28, 2022.

1

**Page 280**

- o Properties located 0.1 mile from (adjacent to) the Site will experience an additional 2.0% value diminution and properties located 2.5 miles (at the furthest extent of the plume) from the Site will experience an additional 0.1% value diminution.

- o Example dollar diminutions range from $78,375 (9.5% diminution) at 2.5 miles for a median priced single-family residence in Reseda to $105,165 (11.4%) for a median priced single-family residence in Canoga Park at 0.1 mile.

- o In addition to distance from the Site, value diminutions vary due to differing property values that represent the specific characteristics of each property and different real estate market conditions in the communities.

- The total loss in property values for the 3,787 injured residential properties, located wholly or partially over the groundwater contamination plume, is $259,840,872.

- I reserve the option to revise my opinions if additional information becomes available.

**Qualifications of Dr. Kevin J. Boyle**

Dr. Boyle has a BS in Economics from the University of Maine, MS in Agricultural and Resource Economics from Oregon State University and a PhD in Agricultural Economics with a specialization in Environmental and Resource Economics from the University of Wisconsin.

He is currently the Founding Head (and Blackwood Professor) of the Blackwood Department of Real Estate in the Pamplin College of Business at Virginia Tech[4], which is one of the top undergraduate real estate academic programs in the country:

#1 Best Bachelor's in Real Estate, Bachelor's Degree Center[5]

#3 Best Real Estate Degree Program, Great Business Schools[6]

#5 Best Real Estate Bachelor's Degree, College Factual[7]

#6 Best Real Estate Schools, College Factual[8]

He is recognized as one of the top 100 real estate professional in the United States for 2022.[9]

---

[4] See: https://realestate.vt.edu/.
[5] See: https://www.bachelorsdegreecenter.org/best-real-estate-degrees/, accessed July 16, 2023.
[6] See: https://www.greatbusinessschools.org/best-real-estate-programs/, accessed July 16, 2023.
[7] See: https://www.collegefactual.com/majors/business-management-marketing-sales/real-estate/rankings/top-ranked/bachelors-degrees/, accessed August 17, 2022.
[8] See: https://www.collegefactual.com/majors/business-management-marketing-sales/real-estate/rankings/top-ranked/, accessed July 16, 2023.
[9] See: https://www.thetop100magazine.com/kevin-boyle, accessed August 17, 2022.

2

**Page 281**

Dr. Boyle is also a Professor of Agricultural and Applied Economics and a Professor in the Myers-Lawson School of Construction at Virginia Tech.

Dr. Boyle has over 35 years of experience in the economic valuation of environmental amenities and disamenities. One of his specialties is the estimation of property-value models to understand how amenities and disamenities affect real estate market values. Groundwater contamination emanating from a site where hazardous wastes were released, such as the former Northrop Grumman site in Canoga Park, CA, is an example of a disamenity that diminishes property values.

He has studied the property-value impacts of air pollution, forest pest infestations, surface and groundwater quality, urban stormwater infrastructure, tree cover, and other applications on property values. His research on these topics has been published in top peer-reviewed journals (a copy of his current CV is provided herewith). Further he is a co-author on a peer-reviewed journal article documenting the state of the art in the estimation of property-value models (Bishop et al., 2020).

Dr. Boyle has received numerous recognitions for the quality of his research. He received the *Presidential Research and Creative Achievement Award* from the University of Maine in 2001 and was named a *Distinguished Maine* Professor in 2003, which is the highest recognition for faculty at the University of Maine. Most recently, he received the highest research award bestowed by Virginia Tech, *Alumni Award for Research Excellence*.

Dr. Boyle also received the highest recognition from prominent, national professional associations. He is a *Fellow* of the Agricultural and Applied Economics Association and a *Fellow* of the Association of Environmental and Resource Economists, the top professional association of environmental economists in the U.S.

> "*The AERE Fellows Program was instituted in 2005 to recognize individuals who have made outstanding contributions to the advancement of the profession of environmental and resource economics.*"

Since the inception of the AERE Fellow award, only 52 people have been named Fellows.[10]

---

[10] See: https://www.aere.org/aere-fellows-program.

3

**Page 282**

Dr. Boyle has served in several national advisory roles including the External-Environmental Economics Advisory Committee's review of the *Repeal of the Clean Water Rule and its Replacement with the Navigable Waters Protection Rule to Define Waters of the United States (WOTUS)*, the Independent Particulate Matter Review Panel supported by the Union of Concerned Scientists, U.S. Environmental Protection Agency (EPA) Science Advisory Board *Environmental Economics Advisory Committee*, U.S. EPA Clean Air Scientific Advisory *Committee Particulate Matter Review Panel*, and U.S. EPA Science Advisory Board *Advisory Council on Clean Air Compliance Analysis*. Most recently, he advised the White House Office of Science and Technology Policy on best practices for benefit transfers by federal agencies.

Dr. Boyle has served as an economic valuation expert on numerous environmental contamination cases involving surface water, groundwater and other media in Alabama, Ohio, Oklahoma, New Jersey, U.S Virginia Islands, West Virginia, Wisconsin, and other locations. He served as an expert for the National Oceanic and Atmospheric Administration and Department of Justice on the Deepwater Horizon oil spill natural resources damage assessment (Bishop et al., 2017).

**Northrop Grumman Site Contamination**

Past manufacturing operations by Northrop Grumman entities at 8020 Deering Avenue, Canoga Park, California (the "Site") resulted in a groundwater contamination plume that is migrating in a southeasterly direction as shown in Figure 1. The groundwater contamination contains volatile organic compounds such as trichloroethylene (TCE) and perchloroethylene (PCE) (documented in Laton and Kram expert reports). The California Office of Environmental Health Hazard Assessment[11] and the U.S. Environmental Protection Agency[12] indicate that exposure to TCE can have significant health impacts, and expert reports by Kram and Powder document the pathway for residential exposure in homes located over the contamination plume.

---

[11] See: https://oehha.ca.gov/media/downloads/risk-assessment/fact-sheet-california-human-health-screening-levels-chhsls/tceindoorairfactsheet.pdf, accessed August 28, 2022.

[12] See: https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-evaluation-trichloroethylene-tce-0, accessed August 28, 2022.

**Page 283**

The red line in Figure 1 denotes the groundwater contamination plume. The plume begins in the upper left in Canoga Park and proceeds in a south easterly direction and passes through the community of Winnetka, and the very southeast tip of the plume enters Reseda. The pink box in the northwest extent of the plume is the Northrop Grumman site that is the origin of the contamination.



**Figure 1. Northrop Grumman Groundwater Contamination Plume
Originating from 8020 Deering Avenue, Canoga Park, CA.**
Source: earthforensics, inc.

**Understanding Property Values and the Effects of Environmental Contamination**

Residential and commercial properties are commodities that are differentiated by their characteristics or attributes (Rosen, 1974; Bishop et al., 2020). In the very simplest case, two properties that are identical in all ways except one is zoned commercial and the other is zoned residential will have different market values because the zoning defines how the properties can be used. Another obvious example is two identical residential lots in a subdivision where one has a house built and one that does not; these two properties will have different market values because the former includes the value of the land and the built structure whereas the latter is

5

just the land value. Thus, the market value of any property is a function of the attributes that enhance or diminish value. The approach economists use to quantify the effects of positive and negative attributes on market values is called a hedonic property-value model. This is a statistical method that uses fair market values (arms-length sales) of properties to quantify the amount that property values increase or decrease due to the presence or absence of property attributes. The term hedonic arises from buyers (sellers) acting in their own best interests, paying (asking) more for properties with desirable attributes and paying (asking) less for properties with undesirable attributes.

Hedonic property-value models are a well-accepted method to statistically understand how characteristics affect property values, the relationships between sale prices of properties and their characteristics (Bishop et al., 2020). Specifically, property sale prices are a function of their characteristics that include:

- land features (LF) such as acreage, location, etc.,
- community features (CF) such as zoning, school quality, etc.,
- characteristics of the structures (SC) on the property such as square feet of built area, age of structure, etc., and
- proximity to amenities and disamenities (A/DC) such as open space or pollution.

This relationship is represented in an equation such as the following:

$$sp = \beta_0 + \beta_{LF}LF + \beta_{CF}CF + \beta_{SC}SC + \beta_{A/DC}A/DC + e.$$

Here, *sp* is the sale prices of properties, *LF*, *CF*, *SC* and *A/DC* include property characteristics as described above and *e* is an error term. It is never possible to include all characteristics in an equation due to data limitations; the effects of omitted characteristics are captured in the error term (*e*). The *sp, LF, CF, SC* and */ADC* are data obtained from observed property transactions.

The $\beta_s$ are estimated effects of each characteristic on sale price. If a $\beta$ for a characteristic is positive, this is evidence that the characteristics increases property values and is a measure of the amount the characteristic contributes to the total value of a property. On the other hand, a negative $\beta$ is evidence that the characteristic decreases property values and is a measure of the amount the characteristic diminishes the total value of a property. Whether a $\beta$ is statistically

6

different from zero or not, it is the best estimate of the influence of a property characteristic on property values. The $\beta_s$ are common to all properties within a market and reveal how property values vary for properties with distinct characteristics within the defined market.

Contaminated groundwater is a disamenity that leads to a negative $\beta_{A/DC}$, indicating a diminishment of property values. There are numerous hedonic property-value studies in the peer-reviewed literature showing the value-diminution effects of hazardous contamination sites (e.g., Greenstone and Gallagher, 2008; McCluskey and Rausser, 2003; Thayer et al., 1992). Boyle and Kiel (2001) reviewed studies that measured the effects of pollution on values of properties and, collectively, these studies show that value diminutions from pollution are common and are not unique to specific case studies. They identified 12 studies where property values were diminished by air pollution around properties, with the earliest study dating back to 1967. They cite seven studies, dating back to 1968, where reduced surface-water quality diminished property values. They reference 16 studies where undesirable land uses (including those that lead to groundwater contamination) diminished property values; the earliest of these studies was 1974.

Reviewing the content of Exhibit 3 in Boyle and Kiel, Michaels and Smith (1990) found that property values increased by $190 (1982-84$s) per mile of distance from a hazardous site ($568/mile, January 2023$s).[13] The table shows Kohlhase (1991) found that property values increased by $2,197 (1982-84$s) at one mile from a Superfund site ($6,569 at one mile, January 2023$s). In addition, Smollen, Moore & Conway (1992) found that houses at 2.6 miles from a hazardous waste site increased in value between $8,187 and $11,452 (1982-84$s) ($24,479-$34,241 at 2.6 miles, January 2023$s). Finally, a study by Kiel (1995) found that properties at one mile from a Superfund site increased by $1,377 to $4,610 (1982-84$s) ($4,117-$13,784 at one mile, January 2023$s). The studies reviewed by Boyle and Kiel show that homes located at the same distance from a hazardous waste site experience a common level of diminution with values increasing with distance from the hazardous waste site.

---

[13] Computed using the consumer price index for all urban consumers: https://www.bls.gov/regions/mid-atlantic/data/consumerpriceindexhistorical_us_table.htm, accessed February 26, 2023.

Boyle et al. (2010) and Guignet et al. (2016) both find that groundwater contamination decreases property values.

Thus, the peer-reviewed economics literature that dates to the late 1960s and early 1970s, continuing with more contemporary studies, demonstrates that the presence of pollution reduces the value of residential real estate. These studies show that physical proximity to contamination is an important driver of the diminution of property values so that the closer a property is to the source of the contamination the more its value is diminished.

The effect of contamination on property values can follow multiple pathways. It could be that the contamination has a direct impact on soil, drinking water, in-door air quality or other media directly on a property. Property values can also be impacted by contamination that is migrating toward the property, e.g., a groundwater plume. In addition, even when there are actions to stem the spatial spread of the contamination or remediate the contamination, people may fear the actions were incomplete or imperfect or that the safety threshold may not be sufficiently protective. In addition, people may not desire to live over or near an area that has a known history of contamination. These pathways of exposure to environmental contamination and concern about proximity to the contamination all can result in reduced property values.

**Estimating Impacts of Contamination on Property Values.** There are two common approaches used in the published literature to estimate the environmental amenity/disamenity impacts on property values. The first is to estimate a hedonic model as described in the preceding paragraph. The impact ($\beta_{A/DC}$) is estimated by including variables in the equation that measure the extent of contamination or proximity of a property to the contamination. The other variables in the equation, *LF*, *CF* and *SC*, control for differences in characteristics of properties that can also affect value.

A condition for this estimation is that people in the community are aware of the contamination and the real estate market has adjusted to the information. However, in the case of the Northrop Grumman site, knowledge of groundwater contamination is not common knowledge to home sellers and home buyers. Public information has not been released regarding the presence and extent of the groundwater contamination plume, the types of contaminates

8

**Page 287**

nor the potential human health effects of the contaminates. Thus, market values of injured residential properties have not experienced the full extent of diminished value. As the groundwater contamination plume becomes common knowledge and sellers of properties disclose knowledge of the contamination to buyers, as required by California law[14], the full extent of the value diminution from the environmental contamination will the realized. This condition precludes the ability to estimate a hedonic model to identify the magnitude of property value diminution.

The second approach to estimating property-value diminution, meta-analysis[15], is uniquely designed to compute the full extent of the groundwater contamination plume on property values once the injury is known by sellers and revealed to buyers. This is because a meta-analysis supports computing property-value diminutions  based on information provided, collectively, by hedonic property-value studies of the effects of environmental contamination on property values that were conducted in locations where the contamination was common public knowledge.  Thus, a meta-analysis is a statistical summary of the results from many hedonic studies (Nelson and Kennedy, 2009; Stanley, 2001).  The multiple hedonic studies collectively present variation in site-specific characteristics such that is possible to compute property-value diminutions customized to sites where a hedonic study has not or cannot (case with the current Site) be estimated.  Stanley (2001) states that:

> "(i)f a number of independent studies have been conducted on a particular subject, using different data sets and methods, then combining their results can furnish more insight and greater explanatory power than the mere listing of individual results" (p. 131).

In the current instance, a meta-analysis can be applied to compute the common property-value diminution calibrated to properties and contamination conditions in Canoga Park, Winnetka, and Reseda. Meta-analysis, using multiple hedonic studies, exploits variation in application

---

[14] See:
https://leginfo.legislature.ca.gov/faces/codes_displayText.xhtml?lawCode=CIV&division=2.&title=4.&part=4.&chapter=2.&article=1.5., accessed August 28, 2022.

[15] Meta-analysis is a procedure that is widely used in economics and other fields of study to statistically summarize results from multiple empirical studies; economic applications for environmental disamenities include Braden et al. (2011), Kiel and Williams (2007), Ready (2010) and Simons and Saginor (2006).

9

**Page 288**

characteristics across the multiple hedonic studies to develop customized predictions.  Stanley (2001) states that

> "(i)f a number of independent studies have been conducted on a particular subject, using different data sets and methods, then combining their results can furnish more insight and greater explanatory power than the mere listing of individual results" (p. 131).

Based on the statistical summary of results from multiple studies, a meta-analysis equation can be used to make customized predictions of diminutions in property values.

**Meta-analysis of Property-value Diminutions.** Meta-analysis is like hedonic property-value models but applied to different data. Where a hedonic model explains variation in property sale prices, a meta-analysis, as applied here, explains how estimated property-value diminutions from hedonic studies vary in terms of characteristics of the studies.

A meta-analysis takes observations on a variable of interest (sale-price diminution as used here) and estimates an equation that explains variation in this variable across studies as a function of key study characteristics. A general meta-equation can be written as:

$$\beta_{spd} = \gamma_0 + \gamma_1 S + \gamma_2 M + \gamma_3 D + \gamma_4 E + \varepsilon.$$

Here, $\beta_{spd}$ is the estimated value diminution from original hedonic studies, $S$ is study-site conditions of the hedonic studies (e.g., the type and extent of contamination), $M$ are market conditions (e.g., unemployment rate), $D$ are population demographics (e.g., suburban/rural), $E$ are study estimation procedures characteristics (e.g., sample size), and $\varepsilon$ is an error term to account for hedonic study characteristics where the data are not available.  In this manner, a meta-analysis can inform what is learned collectively from a set of hedonic property-value studies while controlling for differences across studies.

**Approach Used to Compute Property-Value Diminution**

A two-step approach will be used to compute value diminutions for injured properties.  In the first step, I will record the market values of properties. These market values consider differences in property values due to unique characteristics of individual properties and differences in market conditions across the three communities. As the property transactions will

10

have occurred through time, I will use the Federal Reserve Bank of St. Louis All-Transactions House Price Index[16] to update sale prices to August 2023 dollars for Los Angeles County.[17] This approach provides property-specific baseline values for injured properties.

The second step will be the application of a percentage property-value diminution customized to the properties injured by groundwater contamination from the Northrop Grumman site. A meta-equation of property-value diminution, estimated by Simons and Saginor (2006) (S&S hereafter), will be used to compute the customized property-value diminution common to injured properties. The S&S meta-analysis is based on many hedonic property-value studies that were estimated using thousands of actual property sale prices.

As the full extent of property-value diminutions have not been realized at this time, applying the common property value diminution from the meta-analysis to current market values of properties allows the computation of property-value losses specific to each property once the contamination plume becomes common knowledge to buyers and sellers of properties.

It should be noted that it is not necessary for property values to decline in the face of environmental contamination as other market conditions may cause market values to rise. The appropriate question, whether market values decline, remain unchanged or increase, is to ask what the market values would be in the absence of contamination.

Notably, when appraisers use the "sales comparison approach" they are conducting a very simple meta-analysis, and when they apply the outcome of their analysis to a property, they are transferring the outcome to estimate the property value. The approach here is similar, except statistical analyses with much more data are used to compute more reliable property-value diminutions due to environmental contamination.

**Meta-Analysis of Property-value Diminutions.** The S&S meta-equation explains differences in percentage decreases in property values.  S&S identified 58 studies where the impacts of disamenities (negative amenities) were valued, which generated 184 observations.  I use the equation where outlier observations have been removed from the data (S&S, Exhibit 3,

---

[16] See: https://fred.stlouisfed.org/series/USSTHPI, accessed September 15, 2023.
[17] See: https://fred.stlouisfed.org/series/ATNHPIUS06037A, accessed September 15, 2023.

11

**Page 290**

**Table 1. Meta Equation Variable Definitions**
**(Source: Simons and Saginor, 2006)**

| Variables | Definitions |
|---|---|
| **Dependent Variable** | |
| DIMPERC | Percent loss in property Value |
| **Independent Variables** | |
| Constant | Residual effect after all variables defined below are accounted for |
| Real 2003$ value | Average sale price in 2003 dollars for each study |
| Northeast | =1 if study conducted in the Northeast region, 0 otherwise |
| Industrial Midwest | =1 if study conducted in the Industrial Midwest region, 0 otherwise |
| South | =1 if study conducted in the South region, 0 otherwise |
| Farmland | =1 if study conducted in the Farmland region, 0 otherwise |
| Mineral Extraction | =1 if study conducted in the Mineral Extraction region, 0 otherwise |
| Southern Calif. | =1 if study conducted in Southern California, 0 otherwise |
| Northern Calif. | =1 if study conducted in the Northern California, 0 otherwise |
| U.S. | =1 if a national study, 0 otherwise |
| Sudden | =1 if contamination from a sudden event, 0 otherwise |
| NFA Postrem | =1 if remediation completed, 0 otherwise |
| Log of distance | Natural log of the average property distance from border of contamination site |
| Nukemanf | =1 if nuclear facility, 0 otherwise |
| Superfill | =1 if hazardous waste site, 0 otherwise |
| Groundwater | =1 if groundwater contamination, 0 otherwise |
| AirCAFO | =1 if air pollution from a confined animal feeding operation (CAFO) |
| Urban disamenity | =1 if an urban disamenity, 0 otherwise |
| Litigation dummy | =1 if litigation filed, 0 otherwise |
| Announcement of a bad thing | =1 if public announcement of contamination, 0 otherwise |
| Announcement of closing | =1 if announcement of closing contamination site, 0 otherwise |
| Suburban | =1 if study conducted in an urban market, 0 otherwise |
| Rural | =1 if study conducted in a rural market, 0 otherwise |
| Mix | =1 if study conducted in a mixed market, 0 otherwise |
| Unemployment | Unemployment rate in county from the 2000 Census |
| 30yrrt | Conventional 30-year mortgage rate |
| Log of sample size | Natural log of the number of properties in hedonic analyses |
| Case | =1 if case study, 0 otherwise |
| Survey | =1 if survey-based study, 0 otherwise |
| Other | =1 of other study method, 0 otherwise. |

12

**Page 291**

page 85).  The 184 observations were used to estimate the effects of each of the variables listed in Table 1 on the percent loss in property values.  I use this equation to compute the likely percent property-value diminutions of properties injured by groundwater contamination emanating from the Site.

The independent variables in Table 1 that S&S used to explain changes in the percentage decrease in property values include average sale prices of properties in each study area, geographic location of each study, type of pollution, community characteristics, etc. These variables are explained starting on page 74 of S&S. The meta-analysis equation is used to compute property-value diminution by setting the value of the explanatory variables (S, M, D and E, above) to customize the calculation to conditions commonly experienced by the injured properties.

Notable variables that apply to the injured properties include "Southern Calif." (identifies the region of the country where Canoga Park, Winnetka and Reseda are located), "Log of distance" (distance from the Site to properties), "Superfill" (hazardous waste disposed at Site), "Groundwater" (identifies groundwater contamination), "Litigation dummy" (litigation has been initiated), "Announcement of a bad thing" (public announcements of the contamination), "Suburban" (properties are located in a suburban area),  and "Unemployment", "30yrrt" and "Log of sample size".

I do not use the variables for Case and Survey studies when computing the percentage property-value diminutions. Thus, the percentage diminution is based on hedonic studies of actual market transactions of residential properties faced with environmental contamination.

**Benefit Transfer.** Using the S&S meta-equation to compute the value diminutions for the injured properties is referred to as a benefit transfer. Benefit transfer is a widely used method to calculate natural resource values, both enhancements and diminutions, using existing value data (see *Ecological Economics*, Vol. 60 (2), 2006).  "Value transfer" is a more appropriate label because the procedure is used to transfer values for situations that constitute an increase in value (benefit) or a decrease in value (cost).  I will follow the common language in the peer-reviewed economics literature and refer to this approach as a "benefit transfer".

13

**Page 292**

Bergstrom and De Civita (1999) state that benefit transfer is an analysis procedure that is widely used by government agencies for computing benefits and costs of changes in natural resources. There have been many peer-reviewed applications of benefit transfer including health benefits from improved air quality (Krupnick et al., 1996), clean water and ecological benefits (Iovanna and Griffiths, 2006), and improved water quality (Barton, 2002).  In addition to the resource applications, many studies have also investigated methodological improvements in benefit transfers (Johnston et al., 2021).

The U.S. EPA *Guidelines for Preparing Economic Analyses* (2010) recognize benefit transfer as an accepted method of economic analysis and recommends the following "steps for conducting a benefit transfer" (p. 7-45 – 7-49):

1. Develop the policy case.
2. Select study cases.
3. Transfer values.

In the current application, the "policy case" is the contamination of groundwater and the effect of this contamination on property values.  The study cases have already been selected and they are the studies that S&S selected for their meta-analysis.  I will use the estimated S&S meta-equation to transfer property-value diminutions calibrated to injured properties in Canoga Park, Winnetka, and Reseda. The meta-equation percentage property-value diminution is transferred by multiplying current market values for each property by the percentage value diminution.

The EPA guidance states that:

"*benefit function transfers are preferable to unit value transfers as they incorporate information relevant to the policy scenario*" (p. 7-47).

A meta-equation transfer is such a function, and the relevant information, variables in the meta-equation, allows for computing transferred value diminutions that are calibrated to injured properties.  A unit-value transfer would take a percentage diminution in value from a single hedonic study to support the transfer. The EPA guidance suggests that meta-function is an appealing transfer approach because the variables in the equation allow the analyst to control "*confounding variables*" (p. 7-48).

14

**Page 293**

A function transfer has a direct advantage over a unit-value transfer because matching (or fit) of an individual study to current conditions is not necessary. The collective variation in the study cases used in the meta-analysis allows the function to predict a value that is calibrated to policy-site conditions. The S&S estimated meta-equation allows just such a calibrated calculation of the percentage reduction in residential property values injured by the groundwater contamination plume emanating from the Site.

Using the S&S meta-analysis equation to compute residential property-value diminutions, variables in the equation are coded to calibrate a customized property-value diminution estimate for conditions in Canoga Park, Winnetka, and Reseda. The variables selected and the assigned values are:

- Constant – This represents all factors that influence property-value diminutions that are not controlled by the variables in the equation. This variable is multiplied by "1" to include it in the property-value diminution calculation.

- Real 2003$ value – This represents the market value of properties in the area affected by the contamination. While this variable is relevant, the parameter estimate on this variable is so small (<0.000) that it does not influence the property-value diminution calculation.

- Southern Calif. – This identifies the region of the country where Canoga Park, Winnetka, and Reseda are located. This variable is multiplied by "1" to include it in the property-value diminution calculation.

- Log of distance – This uses the centroid of the Site to the centroid of the location of injured properties (*propdist*). The maximum distance is set at three miles (*maxdist*); the distance from the Site to the furthest extent of the groundwater contamination plume. The calculation is as follows:

$$0.006x[\ln(\max dist) - \ln(propdist)]\, x100x(-1)$$

where 0.006 is the coefficient estimated by S&S and the product is multiplied by -1 as more distant properties are valued more highly than properties located near the Site; the value diminution increases for properties closer to the Site.

- Superfill – This variable indicates the presence of a property with hazardous waste, which is the condition of the Site. This variable is multiplied by "1" to include it in the property-value diminution calculation.

- Groundwater – This variable indicates that groundwater contamination has occurred. This variable is multiplied by "1" to include it in the property-value diminution calculation.

**Page 294**

- Litigation dummy – This variable indicates ongoing litigation related to the contamination. This variable is multiplied by "1" to include it in the property-value diminution calculation.

- Announcement of a bad thing – This variable indicates a public announcement that contamination is present, which will be the case when property owners must reveal the contamination when they sell their properties. This variable is multiplied by "1" to include it in the property-value diminution calculation.

- Suburban – This variable indicates that the contamination occurred in a suburban area. This variable is multiplied by "1" to include it in the property-value diminution calculation.

- Unemployment rate – This variable indicates the unemployment rate in the area where the contamination is located. I used the August 2023 unemployment data for Los Angeles County (5%).[18]

- 30yrrt – This variable is the mortgage rate for a 30-year conventional mortgage. I used the loan rate for a conventional 30-year mortgage as of February 26, 2023, provided by *Realtor.com for* Los Angeles (7.77%).[19]

- Log of sample size – This is the log of the sample size used to estimate the hedonic equations that were the basis of the meta-equation data. S&S did not report his information, but Ready (2010) did include sample sizes for hedonic studies of proximity to landfills that supported his meta-analysis. Given the data Ready provides in his Exhibit 3 (p. 331), sample sizes for specific landfills are used to compute an average of 1,612 properties. This is a plausible and conservative number as sample sizes for hedonic equations can range from less than a hundred to tens of thousands.

The results of the calculated property-value diminution effects are summarized in Table 2. The first column repeats the variable names from Table 1. The second column presents the effects of each variable on property-value diminutions as estimated by S&S (see Exhibit 3, p. 85 in their report). The third column is the coding for relevant variables as discussed in the bullets immediately above. The fourth column presents the calibrated predictions of property-value diminution effects common to all injured properties. The common property-value diminution is a reduction of 9.4% without factoring distance from the Site. The effect of distance on the total property-value diminution is discussed below.

---

[18] See: https://www.labormarketinfo.edd.ca.gov/file/lfmonth/la$pds.pdf, rates change monthly, accessed September 24, 2023.

[19] See: https://www.realtor.com/mortgage/rates/Los-Angeles_CA, rates change daily, accessed September 24, 2023.

16

**Page 295**

**Table 2.  Meta-equations and Percentage Changes in Property Values
(Source: Simons and Saginor, 2006)**

| Estimated Meta-equation | | Predicted Losses in Property Values | |
|---|---|---|---|
| Independent Variables | Coefficient Estimates (CE) | Coding | Percent Effects (CE x Coding x 100) |
| Constant | -0.043 | 1 | -4.3 |
| Real 2003$ value | 0.000 | 1 | 0 |
| Northeast | -0.041 | 0 | 0 |
| Industrial Midwest | -0.087*[a] | 0 | 0 |
| South | -0.074* | 0 | 0 |
| Farmland | -0.101* | 0 | 0 |
| Mineral Extraction | 0.021 | 0 | 0 |
| Southern Calif. | 0.023 | 1 | 2.3 |
| Northern Calif. | 0.041 | 0 | 0 |
| U.S. | 0.007 | 0 | 0 |
| Sudden | 0.064 | 0 | 0 |
| NFA Postrem | 0.115 | 0 | 0 |
| Log of distance | 0.006* | -{ln($maxdist$)-ln($propdist$)} | See Table 3 |
| Nukemanf | -0.097* | 0 | 0 |
| Superfill | -0.048 | 1 | -4.8 |
| Groundwater | -0.085 | 1 | -8.5 |
| AirCAFO | -0.091* | 0 | 0 |
| Urban disamenity | -0.043 | 0 | 0 |
| Litigation dummy | -0.061* | 1 | -6.1 |
| Announcement of a bad thing | 0.012 | 1 | 1.2 |
| Announcement of closing | 0.128* | 0 | 0 |
| Suburban | 0.001 | 1 | 0.1 |
| Rural | -0.102* | 0 | 0 |
| Mix | -0.013 | 0 | 0 |
| 2000 unemployment rate | 0.004 | 5 | 2.0 |
| 30yrrt | 0.014* | 7.77 | 10.9 |
| Log of sample size | -0.003 | ln(1,612) | -2.2 |
| Case | -0.116* | 0 | 0 |
| Survey | -0.063* | 0 | 0 |
| Other | 0.083 | 0 | 0 |
| Total Effect | | | -9.4% |

[a] Indicates coefficient estimates are significant at the 10% level.

17

Some but not all variables used to predict the calibrated property-value diminution of approximately 9.4% are statistically significant (denoted by asterisks in Table 2) in S&S's estimated meta-equation.  The estimated coefficients, however, are the best estimates of the variable effects and all relevant variables that increase and decrease the predicted property-value diminution are included whether they are statistically significant or not.

**Factoring in Distance from Northrop Grumman Site.** All injured properties share the common value diminution of 9.4% as shown in Table 2. Injured properties also share a common distance effect of a 0.6% increase (0.006x100) in property values with each mile of distance from the Site (Table 2). Thus, the full diminution of value for any specific property is 9.4% plus the diminution for being located closer to the source of the contamination.

I use three distances from the Site and median sale prices of single-family homes in Canoga Park, Winnetka, and Reseda to demonstrate the likely property-value diminutions of the groundwater contamination on single-family residences. I use these examples because the plume originates in Canoga Park that has properties located closest to the source of the contamination, passes through Winnetka, and then the tip of the plume enters Reseda (see Figure 1). The distances used are:

- Canoga Park – 0.1 miles (adjacent to the source of the contamination),
- Winnetka – 1.0 mile, and
- Reseda – 2.5 miles (approximately the furthest extent of the contamination plume).

Following the S&S equation, the value diminution due to proximity to the source of the contamination is computed for each distance using the following equation:

$$0.006x[\ln(maxdist) - ln(propdist)]x100x(-1)$$

The 0.006 is the estimated distance coefficient from S&S as shown in Table 2. I set *maxdist* at a range where property values beyond that point are may not be injured by the contamination; three miles. Property values diminish from this point with closer proximity to the source of the contamination. The current contamination plume has extended about 2.5 miles from the Site; properties located beyond 3 miles from the site are 0.5 miles or more from the perimeter of the

18

**Page 297**

groundwater contamination plume. The variable *propdist* is a property-specific distance from the Site, one example distance for each community, as denoted in the bullets immediately above.

The property-value diminution with proximity to the Site ranges from 0.1% to 2.0%, and the total diminution, when the common and distance diminutions are summed, ranges from 9.5% to 11.4% (Table3). The total diminutions in Table 3, divided by 100, is multiplied by the median sales price for each community (see Appendix) to compute example property-value diminutions. The example property-value diminutions range from $83,325 at 2.5 miles in Reseda to $106,425 in Canoga Park at 0.1 miles. While all properties experience a common diminution in value and a common diminution effect with distance, the dollar diminutions vary because the diminutions diminish with distance and the median selling prices differ across communities. These are example are property-value diminutions that will be realized losses when knowledge of the groundwater contamination within the communities is known, and homeowners are required to disclose the contamination when selling properties.

