# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

_____

JED BEHAR, et al.,          )Case No.

                                 )2:21-cv-03946

    Plaintiffs,          )HDV-SK

                                 )

vs.                          )

                                 )

NORTHROP GRUMMAN SYSTEMS  )

CORPORATION, et al.,          )

                                 )

    Defendants.          )

_____)

Videotaped Deposition of

KEVIN J. BOYLE, Ph.D.

December 5, 2023

9:09 a.m.

Reported by:  Bonnie L. Russo

Job No. 6312160

Page 1

Videotaped Deposition of Kevin J. Boyle, Ph.D. held at:

Nidel & Nace PLLC

1 Church Street, Suite 802

Rockville, Maryland

Pursuant to Notice, when were present on behalf of the respective parties:

Page 2

APPEARANCES:

On behalf of the Plaintiffs:

CHRISTOPHER T. NIDEL, ESQUIRE

WILLIAM COWLES, ESQUIRE

NIDEL & NACE PLLC

1 Church Street, Suite 802

Rockville, Maryland 20850

On behalf of the Defendants:

DEENA B. KLABER, ESQUIRE

GIBSON DUNN & CRUTCHER, LLP

555 Mission Street, Suite 3000

San Francisco, California 94105

dklaber@gibsondunn.com

-and-

KATIE K. GEARY, ESQUIRE

GIBSON DUNN & CRUTCHER, LLP

3161 Michelson Drive, Suite 1200

Irvine, California 92612

kgeary@gibsondunn.com

Page 3

APPEARANCES (CONTINUED):

On behalf of Defendants:

PATRICK W. DENNIS, ESQUIRE (Via Remote)

GIBSON DUNN & CRUTCHER, LLP

333 S. Grand Avenue, 47th Floor

Los Angeles, California 90071

pdennis@gibsondunn.com

-and-

JOHN CERMAK, ESQUIRE (Via Remote)

CERMAK & INGLIN LLP

12121 Wilshire Boulevard, Suite 322

Los Angeles, California 90025

hbloink@cermaklegal.com

Also Present:

Zachary Kelsay, Nidel & Nace

Curtis Roginski, Videographer

Page 4

CONTENTS

EXAMINATION OF KEVIN J. BOYLE, Ph.D.    PAGE

BY MS. KLABER                8

BY MR. NIDEL                385

EXHIBITS

Exhibit 41  Expert Report of            36
            Kevin J. Boyle, Ph.D.

Exhibit 42  Alexander vs. Halliburton   92
            Energy Services, Inc.
            Order

Exhibit 43  Second Amended Class        124
            Action Complaint

Exhibit 44  Article entitled:           140
            "A Meta-Analysis of the
            Effect of Environmental
            Contamination and Positive
            Amenities on Residential
            Real Estate Values"

Exhibit 45  7101 Lubao Avenue Zillow    227
            Profile

Exhibit 46  Class Certification         264
            Expert Report of
            Kevin J. Boyle
            Romano vs. Northrop Grumman
            Corporation, et al.

Page 5

2 (Pages 2 - 5)

EXHIBITS (CONTINUED):

Exhibit 47  Article entitled:            282
             "What's Wrong With
             Peer Review?"

Exhibit 48  Guidelines for Preparing     300
             Economic Analyses
             12-17-10

Exhibit 49  Abstract entitled "The       322
             Benefit-Transfer Challenges"

Exhibit 50  Rebuttal of Jennifer Pitts   324
             and Andrea Eisfeldt by
             Kevin J. Boyle

Exhibit 51  Amended Expert Report of     359
             Professor Andrea L.
             Eisfeldt, Ph.D.

Exhibit 52  Article entitled:            370
             "Does drinking water quality
             affect house prices?"

PREVIOUSLY MARKED EXHIBITS:

Exhibit 1   Addendum to Residential
             Purchase or Lease Agreement

(Exhibits included with transcript.)

Page 6

---

P R O C E E D I N G S

(9:09 a.m.)

09:06:08

THE VIDEOGRAPHER:  Good morning.         09:06:08

We are going on the record at 9:09       09:09:01

a.m. on December 5, 2023.                09:09:05

This is Media Unit 1 of the              09:09:08

video-recorded deposition of Kevin Boyle taken     09:09:10

in the matter of Jed and Alisa Behar versus        09:09:12

Northrop Grumman Corporation, et al., Case No.     09:09:15

2:21-cv-03946-HDV-SK.                    09:09:18

My name is Curtis Roginski            09:09:26

representing Veritext.  I'm the videographer.      09:09:28

The court reporter is Bonnie Russo also with       09:09:31

Veritext.                                09:09:32

Will counsel please identify          09:09:33

yourselves and state whom you represent.           09:09:35

MS. KLABER:  Deena Klaber with        09:09:36

Gibson, Dunn & Crutcher for Northrop Grumman.      09:09:38

MS. GEARY:  Katie Geary with Gibson,  09:09:41

Dunn & Crutcher for defendants.          09:09:42

MR. NIDEL:  Chris Nidel on behalf of  09:09:43

Page 7

---

the plaintiffs.                          09:09:46

MR. COWLES:  William Cowles on        09:09:46

behalf of the plaintiffs.                09:09:46

MR. KELSAY:  Zach Kelsay, observing.  09:09:51

THE VIDEOGRAPHER:  Thank you.  Will   09:09:52

the court reporter please swear in the witness.    09:09:53

KEVIN JOHN BOYLE,                     09:09:53

being first duly sworn, to tell the truth, the     09:09:53

whole truth and nothing but the truth,   09:09:53

testified as follows:                    09:09:53

EXAMINATION BY COUNSEL FOR NORTHROP GRUMMAN        09:10:01

BY MS. KLABER:                        09:10:01

Q.  Good morning, sir.  You understand           09:10:03

you are testifying under oath today, correct?      09:10:05

A.  I do.                             09:10:08

Q.  Could you please state your full             09:10:08

name for the record and spell it for the court     09:10:10

reporter.                                09:10:13

A.  Kevin John Boyle, K-E-V-I-N J-O-H-N          09:10:13

B-O-Y-L-E.                               09:10:18

Q.  And what is your current business            09:10:20

address?                                 09:10:22

Page 8

---

A.  So -- sorry, distracted.  I thought          09:10:22

someone was coming in.                   09:10:28

I -- my -- are you asking my               09:10:30

Virginia Tech address?                   09:10:35

Q.  Whichever address you consider to be         09:10:35

your business address.  I'm not sure which one     09:10:38

that is.                                 09:10:40

A.  Okay.  So for my university                  09:10:40

employment, it's 2010 Pamplin Hall on the          09:10:44

Blacksburg Campus of Virginia Tech.      09:10:50

Q.  Do you have an additional address            09:10:51

that you also use as a business address?           09:10:53

A.  I have a home address that is 1508           09:10:56

Howardsville Road, Staunton, Virginia.   09:10:59

Q.  And who is your current employer?            09:11:03

A.  Virginia Tech.                    09:11:05

Q.  When you are engaged in expert work          09:11:07

like you are here, how are you engaged?  09:11:10

MR. NIDEL:  Objection to form.        09:11:13

THE WITNESS:  What do you mean by     09:11:15

"engaged"?                               09:11:15

BY MS. KLABER:                        09:11:17

Page 9

3 (Pages 6 - 9)

Q. Are you retained as an individual, 09:11:17 are you retained through Virginia Tech or some 09:11:20 other entity? 09:11:24

A. I'm retained as an individual. 09:11:25

Q. Do you affiliate with any expert or 09:11:28 consulting firms? 09:11:31

MR. NIDEL: Objection to form. 09:11:33

THE WITNESS: What do you mean by 09:11:35 "affiliate"? 09:11:36

BY MS. KLABER: 09:11:37

Q. Do you have any working association 09:11:37 with a consulting firm or an expert firm? 09:11:40

MR. NIDEL: Objection to form. 09:11:45

THE WITNESS: Can you ask the 09:11:46 question again, please. Sorry. It's 09:11:47 distracting, but go ahead. 09:11:50

BY MS. KLABER: 09:11:52

Q. Do you have any sort of affiliation 09:11:52 or working association with an expert or 09:11:56 consulting firm? 09:11:59

A. I have -- 09:12:01

MR. NIDEL: Objection to form. 09:12:01

Page 10

THE WITNESS: I have no formal 09:12:02 agreements with any firms. 09:12:04

BY MS. KLABER: 09:12:06

Q. Do you have informal agreements with 09:12:06 any firms? 09:12:09

A. I don't have informal agreements 09:12:10 with any firms. 09:12:12

Q. How many times -- actually, strike 09:12:13 that. 09:12:13

Who hired you to work on this case? 09:12:17

A. I honestly don't remember. It's 09:12:19 been a while of who was the first point of 09:12:25 contact, but I am paid through the Lanier firm. 09:12:28

Q. How many times have you been deposed 09:12:33 before? 09:12:37

A. I don't know the exact number. It's 09:12:38 in the tens, but I guess less than 50. 09:12:42

Q. So you are pretty familiar with the 09:12:44 process. 09:12:47

I'll then be kind of a little more 09:12:50 brief in the instructions, but if you have any 09:12:52 questions, feel free to ask them. 09:12:54

Page 11

If you need a break at any point in 09:12:57 the day, just say so. We will strive to take 09:12:59 reasonable breaks, but if you're in need to use 09:13:02 the restroom, please feel free to speak up. 09:13:06 The only thing is, if there is a question 09:13:09 pending, we will have to wait for that question 09:13:12 to be answered fully and then we can take our 09:13:14 break. 09:13:16

If I ask a question and you don't 09:13:17 seek any clarification from me, then I will 09:13:19 assume that you understood the question when 09:13:21 you answer it. Your lawyer may object from 09:13:24 time to time. It will kind of sound like it 09:13:28 sounded, a quick objection. In this 09:13:31 jurisdiction, the Central District of 09:13:35 California, speaking objections are not 09:13:37 allowed, but, you know, let him make his 09:13:39 objection before you answer, and it's important 09:13:41 to kind of pause so that the court reporter can 09:13:43 get everything that everyone has said without 09:13:46 people speaking on top of each other. 09:13:50

And, you know, please also make sure 09:13:53

Page 12

that your answer is audible because the court 09:13:55 reporter can't pick up on head nods or any sort 09:13:57 of mumble. 09:14:01

Does that all make sense to you? 09:14:03

A. I understand what you are saying. 09:14:06

Q. Have you taken or consumed any 09:14:08 substances that would impair your ability to 09:14:11 give testimony under oath today? 09:14:13

A. No. 09:14:15

Q. Do you prefer that I call you Dr. 09:14:16 Boyle, Professor Boyle? 09:14:22

A. I'm comfortable with whatever you 09:14:24 are comfortable with. 09:14:27

Q. Okay. Dr. Boyle, can you tell us 09:14:28 where you went to school for your undergraduate 09:14:32 studies? 09:14:35

A. I went to school at the University 09:14:35 of Maine. 09:14:37

Q. And when was that? 09:14:38

A. That was -- I graduated in '78. 09:14:39

Q. What did you study at the University 09:14:43 of Maine? 09:14:45

Page 13

4 (Pages 10 - 13)

A.   Economics.   09:14:45

Q.   And did you then pursue a graduate   09:14:47
degree?   09:14:52

A.   I did.   09:14:52

Q.   Where did you do that?   09:14:53

A.   At Oregon State University.   09:14:55

Q.   And when did you obtain your   09:14:58
graduate degree?   09:15:00

A.   I don't remember the year exactly   09:15:02
now.  I think maybe it was '82.   09:15:06

Q.   Was that a Ph.D.?   09:15:08

A.   It was a master's.   09:15:10

Q.   Did you -- what was your master's --   09:15:12
what was the subject matter for your master's?   09:15:16

A.   Agriculture and resource economics.   09:15:18

Q.   And then did you go on to obtain a   09:15:24
Ph.D.?   09:15:26

A.   I did.   09:15:27

Q.   Where did you do that?   09:15:27

A.   University of Wisconsin.   09:15:29

Q.   Do you recall the years there?   09:15:30

A.   I don't recall the exact year.  I   09:15:32

Page 14

finished '85, '86.   09:15:36

Q.   And what is the -- what is your   09:15:37
Ph.D. in?   09:15:41

A.   So it's a Ph.D. in agricultural   09:15:42
economics with an emphasis on environmental   09:15:46
economics.   09:15:48

Q.   Could you explain what agricultural   09:15:48
economics is?   09:15:52

A.   So it's the -- an applied area of   09:15:53
economics related to all dimensions of   09:15:57
agriculture, but it's broadened out so that it   09:16:04
has environmental resource economics, community   09:16:07
development, international development, a wide   09:16:11
range of applied areas of economics that are   09:16:15
covered.  Students pick a focus area to work in   09:16:18
and mine was environmental and resource   09:16:21
economics.   09:16:27

Q.   Could you explain what environmental   09:16:28
resource economics is?   09:16:29

A.   So environmental and resource   09:16:29
economics deals with the economic aspects of   09:16:31
the environment, and the environment tends to   09:16:34

Page 15

be more environmental quality, and resource   09:16:36
economics deals with more the quantity aspects   09:16:40
of environmental issues.   09:16:43

So if we are thinking about water,   09:16:46
environmental is more on aspects of the -- of   09:16:48
water quality and resources might be optimum   09:16:51
use of water in an aquifer.   09:16:57

Q.   Can you explain how these areas of   09:16:59
your expertise or your studies, agricultural   09:17:03
economics and environmental and resource   09:17:09
economics differ from just a traditional   09:17:10
economics degree?   09:17:13

A.   So at the -- one of the reasons I   09:17:16
went to the University of Wisconsin is that you   09:17:19
take all of your theory and econometrics and   09:17:22
comprehensive exams in the economics   09:17:25
department, so my degree is the same as any   09:17:28
other Ph.D. in economics in terms of the core.   09:17:30

The only difference is, is that the   09:17:34
fields that you go into after your core differ,   09:17:36
so, you know, my colleagues that were in   09:17:39
economics might have been doing public   09:17:41

Page 16

economics or labor economics, and so the only   09:17:43
difference really is the field after you do   09:17:46
your core.   09:17:48

Q.   Have you ever studied toxicology?   09:17:49

A.   No.   09:17:53

Q.   Have you ever studied epidemiology?   09:17:54

A.   I'm not an epidemiologist.   09:17:57

Q.   Have you ever studied geology?   09:17:59

A.   Not a geologist.   09:18:02

Q.   Have you ever studied hydrogeology?   09:18:04

A.   I'm not a hydrogeologist.   09:18:06

Q.   Have you ever studied fate and   09:18:08
transport?   09:18:11

A.   I'm not a fate and transport   09:18:12
specialist.   09:18:14

Q.   Since obtaining your Ph.D., what   09:18:15
fields have you primarily worked in?   09:18:20

A.   So I have worked in a number of   09:18:22
different areas through my -- through my   09:18:28
career, but I think the two areas that most   09:18:32
people would -- if they are looking at my   09:18:35
record let's say, would be environmental   09:18:37

Page 17

5 (Pages 14 - 17)

economics and research in real estate economics.

Q. And since obtaining your Ph.D., where have you worked?

A. I have worked at the University of Maine, I have worked at North Carolina State Institute, North Carolina State University, I have worked at Research Triangle Institute. I have worked for the U.S. Forest Service, and I have worked for Virginia Tech.

And I have served on a number of science advisory boards for the U.S. EPA where you are considered a federal government employee for those services.

I may have missed something, but those are the ones that come to mind right now.

Q. Okay. Beginning with the academic institutions that you listed, could you explain what you -- in what capacity you were working there?

A. So I -- at the University of Maine, I went from being -- excuse me, an assistant

Page 18

professor to full professor and I was also -- had an endowed position, labor professor of environmental economics, and at the time I left the University of Maine, I was head of the department.

Q. And then moving on to the next institution?

A. Next university appointment?

Q. Yes, the next academic institution, sorry.

A. So I was hired by Virginia Tech to become head of the agriculture and applied economics department there and one year in, I was asked by the provost to start putting together the department of real estate. So for a number of years, I was serving as the head of the agriculture and applied economics department and leading the university's effort to create the department of real estate.

And I think in 2011, maybe, I stopped being head and moved to being full-time, leading the real estate department,

Page 19

which is now the Blackwood Department of Real Estate in the Pamplin College of Business at Virginia Tech, and I'm a founding head.

Q. You also mentioned North Carolina State University?

A. Yeah.

Q. Can you explain what you were doing there?

A. So that was a sabbatical. That was the same time that I was at Research Triangle Institute and so I had a split role between the two of them and they were both research appointments.

Q. And what was the subject matter of your research appointment?

A. It was environmental economics and issues related to natural resource damage assessments.

Q. When you say "it was a research appointment," does it mean at that time you were solely conducting research versus teaching?

Page 20

A. I was solely working on journal article publications.

Q. And then you mentioned that you have worked for the U.S. Forest Service.

Can you explain what you did for the U.S. Forest Service, please.

A. So that was an -- excuse me. When I was on sabbatical, and the main thing we did there is we put together a book, "A Primer on Nonmarket Valuation," that goes over basic procedures for all the various approaches to nonmarket valuation that are used to value environmental and natural resources.

Q. Finally, I believe you said you were a member of the science advisory board for the U.S. EPA, at which point in time you were a federal government employee.

Can you explain what you did in that capacity?

A. So those positions were made -- mainly peer review of actions and policies by the U.S. EPA, and I served on ones for the

Page 21

6 (Pages 18 - 21)

Clean Air Act for water quality and also for the -- for economic analyses.

Q. Can you remind me what time period that was?

A. That probably -- I don't -- I don't have those years right in front of me so I am just kind of roughing it out without having -- without looking at my resume, but probably around the 2010 to 2020. It's, you know, a sequence of appointments.

Q. You currently work as the founding head and Blackwood Professor at the Pamplin College of Business at Virginia Tech, right?

A. Yes.

Q. Do you currently teach students in that role?

A. I have not taught students in the last two years.

Q. Did you -- you had been teaching students up until approximately 2021 and no longer do so?

A. Up till spring of '21, yeah.

Page 22

Q. And when you were teaching in 2021 and prior to that at Virginia Tech, what courses did you teach?

A. So the most recent ones I taught were a -- careers in real estate that you teach to first-year students coming in. I also taught a sophomore real estate data analysis, and I taught the senior Capstone Studio course that all majors have to take before they graduate.

Q. What is a Capstone Studio course?

A. So a capstone is one where you pull everything that students have learned in their classes together, and this one, we do a mock real estate development project where students take it from the initial conceptualization through to the disposition of that and at the end, they pull together what they have learned in marketing and finance and appraisal and development, and they pull all those pieces together to understand kind of how that complex mobile works.

Page 23

Q. Is the curriculum for these courses that you described available online or no longer since you are not teaching them anymore?

MR. NIDEL: Objection to form.

THE WITNESS: Could you ask the question again.

BY MS. KLABER:

Q. Did you understand the question?

A. I am not sure that I did understand the question.

Q. Okay. When you were teaching the courses you described, was the curriculum for them available online?

A. I don't know what you mean by the "curriculum available online."

Q. A course syllabus explaining what the course -- what would be taught in the course.

MR. NIDEL: Objection to form.

THE WITNESS: So are you asking whether the course is taught online or the material is online?

Page 24

BY MS. KLABER:

Q. No, I am asking whether one could access the course syllabus for example online to see what you would be teaching in the course, not view the actual course.

A. So I think the whole time I was teaching at Virginia Tech, we used some type of platform, it was originally blackboarded and then canvas, where you would post the material, so it would be available to the students electronically.

Q. Would it be publicly available?

A. No.

Q. Did you use any particular textbooks for the courses you were teaching?

A. I used a textbook for the data analysis course. For the other courses, it was specific readings, bringing experts in to do lectures or materials that I had developed.

Q. What was the textbook you used that you mentioned?

A. I don't recall at this time.

Page 25

7 (Pages 22 - 25)

Q. Do you recall if you used any texts discussing application of meta-analysis for calculating property value diminution due to environmental disamenity?

A. That was not a topic that was covered in the course.

Q. Have you ever worked in the field of real estate outside of an academic setting?

A. Yes.

Q. Could you explain in what capacity?

A. I have had rental properties that I have owned and managed.

Q. You have never worked as a real estate appraiser, correct?

A. I have not.

Q. You don't have a license in California to appraise residential real estate, correct?

A. I do not.

Q. You don't have a license in any state to appraise property, correct?

A. I do not have a license to appraise,

Page 26

but I do understand what appraisers do.

Q. Have you ever performed an appraisal?

A. No.

Q. Have you ever worked for a company that offers mortgages to home buyers?

A. Yes.

Q. What company was that?

A. Northern National Bank.

Q. What did you do for Northern National Bank?

A. I did a number of things. It was when I was in college and basically I did whatever they asked me to do.

Q. Approximately how many times have you served as an expert witness?

A. I don't know. A lot.

Q. More than ten?

A. Yes.

Q. Have you served as an expert witness more than 20 times?

A. Likely.

Page 27

Q. More than 50 times?

A. Probably not.

Q. In what field do you typically offer expert testimony?

A. Environmental economics and real estate.

Q. Are those two separate fields, just so I can understand. Environmental economics is one field and real estate is a separate field?

A. I would say, you know, if you think about a Venn diagram is that they overlap, so there are parts that are separate and there are parts that are the same.

And, you know, for example, as I have showed in my expert report, you know, hedonic property value models are something that's in real estate because it is dealing with real estate, but it's also in environmental economics, because it's how you look at how environmental amenities and disamenities affect it.

Page 28

So there is complementary methods that are used in both areas.

Q. And when you have served as an expert witness, do you typically offer testimony where those Venn diagrams of environmental economics and real estate meet or do you do kind of all three, environmental economics, real estate and then the overlap?

MR. NIDEL: Objection to form.

THE WITNESS: Can you ask the question again, please.

BY MS. KLABER:

Q. Do you understand the question?

A. I need you to ask the question again if you would, please.

Q. When you offer expert testimony, is it typically in the overlap of environmental economics and real estate?

MR. NIDEL: Objection to form.

THE WITNESS: I offer -- I offer testimony in a variety of different applications. I don't necessarily think of it

Page 29

8 (Pages 26 - 29)

as pigeonholed in one or the other. Some are, for example, earlier this year, I gave testimony for the -- for public television related to royalties and that wasn't real estate or environmental, but because of the knowledge of methods that I use in those two that allowed me to go over there, so it's not kind of, you know, kind of looking at it as kind of a pigeonholing it, but I have a core set of competencies that allows me to be nimble and to testify in a number of different areas.

BY MS. KLABER:

Q. And those areas would include environmental economics and real estate; is that correct?

A. I have done environmental economics, I have done real estate, I have done royalties, I have done breach of contract, but they are all using a common core set of methods that are hedonic meta-analysis and valuation approaches.

Q. Okay. That's what I was trying to understand if your expert testimony is in other

Page 30

areas aside from real estate and environmental economics. It sounds like the answer is yes.

A. I clearly didn't understand your question then.

Q. Could you answer the question that I just asked, please?

A. I thought that was a statement, not a question.

Q. Well, I can say it again then. I said I was trying to understand if the expert testimony that you offer is solely in real estate or in environmental economics, and it sounds like the -- or if it is in another area, and it sounds like you also branch out to other areas; is that correct?

A. I give --

MR. NIDEL: Objection to form.

THE WITNESS: I give testimony in a number of different applications.

BY MS. KLABER:

Q. Approximately how many times have you served as a testifying expert?

Page 31

A. What do you mean by "testifying"?

Q. So you could offer expert consulting services where you don't end up sitting for a deposition or providing testimony in court, and/or you could serve as the testifying expert like you are here today, where you end up as a result of your work, you know, sitting and offering deposition testimony or ultimately testifying in court or in arbitration.

So I had initially asked you about the number of times you served as an expert witness without limiting it to testifying expert and maybe that wasn't clear.

So now, I am asking a more narrow question as to how many times you have worked as an expert and have been a testifying expert witness.

MR. NIDEL: Objection to form.

THE WITNESS: So if you are talking about anytime testifying, if you are talking about adjudicatory hearings, before legislative groups and before government agencies,

Page 32

depositions and court cases, it's in the tens.

BY MS. KLABER:

Q. Okay. I can make it more narrow since I wasn't intending to pick up on congressional testimony for example.

With respect to actual litigation pending either in court or before an arbitration panel, how many times would you say you have served as an expert testifying witness?

A. So could I be clear, you are talking about depositions and in court?

Q. Or at an arbitration, yeah.

A. That would be in -- in the -- in the low tens.

Q. You had previously identified perhaps somewhere between 20 and 50 total engagements as an expert, so would the remainder of those engagements have been just as a consulting expert where you were not offering testimony?

A. If you are saying that I was not

Page 33

9 (Pages 30 - 33)

testifying in court and not giving depositions, that would be the remainder.

Q. Thinking now just about the actual litigation matters that you have served as an expert on, where they were pending before a court or potentially an arbitration panel, in how many of those cases were you an expert for the plaintiff side?

A. I don't recall the numbers. I have been an expert on both sides and I have also been retained as an independent consultant, to kind of peer review and arbitrate between the experts on two sides, so I have been both sides and in the middle.

Q. Can you explain the context in which you served in this role you have described as in the middle, where you were peer reviewing other experts?

A. Yeah. So one that comes to mind was a case in New York State, a Superfund site up on the St. Lawrence and there were the state's experts and the responsible parties' experts,

Page 34

and I was -- they wanted to do a collaborative natural resource damage assessment, and so I was brought in to kind of be the person to help sort out the discussion between the experts about how they were going to go about doing the collaborative, and in that case, I was retained by one of the Native American tribes.

Another example was Passaic River in New Jersey, a natural resource damage case, in kind of that same role of reviewing and giving comments on the information that was being provided by the experts on both sides.

Q. In terms of the other litigation matters where you were serving as either an expert for the plaintiffs or for the defendants' side, can you give an approximation in terms of percentage how frequently you have been for plaintiffs versus how frequently you have been for defendants?

A. I have never really tried to quantify it but through time, it's probably 50/50.

Page 35

Q. When was the last time you testified for the defense that you can recall?

A. Probably within the last three years.

Q. Do you remember the name of the case?

A. It was a case in West Virginia. I don't remember the name of the case right now, but I was an expert. It was an oil spill and I was an expert for the heating oil company and I was retained by their law firm.

Q. Was it pending in state court or federal court if you recall?

A. I have -- I have no knowledge of what court it was in.

MS. KLABER: We are going to mark an exhibit, which is a copy of your expert report in this matter dated September 27, 2023. I believe it is going to be Exhibit No. 41.

(Deposition Exhibit 41 was marked for identification.)

BY MS. KLABER:

Page 36

Q. It should pop up in there.

It looks like you have some materials with you today. Could you identify those?

A. Yes. So the attorneys advised me to bring my expert report and my response report, so I would have hard copies to look at if I wanted to, if you brought them up.

Q. Okay. And you should certainly feel free to consult your hard copies as opposed to the one on the screen if that is easier for you.

Are they clean copies? Do they have any annotations on them?

A. There's no annotations that I know of on them. I think they just came out of the printer.

Q. Hot off the presses.

A. What?

Q. They are hot off the presses.

A. Can I ask a question here?

Q. Sure.

Page 37

10 (Pages 34 - 37)

A. So when things come up, are you going to just them with this program or do I need to click on them for them to come up?

Q. So you may need to refresh is my understanding. You may need to refresh the screen to make sure it populates, and then you should see each new document listed with the exhibit number in there, and I believe you will then have to click it to open it.

A. So it's not up there now. So I need to click it to open it up?

Q. If you -- yeah, why don't we test it out. If you click refresh and see if -- what should be labeled as Exhibit 41 comes in.

A. So where do I click for refresh on this?

Q. I think you just refresh the browser, so you click the browser refresh button.

A. I am just not seeing it right here in front of me, sorry.

Q. Sorry, did you say you're now seeing

Page 38

it or you're not seeing it?

A. I'm not seeing it.

MS. KLABER: Chris, could you take a look?

MR. NIDEL: Yeah. I have never been on this side of the Exhibit Share but I will do that.

MS. KLABER: It should just be the browser refresh button. I'm not sure which browser you are using.

MR. NIDEL: Oh, let's see.

THE VIDEOGRAPHER: Top left.

MS. KLABER: In mine, it's the top left, it is Chrome, but I don't know what you are using.

MR. NIDEL: It's really sensitive but we got it up though.

THE WITNESS: Okay.

BY MS. KLABER:

Q. Were you able to locate where the refresh button is just for the next time?

MR. NIDEL: We didn't use the

Page 39

refresh.

THE WITNESS: We just pulled it up.

BY MS. KLABER:

Q. Okay. So we've marked as Exhibit 41, a copy of your expert report dated September 27, 2023, which was produced by plaintiffs in this litigation.

Do you recognize this document as your report?

A. I do.

MR. NIDEL: Sorry. Now, I have a question. So under my depositions, I only have Laton.

MS. GEARY: Did you go through the link I sent you this morning?

MR. NIDEL: I did, yeah, and I have Laton and I have my Exide case.

MS. GEARY: Can we go off the record?

MS. KLABER: Yeah. Can we go off the record please so we can sort this out.

THE VIDEOGRAPHER: This marks the

Page 40

end of Media Unit No. 1. Going off the record. The time is 9:42 a.m.

(A short recess was taken.)

THE VIDEOGRAPHER: This marks the beginning of Media Unit No. 2. Going back on record. The time is 9:48 p.m.

BY MS. KLABER:

Q. Okay. Dr. Boyle, we just marked Exhibit 41, which is a copy of your expert report dated September 27, 2023, produced by the plaintiffs in this litigation and you have verified that that is what this exhibit, in fact, is.

Did you write this report entirely yourself?

A. I did.

Q. You did not have any help from anyone in putting together this report?

A. I had help in providing some of the information, but I wrote the entire report by myself.

Q. Could you explain, in particular,

Page 41

11 (Pages 38 - 41)

what help you had putting together or obtaining or providing information for the report?

A. For example, Dr. Laton's firm provided the map of the plume area. Also, they provided distances from the Northrop Grumman site to properties, so that everything that was being done there was done consistently.

Q. Looking at Page 2 of your report, there is a heading that says: "Qualifications of Dr. Boyle."

Did you write this section?

A. As I said before, I wrote the entire report.

Q. Curious, why is this written in the third person?

MR. NIDEL: Objection to form.

THE WITNESS: It is just the way I wrote it.

BY MS. KLABER:

Q. On Page 3 of your report, second paragraph, it says: "Dr. Boyle has over 35 years of experience in the economic valuation

Page 42

of environmental amenities and disamenities."

Can you describe that experience, please.

A. So that's basically what I have done for my whole career. So, for example, first study I did was during my Ph.D. work looking at how people valued scenic beauty along the Wisconsin River in Wisconsin, it was a state waterway.

Most recently, we just had a paper published where we looked at how homeowners in different areas of the country value water quality in lakes.

So I have done air quality, water quality, forestry, endangered species, historic sites. You name it, I have probably done it.

Q. What is an environmental amenity?

A. So it's a -- it's basically something in nature that adds value to people. So, you know, if we go back to the examples I just gave you, scenic beauty along the Wisconsin River would be an amenity to people

Page 43

who are canoeing and boating along the river.

If you go to the most recent example I gave you, improved water quality, clean water is an amenity but when you have eutrophication due to nutrient loading and climate change, that is a disamenity.

Q. You anticipated my next question slightly, but I was going to ask you to explain what an environmental disamenity is.

A. So that would be, you know, that example is where eutrophication reduces the quality of the water, so it -- you can't see down as deep in the water. It can change the color and it could result in how harmful and how unsafe to not have contact with the water.

Q. I don't think I -- I understood what you were saying. Were you saying eutrophication?

A. Eutrophication.

Q. What is that?

A. Eutrophication is when nutrient loading into water that -- through the -- I

Page 44

can't -- I'm not a limnologist, so I can't tell you all of it, but that results in algae growth and other features that changes the chemistry in the water column.

Q. More broadly, could you kind of provide your definition of an environmental disamenity?

A. So an environmental disamenity is -- is anything that is within the environment that gives negative utility, as economists talk about it, but maybe in more general terms, negative satisfaction or dissatisfaction to people.

Q. How do people learn about an environmental disamenity?

MR. NIDEL: Objection to form.

THE WITNESS: It really varies with what the different ones are that you are talking about.

BY MS. KLABER:

Q. Could you provide some examples then to explain how it can vary?

Page 45

12 (Pages 42 - 45)

A.   So, you know, I think there are things that, you know, let's stick with the first one that I talked about with scenic beauty along the Wisconsin River. That's one where people are canoeing. If they see the natural shoreline and bluffs, then that is an amenity. When they encounter ones that are developed and that diminishes the view, then -- when they encounter it going down the river.

Q.   So the way that they would learn about it is by sight?

A.   In that case, yes.

Q.   Do you have other examples of ways in which individuals may learn of environmental disamenities?

A.   So there is probably many ways that they learn about it as there are options out there.

Q.   Could you identify any of those options, please?

A.   So if we go to the current case, it would be when the seller needs to reveal to the

Page 46

buyer that there may be -- may be something that is wrong, so if, for example, if you -- should I pause for a minute?

MR. NIDEL:   Yeah.

THE WITNESS:   Can we mute that so it doesn't happen again?

MR. NIDEL:   I think he needs to hear it.

THE WITNESS:   Oh, okay. I'm sorry. I lost my train of thought. Sorry.

BY MS. KLABER:

Q.   I was just asking if you could provide examples of additional options of ways people may learn of an environmental disamenity.

A.   So I was talking about disclosures, so states have disclosure laws where homeowners need to reveal if there is anything that would diminish the value of the property or, you know, put in question of it. So that would be another case, if there was something out there that the homeowner knew about that they would

Page 47

have to disclose and the buyer would know it at the time of the disclosure.

Q.   Do you have any additional examples?

A.   So another -- another case that I worked on, it's wasn't a legal case, but was with contaminated water where the state toxicologist sent out notices to every -- every homeowner and published information in all the places, the media, what have you, so that buyers would know about the contamination in the water.

Q.   Have you ever written about the level of knowledge one must have to be on notice of an environmental disamenity?

A.   I have not.

Q.   Do you consider yourself to have expertise in that area, the level of notice -- the level of information required to be on notice of an environmental disamenity?

MR. NIDEL:   Objection to form.

THE WITNESS:   I rely on other people to provide that information.

Page 48

BY MS. KLABER:

Q.   What sort of people do you rely on to provide that information?

A.   So in the issue in Maine, which was arsenic, I depended on information provided by the state toxicologist. I can't remember his first name -- Andy Smith was his name.

Q.   I think my question may have gotten confused a little bit.

I was asking if you consider yourself to have expertise in determining when the level of knowledge one has of an environmental disamenity rises to being on notice of that environmental disamenity?

MR. NIDEL:   Objection to form.

THE WITNESS:   I'm not understanding the question.

BY MS. KLABER:

Q.   So it seemed as if you thought I was asking about whether or not you were the one who provides notices of environmental disamenities.

Page 49

13 (Pages 46 - 49)

Is that what you understood me to be asking?

A.  No, that wasn't what I understood.

Q.  Okay.  What is -- what was your understanding then so we can -- so I can figure out how to clarify my question.

MR. NIDEL:  Objection to form.

THE WITNESS:  I think I didn't have an understanding of what you were asking and so I was doing my best to try to answer.

BY MS. KLABER:

Q.  Okay.  So I asked you, have you written about the level of knowledge one must have to be on notice of an environmental disamenity, and you said you have not.

A.  That is correct.

Q.  Now, do you have -- do you consider yourself to have expertise in that area?

A.  What do you mean by "expertise"?

Q.  Do you consider yourself to be an expert in determining the level of knowledge one must have to be on notice of an

Page 50

environmental disamenity?

A.  I consider myself to be one who uses the information that is available, and I have an understanding of the information that needs to be available for an economic model to work.

Q.  And how did you obtain that understanding?

A.  So, that's -- I'm not understanding because it varies.  I think each -- each different type of application that you are working with and I gave you one example where -- where you learn the information from the state toxicologist.

If we go way back to that first study I talked about with Wisconsin River, we used photograph images to understand where people thought that there was a level of development that would cause a disamenity, so it varies in each specific application.

Q.  You said that you consider yourself to be one who uses the information that is available and you have an understanding of the

Page 51

information that needs to be available for an economic model to work.

I was trying to ask you, how you became -- how you have an understanding of what information is needed to make the economic model work?

A.  So my understanding is based on the work that I have done in research, but also the research that has been published in the peer-reviewed economics journal.  Some of it I cited in my report and also in my responses, for example, that have shown when sellers have to disclose the information of contamination or disamenity.