### Table 3. Example Property-value diminutions

| Community | *propdist* (miles) | Common Diminution | Distance Diminution | Total Diminution | Median Sale Price (Sept. 24, 2023) | Value Diminution |
|---|---|---|---|---|---|---|
| Canoga Park | 0.1 | 9.4% | 2.0% | 11.4% | $922,500[a] | $105,165 |
| Winnetka | 1.0 | 9.4% | 0.7% | 10.1% | $820,000[b] | $82,820 |
| Reseda | 2.5 | 9.4% | 0.1% | 9.5% | $825,000[c] | $78,375 |

[a] Source: https://www.realtor.com/realestateandhomes-search/Canoga-Park_CA/overview, accessed September 24, 2023.
[b] Source: https://www.realtor.com/realestateandhomes-search/Winnetka_CA/overview, accessed September 24, 2023.
[c] Source: https://www.realtor.com/realestateandhomes-search/Reseda_CA/overview,  accessed September 24, 2023.

**Value Diminutions of Injured Properties**

Property value diminutions, using the above procedure, are computed for each of the 3,814 residential properties located wholly or partially over the contamination. These properties included single family and duplex residences. The number of injured properties is less than the number indicated in Figure 1 of 3,858. The reason for this difference is that the 3,858 count includes all properties that have a GIS locater, but some properties did not have street addresses

19

or residences listed, which precludes computing property-value diminutions, and are not included in the final list of injured properties.

The property-value diminution calculations for injured properties are calculated using the most recent sale price of each injured property. Sale prices represent the market value of properties and differences in sale prices across properties reflect differences in property characteristics (e.g., square footage of living area and age of the structure). In addition, the sale prices account for differences in the market conditions across the three communities. As the sale prices occur through time, they are updated to August 2023 values using the Federal Reserve Bank of St. Louis *All-Transactions House Price Index for Los Angeles County, CA*.[20] These current property values are then multiplied by the sum of the common property-value diminution of 9.4% and plus property-specific distance diminution factors.

The following protocol was followed to obtain property-values for computing individual property damages:

1st.   Data from the Los Angeles County Assessor's office provides the base property data.

2nd.   The groundwater contamination plume is overlaid to identify injured properties located fully or partially over the plume.

3rd.   Injured properties are those in the Assessor data that are coded "single family" or "two unit". Properties with other designations, "five of more apartments" or have designations that are not residential, are excluded. In addition, properties without street addresses are excluded.

4th.   This results in 3,787 injured properties.

5th.   Sale prices of injured properties are obtained using the following protocol.

   a.   If sale-price data were available from Zillow, these sale prices are used in the damage calculations. The sale price for one property was obtained from Redfin.

   b.   If Zillow (or Redfin) sale-price data were not available, the current assessed value was discounted back to the county base year[21] for property-tax assessments using a 2% annual rate[22].

6th.   The property values were then updated to August 2023 values using the Federal Reserve price index.

---

[20] See: https://fred.stlouisfed.org/series/ATNHPIUS06037A, accessed September 15, 2023.
[21] See: https://www.sccassessor.org/faq/understanding-proposition-13, accessed September 26, 2023.
[22] See: https://assessor.lacounty.gov/real-estate-toolkit/proposition-13, accessed September 25, 2023.

**Page 299**

Applying the percentage property value diminutions, the aggregate diminution in value, resulting from the groundwater contamination plume emanating from the former Northrop Grumman manufacturing facility at 8020 Derring Avenue in Canoga Park, is $259,840,872. Individual property-value diminutions are reported in the accompanying excel spreadsheet that is provided as a separate document because it is too large to incorporate in this report.

**Reliability of Methods**

The methods relied upon in my expert report are accepted by the economics and real estate professions, published in peer-reviewed scientific journals, and have peer-reviewed guidance for implementation. Google Scholar searches of the scientific literature result in:

- 133,000 citations for "hedonic property-value models"[23],

- 3,690,000 citations for "economic meta-analysis"[24], and

- 3,560,000 citations for "economic benefit transfers"[25].

These levels of citations indicate each of the methods are well accepted by economists, real estate professionals and individuals in other disciplines.[26]

***Hedonic Property-value models*** are accepted and published in peer-reviewed journals in the fields of environmental economics (Gopalakrishnan et al., 2011; Kim et al., 2003; Landry and Hindsley, 2011; Nelson, 1978; Siriwardena, 2016), real estate (Chamblee et al., 2015; Lipscomb et al., 2013; Reichert et al., 1992; Sirmans et al., 2005), and appraisal (Bible and Hsieh, 2001; Laurice and Bhattacharya, 2005; Leopoldsberger et al., 2011; Wyman and Sperry, 2010).

Hedonic models have been widely applied to estimate  diminutions in property values from environmental contamination, including several contemporary applications (Chamblee et al., 2015; Guignet et al., 2016; Kim et al., 2020; Walsh and Mui, 2017) and a summary of early studies is provided in Boyle and Kiel (2001). It is this type of analysis, based on actual sale prices of residential properties, which is the basis of the S&S meta-analysis that is relied on in this expert report.

Bishop et al. (2020) provides best-practice guidance for the estimation of hedonic property-value models.

---

[23] See: https://scholar.google.com/scholar?hl=en&as_sdt=0%2C47&q=hedonic+property+value+models&btnG=. Accessed August 22, 2022.

[24] See: https://scholar.google.com/scholar?hl=en&as_sdt=0%2C47&q=economic+meta-analysis&btnG=, accessed August 22, 2022.

[25] See: https://scholar.google.com/scholar?hl=en&as_sdt=0%2C47&q=economic+benefit+transfer&btnG=, accessed August 22, 2022.

[26] The citation counts increase as additional documents are identified.

22

**Page 301**

Chapter 7 of the U.S. EPA Guidelines for Preparing Economic Analyses recognizes hedonic property-value models for measuring losses from environmental contamination.[27]

***Meta-analysis*** is accepted and published in peer-reviewed journals in the fields of environmental economics (Barrio and Loureiro, 2010; Brander et al., 2006; Newbold and Johnston, 2020; Smith and Huang, 1995) and real estate (Debrezion et al., 2007; Devaux and Dubé, 2016; Flage, 2018; Flower and Ragas, 1994; Saginor et al., 2011; Sirmans et al., 2005; Turnbull and Zheng, 2021).

Meta analysis is also widely used in disciplines beyond economics and real estate such as education (Hedges, 1992), epidemiology (Stroup et al., 2000), medicine (Glantz, 2008) and psychology (Sedlmeier, 2012).

The S&S meta-analysis relies on the results from studies, like those cited in the preceding paragraph, which provide investigations of property-value diminutions based on results from multiple hedonic property-value studies that rely on thousands of property transactions.

Nelson and Kennedy (2009) provide best-practice guidance for the estimation of meta equations.

The U.S. EPA Guidelines for Preparing Economic Analyses present meta-analysis as an accepted procedure for supporting a benefit transfer.  The guidance states:

> "(t)*here are several approaches for transferring values from study cases to the policy case. These include unit value transfers, value function transfers, and non-structural or structural meta-analysis. … As a general rule, the more related case study estimates involved in a benefit transfer, the more reliable the estimate.*"[28] (p. 7-46, 2nd  col., 2nd para.).

Meta-analyses, based on original studies, provide the most information to support a calibrated benefit-transfer estimate.

---

[27] See: p. 7-9, Table 7.1 and p. 7-17, https://www.epa.gov/sites/default/files/2017-09/documents/ee-0568-07.pdf.
[28] See: p. 7-46, 2nd  col., 2nd para.,  https://www.epa.gov/sites/default/files/2017-09/documents/ee-0568-07.pdf.

**Page 302**

*Benefit Transfer* is an accepted procedure published in peer-reviewed environmental economics journals (Moeltner and Woodward, 2009; Richardson et al., 2015; Smith et al., 2002; Wilson and Hoehn, 2006).

Johnston et al. (2021) provide best-practice guidance for the conduct of benefit transfers.

The USEPA guidance on estimating values for pollution includes benefit transfers as an accepted approach.[29] U.S. EPA economists present examples of where the agency used benefit transfers to estimate the benefits of major U.S. environmental policies (Griffiths and Wheeler, 2005; Newbold et al., 2018; Wheeler, 2015).

**Testimony Last Four Years**

Rosalie Romano, et al. v. Northrop Grumman Corporation, et al., United States District Court, Eastern District of New York, Civil Division, No. 16-CV-5760 (Deposition - February 24, 2022)

Lazy S Ranch Properties, LLC, an Oklahoma Limited Liability Company v. Valero Terminaling and Distribution Company, Valero Partners Operating Co. LLC, and Valero Partners Wynnewood, LLC. United States District Court Eastern District of Oklahoma, Case No. 19-cv-425-JWB (Deposition - September 20, 2022)

Distribution of Cable Royalty Funds, Consolidated Docket Number No. 16-crb-0009 cd (2014-17), Copyright Royalty Judges, Library of Congress, Washington, D.C. (Testimony - March 2023)

**Consulting Rate**

- $450/hour for analysis and report preparation

- $900/hour for deposition and testimony

September 27, 2023

---

[29] See: Section 7.4, page 7-44, https://www.epa.gov/sites/default/files/2017-09/documents/ee-0568-07.pdf.

24

**Page 303**

## References

Barrio, M. and Loureiro, M.L. 2010. A meta-analysis of contingent valuation forest studies. *Ecological Economics*, 69 (5), 1023-1030.

Barton, D.N. 2002. The Transferability of Benefit Transfer: Contingent valuation of water quality improvements in Costa Rica. *Ecological Economics*, 42 (1-2), 147-164.

Bergstrom, J.C. and De Civita, P. 1999. Status of benefits transfer in the United States and Canada: a review. *Canadian Journal of Agricultural Economics*, 47( 1): 79-87.

Bible, D.S. and Hsieh, C. 2001. Gated communities and residential property values. *The Appraisal Journal*, 69 (2), 140-145.

Bishop, K.C., N.V. Kuminoff, H.S. Banzhaf, K.J. Boyle, K. von Gravenitz, J.C. Pope, V.K. Smith, and C.D. Timmins. 2020. Best Practices in Using Hedonic Property-value models to Measure Willingness to Pay for Environmental Quality. *Review of Environmental Economics and Policy*, 14 (2), 260–281.

Bishop, Richard C., Kevin J. Boyle, Richard T. Carson, David Chapman, W. Michael Hanemann, Barbara Kanninen, Raymond J. Kopp, Jon A. Krosnick, John List, Norman Meade, Robert Paterson, Stanley Presser, V. Kerry Smith, Roger Tourangeau, Michael Welsh, Jeffrey M. Wooldridge, Matthew DeBell, Colleen Donovan, Matthew Konopka, Nora Scherer. 2017. Putting a value on injuries to natural assets: The BP oil spill. *Science*, 356 (6335), 253-254.

Boyle, M., and K. Kiel. 2001. A Survey of House Price Hedonic Studies of the Impact of Environmental Externalities. *Journal of Real Estate Literature*, 9 (2), 117-143.

Boyle, K.J., N.V. Kuminoff, C.F. Parmeter and J.C. Pope. 2010a. The Benefit Transfer Challenges. *Annual Review of Resource Economics*, 2, 161-182.

Braden, J.B., Feng, X. and Won, D. 2011. Waste sites and property values: a meta-analysis. *Environmental and Resource Economics*, Vol. 50 (2), 175-201.

Brander, L.M., Florax, R.J. and Vermaat, J.E. 2006. The empirics of wetland valuation: a comprehensive summary and a meta-analysis of the literature. *Environmental and Resource Economics*, 33 (2), 223-250.

Chamblee, J.F., Dehring, C.A., Depken, C.A. and Nicholson, J.R. 2015. Water Contamination, Land Prices, and the Statute of Repose. *The Journal of Real Estate Finance and Economics*, 51 (3), 398-414.

Debrezion, G., Pels, E., and Rietveld, P. 2007. The impact of railway stations on residential and commercial property value: A meta-analysis. *Journal of Real Estate Finance and Economics*, 35, 161-180.

Devaux, N. and Dubé, J. 2016. About the influence of time on spatial dependence: A meta-analysis using real estate hedonic pricing models. *Journal of Real Estate Literature*, 24 (1), 31-66.

Flage, A. 2018. Ethnic and gender discrimination in the rental housing market: Evidence from a meta-analysis of correspondence tests, 2006–2017. *Journal of Housing Economics*, 41,251-273.

Flower, P., and Ragas, W. 1994. The effects of refineries on neighborhood property values. *Journal of Real Estate Research*, 9 (3), 319-338.

Glantz, S.A. 2008. Meta-analysis of the effects of smokefree laws on acute myocardial infarction: an update. *Preventive Medicine*, 47 (4), 452-453.

Gopalakrishnan, S., Smith, M.D., Slott, J.M. and Murray, A.B. 2011. The value of disappearing beaches: a hedonic pricing model with endogenous beach width. *Journal of Environmental Economics and Management*, 61 (3), 297-310.

Greenstone, M., and J. Gallagher. 2008. Does hazardous waste matter? Evidence from the housing market and the superfund program. *The Quarterly Journal of Economics*, 123 (3), 951-1003.

Griffiths, C. and Wheeler, W. 2005. Benefit–cost analysis of regulations affecting surface water quality in the United States. In *Cost–benefit Analysis and Water Resources Management* (223-250). Edward Elgar.

Guignet, D., Walsh, P.J. and Northcutt, R. 2016. Impacts of ground water contamination on property values: Agricultural run-off and private wells. *Agricultural and Resource Economics Review*, 45 (2), 293-318.

Hedges, L.V. 1992. Meta-analysis. *Journal of Educational Statistics*, 7 (4), 279-296.

Iovanna, R., and C. Griffiths. Clean water, ecological benefits, and benefits transfer: a work in progress at the US EPA. *Ecological Economics*, 60 (2), 473-482.

Johnston, R.J., Boyle, K.J., Loureiro, M.L., Navrud, S. and Rolfe, J. 2021. Guidance to Enhance the Validity and Credibility of Environmental Benefit Transfers. *Environmental and Resource Economics*, 79, 575-623.

Kiel, K. A. 1995. Measuring the Impact of the Discovery and Cleaning of Identified Hazardous Waste Sites on House Values. *Land Economics*, 71 (4), 428-35.

Kiel, K. A., and M. Williams. 2007. The impact of Superfund sites on local property values: Are all sites the same? *Journal of Urban Economics*, 61 (1), 170-192.

Kim, C.W., Phipps, T.T. and Anselin, L. 2003. Measuring the benefits of air quality improvement: a spatial hedonic approach. *Journal of Environmental Economics and Management*, 45 (1), 24-39.

Kim, G., Schieffer, J. and Mark, T. 2020. Do superfund sites affect local property values? Evidence from a spatial hedonic approach. *Economic Analysis and Policy*, 67, 15-28.

Kohlhase, J. E. 1991. The Impact of Toxic Waste Sites on Housing Values. *Journal of Urban Economics*, 30 (1), 1-26.

Krupnick, A., K. Harrison, E. Nickell, and M. Toman.  1996.  The Value of health Benefits from Ambient Air Quality Improvements in Central and Eastern Europe: An exercise in benefits transfer.  *Environmental and Resource Economics*, 7 (4), 307-332.

Landry, C.E. and Hindsley, P. 2011. Valuing beach quality with hedonic property models. *Land Economics*, 87 (1), 92-108.

Laurice, J., and Bhattacharya, R. 2005. Prediction performance of a hedonic pricing model for housing. *The Appraisal Journal*, 73 (2), 198-209.

Leopoldsberger, G., Bienert, S., Brunauer, W., Bobsin, K. and Schützenhofer, C. 2011. Energising Property Valuation: Putting a Value on Energy-Efficient Buildings. *Appraisal Journal*, 79 (2).

Lipscomb, C., Mooney, A. and Kilpatrick, J. 2013. Do survey results systematically differ from hedonic regression results? Evidence from a residential property meta-analysis. *Journal of Real Estate Literature*, 21 (2), 233-253.

McCluskey, J.J., and G.C. Rausser. 2003. Hazardous waste sites and housing appreciation rates. *Journal of Environmental Economics and Management*, 45 (2), 166-176.

Michaels, R.G., and V. K. Smith. 1990. Market Segmentation and Valuing Amenities with Hedonic Models: The Case of Hazardous Waste Sites. *Journal of Urban Economics*, 28 (2), 223-242.

Moeltner, K. and Woodward, R. 2009. Meta-functional benefit transfer for wetland valuation: Making the most of small samples. *Environmental and Resource Economics*, 42 (1), 89-108.

Nelson, J.P. 1978. Residential choice, hedonic prices, and the demand for urban air quality. *Journal of Urban Economics*, 5 (3), 357-369.

Nelson, J.P., and P.E. Kennedy.  2009. The Use (and Abuse) of Meta-Analysis in Environmental and Natural Resource Economics: An Assessment.  *Environmental and Resource Economics*, 42 (3), 345-377.

Newbold, S.C. and Johnston, R.J. 2020. Valuing non-market valuation studies using meta-analysis: A demonstration using estimates of willingness-to-pay for water quality improvements. *Journal of Environmental Economics and Management*, 104.

Newbold, S., David Simpson, R., Matthew Massey, D., Heberling, M.T., Wheeler, W., Corona, J. and Hewitt, J. 2018. Benefit transfer challenges: perspectives from US practitioners. *Environmental and Resource Economics*, 69 (3), 467-481.

Ready, R. 2010. Do landfills always depress nearby property values? *Journal of Real Estate Research*, 32 (3), 321-340.

Reichert, A., Small, M. and Mohanty, S. 1992. The impact of landfills on residential property values. *Journal of Real Estate Research*, 7 (3), 297-314.

Richardson, L., Loomis, J., Kroeger, T. and Casey, F. 2015. The role of benefit transfer in ecosystem service valuation. *Ecological Economics*, 115, 51-58.

Rosen, S. 1974. Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition. *Journal of Political Economy*, 8 (1), 34-55.

Saginor, J., Simons, R. and Throupe, R. 2011. A meta-analysis of the effect of environmental contamination on non-residential real estate values. *Journal of Property Investment & Finance*, Vol. 29 (4/5), 460-478.

Sedlmeier, P., Eberth, J., Schwarz, M., Zimmermann, D., Haarig, F., Jaeger, S., and Kunze, S. 2012. The psychological effects of meditation: a meta-analysis. *Psychological Bulletin*, 138 (6), 1139-1171.

Simons, R.A., and J.D. Saginor. 2006. A Meta-Analysis of the Effect of Environmental Contamination and Positive Amenities on residential Real Estate Values. *Journal of Real Estate Research*, 28 (1), 71-104.

Siriwardena, S.D., Boyle, K.J., Holmes, T.P. and Wiseman, P.E. 2016. The implicit value of tree cover in the US: A meta-analysis of hedonic property-value studies. *Ecological Economics*, 128, 68-76.

Sirmans, S., Macpherson, D. and Zietz, E. 2005. The composition of hedonic pricing models. *Journal of Real Estate Literature*, 13 (1), 1-44.

Smith, V.K. and Huang, J.C. 1995. Can markets value air quality? A meta-analysis of hedonic property-value models. *Journal of Political Economy*, 103 (1), 209-227.

Smith, V.K., Van Houtven, G. and Pattanayak, S.K. 2002. Benefit transfer via preference calibration: "Prudential algebra" for policy. *Land Economics*, 78 (1), 132-152.

Smolen, G., Moore, G. and Conway, L. 1992. Economic effects of hazardous chemical and proposed radioactive waste landfills on surrounding real estate values. *Journal of Real Estate Research*, 7 (3): 283-295.

Stanley, T.D. 2001. Wheat from Chaff: Meta-Analysis as Quantitative Literature Review. *Journal of Economic Perspectives*, 15 (3), 131-150.

Stroup, D.F., Berlin, J.A., Morton, S.C., Olkin, I., Williamson, G.D., Rennie, D., Moher, D., Becker, B.J., Sipe, T.A., and Thacker, S.B. 2000. Meta-analysis of observational studies in epidemiology: a proposal for reporting. *Jam*a, 283 (15), 2008-2012.

Thayer, M., Albers, H. and Rahmatian, M., 1992. The benefits of reducing exposure to waste disposal sites: a hedonic housing value approach. *Journal of Real Estate Research*, 7 (3), 265-282.

Turnbull, G.K. and Zheng, M. 2021. A meta-analysis of school quality capitalization in US house prices. *Real Estate Economics*, 49 (4), 1120-1171.

28

Walsh, P. and Mui, P. 2017. Contaminated sites and information in hedonic models: An analysis of a NJ property disclosure law. *Resource and Energy Economics*, 50, 1-14.

Wheeler, W.J. 2015. Benefit transfer for water quality regulatory rulemaking in the United States. In *Benefit Transfer of Environmental and Resource Values* (101-115). Springer, Dordrecht.

Wilson, M.A. and Hoehn, J.P., 2006. Valuing environmental goods and services using benefit transfer: the state-of-the art and science. *Ecological Economics*, 60 (2), 335-342.

Wyman, D. and Sperry, S. 2010. The Million Dollar View: A Study of Golf Course, Mountain, and Lake Lots. *Appraisal Journal*, 78 (2), 159-168.

**APPENDIX**

**Unemployment Source**

**LOS ANGELES-LONG BEACH-GLENDALE METROPOLITAN DIVISION
(LOS ANGELES COUNTY)**
*Nonfarm jobs gain 8,600 over the month and 99,700 over the year*

The seasonally adjusted unemployment rate in Los Angeles County increased over the month to 5.0 percent in August 2023, from a revised 4.9 percent in July 2023, and was above the rate of 4.2 percent one year ago. Civilian employment was unchanged at 4,775,000 in August 2023, while unemployment increased by 4,000 to 250,000. The civilian labor force increased by 4,000 over the month to 5,025,000 in August 2023. (All of the above figures are seasonally adjusted.) The unadjusted unemployment rate for the county was 5.8 percent in August 2023.

Source: https://www.labormarketinfo.edd.ca.gov/file/lfmonth/la$pds.pdf, rates change monthly, accessed February 26, 2023.

**Mortgage Rate Source**

# Los Angeles, CA Mortgage Rates

Current rates in Los Angeles, California are 7.77% for a 30 year fixed loan, 6.94% for 15 year fixed loan and 7.10% for a 5 year ARM

Source: https://www.realtor.com/mortgage/rates/Los-Angeles_CA, rates change daily, accessed February 26, 2023.

30

**Page 309**

**Median Property Sale Price Sources (September 24, 2023)**

Source: https://www.realtor.com/realestateandhomes-search/Canoga-Park_CA/overview, accessed September 24, 2023.

31

# Winnetka, CA

## How do I find the perfect home in Winnetka?

To find the perfect home in Winnetka, you can research the current market trends and home values, what schools and school districts are in the area, and what homes are on the market all on realtor.com®.

**57 Homes for sale**    51 Homes for rent

## Home values in Winnetka, CA ⓘ

Winnetka is a city in California. There are 57 homes for sale, ranging from $278.8K to $4.5M. Winnetka have affordable condo/townhomes, and affordable 2 bedroom listings.

| $799.5K | $477 | $820K |
|---|---|---|
| Median listing home price | Median listing home price/Sq ft | Median sold home price |

Source: https://www.realtor.com/realestateandhomes-search/Winnetka_CA/overview, accessed September 24, 2023.

32

**Page 311**

# Reseda, CA

## How do I find the perfect home in Reseda?

To find the perfect home in Reseda, you can research the current market trends and home values, what schools and school districts are in the area, and what homes are on the market all on realtor.com.

**88 Homes for sale**    **106 Homes for rent**

## Home values in Reseda, CA ⓘ

Reseda is a city in California. There are 88 homes for sale, ranging from $129.9K to $2.3M. Reseda has affordable condo/townhomes.

| $799K | $528 | $825K |
|---|---|---|
| Median listing home price | Median listing home price/Sq ft | Median sold home price |

Source: https://www.realtor.com/realestateandhomes-search/Reseda_CA/overview, accessed September 24, 2023.

33

# VITAE

## KEVIN J. BOYLE

### (August 2023)

**OFFICE:**                                      **HOME:**
880 West Campus Drive                            1508 Howardsville Road
2010 Pamplin Hall (0715)                         Staunton, VA  24401
Blacksburg, VA  24061-0401
(540) 231-2907                                   (540) 357-2501
kjboyle@vt.edu

**PRESENT POSITIONS:**

Willis Blackwood Head, Blackwood Department of Real Estate, Pamplin College of Business, Virginia Tech, November 2022 to present.

Professor, Agricultural and Applied Economics, Virginia Tech, September 2005 to Present.

Principal Faculty, Myers-Lawson School of Construction, Virginia Tech, November 2013 to present.

**EDUCATION:**

Ph.D.   Agricultural Economics, University of Wisconsin

M.S.    Agricultural and Resource Economics, Oregon State University

B.A.    Economics, Distinction, University of Maine

**PREVIOUS PROFESSIONAL POSITIONS:**

Founding Head, Blackwood Department of Real Estate, Pamplin College of Business, Virginia Tech, November 2022 to present.

Founding Director, Blackwood Program in Real Estate, Pamplin College of Business, Virginia Tech, April 2012 to October 2022.

Professor and Head, Department of Agricultural and Applied Economics, Virginia Tech, September 2005 to March 2012.

Chair, Department of Resource Economics and Policy, University of Maine, June 2003 to August 2005.

Founding Director, Center for Tourism Research and Outreach (CenTRO), University of Maine, September 2004 to August 2005.

Distinguished Maine Professor, Department of Resource Economics and Policy, Department of Wildlife Ecology, and Ecology and Environmental Sciences Program, University of Maine, September 2002 to August 2005

**Page 313**

**KEVIN J. BOYLE**                                                                                                          2

Libra Professor of Environmental Economics, Department of Resource Economics and Policy, Department of Wildlife Ecology, and Ecology and Environmental Sciences Program, University of Maine.  September 1997 to August 2002.

Visiting Scientist, Rocky Mountain Experiment Station, USDA Forest Service, Fort Collins, CO.  August 1999 to August 2000.

Associate Professor, Department of Resource Economics and Policy and Department of Wildlife, University of Maine.  September 1991 to August 1997.

Faculty Associate, Center for Economics Research, Research Triangle Institute.  September 1992 to August 1994.

Visiting Scholar, Resource and Environmental Economics Program, Department of Agricultural and Resource Economics, North Carolina State University.  September 1992 to July 1993.

Assistant Professor, Department of Agricultural and Resource Economics and Department of Wildlife, University of Maine.  November 1986 to August 1991.

Resource Economist, HBRS, Madison, WI.  June 1984 to May 1987.

Research Associate, Department of Agricultural Economics, University of Wisconsin, Madison, WI.  January 1986 to November 1986.

Graduate Research Assistant, Department of Agricultural Economics, University of Wisconsin, Madison, WI.  January 1982 to December 1985.

Economist, Land Management Planning, Siuslaw National Forest, Corvallis, OR.  February 1981 to December 1981.

Graduate Research Assistant, Department of Agricultural and Resource Economics, Oregon State University, Corvallis, OR.  September 1979 to January 1981.

Director of Animal Operations, Northeast Biomedical Laboratories, South Windham, ME.  February 1979 to August 1979.

Research Assistant, University of Maine, Orono, ME.  October 1975 to May 1978.


**SELECTED PUBLIC SERVICE:**

Delegate, National Economic Education Delegation, 2021- (https://needelegation.org/).

Review Committee, Repeal of the Clean Water Rule and its Replacement with the Navigable Waters Protection Rule to Define Waters of the United States (WOTUS) of the External-Environmental Economics Advisory Committee (https://www.e-eeac.org/#:~:text=The%20External%20Environmental%20Economics%20Advisory,U.S.%20Environmental%20Protection%20Agency's%20programs), 2020.

Independent Particulate Matter Review Panel, Union of Concerned Scientists, 2019.

U.S. EPA Science Advisory Board Environmental Economics Advisory Committee, 2013-2016, 2017-2018.

U.S. EPA Clean Air Scientific Advisory Committee Particulate Matter Review Panel, 2015-

**KEVIN J. BOYLE**                                                                                           3

---

2018.

Economics Panel, Workshop to Inform EPA's Review of the PM NAAQS", 2015.

Review Panel, U.S. EPA Star Grant proposals, "Water Quality Benefits" program, 2015.

Reviewer, "Meta-analysis of Willingness-to-Pay for Water Quality Improvements', U.S. Environmental Protection Agency, 2015.

Review Panel, U.S. Department of Transportation, "Standards and Guidelines in Estimating Livability Benefits of Transit Projects", 2014/15.

Review, "Chesapeake Bay TMDL Hedonic Analysis", U.S. Environmental Protection Agency, 2013.

Early Career Professional Mentor, American Agricultural Economics Association, 2012-13.

U.S. EPA Science Advisory Board Advisory Council on Clean Air Compliance Analysis, 2011-2013.

"Valuation of Ecosystem Health Due to Drought and Climate Change in Australia." Commonwealth Scientific and Industrial Research Organization (CISRO), Adelaide, AU, 2008-2013.

Expert Panel, Valuation of Groundwater Effects from Stormwater Infiltration Policies," U.S. Environmental Protection Agency, 2012.

Panel, "Social, Psychological, and Economic Impacts of Superfund and Other Contaminated Sites." Brown University Superfund Research Program and National Institute of Environmental Health Sciences, 2012.

Panel, "Potential Effects of Stormwater Management Measures on Property Values and Developer Opportunity Costs," U.S. Environmental Protection Agency, 2012.

Site Review Team, "Making Do with What We Have," Alberta Water Resources Institute, 2010.

Rosenberg Forum on Water Resources Management, Northwest Territories, Canada, 2009.

"Non-market Ecological Valuation of Coastal Marine Resources in California." National Center for Ecological Analysis and Synthesis, University of California, Santa Barbara, 2007-2009.

Scientific Review Panel, "Nonuse Benefits Analysis for 316b Phase II Rule," Office of Water, U. S. Environmental Protection Agency, 2005.

"Committee on Assessing and Valuing Services of Aquatic and Related Terrestrial Ecosystems," National Research Council, 2002-04.

Resource Expert, "Governor's Blaine House Conference on Natural Resource-based Industries: Charting a New Course", State of Maine, 2003.

Reviewer, "Willingness to Pay for Coastal Water Quality Improvements." U.S. Environmental Protection Agency, Office of Water, 2000-01.

**KEVIN J. BOYLE**                                                                                           4

---

Reviewer, "Assessing Benefits of Drinking Water Regulations: A Guidance Manual." U.S. Environmental Protection Agency, Office of Policy and Office of Ground Water and Drinking Water, 1999.

"Groundwater Disinfection Regulations Benefits Group," U.S. EPA and National Water Research Institute.  1997.

"Interagency Work Group on Ecosystem Valuation," Economic Research Service, U.S. Department of Agriculture, 1997.

Reviewer, "National Benefit Estimates for 25 Years of the Clean Water Act."  U.S. EPA, 1997.

Reviewer, "Ecosystem Valuation Framework."  U.S. EPA, 1997.

Technical Advisor, "Study Commission on Property Rights and the Public Health, Safety and Welfare", Maine Legislature 1995.

"Recreational Fishing License Task Force," Maine Department of Marine Resources 1993-94.

"Interoffice Groundwater Valuation Group," U.S. Environmental Protection Agency 1993.

Expert Testimony, "National Estimates of Values for Protecting Groundwater Resources," U.S. Environmental Protection Agency, Economics Science Advisory Board, 1993.

Design Team, "Maine Conservation Fund License Plate," Department of Inland Fisheries, 1992-93.

Technical Advisor, "Subcommittee on National Survey of Fishing, Hunting and Wildlife-Associated Recreation regarding continuation of their National Survey of Hunting, Fishing and Wildlife Associated Recreation," U.S. Fish and Wildlife Service, 1992.

Technical Advisor, "Commission to Study the Impact of Game and Nongame Species on Maine's Economy," Maine Legislature 1988-90.


**SELECTED PROFESSIONAL SERVICE:**

Founding Chair, Council on Food Agriculture and Resource Economics (C-FARE) Blue Ribbon Panel on Natural Resources and Environmental Issues, 2011 to 2014.

Founding Chair, Land, Water and Environmental Economics Section (ENV), American Agricultural Economics Association, 2013/14.

Editorial Board, *Economics Research International*, 2010-2012.

Program Committee, Inaugural Summer Conference, Association of Environmental and Resource Economists, 2010-2011.

Board Member, Association of Environmental and Resource Economists, 2004-2006.

Chair, First offering of the "NAREA Award for Outstanding Public Service through Economics," 2002.

Organizing Committee and Host, Association of Environmental and Resource Economists Workshop, "Assessing and Managing Environmental and Public Health Risks," 2001.

**KEVIN J. BOYLE**                                                                                          5

Past President (1999/00), President (1998/99), President Elect (1997/98), Northeastern Agricultural and Resource Economics Association.