That's when it kicks in, that buyers are aware of it and it affects the market, market value, so it's based on knowledge from my own research and being well read in the peer-reviewed literature.

Q.  But not a topic that you have written on yourself; is that correct?

A.  I don't know where you are going

Page 52

with that question, but I will stick by my answer to your previous question.

Q.  That's a no?

MR. NIDEL:  Objection to form.

THE WITNESS:  Your question is general, so I'm not -- I'm not understanding specifically what you are asking.

BY MS. KLABER:

Q.  Okay.  I will stick with the previous question and the previous answer in that case.

Looking back at Exhibit 41, your report at Page 3, we are still in this second paragraph.  It continues on:  "One of his specialities is the estimation of property value models to understand how amenities and disamenities affect real estate market values."

What is a property value model?

A.  So a property value model is -- the common one is hedonic property value, and you take sale prices of properties, use a regression, and you use characteristics of the

Page 53

14 (Pages 50 - 53)

properties to explain variation in prices across different properties. 10:03:12 10:03:15

Q. So in terms of your statement here regarding your specialty being the estimation of property value models, that's a reference to hedonic modeling? 10:03:17 10:03:22 10:03:25 10:03:27

A. It is. 10:03:29

Q. Other than working as a testifying or consulting expert, what work have you done estimating property value models to understand how amenities and disamenities affect real estate market values? 10:03:30 10:03:35 10:03:38 10:03:41 10:03:45

A. So I have done a lot of studies through time. I -- my first ones that I did were looking at lake water quality, I have looked at proximity to -- excuse me, national wildlife refuges, I have looked at evasive weeds in properties, I have looked at the air quality, a variety of different ones, and I am also the co-author on peer-reviewed article of best practices for applying hedonics to -- to environmental applications. 10:03:46 10:03:49 10:03:56 10:04:00 10:04:07 10:04:13 10:04:16 10:04:20 10:04:23 10:04:27

Page 54

Q. Do you teach -- or I will start again because I know you are not presently teaching. 10:04:29 10:04:35 10:04:37

Have you taught courses on property -- estimating property value models to understand how environmental amenities and disamenities affect real estate value? 10:04:38 10:04:44 10:04:46 10:04:50

A. I have taught graduate environmental economics courses where hedonic property values were one of the topics covered in the course. 10:04:52 10:04:55 10:04:58

Q. Is there a specific textbook you use that covers that topic? 10:05:02 10:05:04

A. So the textbook is -- that's used most recently is the -- "A Primer on Nonmarket Valuation" that I mentioned we put together when I worked for the forest service that I was co-author on, and is probably the most commonly textbook used around the globe. 10:05:06 10:05:10 10:05:13 10:05:17 10:05:20 10:05:24

Q. Have you ever performed your own meta-analysis regarding the effect of environmental disamenities on property valuations? 10:05:26 10:05:26 10:05:31 10:05:32

Page 55

A. I am not remembering all the meta-analyses that I have done. The one that's coming to mind right now is one -- that meta-analysis I did of values for -- nonuse values for -- for groundwater. So that one was done -- excuse me, using stated preference, not property value models. 10:05:41 10:05:44 10:05:47 10:05:50 10:05:54 10:05:57 10:06:04

But I am well-versed in using meta-analysis and I have done research on the validity and reliability of the meta-analysis. 10:06:06 10:06:09 10:06:12

Q. Have you ever published your own meta-analysis regarding the effect of environmental disamenities on property valuations? 10:06:17 10:06:20 10:06:23 10:06:25

A. Not that I can recall. 10:06:26

Q. Looking again at that same paragraph of Exhibit 41, your report, it continues on: "Groundwater contamination emanating from a site where hazardous wastes were released such as the former Northrop Grumman site in Canoga Park, California, is an example of a disamenity that diminishes property values." 10:06:27 10:06:35 10:06:40 10:06:43 10:06:47 10:06:49 10:06:51

Page 56

How many times have you been asked to look at how groundwater contamination affects real estate market values? 10:06:54 10:06:56 10:06:59

MR. NIDEL: Objection to form. 10:07:06

THE WITNESS: Could you ask the question again, please. 10:07:13 10:07:13

BY MS. KLABER: 10:07:16

Q. How many times -- and I will say in the context of litigation to maybe make it more clear. 10:07:17 10:07:20 10:07:23

How many times have you been asked to look at how groundwater contamination affects real estate market values? 10:07:24 10:07:25 10:07:28

A. Probably somewhere in the range of five to ten. 10:07:30 10:07:37

Q. Can you provide the names of particular cases in which you have done that work? 10:07:38 10:07:41 10:07:43

A. At this point in time, I'm not sure of the confidentiality of those cases, and so I don't feel like I can go through and name them. 10:07:44 10:07:50 10:07:55

Q. Have any of them been filed in 10:08:03

Page 57

15 (Pages 54 - 57)

court?

MR. NIDEL: Objection to form and foundation.

THE WITNESS: I never really know exactly whether cases have been filed in court. That is kind of the attorneys and I do my work so I don't -- I don't know the specifics on the different ones.

BY MS. KLABER:

Q. Okay. Are you aware of any confidential arbitrations you have been involved with?

A. Specifically or generally?

Q. Specifically.

A. Yes.

Q. So I am only asking for names of cases.

A. Of what?

Q. I am only asking for names of cases and, you know, if you know where they are pending, if any of the information with those publicly-filed cases are confidential, we won't

Page 58

be able to access it, and I am not asking for any particular details that would be confidential.

So if you can identify names of any cases and other information you can recall regarding where those cases are pending, I would appreciate it.

A. I am not comfortable with that right now. I am willing to check with attorneys and provide information to you after checking with them.

Q. Okay. If that's something we can do during a break, then we can come back to it.

A. I don't know if I can do it that quickly.

Q. Okay.

A. But I think information could be gotten to you with a little bit more time.

Q. Okay. Well, we can then figure out how to deal with that later.

I will represent to you that any case filed in court, its name is not

Page 59

confidential, but we can return to the topic.

How many cases --

A. I was just going to say when you get to a convenient spot, I could use a bathroom break, please.

Q. We can take a bathroom break now if that would be more comfortable.

A. Thank you.

MS. KLABER: Okay. Can we go off the record, please.

THE VIDEOGRAPHER: This marks the end of Media Unit 2. Going off the record. The time is 10:10 a.m.

(A short recess was taken.)

THE VIDEOGRAPHER: This marks the beginning of Media Unit 3. Going back on record. The time is 10:20 a.m.

BY MS. KLABER:

Q. Dr. Boyle, how many cases have you been hired in as an expert that involved property value diminution from groundwater contamination?

Page 60

A. You know, I don't know through time, but I am trying to think back, and are you talking about when there is property values or just when I was the expert on it, because there are some where I might have been on a different part and somebody else was doing the property value one.

Q. When you were the expert.

A. Probably five or so.

Q. And what opinions did you offer in those cases?

A. My opinions were looking at what the property value diminutions were from contamination.

Q. Have you ever opined that alleged groundwater contamination did not cause property value diminution?

A. I have not.

Q. Thinking of the -- I think you said five or six?

A. I think I said five or so.

Q. Five or so cases, could you identify

Page 61

16 (Pages 58 - 61)

the names of those cases, please.    10:22:00

A.    I think that -- that I'm still in    10:22:04
that uncomfortable range, but obviously, there    10:22:11
is one on my record that is another Canoga    10:22:15
Park, which is another Northrop Grumman case    10:22:20
that is in my report, so I guess that one is    10:22:23
disclosed.    10:22:25

Q.    Canoga Park is this case.    10:22:26

A.    Sorry, Bethpage, sorry, I misspoke.    10:22:29
Bethpage.    10:22:33

Q.    Is the issue you are unsure, if you    10:22:33
have been disclosed as an expert yet in any of    10:22:36
these cases?    10:22:40

A.    I, you know, I do not know whether    10:22:41
cases are filed.  I do not know whether I have    10:22:44
been disclosed.    10:22:47

Q.    Well, let's think of the cases in    10:22:48
which you have provided a report.    10:22:50

A.    Uh-huh.    10:22:51

Q.    If you have provided a report, then    10:22:53
you have been disclose as an expert.  Can you    10:22:55
identify any of those cases?    10:22:58

Page 62

A.    So there would be the Bethpage case,    10:23:00
the Duncan, Oklahoma case, and the case in    10:23:12
Wisconsin.    10:23:16

Q.    Do you know the name -- excuse me, I    10:23:25
did not mean to interrupt you.    10:23:28

A.    I can't -- those are the ones that    10:23:37
are coming to mind right now where there has    10:23:40
been a report.    10:23:43

Q.    Okay.  Can you -- do you know the    10:23:44
full name of the Duncan, Oklahoma case?    10:23:46

A.    I do not know the official name of    10:23:49
it right offhand.    10:23:51

Q.    Do you know where in Oklahoma it is    10:23:53
pending?    10:23:55

A.    Do you mean what court?    10:23:56

Q.    What court would be certainly    10:24:01
helpful, but if you know what geographical    10:24:02
locale, that would be helpful as well.    10:24:06

A.    Duncan is like geographic location.    10:24:09

Q.    Okay.  So Duncan, Oklahoma is the    10:24:13
location, it's not any part of the case name?    10:24:15

A.    It's a location.  I don't know    10:24:19

Page 63

whether it is or is not part of the case name.    10:24:20

Q.    Do you know the name for the side    10:24:22
that you have provided a report?    10:24:24

A.    I was retained by the -- an attorney    10:24:27
by the name of Sullivan.  I don't know the kind    10:24:32
of, you know, something versus V on the front    10:24:40
page.  I don't remember whose name was there.    10:24:44

Q.    So you are not sure who Mr.    10:24:46
Sullivan's client is --    10:24:48

A.    That's correct.    10:24:49

Q.    -- that you wrote the report for?    10:24:50

A.    Yeah.    10:24:52

Q.    And then you mentioned a case in    10:24:52
Wisconsin?    10:24:54

A.    Yes.    10:24:54

Q.    Do you know the name of that case?    10:24:55

A.    I just have it as West Bend, the    10:24:56
location.    10:24:59

Q.    Did you say West Bend?    10:25:00

A.    Correct.    10:25:02

Q.    And that's the name of a city in    10:25:02
Wisconsin?    10:25:05

Page 64

A.    Yes.    10:25:06

Q.    Who were you retained by?    10:25:07

A.    I was retained by Nidel & Nace.    10:25:09

Q.    Okay.  Do you know what court that    10:25:13
case is pending in?    10:25:17

A.    No.    10:25:18

Q.    Do you know if it is state or    10:25:19
federal?    10:25:21

A.    I don't know.    10:25:22

Q.    Can you explain the subject matter    10:25:23
of that case?    10:25:25

MR. NIDEL:  Objection to form and    10:25:27
foundation.    10:25:28

THE WITNESS:  What do you mean by    10:25:30
"subject matter"?    10:25:31

BY MS. KLABER:    10:25:33

Q.    I guess I will ask a more specific    10:25:33
question.    10:25:35

What opinions were you offering in    10:25:36
the West Bend, Wisconsin case?    10:25:37

A.    It was groundwater contamination    10:25:40
emanating from a -- excuse me, closed landfill    10:25:47

Page 65

17 (Pages 62 - 65)

and property value diminutions there for -- there from.

Q. And you were offering an opinion as to the amount of property value diminution; is that right?

A. That is correct.

Q. We were speaking about groundwater contamination specifically.

Have you ever opined that any other environmental disamenity did not cause property value diminution?

MR. NIDEL: Objection to form.

THE WITNESS: Can you re-ask the question, please.

BY MS. KLABER:

Q. Have you ever opined that any environmental disamenity, apart from groundwater contamination, did not cause property value diminution?

MR. NIDEL: Objection to form.

THE WITNESS: The West Virginia case that I mentioned -- well, ask the question

Page 66

again, please.

BY MS. KLABER:

Q. Have you ever offered an opinion that an environmental disamenity, apart from groundwater contamination, did not cause property value diminution?

MR. NIDEL: Objection to form.

THE WITNESS: In the West Virginia case, that -- it was a single property and the remedy that was done more than made the property owner whole, so that my opinion was that there was no residual loss in property value.

BY MS. KLABER:

Q. What was the remedy in that case?

A. They excavated the -- the basement, redid foundation, put a new entrance into the basement for the property owner, excavated the subsoil underneath it, and so the contaminants were removed and the work that they did left the property in better condition than before the spill occurred.

Page 67

Q. And I don't -- I don't recall us discussing the West Virginia case previously.

Could you provide the name of that case and any other identifying information that you recall?

A. I don't -- in my -- I will just say in my records, I file everything by the location of where the case occurs.

Q. Do you remember who you were retained by in that case?

A. It was a Richmond law firm. I would have to go look.

Q. And do you remember the client of that law firm who you wrote the report for?

A. I do not.

Q. Was it on behalf of the homeowner?

A. No, it was on behalf of the oil company that delivered the product to the home.

Q. Do you believe there could be a scenario where an environmental disamenity does not cause property value diminution without being remediated?

Page 68

MR. NIDEL: Objection to form.

THE WITNESS: Can you clarify that question for me, please.

BY MS. KLABER:

Q. Could you help me understand what you didn't understand about it so I can clarify?

MR. NIDEL: Objection to form.

THE WITNESS: What I don't understand is awful hard for me to tell you what I don't understand.

BY MS. KLABER:

Q. Was there a particular word that you were not sure of the meaning? I -- it's hard for me to clarify if I don't know what was unclear to you.

MR. NIDEL: Objection to form.

THE WITNESS: Ask the question again, I will see if I can help you.

BY MS. KLABER:

Q. Do you believe there could ever be a scenario where an environmental disamenity that

Page 69

18 (Pages 66 - 69)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

has not been remediated does not cause property value diminution?

MR. NIDEL: Objection to form.

THE WITNESS: That's really, really general and, you know, you know, there could be something that is so trivial that it doesn't -- doesn't have an affect but if it's something substantial, like a, you know, a large groundwater contamination plume, it's not probable.

BY MS. KLABER:

Q. Would an environmental disamenity have to be actual contamination to property or could it be concerns about the existence of contamination?

MR. NIDEL: Objection to form.

THE WITNESS: So the literature on environmental contamination affecting property values is -- and this is both for positive and negative, it's pretty clear that the key thing is, is its proximity, so whether it's a disamenity or amenity, its proximity, and then

Page 70

all the models, its distance or like buffers, you know, let's say half a kilometer, kilometer and a half, and so that is the key factor that has been shown over and over again in hedonic property values, its proximity to the amenity or disamenity.

BY MS. KLABER:

Q. So does that mean that there need not be actual contamination on the property? It needs only to be proximate to some known contamination?

A. That is correct, and the amenity does not need to be on the property. It just needs to be proximate to the property.

Q. Is being located near a source of known air contamination an environmental disamenity?

MR. NIDEL: Objection to form. Incomplete hypothetical.

THE WITNESS: Can you tell me what you mean by "air contamination"?

BY MS. KLABER:

Page 71

Q. Let me ask the question differently and see if this resolves it.

Would a known source of air contamination be considered an environmental disamenity?

MR. NIDEL: Objection to form and foundation. Incomplete hypothetical.

THE WITNESS: So, you know, some of the work that has been done in the LA area, we have done some of it where there is information on air quality and that has been shown to diminish property values, and so the answer is -- the answer is yes.

BY MS. KLABER:

Q. Would an urban environment with -- would background levels of TCE in the environment be considered an environmental disamenity?

MR. NIDEL: Objection to form and foundation.

THE WITNESS: I don't know what you mean by "background."

Page 72

BY MS. KLABER:

Q. If you were to measure the air and find background levels which would be kind of like a baseline present in the air, would that be an environmental disamenity?

MR. NIDEL: Objection to form and foundation. Incomplete hypothetical.

THE WITNESS: I'm sorry. That is just too vague for me to answer. I just don't know.

BY MS. KLABER:

Q. What information would you need to know how to answer that?

A. I don't know what you mean by "background." You know, the studies that are out there show that people don't like pollution and pollution will diminish property values, and also, people are willing to pay to not have pollution.

It's not distinguished by whether it's background or not, so I don't know how to answer it just in terms of background. It's in

Page 73

19 (Pages 70 - 73)

terms of what the economic literature shows is, is -- pollution is pollution, and it's a disamenity, and it's been shown to affect property values, but also in stated preference studies, people are willing to pay to not have pollution in the environment.

Q. So maybe to provide a little more clarity on background, we are sitting in this room here today. We are not near any particular equipment known to emit radiation. If you ride on an airplane, there will be background levels of radiation. If you sit in this room, there will be background levels of radiation, but we are not operating an x-ray machine so, you know, if you step out the door and without a particular, you know, pollution source here that we can see, there are background levels of TCE in the air.

Would you consider that an environmental disamenity?

MR. NIDEL: Objection to form and foundation. Incomplete hypothetical.

Page 74

THE WITNESS: So I think anything that is, you know, not natural that -- in the environment, would be a disamenity.

BY MS. KLABER:

Q. If someone were living a few blocks from a known source of PCE contamination from a former dry cleaner, would that be an environmental disamenity?

MR. NIDEL: Objection to form. Incomplete hypothetical.

THE WITNESS: Can you repeat that question, please.

BY MS. KLABER:

Q. Would you be living near an environmental disamenity if you were a few blocks from a known source of PCE contamination from a former dry cleaner?

MR. NIDEL: Objection to form. Incomplete hypothetical.

THE WITNESS: Sorry. I was thinking about the first part when you got to the second part, so I'm going to ask you to repeat it

Page 75

again if you wouldn't mind.

BY MS. KLABER:

Q. If you were living a few blocks from a former dry cleaner that was a known source of PCE contamination, would that be considered an environmental disamenity?

MR. NIDEL: Objection to form. Incomplete hypothetical.

THE WITNESS: I would need more -- more information to answer that question.

BY MS. KLABER:

Q. What information would you need?

MR. NIDEL: Objection to form.

THE WITNESS: I mean, there is a lot of information. It's not just that, you know, that there is a former dry cleaner that, you know, that the contamination is still there from it. You know, what are the dimensions, dimensions of the contamination.

It's, you know, there is a lot of information that you would just additionally need. Just like in this case, I am relying on

Page 76

information from -- excuse me, Dr. Laton and Dr. Kram. I would be relying on experts like that to give me the information to know whether that was or was not an issue of concern.

BY MS. KLABER:

Q. What do you mean by "issue of concern"?

A. The concern that you expressed in your question.

Q. You would ask them whether or not it was an environmental disamenity?

MR. NIDEL: Objection to form.

THE WITNESS: I don't, you know, the fact that there was a dry cleaner there, I don't know what -- the extent of what occurred there, so I would need them to document kind of what was the current situation of the dry cleaner and of the area of the dry cleaner.

BY MS. KLABER:

Q. So if the current situation of the dry cleaner was that it was known that there was PCE contamination emanating from that site,

Page 77

20 (Pages 74 - 77)

is that an environmental disamenity to someone a few blocks away?

A.   It's possible, but I would still need to have more information about what, you know, kind of what the parameters of it were.

Q.   Would being in the notification area for a California AB 2588 notice be considered an environmental disamenity?

MR. NIDEL:  Objection to form and foundation.

THE WITNESS:  I don't know what that notice is.

BY MS. KLABER:

Q.   Okay.  Do you know what a California Prop 65 notice is?

A.   Not right offhand.

Q.   Is it something you believe you might have been familiar with, you just can't remember at this time?

A.   It seems like I have heard Prop 65, but I'm not pulling it up right now.

Q.   Okay.  Can we look at Page 24 of

Page 78

your September 27, 2023 report, Exhibit 41.

A.   You said Page 24?

Q.   24, please.

Here, you have a list of cases in which you have testified over the last four years.

Looking at this list today, is this list complete?

A.   It is.

Q.   What opinions did you offer in the Romano v. Northrop Grumman case in the Eastern District of New York?

A.   So I provided a report on property value diminution due to groundwater contamination.

Q.   And was your opinion the extent of the property value diminution?

A.   It was the amount of property value diminution.

Q.   Did you use a meta-analysis in this case?

A.   I did.

Page 79

Q.   Was that meta-analysis based on the 2006 Simons and Saginor study?

A.   It was.

Q.   Looking at the next case, what opinions did you offer in the Lazy S Ranch Properties v. Valero Terminaling and Distribution Company case in the Eastern District of Oklahoma?

A.   What the value of the water would be if it was available to sell to a municipality.

Q.   Could you explain what you mean by "the water"?

A.   The groundwater under the ranch.

Q.   Okay.  So there was a ranch with groundwater underneath it, and you were offering an opinion as to what value the ranch could obtain by pumping that water and selling it to the city; is that correct?

A.   Yeah, to a municipality, yes.  Might -- it's a rural area, so it might not have been a city.  It could have been a county or a rural water district.

Page 80

Q.   Is this the Duncan, Oklahoma case?

A.   No.

Q.   No.  Okay.  Did you do a meta-analysis in the Lazy S Ranch Properties case?

A.   I did not.

Q.   What opinions did you offer in the distribution of Cable Royalty Funds case?

A.   So this one, I'm under a pretty tight confidentiality agreement, so I'm not sure how much I can say, but it was, in general, the -- every four years, the way cable companies work is they reprogram shows, they don't create their own shows, so they pay into a royalty fund at the Library of Congress for the shows that they reprogram, and every four years, those are allocated out to the originators.

So it is network news, sports, movie channels, devotional, Canadian broadcasting, public television, there is seven.  I am forgetting the last one.

Page 81

21 (Pages 78 - 81)

So every four years, they do an allocation of that. At this time, it was about a billion dollars. I was the expert for public television and I can't tell you what I did for public television, but it was testimony before -- the Library of Congress before the trade royalty judges.

Q. Okay. That was going to be my next question where the case was pending, because I was not really familiar with the citation to the Library of Congress. It was not a court to be clear?

A. It was -- I think they are officially judges but I don't -- it is not -- not a court. It's more -- this is lay terms, but more an arbitration where royalty disputes are handled, but in this case, it is not a dispute, it's an allocation.

Q. And apart from these four cases in which you -- or sorry, three cases in which you offered testimony from the last four years, about how many more cases would you estimate

Page 82

that you have offered expert reports in?

A. In total?

Q. Yeah.

A. I think it's, you know, we are back to more than -- more than ten, less than 50. I don't -- I don't keep track of them individually.

Q. Can you provide the names of any of those cases where you have filed an expert report?

A. So, you know, I think one that is -- that can be revealed is Hovensa groundwater contamination case in the Virgin Islands.

Q. Can you think of any others sitting here?

A. I am just, you know, not sure exactly, you know, what I should or shouldn't -- I know that, you know, that one, I know the Hovensa, you know, as you ask the questions, it is jogging my memory on some of them, so that one did go to decision so I know that it was -- that there was a public record in the court.

Page 83

Other ones, I just don't -- don't know. You know, I don't even know when they're -- some of the cases are -- are finished.

Q. They don't need to have finished to be in the public record. They just need to be pending or opened with the court, if that helps you identify any other cases in which you have submitted an expert report.

A. So I did an expert report in the MTBE case in New Jersey and my understanding that all the ten -- all but one of the ten defendants has settled.

Q. Okay. I'll start with those two and I will ask you if you know of any others. Ovensa --

A. Hovensa with an H.

Q. Hovensa.

A. Yes.

Q. Pending in the Virgin Islands, do you know what court that was?

A. I think the Virgin Islands is, if I -- I'm not sure if I get it correctly, but it

Page 84

might be -- there's a district court in Philadelphia that it might have been under, something like that.

Q. It was in federal court. Okay. Who were you offering an expert report for in that case?

A. The government of the Virgin Islands.

Q. Was the government the plaintiff or the defendant?

A. They were the plaintiff.

Q. The MTBE litigation, was that a consolidated litigation?

A. Can you tell me what "consolidated" is?

Q. It would be a whole bunch of cases that are kind of pending before one court.

MR. NIDEL: Objection to foundation.

THE WITNESS: All I can tell you is that there were ten cases that were tied together.

BY MS. KLABER:

Page 85

22 (Pages 82 - 85)

Q.  Okay.  And was that in federal court    10:47:33
in New Jersey?    10:47:38

A.  I don't know.    10:47:38

Q.  Who were you offering an expert    10:47:39
report for?    10:47:44

A.  The State of New Jersey.    10:47:44

Q.  And was the State of New Jersey a    10:47:45
plaintiff or a defendant?    10:47:47

A.  Plaintiff.    10:47:48

Q.  And what opinions were you offering    10:47:51
in the MTBE case?    10:47:59

A.  Of nonuse value losses due to    10:48:01
groundwater contamination.    10:48:09

Q.  And were you finding a loss there?    10:48:10

A.  Yes.    10:48:13

Q.  On behalf of whom?    10:48:16

A.  I think I just told you, I was doing    10:48:17
it for the State of New Jersey.    10:48:21

Q.  Were you calculating the State of    10:48:23
New Jersey's losses?    10:48:25

A.  So the citizens affected by the    10:48:28
contamination.    10:48:31

Page 86

Q.  And in the Hovensa case, what    10:48:32
opinion were you offering?    10:48:38

A.  Same thing.  The citizens affected    10:48:39
by the groundwater contamination and we also    10:48:43
did a resource equivalency analysis.    10:48:45

Q.  Sitting here, can you think of any    10:48:50
additional cases in which you have provided an    10:48:55
expert report?    10:48:59

A.  Let me go back through and think    10:49:00
about them.    10:49:13

I have done a couple air quality    10:49:22
studies in Alabama and Mississippi.    10:49:24

Q.  Were those two separate cases, or    10:49:36
one in Alabama and one in Mississippi, or is    10:49:41
that a whole number of different cases?    10:49:43

A.  Two separate cases.    10:49:46

Q.  Do you recall the names of those    10:49:49
cases?    10:49:51

A.  I do not.    10:49:52

Q.  Do you recall what opinions you were    10:49:53
offering?    10:49:55

A.  So one was -- I would have to go    10:49:56

Page 87

back and check.  Those were a while ago, and I    10:50:07
would have to go back and look at the expert    10:50:09
reports to give you a good answer.    10:50:11

Q.  Did they involve contamination?    10:50:14

A.  Yes.    10:50:16

Q.  Do you remember the source of the    10:50:17
contamination?    10:50:19

A.  One was a paper mill and the other    10:50:19
was a chemical manufacturing facility.    10:50:25

Q.  Which state was the paper mill?    10:50:32

A.  Alabama.    10:50:34

Q.  And then the chemical manufacturing    10:50:40
facility would have been in Mississippi.    10:50:42

Do you remember if you were offering    10:50:44
a report for plaintiffs or for defendants in    10:50:45
those two cases?    10:50:47

A.  Those were plaintiffs.    10:50:49

Q.  Both plaintiffs.  Do you recall the    10:50:52
time frame of those reports?    10:50:56

A.  Probably early 20-teens.    10:51:00

Q.  In how many other cases have you    10:51:07
used the Simons and Saginor meta-analysis to    10:51:15

Page 88

form your opinions?    10:51:18

A.  I think the Bethpage and West Bend    10:51:19
are the only two that I recall right off the    10:51:31
top of my head.    10:51:35

Q.  Okay.  Bethpage and the West Bend,    10:51:35
Wisconsin cases?    10:51:37

A.  Yes.    10:51:39

Q.  Were you subject to a Daubert motion    10:51:41
in either of those cases to exclude your    10:51:43
opinion?    10:51:46

MR. NIDEL:  Objection to form and    10:51:46
foundation.    10:51:48

THE WITNESS:  I don't fully know the    10:51:53
status of those cases right now to answer that    10:51:55
question.    10:51:57

BY MS. KLABER:    10:51:57

Q.  I am just asking, not the status of    10:52:00
the cases, but whether you know if a Daubert    10:52:02
motion was filed in either of those cases to    10:52:05
exclude your opinions?    10:52:09

MR. NIDEL:  Objection to form and    10:52:11
foundation.    10:52:12

Page 89

23 (Pages 86 - 89)

THE WITNESS: So I believe there was one filed in the Bethpage case and the West Bend, I have no knowledge.

BY MS. KLABER:

Q. Do you know if the Daubert filed in the Bethpage case has been ruled on?

A. I do not.

Q. Has the court accepted your opinion in the West Bend, Wisconsin case?

A. As I said, I don't know the status.

Q. Have you ever been excluded as an expert before?

MR. NIDEL: Objection to form and foundation.

THE WITNESS: I haven't been excluded, but the topic that I was asked to testify on was excluded in one case.

BY MS. KLABER:

Q. What do you mean that you haven't been excluded but the topic was excluded?

A. What I understand, that was the Duncan, Oklahoma case, and my understanding,

Page 90

not as a lawyer but as a layperson was that the topic that I was asked to testify on was not allowable under Oklahoma law.

Q. So your opinion was excluded in that case?

MR. NIDEL: Objection to form and foundation. Misstates the witness's testimony.

THE WITNESS: I am not sure of the right words, but I wasn't excluded as an expert. It was the topic that was excluded.

BY MS. KLABER:

Q. Were you permitted to testify before that court in that case?

A. It never went to court. It settled as far as I know.

Q. I'm going to show you an exhibit, please. Let me know -- you might have to refresh.

A. I hit refresh, but nothing else has popped up.

Q. It's not ready yet. That's the answer. Sorry about that.

Page 91

MS. GEARY: Okay. It has been introduced now.

(Deposition Exhibit 42 was marked for identification.)

BY MS. KLABER:

Q. Okay. So we have marked Exhibit 42. This is a decision in a case titled: "Alexander v. Halliburton Energy Services, Inc."

Is this case what you refer to as the Duncan, Oklahoma case?

A. It is.

Q. And here, we have an order on a motion to exclude. If you look at the conclusion, the very last paragraph before some bolded caps text that says: "So ordered."

It says: "The court therefore grants HGSI's motion to exclude plaintiff expert, Kevin J. Boyle, and excludes the report and opinions of Kevin J. Boyle, Ph.D."

Do you see that?

A. Yes.

Page 92

Q. Does this refresh your recollection that you have been excluded as an expert as have your opinions?

MR. NIDEL: Objection to form and foundation. Calls for a legal conclusion.

THE WITNESS: I didn't -- I can't interpret what the legal was. I only understand what the -- the lawyers just told me and, you know, the lawyers told me that the interpretation of the court was that if it was immediate, and let's -- let's say that you had a car wreck and the car was totaled, that was admissible, not something that occurred over time, like groundwater, and so it was the substance, not my expertise or the quality of the analysis.

It was what was under -- excuse me, allowed under Oklahoma law, but I can't -- I can't give you a legal opinion. That's not my area.

BY MS. KLABER:

Q. Have you seen the decision before in

Page 93

24 (Pages 90 - 93)

Exhibit 42?

A. Yes.

Q. You have. Okay.

Do you know Simons and Saginor personally?

A. What do you mean by "personally"?

Q. Have you ever met Robert Simons or Jesse Saginor?

A. I have never met Saginor, but I have had discussions with Simons.

Q. What kind of discussions have you had with Simons, with Robert Simons?

A. As two professional real estate academics, I don't remember details of what we talked about.

Q. You said you haven't met Jesse Saginor.

Does that mean you also haven't had any discussions with him?

A. That is correct.

Q. Have you ever discussed with Robert Simons his 2006 meta-analysis and model from

Page 94

his -- the Simons and Saginor article used in your report?

A. We may have. My last discussion with him was quite a while ago and I really don't remember what we discussed. I haven't talked to him in years.

Q. Approximately when would you say you last talked to him?

A. I couldn't tell you, it has been quite a while.

Q. More than ten years ago?

A. I would say somewhere between 2000 and now.

Q. Was the last time you talked to him?

A. Somewhere in the last 20 years.

Q. Okay. Do you think you have talked to him in the last five years?

A. I would doubt it.

Q. Okay. Do you know if Robert Simons or Jesse Saginor has ever used your model from the 2006 article as a basis for an expert opinion on property value diminution?

Page 95

A. I do not.

Q. Do you know if Robert Simons or Jesse Saginor has ever served as an expert witness before?

A. I do not.

Q. Are you aware of any currently pending motions to exclude your opinion filed against you in any cases, apart from the Bethpage matter that we discussed?

A. No.

Q. When were you first retained to work on this case?

A. Couple of years ago.

Q. 2021?

A. I think so, yes.

Q. Who reached out to you initially?

A. I think you asked that before. I'm not sure. You know, I can tell you I am being paid by the Lanier law firm, I talked to them, but I do not recall who reached out to me first.

Q. Have you spoken with anyone at the

Page 96

Lanier law firm --

MR. NIDEL: Objection to form.

BY MS. KLABER:

Q. -- in connection with this case?

A. I have spoken with several people at the Lanier law firm.

Q. Have you worked with anyone at the Lanier law firm prior to this matter?

A. I have not worked with anyone -- with Lanier as kind of the lead, but they may have been one of the attorneys on some cases in the past. I am just not sure.

Q. Have you worked with any other plaintiffs' counsel on this case previously?

A. Yes.

Q. Could you identify who, please?

A. David Page.

Q. And how many matters have you worked on with Mr. Page?

A. Including this one, four.

Q. Could you identify those matters, please?

Page 97

25 (Pages 94 - 97)

A. So it was a poultry case, there was the -- excuse me, the Duncan case. There was the Lazy S case, Lazy S Ranch case we talked about and this case.

Q. What was the poultry case?

A. It was a natural resource damage case for nonpoint source contamination of the Illinois River from spreading of poultry litter.

Q. And who were you offering expert opinions on behalf of in that poultry case?

A. I didn't offer an opinion.

Q. In what capacity did you work with Mr. Page on that case?

A. Mr. Page was one of the attorneys. It was multiple firms that was involved in that, and I provided advice to the attorneys.

Q. Do you recall who Mr. Page's client was in that matter?

A. I do not.

Q. Do you recall the name of this poultry case?

Page 98

A. I do not remember -- recall the exact names. I told you I file everything by the location.

Q. Do you recall the location where it was pending?

A. Legally, no. I'm not talking about physical location. I don't know what court it was in, but I think it was in Oklahoma courts.

Q. The State of Oklahoma, somewhere in the State of Oklahoma?

A. I think so.

Q. And then you mentioned that you -- I believe currently have another case with the Nidel & Nace law firm in West Bend, Wisconsin. Are there additional cases on which you have worked with anyone from the Nidel & Nace firm?

A. No.

Q. Who is your primary contact for your work as an expert on this matter?

MR. NIDEL: Objection to form.

THE WITNESS: I don't know if there

Page 99

is a primary contact that -- attorneys appear to work as a team.

BY MS. KLABER:

Q. Okay. Which attorneys do you generally have contact with for this matter?

A. So the three at this table, and David, who you talked about, and Ryan from the Lanier firm.

Q. And when you were retained, what were you asked to do in this case?

A. I do not recall the initial discussion, but, you know, where my report is, it's looking at property value damages.

Q. Do you recall if the scope of your work changed at any point from your initial retention to when you offered your report?

A. I don't know that the scope changed. It's that I learned more about what the case was as we proceeded.

Q. So what was your -- when you were retained, what was your understanding of what you were being retained to do?

Page 100

MR. NIDEL: Objection to form. Asked and answered.

THE WITNESS: I do not -- do not recall that initial discussion specifically at this -- at this time.

BY MS. KLABER:

Q. You don't recall what you were retained to do in this matter?

MR. NIDEL: Objection to form. Misstates the witness's testimony.

THE WITNESS: I don't recall -- you started out with the initial -- my initial contact and I don't recall what that discussion was at that time, and I don't think that from that discussion, I understood the parameters of the case at that time. That that understanding evolved through time. I don't think things changed. It is just that I learned more as we moved forward.

BY MS. KLABER:

Q. I think maybe I have confused you in some manner by asking first, you know, what you

Page 101

26 (Pages 98 - 101)

were initially asked to do and later asking what you were retained for.

So ignoring the initial conversation you had because I understand you don't remember the contents of that actual conversation, what is your understanding of what you have been retained to do in this case?

A. I think I have answered that too. It's my understanding now is that I have asked to estimate the property value damages associated with the properties proximate to the source of the groundwater contamination plume.

Q. And was there some point where you were asked to do something other than that --

A. No.

Q. -- in this case?

And just to make sure I understand your testimony, the nature of your work didn't necessarily change, you simply gained additional information about what you were to do; is that accurate?

MR. NIDEL: I'm going to object. I

Page 102

mean, I let the questions go. If you are asking him what he talked to the lawyers about --

MS. KLABER: That's not what I asked. I am asking him about his understanding.

MR. NIDEL: You didn't let me finish. You are asking -- you are asking what he was asked to do.

You can ask what he was asked to do for his report and what opinions he provided in his report, but to the extent that he had conversations with the lawyers, I don't think you can ask about that.