Associate Editor, *Journal of Environmental Economics and Management,* 1996-1999.

Associate Editor, *Marine Resource Economics*, 1997-99.

Board of Directors, Northeastern Agricultural and Resource Economics Association, 1992-1996.

Editorial Council, *Journal of Environmental Economics and Management*, 1989-91, 1994-95.

Nominating Committee, Association of Environmental and Resource Economists, 1992-93.

Chair, Recharter Committee, Western Regional Project W-133 (Benefits and Costs in Natural Resources Planning), 1991-92.

President 1989, Secretary 1988 Western Regional Project W-133, "Benefits and Costs in Natural Resource Planning".

Research Participant, National Academy of Sciences Review of the Glen Canyon Environmental Studies, November 1986.


**AWARDS:**

"Top 100 in Real Estate." 2022. (https://www.thetop100magazine.com/kevin-boyle)

"Alumni Award for Research Excellence." Virginia Tech, 2021. (https://www.research.vt.edu/news/2021/kevin-boyle-honored-with-alumni-award-for-research-excellence.html)

"Fellow." Agricultural and Applied Economics Association, 2019. (https://www.aaea.org/about-aaea/awards-and-honors/aaea-fellows/previous-aaea-fellows/kevin-boyle)

"Alumni Engagement Award." College of Agricultural and Life Sciences, Virginia Tech, 2019. (https://www.cals.vt.edu/alumni/awards/2019-awards.html)

"Fellow." Association of Environmental and Resource Economists, 2018. (https://vtx.vt.edu/articles/2018/08/cals-boyle-aere-fellow.html)

"Academy of Faculty Leadership." Virginia Tech, 2018. (https://faculty.vt.edu/faculty-recognition/academy-faculty-leadership-members.html)

"Service Award."  Land, Water and Environmental Economics Section, Agricultural and Applied Economics Association, 2015.

Publication of Merit, *Environmental and Resource Economics,* 2014.  Boyle, Kevin J., Christopher C. Parmeter, Bent Boehlert, and Robert Paterson.  2013. "Due Diligence in Meta-Analyses to Support Benefit Transfers."  *Environmental and Resource Economics*, Vol. 55 (3): 357-386. (http://link.springer.com/article/10.1007/s10640-012-9630-y/fulltext.html)

Carnegie Foundation for the Advancement of Teaching and Council for Advancement and Support of Education, "U.S. Professor of the Year, Maine," 2004

"Distinguished Maine Professor."  University of Maine, 2003.

ESCOP/ACOP Leadership Development Program Certificate, 2003.

**KEVIN J. BOYLE**                                                                                              6
_____

"Distinguished Member," Northeastern Agricultural and Resource Economics Association, 2002.

"2001 Presidential Research and Creative Achievement Award."  University of Maine.

"Post-Tenure Merit Award."  University of Maine, 2001.

"Outstanding Research Award."  College of Natural Sciences, Forestry and Agriculture, University of Maine, 1999.

Research Publication Award for Best Academic Publication, James Madison University, 1993/94. Milliman, Scott R., Barry L. Johnson, Richard C. Bishop, James Kitchell, and Kevin J. Boyle. 1992. "The Bioeconomics of Resource Rehabilitation:  A Commercial-Sport Analysis for a Great Lakes Fishery." *Land Economics*, Vol. 68 (2):191-210.

U.S.D.A. Certificate of Merit as an Economist, Land Management Planning Department, Siuslaw National Forest, U.S. Forest Service, 1981.

Best Master's Thesis, Department of Agricultural and Resource Economics, Oregon State University, 1981.

Savery Master's Student of Excellence as the Outstanding Master's Student in the School of Agriculture, Oregon State University, 1980/81.

Carlton E. Crossland Scholarship for Outstanding Academic Achievement in Economics, College of Liberal Arts, University of Maine, 1976.

**HONORARY SOCIETIES& RECONITIONS:**

Gamma Sigma Delta, Phi Kappa Phi, AND Sigma Xi


**SELECTED CONSULTING:**
Association for the Environmental Health of Soils, Bangor Hydro Electric Company, Central Maine Power Company, Exxon USA, First Wind, Harvard Institute of International Development, Health Canada, Illinois Department of Conservation, Industrial Economics, Inter-American Development Bank, Maine Audubon, Maine Department of Inland Fisheries and Wildlife, Maine Paper Industry Information Office, Minnesota Forest Resources Council, National Oceanic and Atmospheric Administration, National Park Service, New Jersey Attorney General, New Jersey Department of Environmental Protection, New York Attorney General, New York Department of Environmental Conservation, Oak Ridge National Laboratory, Ohio Chapter Nature Conservancy, Oklahoma Attorney General, Pacific Gas and Electric, Triangle Economic Research, U.S. Bureau of Reclamation, U. S. Department of Justice, U. S. Department of the Interior, U.S. Environmental Protection Agency, U. S. Fish and Wildlife Service, Vermont Attorney General, Vermont Department of Fish and Wildlife, Wyoming Fish and Game Department.


**GRANTS** (total ~$12.3 million)**:**
"Quantifying Benefits of Using Satellite Derived Early Warning System to Predict Cholera in Bangladesh." Investigators: Sonia Aziz, Emily Pakhtigian, Ali Akanda and Kevin Boyle. Sponsor: Resources for the Future, Grants for Assessing the Benefits of Satellites. Amount: $100,000.

**KEVIN J. BOYLE** 7
_____

"Linking land use decision-making, water quality, and lake associations to understand human-natural feedbacks in lake catchments."  Investigators:  Kelly Coburn, Kevin J. Boyle, Cayelan Carey, Christopher J. Duffy, and Paul C. Hanson.  Sponsor: National Science Foundation.  Amount: $1,799,931.

"A National Study of the Effects of Tree Canopy, Diversity and Health on Property Values."  Investigators: Kevin J. Boyle, Kelly Coburn, Andrew McCoy, Eric Wiseman and Thomas Holmes.  Sponsor: U.S. Forest Service.  Amount: $84,593.

"Modeling Sociobehavioral Resilience during Epidemics to Reduce Health Disparities."  Investigators: Achla Marathe, Kaja M. Abbas, Kevin J. Boyle, Jiangzhou Chen, Stephen G. Eubank, Bryan L. Lewis, Pamela M. Murray-Tuite, Hazhir Rahmandad and Samarath Swarup.  Sponsor: National Institutes of Health.  Amount: $1,032,334.

"A National Study of the Effects of Tree Canopy, Diversity and Health on Property Values."  Investigators: Kevin J. Boyle, Kelly Coburn, Eric P. Wiseman and Andrew P. McCoy.  Sponsor: U.S. Forest Service. Amount: $44,593.

"Customary and Reasonable Fees for Real Estate Appraisals in the Commonwealth of Virginia."  Investigators: Drew Sanderford, Kevin J. Boyle and Andrew P. McCoy.  Sponsor: Virginia Coalition of Appraisal Professionals. Amount: $10,000.

"Primer Workshop."  Investigator: Kevin J. Boyle. Sponsor: U. S. Forest Service.  Duration: 2012-2017.  Amount: $20,000.

"Large-scale Hedonic Property Value Analysis of Forest Pest Impacts Related to Climate Change, Phase II."  Investigators: Kevin J. Boyle, Klaus Moeltner, Randolph Wynne and Christine Blinn. Sponsor: U. S. Forest Service.  Duration: 2012-2013.  Amount: $140,000.

"Large-scale Hedonic Property Value Analysis of Forest Pest Impacts Related to Climate Change, Phase I."  Investigators: Kevin J. Boyle, Klaus Moeltner, Randolph Wynne and Eric Wiseman.  Sponsor: U. S. Forest Service.  Duration: 2011-2012.  Amount: $79,085.

"Meta-analysis of Forest-Based Hedonic Property Value Studies: Implications for Economic Valuation of Climate Change Impacts."  Investigators: Kevin J. Boyle, Klaus Moeltner, Randolph Wynne and Eric Wiseman. U. S. Forest Service.  Duration: 2011-2012.  Amount: $38,472.

"Institute for Critical Technology and Applied Science Doctoral Fellow."  Fellow: Yuan "Clara" Yuan.  Duration: 2011-2015.  Amount: $142,448.

"Dynamic Interactions of Monetary and Non-monetary Incentives in Weight Loss Interventions."  Investigators: You, Wendy, Kevin J. Boyle and Christopher Parameter. Sponsor: NIH.  Duration: 2010-2012.  Amount: $407,586.

"Integrated Management of Zoosporic Pathogens and Irrigation Water Quality for a Sustainable Green Industry."  Investigators: Hong, Chuanxue, Kevin Boyle, and Gary Moorman.  Sponsor: USDA-Specialty Crops. Duration: 2010-2015.  Amount: $2,729,649.

"Virginia Tech AEEMS for Success."  Investigators: Dixie W. Reaves, Kevin J. Boyle and Rick Rudd.  Sponsor: USDA-CSREES.  Amount: $116,000.

**KEVIN J. BOYLE** 8

_____

"Farm Credit of Armenia."  Investigators: Boyle, Kevin and Douglas Flory. Sponsor: USDA, Foreign Agricultural Service.  Duration: 2007-2009.  Amount: $437,118.

"Validation of Benefit-Transfer Functions."  Investigators: Boyle, Kevin, Christopher Parmeter, Nicolai Kuminoff, and Jaren Pope. Sponsor: U. S. Environmental Protection Agency, EPA-G2006-STAR-G-1.  Duration: 2007-2009.  Amount: $199,986.

"Assessing the Regional Economic Impact of Protected Lands Adjacent to the 100 Mile Wilderness Section of the Appalachian Trail."  Investigators: Kevin J. Boyle and Kathleen P. Bell.  Sponsor:  Maine Department of Conservation.  Duration: 2004-05.  Amount: $35,547.

"Risk Assessment of Fish Consumption by Pregnant Women."  Investigator: Kevin J. Boyle, Sponsor: Maine Department of Human Services.  Duration: 2003-04.  Amount: $12,650.

"GK12 Sensors."  Investigators: John Vetelino, Kevin J. Boyle, and Constance Holden.  Sponsor: National Science Foundation.  Duration: 2004-05.  Amount: $536,566.

"Economic Valuation of Avoiding Arsenic Exposure in Drinking Water."  Investigators: Kevin J. Boyle, and Kathleen P. Bell.  Sponsor: U.S. EPA.  Duration: 2002-04.  Amount: $259,825.

"Measuring the Economic Damages from Oil Spills to Maine's Marine Economy."  Investigators: Jonathan Rubin, Kevin J. Boyle, and Deirdre Mageean.  Sponsor: Maine/New Hampshire Sea Grant Program.  Duration: 2003-05.  Amount: $149,514.

"Experimental Tests of Provision Rules in Conjoint Analysis for Environmental Valuation."  Investigators: Laura Taylor, and Kevin J. Boyle.  Sponsor: U.S. EPA.  Duration: 2002-03.  Amount: $120,479.

"Economic Impacts of Hemlock Woolly Adelgid on Residential Forest Landscapes."  Investigators: Kathleen P. Bell, and Kevin J. Boyle.  Sponsor: USDA Forest Service.  Duration: 2002-03.  Amount: $75,024.

"Urban Regeneration through Environmental Remediation: Valuing Market-Based Incentives for Brownfields Development."  Investigators: Peter Meyer, Kris Wernstedt, Anna Alberini, and Kevin J. Boyle.  Sponsor: U.S. EPA.  Duration: 2002-04.  Amount: $277,388.

"Understanding Public Values Produced by Private Forests in the Southern U.S."  Investigator: Kevin J. Boyle.  Sponsor: Forest Service, U.S. Department of Agriculture.  Duration: 2001-03.  Amount: $57,350.

"National Policy Implications of the Demand for Open Space."  Investigator: Kevin J. Boyle.  Sponsor: Economic Research Service, U.S. Department of Agriculture.  Duration: 1999-04.  Amount: $105,445.

"Formulation Non-market Research Objective."  Investigator: Kevin J. Boyle.  Sponsor: Rocky Mountain Research Station, U.S. Forest Service.  Duration: 2000-01.  Amount: $19,110.

"Improved Information in Support of a National Strategy for Open Land Policies."  Investigators: Kevin J. Boyle, Larry Libby, Mary Ahearn, Anna Alberini, and John Bergstrom.  Sponsor: National Research Initiative Competitive Grants Program, U.S. Department of Agriculture.  Duration: 1999-2001.  Amount: $207,000.

**KEVIN J. BOYLE**                                                                                                    9
_____

"Cooperative Agreement to Study the Demand for Food Safety."  Investigators: Nancy Bockstael, Kevin Boyle, Alan Levy, Mario Teisl (Principal), Alan Randall, and Brian Roe.  Sponsor: Center for Disease Control and Prevention.  Duration: 1998-03.  Amount: $946,447.

"Ice Fishing and Open Water Fishing Survey of Angler Effort and Preferences."  Investigator: Kevin J. Boyle.  Sponsor: Maine Department of Inland Fisheries and Wildlife.  Duration: 1999-00.  Amount: $107,861.

"The Effect of National Wildlife Refuge Proximity on Property Prices."  Investigator: Kevin J. Boyle.  Sponsor: U.S. Fish and Wildlife Service.  Duration: 1998-00.  Amount: $145,770.

"Assessing Public Perceptions and Evaluating Public Preferences for Ecosystem Management and Forest Health."  Investigators: Kevin J. Boyle, and Daniel McCollum.  Sponsor: U.S. Forest Service, Rocky Mountain Research Station.  Duration: 1998-00.  Amount: $59,400.

"The Economic Impacts of Hunting, Fishing and Wildlife-Watching in Maine." Investigators: Mario F. Teisl and Kevin J. Boyle. Sponsor: Maine Department of Inland Fisheries and Wildlife. Duration: 1998. Amount: $7,724.

"A Study of the Effect of Lake-Water Quality on the Prices of Lake-Front Property in Maine, New Hampshire and Vermont."  Investigators: Kevin J. Boyle, and John Halstead.  Sponsor:  U.S. Geological Service.  Duration: 1997-99.  Amount: $182,471.

"1998 Wildlife Survey."  Investigators: Kevin J. Boyle, Brian Roach, and Mario F. Teisl.  Sponsor: Maine Department of Inland Fisheries and Wildlife.  Duration: 1997-98.  Amount: $122,462.

"An Investigation of the Economic Value of Maine's Great Ponds."  Investigator: Kevin J. Boyle.  Sponsor: Maine Department of Environmental Protection.  Duration: 1997.  Amount: $32,872.

"Do Interest Group Preferences Differ from Preferences of the General Public for Managed and Unmanaged Forest Ecosystems?"  Investigators: Kevin J. Boyle, and Thomas P. Holmes.  Sponsor: U.S. Forest Service, Southeastern Forest Experiment Station.  Duration: 1996-98.  Amount" $17,000.

"1996 Survey of Hunter Effort and Preferences."  Investigator: Kevin J. Boyle.  Sponsor: Maine Department of Inland Fisheries and Wildlife.  Duration: 1996-97.  Amount: $105,899.

"The Effects of Agriculture on Wildlife: A Study of Nonuse Values."  Investigators: Kevin J. Boyle, and Richard C. Bishop.  Sponsor: U.S. Department of Agriculture, Economic Research Service.  Duration: 1995-97.  Amount: $280,000.

"Public Preferences for Managed and Unmanaged Forest Ecosystems."  Investigators: Kevin J. Boyle, and Thomas P. Holmes.  Sponsor: U.S. Forest Service, Southeastern Forest Experiment Station.  Duration: 1995-97.  Amount: $9,000.

"A Hedonic Property Value Study of the Economic Value of Protecting Water Quality in Maine Lakes."  Investigator: Kevin J. Boyle.  Sponsor: U.S. Geological Service.  Duration: 1995-96.  Amount: $57,120.

"Open Water Fishing Survey of Angler Effort and Preferences."  Investigator: Kevin J. Boyle.  Sponsor: Maine Department of Inland Fisheries and Wildlife.  Duration: 1994-95.  Amount: $83,322.

**KEVIN J. BOYLE** 10

_____

"Hedonic-Price Study of Water Quality in Maine's Lakes."  Investigator: Kevin J. Boyle.  Sponsor: Maine Department of Environmental Protection and Water Resources Institute, University of Maine.  Duration 1994-95.  Amount: $25,093.

"Meta-Analysis of Response Rates to Contingent-Valuation Surveys."  Investigators: Kevin J. Boyle, V. Kerry Smith, and Donald Epp.  Sponsor: U.S. Forest Service, Rocky Mountain Forest and Range Experiment Station.  Duration: 1994-95.  Amount: $39,000.

"The Effects of Substitutes on Economic Value Estimates of Forest Ecosystem Health."  Investigators: Kevin J. Boyle, and Thomas P. Holmes.  Sponsor: U.S. Forest Service, Southeastern Forest Experiment Station.  Duration: 1993-95.  Amount: $25,000.

"Ice Fishing Survey of Angler Effort and Preferences."  Investigator: Kevin J. Boyle.  Sponsor: Maine Department of Inland Fisheries and Wildlife.  Duration: 1994.  Amount: $86,485.

"Economic Valuation of Groundwater Resources by the U.S. Environmental Protection Agency."  Investigators: Kevin J. Boyle, and John C. Bergstrom.  Sponsor: U.S. Environmental Protection Agency, Cooperative Agreement CR818760-01-0.  Duration: 1993-94.  Amount: $24,637.

"Review of Contingent-Valuation Studies of the Benefits of Groundwater Protection."  Investigator: Kevin J. Boyle.  Sponsor: U.S. Environmental Protection Agency, Cooperative Agreement CR818760-01-0.  Duration: 1993-94. Amount: $7,550.

"Analysis of Contingent-Valuation Data from the 1991/92 National Survey of Hunting, Fishing and Wildlife Associated Recreation."  Investigator:  Kevin J. Boyle.  Sponsor:  U.S. Fish and Wildlife Service.  Duration:   1992-94.  Amount:  $25,000.

"Benefit-Cost Analysis of Atlantic Salmon Restoration on the Penobscot River."  Investigators: Kevin J. Boyle, Stephen D. Reiling, and Mario F. Teisl.  Sponsor:  Bangor Hydro-Electric, Co.  Duration 1991-92.  Amount:  $98,378.

"An Economic Evaluation of Consumptive and Nonconsumptive Uses of Maine's Fish and Wildlife Resources: Addendum."  Investigators: Kevin J. Boyle, Stephen D. Reiling, and Mario Teisl.  Sponsor: Maine Department of Inland Fisheries and Wildlife.  Duration: 1990-1991.  Amount: $46,666.

"Developing Statistical Models to Update State Level Data Collected by the National Survey of Fishing, Hunting and Wildlife-Associated Recreation.  Investigator: Kevin J. Boyle.  Sponsor: U.S. Fish and Wildlife Service.  Duration: 1990-1991.  Amount: $7,000.

"Economic Impacts of Improved Sport Fisheries on the Lower Kennebec River Watershed."  Investigators: Kevin J. Boyle, John R. Moring, and Stephen D. Reiling.  Sponsor:  Maine Department of Marine Resources.  Duration: 1989-1991.  Amount:  $46,000.

"Economic Benefits of Big-Game Hunting."  Investigators:  Kevin J. Boyle, and Stephen D. Reiling.  Sponsor:  U.S. Forest Service, Rocky Mountain Forest and Range Experiment Station.  Duration: 1989-91.  Amount: $22,660.

**KEVIN J. BOYLE**                                                                        11

_____

"Sustainable Crop and Livestock Production." Investigators: Faculty of Sustainable Agriculture, University of Maine. Sponsor: Jessie Smith Noyes Foundation. Duration: 1988-1991. Amount: $60,000.

"Analysis and Reporting of Data from a Comprehensive Survey of Marine, Sport Fishing in Maine." Investigators: Kevin J. Boyle, and Stephen D. Reiling. Sponsor: University of Maine Sea Grant Program. Duration: 1990. Amount: $9,950.

"An Economic Evaluation of Consumptive and Nonconsumptive Uses of Maine's Fish and Wildlife Resources." Investigators: Kevin J. Boyle, and Stephen D. Reiling. Sponsors: Maine Legislative Commission to Study the Impact of Game and Nongame Species on Maine's Economy, Maine Department of Inland Fisheries and Wildlife, and Maine Department of Marine Resources. Duration: 1988-1990. Amount: $396,267.

"Design of Contingent-Valuation Questions for the 1990 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation." Investigator: Kevin J. Boyle. Sponsor: U.S. Fish and Wildlife Service. Duration: 1989-90. Amount: $9,272.

"An Examination of the Economic Value and Use of Maine's Fish and Wildlife Resources." Investigator: Kevin J. Boyle. Sponsors: Maine Department of Inland Fisheries and Wildlife, and Forests for the Future Program, Maine Department of Conservation. Duration: 1987. Amount: $16,060.

**PUBLICATIONS:**
(h-index = 55, http://scholar.google.com/citations?user=m3NjIDUAAAAJ&hl=en&oi=ao)

**A.  Journal Articles**
1. Siriwardena, Shyamani, Kevin J. Boyle and Thomas P. Holmes. "Implicit value of urban tree cover: an internal meta-analysis across multiple cities in the U.S." (in preparation)

2. Cao, Xiang, Kevin J. Boyle and Thomas P. Holmes. "Estimating the Demand for Urban Tree Cover Using a Residential Sorting Model: The Case of Milwaukee, Wisconsin." (in preparation)

3. Paterson, Robert, Kevin J. Boyle, Matthew Schmidt, Bryan Hubbell and Daniel Phaneuf. "Property Value Impacts of Air-pollution on Visibility." (in preparation)

4. Thomy, Buyani, Rosalind Bark, Mark Morrison, Phillip Birtles, Kevin Boyle and Roderick Duncan. "Incorporating ecosystem attributes in hedonic models to estimate implicit prices for socio-ecological services." Ecological Economics (revise and resubmit).

5. Weng, Weizhe, Lingxiao Yan, Kevin J. Boyle and George Parsons. 2023. "COVID-19 and visitation to Central Park, New York City" PLOS ONE (https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0290713).

6. Weizhe Weng, Kelly M. Cobourn, Armen R. Kemanian, Kevin J. Boyle, Yuning Shi, Joseph Stachelek and Charles White. 2023. "Quantifying Co-Benefits of Water Quality Policies: An Integrated Assessment Model of Land and Nitrogen Management." *American Journal of Agricultural Economics* (http://doi.org/10.1111/ajae.12423).

7. Nolte, Christoph, Kevin J. Boyle, Anita Chaudhry, Christopher Clapp, Dennis Guignet, Hannah

**KEVIN J. BOYLE**                                                                                    12

_____

Hennighausen, Ido Kushner, Yanjun Liao, Saleh Mamun, Adam Pollack, Jesse Richardson, Shelby Sundquist, Kristen Swedberg and Johannes H. Uhl. 2023. "Data Practices for Studying the Impacts of Environmental Amenities and Hazards with Nationwide Property Data." Land Economics (forthcoming) (https://doi.org/10.3368/le.100.1.102122-0090R )

8. Swedberg, Kristen, Diego S. Cardoso, Adriana Castillo-Castillo, Saleh Mamun, Kevin J. Boyle, Christoph Nolte, Michael Papenfus and Stephen Polasky. 2023. Spatial Heterogeneity in Hedonic Price Effects for Lake Water Quality. Land Economics (https://doi.org/10.3368/le.100.1.102122-0086R).

9. Mamun, Saleh, Adriana Castillo-Castillo, Kristen Swedberg, Jiarui Zhang, Kevin J. Boyle, Diego Cardoso, Catherine L. Kling, Christoph Nolte, Michael Papenfus, Daniel Phaneuf, and Stephen Polasky. 2023. "Valuing water quality in the United States using a national dataset on property values." *Proceedings of the National Academies of Sciences*, Vol. 120 (15) (https://www.pnas.org/doi/abs/10.1073/pnas.2210417120)

10. Swedberg, Kristen, Kevin J. Boyle, Jemma Stachelek, Nicole K. Ward, Weizhe Weng, and Kelly M. Cobourn. 2022. Examining Implicit Price Variation for Lake Water Quality. *Water Economics and Policy*. (https://doi.org/10.1142/S2382624X22400057)

11. Mark Morrison Kevin J Boyle, Buyani Thomy, Michael Burton, and Weibin Xu. 2022. "Enhancing Urban Stream Values: The Case of the Cooks and Georges River Catchments." *Journal of Water Resources Planning and Management,* Vol. 148 (11). (https://doi.org/10.1061/(ASCE)WR.1943-5452.0001577)

12. Li, Xiaoshu, Kevin J. Boyle, Evan L. Preisser, Thomas P. Holmes and David Orwig. 2022. "Property Value Effects of the Spatial Expansion of the Hemlock Wooly Adelgid in New England, U.S." *Ecological Economics*, Vol. 194 (https://doi.org/10.1016/j.ecolecon.2022.107354).

13. You, W., Yuan, Y., Boyle, K.J., Michaud, T., Parmeter, C., Seidel, R.W., Estabrooks, P.A. 2022. "Examining Ways to Improve Weight Control Programs' Population Reach and Representativeness: A Discrete Choice Experiment of Financial Incentives." *Pharmacoeconomics Open*, Vol. 6: 193-210. (https://doi.org/10.1007/s41669-021-00310-6).

14. Keiser, David A., Sheila M. Olmstead, Kevin J. Boyle, Victor B. Flatt, Bonnie L. Keeler, Daniel J. Phaneuf, Joseph S. Shapiro, and Jay P. Shimshack. 2022. "The Evolution of WOTUS and the Role of Economics." *Review of Environmental Economics and Policy*, Vol 16 (1): 146-152. (https://www.journals.uchicago.edu/doi/10.1086/717917).

15. Bishop, Richard C., and Kevin J. Boyle. 2021. "On Adding-Up as a Validity Criterion for Stated-preference Studies." *Environmental and Resource Economics,* Vol. 80: 587-601. (https://doi.org/10.1007/s10640-021-00599-1)

16. Keiser, David, Sheila Olmstead, Kevin Boyle, Victor Flatt, Bonnie Keeler, Cathy Kling, Daniel Phaneuf, Joseph S. Shapiro and Jay Shimshack. 2021. "A water rule that turns a blind eye to transboundary pollution." *Science,* Vol. 372 (6539): 241-243. (https://doi.org/10.1126/science.abf8885)

17. Johnston, Robert J., Kevin J. Boyle, Maria Loureiro, Ståle Navrd, John Rolfe. 2021. "Guidance

to Enhance the Validity and Credibility of Environmental Benefit Transfers." *Environmental and Resource Economics*, Vol. 79: 575-624. (https://doi.org/10.1007/s10640-021-00574-w)

18. Weng, Weizhe, Mark D. Morrison, Kevin J. Boyle, Peter C. Boxall and John Rose. 2021. "Effects of the Number of Alternatives in Public Good Discrete Choice Experiments." *Ecological Economics,* Vol. 182. (https://www.sciencedirect.com/science/article/abs/pii/S0921800920321959).

19. Parsons, George, Chris Leggett, Joe Herriges, Kevin J. Boyle, Nancy Bockstael and Zoe Chen. 2021. "A Site-Portfolio Model for Multiple-Destination Recreation Trips: Valuing Trips to National Parks in the Southwestern USA." *Journal of the Association of Environmental and Resource Economists*, Vol. 8 (1): 1-25 (https://www.journals.uchicago.edu/doi/10.1086/710714).

20. Frey, Henry Christopher, Peter J. Adams, John L. Adgate, George A. Allen, John Balmes, Kevin Boyle, Judith C. Chow, Douglas W. Dockery, Henry Dirk Felton, Terry Gordon, Jack R. Harkema, Kinney, Michael T. Kleinman, Rob McConnell, Richard L. Poirot, Jeremy A. Sarnat, Lianne Sheppard, Barbara Turpin, and Ron Wyzga. 2020. "The Need for A Tighter Particulate Matter Air Quality Standard: Independent Particulate Matter Review Panel." *The New England Journal of Medicine,* 383:680-683. (https://www.nejm.org/doi/full/10.1056/NEJMsb2011009 )

21. Fitchett, Leah, Michael Sorice, Kevin Boyle, Kelly Cobourn, Kathleen Weathers and Jen Klug. 2020. "Pathways to enhanced lake integrity: A framework to assess effectiveness of local lake associations." *Lakes & Reservoirs: Science, Policy and Management for Sustainable Use,* Vol. 25 (2): 258-268. (https://onlinelibrary.wiley.com/doi/abs/10.1111/lre.12308)

22. Bishop, Kelly C., Nicolai V. Kuminoff, H. Spencer Banzhaf, Kevin J. Boyle, Kathrine von Gravenitz, Jaren C. Pope, V. Kerry Smith, and Christopher D. Timmins. 2020. "Best Practices in Using Hedonic Property Value Models to Measure Willingness to Pay for Environmental Quality." *Review of Environmental Economics and Policy*, Vol. 14 (2): 260–281. (https://academic.oup.com/reep/article-abstract/14/2/260/5894759)

23. Weng, Weizhe, Kevin J. Boyle, Kaitlin J. Farrell, Cayelan C. Carey, Kelly M. Cobourn, Hilary A. Dugan, Paul C. Hanson, Nicole K. Ward, Kathleen C. Weathers. 2020. "Coupling Natural and Human Models in the Context of a Lake Ecosystem: Lake Mendota, Wisconsin, USA." *Ecological Economics*, Vol. 169. (https://doi.org/10.1016/j.ecolecon.2019.106556)

24. Henson, V. Reilly, Kelly M. Cobourn, Cayelan C. Carey, Kevin J. Boyle, Michael G. Sorice, Nicole K. Ward and Kathleen C. Weathers. 2019. "Closing the Human-Nature Feedback Loop: Understanding People's Responses to Changing Lakes." *Lakeline*, Vol. 39 (3): 35-38. (https://www.nalms.org/product/lakeline-39-3-source-water-protection/)

25. Li, Xiaoshu, Thomas P. Holmes, Kevin J. Boyle, Ellen V. Crocker and C. Dana Nelson. 2019. Hedonic Analysis of Forest Pest Invasion: The Case of Emerald Ash Borer. *Forests*, Vol. 10 (9), 820. (https://doi.org/10.3390/f10090820)

26. Boyle, Kevin J., and Matthew J. Kotchen. 2019. The Need for More (Not Less) External Review of Economic Analysis at the U.S. EPA. *Review of Environmental Economics and Policy,* Vol. 13 (2): 308–316. (https://doi.org/10.1093/reep/rez006)

**KEVIN J. BOYLE** 14

27. Boyle, Kevin J., Jessica A. Boatwright, Sreeya Brahma and Weibin Xu. 2019. "NIMBY, not, in Siting Community Wind Farms." *Resource and Energy Economics*, Vol. 57: 85-104. (https://doi.org/10.1016/j.reseneeco.2019.04.004)

28. Singh, Meghendra, Prasenjit Sarkhel, Gloria J Kang, Achla Marathe, Kevin Boyle, Pam Murray-Tuite, Kaja M Abbas and Samarth Swarup. 2019. "Impact of Demographic Disparities in Social Distancing and Vaccination on Influenza Epidemics in Urban and Rural Regions of the United States." *BMC Infectious Diseases*, Vol. 19 (1), 221. (https://bmcinfectdis.biomedcentral.com/articles/10.1186/s12879-019-3703-2)

29. Bishop, Richard C., and Kevin J. Boyle. 2019. "Reliability and Validity in Nonmarket Valuation." *Environmental and Resource Economics,* Vol. 72 (2): 559-582. (https://link.springer.com/article/10.1007/s10640-017-0215-7)

30. Ward, Nicole K., Leah Fitchett, Julia A. Hart, Lele Shu, Joe Stachelek, Weizhe Weng, Yu Zhang, Hilary Dugan, Amy Hetherington, Kevin Boyle, Cayelan C. Carey, Kelly M. Cobourn, Paul C. Hanson, Armen R. Kemanian, Michael G. Sorice and Kathleen C. Weathers. 2019. "Integrating fast and slow processes is essential for simulating human-freshwater interactions." *Ambio* Vol. 48 (10): 1169-1182. (https://doi.org/10.1007/s13280-018-1136-6).

31. Cobourn, K.M., C.C. Carey, K.J. Boyle, C. Duffy, H.A. Dugan, K.J. Farrell, L. Fitchett, P.C. Hanson, J.A. Hart, V.R. Henson, A.L. Hetherington, A.R. Kemanian, L.G. Rudstam, L. Shu, P.A. Soranno, M.G. Sorice, J. Stachelek, N.K. Ward, K.C. Weathers, W. Weng, Y. Zhang. 2018. "From concept to practice to policy: modeling coupled natural and human systems in lake catchments." *Ecosphere,* Vol. 9 (5), e02209. (https://doi.org/10.1002/ecs2.2209)

32. Sorice, Michael G., C. Josh Donlan, Kevin J. Boyle, Weibin Xu, and Stefan Gelcich. 2018. "Scaling Participation in Payments for Ecosystem Services Programs." *Plos One,* Vol. 13 (3): e0192211. (https://doi.org/10.1371/journal.pone.0192211).