MS. KLABER: So my particular question was that -- I understood from his testimony that he wouldn't say the nature of his engagement or the work he was asked to do changed at any point in time, just that he came to understand additional information about the case and what he would be doing.

I don't believe that implicates any

Page 103

communications with counsel, and it was just a yes or no question, if that accurately summarizes.

MR. NIDEL: Asking him what he was asked to do, if that is not what he is offering an opinion on, does implicate his conversations with counsel. I don't know that there is anything there, but I don't think it's a proper question.

And so to the extent that he is relying on conversations with counsel about something that wasn't an opinion disclosed in his report, he shouldn't be asked about it, and he shouldn't be testifying about it.

BY MS. KLABER:

Q. Again, I have not asked you about any conversations with counsel, so without telling me the contents of any conversations with counsel, is it correct that your -- the nature of your assignment on this case changed over time?

MR. NIDEL: Objection to form, and

Page 104

again, the nature of your assignment, the assignment comes from counsel. You are asking specifically --

MS. KLABER: Right. It's a yes or no question.

MR. NIDEL: Yeah, but you are asking about the assignment.

MS. KLABER: I am not. He would not be revealing any communications with counsel by answering a yes or no question.

MR. NIDEL: Yes, he would be, and to the extent that he is relying on --

BY MS. KLABER:

Q. Are you able to answer that question as a yes or no?

MR. NIDEL: I mean, he can answer the question, because I don't -- but we are not waiving privilege and --

MS. KLABER: I would not consider it a privilege waiver at all.

THE WITNESS: I was never asked to do A and then told to do B.

Page 105

27 (Pages 102 - 105)

BY MS. KLABER:    11:08:39

Q.    Okay.  Are all of the materials that    11:08:39 you have reviewed, considered and relied upon    11:08:48 in forming your opinions cited in your report?    11:08:50

A.    To the best of my recollection, yes.    11:08:54

Q.    And would that include anything    11:08:58 provided to you by counsel for the plaintiffs?    11:09:00

A.    Can you ask -- can you ask that    11:09:03 question again, please.    11:09:17

Q.    If plaintiffs provided you with any    11:09:18 materials or information for your report, would    11:09:24 that be cited in your report or your reliance    11:09:28 materials?    11:09:32

MR. NIDEL:  Objection to form.    11:09:32

THE WITNESS:  So by "plaintiffs," do    11:09:33 you mean the Behars?    11:09:34

BY MS. KLABER:    11:09:37

Q.    Plaintiffs' counsel.    11:09:37

MR. NIDEL:  Objection to form.    11:09:41

THE WITNESS:  I -- you know, I    11:09:43 didn't -- you know, the -- for example, the    11:09:51 information, you know, Laton's report was    11:09:57

Page 106

provided to me through counsel.  Kram's report    11:09:59 was provided to me through counsel.  Those are    11:10:06 the ones I am remembering right now.    11:10:09

BY MS. KLABER:    11:10:11

Q.    And those are cited in your report;    11:10:11 is that right?    11:10:11

A.    Yes.    11:10:14

Q.    Did you receive anything from the    11:10:14 Behar plaintiffs directly?    11:10:16

A.    I received nothing from the Behars.    11:10:18

Q.    Did you have any discussions with    11:10:21 the Behars?    11:10:23

A.    I believe I met the Behars, never    11:10:24 had any discussions with them.    11:10:28

Q.    I'm sorry.  Did you say you believe    11:10:30 you met the Behars?    11:10:32

A.    Yes.    11:10:33

Q.    But you never had any discussions    11:10:34 with them?    11:10:35

A.    No.  I believe I was in the same    11:10:35 room with them one time.    11:10:37

Q.    When were you in the same room with    11:10:38

Page 107

them?    11:10:40

A.    When I went out on a site visit to    11:10:41 see the area.    11:10:45

Q.    When was that?    11:10:45

A.    I don't remember, but it was    11:10:51 probably late '21 or early '22, somewhere in    11:10:57 that range.    11:11:01

Q.    And were you particularly introduced    11:11:03 to the Behars?    11:11:06

A.    No.    11:11:07

Q.    You just believe you were sitting in    11:11:08 the same room at some point?    11:11:11

A.    Yeah.    11:11:12

Q.    Okay.  You mentioned that you    11:11:13 received the reports of Dr. Kram and Dr. Laton.    11:11:19 Did you review any of plaintiffs'    11:11:23 other experts' reports submitted in this    11:11:26 matter?    11:11:28

A.    I do not believe I saw any other    11:11:29 expert reports from the plaintiffs.    11:11:38

Q.    You don't believe you saw the report    11:11:42 of Jill Ryer-Powder in this case?    11:11:44

Page 108

A.    I don't believe I did.    11:11:48

Q.    Do you know if you cite to her in    11:11:49 this -- in your report?    11:11:54

A.    I do not think I do, but perhaps.  I    11:11:55 can't remember right now.    11:11:58

Q.    If you do cite to Jill Ryer-Powder    11:11:59 in your report, are you doing so without having    11:12:03 reviewed her report?    11:12:08

MR. NIDEL:  Objection to form.    11:12:10

THE WITNESS:  I don't see her in my    11:12:12 references, but right now, I don't remember    11:12:13 citing her and I don't remember seeing her    11:12:16 report right now.    11:12:18

BY MS. KLABER:    11:12:19

Q.    If you come to remember that you did    11:12:19 see her report at some point in time, you can    11:12:24 update us and let us know, but I will assume at    11:12:27 this point you have not seen Dr. Ryer-Powder's    11:12:30 expert report in this case.    11:12:34

Did you have any discussions with    11:12:38 any of plaintiffs' other experts in this case?    11:12:39

A.    No.    11:12:42

Page 109

28 (Pages 106 - 109)

Q. You noted that Dr. Laton's firm provided you with information for your report. Who were you in contact with there?

A. So that information was provided through counsel and it was the diagram of the plume and also distance of properties to the source of the contamination.

Q. Did you obtain any similar information -- well, let's strike similar. Did you obtain any information from Dr. Kram or those that he works with for your report?

A. So likewise, there was -- excuse me, Dr. Kram's report was provided to me and I don't think there was any other specific information from Dr. Kram that was included in my report, right now off -- off the top of my head.

Q. When -- let's start with Dr. Laton. When was the information that you described from Dr. Laton or his firm provided to you?

Page 110

MR. NIDEL: Objection to form.

THE WITNESS: I do not recall specifically but I would say most of the information was passed on in -- in 2023.

BY MS. KLABER:

Q. Prior to authoring your report, your --

A. Yes.

Q. Let me ask a more specific question. Were you provided with that information from Dr. Laton or those he works with prior to authoring your September 27, 2023 report?

A. The information was received prior to the 27th report.

Q. What about with respect to Dr. Kram, anything you received from Dr. Kram, when did you receive that information?

MR. NIDEL: Objection to form.

THE WITNESS: It would have been received prior to the authoring of my report.

BY MS. KLABER:

Page 111

Q. Have you ever seen a draft form of either Dr. Laton's or Dr. Kram's reports?

A. I do not believe I saw a draft form.

Q. So you have --

A. It could have been. I don't know whether the report I had was draft or final. I would believe it was final but I don't know that for sure.

Q. Ultimately, in your report, are you citing to the final versions of Dr. Laton's and Dr. Kram's reports?

A. Yes.

Q. Did you ever see more than one version, apart from what you have cited to in your report, of Dr. Laton's and Dr. Kram's reports?

A. I think I just saw one -- one version. The information that was provided to me when I was doing my report was pieces of information from -- from their reports.

Q. Have you seen their full reports or just the pieces of information you were

Page 112

provided?

A. No, I have seen -- I have seen their full reports.

Q. Did plaintiffs' counsel provide you with any facts, data or assumptions that you relied upon in forming your opinions in this case?

A. Not that I can recall, other than, you know, providing information from Laton and Kram.

Q. Did you ever visit the proposed class area in this case?

A. I did.

Q. When did you visit?

A. I already answered that, I think late '21, early '22, somewhere in that range.

Q. And when you were visiting the class area, what was the purpose of that visit?

MR. NIDEL: Objection to form.

THE WITNESS: So the main purpose from my perspective was to get an understanding of the -- of the, you know, kind of where the

Page 113

29 (Pages 110 - 113)

contamination site was, what the neighborhoods and properties looked like throughout the area.

BY MS. KLABER:

Q.   And how did you do that?

MR. NIDEL:  Objection to form.

THE WITNESS:  We drove around the area.

BY MS. KLABER:

Q.   Have you ever visited the Behars' home?

A.   I have not visited the Behars' home, but I have driven by the Behars' home.

Q.   Have you ever visited the 8020 Deering site?

A.   I have driven by that site.

Q.   How much time would you say you spent preparing your September 27, 2023 expert report?

A.   I don't have that number off the top of my head.

Q.   Would it be reflected in the invoices you have produced?

Page 114

A.   It would be reflected in the invoices.

Q.   Does your September 27, 2023 report contain all the affirmative opinions you intend to offer in this case?

A.   I have opinions in there and then I have clarifying opinions in my rebuttal report.

Q.   So your rebuttal report contains clarifications to your affirmative opinion?

A.   Yes.

Q.   Would you consider those additional affirmative opinions?

MR. NIDEL:  Objection to form. Calls for a legal conclusion.

THE WITNESS:  What to you mean by "additional"?

BY MS. KLABER:

Q.   Are you offering -- so I understand that you describe your rebuttal report as clarifying affirmative opinions.

Does that mean that your September 27, 2023 report contains all of your actual

Page 115

affirmative opinions and there are no additional affirmative opinions in your rebuttal report?

MR. NIDEL:  Objection to form and foundation.  Calls for a legal conclusion.

THE WITNESS:  There are no new opinions in my rebuttal.  They only clarify the opinions that were in the expert report.

BY MS. KLABER:

Q.   What did you do to prepare for your deposition today?

A.   I went back through my reports.  I went through the reports of Pitts and Eisfeldt. I went through their depositions and I also met with counsel.

Q.   Who did you meet with, which counsel did you meet with?

A.   The three that are present at the table today.

Q.   And when did you meet?

A.   Yesterday.

Q.   Just the one time or any additional

Page 116

times?  Did you either speak with them over the phone to prepare or meet in person?

A.   Yesterday was the preparation day.

Q.   And there were no additional preparation sessions by phone; is that correct?

MR. NIDEL:  Objection.  Asked and answered.

THE WITNESS:  So no additional preparations with counsel, is that what you are asking?

BY MS. KLABER:

Q.   Correct.

A.   No.

Q.   How long would you say you met with counsel yesterday to prepare?

A.   I don't know.  Four-plus hours.

Q.   Did you speak with anyone other than counsel in preparation for your deposition today?

A.   Not that I can recall.

Q.   You identified the reports, the expert reports of Jennifer Pitts and Andrea

Page 117

30 (Pages 114 - 117)

Eisfeldt as well as their deposition transcripts.

Q. Were there any other documents you reviewed to prepare for your deposition today?

A. Not that I can recall.

Q. Did anyone tell you what to say in your deposition today?

A. No.

Q. Did anyone tell you how to testify with regard to any particular question or issue in your deposition today?

A. No.

Q. Did anyone tell you that there were things you should not say in your deposition today?

A. No.

MS. KLABER: I think this would be a good breaking point for about ten or so minutes. Go off the record.

THE VIDEOGRAPHER: This marks the end of Media Unit No. 3. Going off record. The time is 11:22 a.m.

Page 118

(A short recess was taken.)

THE VIDEOGRAPHER: This marks the beginning of Media Unit No. 4. Going back on record. The time is 11:37 a.m.

BY MS. KLABER:

Q. Dr. Boyle, do you offer any opinions as to the cause or source of the groundwater contamination plume in Canoga Park?

A. I do not.

Q. Looking at Exhibit 42 -- I'm sorry, is it 41? Your expert report.

Exhibit 41, your expert report, on Page 4, I am looking at the paragraph right under the bolded heading: "Northrop Grumman Site."

A. Hang on just a second. I was trying to open it there. On Page 4?

Q. Yes, whatever is more convenient.

A. Yeah, I will just ignore that.

Okay. Go ahead.

Q. So on Page 4 of Exhibit 41, you have this paragraph. It reads: "Past manufacturing

Page 119

operations by Northrop Grumman entities at 8020 Deering Avenue, Canoga Park, California (the site) resulted in a groundwater contamination plume that is migrating in a southeasterly direction as shown in Figure 1."

Do you see that?

A. I do.

Q. What support do you have for that opinion? I don't see a citation there.

A. So the citation is with Figure 1, source Earthforensics, and so I am relying upon the information provided by Drs. Laton and Kram which are -- that sentence continues into the next sentence and it says: "Documented in Laton and Kram expert reports."

Q. Okay. So you didn't do any independent work to support that opinion; is that right?

A. No, I am relying on the other plaintiff experts.

Q. Okay. So you also state in this same paragraph: "The California Office of

Page 120

Environmental Health Hazard Assessment and the U.S. Environmental Protection Agency indicate that exposure to TCE can have significant health impacts."

Do you see that --

A. Yeah.

Q. -- portion of the sentence?

Are you offering any opinions as to the potential health impacts from TCE in this case?

A. No, I am not.

Q. Where did you get the information contained in what we just read, as I don't see the citation.

A. It does say: "Expert reports of Kram and Powder," and that does prompt my memory, that the information on Powder came through from counsel.

Q. Do you -- did you see Dr. Ryer-Powder's report?

A. I would have to go back and look.

Q. What did you mean when you said,

Page 121

31 (Pages 118 - 121)

"the information from Powder came through from  11:39:48
counsel"?  11:39:52

A.  As I was putting together my report,  11:39:52
the information was provided to me through  11:39:56
counsel or in conversations in -- in Zoom  11:40:04
meetings or some other type of online meeting  11:40:19
where I received the information.  11:40:21

Q.  So you may not have seen Dr.  11:40:23
Ryer-Powder's report but the information from  11:40:26
her report would have been conveyed to you  11:40:27
through counsel; is that correct?  11:40:31

A.  That is correct.  11:40:32

Q.  And you haven't done any independent  11:40:33
study or analysis of the potential health  11:40:41
impacts from TCE at the levels present in this  11:40:43
case; is that correct?  11:40:46

A.  That's not within my area of  11:40:47
expertise.  11:40:49

Q.  So is that a yes, you have not done  11:40:50
any independent study or analysis of the  11:41:01
potential health impacts of TCE at the levels  11:41:03
present in this case?  11:41:07

Page 122

MR. NIDEL:  Objection to form.  11:41:08
Asked and answered.  11:41:09

THE WITNESS:  I have -- I have not.  11:41:11
My opinion is on property values and I have not  11:41:12
provided an opinion on those matters.  11:41:14

BY MS. KLABER:  11:41:16

Q.  On Page 5 of your report, Exhibit  11:41:18
41, you include a figure from Earthforensics,  11:41:21
Inc., which purports to denote the boundaries  11:41:26
of the groundwater contamination plume.  11:41:29

Did you have any role in creating  11:41:31
this figure?  11:41:33

A.  I did not.  11:41:34

Q.  Do you know who created this figure?  11:41:35

A.  I do not.  11:41:38

Q.  Did you do any independent analysis  11:41:39
of the boundaries in this figure?  11:41:45

A.  I did not.  11:41:47

Q.  Do you know if this figure is  11:41:47
intended to show the proposed class area?  11:41:49

A.  That is my understanding, that this  11:41:51
figure shows properties that are the located  11:41:53

Page 123

fully or partially over the groundwater  11:41:57
contamination plume.  11:42:01

MS. KLABER:  Let's see.  I am going  11:42:02
to mark another exhibit.  This will be Exhibit  11:42:03
43.  11:42:09

(Deposition Exhibit 43 was marked  11:42:09
for identification.)  11:42:11

BY MS. KLABER:  11:42:11

Q.  And it will take a minute to come  11:42:13
through.  11:42:19

Are you able to see Exhibit 43?  11:42:33

A.  Yep.  11:42:39

Q.  This is a copy -- Exhibit 43 is a  11:42:41
copy of the plaintiffs' second amended  11:42:45
complaint in this action.  11:42:47

Have you seen this document before?  11:42:49

A.  I have.  11:42:51

Q.  Can you turn to page -- it's  11:42:52
numbered Page 11 of the complaint.  I believe  11:42:58
it would be Page 14 of the PDF.  11:43:01

A.  Okay.  Hang on.  11:43:03

Q.  Just let me know when you are there.  11:43:08

Page 124

A.  You said Page 14?  11:43:14

Q.  It would be 14 of the PDF, and I  11:43:16
believe numbered Page 11, if you look at the  11:43:18
page numbers at the bottom.  11:43:20

A.  Sometimes this is very sensitive and  11:43:28
sometimes it's not sensitive at all.  11:43:31

Q.  If you click --  11:43:38

A.  It says:  "Adequacy," Item No. 50?  11:43:39

Q.  No.  11:43:43

A.  That's 14.  11:43:44

Q.  There should be a map right at the  11:43:45
top.  11:43:47

A.  Okay.  Yeah.  11:43:47

Q.  It's above Paragraph 42.  11:43:48

Do these arrows change the page?  11:43:54
No.  11:43:57

A.  Okay.  Yeah, I see it now.  11:43:59

Q.  Okay.  So you see a map here in the  11:44:00
second amended complaint --  11:44:05

A.  Yeah.  11:44:06

Q.  -- Exhibit 43, labeled:  "Affected  11:44:07
Class Area."  11:44:10

Page 125

32 (Pages 122 - 125)

Do you see a long -- kind of the middle western boundary, there is a right angle on that map?

A.  Yes.

Q.  And that right angle is omitted from the class area -- or the map you understand to represent the class area in Figure 1 of your report; is that right?

A.  Yes.

Q.  Why is that?

MR. NIDEL:  Objection to form and foundation.

THE WITNESS:  What do you mean by "why is that"?

BY MS. KLABER:

Q.  What is your understanding of why there is no right angle outcropping in kind of the middle western boundary of the proposed class area in your report versus the second amended complaint?

MR. NIDEL:  Objection to form and foundation.  Calls for a legal conclusion.

Page 126

THE WITNESS:  I have -- I have no knowledge of the differences between those two.

BY MS. KLABER:

Q.  Did you have any role at all in developing the map that we are looking at in Exhibit 43, the second amended complaint?

A.  No.

Q.  Have you ever compared the map in the second amended complaint signifying the proposed class area to the map in Figure 1 of your report previously?

A.  I have not compared the two of them.

Q.  So you have no understanding of why the area looks different in this figure that I believe is from Dr. Kram; is that accurate?

A.  I do not know why the two look different.

Q.  Do you know Richard Laton?

A.  I know him professionally through, like, working on this case, but I don't know him personally.

Q.  Have you met with him in connection

Page 127

with this case?

A.  I have not met with him individually.

Q.  Have you met with him with counsel?

A.  I have met with him with counsel.

Q.  Have you worked with Dr. Laton on any other cases in the past?

A.  I believe that Dr. Laton may have worked on some other cases that I have worked on.

Q.  Which cases do you believe he has worked on that you two have worked on?

A.  I don't recall at this time.  I know that I have encountered him before.  I don't recall what case at all.

Q.  Do you recall if you were working on the same side of the case, meaning for plaintiffs or for defendants, or if you were opposing experts or on opposing sides?

A.  I think we were on the same side.

Q.  Looking at Page 8 of your report, the very bottom of the page, you opine that:

Page 128

"Knowledge of groundwater contamination is not common knowledge to home sellers and home buyers."

Do you see that?

A.  Yeah, I am trying to get to Page 8.

Q.  Oh, you are not there?

A.  Yes, okay.  Yes, I see it now.

Q.  What do you mean by "common knowledge"?

A.  When I was doing this, I went out and looked and kind of thought, what is the average person going to do if they are just trying to find information to sell and buy, so I, you know, tried Google and, you know, the searches that, you know, kind of a person would use to go look and just did not pick up anything that would be out there generally accessible to a person searching for information if they had any concern or wanted to know if there was a worry.

Q.  So to you, common knowledge means available through Google searching; is that

Page 129

33 (Pages 126 - 129)

correct?

MR. NIDEL: Objection to form.

THE WITNESS: No. I am just saying that's the method that I used.

BY MS. KLABER:

Q. Okay. So could you explain what you mean by common knowledge. How do you define that term?

MR. NIDEL: Objection to form.

THE WITNESS: So what I am looking at is what a person that is searching for information may easily find if they went out and were -- wanted to know if there was any type of concern, you know.

For example, we -- we had a property, that house that we owned before this, that we sold, and there was a natural gas pipeline proposed in the area, and it was nothing that I had to reveal as a homeowner at the time, but I wanted to know if somebody was coming in and thinking about buying, what -- what type of information would they find so,

Page 130

you know, online searches is one of the ways that people do it.

So it's not how you define common knowledge. There's a process where you go out and see if you can find anything and, you know, honestly, it didn't -- it didn't, you know, for this case, it didn't show up anything.

BY MS. KLABER:

Q. So I am trying to determine how you decide whether or not something is common knowledge, and how I understand you're saying it's not about defining it, but I would like to know your definition.

When does something become common knowledge to you, as you use the term in your report?

A. If you use information in the peer-reviewed literature and I have cited ones there in my report and my rebuttal, it's when there is a disclosure that the sellers need to reveal to the buyers.

Basically, what's been found in the

Page 131

research is asymmetric information between buyers and sellers. Sellers generally have to have more information than the buyers do in these cases and, you know, if they are not required, then it's buyer beware, and so the effect only takes place when it becomes to the point that the sellers need to provide the information to the buyers.

Q. So to make sure I understand that, is your definition of common knowledge for purposes of your report here, something that becomes required -- something that is required to be disclosed in a property transaction?

A. It is required to be disclosed and there are sources where they -- the buyer can gain more information that is easily accessible to them.

Q. Once they have the disclosure or separate from the disclosure?

A. Both.

Q. And so then how do you define that the buyer can gain more information that is

Page 132

easily accessible? What does that mean?

A. I think that's what I told you, you know, the common way that the typical person looks for information is through online search engines and going out and looking and seeing if they can find anything that might be a concern or might be of benefit to them when they are doing it.

Q. And how do you -- strike that.

When you were attempting to do that and performing the Google searches that you referenced, what did you search for, what search terms did you use to locate information?

A. You know, I don't remember all of them but, you know, I used the address, I used --

Q. The address of what?

A. Of the former Northrop Grumman site.

I used groundwater contamination. I used a variety of different ones. It was quite a while ago so I don't remember specifically the words right now at this time.

Page 133

34 (Pages 130 - 133)

Q. Do you have any record of the searches that you performed?

A. I do not.

Q. When you say you used "groundwater contamination," did you use that in conjunction with other search terms to narrow results to the Canoga Park area?

A. I don't remember exactly, but I likely -- likely did, because when I do searches, I often do individual and compound searches.

Q. How would you as an expert determine whether individuals are using appropriate search terms to locate information?

MR. NIDEL: Objection to form.

THE WITNESS: I didn't offer an opinion of whether people use appropriate search terms.

BY MS. KLABER:

Q. I am just trying to understand, since you said performing your own searches on Google is a way to determine whether

Page 134

information is common knowledge or readily accessible, that assumes that anyone searching would be doing the exact same searches as you, doesn't it?

A. That -- they could be, or they could be doing similar ones, you know, that you just use terms that people might be -- be thinking about or using so you use common -- common language terms and, you know, for example, when you do groundwater, you can do groundwater, it hits one word which is now accepted, a lot of people do groundwater as two words, you can do environmental contamination. There is a number of ones that you could do to get a sampling and an idea.

Q. And would you originate all of those search terms in this context yourself, or would you kind of source opinions from others to see what generally people other than yourself might string together in performing a search for information about, in this case, groundwater contamination in Canoga Park?

Page 135

A. I did it myself, but I can say that it's not just personal. I mean, I have got a lot of experience working with this and my research and other applications through time, so I think I have, you know, broad common knowledge to go with it too.

Q. Do you have a definition for common knowledge outside of the real estate transaction context?

A. I am only testifying within the real estate context and, you know, in terms of property values, where the literature is quite clear, is that the effects become manifested and that's, you know, what you would consider common knowledge when there is the disclosure.

Q. Okay. So anytime we see the term common knowledge in your affirmative report or your rebuttal report, we should interpret that to mean that the information is required to be disclosed by a seller in a real estate transaction and that one could then also independently search the Internet for

Page 136

additional information?

MR. NIDEL: Objection to form.

BY MS. KLABER:

Q. Is that accurate?

MR. NIDEL: Objection to form.

THE WITNESS: Can you just re-ask the question again, please.

MS. KLABER: Could the court reporter please read the question back.

(The record was read as requested.)

THE WITNESS: So there is a lot to that, but when the -- when the seller -- the literature would show that when the seller has to disclose, that's a sufficient condition for common knowledge to occur, and that's manifested in what has been demonstrated in terms of price diminutions in properties when there is contamination.

BY MS. KLABER:

Q. So when we read the term common knowledge in either of your reports, is that the definition we should read the term with,

Page 137

35 (Pages 134 - 137)

that you just provided?    11:56:42

THE WITNESS:  Read that back to me.    11:56:49

(The record was read as requested.)    11:57:06

THE WITNESS:  Can you just try    11:57:10
rephrasing that question a little bit more    11:57:11
clearly, please.    11:57:14

BY MS. KLABER:    11:57:15

Q.   I'm going to read you what you said,    11:57:15
and then I will ask my question again.    11:57:16

So you testified -- so there is a    11:57:18
lot to that but when the seller -- the    11:57:25
literature would show that when the seller has    11:57:28
to disclose, that's a sufficient condition for    11:57:29
a common knowledge to occur and that's    11:57:32
manifested in what has been documented in terms    11:57:35
of price diminutions in properties when there    11:57:38
is contamination.    11:57:41

So with that statement in mind, is    11:57:42
that -- when we read the term common knowledge    11:57:45
in either of your reports, is that the meaning    11:57:48
we should be giving the term?    11:57:51

A.   So I had the important word in    11:57:53

Page 138

there, that is sufficient, so that -- that is    11:57:55
-- is enough when it's there.  It can also    11:58:00
occur when there is other types of information    11:58:04
put out there.  You know, for example, when a    11:58:10
class is certified, the property owners would    11:58:12
be notified, there'd be publicity of it, you    11:58:18
know, like many class action suits.    11:58:22

You see things on TV in the news and    11:58:24
what have you, so it can occur in other ways    11:58:26
too, but we know that when sellers are    11:58:29
revealing, that that's sufficient but there are    11:58:32
other ways that it can occur as well.    11:58:35

Q.   Do you have a definition of common    11:58:38
knowledge?    11:58:40

A.   I think I have just given it to you.    11:58:42

Q.   I think you have given me some    11:58:45
examples of how it can occur.  I am wondering    11:58:47
if there is a broad definition for the term.    11:58:50

A.   So --    11:58:53

MR. NIDEL:  Objection to form.    11:58:55
Asked and answered.    11:58:56

THE WITNESS:  For me, there is    11:58:57

Page 139

knowledge that is available to the buyer and    11:58:59
the seller in the market so that they can make    11:59:03
informed decisions.    11:59:08

MS. KLABER:  I am going to introduce    11:59:10
another exhibit.  This will be Exhibit 44.    11:59:16

(Deposition Exhibit 44 was marked    11:59:22
for identification.)    11:59:23

BY MS. KLABER:    11:59:23

Q.   While we are waiting for that, I    11:59:33
will ask you:  Do you know what definition    11:59:38
Simons and Saginor used for the term common    11:59:41
knowledge in their study?    11:59:44

A.   I don't recall.    11:59:45

Q.   Okay.    11:59:47

A.   Also, it looks like I might have    11:59:48
lost stuff here on the computer.  It's your    11:59:51
jobs, Davis versus Lumina, Behar.    11:59:56

Q.   Sorry.  Excuse me?    12:00:04

THE COURT REPORTER:  He is out of    12:00:06
Exhibit Share.    12:00:07

THE WITNESS:  It logged me out.    12:00:07

MS. KLABER:  Can we log back into    12:00:11

Page 140

Exhibit Share, please.  Maybe we can go off the    12:00:13
record for a moment while we figure it out.    12:00:16

THE VIDEOGRAPHER:  This marks the    12:00:19
end of Media Unit No. 4.  Going off the record.    12:00:20
The time is 12:00 p.m.    12:00:22

(A short recess was taken.)    12:00:24

THE VIDEOGRAPHER:  This marks the    12:07:10
beginning of Media Unit No. 5.  Going back on    12:07:27
record.  The time is 12:07 p.m.    12:07:30

BY MS. KLABER:    12:07:32

Q.   We have introduced Exhibit 44.  This    12:07:32
is an article titled:  "A meta-analysis of the    12:07:39
effect of environmental contamination and    12:07:42
positive amenities on residential real estate    12:07:46
values," authored by Robert A. Simons and Jesse    12:07:49
D. Saginor.    12:07:53

Do you see that?    12:07:53

A.   I do.    12:07:54

Q.   And this is the meta-analysis that    12:07:54
serves as the basis for your opinion in this    12:07:57
case; is that correct?    12:07:58

A.   It's part of the basis for my    12:08:00

Page 141

36 (Pages 138 - 141)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

opinion.    12:08:02

Q.   Can you please look at Page 78.    12:08:02 This will be numbered Page 78 from the top left    12:08:07 corner in Exhibit 44.    12:08:11

Just let me know when you are there.    12:08:25

A.   I am on 78.    12:08:36

Q.   Okay.  So I am looking at the middle    12:08:38 paragraph on the page.    12:08:41

The middle of that paragraph states:    12:08:43 "Common knowledge refers to the obvious.  Most    12:08:47 people can see a nuclear power plant or large    12:08:50 industrial plant or understand the source of    12:08:54 noise from an airport or railroad in their    12:08:56 backyards.  Additionally, an explosion or    12:08:58 similar sudden event is also considered common    12:09:01 knowledge."    12:09:04

Do you see that?    12:09:05

A.   Yes.    12:09:05

Q.   You are not using the same    12:09:05 definition of common knowledge as Simons and    12:09:07 Saginor used in creating their model; is that    12:09:10 correct?    12:09:13

Page 142

MR. NIDEL:  Objection to form.    12:09:13

THE WITNESS:  So that -- I think    12:09:14 there is two parts of it.  First of all, that    12:09:17 common knowledge refers to one variable, not    12:09:26 their entire model, and -- and it also -- it's    12:09:32 also the information variable and they say    12:09:38 captures the amount of media or other public    12:09:43 exposure received regarding the source of    12:09:46 contamination.    12:09:48

And then they had this dummy that    12:09:50 had three classifications, called common    12:09:56 knowledge, announcement of a bad thing and    12:09:58 announcement of closing, so common knowledge is    12:10:01 one element of it, and it is not the basis of    12:10:05 their entire model.    12:10:09

And I am using a different one    12:10:13 because there are differences between an    12:10:16 explosion that people can see and groundwater    12:10:24 contamination that they cannot -- cannot see,    12:10:29 and so, you know, for example, in the modeling    12:10:32 that has been done of air pollution in Southern    12:10:36 California, it's been shown that it affects    12:10:44

Page 143

property values.    12:10:46

You can't see that small particulate    12:10:47 but there are air quality index information    12:10:50 that is put out on a regular basis to the    12:10:56 public, and so in things like air pollution,    12:10:59 groundwater pollution, you need to have some    12:11:03 way that there is a signal because people can't    12:11:05 see the contamination of the water in the area.    12:11:09

BY MS. KLABER:    12:11:13

Q.   Thank you.  You anticipated my    12:11:13 question exactly.  I was going to say, you    12:11:15 know, given that Simons and Saginor's    12:11:18 definition of common knowledge seems to be    12:11:20 something people can observe with their senses    12:11:23 or, you know, we saw the other component, a    12:11:25 sudden event, it does not seem that the    12:11:27 groundwater contamination alleged in this case    12:11:33 could ever fit the Simons and Saginor    12:11:35 definition of common knowledge; is that    12:11:38 correct?    12:11:39

A.   So they are talking about a very    12:11:40 specific case of common knowledge, that -- and    12:11:42

Page 144

how they defined a variable, so that they were    12:11:45 -- they were talking about when it's visible    12:11:48 evidence.  That does not mean that common    12:11:50 knowledge doesn't apply to other ones or that    12:11:53 they would not use it in other cases if there    12:11:55 was other information put on before, and when    12:12:01 you are looking at, it's the information    12:12:07 variable and so, you know, I am using their --    12:12:10 their category of announcement of bad things    12:12:17 when there is that media information or other    12:12:21 communication of the information out there.    12:12:23

Q.   Yeah, and I understand that is    12:12:26 something different.  We will get into that    12:12:28 separately.    12:12:30

Have you conducted any analysis as    12:12:31 to what information has been disseminated in    12:12:33 Canoga Park related to the contamination?    12:12:36

MR. NIDEL:  Objection to form.    12:12:42

THE WITNESS:  So I went out and --    12:12:43 and looked at what was available.  I also am    12:12:48 aware that there is information that has been    12:12:52 put out by the company and I believe the state.    12:12:57

Page 145

37 (Pages 142 - 145)

BY MS. KLABER:   12:13:05

Q.   When you say you went out and looked at what information has been put out or you looked at what was available, is that a reference to the Google searching?   12:13:05 12:13:07 12:13:12 12:13:13

A.   Yes.   12:13:15

Q.   And then separately, you say you are aware there is information that has been put out by the company and the state.   12:13:16 12:13:19 12:13:21

Have you analyzed that information?   12:13:24

MR. NIDEL:  Objection to form.   12:13:27

THE WITNESS:  What do you mean by -- by "analyzed"?   12:13:27 12:13:29

BY MS. KLABER:   12:13:29

Q.   Have you reviewed that information and looked at its contents and analyzed what was contained and when things were sent, things of that nature?   12:13:29 12:13:31 12:13:37 12:13:40

MR. NIDEL:  Objection to form.   12:13:41

THE WITNESS:  And look -- in response to the Pitts' and Eisfeldt's comments, I went through and reviewed all of that   12:13:44 12:13:44 12:13:52

Page 146

information.   12:13:55

BY MS. KLABER:   12:13:56

Q.   So in preparing your September 27, 2023 report, Exhibit 41 here, you had not looked at the information that was sent by Northrop Grumman and the state with respect to the groundwater contamination in Canoga Park; is that correct?   12:13:56 12:14:00 12:14:04 12:14:09 12:14:11 12:14:11

A.   I was aware that there was information like that, but what I -- the question I asked is, if someone was going out as a layperson just looking, would they find that -- that information, and the conclusion I came to was that they would not easily find that information.   12:14:14 12:14:16 12:14:19 12:14:22 12:14:25 12:14:28 12:14:30

That is consistent with what I had seen in the literature, is that it has to be out there in some way that it's being communicated to the -- specifically the buyers, but also to the sellers so that they know their obligation, that there was nothing out there that I could find that suggested that people,   12:14:33 12:14:35 12:14:38 12:14:40 12:14:46 12:14:53 12:14:55

Page 147

just looking generally would get to that information, and then when I looked at it in more detail, in response, it only affirmed my conclusion.   12:14:57 12:15:00 12:15:03 12:15:07

Q.   My question was a bit different and a lot more simple so I will ask it again.  It is just a yes or no.   12:15:08 12:15:11 12:15:14

In preparing your September 27, 2023 report, which is Exhibit 41 here, you had not looked at the information that was sent out by Northrop Grumman and the state with respect to the groundwater contamination in Canoga Park; is that correct?   12:15:15 12:15:19 12:15:22 12:15:26 12:15:28 12:15:28

A.   I was aware of it but I had not reviewed it.   12:15:32 12:15:35

Q.   Have you reviewed the GeoTracker website related to the 8020 Deering site?   12:15:36 12:15:46

A.   I have looked at it.   12:15:51

Q.   What did you review on the GeoTracker website?   12:15:52 12:15:55

A.   I basically went down through the different entries and looked at what was   12:15:58 12:16:01

Page 148

available for the entries.   12:16:03

Q.   Did you do that prior to submitting your September 27, 2023 expert report, or did you do that after?   12:16:05 12:16:10 12:16:14

A.   As I said before, I was aware, but I did it after and it didn't change my opinion.   12:16:16 12:16:18

Q.   Can a publicly-available website with reports about the groundwater contamination in the Canoga Park area provide widespread community knowledge of contamination?   12:16:22 12:16:29 12:16:32 12:16:35 12:16:37

A.   Just because something is accessible to the public doesn't mean that it is necessarily sufficient to provide the knowledge that is needed to affect the market.   12:16:37 12:16:42 12:16:44 12:16:48

Q.   Can you explain why a publicly-available website with reports about the contamination in the Canoga Park area is not sufficient to provide community widespread or common community knowledge?   12:16:51 12:16:54 12:16:56 12:17:01 12:17:06

A.   Because what the literature has shown is that you need to have that specific   12:17:08 12:17:11

Page 149

38 (Pages 146 - 149)

push of information so that people, and particularly buyers know of it, know where to look. Just having it -- there is a massive amount of information out there, just having it is not sufficient to have that communication of knowledge. It is kind of how it's pushed out in a way that is generally available to the public.