33. Banerjee, Onil, Kevin J. Boyle, Cassandra T. Rogers, Janice Cumberbatch, Barbara Kanninen, Michele Lemay, and Maja Schiling.  2018. "Estimating benefits of investing in resilience of coastal infrastructure in small island developing states: An application to Barbados." *Marine Policy,* Vol. 90: 78-87. (https://doi.org/10.1016/j.marpol.2018.01.004)

34. Boyle, Kevin J., and Jeffrey M. Wooldridge.  2018. "Understanding Error Structures and Exploiting Panel Data in Meta-Analytic Benefit Transfers." *Environmental and Resource Economics,* Vol. 69 (3): 609-635. (http://www.springer.com/home?SGWID=0-0-1003-0-0&aqId=3433489&download=1&checkval=2d095ee14e8aebd4ccc8be252ef2e204)

35. Boyle, Kevin J., Matthew J. Kotchen, and V. Kerry Smith. 2017. "Deciphering dueling analyses of clean water regulations." *Science*, Vol. 358 (6359): 49-50. (http://science.sciencemag.org/content/358/6359/49.summary)

36. Bishop, Richard C., Kevin J. Boyle, Richard T. Carson, David Chapman, W. Michael Hanemann, Barbara Kanninen, Raymond J. Kopp, Jon A. Krosnick, John List, Norman Meade, Robert Paterson, Stanley Presser, V. Kerry Smith, Roger Tourangeau, Michael Welsh, Jeffrey M. Wooldridge, Matthew DeBell, Colleen Donovan, Matthew Konopka, Nora Scherer.  2017. "Contingent valuation: Flawed logic? Response." *Science*, Vol. 357 (6349): 363-364. (http://science.sciencemag.org/content/357/6349/363.2)

**KEVIN J. BOYLE**                                                                                    15

_____

37. Bishop, Richard C., Kevin J. Boyle, Richard T. Carson, David Chapman, W. Michael Hanemann, Barbara Kanninen, Raymond J. Kopp, Jon A. Krosnick, John List, Norman Meade, Robert Paterson, Stanley Presser, V. Kerry Smith, Roger Tourangeau, Michael Welsh, Jeffrey M. Wooldridge, Matthew DeBell, Colleen Donovan, Matthew Konopka, Nora Scherer.  2017. "Putting a value on injuries to natural assets: The BP oil spill." *Science*, Vol. 356 (6335): 253-254. (http://science.sciencemag.org/content/356/6335/253.summary)

38. Johnston, Robert J., Kevin J. Boyle, Wiktor Adamowicz, Jeff Bennett, Roy Brouwer, Trudy Ann Cameron, W. Michael Hanemann, Nick Hanley, Mandy Ryan, Riccardo Scarpa, Roger Tourangeau, Christian A. Vossler. 2017. "Contemporary Guidance for Stated Preference Studies." *Journal of the Association of Environmental and Resource Economists,* Vol. 4 (2): 319-405. (http://www.journals.uchicago.edu/doi/abs/10.1086/691697?journalCode=jaere)

39. Sanderford, A.R., Read, D.C., Xu, W. and Boyle, K.J., 2017. "Obtaining Differentiation Premiums in the Presence of Fee Regulation in the Residential Real Estate Appraisal Industry." *Housing Policy Debate,* Vol. 27, (5): 698-711. (http://www.tandfonline.com/doi/abs/10.1080/10511482.2017.1305979)

40. Kaul, Sapna, Rochelle R. Smits-Seeman, Eduardo R. Zamora, Holly Spraker-Perlman, Kevin J. Boyle and Anne C. Kirchhoff.  2017. "Adolescent and Young Adult Cancer Survivors' Valuation of Post-Treatment Recommended Care." *Journal of Adolescent and Young Adult Oncology*, Vol 6 (1):  127-133. (doi:10.1089/jayao.2016.0054). (http://online.liebertpub.com/doi/abs/10.1089/jayao.2016.0054)

41. Rothwell, Erin, Sapna Kaul, Kevin Boyle, and Bob Wong.  2016.  "Value of Genetic Incidental Findings Related to Cancer Causing Genes." *American Journal of Cancer Prevention*, Vol. 4 (3): 44-50. (http://pubs.sciepub.com/ajcp/4/3/3/index.html)

42. Siriwardena, Shyamani, Kevin J. Boyle, Thomas P. Holmes and P. Eric Wiseman.  2016. "The implicit value of tree cover in the U.S.: A meta-analysis of hedonic property value studies." *Ecological Economics*, Vol. 128: 68-76. (http://www.sciencedirect.com/science/article/pii/S0921800916304293)

43. Cultice, Alyssa, Darrell J. Bosch, James W. Pease and Kevin J. Boyle.  2016. "Horticultural Growers' Willingness to Adopt Recycling of Irrigation Water". *Journal of Agricultural and Applied Economics*, Vol. 48 (1): 99–118. (https://www.cambridge.org/core/journals/journal-of-agricultural-and-applied-economics/article/horticultural-growers-willingness-to-adopt-recycling-of-irrigation-water/E0BF70D9DA31B4F339BB0E8E30F25320)

44. Boyle, K.J., R.W. Paterson, R.T. Carson, Christopher Leggett, B. Kanninen, John Molenar, and J. Neumann.  2016. "Valuing Shifts in the Distribution of Visibility in National Parks and Wilderness Areas in the United States." *Journal of Environmental Management,* Vol. 173: 10-22. (http://www.sciencedirect.com/science/article/pii/S0301479716300391)

45. Cohen, Jed, Klaus Moeltner, Christine Blinn, Kevin J. Boyle and Thomas P. Holmes. 2016. "Hedonic Valuation with Translating Amenities: Mountain Pine Beetles and Host Trees in the Colorado Front Range." *Environmental and Resource Economics,* Vol. 65 (3): 613-642. (http://link.springer.com/article/10.1007/s10640-014-9856-y)

46. Boyle, Kevin J., Mark Morrison, Darla Hatton MacDonald, and Roderick Duncan. 2016.

**KEVIN J. BOYLE**                                                                 16

_____

"Investigating Internet and Mail Implementation of Stated-Preference Surveys While Controlling for Differences in Sample Frames". *Environmental and Resource Economics,* Vol. 64 (3):401-419. (http://link.springer.com/article/10.1007/s10640-015-9876-2)

47. Yuan, Yuan, Kevin J. Boyle and Wen You.  2015. "Sample Selection, Individual Heterogeneity and Regional Heterogeneity in Valuing Farmland Conservation Easements." *Land Economics*, Vol. 91 (4): 627-649.  (http://le.uwpress.org/content/91/4/627.short)

48. Dymond, Randy, Kevin J. Boyle, Yvan J. Beliveau, Rosemary Carucci Goss, Raman Kumar and P. Eric Wiseman.  2015. "Development of an Interdisciplinary Undergraduate Program in Real Estate: Breaking Down University Silos."  *Journal of Real Estate Practice and Education*, Vol. 18 (2):141-162. (http://aresjournals.org/doi/abs/10.5555/1521-4842.18.2.141)

49. Tanellari, Eftila, Darrell Bosch, Kevin Boyle and Elton Mykerezi.  2015. "On consumers' attitudes and willingness to pay for improved drinking water quality and infrastructure."  *Water Resources Research*, Vol. 51 91): 47-57. (http://onlinelibrary.wiley.com/doi/10.1002/2013WR014934/full)

50. Hashemi, Ali, Wen You, Kevin J. Boyle, Christopher F. Parmeter, Barbara Kanninen and Paul A. Estabrooks.  2015. "Identifying Financial Incentive Designs to Enhance Participation in Weight Loss Programs."  *Journal of Obesity & Weight Loss Therapy,* Vol. 5 (247):2. (http://www.omicsgroup.org/journals/identifying-financial-incentive-designs-to-enhance-participation-in-weight-loss-programs-2165-7904-5-247.pdf)

51. Zhang, Congwen, Kevin J. Boyle and Nicolai V. Kuminoff.  2015. "Partial Identification of Hedonic Demand Functions."  *Journal of Environmental Economics and Management*, Vol. 71:180-197.  (http://www.sciencedirect.com/science/article/pii/S0095069615000170)

52. Aziz, Sonia, Kevin J. Boyle and Thomas Crocker.  2015. "Parental Decisions, Child Health and Valuation of Avoiding Arsenic in Drinking Water in Rural Bangladesh."  *Journal of Water and Health,* Vol. 13 (1): 152-167. (http://jwh.iwaponline.com/content/13/1/152)

53. Li, Xiaoshu, K. J. Boyle, Thomas P. Holmes, and Genevieve Pullis-LaRouche.  2014.  The effect of on-site forest experience on stated preferences for low impact timber harvesting programs.  *Journal of Forest Economics,* Vol. 20 (4): 348-362. (http://www.sciencedirect.com/science/article/pii/S110468991400035X )

54. Li, Xiaoshu, Evan L. Preisser, Kevin J. Boyle, Thomas P. Holmes, Andrew Liebhold and David Orwig.  2014. "Potential social and economic impacts of the hemlock woolly adelgid in Southern New England." *Southern Naturalist/Northeastern Naturalist,* Vol. 13 (6): 130-146. (http://www.bioone.org/doi/pdf/10.1656/058.013.s609)

55. Aziz, Sonia, Khwaja M. Sultanul Aziz and Kevin J. Boyle.  2014.  "Arsenic in drinking water in Bangladesh: factors affecting child health." *Frontiers in Public Health*, Volume 2, Article 57: 1-6.  (http://journal.frontiersin.org/Journal/10.3389/fpubh.2014.00057/abstract)

56. Tobias Börger, Nicola J. Beaumont, Linwood Pendleton, Kevin J. Boyle, Philip Cooper, Stephen Fletcher, Tim Haab, Michael Hanemann, Tara L. Hooper, S. Salman Hussain, Rosimeiry Portela, Mavra Stithou, Joanna Stockill, Tim Taylor and Melanie C. Austen.  2014. "Incorporating Ecosystem Services in Marine Planning: The Role of Valuation." *Marine*

**KEVIN J. BOYLE**                                                                    17

_____

*Policy*, Vol. 46:161-170.
(http://www.sciencedirect.com/science/article/pii/S0308597X14000311)

57.  Boatwright, Jessica, Kurt Stephenson, Kevin Boyle, and Sara Nienow.  2014. "Stormwater Control Infrastructure and Residential Property Values." *Journal of Water Resources Planning and Management*, Vol. 140 (4): 524-532. (http://ascelibrary.org/doi/abs/10.1061/(ASCE)WR.1943-5452.0000356)

58.  Kaul, Sapna, Kevin J. Boyle, Nicolai V. Kuminoff, Christopher F. Parmeter and Jaren C. Pope. 2013. "What Can We Learn from Benefit Transfer Errors?  Evidence from 20 Years of Research on Convergent Validity." *Journal of Environmental Economics and Management*, Vol. 66 (1): 90-104. (http://www.sciencedirect.com/science/article/pii/S0095069613000168)

59.  Boyle, Kevin J., Christopher C. Parmeter, Bent Boehlert, and Robert Paterson.  2013. "Due Diligence in Meta-Analyses to Support Benefit Transfers." *Environmental and Resource Economics*, Vol. 55 (3): 357-386.  (http://link.springer.com/article/10.1007/s10640-012-9630-y/fulltext.html)

60.  Kotchen, Matthew J., Kevin J. Boyle and Anthony A. Leiserowitz. 2013.  "Policy-Instrument Choice and Benefit Estimates for Climate-Change Policy in the United States." *Energy Policy*, Vol. 55: 617-625.  (http://www.sciencedirect.com/science/article/pii/S0301421512011111)

61.  Raheem, N., S. Colt, E. Fleishman, J. Talberth, P. Swedeen, K. J. Boyle, M. Rudd, R.D. Lopez, D. Crocker, D. Bohan, T. O'Higgins, C. Willer, and Rulof. Boumans.  2012. "Applications of Non-Market Valuation to California's Coastal Policy Decisions." *Marine Policy,* Vol. 36 (5): 1166-1171. (http://www.sciencedirect.com/science/article/pii/S0308597X12000061).

62.  Teisl, Mario F., Eric Fromberg, Andrew E. Smith, Kevin J. Boyle and Haley M. Engelberth. 2011. "Awake at the Switch: Improving Fish Consumption Advisories for At-risk Women." *Science of the Total Environment*, Vol. 409 (18):3257-3266. (http://www.sciencedirect.com/science/article/pii/S0048969711004803)

63.  Hatton-MacDonald, Darla, Mark Morrison, John Rose and Kevin J. Boyle.  2011. "Valuing a Multi-State River: The Case of the River Murray." *The Australian Journal of Agricultural and Resource Economics,* Vol. 55 (3): 373-391. (http://onlinelibrary.wiley.com/doi/10.1111/j.1467-8489.2011.00551.x/full)

64.  Zhang, Congwen, and Kevin J. Boyle.  2010. "The Effect of an Aquatic Invasive Species (Eurasian Watermilfoil) on Lakefront Property Values." *Ecological Economics,* Vol. 70 (2): 394-404.  (http://www.sciencedirect.com/science/article/pii/S0921800910003708)

65.  Boyle, Kevin J., Nicolai V. Kuminoff, Christopher F. Parmeter and Jaren C. Pope.  2010. "The Benefit Transfer Challenges." *Annual Review of Resource Economics*, Vol. 2: 161-182. (http://www.annualreviews.org/doi/abs/10.1146/annurev.resource.012809.103933?journalCode=resource)

66.  Taylor, Laura, Mark Morrison and Kevin J. Boyle.  2010.  "Exchange Rules and the Incentive Compatibility of Choice Experiments." *Environmental and Resource Economics,* Vol. 47 (2): 197-220. (http://www.springerlink.com/content/d3018w8424u18mh2/)

**KEVIN J. BOYLE** 18

---

67. Boyle, Kevin J., Nicolai Kuminoff, Congwen Zhang, Michael Devanney, and Kathleen P. Bell. 2010.  "Does a Property-Specific Environmental Health Risk Create a 'Neighborhood' Housing-Price Stigma? Arsenic in Private Well Water." *Water Resources Research*, Vol. 46: W03507.  (http://onlinelibrary.wiley.com/doi/10.1029/2009WR008074/full)

68. Scrogin, David, Richard Hofler, Kevin J. Boyle and J. Walter Milon. 2010. "An Efficiency Approach to Choice set Formation: Theory and Application to Recreational Destination Choice." *Applied Economics*, Vol. 42 (3): 333-350. (http://www.tandfonline.com/doi/abs/10.1080/00036840701604438)

69. Boyle, Kevin J., Nicolai V. Kuminoff, Christopher F. Parmeter and Jaen C. Pope.  2009. "Necessary Conditions for Valid Benefit Transfers." *American Journal of Agricultural Economics*, Vol. 91 (5): 1328-1334.

70. Neumann, Bradley C., Kevin J Boyle and Kathleen P. Bell.  2009. "Property Price Effects of a National Wildlife Refuge: Great Meadows National Wildlife Refuge in Massachusetts." *Land Use Policy*, Vol. 26 (4): 1011-1019.

71. Özdemir, Semra, and Kevin J. Boyle.  2009. "Convergent Validity of Attribute-Based, Choice Questions in Stated-Preference Studies." *Environmental and Resource Economics*, Vol. 42 (2): 247-264.

72. Parson, George, Ami Kang, Christopher Leggett and Kevin J. Boyle.  2009.  "Valuing Beach Closures on the Padre Island National Seashore." *Marine Resource Economics*, Vol. 24 (3): 213-235.

73. Paterson, Robert W., Kevin J. Boyle, Christopher F. Parmeter, James E. Neuman and Paul De Civita.  2008. "Heterogeneity in Preferences for Smoking Cessation." *Health Economics,* Vol. 17 (12): 1363-1377).

74. Nquyen, N., W. Douglass Shaw, Richard T. Woodward, Robert Paterson and Kevin J. Boyle. 2007. "An Empirical Study at Option Prices for Hunting Permits." *Ecological Economics*, Vol. 63 (2&3): 476-484.

75. Moeltner, Klaus, Kevin J. Boyle and Robert W. Paterson. 2007. "Meta-Analysis and Benefit Transfer for Resource Valuation: Addressing Classical Challenges with Bayesian Modeling." *Journal of Environmental Economics and Management*, Vol. 53 (2): 250-269.

76. Nelson, Marcy L., James R. Gilbert and Kevin J. Boyle.  2006. "The Influence of Siting and Deterrence Methods on Seal predation at Atlantic Salmon (Salmo salar) Farms in Maine, 2001-2003." *Canadian Journal of Fisheries and Aquatic Sciences*, Vol. 63 (July): 1710-1721.

77. Aziz Sonia N., Kevin J. Boyle, and Mahfuzar Rahman. 2006. "Knowledge of Arsenic in Drinking-water: Risks and Avoidance in Matlab, Bangladesh." *Journal of Health, Population and Nutrition*, Vol. 24 (3): 327-335.

78. Sargent-Michaud, Jessica, Kevin J. Boyle, and Andrew E. Smith. 2006. "Cost Effective Arsenic Reductions in Private Wells." *Water Resources Bulletin*.  Vol. 42 (5): 237-245.

**KEVIN J. BOYLE**                                                                                  19

_____

79. Holmes, Thomas D., and Kevin J. Boyle.  2005. "Dynamic Learning and Context-Dependence in Sequential, Attribute-Based, Stated-Preference Valuation Questions."  *Land Economics*, Vol. 81 (1): 114-126.

80. McCollum, Daniel W., and Kevin J. Boyle.  2005. "The Effect of Respondent Experience/Knowledge in the Elicitation of Contingent Values: An Investigation of Convergent Validity, Procedural Invariance and Reliability."  *Environmental and Resource Economics*, Vol. 30 (1): 23-33.

81. Scrogin, David, Kevin Boyle, George Parsons, and Andrew Plantinga.  2004. "Effects of Regulations on Expected Catch, Expected Harvest, and Site Choice of Recreational Anglers."  *American Journal of Agricultural Economics*, Vol. 86 (4): 963-974.

82. Bergstrom, John C., Kevin J. Boyle, and Mitsuyasu Yabe.  2004. "Trading Taxes vs. Paying Taxes to Value and Finance Public Environmental Goods."  *Environmental and Resource Economics*, Vol. 28 (4): 533-549.

83. Boyle, Kevin, and Roy Bouchard.  2003. "Water Quality Effects on Property Prices in Northern New England."  *Lakelines,* Vol. 23 (3): 24-27.

84. Evans, Mary F., Nicholas E. Flores, and Kevin J. Boyle.  2003. "Multiple Bounded Uncertainty Choice Data as Probabilistic Intentions."  *Land Economics*, Vol. 79 (4): 549-560.

85. Leggett, Christopher G., Naomi S. Kleckner, Kevin J. Boyle, John W. Duffield, and Robert Cameron Mitchell.  2003. "Social Desirability Bias in Contingent Valuation Surveys Administered Through In-Person Interviews."  *Land Economics,* Vol. 79 (4): 561-575.

86. Alberini, Anna, Kevin Boyle, and Michael Welsh.  2003. "Analysis of Contingent Valuation Data with Multiple Bids and Response Options Allowing Respondents to Express Uncertainty."  *Journal of Environmental Economics and Management*, Vol. 45 (1): 40-62.

87. Sargent-Michaud, Jessica, and Kevin J. Boyle.  2002. "Public Perceptions of Wildlife Management in Maine."  *Human Dimensions of Wildlife*, Vol. 7: 163-178.

88. Holmes, Thomas P., Kevin J. Boyle, Mario F. Teisl, and Brian Roe.  2002. "A Comparison of Conjoint Analysis Response Formats: Reply."  *American Journal of Agricultural Economics*, Vol. 84 (4): 1172-1175.

89. Paterson, Robert W., and Kevin J. Boyle.  2002. "Out of Sight, Out of Mind? Using GIS to Incorporate Visibility in Hedonic Property Value Models."  *Land Economics*, Vol. 78 (3): 417-425.

90. Gibbs, Julie P., John M. Halstead, Kevin J. Boyle, and Ju-Chin Huang. 2002. "A Hedonic Analysis of the Effects of Lake Water Clarity on New Hampshire Lakefront Properties."  *Agricultural and Resource Economics Review*, Vol. 31 (11): 39-46.

91. Roach, Brian, Kevin J. Boyle, and Michael Welsh.  2002. "Testing Bid Design Effects in Multiple Bounded, Contingent-Valuation Questions."  *Land Economics*, Vol. 78 (1): 121-131.

92. Poor, P. Joan, Kevin J. Boyle, Laura O. Taylor, and Roy Bouchard.  2001. "Objective versus Subjective Measures of Water Clarity in Hedonic Property Value Models."  *Land Economics*, Vol. 77 (4): 482-493.

**KEVIN J. BOYLE**                                                           20

93. Roe, Brian, Mario F. Teisl, Alan S. Levy, Kevin Boyle, Mark L. Messonier, T. Lynn Riggs, Melissa J. Herrmann, and Felicia M. Newman. 2001. "Consumers' Assessment of the Food Safety Problem for Meals Prepared at Home and Reactions to Food Safety Labeling." *Journal of Food Product Retailing*, Vol. 6 (4): 9-26.

94. Boyle, Kevin J., and Laura O. Taylor. 2001. "Does the Measurement of Property and Structural Characteristics Affect Estimated Implicit Prices for Environmental Amenities in a Hedonic Model?" *Journal of Real Estate Finance and Economics*, Vol. 23 (2/3): 303-318.

95. Boyle, Kevin J., Thomas P. Holmes, Mario F. Teisl, and Brian Roe. 2001. "A Comparison of Conjoint Analysis Response Formats." *American Journal of Agricultural Economics*, Vol. 83 (2): 441-454.

96. Michael, Holly, J., Kevin J. Boyle, and Roy Bouchard. 2000. "Does the Measurement of Environmental Quality Affect Implicit Prices Estimated from Hedonic Models?" *Land Economics*, Vol. 76 (2): 283-298.

97. Parsons, George R., Andrew J. Plantinga, and Kevin J. Boyle. 2000. "Narrow Choice Sets in a Random Utility Model of Recreation Demand." *Land Economics*, Vol. 76 (1): 86-99.

98. Boyle, Kevin J., P. Joan Poor, and Laura O. Taylor. 1999. "Estimating the Demand for Protecting Freshwater Lakes from Eutrophication." *American Journal of Agricultural Economics* Vol. 81 (5): 1118-1122.

99. Teisl, Mario F., Kevin J. Boyle, and Richard E. Record, Jr. 1999. "License-Sales Revenues: Understanding Angler and Hunter Reactions to Changes in License Prices." *Human Dimensions of Wildlife*, Vol. 4 (4): 1-17.

100. Roach, Brian, Kevin Boyle, John Bergstrom, and Stephen Reiling. 1999. "The Effect of Instream Flows on Whitewater Visitation and Consumer Surplus: A Contingent Valuation Application to the Dead River, Maine." *Rivers*, Vol. 7 (1): 11-20.

101. Roach, Brian, Joan Trail, and Kevin Boyle. 1999. "Comparing 1994 Angler Catch and Harvest Rates from On-Site and Mail Surveys on Selected Maine Lakes." *North American Journal of Fisheries Management*, Vol. 19 (1): 203-208.

102. Phillips, Marcia L., Kevin J. Boyle, and Alan G. Clark. 1998. "A Comparison of Opinions of Wildlife Managers and the Public on Endangered Species Management." *Wildlife Society Bulletin*, Vol. 26 (3): 605-613.

103. Phillips, Marcia L., Kevin J. Boyle, and Alan G. Clark. 1998. "Are There Differences Between Subgroups of Wildlife Managers? Ask the Right Whales." *Human Dimensions of Wildlife*, Vol. 3 (4): 18-28.

104. Yabe, Mitsyasu, John C. Bergstrom, and Kevin J. Boyle. 1998. "Comparison of Economic Value Using Tax Reallocation and Special Tax Payment Vehicles: Applying CVM to Protecting Groundwater Quality in the USA." *Quarterly Journal of Agricultural Economy*, Vol. 52 (2): 1-36.

105. Boyle, Kevin J., Hugh F. MacDonald, Hsiang-tai Cheng, and Daniel W. McCollum.  1998. "Bid Design and Yea Saying in Single-Bounded, Dichotomous-Choice Questions." *Land Economics*, Vol. 74 (1): 49-64.

106. Boyle, Kevin J., F. Reed Johnson, and Daniel W. McCollum.  1997. "Anchor and Adjustment in Single-Bounded, Dichotomous-Choice Questions." *American Journal of Agricultural Economics* Vol. 79 (5): 1495-1500.

107. MacDonald, Hugh F., and Kevin J. Boyle.  1997. "The Effect of a Statewide Sportfish Consumption Advisory on Open Water Fishing in Maine." *North American Journal of Fisheries Management*, Vol. 17 (3): 687-695.

108. Teisl, Mario, F., and Kevin J. Boyle.  1997. "Needles in a Haystack: Cost-Effective Sampling of Marine Sport Anglers." *Marine Resource Economics*, Vol.12 (1): 1-10.

109. Teisl, Mario F., Kevin J. Boyle, and Brian Roe.  1996. "Conjoint Analysis of Angler Evaluations of Atlantic Salmon Restoration on the Penobscot River, Maine." *North American Journal of Fisheries Management*, Vol. 16 (4): 861-871.

110. Boyle, Kevin J., F. Reed Johnson, Daniel W. McCollum, William H. Desvousges, Richard W. Dunford, and Sara P. Hudson.  1996. "Valuing Public Goods: Discrete Versus Continuous Contingent-Valuation Responses." *Land Economics*, Vol. 72 (3): 381-396.

111. Bergstrom, John C., Kevin J. Boyle, Charles A. Job, and Mary Jo Kealy.  1996. "Assessing the Economic Benefits of Ground Water for Environmental Policy Decisions." *Journal of the American Water Resources Association*, Vol. 32 (2): 279-291.

112. Roe, Brian, Kevin J. Boyle, and Mario F. Teisl.  1996. "Using Conjoint Analysis to Derive Estimates of Compensating Variation." *Journal of Environmental Economics and Management*, Vol. 31 (2): 145-159.

113. Mazurkiewicz, Stuart M., Kevin J. Boyle, Mario F. Teisl, Karen I. Morris, and Alan G. Clark.  1996. "Recall Bias and Reliability in Survey Data: Moose Hunting in Maine." *Wildlife Society Bulletin*, Vol. 24 (1): 140-148.

114. Boyle, Kevin J., Michael P. Welsh, Richard C. Bishop, and Robert M. Baumgartner. 1995. "Validating Contingent Valuation Estimates with Surveys of Experts." *Agricultural and Resource Economics Review*, Vol. 24 (2): 247-254.

115. Teisl, Mario F, Kevin J. Boyle, Daniel W. McCollum, and Stephen D. Reiling.  1995. "Test-Retest Reliability of Contingent Valuation with Independent Sample Pretest and Post-Test Control Groups." *American Journal of Agricultural Economics*, Vol. 77 (3): 613-619.

116. Westra, John V., Kevin J. Boyle, and Gregory L. Porter.  1995. "Net Revenues of Potatoes Rotated with Alternative Crops." *American Potato Journal*, Vol. 72: 99-117.

117. Boyle, Kevin J., Gregory L. Poe, and John C. Bergstrom.  1994. "What Do We Know About Groundwater Values? Preliminary Implications from a Meta-Analysis of Contingent-Valuation Studies." *American Journal of Agricultural Economics*, Vol. 76 (5): 1055-1061.

118. Boyle, Kevin J.  1994. "Fish Consumption, Exposure to Dioxin, and Risk Assessments." *Maine Policy Review*, Vol. 3: 27-36.

**KEVIN J. BOYLE**                                                          22

---

119. Boyle, Kevin J., William H. Desvousges, F. Reed Johnson, Richard W. Dunford, and Sara P. Hudson. 1994. "An Investigation of Part-Whole Biases in Contingent-Valuation Studies." *Journal of Environmental Economics and Management*, Vol. 27 (1): 64-83.

120. Boyle, Kevin J., and Alan G. Clark. 1993. "Does Getting a Bull Significantly Increase Value? The Net Economic Value of Moose Hunting in Maine." *Alces*, Vol. 29: 201-211.

121. Boyle, Kevin J., Richard L. Dressler, Alan G. Clark, and Mario F. Teisl. 1993. "Moose Hunter Preferences and Setting Season Timing." *Wildlife Society Bulletin,* Vol. 21 (4): 498-504.

122. Ebert, Ellen S., Natalie W. Harrington, Kevin J. Boyle, James W. Knight, and Russell E. Keenan. 1993. "Estimating Consumption of Freshwater Fish among Maine Anglers." *North American Journal of Fisheries Management*, Vol. 13 (4): 737-745.

123. Teisl, Mario F., Kevin J. Boyle, and Owen Fenderson. 1993. "Angler Opinions Regarding Management Options to Balance Open-Water and Ice Fishing Effort in Maine." *North American Journal of Fisheries Management*, Vol. 13 (3): 353-359.

124. Boyle, Kevin J. 1993. "Ecosystem Valuation as an Approach to Valuing Biological Diversity." *Scandinavian Forest Economics*, No. 34: 18-37.

125. Boyle, Kevin J., Michael P. Welsh, and Richard C. Bishop. 1993. "The Role of Question Order and Respondent Experience in Contingent-Valuation Studies." *Journal of Environmental Economics and Management*, Vol. 25 (1): S80-S99.

126. Milliman, Scott R., Barry L. Johnson, Richard C. Bishop, and Kevin J. Boyle. 1992. "The Bioeconomics of Resource Rehabilitation: A Commercial-Sport Analysis for a Great Lakes Fishery." *Land Economics*, Vol. 68 (2): 191-210.

127. Boyle, Kevin J., and John C. Bergstrom. 1992. "Benefit Transfer Studies: Myths, Pragmatism and Idealism." *Water Resources Research*, Vol. 28 (3): 657-663.

128. Boyle, Kevin J. 1990. "Dichotomous-Choice, Contingent-Valuation Questions: Functional Form is Important." *Northeastern Journal of Agricultural and Resource Economics*, Vol. 19 (2): 125-131.

129. Boyle, Kevin J., Stephen D. Reiling, and Marcia L. Phillips. 1990. "Species Substitution and Question Sequencing in Contingent-Valuation Surveys Evaluating the Hunting of Several Types of Wildlife." *Leisure Sciences,* 12 (1): 103-118.

130. Reiling, Stephen D., Kevin J. Boyle, Marcia L. Phillips, and Mark W. Anderson. 1990. "Temporal Reliability of Contingent Values." *Land Economics*, Vol. 66 (2): 128-134.

131. Bishop, Richard C., Scott R. Milliman, Kevin J. Boyle, and Barry L. Johnson. 1990. "Benefit-Cost Analysis of Fishery Rehabilitation Projects: A Great Lakes Case Study." *Ocean and Shoreline Management*, Vol.13 (3& 4): 253-74.

132. Reiling, Stephen D., Kevin J. Boyle, Hsiang-tai Cheng, and Marcia L. Phillips. 1989. "Contingent Valuation of a Public Program to Control Black Flies." *Northeastern Journal of Agricultural and Resource Economics*, Vol. 18 (2): 126-134.

**KEVIN J. BOYLE**                                                                          23
_____

133. Boyle, Kevin J.  1989. "Commodity Specification and the Framing of Contingent-Valuation Questions." *Land Economics*, Vol. 65 (1): 57-63.

134. Boyle, Kevin J., and Richard C. Bishop.  1988. "Welfare Measurements Using Contingent Valuation: A Comparison of Techniques." *American Journal of Agricultural Economics*, Vol. 70 (1): 20-28.

135. Boyle, Kevin J., Michael P. Welsh, and Richard C. Bishop.  1988. "Validation of Empirical Measures of Welfare Change: Comment." *Land Economics*, Vol. 64 (1): 94-98.

136. Boyle, Kevin J., and Richard C. Bishop.  1987. "Valuing Wildlife in Benefit-Cost Analyses: A Case Study Involving Endangered Species." *Water Resources Research*, Vol. 23 (5): 943-950.

137. Bishop, Richard C., Kevin J. Boyle, and Michael P. Welsh.  1987. "Toward Total Economic Valuation of Great Lakes Fishery Resources." *Transactions of the American Fisheries Society*, Vol. 116 (2): 339-345.

138. Boyle, Kevin J., and Richard C. Bishop.  1986. "The Economic Value of Endangered Species of Wildlife." *Transactions of the 51st North American Wildlife and Natural Resources Conference*, pp. 153-160.