Q. Did any of your Google searching return the GeoTracker site as a hit?

A. No. And I didn't put GeoTracker in as a search item and didn't assume that a layperson would.

Q. Do you know how many of the putative class members reviewed the information on the GeoTracker site?

A. I do not.

Q. Do you know how many of the putative class members reviewed the information that you referenced, sent by Northrop Grumman and the state, regarding the groundwater contamination in the Canoga Park area?

Page 150

A. So what do -- what do you mean by "reviewed"?

Q. Do you know how many people received the information you referenced, sent by Northrop Grumman and the state, regarding the groundwater contamination in the Canoga Park area and read it?

A. So there is documentation of how many were sent but there is no documentation about how many opened it or how many read it.

Q. Do you recall the number of people who were sent information in the putative class area?

A. I don't recall that right off the top of my head.

Q. Do you believe you have that number in your working file somewhere?

A. I could go back to GeoTracker and get it, and there is nothing in there that we can say that any of that information is being conveyed to buyers.

Q. Where would you look to see what is

Page 151

conveyed to buyers?

A. So that's what I have already answered. As the literature shows, it has to reach the threshold that sellers are communicating it to buyers and then that's when the effect occurs in the market.

Q. Did you analyze any communications between sellers and buyers of property in the putative class area?

A. No.

Q. So just to make sure I understand your testimony, you have reviewed the fact sheets that were mailed to residents in Canoga Park and you did so after submitting your September 27, 2023 report; is that correct?

A. Yes.

Q. Have you reviewed the work notices that were mailed to residents in the Canoga Park area?

MR. NIDEL: Objection to form.

THE WITNESS: I don't remember the names of everything, but I worked out through

Page 152

everything that was in the website.

BY MS. KLABER:

Q. Okay. So you believe that after submitting your September 27, 2023 report, you reviewed every type of mailing, regardless of what I called it --

A. It -- that was documented, yes.

Q. -- that went out to residents in the Canoga Park area?

A. As I said before, that did not -- there was nothing in there that changed my opinion.

Q. Are you aware of the vapor intrusion testing conducted by Northrop Grumman in the class area in 2017 and 2018?

A. I was aware that there was testing of a small number of properties.

Q. In your rebuttal report, you state that: "Less than 1 percent of the properties located over the plume are known to have been tested for vapor intrusion."

Do you know how many residences were

Page 153

39 (Pages 150 - 153)

offered vapor intrusion testing and declined it?

A. I believe there was information on how many that was offered. I don't recall that number right off the top of my head.

Q. Have you reviewed any of the results letters that were sent to homeowners in the class area that agreed to testing of their homes in the vapor intrusion study?

A. I can't recall right now if I saw any.

Q. Okay. You can't recall if you reviewed those letters or not. Is that your testimony?

A. Yes.

Q. Does your opinion rely on those results letters at all?

A. No.

Q. Do you have any data on how many of the homes sold in the class area in which VI testing was performed -- strike that. Let me start again.

Page 154

For homes that had VI testing performed in the 2017-2018 time frame, do you know how many of those homes have subsequently sold?

A. Can you ask the question again.

Q. Of the homes that had VI testing, vapor intrusion testing in the 2017-2018 time frame, do you know how many of those homes sold subsequent to the vapor intrusion testing?

A. I don't, but one thing that is important to understand is, the damages in the model I use and in the literature is dependent on proximity to the source of contamination.

The environmental economics and real estate literature demonstrates over and over again that the key thing is proximity, so what goes on in terms of the specific tests in homes is not fundamental to the opinion that I offered.

Q. Of any homes in the class area that had vapor intrusion testing in the 2017-2018 time frame and subsequently sold, did you make

Page 155

any attempt to determine if their VI testing and its results were disclosed to the buyers?

MR. NIDEL: Objection to form.

THE WITNESS: I did an analysis of the properties as a whole using a common model. I did not do a property-by-property analysis.

BY MS. KLABER:

Q. Okay. So my question was whether you made any determination of whether homes that had VI testing in 2017-2018 time frame and subsequently were sold, whether those sellers disclosed the VI testing and its results to the buyers.

Is the answer you did not look at that?

A. I did not.

Q. You did not?

A. No.

Q. Okay. Are you aware that plaintiffs' counsel made a presentation on December 28, 2020, at a Winnetka neighborhood council meeting, regarding the alleged

Page 156

contamination in this case?

A. That the plaintiffs --

Q. Counsel.

A. Yes.

Q. Were you present at that meeting?

A. Yes.

Q. What was discussed at this December 28, 2020 Winnetka neighborhood council meeting?

MR. NIDEL: Objection to form and foundation.

THE WITNESS: I do not have a recollection of the specific information that was conveyed.

BY MS. KLABER:

Q. Do you have a general recollection of the information that was conveyed?

MR. NIDEL: Objection to form and foundation.

THE WITNESS: It was information about the groundwater contamination. I really do not remember any details from that meeting.

BY MS. KLABER:

Page 157

40 (Pages 154 - 157)

Q.   Do you know how many people attended that meeting?

A.   A small number.

Q.   Could you explain what a small number means to you?

MR. NIDEL:  Objection to form and foundation.

THE WITNESS:  I don't recall how many -- how many were -- were in the room.

BY MS. KLABER:

Q.   Was this meeting held live?

MR. NIDEL:  Objection to form and foundation.

THE WITNESS:  What do you mean by "live"?

BY MS. KLABER:

Q.   Was the December 28, 2020 Winnetka neighborhood council meeting held over Zoom or was it held live in person in a physical location where people gathered?

A.   The meeting I recall being at was in person, and I do not know whether there might

Page 158

have been a Zoom element to it.

Q.   Okay.  Did you make a presentation at that December 28, 2020 Winnetka neighborhood council meeting?

MR. NIDEL:  Objection to form and foundation.

THE WITNESS:  I did not make any presentation at that meeting.

BY MS. KLABER:

Q.   Did you review any of the materials that were distributed at that December 28, 2020 Winnetka neighborhood council meeting?

MR. NIDEL:  Objection to form and foundation.  Assumes facts not in evidence.

THE WITNESS:  I can't remember if there was anything distributed or not.

BY MS. KLABER:

Q.   Did you have any discussions with property owners at that December 28, 2020 Winnetka neighborhood council meeting?

A.   I did not have any discussions.  My main purpose was to go around and look at the

Page 159

properties, get a feel for the area, and I just happened to sit in on the meeting.

Q.   You have stated in your rebuttal report that public communications to your knowledge haven't conveyed the health risks from exposure to TCE.

Is it your opinion that plaintiffs' counsel did not mention the health risk from exposure to TCE at this December 28 2020 meeting Winnetka council meeting?

MR. NIDEL:  Objection to form and foundation.

THE WITNESS:  So when I am doing that, I am talking about broad communication of that information that would be available to buyers and sellers broadly.

BY MS. KLABER:

Q.   Okay.  With respect to this particular December 28, 2020 Winnetka neighborhood council meeting, would you say that plaintiffs' counsel did not convey the health risk from exposure to TCE at that

Page 160

meeting?

MR. NIDEL:  Objection to form and foundation.

THE WITNESS:  I've already said I don't -- I don't remember the details of that meeting.

BY MS. KLABER:

Q.   Have you asked plaintiffs' counsel for any records from that meeting to review?

MR. NIDEL:  Objection to form and foundation and then to the extent you are asking about communications he had with counsel, I would instruct him not to answer.

BY MS. KLABER:

Q.   Are you taking your counsel's instruction?

A.   Yes.

Q.   Have you been provided with any materials from that December 28, 2020 Winnetka neighborhood council meeting which I would include as a reporting of the meeting or any materials distributed at that meeting from

Page 161

41 (Pages 158 - 161)

plaintiffs' counsel or from anyone else?

A.  I do not have anything from that meeting.

I could use a lunch break whenever we get to a good point.

Q.  Okay.  We can probably get to that in about the next ten or so minutes if that's okay for you?

A.  Yep.

Q.  Are you aware that plaintiffs' counsel maintained a public website that included a map of the alleged groundwater plume and other information about risks from the alleged contamination?

A.  I am aware that they had information that they put out.

Q.  Did you ever visit that website?

A.  I cannot recall right now.

Q.  You may have visited and you also may not have visited; is that correct?

A.  I just cannot recall.

Q.  Is it your understanding that

Page 162

plaintiffs' counsel's public website didn't adequately convey health risk from exposure to the alleged contamination in this case?

MR. NIDEL:  Objection to form.

THE WITNESS:  Making that decision of whether it's adequate health risks is not something that is within my area of expertise.

BY MS. KLABER:

Q.  Are you of the opinion that plaintiffs' counsel didn't adequately publicize their website to putative class members in this case?

MR. NIDEL:  Objection to form and foundation.

THE WITNESS:  I don't know how to answer that question.

BY MS. KLABER:

Q.  We have been talking about what information is readily accessible to the public through normal Google search terms.

You said you were not able to locate any information using ordinary Google search

Page 163

terms.  You would expect to generate hits for contamination in the Canoga Park area.

Is it your opinion that whatever search terms you considered appropriate, did not result in a hit for plaintiffs' counsel's publicly-available website about the contamination in the Canoga Park area?

A.  It did not --

MR. NIDEL:  Objection to form and foundation.

THE WITNESS:  It did not result in a hit that I recall.

BY MS. KLABER:

Q.  And to be clear, it sounds like you have not made any particular effort to review the information from plaintiffs' counsel's public website to see what was there for purposes of preparing your report; is that accurate?

A.  I looked at information.  I just don't recall right now.

Q.  Are you aware that plaintiffs'

Page 164

counsel made a second presentation regarding the alleged contamination in this case in July of 2021 at a church in Canoga Park?

MR. NIDEL:  Objection to form and foundation.

THE WITNESS:  So I am aware that there was more than one and -- but where it occurred or what have you, I can't -- I can't speak to that.

BY MS. KLABER:

Q.  Were you present at a meeting in July 2021 at a church in the Canoga Park area hosted by plaintiffs' counsel?

A.  I only attended one meeting and to be honest, I'd probably have to go back and review to be -- to confirm which one it was that I was in attendance at.

Q.  But the meeting you were in attendance at was held in a physical location and you were physically present with plaintiffs' counsel and other individuals in the room; is that correct?

Page 165

42 (Pages 162 - 165)

A. Yes. 12:32:46

Q. Is that the one meeting you were describing when I was asking about the December 28, 2020 Winnetka council meeting? 12:32:50 12:32:52 12:32:54

A. Yes, it could be one or the other. I would have to go back and double-check. 12:32:58 12:33:00

Q. Do you have any recollection of attending a Zoom-based meeting hosted by plaintiffs' counsel with members of the putative class area? 12:33:03 12:33:04 12:33:11 12:33:13

A. I would have to go back and check. 12:33:16

Q. Okay. Just to make sure I understand. 12:33:22 12:33:23

Is your testimony that you have attended one total meeting that plaintiffs' counsel have held in the community? 12:33:23 12:33:24 12:33:27

A. One physical. 12:33:30

Q. One physical and potentially additional Zoom meetings; is that correct? 12:33:32 12:33:34

A. Yeah. I mean, there were lots of Zoom meetings throughout the whole thing and I just don't remember -- I'm not saying they were 12:33:37 12:33:39 12:33:41

Page 166

all public. There were just many Zoom meetings. 12:33:43 12:33:46

Q. When you say there have been many Zoom meetings, are you including personal meetings you have, or you are not referring to many community meetings over Zoom, are you? 12:33:47 12:33:49 12:33:51 12:33:54

A. I am referring to many, many Zoom meetings with -- with counsel. 12:33:58 12:34:00

Q. Okay. Can you approximate a number of community meetings that you have been present at along with plaintiffs' counsel and members of the putative class area in this case? 12:34:02 12:34:06 12:34:09 12:34:11 12:34:14

MR. NIDEL: Objection to form and foundation. 12:34:15 12:34:16

THE WITNESS: And I have already told you, I can't -- I can't remember whether I was in one with the public or not. 12:34:17 12:34:18 12:34:21

BY MS. KLABER: 12:34:24

Q. You can't remember a Zoom meeting when you were with the public; is that correct? 12:34:31 12:34:32

A. That's correct. 12:34:34

Page 167

Q. Okay. But you can remember a physical meeting with members of the Canoga Park community. You are just not sure of the time frame or the particular location. 12:34:35 12:34:38 12:34:42 12:34:45

A. Yes. 12:34:47

Q. And when you previously said you didn't make a presentation, you are referring to that one meeting you recall? 12:34:52 12:34:54 12:34:57

A. Yes. 12:34:59

Q. So if you were actually recalling a July 2021 meeting at a church in Canoga Park, you did not make a presentation to the community there; is that correct? 12:35:00 12:35:03 12:35:08 12:35:10

A. I made no presentations to the community. 12:35:12 12:35:14

Q. And if you -- if you were remembering this July 2021 community meeting at a church in Canoga Park, you do not remember how many people attended that meeting; is that correct? 12:35:16 12:35:17 12:35:23 12:35:26 12:35:26

A. That is correct. 12:35:30

Q. And if you were previously 12:35:31

Page 168

remembering this July 2021 community meeting held by plaintiffs' counsel in Canoga Park, and I asked you what was discussed and you didn't have a particular recollection, are we -- is that still the case now? 12:35:34 12:35:38 12:35:43 12:35:45 12:35:49

A. Yes. 12:35:50

Q. You don't recall if a plume map was shown at that July 2021 meeting? 12:35:51 12:35:57

A. I do not. 12:35:59

Q. You do not recall if TCE and PCE were discussed at that July 2021 meeting by plaintiffs' counsel? 12:36:00 12:36:06 12:36:09

A. I do not recall the specifics of what was discussed. 12:36:10 12:36:14

Q. And you do not recall if any health effects related to potential TCE or PCE exposure were discussed by plaintiffs' counsel at that July 2021 meeting; is that correct? 12:36:15 12:36:18 12:36:23 12:36:25

A. That's correct. You know, I -- my recollection is, this is the general subject but I can't testify to specifically what was said. 12:36:28 12:36:31 12:36:33 12:36:36

Page 169

43 (Pages 166 - 169)

Q.   Okay.  And could you -- for this July 2021 meeting, if that was actually the meeting that you were recalling previously, can you just remind me what your general recollection is of what was discussed there?

A.   The, you know, the general -- the general case, but I can't remember specific things that were said or shown at this time.

Q.   You state in your rebuttal report that Jennifer Pitts doesn't provide any data about who was contacted or how many people had attended meetings and what information was presented at these -- at the July 2021 meeting.

Did you request any of that information from plaintiffs' counsel?

MR. NIDEL:  Objection to form. Foundation.

THE WITNESS:  I don't think I can testify to what was discussed with counsel.

BY MS. KLABER:

Q.   So you can't tell us whether or not you asked counsel for any records related to

Page 170

that meeting; is that correct?

MR. NIDEL:  I mean, again, you are asking him what counsel conveyed to him or what he conveyed to counsel?  I would instruct him not to answer.

BY MS. KLABER:

Q.   Let me ask you this: Has counsel provided you with all of the materials that you have asked them to provide you for preparing your reports?

A.   I don't think I can testify to discussions with counsel.

Q.   There is no -- my question is not about any discussions with counsel, and I am entitled to know what information counsel has provided you.  That is not privileged.

So my question is: Is there anything that you asked for?  I am not asking you what you asked them for, but is there anything you asked them for that they said we don't have that information for you?

MR. NIDEL:  So I'm going to object

Page 171

to the form of the question.  Your side has specifically refused to provide things that were provided by counsel as opposed to not provided by counsel, even provided by counsel.

But I mean, if you are asking him -- I mean, yeah.  If you are asking him -- yeah. You guys have objected and refused to provide even things that were provided to your experts, relied on in their reports by counsel.

MS. KLABER:  I don't really know what you are talking about, Chris.

MR. NIDEL:  Oh, I am talking about patents.  I'm talking about help wanted ads.  I am talking about paragraphs that are in expert reports that are in the same -- that are in multiple expert reports that are identical, that experts testified they received from counsel.  Those are things that I am talking about.

MS. KLABER:  Sounds like you got testimony on it then.

MR. NIDEL:  No, we did not get the

Page 172

-- no, we did not.  There were instructions not to answer.

MS. KLABER:  Again, I don't -- I wasn't there and I don't know what you are talking about.

My question to him was --

MR. NIDEL:  Right.  But that is not -- that's not -- what's good for us is good for you and that's going to apply, whether you were there or not.

BY MS. KLABER:  My question was: Have you asked for anything that was not provided.  I am not asking you what you asked for.

MR. NIDEL:  You are asking him about his communications very directly, have you asked for anything that was not provided.

MS. KLABER:  Yeah, that is a valid question.

MR. NIDEL:  Okay.  And you are asking for his communication with --

MS. KLABER:  I am not asking for the

Page 173

44 (Pages 170 - 173)

contents --                                    12:39:57

MR. NIDEL:  You are.                    12:39:57

MS. KLABER: -- of the                    12:39:57
communications.                              12:39:58

MR. NIDEL:  Have you asked for?          12:39:58
It's a back door for the communication.      12:39:59

MS. KLABER:  I am not asking what he      12:40:01
asked for.                                   12:40:02

MR. NIDEL:  It seems to me that you       12:40:03
are.                                         12:40:06

MS. KLABER:  I am not asking you          12:40:06
what you didn't provide.  I am only asking if     12:40:08
there is anything he needed for his report that   12:40:10
he did not receive.                          12:40:12

So do you want me to ask that             12:40:13
question?                                    12:40:14

BY MS. KLABER:                           12:40:14

Q.   Dr. Boyle, were there any materials      12:40:15
that you needed from your -- to prepare your      12:40:16
report that you did not receive?             12:40:18

A.   So I don't recall anything that I        12:40:20
asked for for my report that I did not receive    12:40:35

Page 174

in a broad global sense.                     12:40:40

Q.   Okay.  Is it your opinion that           12:40:42
plaintiffs' counsel have not been effective in    12:40:52
generating widespread community knowledge of      12:40:54
the contamination in the putative class area --   12:40:59

MR. NIDEL:  Objection.                   12:41:01

BY MS. KLABER:                           12:41:01

Q.   -- in this case?                         12:41:01

MR. NIDEL:  Objection to form.           12:41:01

THE WITNESS:  So I'm not making any       12:41:05
decision about whether what is out there is       12:41:12
effective.  What I am saying is, when I looked,    12:41:16
it did not pop up.  That's not a decision of       12:41:21
whether it's effective or not.               12:41:24

In my mind, effective is, once you        12:41:27
do have access to it and you read it, did it      12:41:30
effectively communicate it.  I am also going      12:41:34
back to the information from the literature       12:41:38
that it has to, you know, reach also to the       12:41:39
extent that sellers would be required to          12:41:43
disclose because of that asymmetric information    12:41:48
between buyers and sellers.                  12:41:52

Page 175

BY MS. KLABER:                           12:41:52

Q.   Would filing the complaints in this      12:41:55
action be a means of generating widespread        12:41:57
community knowledge of the contamination in the   12:42:01
putative class area?                         12:42:03

MR. NIDEL:  Objection to form.           12:42:06

THE WITNESS:  I would think that          12:42:14
that is one step, but not a -- a sufficient       12:42:14
step, because that's not necessarily conveyed     12:42:21
to everyone and so it is -- it is one thing.      12:42:26
It's an element in the Simons and Saginor         12:42:31
model, but it's not the only or sufficient        12:42:34
piece of information.                        12:42:39

BY MS. KLABER:                           12:42:40

Q.   Would holding community -- would         12:42:40
plaintiffs' counsel holding community meetings    12:42:45
about their allegations in the complaints be      12:42:48
sufficient to generate widespread community       12:42:50
knowledge of the contamination and its            12:42:53
potential effects?                           12:42:55

A.   No.                                      12:42:56

Q.   What information do you believe has       12:42:56

Page 176

not been disseminated, but needs to be, to the    12:43:00
class area?                                  12:43:04

A.   So I think --                            12:43:05

MR. NIDEL:  Objection to form.           12:43:07

THE WITNESS:  I think I have              12:43:07
answered that before, but it hasn't reached the   12:43:08
point where sellers are -- in the disclosure      12:43:11
have met the standard that they are disclosing    12:43:18
it to buyers, and that's what the literature      12:43:22
has shown over and over again is critical.        12:43:26

BY MS. KLABER:                           12:43:29

Q.   And how do you know that it hasn't       12:43:29
reached the point that sellers are disclosing     12:43:32
to buyers the contamination in the area?          12:43:37

A.   Because there is not -- when you         12:43:42
look at it, there is not the threshold of         12:43:47
information that a -- a seller would be            12:43:49
required with the information that is -- that      12:43:55
is out there to disclose it in the sale of        12:43:58
their property.                              12:44:04

Q.   What is the threshold that would         12:44:04
require a seller to disclose the alleged          12:44:09

Page 177

45 (Pages 174 - 177)

contamination in the sale of their property?

A.   So typically, when -- when that occurs is when there has been something like the certification of a class or the state toxicologist puts out that information. There are a number of different ways that would do it, that would be the threshold where the buyer would -- excuse me, the seller would be required to disclose -- disclose it.

Q.   So is it your opinion that if a seller has actual knowledge that their home is situated above the groundwater plume in Canoga Park, they are not required to disclose that to a seller?

MR. NIDEL:  Objection to form and foundation.

THE WITNESS:  I'm sorry.  That is distracting when that keeps going in the background.  Can you just ask the question again, please.

BY MS. KLABER:

Q.   Is it your opinion that if a seller

Page 178

has actual knowledge that their home is situated above the groundwater plume in Canoga Park, that they are not required to disclose that to a seller?

A.   My understanding is that it is -- at this point, it's not being conveyed to buyers.

Q.   That was not my question.

My question is:  Is it your opinion that a buyer [sic] with actual knowledge that their home is situated above the groundwater plume in Canoga Park -- let me start that again.

Is it your opinion that a buyer [sic] with actual knowledge that their home is situated above the groundwater plume in Canoga Park, is not required to disclose that to a seller -- to a buyer of their property?

A.   So I'm going to go to two things on that.

One is, that's a legal conclusion that I am not prepared to answer.

The second is, is that the

Page 179

literature has shown that when it's disclosed, it -- that's when the effect has, but I'm not going to give a legal opinion on that.

Q.   So you can't offer an opinion when a seller with actual knowledge of contamination is required to disclose it to a buyer; is that accurate?

A.   I'm not going to give a legal opinion, no.

Q.   Is it your opinion that unless a class is certified or -- I believe you said state toxicologist have sent out a notice, there is not a requirement to disclose contamination on your property despite knowledge of it?

A.   I think you are asking me to comment on the legal threshold of when -- when they have to do it.  I can't comment on that.  I can comment on when it is conveyed, that we know that is when the effect kicks in, and I have given you some examples of where that threshold has been met and, you know, kind of the

Page 180

stimulus of where it has gone forward.

Q.   I guess I'm just kind of confused because you do state in your report an opinion that buyers will become required to disclose -- or sellers will become required to disclose the contamination, so that appears as if you are offering an opinion about when disclosure is required.

What is your opinion about when that will occur?

A.   So I am not offering an opinion of when sellers will be required.  I am saying that when they -- when they -- when they are, then that meets the threshold so that they -- you know, basically the properties are injured, and what we are -- you know, what the issue is, is when is that injury manifested in the values of homes.

And my opinion is, is when that information is offered by sellers broadly across the market, that's when it will kick in. I am not offering the legal opinion of when a

Page 181

46 (Pages 178 - 181)

buyer [sic] is legally obliged to provide that information.

Q.   Is it possible that some sellers presently in the class area are legally obliged to disclose the alleged groundwater contamination between their homes --

MR. NIDEL:  Objection.

BY MS. KLABER:

Q.   -- underneath their homes?

MR. NIDEL:  Objection to form and foundation.  Calls for a legal conclusion. Calls for speculation.

THE WITNESS:  Yeah, so I -- I can't give you a legal when -- in terms of when somebody is legally obliged to.  I know -- I know that there are disclosures.  I know that individuals have to disclose but, you know, meeting that legal threshold, I am not -- I can't give you an opinion on it even when I've sold properties, I go -- if I had any question, I refer to my attorney about what, you know, whether I have to disclose or not.

Page 182

BY MS. KLABER:

Q.   Do you know if any putative class members have actual knowledge of the alleged contamination in the groundwater plume?

MR. NIDEL:  Objection to form.

THE WITNESS:  Can you clarify that for me, please.

BY MS. KLABER:

Q.   And what -- can you explain what was not clear so I can do that?

MR. NIDEL:  Objection to form.

THE WITNESS:  I guess from a legal perspective, I don't know exactly who you mean by putative class members.

BY MS. KLABER:

Q.   A putative class member is a potential class member, so somebody who lives within the class area, so I can ask my question again.

Do you know if anyone who lives within the proposed class area has actual knowledge of the existence of the groundwater

Page 183

plume beneath their home?

MR. NIDEL:  Objection to form.

THE WITNESS:  I would assume that some do have knowledge.

MS. KLABER:  Okay.  I think now would be a great time for the lunch break.  I'm sorry, I think that might have gone a few more minutes than I represented.

THE WITNESS:  That's all right.

MS. KLABER:  So we can go off the record.

THE VIDEOGRAPHER:  This marks the end of Media Unit No. 5.  Going off the record. The time is 12:51 p.m.

(A short recess was taken.)

THE VIDEOGRAPHER:  This marks the beginning of Media Unit No. 6.  Going back on record.  The time is 1:50 p.m.

BY MS. KLABER:

Q.   Dr. Boyle, we are back from lunch. Did you have any discussions with counsel about the substance of your testimony during the

Page 184

lunch break?

A.   We just talked about general -- general topics and not specific items.

Q.   If we could turn back to Exhibit 41, which is your September 27, 2023 report, Page 9, please.

In the top paragraph, you write: "As the groundwater contamination plume becomes common knowledge and sellers of properties disclose knowledge of the contamination prior, as required by California law, the full extent of the value diminution from the environmental contamination will be realized."

Do you see that?

A.   Yes.

Q.   Is it your opinion that the value diminution has not been realized as of today?

A.   It is my opinion that the value diminution has not been realized.

Q.   If an individual seller with knowledge of the contamination disclosed that -- disclosed the existence of the groundwater

Page 185

47 (Pages 182 - 185)

plume beneath their home to a buyer who purchased before today, is it your opinion that that seller would have suffered damages?

MR. NIDEL: Objection to form.

THE WITNESS: So it is likely that they may have been able to get more from the buyer if they had not disclosed.

BY MS. KLABER:

Q. And in that case, would it be your opinion that the seller has already suffered a property value diminution loss?

MR. NIDEL: Objection to form.

THE WITNESS: So if the seller did it, then the seller would have experienced the loss.

BY MS. KLABER:

Q. We just discussed your opinion that the value diminution in the class area has not been realized today.

Do you have an opinion as to when the value diminution will be realized?

A. So what I would expect is, at the

Page 186

point of class certification, when everyone in the class is notified, that it would take effect and not be able to see it in the sales, it would probably take a year to two to kind of go through the market.

You wouldn't expect it to go down immediately, kind of expect it to asymptote down, and you need enough sales to occur to be able to identify it.

Q. So is it correct to say that you cannot identify a particular date at this time when the property value diminution will be realized by class members?

MR. NIDEL: Objection to form. Misstates the witness's testimony.

THE WITNESS: I have no information that would allow me to specify a specific date at this time.

I gave you conditions that would be probable for it, but I cannot give you a specific date.

BY MS. KLABER:

Page 187

Q. What information do you believe will be included in the class notice that has not already been included in fact sheets or work notices or other mailings sent out by Northrop Grumman or the State of California regarding the groundwater plume in Canoga Park?

MR. NIDEL: Objection to form.

THE WITNESS: So the -- I can't speak to exactly what is going to be in there and, you know, make that direct one-to-one comparison, but the big difference will be, is that they would be notified that they are part of a class and, you know, part of the class, when you see class actions is, that there is a professional media campaign, and so that -- there would be information that would be reaching buyers that is not reaching buyers at this time, you know, through TV ads, newspaper ads and other things that you see when, you know.

I mean, the big one out there right now is more national, but Camp Lejeune, you

Page 188

know, with the information that they put out there for the class.

BY MS. KLABER:

Q. So is the key factor in class notice creating widespread knowledge that there will be a media campaign to notify buyers as opposed to sellers who actually receive the class notice?

MR. NIDEL: Objection to form.

THE WITNESS: Can you read back the question, please.

BY MS. KLABER:

Q. Let me ask another question.

Do you agree that homeowners, current homeowners in the class area are the ones who would receive the class notice?

A. Those in the class would receive the specialized notice I believe.

Q. And those homeowners in the class area who would receive the class notice are potential sellers, correct?

A. Yes.

Page 189

48 (Pages 186 - 189)

Q.   You identified a media campaign that you believe would go along with any class notice and indicated that that would give buyers information about the groundwater contamination in the class area; is that accurate?

A.   It's accurate that it would provide information to buyers.

Q.   So is that the key piece of information that needs to be disseminated for buyers, to have knowledge of the groundwater plume in Canoga Park, the media campaign following the class certification?

MR. NIDEL:  Objection to form.

THE WITNESS:  So you asked me what information and where it would be, and so I described that.  Going back to what I said before, the literature that looked at property value effects has shown that the key thing is, is when the sellers start disclosing.

So there is one-to-one exchange of information between the buyers and the sellers

Page 190

so that they are on a common basis.  And so that is also an important part of it.

BY MS. KLABER:

Q.   Which part would you identify as the more key part?  Sellers disclosing due to the fact that they received a class notification or the media campaign that may reach potential buyers?

A.   I would say that they are all part of the package, and so I can't say which one is more important because it is shown that it happens when that occurs, but it doesn't, you know, the effect doesn't parse out which piece of that information contributes how much.  It is a package.

Q.   Okay.  So for widespread community knowledge of the alleged contamination in Canoga Park to be achieved, both the class notification to potential sellers and a media campaign that could reach potential buyers are necessary; is that right?

MR. NIDEL:  Objection to form.

Page 191

THE WITNESS:  I am saying that they are part of the package, and I want to answer your question before, that you can't separate them.

What I said earlier to repeat, is that disclosure from the seller to the buyer is sufficient information for doing it, but they are all part of the package and I can't tell you which one is more important than the other.

BY MS. KLABER:

Q.   If a class is certified in the Canoga Park area related to the groundwater plume, how is it ensured that sellers disclose that when putting their home for sale?

A.   So once again, I think you are putting me in the position of giving you a legal opinion.

What I can tell you is, is when that has happened and the empirical studies that have been done shows that that is when the price diminution takes effect.  I can't give you the kind of the legal threshold of kind of

Page 192

the impetus for doing that.

I can say that when that occurs, we know from all the empirical studies being done, that we will see the price diminution.

Q.   I just want to make sure I understand what you are saying in terms of when that, quote, that occurs.

Is that the dissemination of the class notice or is that subsequent disclosure by a certain number of sellers in the area?

MR. NIDEL:  Objection to form.

THE WITNESS:  So I will try and make my answer clearer if I can, is that what the literature shows, when you go out and test the market, is that when the threshold is met so that sellers are disclosing to buyers, that asymmetric information between sellers and buyers is removed, and that's when you see the price diminution occurring.

The other things, you know, the communications and others, they are all part of that package and I can't -- I can't disentangle

Page 193

49 (Pages 190 - 193)

them to say which one so...

BY MS. KLABER:

Q.   Do you have an opinion as to when enough buyers [sic] in the class area will have disclosed the groundwater contamination to see the effect on the market?

A.   I don't think it's the buyers that are disclosing the information.

Q.   Apologies if I said the wrong word there.

Do you have an opinion as to when enough sellers in the class area will disclose the groundwater contamination, such that you will be able to see an effect on the market?

A.   So what the literature shows is when those in -- those that are affected are required to do it to meet the threshold, the disclosure, you will see it, so I don't have a specific number.

It could be more depending on the affected ones, it could be -- could be less, but it's -- what they found is that those that

Page 194

are affected should be disclosing.

Q.   And is it your opinion that the only point in time when sellers in the class area will become required to disclose the alleged contamination is once class notice has gone out?

MR. NIDEL:  Objection to form. Misstates the witness's testimony.

THE WITNESS:  I have said that that's one of the ones.  There could be other ones.  You know, I gave you the example of arsenic where the state toxicologist came in. There could be other things that come as you go through a contamination case that would meet -- that would meet the threshold, so that's one of them.

BY MS. KLABER:

Q.   So thinking of the residents of the class area who have received fact sheets from Northrop Grumman or the state, is that sufficient to require disclosure of the contamination from the groundwater plume?

Page 195

MR. NIDEL:  Objection to form. Incomplete hypothetical.

THE WITNESS:  And so you keep asking me "sufficient," and I'm not going to give you the -- I can't give you the -- the legal one.

When I say sufficient, I am saying it's sufficient when the seller has to reveal to the buyer the threshold where -- I'm not using sufficient in the threshold where the seller is obliged to reveal, and that's a legal question.

If I look at the Pitts report, you know, and the appraisals that she did, the sellers by and large are not disclosing there, so that's evidence that at this point, they have not met that threshold.

BY MS. KLABER:

Q.   Referencing the Pitts report, she also notes that in at least some sales, the sellers were disclosing.

In those cases, would the seller have already realized property value diminution

Page 196

damages?

MR. NIDEL:  Objection to form and foundation.

THE WITNESS:  So I believe that there are only two if my memory serves me right, and we don't know.  I mean, all of her information is with the sellers and -- or the seller's agent.  The agent isn't going to -- if they don't have to, isn't going to reveal -- there is no information really from the buyers to know how they reacted, so we can't tell from the information that is available whether the -- ultimately, the buyers paid less.

BY MS. KLABER:

Q.   So a seller could disclose the contamination from the groundwater plume and a buyer may still -- may choose to not pay less; is that correct?

A.   That isn't what I said.  I said there is no evidence in what Ms. Pitts provided that tells us how the buyer did react.

Q.   Well, you know the price that the

Page 197

50 (Pages 194 - 197)

buyer paid?

A. We don't know what the price is that the buyer would have paid in the absence of contamination.

Q. Is it not your opinion that every buyer would pay less in the face of knowledge of contamination?

MR. NIDEL: Objection to form.

THE WITNESS: So when you -- when you look at it, you don't know what every individual buyer will do, but if you look at the evidence, the evidence shows that by and large, the buyers are paying less because we would not find a statistically significant price diminution if the buyers were not acting in a common way and paying less for properties.

BY MS. KLABER:

Q. So your opinion here is that every homeowner has realized at least a 9.4 percent diminution in their property value by virtue of being over -- proximate to the groundwater plume; is that correct?

Page 198

MR. NIDEL: Objection to form.

THE WITNESS: That's not correct.

BY MS. KLABER:

Q. Okay. What -- where are you offering an opinion on with respect to the diminution in values suffered across the class area?

MR. NIDEL: Objection to form.

THE WITNESS: So there is at least three different levels to this.

One is that the information by Laton and Kram show that they -- that there is an injury to the properties being over the plume. That is not my opinion. That is from their expert reports. The literature shows that being proximate to the source of contamination gives rise to the property value diminution.

For this class, I was asked to consider properties over the plume. If you looked at the literature, there is probably properties that are beyond the edge of the plume that are affected, but they are just not

Page 199

-- I was not asked to consider them as part of this class.

Then at the next level, the model shows the 9-point-plus common property value diminution, but it also shows that there is a common gradient going on that those closer to the plume have experienced a larger loss than those farther away.

BY MS. KLABER:

Q. Right. So I had asked if your opinion in this case is that all residents of the class area will experience at least a 9.4 percent property value diminution as a result of their proximity to contamination, and you said no, that is not your opinion. Is that -- have I misunderstood?

MR. NIDEL: Objection to form.

THE WITNESS: I think you changed the wording or at least the way I heard it. I did not hear the "at least" when you read it before. If it was in there, my mistake for missing it.

Page 200

BY MS. KLABER:

Q. Okay.

A. Then the other thing is that, we know that there is the injury. The price diminution factors in there, but it has not yet to be reflected in the market.

Q. Is it your opinion that all of the proposed class members have already suffered an injury by virtue of their location over the groundwater plume, or has that injury not yet been realized because of the lack of widespread community knowledge?

MR. NIDEL: Objection to form.