139. Boyle, Kevin J., Richard C. Bishop, and Michael P. Welsh.  1985. "Starting Point Bias in Contingent Valuation Bidding Games." *Land Economics*, Vol. 61 (2): 188-194.

**B.  Books and Monographs**

140. Champ, Patricia A., Kevin J. Boyle, and Tom C. Brown (eds.).  2017 (2nd edition).  A Primer on Nonmarket Valuation.  Springer.

141. Bell, Kathleen P., Kevin J. Boyle and Jonathan R. Rubin, (eds.).  2006.  *Economics of Rural Land-Use Change.*  Ashgate Publishers: UK.

142. Heal, Geoffrey M., Edward B. Barbiere, Kevin J. Boyle, Alan P. Covich, Steven P. Gloss, Carlton H. Hershner, John P. Hoehn, Catherine M. Pringle, Stephen Polasky, Kathleen Segerson, and Kristin Schrader-Frechette.  2005.  *Valuing Ecosystem Services: Toward Better Environmental Decision-Making.*  The National Academies Press: Washington, DC.

143. Bergstrom, John C., Kevin J. Boyle, and Gregory L. Poe (eds.).  2001.  *The Economic Value of Water Quality*.  Edward Elgar Publishing, Inc.: Cheltenham, UK.

144. Desvousges, William H., F. Reed Johnson, Richard W. Dunford, Kevin J. Boyle, Sara P. Hudson, and K. Nicole Wilson.  1992 (reprinted 2010).  *Measuring Nonuse Damages Using Contingent Valuation: An Experimental Evaluation of Accuracy*.  Research Triangle Institute Monograph 92-1, Research Triangle Institute, Research Triangle Park, NC.

145. Boyle, Kevin J., and Trish Heekin (eds.). 1989. *Benefits and Costs in Natural Resources Planning: Interim Report 2*. Research publication of Western Regional Project W-133, University of Maine, 490 pp.

**C.  Book Chapters**

146. Boyle, Kevin J., and Christopher F. Parmeter. (forthcoming) "Benefit Transfer for Ecosystem

**KEVIN J. BOYLE** 24

Services." In *Oxford Encyclopedia of Environmental Economics,* J. Kahn, D. Biller and J. Whitehead (eds). Oxford University Press.

147. Boyle, Kevin J. 2017. "Contingent Valuation in Practice." Chapter 4 in "A Primer on Nonmarket Valuation, P.A. Champ. K.J. Boyle and T.C. Champ. Springer.

148. Bishop, Richard C., and Kevin J. Boyle.  2017. "Reliability and Validity in Nonmarket Valuation." Chapter 12 in "A Primer on Nonmarket Valuation, P.A. Champ. K.J. Boyle and T.C. Champ. Springer.

149. Boyle, Kevin J., Sapna Kaul and Christopher F. Parmeter.  2014. "Meta-analysis: Econometric Advances and New perspectives toward Data Synthesis and Robustness." Chapter 20 in  *Benefit Transfer of Environmental and Resource Values:  A Handbook for Researchers and Practitioners,* R Johnston, J. Rolfe, R. Rosenberger and R. Brouwer (eds). Springer.  (http://download.springer.com/static/pdf/785/bok%253A978-94-017-9930-0.pdf?originUrl=http%3A%2F%2Flink.springer.com%2Fbook%2F10.1007%2F978-94-017-9930-0&token2=exp=1452197890~acl=%2Fstatic%2Fpdf%2F785%2Fbok%25253A978-94-017-9930-0.pdf%3ForiginUrl%3Dhttp%253A%252F%252Flink.springer.com%252Fbook%252F10.1007%252F978-94-017-9930-0*~hmac=2b36cef65d0cda46452029c01acce57d8a6e2277c33a36eda4bb999ed029d95e)

150. Boyle, Kevin J., and Thomas P. Holmes.  2014. "Choice Experiments and Valuing Forest Attributes."  Chapter 9 in *Handbook of Forest Resource Economics*, S. Kant and J. Alavalapati (eds).  Routledge: Florence, KY.  (http://www.routledge.com/books/details/9780415623247/)

151. Boyle, Kevin J., Sapna Kaul, Ali Hashemi and Xiaoshu Li.  2015. "Applicability of Benefit Transfers for Evaluation of Homeland Security Counterterrorism Measures."  In *Estimating the Benefits of Homeland Security Policies*, C. Mansfield and V.K. Smith (eds.).

152. Poor, P. Joan, Kevin J. Boyle, Laura O. Taylor, and Roy Bouchard.  2008. "Objective versus Subjective Measures of Water Clarity in Hedonic Property Value Models."  In *Revealed Copy Approaches to Environmental Valuation: Volume II*, J. Herriges and C. Kling (eds.).  Ashgate Publishing: Aldershot, UK.  (Reprinted from *Land Economics*, Vol. 77 (4): 482-493.)

153. Boyle, Kevin J., P. Joan Poor, and Laura O. Taylor.  2008. "Estimating the Demand for Protecting Freshwater Lakes from Eutrophication."  In *Revealed Preference Approaches to Environmental Valuation: Volume II*, J. Herriges and C. Kling (eds.).  Ashgate Publishing: Aldershot, UK.  (Reprinted from *American Journal of Agricultural Economics* Vol. 81 (5): 1118-1122.)

154. Boyle, Kevin J., Gregory L. Poe, and John C. Bergstrom.  2007. "What Do We Know About Groundwater Values? Preliminary Implications from a Meta-Analysis of Contingent-Valuation Studies."  Chapter 11 in *The Stated Preference Approach to Environmental Valuation, Volume III,* R. T. Carson (ed.).  Ashgate Publishing: Aldershot, UK.  (Reprinted from *American Journal of Agricultural Economics*, Vol. 76 (5): 1055-1061.)

155. Boyle, Kevin J., Michael P. Welsh, and Richard C. Bishop.  2007. "The Role of Question Order and Respondent Experience in Contingent-Valuation Studies."  Chapter 2 in *The Stated Preference Approach to Environmental Valuation, Volume III,* R. T. Carson (ed.).  Ashgate

Publishing: Aldershot, UK.  (Reprinted from *Journal of Environmental Economics and Management*, Vol. 25 (1): S80-S99.)

156. Bell, Kathleen P., Kevin J. Boyle, Andrew Plantinga, Jonathan Rubin, and Mario F. Teisl. 2006. "Objectives and Perspectives." Chapter 1 in *Economics of Rural Land-Use Change*, K.P. Bell, K.J. Boyle and J.R. Rubin (eds.).  Ashgate:  UK.

157. Boyle, Kevin J., and Kathleen P. Bell. 2006. "Valuation and Land-Use Change." Chapter 13 in *Economics of Rural Land-Use Change*, K.P. Bell, K.J. Boyle and J.R. Rubin (eds.). Ashgate: UK.

158. Teisl, Mario F., and Kevin J. Boyle. 2006. "Valuing Changes in Rural Land Uses: Measuring the Willingness to Pat for Changes in Forest Management Practices." Chapter 14 in *Economics of Rural Land-Use Change*, K.P. Bell, K.J. Boyle and J.R. Rubin (eds.).  Ashgate: UK.

159. Bell, Kathleen P., Kevin J. Boyle and Jonathan R. Rubin. 2006. "Summary and Conclusions." Chapter 16 in *Economics of Rural Land-Use Change*, K.P. Bell, K.J. Boyle and J.R. Rubin (eds.).  Ashgate: UK.

160. Paterson, Robert W., Kevin J. Boyle, Mary C. Ahearn, Anna Alberini, John C. Bergstrom, Lawrence W. Libby, and Michael P. Welsh.  2005. "Public Preferences for Farmland Attributes of Conservation Easement Programs."  Chapter 12 in *Land Use Problems and Conflicts: Causes, Consequences and Solutions*.  S.J. Goetz, J.S. Shortle and J.C. Bergstrom (eds.).  Routledge: London.

161. Ahearn, Mary Claire, Kevin J. Boyle, and Daniel R. Hellerstein.  2004. "Designing a Contingent-Valuation Study to Estimate the Benefits of the Conservation Reserve Program on Grassland Bird Populations." Chapter 9 in *The Contingent-Valuation Handbook*. A. Alberini and J. Kahn (eds.).  Edward Elger: Cheltenhan, UK.

162. Holmes, Thomas P., and Kevin J. Boyle.  2003. "Stated Preference Methods for Valuing Forest Attributes." Chapter 18 in *Forests in a Market Economy*.  E. Sill and K. Abt (eds.). Kluwer Academic Publishers: Derdrecht.

163. Boyle, Kevin J.  2003. "Contingent Valuation in Practice."  Chapter 5 in *A Primer on Nonmarket Valuation,* P. A. Champ, K. J. Boyle and T. C. Brown (eds.).  Kluwer: UK.

164. Boyle, Kevin J. 2003.  "Introduction to Revealed Preference Methods."  Chapter 8 in *A Primer on Nonmarket Valuation*, P. A. Champ, K. J. Boyle and T. C. Brown (eds.).  Kluwer: UK.

165. Bergstrom, John C., Kevin J. Boyle, and Gregory L. Poe.  2001. "Economic Value of Water Quality: Introduction and Conceptual Background."  Chapter 1 in *The Economic Value of Water Quality*, J.C. Bergstrom, K.J. Boyle and G.L. Poe (eds.). Edward Elger Publishing Limited: Cheltenham, UK.

166. Bergstrom, John C., Kevin J. Boyle, and Mitsyasu Yabe.  2001. "Determinants of Ground Water Quality Values: Georgia and Maine Case Studies."  Chapter 3 in *The Economic Value of Water Quality*, J.C. Bergstrom, K.J. Boyle and G.L. Poe (eds.). Edward Elger Publishing Limited: Cheltenham, UK.

167. Poe, Gregory L., Kevin J. Boyle, and John C. Bergstrom.  2001. "Meta-Analysis of Ground Water Values."  Chapter 8 in *The Economic Value of Water Quality,* J.C. Bergstrom, K.J. Boyle and G.L. Poe (eds.). Edward Elger Publishing Limited: Cheltenham, UK.

168. Boyle, Kevin J., John C. Bergstrom, and Gregory L. Poe.  2001. "Concluding Thoughts on Valuing Ground Water Quality."  Chapter 9 in *The Economic Value of Water Quality*, J.C. Bergstrom, K.J. Boyle and G.L. Poe (eds.). Edward Elger Publishing Limited: Cheltenham, UK.

169. Roe, Brian, Kevin J. Boyle, and Mario F. Teisl.  1998. "Using Conjoint Analysis to Derive Estimates of Compensating Variation."  In*, Environmental Valuation*, K.G. Willis, K.J. Button, and P. Nijkamp (eds.).  Edward Elgar Publishing Limited: UK.  (Reprinted from *Journal of Environmental Economics and Management*, Vol. 31 (2): 145-159.)

170. Boyle, Kevin J., and John C. Bergstrom.  1996. "Doubt, Doubts and Doubters: The Genesis of a New Research Agenda."  Chapter 7 in *Valuing Environmental Preferences: Theory and Practice of the Contingent Valuation Method in the US, EU and Developing Countries*, I. Bateman and K. Willis (eds.).  Oxford University Press: London, UK.

171. Boyle, Kevin J.  1995. "Using Contingent Valuation to Value Elements of Biodiversity."  In *Fundamentals of Conservation Biology*, M.L. Hunter Jr.  Blackwell Scientific Publications: Boston.

172. Desvousges, William H., F. Reed Johnson, Richard W. Dunford, Sara P. Hudson, K. Nicole Wilson and Kevin J. Boyle.  1992. "Measuring Natural Resource Damages with Contingent Valuation: Tests of Validity and Reliability."  Chapter III in *Contingent Valuation: A Critical Assessment*, J.A. Hausman (ed.) North Holland: Amsterdam.

**D.  Proceedings**

173. Boyle, Kevin J.  2009.  "Globalization, International Trade and Food Safety." *Food and Agriculture Extension Magazine*, Vol. 5.  (Arabic) (http://cfa.uaeu.ac.ae/docs/Copy_of_last_-vol.0552-.pdf )

174. Boyle Kevin J., 2008.  "Meta-analysis of Response Rates to Contingent-Valuation Surveys Conducted by Mail."  In, Sample Representativeness:  Implications for Administration and Testing of Stated Preference Surveys, A Krupnick and D. A. Evans (eds.), Resources for the Future. (http://www.rff.org/rff/Events/loader.cfm?url=/commonspot/security/getfile.cfm&PageID=32432)

175. Mario F. Teisl, Brian Roe, Kevin Boyle, T. Lynn Riggs, Mark L. Messonnier, Melissa J. Herrmann. 2001. "Understanding how respondents view food safety risks: Implications to the design of willingness-to-pay experiments."  Proceedings, AERE Workshop.  "Assessing and Managing Environmental and Public Health Risks."

176. Boyle, Kevin J. 1995. "Substitution Between Natural Spawning and Hatchery Stocking in the Restoration of Atlantic Salmon." In Integrated Water Resources Planning for the 21st Century.

M. F. Damenica (ed.). American Society of Civil Engineers, Water Resources Planning and Management Division, Cambridge, Massachusetts.

177. Bergstrom, John C., and Kevin J. Boyle. 1992. "Benefit Transfer Case Study: Benefits of Groundwater Protection in Dougherty County, Georgia." In, Proceedings of the AERE Workshop on Benefits Transfer.

178. Boyle, Kevin J., Daniel W. McCollum, and Mario F. Teisl. 1992. "Evidence on the Size and Sign of Option Value." In Benefits and Costs in Natural Resources Planning: Interim Report 5, R.B. Rettig (ed.), Oregon State University.

179. Bishop, Richard C., Curtis A. Brown, Michael P. Welsh, and Kevin J. Boyle. 1992. "Contingent Valuation of Changes in Recreational Quality: Glen Canyon Dam Operations and Grand Canyon Recreation." In Management of Public Resources, D. Hoag (ed.), Resources Policy Consortium, North Carolina State University.

180. Boyle, Kevin J. 1989. "The Role of Property Rights in Creating Economic Incentives for Wildlife Management on Private Timberland." In Forest and Wildlife Management in New England: What Can We Afford? R.D. Briggs, W.B. Krohn, J.G. Trial, W.A. Ostrofsky and D.B. Field (eds.), Maine Agricultural Experiment Station, Miscellaneous Report No. 336, University of Maine, pp. 11-20.

181. Reiling, Stephen D., Kevin J. Boyle, and Marcia L. Phillips. 1989. "Consumer Surplus Values and Economic Impacts of Hunting and Fishing." In Proceedings of the 1989 Northeastern Recreation Research Symposium, Edited by T.A. More, M.P. Donnelly, A.R. Graefe, and J.J. Vaske, General Technical Report NE-132, Northeastern Forest Experiment Station, U.S. Forest Service, pp. 95-99.

182. Boyle, Kevin J., Stephen D. Reiling, and Marcia L. Phillips. 1989. "Prices of Substitutes: Implicit vs. Explicit Assumptions in Contingent-Valuation Questions." In Benefits and Costs in Natural Resources Planning: Interim Report 2, K.J. Boyle, and T. Heekin (eds.), University of Maine, pp. 285-303.

183. Bishop, Richard C., Curtis Brown, Michael P. Welsh, and Kevin J. Boyle. 1989. "Grand Canyon Recreation and Glen Canyon Dam Operations: An Economic Evaluation." In Benefits and Costs in Natural Resources Planning: Interim Report 2, K.J. Boyle, and T. Heekin (eds.), University of Maine, pp. 407-435.

184. Boyle, Kevin J., Michael P. Welsh, Richard C. Bishop, and Robert M. Baumgartner. 1988. "Analyzing the Effects of Glen Canyon Dam Releases on Colorado River Recreation Using Scenarios of Unexperienced Flow Conditions." In Benefits and Costs in Natural Resources Planning: Interim Report, J.B. Loomis (ed.), University of California-Davis, pp. 111-130.

**E. Peer Reviewed Reports**

185. Banerjee, Onil, Kevin J. Boyle, Cassandra Rogers, Janice Cumberbatch, Barbara Kanninen, Michele Lemay, and Maja Schiling. 2016. A retrospective Stated Preference Approach to Assessment of Coastal Infrastructure Investments: An application to Barbados, Inter-American Development Bank, IDB Working Paper Series N° 727.

186. Schuetz, Jennifer F., Kevin J. Boyle, and Roy Bouchard.  2001. "The Effects of Water Clarity on Economic Values and Economic Impacts of Recreational Uses of Maine's Great Ponds." Miscellaneous Report 421.  Maine Agricultural and Forest Experiment Station, University of Maine.

187. Allen, Thomas G., and Kevin J. Boyle.  2000. "Farm Property Taxes in Maine." Miscellaneous Report 418.  Maine Agricultural and Forest Experiment Station, University of Maine.

188. Boyle, Kevin J., and Mario F. Teisl.  1999. "Public Preferences for Timber Harvesting on Private Forest Land Purchased for Public Ownership in Maine."  Miscellaneous Report 414. Maine Agricultural and Forest Experiment Station, University of Maine.

189. Boyle, Kevin J., Brian Roach, and David G. Wadington.  1998. "1996 Net Economic Values for Bass, Trout and Walleye Fishing, Deer, Elk and Moose Hunting, and Wildlife Watching." Report 96-2, Division of Federal Aid, U.S. Fish and Wildlife Service.

190. Boyle, Kevin J., Steven R. Lawson, Holly J. Michael, and Roy Bouchard.  1998. "Lakefront Property Owners' Economic Demand for Water Clarity in Maine Lakes."  Miscellaneous Report 410, Maine Agricultural and Forest Experiment Station, University of Maine.

191. Michael, Holly J., Kevin J. Boyle, and Roy Bouchard.  1996. "Water Quality Affects Property Prices: A Case Study of Selected Maine Lakes."  Miscellaneous Report 398, Maine Agricultural and Forest Experiment Station, University of Maine.

192. Waddington, David G., Kevin J. Boyle, and Joseph Cooper.  1994. "1991 Net Economic Values for Bass and Trout Fishing, Deer Hunting, and Wildlife Watching."  Report 91-1, Division of Federal Aid, U.S. Fish and Wildlife Service.

193. ElHamzaoui, Ramona, Kevin J. Boyle, Craig McLaughlin, and Jim Sherburne.  1994. "Black Bear Hunting in Maine: Do Hunter Characteristics Affect Hunter Opinions Regarding Hunting Regulations?"  Bulletin 839, Maine Agricultural and Forest Experiment Station, University of Maine, 29pp.

194. Westra, John V., and Kevin J. Boyle.  1991. "An Economic Analysis of Crops Grown in Rotation with Potatoes in Aroostook County, Maine."  Bulletin 834, Maine Agricultural Experiment Station, University of Maine, 39pp.

195. Reiling, Stephen D., Kevin J. Boyle, Marcia L. Phillips, Vicki A. Trefts, and Mark Anderson. 1988. "The Economic Benefits of Late-Season Black Fly Control."  Bulletin 822, Maine Agricultural Experiment Station University of Maine, 1988.

196. Boyle, Kevin J., Vicki A. Trefts, and Parnel S. Hesketh.  1988. "Economic Values for and Uses of Maine's Inland Fish and Wildlife Resources."  Miscellaneous Publication 698, Maine Agricultural Experiment Station University of Maine.

**F.  Popular Publications (Editor Review Only)**:

197. Boyle, Kevin, and Matthew Kotchen, M., 2018. "Retreat on economics at the EPA." *Science*, Vol. 361 (6404): 729. (http://science.sciencemag.org/content/361/6404/729/tab-pdf)

**KEVIN J. BOYLE**                                                                                           29

_____

198. Rees, G., A. Cultice, J. Pease, D. Bosch, and K.J. Boyle.  2015. "Disease management issues and practices in mid-Atlantic nurseries." *American Nurseryman* (March): 20-23.

199. Rees, G., A. Cultice, J. Pease, D. Bosch, and K.J. Boyle.  2015. "Irrigation systems and practices in mid-Atlantic nurseries." *American Nurseryman* (February):14-16, 18-19.

200. D'Alessio, N., K.J. Boyle, D. Bosch, D. Harter, and J. Pease.  2015. "Adding Value to ornamental plants." *American Nurseryman* (January):16-18.

201. Braden, John B., and Kevin J. Boyle.  2013. "Theme Overview:  Innovations in Nonpoint Source Pollution Policy." *Choices*, 3rd Quarter.  (http://www.choicesmagazine.org/choices-magazine/theme-articles/innovations-in-nonpoint-source-pollution-policy/theme-overview-innovations-in-nonpoint-source-pollution-policy)

202. Braden, John B., and Kevin J. Boyle.  2013. "Innovations in Nonpoint Source Pollution Policy." *Farm Foundation AgChallenge2050*  (http://www.agchallenge2050.org/adaptability-resilience/2013/11/innovative-options-for-addressing-nonpoint-source-pollution/)

203. Boyle, Kevin, Lynne Lewis, Jaren Pope, and Jeffrey Zabel.  2012. "Valuation in a Bubble: Hedonic Modeling Pre- and Post-Housing Market Collapse*". AERE Newsletter*, Vol. 32 (2): 24-31. (http://www.aere.org/newsletters/documents/AERENewsletterFall2012_001.pdf)

204. Kotchen, Matthew J., Kevin J. Boyle and Anthony A. Leiserowitz.  2011. "Are Americans Willing to Pay for Climate Change Mitigation? *RFF Policy Commentary Series*, http://www.rff.org/Publications/WPC/Pages/Are-Americans-Willing-to-Pay-for-Climate-Change-Mitigation.aspx.

205. Boyle, Kevin J., George Davis, Paul A. Estabrooks, Deborah J. Good, Brooks King-Casas, Achla Marathe and Wen You.  2011. "Translational Economic Research: Integrating Genetics, Neurosciences and Behavioral Sciences." *AERE Newsletter*, Vol. 31 (1): 15-25.

206. Boyle, Kevin J. 2005. *"Groundwater Valuation, Benefits Transfers and Daubert."* Superfund and Natural Resource Damages Litigation Committee Newsletter, American Bar Association Vol. 1 (2): 13-16.

207. Boyle, Kevin J., and David F. Wihry. 2004. *"Tax Cap, Wrong Fix, Wrong Solution."* Editorial, Bangor Daily News, October 16-17.

208. Teisl, Mario F., and Kevin J. Boyle.  1998. "*Hunting: A Boon to the Maine Economy."* Maine Fish and Wildlife.

209. Michael, Holly J., Kevin J.  Boyle and Roy Bouchard.  1996. "*Protecting Lake Water Quality Means Protecting Your Property Value."*  For the Sake of Maine Lakes: The Newsletter of the CONGRESS OF LAKES ASSOCIATIONS Winter/Spring.

210. Michael, Holly J., Kevin J.  Boyle and Roy Bouchard.  1996. "*Protecting Lake Water Quality Means Protecting Your Property Value."*  Lakeside: Newsletter of the New Hampshire Lakes Association Vol. IV (5): 1.

211. Roper, Robert K., Kevin J. Boyle, Steven Deller, and Stephen D. Reiling.  1992. "*The Economic Impact of Fishing, Hunting, and Wildlife Observation on Maine's Economy.*"  Maine Business Indicators, Vol. 37 (3): 1-4.

_____

212. Fenderson, Owen C., and Kevin J. Boyle.  1992. "*Fishing Quality on Maine's Inland Waters: For Better or Worse."*  Maine Fish and Wildlife, Vol. 34 (2): 24-29.

213. Boyle, Kevin J., Marcia L. Phillips, and Alan G. Clark.  1992*. "Nonconsumptive Uses of Maine's Wildlife: What is it? Who Participates? Why do they do it?"*  Maine Fish and Wildlife, Vol. 34 (1): 2-7, 26-28.

214. Boyle, Kevin J., and Alan G. Clark.  1992. "*Trapping in Maine: Recreation or Business?"*  Maine Fish and Wildlife, Vol. 33 (4): 2-9.

215. Boyle, Kevin J., Mario F. Teisl, and Stephen D. Reiling.  1991. "*Hunting for Hunter Facts."*  Maine Fish and Wildlife, Vol. 33 (3): 2-6, 20.

216. Reiling, Stephen D., Mario F. Teisl, and Kevin J. Boyle.  1991. "*Baiting Maine Bears: How the Hunters Feel."*  Maine Fish and Wildlife, Vol. 33 (2): 7-8, 21.

217. Anderson, James E., Kevin J. Boyle, and Alan G. Clark.  1991. "*Public Opinion: Deer/Moose Management Tradeoffs."*  Maine Fish and Wildlife, Vol. 33 (3): 10-12, 23.

218. Teisl, Mario F., Alan G. Clark, and Kevin J. Boyle.  1991. "*Season Timing: When to Hunt."*  Maine Fish and Wildlife, Vol. 33 (3): 13-15, 24-27.

219. Boyle, Kevin J., Mario F. Teisl, Stephen D. Reiling, and Owen Fenderson.  1991. "*Fishing for Angler Facts."*  Maine Fish and Wildlife, Vol. 33 (2): 2-7.

220. Boyle, Kevin J., Stephen D. Reiling, Mario Teisl, and Marcia L. Phillips.  1991. "*Maine's Fish and Wildlife: How Valuable?"*  Maine Fish and Wildlife, Vol. 33 (1): 3-6.


**G.  Research Reports and Other Publications:**

221. Hong, C., G.W. Moorman, J.D. Lea-Cox, K.J. Boyle, D. Bosch, J. Pease, W.E. Copes, P. Kong, A. Ristvey, B. Carroll, D. Ross, M.E. Stanghellini, B.A. Vinatzer, and E. Weiss.  2015. "Integrated Management of Zoosporic Pathogens and Irrigation Water Quality for a Sustainable Green Industry: Final Report."  SCRI Project (Agreement #: 2010-51181-21140) 43 pp.

222. Sanderford, Andrew R., Kevin J. Boyle, Andrew P. McCoy, Weibin Xu and Melissa Jones. 2014. "2013 Virginia Residential Real Estate Appraiser Remuneration: Survey and Report." Virginia Center for Housing Research and Virginia Tech Program in Real Estate.

223. Tobias Börger, Nicola J. Beaumont, Linwood Pendleton, Kevin J. Boyle, Philip Cooper, Stephen Fletcher, Tim Haab, Michael Hanemann, Tara L. Hooper, S. Salman Hussain, Rosimeiry Portela, Mavra Stithou, Joanna Stockill, Tim Taylor and Melanie C. Austen.  2013. "Incorporating Ecosystem Services in Marine Planning: The Role of Valuation."  Duke University, Nicholas Institute for Environmental Policy Solutions, Working Paper NI WP 13-08 (http://www.nicholasinstitute.duke.edu/ocean/publications/incorporating-ecosystem-services-marine-planning-role-valuation#.UtVozV8o720).

224. Paterson, Robert, Kevin J. Boyle, Richard T. Carson, Barbara Kanninen, Christopher Leggett and John Molenar.  2013. "National Park Service Visibility Valuation Study: Pilot Survey

_____

Results." Report to Policy, Planning and Permit Review Branch, Air Resources Division, National park Service.

225. Kotchen, Matthew J., Kevin J. Boyle and Anthony A. Leiserowitz. 2011. "Policy-Instrument Choice and Benefit Estimates for Climate-Change Policy in the United States." NBER Working Paper 17539 (http://www.nber.org/papers/w17539).

226. Boyle, Kevin J., Nicolai Kuminoff, Christopher Parmeter and Jaren C. Pope. 2010. "Validation of Benefit Function Transfers." Final Report submitted to U.S. Environmental Protection Agency, STAR Grant.

227. Raheem, N., J. Talberth, S. Colt, E. Fleishman. P. Swedeen, K.J. Boyle, M. Rudd, R.D. Lopez, T. O'Higgins, C. Willer and R.M. Bourmans. 2009. "The Economic Value of Coastal Ecosystems in California." U.S. EPA, Landscape Ecology Publications, EPA/600/F-09/046 (http://www.nceas.ucsb.edu/files/news/Raheemreport.pdf ).

228. Mario F. Teisl, Brian Roe, Caroline Noblet, Kevin J. Boyle, Nancy E. Bockstael, Alan S. Levy, Gerald Mumma, Tamera Riggs and Mark Messonnier. 2007. *Can Survey-based Scenarios Measure Consumer Values for Improved Food Safety?* Final Report submitted to the National Center for Infectious Diseases, U.S. Centers for Disease Control and Prevention, Atlanta, GA.

229. Baker, Tanya, Kevin Boyle, Deirdre Mageean, Neal Pettigrew, Jonathan Rubin and Jennifer Ward. 2005. "Maine's Recovery of Recreational Damages Due to Coastal Oil Spills." University of Maine, report to the Maine Oil Spill Advisory Committee.

230. Anderson, Mark, Kevin J. Boyle and Kathleen P. Bell. 2005. "Procedures for Evaluating the Regional Economic Impacts of Conservation Lands in the 100-mile Wilderness Region." Report to the Maine Department of Conservation.

231. Reed, Alison, Semra Ozdemir, and Kevin J. Boyle. 2003. "Public Support for Farmland Conservation Easements in Maine." Department of Resource Economics and Policy, University of Maine.

232. Boyle, Kevin J., Robert Paterson and Joan P. Poor. 2002. "The Effects of National Wildlife Refuge Proximity on Selling Prices of nearby Residential Properties." Staff Paper REP507, Department of Resources Economics and Policy, University of Maine.

233. Sargent-Michaud, Jessica, and Kevin J. Boyle. 2002. "Cost Comparisons for Arsenic Contamination Avoidance Alternatives for Maine Households on Private Wells." Staff Paper REP 506, Department of Resource Economics and Policy, University of Maine.

234. Paterson, Robert W., Kevin J. Boyle, Mary Ahearn, Anna Alberini, John Bergstrom, Larry Libby, and Michael P. Welsh. 2001. "Improved Information in Support of a National Strategy for Open Land Policies: Summary of Focus Group Findings Summer, 2000." Staff Paper REP 495, Department of Resource Economics and Policy, University of Maine.

235. Paterson, Robert W., David O. Scrogin, Kevin J. Boyle, and Dennis McNeish. 2001. "Maine Open Water Fishing Survey Summer, 1999." Staff Paper REP 493, Department of Resource Economics and Policy, University of Maine.

_____

236. Sargent-Michaud, Jessica, and Kevin J. Boyle.  2000. "Maine Residents' Opinions of Wolves in Maine."  Staff Paper REP 490, Department of Resource Economics and Policy, University of Maine.

237. Sargent-Michaud, Jessica, and Kevin J. Boyle.  2000. "Will the Introduction of the Chickadee License Plate Impact Revenues from the Loon License Plate Dedicated to Nongame Management?" Staff Paper REP 489, Department of Resource Economics and Policy, University of Maine.

238. Scrogin, David O., Kevin J. Boyle, and Dennis McNeish.   2000. "Maine Ice Fishing Survey, Winter, 1998-1999."  Staff Paper REP 486, Department of Resource Economics and Policy, University of Maine.

239. Boyle, Kevin J., Mario Teisl and Robert Paterson. 2000. "2000/2001 Revenue Forecasts." Report to the Vermont Department of Fish and Wildlife.

240. Teisl, Mario, and Kevin J. Boyle.  2000. "FY 2000/01 and FY 2002/03 Revenue Forecasts: Maine Department of Inland Fisheries and Wildlife."  Report to the Maine Department of Inland Fisheries and Wildlife.

241. Boyle, Kevin J., Brian Roach, and Henry Hilton.  1999. "Maine Residents Opinions on Wildlife Management, Funding and Policy Issues."  Staff Paper REP 484, Department of Resource Economics and Policy, University of Maine.

242. Boyle, Kevin J. and Mario F. Teisl. 1999. "Fiscal Year 2000 and 2001 Revenue Forecasts." Report to the Maine Department of Inland Fisheries and Wildlife, Bureau of Administrative Services.

243. Boyle, Kevin J., and Brian Roach.  1999. "Replication of Industrial Economics' Meta-Analysis of Sport Fishing Value Estimates."  Report to the Division of Economics, U.S. Fish and Wildlife Service.

244. Boyle, Kevin J., Richard Bishop, Jim Caudill, John Charbonneau, Doug Larson, Marla A. Markowski, Robert E. Unsworth, and Robert W. Paterson.  1998. "A Database of Sportfishing Values."  Report to the Division of Economics, U.S. Department of the Interior, Fish and Wildlife Service.

245. Boyle, Kevin J., Richard Bishop, Jim Caudill, John Charbonneau, Doug Larson, Marla A. Markowski, Robert E. Unsworth, and Robert W. Paterson.  1998. "A Meta-Analysis of Sportfishing Values."  Report to the Division of Economics, U.S. Department of the Interior, Fish and Wildlife Service.