THE WITNESS: So if I follow Laton and Kram, they have done -- identified the plume and the contaminants within the plume and the edge of the plume.

The literature shows that proximity to the source of contamination is the driver for the -- for reducing property values and location over the plume is the properties I was considered -- asked to consider for the class.

Page 201

51 (Pages 198 - 201)

BY MS. KLABER:                                14:09:17

Q.   So have those properties that you        14:09:17
have been asked to consider for the class,    14:09:20
already experienced an injury or have they not 14:09:22
yet experienced an injury?                    14:09:25

A.   My -- my understanding is that the       14:09:27
conditions for them experiencing an injury are 14:09:32
in place, so that they have experienced injury. 14:09:35
The consequence of the injury in terms of price 14:09:37
diminution has not been manifested yet.       14:09:40

Q.   Does the level of contamination         14:09:46
present in the plume beneath a given property  14:09:49
affect the injury that a property owner would  14:09:53
suffer?                                       14:09:58

MR. NIDEL:  Objection to form.               14:09:58

THE WITNESS:  I was thinking on the          14:10:02
first part, and so can you just reread it      14:10:04
again, please.                                14:10:07

BY MS. KLABER:                                14:10:07

Q.   Does the injury that a property         14:10:07
owner in the class area suffer depend upon the 14:10:09
level of contaminants that are present in the  14:10:13

Page 202

plume beneath their home, or are all class     14:10:17
members injured the same by virtue of being    14:10:19
situated over the groundwater plume regardless 14:10:22
of the level of contamination --              14:10:26

MR. NIDEL:  Objection to form.               14:10:29

BY MS. KLABER:                                14:10:29

Q.   -- on their -- near their property?      14:10:29

MR. NIDEL:  Objection to form.               14:10:32

THE WITNESS:  So the model measures          14:10:32
proximity from the source of the contamination, 14:10:34
not the level of contamination at a specific   14:10:38
site, but it is also looking at distance.      14:10:42

So if you think about these things             14:10:46
in a dilution or dissipation through, as it     14:10:52
moves through space and time, that distance     14:10:56
gradient would have a smaller effect for        14:11:06
properties located more distant, could be --    14:11:07
that could be generated in part by lower level  14:11:10
of contamination the farther away you get.      14:11:17

BY MS. KLABER:                                14:11:20

Q.   Did you look at whether the level of     14:11:20
contamination is lower the farther away you     14:11:22

Page 203

get?                                          14:11:25

MR. NIDEL:  Objection to form.               14:11:25

THE WITNESS:  So what I will say is          14:11:27
that that is not critical to my analysis, and I 14:11:29
believe in Dr. Kram's TCE map, that it shows    14:11:35
that there is different -- different levels of  14:11:43
TCE at different locations within the plume. I  14:11:47
don't remember how those gradients go right     14:11:51
now, but off the top of my head.              14:11:55

BY MS. KLABER:                                14:11:56

Q.   If the gradients in Dr. Kram's plume     14:11:56
map -- if the levels of TCE in Dr. Kram's plume 14:12:01
map do not dissipate with distance from the     14:12:07
site, then your model does not take into        14:12:13
consideration the level of contamination on a   14:12:16
particular property, correct?                  14:12:18

MR. NIDEL:  Objection to form.               14:12:21

THE WITNESS:  So it's not that my            14:12:23
model doesn't take account of it.  What people  14:12:25
react to is how close they are to the source of 14:12:28
contamination.  The models over and over again  14:12:33
have been shown that it works with either, you  14:12:36

Page 204

know, kind of -- as the crow flies distance or  14:12:39
buffers.  The specific contaminants or their    14:12:42
concentrations have not been shown to be the    14:12:47
key factor.  It's proximity, so it is not that  14:12:50
it doesn't take account for it.  It takes       14:12:53
account for what people react to it and how     14:12:55
they make their decisions.                     14:12:59

BY MS. KLABER:                                14:13:00

Q.   So you believe, whether or not a         14:13:00
property actually has vapor intrusion, such     14:13:01
that the indoor air is contaminated, will not   14:13:05
affect how much a buyer will pay for that       14:13:09
property; is that right?                       14:13:12

A.   So what my model shows is that the        14:13:13
-- excuse me, it's the proximity to it that     14:13:22
matters, and I think that that's consistent     14:13:26
across the literature.                         14:13:30

Q.   So under your model, if two              14:13:32
properties are both one-half mile from the      14:13:34
source of contamination and one experiences     14:13:38
vapor intrusion and has contamination in indoor 14:13:43
air, and the other experiences no vapor         14:13:48

Page 205

52 (Pages 202 - 205)

intrusion and has no contamination of indoor air, both properties will be treated the same by your model; is that correct?

A.  Both models -- both would be treated the same under my model.

Q.  Your model does not consider the depth of the plume beneath the property in calculating property value diminution, correct?

A.  I think I have answered that one over and over again.  It depends on distance to the source of the contamination.

Q.  So it does not consider the depth of the plume, correct?

A.  It does not.

Q.  If there was a clean water layer between the contaminated groundwater and any property in the class, would that impact your view as to whether the properties have suffered any injury?

A.  It would not.  It would still be there, you know, and the case that we worked on, the Hovensa one, there were -- they called

Page 206

them donuts in that case.  I think the hydrogeologists, those ones, and there was still the damage that was accepted all the way throughout the affected area.

Q.  Can you please define the term "market value" for me?

A.  Market value of what?

Q.  Market value -- is market value not a term that can be defined broadly?

MR. NIDEL:  Objection to form.

THE WITNESS:  There are -- there are different market values.

BY MS. KLABER:

Q.  Okay.  How would you define -- define market value in the context of residential real estate?

MR. NIDEL:  Objection to form.

THE WITNESS:  So there is still multiple market values, so I'm going to give you the one for buying and selling houses and, you know, the best market value is the price that a buyer and a seller agreed on, when they

Page 207

both are informed of the property that they are transacting.

BY MS. KLABER:

Q.  So in your research, generally, you equate the term "market value" with sale price when we are talking about residential real estate; is that correct?

A.  I do.

Q.  How did you determine the market value of the properties within the proposed class area for purposes of your report?

MR. NIDEL:  Objection to form.

THE WITNESS:  I didn't determine them.  I used the Los Angeles County data and also Zillow data on the most recent sale to get the best data on market value so it wasn't something I determined.  I obtained factual information on the market values of properties.

BY MS. KLABER:

Q.  Did you speak to any market participants as part of your effort to determine the market value of the properties

Page 208

within the class area?

A.  No.  Once again, I determined -- I obtained factual information and you don't need to speak to people to -- when you're getting that factual information.

Q.  So you said you pulled the most recent sales data from Zillow; is that correct?

A.  And some was from the Los Angeles County tax records.

Q.  Do the Los Angeles County tax records tell you the most recent sale date?

A.  For some of them, yes.

Q.  Are there properties that the Los Angeles County tax records did not show the most recent sale date for?

A.  When I was getting it from Zillow, I didn't need to go to the county.  I got the sale date and the transaction price there.

When you got the county, you got the date and county there, so you asked me if the county gave me the sales date.  It didn't give me for all of them.  Only the ones that we were

Page 209

53 (Pages 206 - 209)

using there.

Q. Is it possible that a property where you pulled the latest sale date from Zillow, then transferred off-market such that it is not recorded in Zillow?

MR. NIDEL: Objection to form.

THE WITNESS: I don't understand what you are asking.

BY MS. KLABER:

Q. If somebody purchased a property and the sale price is reflected on Zillow, and they subsequently transfer that property in a nonmarket transaction, would that price then be updated into Zillow?

A. So if it was not -- if it was done in a nonmarket way, that would not be in Zillow, but that does not diminish that the Zillow price is a fair market value.

Q. You referenced sale price that you took from the LA County tax records, correct?

A. Yes.

Q. Is that -- does that differ from the

Page 210

assessed taxed value of a home?

A. So with -- with some of -- some of them, what we had to do was to take the assessed value of a home. Because of Prop 13, they assess value, appreciate by 2 percent per year, and so some of them, we had to discount back to the sale year that's recorded in the tax records to get what the sale price was.

Q. Okay. So just to make sure I understand what you were doing with the LA County tax records.

You were taking the latest tax assessed value and also the last recorded sale date and you were discounting the current tax assessed value back to the latest sale date in the record; is that correct?

A. Yes, so that would give you the sale price at that time.

Q. Is it your opinion that the tax assessed value is equivalent to market value?

A. No. That's why we had to discount it back because tax assessed values given a

Page 211

Prop 13 are not market values. They are just values for the purpose of taxation.

Q. How do they become market values when you discount them back to the sale date if they are not market values to begin with?

A. Because they are based on a sale price that was a market value when Prop 13 went into effect. It stopped the rapid acceleration of properties being assessed at current market, so that people would be priced out of their home by taxes.

So when you -- you have a sale price, and that is the -- kind of the base for taxation that you work from and those increase by 2 percent per year for Prop 13, so when you discount back to it, you recover the sale price at that time.

Q. If a property sold since you created your spreadsheet that goes along with your report, which owner would be a member of the proposed class?

A. I think that's a legal question that

Page 212

I can't answer.

MR. NIDEL: Objection to form. Foundation.

BY MS. KLABER:

Q. Did you update all sale prices to August 2023 dollar values in performing the work for your report?

A. We updated sale values to current values, yes.

Q. Current values as of August 2023; is that correct?

A. I think it's August 2022, but I would have to go back and check. 2022 or '23. I would have to check.

Q. Okay. And to do that, you used the Federal Reserve Bank of St. Louis, all-transactions house price index for Los Angeles County; is that correct?

A. Yes.

Q. What does that all-transactions house price index account for?

A. It accounts for -- if you -- one way

Page 213

54 (Pages 210 - 213)

to think about it is, is what would the -- what would be the year-over-year appreciation of an average or typical property within the county.

Q.   And what factors go into what the average year-over-year appreciation would be for a property in the county?

A.   So it would be based on actual sales data that they -- you would build the index on.

Q.   It's not just a matter of updating for inflation; is that right?

A.   So it's not -- not just updating for inflation. It's looking at that market and asking how prices are increasing over -- over a time. Inflation could be one factor but there could be other factors that are pushing prices up related to demand and supply in the market.

Q.   So if somebody purchased a home, say, during a market crash like in 2008, and you updated that sale price to 2023 dollars, the increase wouldn't just reflect the changes in the value of the U.S. dollar. It would be reflective of market changes in that area; is

Page 214

that right?

A.   Yes.

Q.   And that area is countywide for Los Angeles; is that correct?

A.   That's correct. If I was just going to look at the U.S. dollar, I would be using, like, the U.S. consumer price index or something.

I could use another bathroom break when it's convenient for you.

MS. KLABER: Okay. If it would be comfortable for you, we can do a bathroom break now.

THE WITNESS: Okay. Thanks.

MS. KLABER: Go off the record, please.

THE VIDEOGRAPHER: This marks the end of Media Unit 6. Going off the record. The time is 2:25 p.m.

(A short recess was taken.)

THE VIDEOGRAPHER: This marks the beginning of Media Unit 7. Going back on

Page 215

record. The time is 2:31 p.m.

BY MS. KLABER:

Q.   Does a home sale price represent market value if it is not the result of an arm's length transaction?

MR. NIDEL: Objection to form.

THE WITNESS: It depends on kind of what -- what the other type was, but arm's length ensures that there is market value. There is others that may be in there. There is others that would not be.

BY MS. KLABER:

Q.   So when you defined market value as sales price, is there a qualification there that it is the sales price from an arm's length transaction or is there no qualification?

A.   So we took the -- the sale price that was recorded in Zillow as representative of an -- excuse me, a market value, and then we looked at the distribution of sale prices to see if there was any indication that they were not arm's length and we did not see any

Page 216

evidence.

That's typically what is done in these types of economic analyses, that you look at the distributions and see whether they are within the range of expected values. You know, if you looked at the literature and hedonic property value models, it would show different checks like that that people have done.

Q.   So what did you do to identify or filter out any sales with, you know, unusual sale conditions, such as a special or unusual financing or estate sales or foreclosure sales from the Zillow data?

A.   So we did not have any information that would exclude them, but we didn't see anything that would be -- excuse me, wayward to suggest that. An estate sale could very well be an arm's length transaction and we took them as the best evidence available.

When you are doing a study, there are things that you do, that you take some sales out that you are using, get your

Page 217

55 (Pages 214 - 217)

analysis, but this is a different situation where we would be saying it as the -- that we are taking somebody out of a class and we didn't feel like we should be doing that, so we took what we had as the best available information to represent each class member.

Q. So in your research and academic work, it sounds like you don't typically just accept all Zillow sales data as representing the market value, whereas here, you did accept all sales data as representing market value; is that correct?

MR. NIDEL: Objection to form.

THE WITNESS: So I didn't say that we take it as not representing the market data. We may have questions about it. Sometimes, you know, we could be doing things, like, in your hedonic model, you know, at a minimum, you want square footage of a home and square footage might not be available, so there is a variety of different filters that you would put on.

You could be wrong, you could be

Page 218

right in excluding some of them, but you do that as part of your analysis. It doesn't mean that they -- they weren't a valid sale.

BY MS. KLABER:

Q. And you did not do that here; is that correct?

A. Did not.

THE COURT REPORTER: I'm sorry. I need to go back to make sure I heard the right word. That doesn't mean that they weren't a valid sale or they warrant?

THE WITNESS: They were not.

THE COURT REPORTER: Okay. Thank you.

BY MS. KLABER:

Q. Did you do anything here to check the reasonableness of your estimates for the value of each property you included in your spreadsheet accompanying your report?

A. So the estimates of the property, you said?

Q. Yeah. So you created a spreadsheet

Page 219

that accompanies your report that lists, for each property, what you estimate to be the current or the market value as of either that August 2023 or August 2022 date.

Did you do anything to check the reasonableness of your estimates of the value for each property listed in your spreadsheet?

A. So let me kind of make a distinction. As we took the spreadsheet provided by Los Angeles County and then we added information to it, so it is not a spreadsheet that we created, we added information to it, and one of the things that we added was that estimated price that was based on the actual sale and updating with the index which we talked about previously.

So one thing that we did is, I had assistants for me and they went around and kind of did Google Earth and looking at every single property, but the more important thing that we did is we looked at the distribution of values and basically 95 percent of them are between

Page 220

about $450,000 and a million.

And so that's, you know, quite reasonable for where the values would fall and by any standards of data analysis that I have done, that's really pretty darn good.

Q. You calculated the current market value of a property at 7101 Lubao Avenue as $3.74 million.

Do you recall that?

MR. NIDEL: Objection to form.

THE WITNESS: I remember that there were some that were high, there were about 3 percent that were above a million dollars.

BY MS. KLABER:

Q. Are you aware of any homes in the proposed class area that have sold for -- over a price of over $3 million in the past year or two?

A. I am not, but we left those ones in, because we were -- we understood that it is important to be using a common model when you are doing it and not have the investigator do a

Page 221

56 (Pages 218 - 221)

-- individual adjustments because they didn't like a value.

It's not a -- it's not a problem with the model that we applied. That occurs based on what the sale value was of the property at the most recent sale, and so it could be driven by a buyer paying more for a property than they should have, or it could be driven by a data recording error in the information we received on the sales.

Q. Did you attempt to identify data recording errors and remove them from your database?

MR. NIDEL: Objection to form.

THE WITNESS: There was no way to identify data recording, but as I said, you know, previously, in any empirical work that you're doing, there are some errors. You know, only having 3 percent kind of be an outlier to the top is really pretty darn good by any empirical standard.

BY MS. KLABER:

Page 222

Q. Is it your opinion that $3.74 million is an accurate estimate of the market value for 7101 Lubao Avenue?

A. It is probably too high, but I think the key thing to remember is for -- at least 95 percent of the homes, we have a very accurate one, and even if you went to, you know, the approach that Ms. Pitts does, appraisals are going to be high, some are going to be low. There is always some error in any empirical approach.

Q. You said you had individuals working with you who looked at images of every home on Google Maps; is that correct?

A. On Google Earth.

Q. On Google Earth. Who were those individuals?

A. They were individuals that worked for Industrial Economics in Cambridge, Massachusetts.

Q. Okay. I had earlier asked you about preparation of your report and understood that

Page 223

the only people who provided you information for your report were Dr. Kram or people working with Dr. Kram and Dr. Laton.

It sounds like you now worked with individuals at Industrial Economics in Cambridge, Massachusetts?

A. Yes.

Q. Okay. Could you explain what that is and who those people were?

A. So they are a consulting firm in Cambridge, Massachusetts, that specializes in environmental economics and environmental policy analysis. They may have other areas that they work in, that I may not be familiar with.

Q. And apart from looking at Google Earth images of homes in the class area, what other contributions did they make to the work in your report?

A. So they provided me with the calculations in the spreadsheet under my direction.

Page 224

Q. And is that the extent of the assistance you received from others in preparing your report?

A. There is nothing else that I can recall at this time.

Q. Okay. So the only individuals you were working with on your report or the work underlying your report were at Industrial Economics in Cambridge, Massachusetts; is that right?

A. That's right. And so it might be the way you asked the question, and so the earlier one, I was giving you information about who had kind of provided specific stuff that I used and I -- these are differentiated in my mind, who did things under my direction, but these are the only ones that did anything under my direction.

Q. Are there any other categories of people involved in your report, aside from people who provided you with information and people who did things under your direction that

Page 225

57 (Pages 222 - 225)

I should know about?    14:42:43

A. Not that I know of.    14:42:44

Q. Okay. Who was paying for the    14:42:45 services of Industrial Economics in Cambridge,    14:42:47 Massachusetts?    14:42:52

A. The Lanier firm. The Lanier firm.    14:42:52

Q. Okay. Have you provided the    14:42:55 invoices for their services?    14:42:57

A. No.    14:42:58

Q. Do they send you invoices for their    14:42:59 services or do they go only directly to the    14:43:06 Lanier firm?    14:43:11

MR. NIDEL: Objection to form and    14:43:12 foundation.    14:43:13

THE WITNESS: I believe I receive    14:43:14 copies of their invoices, but they don't send    14:43:15 them to me.    14:43:17

BY MS. KLABER:    14:43:20

Q. You receive copies of their invoices    14:43:20 from a third party?    14:43:23

A. No, I am copied on them but they are    14:43:25 not sending them to me.    14:43:27

Page 226

Q. Okay. So you were a recipient when    14:43:28 they send out their invoices; is that correct?    14:43:31

A. Yes.    14:43:33

MS. KLABER: Okay. I'm going to    14:43:34 show you an exhibit. I believe it is Exhibit    14:43:36 45.    14:43:41

(Deposition Exhibit 45 was marked    14:43:41 for identification.)    14:43:46

BY MS. KLABER:    14:43:46

Q. It should come through momentarily.    14:43:54

Are you able to see Exhibit 45?    14:44:15

A. I can.    14:44:17

Q. Okay. This is the property located    14:44:18 at 70 -- 7101 Lubao Avenue in Winnetka that you    14:44:21 have estimated a market value of $3.74 million    14:44:28 in your report, and here, we can see images    14:44:33 from Google Maps of this home.    14:44:38

Do you think Industrial Economics    14:44:41 haven't seen this three bedroom, two bath,    14:44:45 2,000 square foot home that looks as it does in    14:44:48 those images, slightly in a state of disrepair,    14:44:51 would think that $3.74 million is a reasonable    14:44:54

Page 227

and accurate estimate for that property?    14:44:57

MR. NIDEL: Objection to form.    14:44:59

THE WITNESS: So I did not ask    14:45:00 Industrial Economics to make any judgments. I    14:45:03 asked them to provide me with information, and    14:45:04 as I said before, we looked at the    14:45:09 distribution. We knew that some were high, and    14:45:12 there are two factors that it was important to    14:45:19 use a consistent model and method for all class    14:45:23 properties.    14:45:26

And when you are doing any empirical    14:45:26 work, there are some errors and -- by the    14:45:30 bounds of only having 3 percent above a    14:45:32 million, it is pretty darn good based on any    14:45:36 empirical standard that I have worked with.    14:45:40

BY MS. KLABER:    14:45:43

Q. What was the purpose of Industrial    14:45:43 Economics looking at the images of the homes?    14:45:46

A. So they -- they were looking for a    14:45:51 couple things. Some, we were checking the    14:45:57 addresses when we went through to see if they    14:46:03 were consistent. We were seeing some that had    14:46:07

Page 228

the same address. We were looking to see    14:46:17 whether they were duplexes, that maybe they    14:46:19 were A and B or something in the address, but    14:46:23 didn't get put in, and also, when they were    14:46:27 going there, you know, this is where you would    14:46:31 go to get the most recent sales price if you    14:46:34 scrolled down.    14:46:37

Q. You just referenced a 3 percent    14:46:38 error rate. I'm not sure if error rate is the    14:46:44 right term there.    14:46:48

How would you describe that 3    14:46:49 percent figure you used?    14:46:51

MR. NIDEL: Objection to form.    14:46:53

THE WITNESS: I would say, you know,    14:46:54 3 percent looked, you know, looked like a    14:46:58 possible outlier and outliers would be kind of    14:47:02 an element you would consider in error.    14:47:05

BY MS. KLABER:    14:47:08

Q. So how did you calculate that there    14:47:08 was a 3 percent rate of outliers in your    14:47:11 spreadsheet of property value estimates?    14:47:19

A. So what we did is, we took the    14:47:22

Page 229

58 (Pages 226 - 229)

current sales value and we did a -- we looked at the distribution of them from high to low, and so they're 3 percent above a million. I am not saying all of those are outliers. Some of those above a million, it's possible that they could be ones, but if you kind of look at most of the cluster, you would expect them to be somewhat below a million, so that was a reasonable cutoff to look at it.

Q. Did you look only for high outliers or did you also look for low outliers?

A. We looked at low, so about 3 percent or below, about 450,000.

Q. Okay. And how did you determine that 450,000 to $1 million price range?

A. If you -- let's just make it simple for doing it. You have a hundred properties. You do your distribution. Then if a million was the fourth observation from the top, then you got three, 3 percent above, and if 450 was your fourth observation from the bottom, then you have got 3 percent below, so we looked at

Page 230

the distribution, and that's where the -- those cutoffs came from.

Q. So you were looking to identify the bounds, the bottom bound that would have 3 percent of properties below and the top bound would have 3 percent of properties above; is that accurate?

A. So we are looking at the distribution and a thousand was a reasonable break to say, you know, are the ones above a thousand. I mean, excuse me, above a million reasonable, or could they be potential outliers.

Q. I am just trying to understand how you decided on a million.

A. I am using million as an example to show you that there are very few high ones that you would consider that are outliers.

Q. Okay. For the meta-analysis in this case, you did not create your own model, did you?

A. I used the Simons and Saginor model.

Page 231

Q. Why did you not create your own model?

A. Because I thought the Simons and Saginor model was a peer-reviewed model that was suitable to develop damage estimates that fit this case.

Q. Why did you think it was suitable for this case?

A. Because it was the best information available out there in the literature, and it's well established that when you are doing transfers, to do it -- that meta-analyses is one of the best approaches to follow.

Q. How did you determine that Simons and Saginor was the best model out there, I believe you said.

A. So I looked at other -- other ones that are out there. There is a study by Ready that is cited, but that one only looked at landfills and did not identify whether there was contamination, so it wasn't one that was broad enough in the application.

Page 232

There was another one by Braden and colleagues that did it, but when you looked at it, the water part of it was for surface waters, not groundwater contamination, so of the ones that were in the literature, it was the best fit.

Q. And Simons and Saginor 2006 study was the best fit because you felt it was the closest match in terms of the groundwater contamination component; is that right?

A. No.

MR. NIDEL: Objection to form.

THE WITNESS: No, I did not say that. I said that overall, it was the best fit. I was giving you specific reasons why I had excluded the other two.

BY MS. KLABER:

Q. So was it the best fit simply because the other two were not a good fit, or was it a good fit on its own, Simons and Saginor?

MR. NIDEL: Objection to form.

Page 233

59 (Pages 230 - 233)

THE WITNESS: So I was answering -- if I understand correctly, you asked me about other ones, so I told you about why I did it. I -- even if those other ones hadn't been out there, I would have used Simons and Saginor. I think that it provides reliable information to look at the damages.

BY MS. KLABER:

Q. Why do you think it provides reliable information to look at the damages?

A. Well, for a variety of different reasons. It looks at environmental contamination broadly, which is one thing you want in a meta-analysis, and go back to -- I cite in my paper, you know, matter of fact it's the page -- just happens to be sitting out here from where you were, but Stanley says, if a number of independent studies have been conducted on a particular subject using different data sets and methods, then combining the result can furnish more insight and greater explanatory power than the mere listing of

Page 234

individual results, so that's one reason that I am using it.

I am also using it because it's peer reviewed and I am also using it because it is based on over 50 hedonic property value studies that are based on actual property transactions, and then those 50 studies are conducted across the U.S., so it's a study that can give you a prospective broadly that can be customized to different regions of the country.

Q. Okay. So to come up with your common property value diminution percentage of 9.4, you selected which variables from the Simons and Saginor study to turn on and which ones to turn off based on, what you considered to be applicable to this case; is that correct?

A. Yes.

Q. If we turn to Page 12 of your report, Exhibit 41, there is a table showing the variables used in the Simons and Saginor meta-analysis; is that correct?

A. Yes.

Page 235

Q. And looking at some of the variables that you turned on for your study, you used the Southern California variable; is that correct?

A. Yes.

Q. Do you know how many studies included in the Simons and Saginor meta-analysis were coded as Southern California?

A. I do not know, but it's not the matter of how many are looking at specific ones. It is how you look at all of those studies collectively. And so to start breaking it out into -- looking at the number in each different category undermines the fundamental precepts and insight that can come from a meta-analysis.

Q. Looking at the superfill variable, that's the one you turned on, correct?

A. Yes.

Q. Do you know how many studies in the Simons and Saginor meta-analysis were coded with superfill observations?

Page 236

A. I don't have that right here right in front of me.

Q. And same question for groundwater.

Do you know how many studies included in the Simons and Saginor meta-analysis were coded with observations for groundwater?

A. I don't have that in front of me, but my answer is -- before, is that is not a crucial element to doing it, how many you have in each one. It's that you have those mix and this is cross-sectional data and what you can learn from them collectively.

I mean, at the minimum, you wouldn't want them to be all that way because statistically, it would be singular, and you couldn't do it and you wouldn't want it to be zero because you couldn't identify any effect but there is no threshold of how many you have to have in each specific bid.

Q. Looking at Page 15 of your report.

A. Yep.

Page 237

60 (Pages 234 - 237)

Q.   The bullet point second from the bottom: "Superfill."

You state that the superfill variable: "This variable indicates the presence of a property with hazardous waste which is the condition of the site."

Do you see that?

A.   Yes.

Q.   What is Simons and Saginor's definition of the superfill variable?

A.   I would have to go back and look at it, but I know that hazardous waste was one of the elements there.

Q.   Okay.

A.   If we went back to the -- to that exhibit, we can speak to that specifically.

Q.   Yes. Let's go back to that exhibit. Was it 43?

A.   I can't tell -- oh, yes, it was 44, it looks like.

Q.   44. Can we go to Exhibit 44?

A.   Yeah.

Page 238

Q.   And I want to look at Page 77, numbered in the upper right, upper right-hand corner.

Let me know when you are there.

A.   Yep. Yep.

Q.   Okay. Towards the bottom of Page 77, it says: "The superfill variable contains landfills, hazardous waste sites, and Superfund sites."

Do you see that?

A.   I am still looking.

Q.   Five lines from the bottom.

A.   Yes.

Q.   How did you determine that 8020 Deering is a hazardous waste site?

A.   That was relying on Laton and Kram for the release of TCE into the groundwater.

Q.   Okay. So you didn't have your own definition of hazardous waste site; is that correct?

A.   No.

Q.   Do you know if any of the underlying

Page 239

studies for the Simons and Saginor meta-analysis define a hazardous waste site?

A.   I was confused by the wording of that question.

Q.   Do any of the underlying studies from the Simons and Saginor meta-analysis define the term "hazardous waste site"?

MR. NIDEL:  Objection to form and foundation.

THE WITNESS:  I do not know if they define it or if it's defined consistently.

BY MS. KLABER:

Q.   Have you reviewed the underlying studies coded as superfill to ensure that they involve sites similar to the 8020 Deering site here?

A.   So once again, you are -- I'm just going to explain that, you know, basically, we are using the meta-analysis to do a benefit transfer.  When you start breaking it down saying, does it match this A, does it match B, making it the same, that is -- is -- like you

Page 240

are doing a value transfer versus a function transfer.  What matters in the function transfer is that you can use the information collectively.

And I relied on the Simons and Saginor which was a peer-reviewed study and did not go back to kind of asking, does each item match up directly.  It's that they match up collectively.

Q.   So you didn't do anything to determine that the hazardous waste sites in Simons and Saginor's meta-analysis were similar to 8020 Deering in any way before determining that 8020 Deering was a hazardous waste site as defined by the superfill variable; is that right?

A.   So I guess a couple of things here, when you are -- when you are doing it as the -- I lost my train of thought.  Sorry.

So you don't go back, and I did not go back and review each -- each site.  I have to take it as it is in this Simons and Saginor,

Page 241

61 (Pages 238 - 241)

and I have applied it directly without changing their coding or anything as -- following as they have it.

Q.   Well, how did you determine that the superfill variable should be turned on?

A.   I think I have already answered that and I said that it -- they classify ones that are hazardous waste and -- excuse me, I took that from Laton and Kram, but you also -- I think if I can find it, hang on just a second. I thought I remembered something else from Simons and Saginor but I don't think I'm going to be able to quickly, off the cuff, find it. Hang on.

I can't find it right off the top of my head. Sorry.

Q.   Okay. Let me ask a different question.

Do you know if 8020 Deering has been classified as a California hazardous waste site by the California Department of Toxic Substances Control?

Page 242

MR. NIDEL: Objection to form and foundation. Calls for a legal conclusion.

THE WITNESS: I do not have that information and that is not necessarily something that would be required for people to be reacting to contamination from a site. It would be one of the factors that could come in play, but not the only one.

BY MS. KLABER:

Q.   Right, but if we are going to classify it under the model as a hazardous waste site, shouldn't we make sure that it's a hazardous waste site?

MR. NIDEL: Objection to form. Now, you are misstating the document completely.

THE WITNESS: So the hazardous waste is a coding that is used in the model for when there is hazardous waste. It is not a legal definition or a state one. The only one in here that would come -- rise to that level is -- let me just go back up here.

So if it is a Superfund, then

Page 243

clearly, you know, to be that one, Superfund is a very specific classification, so it would have to be hazardous waste, it's not in that same category as a Superfund site.

BY MS. KLABER:

Q.   Right. So on Page 76 here of the Simons and Saginor study, superfill is defined as three types of sites, Superfund sites, and we said this is not a Superfund site, correct?

A.   Yes.

Q.   It's defined as landfills. 8020 Deering is not a landfill; is that correct?

A.   That's correct.

Q.   And then hazardous waste sites, so it is your opinion or Dr. Kram and Laton's who you are adopting, that 8020 Deering is a hazardous waste site; is that right?

MR. NIDEL: Objection to form. Now, again, you are misstating the document.

THE WITNESS: So it is a site where hazardous materials have been released.

BY MS. KLABER:

Page 244

Q.   Okay. In your mind, is there a difference between a hazardous waste site and a site where hazardous materials have been released, or are they the same?

A.   It's a label that was put on the variable, and I would understand that it includes both.

Q.   How would you understand that it includes both?

A.   From my extensive knowledge in the field of labeling variables and understanding how people label variables and peer reviewing journal articles, that you use general categories for groupings.

Q.   But you haven't reviewed the underlying studies that are coded here by Simons and Saginor to determine if they involve both hazardous waste sites and sites on which hazardous waste is present; is that correct?

A.   In my mind, there is -- if they're a hazardous waste site, then there is hazardous waste present. I don't understand the

Page 245

62 (Pages 242 - 245)

distinction you're trying to draw.

Q.   So if California draws a distinction and has a specific definition of hazardous waste sites and identifies them publicly, that doesn't matter to you in whether or not 8020 Deering is a hazardous waste site; is that right?

A.   That would be correct, because it's how the variable was coded in the analysis, not a legal definition.

Q.   Okay.  But I am trying to understand how you think the variable was coded in the analysis, and my understanding is, you didn't look at all the studies that received superfill coding to determine whether -- when they were coded as superfill, due to being a, quote unquote, hazardous waste site, they simply had some hazardous waste versus being, for example, a hazardous waste disposal site.

Did you make that determination?

MR. NIDEL:  Objection to form.

THE WITNESS:  I didn't -- I did not

Page 246

make that distinction, but I will say it again, my experience is, is that what they are talking about is where there have been hazardous materials released.  I have reviewed hundreds of these studies through time that have gone out, and it could be a site operations that there was fill, it could be a disposal site where they are doing, there would be hazardous waste.

The only ones that are, you know, there are some studies that are very specific, like, the Superfund, but there are other ones that -- just looking at the many sites where there is some type of hazardous material released.

BY MS. KLABER:

Q.   So you are relying on your experience as to what the term "hazardous waste site" means without actually making a determination of whether the studies underlying the Simons and Saginor meta-analysis fit that criteria; is that right?

Page 247

MR. NIDEL:  Objection to form.  Misstates the witness's testimony.

THE WITNESS:  I am making that judgment on my experience.  I am also making it on the basis that it is a peer-reviewed journal that others have reviewed and accepted.

If others thought that it was a concern, there would have been an issue brought up in the peer-review process that would have asked them to change it so it made it through the peer-review process and I think that, you know, the peer-review process provides a reliable analysis to base my model on.

BY MS. KLABER:

Q.   Why would the peer-review process care about whether hazardous waste sites means actually designated hazardous waste sites, or whether it means sites on which hazardous waste could be present in some capacity?

MR. NIDEL:  Objection to form.

THE WITNESS:  The peer review would not be worried about the distinction that you

Page 248

are making.  The peer review would be -- excuse me, concerned with whether the label hazardous waste was an appropriate label to use for this variable in the analysis.

BY MS. KLABER:

Q.   And if the hazardous waste sites in the studies underlying Simons and Saginor all involved hazardous waste disposal sites, would that be an inappropriate use of the variable?

MR. NIDEL:  Objection to form.

THE WITNESS:  I don't know whether I can really answer that without any -- any -- without further information.  I mean, you are splitting hairs in terms of how things are coded and when the models are being done.

BY MS. KLABER:

Q.   So you don't know whether the hazardous waste sites and the studies underlying Simon and Saginor are either deemed to be hazardous waste sites by a regulatory body or hazardous waste disposal sites.

You just didn't look at that level

Page 249

63 (Pages 246 - 249)

of granularity; is that right? 15:10:13

A. I did not, but if, in the review 15:10:15 process, the reviewers saw that they were using 15:10:18 ones that were defined by a regulatory body, 15:10:22 they would have asked Simons and Saginor to 15:10:24 clarify their -- their variable definition or 15:10:28 labeling. 15:10:31

Q. How do you know they would have 15:10:33 asked? 15:10:33

A. Because I would have asked in my 15:10:36 peer review and I have had peer reviewers ask 15:10:38 me to clarify. 15:10:41

Q. Peer review is a flawless process 15:10:41 that catches every error; is that right? 15:10:44

MR. NIDEL: Objection to form. 15:10:47

THE WITNESS: There is no process 15:10:48 that is perfect, so there could be errors, but, 15:10:50 you know, one of the things that -- typically, 15:10:53 on these papers, you have three peer reviewers, 15:10:55 so there is three different expert eyes looking 15:10:58 at it, going over it, but there could -- this 15:11:01 -- possibly could be errors in anything in the 15:11:04

Page 250

world. 15:11:06

BY MS. KLABER: 15:11:06

Q. Why would it be an error to define 15:11:06 hazardous waste sites as a regulatory hazardous 15:11:09 waste site? 15:11:14

A. That's not what I said. 15:11:14

Q. Why would it require clarification? 15:11:16

MR. NIDEL: Objection to form. 15:11:20

THE WITNESS: I don't -- I don't 15:11:24 know what you are asking me, as to why would 15:11:26 that require clarification. 15:11:28

BY MS. KLABER: 15:11:30

Q. In this list of what superfill 15:11:30 incorporates, Superfund, landfill and hazardous 15:11:33 waste sites, you said if hazardous waste sites 15:11:37 was limited to sites designated by a regulatory 15:11:39 body as hazardous waste sites, it would require 15:11:43 some kind of clarification in this report. 15:11:46

A. But if they saw that, they would ask 15:11:48 them to clarify it, yes. 15:11:50

Q. Why? Why isn't hazardous waste 15:11:51 sites on its own clear enough? 15:11:55

Page 251

A. Because it would be what the -- an 15:11:57 interpretation of what those were. 15:12:05

Q. It would be -- what the 15:12:07 interpretation of? 15:12:08

A. Of the variables in the model. I 15:12:08 don't know where you are going. I feel like we 15:12:13 are going in circles. 15:12:15

Q. Yeah, I am fairly confused about 15:12:17 what you are trying to say as well. 15:12:19

Okay. Do you know how Simons and 15:12:22 Saginor defined groundwater, the groundwater 15:12:32 variable? 15:12:36

A. They defined it as water pollution 15:12:36 from leaking underground storage tanks and 15:12:41 other sources. 15:12:46

Q. I am looking at Page 77 of the 15:12:46 Simons and Saginor study, bottom two lines. 15:12:55 "Groundwater" -- 15:12:58

A. Give me a chance to get there, 15:12:58 please. 15:13:00

Q. Sure. 15:13:00

A. Okay. 15:13:05

Page 252

Q. "Groundwater focused on the type of 15:13:06 contamination and included general water 15:13:09 pollution studies, effect from leaking 15:13:12 underground storage tanks, water bound PCBs and 15:13:14 other sources." 15:13:19

Do you see that? 15:13:21

A. Yes. 15:13:21

Q. What is your understanding of 15:13:21 general water pollution studies? 15:13:23

A. So it would be a variety of 15:13:26 different types of pollutants, so they have a 15:13:28 mix of sources and contaminants here. They are 15:13:34 just saying there could be other sources and 15:13:40 contaminants that are included in there. 15:13:42

Q. But is it your understanding -- 15:13:45

A. Can you move your hand from your 15:13:47 mouth, please. 15:13:49

Q. Is it your understanding that any 15:13:50 study coded as groundwater involves only water 15:13:52 underneath the ground? 15:13:56

MR. NIDEL: Objection to form. 15:14:00

THE WITNESS: I would have to go 15:14:01

Page 253

64 (Pages 250 - 253)

back and look at each of the studies individually right now to answer that, but generally, groundwater means water below the surface.