246. Boyle, Kevin J., and Mario F. Teisl.  1998. "Calendar Years 2000 and 2001 License Revenue Forecasts: Maine Department of Inland Fisheries and Wildlife."  Report to the Department of Inland Fisheries and Wildlife, Bureau of Administrative Services, Augusta, Maine.

247. Harris, Brian L., and Kevin J. Boyle. 1998. "Highlights from the 1996 Maine Ice Fishing Follow-up Survey." Staff Paper REP474, Department of Resource Economics and Policy, University of Maine.

248. Teisl, Mario F., and Kevin J. Boyle.  1998. "The Economic Impacts of Hunting, Inland Fishing and Wildlife-Associated Recreation in Maine." Staff Paper REP 479, Department of Inland Fisheries and Wildlife, Augusta Maine.

249. Boyle, Kevin J.  1997. "Lifetime License Sales Revenue Predictions."  Report to the Maine Department of Inland Fisheries and Wildlife.

250. Boyle, Kevin J., Jennifer Schuetz, and J. Steve Kahl.  1997. "Great Ponds Play an Integral Role in Maine's Economy."  Water Research Institute, University of Maine.

251. MacDonald, Hugh F., Kevin J. Boyle, and Owen C. Fenderson.  1996. "A Comparison of 1994 Open-Water Fishing Survey Data and 1993-94 Ice Fishing Data."  Staff Paper REP 472, Department of Resource Economics and Policy, University of Maine.

252. Braley, Mark, Kevin J. Boyle, and Roy Bouchard.  1996. "Lake Recreational and Economic Activity Survey Report."  Staff Paper REP 471, Department of Resource Economics and Policy, University of Maine.

253. Boyle, Kevin J., and Alan G. Clark.  1996. "Hunting Data Documentation Report."  Staff Paper REP 468, Department of Resource Economics and Policy, University of Maine.

254. Boyle, Kevin J.  1996. "Design of Dichotomous-Choice, Contingent-Valuation Questions for the 1996 National Survey of Fishing, Hunting and Wildlife-Associated Recreation." Report to the U.S. Fish and Wildlife Service, Division of Federal Aid, Arlington, VA.

255. MacDonald, Hugh F., Kevin J. Boyle, and Owen C. Fenderson.  1996. "Maine Open Water Fishing Survey: Summer, 1994."  Staff Paper, REP 470, Department of Resource Economics and Policy, University of Maine.

256. Reiling, Stephen D., John C. Bergstrom, and Kevin J. Boyle.  1995. "Economic Evaluation of Recreation on Flagstaff Lake."  Report to Central Maine Power Company.

257. Boyle, Kevin J., John C. Bergstrom, and Stephen D. Reiling.  1995. "Qualitative and Economic Evaluations of White-Water Boating on the Dead River."  Report to Central Maine Power Company.

258. MacDonald, Hugh F., Kevin J. Boyle, and Owen C. Fenderson.  1995. "Ice Fishing Survey: Winter, 1993-94."  Staff Paper REP 461, Department of Resource Economics and Policy, University of Maine.

259. MacDonald, Hugh F., Kevin J. Boyle, Alan G. Clark, Alan E. Hutchinson, and James E. Anderson.  1994. "Highlights from the 1991 Survey of Maine Residents' Opinions Regarding Bald Eagle Restoration in Maine."  Staff Paper REP 458, Department of Resource Economics and Policy, University of Maine.

260. Boyle, Kevin J., and John C. Bergstrom.  1994. "A Framework for Measuring Economic Benefits of Ground Water."  Report to the U.S. Environmental Protection Agency, Office of Ground Water and Office of Policy Analysis.

261. Boyle, Kevin J., and Owen Fenderson.  1994. "Sport Fishing Data Documentation Report."  Staff Paper REP 457, Department of Resource Economics and Policy, University of Maine.

262. Boyle, Kevin J.  1994. "A Comparison of Contingent-Valuation Studies of Ground Water Protection."  Staff Paper REP 456, Department of Resource Economics and Policy, University of Maine.

263. Boyle, Kevin J., Alan G. Clark, and Gerald R. Lavigne.  1994. "Highlights from the 1988 Survey of Deer Hunters."  Staff Paper REP 454, Department of Resource Economics and Policy, University of Maine.

264. Boyle Kevin J.  1993. "A Review of Contingent-Valuation Studies of the Benefits of Groundwater Protection."  Report to the U.S. Environmental Protection Agency, Cooperative Agreement CR818760-01-0, Research Triangle Institute.

265. Mario F. Teisl, Kevin J. Boyle and Stephen D. Reiling. 1992. "Highlights from the 1988 Survey of Upland Bird Hunters in Maine." Staff Paper ARE 444, Department of Agricultural and Resource Economics, University of Maine.

266. Boyle, Kevin J., Mario F. Teisl, and Stephen D. Reiling.  1992. "Benefit-Cost Analyses of Atlantic Salmon Restoration on the Penobscot River."  Report to Bangor Hydro-Electric Co.

267. Boyle, Kevin J., and Mario Teisl.  1992. "Angler Evaluations of Potential Management Programs for Atlantic Salmon on the Penobscot River."  Staff Paper ARE 438, Department of Agricultural and Resource Economics, University of Maine.

268. Mario F. Teisl, Kevin J. Boyle and Owen Fenderson, 1992. "Angler Opinions Regarding Management Options to Balance Open-Water and Ice Fishing Effort in Maine." Maine Agricultural Experiment Station Publication 1648.

269. Boyle, Kevin J., Mario F. Teisl, and Stephen D. Reiling.  1992. "Qualitative and Economic Evaluations of Atlantic Salmon Fishing on the Penobscot River."  Staff Paper ARE 436, Department of Agricultural and Resource Economics, University of Maine.

270. Ebert, Ellen, and Kevin J. Boyle. 1992. "Consumption of Freshwater Fish by Maine Anglers." ChemRisk, Division of McLaren/Hart. Report to Maine Paper Industry Information Office.

271. Teisl, Mario F., Kevin J. Boyle, and Stephen D. Reiling.  1991. "Highlights from the 1988 Survey of Migratory Waterfowl Hunters in Maine."  Staff Paper ARE 434, Department of Agricultural and Resource Economics, University of Maine.

272. Teisl, Mario F., Kevin J. Boyle, and Stephen D. Reiling.  1991. "Highlights from the 1988 Survey of Ice Fishing in Maine."  Staff Paper ARE 431, Department of Agricultural and Resource Economics, University of Maine.

273. Reiling, Stephen D., Mario F. Teisl, and Kevin J. Boyle.  1991. "Highlights from the 1988 Survey of Bear Hunting in Maine."  Staff Paper ARE 430, Department of Agricultural and Resource Economics, University of Maine.

274. Boyle, Kevin J., Teisl, Mario F., Moring, John R., and Reiling, Stephen D.  1991. "Economic Benefits Accruing to Sport Fisheries on the Lower Kennebec River from the Provision of Fish Passage at Edwards Dam or from the Removal of Edwards Dam."  Staff Paper ARE 429, Department of Agricultural and Resource Economics, University of Maine.

275. Boyle, Kevin J., Marcia L. Phillips, and Stephen D. Reiling.  1991. "Highlights from the 1989 Maine Wildlife Survey."  Staff Paper 425, Department of Agricultural and Resource Economics, University of Maine.

276. Teisl, Mario, Kevin J. Boyle, and Stephen D. Reiling.  1990. "Highlights from the Survey of Hunters Holding a 1988 Maine Hunting License."  Staff Paper ARE 424, Department of Agricultural and Resource Economics, University of Maine.

277. Boyle, Kevin J., Stephen D. Reiling, Mario Teisl, and Marcia L. Phillips.   1990. "A Study of the Impact of Game and Nongame Species on Maine's Economy."  Staff Paper ARE 423, Department of Agricultural and Resource Economics, University of Maine.

278. Boyle, Kevin J.  1990. "Design of Contingent-Valuation Questions for the 1991 National Survey of Fishing, Hunting and Wildlife-Associated Recreation."  Final report to the Federal Aid Division, U.S. Fish and Wildlife Service, Washington, D.C.

279. Boyle, Kevin J., Robert K. Roper, and Stephen D. Reiling.  1990. "Highlights from the 1988 Survey of Open Water Fishing in Maine."  Staff Paper ARE 416, Department of Agricultural and Resource Economics, University of Maine.

280. Phillips, Marcia L., Kevin J. Boyle, and Stephen D. Reiling.  1990. "Highlights from the Survey of Anglers Holding a 1988 Maine Fishing License."  Staff Paper ARE 415, Department of Agricultural and Resource Economics, University of Maine.

281. Potter, Deanna M., Kevin J. Boyle, and Stephen D. Reiling.  1990. "Highlights from the 1989 Survey of Maine Turkey Hunters."  Staff Paper ARE 413, Department of Agricultural and Resource Economics, University of Maine.

282. Boyle, Kevin J., Mario Teisl, Marcia L. Phillips, Stephen D. Reiling, and Lauri A. Fagerquist.  1990. "Economic Values and Economic Impacts Associated with Consumptive and Nonconsumptive Uses of Maine's Fish and Wildlife Resources."  Staff Paper ARE 410, Department of Agricultural and Resource Economics, University of Maine.

283. Boyle, Kevin J., Marcia L. Phillips, and Stephen D. Reiling.  1989. "Highlights from the 1988 Survey of Maine Trappers."  Staff Paper ARE 396, Department of Agricultural and Resource Economics, University of Maine.

284. Boyle, Kevin J., Marcia L. Phillips, and Stephen D. Reiling.  1989. "Highlights from the Survey of Anglers Holding a 1987 Maine Fishing License."  Staff Paper ARE 398, Department of Agricultural and Resource Economics, University of Maine.

285. Phillips, Marcia L., Kevin J. Boyle, and Stephen D. Reiling.  1989. "Highlights from the Survey of Hunters Holding a 1987 Maine Hunting License."  Staff Paper ARE 397, Department of Agricultural and Resource Economics, University of Maine.

286. Boyle, Kevin J., Stephen D. Reiling, and Marcia L. Phillips.  1989. "Highlights from the Survey of 1988 Moose Hunters."  Staff Paper ARE 392, Department of Agricultural and Resource Economics, University of Maine.

287. Boyle, Kevin J., Marcia L. Phillips, Stephen D. Reiling, and Lawrence K. Demirelli.  1989. "Economic Values and Economic Impacts Associated with Consumptive Uses of Maine's Fish

_____

and Wildlife Resources." Staff Paper ARE 391, Department of Agricultural and Resource Economics, University of Maine.

288. Baumgartner, Robert M., and Kevin J. Boyle. 1987. "Customer Acceptance of the Cycle-to-Shed Conversion for PG&E's Residential Peak Load Reduction Program." Report to Pacific Gas and Electric Company, HBRS.

289. Bishop, Richard C., Kevin J. Boyle, Michael P. Welsh, Robert M. Baumgartner, and Pamela R. Rathbun. 1987. "Glen Canyon Dam Releases and Downstream Recreation: An Analysis of User Preferences and Economic Values." Report to the U.S. Bureau of Reclamation.

290. Bishop, Richard C., and Kevin J. Boyle. 1985. "The Economic Value of Illinois Beach State Nature Preserve." Final report to the Illinois Department of Conservation.

291. Boyle, Kevin J., and Richard C. Bishop. 1984. "A Comparison of Contingent Valuation Techniques." Staff Paper No. 222, Department of Agricultural Economics, University of Wisconsin-Madison.

292. Boyle, Kevin J., and Richard C. Bishop. 1984. "Lower Wisconsin River Recreation: Economic Impacts and Scenic Values." Staff Paper 216, Department of Agricultural Economics, University of Wisconsin.

293. Boyle, Kevin J., and Richard C. Bishop. 1984. "Economic Benefits Associated with Boating and Canoeing on the Lower Wisconsin River." Economic Issues, No. 84, Department of Agricultural Economics, University of Wisconsin.

294. Boyle, Kevin J., Ronald A. Oliveira, and James K. Whittaker. 1982. "An Econometric Model of Barley Acreage Response to Changes in Prices and Wheat Acreage in the Northwest." Special Report No. 647, Agricultural Experiment Station, Oregon State University.

295. Boyle, Kevin J., and Frederick W. Obermiller. 1982. "Modifying Static Input-Output Models to Incorporate New Sectors." Technical Paper No. 6444, Agricultural Experiment Station, Oregon State University.

296. Obermiller, Frederick W., Kevin J. Boyle, and David Lambert. 1981. "Final Report: Morrow County Input-Output Model." Department of Agricultural and Resource Economics, Oregon State University.

297. Wilson, James A., Wayne Meserve, Everett Maxim, and Kevin J. Boyle. 1977. "The Economic Feasibility of the Installation of Chilled and Refrigerated Seawater Systems in New England (Herring) Carrier Vessels." Social Science Research Institute, University of Maine.

**PRESENTATIONS:**

1. Dodson, Laura L., Kevin J. Boyle and Cayelan Carey, 2019. "Statistical Relationships Between Water Quality and Agricultural Intensity in Maine, USA," 2019 Annual Meeting, July 21-23, Atlanta, Georgia 291125, Agricultural and Applied Economics Association.

2. Boyle, Kevin J., and Jeffrey M. Wooldridge. 2018. "Meta-analysis Prediction - Understanding Error Structures." Agricultural and Applied Economics Association Annual Meeting, Washington, DC.

3. Weng, Weizhe, Kevin Boyle, Kaitlin Farrell, Cayelan Carey, Kelly Cobourn, Sreeya Brahma,

Hilary Dugan, Paul Hanson, Nicole Ward and Kathleen Weathers. 2018. "Coupling Lake Water Quality and Hedonic Price Models to Evaluate the Effects of Nutrient Loading." Agricultural and Applied Economics Association Annual Meeting, Washington, DC.

4. Cao, Xiang, Kevin J. Boyle, Shyamani D. Siriwardena and Thomas P. Holmes. 2018. "Estimating Demand for Urban Tree Cover Using a Residential Sorting Model." Agricultural and Applied Economics Association Annual Meeting, Washington, DC.

5. Boyle, Kevin J., Robert Johnston, V. Kerry Smith, Maria Loureiro, Ståle Navrud and John Rolfe. 2018. "Contemporary Guidance for Benefit Transfers." Agricultural and Applied Economics Association Annual Meeting, Washington, DC.

6. Bockstael, Nancy, Kevin Boyle, Zoe Chen, Joe Herriges, Chris Leggett and George Parsons. 2018. "A Site-Portfolio Model for Multiple-Destination Recreation Trips: Valuing Trips to National Parks in the Southwestern USA." World Congress of Environmental and Resource Economists. Gothenburg, Sweden.

7. Xu, Weibin, Kevin J. Boyle, George Parsons and Mark Morrison. 2018. "Attribute Non-Attendance in a Revealed Preference Study." World Congress of Environmental and Resource Economists. Gothenburg, Sweden.

8. Weng, Weizhe, Mark Morrison, Kevin Boyle, Peter Boxall and John Rose. 2018. "Effects of the Number of Alternatives in a Public Good Choice Experiment." World Congress of Environmental and Resource Economists. Gothenburg, Sweden.

9. Weng, Weizhe, Kevin J. Boyle, Cayelan C. Carey, Kelly M. Cobourn, Hilary A. Dugan, Kaitlin J. Farrell, Paul C. Hanson, Sreeya Brahma, Nicole K. Ward, Kathleen C. Weathers. 2018. "Coupling Lake Water Quality Numerical Simulations and a Hedonic Model to Evaluate the Impacts of Changes in Nutrient Loading." UCOWR Conference, Pittsburg, PA.

10. Boyle, Kevin J. 2018. "The Reluctant Stated-preference Expert and Water Over the Dam." Tom Brownfest, Fort Collins, CO.

11. Boyle, Kevin J., Jessica A. Boatwright, Sreeya Brahma, and Weibin Xu. 2018. "NIMBYism (Not?) in Siting Wind Farms." Special Symposium in Honor of Gregory Poe, Cornell University.

12. Boyle, Kevin J. 2018. "Exxon Valdez to the BP Deep Water Horizon: economic assessments of major contamination events." Charles Sturt University, Bathurst, AU.

13. Boyle, Kevin J. 2017. "Exxon Valdez to the BP Deep Water Horizon: economic assessments of major contamination events." University of Waterloo, Waterloo, Canada.

14. Weng, Weizhe, Mark Morrison, Kevin Boyle, Peter Boxall and John Rose. 2017. "The Effects of the Number of Alternatives in Choice Experiment Questions." Camp Resources, Wilmington, NC.

15. Weng, Weizhe, Mark Morrison, Kevin Boyle, Peter Boxall and John Rose. 2017. "The Effects of the Number of Alternatives in Choice Experiment Questions." Agricultural and Applied Economics Association Annual Meeting, Chicago, IL.

16. Carson, Richard C., Kevin J. Boyle, and W. Michael Hanemann. 2017. "What Are U.S. Households Willing to Pay to Avoid the Harm to the Environment from The Deepwater Horizon Oil Spill?" Annual Meeting, European Association of Environmental and Resource Economics, Athens, Greece.

17. Boyle, Kevin J. 2017. "Contemporary Standards and Stated-preference Validity." Annual Meeting, Association of Environmental and Resource Economics, Pittsburg, PA.

**KEVIN J. BOYLE**                                                                                        38

18. Boyle, Kevin J., Weizhe Weng, and Cayelan Carey. 2017. "Lake Mendota water quality effects on property values." CNH Workshop, University of Wisconsin.

19. Boyle, Kevin J.  2017. "John Loomis' Extraordinary Career Exploring the Jungle of Nonmarket Valuation." Annual Meeting, W3133: Benefits and Costs of Natural Resources Policies Affecting Ecosystem Services on Public and Private Lands, Carlsbad, CA.

20. Xu, W, Boyle, K, Parsons, G, Morrison, M, and Thomy, B. 2016. "Recreation Value of Riparian Vegetation in the Georges and Cooks River Catchments in Sydney, Australia." Poster, ASSA Annual Meeting, Chicago, Il.

21. Boyle, Kevin J. 2016. "John Loomis' Extraordinary Career Exploring the Jungle of Nonmarket Valuation." Colorado State university.

22. Siriwardena S., K. Boyle, T. Holmes, and P. Wiseman. 2016. "The Implicit Value of Residential Tree Cover in the U.S." 41st IAHS World Congress on Housing, Albufeira, Portugal.

23. Xu, W, Boyle, K, Parsons, G, Morrison, M, and Thomy, B. 2016. "Recreation Value of Riparian Vegetation in the Georges and Cooks River Catchments in Sydney, Australia." Ecostream Conference, Asheville, NC.

24. Boyle, Kevin J. 2016. "Total Economic Value for Avoiding Injuries Due to Release of Oil from Macondo Well into the Gulf of Mexico in 2010: Best Practices in Assessing Validity." Law Seminars International, Natural Resource Damages Conference, Santa Fe, New Mexico.

25. Boyle, Kevin J. 2016. "The 2010 Gulf of Mexico Oil Spill: Estimating the Economic Losses." Association of Environmental and Resource Economics Summer Conference, Breckenridge.

26. Li, X., Boyle, K., Pressier, E., Holmes, T., Orwig, D., and Liebhold, A. 2016. "The Effect of Adjustment on Spatial Interpolation Errors on the Hedonic Model. International Society of Forest Resource Economics, Raleigh, NC.

27. Boyle, Kevin J. 2016.  "Contemporary Guidance for Stated Preference Studies." U.S. EPA, Washington, DC.

28. Li, X., Boyle, K., Preisser, E., Holmes, T., Orwig, D., and Liebhold, A. 2016. "Spatial Interpolation, Hedonic Model Estimation and Forest Pest Damages." School of Sustainability, Arizona State University

29. Boyle, Kevin J., and Jeffrey Wooldridge. 2016. "Understanding Error Structures and Exploiting Panel Data in Meta-Analytic Benefit Transfers." U.S. EPA benefits-Transfer Workshop, George Washington University.

30. Xu, W, Boyle, K, Parsons, G, Morrison, M, and Thomy, B. 2016. "Recreation Value of Riparian Vegetation in the Georges and Cooks River Catchments in Sydney, Australia." Sydney, AU.

31. Yuan, Yuan, Wen You, Kevin Boyle, and Christopher Parmeter.  2015. "Evaluation of an Alternative Attribute Non-attendance Elicitation Format."  Selected poster, Annual Meeting, Agricultural and Applied Economics Association, San Francisco, CA.

32. Boyle, Kevin J.  2015. "Analysis and Reporting of SP Surveys."  Invited policy session,

**KEVIN J. BOYLE** 39

_____

Annual Meeting of the European Association of Environmental and Resource Economists.

33. Boyle, Kevin J.  2015. "Guidelines for the Reporting and Use of Stated-Preference Estimates." Invited paper, Annual Meeting of the Association of Environmental and Resource Economists, San Diego, CA.

34. Boyle, Kevin J. 2015. "National Real Estate Trends and Implications." RE?MAX Regional Conference, Roanoke, VA.

35. Boyle, Kevin J. October 2015. "Consumer Preferences for Ornamental Plants Grown with Water Conservation Practices." Department of Rural Economy, University of Alberta.

36. Boyle, Kevin J. 2015. "Addressing Major Issues Confronting Colleges of Agriculture and Natural Resources." College of Agriculture and Natural Resources, Michigan State University.

37. Boyle, Kevin J.  2015. "What Happens When the Bugs Come to Town?  NUMBY – Not Until My Backyard."  School of Public and Environmental Affairs, Indiana University.

38. Boyle, Kevin J.  2015. "What Happens When the Bugs Come to Town?  NUMBY – Not Until My Backyard."  Department of Applied Economics, University of Georgia.

39. Boyle, Kevin J.  2015. "What Happens When the Bugs Come to Town?  NUMBY – Not Until My Backyard."  Department of Biological Sciences, Dartmouth College.

40. Boyle Kevin J.  2015.  "A Vision for Leadership." Department of Economics, Iowa State University.

41. Boyle, Kevin, David Hartter, James Pease, Darrell Bosch, and Weibin Xu. 2014. "Consumer Preferences for Ornamental Plants Grown with Water Conservation Practices."  Invited paper, Annual Meeting, Agricultural and Applied Economics Association, Minneapolis, MN.

42. Pease, J., D. Harter, K. Boyle, D. Bosch, and N. D'Alessio.  2014. "Understanding consumer preferences for ornamental plants with disease-free and water conservation labels."  Webinar: http://www.irrigation-pathogens.ppws.vt.edu/webinar/november-2014.php

43. Li, Xiaoshu, Kevin Boyle, Thomas Holmes, Evan Pressier, Andrew Liebhold, and David Orwig.  2014. "The Effect of Spatial Interpolation on the Hedonic Model: A Case of Forest Damages." Selected paper, Annual Meeting, Agricultural and Applied Economics Association, Minneapolis, MN.

44. Yuan, Yuan, Wen You, Kevin Boyle, and Barbara Kanninen.  2014. "Designing Financial Incentives to Maximize Participation of Target Populations in Weight Loss Programs." Selected poster, Annual Meeting, Agricultural and Applied Economics Association, Minneapolis, MN.

45. Li, Xiaoshu, Kevin J. Boyle, Evan Preisser, Thomas P. Holmes, David A. Orwig and Andrew Liebhold.  2014. "The Effect of Spatial Interpolation on the Hedonic Model: A Case of Forest Pest Damages." Invited Policy Presentation, World Congress of Environmental and Resource Economists, Istanbul, Turkey.

46. Boatwright, Jessica, and Kevin J. Boyle.  2014. "Is NIMBY a Factor in Siting Community Wind Farms?"  Invited Policy Presentation, World Congress of Environmental and Resource Economists, Istanbul, Turkey.

**KEVIN J. BOYLE**                                                                                                        40

_____

47. Boyle, Kevin J.  2014. "Developing Contemporary Standards for Stated-Preference Valuation: The need for updated protocols."  Invited Policy Presentation, World Congress of Environmental and Resource Economists, Istanbul, Turkey.

48. Boyle, Kevin J.  2014. "Developing Contemporary Standards for Stated-Preference Valuation."  Invited Policy Presentation, World Congress of Environmental and Resource Economists, Istanbul, Turkey.

49. Kaul, Sapna, and Kevin J. Boyle.  2013. "Benefit Transfer method … The Good, the Bad and the Ugly."  Integrating Biodiversity and Ecosystem Services into Project Appraisal, Inter-American Development Bank, Washington, DC.

50. Paterson, Robert, Kevin J. Boyle, Richard T. Carson, Barbara Kanninen and Christopher Leggett.  2013. "Valuing Changes in Visibility in National Parks and Wilderness Areas: Shifting Distributions."  Selected paper, Annual Meeting of the Association of Environmental and Resource Economists, Banff, Canada.

51. Cohen, Jed, Klaus Moeltner, Christine Blinn, Kevin J. Boyle and Thomas P. Holmes.  2013. "Exploiting Weak Complementarity in Property Value Models: The Case of the Mountain Pine Beetle in the Colorado Front Range."  Selected paper, Annual Meeting of the Association of Environmental and Resource Economists, Banff, Canada.

52. Xiaoshu Li, Kevin J. Boyle, Evan Preisser, Thomas P. Holmes, Klaus Moeltner, and David A. Orwig.  2013. "Is the Hemlock Woolly Adelgid Impact on Property Values: a 'Canary of Global Warming'?" Selected paper, Annual Meeting of the Association of Environmental and Resource Economists, Banff, Canada.

53. Cultice, Alyssa K., Darrell J. Bosch, James W. Pease and Kevin J. Boyle.  2013. "Horticultural producers' willingness to adopt water recirculation technology in the Mid-Atlantic region." Selected Paper, Agricultural and Applied Economics Association Annual Meeting, Washington, DC.

54. You, Wen, Yuan Yuan and Kevin J. Boyle.  2013. "Decision frame heterogeneity in Choice Experiment Analysis: A case study in weight loss."  Selected Paper, Agricultural and Applied Economics Association Annual Meeting, Washington, DC.

55. Boyle, Kevin J.  2013. "Thoughts on Ocean Ecosystem Valuation." A workshop to build a common UK-US perspective on marine ecosystem economics to support marine spatial planning, Plymouth Marine Laboratory, Plymouth, England.

56. Boyle, Kevin J., Jed Cohen, Sapna Kaul, Klaus Moeltner, Christopher Parmeter.  2012. "Are Hedonic Estimates Reliable During a Real Estate Bubble?"  Invited presentation, Annual meeting of the Association of Environmental and Resource Economists, Asheville, NC.

57. Kaul, Sapna, Kevin J. Boyle, Nicolai V. Kuminoff, Christopher F. Parmeter and Jaren C. Pope.  2012. "What Can We Learn from Benefit Transfer Errors?  Evidence from 20 Years of Research on Convergent Validity."  Selected Paper, Annual Meeting of the European Association of Environmental and Resource Economists, Prague, Czech Republic.

_____

58. Yuan, Yuan, Kevin J. Boyle, Wen You and Harry M Fuller.  2012. "A Nationwide Comparison of Farmland Conservation Easement Valuation." Selected Paper, Agricultural and Applied Economics Association Annual Meeting, Seattle, WA.

59. Li, Xiaoshu, Kevin j. Boyle and Genevieve LaRouche.  2012. "Does On-site Experience Affect Responses to Stated Preference Questions? Selected Paper, Agricultural and Applied Economics Association Annual Meeting, Seattle, WA.

60. Kaul, Sapna, Wen You and Kevin J. Boyle.  2012. "Delivery at Home versus Delivery at a Health Care Facility – A Case Study of Bihar, India." Selected Paper, Agricultural and Applied Economics Association Annual Meeting, Seattle, WA.

61. Boyle, Kevin J.  2012. "Successful Participation in Interdisciplinary Grants." National Institute of Food and Agriculture webinar.

62. Kaul, Sapna, Kevin J. Boyle, Nicolai V. Kuminoff, Christopher F. Parmeter and Jaren C. Pope. 2012. "What Can We Learn from Benefit Transfer Errors?  Evidence from 20 Years of Research on Convergent Validity."  Appstate Environmental and Resource Economics Workshop, Walker College of Business and the Center for Economic Research and Policy Analysis, Appalachian State University, Boone, NC.

63. Kaul, Sapna, Kevin J. Boyle, Nicolai V. Kuminoff, Christopher F. Parmeter and Jaren C. Pope. 2011. "What Can We Learn from Benefit Transfer Errors?  Evidence from 20 Years of Research on Convergent Validity."  Invited presentation, Society for Risk Analysis Annual Meeting, Charleston, SC.

64. Zhang, Congwen, Nicolai Kuminoff and Kevin J. Boyle.  2011. "Partial Identification of hedonic Demand Functions."  Invited presentation, *The Economics of Water Quality Improvement in Chesapeake Bay*, Workshop sponsored by U.S EPA and Resources for the Future, Washington, DC.

65. Boyle, Kevin J. 2011. "What Can We Learn from Benefit Transfer Errors?  Evidence from 20 Years of Research on Convergent Validity."  Invited presentation, *Theory, Science, and Statistics in the Use of Benefit Cost Analysis,* Benefit Cost Center, Evans School of Public Affairs, University of Washington, Washington, DC.

66. Boyle, Kevin J., Nicolai V. Kuminoff, Congwen Zhang and Kathleen P. Bell.  2011. "Does a Property-Specific Environmental health Risk Create a 'Neighborhood' Housing-Price Stigma?" Invited presentation, *Ground Water Summit*, National Ground Water Association, Baltimore, MD.

67. Boyle, Kevin J.  2011. "Thoughts on Water/Site Contamination." Invited presentation, Vision 2025, E.I. du Pont de Nemours and Company.

68. Boyle, Kevin J., Richard T. Carson, Robert Paterson and Michael P. Welsh.  2011. "Valuation of Visibility in Class I Visibility Regions."  Invited presentation, U.S. EPA, Office of Water, Research Triangle Park, NC.

69. Boyle, Kevin J., 2011.  "Informing Participants in Stated Preference Studies."  Invited presentation, U.S. EPA, Office of Water, Research Triangle Park, NC.

**KEVIN J. BOYLE**                                                                                      42

_____

70. Boyle, Kevin J., 2011.  "Policy Question for Valuation."  Invited presentation, U.S. EPA, Office of Water, Research Triangle Park, NC.

71. Kaul, Sapna, Kevin J. Boyle, Jaren C. Pope, Christopher F. Parmeter and Nicolai V. Kuminoff. 2011. "Are Benefit-Transfer Errors Explainable or are Benefit Transfers Just a Shot in the Dark."  Invited seminar, Department of Economics and School of Sustainability, Arizona State University.

72. Kevin J. Boyle. 2010. "Benefit-Transfer Validity."  Stratus Consulting, Boulder, CO.

73. Boyle, Kevin J.  2011. "20 Years of Stated Preference Research."  Invited presentation, Allied Social Science Meetings, Denver, CO.

74. Boyle, Kevin J., Sapna Kaul, Ali Hashemi and Xiaoshu Li.  2010. "Applicability of Benefit Transfers for Evaluation of Homeland Security Counterterrorism Measures."  Invited, _Estimating the Benefits of Homeland Security Policies_, workshop sponsored by RTI International and Department of Homeland Security, Washington, DC. (http://create.usc.edu/2010/09/estimating_the_benefits_of_hom.html, Session 2)

75. Boyle, Kevin J., Nicolai V. Kuminoff, Congwen Zhang and Kathleen P. Bell.  2010. "Does a Property-Specific Environmental health Risk Create a 'Neighborhood' Housing-Price Stigma?"  Invited webinar, National Ground Water Association.

76. Boyle, Kevin J., Nicolai V. Kuminoff, Congwen Zhang and Kathleen P. Bell.  2010. "Does a Property-Specific Environmental health Risk Create a 'Neighborhood' Housing-Price Stigma?"  Stratus Consulting, Boulder, CO.

77.  Kevin J. Boyle. 2010. "Benefit-Transfer Validity."  Keynote, 5th Annual Choice Modeling Workshop, University of South Australia.

78. Kevin J. Boyle.  2010. "Voices of Reason and Sober Second Thoughts."  Keynote, 5th Annual Choice Modeling Workshop, University of South Australia.

79. Boyle, Kevin J., Christopher Parmater, Brent Boehlert and Robert Paterson.  2010. "Sample Selection and Robust Meta-Analysis Based Benefit Transfers." Selected, 4th World Congress of Environmental and Resource Economists, Montreal, Canada.

80. Hatton McDonald, Darla, Kevin J. Boyle, Mark Morrison and John Rose.  2010. "Untangling Differences in Values from Internet and Mail Stated Preference Studies." Selected, 4th World Congress of Environmental and Resource Economists, Montreal, Canada. "Untangling Differences in Values from Internet and Mail Stated Preference Studies."  Invited, Annual Meeting, W2133, Tucson, AZ.