BY MS. KLABER:

Q. Do you have any recollection of whether Simons and Saginor included, for example, lakes, experiencing contamination in the groundwater variable?

MR. NIDEL: Objection to form.

THE WITNESS: I would have to go back and -- and look to answer that question.

BY MS. KLABER:

Q. Would you also have to go back to look and see if they included contamination in a body of water such as a bay in the groundwater variable?

A. I would have to go -- go back and look.

Q. Do you believe that type of contamination of a lake or bay would be comparable to groundwater contamination?

Page 254

MR. NIDEL: Objection to form.

THE WITNESS: I believe that there are compatibilities in terms of water contaminant -- water contamination and -- that occur with any -- any type of water contamination.

BY MS. KLABER:

Q. So you think it would be appropriate to compare studies of a contaminated lake to the Canoga Park groundwater plume, right?

A. So once -- once again, we are not comparing individual studies to individual studies. We are comparing what the studies tell us collectively versus individual comparisons.

Q. In performing your calculations, you turned on both the superfill and the groundwater variables.

Is there ever a scenario where you would turn on the groundwater contamination variable without the superfill variable?

MR. NIDEL: Objection to form.

Page 255

THE WITNESS: There possibly might be. I would have to look and know the specific case.

BY MS. KLABER:

Q. So if you used the superfill variable to denote any situation where there is a site from which contamination originates, and that contamination affects the groundwater, would you always turn on both of those variables in that scenario?

MR. NIDEL: Objection to form.

THE WITNESS: Can you read that question back to me, please.

(The record was read as requested.)

THE WITNESS: Yes.

BY MS. KLABER:

Q. Does applying both of those variables duplicate the negative effect coming from a single source?

A. No.

Q. Why not?

A. Because one is describing the source

Page 256

and the other is describing the consequence.

Q. Under your model, proximity to the source is the main driver of property value diminution; isn't that correct?

A. Yes.

Q. So then why do you need to account for both?

A. Because the groundwater described -- further describes what is happening at that source, that it is contaminating groundwater.

Q. If you turned off the superfill variable hypothetically, because it was not appropriately applied, that would reduce your property value diminution percentage by almost half; is that right?

A. That is about half, but, I mean, that is a hypothetical and something that you would not do.

Q. That's a hypothetical, I understand that.

You applied the announcement of a bad thing variable in performing your

Page 257

65 (Pages 254 - 257)

calculations; is that correct?

A. Yes.

Q. How do you define "announcement of a bad thing"?

A. So I followed, you know, Simons and Saginor with what they had in their -- in their paper.

Q. Okay. So Simons and Saginor define announcement of a bad thing, it is on Page 78 in the middle.

"Announcement of a bad thing is the discovery of the contamination such as a study conducted that revealed groundwater contamination or the release of a radioactive cloud."

Do you see that?

A. Yes.

Q. Do Simons and Saginor consider common knowledge to be the same as announcement of a bad thing?

A. So they are -- the way I interpret it is, they are saying common knowledge is one

Page 258

way where information about a bad thing becomes available, not that they are exactly the same, but it's one way that that information becomes available because they define as common knowledge, announcement of a bad thing and announcement of closing.

Q. Okay. This was something that I was very confused about.

Is common knowledge a separate variable from announcement of a bad thing?

A. Not in the model the way they have it specified. It's one of the things that would be -- activate this variable in the model.

Q. So if -- again, because I was really confused about this.

If there is common knowledge is -- under Simons and Saginor's definition, do you turn on the announcement of a bad thing variable?

A. No. I turn it on because --

Q. No, no, I am not -- not asking what

Page 259

you did. I am asking, just understanding --

A. You asked me if you turn it on, so I interpret that as you are asking me.

Q. I said would you turn it on.

But if there is common knowledge, would the appropriate variable to select be announcement of a bad thing, or are there separate items to select in the model?

A. It would be appropriate to turn it on, announcement of a bad thing.

Q. Okay. Thank you for explaining that.

MS. KLABER: If we could take a short break, I think this would be a good time for me.

Go off the record.

THE VIDEOGRAPHER: This marks the end of Media Unit 7. Going off record. The time is 3:22 p.m.

(A short recess was taken.)

THE VIDEOGRAPHER: This marks the beginning of Media Unit 8. Going back on

Page 260

record. The time is 3:37 p.m.

BY MS. KLABER:

Q. Dr. Boyle, looking back at Exhibit 41, your report on Page 16.

You state that: "Simons and Saginor did not report the log of sample size used to estimate the hedonic equations that were the bases of the meta-analysis, so you instead used the log of sample size from different meta-analysis published by Ready in 2010;" is that correct?

A. Yes.

Q. Why is the Ready 2010 log of sample size relevant here?

A. I chose another meta-analysis that had several hedonic studies in it to provide an example of what would be the sample sizes that would be used in a meta-analysis of hedonic property value studies.

Q. You state in your report that 1,612: "Using the 1,612 number for the log of sample size is plausible and conservative because the

Page 261

66 (Pages 258 - 261)

sample size for hedonic equation can range from" less to a hundred -- "less than a hundred to tens of thousands;" is that right?

A. Yes.

Q. You don't know, for the Simons and Saginor study, whether the sample size was less than a hundred or tens of thousands?

A. I am fairly certain that they were not tens of thousands, because tens of thousands have really only been available for us doing analysis with some of the big data availability that has happened in recent years, and so there are much more likely to be in the hundreds range.

Q. How is borrowing the 1612 figure from Ready not just applying a random number from an unrelated study and assuming it is relevant in Simons and Saginor?

MR. NIDEL: Objection to form.

THE WITNESS: Well, what I did was actually avoid just picking a random number from an arbitrary study. If I went out into

Page 262

the literature and just pulled one study, that would be just pulling one arbitrarily, and Simons and Saginor had multiple studies so if I would have been using it, if they had a report, it would have been the average that I was using.

So I went to another meta-analysis, I needed to find out what their average was, and so I was actually doing the best with the information to have one that would be -- provide a similar sample size versus arbitrarily picking a random study for one.

BY MS. KLABER:

Q. How did you know it was a similar sample size?

A. I didn't say it was a similar sample size. I said it was a similar type of analysis, meta-analysis of hedonic, which would give me the best estimate of what it might be for Simons and Saginor.

Q. You said earlier that the Ready 2010 study was another meta-analysis that you

Page 263

decided not to use in this case; is that correct?

A. That's correct.

MS. KLABER: I would like to mark another exhibit.

(Deposition Exhibit 46 was marked for identification.)

BY MS. KLABER:

Q. So we have marked Exhibit 46, which should make it to you momentarily.

This is an expert report authored by you in the case of Romano v. Northrop Grumman.

Do you recognize this report?

A. Yes.

Q. If you could look at Page 18 of Exhibit 46. It's numbered Page 18. I think it will probably also be PDF Page 18.

A. Sorry, it's not scrolling fast.

Q. Well, while you are waiting, I will confirm, for this report in Romano v. Northrop Grumman, you also used the Simons and Saginor meta-analysis to write your report; is that

Page 264

correct?

A. Yes. Okay. Page 18.

Q. So Page 18 at the bottom, the bullet: "Log of sample size."

A. Hang on just a second. I took my finger off and it scrolled. Okay.

Q. You state that you used the population of family homes in Bethpage, you provide the number there, then the number of times an adult moves in their lifetime, you provide the number there, and the life expectancy of an adult -- the life expectancy in the U.S., you provided the number there, and you used all that to compute the number of properties that might sell in a typical year for your log of sample size figure in this analysis.

Do you see that?

A. Yes.

Q. Why did you not do that here?

A. I -- as I thought about it, I thought there are ways of doing that but you

Page 265

67 (Pages 262 - 265)

have properties that sell and properties for different areas, but I thought that if I looked at the -- excuse me, the hedonic studies, that gives me a better idea of the number of observations that would be used in hedonic studies, and so I adjusted, but these do not change very much.

If you, you know, look at the variable, it's Point 003, so I thought it would be better to kind of use information that came from another meta-analysis, but I also checked it against this, and there is not a huge difference in the outcome, so I could have used either one.

Q.    Do you know if any of the studies reviewed by Simons and Saginor involved vapor intrusion?

A.    I do not believe.  When you look at their variable definitions for air, it does not appear that they classify vapor intrusion as one of them and I will just kind of go back to the baseline of what I am doing.  It's the

Page 266

proximity to the source of the contamination.

Q.    That's okay.  You don't have to get into that.  I think you answered the question.

MR. NIDEL:  Okay.  You are not going to tell him how to answer the questions.  So I object to interrupting his answer.

BY MS. KLABER:

Q.    Do you know how Simons and Saginor chose the 75 journal articles that they used for their meta-analysis?

A.    They describe it in their paper, but, you know, without going back to the details, I think they did an extensive review of the literature to find out what ones are there and then chose the ones that had the information to use in their meta-analysis and they followed standard procedures that are used in meta-analysis.

Q.    So if I wanted to know specifically how they chose those 75 articles, I would have to ask Simons and Saginor; is that right?

A.    I think we could go back to their

Page 267

paper and there is a statement about how they did it, how they went about doing it.  It's not that they chose them.  They went out and identified all of them in the literature and then they designate some exclusions of why some of the studies were not carried forward, so it was not a case of choosing individual studies.

It was going out and identifying the ones that are out there, and then any meta-analysis, there are some reasons why some of them might not be included.  For example, they may be, even though they fit your search, they may be a theoretical versus an empirical paper.

Q.    Do you know how old the oldest study that Simons and Saginor analyzed in their meta-analysis is?

A.    I do not have that right off the top of my head but I was not concerned with age. There is no evidence out there in the literature that the proportion of property values changed through time, and it's very

Page 268

standard to use the information that is available when you do these meta-analysis.

You know, I'll give you an example. The water quality one that I did in the Hovensa case was -- this was in the 2000s, was published in 1994, and had studies going back to the '80s and '70s and that was admitted into evidence.

Q.    Would it surprise you if the oldest study analyzed by Simons and Saginor was 41 years old?

A.    It would not surprise me.  The first hedonics were actually done in the 1960s, and they were actually developed in the auto industry of looking at how you price cars with fins or V8s or four-on-the-floor, so that would have been the earliest, yes.

Q.    Did you perform any analysis to determine if data from 41 years ago is relevant for the analysis of property values in 2023?

MR. NIDEL:  Objection to form.

THE WITNESS:  I accepted the Simons

Page 269

68 (Pages 266 - 269)

and Saginor as peer reviewed. If the peer-review process had said that they -- if there was a question with that, it would have -- it would have come up, but it is very standard to use data over a number of years in your analysis and not discount or exclude those studies.

You know, when you are doing -- this is cross-sectional, but this is kind of cross-sectional and time series, but, you know, when you do time series, economic analysis, and you might go back to the '20s and '30s and so older information is included in a pretty standard practice.

BY MS. KLABER:

Q.   Are you aware that there are studies in the Simons and Saginor meta-analysis that show no impact from groundwater contamination?

A.   I am aware that there are some studies that showed no impact, but what the Simons and Saginor study shows is that collectively, there is an impact.

Page 270

Q.   Does Simons and Saginor calculate an average impact from -- from the impact of the underlying studies?

A.   It's not -- it's not -- it's not an average of those studies, but you could interpret the estimated coefficient as an average effect.

Q.   Isn't it true that Simons and Saginor's meta-analysis is always going to show a property value diminution unless all of the underlying studies show zero impact?

MR. NIDEL:  Objection to form.

THE WITNESS:  I can't -- I can't answer that question.

BY MS. KLABER:

Q.   If you are taking an average, and you have any numbers above zero, won't your number always be above zero?

MR. NIDEL:  Objection to form.

THE WITNESS:  So I did not say we are taking an average.  I said you can interpret the average, the coefficient as the

Page 271

average effect.  The effect, if there are -- if the studies are showing significant effects, then you would expect to see a significant effect in the Simons and Saginor analysis.

BY MS. KLABER:

Q.   If you had ten studies and five show no effect and five show a significant effect, running their model, will you not always calculate a positive property value diminution percentage?

MR. NIDEL:  Objection to form.

THE WITNESS:  I would not know until you, you know, specifically ran the analysis of -- if you had had different ones, but you would expect to see a negative property value diminution, because, you know, the literature has shown over and over for a lot of different things that disamenities reduce value and amenities increase value.

So your operating hypothesis would be that there is a negative effect and so, you would, you know, want to test the hypothesis

Page 272

that it's less than zero versus not.

BY MS. KLABER:

Q.   I want to look at Exhibit 42 again, the Simons and Saginor study.

A.   Isn't Simons and Saginor 44?

Q.   Is it 44?  Sorry about that.

Exhibit 44, Simons and Saginor, and I am at Page 86.

There is a header in the middle of Page 86 that says: "Common Validity Threats to Meta-Analysis."

Let me know when you are there.  It is Page 86 in the upper left, just to be clear.

A.   Yep.

Q.   Okay.  So in the middle paragraph under: "Common Validity Threats to Meta-Analysis," Simons and Saginor note that: "There are a few threats to the validity," and then they note: "One of the more important is the file drawer effect. (Studies with no significant findings get buried in a file drawer.  Hence, a bias towards studies with

Page 273

69 (Pages 270 - 273)

significant findings.)"

And then the sentence continues on.

Do you see that?

A.   Yes.

Q.   So in relying on all published studies for your property value diminution percentage, you are biased towards finding diminution, correct?

A.   Well, I think you are misstating this, and so, you know, one of the things is you added the words "most important" and they did not use that. They said the file drawer effect looks at the potential bias of peer-reviewed journal to accept research --

Q.   I think you are looking at a different part from where I read.

A.   Okay.

Q.   If you look at the middle paragraph, it says: "However, there are a few threats."

Do you see that?

A.   Okay.

Q.   And it says: "One of the more

Page 274

important" -- which is what I said.

A.   Okay. I was looking down.

Q.   -- "is the file drawer effect. Studies with no significant findings get buried in a file drawer. Hence, a bias toward studies with significant findings."

Do you see that?

A.   Yeah. Hang on just a second.

I see that.

Q.   Okay. So since your property value diminution percentage relies solely on published studies, it then may have a bias towards finding diminution; is that correct?

MR. NIDEL: Objection to form and foundation. Incomplete hypothetical.

THE WITNESS: So one of the reasons that I chose the Simons and Saginor analysis is, they did robustness analyses and so robustness analyses are ways that you go out and test your model and -- excuse me, what they did here is, they did the Wolf test, and they said it would take 34 studies with contravening

Page 275

-- contravening were my words, to overturn the results.

So this shows that their results are quite robust for what they saw and so they basically are saying they did not find evidence of bias. They said that it's there but with robustness, they did the appropriate thing of testing for it and their evidence shows that the -- it's very unlikely that there is bias.

BY MS. KLABER:

Q.   Can you turn to Page 79 of this same exhibit, 44, the Simons and Saginor study. Simons and Saginor?

A.   Okay. I'm on 79.

Q.   Okay. And this is the very top of the page. Simons and Saginor write: "One final note merits mention before discussing the model results."

Do you see that?

A.   Yes.

Q.   And then the next sentence says: "Some of the results are dated and may not be

Page 276

indicative of changes in either the market or existing laws."

Do you see that?

A.   Uh-huh.

Q.   Simons and Saginor wrote this in 2006; is that right?

A.   Yes.

Q.   That was 17 years ago?

A.   Yeah.

Q.   So anything that was dated then was not necessarily indicative of the market or existing laws in 2006, wouldn't it be even more dated now in 2023?

MR. NIDEL: Objection to form.

THE WITNESS: So you have to look at what it was at the time, and so they're finding a market effect at the time. That does not mean that their market effect at the time that the studies was done is unreliable, but there could be other things now.

And as I said before, that -- if you look across the literature, there's -- there's

Page 277

70 (Pages 274 - 277)

a lot of meta-analysis out there of different -- different types of valuation. There is endangered species, there is coral reefs. There is these contamination ones.

I cannot find any evidence that shows that the proportion that is observed is moving through time. They are fairly, fairly robust. Now, there are new things that happen so that you -- basically, what you see in the literature is this new identifications that come out, so where you didn't see an effect in the past, you see it -- you see it now. So, you know, basically, it's created more studies and a more robust one now.

BY MS. KLABER:

Q. But they felt that they should write that some of their results are dated and that's correct.

A. They use -- they use the word "dated." And one of the things when you were writing an academic paper is you have to put in cautions. That doesn't mean that the

Page 278

information shouldn't be used unrelated or is unreliable. It just means that there are cautions that you put in.

It's standard that you do, and, you know, one of the reasons you do robustness analyses is to see how strong your results are. If one of the ways that you would look for these dated ones is, you would expect if they were of concern that they would be outliers, and one of the reasons I chose Exhibit 3 was the one with outliers removed, and so I followed their robustness to provide the best, most reliable estimates.

Q. Can we go and look at the abstract of Exhibit 4, the Simons and Saginor study.

It will be the first page, but I'm sure you know that.

A. Okay. I got it up.

Q. Okay. And in the abstract here, Simons and Saginor note that they generated a data set of about 290 observations that contain information about each study's loss, the

Page 279

dependent variable, with the independent variable being distance from the source, type of contamination, urban and rural environment, geographic region, market conditions and other -- and several other variables.

Do you see that?

A. Yes.

Q. Have you ever reviewed that data set?

A. I have not.

Q. Do you have the data set underlying the Simons and Saginor study?

A. I do not have the data set. It would not be standard to request it, when you look at peer reviewed, that's a scientific signal that the study is valid and reliable.

Q. Have you ever asked for the Simons and Saginor data set?

A. I have not.

Q. Do you know if Simons and Saginor still have it?

A. I do not.

Page 280

Q. Is it your understanding that in the peer-review process, the peer reviewers review and confirm the validity of the underlying data?

A. Sometimes, but it's not something that is done as a standard practice that you go out and reestimate their models and everything. Typically, what you do in the review process, you ask them to do additional analyses in a revise and resubmit process.

Q. So it's your understanding that the peer-review process typically does not review the study's underlying data?

MR. NIDEL: Objection to form.

BY MS. KLABER:

Q. Is that correct?

MR. NIDEL: Objection to form.

THE WITNESS: I would say that -- that I have never had a reviewer ask to review my data. They have asked me to do additional things.

Now, there are requirements with

Page 281

71 (Pages 278 - 281)

journals that you have to make the data available with -- with some, but not all journals, but that when you have to make it available is when the paper goes to publication.

MS. KLABER: I'm going to show you another exhibit. This should be Exhibit 47.

(Deposition Exhibit 47 was marked for identification.)

THE WITNESS: I was looking. It hasn't popped up the last time I refreshed.

BY MS. KLABER:

Q. It should pop up in a moment.

A. Yes.

Q. This is a Wall Street Journal article dated November 10, 2023. The title of it is: "What's Wrong With Peer Review," with a subtitle of: "A series of high-profile retractions has raised questions about the process used by scientific and medical journals to decide which studies are worthy of publication."

Page 282

Are you able to see the exhibit?

A. Yes.

Q. Okay. The second paragraph of the exhibit states: "Scientific and medical journals use the peer-review process to decide which studies are worthy of publication, but a string of questionable or allegedly fabricated research has made it into print. The problems were exposed only when outside researchers scrutinized the work and performed a job that many believe is the responsibility of the journal. They checked the data."

Do you see that?

A. Yes.

Q. This is on the next page. If you could flip to the next page. That first full paragraph.

The end of it, it says: "The journal editors acknowledge that the error of fraud can escape notice because reviewers don't audit underlying data sets."

Do you see that?

Page 283

A. Yes.

Q. This can kind of confirm what you were saying about the peer-review process not typically reviewing the underlying data set, right?

A. Yes.

Q. Okay.

A. I think -- note -- I should say I'm aware of this. I think we all are.

Q. There wasn't a question pending so...

MR. NIDEL: There was a question pending. He answered it.

MS. KLABER: He answered it yes, and then --

MR. NIDEL: He can continue talking. There is not another question pending, and there is still a question pending. Yeah.

MS. KLABER: The question is answered. If he is going to answer something apart from yes or no to answer a question, after he thinks more, because I paused, he

Page 284

finished answering the question.

MR. NIDEL: No, that is not how it works and that's not how it's worked in any of these depositions.

MS. KLABER: That is exactly how it works.

MR. NIDEL: No, it is not. You can go ahead.

BY MS. KLABER:

Q. Simons and Saginor didn't create --

MR. NIDEL: You can go ahead, Dr. Boyle.

THE WITNESS: I was just going -- I was going to continue. That's something that we're all aware of, but it doesn't mean that the peer-review process is totally flawed. We can't have a few just knocking down the all.

Yeah, there are things that need to be done, but it doesn't incriminate every single peer-review process that is done.

MS. KLABER: I'm going to move to strike all of that as nonresponsive.

Page 285

72 (Pages 282 - 285)

BY MS. KLABER:

Q.   My next question is --

MR. NIDEL:  Good idea.

BY MS. KLABER:

Q.   Simons and Saginor did not create their meta-analysis for purposes of calculating property value diminution in litigation, did they?

A.   I have no knowledge about why they put it together.  When you do your papers, you publish your research, you -- you honestly don't have any idea of how they are going to be used, so you try to do the best job you can of documenting your research so that when people use them, they understand what the research is.

But I have never, you know, myself, have never put one out that is specifically for this or that.  You are trying to advance knowledge and use -- realize your research is going to be used in a number of different ways.

Q.   You don't believe they've stated anywhere in their study what their motivation

Page 286

was for putting it together?

A.   I don't recall, but, you know, motivation and -- and use are two different things.

Q.   Okay.  Could you explain to me what statistical significance is?

MR. NIDEL:  Objection to form.

THE WITNESS:  So statistical significance is when you are testing whether a -- the data supports a hypothesis about an outcome.

BY MS. KLABER:

Q.   Is there a typical P value used in your field as a threshold for statistical significance?

MR. NIDEL:  Objection to form. Incomplete hypothetical.

THE WITNESS:  So I don't know if there is a typical, but it is often at the 1, 5 and 10 percent level.

BY MS. KLABER:

Q.   When you say "it's often at the 1, 5

Page 287

or 10 percent level," are you -- is that the range of P values that are generally considered to show statistical significance?

MR. NIDEL:  Objection to form. Asked and answered.  Incomplete hypothetical.

THE WITNESS:  So there is differences in different papers, but a lot of them that I do, I show significant -- they are often designated with asterisks and so one asterisk might mean 1 percent; two asterisks, 5 percent; three asterisks, 10 percent.

So all three might be reported, if somebody reports the standard error, which is common, then they can compute out the T or Z value and look at it at any significance level they would like as well.

BY MS. KLABER:

Q.   Do you have any published articles where you rely on nonstatistically significant variables to support your conclusion?

MR. NIDEL:  Objection to form.

THE WITNESS:  I don't think that I

Page 288

frame my articles that way when I have done them.  I just report results that I am doing of whether they are significant or insignificant. I'm not sure if my papers are written that, you know, an outcome is necessarily supporting it if you are reporting the outcome of the analysis.

BY MS. KLABER:

Q.   Do you indicate if the outcome is statistically significant or not?

A.   I do.

Q.   You -- I believe you said you used the outlier-free model from Simons and Saginor; is that correct?

A.   Yes.

Q.   Can we look at your September 27, 2023 report, Exhibit 41, Table 2, which is on Page 17.

A.   Yes.

Q.   And this table pulls in information from the outlier-free model from Simons and Saginor; is that correct?

Page 289

73 (Pages 286 - 289)

A. Yes.

Q. In the coefficient estimates column; is that right?

A. Yes.

Q. Okay. And the variables that you have turned on for purposes of your model are coded as 1 in this predicted loss -- this predicted coding column, the middle column; is that right?

A. Ones or down the bottom, there are some other codes.

Q. Some other codes. Okay.

So looking at the Southern California variable, that was not statistically significant at the 10 percent level, correct?

A. That is correct.

Q. And looking at the superfill variable, that was not statistically significant at the 10 percent level; is that correct?

A. That's correct.

Q. And looking at the groundwater

Page 290

variable, that was not statistically significant at the 10 percent level; is that correct?

A. It is not significant at the 10 percent level for the hypothesis equal to zero or not, but it is, if you do -- that's a two-sided test. If you do a one-sided test, that -- the coefficient is negative, which you expect versus zero, it is statistically significant.

Q. Did you do a two-sided test or a one-sided test?

A. I reported a one-sided test in my rebuttal. I was looking at that when I did it. Here, all I am doing is replicating Simons and Saginor and taking the information directly.

Q. Did Simons and Saginor do a one-sided or a two-sided test?

A. They did a two-sided.

Q. Why did you switch from two-sided to one-sided using their model?

A. Because the evidence in the

Page 291

literature has shown that disamenities reduce values, so that supports doing a one-sided test versus a two-sided. You would not expect a disamenity to increase values.

Q. For the groundwater variable, which you said was not significant at the 10 percent level, that means you can't rule out no effect; is that correct?

MR. NIDEL: Objection to form.

THE WITNESS: So first of all, I said that if -- if you do the one-sided, which I think is the appropriate one, there is an effect and it is that you cannot -- you cannot reject it so that means that there may be an effect, but it -- you can't conclude that there is no effect.

BY MS. KLABER:

Q. Okay. For -- and Simons and Saginor study for the superfill variable, which was not significant at the 10 percent level, you also can't rule out no effect; is that correct?

MR. NIDEL: Objection to form.

Page 292

THE WITNESS: Right, and you cannot rule out that there is an effect.

BY MS. KLABER:

Q. Is it your common practice to rely on coefficient estimates that are not statistically significant or not statistically different than zero to inform an estimate of diminution in value?

MR. NIDEL: Objection to form and misstates statistical significance and it's compound.

THE WITNESS: So in my analysis, the coefficients are the best evidence we have of the effect, and when you are looking at what the equation does to exclude variables that describe the situation, it would not be appropriate to move forward without them.

BY MS. KLABER:

Q. And here, some of the coefficients which you describe as the best evidence we have of the effect, are coefficients for which you cannot rule out no effect; is that right?

Page 293

74 (Pages 290 - 293)

MR. NIDEL: Objection to form. 16:14:48

THE WITNESS: For some of them. 16:14:51

BY MS. KLABER: 16:14:52

Q. Okay. Are you aware of any instance 16:14:52 in which a meta-analysis based on the Simons 16:15:03 and Saginor study has been accepted by a court 16:15:07 as a reliable method for showing class-wide 16:15:08 property value diminution? 16:15:11

A. I do not know. I do know that 16:15:13 meta-analysis have been accepted, but I don't 16:15:16 know about the Simons and Saginor. 16:15:18

Q. Are you aware that Robert Simons has 16:15:21 testified that his meta-analysis methodology, 16:15:25 which you likewise employed here as a means to 16:15:28 provide a rough -- as a means to provide a 16:15:34 rough estimate of expected loss that isn't 16:15:37 specifically -- let me ask that again, sorry. 16:15:40

Are you aware that Simons has 16:15:42 testified that his meta-analysis methodology, 16:15:44 which you employed here, is only a means to 16:15:49 provide a rough estimate of expected loss that 16:15:51 isn't specific to case facts or circumstances? 16:15:54

Page 294

MR. NIDEL: Objection to form and 16:15:57 foundation. 16:15:58

THE WITNESS: I am not aware of that 16:16:00 but in doing that, he is not looking at whether 16:16:06 this application has been applied to the -- fit 16:16:09 the issues in this case. 16:16:15

BY MS. KLABER: 16:16:18

Q. I'm sorry. What do you mean by "he 16:16:18 is not looking at whether this application has 16:16:21 been applied to fit the issues of this case"? 16:16:24

A. The application of the variables 16:16:27 that are used to -- to fit this case, how they 16:16:28 are coded, and any meta-analysis, you are using 16:16:30 it to get the best estimate you can. There is 16:16:34 always some error involved because you can't 16:16:39 have every single variable in the equation, and 16:16:42 that's one reason why you have constant term in 16:16:47 there, that constant captures effects of the 16:16:50 other variables that you don't have in to -- to 16:16:53 explain. 16:16:53

Q. How do you know what Simons was 16:16:59 looking at when he made that statement, if you 16:17:01

Page 295

were not aware that he made it? 16:17:04

A. I am saying he was not looking at 16:17:05 this. There is no way he could have been 16:17:07 looking at this. 16:17:09

Q. Oh, he wasn't speaking about your 16:17:10 report? 16:17:12

A. Yeah. 16:17:13

Q. But he was speaking about his 16:17:13 methodology perhaps, you don't know? 16:17:15

A. I have no idea what he was speaking 16:17:17 of, I'm saying he was not speaking to this one. 16:17:20

Q. Looking at your report, Exhibit 41, 16:17:20 yes, Page 22. 16:17:38

You note that -- the amount of 16:17:38 Google Scholar results. You note: "The amount 16:17:48 here of Google Scholar is typical for hedonic 16:17:51 property value models, economic meta-analysis 16:17:52 and economic benefit transfers." 16:17:56

Do you see that? 16:17:57

A. Yes. 16:17:58

Q. And you state that: "This level of 16:17:59 Google Scholar search term hits indicates that 16:18:02

Page 296

these methods are well-accepted by economists, 16:18:05 real estate professionals and individuals in 16:18:08 other disciplines," correct? 16:18:09

A. Yes. 16:18:11

Q. For hedonic property models, you 16:18:18 note there were 133,000 hits; is that right? 16:18:21

A. Yes. 16:18:24

Q. And you view that number of results 16:18:25 as indicating hedonic property models are an 16:18:27 accepted methodology in the field, correct? 16:18:30

A. That's one piece of information. 16:18:32

Q. It's -- are there more pieces of 16:18:34 information in this part of your report? 16:18:37

A. Yeah. When I go down and I talk 16:18:39 about the hedonic property values, I provide 16:18:41 more detail of each of them in the following 16:18:43 sections. 16:18:46

Q. Do you know whether the 133,000 16:18:47 articles you cite approve of hedonic property 16:18:52 value models? 16:18:55

A. I do not know whether they all 16:18:56 approve. When you are doing research, there is 16:19:01

Page 297

75 (Pages 294 - 297)

probably some that are critical and they should be. That helps the knowledge process move forward, but if an approach was not a reliable one, it would dissipate it. It would not be consistently used for, you know, hedonics. They're -- like I said, they are used for many, many different types of applications.

Q.   If you search in Google Scholar for the term "astrology," you get 213,000 results.

Does that mean astrology is a more broadly accepted methodology than hedonic property modeling?

A.   No, it doesn't. You know, if we just compare the hedonic with the meta-analysis, hedonic is a much smaller area used by a subset of economists, environmental and real estate and other ones.

And meta-analysis is used in medicine, education, engineering, so it's not so much a discipline-specific one but one that is used across many disciplines.

Q.   Do you really think the number of

Page 298

Google Scholar hits is a reliable indicator for how accepted a methodology is?

MR. NIDEL: Objection to form.

THE WITNESS: They are one piece of information. They are not the sole one.

BY MS. KLABER:

Q.   Do you think a court would use the number of Google Scholar hits in Daubert, in assessing whether a methodology fits the Daubert standard?

MR. NIDEL: Objection to form. Foundation. Calls for a legal conclusion.

THE WITNESS: I can't -- I wouldn't speak to how the court would respond to it. But I am just repeating what I've already said. There is more here than just this introductory paragraph.

BY MS. KLABER:

Q.   Do you generally agree that Google Scholar is a reasonable way to identify scholarly articles based on keyword searches?

MR. NIDEL: Objection to form.

Page 299

THE WITNESS: Can you ask the question again or repeat it.

BY MS. KLABER:

Q.   Sure. I am changing topics here in case that helps.

But do you agree that Google Scholar is a reasonable way to identify scholarly articles based on keyword searches?

MR. NIDEL: Objection to form. Incomplete hypothetical.

THE WITNESS: It is -- it is commonly used to identify scholarly articles.

MS. KLABER: I am going to introduce Exhibit 47 -- 48. I can't keep my numbers straight.

This is the EPA Guidelines for Preparing Economic Analyses.

(Deposition Exhibit 48 was marked for identification.)

THE WITNESS: Hasn't shown up yet.

BY MS. KLABER:

Q.   Okay.

Page 300

A.   Okay. It just popped up.

Q.   Okay. So you have Exhibit 48?

The EPA Guidelines for Preparing Economic Analyses dated December 7, 2010.

A.   Yes.

Q.   This is a document you cite in your report, correct?

A.   Yes.

Q.   Okay. I want to look at Section 1.2.

A.   So is this the one -- I guess I should ask.

Is this the one that's taken from the website that has, like, the 2014 updates and the like in it? Because when you go to the website, it's the 2010.

Q.   It says: "Updated, May 2014," yeah.

A.   Okay.

Q.   And you can actually navigate to a particular page of the PDF, which I think will be helpful here because this is such a big document.

Page 301

76 (Pages 298 - 301)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

A. Where is the navigation?    16:23:46

Q. So we are trying to get to the page    16:23:47 that is 1-2 on the bottom. It doesn't have any    16:23:49 page numbers. I would guess it is at least 30    16:23:55 pages in.    16:24:04

When we have the PDF page number, we    16:24:04 can give it to you and then if you see, in the    16:24:06 bottom middle of the screen, there is something    16:24:11 that tells you what page number you are on --    16:24:13

A. Yes.    16:24:17

Q. -- as you scroll. If you double    16:24:18 click that, you can enter 20 and that will take    16:24:20 you right to Page 20.    16:24:23

A. Okay.    16:24:27

Q. Okay. So are you at 1.2, the scope    16:24:28 of the guidelines?    16:24:31

A. Yeah.    16:24:33

Q. Okay.    16:24:34

A. Hang on. I am just trying to get    16:24:34 the full document back here.    16:24:38

Okay. I'm ready.    16:24:52

Q. So 1.2, the scope of the guidelines.    16:24:53

Page 302

First sentence reads: "The scope of    16:24:56 the guidelines is on economic analysis    16:24:57 typically conducted for environmental policies    16:24:59 using regulatory or nonregulatory management    16:25:02 strategies."    16:25:06

Do you see that?    16:25:06

A. Yes.    16:25:08

Q. Your assignment in this case was not    16:25:09 to perform an economic analysis for    16:25:11 environmental policies using regulatory or    16:25:13 nonregulatory management strategies, correct?    16:25:17

MR. NIDEL: Objection to form.    16:25:19

THE WITNESS: My -- my -- it was not    16:25:21 policies, but it's the same procedures that are    16:25:25 used.    16:25:27

BY MS. KLABER:    16:25:27

Q. How do you know that it should be    16:25:27 the same procedures, if you are working from    16:25:29 guidelines written for policies when you are    16:25:31 not doing an assignment based on -- or about    16:25:33 environmental policies?    16:25:38

MR. NIDEL: Objection to form.    16:25:39

Page 303

THE WITNESS: These are general    16:25:41 procedures that are used in environmental    16:25:43 economics and real estate and the guidance for    16:25:46 them does not vary with the type of application    16:25:51 that you are using. This just shows that there    16:25:55 is one place where they are used, accepted,    16:25:59 with -- there's important consequences of how    16:26:06 the decisions turn out.    16:26:08

BY MS. KLABER:    16:26:12

Q. Is there somewhere in these    16:26:12 guidelines that says they were written for    16:26:14 general application purposes?    16:26:17

A. No. I am saying the methods are for    16:26:18 general application and this is showing one    16:26:20 area where they are accepted specifically.    16:26:23

Q. Is it your opinion that this    16:26:25 document addresses guidelines for performing    16:26:28 economic analysis to determine property    16:26:31 valuation?    16:26:33

A. So it is guidance for determining    16:26:34 economic values and property value diminutions    16:26:40 is one of them that is discussed in here.    16:26:43

Page 304

Q. Do you know if the words "property    16:26:45 valuation" appear anywhere in this 300-page    16:26:47 document?    16:26:51

A. I do not know specific, but I cited    16:26:51 places in my report where they are -- where    16:26:54 hedonics are referenced.    16:26:59

Q. And you believe those hedonics --    16:27:01 those hedonic models reference for -- to the    16:27:06 valuation of residential real estate?    16:27:10

A. Yes.    16:27:14

Q. I want to turn to Chapter 7 of the    16:27:36 EPA guidelines. This is going to be more than    16:27:39 a hundred pages in, and we'll get you a page    16:27:42 number when we can. This is really tough    16:27:48 because this does not have actual page numbers    16:27:51 on it.    16:27:54

MR. NIDEL: The other beauty of    16:27:55 AgileLaw.    16:27:59

MS. KLABER: How does AgileLaw    16:27:59 interest this issue?    16:28:02

MR. NIDEL: Well, you can highlight    16:28:02 places in your exhibit that let you go straight    16:28:04

Page 305

77 (Pages 302 - 305)

to them.