81. Boyle, Kevin J.  2009.  "Frontiers in Nonmarket Valuation." Keynote presentation, E-CReW 2009, Charles Sturt University, AU.  (http://www.ecrew.org.au/ )

82. Azziz, Sonia, Kevin J. Boyle and Thomas Crocker.  2009. "Valuation of Avoiding Arsenic in Rural Bangladesh: An Averting behavior Analysis."  Selected paper, World Congress of Health Economists, Beijing, China.

83. Boyle, Kevin J.  2009. "Globalization, International Trade and Food Safety."  Keynote address, 2nd Food and Agriculture update 2009: "Toward Agro-Health."  United Arab Emirates

_____

University. (http://cfa.uaeu.ac.ae/college_news.shtml )

84. Azziz, Sonia, Kevin J. Boyle and Thomas Crocker.  2009. "Valuation of Avoiding Arsenic in Rural Bangladesh: An Averting behavior Analysis."  Invited Presentation, Department of Agribusiness and Consumer Science, United Arab Emirates University.

85. Boyle, Kevin J., Nicolai V. Kuminoff, Congwen Zhang and Kathleen P. Bell.  2009. "Does a Property-Specific Environmental health Risk Create a 'Neighborhood' Housing-Price Stigma?"  Invited Presentation, Department of Agribusiness and Consumer Science, United Arab Emirates University.

86. Azziz, Sonia, Kevin J. Boyle and Thomas Crocker.  2008. "Valuation of Avoiding Arsenic in Rural Bangladesh: An Averting behavior Analysis."  Invited Presentation, *Camp Resources*, North Carolina State University.

87. Özdemir, Semra, and Kevin J. Boyle.  2008. "Convergent Validity of Attribute-Based, Choice Questions in Stated-Preference Studies."  University of Sydney, Sydney, AU.

88. Bell, Kathleen, Shan Huang and Kevin J. Boyle. 2008. "Arsenic Contamination of Groundwater, Health Risks and Public Responses top Mass media Coverage."  Commonwealth Scientific and Industrial Research Organization, Adelaide (CISRO), AU.

89. Boyle, Kevin J., Nicolai V. Kuminoff, Congwen Zhang and Kathleen P. Bell.  2008. "Does a Property-Specific Environmental health Risk Create a 'Neighborhood' Housing-Price Stigma?"  Commonwealth Scientific and Industrial Research Organization, Adelaide (CISRO), AU.

90. Azziz, Sonia, Kevin J. Boyle and Thomas Crocker.  2008. "Valuation of Avoiding Arsenic in Rural Bangladesh: An Averting behavior Analysis."  Centers for Disease Control, Atlanta, GA.

91. Paterson, Robert W., Kevin J. Boyle, Christopher F. Parmeter, James E. Neuman and Paul De Civita.  2008. "Heterogeneity in Preferences for Smoking Cessation."  Centers for Disease Control, Atlanta, GA.

92. Paterson, Robert W., Kevin J. Boyle, Christopher F. Parmeter, James E. Neuman and Paul De Civita.  2008. "Heterogeneity in Preferences for Smoking Cessation."  Virginia Bioinformatics Institute, Virginia Tech.

93. Boyle, Kevin J. 2006. "Economics of Emerging Diseases." Keynote Presentation, *Bangladesh Society of Microbiologists 22nd Annual Conference*. Dhaka, Bangladesh.

94. Boyle, Kevin J. 2006. "The Economist as the Voice of Biological and Physical Systems in Natural Resource Damage Assessments." Invited Lecture, Department of Economics and Department of Costal and Marine Studies, East Carolina University.

95. Taylor, Laura O., Mark M. Morrison, and Kevin J. Boyle. 2006. "Provision Rules and the Incentive Compatibility of Choice Surveys." Invited Lecture, Department of Economics, East Carolina University.

96. Boyle, Kevin J., Sonia Aziz, and V. Kerry Smith. 2006. "Meta-analysis of Response Rates to Contingent-Valuation Studies Conducted by Mail." Keynote Presentation. Resources for the

Future, Washington, DC. *Implications for Administering and Testing Representativeness Workshop*.

97. Boyle, Kevin J. 2006. "Negotiation Talking Points: Seeking Your First Academic Position." Invited Lecture, *Transforming the Professoriate: Preparing Women for careers in Science and Engineering*, Advance Virginia Tech.

98. Taylor, Laura O., Mark M. Morrison, and Kevin J. Boyle. 2006. "Provision Rules and the Incentive Compatibility of Choice Surveys." Invited Presentation, *Third World Congress of Environmental and Resource Economist*. Kyoto, Japan.

99. Boyle, Kevin J. 2006. "Economic Benefit Estimation of Health Outcomes." Invited Presentation, International Center for Diarrheal Research. Dhaka, Bangladesh.

100. Taylor, Laura O., Mark M. Morrison, and Kevin J. Boyle. 2006. "Provision Rules and the Incentive Compatibility of Choice Surveys." Invited Lecture, School of Marine Resources and Department of Food and Resource Economics, University of Delaware.

101. Boyle, Kevin J. and Kathleen P. Bell. 2006. "Economic Valuation of Avoiding Exposure to Arsenic in Drinking Water." Invited Presentation, U.S. EPA NCER/NCEE Workshop, *Morbidity and Mortality: How Do We Value Risk of Illness and Death*.

102. Boyle, Kevin J. 2006. "Chaos or Organized Confusion: Structural Models, Policy Relevance and Validity in Nonmarket Valuation." Keynote lecture, *Frontiers in Natural Resource Economics: A Symposium Honoring the Career of Richard C. Bishop*, University of Wisconsin.

103. Boyle, Kevin J. 2005. "Economic Modeling of Natural Resource Damages." Invited presentation, Natural Resource Damages Litigation, Law Seminars International, Newark, New Jersey.

104. Holmes, Thomas P. and Kevin J. Boyle. 2003. "Dynamic Bid Anchoring in Sequential, Attribute-Based Contingent Valuation." Selected paper, European Association of Environmental and Resource Economists, Twelfth Annual Conference, Bilbao, Spain.

105. Boyle, Kevin J., Mark M. Morrison, and Laura O. Taylor. 2003. "Provision Rules and the Incentive Compatibility of Conjoint Surveys." Selected paper, European Association of Environmental and Resource Economists, Twelfth Annual Conference, Bilbao, Spain.

106. Teisl, Mario F., Kevin J. Boyle, Richard Record, and Rob Southwick. 2001. "Optimizing License Revenues." CMBA conference, New Orleans, Aug. 28th.

107. Teisl, Mario F., Brian Roe, Kevin Boyle, T. Lynn Riggs, Mark L. Messonnier, Melissa J. Herrmann. 2001. "Understanding how respondents view food safety risks: Implications to the design of willingness-to-pay experiments." Annual Workshop, Association of Environmental and Resource Economists, Bar Harbor, ME.

108. Boyle, Kevin J., and Tommy Hsu. 2001. "Effect of Aquatic Weeds on Lakefront Property Values." Maine Water Conference. Augusta, Maine.

109. Boyle, Kevin J. 2001. "Stated Preference Estimation of Hicksian Surplus Using Conjoint Analysis." Department of Economics. University of Colorado, Boulder, CO.

110. Boyle, Kevin J.  2001. "Including Regulations and Angler Characteristics in RUM Models: Preliminary Thoughts and Estimates."  Benefit Transfer workshop, North Carolina.

111. Boyle, Kevin J.  2001. "Meta Analysis of Sport Fishing Values."  Benefit Transfer workshop, North Carolina.

112. Boyle, Kevin J.  2001. "A Comparison of Rank and Choice Data in Eliciting Stated Preferences: An Application to the Maquarie Marshes, NSW, AU," Department of Economics, University of Central, Orlando, Florida.

113. Boyle, Kevin J.  2001. "Stated Preference Estimation of Hicksian Surplus Using Conjoint Analysis."  Department of Economics.  University of New Hampshire, Durham, New Hampshire.

114. Paterson, Robert, and Kevin J. Boyle.  2001. "Out of Sight, Out of Mind?  Using GIS to Incorporate Topography in Hedonic Property Value Models."  Northeastern Agricultural and Resource Economics Association annual meetings, Bar Harbor, Maine.

115. Scrogin, David, Kevin J. Boyle, Andrew Plantinga, and George Parsons.  2001. "Regulated Recreationists: Case and Angler Catch, Harvest and Destination Choice."  Northeastern Agricultural and Resource Economics Association annual meetings, Bar Harbor, Maine.

116. Paterson, Robert, Kevin J. Boyle, Mary Ahearn, Anna Alberini, John Bergstrom, Larry Libby, and Michael P. Welsh.  2001. "Attributes of Farmland in the Provision of Open Space: It is Not a Black and White Issue."  Northeastern Agricultural and Resource Economics Association annual meetings, Bar Harbor, Maine.

117. Boyle, Kevin J.  2001. "Stated Preference Estimation of Hicksian Surplus Using Conjoint Analysis."  University of New Hampshire, Durham, NH.

118. Boyle, Kevin J., and Thomas P. Holmes.  2001. "Anchoring in Conjoint Choice Experiments."  Selected paper, European Association of Environmental and Resource Economists, Eleventh Annual Conference, South Hampton, England.

119. Poor, P. Joan, and Kevin J. Boyle.  2000. "The Value of Publicly protected National Wildlife Refuges, Using a Hedonic Property-Value Model."  Annual meeting of the American Agricultural Economics Association, Tampa, Florida.

120. Alberini, Anna, Kevin J. Boyle, and Michael P. Welsh.  2000. "Analysis of Contingent Valuation Data with Multiple Bids and Response Options Allowing Respondents to Express Uncertainty."  Selected paper, European Association of Environmental and Resource Economists, Tenth Annual Conference, Crete, Greece.

121. Poe, Gregory L., Kevin J. Boyle, and John C. Bergstrom.   2000. "A Meta Analysis of Contingent Values for Groundwater Quality in the United States."  Selected paper, European Association of Environmental and Resource Economists, Tenth Annual Conference, Crete, Greece.

122. Poor, P. Joan, and Kevin J. Boyle.  2000. "A Hedonic Property-Value Model of the Value of Open Space Provided by the Great Meadows National Wildlife Refuge." Northeastern Agricultural and Resource Economics Association annual meeting, Rhode Island.

**KEVIN J. BOYLE**                                                                                     46

_____

123. Boyle, Kevin J., and Laura O. Taylor.  2000. "Estimating the Demand for Lake Water Quality with a Hedonic Property-Value Model: Objective versus Subjective Measures of Quality." Department of Economics, University of New Mexico.

124. Boyle, Kevin J.  2000. "New Frontiers in Environmental Policy in the United States." Department of Environmental Protection, New South Wales, Australia.

125. Boyle, Kevin J., and Laura O. Taylor.  2000. "Estimating the Demand for Lake Water Quality with a Hedonic Property-Value Model: Objective versus Subjective Measures of Quality." Department of Environmental Protection, New South Wales, Australia.

126. Boyle, Kevin J., Thomas P. Holmes, Mario F. Teisl, and Brian Roe.  2000. "Assessing Public Preferences for Timber Harvesting Using Conjoint Analysis: A Comparison of Response Formats."  Charles Stuart University, Bathurst, Australia.

127. Boyle, Kevin J., Daniel Hellerstein, Richard C. Bishop, Michael P. Welsh, Mary Ahearn, Andrew Laughland, and John Charbonneau.  2000. "Tests of Scope in Contingent-Valuation Studies: Are the Numbers for the Birds?"  Australian National University and the Australian Agricultural Economics Association, Canberra, Australia.

128. Poor, P. Joan, Kevin J. Boyle, and Laura Taylor.  2000. "Objective Verses Subjective Measures of Environmental Quality in Hedonic Property-Value Models."  Annual meeting of Regional Project W-133, Benefits and Costs Transfer in Natural Resources Planning, Kauai, Hawaii.

129. Boyle, Kevin J., Thomas P. Holmes, Mario F. Teisl, and Brian Roe.  2000. "Assessing Public Preferences for Timber Harvesting Using Conjoint Analysis: A Comparison of Response Formats." Department of Agricultural and Resource Economics, Colorado State University, Fort Collins, CO.

130. Boyle, Kevin J., Daniel Hellerstein, Richard C. Bishop, Michael P. Welsh, Mary Ahearn, Andrew Laughland, and John Charbonneau.  2000. "Tests of Scope in Contingent-Valuation Studies: Are the Numbers for the Birds?"  Selected paper, Association of Environmental and Resource Economists' session on "Advances in Valuation Methods," Allied Social Science Meetings, Boston, MA.

131. Alberini, Anna, Kevin J. Boyle, and Michael P. Welsh.  1999. "Analysis of Non-Market Valuation Data with Multiple Bids and Response Options that Allow Respondents to Indicate They Are Uncertain."  Department of Agricultural and Resource Economics, Colorado State University, Fort Collins, CO.

132. Boyle, Kevin J.  1999. "Estimating the Demand for Lake Water Quality with a Hedonic, Property-Value Model: Objective versus Subjective Measures of Quality."  Department of Economics, University of Wyoming, Laramie, Wyoming.

133. Taylor, Laura O., Kevin J. Boyle, and P. Joan Poor.  1999. "Subjective versus Objective Quality Measures in Hedonic Demand Models: Implication for Valuing Water Quality." Selected paper, annual meeting of the Southern Economic Association, New Orleans, LA.

134. Holmes, Thomas P., and Kevin J. Boyle.  1999. "Response Bias in Conjoint Analysis." Selected paper, annual meeting of the Southern Economic Association, New Orleans, LA.

**KEVIN J. BOYLE**                                                                               47

_____

135. Taylor, Laura O., Kevin J. Boyle, and P. Joan Poor.  1999. "Subjective versus Objective Quality Measures in Hedonic Demand Models: Implication for Valuing Water Quality."  7th Annual Triangle Camp Resources, Wilmington, NC.

136. Boyle, Kevin J., P. Joan Poor, and Laura O. Taylor.  1999. "Estimating the Demand for Protecting Freshwater Lakes from Eutrophication."  Invited paper, Association of Environmental and Resource Economics session on "Frontiers of Applications of Hedonics to Environmental Issues," annual meeting of the American Agricultural Economics Association. Nashville, TN.

137. Poor, P. Joan, Kevin J. Boyle, and Laura O. Taylor.  1999. "Objective versus Subjective Measures of Environmental Quality in Hedonic Property Value Models."  Selected paper, annual meeting of the Northeastern Agricultural and Resource Economics Association, Morgantown, WV.

138. Boyle, Kevin J., Roy Bouchard, and Jennifer Schuetz.  1999. "Economic Values and Economic Impacts of Nonresidential Users of Maine's Lakes."  12th Annual National Conference Enhancing the States' Lake Management Programs, Chicago, Illinois.

139. Boyle, Kevin J.  1999. "The Effect of Lake Water Clarity on Recreational Uses of Maine's Lakes."  Annual New England Lakes Conference "Promoting Awareness & Action for our Lakes' Future," Auburn, Maine.

140. Boyle, Kevin J., Thomas P. Holmes, Mario F. Teisl, and Brian Roe.  1999. "Assessing Public Preferences for Timber Harvesting Using Conjoint Analysis: A Comparison of Response Formats."  Department of Agricultural and Resource Economics, University of Georgia.

141. Boyle, Kevin J., Richard C. Bishop, Daniel Hellerstein, Michael P. Welsh, Mary C. Ahearn, Andrew Laughland, John Charbonneau, Raymond O'Connor, and Anna Alberini.  1999. "Tests of Scope in Contingent-Valuation Studies: Are the Numbers for the Birds?"  Department of Economics, Georgia State University, Atlanta, GA.

142. Boyle, Kevin.  1998. "Experimental Designs Affect Preference Measures."  National Science Foundation Workshop on Alternatives to Traditional Contingent Valuation Techniques, Nashville, TN.

143. Boyle, Kevin J. 1998.  "Valuation of Ecosystems and Biological Diversity."  The Nature Conservancy, International Leadership Council, Emerging Issues Forum, Charleston, SC.

144. Yabe, Mitsuyasu, John C. Bergstrom, and Kevin J. Boyle.  1998. "Political Meaning of Contingent Valuation Estimates: Comparison of Economic Value Between Tax Reallocation and Special Tax."  Annual meeting of the Society for Environmental Economics and Policy Studies, Tokyo, Japan.

145. Boyle, Kevin J., Richard C. Bishop, Daniel Hellerstein, Michael P. Welsh, Mary C. Ahearn, Andrew Laughland, John Charbonneau, and Raymond O'Connor.  1998. "Tests of Scope in Contingent-Valuation Studies: Are the Numbers for the Birds?"  World Congress of Environmental and Resource Economists, Venice, Italy.

146. Boyle, Kevin J., Thomas P. Holmes, Mario F. Teisl, Brian Roe, Shelley Phillips, and Genevieve Pullis.  1998. "Assessing Public Preferences for Timber Harvesting Using Conjoint

Analysis: A Comparison of Response Formats."  World congress of Environmental Economists, Venice, Italy.

147. Boyle, Kevin J., Thomas P. Holmes, Mario F. Teisl, Brian Roe, Shelley Phillips, and Genevieve Pullis.  1998. "Assessing Public Preferences for Timber Harvesting Using Conjoint Analysis."  Annual meeting of the Northeastern Forest Economics Association, Fredericton, New Brunswick, Canada.

148. Schuetz, Jennifer, and Kevin J. Boyle.  1998. "The Effects of Water Quality on Recreational Benefits of Maine's Great Ponds."  Presented at Our New England Waters: Watershed Stewardship for the Next Millennium, Durham, New Hampshire.  Hosted by the New Hampshire Lakes Lay Monitoring Program, New Hampshire Lakes Association and the New England Chapter of the North American Lake Management Society.

149. Boyle, Kevin J.  1998. "Biodiversity, Valuation and Trade-Offs."  Social Science Research Needs in Forestry: The Human Dimensions of Forest Management, Montreal, Canada. Sponsored by the Canadian Forest Service.

150. Boyle, Kevin J., and Steven R. Lawson.  1998. "Hedonic Demand for Lake Water Clarity." Annual meeting of Regional Project W-133, Benefits and Costs Transfer in Natural Resources Planning, Colorado Springs, CO.

151. Boyle, Kevin J., and Steven R. Lawson.  1998. "Hedonic Demand for Lake Water Clarity." Invited Alumni Lecture, Department of Agricultural Economics, University of Wisconsin.

152. Boyle, Kevin J., Jennifer Schuetz, and Jeffrey S. Kahl.  1997. "Great Ponds Play an Integral Role in Maine's Economy."  17th International Symposium of the North American Lake Management Society, Houston, TX.

153. Boyle, Kevin J.  1997. "Protecting Water Quality Makes Sense for Maine Businesses." Keynote address, Maine Water Conference, Augusta, ME.  Hosted by the Water Research Institute, University of Maine.

154. Bergstrom, John C., Kevin J. Boyle, and M. Yabe. 1997. "Comparison of Economic Value for Protecting Ground Water Quality in Maine and Georgia Using Tax Reallocation and Special Tax Payment Vehicles".  Annual meeting of Regional Project W-133, Benefits and Costs Transfer in Natural Resources Planning.

155. Alberini, Anna, Kevin J. Boyle, and M.P. Welsh. 1997. "Using Multiple-Bounded Questions to Incorporate Preference Uncertainty in Non-Market Valuation".  Annual meeting of Regional Project W-133, Benefits and Costs Transfer in Natural Resources Planning.

156. Boyle, Kevin J., Margaret Schneemann, V.K. Smith, and Donald Epp. 1997. "Meta Analysis of Response Rates to Contingent-Valuation Studies Conducted by Mail".  Annual meeting of Regional Project W-133, Benefits and Costs Transfer in Natural Resources Planning.

157. Boyle, Kevin J., Jennifer Schuetz, and J. Steve Kahl. 1997. "Great Ponds Plan an Integral Role in Maine's Economy.  National Conference on Enhancing the States' Lake Management Programs".  U.S. Environmental Protection Agency and the Northeastern Illinois Planning Commission.

158. Boyle, Kevin J., Jennifer Schuetz, and J. Steve Kahl. 1997. "Great Ponds Play an Integral Role in Maine's Economy.  Maine Water Conference".  Augusta, ME.  Hosted by the Water Research Institute, University of Maine.

159. Boyle, Kevin J., Jennifer Schuetz, and J. Steve Kahl. 1997. "Great Ponds Play an Integral Role in Maine's Economy".  Our New England Waters Conference.  Kingston, RI.  Hosted by University of Rhode Island (URI) cooperative Extension Water Quality Programs; US EPA, New England Region; RI Department of Environmental Management; New England Chapter of the North American Lake Management Society; URI Department of Natural Resources.

160. Boyle, Kevin J.  1996. "Valuing the Invaluable: Economic Values for Natural Resources." Invited plenary presentation, International Conference on Integrated Management and Sustainable Development in Coastal Zones, Rimouski, Quebec, Canada.

161. James, Holly L., Kevin J. Boyle, Roy Bouchard, and Steven Lawson.  1996. "The Relationship between Lake Water Quality and Property Values."  Invited presentation, Bridging the Gulf of Maine: A Watershed of Watersheds, sponsored by the Collaboration of Community Foundations for the Gulf of Maine, Portland, ME.

162. James, Holly L., Kevin J. Boyle, Roy Bouchard, and Steven Lawson.  1996. "The Relationship Between Lake Water Quality and Property Values."  Invited presentation, New England Lake Conference, Ashland, MA.

163. Boyle, Kevin J., Hugh F. MacDonald, Hsiang-tai Cheng, and Daniel W. McCollum.  1996. "Bid Design and Yea Saying in Single-Bounded, Dichotomous-Choice Questions."  Selected paper, annual meeting of the Northeastern Agricultural and Resource Economics Association, Atlantic City, N.J.

164. Boyle, Kevin J.  1996. "Water Quality and Property Values."  Invited presentation, Maine Lakes Conference, Auburn, ME.

165. Boyle, Kevin J., Hugh F. MacDonald, Hsiang-tai Cheng, and Daniel W. McCollum.  1996. "Bid Design and Yea Saying in Single-Bounded, Dichotomous-Choice Questions."  Selected paper, annual meeting of Regional Project W-133 (Benefits and Costs in Natural Resources Planning), Jekyl Island, GA.

166. James, Holly L., Kevin J. Boyle, Roy Bouchard, and Steven Lawson.  1995. "The Relationship Between Lake Water Quality and Property Values."  Invited presentation, Fish River Lakes Water Quality Association Annual Conference, Sinclair, ME.

167. James, Holly L., Kevin J. Boyle, and Roy Bouchard.  1995. "The Relationship Between Lake Water Quality and Property Values."  Invited paper, North American Lake Society Annual Symposium, Toronto, Canada.

168. Boyle, Kevin J., Holly L. James, and Roy Bouchard.  1995. "The Economic Value of Maine's Great Ponds."  Invited paper, Maine Coalition of Lake Associations, Maine Lake Conference, Colby College, Waterville, Maine.

169. James, Holly L., Kevin J. Boyle, and Roy Bouchard.  1995. "A Hedonic Property Value Study of Water Quality in Maine's Lakes."  Selected paper, annual meeting of the Northeastern Agricultural and Resource Economics Association.

**KEVIN J. BOYLE**                                                                                                      50

_____

170. MacDonald, Hugh F., and Kevin J. Boyle.  1995. "Zero Bidders and Payment Vehicles in Dichotomous-Choice, Contingent-Valuation Studies: A Bivariate Probit Analysis."  Selected paper annual meeting of the Northeastern Agricultural and Resource Economics Association.

171. James, Holly L., Kevin J. Boyle, and Roy Bouchard.  1995. "Measuring the Economic Benefits to Property Owners of Lake Water Quality Protection."  Selected paper, annual conference of The Universities Council on Water Resources.

172. Boyle, Kevin J.  1995. "Substitution Between Natural Spawning and Hatchery Stocking in the Value of Atlantic Salmon Fishing: Implications for Restoration Efforts."  Invited paper, 22nd Annual Conference of the Water Resources Planning and Management Division, American Society of Civil Engineers.

173. Bergstrom, John C., and Kevin J. Boyle.  1995. "How Do People Perceive Ground Water Resources and Problems? Recent Focus Group Results."  Presentation, annual meeting of Regional Project W-133 (Benefits and Costs in Natural Resources Planning).

174. Boyle, Kevin J., Gregory Poe, and John C. Bergstrom.  1995. "What We Know About Ground Water Valuation: Results and Implications from Contingent-Valuation Studies."  Selected paper, annual meeting of Regional Project W-133 (Benefits and Costs in Natural Resources Planning).

175. James, Holly L., Kevin J. Boyle, and Roy Bouchard.  1995. "The Effect of Lake Water Quality on Property Values."  Keynote address, A National Conference on Enhancing the States' Lake Management Programs, U.S. Environmental Protection Agency and the Northeastern Illinois Planning Commission.

176. Teisl, Mario F., Kevin J. Boyle, and Brian Roe.  1994. "Conflicts Between Atlantic Salmon Restoration and Recreational Angling."  Invited paper, 1994 meeting of the American Fisheries Society.

177. Boyle, Kevin J., Gregory Poe, and John C. Bergstrom.  1994. "What We Know About Ground Water Valuation: Results and Implications from Contingent-Valuation Studies."  Invited paper, joint meetings of the Association of Environmental and Resource Economists and the American Agricultural Economics Association.

178. Roe, Brian, Kevin J. Boyle, and Mario F. Teisl.  1994. "Deriving Compensating Variation from Conjoint Data Sets: A Theoretical Model and Empirical Issues."  Submitted paper, annual meeting of the American Agricultural Economics Association.

179. Boyle, Kevin J. 1994.  "The Practical Implications of Accomplishing an Ideal Benefits Transfer with Limited Data Availability."  Invited paper, Workshop on Valuation of Environmental Damages, Bialowieza, Poland.

180. Boyle, Kevin J., V. Kerry Smith, and Donald Epp.  1994. "Do Contingent-Valuation Survey Response Rates Have a Story to Tell?"  Selected paper, annual meeting of Regional Project W-133.  (Benefits and Costs Transfer in Natural Resources Planning.)

181. Boyle, Kevin J., F. Reed Johnson, Daniel W. McCollum, William H. Desvousges, Richard W. Dunford, and Sara P. Hudson.  1993. "Valuing Public Goods: Discrete Versus Continuous

_____

Contingent-Valuation Responses." Invited seminar, Department of Agricultural Economics, Colorado State University.

182. Bergstrom, John C., and Kevin J. Boyle. 1993. "Benefit Transfer Case Study: Benefits of Groundwater Protection in Dougherty County, Georgia." Invited paper, annual meetings of the American Agricultural Economics Association July.

183. Boyle, Kevin J. et al. "Valuing Public Goods: Discrete versus Continuous Contingent-Valuation Responses." Selected paper, annual meetings of the American Agricultural Economics Association, July 1993.

184. Teisl, Mario, Kevin J. Boyle, Daniel W. McCollum, and Stephen D. Reiling. "Reliability of Dichotomous Choice Contingent Valuation: An Application of Full Panel Design." Selected paper, annual meeting of the Northeastern Agricultural and Resource Economics Association, June 1993.

185. Boyle, Kevin J., and Alan G. Clark. "The Economic Value of Moose Hunting: Does Getting a Bull Significantly Increase Value?" Selected paper, 29th North American Moose Conference, May 1993.

186. Boyle, Kevin J. "Review of Contingent-Valuation Studies of Groundwater Protection." Invited presentation, U.S. Environmental Protection Agency's Science Advisory Board, Environmental Economics Advisory Committee, April 1993.

187. Boyle, Kevin J. "Are Economic Values Sensitive to Changes in Environmental Conditions?" Invited seminar, University of Quebec at Rimouski, April 1993.

188. Boyle, Kevin J. et al. "Valuing Public Goods: Discrete versus Continuous Contingent-Valuation Responses." Selected paper, annual meeting of Regional Project W-133 (Benefits and Costs in Natural Resources Planning), March 1993.

189. Boyle, Kevin J. "Freshwater Fish Consumption and Dioxin Rule Making for Maine Rivers." Seminar, Resource and Environmental Economics Program, Department of Economics, North Carolina State University, October 1992.

190. Boyle, Kevin J. 1992. "Economic Research of Fish and Wildlife Resources." Invited paper, Maine Agricultural and Forest Experiment Station Research Conference, University of Maine.

191. Boyle, Kevin J. "Total Valuation of Complex Ecosystems." Keynote address, Scandinavian Society of Forest Economics Workshop on "Valuing Biodiversity." Helsinki, Finland. October 1992.

192. Boyle, Kevin J. "Benefits and Costs of Atlantic Salmon Restoration." Keynote address, Scandinavian Society of Forest Economics Workshop on "Valuing Biodiversity." Helsinki, Finland. October 1992.

193. Boyle, Kevin J. "Natural Resource Damage Assessments and The Cambridge Economics Symposium on Nonuse Values." Invited seminar, joint with Alan Randall of Ohio State University, Stockholm School of Economics, Stockholm, Sweden. October 1992.

194. Johnson, F. Reed, William H. Desvousges, Richard W. Dunford, Kevin J. Boyle, and Sara P. Hudson. "The Validity of Expressed Nonuse Values for Environmental Commodities."

**KEVIN J. BOYLE**                                                                                         52

_____

Invited paper, annual meeting of the American Agricultural Economics Association and the Association of Environmental and Resource Economists, August 1992.

195. Bergstrom, John C., and Kevin J. Boyle. "Benefit Transfer Case Study: Benefits of Groundwater Protection in Dougherty County, Georgia." AERE workshop on Benefit Transfer: Procedures, Problems and Research Needs, June 1992.

196. Desvousges, William H., F. Reed Johnson, Richard W. Dunford, Kevin J. Boyle, Sara P. Hudson, and K. Nicole Wilson. "Measuring Natural Resource Damages with Contingent Valuation: Tests of Validity and Reliability." Cambridge Economics Symposium on Contingent Valuation: A Critical Assessment, April 1992.

197. Boyle, Kevin J., Daniel McCollum, and Mario F. Teisl. 1992. "The Sign and Size of Option Value." Invited seminar, Resource and Environmental Economics Program, Department of Economics, North Carolina State University, March 1992.

198. Boyle, Kevin J., Daniel McCollum, and Mario F. Teisl. 1992. "Empirical Evidence on the Sign and Size of Option Value." Invited paper, Thirty-First Annual Meeting of the Western Regional Science Association, February 1992.

199. Boyle, Kevin J., and Marcia L. Phillips. "Contingent Valuation of Endangered Species: How Should Valuation Estimates be Interpreted?" Invited seminar, Department of Resource Economics, University of Rhode Island, November 1991.

200. Boyle, Kevin J., Mario F. Teisl, and Stephen D. Reiling. "Managing Maine's Atlantic Salmon Resource: Qualitative and Economic Evaluations of Atlantic Salmon Fishing on the Penobscot River." Selected paper, Northeast Fish and Wildlife Conference, May 1991.

201. Teisl, Mario F., Kevin J. Boyle, Stephen D. Reiling, and Owen Fenderson. "Angler Opinions Regarding the Allocation of Harvest Between Open Water Fishing and Ice Fishing." Selected paper, Northeast Fish and Wildlife Conference, May 1991.

202. Boyle, Kevin J., Daniel W. McCollum, Mario F. Teisl, and Stephen D. Reiling. "Test-Retest Reliability of Contingent Values Using a Complete, Experimental Panel Design." Selected paper, annual meeting of Regional Project W-133 (Benefits and Costs in Natural Resources Planning), February 1991.

203. Boyle, Kevin J., and Stephen D. Reiling. 1989. "Economic Benefits of Fishing, Hunting, and Wildlife-Associated Recreation." Invited seminar, Rocky Mountain Range and Forest Experiment Station, U.S. Forest Service, Fort Collins, CO.

204. Reiling, Stephen D., Kevin J. Boyle, Hsiang-Tai Cheng, and Marcia L. Phillips. "Contingent Valuation of a Public Program to Control Black Flies." Selected paper, annual meeting of the Northeastern Agricultural and Resource Economics Association, June 1989.

205. Boyle, Kevin J., Marcia L. Phillips, and Stephen D. Reiling. "Comprehensive Evaluation of a State's Fishing and Hunting Resources: A Case Study of Maine." Invited paper, annual meeting of the Western Forest Economists Association, May 1989.

206. Boyle, Kevin J. "The Role of Property Rights in Creating Economic Incentives for Wildlife Management on Private Timberland." Invited paper, joint meeting of the New England

Society of American Foresters, Maine Chapter of the Wildlife Society, and Atlantic International Chapter of the American Fisheries Society, March 1989.

207. Bishop, Richard C., Curtis Brown, Michael P. Welsh, and Kevin J. Boyle. "Grand Canyon Recreation and Glen Canyon Dam Operations: An Economic Evaluation." Invited paper, Twenty-Eighth Annual Meeting of the Western Regional Science Association, February 1989.