MS. KLABER: I am not working in that, so it wouldn't help me. Mine is 7-1.

MS. GEARY: 92.

BY MS. KLABER:

Q. If you type in 92 in that little box at the bottom.

A. Okay.

Q. So this is -- you cite to Chapter 7 of these EPA guidelines in your report, correct?

A. Yes.

Q. And it states here: "The aim of an economic benefit analysis is to estimates the benefits and monetary terms of proposed policy changes in order to inform decision-making."

Do you see that?

A. Yes.

Q. Your assignment wasn't to estimate the benefits and monetary terms of proposed policy changes in order to inform decision-making, correct?

Page 306

MR. NIDEL: Objection to form.

THE WITNESS: So a loss of just a negative benefit, so when they talk about benefits here, it could be a gain, a positive or a loss, a negative benefit, and I will just repeat what I have said already is, you know, these are commonly used and nimble procedures for different ones, so this is one specific example where they are accepted.

BY MS. KLABER:

Q. Okay. And just to be clear, you were not doing an analysis with respect to proposed policy changes; is that right?

A. Correct.

Q. Okay.

A. But from an economic perspective, you would do the analysis exactly the same, whether it's litigation or a policy one.

Q. To come to your opinions in this case, you performed a benefit transfer, correct?

A. Yes.

Page 307

Q. Okay. Now I have the page numbers from this point on.

Can we go to Page 133 of the PDF. It should say 7-44 on the bottom.

MR. NIDEL: Hang on. 134.

MS. KLABER: It's 134?

MR. NIDEL: Uh-huh.

MS. KLABER: Okay.

THE WITNESS: Yeah.

MS. KLABER: Okay. It may be 135.

THE WITNESS: 135 is where it took me.

MS. KLABER: Okay.

THE WITNESS: I went scrolling from there. I am at 135.

BY MS. KLABER:

Q. Okay. And here under 7.4, benefit transfer, it says: "Benefit transfer refers to the use of estimated nonmarket values of environmental quality changes from one study and the evaluation of a different policy that is of interest to the analyst."

Page 308

Do you see that?

A. Yes.

Q. And again, you were not analyzing any environmental policies here, correct?

A. Yes, but I was taking the basics of it, taking an estimated environmental value, and applying it to a new decision-making context, which is standard for benefit transfer.

Q. Looking to the next paragraph here, which would be on the next page, 7-45.

Towards the middle of that paragraph, it states that: "A benefit transfer should only be used as a last resort," isn't that right?

A. So I don't know what -- you said towards the middle of that paragraph. I don't know what paragraph you are referring to.

Q. The next paragraph down from the one we were previously reading. On the next page.

A. The one that says: "Benefit transfer is necessary"?

Page 309

78 (Pages 306 - 309)

Q. Yes. And then towards the middle, it says: "Benefit transfer should only be used as a last resort."

A. Yes.

Q. Isn't that right?

A. Yes.

Q. And then further down in this paragraph, it says: "The advantages of benefit transfers in terms of time and cost savings must be weighed against the disadvantages in terms of potential reduced reliability of the final benefit estimates;" isn't that right?

A. Yes, and I made that tradeoff in my decision that if we did another meta-analysis, we would not substantially change the outcome.

Q. Then the EPA guidelines provide steps for conducting a benefit transfer, correct?

A. Yes.

Q. Step 2 is: "Select case studies," right?

A. A study case, yes.

Page 310

Q. Study case. Sorry.

And the EPA guidelines note: "A benefit transfer is only as good as the study cases from which it is derived and is therefore crucial that the studies be carefully selected. First, the analyst should identity potentially relevant studies by conducting a comprehensive literature search."

Do you see that?

A. Yes.

Q. Did you do a comprehensive literature search here in this case?

A. I looked for all meta-analyses that had looked at hedonic property values and environmental damages that, you know, we went through this and we talked earlier. I selected the one that I thought was the best to use in this case.

Q. Further down in this same paragraph, the step also identifies the issue of publication bias, which is that: "Researchers are more likely to present and/or editors be

Page 311

more likely to publish studies that demonstrate statistically significant results or results that are of an unexpected sign or magnitude."

Do you see that?

A. Yes, and that's the same issue we talked about with Simons and Saginor, and one of the reasons I picked theirs is that part of their robustness, they -- they looked for that, whether there was a likelihood of that file drawer effect and found that it was not likely.

Q. Going to the next page, 7-46, the first full paragraph.

Consistent with these guidelines, did you: "Develop an explicit set of selection criteria to evaluate each of the potentially relevant studies for quality and applicability to the policy case"?

A. So I went and looked at all of the ones that were out there, and I was looking for ones that looked at -- that were ones that did hedonic property value models, ones that had groundwater contamination in them, ones --

Page 312

excuse me, that had a variety of regressors or explanatory variables that allowed you to develop a benefit transfer that customized or fits the Canoga Park case, and so, yes, I was looking at them and I have talked to you earlier about, there is not a large group out there but I talked about why there are ones that were available but were not selected.

Q. But you didn't read the studies with groundwater contamination underlying Simons and Saginor to see if they were similar to the alleged groundwater contamination here, correct?

MR. NIDEL: Objection to form.

THE WITNESS: That is not what I was doing. So if I was just going to use the groundwater ones, yeah, that's what I would be doing, but I did not do that. I was doing a -- looking at meta-analysis ones that looked broadly at -- at hedonic property value studies, and I did read each of those meta-analyses.

Page 313

79 (Pages 310 - 313)

BY MS. KLABER:   16:36:16

Q.   And you didn't read the studies that   16:36:20 Simons and Saginor coded as superfill observations to see if those were similar to   16:36:25 the 8020 Deering site, correct?   16:36:26

A.   I didn't and that was not necessary   16:36:29 in either of those cases.   16:36:30

Q.   And you didn't read the studies that   16:36:30 Simons and Saginor coded as Southern California   16:36:33 to see if those areas were similar to the class   16:36:35 area here, correct?   16:36:39

A.   I did not, and they do not need to   16:36:40 be similar. It's what you can do with them   16:36:43 collectively.   16:36:45

Q.   I'm sorry, did you say you did or   16:36:46 you didn't?   16:36:49

A.   Did or didn't --   16:36:50

MR. NIDEL:  Objection to form.   16:36:53

THE WITNESS:  I don't --   16:36:53

BY MS. KLABER:   16:36:56

Q.   I asked:  You didn't read the   16:36:56 studies that Simons and Saginor labeled as   16:36:58

Page 314

superfill to see if those were similar to the   16:37:03 8020 Deering site, and the response I am seeing   16:37:05 is that I did, but I believe --   16:37:08

A.   If I said I did, I must have   16:37:10 misspoke or not spoke clearly. I did not.   16:37:12

Q.   Okay. Thank you. I just wanted to   16:37:16 clarify that.   16:37:18

The guidelines here -- the EPA   16:37:20 guidelines here are very clear that "as a   16:37:21 general rule, the more related case study   16:37:25 estimates involved in a benefit transfer, the   16:37:26 more reliable the estimate," correct?   16:37:28

A.   That is what it says.   16:37:31

Q.   Do you agree that valuation   16:37:36 estimates always contain a degree of   16:37:38 uncertainty?   16:37:40

A.   I think we talked about it, all   16:37:42 empirical work has an error in it.   16:37:44

Q.   Do you agree that using valuation   16:37:50 estimates in the context, other than the one in   16:37:55 which they were initially estimated, only   16:37:57 increases that uncertainty?   16:38:02

Page 315

MR. NIDEL:  Objection to form.   16:38:03 Incomplete hypothetical.   16:38:04

THE WITNESS:  I do not.   16:38:07

BY MS. KLABER:   16:38:07

Q.   Don't the EPA guidelines state that?   16:38:07

A.   It does state that, but I don't   16:38:10 think that that is always the case. There   16:38:12 could be -- excuse me, errors in an original   16:38:17 study that -- excuse me, have -- that are   16:38:23 larger than what you would get when you do a   16:38:31 transfer that results in -- uses results from   16:38:34 multiple studies, and so there is kind of a   16:38:38 fallacy assumption out there that the errors   16:38:43 are always additive and that is not necessarily   16:38:46 the case.   16:38:49

Q.   So you disagree with the EPA   16:38:52 guidelines on this point?   16:38:53

A.   On that point, I do.   16:38:55

Q.   The EPA guidelines also state that:   16:38:56 "An analyst should include a quantitative   16:38:58 uncertainty assessment when possible."   16:39:01

You didn't do that, did you?   16:39:04

Page 316

A.   I provided information of what the   16:39:05 error might be in my rebuttal, but there was   16:39:08 not specific information that allowed me to   16:39:13 look at the specific error.   16:39:18

Q.   Okay. So just to be clear, you have   16:39:22 not calculated an error rate for your common   16:39:26 diminution of value percentage of 9.4 percent;   16:39:29 is that correct?   16:39:33

MR. NIDEL:  Objection to form.   16:39:33

THE WITNESS:  I do not, but from the   16:39:35 work that I have done with errors and benefit   16:39:37 transfers, I know that an outside one is plus   16:39:40 or minus 30 percent, but that is based on the   16:39:46 benefit transfer studies that are just looking   16:39:49 at how broadly you can apply benefit transfer   16:39:51 in the literature, so it overstates when you   16:39:54 are doing a specific case versus just looking   16:39:57 at all the possible ranges in there.   16:40:00

BY MS. KLABER:   16:40:05

Q.   Could you have calculated an error   16:40:05 rate here?   16:40:07

MR. NIDEL:  Objection to form.   16:40:09

Page 317

80 (Pages 314 - 317)

THE WITNESS: There was not information that would allow me to do a specific error rate calculation in this, but we kind of know the error rate of -- the potential of what it is based on many applications in the literature.

BY MS. KLABER:

Q. So if you know the error rate or the potential error rate based on the literature, what is your best estimate of the error rate for your 9.4 percent calculation?

MR. NIDEL: Objection to form. Asked and answered.

THE WITNESS: So the outer bound of it would -- is plus or minus 30 percent. If you ask me what my best professional guess is, it would be plus or minus 10 percent.

BY MS. KLABER:

Q. If your error rate was 10 percent, wouldn't that erase the entire 9.4 percent property value diminution calculation on one end?

Page 318

MR. NIDEL: Objection to form.

THE WITNESS: No. It would be 10 percent on 9.4 percent, so 10 percent of 9.4, not 10 percent added or subtracted to 9.4.

BY MS. KLABER:

Q. And -- so then if we use the 33 percent median transfer error rate that you cite from the Kaul, et al., report, it would be 33 percent on that 9.4 percent as well; is that right?

A. Yes, but that would be a gross overestimate.

Q. How do you know that would be a gross overestimate?

A. Because we looked at all the studies that have been looking at the validity of benefit transfers and those studies are not looking at -- what are our cases where we specifically do a benefit transfer. They are looking at what are all the ones where we could, so some studies took every single pair of eyes, one that they could look at to do a

Page 319

benefit transfer.

They also didn't necessarily do -- they might have done value transfers versus function transfers and so it gives you that -- that wide range, and this would be using best practices and ones where you use an equation to fit the situation, so that it would not be those large ones that would be excluded, when you just do it from, you know, there, you are doing exploratory research.

Q. You also cite to a report by Rosenberger which found a function transfer error rate of 36 percent, correct?

A. And so Rosenberger was also -- that one is based on the broad -- where can we explore where it might be done, so it is not coming down to a specific case of following. So those are error rates based on the exploratory research in both cases.

Q. How did you arrive at the approximate 10 percent error rate for your common property value diminution percentage

Page 320

here?

A. I was using, you asked me what it was, and I was using my best professional experience to say that it's likely around 10 percent, and from what I know of the studies that were used in the Kaul analysis and from discussions with Rosenberger about benefit transfer.

Q. I'm going to show you another exhibit.

A. While we were talking, it appears that it has bumped me out again.

MS. KLABER: Oh, really?

Can we go off the record then and figure out how to get him back in.

THE VIDEOGRAPHER: This marks the end of Media Unit 8. We are going off the record. The time is 4:45 p.m.

(A short recess was taken.)

THE VIDEOGRAPHER: This marks the beginning of Media Unit 9. Going back on record. The time is 5:08 p.m.

Page 321

81 (Pages 318 - 321)

(Deposition Exhibit 49 was marked for identification.)

BY MS. KLABER:

Q.   Okay.  We were just about to introduce to you Exhibit 49.

This is an article titled:  "The Benefit-Transfer Challenges," and let us -- let me know when it is available.

A.   Got it.

Q.   Okay.  Exhibit 49, the Benefit-Transfer Challenges is an article that you are listed as an author, correct?

A.   Yes.

Q.   Can we look at the page numbered 165 in the article.

A.   I'm there.

Q.   And the last paragraph of this page reads:  "Although the primary use of benefit transfers in the United States has been to assess benefits and costs as components of federal regulatory impact analyses, another use has been to develop liability payments for

Page 322

court cases.  This latter use of the benefit transfer requires adherence to the Daubert standard for scientific evidence."

Do you see that?

A.   Yeah.

Q.   Continuing on:  "Under this standard, admissible evidence must" -- skipping down to the second bullet point:  "Have a known error rate."

Do you see that?

A.   Yes.

Q.   And again, your benefit transfer resulting in the common 9.4 percent property diminution value does not have a known error rate, does it?

A.   But what we were referring to was the method when we were talking about that, and that's what we understood it should be.  It's the method, and so I have talked to the method and not the specific application here.

Q.   So when you use the word "admissible evidence," that refers to the method and not

Page 323

its actual application?

A.   That was what we understood it should be, is that the method should have a known error rate.

Q.   And so if the method has a known error rate, but the error rate is not actually calculated or provided in the particular instance, it's your opinion that still satisfies the Daubert standard?

MR. NIDEL:  Objection to form and foundation.  Calls for a legal conclusion.

THE WITNESS:  That is what we understood when we were writing this paper.

MS. KLABER:  Okay.  I would like to introduce Exhibit 50, and this is your rebuttal report dated November 20, 2023.

(Deposition Exhibit 50 was marked for identification.)

BY MS. KLABER:

Q.   It looks like you have a hard copy of that report with you, and you should feel free to reference the paper as opposed to the

Page 324

electronic exhibit if that's easier.

While that is being marked, since it looks like you're going to look at the paper anyway.

What were you asked to do in preparing your rebuttal report?

A.   To reply to the opinions of Ms. Pitts and Dr. Eisfeldt.

Q.   Were you also asked to clarify your affirmative opinions?

MR. NIDEL:  Objection to form and again, you are asking him what he was asked to do by the lawyers, so I'm going to instruct him not to answer as to what lawyers instructed him to do or asked him to do.

BY MS. KLABER:

Q.   What was the scope of your assignment for the rebuttal report?

A.   So it was to reply to the opinions of Pitts and Eisfeldt.

Q.   Are all of the materials that you reviewed, considered and relied upon in forming

Page 325

82 (Pages 322 - 325)

the opinions in your rebuttal report, cited 17:12:14 therein? 17:12:16

A.   I believe so. 17:12:17

Q.   Did plaintiffs' counsel provide you 17:12:18 with any facts, data or assumptions that you 17:12:21 relied upon in forming your rebuttal opinions? 17:12:23

A.   Not that I can recall at this 17:12:27 moment. 17:12:29

Q.   Did anyone assist you in the 17:12:30 preparation of your rebuttal report, Exhibit 17:12:32 50? 17:12:35

A.   No. 17:12:35

Q.   So none of the individuals you 17:12:38 identified before including from -- I think 17:12:45 Industrial Economics in Cambridge, 17:12:51 Massachusetts, assisted in the preparation of 17:12:52 this report? 17:12:53

A.   So I was thinking about the 17:12:54 rebuttal, but I did do clarifications that were 17:12:57 -- was in response to the rebuttal, and so I 17:13:00 did clarify with Laton's firm that the 17:13:06 measurements and also I had IEC update the 17:13:13

Page 326

spreadsheet, which I resubmitted, with that -- 17:13:24 sorry, I was just responding to the rebuttal 17:13:27 and not that part of it. 17:13:30

Q.   Okay.  So just to make sure I 17:13:36 understand, for any of the report -- preceding 17:13:39 responses to Ms. Pitts' expert report on Page 17:13:46 5, you had assistance form Industrial Economics 17:13:52 in Cambridge, Massachusetts -- 17:13:57

A.   Yes. 17:13:59

Q.   -- and then you also consulted with 17:13:59 Richard Laton's firm? 17:14:02

A.   Yes. 17:14:03

Q.   Did anyone contribute to the writing 17:14:04 of any portion of your report? 17:14:07

A.   No. 17:14:09

Q.   Did anyone review any portion of 17:14:09 your report and provide comments on a draft? 17:14:13

A.   The attorneys have read my first 17:14:16 report and this and they did provide comments. 17:14:20

Q.   Apart from attorneys, you didn't 17:14:23 have anyone else on your team -- 17:14:25

A.   No. 17:14:28

Page 327

Q.   -- from Industrial Economics or 17:14:29 anyone else who provided you with any edits; is 17:14:32 that right? 17:14:35

A.   That's correct. 17:14:35

Q.   Okay.  Does this report contain all 17:14:36 the rebuttal opinions you intend to offer in 17:14:42 this case? 17:14:45

A.   All that I have been asked to do, 17:14:45 yes. 17:14:47

Q.   Looking at Page 4 of your rebuttal 17:14:47 report, Exhibit 50, in Paragraph B1, you state: 17:14:58 "Certain multifamily properties are removed 17:15:06 from the analysis which are condominiums in 17:15:08 buildings with three or more floors of 17:15:11 residential units and townhomes where the 17:15:15 living areas are located over garages." 17:15:18

Do you see that? 17:15:20

A.   Yes. 17:15:21

Q.   Is it your understanding that the 17:15:21 properties described in Paragraph B1 are no 17:15:23 longer part of the class? 17:15:26

A.   That is my understanding. 17:15:30

Page 328

Q.   Why did you remove those properties 17:15:32 from your analysis? 17:15:37

A.   So I removed those because there was 17:15:38 some confusion since the Los Angeles County 17:15:44 included these as single -- single family, and 17:15:54 they did not align with the types of properties 17:15:58 that were in the Simons and Saginor report -- 17:16:05 or article. 17:16:14

Q.   Okay.  So you had never -- you had 17:16:14 only intended to include single-family homes or 17:16:17 duplexes initially? 17:16:24

A.   Initially, single family -- single 17:16:27 family with accessory dwelling unit, duplexes 17:16:30 and townhomes. 17:16:35

Q.   And so after removing the properties 17:16:38 you identified in Paragraph B1 of Exhibit 50, 17:16:43 that decreased the number of properties to 17:16:46 3,294, correct? 17:16:52

A.   Yes. 17:16:53

Q.   Is that number what you understand 17:16:54 to be the total number of residences included 17:16:56 in the proposed class? 17:16:59

Page 329

83 (Pages 326 - 329)

A.   It is.

Q.   In Paragraph B4 on Page 5, you state that: "Property values in my expert report were each updated to a current value using the all-transaction house price index for Los Angeles, Long Beach, Glendale, California, metropolitan statistical area that includes more than Los Angeles County. In this revision, the updating is done using the all-transaction housing price index for Los Angeles County, California, which matches the source of the property data used in the damages calculation."

Why did you make this change to your original September 27 report?

A.   Somehow, the Los Angeles, Long Beach, Glendale was pulled. I don't know how it was, but it was intended to be Los Angeles County from the very beginning.

I do not know whether I didn't give a clear instruction to IEC or they thought that they were one and the same when they did it.

Page 330

Q.   Okay. So IEC is --

A.   Industrial Economics.

Q.   Okay. So Industrial -- Industrial Economics Consulting is the one who initially pulled the index and had inadvertently pulled the wrong one?

A.   Yes, I pulled the index and told them which one to use, and so I don't know whether my instruction to them was not clear or they -- when they pulled the one to use, they pulled the wrong one.

Q.   Did you only realize this error after seeing defendants' expert reports?

A.   Yes.

Q.   What was the impact of this change?

A.   So basically, the combination of the two reduced the damages -- total damages from about 260 million to about 236 million.

Q.   You don't know the independent impact of changing the house price index on the total damages estimate; is that right?

A.   I don't have them each individually

Page 331

in front of me. I know that I looked at them at the time, but I don't have them now.

Q.   Looking at Paragraph P5 of your report, you state that: "Ms. Pitts incorrectly asserts that the periods of ownership of class properties are not addressed in the damages analysis, but this information is contained in Column AY (most recent sales date) of the Excel file documenting the Boyle analyses."

Do you see that?

A.   Yes.

Q.   Isn't it possible there may have been multiple periods of ownership over a period of time that are not accounted for in Column AY of your spreadsheet?

MR. NIDEL: Objection to form.

THE WITNESS: So it would have captured the most recent -- if you looked past the most recent, there could have been sales previous to the properties, but the most recent is the best market value information, and as you talked, there could have been some that

Page 332

have slipped through since -- since that time that we did it, but you are looking at the best estimate of value when you take the most recent.

BY MS. KLABER:

Q.   So if something last sold in 2021, that would be reflected in your spreadsheet but you don't know if it had a prior sale date of 2020 or 2019 or any other date before that; is that correct?

A.   Well, when we were looking at the information, we would have seen it, but we did not use it because we used the most recent as the best information.

Q.   Did you make any attempt to determine the turnover rate of properties in the class area?

A.   Did not. We're using the value that represents the market value.

Q.   Looking at Paragraph P8 of Exhibit 50, your rebuttal report, you state that: "Ms. Pitts does not present evidence that other

Page 333

84 (Pages 330 - 333)

types of disamenities are affecting the percentage diminution in value applied in the Boyle analyses."

Q. Do you see that?

A. Yes.

Q. Do you have any basis to assert that other types of disamenities are not affecting property values in the proposed class area?

A. I do, from the work of Dr. Laton, and he talks about how the TCE -- there's no other source of, you know, contributing to the TCE, and so there is information in Dr. Laton's report that supports that.

Q. Did Dr. Laton look at environmental disamenities outside of TCE contamination?

A. I can't remember everything that he talked about at this time.

Q. So you believe Dr. Laton ruled out the possibility in his report that there are other environmental disamenities in the area that could impact property values; is that correct?

Page 334

MR. NIDEL: Objection to form. Misstates his testimony.

THE WITNESS: So Dr. Laton was talking about the plume of other ones doing it, and there could be other things that affect property values, but when you look at it, the -- excuse me, the literature, as you are looking at distance from a contamination source is what you look at and then also, there is a number of variables in the Simons and Saginor equation that are turned on and off, so yes, there is air pollution in the area, but I did not turn that variable on.

So there could be some other disamenities but we tried to account for them within the equation and within the information from Dr. Laton.

BY MS. KLABER:

Q. How did you try to account for them with the equation and with the information from Dr. Laton?

A. So I just said that, you know,

Page 335

Dr. Laton had information that, you know, that would -- there was no evidence of TCE coming from another source, so that is not another disamenity contributing to the plume, and I just gave you the example where we did not include air pollution in the damages.

By turning that off, we don't -- we could have turned it on and said that there are damages from air pollution in the area, but that would not have been appropriate because that's not emanating from the source.

Q. Ignoring TCE, did you do any analysis to determine whether any other environmental disamenities impact property values in the proposed class area?

A. No.

Q. In Paragraph P9 you discuss Ms. Pitts, quote unquote, conclusion of no diminution in value.

A. Yeah.

Q. Are you referring to the appraisal of the Behar home?

Page 336

A. The multiple appraisals that she did at her analysis.

Q. It's your understanding that Ms. Pitts performed multiple appraisals?

A. She reported multiple paired comparisons which is one way of looking at the appraisals.

Q. So when you say "appraisals," you are speaking about her paired sales analysis?

A. Yes.

Q. Is that correct?

A. Yes.

Q. In Subparagraph C here of P9, you state that: "Ms. Pitts does not identify the error rate in her appraisals."

Can you explain how one would calculate the error rate on an appraisal of a single property?

A. So the challenge with the appraisal is the same challenge on any I do, is that there is no way to assess what the error rate might be in an individual appraisal, and, you

Page 337

85 (Pages 334 - 337)

know, at least in the meta-analysis, we know that there's been robustness checks in the model that come in, but it is the same challenge that the approach I do faces.

Q.   Is it your opinion that an error rate is typical, that it's typical to report an error rate on an appraisal of a single property?

MR. NIDEL:  Objection to form.

THE WITNESS:  If I just said that it's -- it's impossible to do it, so it would not be typical, but we know that properties sell for more and less than their appraised values, so with that, you know, after the fact, we know that there are error rates in appraisals.

BY MS. KLABER:

Q.   Is it possible that a property sells more than it -- sells for more than it appraises for because somebody is willing to pay more than market value for the property?

MR. NIDEL:  Objection to form.

Page 338

THE WITNESS:  I would say that what they will pay is the market value. The appraisal is an estimate of market value. It is not the market value.

BY MS. KLABER:

Q.   So there is no such thing as an outlier sale price?

MR. NIDEL:  Objection to form and foundation.

BY MS. KLABER:

Q.   Is that correct?

A.   There could be ones that are outliers from the appraisal process, but the appraisal can't take into account all factors that go into what somebody would pay for a property.

Q.   Looking at Paragraph P27 on Page 10 of Exhibit 50, your rebuttal report.

You state that:  "Groundwater contaminated with TCE and the associated risks will become common knowledge at class certification and notices are sent to all

Page 339

property owners, which is the time that sellers and Realtors will need to notify buyers of the class."

Did I read that correctly?

A.   I believe you did.

Q.   You did not offer this opinion in your affirmative report, correct?

A.   I don't think I said it as explicitly in my report.

Q.   Meaning you did not say in your affirmative report when common knowledge would occur with respect to the alleged TCE contamination, correct?

A.   Yes.

Q.   And here, you are offering an opinion that class certification will trigger the legal requirement that sellers notify buyers in their disclosures of contamination; is that correct?

A.   I believe that that -- that's when it will occur.

Q.   That's when the legal obligation

Page 340

will occur to disclose?

A.   I can't reach a legal conclusion for you, but I believe that that will be the kicker, because also, you know, there's going to be the media publications and other things that come into play at that time.

Q.   So when you state here that at class certification, it will be the, quote, the time that sellers and Realtors will need to notify buyers of the class, you are not sure if that's the legal requirement.

You just -- that's your opinion as to what you think should happen?

A.   That's my opinion.

Q.   Okay.  In Paragraph 34 of your report on Page 12 of Exhibit 50, you state that:  "The Federal Reserve Bank of St. Louis treats Los Angeles County, where the class properties are located, as a common real estate market;" is that correct?

A.   Yes.

Q.   Is it your opinion that all cities

Page 341

86 (Pages 338 - 341)

within Los Angeles County are part of a common real estate market?

A. What I am saying is that that's what the index does when it uses all of that information to create the index.

Q. And I am asking if it is your opinion that all cities within Los Angeles County are part of a common real estate market?

A. I do not have an opinion of whether they are all part of a common real estate market, and it wasn't critical for my analysis, because I was using actual sale prices that reflect the location where properties were transacted.

Q. Would you consider Beverly Hills and Canoga Park to be the same market?

MR. NIDEL: Objection to form and foundation.

THE WITNESS: I just said that I don't have an opinion on what is a common market.

BY MS. KLABER:

Page 342

Q. Okay. Looking at Paragraph E14.

A. P or E?

Q. I'm sorry, E as in elephant.

A. Okay.

Q. We are skipping ahead a bit. It looks like it's on Page 25 of Exhibit 50.

You include Dr. Laton's groundwater contamination plume map; is that correct?

A. Yes.

Q. And then in Paragraph E19 of Exhibit 50 on the next page, you include Dr. Kram's groundwater plume map; is that correct?

A. I had -- that is not groundwater. That's the TCE plume contours and so -- the groundwater TCE plume contours, yes.

Q. Okay. I got a little bit confused there, so Figure E1 is Dr. Laton's map which you've labeled: "Groundwater contamination plume," right?

A. Yes.

Q. And then Figure E2 is Dr. Kram's map which you have labeled: "TCE concentrations in

Page 343

the groundwater contamination plume;" is that correct?

A. Yes.

Q. Okay. These maps are not the same shape, are they?

A. They are not exactly the same shape.

Q. Do you know why these two maps are different?

MR. NIDEL: Objection to form and foundation.

THE WITNESS: I cannot answer that.

BY MS. KLABER:

Q. You cannot answer because you don't know why the two maps are different?

A. Right, I do not know.

Q. Okay. If you were to overlay these maps, do you know if there would be areas in the proposed class where, according to Dr. Kram, there is not any concentration of TCE present?

A. Well, if you just kind of look at them, it looks like there is some that may not

Page 344

-- I don't know whether there is no TCE present or it just doesn't meet a certain threshold so I really can't objectively answer totally.

Q. Okay. Let's go with below threshold instead of no TCE.

Do you claim that homes in the areas where there is either no TCE or its below threshold on Dr. Kram's map have suffered property value diminution --

MR. NIDEL: Objection to form and foundation.

BY MS. KLABER:

Q. -- if they are inside of Dr. Laton's map area?

MR. NIDEL: Same objections.

THE WITNESS: So my model and the vast amount of the literature shows that it's proximity to the source of the contamination. In terms of the class, I was instructed to follow Dr. Laton's map.

But if you looked at the literature, there is probably ones outside of Dr. Laton's

Page 345

87 (Pages 342 - 345)

map that would be affected, and so in that sense, it makes the damages conservative.

BY MS. KLABER:

Q. Okay. So the reason you used the particular area in your report for determining which residents would be included in the class is because you were instructed to use Dr. Laton's map in exhibit -- or Figure E1 here; is that right?

MR. NIDEL: Objection to form and foundation, and again, to the extent that you were instructed by attorneys, then I would instruct you not to answer.

BY MS. KLABER:

Q. I am entitled to know if your attorneys asked you to assume information for the purposes of your report, so if you were asked to assume that Dr. Laton's map represented the class boundaries, then I am entitled to know that.

MR. NIDEL: That's not the question you asked, so if you are asking a new question,

Page 346

you can ask it, but I'm going to instruct him not to answer your last question.

BY MS. KLABER:

Q. Okay. Were you -- is the reason you used Dr. Laton's map for purposes of calculating -- performing your calculations in your report, because you were asked to assume that Dr. Laton's map represents the class boundaries?

MR. NIDEL: Objection to form and foundation, and you are still asking for what he was tasked by lawyers, so I'm going to instruct him not to answer.

MS. KLABER: I am entitled to know what his lawyers told him to assume as factual.

MR. NIDEL: Okay. You relied on Dr. Laton's map for the class boundaries, did you? Okay. You don't have to ask him what he was instructed to do.

MS. KLABER: I am entitled to know if he was told to rely on -- I am 100 percent entitled to know if he was told to rely on

Page 347

Dr. Laton's map.

MR. NIDEL: Okay. Well, I disagree, and I will instruct him not to answer.

BY MS. KLABER:

Q. Are you accepting his instruction and will you not answer the question of whether you were told to rely on Dr. Laton's map for purposes of determining the class boundaries?

A. I can't make legal judgments so I'm going to follow his instruction.

Q. Okay. Do you understand that Dr. Laton explains that the putative class area represents only the area where there is a threat of vapor intrusion and not actual vapor intrusion?

MR. NIDEL: Objection to form.

THE WITNESS: I don't know what Dr. Laton testified.

BY MS. KLABER:

Q. I am not -- I wasn't limiting that to his testimony, so if it was in his report which you reviewed, please consider that in

Page 348

your answer as well.

A. Ask the question again then, please.

Q. Do you understand that Dr. Laton explains that the putative class area represents only the area where there is threat of vapor intrusion and not actual vapor intrusion?

MR. NIDEL: Objection to form.

THE WITNESS: I would have to go back and look at Dr. Laton's report to be sure in answering that question, but I, you know, I reference back that, you know, my analysis is based on models that shows its distance to the source of the contamination so how he -- he testifies that would not change the damage calculations that I report.

BY MS. KLABER:

Q. So just to confirm, whether or not any property actually experiences vapor intrusion is not relevant to your model or your calculations, correct?

A. Right. It's based on proximity

Page 349

88 (Pages 346 - 349)

which is well-established.    17:39:02

Q.   And you don't make any claim that    17:39:06 Simons and Saginor's methodology accounts for    17:39:19 harm due to actual vapor intrusion, correct?    17:39:22

A.   I do not make any claim.    17:39:27

Q.   Are you aware that the risk of vapor    17:39:32 intrusion may vary depending on individual    17:39:34 physical characteristics of the home?    17:39:37

MR. NIDEL:  Objection to form and    17:39:41 foundation.    17:39:42

THE WITNESS:  I am not a vapor    17:39:43 intrusion expert and cannot testify to vapor    17:39:45 intrusion.    17:39:47

BY MS. KLABER:    17:39:48

Q.   Did you perform any analysis of the    17:39:48 characteristics of any homes in the class area    17:39:50 to see if they may -- if those characteristics    17:39:54 may influence the risk of vapor intrusion?    17:39:58

A.   Same answer as before.  I am not a    17:40:01 vapor intrusion expert.    17:40:03

Q.   So you did not do that work,    17:40:05 correct?    17:40:05

Page 350

A.   No.    17:40:07

Q.   Your model does not incorporate in    17:40:07 any way the fact that the risk of vapor    17:40:20 intrusion may be different for two properties    17:40:22 that have different physical characteristics,    17:40:25 correct?    17:40:27

MR. NIDEL:  Objection to form.    17:40:27

THE WITNESS:  Sorry.  It just    17:40:28 flashed up that the meeting has ended here, and    17:40:29 that distracted my attention.  Could you ask    17:40:31 again.    17:40:34

BY MS. KLABER:    17:40:34

Q.   Sure.  Your model does not    17:40:34 incorporate any way -- in any way the fact that    17:40:38 the risk of vapor intrusion may be different    17:40:41 for two properties that have different physical    17:40:43 characteristics, correct?    17:40:45

MR. NIDEL:  Objection to form.    17:40:47 Asked and answered.    17:40:48

THE WITNESS:  It's the same answer.    17:40:50 Its proximity.  It's not vapor intrusion.    17:40:51

BY MS. KLABER:    17:40:56

Page 351

Q.   So is that no, your model does not    17:40:56 incorporate in any way the fact that the risk    17:41:02 of vapor intrusion may be different for two    17:41:04 properties that have different physical    17:41:07 characteristics?    17:41:09

MR. NIDEL:  Objection to form.    17:41:10 Asked and answered.    17:41:11

THE WITNESS:  So the property -- the    17:41:12 model just accounts for proximity, and one of    17:41:15 the reasons proximity declines is because of    17:41:19 the effects of contamination typically    17:41:22 dissipate with distance from a source, but I am    17:41:27 doing a common property value diminution for    17:41:32 the class, not a property-by-property    17:41:35 assessment.    17:41:38

BY MS. KLABER:    17:41:39

Q.   Okay.  I am trying to ask a yes or    17:41:39 no question here, so we can move on.    17:41:43

So if you could give me a yes or no,    17:41:44 I would very much appreciate that.    17:41:47

Your model does not incorporate in    17:41:49 any way the fact that the risk of vapor    17:41:51

Page 352

intrusion may be different for two properties    17:41:53 that have different physical characteristics,    17:41:56 correct?    17:41:57

MR. NIDEL:  Objection to form.    17:41:58 Asked and answered now the third time.    17:41:59

THE WITNESS:  I did not have a vapor    17:42:01 intrusion in the model.    17:42:03

BY MS. KLABER:    17:42:05

Q.   I am not sure what you mean by vapor    17:42:05 intrusion.    17:42:08

I am asking if you are accounting    17:42:08 for the fact that different properties that    17:42:10 have different physical characteristics may    17:42:13 lead to different risks of vapor intrusion, so    17:42:17 I'm going to ask a yes or no again.    17:42:20

MS. KLABER:  I know, Chris, you    17:42:22 think it has been answered, but I don't believe    17:42:24 I have gotten the answer.    17:42:26

MR. NIDEL:  This has happened a    17:42:29 hundred times in my depositions of your    17:42:31 witnesses, and I've been instructing -- just    17:42:33 because I don't like their answer doesn't mean    17:42:33

Page 353

89 (Pages 350 - 353)

that --

MS. KLABER: Well, I haven't gotten a yes or no. So I'm going to ask it again.

MR. NIDEL: You are entitled to an answer. You are not entitled to the answer that you choose.

MS. KLABER: If he can't say yes or no --

MR. NIDEL: It is not multiple choice.

MS. KLABER: If he can't say --

MR. NIDEL: It's not true/false.

MS. KLABER: If he can't say yes or no, he can explain why he can't say yes or no.

MR. NIDEL: He has answered your question now three times.

MS. KLABER: He has not.

MR. NIDEL: Yes, he has.

BY MS. KLABER:

Q. Your model does not incorporate in any way the fact that the risk of vapor intrusion may be different for two properties

Page 354

that have different physical characteristics, correct?

MR. NIDEL: Objection to form. Asked and answered. Now you are harassing the witness.

THE WITNESS: I think that I gave you an answer to it that it is not a yes or no answer, because what I said was, is that the -- when you have distance, the reason distance is in there is because there is risk as you go, you know, the risk changes at different distances, and so that affects the properties at different distances, have different risks and different property value diminutions.

BY MS. KLABER:

Q. What does distance have to do with the physical characteristics of the home?

A. It doesn't have anything to do, but I didn't interpret your question as only physical characteristics.

Q. Okay. So it sounds like you didn't actually understand my question, so whatever

Page 355

you were answering wasn't the question that I was asking.

I am asking if your model in any way incorporates the differing risks that two properties may experience based on their different physical characteristics?

MR. NIDEL: Objection to form. Asked and answered now for the fourth time, and you are badgering the witness and you are laughing at the witness.

THE WITNESS: So I don't have physical characteristics of the properties in the model, but physical characteristics of the properties are reflected in the market values of the properties.

BY MS. KLABER:

Q. How do you define "physical characteristics of the home"?

A. Any characteristics that are considered when people are buying a property.

Q. Do you think people pay a different price for a property that has a concrete slab

Page 356

versus a property with a crawl space?

MR. NIDEL: Objection to form and foundation. Beyond the scope.

THE WITNESS: So my experience is that the foundation can affect the price that people will pay for a property.

BY MS. KLABER:

Q. Can you explain your experience in that area?

A. In doing a number of hedonic studies, looking at them, that those are characteristics that are considered.

Q. So what have you found with respect to the difference in value of a home with a concrete slab versus a home with a crawl space?

MR. NIDEL: Objection to form.

THE WITNESS: I don't have that specific comparison, but I do know that those are characteristics that would be considered and could affect the value of a home.

BY MS. KLABER:

Q. Okay. So it is your testimony that

Page 357

90 (Pages 354 - 357)

buyers of a home factor in a crawl space versus 17:45:44 a concrete sub slab in deciding what price to 17:45:48 pay for property; is that correct? 17:45:52

A. Yes, it can have an influence. 17:45:53

Q. Looking at Paragraph E121 of your 17:45:56 rebuttal report, this is on Page 47. 17:46:29

You reference here Professor 17:46:38 Eisfeldt's Figure 7 and you state that: "It 17:46:40 results in an illogical conclusion that 17:46:44 property value diminutions increase with 17:46:46 distance from source of the contamination." 17:46:49

Do you see that? 17:46:52

A. Yes. 17:46:53

MS. KLABER: I'm going to show you 17:46:54 Dr. Eisfeldt's report. This is going to be 17:46:55 Exhibit 51. 17:46:59

THE WITNESS: It knocked me out 17:47:19 again when that flashed out before. 17:47:20

MS. KLABER: Can we go off the 17:47:22 record. 17:47:25

THE VIDEOGRAPHER: This marks the 17:47:25 end of Media Unit 9. Going off record. The 17:47:27

Page 358

time is 5:47 p.m. 17:47:29

(A short recess was taken.) 17:47:33

THE VIDEOGRAPHER: This marks the 17:50:34 beginning of Media Unit 10. Going back on 17:50:35 record. The time is 5:51 p.m. 17:50:39

(Deposition Exhibit 51 was marked 17:50:39 for identification.) 17:50:39

BY MS. KLABER: 17:50:43

Q. We now have Exhibit 51, which is the 17:50:43 amended expert report of Andrea L. Eisfeldt in 17:50:46 this case, and we were about to look at Figure 17:50:50 7 which you had referenced in Paragraph E121 of 17:50:54 your report. It is on Page 65 of the PDF, if 17:50:58 you want to navigate to that. 17:51:06

You can type it into that little box 17:51:15 at the bottom. 17:51:18

A. Oh, yeah. I always forget. 17:51:19

Figure 7? 17:51:35

Q. Figure 7, yes. 17:51:36

Okay. And looking at Column 2 of 17:51:38 Figure 7 here -- well, let's just say first, 17:51:41 Column 1 shows distance from property to the 17:51:48

Page 359

site. 17:51:51

Do you see that? 17:51:51

A. Yep. 17:51:54

Q. And then Column 2 shows Simons and 17:51:54 Saginor meta-analysis, diminution value -- 17:52:00

A. Yes. 17:52:06

Q. -- for the log of distance variable. 17:52:06

So for 0.5 miles, Professor Eisfeldt 17:52:11 indicates a property value diminution of 0.4 17:52:18 percent. 17:52:18

Do you see that? 17:52:20

A. Yes. 17:52:20

Q. For one mile, she indicates a 17:52:21 property value diminution of zero percent. 17:52:22

A. Yeah. 17:52:23

Q. For 1.5 miles, she indicates a 17:52:24 property value diminution of negative 0.2 17:52:27 percent. 17:52:30

And then for two miles, she 17:52:33 indicates a property value diminution of 17:52:35 negative 0.4 percent, and for 2.5 miles, she 17:52:37 indicates a property value diminution of 17:52:41

Page 360

negative 0.5 percent. 17:52:43

A. Yes. 17:52:46

Q. Do you understand that these 17:52:49 negative values indicate a decrease in the 17:52:50 property value diminution, that means the 17:52:53 diminution is less? 17:52:55

MR. NIDEL: Objection to form and 17:52:58 foundation. 17:52:59

THE WITNESS: So I would have to go 17:53:02 back and look, so I will take these at face 17:53:05 value right now, what we are looking at. 17:53:10

BY MS. KLABER: 17:53:12

Q. Okay. Because you indicated that 17:53:12 Figure 7 shows an increase with distance from 17:53:13 the site, an increase of property value 17:53:16 diminution with distance from the site, and I 17:53:20 am looking at here, a decrease in property 17:53:22 value diminution with distance from the site, 17:53:25 correct? 17:53:28

A. So when I interpreted these and the 17:53:28 diminutions in Simons and Saginor, it was 17:53:33 negative numbers, and so a negative number I 17:53:41

Page 361

91 (Pages 358 - 361)

was interpreting as increasing the property value diminution, following directly from Simons and Saginor where a negative indicates a larger property value diminution.

Q. If in Professor Eisfeldt's report, the negative indicates that the property diminution value is less, does that change your opinion in E121?

MR. NIDEL: Objection to form and foundation.

THE WITNESS: It -- what it still conveys to me is that Professor Eisfeldt did not understand what I was doing with the distance variable. The fact that it is a constant is not surprising, because there's two different ways of using a log variable which gives a proportionate change, so you'd expect, if you were using that variable two different ways but looking at it, that it would be the same.

But what I did in my analysis is that the property value diminution does

Page 362

decrease when you go with distance from the plume, so what you have to do is a -- if you have two properties, one is located at a mile and another is at two miles, that property value at two miles has less of a property value diminution.

So it could be a similar one to the one at a mile, but it has a higher property value, so to look at what that loss of the one is at a mile, you have to compare it to two miles. So what I did is, I set the maximum distance -- maximum approximate distance of the plume of three miles, and since that is a class, we are assuming that there is no diminution beyond three miles.

So that would be at three miles, a property that supposedly does not have any diminution. So you take the diminution at three minus the diminution of each of the other ones, and that shows you how much the increased diminution is for each of the other properties that are located closer to the contamination

Page 363

source.

MS. KLABER: I'm going to move to strike that answer as nonresponsive.

BY MS. KLABER:

Q. Having discussed Figure 7 from Professor Eisfeldt's report, Exhibit 51 here, do you still offer the same opinion in E121 that Professor Eisfeldt's calculation in her Figure 7 shows that property value diminution increases with distance from the source of the contamination?

A. I understand now that she has the variables coded opposite of what they are in Simons and Saginor, so that led me to believe that they were increasing.

Q. Do you have any explanation for why you decided to increase the property value diminution by 0.7 percent across the board, compared to the Simons and Saginor meta-analysis?

A. I did not increase it by 0.7 percent across the board. What I did is, I just told

Page 364

you how I used the numbers and when you take them in two different ways, since a log gives you a proportionate change, that is simply the difference between those two different calculations.

Q. I am not an economist, so I confess that what you explained is hard for me to connect to why your property value diminution values are 0.7 higher across the board at every distance.

So if you have a way of maybe using slightly more laymen's terms so I can understand that result, I would appreciate that explanation.

MR. NIDEL: Objection to form. Asked and answered.

THE WITNESS: I am trying to think of a simple way to look at it and --

BY MS. KLABER:

Q. Even if you took one example of a distance, maybe 0.5 miles, what Simons and Saginor show a 0.4 percent property value

Page 365

92 (Pages 362 - 365)

diminution, if you explain how the 0.4 becomes 1.1 based on your calculation, that would be helpful.

A. So what 0.4 is -- 0.4 says that in the -- from what Simons and Saginor, that is looking at how the property value diminution changes with distance.

What my 1.1 says is, how much less of a percentage diminution is there for a property of 0.5 versus 0.3, where I assume that there is no -- no effect at 0.3, and then 0.7, that is at 1 versus 3.

And so it's simple algebra that is going on, that I have a constant adjustment that I am making there to adjust how much properties -- what is the percentage higher of property diminution for properties close to -- closer to the site, and when you are using that same formula, you are always going to get a constant difference between the two of them.

Q. So the 1.1 percent for 0.5 miles is the increase in property value diminution for a

Page 366

property 0.5 miles from 8020 Deering versus three miles from 8020 Deering; is that correct?

A. Yes.

Q. Did you change the definition of the log of distance variable to get that 0.7 percent increase?

MR. NIDEL: Objection to form.

THE WITNESS: No.

BY MS. KLABER:

Q. Looking at Paragraph E97 of Exhibit 50, your rebuttal report.

You state that: "The distance variable reflects that people located closer to the source of contamination have received more direct information about the groundwater contamination, which is common for contaminated sites, and is one of the reasons that the observed property value diminutions are lower for properties located closer to the source of the contamination."

Do you see that?

A. It's looks like a typo there.

Page 367

Q. Okay. Did you intend to convey that properties closer to the site would have property value diminutions that are higher?

A. Yes.

Q. Okay. Looking at Paragraph E6 of your report, Exhibit 50, that's on Page 23.

A. Yes.

Q. You are referring to some of the studies underlying Simons and Saginor, and you state that: "Many of the studies were conducted in areas where residents use municipal" -- I believe it should say "water that is treated to remove contaminants;" is that correct?

A. Yes.

Q. Okay. And then in Paragraph E37 on Page 31, you reference back to Figure E3, which is on the prior page, ending with: "Nine studies in the Simons and Saginor meta-analysis that involve groundwater contamination."

Do you see that?

A. Yeah.

Page 368

Q. And with respect to the studies in this -- your Figure E3 which comes from Figure 4 of Professor Eisfeldt's report, you state: "For five of the studies in Figure E3, municipal, city or public (blue circles) deliveries of groundwater are cited as drinking water sources which indicates that property value diminutions are due to proximity to the contamination, not contaminated drinking water as public water supplies are treated prior to delivery to the residents."

Do you see that?

A. Yes.

Q. Is it your contention that water that is publicly treated is never contaminated?

MR. NIDEL: Objection to form.

THE WITNESS: So my understanding is, is that water that is from cities is checked regularly, and if there is contamination, then do not drink it, or other things are issued until the issue is remedied.

BY MS. KLABER:

Page 369

93 (Pages 366 - 369)

Q.   And so if that scenario that you just described occurred, it would be your assumption that a study covering that topic then is showing property value diminution based on groundwater contamination as opposed to drinking water contamination; is that correct?

MR. NIDEL:  Objection to form.

THE WITNESS:  I am assuming that the -- it's looking at groundwater contamination, yes, and I am also looking at a number of them did, proximity or distance to the source as well.

MS. KLABER:  I'm going to show you Exhibit 52.

(Deposition Exhibit 52 was marked for identification.)

BY MS. KLABER:

Q.   This is the article that is listed as No. 1 in your Figure E3, by Des Rosiers: "Environment and Value.  Does drinking water quality affect house prices."

A.   Oh.

Page 370

Q.   No?

A.   What?

Q.   I'm sorry.  Did you say no?

A.   No, I didn't say no.  I think I might have just grunted it and recognized it.

Q.   Oh, okay.  I didn't know whether it showed up as no.

A.   Oh.

Q.   Are you able to see that exhibit?

A.   I have it up.  I think I was just acknowledging that I saw the exhibit.  Sorry.  No answer.

Q.   Okay.  So this is one of the articles that you identify as studying property value diminution due to groundwater contamination, because there is municipal delivery of water rather than property value diminution for contaminated drinking water, correct?

A.   Yes.

Q.   Have you reviewed this study in full?

Page 371

A.   I have read this study.

Q.   Okay.  Can we look at Page 446 of this study, the number in the upper right-hand corner.

A.   Yes, I'm there.

Q.   And I am looking at the first full paragraph on that page.

It says:  "The present research is based on information provided by the Ministry of the Environment of Quebec (MEQ) pertaining to drinking water quality levels in Charlesbourg, a major municipality (70,000 inhabitants) of the Quebec City region.  The MEQ (1988) requires that a series of bacteriological tests be performed on a regular basis on water samples provided by the local authorities.  Where results of tests do not conform to established quality standards, a public warning indicates that water should be brought to the boil before use is issued to the population of the concerned sector.  The duration of the warning expressed in days

Page 372

depends on the seriousness of the bacteriological problem.  The City of Charlesbourg obtains its drinking water from three distribution networks fed by wells, the Sept-Ponts River, Lake Saint-Charles (via Quebec City) and the Montmorency River by the City of Beauport.  Over the 1990-1991 period, Charlesbourg experienced repeated water quality problems which resulted in a severe gastro-enteritis epidemic among local residents.  Considering the extent and duration of the phenomenon, it is relevant to address the issue of possible negative impacts on property values."

Do you see that?

A.   I do.

Q.   Do you read this as the article providing the impact of contaminated drinking water on the value of property?

MR. NIDEL:  Objection to form.

THE WITNESS:  Could you read back that question, please.

Page 373

94 (Pages 370 - 373)

(The record was read as requested.)

MR. NIDEL: Objection to form.

THE WITNESS: I did -- I did see that and I -- once again, when you are doing a function transfer, it is not how each one matches up, it's how they do collectively, and also going back, that contaminated water, what you are looking at -- at the -- you know, percentage of property diminution is a common effect that you see across these, and so, yes, there is going to be a mix in the studies that are used and not everyone needs to match perfectly, it's what they provide collectively that you use in your analysis.

BY MS. KLABER:

Q. So in your report, Exhibit 50, your rebuttal report, at E37, you describe this study as one that involves the public delivery of groundwater indicating that property value diminutions are due to proximity to contamination, not contaminated drinking water.

Do you stand by that description

Page 374

with respect to the Des Rosiers study?

A. I would need to look further down through it. Just give me a second here.

Q. Okay. If you see anything in here indicating that the analysis is with respect to property value diminution due to proximity to groundwater contamination as opposed to contaminated drinking water, please tell me where you see it.

A. So I don't see it in there, but I did not say that that study had proximity. I was showing proximity where the red circles are, and there is not a red circle on the Des Rosiers one in my Figure E3.

Q. You referenced blue circles here in Paragraph E37 that we're looking at.

A. Right, but it was looking at all of this information collectively.

Q. What does a blue circle show?

A. A blue circle just shows where it is city water, red circles show where its proximity.

Page 375

Q. And you tell me that a -- well, your report says that a blue circle indicates public water.

A. What page are you on, what number?

Q. Paragraph E37, same we were looking at.

You say that a blue circle indicates that drinking water is delivered from a public source, such that the property value diminution in due to proximity to contamination, not contaminated drinking water.

Do you see that?

A. I do.

Q. Do you believe that is an accurate description of the Des Rosiers study that we just read?

A. Not the Des Rosiers study individually, but that was my interpretation of what the studies collectively show, and there could be exceptions. You could pick at any one when you are doing a meta-analysis, but that's my interpretation of what they collectively

Page 376

show.

Q. So the Des Rosiers study is an exception to what you state in Paragraph 37?

A. Yes.

MR. NIDEL: Objection to form.

MS. KLABER: Okay. If we could take one last break so I can figure out if there are any last questions to ask, and then hopefully, we will be able to finish up relatively quickly.

MR. NIDEL: Before we go on the break, I just want to point out on the record that we did probably an hour and a half ago, send invoices for Industrial Economics.

MS. KLABER: Okay. Thank you.

MR. NIDEL: So you have those.

THE VIDEOGRAPHER: This marks the end of Media Unit 10. Going off record. The time is 6:13 p.m.

(A short recess was taken.)

THE VIDEOGRAPHER: This marks the beginning of Media Unit 11. Going back on

Page 377

95 (Pages 374 - 377)

record. The time is 16:29.    18:28:49

BY MS. KLABER:    18:28:52

Q.    Okay, Dr. Boyle.  I just have a few    18:28:53
remaining questions for you and then hopefully,    18:28:55
we can wrap up.    18:28:58

If proximity to the contamination    18:29:02
source is the driving factor for property value    18:29:06
diminution, is it true that residences within    18:29:09
three miles to the north or west of 8020    18:29:13
Deering would experience property value    18:29:18
diminution at the same percentage of those to    18:29:20
the southeast?    18:29:23

MR. NIDEL:  Objection to form and    18:29:24
foundation.  Incomplete hypothetical.    18:29:26

THE WITNESS:  So it is proximity,    18:29:29
but there has been research that shows that it    18:29:31
relates to the direction of the contamination,    18:29:35
and so how it is dispersing, so three miles to    18:29:42
the north likely would not be expected to have    18:29:48
the same effect as three miles to the south.    18:29:52

BY MS. KLABER:    18:29:55

Q.    What about one mile to the north of    18:29:56

Page 378

8020 Deering?  Would there be an affect on    18:30:00
property values at that distance to the north    18:30:04
or west?    18:30:08

MR. NIDEL:  Objection to form and    18:30:09
foundation.  Incomplete hypothetical.  Beyond    18:30:10
the scope.    18:30:16

THE WITNESS:  So the literature out    18:30:17
there shows that it depends on the direction of    18:30:18
dispersion.  I can't tell you specifically, you    18:30:24
know, how close it needs to be for there not to    18:30:30
be an effect, but you would not expect a, you    18:30:36
know, this one is going southeast.    18:30:43

You would not expect a similar    18:30:46
effect moving north -- northwest.    18:30:48

BY MS. KLABER:    18:30:48

Q.    So it's your opinion that proximity    18:30:55
to the contamination source, as well as being    18:30:59
in the general direction of dispersion of the    18:31:04
contamination, contributes to property value    18:31:09
diminution, again, regardless of whether a    18:31:11
particular property is contaminated, correct?    18:31:14

A.    It's the direction -- I'm not sure    18:31:19

Page 379

exactly everything you included in there, but    18:31:22
it's the direction of the flow of the    18:31:24
contamination.    18:31:29

Q.    And just to be clear, you are saying    18:31:30
a property will experience value diminution if    18:31:34
it is within a certain proximity of the    18:31:39
contamination source, as well as in the    18:31:42
direction of the contamination dispersion,    18:31:45
regardless of whether there is any actual    18:31:48
contamination on a particular property in the    18:31:52
area; is that correct?    18:31:56

MR. NIDEL:  Objection to form.    18:31:57

THE WITNESS:  So it is the direction    18:31:59
of it and the potential for properties in that    18:32:06
direction to be affected.    18:32:13

BY MS. KLABER:    18:32:17

Q.    And that is regardless of whether or    18:32:17
not properties in that direction are actually    18:32:19
affected, correct?    18:32:22

MR. NIDEL:  Objection to form.    18:32:24

THE WITNESS:  Right, because there    18:32:26
could be the -- could be concerned about the    18:32:27

Page 380

risk to them, also the stigma just being    18:32:31
associated near them.  There is a number of    18:32:35
factors that could come in that would affect    18:32:38
it.    18:32:44

MS. KLABER:  Okay.  I am going to    18:32:45
show you one last exhibit.    18:32:46

THE WITNESS:  Okay.  Cross your    18:32:48
fingers that we are still here.    18:32:49

BY MS. KLABER:    18:32:51

Q.    This exhibit has been marked Exhibit    18:32:51
1 in a prior deposition and we are going to    18:32:53
maintain that exhibit numbering here.  So it    18:33:01
will also be Defendant's Exhibit 1 here.    18:33:03

THE WITNESS:  Have you sent it?    18:33:15

BY MS. KLABER:    18:33:16

Q.    It has not yet come through.    18:33:16

It should have come through now.    18:33:39

This is a document with a Bates    18:33:42
stamp on it of Behar_000401 and it is titled:    18:33:45
"Addendum to Residential Purchase or Lease    18:33:51
Agreement."    18:33:54

Do you see that at the top, there is    18:33:55

Page 381

96 (Pages 378 - 381)

an address written in 7031 Keokuk Avenue?

A. I do see that.

Q. Do you recognize that as the Behars' address?

A. I do.

Q. Let's turn to Paragraph 18 of this addendum to residential purchase or lease agreement.

And this paragraph is a disclosure regarding the Boeing Rocketdyne Santa Susana facility.

Are you familiar with the Boeing Rocketdyne Santa Susana facility at all?

A. Yes.

Q. It reads: "Buyer is aware that there is a former Rocketdyne testing facility located in the Santa Susana Mountains between Chatsworth and Simi Valley. The U.S. Department of Energy has indicated that there are some radioactive materials and industrial solvents on this site which are in the process of clean-up. Lawsuits have been filed alleging

Page 382

that the Rocketdyne facility has caused environmental contamination beyond the site. Two recent studies by UCLA and the University of Michigan have indicated that residents living within two miles of this facility may have been exposed to toxic chemicals and have slightly higher cancer rates than people in communities farther from the lab. However, authors of both reports have warned that the results of those studies do not conclusively show that contamination from this facility caused cancer or other illnesses in the surrounding community. The seller and real estate brokers are unable to give any definitive answers regarding potential health hazards that may result from proximity of the property to this former testing facility. Buyer is advised to conduct an independent investigation of this matter. It is strongly recommended that buyer have a soil test conducted of the subject property to determine any potential contamination."

Page 383

Do you see that?

A. Yes.

Q. Do you believe this disclosure would result in property value diminution?

MR. NIDEL: Objection to form and foundation. Incomplete hypothetical and beyond the scope.

THE WITNESS: It is of the type that one would expect that there would be a property value diminution.

BY MS. KLABER:

Q. Are you aware that Jed Behar testified that he was not concerned about this disclosure because he believed he was protected from any contamination by a mountain range?

MR. NIDEL: Objection to form and foundation. Assumes facts not in evidence.

THE WITNESS: I'm not aware.

BY MS. KLABER:

Q. Are you aware that Alisa Behar stated that she was not concerned about this disclosure because she believed the Rocketdyne

Page 384

site was far enough away from them?

MR. NIDEL: Objection to form and foundation. Assumes facts not in evidence.

THE WITNESS: I'm not aware.

MS. KLABER: I have no further questions.

MR. NIDEL: I just have a few.

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. NIDEL:

Q. Dr. Boyle, I just want to follow up on some of the subject areas that you provided testimony on earlier -- or throughout the day.

Did you rely on the Simons and Saginor meta-analysis for your damage estimates in this case?

A. Yes.

Q. Is the Simons and Saginor meta-analysis, is that published and peer-reviewed?

A. Yes.

Q. And in your opinion, is the Simons and Saginor meta-analysis reliable for the --

Page 385

97 (Pages 382 - 385)

for your valuation of the property damage in this case?

A. Yes.

Q. Did you use the same methods for property damage valuation in this case that you do in your academic work?

A. It's one of the methods I use in my academic work.

Q. You were asked about whether you could -- you were asked about statistical significance.

Do you recall that discussion?

A. I do.

Q. And you were asked if you could not rule out no effect for some of the variables that are part of your model.

Do you recall that discussion?

A. I do.

Q. And is that simply ruling it out to beyond a certain degree of statistical certainty?

A. It is.

Page 386

Q. So if the degree of statistical certainty was less restrictive, it's possible that those could -- that no effect could be ruled out; is that true?

A. Can you repeat that, please.

Q. Yeah. If a lesser degree of statistical certainty was used, it is possible that you could rule out no effect; is that true?

A. Yes.

Q. You were asked earlier about the error and you -- I believe your testimony was that all empirical estimates have a degree of error.

Do you recall that?

A. Yes.

Q. Does that also apply to valuing properties through appraisals?

A. Yes.

Q. Does that also apply to valuing property damage from contamination by using appraisals?

Page 387

A. Yes.

Q. And would that apply to your methods, whether you were addressing damage to one property versus a class of properties, like you have done in this case?

A. Yes.

Q. You were asked questions about the difference -- the different preferences and the different valuation in the market for homes with a slab versus a crawl space.

Do you recall that discussion?

A. Yes.

Q. Would that difference in market value of a slab versus a crawl space home, would that be incorporated into the sales prices that you relied on?

A. If people considered it, that's one of the characteristics and it would be incorporated into the sales price.

Q. You -- you were asked questions about your model and what different parameters were taken into account in the model.

Page 388

Do you recall those questions or that discussion?

A. Yes.

MS. KLABER: Object as to form.

BY MR. NIDEL:

Q. And you testified that your model does not take into account vapor intrusion; is that right?

A. That's correct.

Q. And you testified -- I believe, that your model does not take into account the depth to groundwater; is that correct?

MS. KLABER: Object as to form.

THE WITNESS: Yes.

BY MR. NIDEL:

Q. And I believe you testified also that your model does not take into account the presence of a possible groundwater lens; is that correct?

A. Yes.

Q. Are those variables necessary for your damage calculation?

Page 389

Veritext Legal Solutions
Calendar-CA@veritext.com  866-299-5127

A. No. It just belonged -- it's proximity to the source of contamination and the other factors that we used, the meta-equation to fit the current case.

Q. Is your assessment of property damage dependent in any way on those variables?

A. No.

Q. Is it your opinion that the actual property damage caused by the presence of a plume extends beyond the plume itself?

MS. KLABER: Object as to form.

THE WITNESS: Could you ask that question again, please.

BY MR. NIDEL:

Q. Sure. Is it your opinion, based on your experience and your research and the literature, that the actual property damage extends beyond the boundary of the plume itself?

MS. KLABER: Object as to form.

THE WITNESS: It is likely that it does.

Page 390

BY MR. NIDEL:

Q. Okay. And why did you not include homes beyond the plume in your damage assessment?

A. Because I understood the class was defined by the limits of the plume.

Q. Do you believe that your estimate for damages from the plume, as far as the property goes, is a conservative estimate?

A. Yes.

MR. NIDEL: I think that's all I have.

MS. KLABER: Nothing more from me.

MR. NIDEL: Okay.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: This concludes today's deposition of Kevin Boyle. This is Media Unit 11. Going off the record. The time is 6:42 p.m.

(Whereupon, the proceeding was concluded at 6:42 p.m.)

Page 391

I declare under penalty of perjury under the laws that the foregoing is true and correct.

Executed on _____ , 20___,

at _____, _____.


_____

W I T N E S S

Page 392

CERTIFICATE OF NOTARY PUBLIC

I, Bonnie L. Russo, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in shorthand and thereafter reduced to computerized transcription under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

Date: 12/21/23

*Bonnie L. Russo*

Notary Public in and for

the State of Maryland

My Commission expires: August 14, 2024

Page 393

99 (Pages 390 - 393)

CHRISTOPHER T. NIDEL, ESQ

chris@nidellaw.com

December 21, 2023

RE: JED BEHAR VS. NORTHROP GRUMMAN SYSTEMS CORPORATION

DECEMBER 5, 2023, KEVIN J. BOYLE, PH.D., JOB NO. 6312160

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 394

_X_Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 395

RE: JED BEHAR VS. NORTHROP GRUMMAN SYSTEMS CORPORATION

KEVIN J. BOYLE, PH.D., JOB NO. 6312160

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

WITNESS                    Date

Page 396

100 (Pages 394 - 396)

RE: JED BEHAR VS. NORTHROP GRUMMAN SYSTEMS CORPORATION

KEVIN J. BOYLE, PH.D., JOB NO. 6312160

E R R A T A   S H E E T

PAGE _18_ LINE _6-7_ CHANGE _strike "North Carollina_
_Institute"._

REASON _Misspoke_

PAGE _19_ LINE _2_ CHANGE _"labour" to "Libra"._

REASON _Typo_

PAGE _22_ LINE _#1_ CHANGE _"Act far" to "Act, far"_

REASON _Typo_

PAGE _22_ LINE _2_ CHANGE _"the --" to "various"_

REASON _I may not have spoken clearly._

PAGE _29_ LINE _1_ CHANGE _"is" to "Are"_

REASON _Typo or I misspoke._

PAGE _36_ LINE _3-4_ CHANGE _I provided An_
_expert ophian, but did not teotify._

REASON _Misspoke_

_____    ___1/19/24___
WITNESS                              Date

Page 396

RE: JED BEHAR VS. NORTHROP GRUMMAN SYSTEMS CORPORATION

KEVIN J. BOYLE, PH.D., JOB NO. 6312160

E R R A T A   S H E E T

PAGE __44__ LINE _14-15_ CHANGE _"how harmful and how unsafe to not have" to how harmful and unsafe it is to have"_

REASON _clarification of confusing statement_

PAGE _846_ LINE _8_ CHANGE _"--" to "it is a disAmenity"_

REASON _missing text_

PAGE _46_ LINE _6_ CHANGE _"is" to "are"_

REASON _wrong word_

PAGE _54_ LINE _15_ CHANGE _"were" to "was"_

REASON _wrong word_

PAGE _54_ LINE _17_ CHANGE _"evasive" to "invasive"_

REASON _typo_

PAGE _63_ LINE _19_ CHANGE _"like" to "the"_

REASON _wrong word_

WITNESS                                    Date 1/19/24

Page 396

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127



RE: JED BEHAR VS. NORTHROP GRUMMAN SYSTEMS CORPORATION

KEVIN J. BOYLE, PH.D., JOB NO. 6312160

E R R A T A   S H E E T

PAGE _82_ LINE _6_ CHANGE _"trade" to "copyright"_

REASON _wrong word_

PAGE _83_ LINE _7_ CHANGE _"individual" to_ _"in total"_

REASON _wrong word_

PAGE _98_ LINE _16_ CHANGE _"was" to "were"_

REASON _wrong word_

PAGE _99_ LINE _6_ CHANGE _strike "not"_

REASON _misspoke_

PAGE _144_ LINE _3_ CHANGE _"Are" to "is"_

REASON _wrong word_

PAGE _182_ LINE _1_ CHANGE _"buyer" to "seller"_

REASON _Misspoke_

WITNESS _____        Date _1/19/24_

Page 396

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

RE: JED BEHAR VS. NORTHROP GRUMMAN SYSTEMS CORPORATION

KEVIN J. BOYLE, PH.D., JOB NO. 6312160

E R R A T A    S H E E T

PAGE _200_ LINE _4_ CHANGE _"9-point-plus"_ to
_"9 percent plus"_

REASON _typo_

PAGE _211_ LINE _5_ CHANGE _"they assess"_ to
_"the assessed"    "Appreciate" to "Appreciates"_

REASON _typo_

PAGE _217_ LINE _8_ CHANGE _strike "that"_

REASON _Repeated word_

PAGE _230_ LINE _6_ CHANGE _"ones" to "Actual market_
_values"_

REASON _did not speak clearly_

PAGE _237_ LINE _9_ CHANGE _"--" to "As"_

REASON _Missing word_

PAGE _237_ LINE _20_ CHANGE _"bid" to "bin"_

REASON _typo_

_[signature]_                              _1/19/24_

WITNESS                                    Date

Page 396

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

4

RE: JED BEHAR VS. NORTHROP GRUMMAN SYSTEMS CORPORATION

KEVIN J. BOYLE, PH.D., JOB NO. 6312160

E R R A T A   S H E E T

PAGE 244 LINE 3 CHANGE "be hazardous" to "be. A hazardous"

REASON May not have spoken clearly

PAGE 247 LINE 6-7 CHANGE "operations that there was fill," to "site operations where there were releases or"

REASON Appear to not have spoken clearly

PAGE 263 LINE 11 CHANGE strike "similar"

REASON Misspoke and corrected in response to next question

PAGE 264 LINE 9 CHANGE "0.003"

REASON clarification

PAGE 268 LINE 11 CHANGE "included" to "excluded"

REASON wrong word

PAGE 276 LINE 6 CHANGE "it's there" to "it may be there"

REASON Misspoke

_____          1/19/24
WITNESS                          Date

Page 396

RE: JED BEHAR VS. NORTHROP GRUMMAN SYSTEMS CORPORATION

KEVIN J. BOYLE, PH.D., JOB NO. 6312160

E R R A T A   S H E E T

PAGE 278 LINE 4 CHANGE "is" to "Are"

REASON wrong word

PAGE 292 LINE 13 CHANGE "and it is" to "And the one-sided test conclusion is"

REASON missed key words in my response

PAGE 296 LINE 3-4 CHANGE I am referring to the Behar v Northrop Grumman case when saying "this"

REASON clarification

PAGE 305 LINE 10 CHANGE I should have explained the EPA citation is for All relevant uses of hedonics not just Residential.

REASON Incomplete Response

PAGE 319 LINE 22 CHANGE "eyes" to estimates

REASON typo

PAGE 320 LINE 17 CHANGE strike "of following"

REASON Unneeded words

_____          1/19/24
WITNESS                                   Date

Page 396

6

RE: JED BEHAR VS. NORTHROP GRUMMAN SYSTEMS CORPORATION

KEVIN J. BOYLE, PH.D., JOB NO. 6312160

E R R A T A  S H E E T

PAGE _337_ LINE _20_ CHANGE _"on Any I do"_ to

_face in the Analysis I conducted"_

REASON _I did not speak clearly._

PAGE _353_ LINE _7_ CHANGE _"intrusion in"_ to

_"intrusion variable in"_

REASON _missing word_

PAGE _366_ LINE _10_ CHANGE _"0.3"_ to _"3"_

REASON _typo_

PAGE _366_ LINE _11_ CHANGE _"no effect"_ to _"no effect,"_

REASON _missing ~~period~~ comma_

PAGE _366_ LINE _11_ CHANGE _strike "at 0.3"_

REASON _unnecessary repitition_

PAGE _____ LINE _____ CHANGE _____

REASON _____

_____                    _____
WITNESS                                      Date

Page 396

7

I declare under penalty of perjury under the laws that the foregoing is true and correct.

Executed on ___January 19___ , 20_24_, at ___3:35 PM___ , ___Kevin Ngu___ .

_____
W I T N E S S

Page 392