208. Boyle, Kevin J., Stephen D. Reiling, and Marcia L. Phillips. "Prices of Substitutes: Implicit vs. Explicit Assumptions in Contingent-Valuation Questions." Invited paper, annual meeting of Regional Project W-133, February 1989.

209. Boyle, Kevin J. "Commodity Specification and the Framing of Contingent-Valuation Questions." Selected paper, annual meeting of the Northeastern Agricultural and Resource Economics Association, June 1988.

210. Bishop, Richard C., Scott R. Milliman, Barry L. Johnson, and Kevin J. Boyle. "Economic Evaluation of Fishery Rehabilitation Projects: Theoretical Principles and a Case Study." Invited paper, The Second Symposium on Social Science in Resource Management, June 1988.

211. Boyle, Kevin J., Michael P. Welsh, Richard C. Bishop, and Robert M. Baumgartner. "Contingent Valuation of Unexperienced Environmental Conditions." Invited paper, annual meeting of Regional Project W-133, January 1988.

212. Boyle, Kevin J. 1987. "Economic Valuation of Endangered Species of Wildlife." Invited seminar, Unity College, Unity, ME.

213. Boyle, Kevin J. 1987. "Welfare Measurements Using Contingent Valuation: A Comparison of Techniques." Invited presentation, Department of Agricultural Economics, Stillwater, OK.

214. Boyle, Kevin J., Michael P. Welsh, Richard C. Bishop, and Robert M. Baumgartner. "Analyzing the Effects of Glen Canyon Dam Releases on Colorado River Recreation Using Scenarios of Unexperienced Flow Conditions." Selected paper, annual meeting of the American Agricultural Economics Association, August 1987.

215. Boyle, Kevin J., and Richard C. Bishop. "The Economic Value of Endangered Species of Wildlife." Selected paper, 51st North American Wildlife and Natural Resources Conferences, March 1986.

216. Bishop, Richard C., Kevin J. Boyle, and Michael P. Welsh. "Toward Total Valuation of Great Lakes Fishery Resources." Invited paper, Symposium on Social Assessment of Fishery Resources, September 1985. Conference sponsored by the Great Lakes Fishery Commission.

217. Boyle, Kevin J., and Richard C. Bishop. "The Total Value of Wildlife: A Case Study Involving Endangered Species." Selected paper, annual meeting of the American Agricultural Economics Association, August 1985.

218. Boyle, Kevin J., and Richard C. Bishop. "The Total Value of Wildlife Resources: Conceptual and Empirical Issues." Invited paper, Association of Environmental and Resource Economists Workshop on Recreational Demand Modeling, May 1985.

**KEVIN J. BOYLE**                                                                                                          54

_____

219. Boyle, Kevin J., Richard C. Bishop, and Michael P. Welsh.  "Testing for Starting Point Bias in the Iterative Bidding Format of Contingent Valuation Studies."  Selected paper, annual meeting of the American Agricultural Economics Association, August 1984.

220. Obermiller, Frederick W., and Kevin J. Boyle.  "The Local Economic Effects of Wilderness Area Additions: Distributive Equity Implications."  Discussion paper presented at the 1981 Western Forest Economists Meeting, May 1981.

221. Boyle, Kevin J.  "Subsidies to the New England Fishing Industry."  In Harold J. Kyte and Wayne H. Meserve, "The Impact of Subsidies on Canadian-American Fisheries: An Obstacle to Joint Management."  A paper presented at the Conference on Canadian-American Relations, April 1976.


**TEACHING ACTIVITIES:**

Careers in Real Estate, REAL 2014 (Fall 2014/15/16/17/18, Spring 2013/14/15/16/17/18)

Professional Development in Real Estate, REAL 3014 (Fall 2013/14)

Real Estate Data Analysis, REAL 2984 (Fall 2015/16/18, Spring 2015/16/17/18)

Real Estate Financial and Market Analysis, REAL 4984 (Winter 2015/17)

Real Estate Studio REAL 4075/4076 (Fall 2016/17/18, Spring 2017/18)

Advanced Environmental Economics, REP 471. (Spring 1987/88, Fall 01/02/03)

Senior Seminar, REP 489. (Spring 03)

Research Methods in Agricultural and Resource Economics, ARE 517. (Fall 1987/88/89/90/94/95/96/97/98)

Advanced Resource Economics, ARE 571. (Fall 1987/88/89/90/91/94/96/97/98, Spring 01/03/05)

Sophomore Seminar in Natural Resources, NRC 200. (Fall 1990/91/93)

Junior Seminar in Natural Resources, NRC 300. (Fall 1994/95/96)

Critical Issues in Natural Resources, NRC 489. (Fall 97/98/00)

Mathematical Economics Short Course. (Fall 1989)


**GRADUATE STUDENTS:**

**A.    Post-doctoral:**

Siriwardena, Shyamani D. Project: "A National Study of the Effects of Tree Canopy, Diversity and Health on Property Values." 2016-present.

Sarkhel, Prasenjit. Project: "Does In-premise Water Reduce Open Defecation in India?"  2016-17. Current Position: Assistant Professor, Department of Economics, Kalyani University, Nadia, West Bengal, India.

Scrogin, David O.  Project: Random utility modeling of sport fishing with varying regulations. 1999-00. Current position: Associate Professor, Department of Economics, University of Central Florida.

Poor, P. Joan.  Project: Hedonic modeling of the effects of National Wildlife Refuges on property prices in urban and rural areas. 1998-00. Current position: Provost and Vice President for Academic Affairs, Truman State University.

Roach, Brian.  Project: Issues in the management of nongame wildlife.  1996-98. Current position: Senior Research Associate, Global Development and Environment Institute, Tufts University.


**B.  PH.D.:**

Agnew, Jessica. 2020. "Buying to Thrive: Exploring the Potential for Market-Based Approaches to Contribute to Increases in Diet Diversity in Mozambique" Assistant Director of Research, Operations, & Program Management, Center for International Research, Education and Development, School of Public and International Affairs, Virginia Tech. (Zody Best Dissertation Award, Urban Affairs and Planning, Virginia Tech.

Weng, Weizhe. 2019. "Essays on Non-market Valuation and Coupled Natural and Human Systems." Assistant Professor, School of Business, SUNY Geneseo.

Cao, Xiang. 2019. 2019. "Essays on Environmental Economics with a Focus on Non-market Valuation." Assistant Professor, Department of Economics, Sichuan University.

Xu, Weibin. 2016. "Attribute Non-attendance in Random Utility Models: Evidence from Urban Public Green Spaces in Sydney, Australia." Senior Analyst-Enterprise Optimization, United Airlines.

Siriwardena, Shyamani D. 2016. Essays on the Non-market Valuation and Optimal Control of Bio-invasions in Urban Forest Resources." Post-doctoral Researcher, Virginia Tech.

Yuan, Yuan. 2015. "Conditional, Structural and Unobserved Heterogeneity: three essays on preference heterogeneity in the design of financial incentives to increase weight loss program reach." Data Scientist, MAANA, Bellevue, WA.

Li, Xiaoshu.  2014. "Stated and Revealed Preference Valuation of Forest Ecosystems." Research Associate Senior, Center for Health Services Research, University of Kentucky College of Medicine.

Kaul, Sapna.  2013. "Exploring Alternative Methodologies for Robust Inferences: Applications in Environmental and Health Economics."  (http://vtechworks.lib.vt.edu/handle/10919/23925) Assistant Professor, Department of Preventive Medicine and Community Health, University of Texas Medical Branch at Galveston.

Zhang, Congwen.  2012. "Essays on the Application and Estimation of Hedonic Models." (http://vtechworks.lib.vt.edu/handle/10919/37788)

Tanellari, Eftila. 2010. "Essays on the Economics of Drinking Water Quality and Infrastructure." Assistant Professor, Department of Economics, Radford University.

**KEVIN J. BOYLE**                                                                                      56

_____

Kleczyk, Ewa.  2008. "Incidence and Costs of Pinhole Leak Corrosion and Corporate Cost of Capital Borrowing."  (http://vtechworks.lib.vt.edu/handle/10919/29901) Vice President, Client Analytics, Symphony Health, PRA Health Sciences Company.

Aziz, Sonia. 2006. "Valuation of Avoiding Arsenic in Drinking Water in Rural Bangladesh: An Averting Behavior Analysis."  Associate Professor, Moravian College.

**B.  M.S.:**

Vannoy, Mallory. 2021. "Hedonic Valuation of Forested Riparian Buffers Along Rivers in Northwestern North Carolina."

Swedberg, Kristen. 2020. "Examining Implicit Price Variation for Lake Water Quality." PhD student, Virginia Tech.

Stump, Katie. 2019. "Impact of Oyster Aquaculture in Virginia on Waterfront Property Values." Manager, Science Policy, CropLife America.

Brahma, Sreeya. 2019. "NIMBY, Not, in Siting Community Wind Farms." PhD student, Architecture, Virginia Tech.

Johnson, Wesley. 2017. "Understanding Willingness to Pay for Pollination and Sense of Place Connections on the Eastern Shore." Forest Planning Analyst, American Forest Management, Charlotte, NC.

Dodson, Laura. 2016. "Statistical Relationships Between Observational Water Quality and Catchment Agricultural Intensity in Rural Maine."  Agricultural Economist, US Department of Agriculture, Washington, DC.

D'Alessio, Nicole M.  2015. "Segmentation of the market for labeled ornamental plants by environmental preferences: A latent class model. Senior Marketing Analyst, BFG Agency, Atlanta, GA.

Boatwright, Jessica.  2013. "Siting Community Wind Farms: An Investigation of NIMBY." (http://vtechworks.lib.vt.edu/handle/10919/23750) First position: Cost Analyst, Technomics, Inc.

Heier, Elizabeth N. 2012. "The Amenity Value of Trees: A meta-analysis of Hedonic, Property-value Studies."  First position: Loan Administrator, Bank of America.

Hartter, David L. 2012. "Understanding Consumers' Ornamental Plant Preferences for Disease-free and Water Conservation Labels."  First position: Sustainability Analyst, EarthShift, Charlotte, NC.

Fuller, Harry M.  2011. "Farmland Conservation Easement Valuation Using an Attribute-based Choice Survey:  Comparing Preferences within the United States, Georgia, Ohio and Maine." First position: Economist, U.S. Fish and Wildlife Service.

Prasai, Nilam.  2008. "Testing Criterion Validity of Benefit Transfers Using Simulated Data." First position: Research Analyst, International Food Policy Research Institute.

Reed, Scott. 2006. "Perception and Preference in Random Utility Models: An Applied Analysis of Lake Water Quality and Site Choice."

**KEVIN J. BOYLE**                                                            57
_____

Ozdemir, Semra.  2003. "Convergent Validity of Conjoint Values for Farmland Conservation Easement Programs."  Current position: Duke-NUS Graduate Medical School, Singapore. (The Norris Charles Clements Graduate Award for outstanding graduate student research, Maine Agricultural and Forest Experiment Station Research Council, 2003.)

Sargent-Michaud, Jessica.  2002. "Arsenic in Drinking Water and Public Opinion on Wildlife Management as Case Studies of Natural Resource Policy."  Current position: Senior Research Associate, The Trust for Public Land, Boston, MA

Paterson, Robert.  2001. "Nonmarket Valuation and Land Use: Two Essays."  Current position: Partner, Industrial Economics, Cambridge, MA

Hsu, Tommy I.  2000. "A Hedonic Study of the Effects of Lake-Water Clarity and Aquatic Plants on Lakefront Property Prices in Vermont."  Current position: Environmental Planner, California Department of Transportation, Los Angeles, CA.

La Rouch, Genevieve Pullis.  1998. "Public Perceptions of Forest Ecosystem Attributes and Economic Values for Small, Private Woodlots With and Without Alternative Timber Harvesting."  Current position: U.S. Fish and Wildlife Service, Washington, DC.

Schuetz, Jennifer.  1998. "Economic Values and Impacts Associated with Access Users' Recreational Use of Maine's Great Ponds."  Current position: Field Coordinator, Bosque School, Albuquerque, New Mexico.

Harris, Brian.  1998. "Highlights from the 1996 Maine Ice Fishing Follow-Up Survey." (Nonthesis) First position: Analyst, University of Kansas.

Phillips, Shelley.  1997. "Public Preferences for Timber Harvesting."  (Nonthesis) First position: Manager, MBNA, Belfast, ME.

Lawson, Steven R.  1997. "Estimating the Benefits of Water Quality in Maine's Lakes: A Hedonic Property Value Model."  Current position: Director, Public Lands Planning and Management, RSG, Inc.

Schneemann, Margaret.  1997. "A Meta-Analysis of Response Rates to Contingent Valuation Studies Conducted by Mail."  Current position: Water Resource Economist, Illinois-Indiana Sea grant program.

James, Holly L.  1995. "A Hedonic Property Value Study of Water Quality in Maine Lakes." Current position: Senior Economist, W.H Desvousges & Associates.  (Dow-Griffee Award for the best graduate student research, Maine Agricultural and Forest Experiment Station, 1994. Thesis nominated for the NEARA Best Masters Thesis award.)

Phillips, Marcia L.  1994. "Understanding Users' and Wildlife Managers Perceptions of Wildlife Management."  Current position: Senior Recreation Resource Economist, Kleinschmidt Associates, Pittsfield, Maine.  (Thesis nominated for the NEARA Best Masters Thesis award.)

James E. Anderson.  1994. "Who Contributes to the Chickadee Checkoff?"  First position: Policy Analyst, National Center for Food and Agricultural Policy, Washington, DC.

**KEVIN J. BOYLE**                                                                                        58

---

Ramona ElHamzoui.  1993. "Black Bear Hunting in Maine: Do Hunter Characteristics Affect Opinions Regarding Hunting Regulations?"  Current position: Program Officer, USAID. Morocco.

Deanna Potter.  1991. "Benefit-Cost Analysis for Wildlife Reintroductions."  Current position: Extension Educator, University of Maine Cooperative Extension, Fort Kent, ME.

John V. Westra.  1991. "Net Revenue Maximizing Crop Rotations for Maine's Potato Farmers."  Current position: Associate Professor, Louisiana State University.  (Thesis nominated for the NEARA Best Masters Thesis award.)

# EXHIBIT I

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

```
_____
                              )
JED AND ALISA BEHAR,          )
individually and on behalf of )
all others similarly          )
situated,                     )
                              )
          Plaintiffs,         )
                              )
     vs.                      )Case No.
                              )21-cv-03946-HDV-SK
NORTHROP GRUMMAN CORPORATION  )
AND NORTHROP GRUMMAN SYSTEMS  )
CORPORATION,                  )
                              )
          Defendants.         )
_____)
```

DEPOSITION OF MILES GROSE

Tuesday, January 23, 2024

Volume I

Reported by:
KATHLEEN E. BARNEY
CSR No. 5698, RPR
Job No. 6415254
PAGES 1 - 138

Page 1

BY MS. SOMAWEERA:

Q   I'm sorry?

A   No.

Q   Thank you.

And you read the document when you received    01:45:52
it?

A   I don't recall.

Q   Do you have any reason to believe that you
didn't read it?

A   Yeah.                                           01:46:02

Q   Why do you say that?

MR. NIDEL:  Objection to form.

THE WITNESS:  We get a lot of notices.  This
one seemed important, so I imagine I looked at it,
but I can't tell you for a fact.                    01:46:16

BY MS. SOMAWEERA:

Q   Why do you say this one seemed important?

A   I've gone on to the next page and when you
see your house in a shaded area of many areas, it
raises concern.  So something coming officially from    01:46:36
a place like the water board certainly raises red
flags, so I would assume I took a look at it.

Q   Okay.  So you're referring to the letterhead
that says "California Water Boards," correct?

A   Yes.                                             01:46:56

Page 34

# EXHIBIT J

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

_____
                              )
JED AND ALISA BEHAR,          )
individually and on behalf of )
all others similarly          )
situated,                     )
                              )
            Plaintiffs,        )
                              )
      vs.                     )Case No.
                              )21-cv-03946-HDV-SK
NORTHROP GRUMMAN CORPORATION  )
AND NORTHROP GRUMMAN SYSTEMS  )
CORPORATION,                  )
                              )
            Defendants.        )
_____)

DEPOSITION OF LISA FORD GROSE

Tuesday, January 23, 2024

Volume I

Reported by:
KATHLEEN E. BARNEY
CSR No. 5698, RPR
Job No. 6415254A
PAGES 1 - 118

Page 1

MR. TOMAIER:  Court Reporter, do you mind reading -- asking -- or repeating the question.

(Record read.)

MR. NIDEL:  Objection to form.

THE WITNESS:  What makes it important enough    05:35:00 to file is that I see it's from the water board. That's it.

BY MR. TOMAIER:

Q   How do you know whether you should peruse a document or look at it intently?    05:35:16

MR. NIDEL:  Objection to form.

THE WITNESS:  I don't really know.  It's just the sense I get.

BY MR. TOMAIER:

Q   Gut feeling?    05:35:29

MR. NIDEL:  Objection to form.

THE WITNESS:  Yeah.

BY MR. TOMAIER:

Q   Do you remember discussing this document or any other water board document when you received it    05:35:45 in the mail with anyone?

A   My husband.

Q   Anyone else?

A   No.

Q   Neighbors?    05:35:53

Page 32

looked at, there is a description of the potentially

harmful vapor and a diagram of how those vapors can

infiltrate a building.

Do you see that?

A    I do.                                          05:53:14

Q    So we've gone through a few of these fact

sheets you received.  And I understand you don't

recall which one you may have looked at closely or

not, but do you recall reviewing one of these and

what your reaction was to reviewing these fact        05:53:54

sheets?

MR. NIDEL:  Objection to form.

THE WITNESS:  I don't recall.

BY MR. TOMAIER:

Q    You just knew they were important enough to    05:54:04

file away?

MR. NIDEL:  Objection to form.

THE WITNESS:  Yes.

BY MR. TOMAIER:

Q    Did you know what they were about?            05:54:08

A    Yeah, because I -- we received them often.

Q    And having received them often --

A    Or yearly maybe.  Yeah.

Q    Having received them yearly, did that make

them seem more important to you?                      05:54:25

Page  47

MR. NIDEL:  Objection to form.

THE WITNESS:  It seemed to be monitoring of this issue and them saying it was okay.

BY MR. TOMAIER:

Q   When you say "them saying it's okay" --                05:54:37

A   Just informing us, basically.

Q   Informing you of what?

A   Of the vapors.

Q   The vapors --

A   The vapor intrusion and things like that.          05:54:48

MR. NIDEL:  Is there a question?

BY MR. TOMAIER:

Q   I'm just reviewing --

MR. NIDEL:  You said "the vapors."  I'm going to object to the form of that question.          05:55:02

BY MR. TOMAIER:

Q   So you have reviewed these fact sheets, and you're aware of these papers.  Were you aware that they were potentially harmful vapors?

MR. NIDEL:  Objection to form.          05:55:19

THE WITNESS:  I don't -- I'm not a professional, so I don't know -- chemist or anything.  I have no clue.

BY MR. TOMAIER:

Q   But you see that these fact sheets all have          05:55:28

Page 48

BY MR. TOMAIER:

Q   Do you think PCE is carcinogenic?

A   I don't know.  I haven't looked it up.

Q   What does the term "carcinogenic" mean to you?                                                06:14:24

A   Cancerous, causing cancer.

Q   So your testimony today is you do not know whether TCE or PCE is carcinogenic?

MR. NIDEL:  Objection to form.

THE WITNESS:  I have no idea.                06:14:38

BY MR. TOMAIER:

Q   Turn to GROSE 13.

Do you see this document?

A   Sampling Access Agreement?

Q   That's right.                                06:15:27

A   Yes.

Q   Are you familiar with this document?

A   Yes.

Q   What is this document?

A   This is when we agreed to the sampling for    06:15:38
the air quality.

Q   Why did you agree to have your house sampled?

A   Because they came to our door, so we thought it was important to have the air sampled.  Why not?

Q   What was your understanding of why it was    06:16:01

Page 55

important?

A   Because of the letters from the water board, and I knew that there was something with Northrop Grumman.  So they said they were sampling it and that they were independent and they wanted to test the air.

Q   Taking a step back, we've gone through some fact sheets.  August 2015 fact sheet was the first one, May 2016 and April 2017.  Now the June 2nd letter, which culminated in the signing of this Sampling Access Agreement, right?

A   Okay.  I saw this -- yes.

Q   And so having received these fact sheets and ultimately agreeing to have your house sampled, did you have any concerns about vapor intrusion entering your house?

MR. NIDEL:  Objection to form.

THE WITNESS:  Yes.

BY MR. TOMAIER:

Q   Can you describe those concerns?

A   Concerns arose when they came to us and asked us if they can sample.  Why would they want to sample if nothing is wrong?  So I'd rather have it -- have them sample and let me know if everything is okay, just to be sure.

Page 56

# EXHIBIT K

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JED and ALISA BEHAR,                    )
                                        ) Case No.:
        Plaintiffs,                     ) 2:21-cv-03946-FMO-SK
                                        )
    vs.                                 )
                                        ) Pages 1 to 261
NORTHROP GRUMMAN CORPORATION    )
and NORTHROP GRUMMAN SYSTEMS    )
CORPORATION,                            )
                                        )
        Defendants.                     )
_____)

DEPOSITION OF:

JEDIDIAH NATHAN BEHAR

MONDAY, JULY 25, 2022

8:39 a.m.

REPORTED BY:

Vickie Blair

CSR No. 8940, RPR-CRR

JOB NO. 5329789

PAGES 1 - 261

Page 1

purchased the home at Keokuk in 2011?                    10:01:03

A    Yes.                                                10:01:06

Q    And, if you look at the bottom, there's           10:01:09
initials where it says "Buyer," slash, "Tenant."        10:01:12

Are those your initials at the bottom?                   10:01:14

A    Yes.                                                10:01:16

Q    And your wife's next to yours?                      10:01:16

A    Yes.                                                10:01:18

Q    Do you remember reviewing this document            10:01:19
when you received it?                                    10:01:23

A    Yes.                                                10:01:24

Q    Let's turn to the second page, it says             10:01:24
Behar_000402 at the bottom.                              10:01:28

A    Yes.                                                10:01:35

Q    And if you look at the paragraph number            10:01:35
18 --                                                    10:01:39

A    Okay.                                               10:01:39

Q    -- it says "Boeing Rocketdyne                       10:01:39
Santa Susanna Facility."                                 10:01:42

Do you see that?                                          10:01:45

A    I do.                                               10:01:45

Q    Do you remember reading that when you              10:01:45
received it?                                             10:01:46

A    Yes.                                                10:01:47

Q    Do you remember at any point asking                10:01:49

Page 74

questions about that disclosure?                         10:01:50

A    Oh, no, this is a well-known issue in the           10:01:52
Santa Susanna Pass, which is a number of miles west of   10:01:57
us protected by a mountain range, I'm not concerned      10:01:59
about this.  In fact, them calling this out makes he     10:02:02
comfortable that I'm being told what's, even broadly,    10:02:07
in my neighborhood.                                      10:02:10

Q    And were you told anything else other than         10:02:11
this?                                                    10:02:13

A    I had no further questions reading this.            10:02:13

Q    But did you at any point ask any questions          10:02:15
about this facility when you received this disclosure?   10:02:17

A    No.                                                 10:02:21

Q    Did you ask whether there was anything              10:02:21
else?                                                    10:02:24

A    No.                                                 10:02:24

Q    At the end of that paragraph, I'll read             10:02:24
the last two sentences (as read):                        10:02:32

          Buyer is advised to conduct an                 10:02:35
          independent investigation of this matter.      10:02:37
          It is strongly recommended that buyer have     10:02:39
          a soil test conducted of the subject           10:02:41
          property to determine any potential            10:02:43
          contamination.                                 10:02:44
          Do you see that?                                10:02:46

Page 75

# EXHIBIT L

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JED and ALISA BEHAR,                )
                                    ) Case No.:
        Plaintiffs,                 ) 2:21-cv-03946-FMO-SK
                                    )
    vs.                             ) Pages 1 to 163
                                    )
NORTHROP GRUMMAN CORPORATION   )
and NORTHROP GRUMMAN SYSTEMS   )
CORPORATION,                   )
                               )
        Defendants.            )
_____)

DEPOSITION OF:

ALISA LORRAINE BEHAR

MONDAY, JULY 25, 2022

3:20 p.m.

REPORTED BY:

Vickie Blair

CSR No. 8940, RPR-CRR

JOB NO. 5329789

PAGES 1 - 163

Page 1

Do you recall receiving this document when    15:58:02

you purchased your home?    15:58:03

A    Yes.    15:58:04

(Deposition Exhibit 11 was marked    15:58:04

for identification and is attached    15:58:04

hereto.)    15:58:04

BY MS. KLABER:    15:58:04

Q    And do you see your initials on this    15:58:04

document?    15:58:06

A    I do.    15:58:06

Q    Did you review this document when you    15:58:08

received it?    15:58:11

A    I'm sure I did.    15:58:11

Q    Can we go to paragraph 18.  And we're    15:58:13

looking at paragraph 18 of Exhibit 11, the "ADDENDUM TO    15:58:25

RESIDENTIAL PURCHASE OR LEASE AGREEMENT."    15:58:29

Could you please read that paragraph.    15:58:31

A    Sure.    15:58:34

Okay.    15:59:07

Q    This is a disclosures about the former    15:59:08

Rocketdyne testing facilities in the Santa Susanna    15:59:12

mountains.    15:59:15

When you received this disclosure, did    15:59:15

this raise any concerns for you?    15:59:17

A    No, it did not.    15:59:19

Page 47

Q    Why did this disclosure not raise any    15:59:20
concerns for?    15:59:22

A    Because the facility is a pretty good    15:59:22
distance away from us and it -- you know, it's saying    15:59:24
on here it's within the two-mile radius, we're pretty    15:59:27
far from that facility.    15:59:30

Q    Do you know how -- sorry, I didn't mean to    15:59:34
talk over you.    15:59:36

A    It's okay.    15:59:36

Q    Do you know how many miles you are from    15:59:37
that former Rocketdyne facility?    15:59:40

A    I would know approximately, I don't know    15:59:41
the exact number, but I believe it's about a good    15:59:43
seven, eight miles away.    15:59:45

Q    If you were three miles away, would you    15:59:46
feel comfortable with that disclosure?    15:59:49

A    I don't know, I couldn't tell you, I don't    15:59:51
know.    15:59:54

Q    Now, this disclosure references industrial    15:59:54
solvents.    15:59:56

Did you see where that is?    15:59:56

A    Yes.    15:59:59

Q    Do you know what industrial solvents they    15:59:59
were talking about that were used at that site?    16:00:03

A    I do not know.    16:00:06

Page 48

Q    Do you know if it's -- do you know if any    16:00:07
TCE was used at that site?    16:00:08

A    I do not.    16:00:10

Q    Did you ever attempt to investigate that?    16:00:10

A    From this facility, no, I did not.    16:00:12

Q    Was distance the only factor that gave you    16:00:16
comfort such that you weren't concerned about potential    16:00:29
radioactive or toxic chemical contamination reaching    16:00:32
your home?    16:00:38

MR. NIDEL:  Objection.  Form.    16:00:40

THE WITNESS:  For this -- this particular    16:00:40
facility, I felt that we were a good proximity away    16:00:43
from this to -- to not need to worry.    16:00:48

BY MS. KLABER:    16:00:51

Q    Did you discuss the disclosure regarding    16:00:51
the former Rocketdyne facility with anyone?    16:00:53

A    My husband has been well aware of it, so    16:00:56
we did discuss -- we have discussed it before.    16:01:00

Q    Did you discuss it with anyone apart from    16:01:02
your husband?    16:01:08

A    I don't remember discussing this with    16:01:09
anyone else, no.    16:01:11

Q    Do you remember if you discussed it with    16:01:11
your realtor at all?    16:01:13

A    I don't remember discussing it with my    16:01:14

Page 49

realtor.                                                      16:01:16

Q    When you purchased your home in December    16:01:16
of 2011, do you -- how did you take title to the home?    16:01:18

MR. NIDEL:  Objection to form and    16:01:23
foundation.                                                  16:01:24

THE WITNESS:  If I remember correctly, it    16:01:24
was a joint title, married title, if that's how you say    16:01:29
it.  We were both on the title.                              16:01:31

BY MS. KLABER:                                               16:01:33

Q    Okay.  And do you believe the title to    16:01:37
your property has changed at all over time?                  16:01:38

A    I believe that --                                  16:01:40

MR. NIDEL:  Objection to form.    16:01:41

THE WITNESS:  Yes, I believe that it has.    16:01:42

BY MS. KLABER:                                               16:01:43

Q    How do you believe the title has changed    16:01:44
to your property?                                            16:01:45

A    I believe the title is now solely in my    16:01:45
name.                                                        16:01:49

Q    So do you -- is it your understanding that    16:01:49
only you, and not your husband, owned your home at    16:01:51
three -- 7031 Keokuk?                                        16:01:53

MR. NIDEL:  Objection to form and    16:01:57
foundation.                                                  16:01:58

THE WITNESS:  It's my understanding that    16:01:58

Page 50

# EXHIBIT M

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

JED AND ALISA BEHAR, individually
and on behalf of all others similarly
situated,

       Plaintiffs,

vs.                Case No.: 21-cv-03946-HDV-SK

NORTHROP GRUMMAN CORPORATION
AND NORTHROP GRUMMAN SYSTEMS
CORPORATION,

       Defendants.

_____

**VIDEOTAPED DEPOSITION OF**

**ANDREA EISFELDT, PH.D.**

**TAKEN ON**
**THURSDAY, NOVEMBER 9, 2023**
**9:44 A.M.**

**GIBSON DUNN & CRUTCHER, LLP**
**333 SOUTH GRAND AVENUE**
**LOS ANGELES, CALIFORNIA 90071**

**Page 392**



NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM

Nationwide

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

Powerful
LITIGATION SUPPORT

A.    Yeah.

**Q.    Okay.  All right.  So Professor, please describe -- or please tell us every way in which you believe Dr. Boyle's opinions work in this case does not comply with the benefit transfer guidance here.**

A.    Sure.  Now, bearing in mind that I'm not utilizing this EPA guidelines as my metric for whether the methodology was appropriate or not, this benefit transfer is essentially an out-of-sample prediction from the Simons and Saginor meta-analysis.  A benefit transfer is an out-of-sample prediction, or kind of layman language an extrapolation, and the Boyle report hasn't reliably shown the contamination studies in Simons and Saginor sufficiently representative of the contamination at this site.  That's the first critique.

There is -- the Boyle report has not shown that the Simons and Saginor meta-analysis reliably accounts for information about contamination or risk of contamination from other sites.

And then there's a third category, which is the Boyle report has not shown that the Simons and Saginor meta-analysis reliably accounts for what may be important characteristics of the properties at issue, and that includes the confounding information from the other nearby sites.

Andrea Elsfeldt PHD    November 9, 2023 - NDT Assgn # 70026    Page 160

to be able to compute those prediction error bands from

his benefit transfer, from this meta-analysis, for which

my understanding is, he doesn't have the underlying

data.

**Q.    Earlier you mentioned -- you used a term, and I think you used it in your report, "out-of-sample." Can you explain what that means?  Out-of-sample application of something?**

A.    Well, he's extrapolating from the Simons and Saginor meta-analysis.  So bearing in mind what the meta-analysis is, he's got -- you have each of these individual studies.  Those individual studies have come up with coefficients.

Those coefficients are in matrix algebra, X prime X inverse prime Y, and now you're going to take each one of them and you're going to put that into a big matrix algebra computation, X prime X inverse X prime Y. That's going to come up with some new coefficients, and that whole exercise is leading to the statistical properties that you see in the table here.

**Q.    So is your problem with just out-of-sample uses in general, or just specifically the way Dr. Boyle did it?**

A.    No.  So let me finish the answer to my question.  The -- it's -- out-of-sample prediction is

always tricky, but there's something we talk about in economics called external validity, and it is sort of like -- imagine you're looking under the lamp post because that's where it's light, so you can see everything under the lamp post. But what you see under the lamp post does not necessarily tell you what you would see if you looked somewhere else.

So think of the data that's underlying Simons -- Dr. Boyle's model as the Simons and Saginor analysis, so that's some, you know, transformation of the underlying data that underly the original studies. Now, that's where he is looking. The actual site is not under the lamp post. It is different.

We already talked about the way that it's different in terms of groundwater. We already talked about the way it is different in terms of other sites nearby, and we talked about the ways it is different in terms of heterogeneity and the cross-section and time series of information.

Q. **And it's different from -- but isn't that part of the beauty of a meta-analysis, though, it accounts for all these different variables and all these different types of sites across the country and across the world even? And -- oh, go ahead.**

A. No. Go ahead.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM